AES/DCP:MEB/AS
F. #2019R01460

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

JAVIER AGUILAR,

             Defendant.

- - - - - - - - - - - - - - - - X

<u>20-M-526</u>

<u>TO BE FILED UNDER SEAL</u>

<u>COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANT</u>

(T. 18, U.S.C., § 371)

EASTERN DISTRICT OF NEW YORK, SS:

      JAMES KELLEY, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

      Upon information and belief, in or about and between 2015 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JAVIER AGUILAR, together with others, did knowingly and willfully conspire to commit one or more offenses against the United States, to wit:

      (a)    being a domestic concern, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all or a portion of such money and thing of value would be offered, given, and promised to a foreign official and to a

foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Trading Company and others in obtaining and retaining business for and with, and directing business to Trading Company, Trading Company's parent company and others, contrary to Title 15, United States Code, Section 78dd-2; and

(b) while in the territory of the United States, corruptly to make use of the mails and means and instrumentalities of interstate commerce and to do any act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all or a portion of such money and thing of value would be offered, given, and promised to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her or its influence with

a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Trading Company's parent company, and others in obtaining and retaining business for and with, and directing business to Trading Company, Trading Company's parent company and others contrary to Title 15, United States Code, Section 78dd-3.

In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant JAVIER AGUILAR, together with others, committed and caused to be committed overt acts described herein.

(Title 18, United States Code, Section 371)

The source of your affiant's information and the grounds for his belief are as follows:[1]

1. I am a Special Agent with the FBI. I have been an FBI Special Agent since January 2016. I am currently assigned to the international corruption squad ("ICU"), a group that investigates violations of the Foreign Corrupt Practices Act ("FCPA"), international money laundering, and kleptocracy. Prior to my assignment with the ICU, I was assigned to the South Florida Violent Crime and Fugitive Task Force for approximately three years. As part of my work at the FBI, I have received training regarding fraud and white collar crimes, including the FCPA and money laundering. I have further applied for and executed both search and arrest warrants.

---

[1] Because the purpose of this affidavit is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware. In addition, where I describe statements made by others, such statements are set forth in part and in sum and substance ("in substance") unless otherwise indicated.

2. In addition to my training and experience, I am familiar with the information contained in this complaint and affidavit based upon, among other sources of information: (i) my own personal participation in the investigation, (ii) my review of documents, records, reports, and recordings, (iii) interviews of witnesses, and (iv) discussions with other law enforcement personnel.

I.   BACKGROUND

   A.   The Foreign Corrupt Practices Act

3. The FCPA was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

   B.   The Defendant and Relevant Entities and Individuals

4. Trading Company[2] was the U.S. subsidiary of a European energy trading company and had its principal place of business in Houston, Texas. Trading Company was a "domestic concern," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

5. The defendant JAVIER AGUILAR was a naturalized United States citizen. AGUILAR worked in Houston, Texas for the U.S. subsidiary of Trading Company as a manager and energy trader. AGUILAR was a "domestic concern," and an employee and

---

[2] Certain entities' and individuals' names have been anonymized for the purpose of this criminal complaint. The identity of each of these entities and individuals is known to me.

agent of a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

6. Intermediary was a citizen of Curacao who resided in Curacao and owned and maintained several shell companies and bank accounts that were used to facilitate the payment of bribes to Ecuadorian officials on behalf of Trading Company.

7. Shell Company #1 was a shell company formed by Intermediary in Curacao that was used to receive and conceal corrupt payments from Trading Company for the benefit of Ecuadorian officials, and to make payments to Consulting Company, defined below.

8. Shell Company #2 was a shell company formed by Intermediary in Curacao that was used to receive and conceal corrupt payments from Trading Company for the benefit of Ecuadorian officials, and to make payments to Consulting Company, defined below.

9. Consultant #1 was a citizen of Ecuador, the United States and Spain and a resident of Miami, Florida. Consultant #1, along with Consultant #2, defined below, exercised control over companies and bank accounts that were used to facilitate the payment of bribes to Ecuadorian officials on behalf of Trading Company and others. Consultant #1 was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

10. Consultant #2 was a citizen of Ecuador and Spain and a close relative of Consultant #1. Consultant #2 provided consulting services, incorporated consulting businesses and opened bank accounts in the United States and elsewhere. Consultant #2, along with Consultant #1, exercised control over companies and bank accounts that were

used to facilitate the payment of bribes to Ecuadorian officials. Consultant #2 was an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

11. Consulting Company was a company formed by Consultant #1 and Consultant #2 in the British Virgin Islands. Consultant #1, together with Consultant #2 and others, used Consulting Company to conceal and transmit bribe payments to Ecuadorian officials to obtain and retain business for Trading Company; specifically, payments were made on behalf of Trading Company from Shell Company #1 and Shell Company #2 to Consulting Company, and then portions of those payments were transferred from Consulting Company to and for the benefit of Ecuadorian officials.

