UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

    - against -

JAVIER AGUILAR

                Defendant.

– – – – – – – – – – – – – – – – – – – – – – – – X

No. 20-cr-390 (ENV)

**Served Via ECF on October 12, 2021**

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
## MOTION TO SUPPRESS STATEMENTS AND FOR AN EVIDENTIARY HEARING

---

**QUINN EMANUEL URQUHART**
**& SULLIVAN, LLP**

Alex Spiro
Tai H. Park
George T. Phillips
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
alexspiro@quinnemanuel.com
taipark@quinnemanuel.com
georgephillips@quinnemanuel.com

Allison L. McGuire
1300 I Street NW, Suite 900
Washington, DC 20005
(202) 538-8000
allisonmcguire@quinnemanuel.com

*Counsel for Defendant Javier Aguilar*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ........................................................................................................... 4

    A.   Mr. Aguilar Undergoes The Immigration, Passport Control, And Customs
        Processes .......................................................................................................... 4

    B.   FBI and Homeland Security Agents Place Mr. Aguilar In A Guarded Room And
        Interrogate Him About A Criminal Investigation ............................................ 5

STANDARD OF REVIEW ............................................................................................ 8

ARGUMENT ................................................................................................................ 10

I.   THE GOVERNMENT'S FAILURE TO PROVIDE *MIRANDA* WARNINGS
    REQUIRES SUPPRESSION .................................................................................. 11

    A.   Mr. Aguilar's Interrogation At An International Airport Regarding Non-Border
        Issues Triggered *Miranda* Requirement ....................................................... 11

    B.   Agents Zukas And Wood Used Coercive Pressures To Convey That Mr. Aguilar
        Was Not Free To Leave ................................................................................... 17

    C.   Continued Questioning of Mr. Aguilar After He Requested Counsel Was
        Unconstitutional .............................................................................................. 22

II.  AT A MINIMUM, THE COURT SHOULD HOLD AN EVIDENTIARY HEARING ........ 22

CONCLUSION ............................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berkemer v. McCarty*,
   468 U.S. 420 (1984)....................................................................................... 3

*Colorado v. Connelly*,
   479 U.S. 157 (1986)....................................................................................... 9

*Davis v. United States*,
   512 U.S. 452 (1994)....................................................................................... 20

*Dickerson v. United States*,
   530 U.S. 428 (2000)....................................................................................... 11

*Georgison v. Donnelli*,
   588 F.3d 145 (2d Cir. 2009) ........................................................................ 8, 9

*Michigan v. Harvey*,
   494 U.S. 344 (1990)....................................................................................... 9

*Miranda v. Arizona*,
   384 U.S. 436 (1966)................................................................................ *passim*

*Rhode Island v. Innis*,
   446 U.S. 291 (1980)................................................................................... 8, 16

*Simmons v. United States*,
   390 U.S. 377 (1968)....................................................................................... 1

*Tankleff v. Senkowski*,
   135 F.3d 235 (2d Cir. 1998) ..................................................................... 17, 19

*In re Terrorist Bombings of U.S. Embassies in E. Afr.*,
   552 F.3d 177 (2d Cir. 2008) ................................................................. 1, 10, 23

*Thompson v. Keohane*,
   516 U.S. 99 (1995)...................................................................................... 3, 9

*United States v. Abbas*,
   418 F. Supp. 2d 280 (W.D.N.Y. 2006) ..................................................... 18, 19

*United States v. Anderson*,
   929 F.2d 96 (2d Cir. 1991) ........................................................................... 9

*United States v. Carr*,
    63 F. Supp. 3d 226 (E.D.N.Y. 2014) ........................................................................ 18, 19

*United States v. Carter*,
    489 F.3d 528 (2d Cir. 2007) ............................................................................................... 8

*United States v. Ceballos*,
    812 F.2d 42 (2d Cir. 1987) ........................................................................................ 17, 21

*United States v. Charbonneau*,
    979 F. Supp. 1177 (S.D. Ohio 1997) ............................................................ 16, 18, 19, 21

*United States v. Codrington*,
    2008 WL 1927372 (E.D.N.Y. May 1, 2008) ................................................................. 20

*United States v. Cohen*,
    372 F. Supp. 2d 340 (E.D.N.Y. 2005) ............................................................... 12, 18, 20

*United States v. Culotta*,
    413 F.2d 1343 (2d Cir. 1969) ..................................................................................... 10, 23

*United States v. Djibo*,
    151 F. Supp. 3d 297 (E.D.N.Y. 2015) ............................................................... 13, 16, 23

*United States v. FNU LNU*,
    653 F.3d 144 (2d Cir. 2011) .................................................................................. *passim*

*United States v. Galloway*,
    316 F.3d 624 (6th Cir. 2003) ........................................................................................ 14

*United States v. Griffin*,
    7 F.3d 1512 (10th Cir. 1993) ....................................................................................... 18

*United States v. Gupta*,
    183 F.3d 615 (7th Cir. 1999) ....................................................................................... 14

*United States v. Guzman*,
    724 F. Supp. 2d 434 (S.D.N.Y. 2010) .......................................................................... 19

*United States v. Hassan*,
    2019 WL 5684367 (E.D.N.Y. Nov. 1, 2019)................................................................ 15

*United States v. Irving*,
    2003 WL 22127913 (S.D.N.Y. Sept. 15, 2003)............................................................ 16

*United States v. Kiam*,
    432 F.3d 524 (3d Cir. 2006) ......................................................................................... 14

*United States v. Long Huang You*,
    198 F. Supp. 2d 393 (S.D.N.Y. 2002) ................................................................ 20

*United States v. Mathurin*,
    148 F.3d 68 (2d Cir. 1998) ........................................................................ 10, 22

*United States v. Miller*,
    382 F. Supp. 2d 350 (N.D.N.Y. 2005) ..................................................... 1, 10, 23

*United States v. Molina-Gomez*,
    781 F.3d 13 (1st Cir. 2015) ........................................................... 13, 14, 16, 19

*United States v. Montana*,
    958 F.2d 516 (2d Cir. 1992) ................................................................................ 16

*United States v. Moody*,
    649 F.2d 124 (2d Cir. 1981) ......................................................................... 12, 13

*United States v. Morales*,
    834 F.2d 35 (2d Cir. 1987) .................................................................................. 11

*United States v. Moya*,
    74 F.3d 1117 (11th Cir. 1996) ............................................................................ 14

*United States v. Newton*,
    369 F.3d 659 (2d Cir. 2004) ............................................................................ 8, 11

