UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X

UNITED STATES OF AMERICA

   - against -

JAVIER AGUILAR

               Defendant.

No. 20-cr-390 (ENV)

------------------------------X

## DECLARATION OF JAVIER AGUILAR

I, Javier Aguilar, declare pursuant to 28 U.S.C. § 1764 and state as follows:

1.    I am the defendant in this case. I respectfully submit this declaration in support of my Motion to Suppress Statements Made on July 10, 2020 and for an Evidentiary Hearing.

2.    I am a Mexican citizen who holds a green card to work in the United States. I regularly fly between Mexico City, Mexico and Houston, Texas. In the approximately 200 times that I have made this trip, I have never been stopped and questioned about my employment or any alleged crimes.

3.    At or around 7:55 a.m. Central Time on July 10, 2020, I arrived at George Bush Intercontinental Airport in Houston, Texas ("IAH") from Mexico City, Mexico on United Airlines flight number 1085. I was returning to Houston, where I live, after a brief business trip.

4.    On the jet bridge, an officer whom I understood to be affiliated with U.S. Customs and Border Protection ("CBP") stopped me and asked to see my passport and green card. The CBP officer reviewed my travel documents then directed me to proceed to the immigration and passport control area at IAH. I now understand that this CBP officer's name is Preston Davis.

5.    As I walked toward immigration and passport control, I noticed that Officer Davis was following me. When I entered the area for passport screening, an IAH employee directed me

to an empty booth. I briefly waited there until Officer Davis entered the booth and asked to see my travel documents again.

6. Officer Davis took my photo, scanned my fingerprints, and reviewed my passport and green card again. Officer Davis then directed me to follow him to a secondary area for additional screening.

7. Officer Davis walked me downstairs to the Customs area and then returned my passport and green card.

8. After waiting several minutes, two different CBP officers told me to put my bag on an inspection table. They also asked me for my passport and green card. These CBP officers searched my bag for about 15 minutes. They then told me that the border screening was complete and returned my passport and green card.

9. I had previously seen these two CBP officers conversing near a side door of the Customs area with two men in suits. While the two CBP officers inspected my luggage, I saw the same two men in suits come back out of that side door briefly, before going back in.

10. As I walked towards the exit of the Customs screening area to leave the airport, a man stepped into my path. The man, who later identified himself as FBI Special Agent Paul Zukas, showed me his badge. In doing so, he revealed that he was carrying a handgun. I recognized Agent Zukas as one of the men in suits who I had seen earlier with the two CBP officers.

11. Agent Zukas told me to follow him and then led me past the secondary screening area and through a side door to a room not accessible to the public with a table in the middle. The room had a door on one side (through which I entered the room), and the other side of the room opened into a corridor where the airport jail cells are located.

12. Another man was waiting in the room, a federal agent with Homeland Security Investigations who I later learned was named Matt Wood. I recognized Agent Wood as the other man in a suit who I had seen before with the two CBP officers.

13. Agent Wood directed me to sit in a chair that faced both him and Agent Zukas. The chair had handcuffs attached to it. One handcuff connected the arm of the chair to the table, and the other handcuff dangled from the arm of the chair.

14. Two CBP officers followed me and Agent Zukas to this room. I noticed that they were standing outside of the door, blocking any exit.

15. The agents told me that they wanted to talk about my employer and a bribery scheme in Ecuador in which they claimed I had participated.

16. The agents asked me a series of questions about my supposed involvement in alleged corruption involving my employer and others.

17. None of the agents' questions concerned my arrival in, or admissibility to, the United States.

18. During their questioning, the agents showed me some photographs taken of me and other men that the agents claimed were involved in the alleged corruption. They asked me several questions about the men and our alleged meetings.

19. During the questioning, the agents referenced documents that they claimed tracked payments relating to the alleged corruption, but they did not let me review the documents in detail. They asked me several questions about these documents and the alleged payments.

20. During the questioning, the agents read me portions of what they claimed was a transcript of conversations between myself and the men in the photographs that apparently had been recorded by government agents. They did not show me the documents from which they read.

They asked me several questions about these conversations and claimed that I had participated in criminal activity.

21. In part because the agents informed me that they had previously surveilled me and had accessed my private communications which, according to the agents, incriminate me, I believed that I was not free to leave and that they were going to arrest me.

22. During the questioning, the agents repeatedly asked me to cooperate with them and to help the government's investigation. They told me several times that it would be better for me if I cooperated with them and identified others involved in the alleged corruption.

23. During the questioning, the agents spoke English the entire time. English is not my native language, and I struggle to articulate complex concepts verbally in English. I also found it difficult to understand and respond to the agents' questions because they were wearing masks due to COVID-19. I responded to their questions in my normal dialect, which reflects a noticeable accent. I told the agents that I was concerned that they were misunderstanding and misinterpreting what I was saying, but at no point did the agents allow me to have a translator present during the interview.

24. Near the beginning of the agents' questioning, I told them that I believed I needed a lawyer. Agent Wood responded that it would be best for me if I cooperated instead.

25. When I tried to remain silent or disagreed with the agents' characterizations in their questions, the agents became visibly angry and shouted at me. The agents also told me that lying to them was a crime on its own and stressed that it would be best for me if I cooperated with them.

26. As the agents' questions continued, they started asking me about the details of my employment. I again asked to speak with a lawyer. I specifically mentioned that I should speak

with my employer's in-house counsel. The agents asked for the name of this lawyer, and I provided it.

27. Agent Wood again responded that it would be best for me if I cooperated with them. He suggested that I not discuss their questions with my employer's in-house counsel.

28. Agent Wood and Agent Zukas did not appear to be listening to me, and I felt they were trying to put words in my mouth.

29. After over an hour of questioning, at around 10:00 a.m. CT, I again told the agents that I wanted to get a lawyer. At this point, they responded that I should find a criminal lawyer and contact them after I had retained counsel.

30. To the best of my recollection, I left the interrogation room around 10:15 a.m. CT.

31. I do not recall Agent Zukas or Agent Wood at any time telling me that the interrogation was voluntary or that I could stop the questioning.

32. At no point during my encounter with Agent Zukas and Agent Wood did anyone tell me:

    a. that I had the right to remain silent;

    b. that I had the right to have an attorney present for any questions;

    c. that I had the right to a free attorney if I could not afford one; or

    d. that anything I told them could be used against me in court.

33. Based on everything that I saw and heard, and the way in which the agents conducted themselves in their interactions with me, I did not understand that I could voluntarily leave the room with Agent Zukas and Agent Wood or that I could refuse to answer their questions.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed On: October 12, 2021
Houston, TX

_____
Javier Aguilar

6