DCP:JPL
F. #2019R01460

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


UNITED STATES OF AMERICA                    Docket No. <u>20-CR-390 (ENV)</u>

        - against –

JAVIER AGUILAR,

                        Defendant.


- - - - - - - - - - - - - - - - - - - - - - - - - - - -X


THE GOVERNMENT'S MEMORANDUM OF LAW
<u>IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS</u>

                                BREON PEACE
                                UNITED STATES ATTORNEY
                                Eastern District of New York
                                271 Cadman Plaza East
                                Brooklyn, NY 11201

Jonathan P. Lax
Assistant United States Attorney
        (Of Counsel)

Derek J. Ettinger
Jonathan P. Robell
Assistant Chiefs, Fraud Section
Clayton P. Solomon
Trial Attorney, Fraud Section
        (Of Counsel)

Adam Schwartz
Deputy Chief, Money Laundering and Asset Recovery Section
D. Hunter Smith
Trial Attorney, Money Laundering and Asset Recovery Section
        (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to the defendant Javier Aguilar's October 12, 2021 motion (the "Motion," ECF Dkt. No. 66), in which he moves to suppress statements that he voluntarily made to law enforcement officers on July 10, 2020, at George Bush Intercontinental Airport ("IAH") in Houston, Texas.  In his Motion, Aguilar claims that his statements were obtained in violation of the Fifth Amendment, specifically, that: (1) his statements were the product of a custodial interrogation without the administration of Miranda warnings; and (2) law enforcement officers refused to honor his request to speak with an attorney.

On July 10, 2020, Aguilar arrived at IAH onboard an international flight.  After Aguilar cleared immigration and customs inspection, a plain-clothes federal law enforcement agent identified himself to Aguilar and asked him whether he would be willing to answer some questions on a voluntary basis.  Aguilar agreed and walked with the agent to a nearby room for questioning.  Shortly thereafter, the agent and Aguilar were joined by another plain-clothes law enforcement agent who also introduced himself to Aguilar and, before proceeding with any questions, reminded Aguilar that he had already cleared immigration and customs and was free to leave at any time.

During the interview, the defendant made various admissions to the agents, as well as false exculpatory statements, concerning his participation in a bribery and money laundering scheme in connection with Aguilar's then-employer, Vitol Inc. ("Vitol"), a Houston, Texas-based energy trading company.  Aguilar was never handcuffed, restrained or patted down; the agents' weapons were never drawn; and Aguilar sat closest to the open unguarded door through which he initially entered.  After approximately one hour of discussion, the agents shifted their questioning

from Vitol's business in Ecuador to Vitol's business in Mexico.  It was at that point that Aguilar first requested the assistance of an attorney.  In response, the agents immediately terminated the interview and Aguilar departed IAH.

Accordingly, the interview was not "custodial," therefore, it was not necessary for the agents to advise Aguilar of his rights under <u>Miranda</u>.  Similarly, Aguilar's Fifth Amendment right to counsel was neither triggered nor violated.  Aguilar's arguments to the contrary are without merit and, for the reasons set forth below, the defendant's Motion should be denied.

<u>STATEMENT OF RELEVANT FACTS</u>[1]

The defendant Aguilar is a Mexican citizen and has been a lawful permanent resident of the United States since 2012.  For several years, Aguilar worked as a manager and energy trader at Vitol, a subsidiary of a European global energy trading company.  At the time of his interview, the government was investigating Aguilar concerning his role in, among other things, a scheme to bribe foreign officials to obtain an improper advantage for Vitol and others in obtaining and retaining business related to Ecuador's state-owned and state-controlled oil company, Empresa Publica de Hidrocarburos del Ecuador ("Petroecuador").

In or about late June 2020, the government learned that Aguilar was scheduled to arrive at IAH from Mexico City on the morning of July 10, 2020.  Due to travel limitations associated with exceptionally high COVID-19 numbers in Texas at that time,[2] the government's

---

[1]     The government expects to establish the following facts if an evidentiary hearing is held on the instant motion.

[2]     As of July 7, 2020, nearly 1 in 7 new coronavirus cases in the United States originated in Texas.  <u>See</u> "Nearly 14% of new U.S. COVID-19 cases are recorded in Texas," Texas Star Tribune (July 8, 2020), <u>available at</u> <u>https://www.texastribune.org/2020/07/08/texas-coronavirus-cases-us/</u>.

case agent, who is based in Miami, Florida, requested the assistance of Special Agent Paul Zukas of the Federal Bureau of Investigation ("FBI") and Special Agent Matthew Wood of the U.S. Department of Homeland Security, Homeland Security Investigations ("HSI"), both of whom are based in Houston, Texas, to conduct a voluntary interview of Aguilar.  Neither Special Agent Zukas nor Special Agent Wood had previously participated in the Aguilar investigation.

