DCP:JPL
F. #2019R01460

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                                     Docket No. 20-CR-390 (ENV)

JAVIER AGUILAR,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GOVERNMENT'S POST-HEARING
MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

                                                      BREON PEACE
                                                      UNITED STATES ATTORNEY
                                                      Eastern District of New York
                                                      271 Cadman Plaza East
                                                      Brooklyn, NY 11201

Jonathan P. Lax
Assistant United States Attorney
      (Of Counsel)

Derek J. Ettinger
Jonathan P. Robell
Assistant Chiefs, Fraud Section
Clayton P. Solomon
Trial Attorney, Fraud Section
      (Of Counsel)

Adam Schwartz
Deputy Chief, Money Laundering and Asset Recovery Section
D. Hunter Smith
Trial Attorney, Money Laundering and Asset Recovery Section
      (Of Counsel)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 1

ARGUMENT ....................................................................................................................... 6

I.   Aguilar Was Not Subjected to a "Custodial Interrogation" Requiring Miranda Warnings...... 6

    A.  Applicable Law ................................................................................................ 6

    B.  Discussion ......................................................................................................... 8

II.  The Interviewing Agents Immediately Honored Aguilar's Request to Consult with an Attorney ............................................................................................................... 11

    A.  Applicable Law ................................................................................................ 11

    B.  Discussion ......................................................................................................... 12

CONCLUSION .................................................................................................................... 14

## TABLE OF AUTHORITIES

Davis v. United States,
    512 U.S. 452 (1994) ............................................................................................. 11

Florida v. Bostick,
    501 U.S. 429 (1991) ............................................................................................ 7, 8

Howes v. Fields,
    565 U.S. 499 (2012) ......................................................................................... 10, 11

McNeil v. Wisconsin,
    501 U.S. 171 (1991) ............................................................................................. 11

Miranda v. Arizona,
    384 U.S. 436 (1966) ......................................................................................... *passim*

Oregon v. Mathiason,
    429 U.S. 492 (1977) ............................................................................................. 10

Tankleff v. Senkowski,
    135 F.3d 235 (2d Cir. 1998) ................................................................................... 9

United States v. Annuci,
    2007 WL 1310156 (S.D.N.Y. May 3, 2007) ....................................................... 11

United States v. Choudhry,
    24 F. Supp. 3d 273 (E.D.N.Y. 2014) .................................................................... 11

United States v. Colon,
    835 F.2d 27 (2d. Cir. 1987) .................................................................................. 11

United States v. Efthimiatos,
    799 F. App'x 75 (2d Cir. 2020) ............................................................................. 7

United States v. FNU LNU,
    653 F.3d 144 (2d Cir. 2011) ................................................................. 6, 7, 10, 11

United States v. Medina,
    19 F. Supp. 3d 518 (S.D.N.Y. 2014) ...................................................................... 9

United States v. Montana,
    958 F.2d 516 (2d Cir. 1992) ................................................................................ 11

United States v. Newton,
    369 F.3d 659 (2004) ..................................................................................... 7, 9, 10

United States v. Palase,
    2014 WL 6802560 (E.D.N.Y. Dec. 2, 2014) ......................................................... 9

United States v. Pinto-Thomaz,
    357 F. Supp. 3d 324 (S.D.N.Y. 2019) .......................................................................... 11, 13

United States v. Santillan,
    902 F.3d 49 (2d Cir. 2018) ............................................................................................ 6, 7, 9

United States v. Saab,
    2021 WL 5868157 (S.D.N.Y. Dec. 10, 2021) ................................................................... 7

United States v. Thompson,
    2010 WL 3069668 (S.D.N.Y. July 29, 2010) ................................................................... 9

United States v. Tunstall,
    2021 WL 2666991 (E.D.N.Y. June 10, 2021),
    report and recommendation adopted, 2021 WL 2661162 (E.D.N.Y. June 29, 2021) ........ 9

United States v. Wallraff,
    705 F.2d 980 (8th Cir. 1983) ........................................................................................... 10

United States v. Wainwright,
    2012 WL 6935654 (W.D.N.Y. Dec. 10, 2012),
    report and recommendation adopted, 2013 WL 310414 (W.D.N.Y. Jan. 25, 2013) ........ 12

PRELIMINARY STATEMENT

On March 1 and March 2, 2022, the Court held an evidentiary hearing on the defendant's Javier Aguilar's motion to suppress statements that he voluntarily made to law enforcement officers on July 10, 2020 at George Bush Intercontinental Airport ("IAH") in Houston, Texas (DE 66).[1] At the hearing, both of the interviewing agents, Federal Bureau of Investigation ("FBI") Special Agent Paul Zukas and U.S. Department of Homeland Security, Homeland Security Investigations ("HSI") Special Agent Matthew Wood, testified and were cross-examined for several hours.