12. Empresa Publica de Hidrocarburos del Ecuador ("Petroecuador") was the state-owned and state-controlled oil company of Ecuador and performed a function that Ecuador treated as its own. Petroecuador was an "instrumentality" of the Ecuadorian government, as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

13. Ecuadorian Official #1 was a citizen of Ecuador, and served as a senior manager at Petroecuador from approximately in or about and between 2010 and May 2017. Ecuadorian Official #1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2) and Section 78dd-3(f)(2)(A).

14. Ecuadorian Official #2 was a citizen of Ecuador, and held various positions in the Ecuadorian Ministry of Hydrocarbons from approximately in or about and between 2013 to 2016. Ecuadorian Official #2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2) and Section 78dd-

3(f)(2)(A).

15.     State-Owned Entity, was a state-owned commodities trading company located in the Middle East.

II.     THE CONSPIRACY

16.     Based upon, among other evidence, information provided by two cooperating witnesses,[3] a review of bank records, recorded phone calls, e-mail and text message communications obtained from a variety of sources and involving the defendant JAVIER AGUILAR, and a review of contracts, agreements and other documents, I have learned that beginning in or about mid-2015, AGUILAR, Consultant #1, Consultant #2 and others agreed to pay, and paid, bribes to Ecuadorian officials to obtain an improper advantage in order to assist Trading Company and others in obtaining and retaining business related to Petroecuador. Among other things, I have personally reviewed many of the bank records described below and summaries of those bank records, as well as English transcripts of the recordings described below.

17.     In furtherance of the bribery scheme and pursuant to the agreement to pay Ecuadorian officials, in or about and between March 2017 and March 2020, the defendant JAVIER AGUILAR and others caused Consultant #1 and Consultant #2, on behalf Trading Company, to pay bribes to Ecuadorian Official #1 and Ecuadorian Official #2 to

---

[3] The identity of each of the two cooperating witnesses is known to me. The cooperating witnesses have entered into written cooperation agreements with the government and are expected to enter guilty pleas in the Eastern District of New York. The cooperating witnesses have admitted to and will plead guilty to participating in one or more conspiracies to violate the FCPA. The witnesses are cooperating in the hope of receiving a more lenient sentence in connection with their cases. The information provided by these cooperating witnesses has been corroborated by a review of bank records, e-mail and other messaging communications, and recorded phone calls gathered during the investigation.

7

secure improper business opportunities for Trading Company.

18. For example, in or about and between March 2017 and November 2018, Consultant #1 and Consultant #2 paid Ecuadorian Official #2 approximately $270,000 on behalf of Trading Company. In addition, in or about and between May 2018 and March 2020, AGUILAR and others caused Trading Company, through Intermediary, to pay Consultant #1 and Consultant #2 approximately $1,400,000 of the approximately $3,600,000 owed pursuant to the agreement. In turn, during this same time period, Consultant #1 and Consultant #2 paid Ecuadorian Official #1 approximately $600,000 of the more than $1.5 million that the conspirators agreed to pay Ecuadorian Official #1 on behalf of Trading Company. Specifically, based upon the information and evidence outlined above, I have learned the following:

A. The Bribery Scheme

19. In or about early 2015, Ecuadorian Official #1 introduced Consultant #1 to Ecuadorian Official #2. Ecuadorian Official #1 had a preexisting criminal relationship with Consultant #1 and believed that Ecuadorian Official #2 could facilitate business opportunities for Consultant #1 in exchange for bribe payments. Ecuadorian Official #2 subsequently introduced Consultant #1 to the defendant JAVIER AGUILAR. AGUILAR, Consultant #1, Ecuadorian Official #1 and Ecuadorian Official #2 agreed to work together to corruptly obtain and retain business opportunities for Trading Company with Petroecuador, and further agreed that Ecuadorian Official #1 and Ecuadorian Official #2 would be paid bribes for their role in the scheme.

20. As part of this agreement, in or about 2016, the defendant JAVIER AGUILAR, Consultant #1 and Ecuadorian Official #1 began working on a project related to

8

the purchase of fuel oil from Petroecuador using State-Owned Entity as a front company. Petroecuador did not submit contracts with state-owned entities for public tender. AGUILAR indicated to Consultant #1 that Trading Company had previously worked with State-Owned Entity, and could use State-Owned Entity to purchase fuel oil from Petroecuador on Trading Company's behalf.  In particular, AGUILAR, Consultant #1 and others agreed that Ecuadorian Official #1 would help Trading Company secure an improper business advantage from Petroecuador by causing Petroecuador to award a contract to purchase fuel oil to State-Owned Entity (the "Petroecuador Contract").  At the time of this agreement, AGUILAR and Consultant #1 knew that Trading Company intended to enter into a subsequent agreement with State-Owned Entity to assume the obligations and benefits of the Petroecuador Contract once it was signed.