*United States v. Oladokun*,
    2016 WL 4033166 (E.D.N.Y. July 27, 2016) .................................................... 13

*United States v. Ortiz*,
    943 F. Supp. 2d 447 (S.D.N.Y. 2013) ................................................... 18, 19, 20

*United States v. Redzepagic*,
    2020 WL 5232066 (E.D.N.Y. Sept. 2, 2020) .................................................... 23

*United States v. Rivera*,
    2009 WL 3030302 (S.D.N.Y. Sept. 22, 2009) .................................................. 16

*United States v. Silva*,
    715 F.2d 43 (2d Cir. 1983) .................................................................................. 12

*United States v. Soto*,
    2014 WL 3695990 (E.D.N.Y. July 24, 2014) .................................................... 16

*United States v. Tudoran*,
    476 F. Supp. 2d 205 (N.D.N.Y. 2007) .................................................. 10, 13, 23

*United States v. Vinas*,
  910 F.3d 52 (2d Cir. 2018) ................................................................................................ 18

*Wood v. Ercole*,
  644 F.3d 83 (2d Cir. 2011) ..................................................................................... 9, 10, 20, 22

*Yarborough v. Alvarado*,
  541 U.S. 652 (2004)............................................................................................................. 9

## <u>Constitutional Provisions</u>

U.S. Const. amend. V........................................................................................... *passim*

Defendant Javier Aguilar respectfully submits this Memorandum of Law in Support of his Motion to Suppress Statements Made on July 10, 2020 and for an Evidentiary Hearing.[1]

## PRELIMINARY STATEMENT

The government's questioning of Mr. Aguilar at the George Bush Intercontinental Airport ("IAH") in Houston, Texas on July 10, 2020 was unconstitutional because the FBI and Homeland Security interrogators admittedly failed to give Mr. Aguilar the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), before subjecting him to a custodial interrogation, and because they refused to stop questioning him when he repeatedly expressed his desire for a lawyer. As a result, all statements allegedly made by Mr. Aguilar in response to the interrogation, as well as any evidence derived from those statements, must be suppressed.[2]

From the moment that Mr. Aguilar deplaned at IAH after a business trip to Mexico, he was shadowed and approached by government agents seeking to subject him to custodial interrogation by exploiting the coercive pressures of the international-reentry process. As he walked onto the jet bridge, a U.S. Customs and Border Protection ("CBP") officer intercepted him and inspected his travel documents. That same officer followed him to passport control, where he again inspected Mr. Aguilar's travel documents and ordered him and his luggage to undergo additional screening by two other CBP officers. After that part of the process, an armed FBI agent confronted

---

[1]   Mr. Aguilar brings this Motion, and his declaration in support, without waiving his Fifth Amendment right against self-incrimination. *See Simmons v. United States*, 390 U.S. 377, 393–94 (1968) ("when a defendant testifies in support of a motion to suppress . . . his testimony may not thereafter be admitted against him at trial on the issue of guilt" since it is "intolerable that one constitutional right should have to be surrendered . . . to assert another"); *United States v. Miller*, 382 F. Supp. 2d 350, 362 (N.D.N.Y. 2005) (noting that statements supporting a suppression motion based on, *inter alia*, *Miranda*, "cannot [be] use[d] directly in a subsequent trial").

[2]   *Miranda*'s protections apply equally to non-U.S. citizens like Mr. Aguilar. *See In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 177, 200 (2d Cir. 2008) ("[T]he principles animating the privilege against self-incrimination apply with equal force to both citizens and foreigners who are haled into our courts to answer criminal charges.").

Mr. Aguilar and directed him to a confined, non-public room.  In those close quarters, that FBI agent, along with another agent from Homeland Security, questioned Mr. Aguilar for over an hour about an ongoing criminal investigation into alleged international corruption and bribery while two CBP officers guarded the door.  The agents' questions were wholly unrelated to Mr. Aguilar's entrance or admissibility into the United States and instead focused exclusively on Mr. Aguilar's alleged criminal wrongdoing.

This fact alone—exploiting the inherently custodial setting of a heavily secured international airport to get a suspect to talk about alleged criminality untethered to reentry issues— triggered the *Miranda* requirement.  As any traveler knows, Mr. Aguilar was at the mercy of the authorities while in the airport.  When stopped by an FBI agent before exiting the secure Customs area, no reasonable person would believe that he could simply ignore that armed federal official and walk on.  This no doubt was the very reason the agents chose to confront him for statements at an international airport.  But Second Circuit law, as well as decisions from multiple other Circuits, prohibit this abusive procedure by requiring that *Miranda* warnings be provided before any questions about non-reentry issues can be put to a traveler placed in a confined interrogation space.  For this reason alone, Mr. Aguilar's alleged statements obtained without *Miranda* warnings should be suppressed.

Further, Mr. Aguilar maintains that he asked to speak to counsel at several points throughout the interrogation, that he felt coerced into answering the agents' questions, and that he believed the agents would arrest him.  Mr. Aguilar's fears were entirely reasonable and justified given the highly coercive environment into which the agents placed him in their effort to extract allegedly self-incriminating information, as well as based on what the agents did and said, and how they carried themselves in their interactions with him.  Mr. Aguilar was not simply questioned at

a heavily secured international airport:  He was deliberately placed in a small, confined, non-public room beyond the secondary Customs screening area—a room that had its exit blocked by armed CBP officers.  He was seated in a chair with handcuffs attached to both the arm of the chair and the table, as he faced armed FBI and Homeland Security agents.  These agents then repeatedly prodded Mr. Aguilar to cooperate, issued veiled threats about added criminal punishment for lying to federal agents when he tried to demur to their questioning, and ignored his requests to speak with counsel.

No reasonable person in these circumstances would have believed that he could simply stand up, refuse to answer the agents' targeted questions about a criminal investigation, push past the additional, armed officers at the door, and walk out.  There was no option for Mr. Aguilar "to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).  Rather, like Mr. Aguilar, a reasonable person would have understood himself to be under "restraints comparable to those associated with a formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984).  As a result, Mr. Aguilar was "in custody" when the FBI and Homeland Security agents detained and questioned him, and so their failure to administer the warnings required by *Miranda* violated his Fifth Amendment rights.

In addition, in light of the custodial interrogation, when Mr. Aguilar expressed a desire to speak to a lawyer, the interrogation should have "cease[d]" until he had an attorney present, which of course did not happen. *Miranda*, 384 U.S. at 474.  The agents' decision to ignore Mr. Aguilar's requests and continue the interrogation forms an independent basis for suppression of his purported statements.