On July 10, 2020, at approximately 8:00 a.m., Aguilar arrived at IAH.  As he proceeded through immigration and customs, U.S. Customs and Border Protection ("CBP") questioned Aguilar and searched his luggage.  Neither Special Agent Zukas nor Special Agent Wood participated in CBP's border questioning or luggage search.

After Aguilar cleared immigration and customs, he walked unaccompanied toward the exit of the secondary screening area.  Before Aguilar reached the exit, Special Agent Zukas approached Aguilar, showed Aguilar his credentials to identify himself and asked Aguilar if he would be willing to answer some questions on a voluntary basis.  Aguilar stated that he understood, was willing to answer any questions, and agreed to accompany Special Agent Zukas to a nearby room for questioning.  Around that time, Special Agent Wood joined them and introduced himself to Aguilar.

The room where the agents interviewed Aguilar functions as a common area adjacent to the CBP secondary screening area.  This room was larger than other available rooms and had multiple desks and exits.

Inside the room, the agents invited Aguilar to sit at the desk closest to the door and on the side of the desk closest to the door.  Nothing stood between Aguilar and the door, which remained open throughout the interview.  Special Agents Zukas and Wood sat together on the

3

opposite side of the desk, further away from the door. Although CBP employees, including uniformed officers, may have walked in front of the door, the door was never, as the defendant claims, "blocked by armed CBP officers." Aguilar Memorandum of Law ("Def. Mem.," ECF Dkt. No. 66-1) at 3. Aguilar was never handcuffed or otherwise physically restrained; nor were there any handcuffs attaching his chair to the desk.[3] Aguilar was never told he was under arrest and was not provided with <u>Miranda</u> warnings. Although both agents were carrying concealed firearms underneath their jackets, neither agent drew attention to their weapon at any point before, during or after the interview.

Prior to any questioning, the agents reminded Aguilar that he had already cleared customs and that he was free to leave at any time. Aguilar responded that he understood, was willing to answer any questions, and asked what the questioning would be about. The agents responded that they wanted to ask Aguilar questions about his work for Vitol. Aguilar appeared generally relaxed and comfortable speaking in English. Aguilar did not ask for an interpreter or express any difficulty in understanding the agents' questions.

Aguilar spoke with the agents for little over an hour about his work at Vitol and his dealings with certain individuals connected to Vitol's business in Ecuador, such as Consultant #1, Consultant #2 and Intermediary.[4] At several points during the interview, the agents asked Aguilar whether some portion of the commissions paid to Consultant #1 and Consultant #2, through Intermediary, were used to pay bribes to Ecuadorian officials. At first, Aguilar stated that he had

---

[3]       The chair was attached to the desk using metal hardware.

[4]       References to Consultant #1, Consultant #2 and Intermediary are to the same individuals referenced as such in the complaint (ECF Dkt. No. 1) and the indictment (ECF Dkt. No. 13).

no knowledge about any bribes being paid on behalf of Vitol.  Later, however, after being informed that it was a crime to lie to federal agents, Aguilar acknowledged that the payments to Intermediary were probably not part of a legitimate business deal, and that some portion of the money was "probably" going to officials at Petroecuador.  Aguilar further stated Consultant #1 and Consultant #2 told him that some of the money was going to people in government, but Aguilar stated that he could not know for sure if this was true because people in the industry lie all the time.

When asked about his own role in Vitol's payments to Intermediary, and Intermediary's payments to Consultant #1 and Consultant #2, Aguilar remained silent.  The interviewing agents again reminded Aguilar that it was a crime to lie to federal agents.  Aguilar continued speaking with the agents after this instruction, and thereafter reviewed with the agents a series of emails regarding payments from Vitol to Intermediary.  During the entirety of the questioning described above, Aguilar's only reference to a lawyer was a statement to the agents that other Vitol employees had lawyers.