The facts established at the hearing make clear that Aguilar was not in custody for purposes of Miranda v. Arizona, 384 U.S. 436 (1966), or otherwise, and that a reasonable person in Aguilar's position would have felt free to leave. The interviewing agents repeatedly told Aguilar that the interview was voluntary. They conducted the interview in a large room with an open door after border officials told Aguilar that the customs and immigration process was complete and had returned his passport and luggage to him. When Aguilar told the agents he did not want to answer any more of their questions without the assistance of counsel, he simply said so and left the room, and the airport, without incident. For the reasons set forth herein and for the reasons previously set forth in the government's initial opposition (DE 73), Aguilar's motion should be denied.

STATEMENT OF FACTS

Aguilar is charged in a two-count indictment with conspiracy to violate the Foreign Corrupt Practices Act, in violation of Title 18, United States Code, Section 371, and money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h). (DE 13).

---

[1] Parenthetical references to "DE" refer to entries on the Court's docket; references to "Tr.," "GX" and "DX" refer to the transcript, government exhibits and defense exhibits from the hearing, respectively.

The charges stem from Aguilar's alleged role in a scheme to bribe foreign officials to obtain improper advantages for his then-employer, Vitol, Inc. ("Vitol") and others, in obtaining and retaining business related to Ecuador's state-owned and state-controlled oil company, Empresa Publica de Hidrocarburos del Ecuador ("Petroecuador"). (DE 1).

Aguilar is a Mexican citizen and lawful permanent resident of the United States. (DE 66-2 ¶ 1). He has resided in Houston, Texas, since approximately 2012 (id. ¶ 3; Tr. 29:16-20; DX-D at 3), where he has worked for Vitol and, among other things, run Vitol's liquefied petroleum gas program for the Latin America region. (Tr. 29:12-20; DX-D at 3).

In mid-2020, federal agents sought to interview Aguilar concerning, among other things, his employment at Vitol and his dealings with Ecuadorian and Mexican government officials. (Tr. 9:3-19, 10:1-17). Due to COVID-19-related travel restrictions at the time, the Miami-based FBI case agent was unable to travel to Houston to conduct the interview. (Tr. 10:18-11:9, 47:21-49:5, 232:16-25). As a result, approximately one month before the interview, the case agent sought the assistance of Special Agents Paul Zukas and Matthew Wood. (Tr. 9:6-14, 11:2-9, 232:8-233:7). Neither Special Agent Zukas nor Special Agent Wood had any prior involvement in the Aguilar investigation. (Tr. 11:10-17, 231:17-232:9).

On July 10, 2020, at approximately 8:00 a.m., Aguilar arrived at IAH from Mexico City, Mexico. (Tr. 9:3-25; DE 66-2 ¶ 3). After deplaning and clearing the primary immigration screening by the U.S. Department of Homeland Security, Customs and Border Protection ("CBP"), which all international passengers must go through, Aguilar was referred for a secondary customs inspection with CBP. (Tr. 238:15-239:20). During secondary inspection, CBP personnel screened Aguilar's bags. (Tr. 15:22-16:2, 239:16-23; DX-O at 3). When the inspection was complete, CBP

2

personnel told Aguilar that his border screening was complete and returned his passport and legal permanent resident card. (DE 66-2 ¶ 8; Tr. 240:18-241:5).