21. AGUILAR, Consultant #1 and Consultant #2 further agreed that Consulting Company would pay bribes to Ecuadorian officials on Trading Company's behalf as payment for awarding the Petroecuador Contract to State-Owned Entity.  To pay the bribes, AGUILAR, Consultant #1 and Consultant #2 agreed that Trading Company would make corrupt payments to Consultant #1 and Consultant #2 through Intermediary, that the amount of those corrupt payments would be 25 cents per barrel of fuel oil provided to Trading Company pursuant to the Petroecuador Contract, and that Consultant #1 and Consultant #2 would use a portion of those funds to pay bribes to Ecuadorian officials on Trading Company's behalf.

22. In or about late 2016, Trading Company agreed with State-Owned Entity to perform the work, assume the risk and keep the product that would be purchased under the Petroecuador Contract.

23. On or about December 6, 2016, Petroecuador and State-Owned Entity executed the Petroecuador Contract under which Petroecuador agreed to supply fuel oil in exchange for a loan of $300 million. Pursuant to its agreement with Trading Company, State-Owned Entity paid the loan using funds provided by Trading Company for that purpose.

24. To effectuate and conceal the bribery scheme, the defendant JAVIER AGUILAR instructed Consultant #1 that they would use Intermediary to hide the source of the payments made on behalf of Trading Company to Consultant #1 and Consultant #2. Specifically, in or about late 2016, AGUILAR informed Consultant #1 that Trading Company's involvement in payments to Consultant #1 and Consultant #2 needed to be concealed. To do so, AGUILAR informed Consultant #1 that Trading Company's payments to Consultant #1 and Consultant #2 would be made through Intermediary and instructed Consultant #1 to contact Intermediary. In turn, Consultant #1 instructed Consultant #2 to contact Intermediary to facilitate receipt of the payments.

25. On or about December 22, 2016, with the knowledge of the defendant JAVIER AGUILAR, Consultant #2 and Intermediary executed sham consulting agreements between Consulting Company and Shell Company #1, and between Consulting Company and Shell Company #2. These agreements facilitated the payment of bribes on behalf of Trading Company through Consulting Company for the benefit of Ecuadorian Official #1 and Ecuadorian Official #2. To receive payment under the sham consulting agreements, Consultant #2 periodically sent invoices to Intermediary requesting payment to Consulting Company based upon the number of barrels of fuel oil that Trading Company had received.

26. Pursuant to this arrangement, in or about and between May 2018 and

March 2020, Trading Company made payments to bank accounts in Curacao in the name of Shell Company #1 and Shell Company #2 that were controlled by Intermediary. Intermediary then caused wire payments to be sent from those accounts pursuant to the sham consulting agreements, some of which traveled through correspondent accounts located in New York, New York, to a Consulting Company bank account located in the Cayman Islands. Consultant #1 and Consultant #2 subsequently paid the bribes promised to Ecuadorian Official #1 and Ecuadorian Official #2 from bank accounts for Consulting Company. Bank account records show payments from Consulting Company to accounts controlled by Ecuadorian Official #1 and accounts controlled by associates of Ecuadorian Official #2 for the benefit of Ecuadorian Official #2. I have personally reviewed bank records showing many of the payments from Intermediary to bank accounts controlled by Consultant #1 and Consultant #2, and bank records showing payments to accounts controlled by Ecuadorian Official #1 and associates of Ecuadorian Official #2.

B. <u>Discussion of Outstanding Bribe Payments on Recorded Calls</u>

27. Beginning in or about August 2019, Consultant #1 and Consultant #2 temporarily stopped sending invoices to Intermediary for payment to Consultant #1 and Consultant #2 and, in turn, for payments to the Ecuadorian officials. Nevertheless, the bribery scheme remained in place, pursuant to which Trading Company continued to owe money to Consultant #1, Consultant #2 and the Ecuadorian officials. Beginning in or about February 2020, the defendant JAVIER AGUILAR discussed with Consultant #1 and Consultant #2, in a series of recorded phone calls and meetings, the money that Trading Company had promised to Consultant #1, Consultant #2 and the Ecuadorian officials pursuant to the bribery scheme. I have personally reviewed English transcripts of the

11

recorded calls and meetings described below.