The undisputed facts here are clear:  (1) criminal investigators exploited the trappings of a routine airport inspection to bootstrap a criminal investigation, asking questions having nothing to

do with reentry and focusing instead exclusively on a bribery investigation; and (2) those criminal investigators failed to provide Mr. Aguilar with the required *Miranda* warnings before interrogating him about an ongoing criminal investigation and attempting to elicit incriminating information from him.  The government's end-run around *Miranda* should not stand.  Thus, suppression of any statements that Mr. Aguilar purportedly made during that custodial interrogation—and evidence obtained as a result of that interrogation—is the appropriate remedy.

At a minimum, a factual hearing is required to address any contested facts.

## BACKGROUND

### A.    Mr. Aguilar Undergoes The Immigration, Passport Control, And Customs Processes

Mr. Aguilar is a Mexican citizen who holds a green card to work and live in the United States.  Declaration of Javier Aguilar ¶ 2.  After an extensive investigation targeting his alleged activities, including causing cooperating informants to record dozens of hours of conversations with Mr. Aguilar, *id.* ¶¶ 20–21; Declaration of Alex Spiro ¶ 5, the government apparently chose to wait for him to land at an international airport to induce him to talk without counsel.

At around 7:55 a.m. CT on July 10, 2020, Mr. Aguilar landed at IAH after a short business trip to Mexico City, Mexico.  Aguilar Decl. ¶ 3.  As he stepped onto the jet bridge, a CBP officer named Preston Davis stopped Mr. Aguilar and asked for his passport and green card.  *Id.* ¶ 4.  Officer Davis reviewed Mr. Aguilar's travel documents and directed him to continue to the immigration and passport-control area.  *Id.* ¶¶ 4–5.  Mr. Aguilar saw Officer Davis following behind him as he left the jet bridge and walked toward immigration and passport control.  *Id.* ¶ 5.  At the passport-control area, Officer Davis walked ahead, entered the inspection booth, and again asked to see Mr. Aguilar's travel documents.  *Id.*  After reviewing Mr. Aguilar's passport and

green card for a second time, Officer Davis walked Mr. Aguilar to the Customs luggage-search area for additional screening and returned Mr. Aguilar's travel documents.  *Id.* ¶¶ 6–7.

    After Mr. Aguilar waited several minutes, two different CBP officers directed Mr. Aguilar to place his bag on a table and again asked for his passport and green card.  *Id.* ¶ 8.  Mr. Aguilar had previously seen these two CBP officers talking with two men in suits to the side of the Customs area near a door.  *Id.* ¶ 9.  These CBP officers searched Mr. Aguilar's bag for around 15 minutes. *Id.* ¶ 8.  While his bag was being searched, Mr. Aguilar saw the same two men in suits standing outside that door observing the room briefly before returning through that door.  *Id.* ¶ 9.  Afterward, these officers returned Mr. Aguilar's passport and green card and told him that their border screening had finished.  *Id.* ¶ 8.

### B.    FBI and Homeland Security Agents Place Mr. Aguilar In A Guarded Room And Interrogate Him About A Criminal Investigation

    Then, as Mr. Aguilar walked toward the Customs exit, a man stepped into his path.  *Id.* ¶ 10.  This man, who later identified himself as FBI Special Agent Paul Zukas, showed Mr. Aguilar his badge, simultaneously revealing that he was carrying a handgun.  *Id.*  Mr. Aguilar recognized Agent Zukas as one of the men in suits who he had seen earlier talking to the two CBP officers who inspected his bag.  *Id.*  Agent Zukas "pulled Mr. Aguilar aside" and directed him to follow him past the secondary screening area and into a small, non-public room for additional questioning. Spiro Decl., Ex. A at DOJ-ADD-0000000001; Aguilar Decl. ¶ 11.  The airport holding cells used to house prisoners were just beyond the interrogation room.  Aguilar Decl. ¶ 11.

    Another federal agent with Homeland Security Investigations, Matt Wood, waited for Mr. Aguilar in the interrogation room.  *Id.* ¶ 12.  Mr. Aguilar recognized Agent Wood as the other man in a suit who he had seen before talking with the two CBP officers who searched his bag.  *Id.* Agent Wood instructed Mr. Aguilar to sit in a chair that faced both agents.  *Id.* ¶ 13.  The chair had

handcuffs attached, with one handcuff connecting the chair to the table and the other dangling from the arm of the chair.  *Id.*  Two CBP officers followed behind and stood guard outside the door, visibly blocking Mr. Aguilar's only exit.  *Id.* ¶ 14.

Agents Wood and Zukas detained and interrogated Mr. Aguilar until around 10:00 a.m. CT.  Spiro Decl. Ex. B at DOJ-ADD-0000000044; *see* Aguilar Decl. ¶ 29–30.  Rather than ask about his arrival or admissibility to the country, the agents questioned Mr. Aguilar solely about non-travel related topics:  a preexisting criminal investigation of alleged corruption involving Mr. Aguilar's employer and alleged bribes paid to foreign government officials.  Spiro Decl. Exs. A, B; Aguilar Decl. ¶¶ 15–22.[3]  Agents Wood and Zukas questioned Mr. Aguilar about these alleged bribery schemes, showed him pictures of alleged coconspirators, brandished documents that they claimed tracked alleged bribe payments, and read him portions of conversations with those alleged coconspirators that the government had secretly recorded.  Spiro Decl. Ex. A at DOJ-ADD-0000000005; *id.* Ex. B at DOJ-ADD-0000000039–43; *see* Aguilar Decl. ¶¶ 15–22.

Based on the materials that the agents showed Mr. Aguilar, the targeted nature of their questions, and the way the agents conducted themselves, it was clear to Mr. Aguilar that the government had been investigating him for a long time.  *See* Aguilar Decl. ¶¶ 21, 33.  Discovery produced so far has confirmed those facts, revealing the government's significant surveillance activities and the use of confidential informants to record dozens of hours of conversations with Mr. Aguilar.  Spiro Decl. ¶ 5.  Using these materials, the agents pressured Mr. Aguilar to cooperate and to help the government with its investigation, echoing that it would be best for him if he

---

[3]   The prosecution alleges that Mr. Aguilar conspired to pay bribes to foreign officials in Ecuador through Consultants to retain and direct business to his employer in violation of the Foreign Corrupt Practices Act.  *See generally* ECF Nos. 1, 13.

cooperated with the government and identified other players in the alleged conspiracy. Aguilar Decl. ¶¶ 22, 24–27.

Near the beginning of Agent Wood's and Agent Zukas' questioning, Mr. Aguilar stated that he wanted a lawyer present. *Id.* ¶ 24. Rather than halting the interrogation then and there or giving Mr. Aguilar time to consult counsel, Agent Wood responded that it would be best for Mr. Aguilar if he cooperated. *Id.* When Mr. Aguilar tried to remain silent or disagreed with the agents' characterizations, the agents twice told him that "lying to Federal Agents was a crime on its own." Spiro Decl. Ex. A at DOJ-ADD-0000000004–5; Aguilar Decl. ¶¶ 25, 28. The questioning took place entirely in English, even though English is not Mr. Aguilar's native language, and despite that he speaks with a noticeable accent and struggles to articulate complex concepts in verbal, spontaneous discussions. Aguilar Decl. ¶ 23. Further, Mr. Aguilar and both federal agents were masked because of COVID-19, making it even harder for a non-native English speaker to understand the questions posed to him. *Id.*

As the agents' interrogation into the alleged bribery schemes continued and began to probe the details of Mr. Aguilar's employment, Mr. Aguilar again stated that he should speak with a lawyer and, at the very least, should call his employer's in-house counsel. *Id.* ¶ 26. Once again, Agent Wood insisted that it would be best if Mr. Aguilar cooperated and urged Mr. Aguilar not to discuss the interrogation with his employer's counsel. *Id.* ¶¶ 26–27.

After more than one hour of questioning, Mr. Aguilar once again stated that he wished to speak with an attorney. *Id.* ¶ 29. This time, after two prior requests for counsel and over 60 minutes of incriminating questioning, the agents at last informed Mr. Aguilar that he would need to find criminal counsel. *Id.* ¶ 29; *see id.* ¶¶ 24, 26. Agent Zukas then gave Mr. Aguilar his

business card and told Mr. Aguilar that once he retained an attorney, his attorney should contact Agent Zukas.  Spiro Decl. Ex. A at DOJ-ADD-0000000006; Aguilar Decl. ¶ 28.

Neither Agent Wood nor Agent Zukas provided Mr. Aguilar with a *Miranda* warning at any point before or during the interrogation.  Aguilar Decl. ¶¶ 31–32; *see generally* Spiro Decl. Ex. A.  To date, the prosecution has produced no audio or visual recordings of the interrogation and has represented that no such recordings exist.  Spiro Decl. ¶ 4.

## STANDARD OF REVIEW

A suspect is entitled to *Miranda* warnings when he undergoes "custodial interrogation." *Miranda*, 384 U.S. at 444–45; *see Georgison v. Donnelli*, 588 F.3d 145, 155 (2d Cir. 2009) ("It is well settled that *Miranda* requires all individuals who are under arrest, or otherwise in police custody, to be informed prior to interrogation, *inter alia*, of their right to remain silent and to have an attorney present during questioning.").  A custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444.  An "'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnote omitted).  "The purpose of the Miranda warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007) (citations omitted).  Once a court determines that the government has violated its *Miranda* obligations, "the prosecution is barred from using statements obtained during the interrogation to establish its case in chief." *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004).

The custody determination involves two separate inquiries:  the first "requires a court to consider the circumstances surrounding the interrogation," and the second considers "whether a reasonable person would have felt at liberty to leave."  *Yarborough v. Alvarado*, 541 U.S. 652, 659 (2004).  Whether the accused was in custody "must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances."  *Id.* at 662; *see also Georgison*, 588 F.3d at 155 (holding that the overarching question is whether "a reasonable [person] in the suspect's position would have understood" himself to be "subjected to restraints comparable to those associated with a formal arrest").  This is a "distinctly factual" inquiry.  *Thompson*, 516 U.S. at 112.

"[T]he prosecution has the burden of establishing by a preponderance of the evidence that a suspect waived his *Miranda* rights, and that his confession is truly the product of free choice."  *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991) (citing *Colorado v. Connelly*, 479 U.S. 157, 168–69 (1986)).  Because the "[government] is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation," the "heavy burden" of showing a knowing and voluntary waiver falls on the government's shoulders.  *Miranda*, 384 U.S. at 475.

Further, when a person under custodial interrogation "indicates in any manner and at any stage of the process that he wishes to consult with an attorney," then "the interrogation must cease until an attorney is present."  *Miranda*, 384 U.S. at 444–45, 474.  "This important 'prophylactic rule [is] designed to prevent police from badgering a defendant into waiving his . . . rights.'"  *Wood v. Ercole*, 644 F.3d 83, 90 (2d Cir. 2011) (original alterations) (quoting *Michigan v. Harvey*, 494 U.S. 344, 350 (1990)); *see also id.* at 86 n.1 ("Fifth Amendment rights entitle a suspect to

request the presence of an attorney during custodial interrogation," a request which interrogators must "'scrupulously honor'" (quoting *Miranda*, 384 U.S. at 479)). "Evidence collected in violation of a suspect's right to counsel is inadmissible as part of the prosecution's case-in-chief." *Id.* at 90–91.

Finally, if there are "specific factual dispute[s]" that "cannot properly be resolved without an evidentiary hearing," the Court should hold a hearing to resolve those issues. *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998) (per curiam); *accord In re Terrorist Bombings*, 552 F.3d at 165 ("[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact . . . are in question." (quotation omitted)); *United States v. Culotta*, 413 F.2d 1343, 1345 (2d Cir. 1969) (courts must convene an evidentiary hearing when a defendant's motion to suppress "state[s] sufficient facts which, if proven, would [ ] require[ ] the granting of the relief requested"). Thus, when a defendant's motion to suppress evidence raises particularized factual disputes, the Court "must conduct a hearing to determine whether the government can prove by a preponderance of the evidence that 'there was no custodial interrogation implicating *Miranda*, there was some exception to the *Miranda* rule, or . . . [the defendant] . . . was properly *Mirandized* and waived his rights.'" *United States v. Tudoran*, 476 F. Supp. 2d 205, 216 (N.D.N.Y. 2007) (quoting *United States v. Miller*, 382 F. Supp. 2d 350, 362 (N.D.N.Y. 2005)) (original alterations).

## **ARGUMENT**

The government's interrogation of Mr. Aguilar in the inherently custodial setting of a heavily secured international airport and without first administering *Miranda* warnings violated Mr. Aguilar's Fifth Amendment rights. The Court should thus suppress all statements that the government purportedly obtained from Mr. Aguilar and any evidence derived therefrom.

Special Agents of the FBI and Homeland Security exploited the coercive pressures of IAH to hold, confine, and interrogate Mr. Aguilar—not about issues pertaining to entry into the United States, but solely about an ongoing criminal investigation that the government had been conducting against Mr. Aguilar for many months.  These circumstances triggered *Miranda* custody and so the agents' failure to provide *Miranda* warnings is grounds to suppress the ensuing statements and other resulting evidence.  This is especially true when the agents sought to extract self-incriminatory statements by placing Mr. Aguilar in close confines, surrounded by armed agents at a chair from which handcuffs dangled, and questioned him for over an hour about the evidence that they claimed to have about his alleged criminal activities.

Because no reasonable person in Mr. Aguilar's position would have believed that he could avoid the interrogation before it began or end the interrogation after it started by leaving the interrogation room in a sequestered, nonpublic part of IAH, the Court should grant this Motion to Suppress.  A separate and independent basis for suppression is the fact that the agents ignored Mr. Aguilar's repeated requests to speak with counsel during the interrogation.

## I.   THE GOVERNMENT'S FAILURE TO PROVIDE *MIRANDA* WARNINGS REQUIRES SUPPRESSION

### A.   Mr. Aguilar's Interrogation At An International Airport Regarding Non-Border Issues Triggered *Miranda* Requirement

*Miranda* warnings are required when the government's questioning is "conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak."  *Newton,* 369 F.3d at 669 (quoting *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987)); *see also Dickerson v. United States*, 530 U.S. 428, 435 (2000) ("[T]he coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements.").  The *Miranda* rule "exists to temper the 'potentiality for compulsion' that exists when an individual is 'cut off from the outside world' and subjected to 'incommunicado

interrogation in a police-dominated atmosphere.'" *United States v. FNU LNU*, 653 F.3d 144, 154 (2d Cir. 2011) (quoting *Miranda,* 384 U.S. at 445).

That, of course, is precisely the atmosphere the government created when the agents deliberately subjected Mr. Aguilar to interrogation at an international airport.  It was no accident that the government, which had long been tracking Mr. Aguilar's activities, waited to confront him until he arrived at an international airport (a border crossing) to exploit a setting that would automatically restrict Mr. Aguilar's freedom of movement.  Indeed, "anyone who travels by air knows that they are at the mercy of the authorities when flying," because "airplanes and airports involve heightened security in which an individual's freedom of movement can be curtailed in a way similar to an arrest."  *United States v. Cohen*, 372 F. Supp. 2d 340, 350–51 (E.D.N.Y. 2005).

To be sure, in the international-airport setting, the law is clear that travelers reentering the United States must submit to some acceptable level of inquiry at the border about their eligibility to reenter the country.  The law tolerates this inherent restriction on movement, as coercive as it may be, because of the governmental interest in protecting the integrity of our borders.  *See FNU LNU*, 653 F.3d at 153–55.

The law is just as clear, however, that when the questioning veers away from border-entry questions and into criminal investigations, *Miranda* warnings must be given.  As the Second Circuit held in *United States v. Silva*, "*Miranda* warnings are required in border interrogations when the questioning of the official becomes an interrogation that is custodial in nature and is one in which 'information is sought for the purpose of using it against [a] person in a criminal proceeding.'"  715 F.2d 43, 47–48 (2d Cir. 1983) (quoting *United States v. Moody*, 649 F.2d 124, 127 (2d Cir. 1981)).

In other words, "[t]he types of questions asked . . . may transform what is otherwise a routine inspection to a custodial interrogation." *United States v. Oladokun*, 2016 WL 4033166, at *2 (E.D.N.Y. July 27, 2016).  Then-Chief Judge Jacobs put it succinctly:  "Practically speaking, the *most* important factor in determining whether *Miranda* applies at our borders will often be the objective function of an inspector's questions, not the custodial nature of the questioning." *FNU LNU*, 653 F.3d at 156 (Jacobs, C.J., concurring) (original emphasis).  Thus, in affirming the denial of a suppression motion for a statement taken at an airport, the *FNU LNU* majority opinion held:  "crucially, a reasonable person would recognize all [the border agent's] questions as relevant to her admissibility to the United States.  Such a person would consider [the border agent's questions] par for the course of entering the country from abroad." *Id.* at 155 (Calabresi, J.).  In that situation—not present here—the airport interrogation is not custodial under *Miranda*.

But when the "line of inquiry . . . completely change[s]" from "the purpose of the original [border] search" to one unrelated to border security or reentry, those inherently coercive confines become "custodial" under *Miranda*, and so the failure to provide *Miranda* warnings warrants suppressing the resulting statements. *United States v. Djibo*, 151 F. Supp. 3d 297, 306 (E.D.N.Y. 2015); *see also Moody*, 649 F.2d at 127–28 (admission of statement made by detainee at airport violated constitution when questioning by Customs agents veered into inquiry about drugs); *Tudoran*, 476 F. Supp. 2d at 211–15 (*Miranda* warnings were required when Customs inspector's questions were no longer attempts to discern defendant's alienage).

Other Courts of Appeals agree.  In *United States v. Molina-Gomez*, the First Circuit reversed the denial of a motion to suppress an arriving international passenger's statements, holding that he was in *Miranda* custody when he was placed in a "small, windowless room" with at least two federal officers, interrogated for 90–120 minutes, and—critically—the officers'

"questioning was not 'routine,'" but focused on particularized allegations of criminality.  781 F.3d 13, 22–23 (1st Cir. 2015).  Likewise, the Third Circuit has held that "*Miranda* was implicated" at an international airport once Customs officials "ceased questioning about [immigration] admissibility and called in a criminal investigator" to continue the interrogation.  *United States v. Kiam*, 432 F.3d 524, 531 (3d Cir. 2006).  The Sixth, Seventh, and Eleventh Circuits are each in accord.  *See United States v. Galloway*, 316 F.3d 624, 630–31 (6th Cir. 2003) (considering whether an officer's questioning in an airport was "indicative of a routine customs inquiry" in evaluating whether suspect was in custody); *United States v. Gupta*, 183 F.3d 615, 618 (7th Cir. 1999) ("the arrival of criminal investigators," instead of ordinary Customs officials, may "suppl[y] the demarcation" between custodial and non-custodial border interrogations); *United States v. Moya*, 74 F.3d 1117, 1120 (11th Cir. 1996) (questioning at the border becomes custodial when it "rise[s] to a distinctly accusatory level").

This uniform line of cases supports a powerful principle:  The Constitution tolerates some limitations on freedom of movement while under governmental interrogation when the nation's interest in border integrity is at stake.  In that limited setting and for that limited purpose, "compulsory questioning—with no freedom to enter the United States and with nowhere else to go—*inheres* in the situation," yet is tolerated.  *FNU LNU*, 653 F.3d at 153 (emphasis added).  But courts do not allow the government to abuse this narrow, situational exception to Fifth Amendment principles at the border when government agents seek to exploit the cover of the border to extract incriminating statements to advance unrelated criminal investigations.  In circumstances like these, the inherently coercive reentry process becomes custodial under *Miranda*.

The facts at issue present precisely this form of abuse.  The interrogation of Mr. Aguilar had nothing whatever to do with Customs or border issues.  Mr. Aguilar had already undergone

14

two Customs screenings, including a search of his bags, when Agent Zukas stopped him.  Yet the agents piggybacked off of the inherent coerciveness of the reentry process to get Mr. Aguilar to talk.  That is doubtless why—in Agent Zukas' words—he intercepted Mr. Aguilar as he was "passing through customs."   Spiro Decl. Ex. A at DOJ-ADD-0000000001.   In addition, Mr. Aguilar had seen Agents Wood and Zukas talking with the two CBP officers who inspected his luggage, and had noticed them observing that inspection.  Aguilar Decl. ¶¶ 9, 10, 12.  Thus, when Agent Zukas approached Mr. Aguilar in the Customs-inspection area, a reasonable traveler would have concluded that Agent Zukas' conduct was part of the mandatory CBP reentry process.

Once the interrogation began, it was conducted solely by criminal investigators, not by Customs or airport-security officers—though such officers continued to support the agents by making their facilities available for the criminal investigators, by shepherding Mr. Aguilar into the agents' hands, and by standing guard outside while the interrogation proceeded.  Nothing about Agent Zukas' and Agent Wood's questions to Mr. Aguilar resembled "routine restraints at a border crossing" such as travel questions, luggage searches, or a review of travel documents.  *United States v. Hassan*, 2019 WL 5684367, at *3 (E.D.N.Y. Nov. 1, 2019).  The questions indisputably were squarely aimed at alleged criminal conduct and a preexisting criminal investigation.  *See* Spiro Decl. Ex. A.  The agents expressly concede that their questioning "was about [Mr. Aguilar's] employment" and spanned non-travel related topics including:  (1) secretly recorded conversations among Mr. Aguilar and the government's informants, (2) Mr. Aguilar's introduction to the Intermediary who allegedly facilitated payments to the Consultants, (3) "payments to [foreign] government officials," (4) the identity of the foreign government officials alleged to have received

bribes, (5) whether Mr. Aguilar "put himself in criminal liability," and (6) "what exactly his role

was in" the alleged conspiracy.  *Id.* at DOJ-ADD-0000000001–5.[4]

These questions unrelated to Mr. Aguilar's admissibility, asked by non-routine airport

agents, "would raise the suspicions of an ordinary traveler," making him think that this was not

typical airport questioning and that he was instead in formal custody.  *Djibo*, 151 F. Supp. 3d

at 306 (quoting *United States v. Soto*, 2014 WL 3695990, at *5 (E.D.N.Y. July 24, 2014)); *see*

*Molina-Gomez*, 781 F.3d at 24 (*Miranda* warnings required when officers asked questions about

drug activity that "had nothing to do with whether or not to admit [the defendant] into the

country").[5]  As a result, the government had to provide *Miranda* warnings.  Because it cannot—

and likely will not—dispute that the agents failed to inform Mr. Aguilar of his *Miranda* rights at

---

[4]   In light of these questions, the government is unlikely to dispute that the agents' questions constituted "interrogation" under *Miranda*.  "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response."  *Innis*, 446 U.S. at 301.  In fact, when Mr. Aguilar "remained silent and would not say," in response to a question, "SAs Wood and Zukas explained to [Mr. Aguilar] that lying to Federal Agents was a crime on its own and it was important that [Mr. Aguilar] tell the truth."  Spiro Decl. Ex. A, at DOJ-ADD-0000000004.  This was blatant solicitation of incriminating responses from a subject of an ongoing criminal investigation.  *See United States v. Montana*, 958 F.2d 516, 518 (2d Cir. 1992) (agent's statements informing a defendant that "cooperation would inure to his benefit" and "any cooperation would be brought to the attention of the Assistant United States Attorney constituted 'interrogation'" for *Miranda* purposes); *United States v. Rivera*, 2009 WL 3030302, at *4 (S.D.N.Y. Sept. 22, 2009) (officer's statements that defendant's "cooperation with the government was one way" to "reduce his exposure to jail time" constituted an interrogation because they were "reasonably likely to elicit an incriminating response" (quotation marks omitted)); *see also United States v. Charbonneau*, 979 F. Supp. 1177, 1182 (S.D. Ohio 1997) (defendant underwent custodial interrogation when agents "showed him the evidence they had gathered against him" and "reasonably knew that their questioning would illicit an incriminating response from Defendant").

[5]   Thus, this case presents a stark contrast to cases such as *United States v. Irving*, in which suppression was denied in circumstances involving questioning conducted by Customs agents (not FBI and Homeland Security agents) who also searched defendant's luggage and asked him to sign a Customs form.  2003 WL 22127913, at *2 (S.D.N.Y. Sept. 15, 2003).  Here, by contrast, agents of the FBI and Homeland Security focused their questions exclusively on alleged international corruption.  Border integrity had nothing to do with this interrogation.

any point during the interrogation, *see id.*; *see also* Aguilar Decl. ¶¶ 31–32, the statements that the agents allegedly obtained from Mr. Aguilar, and any resulting fruits, must be suppressed.

### B. Agents Zukas And Wood Used Coercive Pressures To Convey That Mr. Aguilar Was Not Free To Leave

Compounding the inherently coercive pressures of a heavily secured international airport was the quintessentially "custodial" nature of the interrogation to which Agents Wood and Zukas subjected Mr. Aguilar. The "custody" inquiry under *Miranda* is "holistic" and considers "the nature and context of the questions asked, together with the nature and degree of restraints placed on the person questioned, are relevant." *FNU LNU*, 653 F.3d at 154. Courts consider the totality of the objective circumstances surrounding an interrogation, including: (1) the duration of the interrogation, (2) its location, (3) "whether the suspect volunteered for the interview," (4) whether the officers used restraints, (5) whether weapons were present, (6) whether the suspect was told he "was free to leave or under suspicion," and (7) whether the suspect was searched, frisked, or patted down. *Id.* at 153–55 (finding that 90-minute interrogation in a "closed room, out of public view" and "armed guards escort[ing] the defendant there and remain[ing] in the vicinity," all "militate[d] in favor" of a custody finding); *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998) (noting that courts have addressed "whether a suspect is or is not told that she is free to leave; the location and atmosphere of the interrogation; the language and tone used by the police; whether the suspect is searched, frisked, or patted down; and the length of the interrogation" (citations omitted)). A suspect's objectively apparent difficulty with English must also be considered when assessing *Miranda* custody. *See United States v. Ceballos*, 812 F.2d 42, 48 & n.4 (2d Cir. 1987) (lack of English fluency "critically bear[s]" on the voluntariness of an interrogation).

Here, virtually every single one of the above factors supports a finding of custodial interrogation: *First*, we begin with the location of the interrogation at an international airport—a

setting that the agents deliberately exploited—in which "compulsory questioning—with no freedom to enter the United States and with nowhere else to go—*inheres* in the situation." *FNU LNU*, 653 F.3d at 153 (emphasis added).  Because "airports involve heightened security in which an individual's freedom of movement can be curtailed in a way similar to an arrest," airports are inherently "different than streets with respect to feeling free to leave or coercive pressure." *Cohen*, 372 F. Supp. 2d at 350–51.

     *Second*, at this airport location, armed federal officers surrounded Mr. Aguilar throughout the interrogation, creating a law enforcement "dominated" atmosphere. *United States v. Carr*, 63 F. Supp. 3d 226, 236 (E.D.N.Y. 2014) (finding custody because of the "CBP-dominated atmosphere" and suppressing pre-arrest statements).  While the FBI and Homeland Security agents questioned Mr. Aguilar in a small room, two uniformed CBP officers blocked the door and any potential exit.  *See United States v. Abbas*, 418 F. Supp. 2d 280, 286 (W.D.N.Y. 2006) (finding custody when federal agent "stood and blocked the door . . . [which is] an action that would reasonably suggest to someone being interrogated that their freedom of movement was being restrained or restricted in a way akin to a formal arrest").  Such a strong presence of law enforcement would lead any reasonable person to conclude that they were in custody.  *See United States v. Vinas*, 910 F.3d 52, 62 (2d Cir. 2018) (suspect's questioning in an airport's closed room surrounded by four armed officers supported finding custody); *United States v. Ortiz*, 943 F. Supp. 2d 447, 456 (S.D.N.Y. 2013) (finding custody in part because of presence of four officers and suppressing statements); *see also United States v. Griffin*, 7 F.3d 1512, 1518–19 (10th Cir. 1993) ("Where police are in full control of the questioning environment, custody is more easily found."); *Charbonneau*, 979 F. Supp. at 1181–82 (holding that a defendant under investigation was in custody when he was approached by four federal agents whose "show of force was enough to

convince Defendant that he had no choice but to follow the agents into the back rooms of the airport").

*Third*, the atmosphere created by the agents in that room added to the custodial nature of the interrogation.  Mr. Aguilar was directed to sit in a chair attached to the table by metal handcuffs.  Agents Zukas and Wood sat between Mr. Aguilar and the blocked exit and became visibly agitated when Mr. Aguilar did not provide the answers that they wanted.  The agents shouted at Mr. Aguilar and repeatedly accused him of wrongdoing despite his statements to the contrary.  Aguilar Decl. ¶ 25.  Further, Mr. Aguilar's interrogation occurred at the threshold of the airport jail, where prisoners are detained in cells, *see id.* ¶ 11—a fate that Mr. Aguilar reasonably feared if he did not cooperate with the agents.  This too shows the coercive pressure inherent in Mr. Aguilar's interrogation.  *See, e.g.*, *Molina-Gomez*, 781 F.3d at 22–23 (finding custody when suspect was questioned in windowless, ten-foot-by-ten-foot secondary screening room); *Tankleff*, 135 F.3d at 244 (finding custody when suspect was "subjected to increasingly hostile questioning" and suppressing pre-*Miranda* statements); *Carr*, 63 F. Supp. 3d at 236 (finding custody when suspect was "physically removed from the public screening area and escorted by four armed officers to a separate, private pat-down room"); *United States v. Guzman*, 724 F. Supp. 2d 434, 446 (S.D.N.Y. 2010) (finding custody when interrogation was "hostile" and investigator "repeatedly threatened to arrest" suspect); *Abbas*, 418 F. Supp. 2d at 286 (finding custody when federal agents directed suspect to a table and placed handcuffs in front of him).  The hostile atmosphere of Mr. Aguilar's interrogation was amplified by the fact that he was repeatedly warned that it was a crime not to cooperate with law enforcement and threatened with more criminal charges if he withheld information from the federal agents.  *See Ortiz*, 943 F. Supp. 2d at 456 ("A

threat to arrest a person who refuses questioning clearly communicates to that person that they are not free to terminate the interrogation and leave.").

*Fourth*, at the beginning, middle, and end of the interrogation, Mr. Aguilar said he wished to speak to counsel, only to be rebuffed by the agents, who told him that he would be better off if he cooperated with the government.  Aguilar Decl. ¶¶ 22, 24–27.  Mr. Aguilar's repeated, express statements to the agents, *id.*, "articulate[d] his desire to have counsel present sufficiently clearly, [such that] that a reasonable [ ] officer in the circumstances would understand the statement to be a request for an attorney."  *Davis v. United States*, 512 U.S. 452, 459 (1994); *see Wood*, 644 F.3d at 91 ("I think I should get a lawyer" enough to invoke right to counsel).  The agents' refusal to allow Mr. Aguilar to talk to a lawyer would underscore for a reasonable person that there was no alternative but to continue to answer the questions in order to be permitted to leave.

*Fifth*, Agents Zukas and Wood questioned Mr. Aguilar for more than one hour, a time more than enough to find that a defendant was in *Miranda* custody.  *See United States v. Codrington*, 2008 WL 1927372, at *11 (E.D.N.Y. May 1, 2008) (suspect was in custody during thirty minute questioning); *Cohen*, 372 F. Supp. 2d at 350 (suspect questioned on jet way by police for five to ten minutes was in custody for *Miranda* purposes); *see also United States v. Long Huang You*, 198 F. Supp. 2d 393, 405 (S.D.N.Y. 2002) (defendant with limited English proficiency was in custody of federal agents for thirty minutes while waiting for more agents and an interpreter to arrive).  Mr. Aguilar deplaned early in the morning at around 7:55 a.m. CT and did not leave the airport until around 10:15 a.m. CT.  *See* Aguilar Decl. ¶¶ 3, 29–30.  Even by a conservative estimate, Mr. Aguilar spent more than sixty minutes (if not closer ninety minutes) being probed by Agents Zukas and Wood about his alleged involvement in a criminal scheme, a time "substantially longer than most interviews that we have deemed non-custodial in other contexts."  *FNU LNU*, 653 F.3d

at 155; *see, e.g.*, *Charbonneau*, 979 F. Supp. at 1183 (finding custody when defendant was interrogated for over an hour in the late evening without being informed of his rights, "had just returned from a business trip," and "was tired and was not used to being interrogated").

*Finally*, a reasonable person in Mr. Aguilar's circumstances, with his limited level of English proficiency, would not have understood he was free to leave the interrogation.  Mr. Aguilar is a non-native English speaker, and it is apparent to those speaking with him that has a noticeable accent and struggles to articulate concepts verbally in English.  The interrogation was conducted in English without assistance from a Spanish-speaking agent or interpreter, despite Mr. Aguilar stating his concerns that the agents were misunderstanding and misinterpreting his words.  *See* Aguilar Decl. ¶ 23.  This objectively apparent linguistic barrier vitiated any voluntariness to Mr. Aguilar's participation.  *Ceballos*, 812 F.2d at 48 & n.4 (holding that the reasonable-person test "recognize[s] obvious incapacities that critically bear upon voluntariness such as lack of fluency in English").  Compounding Mr. Aguilar's limited understanding of the interrogation, he and the agents wore masks, which obscured Mr. Aguilar's ability to see the agents' mouths and hear them clearly and further hindered his ability to understand the nature of the interrogation. Aguilar Decl. ¶ 23.

While the government contends that it informed Mr. Aguilar that he "could stop the interview at any time and leave of his own accord," Spiro Decl. Ex. A at DOJ-ADD-0000000001, this contention is implausible at best and, certainly, Mr. Aguilar has no recollection of being given any such assurance, Aguilar Decl. ¶ 31.  Even if the agents, who were masked at all times, *id.* ¶ 23, had uttered those words in passing, under these myriad, exceedingly coercive circumstances, no reasonable person in Mr. Aguilar's position would have believed that he was, in fact, free to end

the interrogation and leave the room.  Indeed, the agents placed him in exactly these coercive conditions to exploit those conditions and undermine any sense of freedom to walk away.

Because all the relevant factors "militate in favor of finding [the interrogation] 'custodial,'" *FNU LNU*, 653 F.3d at 154–55, the Court should suppress Mr. Aguilar's July 10, 2020 statements, which were obtained in violation of his Fifth Amendment rights, as well as any and all evidence derived therefrom.

### C.   Continued Questioning of Mr. Aguilar After He Requested Counsel Was Unconstitutional

A separate and independent ground for suppressing Mr. Aguilar's alleged statements, and their fruits, is the agents' refusal to honor Mr. Aguilar's repeated requests to speak to a lawyer. Aguilar Decl. ¶¶ 24, 26–27, 29.  "Binding precedent is clear:  once a suspect requests counsel, all interrogation must stop until an attorney is provided or the suspect reinitiates conversation." *Wood*, 644 F.3d at 90 (collecting cases).  The agents' decision to ignore Mr. Aguilar's repeated requests and continue the interrogation warrants suppression of the later alleged statements and any other resulting evidence.  *See id.* at 91 (suspect's statement "I think I should get a lawyer" sufficient to invoke his right to counsel).

## II.   AT A MINIMUM, THE COURT SHOULD HOLD AN EVIDENTIARY HEARING

The government disputes that their interrogation took place when Mr. Aguilar was in "custodial" conditions, or that he asked for counsel.  The government also apparently intends to assert that its agents advised Mr. Aguilar he was free to leave.  *See* Spiro Decl. Ex. A at DOJ-ADD-0000000001.  If the Court determines that material factual disputes remain, the Court should hold an evidentiary hearing to resolve any such disputes.  *See Mathurin*, 148 F.3d at 69 ("specific factual dispute[s]" over a *Miranda* motion "cannot properly be resolved without an evidentiary hearing"); *see also* ECF No. 62 (tentatively scheduling evidentiary hearing for Dec. 2, 2021).  An

evidentiary hearing is all the more necessary here given that the prosecution has represented that it does not have any audio or visual recordings of Mr. Aguilar's interrogation to support its characterization of these events.  *See* Spiro Decl. ¶ 4; *see id.* Ex. A.

At such a hearing, the government bears the burden to "prove by a preponderance of the evidence that 'there was no custodial interrogation implicating *Miranda*, there was some exception to the *Miranda* rule, or . . . [the defendant] . . . was properly *Mirandized* and waived his rights.'" *Tudoran*, 476 F. Supp. 2d at 216 (quoting *Miller*, 382 F. Supp. 2d at 362) (original alterations); *see also In re Terrorist Bombings*, 552 F.3d at 165 ("[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact . . . are in question." (quotation omitted)); *Culotta*, 413 F.2d at 1345 (evidentiary hearing required when a defendant's motion to suppress "state[s] sufficient facts which, if proven, would [] require[] the granting of the relief requested").

The hearing should also be held to determine what, if any, evidence beyond Mr. Aguilar's alleged statements should be suppressed.  *See, e.g.*, *United States v. Redzepagic*, 2020 WL 5232066, at *11 (E.D.N.Y. Sept. 2, 2020) (staying resolution of motion to suppress evidence obtained from two search warrants because "a 'fruit of the poisonous tree' argument could be advanced if the government loses the pending *Miranda* and constitutional attack" on statements used to get those warrants); *see also Djibo*, 151 F. Supp. 3d at 307–10 (suppressing evidence resulting from an unconstitutional interrogation).

## CONCLUSION

For all these reasons, Defendant Javier Aguilar respectfully requests that the Court grant his Motion to Suppress or, in the alternative, hold an evidentiary hearing.

Respectfully submitted,

Dated:   October 12, 2021

**QUINN EMANUEL URQUHART
   & SULLIVAN, LLP**

Alex Spiro
Tai H. Park
George T. Phillips
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
alexspiro@quinnemanuel.com
taipark@quinnemanuel.com
georgephillips@quinnemanuel.com

Allison L. McGuire
1300 I Street, NW, Suite 900
Washington, DC 20005
(202) 538-8000
allisonmcguire@quinnemanuel.com

*Counsel for Defendant Javier Aguilar*