At approximately 10:00 a.m., the agents' questioning shifted from the topic of Petroecuador-related bribery to payments to government officials in Mexico.  At this time, Aguilar told the agents that he wanted to help law enforcement as much as he could, but that he wanted to seek legal advice before continuing.  The agents immediately stopped their questioning and, after a short discussion on unrelated matters,[5] Special Agent Zukas gave Aguilar his contact information

---

[5]      After stating that he wanted to speak with an attorney, Aguilar volunteered additional information regarding meetings he had scheduled in Houston and his planned relocation to Mexico.  There was no further questioning regarding improper payments or Vitol's business in Ecuador or Mexico.

and suggested that Aguilar have his attorney contact him directly.  Aguilar then provided the agents his business card and left the room.

Later that day, a criminal complaint was filed in the Eastern District of New York charging Aguilar with one count of conspiracy to violate the Foreign Corrupt Practices Act ("FCPA"), in violation of 18 U.S.C. § 371, and a warrant issued for his arrest.  (ECF Dkt. No. 1). On July 15, 2020, Aguilar self-surrendered pursuant to the criminal complaint.  On September 22, 2020, a grand jury sitting in the Eastern District of New York returned a two-count indictment charging Aguilar with conspiracy to violate the FCPA, in violation of 18 U.S.C. § 371 and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).  (ECF Dkt. No. 13). The indictment alleges, among other things, that in or about and between March 2015 and July 10, 2020, Aguilar and others agreed to pay, and did pay, bribes to Ecuadorian officials to obtain an improper advantage for Vitol and others in obtaining and retaining business related to Petroecuador.

<u>ARGUMENT</u>

In his Motion, Aguilar claims that his statements were obtained in violation the Fifth Amendment, specifically, that: (1) his statements were the product of a custodial interrogation without the administration of <u>Miranda</u> warnings; and (2) law enforcement officers refused to honor his request to speak with an attorney.  Aguilar's claims should be denied.

Aguilar knowingly, intelligently and voluntarily consented to the interview.  The circumstances of the interview establish that a reasonable person in Aguilar's position would have felt free to terminate the interview and leave at any time.  Indeed, Aguilar did effectively terminate the interview and leave the airport as soon as he decided he no longer wished to participate.  As

such, the interview was not "custodial," and therefore it was not necessary for the agents to advise Aguilar of his rights under Miranda.  For the same reason, Aguilar also had no Fifth Amendment right to counsel.  Even assuming, arguendo, that Aguilar had a constitutional right to counsel, that right was scrupulously honored by the interviewing agents who terminated the interview once Aguilar expressed his desire to consult with an attorney.  Accordingly, and for the reasons set forth below, Aguilar's Motion to suppress should be denied.

I.    Aguilar Was Not Subjected to a "Custodial Interrogation" Requiring Miranda Warnings

  A.    Applicable Law

    It is well-established that, prior to any custodial interrogation, a defendant must be informed of his Fifth Amendment rights.  Miranda v. Arizona, 384 U.S. 436 (1966).  However, "Miranda's warning requirements apply only to 'custodial interrogation.'"  United States v. Newton, 369 F.3d 659, 669 (2d Cir. 2004).  In order for the warnings to be required, the Court must find both that: (1) there was an interrogation of the defendant; and (2) the interrogation was while the defendant was in "custody."  United States v. FNU LNU, 653 F.3d 144, 148 (2d Cir. 2011) (citing Cruz v. Miller, 255 F.3d 77, 80-81 (2d Cir. 2001)).  For Miranda purposes, "interrogation" includes express questioning of the suspect and its "functional equivalent . . . [i.e.,] words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (footnote omitted).[6]

---

  [6]    The government does not dispute that Aguilar was subject to "interrogation" for the purposes of Miranda.

To determine whether a suspect was in "custody" for the purposes of <u>Miranda</u>, the Court must apply a "two-step, objective test." <u>United States v. Santillan</u>, 902 F.3d 49, 60 (2d Cir. 2018). First, the Court must ask whether "a reasonable person in the defendant's position would have understood that he or she was free to leave." <u>Id</u>. If a reasonable person would have felt free to leave, "the <u>Miranda</u> inquiry is at an end; the challenged interrogation did not require advice of rights." <u>Newton</u>, 369 F.3d at 672. In other words, this so-called "freedom-of-movement test identifies . . . a necessary . . . condition for <u>Miranda</u> custody." <u>Maryland v. Shatzer</u>, 559 U.S. 98, 112 (2010); <u>Howes v. Fields</u>, 565 U.S. 499, 509 (2012).

Second, if the Court finds that a reasonable person would not have believed that he was free to leave, then the Court must also ask whether "there was a restraint of freedom of movement akin to that associated with a formal arrest." <u>Santillan</u>, 902 F.3d at 60. This inquiry necessarily involves consideration of several factors, including "whether the suspect is told that he or she is free to leave, the location and atmosphere of the interrogation, the language and tone used by the law enforcement officers, whether the subject is searched or frisked, and the length of the interrogation." <u>Id.</u>; <u>see also</u> <u>FNU LNU</u>, 653 F.3d at 153 (considering whether weapons were present and "especially whether they were drawn"). Thus, for example, "[a]n individual who understands that her detention is not likely to be temporary and brief and feels that she is completely at the mercy of police could reasonably deem her situation comparable to formal arrest." <u>United States v. Faux</u>, 828 F.3d 130, 135 (2d Cir. 2016) (quotation marks omitted).

Whether a person was in custody for <u>Miranda</u> purposes "is determined by neither the perception of the defendant nor of the police." <u>United States v. Galloway</u>, 316 F.3d 624, 629 (6th Cir. 2003). Rather, it is determined by the "objective perception of a reasonable man in the

defendant's shoes."  Id. (citing Stansbury v. California, 511 U.S. 318, 323 (1994)); FNU LNU, 653 F.3d at 153.  Notably, the reasonable person from whose perspective "custody" is defined is a reasonable innocent person.  Florida v. Bostick, 501 U.S. 429, 438 (1991); United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996).  The perception of the defendant himself is not determinative, since "a guilty person will always perceive his situation as coercive."  Galloway, 316 F.3d at 629; accord Bostick, 501 U.S. at 438.

B.      A Reasonable Person in Aguilar's Position Would Have Understood that
He Was Free to Leave

A reasonable person in Aguilar's position would have felt free to leave.  Aguilar was initially approached by Special Agent Zukas, who was alone at the time.  By then, Aguilar, a lawful permanent resident of the United States with an extensive history of international travel, had cleared immigration and customs inspection—i.e., he had been admitted into the United States—and his passport and luggage had been returned to him.  Special Agent Zukas told Aguilar that he would like to ask him some questions and explained to Aguilar that his participation would be entirely voluntary.  Aguilar agreed and followed Special Agent Zukas to a nearby room where he would be interviewed.  Around that time, Special Agent Wood also introduced himself to Aguilar and joined them in the room.

Prior to questioning, the agents again told Aguilar that he was free to leave and that he could stop the interview at any time.  The agents suggested that Aguilar sit in the chair closest to the open door through which he entered, and which led back to the area of the airport where he first met Special Agent Zukas.  He was never handcuffed or otherwise restrained; nor was he ever told that he was under arrest.

9

Aguilar's claim that "I believed that I was not free to leave and that they were going to arrest me," Aguilar Declaration ("Aguilar Decl.," ECF Dkt. No. 66-2) ¶ 21, is both legally irrelevant and belied by his own words and actions. Aguilar initially stated that he wanted to help law enforcement as much as he could and freely answered questions. It was only when he apparently became uncomfortable with the agents' questions that he requested the assistance of counsel, and the agents terminated the interview. At that point, he did not ask if he was free to leave, but instead handed the agents his business card and left the airport without issue. Aguilar thus demonstrated, as any reasonable person would have similarly understood, that he felt free to leave the interview at any point. Accordingly, the interview was not custodial.

Moreover, even if the Court were to credit Aguilar's self-serving claim that he "believed that [he] was not free to leave and that [the agents] were going to arrest" him, Aguilar Decl. ¶ 21, his subjective belief is irrelevant. "[W]hether a suspect is 'in custody' is an objective inquiry." J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011). "The test, in other words, involves no consideration of the actual mindset of the particular suspect subjected to police questioning." Id. at 271 (quotation marks omitted). No doubt, "any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the subject to be charged with a crime." Newton, 369 F.3d at 671 (quotation marks omitted).

Indeed, Aguilar's subjective feelings about the interview were rooted in the incriminating evidence of his participation in the schemes under investigation, and questioning about the same. See Aguilar Decl. ¶¶ 18-21 (describing photographs, documents and transcripts shown to Aguilar during the interview). As a result, it is not surprising that Aguilar viewed those

10

questions and that evidence negatively because they most likely revealed that law enforcement was aware of his participation in criminal conduct.  See id.  However, such circumstances do not trigger the requirement for Miranda warnings.  See Newton, 369 F.3d at 671 ("Miranda does not reach so broadly.").

For the foregoing reasons alone, Aguilar's Motion should be denied.  See id., at 672 (if a "reasonable person would have thought he was free to leave . . . the Miranda inquiry is at an end.").

C.      There Was No Restriction on Aguilar's Freedom of Movement
        Akin to Formal Arrest or Otherwise

Even assuming, arguendo, that a reasonable person in Aguilar's position would not have felt free to leave, Aguilar still would not have been in "custody" for purposes of Miranda because any restrictions on his freedom of movement were not "akin to th[ose] associated with a formal arrest."  Santillan, 902 F.3d at 60.

1.      Aguilar Was Told He Was Free Leave

As noted above, Aguilar had cleared customs and immigration, been given his passport and green card and was clearly told that he was free to leave—an option that he ultimately exercised.  See id. (observing "whether the suspect is told that he or she is free to leave" is a factor in determining whether restrictions on freedom of movement were akin to formal arrest).  Notably, Aguilar does not contest any of these facts.  He admits that, prior to the interview, his "border screening was complete and [CBP] returned my passport and green card," Aguilar Decl. ¶ 8.  Nor does Aguilar deny that he was told he was free to leave the interview.  Instead, he merely claims that he "do[es] not recall Agent Zukas or Agent Wood at any time telling me that the interrogation

11

was voluntary or that I could stop the questioning." Aguilar Decl. ¶ 31.[7]  Further, Aguilar asserts

that, "[e]ven if the agents, who were masked at all times, had uttered those words in passing," no

reasonable person would have believed that he was, in fact, free to leave, since the agents placed

him in "coercive conditions." Def. Mem. at 21-22 (citations omitted).  As demonstrated above,

Aguilar's claim is belied by the objective factual circumstances and by his own actions in

terminating the interview.

> 2.     The Location and Atmosphere of the Interview Conveyed that Aguilar
>        Was Not in Custody

Aguilar asserts that an international airport is an "inherently custodial setting,"

which, by itself, "triggered" the Miranda requirement. Def. Mem. at 2.  For the reasons set forth

below, Aguilar's assertion is both factually and legally wrong and should be rejected.

As an initial matter, Aguilar conflates his "international-reentry," Def. Mem. at 1,

with his voluntary interview.  Here, the two events were distinct from one another, which

completely undercuts any argument that the setting of the interview was custodial.  As he

acknowledges, Aguilar was questioned by the agents only after he had cleared immigration and

customs, had his travel documents returned to him and was free to leave the airport.  See Aguilar

Decl. ¶ 8 (prior to the interview, his "border screening was complete and [CBP] returned my

passport and green card.").

---

[7]     Aguilar's argument that his limited English proficiency vitiated his understanding of the voluntariness of his interview, see Aguilar Decl. ¶ 23, is belied by a number of factors including, but not limited to, the fact that he has lived and worked in the United States since 2012 and that he works for a United States-based subsidiary of a European company, whose working language is English.  Furthermore, Aguilar never asked for an interpreter, or indicated to the agents that he did not understand the agents, or that the agents were not understanding him, on account of any purported lack of English proficiency.

Moreover, the specific circumstances of Aguilar's interview show that it did not take place in a setting akin to the type of "police-dominated atmosphere" with which Miranda was concerned.  See FNU LNU, 653 F.3d at 154 (quoting Miranda, 384 U.S. at 457).  The interview took place in a room off of a large screening area, just steps away from an area of the airport that was open to other ticketed passengers.  Throughout his Motion, Aguilar repeatedly asserts that the room was "close quarters" and in a "small, confined" space, yet such claims are notably absent from his declaration.  See generally Aguilar Decl.  In fact, the room where Aguilar was interviewed was not even an interview room, but was a larger common area with at least two desks.

Even assuming that the interview conditions constituted a "coercive environment"—which they did not—the Supreme Court has "expressly refused to convert 'a noncustodial situation . . . to one in which Miranda applies simply because . . . in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.''"  Newton, 369 F.3d at 671 (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)) (per curiam) (involving questioning at a police station)); see also United States v. Knox, 839 F.2d 285, 293 (6th Cir. 1988) ("Following the dictates of the Supreme Court, we reject, as the sole criterion for the attachment of Miranda rights, reliance on the concept of an 'inherently coercive environment'" when analyzing nature of questioning at an airport security office); United States v. Wallraff, 705 F.2d 980, 991 (8th Cir. 1983) (holding, in a case involving questioning at an airport, "simply identifying the place where an interrogation occurs does not conclusively establish the presence or absence of custody").

The cases cited by Aguilar for the proposition that interviews in airports are inherently coercive are easily distinguishable from this case because, unlike Aguilar, the

13

defendants in those cases had not cleared customs and, thus, were not actually free to leave.[8]  These cases merely establish that a person undergoing a "compulsory" customs and immigration inspection at the border is generally <u>not</u> in <u>Miranda</u> custody so long as the questions remain routine. <u>FNU LNU</u>, 653 F.3d at 153-55.  Here, however, Aguilar was no longer subject to customs and immigration inspection and was completely free to leave.  If Aguilar's claims are credited, it would effectively mean that each and every investigatory interview of a suspect, if located in an international airport and on matters unrelated to re-entry, must be accompanied by <u>Miranda</u> warnings.  That result would be both inconsistent with the law and factually absurd.  The fact that an investigatory interview takes place at an international airport does not, by itself, establish custody for <u>Miranda</u> purposes.

The remainder of the purportedly "coercive conditions" Aguilar cites also do not establish that the interview took place under conditions "akin to . . . a formal arrest."  <u>Santillan</u>, 902 F.3d at 60.  The fact that Aguilar's chair was attached to his desk with metal hardware is

---

[8]     <u>See, e.g.</u>, <u>FNU LNU</u>, 653 F.3d at 146 (the defendant "was not free to leave"); <u>United States v. Silva</u>, 715 F.2d 43, 47 (2d Cir. 1983) ("there was a detention of appellant"); <u>United States v. Moody</u>, 649 F.2d 124, 126-27 (2d Cir. 1981) (defendant detained by customs for "a secondary search"); <u>United States v. Hassan</u>, No. 18-CR-603 (ARR), 2019 WL 5684367, at *1 (E.D.N.Y. Nov. 1, 2019) ("Hassan was not permitted to leave"); <u>United States v. Oladokun</u>, No. 15-CR-559 (BMC), 2016 WL 4033166, at *1 (E.D.N.Y. July 27, 2016) ("defendant was referred to secondary inspection"); <u>United States v. Soto</u>, No. 13-CR-76 (MKB), 2014 WL 3695990, at *1 (E.D.N.Y. July 24, 2014) ("Soto was not free to leave"); <u>United States v. Djibo</u>, 151 F. Supp. 3d 297, 306 (E.D.N.Y. 2015) ("Djibo was not free to leave"); <u>United States v. Cohen</u>, 372 F. Supp. 2d 340, 350 (E.D.N.Y. 2005) (passenger removed from flight "was, in fact, not free to go"); <u>United States v. Molina-Gomez</u>, 781 F.3d 13, 22 (1st Cir. 2015) (defendant "was held" for secondary inspection); <u>United States v. Kiam</u>, 432 F.3d 524, 529-30 (3d Cir. 2006) (defendant was "removed from a plane" and taken to secondary inspection); <u>Galloway</u>, 316 F.3d at 630 (defendant was "not free to leave"); <u>United States v. Gupta</u>, 183 F.3d 615, 617 (7th Cir. 1999) (defendant was "certainly was not free to leave"); <u>Moya</u>, 74 F.3d at 1118 (defendant "was referred to the 'secondary' area at Customs").

irrelevant. Aguilar himself was never restrained or even threatened with restraint.[9] Moreover, the fact that the agents were armed or that there were allegedly other armed agents in the vicinity also did not make Aguilar's interview custodial. As noted above, the agents' weapons were concealed beneath their suit jackets and were never drawn. CBP officers were not "stationed" outside the door as he claims. At most, CBP officers may have walked by the open door in connection with their regular job duties that were unrelated to Aguilar's interview.

Finally, Aguilar's claim that the agents deliberately chose the location of the interview to "piggyback" off the coercive customs reentry process, Def. Mem. at 12, 15, is both factually incorrect and irrelevant. "[C]ustody depends on the objective circumstances of the interrogation, not on the subjective views harbored by . . . the interrogating officers." Stansbury, 511 U.S. at 323. Federal agents routinely conduct interviews at airports for various pragmatic reasons including, but not limited to, safety, convenience and, as here, the mitigation of their potential exposure to COVID-19, which was spreading rapidly throughout Texas—more so than anywhere else in the United States at that time. Indeed, conducting the interview at an international airport both limited the number of people in the immediate area and gave some assurance that Aguilar was not exhibiting symptoms of COVID-19. Most importantly, the agents chose a larger room beyond where Aguilar had cleared customs, with an open door and offered Aguilar the seat closest to the open door. This signifies that the agents chose a location at the airport that was unlikely to appear custodial.

---

[9]       Despite his claim to the contrary, see Aguilar Decl. ¶ 13 (describing handcuffs attached to his chair), as noted above, Aguilar's chair was not handcuffed to the desk where he was interviewed. Moreover, even if Aguilar himself had been handcuffed—which he was not—it still would not be determinative of whether his interview was custodial. United States v. Palase, No. 11-CR-413 (SLT), 2014 WL 6802560, at *8 (E.D.N.Y. Dec. 2, 2014) (collecting examples of suspects who were in handcuffs but held not to be in Miranda custody).

3.     The Remaining Circumstances of the Interview Did Not Convey that
Aguilar's Movement Was Restricted in a Manner Akin to that Associated
With Formal Arrest

Contrary to Aguilar's assertion, the language and tone of the interviewing agents, which did not include a pat down or frisk of Aguilar, and the reasonable length of the interview all strongly support the conclusion that Aguilar's freedom of movement was not restricted even remotely to a degree "associated with a formal arrest." Santillan, 902 F.3d at 60.

First, the interviewing agents' demeanor throughout the duration of interview was professional and courteous. Although the agents warned Aguilar that lying to them was a crime, which was true, such warnings do not transform a voluntary interview into a custodial one, even if given sternly enough to convey the weight of the message. The government disputes Aguilar's claim that "the agents became visibly angry and shouted at [him]." Aguilar Decl. ¶ 25.

Second, it is undisputed that the interviewing agents did not search, pat down, or frisk Aguilar at any point. Indeed, there was virtually no physical contact between Aguilar and the interviewing agents—a factor that undoubtedly weighs against a finding of custody. See United States v. Infante, 701 F.3d 386, 398 (1st Cir. 2012) (considering lack of physical contact as relevant factor supporting no-custody finding); United States v. Parker, 116 F. Supp. 3d 159, 172 (W.D.N.Y. 2015) (same).

Third, the interviewing agents spoke with Aguilar for only approximately one hour before he terminated the interview, which is wholly inconsistent with a finding that Aguilar was "completely at the mercy of police." Faux, 828 F.3d at 135; see also FNU LNU, 653 F.3d at 154-55 (questioning a defendant for 90 minutes in a private room at the airport, out of public view, taking fingerprints, with armed guards escorting the defendant and remaining in the vicinity, did

16

not render the defendant in custody); Fields, 565 U.S. at 515-17 (questioning of incarcerated defendant between five and seven hours not in custody within the meaning of Miranda).

Taken together, the fact that Aguilar was clearly told that the interview was voluntary and that he was free to leave, that he was interviewed only after clearing customs inspection, that during the interview he was sitting closest to the door, that the door remained open for the duration of the interview, that Aguilar's path to the exit was wholly unobstructed, that the interviewing agents were polite, respectful and professional, that Aguilar was not handcuffed or patted down, that the agents did not draw, or draw attention to, their weapons, that the interview lasted approximately one hour and that Aguilar freely left the interview when the topic of questions changed, all demonstrate that there was no restraint on Aguilar's freedom of movement akin to that associated with a formal arrest such that Miranda warnings were required.

II. **Although Aguilar Had No Fifth Amendment Right to Counsel, the Interviewing Agents Scrupulously Honored Aguilar's Request to Consult with an Attorney**

The Court should also reject the defendant's argument that his statements should be suppressed because his requests for counsel were ignored. Because the interview was not custodial, Aguilar had no constitutional right to counsel. Even assuming, arguendo, that the interview was custodial, Special Agents Zukas and Wood honored his first and only request to consult with an attorney and ended their questioning.

A. **Applicable Law**

The Fifth Amendment right to counsel "relates only to custodial interrogation." McNeil v. Wisconsin, 501 U.S. 171, 178 (1991). If, at any point during a custodial interrogation, a defendant indicates that he wishes to consult an attorney before continuing to speak, law enforcement officers must immediately cease questioning. Miranda, 384 U.S. at 445.

17

However, not every bare "reference" to an attorney constitutes a valid invocation of the <u>Miranda</u> right to counsel.  <u>Davis v. United States</u>, 512 U.S. 452, 459 (1994).  Rather, "[i]nvocation of the <u>Miranda</u> right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney."  <u>Id.</u>  Therefore, "[t]he request for counsel as phrased must be reasonably construable as a desire for the present assistance of counsel in dealing with questioning in the circumstances in which the request is made." <u>United States v. Pinto-Thomaz</u>, 357 F. Supp. 3d 324, 339 (S.D.N.Y. 2019) (citing <u>Davis</u>, 512 U.S. at 459).  In other words, "the suspect must unambiguously request counsel," <u>id.</u>, in connection with his "present interactions with police." <u>Pinto-Thomaz</u>, 357 F. Supp. at 339 (citing <u>Davis</u>, 512 U.S. at 459).  "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect <u>might</u> be invoking the right to counsel, our precedents do not require the cessation of questioning," and the interrogation may continue.  <u>Davis</u>, 512 U.S. at 459 (emphasis in original).

B.     <u>Discussion</u>

As explained above, because Aguilar was not subject to custodial interrogation, he did not have a Fifth Amendment right to counsel.  Because the defendant's statement was not taken "while he was in custody, [the Court] need not determine whether he requested counsel, because he had no such right." <u>United States v. Wainwright</u>, No. 10-CR-215 (RJA) (JJM), 2012 WL 6935654, at *1 (W.D.N.Y. Dec. 10, 2012), <u>report and recommendation adopted</u>, 2013 WL 310414 (W.D.N.Y. Jan. 25, 2013).

Nonetheless, the interviewing agents scrupulously honored Aguilar's request to speak with counsel.  Despite Aguilar's claims to the contrary, <u>see</u> Aguilar Decl. ¶ 24 ("Near the

18

beginning of the agents' questioning, I told them that I believe I needed a lawyer."), Aguilar did not ask to speak with an attorney until the agents began to question him about potential bribe payments in Mexico, approximately one hour into the interview.  At that time, the interviewing agents immediately ceased questioning and, shortly thereafter, Aguilar departed IAH.

The government expects that Special Agents Zukas and Wood would both testify that Aguilar did not request counsel, even ambiguously, before that time.  At most, before stating that he wanted to consult with an attorney, Aguilar mentioned to the interviewing agents that he knew other Vitol employees have lawyers, but that he did not have anything to do with that.

Because Aguilar had no Fifth Amendment right to counsel during his July 2020 voluntary interview with law enforcement agents, this claim must be rejected.  Even assuming, arguendo, that he did have such a right, it was honored by the interviewing agents, which provides an independent basis for the Court to reject this claim.

III.    The Court Can Deny the Motion Without a Hearing

Though Aguilar has requested a hearing on the motion, a hearing is not required because Aguilar has failed to show that he would be entitled to suppression even if the Court credited the facts in his declaration.  United States v. Watson, 404 F.3d 163, 167 (2d Cir. 2005).  As noted above, in his declaration, Aguilar seemingly does not dispute that the agents informed Aguilar that the interview was voluntary and that, having cleared immigration and customs, Aguilar was free to leave at any time.  Cf. Aguilar Decl. ¶ 31 (stating only that Aguilar "does not recall" being told interview was voluntary).  Further, Aguilar does not claim that he was ever physically restrained, that he was told he was under arrest, or that the agents drew their weapons. Accordingly, the Court may deny Aguilar's Motion without a hearing.

19

CONCLUSION

For the reasons set forth above, the Court should deny the defendant's Motion in

its entirety.

Dated:      Brooklyn, New York
            November 8, 2021


                              Respectfully submitted,

                              BREON PEACE
                              UNITED STATES ATTORNEY
                              Eastern District of New York

                    By:       _____/s/_____
                              Jonathan P. Lax
                              Assistant United States Attorney


                              JOSEPH S. BEEMSTERBOER
                              Acting Chief, Fraud Section
                              Criminal Division, U.S. Dept. of Justice

                    By:       _____/s/_____
                              Derek J. Ettinger
                              Jonathan P. Robell
                              Assistant Chiefs
                              Clayton P. Solomon
                              Trial Attorney


                              DEBORAH L. CONNOR
                              Chief, Money Laundering and Asset Recovery
                                Section
                              Criminal Division, U.S. Dept. of Justice

                    By:       _____/s/_____
                              Adam Schwartz
                              Deputy Chief, International Unit
                              D. Hunter Smith
                              Trial Attorney, International Unit