Neither Special Agent Zukas nor Special Agent Wood participated in either the primary immigration or secondary customs screenings. (Tr. 16:3-7, 239:3-25). Special Agent Zukas observed the secondary screening from approximately 15 to 20 feet away (Tr. 16:8-11); Special Agent Wood was in the restroom during the secondary screening. (Tr. 16:12-20, 241:9-13). Special Agents Zukas and Wood were both dressed in plainclothes (Tr. 12:24-13:1, 242:11-19), and their firearms were concealed beneath their suit or sport coat. (Tr. 13:20-14:21, 243:2-19). Special Agent Zukas also had handcuffs, which were concealed beneath his suit coat. (Tr. 14:6-16, 244:9-13). Special Agent Wood did not have handcuffs with him that day. (Tr. 244:5-8).

After CBP told Aguilar that his border screening was complete and returned his travel documents, Aguilar walked towards the exit of the customs area to leave the airport. (Id. ¶ 10; Tr. 16:12-15). Before Aguilar reached the exit, Special Agent Zukas approached Aguilar, identified himself and asked whether Aguilar would agree to be interviewed. (Tr. 16:12-17:10). Special Agent Zukas explained to Aguilar that the interview was voluntary and that he did not have to participate if he did not want to. (Tr. 17:4-10). Aguilar agreed to the interview and accompanied Special Agent Zukas through a doorway into an adjacent room. (Tr. 17:11-18:6). Around the same time, Special Agent Wood returned from the bathroom and joined Aguilar and Special Agent Zukas in the room. (Tr. 17:20-18:6, 241:12-16).

The room where Aguilar's interview took place was large and contained, among other things, a table and chairs. (GX-1C; GX-1D; GX-1E). Special Agent Wood chose this room because it was the largest room available. (Tr. 236:15-21). Aguilar sat in a chair on the side of

3

the table closest to the door through which he entered. (Tr. 21:8-15, 22:15-25, 245:23-246:3; GX-1C). Special Agents Zukas and Wood sat on the opposite side of the table, further from the door and against the wall. (Tr. 23:3-9, 246:4-5; GX-1C). Special Agents Zukas and Wood offered Aguilar the chair closest to the door so that he would have a clear view of the doorway. (Tr. 246:6-14).[2] Special Agents Zukas and Wood also left the door open during the interview so that Aguilar would feel free to leave. (Tr. 23:15-24:1, 247:1-14; GX-1E). Indeed, Aguilar had a direct and unobstructed path to the open door throughout the duration of the interview. (Tr. 23:10-16, 247:15-22; GX-1C, GX-1D, GX-1E). Although CBP personnel may have at times passed by the doorway or been visible in the adjacent room where they worked (Tr. 335:5-336:8), no one else entered the room, stood guard outside the door or otherwise blocked Aguilar's path to the exit. (Tr. 36:3-11, 247:15-22, 256:9-18).

Before the interview began, Special Agent Wood informed Aguilar again that he had cleared immigration and customs, that the interview was voluntary and that he was free to leave at any time. (Tr. 26:17-21, 211:5-212:1, 251:24-252:10, 350:1-10; DX-D at 1). The agents did not provide Aguilar with Miranda warnings because he was not under arrest or otherwise being detained. (Tr. 27:5-11, 342:12-17). In fact, the agents took various measures to make clear to Aguilar that he was free to leave at any time. (Tr. 23:10-24:1, 26:17-21, 246:6-14, 247:7-14, 251:24-252:10).

The interview lasted between 60 and 90 minutes (Tr. 25:10-13, 255:7-9), and was conducted in English. (Tr. 27:23-24, 251:8-9). Aguilar, who had completed a PhD in London and

---

[2] Although Aguilar's chair was permanently secured to the table by chain, as noted herein, Aguilar was not restrained in any way during the interview. (Tr. 37:19-20, 249:19-250:14, 257:16-17; GX-1A).

4

had lived and worked in the United States and United Kingdom for well over a decade (Tr. 28:21-29:20; DX-D at 3), never indicated that he was uncomfortable proceeding in English or requested the assistance of an interpreter. (Tr. 27:25-28:15, 251:12-23).

During the interview, the agents asked Aguilar about, among other things, his work for Vitol and bribes paid on behalf of Vitol in connection with Petroecuador. (Tr. 29:21-30:6; DX-D). The agents showed Aguilar certain documents, including emails and photographs, related to the government's investigation. (Tr. 71:9-16, 253:17-18; DX D). At times, such as when Aguilar told the agents that he could not be certain whether any money changed hands or went to public officials in Ecuador, Special Agents Zukas and Wood stressed the importance of telling the truth and advised Aguilar that it was a crime to lie to federal agents. (Tr. 30:13-31:10, 253:23-254:2; DX-D at 4-5).

At one point during the interview, while being questioned about topics relating to Ecuador, Aguilar stated that some of his colleagues at Vitol had retained lawyers. (Tr. 253:4-8; DX-D at 1; DX-F at 1). Aguilar told the agents, however, that he did not have a lawyer and did not otherwise indicate that he wanted to seek the advice of counsel before answering any additional questions. (Tr. 30:7-12, 33:14-34:5, 253:1-12; DX-D at 1; DX-F at 1). He also did not seek to terminate the interview at that time. (Tr. 34:7-9).

At approximately 10:00 a.m., the agents began to ask Aguilar questions about Mexico. (Tr. 31:11-18; DX-D at 5). At that time, Aguilar told Special Agents Zukas and Wood, for the first time, that he did not want to answer any further questions without the assistance of an attorney. (Tr. 31:19-23, 34:8-11, 255:10-15; DX-D at 5; DX-F at 18). In response, Special Agents Zukas and Wood terminated the interview. (Tr. 31:20-33:5, 255:10-19; DX-D at 5). Special Agent

5

Zukas specifically memorialized the time that Aguilar had invoked his right to counsel in his notes. (DX-F at 18).

Subsequent to invoking his right to counsel, and without questioning by Special Agents Zukas and Wood, Aguilar nonetheless volunteered a limited amount of additional information about his company and asked the agents some questions about logistical matters; he also provided the agents with his business card. (Tr. 33:3-13, 34:12-35:19, 152:17-153:7, 156:15-158:2, 214:11-215:2, 255:16-23, 340:8-341:10; DX-D at 5-6; DX-F at 18-19). Then, with his luggage and passport already in his possession, Aguilar left the room and exited the airport without incident. (Tr. 35:7-19, 255:24-256:3).

During their entire interaction with Aguilar, Special Agents Zukas and Wood did not remove their jackets, draw attention to their firearms, display handcuffs, or yell or shout. (Tr. 36:12-22, 243:18-244:13, 254:15-17). The agents did not pat down, frisk or physically search or restrain Aguilar in any way. (Tr. 17:16-17, 37:19-20, 241:24-242:8, 257:16-19). They did not tell Aguilar that he could not leave, that he was under arrest, or that he had committed or been charged with a crime. (Tr. 37:3-16, 254:20-255:1, 257:5-15). In fact, as he was repeatedly informed, Aguilar was free to terminate the interview and leave the airport at any time. (Tr. 36:23-37:2, 251:24-252:3, 257:8-9).

## ARGUMENT

I. AGUILAR WAS NOT SUBJECTED TO A "CUSTODIAL INTERROGATION" REQUIRING MIRANDA WARNINGS

   A. Applicable Law

Miranda warnings are required only when a defendant is questioned while in "custody." United States v. FNU LNU, 653 F.3d 144, 148 (2d Cir. 2011). To determine whether a defendant was in custody, courts apply a "two-step, objective test." United States v. Santillan,

6

902 F.3d 49, 60 (2d Cir. 2018); United States v. Efthimiatos, 799 F. App'x 75, 76 (2d Cir. 2020). First, the Court must ask whether "a reasonable person in the defendant's position would have understood that he or she was free to leave." Santillan, 902 F.3d at 60. Second, if the Court finds that a reasonable person would not have believed that he was free to leave, the Court must also ask whether the "restraint of freedom of movement [was] akin to that associated with a formal arrest." Id. "Only if a court finds that both the first and second steps are satisfied is 'the person in custody for practical purposes, and entitled to the full panoply of protections prescribed by Miranda.'" United States v. Saab, 2021 WL 5868157, at *8 (S.D.N.Y. Dec. 10, 2021) (quoting United States v. Newton, 369 F.3d 659, 672 (2004)).

Whether a defendant was in custody is an objective inquiry into "how a reasonable person in the suspect's position would view the situation." FNU LNU, 653 F.3d at 151 (emphasis in original); see also Newton, 369 F.3d at 672 ("[Second Circuit precedent] does not require officers to administer Miranda warnings based on a self-assessment of their actions as 'coercive'; rather, it instructs them to administer warnings whenever they place a person under formal arrest or apply restraints generally understood as comparable to those of a formal arrest."). This inquiry necessarily involves "considering the circumstances surrounding the encounter with authorities," including:

> the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; [and] whether officers told the suspect he was free to leave or under suspicion . . .

FNU LNU, 653 F.3d at 153. Notably, the reasonable person from whose perspective "custody" is defined is a reasonable innocent person. Florida v. Bostick, 501 U.S. 429, 437-38 (1991). Whether

7

a defendant knows he is guilty and believes incriminating evidence will soon be discovered is irrelevant. Id.

B.   Discussion

Miranda warnings were not required here because neither portion of the two-step test was met. A reasonable person in Aguilar's position would have felt free to leave and there was no restraint of Aguilar's freedom of movement akin to that associated with a formal arrest.

First, Aguilar voluntarily agreed to the interview and was told multiple times that he was free to leave. Immediately after Special Agent Zukas first introduced and identified himself to Aguilar, he asked Aguilar whether he would agree to an interview, and specifically told Aguilar that the interview was voluntary and that Aguilar did not have to agree to be interviewed. (Tr. 16:21-17:10). After Aguilar consented to the interview and Special Agent Wood joined them, and prior to any questioning, Special Agent Wood told Aguilar—again—that he had cleared immigration and customs, that the interview was voluntary and that he was free to leave at any time. (Tr. 26:17-21, 211:5-212:1, 251:24-252:10, 350:1-10; DX-D at 1). In fact, Aguilar concedes in his affidavit that, before he was even approached by Special Agent Zukas, CBP "told [him] that the border screening was complete and returned [his] passport and green card." (DE 66-2 ¶ 8).

Notably, Special Agent Zukas's and Special Agent Wood's testimony on this subject is undisputed. Aguilar does not deny that he was told he was free to leave the interview. Instead, he merely claims in his affidavit that he "do[es] not recall Agent Zukas or Agent Wood at any time telling me that the interrogation was voluntary or that I could stop the questioning." (DE 66-2 ¶ 31).[3] At all times during the interview, Aguilar, who had already retrieved his luggage and

---

[3]    Aguilar did not testify at the hearing. To the extent the Court considers the facts set forth in Aguilar's affidavit – which are themselves insufficient to show custody for the purposes of Miranda – the government submits that they should be not be credited over the testimony of

8

travel documents, was free to terminate the interview and leave the airport without any further checkpoint, obstruction or delay, and he was told as much multiple times. See Santillan, 902 F.3d at 60 (observing "whether the suspect is told that he or she is free to leave" is a factor in determining whether Miranda warnings are required); Newton, 369 F.3d at 676 (same); Tankleff v. Senkowski, 135 F.3d 235, 244 (2d Cir. 1998) (same); see also United States v. Palase, 2014 WL 6802560, at *9-10 (E.D.N.Y. Dec. 2, 2014) (denying motion to suppress statements made to agents during the execution of a search warrant where defendants were told they were not under arrest and understood detention would likely be temporary and brief, even after they had been temporarily handcuffed).

        Second, the location and atmosphere of the interview would have clearly conveyed to a reasonable person in Aguilar's position that he was free to leave. Aguilar was interviewed in a large room with a view of, and clear path to, the door that he initially entered, and that door remained open throughout the duration of the interview. (Tr. 23:10-24:1, 236:15-21, 247:1-22; GX-1C; GX-1D; GX-1E). Aguilar sat in the chair on the side of the table closest to the door. (Tr. 21:8-15, 22:15-25, 245:23-246:3; GX-1C). Though Aguilar's chair was permanently secured to the table by a chain (Tr. 249:19-250:14; GX-1A), Aguilar was never physically restrained or threatened with restraint, arrest, or in any other way. (Tr. 37:19-23, 242:7-10, 254:23-255:1,

---

Special Agents Zukas and Wood, which was consistent in all material respects. See United States v. Tunstall, 2021 WL 2666991, at *15 (E.D.N.Y. June 10, 2021), report and recommendation adopted, 2021 WL 2661162 (E.D.N.Y. June 29, 2021) (declining to credit defendant's hearsay affidavit over federal agents' "'credible, detailed and live testimony,' . . . which was subject to cross examination"); see also United States v. Medina, 19 F. Supp. 3d 518, 535 n.13 (S.D.N.Y. 2014) ("As a general matter, credible testimony at a hearing is entitled to more weight than an affidavit, because testimony has been subjected to cross-examination.") (collecting cases); United States v. Thompson, 2010 WL 3069668 at *5 (S.D.N.Y. July 29, 2010) ("though [a] defendant's decision not to testify may itself not be held against him, his hearsay assertions in his affidavit are not entitled to any weight unless received in evidence and, even then, may not be worth much.").

257:16-17). There were no handcuffs visible anywhere in the room (Tr. 36:19-20, 244:9-13, 257:3-4); one of the agents did not even bring handcuffs with him that day. (Tr. 244:5-8). The agents' firearms were concealed beneath their coats, and they never removed their coats or drew attention to their weapons. (Tr. 36:12-18, 243:4-24). Further, the tone of the agents' questioning was professional; they did not yell or shout. (Tr. 30:23-31:7, 36:21-22, 254:15-17).

The mere fact that the interview took place in an international airport does not, by itself, establish custody for Miranda purposes. See United States v. Wallraff, 705 F.2d 980, 991 (8th Cir. 1983) (holding, in a case involving questioning at an airport, "simply identifying the place where an interrogation occurs does not conclusively establish the presence or absence of custody"). Further, the Second Circuit has observed that even interviews conducted in the "coercive environment" of a police station are not necessarily custodial. See Newton, 369 F.3d at 671 (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)) (per curiam) (observing, in the context of police questioning a suspect inside a police station, that the Supreme Court has "expressly refused to convert 'a noncustodial situation . . . to one in which Miranda applies simply because . . . in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.'""). Taken together, the circumstances of Aguilar's interview clearly demonstrate that it did not take place in a setting akin to the type of "police dominated atmosphere" with which Miranda was concerned. See FNU LNU, 653 F.3d at 154 (quoting Miranda, 384 U.S. at 457).

Finally, even beyond the other circumstances demonstrating the interview was not custodial, the interviewing agents spoke with Aguilar for only between 60 to 90 minutes (Tr. 25:10-13, 255:7-9), a duration well within the range that courts have found Miranda warnings are not required. See, e.g., Howes v. Fields, 565 U.S. 499, 515-17 (2012) (finding that questioning of

10

incarcerated defendant between five and seven hours was not custodial within the meaning of Miranda under the circumstances); FNU LNU, 653 F.3d at 154-55 (questioning a defendant for 90 minutes in a private room at the airport, out of public view, taking fingerprints, with armed guards escorting the defendant and remaining in the vicinity, did not render the defendant in custody).

Given the totality of the circumstances of the interview as set forth herein and established at the hearing, a reasonable person in Aguilar's position would have felt free to leave and there was no restraint on Aguilar's freedom of movement akin to that associated with formal arrest. Therefore, Miranda warnings were not required.

II. THE INTERVIEWING AGENTS IMMEDIATELY HONORED AGUILAR'S REQUEST TO CONSULT WITH AN ATTORNEY

A. Applicable Law

The Fifth Amendment right to counsel "relates only to custodial interrogation." McNeil v. Wisconsin, 501 U.S. 171, 178 (1991). If, at any point during a custodial interrogation, a defendant indicates that he wishes to consult an attorney before continuing to speak, law enforcement officers must immediately cease questioning. Miranda, 384 U.S. at 445. However, not every bare reference to an attorney constitutes a valid invocation of the right to counsel. Davis v. United States, 512 U.S. 452, 459 (1994). Instead, the suspect must "unambiguously request counsel," id., in connection with his "present interactions with police." United States v. Pinto-Thomaz, 357 F. Supp. 3d 324, 339 (S.D.N.Y. 2019) (citing Davis, 512 U.S. at 459).

Additionally, where a defendant invokes his right to counsel but then voluntarily reinitiates communication with law enforcement authorities, his subsequent statements are admissible. See, e.g., United States v. Montana, 958 F.2d 516, 519 (2d Cir. 1992); United States v. Colon, 835 F.2d 27, 30-31 (2d. Cir. 1987); United States v. Choudhry, 24 F. Supp. 3d 273, 281 (E.D.N.Y. 2014); United States v. Annuci, 2007 WL 1310156, at *6-7 (S.D.N.Y. May 3, 2007).

11

B.  Discussion

Because the interview was not custodial, Aguilar had no constitutional right to counsel. See United States v. Wainwright, 2012 WL 6935654, at *1 (W.D.N.Y. Dec. 10, 2012), report and recommendation adopted, 2013 WL 310414 (W.D.N.Y. Jan. 25, 2013) (acknowledging that when a defendant's statement was not taken "while he was in custody, [the Court] need not determine whether he requested counsel, because he had no such right.").

Even assuming, arguendo, that the interview was custodial, the record shows that Special Agents Zukas and Wood honored Aguilar's request to consult with an attorney. The first and only time that Aguilar indicated to the interviewing agents that he wanted to consult with an attorney was when the topic of the questioning shifted from Aguilar's business in Ecuador to his dealings in Mexico. (Tr. 31:19-23, 34:8-11, 255:10-15; DX-D at 5; DX-F at 18). In response to Aguilar's statement, the agents terminated the interview. (Tr. 31:20-33:5, 255:10-19; DX-D at 5). The fact that the agents immediately recognized and honored Aguilar's invocation of counsel is corroborated by Special Agent Zukas' contemporaneous handwritten notes. (DX-F at 18; Tr. 209:21-210:10). Specifically, on page 18 of his handwritten notes, Special Agent Zukas wrote: "I do want to look for legal advice. [B]ut I will help you as much as I can." (DX-F at 18). He then drew a box around those words and beneath the box wrote: "Invoke @ 10:00am." (Id.). Special Agent Zukas also documented Aguilar's invocation of counsel in his final report. (DX-D at 5).

As for Aguilar's statements to the agents after his invocation, Special Agents Zukas and Wood both testified that those statements were made spontaneously and were unsolicited. (Tr. 153:24-153:7, 340:8-341:10). It was Aguilar who initiated the discussion and asked the agents questions about logistics and about what kind of lawyer he should hire. (Tr. 33:3-13, 34:8-23, 340:8-341:10). To the extent that the agents asked any additional questions to Aguilar at this time, it was in response to a statement or question from Aguilar. (Tr. 156:23-157:12).

12

The only other time during the interview that Aguilar even referenced attorneys was when he mentioned that other Vitol employees had lawyers. (Tr. 33:14-34:5, 253:3-9). At that time, Aguilar made clear that he did not have a lawyer (Tr. 33:17-34:2, 253:3-9), and he did not ask to speak with one or to stop the interview. (Tr. 34:3-7, 253:10-12). This interaction was also captured by Special Agent Zukas in his handwritten notes (DX-F at 1 ("a few guys in comp[any] that have lawyers & I don have a/t [anything] to do w/ that"), as well as in his final report. (DX-D at 1 ("there are guys in the company who have lawyers but [Aguilar] has nothing to do with that.")). Aguilar's general statements regarding attorneys that had been engaged by others was not an "unambiguous" request for counsel. See Pinto-Thomaz, 357 F. Supp. 3d at 339. In light of both agents' testimony and Special Agent Zukas's contemporaneous notes, Aguilar's claim that he asked for an attorney on multiple occasions—a claim made in a declaration, and not subject to cross-examination—is simply not credible.

Because Aguilar had no Fifth Amendment right to counsel during the interview, this argument must be rejected. Nevertheless, even if he did have such a right, it was honored by the interviewing agents, which provides an independent basis for the Court to reject this claim.

13

## CONCLUSION

For the reasons set forth herein and in the government's prior submissions, the Court should deny the defendant's motion.

Dated:       Brooklyn, New York
              April 5, 2021

Respectfully submitted,

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York

By:     /s/
Jonathan P. Lax
Assistant United States Attorney


JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division, U.S. Dept. of Justice

By:     /s/
Derek J. Ettinger
Jonathan P. Robell
Assistant Chiefs
Clayton P. Solomon
Trial Attorney


DEBORAH L. CONNOR
Chief, Money Laundering and Asset Recovery
   Section
Criminal Division, U.S. Dept. of Justice

By:     /s/
Adam Schwartz
Deputy Chief, International Unit
D. Hunter Smith
Trial Attorney, International Unit