28. For example, on or about February 6, 2020, the defendant JAVIER AGUILAR spoke by telephone to Consultant #1 while Consultant #1 was in the Eastern District of New York. The call was recorded and both Consultant #1 and AGUILAR spoke Spanish. AGUILAR and Consultant #1 discussed that Consultant #1 still owed Ecuadorian officials certain bribe payments on behalf of Trading Company, but that Consultant #1 had been unable to make those bribe payments because Trading Company had not yet paid Consultant #2. During the call, AGUILAR acknowledged that there was an existing commitment to pay bribes, stating: "It's a commitment… I mean, I manage it. It will be done. I have to accelerate this, so there will be no more hindering of this."

29. On or about February 25, 2020, the defendant JAVIER AGUILAR again spoke with Consultant #1 by telephone. The call was recorded and both Consultant #1 and AGUILAR spoke Spanish. AGUILAR and Consultant #1 discussed how payment would be made to Consultant #2 pursuant to the sham consulting agreements in furtherance of the bribery scheme. During the call, AGUILAR referred to, in substance, "fake contracts" that would need to be drafted to facilitate additional payments from Intermediary to Consultant #2 on behalf of Trading Company.

30. On or about March 5, 2020, the defendant JAVIER AGUILAR met with Consultant #1 and Consultant #2 at a restaurant in Houston, Texas. The meeting was recorded and all three participants spoke Spanish. AGUILAR, Consultant #1 and Consultant #2 discussed payments that Trading Company had promised to Consulting Company that would be used to pay bribes promised to Ecuadorian Official #1. During the meeting, Consultant #1 and Consultant #2 stated, in substance, that they had not been paid by

Intermediary on Trading Company's behalf the money they needed to pay to Ecuadorian Official #1.  AGUILAR indicated, in substance, that he was also in contact with Intermediary regarding [payments] to "four or five others," and stated that there were others who had to contact Intermediary "to fix the schemes in other parts of the continent."

31.  In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant JAVIER AGUILAR, together with others, committed and caused to be committed, among others, the following:

### OVERT ACTS

(a)  On or about June 25, 2018, AGUILAR caused Trading Company to wire approximately $486,000 from a bank account located in London, United Kingdom to a bank account in the name of Shell Company #2 located in the Netherlands.  Shell Company #2 then wired three payments totaling more than $186,000 between approximately June 27, 2018 and August 6, 2018 to a bank account for Consulting Company located in the Cayman Islands.

(b)  On or about July 5, 2018, Consultant #1 and Consultant #2, while in the United States, sent instructions to a bank employee to wire approximately $225,000 from an account for Consulting Company located in the Cayman Islands, through a correspondent bank account located in New York, New York, to an account located in Portugal for the benefit of Ecuadorian Official #1.

(c)  On or about September 12, 2018, Consultant #1 and Consultant #2 wired approximately $70,000 from a bank account they controlled in Panama, to another bank account located in Panama controlled by an associate of Consultant #2, to effectuate the delivery of $30,000 in cash to Ecuadorian Official #2.

13

(d) On or about February 6, 2020, Consultant #2, while in the Eastern District of New York, emailed Intermediary a draft invoice from Consulting Company attaching a spreadsheet indicating that Intermediary owed Consulting Company more than $2.5 million for more than 17 million barrels of Petroecuador oil that was received by Trading Company.

(e) On or about February 20, 2020, AGUILAR had a phone call with Consultant #2 in which AGUILAR stated, while discussing money that Trading Company owed to Consultant #1 and Consultant #2 for bribe payments, in substance, "I, I told some people over here: I need this fast. We owe them this much. But I need to show them, give them a token of appreciation. … I need you to, to send me, like now, two hundred and fifty. Before they close everything down and then it might take two or three months more, dude. That's it."

(f) On or about March 9, 2020, AGUILAR, on behalf of Trading Company, caused Intermediary to wire approximately $75,550.58 from a Shell Company #1 bank account located in Curacao, to a Consulting Company bank account located in Curacao.

(g) On or about March 10, 2020, AGUILAR, on behalf of Trading Company, caused Intermediary to wire approximately $62,664.25 from a Shell Company #2 bank account located in Curacao, to a Consulting Company bank account located in Curacao.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

III.     CONCLUSION

WHEREFORE, your affiant respectfully requests that an arrest warrant be issued for the defendant JAVIER AGUILAR so that he may be dealt with according to law.

IT IS FURTHER REQUESTED that, because public filing of this document at this time could result in a risk of flight by the defendant, as well as jeopardize the government's investigation, all papers submitted in support of this application, including the complaint and arrest warrant, be sealed until further order of the Court.

_____
JAMES KELLEY
Special Agent
Federal Bureau of Investigation

Sworn to before me by telephone this
\_\_10\_th day of July, 2020

    /s  Roanne L. Mann
_____
THE HONORABLE ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK