# DEFENSE EXHIBIT Q
# Consol. Hr'g Tr.

1

<pre>
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NEW YORK
 2
       - - - - - - - - - - - - - X
 3
     UNITED STATES OF AMERICA,    :   20-CR-390(ENV)
 4
              Plaintiff ,         :
 5                                     United States Courthouse
         -against-                :   Brooklyn, New York
 6
     JAVIER AGUILAR,              :
 7                                     March 1, 2022
              Defendant.          :   11:00 a.m.
 8
       - - - - - - - - - - - - - X
 9
                   TRANSCRIPT OF SUPPRESSION HEARING
10               BEFORE THE HONORABLE ERIC N. VITALIANO
                 UNITED STATES SENIOR DISTRICT JUDGE
11
     APPEARANCES:
12
     For the Government:        JACQUELYN M. KASULIS
13                              United States Attorney
                                BY: JONATHAN LAX,
14                              Assistant United States Attorney
                                271 Cadman Plaza East
15                              Brooklyn, New York

16                              D. HUNTER SMITH, Trial Attorney
                                CLAYTON P. SOLOMON, Trial Attorney
17

18   For the Defendant:        QUINN EMANUEL URQUHART & SULLIVAN,LLP
                                51 Madison Avenue, 22nd Floor
19                              New York, New York
                                BY: ALEX SPIRO, ESQ.
20                                  TAI H. PARK, ESQ.
                                    GEORGE T. PHILLIPS, ESQ.
21                                  MICHAEL BLOOM, ESQ.

22
     Court Reporter:           Andronikh M. Barna
23                             225 Cadman Plaza East
                               Brooklyn, New York
24                             (718) 613-2178

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
</pre>

```
                        Proceedings                    2

 1              (In open court.) (Parties present.)

 2              THE CLERK:  All rise.

 3              Court is now open.  The honorable Eric N. Vitaliano

 4      presiding.

 5              Case on the calendar is U.S.A. versus Aguilar, case

 6      No. 20-CR-390 on for a suppression hearing.

 7              Will attorneys please note their appearance,

 8      beginning with government counsel.

 9              MR. LAX:  Good morning, Your Honor.

10              Jonathan Lax, Clayton Solomon and Hunter Smith on

11      behalf of the United States.

12              THE COURT:  Good morning, all.

13              MR. SPIRO:  And on behalf of the defense, it's Alex

14      Spiro and my colleagues from Quinn Emanuel.

15              Good morning, Your Honor.

16              THE COURT:  Good morning.

17              THE CLERK:  Counsel for both sides are present,

18      including defendant.

19              We also have a stand-by Spanish interpreter who

20      needs to note her appearance for the record.

21              THE INTERPRETER:  Rosa Olivera.

22              THE COURT:  Rosa, good to have you.

23              THE INTERPRETER:  Good morning, Judge.

24              THE COURT:  Good morning.

25              THE CLERK:  Thank you.
```

Proceedings                                        3

1          THE COURT:  Be seated all.

2          Mr. Lax, do you have a program for --

3          MR. LAX:  I do, Your Honor.  We are, of course, here

4    on a motion to suppress.  The government is prepared to

5    proceed and call its first witness, if that's what the Court

6    would like.

7          THE COURT:  Mr. Phillips, are we ready to go?

8          MR. SPIRO:  Yes, Your Honor.

9          THE COURT:  And you are going to take the lead, is

10   that it?

11         MR. SPIRO:  Yes, Your Honor.

12         THE COURT:  And Jonathan Lax, you are taking the

13   lead for the government?

14         MR. LAX:  Myself and Mr. Solomon will be splitting

15   witnesses.  The government I think at this point intends to

16   call two witnesses.

17         THE COURT:  All right.

18         Oh, Mr. Spiro is going to take the lead; is that

19   correct?

20         MR. SPIRO:  Yes, Your Honor.

21         THE COURT:  Okay.  Then we shall proceed.

22         MR. LAX:  All right.  With that, the government --

23         THE COURT:  Under the protocols, I do not know how

24   many times we have to disinfect.  I do not know where we are,

25   but the case manager and the deputy clerk will keep us on the

Proceedings                                              4

1   road to straight and narrow.

2              MR. LAX:  Thank you, Your Honor.

3              May I ask a logistical question?  Are we going to

4   have -- in light of COVID and the protocols, where would the

5   Court like the witness to sit, in the box or somewhere else?

6              THE COURT:  Just have him there.  Because actually,

7   I have not had that many proceedings involving a witness

8   during COVID, but we have had them in the witness box.

9              MR. LAX:  Okay.  And would the Court also like for

10  the witness to remove his face mask?

11             THE COURT:  No, it is not required.  If any of the

12  parties need at some point to have the witness unmask, then we

13  will handle it then.  As you know, Mr. Lax, the facial

14  impressions are not going to be that important to me.

15             MR. LAX:  Understood, Your Honor.

16             With that, the government calls Special Agent Paul

17  Zukas.

18             THE CLERK:  Stand right there.

19             (Witness sworn or affirmed.)

20             THE CLERK:  Please state your first and last name

21  and spell it for the record.

22             THE WITNESS:  Paul Zukas.  Z-, as in zebra,

23  -u-k-a-s.

24             THE CLERK:  Thank you have a seat please.

25             THE WITNESS:  Thank you.

Zukas - Direct - Lax                                    5

1          THE COURT:  You may proceed.

2          MR. LAX:  Thank you, Your Honor.

3   **PAUL ZUKAS,** having been first duly sworn/affirmed, was

4   examined and testified as follows:

5   DIRECT EXAMINATION

6   BY MR. LAX:

7   Q    Good morning.

8   A    Good morning.

9   Q    Mr. Zukas, who do you work for?

10  A    I work for the Federal Bureau of Investigation.

11  Q    And what is your title?

12  A    I'm a special agent.

13  Q    How long have you been an FBI special agent?

14  A    This April will be 19 years.

15  Q    What is your current assignment?

16  A    I work in the counterintelligence task force in Houston,

17  Texas.

18  Q    And how long have you worked on the counterintelligence

19  task force?

20  A    Approximately one year.

21  Q    What did you do before that assignment?

22  A    I worked international corruption.  More specifically,

23  violations of the Foreign Corrupt Practices Act, which I still

24  do work to some capacity.

25          And before that, I worked criminal enterprise and

Zukas - Direct - Lax                                6

1  OCDETF, Organized Crime Drug Enforcement Task Force, gangs and

2  drugs, in Chicago, Illinois.

3  Q    Approximately how long have you worked in Houston?

4  A    Since 2016.  So this summer will be six years.

5  Q    And then prior to that, where did you work?

6  A    I worked in Chicago and Warsaw, Poland.

7  Q    How long were you in Warsaw, Poland?

8  A    120 days.

9  Q    Can you describe some of your duties and responsibilities

10 as an FBI special agent?

11 A    Sure, of course.

12        I'm primarily a case agent, which is a lead

13 investigator on the criminal side of the FBI.  As you know,

14 the FBI has a national securities side and a criminal side.  I

15 have been mostly criminal, so I investigate crimes against the

16 United States Criminal Code and I gather evidence,

17 instrumentalities of the crime, in order to deter such

18 behavior and to incarcerate individuals who break the law.

19 Q    What are some of the types of things that you do in

20 conducting criminal investigations?

21 A    So we do interviews of individuals, witnesses, work

22 informants, what we call cooperating witnesses.  We gather

23 evidence to draft affidavits on search warrants, criminal

24 complaints, search warrants of physical locations, as well as

25 e-mails, travel internationally quite a bit to gather evidence

1  and take witness testimony statements overseas, for example.

2  Q     Are you familiar with something called a collateral

3  assignment?

4  A     Yes.

5  Q     What is a collateral assignment?

6  A     It's an assignment that is in an extra duty to your

7  primary duty as a case agent.

8  Q     Do you have any collateral assignments at the FBI?

9  A     Yes, I do.

10  Q     What are those?

11  A     I am a certified hostage negotiator for the FBI and I am

12  also an investigator of art crime.  Those are both my

13  collateral duties at the moment.

14  Q     Did you receive any specialized training in connection

15  with hostage negotiations?

16  A     Quite a bit, yes.

17  Q     Describe it briefly.

18  A     In order to be a certified hostage negotiator with the

19  Bureau, it's a very rigorous process.  We have to do a 40-hour

20  course at a local sheriff's office before we can essentially

21  work on a team.  In this case, Houston where I'm assigned.

22  After the completion of the 40-hour course, we have to go to

23  an advanced training, what we call the NCNC, the negotiations

24  course or the National Crisis Negotiation Course.  N-C-N-C is

25  the acronym.  This is an 80-hour course that's held at

Zukas - Direct - Lax                                          8

1  Quantico.  It's part of our critical incident response group.

2  We work with their hostage rescue team as well as our crisis

3  negotiations unit.  It's a -- you can't fail out of the course

4  and it's long days and once you're completed with the two

5  weeks, you are in pass, you are a certified hostage negotiator

6  and can be deployed anywhere in the world in such capacity.

7  Q    Did you receive other types of training in connection

8  with your work as a special agent?

9  A    Yes, I have.

10  Q    Describe some of those.

11  A    I also train overseas quite a bit.  So it's a reciprocal

12  program for other nations of the world.  So we train on a

13  number of topics, white collar and I guess you would call it

14  drug and OCDETF violations.  But in that process, we also

15  receive training from law enforcement brothers-in-arms from

16  those other nations as well, so I've done that extensively as

17  well.

18  Q    What did you do for work prior to being a special agent?

19  A    Prior to that, I was a research scientist in the field of

20  molecular biology and cellular genetics at UT Southwestern

21  Medical Center in Dallas.  I ran a lab, the T.L. Shields

22  Laboratory for Molecular Dermatology.  Did that for a number

23  of years and then I became an attorney.

24  Q    You have a law degree?

25  A    I have a law degree, yes.

1   Q      Did you take the bar?

2   A      I have not, no.  I'm not licensed.

3   Q      Directing your attention to July 10, 2020, were you

4   working that day?

5   A      Yes.

6   Q      What was your assignment?

7   A      We were to interview Mr. Javier Aguilar on that day.

8   Q      You said "we."  Who is "we"?

9   A      There was a Department of Homeland Security, HSI,

10  Homeland Security Investigations' special agent named

11  Matt Wood who was also going to be with me that day.

12  Q      And where were you working that day?

13  A      We were going to be working at the George Bush

14  Intercontinental Airport in Houston, Texas.

15  Q      Is that also known as IAH?

16  A      Yes, that's correct.

17  Q      Did you know that Mr. Aguilar would be arriving to IAH

18  that day?

19  A      Yes, I did.

20  Q      How did you know that?

21  A      We had travel records that were provided by the Customs

22  and Border Patrol, CBP.

23  Q      Approximately what time was he scheduled to arrive?

24  A      I believe it was 8:00 or 8:10 a.m. that morning,

25  July 10th.

1    Q    Could you describe the general subject matter of the

2    planned interview?

3    A    Yes.  It was going to be an FCPA type of case, Foreign

4    Corrupt Practices Act.  And Mr. Aguilar, I believe, was

5    employed by Vitol company at the time and we were going to be

6    questioning him on some of his relationships with various

7    entities in his capacity as an employee of Vitol.

8    Q    What were some of the entities?

9    A    I believe Petroecaudor was one of them.  And I also know

10   he had previously worked for the other energy commodities

11   company, Trafigura, and we were going to be questioning him on

12   his role in the Latin America sphere of influence that he had

13   as an employee of Vitol.

14   Q    You mentioned Petroecaudor.  Where is that?

15   A    That is Ecuador.  Ecuador, South America.

16   Q    You were also going to ask some questions about Mexico?

17   A    Yes, that's correct.

18   Q    Were you the case agent for that investigation?

19   A    I was not the case agent.

20   Q    Was the investigation even being run out of the Houston

21   field office?

22   A    No.

23   Q    Where was the investigation being run?

24   A    Miami, Florida.

25   Q    So who is the case agent for that?

1  A    The case agent is a special agent named Jimmy Kelley.

2  Q    How is it that you became involved in the investigation?

3  A    Well, FCPA, a lot of the cases are centric to the oil and

4  gas industry of which Houston is a major hub, Houston, Texas.

5  It was during this time that coronavirus was in full swing and

6  so Jimmy Kelley and, in fact, my organization, the FBI, it was

7  restrictive for traveling, so Jimmy had contacted me to help

8  him do interviews and some surveillance in other investigative

9  aspects of his case.

10  Q    Approximately when did you first become involved in the

11  Aguilar investigation?

12  A    Maybe June, early June of 2020, so about a month, maybe

13  five weeks before we actually did the interview of Mr. Aguilar

14  on July 10th.

15  Q    Prior to that, did you have any participation in the

16  investigation?

17  A    No.

18  Q    You mentioned previously that some of the interview was

19  going to be conducted at an airport.  What were the reasons

20  for that?

21  A    There were several reasons.  Having been an agent for

22  almost 19 years, my first priority, and will always be, is

23  safety, so we take that into the calculus of when we approach

24  somebody, whoever it may be.  So we had a pretty good idea

25  that, since we had the records from CBP, that he was going to

1  be disembarking on a plane in Houston, that we knew he was

2  going to be there.  We did not want to interview him at his

3  home because we didn't know, for coronavirus purposes, if that

4  was going to be the best course of action.  Also, knowing that

5  he was going to be getting off a plane, the safety measures

6  were probably going to be at their highest for us because

7  you're not allowed to travel, obviously, with a firearm unless

8  you are a law enforcement officer.  So there's always a risk

9  involved when you're going to somebody's house and you

10  interview them on their soil, so we have to take all

11  precautions and safety issues when we approach anybody in any

12  type of interview.

13  Q    You also mentioned that COVID was one of the factors.

14  Could you expand on the reasons for that?

15  A    Well, yes, of course.

16       So my agency, the FBI, was also issuing directives

17  to be very careful with interviewing and even arresting people

18  because of COVID and because of acquiring coronavirus, and at

19  that point in time the efficacy of drugs was not well known.

20  So we decided that if we got him in an open public space in

21  terms of interviewing him, that that would be not only our

22  safest course of action, but it would also be the best chance

23  we have of actually getting the opportunity to interview him.

24  Q    On the day of the interview, were you in uniform or plain

25  clothes?

Zukas - Direct - Lax                    13

1   A    I was wearing a suit and tie.

2   Q    Did you have your credentials with you?

3   A    Yes.

4   Q    Where were those?

5   A    In my pocket here, in my jacket, where it always is.

6   Q    What do your credentials look like?

7   A    Well, first off, they're 19 years old.  So, they're a

8   picture of myself and it says the "United States Department of

9   Justice, Federal Bureau of Investigation" and it shows that I

10  have a unique credential number that is assigned to me and

11  only me.  And it's essentially, you know, my identification as

12  being an FBI agent.

13  Q    Did you have a badge with you?

14  A    Yes, I did.

15  Q    Where was that?

16  A    That is always on my belt side on my right side.  I'm

17  right handed, so I always keep the badge next to my firearm

18  and it's always going to be on my right side, attached to my

19  belt.

20  Q    Did you have your firearm with you that day?

21  A    I did, yes.

22  Q    Where was that?

23  A    That was on my right side, because I'm right handed,

24  right side of my belt, connected to my outside pancake holder,

25  holster.

Zukas - Direct - Lax                                    14

1   Q     Was the firearm concealed or exposed?

2   A     The firearm was concealed, yes.

3   Q     How so?

4   A     My jacket was covering it and it was on my side, so it

5   was not exposed.

6   Q     Did you have handcuffs with you?

7   A     Yes.

8   Q     Where were those?

9   A     I always carry my handcuffs in the small of my back on

10  the belt.  Part of it is hanging inside my pants and the other

11  part is hanging outside on the small of my back.

12  Q     Were your handcuffs exposed?

13  A     They were not.

14  Q     How were they concealed?

15  A     My jacket was concealing them.  And also, they're behind

16  me, so there's no way you can see it.

17  Q     What about Special Agent Wood, was he in uniform or plain

18  clothes?

19  A     Also wearing a suit and tie.

20  Q     Did you see if he had a firearm that day?

21  A     I did not.

22  Q     Did you see if he had handcuffs that day?

23  A     I did not see that.

24  Q     Where did you wait to meet Mr. Aguilar?

25  A     We were at the international terminal of the George Bush

1   Airport and we had positioned ourselves adjacent to a room

2   that we were going to conduct the interview that was very

3   close to the exit of the terminal where the people

4   disembarking from their aircraft would, once passing through

5   Customs and getting luggage, would have to exit that portion

6   of the terminal to go to the outside space to get, you know,

7   their cars or buses to their -- where their cars are parked,

8   shuttle transportation.  So we were very close to those exits.

9   Q    Could you describe the room that you were waiting in?

10  A    I would more describe it as kind of like a corridor.  It

11  was just a large room, a large corridor area that had these

12  metallic kiosks that the -- we had some -- sorry, CBP officers

13  were there waiting for passengers disembarking from the

14  Customs area to come to the exit area.  So we were waiting in

15  that area.

16  Q    Where did you first see Mr. Aguilar?

17  A    So I was outside in the aforementioned area and

18  Mr. Aguilar appeared coming down from this -- kind of turned

19  the corner and was walking down the corridor.  I recognized

20  him immediately because I've seen pictures of him before and I

21  just saw him walking towards me.

22  Q    What happened after that?

23  A    In between where I was and where he was walking, there

24  was those CBP kiosks that I had mentioned.  I believe there

25  was one or, perhaps two, CBP officers there.  And he walked up

Zukas - Direct - Lax                              16

1    to them and they inspected his bag.  There was some luggage,

2    personal property.

3    Q    Did you participate in that baggage screening?

4    A    I did not.

5    Q    Did you participate at any point in the immigration

6    process?

7    A    I did not.

8    Q    Approximately how far away were you from Mr. Aguilar when

9    that baggage screening occurred?

10   A    Fifteen to 20 feet.  I had a direct line of sight on him

11   the entire time.

12   Q    So when did you first meet Mr. Aguilar?

13   A    So once he had completed his screening where the CBP

14   officers had looked at his luggage and personal effects, he

15   started walking towards the exit and I was there and that's

16   when I walked up to him.

17   Q    Where was Special Agent Wood?

18   A    Special Agent Wood was not there because at that exact

19   moment before Mr. Aguilar had turned the corner, Special Agent

20   Wood had to go to the bathroom.

21   Q    So you approached Mr. Aguilar by yourself?

22   A    I did.

23   Q    Could you describe that?

24   A    Yes.  I approached him, very friendly, and I identified

25   who I was.  I showed him my credentials and told him that I

1    was -- my name was Paul Zukas with the FBI as a special agent

2    and I was hoping that he would be willing to do an interview,

3    voluntary, and he agreed.

4    Q    Did you mention that it would be a voluntary interview?

5    A    I did.

6    Q    Do you recall the words that you used?

7    A    It was voluntary, that it was a voluntary interview that

8    I would like to do of him and he did not have to do it if he

9    wanted and -- but I would like to do the interview if he was

10   okay with it.

11   Q    What was his response?

12   A    He agreed.  He was very cooperative, very accommodating.

13   Q    Did you touch him or make any other physical contact?

14   A    I believe I extended my right hand as I usually do just

15   to shake his hand, put him at ease.

16   Q    Did you pat him down or frisk him?

17   A    No.

18   Q    Other than shaking his hand, any other physical contact?

19   A    No.

20   Q    What happened next?

21   A    During this time that I was having this initial dialogue

22   with Mr. Aguilar, Special Agent Wood started coming from where

23   the bathroom was, I guess, and he also identified himself.

24   And, you know, this is my partner, Mr. Aguilar.  And he said

25   we would like to interview -- essentially, reciprocate or, you

1    know, repeating what I had said.

2              And we then told Mr. Aguilar that the interview, if

3    you're willing to do it, would be conducted in this room,

4    which was literally right next to the corridor I'm describing.

5    We pointed to it.  He agreed again and all three of us walked

6    to the room.

7              MR. LAX:  Mr. Villanueva, may I please have the

8    ELMO?

9              THE CLERK:  Sure.  You're using a laptop?

10             MR. LAX:  No, just the ELMO.

11             THE CLERK:  Oh, okay.  Okay.

12   Q    Special Agent Zukas, I am showing you what has been

13   marked DOJ GX-1C.

14   A    Okay.

15   Q    Do you recognize that?

16   A    I do.

17   Q    What is it?

18   A    That is the room that we conducted the interview of

19   Mr. Aguilar.

20   Q    Did you take this photograph?

21   A    I did not.

22   Q    Does it fairly and accurately depict the room in which

23   you and Special Agent Wood interviewed Mr. Aguilar?

24   A    I think it fairly depicts it.  I believe the table was

25   different.  And the seating arrangement, there were more

Case 1:20-cr-00390-ENV Document 98-16 Filed 04/05/22 Page 20 of 360 PageID #: 1125

Zukas - Direct - Lax                                19

1  chairs because there were three of us sitting at the table.

2  Q    So other than some of the furniture arrangements, does it

3  fairly and accurately depict the room?

4  A    Yes.

5           MR. LAX:  The government moves to admit DOJ GX-1C.

6           MR. SPIRO:  No objection.

7           THE COURT:  Received without objection.

8           (Government's Exhibit DOJ GX-1C was received in

9  evidence.)

10          And that is DOJ -- Mr. Lax, what is that exhibit

11  number again?

12          MR. LAX:  It's DOJ GX-1C.  Or just 1C I think is --

13          THE COURT:  Yes.  GX-1C in evidence.

14  Q    Showing you now, Special Agent Zukas, what has been

15  marked Exhibit 1D.  Do you recognize that?

16  A    I do.

17  Q    What is it?

18  A    This is the same room we conducted the interview, but

19  from the opposite orientation.

20  Q    Did you take this photograph?

21  A    I did not.

22  Q    Does it fairly and accurately depict the room in which

23  you and Special Agent Wood interviewed Mr. Aguilar?

24  A    I think it does.  I do not recall the table to the left

25  being there on the day of the interview.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

1  Q    So again, other than some of the furniture arrangements,

2  does it fairly and accurately depict the room as on the day in

3  question?

4  A    Yes, it does.

5           MR. LAX:  The government moves to admit DOJ GX-1D.

6           THE COURT:  Any objection?

7           MR. SPIRO:  No objection.

8           THE COURT:  Received without objection.

9           (Government's Exhibit DOJ GX-1D was received in

10  evidence.)

11           That is 1 as in boy or dog?

12           MR. LAX:  1D as in David.

13           THE COURT:  David.

14           MR. LAX:  So 1C as in cat, 1D as in David.

15           And this is 1E as in echo.

16  Q    Special Agent Zukas, do you recognize what has been

17  marked for identification Government Exhibit 1E?

18  A    Yes, I do.

19  Q    What is that?

20  A    That's the same room that we conducted the interview of

21  Mr. Aguilar.

22  Q    Did you take this photograph?

23  A    I did not.

24  Q    Does it fairly and accurately depict the room in which

25  you and Special Agent Wood interviewed Mr. Aguilar?

1  A    Other than the tables perhaps being different, yes.

2        MR. LAX:  The government also moves to admit

3  Government Exhibit 1E.

4        MR. SPIRO:  No objection.

5        THE COURT:  Received without objection.

6  Q    Returning now, Special Agent Zukas, to Exhibit 1C.

7  A    Okay.

8  Q    I can see this photographs appears to be taken from a

9  doorway.  What is that doorway?

10 A    That's the doorway entering the room we conducted the

11 interview of Mr. Aguilar from the outside corridor where I had

12 first approached Mr. Aguilar.

13 Q    So this is the doorway through which Mr. Aguilar and you

14 entered the room?

15 A    That's correct.

16 Q    From this vantage point, what is behind the person taking

17 the photograph?

18 A    That would be that corridor that I was waiting before I

19 approached Mr. Aguilar.

20 Q    You mentioned some of the furniture may have been

21 different on that day.  Could you describe how?

22 A    Yes.  My recollection is, if you look at the table in

23 that corner, so the table I recall being silver and there

24 being more seating availability because myself and Agent Wood

25 sat on the far side next to the corner where the right angle

Zukas - Direct - Lax                          22

1    is where the two walls intersect, so clearly there was more

2    chairs there or like a bench that we were sitting.  But the

3    table, as is in this photograph, was in the exact same

4    position as the table that we conducted the interview.

5    Q    So in this photograph there are two chairs?

6    A    Yes.  There are two chairs, yes.

7    Q    Was anyone standing there in the course of the interview?

8    A    No.

9    Q    So there was additional -- was it an additional chair at

10   the table?

11   A    I seem to remember like a bench, but there had to have

12   been like at least an extra chair for myself and Agent Wood or

13   like a bench, much similar to what you would see at a picnic

14   table.

15   Q    Using this photograph, can you describe approximately

16   where Mr. Aguilar sat during the interview?

17   A    Yes.

18        So if you look, you will see that corridor to the

19   left that kind of extends back down to wherever, that chair

20   closest to the corridor that you can see a full visual

21   depiction of the chair is where he would have sat.

22   Q    So in this picture, right, the table is a light green

23   color and there is a chair on the left and a chair on the

24   right?

25   A    Yes.

1  Q    Mr. Aguilar sat in approximately that left chair?

2  A    That's correct.

3  Q    And who sat, if anyone, in the chair on the right or in

4  that area?

5  A    So myself and Agent Wood sat in the right side, where

6  that chair is on the right side of the table.  That's where we

7  sat.

8  Q    Both of you sat on the other side of the table?

9  A    Correct.

10  Q    I see there is a clear path between this doorway and that

11  chair where Mr. Aguilar sat or the area in which he sat.  Was

12  anything blocking that path to the door on the day of the

13  interview?

14  A    No.

15  Q    Throughout the interview, was the door ever closed?

16  A    No.

17  Q    Why not?

18  A    Because we had told him that he was free to leave at any

19  point in the interview, that the interview was voluntary and

20  if he didn't want to do it or wanted to terminate the

21  interview, he was free to leave and we even pointed to the

22  door.

23          And in addition to this, it's -- we usually do this

24  when we interview people that is voluntary in nature; we like

25  to leave the door either open or cracked open so that they

1   understand they are free to leave even after we say it.

2   Q    The hallway that goes down the left side of this

3   photograph, did Mr. Aguilar ever walk down that hallway?

4   A    No, he did not.

5   Q    I am going to move on to Exhibit 1D, as in David.

6        So what is being shown from this vantage point?

7   A    That is the same room that we conducted the interview

8   from the opposite orientation of the previous photograph and

9   you can see, through the open door, the corridor that I was

10  positioned when I walked up to Mr. Aguilar.

11  Q    So using this photograph as a reference, where

12  approximately were you positioned when you first met

13  Mr. Aguilar?

14  A    So if you see the wall that is to the left of the open

15  door, on the other side of that wall is approximately where I

16  would have been standing.

17  Q    Is this more or less the view that Mr. Aguilar would have

18  seen sitting in that area where he sat that day?

19  A    Yes.  He would have had to have turned his head to his

20  right and he would have seen this view.

21  Q    So although it's not pictured, to the left of this

22  picture is what?

23  A    To the left of this picture, so if you were to walk down

24  that hallway, going to your left would have been the first set

25  of exit doors, I believe, that would have allowed you then to

Zukas - Direct - Lax                                    25

1   take another left and then you would exit the terminal

2   altogether.

3   Q    I'm sorry.  If the person in this, taking this photograph

4   just turned their head to the left, what would they be looking

5   at?

6   A    Oh.  The person taking that picture, they would be

7   looking at the table.  From where this orientation is, if he

8   turns his head to the left, if I'm understanding the question,

9   he's looking at the table he's sitting at.

10  Q    Okay.  Approximately how long did you and Special Agent

11  Wood interview Mr. Aguilar in that room?

12  A    Under two hours.  I would say about 90 minutes,

13  approximately.

14  Q    I am going to ask you to look around the courtroom and if

15  you see Mr. Aguilar in the courtroom here today.

16  A    I can't see back there.  I don't know if he's back there

17  behind you.  It's not over here.  It's hard to see with masks.

18  I couldn't say I see him right now.

19  Q    Difficult to see with masks?

20  A    Yeah.

21  Q    Did you see him without a mask?

22  A    Yes, I did.

23  Q    That day?

24  A    I did, yes.

25         He's definitely not over here.  I don't know if he's

1   in the back area over there.  I don't know.

2   Q    How did --

3   A    No, actually, it's that gentleman right there, one, two

4   -- from the end of the table, if you count three over, I

5   believe that's him right there.

6            It's hard to see with the masks.  If he took his

7   mask off, I could see his face.

8   Q    Could you identify an article of clothing that that

9   person is wearing?

10  A    Yeah.  He's got a suit and tie, white shirt.  I mean, I

11  can't see what color his tie is, it's kind of far.

12           MR. SPIRO:  If he's identifying the third person at

13  the table, we'll acknowledge that's Mr. Aguilar.

14           THE WITNESS:  Yeah.

15           MR. LAX:  Thank you.

16           THE COURT:  Identification has been acknowledged.

17  Q    So prior to questioning, once the three of you sat down

18  at the table, did you and Special Agent Wood advise the

19  defendant of anything?

20  A    That this was a voluntary interview and he was free to

21  leave if he didn't want to conduct the interview with us.

22  Q    And how did he respond then?

23  A    He said he would be happy to cooperate and he agreed to

24  be interviewed.

25  Q    Could you describe his demeanor?

1   A    It was very accommodating.  I think he was very

2   agreeable.  He was very pleasant to talk to.  There was no

3   adversarialness in his tone.  It was almost like he wanted to

4   assist us and help us with any questions that we had.

5   Q    At any point, did you provide the defendant with Miranda

6   warnings?

7   A    I did not.

8   Q    Why not?

9   A    Well, it was a noncustodial interview.  He was not under

10  arrest nor he was under custody, so there was no reason to

11  Mirandize him at the time.

12  Q    Did any particular agent lead the questioning?

13  A    Yes.

14  Q    Who?

15  A    That was Agent Wood.

16  Q    And who took notes?

17  A    I took notes.

18  Q    Was the interview audio or video recorded?

19  A    It was not.

20  Q    Was there any policy that you're aware of that required

21  you to record this type of interview?

22  A    No.

23  Q    What language was the interview conducted in?

24  A    English.

25  Q    At any point during the interview, did the defendant

1   appear to have any difficulty understanding your questions in

2   English?

3   A    No.

4   Q    Did the defendant ever express that he did not understand

5   English?

6   A    No.

7   Q    Did you or Special Agent Wood ever ask him whether or not

8   he was comfortable proceeding in English?

9   A    I believe Agent Wood said if he was okay doing the

10  interview in English.

11  Q    And what did the defendant respond?

12  A    He said he was fine with it.

13  Q    Did the defendant ever ask for the assistance of an

14  interpreter?

15  A    No.

16  Q    Did you have any difficulty understanding the defendant?

17  A    None whatsoever.

18  Q    Was the defendant asked any questions about his

19  educational background?

20  A    Yes.

21  Q    What did he say about his educational background?

22  A    I believe he said he received a degree in chemical

23  engineering, I thought it was, in Mexico and then I think he

24  also received a Ph.D. perhaps in London, if I recall.

25  Q    Did you ask him any questions about his work history?

1   A    We did.

2   Q    What did he say about his work history?

3   A    He worked at Trafigura as an analyst, I thought he said.

4   Q    Did he say where he worked for Trafigura?

5   A    London.

6   Q    Did he say anything about where he worked after

7   Trafigura?

8   A    He worked at Vitol.  He went from, I believe, Trafigura

9   to Vitol.

10  Q    And where did he initially work at Vitol?

11  A    I think that was London still.

12  Q    Did there come a time when he transferred to a different

13  Vitol office?

14  A    Yes.

15  Q    Did he tell you where that was?

16  A    Yeah.  I know he said he moved to Houston in the early

17  2010s, perhaps 2012.

18  Q    In general --

19  A    He had -- sorry.

20        He had relocated to Houston.

21  Q    In general, what topics were covered with the defendant?

22  A    We discussed his educational background, as I just told

23  you, and his work history and then also what he does at his

24  current employer, Vitol, and just the relationships that he

25  had with some of his individuals that he worked while he's

1   employed at Vitol.

2   Q    Did you ask him questions as it related to his business

3   with Ecuador?

4   A    Yes.

5   Q    Petroecaudor?

6   A    That's correct.

7   Q    During the questions on -- related to Ecuador, did the

8   defendant ever ask to stop the interview?

9   A    No.

10  Q    During the questioning as it related to Ecuador, did he

11  ever ask for a lawyer?

12  A    No.

13  Q    During the course of the interview, did there come a time

14  or times where you or Special Agent Wood stressed the

15  importance of telling the truth?

16  A    Yes.

17  Q    Could you describe that?

18  A    There was at least I believe two points in time midway to

19  the latter part of the interview where we said that it's

20  important that you tell us the truth and that lying or not

21  telling the truth to a federal agent of the U.S. government is

22  in and of itself a crime.

23  Q    Can you describe how you told him that?

24  A    In a very ease -- the tone of our interview stayed the

25  same throughout the duration of the interview, so it was very

1  even-keeled, much in the same way that I'm speaking right now.

2  And we just told him that, look, you just need to tell the

3  truth.  You know, whatever happened, happened.  Just be honest

4  with us and, of course, you may not know this, but, you know,

5  lying to the FBI or to Homeland Security, Homeland Security

6  Investigations is in and of itself a crime, so just tell the

7  truth.

8  Q    How did he respond?

9  A    He said that -- he acknowledged it.  He acknowledged he

10  understood.

11  Q    Did there come a time when the focus of the interview

12  shifted from Ecuador to Mexico?

13  A    Yes.

14  Q    Approximately how long had the interview been going by

15  that point?

16  A    The interview, now looking back, it almost was done at

17  that point, so it had been going for a good -- over an hour

18  probably at that point.

19  Q    What happened when the topics changed?

20  A    So Agent Wood started asking questions on Mexico and it

21  was during this time that Mr. Aguilar said that he wanted to

22  continue to cooperate with us, but he wanted to seek legal

23  advice.

24  Q    When he said that, how did you and Special Agent Wood

25  respond?

1   A    To me that was an invocation of his counsel and so I

2   terminated the interview.  Matt Wood and I, Agent Wood and I,

3   terminated the interview forthwith at that exact moment.

4

5            (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Zukas - direct - Lax                                    33

1    EXAMINATION CONTINUES

2    BY MR. LAX:

3    Q    After you understood that Mr. Aguilar invoked counsel,

4    did you ask him any additional questions?

5    A    We did not, but he asked us questions.

6    Q    What types of questions?

7    A    Mostly logistical.  He had told us, I believe, that he

8    didn't know what kind of lawyer to get, and he had -- he was

9    asking us, like, legal advice.  And we told him, well, you

10   know, we can't offer you any legal advice, we're not your

11   attorney.  But when you do get an attorney, make sure that you

12   contact us with the attorney's number and name so we can pass

13   it on to the DOJ prosecutors.

14   Q    Did the defendant refer to attorneys at any other point

15   during the interview?

16   A    He did.

17   Q    How so?

18   A    He mentioned the word attorney early on in the interview.

19   I wouldn't call it an excited utterance, but early on in the

20   interview he mentioned that he thought he kinda knew what this

21   was about.  In the sense that there were people at Vitol,

22   perhaps, or maybe Trafigura -- I thought it was Vitol -- that

23   were being looked at and they had attorneys, but he had

24   nothing to do with that.  So, it was just an offhanded comment

25   that he made at that point.

1  Q    Did he indicate to you whether or not he had an attorney?

2  A    No.

3  Q    Did he indicate to you whether or not he wanted an

4  attorney at that point?

5  A    No.

6  Q    Did he ask to terminate the interview at that point?

7  A    No.

8  Q    So, when was the very first time that you understood the

9  defendant asked to speak with an attorney?

10 A    It's when he invoked counsel at the very end of the

11 interview after we had changed the topic to Mexico.

12 Q    What happened after that?

13 A    We terminated the interview and he then asked us about

14 some legal questions and then he made mention, I think he was

15 meeting his supervisor or former supervisor.  I can't recall

16 the guy's name, Loya, perhaps.

17         And he also mentioned to us he was working on some

18 project, I guess that was in Matamoros, Mexico.  It's in

19 Tamaulipas Province.

20         So, he had mentioned he was working on some project,

21 I don't know exactly what it was.  And that also, his flight

22 arrangements and his address that he was staying while he was

23 in Houston.

24 Q    After -- after those interactions, what happened?

25 A    He also provided me a business card of his, I believe,

1    which I took from him.  And then I gave him my contact

2    information, my name and number, to have his attorney or

3    whoever that attorney was, you know, contact me so I can reach

4    out and then put the appropriate DOJ prosecutor in touch with

5    the attorney.

6    Q    What do you mean you took a business card from him?

7    A    Well, he gave -- he gave me his business card.

8    Q    Did you search him for a business card or anything like

9    that?

10   A    No.  No, of course not.

11   Q    What happened after he provided you with his business

12   card?

13   A    I think we just exchanged pleasantries and we all got up

14   from the table inside the room that you had pictures of.  We

15   walked out the door.  I believe I shook his hand and thanked

16   him for his cooperation and thanked him for taking the time

17   out of his day, you know, to be interviewed by -- by law

18   enforcement, and then he left.

19   Q    Just walked away?

20   A    Yes.  So, he would have turned left and then a corridor.

21   Q    Just prior to that, did he need to wait for the return of

22   any of his property?

23   A    No, I don't think so.  I think he had everything on him.

24   Q    So, start to finish, approximately how long were you with

25   the defendant?

1  A     Less than two hours, maybe ninety minutes, I would say, a

2  hundred minutes.  It was less than two hours.

3  Q     Was anyone blocking the defendant's path to the door at

4  any point?

5  A     No.

6  Q     During the course of the interview, did anyone else enter

7  the room?

8  A     No.

9  Q     During the course of the interview was anyone posted

10 right outside the door?

11 A     No.

12 Q     At any point during your interactions with the defendant,

13 did you or Agent Wood draw your firearm?

14 A     No.

15 Q     Did either of you draw attention to your firearm?

16 A     No.

17 Q     Did either of you remove your jackets?

18 A     No.

19 Q     Did either of you display handcuffs?

20 A     No.

21 Q     Did either of you yell or shout?

22 A     No.

23 Q     At any point during your interactions with the defendant,

24 was he not actually free to leave?

25 A     No.

Zukas - direct - Lax                                    37

1    Q    He was always free to leave?

2    A    Correct.

3    Q    Did either of you ever tell the defendant that he was not

4    free to leave?

5    A    No.

6    Q    Did the defendant ever ask if he was free to leave?

7    A    No, I don't recall that.

8    Q    Did either of you tell the defendant that he had

9    committed a crime?

10   A    No.

11   Q    Did either of you tell the defendant that he had been

12   charged with a crime?

13   A    No.

14   Q    Did either of you tell the defendant that he was under

15   arrest?

16   A    No.

17   Q    Did he ever ask if he was under arrest?

18   A    I don't believe so, no.

19   Q    Did either of you physically restrain him?

20   A    No.

21   Q    Other than shaking hands, did either of you physically

22   contact him at all?

23   A    No.

24   Q    And then he just walked away?

25   A    Correct.

1           MR. LAX:  No further questions.

2           THE COURT:  Thank you, Mr. Lax.

3           Mr. Spiro, any cross?

4           MR. SPIRO:  Yes, Your Honor.

5    CROSS-EXAMINATION

6    BY MR. SPIRO:

7    Q     Good morning, Agent.

8    A     Good morning.

9    Q     You hold the same position, as I understand it, in the

10   Bureau as Agent Kelley, who was the lead agent on this case,

11   correct?

12   A     Yes.

13   Q     And you had worked with him before, correct?

14   A     Yes.

15   Q     On FCPA cases?

16   A     Yes.

17   Q     On cases which you took statements from witnesses?

18   A     I don't think I took any statements from witnesses

19   with -- for his cases.  It might have been after.

20   Q     What do you mean by that?

21   A     After the July 10th date that we interviewed Mr. Aguilar.

22   Q     So, you're saying after the events that bring you to

23   testify in this case you've worked with Agent Kelley since,

24   and on those cases you have interviewed witnesses for him?

25   A     Yes.

Zukas - cross - Spiro                                    39

1   Q    And you've worked on cases with Agent Kelley where there

2   were cooperating witnesses, correct?

3   A    Correct.

4   Q    Now, you have training, as you said, in FCPA cases,

5   correct?

6   A    Yes.

7   Q    And in taking statements?

8   A    Yes.

9   Q    And in those trainings in taking statements, you learn

10  about planning for interviews, right?

11  A    Yes.

12  Q    And you learn about a concept called voluntariness,

13  right?

14  A    Correct.

15  Q    There's actually a section in the FBI manual that's

16  headlined Voluntariness, right?

17  A    Oh, I'm not aware of that.

18  Q    Well, are you familiar with the various manuals that

19  apply?

20       You were asked a question from the Assistant United

21  States Attorney about is there any policy that forbids you or

22  requires you; do you remember those questions?

23  A    Yes.

24  Q    Are you familiar with the policies that were in operation

25  at the time for agents within the Bureau?

1   A    The general substance of the policies, yes.

2   Q    Okay.  And you're aware that there are policies on how

3   one should conduct an interview in the concept of

4   voluntariness, correct?

5   A    We can interview anybody.  And if they want to volunteer

6   to be interviewed, then we interview them.  That's the general

7   concept.

8   Q    Okay.  But there are times in which -- which the issue of

9   voluntariness comes up in cases; you knew that, right?

10  A    Yes, in a custodial arrest, for example, that would be

11  the case.

12  Q    And you also understand the importance of keeping the

13  identity of cooperators and informants confidential, correct?

14  A    Oh, of course, yes.

15  Q    And you learn other things in your training, right?

16          So, obviously, you learn at the academy, like all

17  FBI agents, that agents typically work in pairs, right?

18  A    Yes.

19  Q    And that's so that -- you know, for safety, like you said

20  earlier, right?

21  A    Correct.

22  Q    And so that there's two sets of eyes and two witnesses

23  for what happens, right?

24  A    Correct.

25  Q    When you went -- withdrawn.

1          Do you carry in your normal course when you're

2    conducting interviews a Miranda form?

3    A    A lot of time I do, yes.  I carry a ready bag in my trunk

4    of my car for every single day that I go out on my job.

5    Q    Okay.  And what's in that ready bag?

6    A    Extra ammo, extra offensive weapons, my asp baton, all

7    types of forms to enlist informants, including Miranda rights

8    and consent to searches, for example.

9    Q    Did you have a Miranda rights form with you on the day in

10   question?

11   A    I did not.

12   Q    Had you previously taken statements at airports before?

13   A    Yes.

14   Q    On cases with Agent Kelley?

15   A    Not at the airport with Agent -- I don't think I've ever

16   taken a statement at an airport with Agent Kelley from what I

17   recall.

18   Q    Taken a statement at an airport on a case in which Agent

19   Kelley was involved, whether or not he's there personally?

20   A    Let me think about that.

21          I've done many, many interviews at airports, so I'm

22   trying to see if he was involved in the interviews I've done.

23          I can't remember.  I don't think so.

24   Q    And some of the interviews you do at airports, I assume

25   were prior to the COVID-19 pandemic?

Zukas - cross - Spiro                                    42

1   A    Oh, yes, of course.

2   Q    Lots of them, right?

3   A    Yes.

4   Q    Well, you listed two reasons, as I understood it, that

5   you would do interviews at airports from your perspective here

6   testifying before His Honor?

7   A    Sure.

8   Q    One was the COVID-19 pandemic?

9   A    Correct.

10  Q    One of the reasons you gave in this court for why you

11  conduct interviews at airports was because of the COVID-19

12  pandemic, correct?

13  A    Correct.

14  Q    The other reason, as I understood it, that you conduct

15  interviews at airports is for officer safety?

16  A    Correct.

17  Q    Those were the two reasons, right?

18  A    Two of -- two of the reasons, yes.

19  Q    Well, are there more reasons?

20  A    Depends on the interview.  It depends on the nature of

21  the interview.  There's a lot of factors.  There's no

22  cookie-cutter way to do an interview.  So, officer safety is

23  always prime directive when we do any interview, however, yes.

24  Q    Okay.  So, give me the other reasons.

25            You gave two reasons on direct.  If those were the

1    two main reasons, we can leave it there.

2    A    There's plenty of other reasons.

3         I mean if I'm doing an interview on the south side

4    of Chicago, if you've ever been there, I'm probably going to

5    bring more than two people, for example.  So, that's different

6    than bringing the two agents to an interview because the south

7    side of Chicago is a very dangerous place.  I grew up there as

8    a kid.  That's just an example off the top of my head.

9         I could be doing an interview in Baku, Azerbaijan,

10   which I have done, and I'm not going to bring another agent

11   because they won't allow us travel with two agents.  I'll

12   probably have to be interviewed by an individual in a foreign

13   police force of a different country.  So, there's second

14   example.

15        I can keep going, if you'd like.

16   Q    That's not really my question?  My question is these --

17   all these interviews done at airports?

18   A    Yes.

19   Q    You testified on direct that the two reasons you do

20   interviews at --

21   A    Yes.

22   Q    -- airports are, one, the COVID-19 pandemic?

23   A    Yes.

24   Q    Two, officer safety?

25   A    Correct.

1  Q    I'm asking, I don't believe there is a third reason, but

2  if there is I'd like to know what the third reason would be

3  just for why you would choose an airport of any setting?

4  A    In this case, those would be the main reasons.

5  Q    Okay.  And while the south side of Chicago and certain

6  foreign locations are very, very dangerous, you actually went

7  by Mr. Aguilar's community and home in this case, correct?

8  A    Yeah, of course.

9  Q    It's not very dangerous, right?

10 A    It's not dangerous, but that's -- that's not an accurate

11 description, sir.

12        You can -- you can be shot at, which I have been, in

13 some of the nicest neighborhoods in America.  So, to simply

14 suggest that his neighborhood is not dangerous because of its

15 outward, you know, appearance or where it's situated in the

16 city of Houston, in my mind, from a law enforcement

17 perspective, is not an accurate depiction of why we would do

18 that.  I think that's utterly incorrect.

19 Q    Okay.  So, do you consider his neighborhood in Houston to

20 be a dangerous area?

21 A    No, it's not, but that's not the answer I gave.

22        I mean it's not a dangerous area, but there's other

23 factors that go into the calculus as to why we choose to do an

24 interview one place as opposed to another.

25 Q    Of course, I'm just simply asking.

1           Is his neighborhood -- isn't it true that his

2   neighborhood in Houston is a suburban neighborhood that is not

3   a particularly dangerous neighborhood?

4   A    I didn't appear to be dangerous from the outside, but I

5   don't know what the crime statistics are so I couldn't

6   accurately tell you.

7           His neighborhood appeared not to be dangerous, but

8   in my 19 years of law enforcement experience, just because a

9   neighborhood appears not to be dangerous from an outward

10  perception does not implicitly say the neighborhood is safe or

11  I have to take less precautions.

12  Q    Okay.

13          You went to his neighborhood alone when you were

14  casing his house, right?

15  A    I was doing surveillance, yes.

16  Q    And you talked a little bit about custody and arresting,

17  and I don't want to spend too much time on the arrest proces.

18          But, basically, your point in differentiating

19  custody versus not, an arrest in your mind is when you take

20  somebody, you take them to be processed and then you put them

21  into a jail cell?

22  A    That's correct.

23  Q    So, in this case you didn't put Mr. Aguilar in a jail

24  cell?

25  A    That's correct, we did not.

1    Q    And, you know, you have experience and training on the
2    law from being an FBI agent, right?
3    A    Yes.
4    Q    And from testifying?
5    A    Yes.
6    Q    And from being a lawyer?
7    A    Not so much for being a lawyer because I didn't work in
8    the criminal area.
9    Q    But you went to law school, right?
10   A    I did.
11   Q    And are you aware of the law on the custody of a traveler
12   being questioned on non-border related questions; are you
13   aware of that?
14   A    What precisely?  I'm not.  If you can elaborate.
15   Q    Well, I mean before this case, in those interviews you
16   were doing at airports, were you aware of the law that applied
17   to asking individuals passing through airports non-immigration
18   related questions?
19         Were you aware of that law?
20   A    I don't know what law you're referring to, sir.
21   Q    Were you aware of any of the legal rules, the legal
22   framework around stopping people and asking them questions?
23   A    Yes.  Yeah, I am aware of some of the legal framework,
24   yes, but I don't know any particular law, or at least the law
25   that you're referring to, perhaps.

1    Q    Well, just in terms of that, what was your understanding

2    at the time of what the laws were regarding asking people

3    questions as they're passing through airports?

4    A    Yes.

5    Q    On non-border related topics?

6              MR. LAX:  Objection.

7              THE COURT:  I'll allow him to answer what he

8    understands the policy of the FBI to be.

9    A    So, we are allowed to ask questions as long as the

10   individual is willing to, you know, agree to the interview.

11   So, that he is stepping off an airplane or is at an airport,

12   you know, we still -- it doesn't change our optic of whether

13   we want to conduct the interview or not.

14             THE COURT:  Are you aware of any policy restriction

15   by the Federal Bureau of Investigation --

16             THE WITNESS:  I am not.

17             THE COURT:   -- as the subject matter of an interview

18   to be conducted, as conducted at an airport?

19             THE WITNESS:  No, I'm not.

20   BY MR. SPIRO:

21   Q    The reason, according to you, that Agent Kelley did not

22   come on this mission to interview Mr. Aguilar was because of

23   concerns over the COVID-19 virus?

24   A    Yes, that was the prime reason, I would say.  Yes.

25   Q    Okay.

1        You're aware that certain e-mails were turned over

2   in this case regarding the planning and preparation for the

3   interview of Mr. Aguilar, correct?

4   A    Yes.

5   Q    In any of those e-mails or communications, is there any

6   mention of Agent Kelley not wanting to attend this interview

7   because of the COVID-19 virus?

8   A    I don't think so.  I don't believe so.

9   Q    Can you tell me how you came to believe that that was

10  Agent Kelley's genuine reason for not attending this

11  interview?

12  A    Well, the Bureau, itself, as an organization had issued a

13  number of e-mails, bureau-wide, about the travel policies in

14  light of Coronavirus.

15       So, prior to Coronavirus, COVID-19, other than

16  traveling to a dangerous country there was really no

17  restrictive travel policies.  However, because of Coronavirus,

18  we had to take that into effect.  So, a lot of our -- all of

19  the FBI was hindered in its ability to travel.  So, this was

20  understood by everybody because our director of the FBI and

21  our executive management had issued those admonishments,

22  essentially, to the entire agency.

23  Q    And if I understand it correct, the rationale being the

24  travel and the like risks exposure to COVID-19?

25  A    Yeah, we didn't want to get sick and die.

1  Q     But Agent Kelley never told you, sir, that that was his

2  reason?

3  A     I don't think he did, but he didn't have to.  It was,

4  like, everybody knew it.  Like, we weren't allowed to travel

5  because of Coronavirus.

6  Q     Well, I mean the Coronavirus pandemic started, for all

7  intents and purposes in -- in, you know, -- in the FBI world

8  of travel and whatnot, February/March 2020, correct?

9  A     Maybe.  That sounds about right, yes, it was about two

10 years ago.  Yep.

11 Q     Right.

12            Certainly before, this wasn't the first week that

13 your interviewing him that the COVID pandemic broke, it had

14 been going on for a few months at the time of this interview,

15 correct?

16 A     Yes.  That's fair to say, yes.

17 Q     Okay.  As of June, about a month earlier, Agent Kelley

18 was intending to participate in this interview, correct?

19 A     I believe there was some discussion about that, yes.

20 Q     Okay.  Do you have an explanation for this Court why as

21 the sole reason you're assuming that Agent Kelley is not

22 participating is the COVID-19 pandemic, why weeks earlier if

23 he was wanting to participate and then not?

24 A     I can't -- I can't answer that question.  I don't know

25 what was going on through Agent Kelley's mind.  All I can tell

1    you is that we had -- we had restrictive policies with travel

2    because Coronavirus had hindered our ability to travel.  And I

3    knew it was going to be tough for him to fly to Houston.

4            As to what else was going through his mind as to why

5    he couldn't make it, my -- your speculation is as good as

6    mine.

7    Q    I'd have to ask Agent Kelley, right?

8    A    Probably so, yes.

9    Q    Now, the other individual that then attends this

10   interview, okay, is not an FBI agent, it's a DHS agent,

11   correct?

12   A    Correct.

13   Q    And DHS doesn't normally do white collar crimes, correct?

14   A    Oh, I think they do white collar crimes; yes.

15   Q    Oh, they do?

16   A    Yes.  I think they do white collar crimes.

17   Q    Okay.  What are their primary roles and responsibilities,

18   DHS?

19   A    To enforce the United States Criminal Code and other

20   criminal laws, just like the FBI.

21   Q    You don't -- is there any distinction in your mind

22   between the purview of DHS and the purview of the FBI?

23   A    I think originally, how it was envisioned, DHS had more

24   of a border-patrol-type of pro-activeness, but that has

25   definitely evolved.

1              If you are in the sphere of law enforcement, like

2       myself, they pretty much work every violation that I'm aware

3       of that the FBI works.

4       Q    But you would agree with me that they also have purview

5       over the border, over Customs, more directly than the FBI does

6       on a day-to-day basis, correct?

7       A    Yes, I think that's accurate.

8       Q    And they work closer with CBP -- Customs, Borders and

9       Patrol -- than the FBI does, all things equal, on a daily

10      basis; correct?

11      A    I would say that's correct, yes.

12      Q    So, while there can be overlap between the functions of

13      DHS and FBI, they have a different mandate.

14              There's no question about that, right?

15      A    I wouldn't say that.  I'd say their mandate is similar to

16      ours, in the sense that they also are another federal law

17      enforcement agency.  Their special agents are 1811 just like

18      we are.  It's adjust a labeling of federal agents.  And they

19      have been, you know, enumerated the powers to uphold the law

20      in a similar fashion that we have.  They can -- they can

21      investigate all of these federal crimes, as far as I know, in

22      a very similar capacity as to what FBI agents can do.

23              So, I think their mandate is not dissimilar from our

24      own, ours being the FBI.

25      Q    Other than the difference that they have primary purview

1   also over border?

2   A    I would say they have primary purview over border, yes.

3   Q    Now, this investigation you've become aware of in

4   mid-June, June 12th, to be exact, 2020, is that right, or are

5   you aware of it prior to the original e-mail?

6   A    That -- that sounds about right.  I might have heard of

7   Vitol before.  In fact, I know I've heard of Vitol, but not in

8   Jimmy's -- Agent Kelley's investigation.

9   Q    And, in fact, the investigation was into Vitol, correct?

10  A    I believe so, yes.

11  Q    It wasn't just into Javier Aguilar, right?

12  A    Oh, I don't know.  I wasn't involved in the investigation

13  outside of just the very, very small things that I did, that I

14  participated in.  So, I couldn't tell you the scope of the

15  investigation at all.

16  Q    Well, did you know that the company was involved in

17  negotiating a deferred prosecution agreement and that the U.S.

18  Attorney's office was looking at the company in terms of

19  criminal liability?  Did you know that?

20  A    I can't even -- I don't remember that.  I don't remember

21  knowing that, no.

22  Q    Do you have notes of any of the correspondences that you

23  had -- the telephone calls, the meetings -- leading up to from

24  June through July 10th in preparing to interrogate

25  Mr. Aguilar?

1  A    Logistical notes, perhaps, but nothing of substance.

2  Because it was not my -- my job to run the investigation.  So,

3  I just needed to know where to be, when and what to do.

4  Q    Did you maintain those logistical notes?

5  A    Probably not.

6  Q    Okay.

7  A    Or I might have turned some over, I don't know.  I

8  don't -- I don't -- when I write something down, I have a

9  meeting at 10 o'clock next week, I usually -- after the

10 meeting is done, I don't find a reason to maintain that.

11 Q    Okay.

12      Well, during the lunch break can you doublecheck to

13 make sure you've done your best to make sure we have all those

14 notes?

15 A    I already have done my best.  The attorneys were very

16 thorough in my preparation and I'm pretty sure I turned

17 everything over, but I'll check again if you'd like.

18 Q    Please.

19      You would agree that in terms of the case against

20 Javier Aguilar, you all, the Bureau of Investigation, the

21 Department of Justice, were very close to effectuating an

22 arrest, right?

23 A    That was discussed, yes.

24 Q    Okay.  And, in fact, you had in your possession a fully

25 drafted, ready-to-be-filed criminal complaint, correct?

Zukas - cross - Spiro                    54

1  A    Was it fully drafted?

2         I had a criminal complaint.  I remember looking at

3  having an affidavit for a criminal complaint, yes.

4  Q    Okay.  And --

5  A    I don't know if it was the final draft.  I have no idea.

6  Q    Well, have you had an opportunity to review that draft in

7  preparation for today?

8  A    No.

9  Q    Have you had an opportunity to review the filed criminal

10 complaint in this case?

11 A    I don't think I've ever reviewed the filed criminal

12 complaint for Mr. Aguilar, the filed one.  I don't remember

13 reviewing that.

14 Q    Okay.  Well, we are going to give you a copy of it.

15 A    Okay.

16        I remember viewing the criminal complaint, I

17 believe.  I don't know if it was the filed final version of it

18 or if it was just a draft, I don't recall that.

19 Q    Okay, but just so the Court is perfectly aware --

20 A    Yes.

21 Q    -- the criminal complaint that you had in your possession

22 was filed in this case the exact same day you interviewed

23 Mr. Aguilar?

24 A    Oh, was it?  I didn't know.

25 Q    So, when you say:  Oh, I never told Mr. Aguilar that he

Zukas - cross - Spiro                                    55

1    was in any trouble, that he was under arrest or anything --

2    right, do you remember testifying to that?

3    A    Yes.

4             MR. LAX:  Objection, misstates prior testimony.

5             MR. SPIRO:  He just said yes.

6             THE COURT:  Well, I don't think it was in haec

7    verba, but I think the witness understood it to be in a close

8    enough neighborhood to what he said that he was comfortable in

9    answering yes.

10   BY MR. SPIRO:

11   Q    Did you tell Mr. Aguilar that with you, you had a ready

12   to be drafted -- ready-to-be-filed criminal complaint?

13   A    I did not tell that to him.

14            THE COURT:  Well, did you know you had a

15   ready-to-be-filed criminal complaint?

16            THE WITNESS:  I know I had looked at the criminal

17   complaint and that's all, Your Honor.

18            MR. SPIRO:  This is Tab 7.  I am marking it as

19   Defense 1.  It's the as-filed criminal complaint.

20            I think there's a binder, and we are going pass it

21   up to you.

22            THE WITNESS:  Sure.

23   Q    And I am going to ask, if you can, to tell me if you

24   notice any difference between --

25            MR. LAX:  Objection.

```
                           Sidebar                        56

 1          May I be heard at sidebar, Your Honor?

 2          THE COURT:  Sure.  We haven't had one of those in

 3   two years.

 4          (The following sidebar was held with counsel and the

 5   Court only.)

 6          MR. LAX:  Your Honor, my objection is principally

 7   based on relevance.

 8          There's a couple facets to this.  One, the defense

 9   is asking Special Agent Kelley [sic] to talk about or discuss

10   the contents of a document that was one of the internal

11   Government documents that this Court has ruled is not subject

12   to discovery.

13          In addition, they are asking him or are about to

14   show him the criminal complaint that was filed after this --

15   this interview occurred.

16          MR. PARK:  Could I ask, Mr. Lax, you just keep your

17   voice down?

18          Because the witness -- I don't want the witness to

19   hear this colloquy.

20          MR. LAX:  Okay.

21          So, you know, generally, Your Honor, of course, they

22   could generally show this defendant anything, but I think

23   we're quite far afield of how a filed criminal complaint after

24   the substance of this interview has any relevance on what

25   happened during the course of the interview, what was said or
```

1   shown to Mr. Aguilar, because this criminal complaint hadn't

2   been filed.  It didn't exist.

3          And so I --

4          THE COURT:  I would just want to know where you're

5   going with it.  If you're going to ask him to compare the two

6   complaints, then you can save your breath.  We are not going

7   down that road.

8          MR. SPIRO:  I have a follow-up question, I think,

9   that will make it clear that will not require him to compare

10  the two.

11         I understand the Court is sustaining that objection,

12  so I'll move on.

13         THE COURT:  Okay.

14         MR. LAX:  Thank you.

15         (Sidebar concluded.)

16         (In open court.)

17  EXAMINATION CONTINUES

18  BY MR. SPIRO:

19  Q    Agent Zukas --

20  A    Yes.

21  Q    -- I had asked you earlier about the fact that Agent

22  Kelley had intended, in the weeks leading up to the interview

23  with Mr. Aguilar, to attend that.

24         And I am going to show you what I am marking as

25  Defense 2, an e-mail.

1           MR. SPIRO:  And I am putting it up.  Let me see if I

2    can figure out how to work this.

3    Q    And I am going to show you --

4           THE COURT:  Mr. Spiro, have you marked all your

5    exhibits in advance?

6           MR. SPIRO:  I have them in tabs, that is within the

7    tabbed binder that is available.

8           THE COURT:  Normally, the sequence here would be

9    letters to the defense.

10          MR. SPIRO:  Understood.  I've seen it both ways at

11   suppression hearings.  I can do letters.

12          So Defense, this will be Defense B; and we'll call

13   the first one Defense A.

14          Is that okay with the Court?

15          THE COURT:  Yes, I think that would keep things

16   moving in the normal fashion.

17          MR. SPIRO:  Sounds good; okay.

18   BY MR. SPIRO:

19   Q    So, I draw your attention --

20          THE COURT:  If you are going to have them all in one

21   binder, it would be B-1, B-2, et cetera.

22          (Exhibit published.)

23          MR. LAX:  Is this identified by some other document

24   number, Mr. Spiro?

25          MR. SPIRO:  Sure.  It's in yours as DOJ-3500-PZ-1.

Zukas - cross - Spiro                                    59

1            MR. LAX:  Okay, thank you.  That's just not -- we

2    just got a binder from you and the ordering is not the same

3    that we just got.  So, I was just trying to keep track.

4            MR. SPIRO:  I am moving to a different subject,

5    so...

6            MR. LAX:  Thank you.

7    Q    So, I am going to take you to the first e-mail in that

8    chain.

9            Can you see the screen?

10           (Exhibit published.)

11   A    Yes.

12   Q    Okay.  And then I am just going to go up the chain to the

13   next interview in which you are copied; but, of course, that

14   first --

15   A    The next interview?

16   Q    The next e-mail on that chain.

17   A    Oh, okay.

18   Q    But, of course, you see your name and e-mail address here

19   (indicating) at the bottom?

20   A    Yes.

21   Q    Okay.

22           And then this is an e-mail right above that,

23   June 12th, 10:36 a.m.  You're a recipient on that e-mail,

24   correct?

25   A    Yes.

1    Q    And it says:  "Good morning, Paul.  It appears at this

2    time that Jimmy and I will only be conducting an interview of

3    the subject to try and solicit his cooperation with no

4    arrest."

5    A    Okay.

6    Q    Did I read that right?

7    A    Yes.

8    Q    And so, as of June 12th, less than a month prior to the

9    interrogation of Mr. Aguilar, the plan was for Mario Tariche

10   of the FBI and Jimmy -- that's Jimmy Kelley, the lead agent,

11   correct?

12   A    Correct.

13   Q    -- to conduct an interview of the subject, meaning

14   Mr. Aguilar, to try to solicit his cooperation with no arrest;

15   correct?

16   A    Correct.

17   Q    And that was the plan as of June 12th, 2020, weeks

18   before, correct?

19   A    It looks like it from here, yeah.

20   Q    And then Mr. Kelley indicates in the next e-mail on the

21   same day that they're all -- they, they meaning Mr. Kelley, is

22   going to hold off on the approach and wait.

23        Do you see that?

24   A    Yes.

25   Q    And then there is a conversation, if you look up in the

Zukas - cross - Spiro                          61

1   e-mail, that it, at least suggests, that you all had a

2   conversation by phone.

3             Do you see that?

4   A    I don't see that.  Maybe if you move it over a little bit

5   to your right.  Yes.  Let's see here.

6             Yeah, we're having a conversation, correct.  It

7   looks like we're agreeing to have a conversation at some

8   future date and time.

9   Q    Okay.  And did you have a conversation with Mr. Kelley

10  about this e-mail?

11  A    I believe I did, yes.

12  Q    Do you remember the contents of that conversation?

13  A    Just maybe very generically.

14  Q    Can you tell us what you remember?

15            THE COURT:  Do you remember, first of all, when it

16  was?

17            THE WITNESS:  I don't.  I don't remember the exact

18  date we had a phone conversation, I had a phone conversation

19  with Jimmy Kelley.

20            THE COURT:  How late or how soon after this exchange

21  of e-mails?

22            THE WITNESS:  It was probably very soon afterwards.

23  It would be, I would say -- but I couldn't tell you the exact

24  date or time I had a phone conversation with him.

25  BY MR. SPIRO:

SAM      OCR      RMR      CRR      RPR

Zukas - cross - Spiro                          62

1    Q    Fair to say that this e-mail chain suggests:  "Copy that,
2    buddy.  Would next Tuesday at 11 a.m. Eastern work for you on
3    June 12th?"
4              Do you see that?
5    A    Yeah, I do.
6    Q    So, and then:  "Yes, sir, that works for me."
7              Do you see that?
8    A    I do.
9    Q    And there is nothing here that suggests you didn't have
10   that conversation on the Tuesday, which would have been June
11   the 16th, right?
12   A    There's nothing to suggest we had the conversation or
13   didn't have the conversation, yes, correct.
14   Q    Well, there's no e-mail afterwards saying sorry we missed
15   each other, let's reschedule, is there?
16   A    I think it's fair to say we had a conversation.  I just
17   don't know when it was exactly.
18             MR. SPIRO:  I'd offer Defense B into evidence.
19             THE COURT:  This is, again, B.
20             Any objection, Mr. Lax?
21             MR. LAX:  No objection.
22             THE COURT:  Received in evidence without objection.
23   And that's that whole chain of e-mails?
24             MR. SPIRO:  Yes, sir.
25             (Defense Exhibit B was received in evidence.)

1   BY MR. SPIRO:

2   Q    Fair to say in that e-mail chain that the Department of

3   Justice and the FBI, the FBI mainly, is discussing cooperating

4   Mr. Aguilar, correct?

5   A    Yes, it looks like in that e-mail; yes.

6   Q    So, fair to say you knew as of mid-June that Mr. Aguilar

7   was not the only target of this investigation, right?

8   A    Correct.

9   Q    And, in fact, the questions that were asked during his

10  interrogation, many of them were regarding people above him

11  within the Vitol organization, correct?

12  A    Yes.

13  Q    So when I asked you earlier, you did understand, of

14  course, that the goal of this was to cooperate him against

15  other people within Vitol, correct?

16  A    Not necessarily.  I mean that is one possible outcome as

17  to where the interview is going to go.  That depends on, first

18  off, is he -- is he willing to interview -- to be interviewed

19  in the first place.

20            So, it's not as cut and dry as what you say.

21  Q    Well, forget what could have happened.  I'm asking you

22  your goals.

23            Wasn't one of the goals of the Federal Bureau of

24  Investigation, as it is in pretty much every FCPA case, to

25  take a low-level person and potentially flip them up and move

Zukas - cross - Spiro                                        64

1   up the chain of command?

2   A    That's a possibility, yes.

3   Q    Well, I'm not asking about possibilities.

4        I'm asking in this case was it or was it not one

5   of -- one of your goals?

6   A    That's a possibility that that could happen.

7        THE COURT:  The question was:  Did you have any

8   goals or objectives when you conducted the interview of

9   Mr. Aguilar?

10       THE WITNESS:  Our goal was to interview him and if

11  he was willing to cooperate with us, then, yes, he could

12  potentially be a cooperator for the FBI or for Homeland

13  Security, yes.

14  BY MR. SPIRO:

15  Q    In the first known e-mail or communication between the

16  lead agent in this case and you, sir --

17  A    Yes.

18  Q    -- he says, in sum and substance, that the goal is to

19  cooperate Mr. Aguilar, doesn't he?

20  A    Correct.

21

22            (Continued on the following page.)

23

24

25

SAM      OCR      RMR      CRR      RPR

1  CROSS-EXAMINATION (Continued)

2  BY MR. SPIRO:

3  Q    And he never took that back did he?  He never said, you

4  know, the goals have changed, we're no longer trying to

5  cooperate, Mr. Aguilar.

6            He never told you that, did he?

7  A    I don't recall him saying that.

8  Q    In the communications you had between the 12th of June

9  and the 10th of July, that were oral, either at meetings or on

10 the phone, do you have any notes from any of those

11 communications?

12 A    I think whatever I have, I've turned over.

13 Q    Can you check that?

14 A    I will.

15 Q    When you first stopped Mr. Aguilar passing through

16 customs, you knew a little bit about him, correct?

17 A    I did not stop Mr. Aguilar passing through customs.

18 Q    You didn't stop him passing through customs?

19 A    No.  I did not -- I was not there for his customs.  I did

20 not stop him.  I just talked to him when he fished getting his

21 bags checked by CBP.

22 Q    So are you testifying under oath here today that you did

23 not stop Mr. Aguilar passing through customs?

24 A    What do you mean passing through customs?  Like, through

25 the processing of scanning your passport?

Zukas - Cross - Spiro                    66

1          What exactly are you referring to?  I feel like
2     you're trying to set me up here.  I'm sorry.
3     Q    I can tell from your answer that you're trying to
4     anticipate several questions ahead.
5     A    No.  Not at all.
6     Q    Doesn't your 302 say at the top of it, I stopped Javier
7     Aguilar, quote, unquote, your words, sir, passing through
8     customs?
9     A    He had finished passing through customs and he had his
10    bags inspected by CBP I approached him.  That was simple as
11    that.
12         MR. SPIRO:  I move to strike that answer as
13    nonresponsive.
14         I'll ask the question again, sir.
15         THE COURT:  You can strike it, but somebody's going
16    to ask it either way, so go ahead.
17    A    So what's your exact question again?
18    Q    My exact question -- it's a simple question -- in your
19    302 at the very beginning, don't you say that you stopped
20    Mr. Aguilar -- your words, quote, unquote -- passing through
21    customs?
22    A    Yeah.  He's finished customs.
23         THE COURT:  The question requires a yes or a no.
24    Not what did it happen, the question was, did you put that in
25    your 302.

1          THE WITNESS:  Oh, yes, I put that into my 302.

2          I'd have to look at my 302 for the exact words, but

3     yeah, that sounds familiar.

4     Q    Are you disputing that that's in the 302?

5     A    No.

6     Q    Okay.  Are you disputing that's what happened?

7     A    No.

8     Q    You knew that he was from Mexico, right?

9     A    Yes.

10    Q    You knew that he spoke Spanish, right?

11    A    Yes.  I had a good idea he spoke Spanish, yes.

12    Q    You knew he was a Mexican citizen?

13    A    Correct.

14    Q    You knew he traveled a lot?

15         You knew that because you had his travel background

16    printout, right?

17    A    I did not have that, no.

18    Q    Well, were you aware that he was a frequent traveler?

19    A    I think I heard that he traveled, yeah.

20    Q    And beyond what you knew about him, you knew a fair

21    amount about this case, did you not, sir?

22    A    Not really.

23    Q    Well --

24    A    I mean, what's a fair amount, exactly?

25         I mean, specify that.

1   Q    Well, you exchanged at least 30 e-mails with the lead

2   agent on this case in the lead up to this interrogation,

3   correct?

4   A    Yes.  But that's in my estimation, not necessarily

5   knowing a fair amount of the case.  I had my own cases, you

6   know.

7   Q    Well, we talked about this.  You had the draft criminal

8   complaint that was ready enough to be filed the same day?

9   A    Sure.

10  Q    You had financial tracing and analysis of the

11  transactions at issue or some of them at issue in this case,

12  right?

13  A    I never had any financial tracing.  I never was involved

14  in that aspect of the case.  I was not on this case.

15  Q    Did you receive that in your e-mail account?

16  A    There was some -- I think there was a spreadsheet

17  received that had some financial values on it.

18  Q    What about other 302s related to this case?

19  A    I'd have to look.  I don't remember exactly how many, who

20  offered them, or anything.

21  Q    Not how many and who offered.

22         You did receive 302s related to this case?

23  A    I think that's accurate, yes.

24  Q    You and received transcripts from an encounter that

25  Mr. Aguilar with cooperators in this case, correct?

1   A    That sounds familiar, yes.

2   Q    Right.  That had lots of detail about what the Government

3   was claimings Mr. Aguilar did or did not do?

4   A    Correct.

5   Q    And you had phone calls with the DOJ prosecutors

6   regarding the approach to Mr. Aguilar, correct?

7   A    Yes.

8   Q    You met with and liaisoned with members of the bureau on

9   this case, right?

10  A    Yes.

11  Q    Okay.  You worked with DHS on this case?

12  A    Yes.

13  Q    CBP on this case?

14  A    No.  Just CBP set up the room that was pretty much it, my

15  role in it was.  I don't know if that's working with them

16  necessarily on an investigation.  I mean, there is something

17  to be said about the degree of detail here.

18  Q    Well, when did you learn that you wouldn't be the one

19  asking the questions, the primary questioner at the

20  interrogation, that it would be Agent Wood?

21         When was that decision made?

22  A    Oh, I couldn't even remember.  Probably at some point

23  close to when the interview was actually conducted.

24  Q    Do you recall that actually happening?

25  A    What actually happening, who was going to do the

1    interview?

2    Q    The decision --

3    A    Go ahead.  Sorry.

4    Q    The decision as to who was going to be primarily in

5    charge of the interview?

6    A    Yeah, I think we had, like, a very short conversation

7    about that.  Yeah.

8    Q    Who did?

9    A    Agent Wood and I had the conversation.

10   Q    And tell me what you can about that conversation.

11   A    Agent Wood was going to be the primary lead on the

12   interview.

13   Q    Whose idea was that, you or his?

14   A    I think we just reached a consensus.  I honestly even

15   don't remember, like, why.  Yeah.

16   Q    And you don't know what date that happened on?

17   A    What date we decided who would be the main interviewer,

18   oh, I don't remember that date, no.  I couldn't tell you.

19   Q    Sorry.  You don't remember how close it was in time to

20   the actual interrogation, correct?

21   A    I don't remember how close it was.  I would be

22   speculating.  I don't remember exactly, no.  I'm sorry.

23   Q    In the e-mails in this case that you have turned over to

24   the prosecutors that we have.

25   A    Yes.

1    Q     You all are given the opportunity to ask follow-up

2    questions on the materials provided, correct?

3    A     Yes.

4    Q     Ask questions, right?

5    A     Correct.

6    Q     And were materials also mailed to your address at the

7    FBI?

8    A     I don't think so.

9    Q     When you went to the interview in this case, you had a

10   big stack of papers with you.

11          Do you remember that.

12   A     I had a -- I don't know if it was a big stack.  I

13   remember having a couple of photographs that I looked at and I

14   had a document which I think we called the spreadsheet which I

15   think was some financial numbers were on it, and I think Matt

16   Wood had the transcript.  I did not have the transcript.

17   Q     And you already told us you didn't have a Miranda form

18   with you, right.

19   A     In my car.  I didn't have it on my person.

20   Q     Is your testimony now that it was in the car?

21   A     Well, I think you either misunderstood my answer or I

22   misunderstood your question.

23          I keep a ready bag in my car, as I said earlier,

24   that has everything.  I didn't -- I don't bring the ready bag

25   in with me.

1    Q    Well if, you intend to Mirandize somebody, you bring the

2    form in with you; do you not?

3    A    Yeah.

4    Q    So you didn't bring the form with you inside that day?

5    A    No.

6    Q    Did you bring the cooperation form with you inside that

7    day?

8    A    I didn't have any cooperation forms.  It doesn't work

9    that way, sir.  It just doesn't work that way.  We don't bring

10   a cooperation form, necessarily.  Maybe Jimmy does it

11   differently, but there's an art in working cooperators.  It's

12   not cut and dry, cookie cutter, we bring a form, we follow

13   this procedure.  It's just not like.

14   Q    Okay.  Well you just said, sir, it doesn't work that way,

15   said, sir, it doesn't work that way?

16   A    Yes.

17   Q    Many member of the FBI, do they not, bring FBI cooperator

18   forms when they are out to interview witnesses?

19   A    Some do and some don't.

20   Q    So it does work that way for many many FBI agents?

21   A    No, I don't think so.

22   Q    Okay.

23   A    I don't think so.  There's no one way to do it, sir.

24   Q    And you were provided in this case with this transcript

25   of the cooperators meeting with Mr. Aguilar at a lunch in the

1  months that led up to your interrogation --

2  A     Yes.  That's correct.

3  Q     And this was the strongest evidence in the case, right?

4  A     Yes.  I would say so that I saw.  I don't know if that

5  was the strongest evidence in the case, but at least that what

6  I saw.

7  Q     And in that evidence, your view was that you had proof

8  that he had paid or knew that payments had been made to a

9  public official, and you were going to confront him with that,

10 right?

11 A     It was likely, yes.

12 Q     It was likely that you knew that payment had been made to

13 a public official and you were going to confront him with

14 that, right?

15 A     Correct.

16 Q     You had the strongest piece of evidence with you that

17 day, sir, didn't you?

18 A     Yes.

19 Q     And you told him you had it with you, didn't you?

20 A     I did not tell him that.

21 Q     Agent Wood told him that, right?

22 A     Correct.

23 Q     In all those meetings that you had, phone calls, the

24 e-mails, did you ever ask anybody if Mr. Aguilar had a lawyer?

25 A     No.

1  Q    Did you ever ask if there was any exculpatory evidence

2  related to Mr. Aguilar?

3  A    I don't believe so, no.

4  Q    What about the fact that his company had lawyers involved

5  in this case?

6  A    I don't think I asked questions like that.

7  Q    What about your obligations to contact the consolute

8  because he was a Mexican citizen?  Did you ask that?  Did that

9  come up?

10 A    No.  That's not my case.  That's beyond my purview

11 because I'm not the case agent.

12 Q    Okay.  Well, forget what you asked.

13       Did any of the people on these phone calls, the

14 Department of Justice, the prosecutors, the FBI, the

15 Department of Homeland Security, did any of them bring up any

16 of those topics to you, sir?

17 A    I don't recall that.

18 Q    Did anyone ever mention in any of the preparation that

19 led up to the interrogation of Mr. Aguilar anything about

20 Mr. Aguilar's rights?

21 A    I don't recall that.

22 Q    Were you interested in these topics?

23 A    I'm interested in what I need to do so I -- those topics,

24 I don't recall being brought up.  I'm obviously interested in

25 everything that has to do with my responsibility.

Zukas - Cross - Spiro                                    75

1   Q    And your responsibility was to stop Mr. Aguilar at the

2   airport and attempt to interrogate him, correct?

3   A    To facilitate an interview, yes.

4   Q    Now, in the beginning of July, we talked a little bit

5   about this, but you drove by Mr. Aguilar's home, correct?

6   A    Yes.

7   Q    And did you go by twice?

8   A    I can't remember.  It might have been multiple times.

9   That's possible.

10  Q    Okay.  And what happens after you go by Mr. Aguilar's

11  house -- and the reason you do that, of course, sir, is

12  because going to his house to interview him was an option,

13  right?

14  A    Yes.

15  Q    Okay.  Interviewing him in the Starbucks parking lot is

16  an option, right?

17  A    All options are available, yes.

18  Q    Interviewing him at his office is an option, right?

19  A    Potentially, yes.

20  Q    But the reason you're going him by his home multiple

21  times is because interviewing him at his home was an option,

22  right?

23  A    Yes.

24  Q    And nothing that you saw in scoping out his home

25  suggested to you that this was a particularly dangerous home,

1  did it?

2  A    No.  I think it was a -- fair to say it was a safe

3  neighborhood.

4  Q    And what happens after you have been casing his home is

5  that his travel plans changed, right?

6         Do you remember that happening?

7  A    When I was conducting surveillance his home, yes, I

8  believe there was something about his travel plans.

9  Q    You don't like the word casing.  I'll say surveillance.

10  I'll use the word surveils.

11         So while you're surveilling his home and

12  contemplating that as a upon location for the interrogation,

13  his travel plan changes, doesn't it?

14  A    Well, there's two questions there.  So surveillance on

15  his home was not just to have the option of doing a interview

16  at his home.  It's also to see, actually, if he lives there,

17  if there's proof of his patterns of life, as we call it.  So

18  we're just seeing if he lives there.  So that's also the

19  purpose of the surveillance.

20  Q    And why was that important to you, given your very

21  limited role here.

22  A    Because we wanted to make sure that he actually lives --

23  you know, if you go to public records, it's not always

24  accurate that somebody lives at the address that's on their

25  driver's license, for example, or is in a Department of Motor

1    Vehicle records, so we like to do a driveby to see if there's

2    more prima facie evidence as to the reason or the fact that

3    somebody lives there.

4    Q    But one of the reasons was, as you've already stated --

5    not to the exclusion of all other reasons.  One of the reasons

6    was you were considering that as a potential location for the

7    interrogation?

8    A    Yes.  That's correct.

9    Q    And after that time in which you were surveilling his

10   home, Mr. Aguilar's travel plans changed?

11   A    I think that sounds accurate, yeah.

12   Q    And so at that point, Mr. Zukas, you had a choice, right,

13   to either interrogate him at his home, option one, right, or

14   allow him to fly out of the country since you and the bureau

15   knew that he was flying out of the country, correct?

16   A    Yeah, the options to interview him at his home or

17   interview him at the airport were still on the table, correct.

18   Q    You don't like the word interrogate?

19   A    Not necessarily, but you can use that if you'd like.

20   Q    And the FBI and you, sir --

21   A    Yes.

22   Q    -- elected to let Mr. Aguilar travel internationally --

23   A    Yes.

24   Q    -- instead of conducting an interview at his home, right?

25   A    That was the final decision, yes.

1   Q    And who made that decision?

2   A    The investigative team that I was not apart of.  So it

3   would have been probably Jimmy Kelley and I guess the

4   prosecutors decided what was best.

5   Q    And you refer to yourself though, even though you say

6   you're not on the team, in the e-mails you all refer to

7   yourself as a team, right?

8   A    Well, of course.

9   Q    And the team decision on this issue, the issue meaning

10  weighing, letting a -- was he say suspect to you, right?

11  A    He was a suspect, I would say, yes.

12  Q    So you're letting a suspect fly out of the United States

13  who's not a United States citizen, right?

14  A    Okay.  Yes.

15  Q    And you were choosing to allow that rather than just

16  simply interviewing him in his home, right?

17          MR. LAX:  Objection, Your Honor.  I'm sorry, may I

18  be heard at sidebar again?

19          THE COURT:  If you'd like.

20          MR. LAX:  I'm happy to do it here --

21          THE COURT:  I was going to sustain the objection,

22  because it was compound, but if you'd like a sidebar, we can

23  have a sidebar.

24          MR. LAX:  I think the objection is a little broader

25  than that.

1          THE COURT:  Okay --

2          MR. LAX:  You know --

3          THE COURT:  -- the question either way though.

4          MR. LAX:  I certainly object to the format of the

5     question.  But all of these questions about what was in the

6     mind of this witness and the FBI and the DOJ really just have

7     no relevance in what was happening for a 90-minute period on

8     July 10, 2020.

9          I've maintained -- you know, I've withheld objecting

10    to a number of these, but I just want to note, I just don't

11    think really hardly any of this is relevant to the matter that

12    is before the Court which is what was communicated to the

13    defendant and, you know, what an objective person would have

14    observed or understood within that 90-minute window.

15          We're here for suppression hearing, not endless

16    discovery of what was going on in the minds of prosecutors in

17    this case.

18          MR. SPIRO:  I think it would become relevant in a

19    couple of questions.

20          THE COURT:  I suspect that it will become relevant

21    in a couple of questions.

22          So I'm, as the jury of one, I'm not uninterested.

23          MR. LAX:  Understood, Your Honor.  Thank you.

24          MR. SPIRO:  I'm going to enter or offer Defense C

25    which is up on the screen which is the e-mail correspondence

1    or an e-mail correspondence about this.

2              (Exhibit published.)

3    Q    Do you recognize this, sir?

4    A    I do.

5              MR. LAX:  Mr. Spiro, I'm sorry can you identify this

6    for us.

7              MR. SPIRO:  DOJ 3500PZ6.

8              MR. LAX:  Thank you.

9    Q    Do you recognize this?

10   A    I do.

11   Q    And what is this?

12   A    Just e-mail correspondences that I've had with, looks,

13   Jim Kelley and Matt Wood.

14   Q    And in this e-mail correspondence, you, sir, suggest the

15   option of interviewing -- your word, interviewing --

16   Mr. Aguilar at his home before he leaves for international

17   travel, and eventually the team decides to go in a different

18   direction, correct?

19   A    No.  No.  I'm just offering --

20   Q    You disagree with what I just said?

21   A    I do.

22   Q    So why don't you tell me what you think?

23   A    As you see there, a few observations.  It's not my job as

24   a non-case agent to dictate the direction of a case.  I'm just

25   offering just thoughts, as I explicitly state there,

1    observations in terms of logistics of how to handle it since

2    I'm essentially -- you know, was on the ground in Houston.

3              But this in no way is made to mean I am dictating

4    the investigative direction of this case.

5    Q    Right.  It was obviously Agent Kelley's decision,

6    correct?

7    A    Agent Kelley and the prosecution team, yes.

8    Q    And if I want to know why Agent Kelley made the decision

9    he did to not approach at the home, but wait for him to fly

10   back internationally, I'd have to ask Agent Kelley that,

11   right?

12             MR. LAX:  Objection to form.

13             Calls for speculation.

14             THE COURT:  Yes.  That is sustained.

15   Q    Agent Kelley was one of the individuals, according to

16   your testimony, that made the decision to not interview

17   Mr. Aguilar at his home before he flew internationally and

18   instead, wait for him to fly back from international travel to

19   be interviewed, correct?

20   A    My understanding is he was part of that decision-making

21   process, yes, Agent Kelley.

22             THE COURT:  See, if we're going to go further down

23   this rabbit hole, was the reason ever communicated to you by

24   Agent Kelley or anyone else on the team as to why that

25   decision was made?

```
                    Zukas - Cross - Spiro                    82

 1              THE WITNESS:  No.

 2              MR. SPIRO:  Okay.

 3              THE COURT:  Rabbit hole closed.

 4              MR. SPIRO:  Rabbit hole closed.

 5   Q    But a couple of follow-up questions just about the

 6   airport.

 7              I mean, Mr. Aguilar's home was closer to FBI

 8   headquarters in Houston than the airport is, right?

 9   A    Man, well your guess is as good as mine.

10              THE COURT:  Sustained.

11              Let's move on.

12   Q    Going to his home requires less bureaucratic logistics

13   than goings to the airport, right?

14   A    I'd say that's fair, yeah.

15   Q    And less members of law enforcement and the various

16   departments, CBP, DHS, et cetera that were involved in this

17   coordination that we see in these e-mails to stop Mr. Aguilar

18   at the airport, that sort of grouping, that sort of effort

19   would not have been necessary at his home, right?

20   A    Could you repeat?  I'm not sure if I understand your

21   question.  Coordination?

22   Q    Sure.

23              THE COURT:  Stop.  Stop.

24              This witness has told us he wasn't involved in that

25   decision.  We're not here to have an examination of his
```

1   expertise in bona fides as an agent or what he would have done

2   or what some other agent would have done.  He wasn't involved

3   in the decision.  The decision was made by somebody else.

4           MR. SPIRO:  Moving on from the decision itself, and

5   I'll see if the Court will allow a minor inquiry into this.

6   Q    After the decision has been made, not by you, to

7   interview Mr. Aguilar at the airport --

8   A    Yes.

9   Q    -- you were involved in coordinating, to a certain

10  extent, that process, right?

11  A    To a degree, yes.

12  Q    They have to put up a border watch for Mr. Aguilar so

13  that you know when his flight changes, right?

14  A    Yes.

15  Q    And in fact, his flight changed yet again, if you recall,

16  the night before you were set to interview him, right?

17  A    I believe so, correct.

18  Q    And you were set up so that when you arrived at the

19  airport, there would be a process by which you could check in

20  and have access to the DHS sterile areas of the airport that

21  are not open to the public, right?

22  A    Oh, yes.  Of course.

23  Q    And there were lots of people involved in that process,

24  right?

25  A    I don't know how many people, but there are people, yes.

1    I was not involved in that process.

2    Q    Okay.  Can you explain to me why somebody arriving from

3    international travel into an airport, why an airport would be

4    a safer place, just as it pertains to COVID-19, to interview

5    somebody than, say, the backyard of their home or a Starbucks

6    or anywhere outside?

7    A    I would say number one, in my opinion, it's a safety

8    issue.  My 19 years of experience in the bureau has taught me

9    that any time you're not in a public place -- in this case

10   he's coming off an airport, Mr. Aguilar is departing from a

11   airport --

12             THE COURT:  The question, Agent Zukas, was only

13   directed at COVID-19, the COVID-19 aspect.

14             THE WITNESS:  Yes.  So regarding COVID-19, I think

15   it was safer to interview him at the airport.

16             THE COURT:  Because.  That was the question.

17   Because, now...

18             THE WITNESS:  We don't know in Mr. Aguilar's

19   house -- I've never been in Mr. Aguilar's house -- if there

20   are individuals there that have COVID-19, and we don't want to

21   catch COVID-19, and so we figured if we were going to

22   interview him outside the house, it would have been safer,

23   from a COVID-19 prerogative, to interview him not at the

24   house.

25   Q    Okay.  And what about the -- we'll get back to that

1    answer.

2            But what about a Starbucks parking lot?

3    A    What about it?

4    Q    Why is interviewing somebody indoors after they've gotten

5    off of an international flight in the height of the COVID-19

6    pandemic, why is that safer, as it pertains to COVID-19, than

7    doing an interview outside?

8    A    I don't think it's necessarily safer or not, it's just

9    what we decided to do.

10   Q    Well, but stated in this case by you, on direct

11   examination, you stated that the first reason, in fact, you

12   gave, for going to the airport was because you thought it was

13   safer vis-à-vis COVID-19?

14   A    Yeah.  But I didn't say it was safer than a Starbucks

15   parking lot.  You said that.

16   Q    Okay.  So is it your testimony that other than his house,

17   it's the safest place?

18           What is your testimony on that subject?  Meaning --

19   A    I said it's in my opinion safer, one of the reasons it's

20   safer to do it there, than at the house.  Yes, I did say that.

21   Q    Even though there's far more people inside of an

22   international airport than the home, right?

23   A    Well, you'd be surprised that on that particular day that

24   was not the case.

25   Q    Well, there were more people inside of the airport than

1   there were at his home?

2   A    Oh, yes.  Clearly, yes.

3   Q    And there's outdoor areas.  You surveilled the house and

4   you knew he had a porch where you could have had the

5   interview.

6              You could have been outside at his home, right?

7   A    Sure.

8   Q    Mexico actually had very high COVID-19 rates at the time

9   and he was getting off of an international flight, not having

10  been tested, walking into your interview room, right?

11  A    If you say so.

12  Q    Well I'm asking you --

13  A    I don't know if Mexico had higher COVID-19 -- I honestly

14  didn't -- that didn't enter into the equation.

15  Q    Well, you didn't make him get a negative COVID test

16  before you --

17  A    No.

18  Q    Is there anywhere where I can find this policy that I'm

19  hearing about today that the FBI thinks that during the

20  COVID-19 pandemic, that international airports are a safe

21  place to interview witnesses vis-à-vis other location?

22  A    No.  There's no policy I'm aware of.

23  Q    How about an e-mail?

24  A    What do you mean?

25  Q    How about any e-mail in any of your cases that says from

1  one FBI agent to another, from a supervisor to another,

2  saying, you know what, we ought to do this at the airport,

3  that's a safe location given COVID-19.

4         Is there any e-mail that you're aware of?

5  A    No.

6         Just so I understand the question, you're saying is

7  there an e-mail that the FBI would have released to all of its

8  investigators saying do not do an interview an at airport, is

9  that what you're asking?

10 Q    I'm asking, if there's an e-mail, right -- it could be an

11 APB or e-mail to all FBI agents or even a one-off e-mail --

12 saying the reason we should go to the airport is because it's

13 so safe, given COVID-19?

14 A    Well, that's not what -- you said APB.  That's not what

15 an APB would be issued for.  But I think I take your meaning.

16        It's no -- I don't recall any e-mails by our

17 directors, our assistant directors, our management in Houston

18 saying anything to interviews at airports because of COVID-19.

19 Q    When was the first time you recall the concept of anyone

20 suggesting within the bureau that an international airport was

21 a safe place, given COVID-19, to do interviews?

22 A    I don't recall anything like that.  Like, I don't -- I'm

23 trying to answer the question as best I can, but I'm a little

24 bit unclear what you're asking.

25        Like, you're asking if the FBI released FBI

1  statements about the safeness of doing interviews at

2  international airports?

3          Is that what you're asking?

4  Q    Well, that was one of the questions, right.

5          Another question was is there any contemporaneous

6  e-mail, whatsoever, on this case or any of other cases in

7  which you interview people at airports in which it is even

8  suggested, this notion, that international airports are

9  particularly safe places to conduct interviews?

10 A    I don't remember ever seeing an e-mail like that.

11 Q    Okay.  And how about in any of your notes,

12 contemporaneous writings, in this case or in any other case?

13 A    No.  I don't know.

14 Q    Did you review the motion that the Government filed in

15 this case?

16 A    Which motion?

17 Q    The motion that they filed in opposition to our motion to

18 suppress to attempt to block this hearing and/or get the judge

19 to rule in favor of the Government that this statement at

20 issue here should not be addressed?

21 A    I don't recall seeing a motion like.

22 Q    Did you review any of the filings in this case?

23 A    No.  I don't think so.

24 Q    Were you called and interviewed by the prosecutors as to

25 your memories regarding this matter?

1  A     Yes.  They prepped -- the prosecutors prepped me for my

2  testimony today.

3  Q     So they prepped you.

4        When was the first time you were prepped for your

5  testimony?

6  A     It was 2021.  I thought that this initial suppression

7  hearing was supposed to go in December of 2021, and so the

8  prepping would have been shortly before that, I believe.  But

9  I could get my dates wrong.  But that's what I seem to

10  remember.

11        I think this things' been postponed I think, three

12  times, right, I believe?  I'm not sure.  Two times, maybe.

13  Q     Okay.  So you're talking about specific preparations with

14  the prosecutors for your testimony here today.

15        I'm asking you if you had any memory of the

16  prosecutors telling you, we also have to prepare motions in

17  this case, legal filings, and we have to ask you questions

18  about that, or is your mind -- or is there a distinction you

19  can point to as to that specificity?

20  A     I can't point to any kind of distinction like that.

21  Q     Okay.  Did the prosecutors in this case ask you or

22  suggest to you that one of the reasons the airport would have

23  been a good decision would have been because it's a safe place

24  from the COVID-19 pandemic?

25        Did that come up?

1  A    I don't remember that coming up.

2  Q    Do you have any idea, given that it's not in any of the

3  e-mails or any of the correspondences and it defies logic, how

4  that ended up inside of the motion that the prosecutors filed

5  in this case?

6            MR. LAX:  Objection.

7            THE COURT:  Only if he had a conversation to that

8  effect.

9            MR. LAX:  Just to the form of the question, whether

10  or not it defies logic.

11           THE COURT:  I'm going to allow him to answer if he's

12  had any conversations in preparing for this suppression

13  hearing including in connection with any of the filings that

14  were made with the Court of the topic of COVID-19 and the

15  safety of international airports being part of that

16  conversation.

17  A    I don't remember any discussions like that.

18           THE COURT:  That's the answer.

19  Q    You did mention that the airport was or -- strike that.

20           There were very few people on Mr. Aguilar's flight

21  that morning when he landed at approximately 8:00 a.m.,

22  correct?

23  A    I don't know how many people were on the flight, but I do

24  recall, when we entered the terminal, there appeared to be a

25  lot of planes on the tarmac which struck me as, oh, there's a

1  lot of flights that aren't going out.

2  Q    What about humans inside the airport?

3  A    Oh, there was very few.

4  Q    In fact, in the area in which you first saw Mr. Aguilar,

5  fair to say there were more agents and CBP officers than

6  civilians, correct?

7  A    Oh, yeah.  I'd say that's fair to say, yes.

8  Q    And Mr. Aguilar was flying alone, correct?

9  A    Yes.  He was alone.

10 Q    And when Mr. Aguilar got off the plane, if you know,

11 isn't it a fact that he was immediately stopped before even

12 leaving the bridge, before he even got to check his passport,

13 that he was stopped by a CBP officer who checked his

14 credentials?

15           Are you aware of that?

16 A    I don't know that, no.

17 Q    Were you involved in the planning of that?

18 A    No.

19 Q    Are you aware that he was also stopped at the passport

20 booth before he made his way over to where you first saw him,

21 sir?

22 A    I was not aware of that, but that makes sense that he

23 would be.

24 Q    Assume for the sake of this question he stopped leaving

25 the bridge, and then assume, as you just stated, that he would

1   have been stopped checking at the passport booth, okay?

2   A     Okay.

3   Q     He then comes downstairs.

4   A     Okay.

5   Q     And when he comes downstairs, is it your testimony you're

6   not aware of anything that happened as he exited the plane?

7   A     I was not involved in that process.  So I have done

8   secondary inspections on individuals, so I'm aware of how I do

9   it, and I've also been an international traveler more times

10  than I can remember, so I'm aware of it from that perspective,

11  but when he disembarked the plane and going through the

12  process of what he went through, I was not involved in that,

13  nor did I see any aspect of it.

14

15             (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

1  CROSS-EXAMINATION

2  BY MR. SPIRO:  (Continued)

3  Q    And you weren't involved in the planning of it?

4  A    Not in the planning of CBP pulling him aside, no.

5  Q    Okay.  Was Agent Wood, if you know, involved in the

6  planning of that?

7  A    I think he was the one corresponding with CBP, I believe,

8  yes.

9  Q    And he was staying in touch with them so that you knew

10  the timing of when Mr. Aguilar would get off the plane and

11  when he entered the passport area, correct?

12  A    I believe so.

13  Q    In fact, you were with Agent Wood while he was texting on

14  his phone with people that are involved in the CBP process,

15  correct?

16  A    I don't remember if he was texting on his phone or who he

17  was texting to.  I didn't pay attention to that.

18  Q    But you're saying that the primary responsibility of

19  coordinating with CBP was Agent Wood's, not yours?

20  A    In this instance, yes.

21  Q    In this instance?

22  A    Correct.

23  Q    Did you ever go back and ask Agent Wood, you know, what

24  was the plan for when he disembarked the plane?  Did you ever

25  ask him that?

Case 1:20-cr-00390-ENV   Document 98-16   Filed 04/05/22   Page 95 of 360 PageID #: 1200

1   A    No, I don't think I did.

2          Well, if I may elaborate.  I mean, we've done this

3   many times, it's just a -- it's a very simple process, so I

4   don't think I ever asked him.  I knew he was going to take

5   care of it.

6   Q    Okay.  And by take care of it, again, Mr. Aguilar had

7   been stopped twice before he had even gotten to secondary

8   inspection?

9   A    I have no idea.  I mean, when I say take care of it, I'm

10  talking the logistics.

11  Q    Did you ever talk to the CBP officers about this process

12  after the fact?

13  A    No.

14  Q    Did you watch the secondary inspection occur?

15  A    The only thing I saw was the CBP officers looking at

16  Mr. Aguilar's luggage, that was it.

17  Q    When you say looking at, they actually searched, correct?

18  A    Yes, they were searching it.  Yeah.

19          THE COURT:  Mr. Spiro, do you need a break around

20  this time?  When you come to a logical stopping point, let me

21  know and we will stop.

22          MR. SPIRO:  Okay.  Just a moment.

23          Probably two minutes and then I will -- we'll be at

24  a stopping point.

25          THE COURT:  Just let me know.

1          And also, we do not have a jury, there is a lot more

2    flexibility.

3          MR. SPIRO:  I know.  That's why I'm sort of getting,

4    you know, warm as I go, Your Honor.

5          THE COURT:  How about that.

6    Q    They did inspect his bag and credentials in the secondary

7    inspection, correct?

8    A    I didn't see it.  I guess so.  I wasn't involved in it.

9    Q    Okay.  But you said you were 15 feet away.  I mean, you

10   saw it, right?

11   A    I saw them looking at his bags, that's it.

12   Q    Okay.  And then as Mr. Aguilar walked towards you, you

13   said Mr. -- excuse me, Agent Wood had to all of a sudden go to

14   the bathroom?

15   A    Before Mr. Aguilar, I saw Mr. Aguilar for the first time,

16   Agent Wood had gone somewhere to go use the bathroom, yes.

17   Q    Was Agent Wood next to you when you were 15 feet away

18   looking at the secondary inspection, if you remember?

19   A    I don't think he was there.

20   Q    So the person -- there was nobody next to you when you're

21   doing your observations of the secondary inspection?

22   A    Yeah, probably.  I would say so.  He might have come -- I

23   know Agent Wood came up to me, I was already having a

24   conversation with Mr. Aguilar, so obviously that would have

25   been after the inspection, the CBP inspection.

```
                    Zukas - Cross - Spiro                  96
```

1   Q     And how long would you estimate the CBP inspection

2   lasted?

3   A     Minutes.

4   Q     Okay.  And we agree you stopped him before he reached the

5   double doors and exited Customs, right?

6   A     Yes.  I went up to him and I mentioned his name, which

7   usually gets people's attention, and introduced myself.

8   Q     And when you walked up to him and introduced yourself,

9   you were, sir, alone?

10  A     Yes.

11  Q     And there was nothing preventing you from taking a CBP

12  officer with you to do that, right?

13  A     Nothing preventing me, but that wasn't -- that was not

14  going to be the interview, though.  The interview was going to

15  be Agent Wood and myself, so I didn't want to deviate from the

16  plan of the interview.

17  Q     Okay.  And can you just tell the -- you didn't take notes

18  of what you said to him at the time, right?

19  A     Take notes of what I said to Mr. Aguilar?

20  Q     Correct.

21  A     No, no.

22  Q     You didn't have a body camera on, right?

23  A     No.

24  Q     There's no witnesses to what you said to him, right?

25  A     Correct.

1   Q    Other than you, right?

2   A    Correct.

3   Q    You went alone, right?

4   A    Correct, yes.

5   Q    And you never memorialized what you said in that

6   conversation verbatim, right?

7   A    No.

8   Q    Okay.  And this is now a year plus ago, right?

9   A    Correct.

10  Q    And it's why, you know, because of the passage of time,

11  why you answer certain questions with "I believe I shook his

12  hand," right?

13  A    If you say so.  I mean, I'm trying to do the best I can

14  from my recollection.

15  Q    I understand that.  But I'm asking you because I noticed

16  you do it a few times.  You said "I believe I shook his hand,"

17  right?  And what you mean by that is, I'm not positive I shook

18  his hand?

19  A    That's fair to say, yes.

20  Q    Okay.  And you don't remember the exact words that you

21  said, of course, correct?

22  A    The precise words, no.  But I do remember mentioning his

23  name and introducing myself, yes.

24  Q    Okay.  So you remember those things?

25  A    Correct.

```
                   Zukas - Cross - Spiro                    98
```

1   Q     I get it.

2         But you don't remember the precise words, right?

3   A     No.

4   Q     And what ends up happening is Mr. Aguilar comes with you,

5   right?

6   A     Yes.

7   Q     Right?  No doubt about it, right?

8   A     Yes.

9   Q     He doesn't leave Customs, he comes with you?

10  A     Correct.

11        MR. SPIRO:  I think this is a fine time to break.

12        THE COURT:  Okay, then we shall.  Thank you,

13  Mr. Spiro.

14        We will take our lunch break a little later than

15  usual.  We will try to get back some time between 2:15 and

16  2:30.

17        Our normal practice is that, counsel, you can feel

18  free to leave any of your materials at your table.  William

19  will lock the door so it will be safe.  To the extent that you

20  might need something during the lunch period, take them with

21  you because the door will be locked and they will be safe.

22        So we will come back between 2:15 and 2:30 and we

23  will resume then.  Everybody should have a good lunch and be

24  safe and we will see you thereafter.

25        THE WITNESS:  Thank you, Your Honor.

Zukas - Cross - Spiro                99

1          THE COURT:  You are welcome.

2          Agent Zukas, you may step down.

3          THE WITNESS:  Thank you, sir.

4          (Witness steps down.)

5          (Luncheon recess taken.)

6

7          (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    100

AFTERNOON SESSION

1

2                    (In open court.) (Parties present.)

3            THE CLERK:  All rise.  Court is back in session.

4            Counsel for both sides are present, including

5     defendant.

6            THE COURT:  Okay.  Welcome back.  Hope you enjoyed

7     your lunch.

8            Are we ready to resume?

9            MR. SPIRO:  Yes, Your Honor.

10           THE COURT:  All right.  We will follow our normal

11    practice, which is we will take a midafternoon break.  And I

12    guess I do not necessarily stop at 5:00, so we will see where

13    we are at around that time.

14           Other than that, Mr. Spiro, you may resume your

15    cross-examination.

16           MR. SPIRO:  Thank you.

17           We had neglected to enter Defense C.  I had offered

18    it, but I don't think it got entered.

19           THE COURT:  I do not believe so.  I think you are

20    correct.

21           Any objection, Mr. Lax?

22           MR. LAX:  No objection, Your Honor.

23           THE COURT:  Defense C is received in evidence

24    without objection.

25                    (Defendant's Exhibit C was received in evidence.)

Proceedings                     101

1          MR. SPIRO:  And I've put before the government and

2    the witness, and Your Honor also has it in a binder, three

3    documents that I'd seek to enter now.  It's the 302 from the

4    interview, which will be Defense D; the notes that the agent

5    took during the interview, which is F; and then the typed

6    notes, which is Defense E.

7          The typed notes, just to be very clear, are us

8    taking the handwritten notes from the agent and turning them

9    into a more readable form, at least for me.  I understand the

10   government doesn't have objections to D and F, his actual

11   notes and the typed 302, but they may have an objection to E.

12         THE COURT:  Mr. Lax?

13         MR. LAX:  I do.  I mean, I'm not sure where we're

14   going, so I may have an objection.  I mean, I don't think I

15   have an objection to the 302 or the notes.  The typed notes,

16   we just received a few minutes ago; I have not had an

17   opportunity to fully compare the handwritten notes with the

18   typed notes.  I think this is the first time the witness is

19   seeing them.  And, you know, I'll already note that, you know,

20   I already see a number of discrepancies between the two, so I

21   don't -- you know, we have the actual handwritten notes; that

22   seems to be the best evidence.

23         THE COURT:  Yes, I mean, normally E would be for

24   identification and as an assist to an understanding of F.

25         MR. SPIRO:  That's fine with the defense at this

1    time.  And we can leave it at that for now and take it up

2    later if necessary.

3              MR. LAX:  Yes, we're happy to work through and, you

4    know, with the appropriate amount of time come to an

5    arrangement as to --

6              THE COURT:  Sort of like a wire tap and the

7    government provides a transcript not in evidence, but it helps

8    you understand what is on there.  This is more old-fashioned,

9    kind of trying to give an assist to somebody's handwriting.

10             I assume that that is what you are trying to do?

11             MR. SPIRO:  That's exactly right.  And it assisted

12   me, frankly, so that I can follow along.

13             THE COURT:  Yes.

14             And, you know, as Mr. Lax correctly points out, you

15   have the witness on the stand now and this is his handwriting,

16   correct?

17             MR. LAX:  Yes, Your Honor.

18             THE COURT:  That may be the best assist that we can

19   get.

20             Okay.  So C is in evidence, D is in, F is in.

21             E is for identification.

22             (Defendant's Exhibits C, D and F were received in

23   evidence.)

24             MR. SPIRO:  Thank you.

25

1   CROSS-EXAMINATION

2   BY MR. SPIRO:  (Continued)

3   Q    So where we left off, Agent, was we were talking about --

4   we spent some time talking about all the preparation that went

5   into getting to Mr. Aguilar that day in the interview.  You

6   remember those questions, of course, from this morning.  And

7   we were at the point in time in which you finally lay eyes on

8   Mr. Aguilar, right, where we broke for lunch.

9             You with me so far?

10  A    Yes.

11  Q    Okay.  And you had handcuffs on your person at that time,

12  correct?

13  A    Yes.

14  Q    And you had a gun with you at that time, correct?

15  A    Yes.

16  Q    And it's correct that you did not brandish either,

17  correct?

18  A    Correct.

19  Q    But as you sit here, you don't know whether 18 months

20  ago, at any point as you're moving to either show your

21  credentials or moving at any point in the airport that day,

22  that either/or was visible or a bulge was visible; you don't

23  know that one way or another, correct?

24  A    I'd say with the firearm on my right side, I would agree.

25            There is no way he would have seen my handcuffs.

1   Q     Okay.  So the other thing is, when Mr. Aguilar follows

2   you to the room where you conduct the interview, at the time

3   in which he enters the room, he doesn't know the substance of

4   what the interview is, correct?

5   A     It was while we were walking and in the process of

6   sitting, so it was -- we're talking seconds here, he had asked

7   the question what this is about.  He had asked the question.

8   Mr. Aguilar, as in he.

9   Q     Well, let's put it this way.  When he asked the question

10  what's this about, at that time he didn't know what it was

11  about.  We agree on that?

12  A     Before the question was asked, correct.

13  Q     And he doesn't ask that question until he enters the

14  threshold of that room, right?

15  A     He's in the process of entering and sitting down, yes.

16  Q     Well, are you here to testify under oath that you know

17  whether or not he had crossed the threshold?

18  A     You mean like the doorjamb, like physically crossing the

19  doorjamb?  Oh, I don't remember precisely when that dialogue

20  occurred.

21  Q     Because that first statement from Mr. Aguilar is

22  memorialized in your notes, isn't it?

23  A     Mm-hm.

24  Q     Right?

25  A     Which first statement?

1    Q    The first statement where he says what's this about?

2    A    Correct.

3    Q    Okay.  He says, "I need to know what this is about,"

4    right?

5    A    Something to that effect, yes.

6    Q    Well, that's what your notes say, right?

7    A    Okay.

8    Q    And you started taking notes once you were sitting down,

9    right?

10   A    Correct.

11   Q    Sitting down in the room, right?

12   A    Correct.  When we were interviewing him, correct.

13   Q    Now, right before you got into the room, Mr. Aguilar had

14   just been searched, correct?

15   A    Yes.

16   Q    And the CBP officers, which you said you hadn't been

17   involved with directing, that Agent Wood was more coordinating

18   that aspect of it --

19              THE COURT:  So I am clear, Mr. Spiro, you are

20   talking about a standard Customs search?

21              MR. SPIRO:  Correct.  I was talking about the --

22   well, I -- this search -- well, let me answer your question

23   Your Honor.

24              I am talking about the search that he observed from

25   15 or 20 feet away that happened prior to entering the room,

1    right?

2              THE COURT:  Okay.

3    Q    Agent Zukas, just to take his Honor's question, this was

4    no standard search, right?

5    A    I actually don't know if it was a standard search or not.

6    Q    Did you have a chance to review the materials that were

7    turned over to the defense last night indicating that this was

8    a mandatory law enforcement search?

9    A    Which materials?  Can you show me?

10   Q    What I'm just asking is if in the last 24 hours you

11   reviewed CBP e-mails between CBP and Agent Wood indicating

12   that this was a "mandatory referral," quote/unquote, and

13   "enforcement referral," quote/unquote?

14   A    I don't recall reviewing those e-mails, no.

15   Q    Well, based on everything that you know about what

16   happened that day, sir, all the steps that went into getting

17   Mr. Aguilar there, the fact that CBP was monitoring his flight

18   patterns, the fact that you changed the time you were coming

19   to the airport because his time of flight changed, you would

20   agree, right, that there is no reason to think that the

21   inspection was just some random inspection, right?

22   A    No, not necessarily.  No.

23   Q    So in your mind, when you're watching this inspection,

24   it's you, Agent Wood watching CBP do the inspection, right?

25   A    I don't know if Agent Wood was watching the inspection at

1  that time.  I was watching it, but I think he was still in the

2  bathroom, I believe.

3  Q    Right.  And then he met you back in the room, right?

4  A    No, that's incorrect.  He met me outside the room.  The

5  three of us, as I stated earlier, Mr. Aguilar, myself and

6  Agent Wood, all walked from the corridor to the room, cross

7  the threshold of the room, as you said, and then went into the

8  room.

9  Q    Well, from the -- you and Mr. Aguilar start moving almost

10 immediately upon you greeting him, correct?

11 A    No, that's not true.

12 Q    You stood there and sort of hung out in that corridor

13 before moving towards the interview room?

14 A    Yeah.  Because when I saw him come up to me, I approached

15 him and I didn't just take him into the room.  As I said

16 before, I mentioned his name, I identified who I was, I showed

17 him my credentials, I extended my hand to shake his hand, I

18 said we would like to interview you.

19 Q    Well, let me stop you there for the extension of the

20 hand.  I think we talked about just before that --

21 A    I believe I did that.  I believe I did that.

22 Q    Right.  And I pointed out to you that while you believe

23 you did that, you can't be sure on your oath that you did

24 that?

25 A    95 percent sure.

1   Q    Okay.  Now you're 95 percent sure?

2   A    Yeah.

3   Q    Were you 95 percent sure before the lunch break?

4   A    I had to rethink it and I believe I did shake his hand,

5   yes.

6   Q    Did occur to you that given the great concerns that the

7   FBI apparently had regarding COVID-19 at this time --

8   A    Great concerns?  You mean in terms of --

9   Q    Great concerns.  The great concerns that you testified on

10  direct, that the FBI was so concerned about COVID-19 and the

11  dangers of it that they were doing interviews at the airport,

12  not at people's houses.  Remember that testimony?

13  A    Concerns that -- we were concerned about COVID, but I'm

14  going to challenge you on that.  I'm going to challenge the

15  premise of your question.  So we were concerned about COVID,

16  not we were concerned about COVID and, therefore, do

17  interviews at the airport.  That is an inaccurate statement.

18  Q    Okay.  Well, the record -- I'd ask you to just try to do

19  your best to just answer the question as best you can.

20  A    Okay.

21  Q    But the record is what the record is for the reasons you

22  were at the airport.

23          But my question is just simply this.  Isn't it

24  possible, given that it was -- while it may have been your

25  practice to be shaking hands and you might believe that you

1    had shaken hands and you have a 95 percent certainty that

2    you're shaking hands, isn't it possible, given that we were in

3    COVID-19 and that was apparently much on the mind of the FBI

4    that day, that you didn't shake hands?

5    A    That I didn't shake his hand?

6    Q    Right.

7    A    It is possible, yes.

8    Q    Okay.

9    A    That's why I said not 100 percent.

10   Q    Right.  I was just surprised to hear that during the

11   lunch break it went all the way to 95.

12   A    Yeah, because you have to rethink some things.  You know,

13   after you posed the question to me, I thought about it more

14   and I'm pretty certain -- I'll choose my words carefully.  I'm

15   pretty certain, I'm about 95 percent certain I shook has hand,

16   yes.

17   Q    You don't relieve -- to the degree that CBP was involved

18   in this operation, okay, you personally did not relieve them

19   of duty, correct?

20   A    No.

21   Q    Okay.

22   A    That's correct, yes.

23   Q    And you didn't hear Agent Wood relieve them of their

24   duties?

25   A    No, I don't think so.

1          You're talking about the CBP individuals who were

2    inspecting Mr. Aguilar's bags or just any CBP?

3    Q    Well, there were the CBP individuals inspecting his bags,

4    right?

5    A    Correct.

6    Q    There was the CBP officer who escorted him off the plane

7    and checked his credentials twice that we talked about?

8    A    I had never witnessed any of that.

9    Q    Right, but -- well, if you didn't witness it and you

10   didn't speak to him, you didn't relieve him, right?

11   A    Correct.

12   Q    Okay.  And you also said that once you all were in the

13   room, you believed that Mr. Wood offered a Spanish

14   interpreter?

15   A    No, no.  No, I don't think he said do you want a Spanish

16   interpreter.  I believe it was something to the effect of are

17   you okay doing this interview in English.  I believe that's

18   what he said.

19   Q    When was the first time you told anybody that?

20   A    I don't remember.  You're talking about in the interview?

21   Q    No, no, no.  Not my question.  My question is, you've

22   just testified -- you testified on direct examination that you

23   believe --

24   A    Yes.

25   Q    -- Agent Wood said to Mr. Aguilar words to the effect of

1    are you comfortable having this conversation in English?

2    A    Yes, that's correct.

3    Q    Do you need an interpreter, right?

4    A    No.  No, I think are you comfortable doing it in English.

5    Q    Okay, are you comfortable doing it in English.

6    A    It's just like what I said.

7    Q    Okay.  When was the first time you ever told anybody that

8    Agent Wood said that?

9    A    Oh, I don't remember.  I don't remember when was the

10   first time.  I don't remember.  It wasn't a big issue because

11   he -- it just wasn't a big issue.  I mean, he spoke good

12   English.  We determined that.

13   Q    Well, I agree that it may not be a big issue.  You're the

14   one who is telling us that --

15   A    Correct.

16   Q    -- that you believe --

17   A    Yes.

18   Q    -- that he said that?

19   A    I believe he said that.  I'm not 100 percent for certain,

20   but I believe he said that, correct.

21   Q    Can we hope on this one not quite 95 percent either?

22   A    I'm sorry?

23   Q    You're not 95 percent certain on that either, are you?

24   A    No.  I would say I'm not 95 percent certain.

25   Q    And just so everybody is clear on this, that statement

Zukas - Cross - Spiro                        112

1   that you made in this courtroom that Agent Wood -- you believe

2   Agent Wood said are you comfortable in English, you -- that's

3   not in your notes, right?

4   A     No.

5   Q     Not in the 302, right?

6   A     Correct.

7   Q     Not in any of the followup correspondences, right?

8   A     I believe not, no.

9   Q     Not in the government's motion in this case, right?

10  A     Apparently not.

11  Q     And so the first time, as far as we all here today know,

12  that you ever told anybody that is sitting here testifying

13  today, right?

14  A     Perhaps.  I don't know.

15              MR. SPIRO:  We have a diagram of the airport, which

16  is at tab 10.  It's going to be Defense H.

17              THE COURT:  Defense what?

18              MR. SPIRO:  Produced to us by the Department of

19  Justice.  And I offer this diagram.

20              THE COURT:  Defense?  Again, the exhibit?  What

21  letter?

22              MR. SPIRO:  H.

23              THE COURT:  H as in?

24              MR. SPIRO:  H as in Harry.

25              THE COURT:  Harry.

Zukas - Cross - Spiro                    113

1              And it is a diagram again of?

2              MR. SPIRO:  Of the layout of Level 1 of the airport.

3              THE COURT:  You are asking him if that is what it

4    looked like at or around the time of this examination?

5              MR. SPIRO:  Yes.

6    Q    Do you have it in front of you, Agent?

7    A    I can see it, yes.

8    Q    And we're obviously not going to go through all the

9    intricacies of it, but have you looked at this before?

10   A    I saw it yesterday for the first time.

11   Q    During preparation with the government?

12   A    Correct.

13   Q    And is this a fair an accurate depiction of the diagram

14   that you used in preparation with the government?

15   A    Yes.  But I couldn't tell you anything about it.

16             MR. SPIRO:  Okay.  Well, I'd ask the -- I mean, we

17   can call somebody from the airport, but I'd ask that the

18   government --

19             THE COURT:  Why don't you ask him if it is a fair

20   and accurate depiction of what the airport looked like on the

21   day of the incident?

22   Q    Okay.  Is this a fair and accurate depiction of the

23   layout, as far as you know, of the airport?

24   A    I don't want to speculate, but I am going to say I'm -- I

25   guess it is, but I couldn't even tell you where we did the

1  room -- interview in the room or anything from this depiction.

2  Q    Okay.  Well --

3  A    I just could not honestly tell you.  I have no idea where

4  the room would be in relation to everywhere else.  There's no

5  cardinal points, north, west, south, east.  There's no

6  orientation, depth orientation.  There's nothing here to

7  indicate where the room was in relation to other rooms.

8  Q    Well, let me ask you this.  Are you aware, as you sit

9  here today, that the defense has demanded of the government a

10  diagram of the area in the airport where this all happened?

11  Did you know that?

12  A    I think when they showed it to me yesterday, I believe

13  so, yes.

14  Q    And when you went and planned this mission to interview

15  Mr. Aguilar, when you went that day, you didn't have a

16  diagram, right?

17  A    Correct.

18  Q    And when you left that day, you didn't get a diagram,

19  right?

20  A    Correct.

21  Q    And in your case file, you didn't have a diagram, right?

22  A    I don't have a case on this, on Mr. Aguilar.

23  Q    On whatever file that you had, whatever notes you had,

24  whatever was in your possession in terms of your -- you want

25  to use the word "file"?

1          THE COURT:  No, case file is a word of art.

2    Q    So not case file.  But in your set of documents related

3    to this case, you didn't pull or have a diagram, right?

4    A    Correct.

5    Q    So this is what the Department of Justice produced to us

6    and what they prepped you on, right?

7    A    Yes.

8    Q    Okay.  So what I am going to ask you is just, do you see

9    this, where my finger is, that says -- this room that says

10   "process"?

11   A    Could you bring down the page a little bit, please?

12        Okay.

13   Q    Zoom in a little bit?

14   A    Yeah.  I see it now, yes.

15   Q    And you see the exit area or the opening right here that

16   I am pointing out which is at the top center of the document?

17   I'm looking at the document, it's oriented with the name of

18   the document at the bottom.

19   A    I don't think I'm looking at the right thing.  I don't

20   see that.

21   Q    The opening between the two walls.

22        You can look up at your screen.

23        Okay.  It says "monitoring room south" and then it

24   has an opening there between the walls.  Do you see that?

25   A    Yes, I see mine, but it's not exactly the same orient --

1    I mean, your page goes way higher up than mine, so I'm having

2    trouble.

3           But I think I see it now.  Level 2, monitoring room

4    south, with the little line to like a little red square box;

5    is that it?

6    Q    Yes.

7    A    Yes, right there.  Yes, a little bit higher.  Okay.

8    Q    And you see the room that says "processing"?

9    A    Processing?

10   Q    It's right below that room.

11   A    I do.  It says "process," yes.  Correct.

12   Q    And you see the exit just -- you know, you testified you

13   take a left and then you take another left and you're out.

14   You see the exits to Customs there?

15   A    Yes.  It looks like there's an exit there, yes.

16   Q    Is this room that's identified -- that's been identified

17   by the government as process, is this consistent with the room

18   and the layout that you believe you were in that day?  Again,

19   going on the representations of the government.

20   A    Looks like it, yeah, because it was a square room and we

21   would have -- it looks like there's that corridor going out to

22   the left of process, left and down.  So this appears to be the

23   room, but I -- I can't say with 100 percent certainty.

24          MR. SPIRO:  I'd offer this into evidence.

25          THE COURT:  Mr. Lax?

Zukas - Cross - Spiro                    117

1          MR. LAX:  I mean, I don't have an objection to it.

2   We provided it to the defense subject to all the caveats that

3   we just heard on testimony.

4          THE COURT:  And you provided it because of what?

5          What was the reason why you provided it?

6          MR. LAX:  It's something that we obtained and

7   produced it during the course of Rule 16.  We also provided it

8   with the caveat that it may not be accurate as to the area at

9   the top.  So we brought it -- I'm not sure if it was accurate,

10  but it was a photograph that we obtained during the course of,

11  you know, hearing discovery discussions and something we

12  wanted to produce, as was our obligation.

13         THE COURT:  And you have no objection to that?

14         Did you provide it?

15         MR. LAX:  No, I mean, I have no objection to it

16  under those circumstances.

17         THE COURT:  Received in evidence, Defense H.

18         (Defendant's Exhibit H was received in evidence.)

19  Q    Okay.  And I have blown up the area a little bit and you

20  can see on your screen that there is a room that says

21  "process"?

22  A    I see it.

23  Q    And there's desks and computers, right?  It says "desks,"

24  "computers" and it looks like there's a configuration of

25  desks, right?

1   A    It looks like that, yes.

2   Q    And then as you go down that corridor, it looks like the

3   corridor that's depicted in the photograph and there's a

4   couple of additional rooms, right?

5   A    Looks like it, yeah.

6   Q    So, again, it's consistent -- we can agree that it's

7   consistent with the photographs that the government showed

8   you, correct?

9   A    I'd say so.

10  Q    Okay.  And of course what this room is used for -- I

11  mean, did you ask CBP what this room was used for?

12  A    No.

13  Q    How did you choose this room?

14  A    I didn't.

15  Q    Do you know who did?

16  A    I think CBP said we were going to -- the interview would

17  best be done in this room.  But I didn't handle the logistics

18  of selecting a room.

19  Q    When you say CBP said that, did you hear them say that or

20  that's just your belief?

21  A    I didn't hear them say that, no.

22  Q    Did Wood tell you that?

23  A    I believe he did when he was talking to CBP.  But if he

24  didn't, he would have had to have talked to somebody at CBP

25  because it was their space.  Somebody would have to have

1  talked to CBP.

2  Q    Correct.  Because this is a sterile area where the FBI

3  normally doesn't have purview, correct?

4  A    Correct.

5  Q    And in this sterile space, what this word "process" means

6  is this is actually where you get processed in the arrest?

7  A    Oh, I don't know.

8  Q    Okay.  And then there is jail cells next to it, right?

9  A    Oh, is there?  I don't know.

10  Q    Well, I'm asking you, do you remember that day that next

11  to where you were sitting with Mr. Aguilar there were cells

12  that are made to house people who are detained?

13  A    This is the first time I am learning that there were

14  cells there.

15  Q    Different question.  I am asking you, on the day in

16  question, do you remember that there were cells?

17  A    No.

18  Q    You have no memory of that?

19  A    No.  No, there were -- I did not know if there were

20  cells.  I never asked, no one ever told me.

21         THE COURT:  And you never saw?

22         THE WITNESS:  I never saw, no.

23         I didn't even walk down the corridor.  I stayed

24  right in the corridor and the room.  That's it.

25  Q    Okay.  You know, you described that Mr. Aguilar, at one

1  point I think you said, was happy, right?

2  A    Oh, did I?

3  Q    I don't know.  Was he happy?

4  A    He seemed very in a good mood, yeah.  He was very

5  cooperative, yes.  He was very pleasant.

6  Q    Okay.  And that the tone of the interview never changed.

7  Do you remember testifying to that?

8  A    Correct.

9  Q    Okay.  You are aware, right, or did you know that day

10  that Mr. Aguilar, his plane landed at 8:00 a.m., right,

11  approximately?

12  A    Yeah, that's true.

13  Q    And the flight from Mexico, couple hours at least, right?

14  A    Mexico City?

15  Q    Yes.

16  A    Yeah.  Is it?  I guess so.  Okay.

17  Q    And you have to get to an international airport a couple

18  of hours before, right?

19  A    Yeah.

20  Q    And you got to wake up and get to an airport and do

21  whatever you need to do to do that, right?

22  A    Sure.

23  Q    So fair to say it's a logical conclusion to think, know,

24  and you did know, Mr. Aguilar had been up most of the night,

25  right?

1    A    No, I actually never thought that, honestly.

2    Q    It never occurred to you?

3    A    No.

4    Q    Never occurred to you that he had been up since 2:00 a.m.

5    when you first encountered him?

6    A    No.

7    Q    It never occurred to you as the interrogation wore on and

8    on, did not occur to you?

9    A    No.

10   Q    Now, were you surprised when he entered the room with

11   you?

12   A    Yes, I was, actually.  I was surprised that he agreed to

13   be interviewed, yes.

14   Q    Well, you know that Mr. Aguilar's contention is he never

15   did agree to be interviewed?  You know that, right?

16   A    No, I don't.  My presupposition is, is that is the case;

17   that's why we're here.

18   Q    Okay.  And we don't have a recording of what happened in

19   that room, do we?

20   A    That's correct.

21   Q    And that's because you, sir, made the choice not to

22   record the interview, correct?

23   A    I did not make the choice.

24   Q    Who did?

25   A    The investigative team.  That was the case agent,

1  Jimmy Kelley, and whoever else was on the team.  I had no role

2  in making the decision of whether to record the interview or

3  not.

4  Q    Okay.  And that decision, that final decision was made in

5  a phone call with the prosecutors on July 9th, the day before

6  the interview, correct?

7  A    I believe so.  I would have to look at my e-mails again

8  or the e-mail chain.

9  Q    But that July 9th phone call with the prosecutors, when

10  they asked to speak to you the day before, they wanted to talk

11  to you one last time before the interrogation, is, if I am

12  correct, where the final decisions were made, right?

13  A    Yes.  I think there was a decision not to record it,

14  correct.

15  Q    And you said earlier that there is no policy that

16  requires you to record, right?

17  A    No.  I said there's no policy that requires to record a

18  noncustodial interview, an interview of this manner.

19  Q    But if it is a custodial interview and if he had been

20  arrested, you would have to record it, right?

21  A    Correct.

22  Q    So the only thing separating recording this interview

23  from not recording this interview is the complaint that would

24  later be filed that day was in someone's drawer, it just

25  hadn't been filed, and you all decided he wasn't in custody,

Zukas - Cross - Spiro                          123

1    right?

2    A    No, not necessarily.  No, I would not agree with that.

3    Q    Well, you would agree that if this interview,

4    interrogation, whatever you want to call it, had been

5    recorded, that recording would be the best evidence we could

6    have of what happened in that room, right?

7    A    Oh, yes, I would agree with that.

8

9            (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   EXAMINATION CONTINUES

2   BY MR. SPIRO:

3   Q    Okay, but you and the Department decided not to record

4   it, right?

5   A    There was a decision made not to record it, yes.

6   Q    And not only did you not video record it, you didn't

7   audio record it, right?

8   A    Correct.

9   Q    And that decision was made by the Department, right?

10  A    Correct.

11  Q    Right.  And so I can't stand here and ask you:  Well,

12  isn't it true you said X, Y, Z, it's in the recording now, can

13  I?

14  A    That's correct.

15  Q    Now, fair to say that despite the revelation today that

16  you say that Wood said maybe, if you don't -- you know, are

17  you okay to proceed in English; despite that revelation, it is

18  true that at the time of the interview you did not understand

19  Mr. Aguilar's accent perfectly, correct?

20  A    No, I didn't understand it perfectly, but -- but yes, I

21  didn't understand it perfectly; yes.

22  Q    And, in fact, at the beginning of your notes, just as an

23  example, you write that Mr. Aguilar told you about an

24  investigation into Racile --

25  A    Correct.

1    Q     -- with an R --

2    A     Yes.

3    Q     -- right?

4    A     Yep.

5    Q     And the truth is now, stepping back, sir, you know, you

6    didn't understand him perfectly because he has a strong accent

7    and what he most likely said was Brazil, right?

8    A     No, he was speaking softly, and when we encounter

9    soft-speakers also, we'll ask them to speak up because we

10   don't understand what they're saying.

11           So, it's not just the accent, it's also the tone of

12   the voice.

13   Q     Okay.  So, now we've got the accent, which we agree on,

14   right?

15   A     Yeah.

16   Q     Okay.  We've got the maybe Wood said something that we

17   learned about for the first time today about English, right?

18   A     (No response.)

19   Q     Do you remember that conversation that we just had,

20   right?

21   A     If you say so.

22   Q     Okay.  Well, you said so, sir, right?

23   A     Well, if I remember it, that's how I remember it.  I

24   believe he said that, I don't know how many more times I have

25   to say it.

SAM      OCR      RMR      CRR      RPR

1    Q    And now you think that are the part of the trouble you

2    had understanding was because Mr. Aguilar is a soft speaker?

3    A    No, I said -- I didn't say that.

4         I said in this particular case in the beginning, you

5    know, sometimes when you're speaking softly we ask you to

6    raise your voice.  That is just another reason we might not

7    understand something.  It's not just the accent.

8    Q    Sure, sure.

9    A    I had no problem understanding him, period.

10   Q    Well, you're the one who wrote a word into the beginning

11   of your notes --

12   A    Yeah.

13   Q    -- that we both agree, either because of his accent or

14   soft speaking --

15   A    Yeah.

16   Q    -- you did not get down correctly, right?

17   A    Yeah.

18   Q    Okay.  And this whole soft-speaking thing, you never

19   testified about that on direct, did you?

20   A    No.

21   Q    Okay.  That's not anywhere in your notes, is it?

22   A    No.

23   Q    Okay, that's not anywhere in the memorialization of

24   anything that's occurred until you just said it; right?

25   A    Yeah.  I don't think I've ever said soft speaking in any

1  of the hundreds of reports that I've ever written.

2  Q    Okay, but isn't it true that what you're talking about

3  really right now, sir, is an observation that sometimes people

4  speak softly?

5  A    Yes.

6  Q    Not that you have a specific memory that he said this

7  word softly, correct?

8  A    That's correct.

9  Q    Okay.

10        I want to be very clear, you don't actually remember

11  him saying the word of what you thought was Racile, right, you

12  don't remember that?

13  A    Correct.  I remember him speaking softly in the

14  beginning, and then not having any issues once we had the

15  appropriate tone of the interview, of not having any

16  understanding issues whatsoever.

17  Q    Well, you know if you had an understanding issue and you

18  didn't realize it, you might just have written something down

19  wrong; right?

20  A    I'm sorry?

21  Q    How would you know whether you were misunderstanding him,

22  you never took your notes and showed them to Mr. Aguilar and

23  said:  Did I get it down right?

24  A    Correct, correct.

25  Q    And, in fact, you're now saying at the very beginning

1   there was this soft speaking, right?

2   A    No, what I'm saying is -- is that the tone in this case,

3   if it's soft, which in the beginning it was, and we would have

4   said something.  That is another reason why we can't -- you

5   might write something down that you didn't hear correctly.  It

6   had nothing to do with his -- me not understanding his

7   English.

8   Q    And are you saying that you have a memory of telling him

9   to keep his voice up during this interview?

10  A    I don't remember that, no.

11  Q    Okay.  And didn't you tell us on direct an hour or two

12  ago that the tone of the interview remained consistent

13  throughout?

14  A    Pretty much, yeah.

15  Q    Okay.  You didn't say anything about soft tones then,

16  right?

17  A    I wasn't referring it to that way.  The tone as in us

18  elevating in escalating or de-escalating the, you know,

19  adversarialness of the interview.

20  Q    You had to repeat, when I say "you," Agent Wood had to

21  repeat things several teams during this interview, right?

22  A    Yes, I believe so.

23  Q    Okay.  And sometimes Mr. Aguilar would appear confused,

24  right?

25  A    He was confused, but not for the reasons you specified.

1   Q    Oh, you know why Mr. Aguilar was confused at each and

2   every point of this interview?

3   A    I do not know because I don't read minds, but based on my

4   experience there was other reasons why he -- we had to ask him

5   questions over again.

6   Q    And you, of course, were confused when he said Brazil and

7   you wrote down Racile, right?

8   A    Yeah, correct.  That happens all the time.

9   Q    And sometimes Mr. Aguilar didn't answer questions right

10  away, right?

11  A    I believe so.  I think he had to think about some of his

12  responses.  Yes, I think that's correct.

13  Q    Some of the things he might have been thinking about was

14  understanding your words, wasn't that possible?

15  A    I didn't get that sense, no.

16  Q    Okay.  You also were wearing a mask, right?

17  A    I believe we were, and I think we decided all to do the

18  interview without the masks.

19  Q    You did the interview without the masks?

20  A    I believe so, yes.  I believe we took some of the masks

21  off sometimes when we asked questions.

22  Q    I thought that we were in the height of COVID-19 and we

23  were in the airport because of the danger of the pandemic?

24  A    Yeah, okay.

25  Q    When was the first time you ever told anybody that you

1    took your mask off during the interview?

2    A    I believe I told the prosecutors that during the course

3    of the prep.

4    Q    When was that?

5    A    I don't recall when.

6    Q    In the last 48 hours?

7    A    I don't recall when I would have said that.

8    Q    Okay.  You understand that there's been an assertion in

9    this case that there were masks worn the entire --

10   A    Yeah, we had -- we had masks on, but what I'm saying is

11   we took masks off sometimes for certain questions.

12            That's what you're asking, right?

13            We took the masks off at times to -- like I am now,

14   for example, and then we put it back on.

15   Q    And why -- according to you, you've said this to the

16   prosecutors before, is that right?

17   A    Correct.  I believe so, yes.

18   Q    Okay.  You didn't have a microphone like you have here,

19   though, right?

20   A    No.

21   Q    Okay.  And you don't remember which times or when or why

22   you took your mask down or up or down or up as you were

23   speaking, right?

24   A    Correct, or whether we took it off for certain lengths of

25   time or put it back, I don't remember.  Like, actually

1  taking -- when I took the mask off or put it back on and how

2  long, I don't remember that.  I'm sorry.

3  Q    Well, do you actually have a clear memory as you sit here

4  today of events that occurred two years ago of whether or not

5  you even took it off completely at all?

6  A    No, I can't say I have a complete, unhindered memory of

7  that; no.

8  Q    Okay.  And we don't have a video of it either, do we?

9  A    Correct.

10  Q    And you didn't ask for an interpreter, right?

11  A    Correct, I don't believe that we did; no.

12  Q    And you didn't use the call service to get an

13  interpreter, right?

14  A    No.

15  Q    And you, being an experienced special agent in Houston,

16  you know that the CBP officers, many of them speak Spanish,

17  right?

18  A    I know the ones I deal with, some of them speak Spanish,

19  yes.

20  Q    Okay.  You didn't ask one of the CBP officers to be

21  available, like the Court has today, in case there's some

22  misunderstanding issues, right?

23  A    I did not ask, no; correct.

24  Q    And not a single one, not a single one of the questions

25  for that ninety minutes had anything to do with the border

1    re-entry or Customs process, correct?

2    A    I believe that's correct.

3    Q    You were there to interview him on a criminal case,

4    correct?

5    A    Correct.

6    Q    And you were there to flip him and cooperate him, if at

7    all possible; correct?

8    A    That was a possibility, yes.

9    Q    You seem to want to answer that question every single

10   time with the "it's a possibility."

11              I understand it's a possibility.  There's lots of

12   possibilities.

13   A    Correct.

14   Q    Isn't it true that one of your goals, in fact, was as

15   Wood and you and Kelley discussed from the inception, one of

16   the goals was for him to cooperate?

17   A    That's correct.

18   Q    Now, that room had no windows, right?

19   A    Correct.

20   Q    Thick, metal door; right?

21   A    Yes, I believe -- yes, that's correct.

22   Q    Okay.  No cell phone use allowed in there, right?

23   A    I'm not sure about that.  I don't know.

24   Q    Well, you saw that in Customs they've got that sign up

25   everywhere, including in that room.  And we can look at the

1  pictures, if I could have the Government's exhibits so I don't

2  have to re-enter them.

3          There were signs up all over that said no cell

4  phones, right?

5  A    I did not observe the signs, perhaps there was.

6  Q    Okay, you do know that in Customs there are signs up that

7  say no cell phones, right?

8  A    That sounds -- yeah, that sounds accurate; yep.

9  Q    Well, it doesn't just sound accurate, you know that, sir,

10 don't you --

11 A    No, actually that's not the case because I've been in

12 Customs' areas before where we have used cell phones.

13 Q    Okay.  Well, you're an agent.

14 A    Yeah.

15 Q    I'm talking about civilians in Customs, there are

16 typically signs that say no cell phone usage?

17 A    Is that the case?  I don't know.

18 Q    Okay.

19          MR. SPIRO:  If I could have those exhibits from the

20 Government, we'll look at those signs.

21 BY MR. SPIRO:

22 Q    It's cold in that room.  Did you notice it's cold in that

23 room?

24 A    No, I didn't actually.

25 Q    Did you know that in Houston -- you know, you've been in

1  Houston how long you said on direct?

2  A    About five-and-a-half years.

3  Q    And you know some of the CBP officers that work on your

4  cases, right?

5  A    I'm sorry?

6  Q    You know some of the CBP officers professionally, some of

7  them that you just referred to that speak Spanish, you've

8  worked with them?

9  A    I know one, yes.

10  Q    It's just one now?

11  A    I know one for sure, and I would say I know him very

12  well.  I know others, but if you're talking about -- you said

13  very well, professionally.  I know one, yes.

14  Q    Okay.  So, you know others professionally, correct?

15  A    Yes.  I know of them, yes.

16  Q    Okay.  Well, you know that they call this room the icebox

17  because they bring people here into the cold and they shut it

18  so they can break people and talk to them, right?

19  A    Oh, really?  I've never heard of that.

20  Q    Okay.  Ask CBP -- when you leave here today, after you're

21  done being under oath, do that for me so that if we meet again

22  you can ask and find out whether or not they refer to this

23  room as the icebox because this is where they break people who

24  are traveling and they want to interrogate, and they make it

25  really cold in there.  Okay?

1            MR. LAX:  Objection.

2    A    Okay.

3    Q    Now, we looked at these pictures before and this is

4    Government 1-D, right?

5            And you said this is the one where Aguilar's view of

6    the door would be, right?

7            (Exhibit published.)

8    A    Correct.

9    Q    And you see on the door it says Secondary Inspection?

10   A    (No response.)

11   Q    See (indicating)?  The metal door we just talked about.

12   A    Yes, I can see it.

13   Q    Okay.  And you see on the wall right in front of where

14   Aguilar was sitting, how it says:  No cell phone usage?

15   A    I can see it.

16   Q    Okay.

17           And you see in Government's 1-E, how on the -- on

18   the other wall where Aguilar would have been to just his left,

19   but able to see, it says, Keep Detention Safe?

20   A    It would have been to his right, but, yes, I can see that

21   poster.

22   Q    I guess his chair is tilted in this photograph, but I get

23   your point.

24           But within his line of sight, there's a sign that

25   says Keep Detention Safe, right?

Zukas - cross - Spiro                    136

1   A    I can see it.

2   Q    And there's another sign next to it which indicates

3   you're, in sum and substance, within the confines of the

4   Customs area, right?

5   A    I'm sorry, repeat that.

6   Q    There's another sign next to it that indicates, a sign

7   regarding that you're in a Customs area, correct?

8   A    I can't read it, but I'm assuming that's what -- I mean I

9   don't want to assume.  I can't read that, so I don't know what

10  it says.

11  Q    But you're not here to dispute that?

12  A    No.

13  Q    Okay, but back to the sign that says Keep Detention Safe,

14  do you see that?

15  A    I see it.

16  Q    And you're aware, are you not, that in areas of detention

17  CBP and DHS put up signs that talk about abuse that happens in

18  custody?

19       Did you know that?

20  A    I believe they put up signs, yes.

21  Q    Okay.  And it's about abuse in custody.

22  A    If it says -- if that's what the sign says.

23  Q    Well, it says -- I mean we're going to get closer to the

24  sign if you want, but it says Keep Detention Safe.  Right?

25  A    I can see it, yes.

1   Q    Okay.  And you agree with me that those are the words,

2   right?

3   A    Of course.

4   Q    And Aguilar sees a sign talking about keeping detention

5   safe, right?

6   A    Well, I don't know if that poster was in that room at the

7   time.  I have no idea.  So, I don't know if that's what he saw

8   or not.

9   Q    Okay, and we don't know what the room looked at the time.

10          It's going to be similar to all of the other things

11  because you didn't take pictures of the room, right?

12  A    I did not take pictures of the room.

13  Q    So, we've been talking -- you talked on direct and you

14  were asked a dozen-plus questions about what was in the room

15  and the chair.

16          Do you remember those questions?

17  A    I do.

18  Q    You never said to any of -- the prosecutor asking you the

19  questions:  Well, sure, but maybe that wasn't the same chair

20  or maybe that wasn't in the room at the time?  Right, you

21  never answered any of his questions that way, did you?

22  A    No, I think I did, with the -- the color of the table I

23  thought was silver.

24  Q    The color of the table?

25  A    Yeah.  I seem to remember the color of the table being

1  silver, but, you know, I'm not a hundred percent sure what the

2  table looked like exactly.  And I did say that there was not

3  one chair.  That would have been impossible because there were

4  three of us.  So, there were only two chairs in the photograph

5  that was -- that was showed earlier.

6  Q    Well, sure, I understand the configuration of the chair

7  and the table.  But let me ask you this:

8           You don't -- you're not contesting that this sign

9  has been up in this room since long before you ever

10 interrogated Mr. Aguilar?

11 A    I have no idea.

12 Q    But you have no reason to believe that, do you?

13 A    That's true.

14 Q    And Mr. Aguilar saw CBP officers standing in and around,

15 not inside of the room, but outside of the room at the

16 exterior of the door, correct?

17 A    Oh, I don't know that.

18 Q    But you have no reason to doubt that?

19 A    I have no reason to doubt it and I also don't have any

20 reason to expect that that's the case.

21 Q    Well, there were CBP officers working alongside all of

22 you at different parts of this mission; we agree on that,

23 right?

24 A    Correct.

25 Q    Okay.  You never relieved the CBP officers, right?

1   A    Correct.

2   Q    Okay.  And the CBP officers, as you've already said,

3   outnumbered the civilians at that time in the airport, right?

4   A    Outnumbered the civilians in this area of the airport?

5   Q    Sure, this area of the airport.

6   A    I would say so, yes.

7   Q    Okay.  And you don't know that they had anything else to

8   do at this time, do you?

9   A    I have no idea what they were doing.

10  Q    As we look back at Government 1-C, okay, and we're going

11  to now go to Mr. Aguilar's chair.

12            (Exhibit published.)

13  BY MR. SPIRO:

14  Q    That's his chair, right, underneath the sign that's

15  written in Spanish that talks about abuse in detention; right?

16  A    That's where he would have sat.  I don't know if that's

17  his chair necessarily.

18  Q    Okay.  This chair, where he would have sat, is chained to

19  the table, correct?

20  A    It looks like it, yes.

21  Q    Meaning you can't move that chair, right, away from the

22  table if you want to, can you?

23  A    Correct.

24  Q    And, in fact, there were chains on that chair that day,

25  and there have been chains on those chairs in that room for

1    years, right?

2    A    Oh, is that the case?  I don't know.  I've never been in

3    that room until that day.

4    Q    Okay.  Do you dispute that there were chains on the

5    chairs?

6    A    I don't remember, honestly, there being a chain.  I

7    thought it was a -- like I said earlier, like a picnic table

8    desk that was kind of silver and the table kind of extended

9    into the chair.  So, like, the chair and the table were one.

10            Does that make any sense?

11   Q    Not really.

12   A    So, have you ever been to a park before?

13   Q    I have.

14   A    So, you know what a picnic table looks like, right?

15   Q    I do.

16   A    So, chairs are not actually disconnected from the picnic

17   table, they're all part of the table.

18            Does that make sense?

19   Q    So as you remember it -- well, you don't remember

20   Mr. Aguilar sitting on a bench, you remember him sitting in a

21   chair, correct?

22   A    It was like a -- kind of like just a sitting area, like

23   an extended sitting area that was connected to the table.  So,

24   it would have been you couldn't remove the table without

25   removing the entire apparatus.

1  Q    You don't remember when Mr. Aguilar walked in the room

2  Agent Wood picking up the chair and smacking it a little bit

3  on the ground to make a pinging sound and saying:  Sit here?

4  A    No, I don't remember that at all.

5  Q    I mean you are aware that the Government has identified

6  that seat, whether it's the exact same chair or not, as him

7  sitting in a chair in that location?

8  A    Yeah.  Yeah, he sat -- absolutely.  Yeah, he sat in

9  that -- where that chair would have been.  He sat right around

10  in that location, that's correct.

11  Q    Well, but I'm saying something slightly different.

12        Which is the Government has identified in a formal

13  letter to us that this is the seat in which he sat, not a

14  bench, not a picnic basket, that seat chained to that table.

15        Do you know that?

16  A    No.  No.

17  Q    And if you look, the truth is, and it's easier if you

18  look at it up close, there's a hole on the other arm of the

19  chair and there were at the time in that room handcuffs

20  dangling off the other arm of that chair or hardware that

21  looks like that chain?

22  A    I don't remember that at all.

23  Q    Okay, but you don't deny it?

24  A    I don't remember it.

25  Q    Well, I understand that you don't remember it, okay, or

1  you're testifying you don't remember it.

2          And, again, we can't check, you didn't take a

3  picture; right?

4  A    Nope.

5  Q    You had your phone with you that day, right?

6  A    Yes.

7  Q    Agent Wood had his phone with him that day, right?

8  A    I don't know.

9  Q    Well, we talked a little bit earlier about how he was

10 texting with CBP, right?

11 A    Correct, then he would have had his phone.

12 Q    He would have had his phone, right?

13         So you guys have your phone, and you have an iPhone

14 I assume?

15 A    No.

16 Q    Well, you have a phone that has a camera?

17 A    Yes.

18 Q    Okay.  You didn't use that phone to take pictures, right?

19 A    No.

20 Q    You could have recorded with your phone and you didn't do

21 that either, right?

22 A    No, I did not.

23 Q    And so, the reason why these chairs have chains and why

24 they are secured this way is... you see these doors right next

25 to the wall where Mr. Aguilar was?

1   A    I see the door, yes.

2   Q    Okay.  Those are cells, right?

3   A    Oh, I have no idea.  That's the first time I'm hearing

4   about it today.

5   Q    And next to the cell is another photo of the same picture

6   that talks about abuse in detention.

7            Do you see that poster?

8   A    The one in Spanish?

9   Q    The Spanish one, yes.

10  A    Yes, I see it.

11  Q    Okay.  And Aguilar's chair is up against the wall of that

12  cell, right?

13  A    Yes, it looks like that.  Yes.

14  Q    And in a filing it was said that Aguilar was in the

15  closest area to the door that he could have been in, in sum

16  and substance.

17           Do you agree with that?

18  A    Yes, I do.

19  Q    He couldn't have sat anywhere closer to that open door

20  than that seat with his back against the jail cell?

21  A    I don't think so.  I think that was the only table in the

22  room from my recollection at the time.

23  Q    You were actually sitting at the right corner of this

24  table, right?  Because it was so narrow in that corner,

25  your -- whether it was a picnic basket desk or a chair or

1  whatever it was that you were sitting in, you were sitting at

2  the corner area of that table, right?

3  A    Agent Wood was to my right.  So, that's correct.

4  Q    Right.

5         And so, I don't want to like, you know, draw a

6  triangle here, but when you all say that Mr. Aguilar was the

7  closest person to the door, that's not true either, you were

8  the closest person to the door?

9  A    No, I disagree.  I think he was the closest person to the

10  door.

11  Q    Okay, and you disagree because you think he had a cleaner

12  line of sight to the door or you disagree because you believe

13  that, you know, the hypotenuse isn't the fastest way to the

14  door?

15  A    Because geometrically the way that the orientation of

16  that table was, he appeared, by my visual sight, to be the

17  closest to the door.

18  Q    Right.  He didn't have any handcuffs with him, right?

19  A    Mr. Aguilar have handcuffs?

20  Q    Yes.

21  A    No, I didn't see any.

22  Q    He didn't have a gun, right?

23  A    Correct.

24  Q    You both had guns, right?

25  A    Correct.

1   Q    You had him outnumbered, right?

2   A    Yes.

3   Q    Surely, a chair at any other location, any other location

4   you could have picked in all of Houston to interview him,

5   wouldn't have been chained to the desk, would you agree with

6   that?

7   A    Any other chair chained to the desk?

8   Q    Right.

9   A    No.  There is a lot of chairs that are chained to the

10  desk in many law enforcement facilities where we interview

11  people in a non-custodial fashion.

12  Q    Outside of law enforcement settings, if you had picked

13  any other chair in Houston to interview him at, you would

14  agree with me the vast majority of chairs are not chained to

15  the table, right?

16  A    I would say that's an accurate statement.

17  Q    And the vast majority of chairs, like at the Starbucks I

18  suggested, right, don't abut a jail cell, do they?

19  A    Yes, that's correct.

20  Q    And just to blow up that poster that's in the room

21  several times, okay?

22          (Exhibit published.)

23  BY MR. SPIRO:

24  Q    And tell me if I'm reading this right:  Keep detention

25  safe.  CBP has zero tolerance for sexual abuse and assault.

1    Speak up.  Report privately.  Be safe and get help.

2         Right?

3    A    Yes, that's what it says.

4    Q    Now, we talked about that meeting, virtual meeting with

5    the Department of Justice the day before where the decision to

6    not record was made.

7         At that same meeting, again I understand it's a

8    remote meeting, but at that same meeting it was also agreed

9    that you would not be reading Miranda warnings at this

10   interview, correct?

11   A    I don't know if that was agreed, just that it was a

12   non-custodial interview so we're not Mirandizing anybody.  I

13   mean it was a non-custodial interview, so, therefore, there's

14   no need to Mirandize because we're not arresting him.

15   Q    Well, I mean you had a draft complaint near final in your

16   pocket, right?

17   A    I didn't have it in my pocket.  I'd just seen it

18   virtually, that's it.

19   Q    You didn't bring it with you to the interrogation?

20   A    No.

21   Q    You had them in your e-mail account on your phone,

22   though, right?

23   A    Correct.

24   Q    Okay.  And he was as close -- that arrest warrant was

25   filed the same day, right?

1    A    I don't -- was it?  I don't remember.

2    Q    Okay.

3    A    I was not involved in that.

4    Q    Okay.  But let's assume for the sake of this question it

5    was.  Okay?

6    A    Okay.

7    Q    He couldn't have been any closer to an arrest, you can't

8    get closer than that, the fact that the agent interviewing you

9    has a ready-to-file arrest warrant and is just not filing it

10   for some reason; right?

11   A    Sure, if you say.  That's as close temporally, yeah, I

12   guess so.

13   Q    Well, not only close temporally, he's chained to a table

14   and his back is to a jail cell, too, right?

15   A    He was not chained to a table.

16   Q    Well, his chair was chained to a table?

17   A    His chair was part of the table.  He was not chained to

18   it, though.

19   Q    Well, wait a second.

20   A    You said it, not me.

21   Q    Okay.  The chair is chained to the table, correct?

22            THE COURT:  He disagrees with your description,

23   Mr. Spiro.  Don't fight with him.

24            MR. SPIRO:  I'll move on.

25   BY MR. SPIRO:

Zukas - cross - Spiro                            148

1   Q    The truth is the reason that this happened this way is

2   because by not filing the arrest warrant, you could interview

3   him in this way, flip him quietly, and there would be no trail

4   that he had ever formally been arrested.

5           Isn't that a fact?

6   A    Be no trail?  What do you mean by that exactly, no trail?

7   Just so I understand.

8           I think I understand what you mean, but if you can

9   clarify please, sir.

10  Q    There would be nothing filed that anybody could look to

11  and point to, right?

12  A    Correct.

13  Q    And that's why law enforcement does it this way sometimes

14  when they're looking to flip somebody, right?

15  A    Yes.

16  Q    Okay.  And so, not only do you have the benefit by not

17  filing the warrant first, of not having to, according to you

18  and the prosecutors and the agents, not having to read him

19  Miranda warnings, right; but the second benefit that you have

20  is, if you're able to flip him, no one ever knows that it ever

21  happened; right?

22  A    Yeah, I'd say that's true.

23  Q    And then he can leave there, wear a wire, do what you

24  need him to do, and get up the chain, which was the plan;

25  right?

1   A    I would say so.  That wasn't my plan, it's not my case.

2   I would be assuming if that was the plan, it sounds very much

3   like what the FBI would do.  But it was not my case, so I

4   can't say that was their plan.

5   Q    It wasn't your case, sir, but you were very, very much

6   involved in this process?

7   A    For the interview and -- yes, correct.

8   Q    And --

9           THE COURT:  Did you participate in any arrest of

10  Mr. Aguilar?

11          THE WITNESS:  Yes, I was the arresting agent on

12  Mr. Aguilar.

13  BY MR. SPIRO:

14  Q    And so you know from being the arresting agent, or you

15  have in your records, maybe not your case file, you have in

16  your records that the warrant was filed that day and several

17  days later he turned himself in, right?

18  A    Yes, he -- the warrant was filed at some point.  I don't

19  know if it as filed that day.  Honestly, I don't remember what

20  day it was filed, and he self-surrendered at the FBI office in

21  Houston.

22  Q    Right.  And after -- before he surrendered and in the

23  days after his surrender, the Department of Justice was still

24  trying to get Mr. Aguilar to cooperate, correct?

25  A    Oh, I don't know.  I was not involved in any of that.

Zukas - cross - Spiro                    150

1    Q    And you knew, did you not, that Vitol, the organization,

2    had lawyers; correct?

3    A    Yes.

4    Q    Okay.  And you knew that Mr. Aguilar was a manager at

5    Vitol, right?

6    A    Yes.

7    Q    Okay.  And --

8    A    Or he was a -- I did not know he was a manager, I thought

9    he was a trader, like an LPG trader -- liquified petroleum

10   gas, liquified natural gas.

11   Q    Okay.

12   A    Was he a manager?

13   Q    Did the draft complaint, as far as you remember, call him

14   a manager?

15   A    I don't remember what it called him.

16   Q    Did the Department of Justice press release call him a

17   manager?

18   A    I didn't read the press release.

19        THE COURT:  Were you involved in the drafting of the

20   complaint?

21        THE WITNESS:  No, I was not.

22   BY MR. SPIRO:

23   Q    And you did not provide any edits to the complaint after

24   the interrogation of Mr. Aguilar either, correct?

25   A    I was not involved in the complaint process.

1   Q    And he actually told you, "he" meaning Mr. Aguilar, at

2   the beginning of the interview that managers at Vitol, people

3   at Vitol, employees at Vitol, had lawyers; right?

4   A    He said -- I believe he said there were several people at

5   Vitol that had attorneys, lawyers; yes.

6   Q    Okay.

7   A    I think he said guys, actually, G-U-Y-S, I believe, but

8   I'd have to look at my report.

9   Q    Well, that was right around the same time that you

10  misunderstood Brazil, right?

11  A    (No response.)

12  Q    Correct?

13  A    Yes.

14  Q    And, in fact, you knew that he was a current manager at

15  Vitol when he told you that, right?

16  A    He was an employee of Vitol, yes, that's what I knew.

17  Q    And you asked him questions during this interrogation

18  about his bosses, right?

19  A    I asked some questions.  I was not the lead interviewer.

20  Q    Agent Wood asked questions about his bosses, correct?

21  A    Correct.

22  Q    And he asked questions, we don't have to go through it

23  line by line, he asked questions trying to work his way up the

24  chain, right?

25  A    He was trying to ask questions about individuals that he

1  had relationships with in Vitol.  I don't know if it was

2  working up the chain.

3  Q    Well, he was trying to find incriminating evidence that

4  he could get from Mr. Aguilar regarding more senior people at

5  Vitol?

6  A    Correct.

7  Q    And, in fact, not only did Mr. Aguilar mention lawyers at

8  the beginning of the interrogation, but he mentioned them when

9  you switched subjects to Mexico, right?

10  A    Yes.

11  Q    Right.  And is it your position that you scrupulously

12  honored, I'm using a word from the brief, you scrupulously

13  honored his invocation at that point?

14  A    You said I'm using the word from --

15  Q    From the Government's motion.

16  A    Oh, gotcha, okay.

17  Q    Did you scrupulously honor his invocation?

18  A    Yes, I believe I did.

19  Q    You didn't ask him a single question after that?

20  A    Only when he asked us a question.

21  Q    Ah, I see, okay.

22         THE COURT:  You answered the question or you asked

23  him another question?

24         THE WITNESS:  Once he made the invocation, I told

25  him the interview was now terminated and we stopped all

1   questioning.  He then, I guess you would call them excited

2   utterances, made statements asking us questions.

3            THE COURT:  And did you respond to those utterances?

4            THE WITNESS:  I did because some of the questions

5   were:  How do I get in contact?  And that's when I -- at the

6   end of the dialogue, he gave me his business card because we

7   needed to have a way to get in touch with him in the future.

8   BY MR. SPIRO:

9   Q    Well, we are going to have to go back to that now, right?

10           I mean a moment ago you told this Court, as His

11  Honor followed up, that after the invocation that you

12  scrupulously honored, Mr. Aguilar you claim asked questions

13  and you also asked questions following those questions;

14  correct?

15  A    We asked questions and gave him answers in response to

16  his questions, and asked him questions following up on his

17  questions.

18  Q    Correct.  You asked, this is just a very simple yes or no

19  and it's already in the record.

20  A    Yep, it's a very simple answer.

21  Q    After, after he invoked and you scrupulously honored,

22  okay, he asked certain questions and you followed up by asking

23  certain questions, correct?

24  A    Yes.

25  Q    And so, on direct you said in this courtroom, under oath,

Zukas - cross - Spiro                    154

1    after he invoked, "We did not ask any questions."

2          Right?

3    A    Is that -- is that what I said?

4    Q    That's what you said.

5    A    But it's not in the same context as when I was asked on

6    direct.  You have changed the context of the question, sir.

7    Q    Well, I guess the record will so speak.

8    A    Well, you have, but that's fine.

9    Q    Okay.

10         Do you want to amend that answer?

11   A    No, I do not.  You have changed the context of the

12   question now as it was posed to me, and that was my response.

13   Q    You're going to let that answer stand?

14   A    Absolutely.

15         And the way he asked the question, the way I

16   understood it, was we asked none -- no substantive questions

17   about the substance or subject matter of the case that we were

18   there to talk to him about.  None of those questions were

19   discussed.  We never asked a question.

20         That was my response.  That is not the same question

21   you're asking me, sir.

22   Q    Are you done so I can ask a follow-up?

23   A    Absolutely.

24   Q    Okay.  You didn't make that -- that caveat this morning

25   when you asked the prosecutors -- when you answered the

Zukas - cross - Spiro                                    155

1  prosecutor's question, you didn't make all these caveats and

2  explanations you're making now.

3          What you said this morning was you did not ask any

4  questions, that's what you said, right?

5  A    Yes, but because you didn't question me now on it.

6

7          (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  CROSS-EXAMINATION (Continued)

2  BY MR. SPIRO:

3  Q    So given that you did ask questions after the invocation,

4  you would at least agree with me that you did not ask zero

5  questions after of invocation, correct?

6  A    Correct.

7  Q    And you can agree with me, I hope, that you did not

8  scrupulously honor his invocation, you didn't keep asking him

9  pressing questions about the investigation and had a couple of

10  small follow ups, is a more accurate description?

11  A    No.  I disagree.  I think I scrupulously honored his

12  invocation.

13          As I said before, his questions were not substantive

14  to our interview.  He was asked --

15          THE COURT:  Let me see if I can -- since I have to

16  understand.

17          THE WITNESS:  Yes, sir.

18          THE COURT:  Maybe I can clear up any confusion I may

19  have.

20          Did you ask him any questions after the invocation

21  of counsel that did not relate to a question that he

22  specifically asked you or Agent Wood?

23          THE WITNESS:  No.  We didn't ask him anything that

24  was when he offered a question first.

25          THE COURT:  And so was any question back in the

1    nature of clarifying your response to his utterance?

2           THE WITNESS:  Yes.  There was determining logistics

3    of how we would communicate in the future, for example.

4    Q    For example?

5    A    Yes.

6    Q    But not every question, not every question was about

7    logistics?

8    A    No.  We asked him -- he asked us a question, who should I

9    get for an attorney.  That was a question he asked us, and we

10   said we can't advise you to that.  So we're responding to him.

11   Just when you get an attorney, have him reach out to me.  That

12   was that was essentially the dialogue at that point.

13   Q    Mr. Aguilar, in your own notes, after what you claim is

14   an invocation you scrupulously honored, Mr. Aguilar talked

15   about his boss, he talked about London and Mexico City, he

16   talked about when he was hired from Vitol, he talked about

17   when he got to Houston, he talked about his $80 million

18   pipeline project, he talked about Brownsville, all of these

19   subjects came up after his invocation, correct?

20   A    That's correct.

21   Q    But I did not ask --

22          THE COURT:  Did you ask him questions about any of

23   those subjects that Mr. Spiro has just spread out on the

24   record?

25          THE WITNESS:  No.  Those were all statements that he

1    made, I guess you'd call them excited utterances.  He made

2    those statements.  We did not ask him any of those questions.

3    Q    So he was just -- at the time that happens and we're

4    going to go backwards now -- at the time that happens, your

5    testimony is that he is so interested in speaking to you, so

6    interested, that he is just going on and on about these

7    subject matters which sound an awful lot like the subject

8    matters that were part of the interrogation?

9    A    I can't speculate if he was interested.  All I can tell

10   you is that's what he said, and that's what I would swear to.

11   Q    By the time he had invoked, okay, he had been being

12   interrogated for approximately 90 minutes, right?

13   A    About, yeah.

14   Q    Okay.  You had repeatedly -- you and Agent Wood had

15   repeatedly told him that lying to a federal agent is a crime,

16   right?

17   A    I think we told him twice.

18   Q    Okay.  That's repeatedly, right?

19   A    Yes.

20   Q    And in your notes, there's a couple of things I want to

21   ask you about, okay.

22        First is in Aguilar's responses to questions from

23   you and Wood, you used exclamation points sometimes, right?

24   A    Mm hm.

25   Q    And you used exclamation point to convey that he said

1    that in an exclaimed way, right?

2    A    Not necessarily.  I like to use the exclamation points a

3    lot of times, honestly.

4    Q    So you're just dotting those notes and exclamation

5    points?

6    A    Yeah.  I don't know where I use those points, but I use

7    exclamation points quite a bit.  Even when I just send e-mails

8    to people.  I just do that.  I don't know why.

9    Q    And is it in your practice in making formal 302 reports

10   that are going to be used in evidence with people's lives on

11   the line, is it your practice to just add exclamation points?

12   A    I don't even think about it.  I just add them when I feel

13   like it sometimes.

14   Q    Another question about the notes is sometimes you cross

15   things out in the notes.

16   A    Yes.

17   Q    Is that something you just do sometimes?

18   A    I cross things out all the time.

19   Q    And you do that in formal FBI reports?

20   A    Yes.  Because I'm a human being.

21   Q    Well, can we agree that there's nothing in any of the FBI

22   manuals that suggest that you should add or put punctuation in

23   that does not suggest what it is purported to address?

24         There's nothing in the manual that says you should

25   do that, right?

Zukas - Cross - Spiro                    160

1    A    I'm not aware of it.

2    Q    And there's nothing in the manual that says you're

3    allowed to cross outs things in the notes, right?

4    A    There's nothing in my manual that say I have to cross

5    things out --

6    Q    That you're allowed to cross things out?

7    A    I've never heard of anything what you're talking about,

8    no.

9    Q    Okay.  Well, you want those notes --

10              THE COURT:  Let me inquire.

11              MR. SPIRO:  Yes.

12              THE COURT:  When do the cross-outs occur,

13   contemporaneous with the writing, or some time later?

14              THE WITNESS:  Usually, it's contemporaneous with the

15   writing, because I misunderstand something because I didn't

16   hear it correctly or maybe somebody was coughing and I didn't

17   hear it correctly.  I mean, I cross out things all the time in

18   my notes because that's just what human beings do, I guess.

19   Q    So back to the exclamation points for a second.

20              The notes are the notes, okay.

21   A    Mm hm.

22   Q    And the exclamation points appear to be in places in

23   which it looks like very pressing interrogatory investigatory

24   questions are being posed to Mr. Aguilar, okay.

25   A    Yes.  Okay.

Avery N. Armstrong, RPR,   Official Court Reporter

1  Q    Are you saying that those exclamation points are just

2  coincidentally there on the page because you have a tendency

3  to add exclamation points?

4  A    No.

5  Q    Isn't it a fact that those exclamation points more likely

6  than not indicate that at that moment there was more a

7  exclaimed statement from Mr. Aguilar?

8  A    Sometimes, yes.

9  Q    And we don't have a video, right?

10 A    That's correct.  You've asked that question like five

11 times.  Yes.

12            THE COURT:  I don't think it's necessary to ask it

13 again.

14            MR. SPIRO:  I apologize.  I'm --

15            THE COURT:  I wouldn't let you do it with a jury.  I

16 just do it because it's easier to keep things moving.  But

17 it's certainly not impressive to me.

18 Q    Well, let me ask you this:  Are there any other

19 punctuation marks that are in your note taking as part of your

20 habits beyond exclamation points and crossing out that are not

21 typical?

22 A    In this particular note set?

23 Q    Sure.

24 A    I don't know.  I'd have to look at my notes.

25 Q    I ask have to ask this.  And the reason I'm asking you

1   again about the video is because I'm surprised to hear this

2   exclamation point anecdote.

3           With question marks, if in your notes you use a

4   question mark, is it fair for the reader to assume that you

5   are using that at the end of a question?

6   A    Yes.  Or there's some clarification that's needed

7   perhaps.

8   Q    Okay.  And in these notes, okay, in terms of the

9   cross-outs --

10  A    Okay.

11  Q    -- well, withdrawn.

12          Would you agree with me that there were times during

13  the interview in which the pressing questions of Mr. Aguilar

14  made him upset?

15  A    I think his demeanor changed, yes.  There were times,

16  yes.

17  Q    Okay.  So that's really my point is that he was not, as

18  you described earlier, happy or relaxed the entire time,

19  right?

20  A    I would say he looked pretty relaxed the entire time,

21  yeah.  I would say he was.  But there was subtle shifts in his

22  demeanor too.  That's for sure too.

23  Q    And could the exclamation points, at least in part,

24  describe parts in which the demeanor changed?

25  A    No.

Zukas - Cross - Spiro                              163

1    Q    An Aguilar statement followed by an exclamation point,

2    one is supposed to take nothing away from that in terms of

3    what you're trying to convey to the reader?

4    A    Can I look at my notes? Because then I would have a

5    better understanding of where you're trying to go with this,

6    because I'm confused.

7    Q    Sure.

8               THE COURT:  Why don't you direct his attention to a

9    specific one.

10              MR. SPIRO:  Sure.  On the first page --

11              THE COURT:  So for the record, that's Defense.

12              MR. SPIRO:  Defense F.

13              THE COURT:  F as in frank.

14              THE WITNESS:  Okay.

15   Q    At the beginning of the -- or towards the beginning of

16   the interrogation, you've got Aguilar in the room, right?

17   A    Yes.

18   Q    Okay.  Got him in that chair, right?

19   A    I do.

20   Q    And what Agent Wood does is shows him a photograph of

21   Aguilar meeting with informants, cooperators right?

22   A    Yes.

23   Q    Okay.  He confronts him with it, right?

24   A    Correct.

25   Q    And he's confronting him with that as we talked about

1  earlier, that that meeting, the lunch that occurred months

2  earlier, was, as you put it, the strongest evidence in the

3  case, right?

4  A    Oh, I guess so.  I mean, I wasn't aware of the meeting

5  earlier until shortly before the interview.

6  Q    Sure.  I get it.  You were learning the case as you got

7  up to speed the week before the interview, and you reached the

8  conclusion that you testified this morning that the strongest

9  piece of evidence in the case was the lunch meeting, right?

10 A    Correct.  The recorded meeting, correct.

11 Q    And you had a photograph showing Aguilar at the recorded

12 meeting?

13 A    Yes.

14 Q    And you confronted -- you and your partner at the time,

15 Wood, confronted Aguilar with a picture that you assumed he

16 never saw before, of him at that lunch --

17 A    Correct.  We showed him the picture, yes.

18 Q    You showed him the picture to show him that you knew

19 things and you wanted answers, right?  That's what you were

20 trying to convey to him?

21 A    Yes.

22 Q    And by doing that right out of the gate, he said,

23 exclamation point, I'm always -- well, again, we're getting

24 into the note thing -- I'm always meeting people there,

25 exclamation point.

1   A    Okay.

2   Q    You agree with me?

3   A    Yeah.

4   Q    That's in your notes?

5   A    I wrote it right there, yeah.

6        I don't know what your question is though.

7   Q    And you ended that sentence with an exclamation point?

8        THE COURT:  He wants to know why.

9   A    Because I just put an exclamation point there.

10  Q    Okay.  I'm not going to ask about the -- do you have a

11  memory, as you sit here today, sir, of the fact that having

12  Aguilar in that room, in that chair, with all the

13  circumstances we've already described, and putting in front of

14  him, a photo he'd never seen that was meant to suggest to him

15  that you had him, okay, that when he saw that photo, he said

16  in a less than relaxed, less-than-happy voice,

17  less-than-consistent tone, I'm always meeting people there?

18  A    No.  He didn't say that at all.

19  Q    It's just that that sentence happens to have an

20  exclamation point.  That's your testimony?

21  A    I put exclamation points everywhere, yes.

22  Q    All right.  Let's look at one of those cross-outs to find

23  out if there's cross-outs everywhere.

24       Can we go to Page 14.

25       Now, you understand that it's Mr. Aguilar's position

Zukas - Cross - Spiro                    166

1   that many times during this encounter with you, he asked to

2   speak to lawyers?  You do know that, don't you?

3   A    No, I don't.

4   Q    Okay.  And on Page 14, he says, I'm going to help you,

5   but I'm not.

6   A    Yes.  I see it.

7   Q    You see that and you crossed it out?

8   A    Yes.

9   Q    You crossed out that sentence, right?

10  A    Yes.

11  Q    Correct?

12  A    I did, yes.

13  Q    It's the only sentence on that page you crossed out?

14  A    Appears to be, yes.

15  Q    Okay.  You look at the next page, it's still the only

16  sentence on those two pages you crossed out?

17  A    Okay.

18  Q    And what he really said was, I'm going to help you, but

19  I'm not going to help you without having a lawyer?

20  A    No.  That's not true.  He did not say that.

21  Q    And then later, he said the exact same sentence, the

22  exact same sentence, when he asked for a lawyer and you don't

23  cross it out and -- when he invoked, when you say he finally

24  invoked, he said the same thing.  He said, I'd love to help

25  you with Mexico, but I'm not going to speak to you without a

Avery N. Armstrong, RPR,   Official Court Reporter

1  lawyer, and there, no more cross-out, right?

2  A    Is that what I said there on that page?

3  Q    Well, that's what happened.

4        Do you have a memory of that happening?

5  A    Yeah.  That's when he invoked.  Correct.

6  Q    Okay.  You know, I notice that another time in this

7  statement, right in the middle of what looks like a lot of

8  pressing questions, what looks like a lot of exclamation

9  points, what looks like a real hot interrogation, I notice

10  that all of a sudden you switch and started asking Mr. Aguilar

11  about his background.

12        Do you remember that happening?

13  A    I remember that questioning happening, correct.

14  Q    Well, do you remember leaving a very intense accusatory

15  subject and transitioning to a question about, oh, where did

16  you get your degree and where are you from and how old are

17  your kids.

18        Do you remember there was a shift in the middle of

19  the questioning?

20  A    I never thought of it that way, but I know we went from

21  substantive, his working at Vitol, to his background,

22  educational background, but it was not in the way you

23  described.

24  Q    Well, it did -- well, you would agree with me that it

25  does shift from more pressing questions, all things equal,

1  about criminal activity, to more mundane questions about his

2  background, right?

3  A    No.  That was not how we planned it or the strategy.  It

4  was the just the flow of the interview.

5  Q    Well, I'm not saying you planned it that way.  I'm just

6  asking did it, in fact, occur that way as it reads in your

7  notes and as Mr. Aguilar sets out?

8  A    I never thought of it that way until you're saying it to

9  me now, so I guess you can make that interpretation.

10  Q    Well, didn't you learn in hostage negotiation school and

11  in all your training and experience that if you're pressing a

12  suspect on something and you're going at him hard and it

13  doesn't seem to be working and you might lose him and he might

14  be invoking or whatnot or you might be just losing the hostage

15  negotiation situation, that you should retreat slightly and

16  go to a more comfortable familial concept?

17  A    It depends on the context, but not necessarily, sir.

18  Q    I understand it depends on the context, and I understand

19  not necessarily.

20          But isn't that, in fact, part of your training?

21  A    That is one aspect of the training, yes.

22  Q    And what happens in the middle of this interview at yet

23  another point, the fourth mention of counsel, is you're

24  pressing him and pressing him, he wants to speak to a lawyer,

25  and you say, hold on a second, you don't have to go there, let

1  me ask you some questions about your background, let's talk

2  about London and economics, right?

3  A     No.

4  Q     Mr. Aguilar, at times in this interview, stayed silent in

5  response to your questioning, correct?

6  A     Yes.

7  Q     Okay.  And there were times in which he would stay silent

8  and you would instruct him to answer, correct?

9  A     Yes.  I believe so.  I believe Matt would instruct --

10  Agent Wood instructed him to answer, yes.

11  Q     In fact, multiple times when he remained silent, Wood

12  commanded him to answer?

13  A     He asked for an answer, I believe, yes.

14  Q     Well, he instructed him to answer?

15  A     Yes.

16  Q     He told him, answer me, right?

17  A     Not in that tone, no.  He didn't say it in that way.

18  That's incorrect.

19  Q     But he instructed him, we can agree on that?

20  A     Yeah.  He asked for an answer, yes.

21          MR. SPIRO:  I know the Court wants to take an

22  afternoon break and we may be at an okay time for it.  I just

23  want to put back up the Government's 1C.

24          THE COURT:  I take the cues in the afternoon just

25  like for lunch.

1           MR. SPIRO:  That's why I'm leading into the cue to

2    give everybody a break.

3    Q    By the way, you know, do they train you on how to take

4    notes at the FBI?

5    A    No not really.

6    Q    But based on your 19 years of experience and you've had a

7    long professional career, you know that the more the accurate

8    the notes, the better they are to refresh the memory later,

9    right?

10   A    Oh, yes.  I would agree with that.

11   Q    And notes that are harder to read, harder to understand

12   are harder to use to refresh memory, right?

13   A    It depends.  Like, I write my notes for me, not for you

14   or anybody else.  So I can interpret my notes for the most

15   part.  But I'm not writing them with the belief that somebody

16   else can or cannot interpret my notes.  I'm writing them the

17   way I feel is necessary.

18   Q    Well, you --

19   A    My style.

20   Q    You know that your notes under FBI protocol are being

21   uploaded to the system and provided to the lead agent on the

22   case and everybody else who works on the case, right?

23   A    Yes.

24   Q    And you know that they're going to have to look at your

25   notes and make some sense of them, right?

1   A    Yes.

2   Q    And you know that one day if somebody ever challenges

3   anything you do, they may be provided to defense lawyers,

4   right?

5   A    Yes.

6   Q    And that we have a defendant in this case that was not

7   read Miranda rights?

8   A    Correct.

9   Q    Right.  His interview wasn't -- we'll move on from that

10  subject -- and all he has is your notes, right?

11  A    Yes.

12  Q    There's a sign on the wall that says no phones, Mr.

13  Aguilar.  He couldn't take out his phone right?

14  A    I believe so.  Correct.

15  Q    Nobody was allowed to come into that room on behalf of

16  Mr. Aguilar, correct?

17  A    Correct.

18  Q    In fact, no one even, lawyers are never allowed in that

19  room, right, the ice box?

20  A    Oh, I don't know.

21  Q    And no one is allowed to walk in customs, right, into

22  that room?

23  A    Correct.

24  Q    Okay.  And the only way out of customs other than getting

25  all the way through customs is to go back to the planes that

1    are arriving, right?

2            There's no way out?

3    A    Of that room?

4    Q    There's no way out of customs except out the one way you

5    get out of customs, right?

6    A    Yeah.  I mean, you have to walk out the door and exit.

7    That's correct.

8    Q    And your notes in this case, call them what you want, are

9    not written verbatim, right?

10   A    Correct.

11   Q    And they're not written question, answer, question,

12   answer, right?

13           It's not stenographic record, right?

14   A    That's correct.

15   Q    Showing you Government's 1C.

16           Do you see what I'm pointing to in this photograph?

17   A    I see it.

18   Q    What is that?

19   A    Is that a camera?

20   Q    It's a camera.

21           Did you know that that room records what goes on in

22   that room?

23   A    I did not.

24   Q    Did you or Agent Woods ever seek that recording?

25   A    No.  I did not.  I don't know if Agent Wood did or not.

1    I did not.

2    Q     Did you notice that it was recording you, potentially,

3    that day?

4    A     I didn't notice that, no.

5    Q     Do you know whether the prosecutors obtained that video

6    footage?

7    A     I had no idea.

8    Q     Do you know whether the defense has tried everything

9    possible to obtain that video footage?

10   A     I had no idea.

11   Q     You understand regarding the 302 which is the

12   memorialization of the interview, right?  And it's in

13   evidence, it's in front of you, right?

14   A     Correct.

15   Q     You understand that there are certain protocols regarding

16   that, right?

17   A     Yes.

18   Q     One is that in the FBI manuals it says that you have to

19   fill it out as soon as practicable, right?

20   A     Yes.

21   Q     And there's a five-day rule, using quotation marks, where

22   it suggests that it should be started and finished within five

23   days so that your memory is accurate and that the report is as

24   accurate as possible, correct?

25   A     Started within five days.  That's correct.

1  Q    Well, if the protocol suggests that it should be started

2  and finished within five days, does it not?

3  A    Correct.  But it's not a hard-line rule.

4  Q    Well, you're correct, because we're sitting here and this

5  is in evidence and you took 19 days to do it, right?

6  A    I didn't take 19 days.  By the time it's finished, it has

7  to go through appropriate sign-off policy by my manages and

8  that could take days, as well.

9  Q    Well, how many days did it take you?

10 A    Gosh.  I can't remember.  Maybe a week.  I'm just

11 guessing.

12 Q    Could it have been more than two weeks?

13 A    It's possible.

14 Q    And during the time in which you are finishings, using

15 quotation marks again, finishing the 302, during that time,

16 Mr. Aguilar's arrest had happened, correct?

17 A    I think so, yes.

18 Q    And you all were still trying to cooperate him, right?

19 A    I have no idea.  I wasn't.

20 Q    Agent Kelley was?

21 A    Was he?  Okay.

22 Q    Well, let me ask you this:  Why did it take so long to

23 finish the 302 in this specific case?

24 A    I don't know.

25 Q    You have no memory, nothing that you can provide this

1    Court to help on that?

2    A    No.

3    Q    Okay.

4              MR. SPIRO:  I think this is a good place to break

5    briefly.

6              THE COURT:  Okay.  Then we shall.

7              We'll take about a 15 minute break or so.

8              Agent Zukas you can step down, and we shall turn.

9              THE WITNESS:  Yes.

10             (The witness exited the witness stand at this time.)

11             (A recess was taken at 4:10 p.m.)

12             THE COURTROOM DEPUTY:  All rise.

13             (Judge ERIC N. VITALIANO enters the courtroom.)

14             THE COURTROOM DEPUTY:  The Court is back in session.

15             Counsel for both sides are present, including the

16   defendant.

17             THE COURT:  Are we ready to go?

18             Mr. Spiro, are you ready?

19             MR. SPIRO:  Yes, Your Honor.

20             THE COURT:  Okay.  Then we shall.

21   Q    Just a couple of quick questions about what we were

22   talking about before we broke.  But you're aware, are you not,

23   that the FBI has a protocol in place that if somebody -- a

24   prosecutor directs you not to record an interview, that you

25   should opt out of that interview.

1              Did you know that?

2    A    No.  I'm no not aware of a protocol like that.

3    Q    If an FBI employee and an AUSA conduct an interview and

4    the AUSA asks for or tells the FBI employee to refrain from

5    recording the substance of the interview or from taking notes,

6    the FBI employee should decline to participate.

7              Have you ever heard of that?

8    A    We've had discusses not, in this case, but I've had

9    discussion with attorneys about recording an interview or not,

10   correct.  And sometimes we'll record the interview and

11   sometimes we won't.

12   Q    Right.  I understand that.  I'm just asking are you aware

13   of that, what I just read to you, policy?

14   A    I'm not aware of a policy like that, no.

15   Q    Are you familiar with the Domestic Investigations and

16   Operations guide of the Federal Bureau of Investigation?

17   A    Yes.

18   Q    And you don't dispute that that's in that manual?

19             THE COURT:  You want to confront them, confront

20   them.  Let's not speculate.

21             Read it to him and ask him if he understands that to

22   be the protocol.

23   Q    So I'm going to put, just for the purposes of

24   identification, up on the screen, the section in this manual

25   called documentation under 1833, and I'm going to direct your

1   attention to D.  And I've bracketed it.

2        Do you see that section?

3   A    I do.

4   Q    And is that consistent with what I just read?

5   A    I have to read it.

6   Q    Sure.

7        THE COURT:  Please do, to yourself.

8        THE WITNESS:  Thank you.

9   A    Yes.  I see it.  Yup.

10  Q    And it's consistent with what I just said?

11  A    Yes.

12  Q    In terms of your notes in this case, the interview

13  happens on the 10th, a Friday, correct?

14  A    Yes.  I believe that was a Friday.

15  Q    You don't start drafting, according to the form, until

16  the 14th, four days later, correct?

17  A    I believe so.

18  Q    Okay.  And we talked about the five-day rule.

19        And fair to say, memory day one is probably better

20  even than memory day four, correct?

21  A    I would say so, yes.

22  Q    And the complaint, you don't start drafting until after

23  the arrest warrant's issued in this case, the complaint's

24  filed?

25  A    I didn't draft the complaint.

1  Q    I understand that.

2       Assume for the sake of this question that the

3  complaint is filed with this Court as a matter of absolute

4  certainty on the same day as your interrogation, okay.

5  A    Okay.

6  Q    That would mean that complaint was filed prior to you

7  even beginning the drafting of the 302, correct?

8  A    It appears to be so, yes.

9  Q    And the date of entry on the 302 is July 19th, some nine

10 more days later, right?

11 A    Okay.  Yes.

12 Q    Okay.  And who helped you write the 302?

13 A    I wrote the 302.

14 Q    Okay.  Did anyone else assist you in writing the 302?

15 A    No.

16 Q    Did Agent Wood provide you with his notes from the

17 interview?

18 A    I wasn't aware of any notes.  I just used my notes.

19 Q    Okay.  Did you ask Agent Wood for his notes?

20 A    No.

21 Q    Okay.  Don't you think it would have been a good idea to

22 get the notes from the other person in the interview room?

23 A    No.  Not necessarily.

24 Q    Can you explain that to me?

25 A    Sure.  I'd be happy to.  Because I sent a draft to Agent

1  Wood to look at, and if it was in accordance with his

2  recollection of the events.

3  Q    Okay.  And did Agent Wood -- how many pages was the 302?

4  A    Five or six.  I think six, maybe.

5  Q    It's a pretty substantial, many paragraphs, lots of

6  sentences -- it's a pretty substantial document, right?

7  A    Sure.

8  Q    It was a long interview, right?

9  A    Not really, actually.  I've done so many longer, much

10 more longer interviews.

11 Q    I see.

12 A    Yeah.

13 Q    Does Agent Wood -- and what is the purpose of sending the

14 draft to Agent Wood?

15 A    So he can take a look at it, and if what he's reading,

16 based on my drafting of it is in accordance with what he is

17 recollecting.  We want to make sure that we have it accurately

18 memorialized.

19 Q    Okay.  And tell us, what were agent -- and you agree,

20 nobody's memory is the same, right, no two people --

21 A    Oh, yes.  I'd agree with that.

22 Q    So what were Agent Wood's edits to your 302?

23 A    I believe -- I don't recall any edits.  Maybe there were

24 a few minor edits, but I don't recall anything off the top of

25 my head.

Zukas - Cross - Spiro                    180

1    Q    So what you're telling this Court is that essentially, in

2    a five, six page document in a 90-minute interview, in all of

3    the conditions we've described, Agent Wood did not have a

4    single substantive change to your 302?

5    A    I don't know if he did or not.  I don't recall many

6    substantive changes if there were.  Honestly, I don't recall.

7    He didn't say, hey, we need to change this, this, and this.

8    He recollected it like I did, is my understanding.

9    Q    Well, did you have a conversation with him about --

10   A    I did.  I did, yes.

11   Q    And tell me about that conversation.

12   A    I asked him if this is what you recollected it and how

13   you recollected it, and he pretty much agreed.

14   Q    Verbatim?

15   A    I'm sorry, verbatim?

16   Q    Verbatim, with your 302?

17   A    I think might have been some typos or maybe some commas

18   or periods, but I think that was the substance of it.

19   Q    So it was on the evening of the 21st that you send the

20   draft to Agent Wood?

21   A    Oh, was it?  I'd have to look at my e-mails.  I don't

22   know.

23   Q    I'm going to put up DOJ 3500 PZ11 which is marked as

24   Defense I.

25            And this is an e-mail from you to Matt Wood on

1    July 21st, 11 days after the interview, correct.

2    A    That's correct.

3    Q    In the evening, correct?

4    A    Correct.

5    Q    And you say, Matt, hope all is well, my friend.  Please

6    see attached the draft interview report for Aguilar.

7    A    Correct.

8    Q    Let me know what you think and feel free to call me if

9    you want to discuss.  Paul.

10    A    Yes.

11    Q    And it's your recollection he called?

12    A    I believe we have had a conversation, yes.  I believe we

13    did.

14    Q    Okay.  And is it possible that after that conversation,

15    he made not a single edit to that document?

16    A    I don't remember.  I don't remember if he made any -- how

17    many edits he made, what the edits were.  I remember him

18    saying it looks good to me.  This is a -- I agree with what

19    you're saying.  And this is based on his recollection.

20    Q    Okay.  And is there any e-mail that you can point to or

21    note or memorialization of him making even a single edit to

22    this document?

23    A    I don't think I can.  I don't know if there is such a

24    thing.  I think we discussed it over the phone.

25                MR. SPIRO:  I'm offering I into evidence.

1          THE COURT:  Any objection?

2          MR. LAX:  Just object.  I mean, the witness has

3    answered about the questions on the documents.  The witness

4    has answered the questions about the e-mail.  He doesn't

5    contest them.

6          What's the basis to admit this particular document?

7          THE COURT:  What was the -- I didn't hear that as an

8    objection.

9          MR. SPIRO:  Neither did I.

10         THE COURT:  So it's an observation.

11         There being no objection, I'm going to admit.

12         (Defense Exhibit I, was received in evidence.)

13   Q    And then J which is the next e-mail in the chain which is

14   PZ 12 of the Government's production.  And this is you taking

15   the same draft that you forwarded to Wood, your partner that

16   day, and you're forwarding it to the lead agent on the case,

17   Agent Kelley.

18   A    Correct.

19   Q    Can you explain -- then the purpose of sending it to

20   Wood, is Wood's in the room, right?

21   A    Correct.

22   Q    Can you explain to this Court what the purpose is of

23   sending it to the lead agent as a draft who was not in the

24   room?

25   A    He's the case agent.  He needs to know what happened.

1    Q    And you needs to see it in draft form and comment on it?

2    A    Correct.  He needs to see it and then turn it over to

3    whoever the prosecutors are so they have an understanding of

4    the particulars of the case, what's going on.

5              MR. SPIRO:  I offer --

6    Q    And this is the following morning, you're sending the

7    same draft, unedited, to Wood correct -- I mean to Kelley,

8    correct?

9    A    Yes.  The draft.  Correct.

10             MR. SPIRO:  I'd offer this as J.

11             MR. LAX:  No objection.

12             THE COURT:  Received without objection.

13             (Defense Exhibit J, was received in evidence.)

14             MR. SPIRO:  And I would offer the draft 302 as JA.

15             MR. LAX:  No objection.

16             THE COURT:  Received.

17             MR. SPIRO:  It's the attachment to that.

18             (Defense Exhibit JA, was received in evidence.)

19   Q    So the only edits -- well, let me ask you this:  Remember

20   we looked earlier about how Aguilar is saying to you, like,

21   listen, I'd like to help you.

22             Remember we saw a couple of times where he's saying

23   I'm trying to help?

24   A    I remember, yes.

25   Q    We talked about how one of the goals was to cooperate,

1  right?

2  A    Correct.

3  Q    And can you explain why the word cooperate doesn't appear

4  anywhere in the 302?

5  A    No.  I can't explain.  Just because I probably chose not

6  to use that word.  I don't know.

7  Q    Okay.  Do you remember on -- well, is there any synonym

8  for cooperate anywhere in the five pages of draft 302?

9  A    I have no idea.  I'd have to re-read it.  I have no idea

10 where that would be.  I don't know.  I'd have to re-read the

11 302 word by word.

12 Q    Okay.  And do you remember this morning when the

13 prosecutor was directing you, you talked about all this, you

14 know, he was happy and he was volunteering and you were

15 volunteering to do it voluntarily and that he was volunteering

16 more.

17          Do you remember you used the word volunteer many

18 many times?

19 A    I used the word that it was a voluntary interview, yes,

20 when I approached him.

21 Q    Right.  Like, as a categorization, it was voluntary?

22 A    Correct.

23 Q    Okay.  Now I think I understand.  Because in your 19

24 pages of notes, 19 pages of notes, not once does the word

25 voluntarily or voluntary or any synonym come up for it once.

1  A    Okay.

2  Q    What is changed in the draft is even though the notes say

3  that you started drafting it on the 14th, the actual 302 that

4  you send to Zukas -- withdrawn.

5         The actual 302 you send to Wood and Kelley is

6  drafted July 20th, the day that it looks like you drafted it,

7  and it's edited to say July 10th.

8         Did you know that?

9  A    No.  I don't know what you're talking about.  I'm sorry.

10 But the dates here -- I'm a little bit confused as to what

11 you're saying.

12 Q    Okay.  And do you know that the edits, the other edits --

13 and listen, the draft is in evidence, the actual 302 is in

14 evidence.  But I mean, if you want to just look at one thing

15 that you did, okay, because it's very few words that are

16 changed, but I'm just going to just show you the draft 302 at

17 the very beginning.

18 A    Sure.

19 Q    Okay.  There's something called a -- first there's the

20 intro paragraph, right, which says on July 20th?

21 A    Correct.  The preamble.

22 Q    The preamble, right.  And we agree that it wasn't on July

23 20th.  You may have been writing it on July 20th, given the

24 time sentence here, but what you really mean is on July 10th?

25 A    Correct.  That's a typo.  (Continued on following page.)

1    CROSS-EXAMINATION

2    BY MR. SPIRO:  (Continued)

3    Q    That's a typo?

4    A    Yeah.

5    Q    Then there's this agent note, right?

6    A    Yes, I see it.  Yup.

7    Q    Okay.  And then it says "Aguilar advised"?

8    A    Correct.

9    Q    Right?

10         And do you know that in the final 302, you all

11   changed that.  You changed the word "advised" to

12   "volunteered"?

13   A    Yes.

14   Q    Okay.  And then you changed -- the next sentence where it

15   says "Aguilar stated," you changed it to "he also offered"?

16   A    Yes.

17   Q    Okay.  And, of course, Kelley wasn't in the room, right?

18   A    Correct.

19   Q    These are just his suggestions?

20   A    No, he didn't make these suggestions.  I changed it.

21         Do you want to know why?

22   Q    Sure, you can tell me why.

23   A    Sure.  If you put it back up, I will explain it to you.

24   Put up 302, please.

25   Q    You know what --

1           THE COURT:  Mr. Spiro, it will save time if we don't

2     have to do it on redirect.

3           MR. SPIRO:  Fair enough.

4           THE WITNESS:  Do you want to do it on redirect?

5           THE COURT:  No.

6           MR. SPIRO:  No.  I agree.

7     Q    Okay.  "Aguilar advised."  Okay, here it is.

8     A    Because I wanted to specify.  If you look at the

9     preamble, it said "Aguilar advised the following" at the

10    preamble.  You see that at the very top, the end of the first

11    paragraph by the colon?  Right there, "Aguilar advised the

12    following."  When you go down to the paragraph, the third

13    paragraph where it says "Aguilar advised," we had actually

14    not -- he -- that was an excited utterance, so I wanted to

15    make sure that I didn't use the same word and that it was

16    explicitly understood that he volunteered that information.

17    It wasn't in the course of a questioning, he just said this.

18    Q    Is there anything further you would like to add on that

19    topic?

20    A    No, that's it.  That's what happened.

21    Q    Well, when you -- again, that word "volunteer" is nowhere

22    in your notes; you agree, right?

23    A    I would have to look at my notes, but I guess so.

24    Q    Okay.  And for some reason on July 10th and July 11th,

25    July 12th, all those days before you send your draft to the

1   lead agent, right, you did not have this epiphany that you've

2   just described where you realized, shoot, this is an error, he

3   didn't advise, he outcries "volunteered"?

4          In the days between July 10th and July 20th, you

5   don't have that realization that this is some error that needs

6   to be corrected on your part, correct?

7   A    If I understand what you're saying, maybe I can clarify

8   it.  So it was just a choice of words that I thought was

9   better in that position.  There was nothing more than that.

10  Q    That's what you say?

11  A    Yes.  It was just a choice of words.  I didn't want to

12  use the same word twice and I also wanted to make sure he --

13  it was expressed that he was telling us this.

14         Do you understand?  Instead of saying "advise," that

15  he volunteered, he advised that he was saying this to us.

16  Q    Well, we're going to stay on this for a minute now.  But

17  what I am asking is a very specific question, which is,

18  whenever you decided that the repetition of this word somehow,

19  you know, grammatically or in the flow of this not right by

20  you, okay, you did not come to that realization in any of the

21  ten days after you began drafting this document, you only came

22  to this realization about word choice after you sent this to

23  Agent Kelley, correct?

24  A    If I'm understanding, I guess so.  I --

25  Q    Okay.

1   A    I really -- I apologize, sir.  I'm trying to understand

2   where you're going with this.  I could help you perhaps more,

3   but I don't understand.

4        THE COURT:  Do not try to figure out where he is

5   going.  He is just trying to figure out the timing.

6        THE WITNESS:  Okay.

7        THE COURT:  And the simple question was whether or

8   not the change came after another event in time, that other

9   event in time being your communication to Agent Kelley.

10       Is that your question, Mr. Spiro?

11       MR. SPIRO:  That's exactly, better stated, my

12  question.

13       THE WITNESS:  That I understand.  Thank you, sir.

14  A    Yes, that's correct.

15  Q    Okay.  And your rationale that you've -- you've

16  volunteered, right?  There was no question.  You volunteered

17  an answer just now --

18  A    Mm-hm.  Yes.

19  Q    -- that the reason that you changed it is because, in

20  substance, you didn't like the fact that you had used the word

21  "advised" over and over and you wanted to make some sort of a

22  distinction?

23  A    That's one of the reasons, yes.

24  Q    Well, that was the only reason you gave a moment ago, is

25  --

Zukas - Cross - Spiro                          190

1   A    No, that's incorrect, sir.  No.  I said I changed it

2   because the word, but I also wanted to explicitly mention -- I

3   was being careful in my word choice in this 302.

4          If you read the paragraph, "Aguilar" -- the previous

5   paragraph, "Aguilar then sat down and stated again he would be

6   happy to answer any questions."  So before we actually started

7   doing the interview formally, he made this statement.  So I

8   thought it was better to express that he volunteered this

9   because it would be better understood by the reader that he's

10  making this statement that is right before the actual

11  interview started.

12  Q    I thought the reader didn't matter.  I thought 30 minutes

13  ago --

14  A    No.

15  Q    -- the only thing that matters is, it doesn't matter

16  whether your notes are comprehensible, who reads this, nothing

17  matters?

18  A    No.

19  Q    They're your notes for you?

20  A    Incorrect, sir.  Those are your words, not mine.

21         I said the notes I write for what I write, but this

22  is I wanted the reader to understand because that's exactly

23  what happened.  This is precisely what happened and all I can

24  use is the English language to illuminate what happened.

25  Q    And you only came to this illumination after forwarding

1   this to Agent Kelley?

2   A    I don't -- I guess so, yes.  I don't remember when it

3   was.

4   Q    And it's your testimony that you never discussed this

5   illumination with Agent Kelley?

6   A    Nope.  Nope.  He didn't -- when I sent it to him, it was

7   so that he would have it.

8        He didn't -- I don't know if you're asking me if he

9   asked me to change something.  Is that what you're saying?

10  Q    Well, you're the one who sent him the draft, you're the

11  one who then has the realization about the illumination.  I'm

12  asking you, is it your testimony under oath that Kelley made

13  no suggestions regarding --

14  A    No.  No, he didn't ask me to change anything, other than

15  I wanted to make sure he had it and that I had all the

16  spellings correct and, you know, just the facts of the case

17  were correct because it's not my case.

18  Q    Right.  The facts of the case were correct?

19  A    Correct.

20  Q    Okay.  You know, you also in your draft, at the time in

21  which you concede that Aguilar invoked, right, you concede he

22  invoked when you brought up Mexico, right?

23  A    When Agent Wood brought up Mexico, yes.

24  Q    All right.  That's a concession.

25       In this 302 draft which you had for ten days, that

Zukas - Cross - Spiro                    192

1   you were working on for ten days or you had open for ten days,

2   you don't state anything about his invocation happening

3   vis-à-vis Mexico questions, right?

4   A    Yes, yes.

5   Q    That's another place where, after sending it to

6   Agent Kelley, you add that he only invoked after you asked

7   questions about Mexico, right?

8   A    Okay.

9   Q    And you added that sentence which appears nowhere in the

10  ten days prior after speaking to Kelley, correct?

11  A    Nope.  No, I don't remember him -- we discussing that at

12  all with him.

13  Q    I didn't ask you if you discussed it.  I know you're

14  going to say you never discussed anything I ask you.

15       What I'm asking you is, it was only after that point

16  in time in which this edit happens?

17  A    Is it?  I would have to look at the edit and the 302.

18  Q    Well, let's look at the 302 --

19  A    Sure.

20  Q    -- on page 004.

21       And it says, where I'm pointing, "Aguilar stated

22  that this was all the knowledge that he had.  Aguilar added

23  that he wanted to help law enforcement as much as he could,

24  but he needed to look for legal advice in order to continue."

25       Do you see that?

1    A    Yes.

2    Q    Did I read that right?

3    A    Yes.

4    Q    Okay.  In the final 302 that appears only after you

5    forward this draft to Agent Kelley, you add that this happened

6    regarding any involvement that Aguilar had with Mexico; you

7    added that?

8    A    I did?  Okay.

9    Q    Okay.  302 is in front of you.  It's in evidence.  You

10   can look if you want, but you added that.  Okay?

11   A    Yes.

12   Q    And my question is, was that another illumination that

13   you just happened to have after conferring with Kelley?

14   A    Yeah, I remember during the interview it was the

15   invocation that was right after we had gone to Mexico, so I

16   wanted to make sure that was in the 302.  We were discussing

17   Mexico.  It was towards the end of the interview.  At the

18   time, we didn't know that was going to be the end of the

19   interview.  And then he invoked after we mentioned Mexico or

20   Agent Wood mentioned Mexico, so I wanted to make sure that was

21   in the 302.

22   Q    Okay.  And I'm asking you if you can help me understand

23   why, immediately following your conversation with the lead

24   detective -- lead agent on the case, what it was precisely

25   that jogged your memory as to that point?

1  A    I don't know.  We didn't discuss that at all.

2  Q    And somehow, some way it just ended up that way?

3  A    Yeah, because I'm careful in making sure we articulate

4  the facts in the 302 as best as we recollect them, yes.  And

5  that was my recollection.

6  Q    And nowhere in your 302, nowhere, nowhere, nowhere, not

7  in the notes, not in the draft, not in the final do you ever

8  suggest that you were discussing cooperation or leniency or

9  anything like that, right?

10 A    That I would ever suggest?  I would not put that in a

11 302.  Yeah, I wouldn't put that I'm discussing cooperation.

12 Q    And why is that?

13 A    I just didn't find it necessary to say that in a 302 at

14 that point because we were talking about the substance of the

15 interview, not -- you know, just getting the facts, not

16 potential of recruiting him as an FBI cooperator or as a

17 Homeland Security cooperator.  We're just trying to articulate

18 the facts as he tells them to us.

19 Q    Well, you made the decision to not include that in the

20 302, correct?

21 A    Yes, I believe so.  You're talking about recruiting him,

22 potentially recruiting him as a cooperating witness?

23 Q    Any conversation about that, about leniency, the fact

24 that that was your goal, that notion, the words that were

25 spoken regarding that in the interview, none of that was in

Zukas - Cross - Spiro                      195

1    your 302?

2    A    Correct, because he didn't say it.

3         Do you understand?

4    Q    Well, there are things in your notes, sir, that are your

5    words?

6    A    Yes.

7    Q    There are things in your notes that are Agent Wood's

8    words?

9    A    Correct.

10   Q    You write, you know, Agent Wood said X, right?

11   A    Yes.

12   Q    So nothing would have prevented you from adding into your

13   notes words that not just Aguilar said, but then you and your

14   partner that day said, right, nothing prevented that?

15   A    Nothing preventing me from writing what my partner was

16   telling me about what exactly?

17   Q    I'll try it again.

18        You said a moment ago the reason that you did not

19   include this language that occurred during the interrogation

20   into the notes was because Aguilar didn't say it, you all said

21   it, right?  Didn't you just say that a minute ago?

22   A    I didn't write them in the notes because that was never

23   discussed in the interview.

24   Q    Wait a second.

25        Didn't you just say two minutes ago under oath that

1    the reason that you did not put that in the notes was because

2    Aguilar didn't say it, you all said it?  Didn't you just say

3    that?

4    A    I'm very confused as to what you're asking, sir.  I'm

5    sorry.

6            If you're asking about recruiting him -- if I

7    understand this correctly, if you're asking about recruiting

8    him as a cooperating witness, I did not write that in the

9    notes.  I don't believe I wrote that in the notes because I

10   believe he didn't -- he never said -- we never discussed that

11   with him.  I don't recall discussing, like, hey, we're going

12   to sign you up, you're going to -- he never said anything like

13   that.  I wouldn't write that.

14           I'm not following you.  I'm sorry.

15   Q    Well, I think you're following me, but I --

16   A    No, I'm actually not.

17   Q    Well, the Court and record will speak for that.

18           But I'm asking you not formal -- you're now taking

19   the words and you're making it formal cooperation and a formal

20   discussion.  You have already testified, sir, multiple times

21   under oath that one of the goals was cooperating him, correct?

22   A    That was the goal of the case agents and the

23   investigative team, yes.

24   Q    And we see language in there, in the notes about Aguilar,

25   saying, listen, I'm trying to help you guys, I'm here to help,

1  right, words to that effect?

2  A     Yes.

3  Q     Okay.  And there is no mention in the notes of the fact

4  that you and Wood told him that he could do better, have

5  leniency, has the opportunity here to tell the truth and to

6  cooperate; that's not in the notes?

7  A     Correct.

8  Q     And it's not in your 302?

9  A     Correct.

10 Q     And then the final point on this is after what you even

11 concede was a clear invocation, right -- this is the draft,

12 okay?

13 A     Okay.

14 Q     Okay?  Do you see, you know, we're "at this point"?  You

15 see that we just talked about this, right?

16 A     Yeah.  "At this point in the interview all questioning

17 stopped."  Is that what you're referring to?

18 Q     Right.

19 A     Okay.

20 Q     And then you say "Aguilar added."  And then you say

21 "Aguilar stated."

22            Do you see that?

23 A     Correct.

24

25            (Continued on the next page.)

1   EXAMINATION CONTINUES

2   BY MR. SPIRO:

3   Q    Are you aware that that -- there you didn't change it to

4   volunteer, you forgot to do that there?

5   A    I don't know if I forgot or I just used that word choice.

6   That was it.

7   Q    Well, earlier a few minutes ago didn't you say that you

8   wanted to convey to the reader an excited utterance, and so

9   when Aguilar was saying something spontaneously you wanted to

10  use the word volunteer to capture that?

11  A    Correct, correct.  At the beginning of the interview

12  before the formal questioning started, I wanted to explicitly

13  make that as clear as I could.  Yes, that's correct.

14  Q    Okay.  But here you don't use that word volunteer?

15  A    I didn't use the word volunteer.

16  Q    But just like this -- the case, though, by the time it

17  gets to the motion, which you say you have not reviewed in

18  this case?

19  A    I haven't -- I haven't seen any motions or anything as

20  far as I recollect, no.

21  Q    And you don't know in your interviews with the

22  prosecutors if any of them were for the purpose of creating

23  their motion response?

24  A    No, I'm not -- I wasn't involved in that.

25  Q    But it says, and I just want to know if this is accurate.

1  A    Okay.

2  Q    It says, it goes -- in the 302 you said stated and added,

3  and in the motion it says:  No, no, no, Aguilar volunteered

4  additional information.

5        Is that accurate?

6  A    I don't know.  I've never seen the motion, so I don't

7  know what you're talk -- like, you have to show me the

8  document.

9        Are you -- are you saying that I said stated and

10 added, I should have used volunteered?

11       I just chose those words at that time because he

12 stated it and it was added.  So, I used the words stated and

13 added.  I don't know what else I can say.

14 Q    The 302 is not finalized for 19 days after the interview,

15 correct?

16 A    I believe so, yes.

17 Q    Okay.  And that was 19 days to speak to and do whatever

18 it is that you wanted, right?

19 A    To make it as accurate a reflection of what the interview

20 was, yes.

21 Q    But there were no restrictions, sir, on your ability to

22 ask and speak with anybody about what should be in the 302

23 during those 19 days?

24 A    There was no restrictions.  I'd say that's fair to say,

25 yes.

Zukas - cross - Spiro                                   200

1   Q    And it was, at least, three times longer than the five

2   days that the FBI suggests, in fact close to mandates, you

3   finish the report by; right?

4   A    We're supposed to start a report within five days, that's

5   correct; and yes.

6   Q    And you can agree with me it's not best practice, not

7   best for the memory to wait 19 days to finalize, right?

8   A    I would agree with you, yes.

9   Q    Okay.  And in the final 302 appears something called an

10  agent's note.

11  A    Okay.

12  Q    Do you know what I'm referring to?

13  A    Is it at the beginning of the 302?

14  Q    It's the second paragraph of the 302.

15  A    Correct.

16  Q    It's called -- it says in it agent notes, right?

17  A    Yeah.

18  Q    It has a different indentation for the rest of the --

19  than the rest of the document, right?

20  A    Correct.

21  Q    The substance of it is found nowhere in your notes,

22  right?

23  A    Correct.  Correct.

24  Q    The substance of it is found in no contemporaneous

25  communications between you and Wood, right?

1    A    Say that again, please.  I'm sorry.

2    Q    The statement in there is found nowhere in the

3    contemporaneous communications between you and Wood?

4    A    Okay, I guess so.

5    Q    And, in fact, that is something that you copied and

6    pasted from another document, correct?

7    A    No, no.  Actually, I use this format, agent note.  A lot

8    of agents won't use that.  I just do that to make sure that

9    it's accurately describing the situation as it reads out right

10   here.

11   Q    Okay.

12   A    So, he was arriving in Houston and, you know, was getting

13   luggage inspected.  And I pulled him aside and so forth.

14             So, it accurately represents that, that's why I put

15   that in there.  And that's why I put agent note to

16   differentiate it from the substance of the questioning and

17   interview that we did with him.

18             Do you understand?

19   Q    Well, I can't answer that.  I can't answer your

20   questions.

21   A    Well, obviously, I'm just telling you why I did that, the

22   agent note.  So, it's to specify that this portion, this

23   paragraph, agent note, was not the interview.

24   Q    This is not, as you just said, typical of all FBI case

25   agent reports, this is a Agent Zukas edition, right?

Zukas - cross - Spiro                          202

1   A    A lot of people do it, but I know a lot of people that

2   don't do it.

3   Q    And you did copy, okay, I'm not saying you plagiarized,

4   I'm just saying you copied and pasted this concept from

5   another one of your own reports?

6   A    I didn't copy it.  I just know to do this if it's

7   necessary to help specify that it's not part of the interview.

8         I didn't -- I don't understand what you mean

9   plagiarize.  I can't plagiarize from myself.

10  Q    I said you did not, I'm not saying you plagiarized.

11  A    Okay.

12  Q    I'm saying but what you've done here, and it's why the

13  indentation is different, is you copied a concept from one of

14  your other reports and inserted it into this report even

15  though it wasn't part of the interview.

16        Isn't that about right?

17  A    Yeah.

18  Q    Okay.  And this, again, appears into this 302, 19 days

19  later that gets filed, the substance of it is found nowhere

20  else other than in this agent note, right?

21  A    Okay.

22  Q    You agree with me, right?

23  A    Yes.

24  Q    And, in fact, there's -- well, withdrawn.

25        And in this new Agent Zukas' agent note, you say he

1   voluntarily -- if he would voluntarily be willing to answer

2   some questions, would answer some questions, free to stop, at

3   any time leave, willing to answer questions, stated again he

4   would be happy to answer any questions.

5           All of that's in there, right?

6   A    Correct.

7   Q    And nowhere else?

8   A    Correct, because this is exactly what happened.

9   Q    The reality is when he was being interviewed, he told you

10  that he had no knowledge -- the first thing he told you about

11  bribes was he had no knowledge of bribes being paid?

12  A    I remember that, yes.

13  Q    Okay.

14  A    Early on in the interview, correct.

15  Q    And he also said to you that he doubts, okay, these are

16  your words, these are your words, doubts that payments went to

17  government officials; right?

18  A    I believe he said that to us, yes.

19  Q    And he also told you that he didn't make one dollar, he

20  didn't make one dollar for any of the conduct you're talking

21  about in this case, right?

22  A    Correct, I believe he said that.  Yes.

23  Q    What did you do to prepare yourself for today?

24  A    What did I do today?

25  Q    No, to prepare yourself.

Zukas - cross - Spiro                                204

1   A    Oh, I reread my 302 and I looked at my notes and looked

2   at the e-mails that I had sent back and forth or the e-mails

3   that you showed me, for example.  And I, obviously, was

4   prepped with the attorneys, the prosecutors.

5   Q    Okay.  And when did you -- you said that you think this

6   hearing was first set in December, so you believe that your

7   preps with the attorneys started in 2021, correct?

8   A    I believe so.  I thought this, on my calendar this was

9   December, early December, and then it was postponed.

10  Q    And they told you the questions they were going to ask

11  you on direct examination?

12  A    We went over questions, correct.

13  Q    And so, when he was asking you, "he" the prosecutor, was

14  asking you those questions, there was no surprises there, you

15  knew those questions were coming, right?

16  A    Yeah.

17  Q    And did you prepare for things that you could be asked

18  about on cross-examination?

19  A    Correct.

20  Q    And what topics did you prepare for?

21  A    Going over my -- my notes, that my notes would probably

22  be brought up -- brought up on cross-examination.  And the

23  e-mails, that the correspondences I had with the various

24  parties would probably be brought up on cross-examination.

25           So, those were some of the topics there.

SAM      OCR      RMR      CRR      RPR

1    Q    Did they prepare you on the topic of -- well, let me ask

2    you this:

3          Did there come a point in time in this case where

4    you knew that the defense was asking for certain documents

5    relating to the airport and what happened at the airport?

6    A    I thought -- yeah, they were asked -- I think I heard

7    there was an ask of defense for just -- just everything.  I

8    mean I couldn't tell you explicitly what particularly was

9    asked.

10         In my purview, I knew I had to give them e-mails

11   that I was involved in and, obviously, my notes.  And then the

12   supporting documentation, which would have been would like

13   those photographs that Agent Wood showed, because those were

14   all part of the interview.  So, that has to be part of the --

15   the interview packet that gets memorialized.

16   Q    Okay.

17   A    So, we talked about that and I had to provide that and so

18   forth.

19   Q    What about going back to the airport and getting stuff?

20   A    I never went back to the airport to get stuff.

21   Q    Or from folks that work in and around the airport?

22   A    I wasn't involved in any of that.

23   Q    What about your text messages, did you provide your text

24   messages?

25   A    I believe so, but they were, you know:  Hey, can you call

1    me?  Can we call at this time?  Logistical.

2    Q    Between you and Wood?

3    A    Yes, correct.  Or:  What's your cell phone?  I think it

4    was a couple of times I might have lost his cell phone number.

5    Q    What about between you and Kelley, did you provide those?

6    A    I provided everything I had.  I scrubbed everything I had

7    multiple times.

8    Q    You provided your text messages between you and Kelley?

9    A    I believe so, yes.  I believe I provided everything I

10   had, as I just stated.

11   Q    And you never went back to check for video?

12   A    No, I never went -- I have not been back in that room

13   since that interview.

14   Q    Okay.  And did you prepare to be cross-examined on the

15   concept of the fact that you went to the airport because the

16   FBI felt it safest due to COVID-19; did you prepare to be

17   questioned on that subject?

18   A    Yeah, yeah.  We definitely talked about the safety

19   issues, correct.

20            MR. SPIRO:  Just a moment.

21            (Pause.)

22   BY MR. SPIRO:

23   Q    You remember my question about why you added into the 302

24   after the conferral with Kelley this, not saying he told you

25   to do it, I'm just saying after the conferral with Kelley

1   added into the final 302 was this concept that he only invoked

2   after the concept of Mexico came up, right?

3   A    Yes.

4   Q    Okay.  That is nowhere in your notes?

5   A    Okay.

6            MR. SPIRO:  Okay, I have nothing further.  Thank

7   you.

8            THE COURT:  Thank you, Mr. Spiro.

9            Any redirect, Mr. Lax?

10           MR. LAX:  Some, Your Honor, although I think I'll be

11  relatively brief.

12           THE COURT:  Ah, yes, some things never change since

13  COVID struck.

14           Go ahead.

15  REDIRECT EXAMINATION

16  BY MR. LAX:

17  Q    Special Agent Zukas, do you recall, I guess, hours ago

18  now, some questions that you got about your 302 regarding

19  whether or not you wrote the words "passing through Customs"?

20           Do you recall that?

21  A    Yeah, I think that was at the beginning.

22  Q    Yes, it may have even been before the lunch break.

23           But you were asked about whether or not you used

24  those words, does that sound -- do you remember that?

25  A    Yes.

1   Q    At that point, were you shown the 302 for those

2   questions?

3   A    You mean shown the 302 for what questions?

4   Q    The question about whether or not you used the words

5   "passing through Customs"?

6   A    No, I don't think I was shown.  I mean I saw my 302, but

7   nobody showed it to me in between.

8   Q    I mean when you were actually asked that question, was

9   the 302 in front of you?

10  A    No.

11  Q    You were just asked about three particular words in your

12  302 without -- without context, right?

13  A    Correct.

14  Q    I'm going to show you your 302, which is now in evidence

15  as Defense D.  It's in the second paragraph.  I'll direct your

16  attention to the second paragraph.

17  A    Okay.

18  Q    Where it says agent note, and there were a bunch of

19  questions on that just a moment ago, but we can come back to

20  that.

21       Do you see in the agent note where it says "passing

22  through Customs"?

23  A    I do, it's in the first sentence, second line of that

24  paragraph.

25            (Continued on the following page.)

1   REDIRECT EXAMINATION (Continued)

2   BY MR. LAX:

3   Q    So now you have this full report in front of you.  I

4   would just like to you read that full sentence so that the

5   full context of the use of those three words is apparent.

6   A    Agent note, colon, Aguilar was arriving in Houston from

7   Mexico City and was passing through customs and had finished

8   having his luggage inspected when SA Zukas pulled him aside

9   and asked if he would voluntarily be willing to answer -- be

10  willing to answer some questions in an adjacent room.

11  Q    So it says, passing through customs and had finished

12  having his luggage inspected?

13  A    Yes.  That's correct.

14  Q    Is that the full context of the use of those words?

15  A    Correct.

16  Q    Thank you.  You were also asked a bunch of questions

17  about your handwritten notes?

18  A    Correct.

19  Q    Do you recall that?

20  A    Yes.

21  Q    So your handwritten notes for this interview, do you

22  remember how many pages they are?

23  A    I believe it was 19 pages.

24  Q    And you're taking these contemporaneously with -- when

25  the interview is going on?

1   A    Yes.

2   Q    So Special Agent Wood is asking questions?

3   A    Correct.

4   Q    Perhaps you're asking questions?

5   A    Correct.

6   Q    Mr. Aguilar is responding?

7   A    Yes.

8   Q    And all of this is going on while you're also taking

9   notes?

10  A    That's right.

11  Q    Do your notes reflect every single word that was stated

12  during the course of this interview?

13  A    No.

14  Q    Are -- was it ever intended to do so that?

15  A    No.

16  Q    Is it required to do that?

17  A    No.

18  Q    Are there things that occurred during the course of the

19  interview that didn't appear in your notes?

20  A    Yes.

21  Q    Was one of the reasons because just the flow of human

22  conversation is a little bit faster than the flow of the human

23  hand?

24  A    That's exactly correct.

25          MR. SPIRO:  Objection.

Zukas - Redirect - Lax                          211

1          Leading, every question.

2          THE COURT:  It was leading.  But I'm going to allow

3    it.

4          MR. SPIRO:  Okay.

5    Q    So when you were asked a whole bunch of questions about

6    the agent's note --

7    A    Yes.

8    Q    -- and the questions about it, it didn't appear in your

9    notes.  I'll put the agent's note up again for you.

10   A    Sure.

11   Q    Everything in that agent note, did that happen?

12   A    Everything.  Yes.

13   Q    So Mr. Aguilar, the defendant, was told that he was free

14   to stop the interview at any time and leave of his on accord?

15   A    Yes.

16   Q    He said that he understood and was willing to answer any

17   questions?

18   A    Yes.

19   Q    Aguilar asked what this was all about and Special Agent

20   Wood told him it was about his employment at Vitol?

21   A    Correct.

22   Q    And Aguilar even then sat down and stated he would be

23   happy to answer any questions?

24   A    Yes.

25   Q    All those things happened?

Avery N. Armstrong, RPR, Official Court Reporter

1   A    Yes.

2   Q    I'd like to return to your handwritten notes which I

3   think is Defense F.

4   A    Okay.

5   Q    You were asked a bunch of questions about your

6   handwritten notes and when Mr. Aguilar invoked counsel?

7   A    Yes.

8   Q    So just on the very first page here -- first, this isn't

9   your handwriting, correct?

10  A    That's my handwriting.

11  Q    Do you have any difficulty reading this?

12  A    No.

13  Q    I want to direct your attention among the first page, and

14  there's sort of a line break.  Right above that.

15  A    Yes.

16  Q    Can you read that for me.

17  A    Yeah.  That have lawyers and I do not have -- I do not

18  have anything to do with that.

19  Q    Did that statement, in sum and substance, appear in your

20  302?

21  A    Yes.  I believe so.

22  Q    And at that point early on in the interview, did you

23  understand that Mr. Aguilar had asked for the assistance of

24  counsel?

25  A    No.  He never did.

1    Q      In any way?

2    A      No.

3    Q      So when was the very first time Mr. Aguilar asked for the

4    assistance of counsel?

5    A      It would have been at the end of the interview which I

6    notated in my notes that he invoked counsel.

7    Q      That is in your notes?

8    A      Correct.

9    Q      Why was that in your notes?

10   A      It was a seminal point in the interview because he had

11   invoked counsel.

12   Q      It's important?

13   A      Correct.

14   Q      And you understood that?

15   A      Correct.

16   Q      And so is that -- that's why you wrote it down in your

17   notes?

18   A      Correct.

19   Q      Do you take those notes, you know, in the order of, I

20   guess, temporally?

21   A      Yes.  We try to just write it down as we're doing the

22   interview.

23   Q      So let me jump to Page 18 of your handwritten notes.

24          THE COURT:  And while you're jumping, Mr. Lax, I

25   didn't sustain Mr. Spiro's objection to leading.  I don't want

1   to you confuse that with an invitation to continue with it.

2           MR. LAX:  Understood, Your Honor.  Thank you.

3   Q    Directing your attention now to 18, there is something

4   written inside of a box.

5           What does it say inside that box?

6   A    I do want to look for legal advice, but I will help you

7   as much as I can.  That's what it says in the box.

8   Q    Why did you put that in a box?

9   A    Because that was my understanding that he was invoking

10  counsel and he wanted an attorney.

11  Q    What did you write immediately beneath that?

12  A    Invoke at 10:00 o'clock a.m.

13  Q    The things then that are written after this in your

14  notes, what is the first -- they're sort of separated by line

15  breaks, I'll call it.

16  A    Correct.

17  Q    What are those?

18  A    Those are statements he made to us.

19  Q    Before or after the invocation?

20  A    It was after the invocation.

21  Q    Are the things written in these notes everything --

22  sorry, are the things written in these notes that are beneath

23  invoke at 10:00 a.m., are those all things that were stated by

24  Mr. Aguilar after?

25  A    Correct.

1   Q    Are those things also reflected in your 302?

2   A    I believe they are, yes.

3           MR. LAX:  Your Honor, may I just have a moment to

4   confer with counsel.

5           THE COURT:  Yes, indeed.

6           MR. LAX:  Co-counsel.

7           THE COURT:  I assumed that.

8           Mr. Spiro can give you a whole list of questions, if

9   you want.

10          MR. LAX:  No further questions, Your Honor.

11          THE COURT:  Thank you very much, Mr. Lax.

12          MR. SPIRO:  Just two quick follow ups, Your Honor.

13  If you would indulge.

14          THE COURT:  I'm game, Mr. Spiro.

15          MR. SPIRO:  You're game.  Thank you very much.

16  RECROSS-EXAMINATION

17  BY MR. SPIRO:

18  Q    Agent Zukas.

19  A    Yes, sir.

20  Q    Javier Aguilar was passing through customs when you

21  stopped him and had not reached the double doors to exit

22  customs at that time, correct?

23  A    I believe he had finished passing through customs, yes.

24  Q    Well, wait a second.

25          Maybe --

1        THE COURT:  You didn't -- just if you go directly to

2   the -- without the preamble, Mr. Spiro, then perhaps it will

3   be less confusing.  Just ask him about the doors.

4   Q    He had not reached the exit of customs when you stopped

5   him?

6   A    Correct.

7   Q    And in fact, as you testified on direct, he would have

8   had to have left that room, taken a left, taken another left,

9   walked by the CBP officer who takes those customs forms

10  and exited --

11       MR. LAX:  Objection.

12       Outside the scope of recross.

13       THE COURT:  No, you asked about passing through and

14  he's asking about passing through.

15  Q    Right?  He would have had to left the room?

16  A    Yes.

17  Q    Gone out of that room, taken a left, taken another left,

18  gone through that opening that we looked at, gone through the

19  other extra doors, and that's where you pass the form to the

20  CBP officers if you have one of though declaration forms, and

21  then you can leave and meet your family and your driver or

22  whatever else, right?

23  A    I don't know anything about forms.  But I know he would

24  have had to exited the room like you said, he would had to

25  have taken a left in that corridor, and taken another left,

1   and I think he would have been outside at that point, yes.

2   Q    So you had a couple more doors and exits to go?

3   A    Yes.

4   Q    And you're a well traveled international man, you know

5   that at the very end of the customs and border process, right,

6   you oftentimes have a form to hand over to somebody right

7   before you exit that final set of doors, right?

8            You've done that before?

9   A    Yes.  Not traveling under my official passport though,

10  no.

11  Q    Right.  But in your civil --

12  A    Correct.  Correct.  Yes.

13  Q    That's how I have to travel, right.  I have to pass in

14  that form, right?

15  A    Yes.

16  Q    And he's a civilian, right?

17  A    I guess so, yes.

18  Q    Okay.  And you know, you were asked sort of -- you went

19  back through and just explained the whole invocation thing,

20  the Government asked you some questions about that.

21  A    Okay.

22  Q    And you know, right before -- right at the

23  end -- withdrawn.

24            What were you planning on asking him about Mexico?

25  A    I don't know.  I wasn't asking the questions.  So at that

Zukas - Recross - Spiro                    218

1  point -- so I know there was, from my understanding, is there

2  was a Latin America region he was involved in, and there was

3  just questions about Mexico.  But I don't know what the exact

4  questions that were going to be asked at that point.

5  Q    Forget the exact questions.  Just substantively, did you

6  know -- you knew a lot of about Ecuador --

7  A    Correct.

8  Q    Did you know substantively that kind of stuff about

9  Mexico?

10 A    No.

11 Q    And so really what happened is right before the

12 invocation that you, sir, acknowledge, Agent Wood said --

13 confronted Aguilar, and said, they told you that the money was

14 going to the people in the Government, Agent Wood, you know

15 that, right?  Remember Agent Wood saying you know that to

16 Aguilar?

17 A    I'd have to look at -- that sounds familiar.  I don't

18 know if he said it in that tone or that accusatory tone, to be

19 honest with you, sir.  But I believe there was, like,

20 questions about money going to government officials at that

21 point in the interview before the invocation, yes.

22 Q    Well, don't you think if you're sitting with who he knows

23 in his credential is an FBI agent in a room like that and he

24 says he's already told you you can't be silent, he's already

25 told you you can't lie to FBI agents, and he says you did know

1  that money was going to government officials, wouldn't you

2  call that an accusation?

3  A    Perhaps.  But he was free to leave at any time.

4  Q    Not perhaps.  That's an accusation, sir, isn't it?

5  A    Sure.  If you want to call it that, yeah.

6  Q    Well, no, no.  We're not going to do that.  We're almost

7  done, but we're not goings to do that.

8           It is an accusation, sir?

9           MR. LAX:  Objection.

10          Asked and answered.

11          THE COURT:  Sustained.

12 Q    And after that accusation, okay, according to you, the

13 subject matter switches to Mexico and the Government asked you

14 questions implying, in essence, well look, the agent puts in a

15 special box when he thinks Aguilar invokes, and so it's -- it

16 shows -- he suggested in his question that it shows how

17 directly honest and how scrupulously you honored his rights by

18 putting it in that box and admitting for the world that he

19 invoked, right?

20          Remember those questions?

21 A    Correct.

22 Q    The truth is you guys were done with him at that point?

23 You were done?

24 A    I don't follow.  I was done with him -- he invoked and we

25 were done with him.

1  Q    The reason why the first invocation didn't work as well

2  is because during that time, you still had questions, whereas

3  by the time you decide to write into these notes that he

4  invoked, you were done with him, you didn't have a single

5  question about Mexico, and so it was easy for you to concede

6  his invocation at that point, and you wouldn't lose the chance

7  to interrogate him on Ecuador, correct?

8  A     No.

9            MR. SPIRO:  I have nothing further.

10           THE COURT:  Thank you, Mr. Spiro.

11           Mr. Lax, I assume you have nothing further.

12           MR. LAX:  No, Your Honor.

13           THE COURT:  That's good.  That's a good assumption.

14           Special Agent Zukas, thank you very much.

15           THE WITNESS:  You're welcome, sir.

16           THE COURT:  Be safe in your return wherever you're

17  returning to.

18           THE WITNESS:  Thank you.

19           THE COURT:  So you're excused.

20           (The witness exited the witness stand at this time.)

21           THE COURT:  So Mr. Lax, tell us -- the good news is

22  we're breaking for the evening.  And what's our plan for

23  tomorrow, I guess, is the next inquiry.

24           MR. LAX:  Yes, Your Honor.  So the Government

25  intends to call one additional witness.  I think at least in

1   terms of direct, it will be about the same duration, so 45

2   minutes to an hour.

3          THE COURT:  All right.  So tomorrow -- so we're

4   starting to get back into the pre-COVID world.  We actually

5   have another in-person thing.

6          William what's our calendar look like?

7          THE COURTROOM DEPUTY:  We have a sentencing at

8   11:00.

9          THE COURT:  So this is -- we're scheduling this for

10  what, 12:00?

11         THE COURTROOM DEPUTY:  Yes.

12         THE COURT:  So we're going to start at noon and work

13  probably the usual schedule, this way we can -- I want to give

14  you an alert so when you're not coming into the courtroom too

15  soon since we will have other people, and I think we're still

16  working on capacity limits.

17         Aren't we, William?

18         THE COURTROOM DEPUTY:  Yes.

19         THE COURT:  So you can keep your powder dry until

20  close to noon.  I don't know how long the sentencing will

21  last, but it's our expectation that -- in fact, you know, does

22  William have your cell phone numbers?  Maybe he can text you

23  as we're getting close.

24         THE COURTROOM DEPUTY:  I think I can e-mail them.

25  They're pretty responsive to the e-mails.

Proceedings                222

1          Judge, I can e-mail them.  They're very responsive

2    to e-mails.

3          THE COURT:  Okay.  Whatever.  Then there may be

4    places you can -- again, as long as the administrative order

5    is in place, we're trying to keep people spaced out in the

6    courthouse, and at the same time, not disrupt the flow of the

7    calendar to the extent that we can avoid it.  So that's the

8    game plan, in a nutshell.  We're targeting the start at 12:00.

9    Should the courtroom become available prior to that time, in

10   any significant way, we'll try to get that word to you so we

11   can be all set up in time to begin.

12         Anything else we need to attend to before we adjourn

13   for the evening?

14         MR. LAX:  Not from the Government, Your Honor.

15         MR. SPIRO:  Not from the defense, Your Honor.

16         THE COURT:  All right.  Thanks all.

17         Everybody be safe and smart and enjoy a pleasant

18   evening, and we'll see you all around noon tomorrow, and we'll

19   go from there.

20         MR. LAX:  Thank you, Your Yonor.

21         THE COURT:  You're welcome.

22         (Matter adjourned until 12:00 p.m., March 2, 2022.)

23                        - ooOoo -

24

25

1                                     **INDEX**

2      **WITNESS:**                                                          **PAGE:**

3       **PAUL ZUKAS**
                           DIRECT EXAMINATION                            5
4                          BY MR. LAX

5                          CROSS-EXAMINATION                            38
                           BY MR. SPIRO
6
                           REDIRECT EXAMINATION                        207
7                          BY MR. LAX

8                          RECROSS-EXAMINATION                         215
                           BY MR. SPIRO
9
                                        * * * * *
10

11     Government's Exhibit DOJ GX-1C                                      19

12     Government's Exhibit DOJ GX-1D                                      20

13     Defense Exhibit B                                                   62

14     Defendant's Exhibit C                                              100

15     Defendant's Exhibits C, D and F                                    102

16     Defendant's Exhibit H                                              117

17     Defense Exhibit I                                                  182

18     Defense Exhibit J                                                  183

19     Defense Exhibit JA                                                 183

20                                      * * * * *

21

22

23

24

25

224

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - X
3
     UNITED STATES OF AMERICA,     :    20-CR-390(ENV)
4
               Plaintiff ,         :
5                                       United States Courthouse
          -against-                :    Brooklyn, New York
6
     JAVIER AGUILAR,               :
7                                       March 2, 2022
               Defendant.          :    11:00 a.m.
8
     - - - - - - - - - - - - X
9
                    TRANSCRIPT OF SUPPRESSION HEARING
10           BEFORE THE HONORABLE ERIC N. VITALIANO
              UNITED STATES SENIOR DISTRICT JUDGE
11
     APPEARANCES:
12
     For the Government:       JACQUELYN M. KASULIS
13                             United States Attorney
                               BY: JONATHAN LAX,
14                             Assistant United States Attorney
                               271 Cadman Plaza East
15                             Brooklyn, New York

16                             D. HUNTER SMITH, Trial Attorney
                               CLAYTON P. SOLOMON, Trial Attorney
17

18   For the Defendant:        QUINN EMANUEL URQUHART & SULLIVAN,LLP
                               51 Madison Avenue, 22nd Floor
19                             New York, New York
                               BY: ALEX SPIRO, ESQ.
20                                 TAI H. PARK, ESQ.
                                   GEORGE T. PHILLIPS, ESQ.
21                                 MICHAEL BLOOM, ESQ.

22
     Court Reporter:           Andronikh M. Barna
23                             225 Cadman Plaza East
                               Brooklyn, New York
24                             (718) 613-2178

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.

Proceedings                                    225

1          THE CLERK:  All rise.  Court is now open.

2          The honorable Eric N. Vitaliano is presiding.

3          Case on the calendar is U.S.A. versus Aguilar,

4    Case No. 20-CR-390 on for a suppression hearing.

5          Will the attorneys please note their appearance,

6    beginning with government counsel.

7          MR. LAX:  Good afternoon, Your Honor.

8          Jonathan Lax, Clayton Solomon and Hunter Smith on

9    behalf of the government.

10         THE COURT:  And good afternoon.

11         MR. SPIRO:  On behalf of the defendant, Alex Spiro

12   and my colleagues at Quinn Emanuel.

13         THE COURT:  Good afternoon, Mr. Spiro, as well as

14   your colleagues.

15         THE CLERK:  We also have a Spanish interpreter who

16   needs to note her appearance for the record.

17         THE INTERPRETER:  Rosa Olivera.

18         THE COURT:  Hi, Rosa.

19         THE CLERK:  All parties are present, including

20   defendant.

21         THE COURT:  Everybody can be temporarily seated.

22         The morning matter was convoluted -- are we on?

23         THE CLERK:  There you go.

24         THE COURT:  Even without the microphone not working,

25   the morning matter was somewhat more convoluted.  The defense

Proceedings                              226

1   had made a request that resulted in a delay, so we finished

2   later than we had anticipated.

3           We are now just going to sketch out where we -- we

4   are going to take a lunch break, so everybody will not be, you

5   know, forced into starvation and then -- what are we up to,

6   about 1:30, William?

7           THE CLERK:  It's currently about 1:15.

8           THE COURT:  Yes.  So why don't we try to shoot to

9   get back around 2:30 and we will start as close to that.

10          Mr. Lax, just to touch base, what is our plan for

11  the balance of the day?

12          MR. LAX:  Yes, Your Honor.

13          So we only have -- the government only has one

14  additional witness and I expect that direct will be about the

15  same as last time, perhaps even shorter, so approximately

16  45 minutes, maybe less, and we can try to move things along as

17  quickly as we can.  You know, all the witnesses are out of

18  town, so, you know, we hope to avoid additional travel or, you

19  know --

20          THE COURT:  Right.

21          MR. LAX:  -- any unnecessary delay, travel, things

22  like that.  If possible.

23          THE COURT:  And we do not know what the defense's

24  plan is, if there are any other witnesses, but have you all

25  worked out a spill-over day in case we do not finish today?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                227

1  Because William advised us that we had said we were available

2  Friday and the parties are not.  Have you all come up with a

3  -- in case we need a spill-over day that we know where we are

4  going?

5           MR. SPIRO:  Well, William provided to the defense,

6  and I believe the prosecutors, the option of next Tuesday.

7           THE COURT:  Yes.

8           MR. SPIRO:  I don't know, I haven't conferred with

9  my colleagues with the government if that's okay, but that

10  would be a possibility for the defense.

11           THE COURT:  For the defense it is a possibility.

12           MR. LAX:  We will need to confer and I think also

13  confer with witnesses.

14           THE COURT:  Ah, yes.

15           MR. LAX:  You know, it will require travel.  All the

16  witnesses are from Houston, not surprisingly, so we'll have to

17  coordinate that as well and we can, during the lunch break,

18  perhaps figure that out.

19           THE COURT:  Okay.  All right.  So we will come back

20  as close to 2:30 as we can.  We, again, appreciate your

21  indulgence with this morning's calendar and we will reconvene

22  at 2:30.  Enjoy your lunch.

23           MR. SPIRO:  Thank you.

24           MR. LAX:  Thank you, Your Honor.

25           THE COURT:  You are welcome.

Proceedings                                      228

1          (Luncheon recess taken.)

2          (Continued on the next page.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURTROOM DEPUTY:  All Rise.  Court is back in

2    session.  Counsel for both sides are present including the

3    defendant.

4          THE COURT:  Any housekeeping before we start?

5          MR. SPIRO:  Nothing, Judge.

6          MR. LAX:  No, your Honor.  The Government is

7    prepared to call the next witness.

8          MR. SOLOMON:  For the United States we call Special

9    Agent Matthew Wood.

10         (Witness takes the witness stand.)

11         THE COURTROOM DEPUTY:  Please raise your right hand.

12              (Witness sworn.)

13         THE WITNESS:  I do.

14    **MATTHEW WOOD,** having been first duly sworn, was examined and

15    testified as follows:

16         THE COURTROOM DEPUTY:  State your first and last

17    name spell it.

18         THE WITNESS:  Matthew Wood, M-A-T-T-H-E-W, W-O-O-D.

19         THE COURTROOM DEPUTY:  Have a seat.

20         THE COURT:  Mr. Solomon, you may inquire.

21         MR. SOLOMON:  Thank you, your Honor.

22    DIRECT EXAMINATION

23    BY MR. SOLOMON:

24    Q    Good afternoon, Agent Wood.

25    A    Good afternoon.

1   Q    I'd like to begin this afternoon by asking you a few

2   questions about your professional background.  First of all,

3   what agency do you work for?

4   A    Homeland Security.

5   Q    Within the Department of Homeland Security, are you

6   assigned to a particular division?

7   A    Homeland Security Investigations.

8   Q    Is that sometimes called his?

9   A    Yes.

10  Q    What is your title at his?

11  A    Special Agent.

12  Q    How long have you been employed as a Special Agent at

13  his?

14  A    Twelve years.

15  Q    Where is your duty location?

16  A    Houston, Texas.

17  Q    Were you based in Houston in July of 2020?

18  A    Yes.

19  Q    How long have you been based in Houston?

20  A    My entire career.

21  Q    Within his do you focus on any particular kinds of

22  investigations?

23  A    For the past ten years I've focused exclusively on

24  Foreign Corrupt Practices Act and money laundering violations.

25  Q    In July of 2020 were you part of any specialized group

1   within his?

2   A    I was.  I was assigned to the financial fraud group in

3   Houston.

4   Q    Do you have a graduate degree?

5   A    I do.

6   Q    What is that degree in?

7   A    Accounting.

8   Q    After graduate school, what did you do, sir?

9   A    I was an auditor for the Government Accountability Office

10  in Washington DC.

11  Q    How long did you do that?

12  A    Approximately five years.

13  Q    After you left the GAO, did you immediately become a

14  federal agent?

15  A    Yes.

16  Q    You said that a hundred percent of your work is money

17  laundering and corruption cases.  Prior to July 2020, had you

18  done any work on the Government's investigation of

19  Mr. Aguilar?

20  A    No.

21  Q    How was it then that you came to be involved in this

22  investigation?

23  A    At that time I was on detail to the Foreign Corrupt

24  Practices Act unit with the Department of Justice in

25  Washington DC.

Wood - Direct - Solomon                    232

1    Q    And were you located in Washington DC, or was it just the
2    unit that is located there?
3    A    The unit is located in Washington; I was located in
4    Houston.
5    Q    Did anyone ever call you and ask you to be a part of this
6    particular investigation?
7    A    No.
8    Q    When is the first time you heard of Mr. Aguilar?
9    A    Late June of 2020.
10   Q    Was that -- who was that conversation with, sir?
11   A    My initial conversation was with Derrick Edinger, a
12   supervisor in the FCPA unit with DOJ.
13   Q    What was your understanding of the assignment, sir?
14   A    My understanding was that I would be assisting with an
15   interview at George Bush Intercontinental Airport in Houston.
16   Q    Were you the case agent on that investigation?
17   A    No, I was not.
18   Q    Who was the case agent?
19   A    FBI Special Agent Jimmy Kelley.
20   Q    Do you know where Agent Kelley was based in 2020?
21   A    Yes, I believe it was Miami, Florida.
22   Q    Do you have an understanding as to why Mr. Kelley did not
23   conduct the interview himself?
24   A    Mr. Kelley was unable to travel to Houston due to COVID
25   restrictions within his agency.

1  Q     How do you know that?

2  A     That's what I was told.

3  Q     Was anyone else also asked to assist you with the

4  interview?

5  A     Yes.

6  Q     Who was that?

7  A     FBI Special Agent Paul Zukas.

8  Q     Did you and Agent Zukas ever discuss the possibility of

9  arresting Mr. Aguilar?

10 A     No.

11 Q     Did you know in advance that Mr. Aguilar would be

12 arriving at the George Bush Intercontinental Airport that day?

13 A     Yes.

14 Q     How do you know that?

15 A     I received a travel alert for Mr. Aguilar.

16 Q     What is a travel alert?

17 A     It's an alert that's automatically generated by one of

18 our systems that will alert us when a particular person is

19 traveling.

20 Q     At that time did you also know where Mr. Aguilar lived?

21 A     Yes.

22 Q     Where was that?

23 A     Houston.

24 Q     Why didn't you just interview Mr. Aguilar at home?

25 A     Well, several reasons.  We prefer the airport because

1  it's a sterile environment.  It's controlled.  It's an

2  officer-safety issue for us.  It's also logical.  It's good

3  from a logistical standpoint for us.  We know where a person

4  is going to be at a particular time.

5  Q    When you say a sterile environment, what do you mean by

6  that?

7  A    All travelers have gone through security so we know that

8  no one has a weapon, everyone has been screened prior to

9  boarding the aircraft.  So when they arrive at the airport,

10  the travel alert has been screened by TSA.

11  Q    You use the word control, what do you mean by that?

12  A    An environment where people stay in a particular area.

13  So when you arrive at an airport you stay within a terminal,

14  the terminal itself is controlled.  Once you exit the terminal

15  you have to go through security to reenter.  As long as you're

16  in the terminal area of the airport, it's a sterile,

17  controlled environment.

18  Q    You mentioned earlier that part of the reason Mr. Kelley

19  didn't travel for the interview himself was because of

20  COVID-19 restrictions, right?

21  A    That's correct.

22  Q    How, if at all, did COVID-19 impact your decision to do

23  the interview at the airport?

24  A    It was a factor in our decision-making process.

25  Q    Okay.  Can you explain that?

Wood - Direct - Solomon                    235

1   A    Sure.  We have to decide from time to time whether or not

2   it was a good idea to approach individuals at their residence

3   for COVID concerns.  We were concerned about the safety of

4   people that may be in the residence, and the fact that they

5   may not want to be exposed to us from the outside in their

6   home.

7   Q    I see.  If you were concerned about potential exposure to

8   COVID-19, either to you or someone else, why didn't you just

9   conduct the interview somewhere outside?

10  A    We could have conducted the interview outside, but it was

11  July in Houston.  It's very hot and humid.  It would have been

12  very unpleasant for everyone involved.

13  Q    Any other reasons why you wouldn't conduct it outside?

14  A    It's also not good for us to be seen conducting an

15  interview of someone.  We prefer to keep that private.  And so

16  sometimes public places aren't the best places for us to

17  conduct interviews.

18  Q    Was this the first time that you interviewed someone at

19  an airport?

20  A    No.

21  Q    Was this the first time that you interviewed someone at

22  this airport?

23  A    No.

24  Q    Do you have an estimate of how many times you interviewed

25  someone at Houston airport, sir?

1   A     At least 20 times.

2   Q     Any of those individuals U.S. citizens or residents?

3   A     Yes.

4   Q     Any of them also live in Houston?

5   A     Yes.

6   Q     Were any of those interviews conducted in the same room

7   where you interviewed Mr. Aguilar?

8   A     Every interview.

9   Q     Were those interviewed voluntary?

10  A     Yes.

11            MR. SPIRO:  Objection.

12            THE COURT:  Well, he can lay a foundation then ask

13  him the question.

14            MR. SOLOMON:  I think we can just move on from that.

15  Q     Is there a reason why you choose that room?

16  A     Yes, there is.

17  Q     What is the reason, sir?

18  A     It's a large room.  It's the largest room that I'm aware

19  of that we can use to conduct interviews.  It allows us to

20  conduct the interview in a manner that we believe is

21  beneficial to us and to the interviewee.

22  Q     Do you have to obtain any kind of permissions to

23  interview someone at the airport?

24  A     Yes.

25  Q     Did you have to do that here?

Wood - Direct - Solomon                    237

1    A    Yes.

2    Q    Who did you speak with?

3    A    I initially spoke with my first line supervisor in

4    Houston.  And I spoke with an agent that's assigned to the

5    airport in Houston.

6                  THE COURT:  What agency?

7                  THE WITNESS:  He's with Homeland Security

8    Investigations.  Our airport agents who are located at the

9    airport are the ones who help facilitate the interviews at the

10   airport.

11   Q    Your supervisor, is that also someone in his?

12   A    Yes.

13   Q    Do you remember what you discussed with your supervisor?

14   A    Not specifically, but it would have just been

15   informational, just to let him know that I plan to be at the

16   airport at a particular day at a particular time.

17   Q    Do you remember what you said to the duty agent?

18   A    Not specifically, but it would have been the same type of

19   coordination, the particular individual, the date and time of

20   expected arrival.

21   Q    Did you tell the duty agent anything about this

22   investigation in particular?

23   A    No.

24   Q    Did you speak with anyone at CBP?

25   A    I did not.

1    Q    Do you know what the duty agent said to the folks at CBP?

2    A    I do not.

3    Q    Did you know what flight Mr. Aguilar would be arriving

4    on?

5    A    I did.

6    Q    Did you know where he would be coming in from?

7    A    Yes.

8    Q    Were you waiting for him at the gate?

9    A    No.

10    Q    Where were you waiting for him?

11    A    I was waiting for him in the room where we conducted the

12    interview.

13    Q    Were you waiting with anyone else?

14    A    Special Agent Zukas.

15    Q    Do you know whether before Mr. Aguilar got to that area

16    of the airport he had to go through a primary inspection?

17    A    Yes.

18    Q    What is a primary inspection?

19    A    Primary inspection is the immigration portion of the

20    inspection.

21    Q    What is involved in the primary inspection?

22    A    In Houston, once you exit the plane you walk down the jet

23    bridge to the area where CBP officers are waiting to scan your

24    passport.  That is the initial inspection.

25    Q    Do all international passengers have to go through a

1   primary inspection?

2   A    It's my understanding, yes.

3   Q    Did you participate in Mr. Aguilar's primary inspection?

4   A    I did not.

5   Q    Assuming someone has gone through the primary inspection

6   process, what is next?

7   A    From there the traveler goes down the escalator or an

8   elevator to a lower floor to the baggage claim area for

9   international arrivals.

10  Q    Are you familiar with the term secondary inspection?

11  A    Yes.

12  Q    What is that?

13  A    That is where a traveler could be referred to secondary

14  inspection once they've cleared immigration.  It's a Customs

15  Inspection.

16  Q    Do you know whether after he left immigration Mr. Aguilar

17  had to go through a secondary inspection?

18  A    Yes.

19  Q    Yes, you know?  Or yes, he had to go through?

20  A    Yes, he had to go through it.

21  Q    As part of that, do you know whether his baggage was

22  inspected?

23  A    Yes.

24  Q    Were you part of his baggage inspection?

25  A    No.

1          THE COURT:  Does the secondary inspection include

2     inspection of the person or just the baggage?

3          THE WITNESS:  It's my understanding it could be

4     both.

5     Q    Do you know whether in this case, there was an inspection

6     of Mr. Aguilar's person at the secondary inspection?

7          MR. SPIRO:  Objection.  Outside of his personal

8     knowledge, from what I understand.

9          THE COURT:  It's a hearing and that was the question

10    he asked, if he knows.

11    A    I'm not aware of one, no.

12    Q    When you met Mr. Aguilar, did he have his bags with him?

13    A    Yes.

14    Q    After a secondary inspection, are there any other steps

15    in the Customs and Immigration process that passengers need to

16    complete?

17    A    No, not to my knowledge.

18    Q    The area where the baggage inspection takes place at

19    Houston International Airport, are you familiar with that

20    area?

21    A    Yes.

22    Q    How do you exit that area?

23    A    You exit that area through a doorway to the right side.

24    Q    Okay.  Between the baggage inspection and those doors,

25    are there any other steps the passengers need to go through in

1    order to exit through those doors?

2    A    No.

3    Q    Between those doors and the exit of the airport, are

4    there any other steps in the Customs and Immigration process?

5    A    No, not to my knowledge.

6    Q    You said you were waiting for Mr. Aguilar after the

7    baggage inspection; is that right?

8    A    Correct.

9    Q    Were you present when Mr. Aguilar completed his baggage

10   screening?

11   A    I was not.

12   Q    Where were you?

13   A    In the restroom.

14   Q    So when did you meet Mr. Aguilar for the first time?

15   A    I met Mr. Aguilar for the first time after he had been

16   approached initially by Special Agent Zukas.

17   Q    Do you recall his demeanor when you met him?

18   A    Yes.  He was relaxed.

19   Q    Do you know whether he also had his passport with him?

20   A    Yes, he did.

21   Q    Did you or Special Agent Zukas ever take his passport

22   from him?

23   A    No.

24   Q    Ever take his luggage?

25   A    No.

1   Q     Did you ever search his luggage?

2   A     No.

3   Q     Did you ever pat him down?

4   A     No.

5   Q     Ever frisk him?

6   A     No.

7   Q     Did you touch Mr. Aguilar at all?

8   A     No.

9   Q     Did you ever see Agent Zukas touch Mr. Aguilar?

10  A     No.

11  Q     That day, were you in a uniform?

12  A     No.

13  Q     How you were dressed?

14  A     Similar to the way I'm dressed today with, a sport coat,

15  slacks and a collared shirt.

16  Q     The sport coat, did it have any police insignia?

17  A     No.

18  Q     Do Customs officers also wear sports coats?

19  A     No, Customs officers wear uniforms.

20  Q     Did you have your credentials with you that day?

21  A     Yes.

22  Q     Did you show your credentials to Mr. Aguilar?

23  A     Yes.

24  Q     Did those credentials identify you as a Special Agent

25  with his?

1    A    Yes.

2    Q    Do you typically carry a firearm with you to work?

3    A    Yes.

4    Q    Did you have your firearm with you that day?

5    A    Yes.

6    Q    How do you normally carry your firearm?

7    A    I carry my firearm on my right hip.

8    Q    Is your firearm enclosed in anything?

9    A    I carry my firearm inside my pants with a clip, so that

10   the majority of the weapon is actually inside of my pants.

11   Q    Is that how you were carrying your weapon on that day?

12   A    Yes.

13   Q    You mentioned that you were wearing a sports coat, so was

14   your clip underneath your jacket?

15   A    Yes.

16   Q    And inside of your pants?

17   A    Correct.

18   Q    Did you ever take off your jacket during the interview?

19   A    No.

20   Q    Did you ever put your firearm on the table?

21   A    No.

22   Q    To your knowledge, was it ever in a location where it

23   could have been seen by Mr. Aguilar?

24   A    No.

25   Q    How about Special Agent Zukas, do you know whether he had

1   his weapon with him that day?

2   A    I don't know.

3   Q    Were any weapons visible in the interview room?

4   A    No.

5   Q    Do you have handcuffs?

6   A    Yes.

7   Q    Did you have your handcuffs with you that day?

8   A    No.

9   Q    Do you know whether Special Agent Zukas had handcuffs

10  with him that day?

11  A    I don't know.

12  Q    Did you see handcuffs anywhere in the room?

13  A    No.

14  Q    I'd like to ask you a few questions about the room.

15  Earlier you said it's not the first time you interviewed

16  someone there; is that right?

17  A    Correct.

18  Q    In advance of coming here today did you take some photos

19  of the room?

20  A    Yes.

21       MR. SOLOMON:  Mr. Villanueva, if I can access the

22  Elmo that would be great.

23       I'd like to show a few of these photos.  And I'll

24  begin with an exhibit that's been introduced into evidence as

25  DOJ GX-1C?

1          THE COURT:  This is in already?

2          MR. SOLOMON:  It is, your Honor.

3   BY MR. SOLOMON:

4   Q    Agent Wood, can you see this photo all right?

5   A    Yes.

6   Q    At any point if you want me to zoom in to a particular

7   area just let me know.  Did you take this photo?

8   A    I did.

9   Q    Is this the room where Mr. Aguilar was interviewed?

10  A    Yes.

11  Q    Where were you standing when you took the photo?

12  A    In the doorway where you exit the room.

13  Q    What does that exit into, sir?

14  A    That exits into the secondary inspection area.

15  Q    On the far left of the photo, this area here that I'm

16  directing with my finger, what is on the far left side of the

17  photograph?

18  A    There are interview rooms right there on that wall.  To

19  the left is a long hallway that goes down to a CBP break area,

20  into additional restrooms and offices for CBP.

21  Q    Did Mr. Aguilar ever go down that hall?

22  A    No.

23  Q    Do you recognize the table in that photo?

24  A    Yes.

25  Q    Did any of you sit at that table?

1    A    Yes.

2    Q    Which side did Mr. Aguilar sit on?

3    A    Mr. Aguilar sat on the left side of the table.

4    Q    And you and Special Agent Zukas?

5    A    On the right side.

6    Q    Did you and Special Agent Zukas talk about who would sit

7    where in advance of the interview?

8    A    Yes.

9    Q    What did you decide?

10   A    Agent Zukas and I decided we would sit behind the table,

11   on the right side of the table in the photograph.

12   Q    Why was that?

13   A    So Mr. Aguilar could sit on the left side and have a

14   clear view of the doorway.

15   Q    I'm going to show you another photograph, already in

16   evidence, DOJ GX-1E.  Can you see this photo all right?

17   A    Yes.

18   Q    Did you take this photo?

19   A    Yes.

20   Q    Where were you standing when you took this photo?

21   A    Inside the room at the entrance to the hallway facing

22   outside towards the CBP secondary inspection.

23   Q    Was this the opposite orientation of what we were looking

24   at a moment ago?

25   A    Yes.

1    Q    In this photo there is an open door to the right, do you

2    see that?

3    A    Yes.

4    Q    Is that the same door where you said you took the photo

5    we looked at just a minute ago from?

6    A    Yes.

7    Q    In this photo, that door is open.  Was that door open or

8    closed during the interview?

9    A    Open.

10   Q    The whole time?

11   A    Yes.

12   Q    Was there any reason for that?

13   A    We wanted Mr. Aguilar to feel he was free to leave at any

14   time.

15   Q    Was there anything between Mr. Aguilar and the door?

16   A    No.

17   Q    Was there any one between Mr. Aguilar and the door?

18   A    No.

19   Q    Was there anyone guarding the door from the outside?

20   A    No.

21   Q    Anything else obstructing the door?

22   A    No.

23   Q    Before we move on, do you remember when these photos were

24   taken?

25   A    I don't remember the date, no.

1    Q    Do you remember the year the photos were taken?

2    A    2021.

3    Q    Were they taken at the -- do you know if they were taken

4    in the beginning of 2021?  In the last six months?

5    A    I believe they were taken at the end of year.

6    Q    That's the end of 2021?

7    A    Yes.

8            MR. SOLOMON:  I'm now going to show you a photo that

9    has been marked for identification as DOJ GX-1A.  This is not

10   yet in evidence.

11           MR. SPIRO:  No objection.

12           THE COURT:  Received without objection.

13           (Government Exhibit DOJ GX-1A was received in

14   evidence.)

15   BY MR. SOLOMON:

16   Q    Agent Wood, what is this a photo of?

17   A    This is a photograph of the chair in the room where we

18   conducted the interview.

19   Q    Do you know who sat in this chair?

20   A    I do not.

21   Q    I'm going to show you another photo, Agent wood.  This is

22   DOJ GX-1B, also not in evidence.

23           MR. SPIRO:  No objection.

24           THE COURT:  Received without objection.

25           (Government Exhibit DOJ GX-1B was received in

1    evidence.)

2    BY MR. SOLOMON:

3    Q    Did you take this photo, Mr. Wood?

4    A    I did.

5    Q    Do you know what this is a photo of?

6    A    Can you please move the photo down?

7    Q    Yes.

8    A    Yes, I do.

9    Q    What is this a photo of, sir?

10   A    This is a photo of a chair in the room where we conducted

11   the interview.

12   Q    Does looking at this photo help refresh your memory on

13   what chair we looked at moment ago IN DOJ GX-1A?

14   A    Yes.

15   Q    I'm going to put that back up.  Looking again at

16   Government's Exhibit 1A, which has been admitted into

17   evidence, can you see that, sir?

18   A    Yes.

19   Q    Who sat in this chair?

20   A    Mr. Aguilar.

21   Q    It looks like there is something attaching the chair to

22   the table.  Do you see that?

23   A    Yes.

24   Q    Do you know what that is?

25   A    I do.

1   Q    Can you describe it for us, sir?

2   A    I should be able to describe that.  They look like bolts

3   of some kind.

4   Q    You said you took these photos at the end of 2021; is

5   that right?

6   A    That's correct.

7   Q    Do you know whether these bolts were there on the day of

8   the interview with Mr. Aguilar?

9   A    Yes, they were.

10  Q    Do you know why those bullets are attached to the chair?

11  A    For officer safety purposes, to ensure that the chair

12  cannot be picked up and used as a weapon.  And presumably, so

13  the chair can't walk off and disappear, so it remains in

14  place.

15  Q    On the day of the interview of Mr. Aguilar, were there

16  any handcuffs attached to this chair?

17  A    No.

18  Q    Was Mr. Aguilar ever restrained at any point in the

19  interview?

20  A    No.

21  Q    Did you ever threaten to restrain him?

22  A    No.

23  Q    I'd like to ask you some questions about the interview.

24  Between you and Special Agent Zukas, did one of you lead the

25  questioning of Mr. Aguilar?

1   A    Yes, I led the questioning.

2   Q    Did you take notes that day, sir?

3   A    No.

4   Q    Who took notes?

5   A    Special Agent Zukas.

6   Q    Do you speak Spanish?

7   A    No.

8   Q    So was the interview conducted in English?

9   A    Yes.

10  Q    Did you use an interpreter?

11  A    No.

12  Q    Did Mr. Aguilar ever ask for an interpreter?

13  A    No.

14  Q    Did you ask Mr. Aguilar if he was okay proceeding

15  English?

16  A    No.

17  Q    Did he respond to your questions in English or Spanish?

18  A    English.

19  Q    From what you could tell, did he have any difficulty

20  understanding your questions?

21  A    No, he appeared to be fluent in English.

22  Q    Did you have any difficulty understanding him?

23  A    No.

24  Q    What did you say to start the interview?

25  A    I advised Mr. Aguilar that he had cleared Customs and

1    Immigration.  He was free to leave at any time.  We would

2    appreciate it if he would voluntarily answer some questions

3    for us.

4    Q    Is that something that you normally say when you begin

5    witness interviews?

6    A    At the airport, 100 percent of the time.

7    Q    Why is that?

8    A    Because I want the person to understand that they are

9    free to leave.  And that if they don't want to talk to us,

10   then they can leave.

11   Q    Did Mr. Aguilar say anything in response to those

12   statements, sir?

13   A    No.

14   Q    Do you have any reason to believe that he didn't

15   understand what you meant?

16   A    No, not at all.

17   Q    After telling Mr. Aguilar that he had cleared Customs and

18   he was free to leave, what kinds of questions did you move on

19   to?

20   A    Biographical questions, a little bit about Mr. Aguilar's

21   history, employment history, education history.

22   Q    Do you know who he worked for at the time?

23   A    Yes.

24   Q    Who was that?

25   A    Vitol.

1   Q    In discussing Mr. Aguilar's work at Vitol, did he say

2   anything about the people he worked with in Houston?

3   A    He did.

4   Q    Did he say anything about any of his colleagues having

5   lawyers?

6   A    He did.

7   Q    Do you remember what he said?

8   A    He said that some of his colleagues had attorneys, but

9   that he did not.

10  Q    At that point in the interview did Mr. Aguilar say that

11  he wanted to speak with a lawyer?

12  A    No.

13  Q    At some point in the interview did you start asking

14  Mr. Aguilar more specific questions related to your

15  investigation?

16  A    Related to Special Agent Kelley's investigation, yes.

17  Q    Okay.  Did you show him any documents?

18  A    Yes.

19  Q    Did you change your tone of voice once you moved on from

20  background questions to questions concerning the

21  investigation?

22  A    No.

23  Q    Was there any point during the interview where you

24  believed that Mr. Aguilar was not telling you the truth?

25  A    Yes.

1  Q    Did you raise your voice with him at that time?

2  A    No.

3  Q    Did you ever tell Mr. Aguilar that you believed that he

4  committed a crime?

5  A    No.

6  Q    Did Special Agent Zukas?

7  A    No.

8  Q    Was there ever any point during the interview where

9  Mr. Aguilar declined to answer one of your questions?

10 A    Yes.

11 Q    Did you raise your voice with him at that time?

12 A    No.

13 Q    Did you command him to answer your questions?

14 A    No.

15 Q    Do you recall ever raising your voice to Mr. Aguilar at

16 any point in the interview?

17 A    No.

18 Q    How about Special Agent Zukas?

19 A    No.

20 Q    Did you recall ever tell Mr. Aguilar that he was under

21 arrest?

22 A    No.

23 Q    Did you ever threaten him with arrest?

24 A    No.

25 Q    Did you ever threaten him in any other way?

1   A    No.

2   Q    Earlier you said that at some point in the interview

3   Mr. Aguilar told you about others at Vitol who had attorneys,

4   and I asked you whether he asked to speak to an attorney at

5   that time.  Do you remember that?

6   A    Yes.

7   Q    Do you have an estimate of how long the interview lasted

8   from beginning to end?

9   A    Hour to hour and a half.

10  Q    At any point in that interview, did Mr. Aguilar ask you

11  to speak with an attorney?

12  A    Yes, towards the end of the interview.

13  Q    Do you remember what he said?

14  A    I don't remember specifically what he said, but he

15  indicated that he would like to speak to an attorney.

16  Q    After Mr. Aguilar told you that he wanted to speak to an

17  attorney, did you discuss anything else?

18  A    We did not.  Mr. Aguilar said a few additional things to

19  us.

20  Q    Do you remember what those things were?

21  A    I believe he mentioned that he had a meeting that day

22  with the Houston president of Vitol.  He told us where he

23  lived in Houston and when he planned to travel back to Mexico.

24  Q    Before he left the room, did he need to retrieve his bags

25  from you?

1    A    No, he had his bags.

2    Q    How about his passport?

3    A    No.

4    Q    Did you give Mr. Aguilar your business card?

5    A    I don't think that I did; I think Special Agent Zukas

6    did.

7    Q    Did Mr. Aguilar give you his business card?

8    A    No.

9    Q    A few more questions and all of them relate to any point

10   in the interview.  At any point in the interview was the room

11   to the door closed?

12   A    No.

13   Q    Was anyone blocking Mr. Aguilar's path to that door?

14   A    No.

15   Q    Anyone else come in the room?

16   A    Not to my knowledge.

17   Q    Anyone standing right outside of the door?

18   A    No.

19   Q    At any point did you or Special Agent Wood draw your

20   firearm?

21   A    No.

22   Q    Excuse me, Special Agent Zukas?

23   A    No.

24   Q    Did either of you draw attention to your firearm?

25   A    No.

```
                    Wood - Cross - Spiro                 257

 1  Q     Did you ever remove your jackets?

 2  A     No.

 3  Q     Did you ever display handcuffs?

 4  A     No.

 5  Q     Did you ever tell the defendant, tell Mr. Aguilar, he was

 6  not free to leave?

 7  A     No.

 8  Q     At any point was he not actually free to leave?

 9  A     No.

10  Q     Did you ever tell him he committed a crime?

11  A     No.

12  Q     Did you tell him he was charged with a crime?

13  A     No.

14  Q     Did you ever tell him he was under arrest?

15  A     No.

16  Q     Did you ever restrain him?

17  A     No.

18  Q     Did you ever touch his bags?

19  A     No.

20          MR. SOLOMON:  That's all.  Thank you, sir.

21          THE COURT:  Thank you, Mr. Solomon.

22          Mr. Spiro, any cross?

23          MR. SPIRO:  Yes, your Honor.

24  CROSS EXAMINATION

25  BY MR. SPIRO:
```

1   Q    How many times did you practice what you just did before
2   the Court?
3   A    Three times.
4   Q    Did you do it this morning?
5   A    No.
6   Q    Did you do it after court yesterday?
7   A    No.
8   Q    You haven't practiced that since you've been to New York
9   or did you practice it before yesterday?
10  A    Before yesterday.
11  Q    Can you tell us when?
12  A    Monday afternoon.
13  Q    You would agree with me, right, as somebody who conducted
14  dozens of interviews, the back and forth between you and the
15  prosecutor, you knew each question he was going to ask and you
16  knew which answer you were going to give, right?
17  A    Yes.
18  Q    And after court yesterday, you also learned some of the
19  things that Agent Zukas testified about, didn't you?
20  A    No.
21  Q    In speaking to the prosecutors last night or this
22  morning, did anything about, for example, exclamation points
23  in Mr. Zukas' notes come up?
24  A    No, sir.
25  Q    What about anything about that COVID-19 was the reason

1   why you all were conducting this interrogation at the airport?

2   A    No, sir.

3   Q    Did you speak at all to the prosecutors yesterday during

4   the day?

5   A    Yes.

6   Q    Did you speak to them again this morning?

7   A    Yes.

8   Q    Did you speak to them about the substance of your

9   testimony yesterday and/or this morning?

10  A    Yes.

11  Q    Were you present in the courthouse yesterday?

12  A    Yes.

13  Q    Did you set out to work for DHS when you began your law

14  enforcement career?

15  A    No, sir.

16  Q    What did you want to do?

17  A    I wanted to work for the first agency that would hire me.

18  Q    You also wanted to work for the FBI, right?

19  A    Yes.

20  Q    What you've been able to accomplish at DHS is sometimes

21  working alongside the FBI, right?

22  A    Yes.

23  Q    And DHS is not part of the Department of Justice,

24  correct?

25  A    Yes.

1   Q     DHS is part of Homeland Security, right?

2   A     Yes.

3   Q     So is ICE, U.S. Immigration and Customs Enforcement?

4   A     Yes.

5   Q     And so is Customs and Border Protection, CBP, which we've

6   talked about, right?

7   A     Yes.

8   Q     They all fall under the Homeland Security purview,

9   correct.

10  A     Yes.

11  Q     They have primary responsibility for the borders,

12  correct?

13  A     Yes.

14  Q     And in the overview of DHS, U.S. Immigration Customs

15  Enforcement, it lists lots and lots of crimes that you all are

16  charged with investigating, like child exploitation, terrorism

17  and lots of things that cross the border, right?

18  A     Yes.

19  Q     Doesn't list FCPA.

20  A     It does not.

21  Q     But you have become, as I understood it, an FCPA

22  specialist within the Department of Homeland Security?

23  A     For better or worse, yes.

24  Q     The only one in the Houston office, right?

25  A     Yes.

1   Q     And do you have any idea why they keep coming to you?

2   A     I have no idea, no.

3   Q     But you've been able to conduct at least 20 interviews in

4   that room at that airport, right?

5   A     Yes.

6   Q     And you've done lots of them before COVID-19, right?

7   A     Yes.

8   Q     You said on direct that all of those interviews were

9   voluntary?

10  A     Yes.

11  Q     Do you remember saying that?

12  A     Yes.

13  Q     You understand that voluntariness is a legal question,

14  right?

15  A     I do.

16  Q     Did any of those, what you're calling voluntary

17  interviews, lead you to be sitting as a witness in a federal

18  courtroom in a suppression hearing?

19  A     No.

20  Q     This is the first time, the first time that that concept

21  is being challenged based on one of your interviews in one of

22  those rooms, right?

23  A     Yes.

24  Q     Who told you that bit you shared earlier about Agent

25  Kelley not coming because of COVID?

A    I don't remember who told me specifically, it may have

been Mr. Edinger with DOJ.


(Continued on next page.)

1  CROSS-EXAMINATION

2  BY MR. SPIRO:   (Continued)

3  Q    You never asked Kelley that question, right?

4  A    I don't recall if I did.

5  Q    You certainly haven't gone back and asked him since?

6  A    No, sir.

7  Q    And you gave a lot of reasons for why the airport was

8  such an important place to do this.  Remember those questions?

9  A    Yes.

10 Q    Okay.  And we're going to go through those reasons.

11        Were some of those reasons discussed with you and

12 the prosecutors either this morning or yesterday?

13 A    Yes.

14 Q    And just taking them in just the order of somewhat

15 interest, one of the reasons you gave is that it's hot in

16 Houston, right?

17 A    In July it is, yes, sir.

18 Q    Well, it wasn't actually hot that morning when

19 Mr. Aguilar landed at eight in the morning, right?  Maybe it

20 was hot at 2:00 in the afternoon; it wasn't actually hot when

21 you landed at eight in the morning?

22 A    Yes, sir, hot is a subjective term.  In Houston it's

23 constantly wet and hot, yes, in July.

24 Q    Okay.  I mean, did you go back -- I mean, do you remember

25 that morning and how hot or not hot it was?

1   A    No, sir I don't.

2   Q    You were in a jacket, right?  A sports coat, right?

3   A    Yes, sir.

4   Q    Okay.  And people do do things outside in Houston even in

5   July, especially at eight in the morning, right?

6   A    Yes.

7   Q    Another reason you gave is that the airport is somehow

8   more private than other locations.  Is that the reason you

9   gave?

10  A    Yes.

11  Q    Okay.  There's lots of more private locations in Houston

12  than a public international airport, would you agree?

13  A    Sure.

14  Q    We've been through two reasons.

15            Another reason you gave was that it's a great place

16  to do it because you know where somebody's going to be at a

17  given period of time.  Do you remember that?

18  A    Yes.

19  Q    Well, there's lots of places that people go with far more

20  regularity on far more established patterns of behavior than

21  the airports, right?

22  A    Yes.

23  Q    In fact, most people wake up at around the same time,

24  leave their home at the same time, get coffee from Starbucks,

25  go to work, right?

1    A    Yes.

2    Q    So there's lots of places where people can be interviewed

3    that are on far more regular patterns than international

4    airports, right?

5    A    Sure.

6    Q    And another reason you gave was because people in their

7    homes, you believe, don't want to be exposed to agents coming

8    into their homes that could potentially give them COVID?

9    A    Yes.

10   Q    So that reason is a reason based on what you might --

11   what the person who you'd be interviewing's family might think

12   about the interview?

13   A    Correct.

14   Q    Okay.  And then another reason is that it would be

15   sterile in that it would be a controlled environment because

16   there wouldn't be weapons present?

17   A    Yes, sir.

18   Q    You had no reason to believe that Mr. Aguilar was armed

19   and dangerous, did you?

20   A    No, sir.

21   Q    And, in fact, you and your colleagues, your team in this

22   case, made a conscious decision that Mr. Aguilar was so not

23   dangerous that in the middle of this investigation, you

24   knowingly and wittingly let him fly out of the country and

25   back into the country, right?

Wood - Cross - Spiro                          266

1  A    Yes.

2  Q    And, in fact, there was the opportunity to arrest

3  Mr. Aguilar much earlier in this case and neither you nor the

4  Department of Justice thought that Aguilar was of such danger

5  that he needed to be arrested earlier, right?

6         MR. SOLOMON:  Objection.

7  A    I don't know, sir.

8         MR. SOLOMON:  Excuse me, Your Honor, we had an

9  objection.

10        THE COURT:  Okay.

11        MR. SOLOMON:  Mr. Spiro asked for the knowledge of

12  the entire Department of Justice.  I think he can speak to --

13        THE COURT:  Well, I have limited the question to the

14  witness.

15        MR. SOLOMON:  Understood.

16        THE COURT:  And the answer is?

17        THE WITNESS:  Yes, sir, can you please re-ask the

18  question?

19        MR. SPIRO:  Sure.

20  Q    The decision to go to the airport, right, in your mind

21  when that decision was made, you didn't make that decision at

22  that time because you were concerned that if you didn't go to

23  the airport, Mr. Aguilar would have a gun, did you?

24  A    No, sir.

25  Q    And Agent Kelley never said, you know, we could just

1  interview him at his home or Starbucks or work, but because he

2  could be armed, let's go to the airport; nobody ever said

3  that?

4  A    No, sir.

5  Q    Of course not, right?

6  A    Right.

7  Q    So we're left with that last reason that you gave, okay,

8  which is that an airport is a controlled environment.

9  Remember that last reason?

10  A    Yes.

11  Q    Right?

12  A    Yes.

13  Q    And that reason actually to you, sir, makes a lot more

14  sense, frankly, than the other reasons, doesn't it?

15  A    No, sir.

16  Q    You don't think that reason is a little bit more logical

17  than the other reasons, like it's hot in Houston?

18  A    No, sir.

19  Q    What about that reason being a little bit more sensible

20  than the COVID-19 reason?  You don't think so?

21  A    No, sir.

22  Q    You would give all six of your reasons equal weight in

23  your reasoning?

24  A    Well, I mean, COVID was a different time period, so we

25  had to factor in COVID in our decision-making in 2020 and 2021

1    when we did not have to do that previously.

2    Q    I understand that, but we can both agree that given that

3    you did lots of these before anybody knew what COVID-19 was,

4    right, one of these variables preexisted COVID-19, right?

5    A    Yes, sir, it did.

6    Q    One of these variables makes it irrelevant how dangerous

7    or not dangerous the suspect is, right, whether they're armed

8    or not, one of these variables, right, the control of the

9    environment, right?

10   A    Yes, sir, I would -- it's still my opinion that they all

11   shared equal weight.

12   Q    They all share equal weight now; is that what your

13   testimony is?

14   A    Well, my testimony is that we have to take all those

15   things into consideration when we're making a decision.

16   Q    Ah, okay.  So I thought that would be your testimony.  I

17   was surprised to hear that you said they'd all be given equal

18   weight.  Do you want to take that back?

19   A    Well, we factor all those in when we're making a

20   decision.

21   Q    I understand that, but do you want to take back the

22   statement that they're all of equal weight?

23   A    Well, I --

24              THE COURT:  Let me ask you a question, Special

25   Agent.

Wood - Cross - Spiro                    269

1          THE WITNESS:  Yes, sir.

2          THE COURT:  At the time that the decision was made,

3   did you consider the variable potential weight of the factors

4   that you identified?

5          THE WITNESS:  Yes, Your Honor.

6          THE COURT:  So you compared them, in your own mind,

7   in the fashion that Mr. Spiro is asking you; you compared the

8   weight assigned to Factor No. 1, as opposed to the weight

9   assigned to Factor No. 5, as opposed to the weight assigned to

10  Factor No. 3?  You went through that process before you made a

11  decision?

12         THE WITNESS:  Yes, sir.

13         THE COURT:  And when you did that, I assume

14  Mr. Spiro wants to know, how did you rate them?

15         THE WITNESS:  Well, if I have to --

16         THE COURT:  What was at the top?

17         If I am misunderstanding the thread you were working

18  on, Mr. Spiro.  Isn't that what you were driving at?

19         MR. SPIRO:  100 percent, Judge.

20         THE WITNESS:  Okay.  Sure.

21         To me, the most important consideration is safety.

22  So when we do an interview, we like to make sure it's done in

23  a safe manner.  There are always unknown factors when you go

24  into someone's house regardless of whether or not they're a

25  white-collar criminal with no criminal history.  You never

1    know what you're going encounter and so we have to take that

2    into consideration as our primary consideration.

3    Q    Okay.  So you want to go with -- you are going with that

4    the sterile, no weapon of Mr. Aguilar, even though you

5    believed him --

6              THE COURT:  My question was, what was his actual --

7    not what you are going with now.  My question was, what did

8    you go with then, which is what is relevant.

9              THE WITNESS:  Yes, sir.

10             So every time we conduct an interview, including

11   this particular interview, the safety of the agents and the

12   interviewee is the first concern.  So at this time, however,

13   there were other factors that we took into consideration, such

14   as COVID.  And I specifically remember, before this interview

15   took place in my mind, we considered whether or not

16   Mr. Aguilar's family would want us in his residence.  So, for

17   example, we had people come to our house during the height of

18   COVID, plumbers, electricians; we weren't comfortable with

19   that.  I didn't want them in the house.  I didn't want to

20   force myself on someone else that way.

21   Q    Didn't you know that Mr. Aguilar lived alone?

22   A    I did not.

23   Q    Didn't your partner in the case do background research on

24   his home and sit outside of his home in a car?

25   A    No, sir, I don't know if he did.

1   Q    You don't know if Agent Zukas was casing his house the

2   week before the interview?

3   A    No, sir.

4   Q    He never told you that?

5   A    No.

6   Q    He never told you that in an e-mail?

7   A    He sent me an e-mail, yes, but he didn't tell me he was

8   casing his house.  He told me he did a drive-by, which is

9   different.

10  Q    That he was surveilling his house, how about that?

11  A    He told me -- I believe the e-mail said he did a drive-by

12  of the house.

13  Q    Well, when you say a drive-by, you don't mean like, you

14  know, driving by at 30 miles an hour; you mean go, stop, look,

15  observe, do research, right?

16  A    Well, when you do a drive-by, it's a slow drive by.  I

17  mean, surveillance, in my mind, is when you're sitting at

18  someone's house all day looking for them to leave and looking

19  for a pattern life.

20  Q    Let's go back to the safety thing.  Okay?

21       The safety thing, as I understand it, has two

22  components that on direct examination you laid out sort of in

23  two factors.  One is the safety that happens because the

24  person, the human who you're going to interview, could be

25  dangerous.  Another part of safety has to do with the

1  environment.  Is that fair?

2  A    Yes.

3  Q    Okay.  In terms of Mr. Aguilar as the person, we've

4  already agreed, right, you didn't consider him dangerous as a

5  person?

6  A    Correct.

7  Q    Now, in the environment component of it, you did say --

8  it was actually the factor we were just about to get to -- is

9  that the airport is a controlled environment, right?

10  A    Right.

11  Q    And you know where people are going to go in an airport,

12  right?

13  A    Yes.

14  Q    You know that when they get off the plane, that they're

15  going to immediately interact with members of the same

16  Homeland Security grouping that you work for in that Customs

17  Borders and Patrol is going to check their identity, ask them

18  questions potentially and there's going to be a primary

19  inspection, right?

20  A    Yes.

21  Q    And you know in this case there was actually two

22  inspections done on that first level.  Right as he got off the

23  jet bridge, a CBP officer walked up to him, checked his

24  passport, made sure they had the right person so that they can

25  track him to the passport counter and then they checked him

1  again, right?

2  A    I don't know that, sir.

3  Q    You don't deny that, do you?

4  A    I don't know that that actually occurred.

5  Q    Okay.  And then -- but you do agree with me, right, that

6  it's only logical that he would have at least then been

7  inspected at that first primary inspection point, traditional

8  primary inspection point for his passport, right?

9  A    Yes, sir.

10 Q    And then they directed him down into the other area where

11 he had the secondary inspection, right?

12 A    I don't know that they did that.

13 Q    Well, you know he ends up at the secondary inspection

14 station?

15 A    Yes, sir, but I don't know how he got there.

16 Q    Right.  Well, did you, in your mind at the time, think

17 given that you had done an alert through CBP, in your mind at

18 the time, did you think that was a coincidence that he ended

19 up down there getting inspected?

20 A    No, sir.

21 Q    You thought, in fact, it probably had something to do

22 with the directive that you gave, right?

23 A    Yes.

24 Q    And, in fact, you spoke to the duty agent, right?

25 A    Yes.

1  Q    Is that Terry?

2  A    Yes.

3  Q    Okay.  And you spoke to Terry, and you don't know what

4  directives Terry gave anybody else, right?

5  A    Correct.

6  Q    But what you do know is that you had marked his file as a

7  mandatory stop, right?

8  A    Yes.

9  Q    Law-enforcement-involved mandatory stop, right?

10 A    Yes.

11 Q    And that order was going to be followed, wasn't it?

12 A    Yes.

13 Q    Okay.  When he gets to the secondary inspection, he's

14 inspected and they also check his passport there?

15 A    I don't know, sir.

16 Q    Okay.  You don't know whether they checked his passport

17 at the secondary inspection?

18 A    No, sir.

19 Q    But you knew he was going to have that secondary

20 inspection because on the form you alerted them that he was to

21 have a secondary inspection, correct?

22 A    Yes.

23 Q    Okay.  So, in other words, I don't think I heard you say

24 that on your direct examination, right?  You didn't tell the

25 Court that on your direct examination, did you?

1  A    Tell the Court what, sir?

2  Q    Tell the Court that that secondary inspection that seemed

3  like it was as random as anything was actually something

4  directed by you working with the FBI and the Department of

5  Justice and was not random at all; you didn't suggest that in

6  your direct examination, did you?

7  A    No, sir.

8  Q    But that's the truth, isn't it?

9  A    Yes.

10  Q    And they check his passport there and then your testimony

11  is, as I understand your testimony, you and Zukas never check

12  his passport?

13       Just use your best memory you have, sir.  I

14  understand this is two years ago.

15  A    Yes, sir.

16       No, I don't think I testified to that.  I may have

17  looked at Mr. Aguilar's passport when he sat down, but I did

18  not do a formal inspection of the passport.

19  Q    Fair enough.

20       So you looked at his passport when he got in that

21  room, right?

22  A    Potentially.

23  Q    Wait.  Well --

24       THE COURT:  The question is, do you have a

25  recollection one way or the other?

1           THE WITNESS:  I don't.

2   Q    You don't have a clean recollection, but it seems to me

3   by the way you're answering the question, you think it more

4   likely than not that you looked at his passport?

5           MR. SOLOMON:  Objection, Your Honor.

6           THE COURT:  I'm going to sustain the objection and

7   ask a question.

8           You said you conducted 20 interviews in that room?

9           THE WITNESS:  Yes, sir.

10          THE COURT:  Do the people that were interviewed by

11  you in that room come from the secondary inspection area?

12          THE WITNESS:  Yes, sir.

13          THE COURT:  And was it your normal practice to look

14  at their passport after they entered the room?

15          THE WITNESS:  No, sir, it's not normal practice, but

16  I have done it on occasion.

17  Q    Fair to say that some of these interviews, given they all

18  happened in that same room, blend together in your mind?

19  A    Some of them do, yes.

20  Q    But if you had checked his passport -- which is a

21  distinct possibility, we agree, right?

22  A    Possible, yes.

23  Q    That may have very well been the fourth time that he had

24  his passport checked in that original 40 minutes when he's

25  landing back in Houston, right?

1  A    I don't know, sir, how many times he had his passport

2  checked before he came to us.

3  Q    Well, assume for the sake of this question he gets a

4  check at the jet bridge, he gets a check in the normal way

5  that he does in primary inspection, he gets a check in

6  secondary inspection and you check it when he gets into the

7  room; that would be four, right?

8              MR. SOLOMON:  Objection, Your Honor.

9              THE COURT:  No, overruled.

10             The question was, was that possible.

11             And it is really a simple question of addition, and

12  you could add up Special Agent Wood's answers.

13             It adds up to four, which is the question that

14  Mr. Spiro is asking now.

15             Were there potentially four inspections of

16  Mr. Aguilar's passport on that day?

17             THE WITNESS:  Potentially, sir.  But I don't know --

18             THE COURT:  He did not ask you what you know.

19             The question was whether or not -- based on your

20  testimony, were there potentially four inspections?  Because

21  you admit there is a possibility there was a secondary --

22  inspection of the passport secondary inspection and you admit

23  there is a possibility that there was an inspection by you in

24  the interview room.  You do not dispute that there could have

25  been an inspection on the bridge and you admit that there was

Wood - Cross - Spiro                                    278

1    an inspection on the primary inspection.  So I did not do well

2    in math in school, but it comes out to four, by my count.

3           THE WITNESS:  Yes, sir, it does.

4    Q    Okay.  And I want to direct your attention back to

5    something you said on direct, which maybe by reminding you of

6    this will help jog your memory, which is, you were asked by

7    the prosecutor under oath on direct did Mr. Aguilar have his

8    passport on him, right?  You remember that question?

9    A    Yes.

10   Q    You went over that question and practiced it several

11   times, right, when meeting with the prosecutors, right?

12   A    Yes.

13   Q    You answered it exactly the same way every time, I bet,

14   right?

15   A    Yes.

16   Q    The answer was unequivocally under oath, yes, he did?

17   A    He did, yes.

18   Q    Right?  So at some point, in order to testify to that

19   under oath, you obviously saw it, didn't you, sir?

20   A    Yes.

21   Q    The other thing that didn't come up on direct examination

22   regarding the sequence in Customs and Borders and Patrol is,

23   there's always when you're a civilian, not a law enforcement

24   agent, there's that Customs and Border form that you put in

25   that says I don't have any, you know, rare fruits and I have

Wood - Cross - Spiro                    279

1   under $10,000, you know, that form, right?

2   A    Yes.

3   Q    Right.  He had that on him, too, you know, right?

4   A    I don't recall that.

5   Q    Well, you have to give that before you exit Customs in

6   the ordinary course, right?

7   A    Yes.

8            THE COURT:  Your question is had it on him when?

9   Q    Had it on him when you were interviewing him?

10  A    I don't remember that, sir.

11           THE COURT:  He already passed through Customs, he

12  indicated.

13           MR. SPIRO:  He absolutely, unequivocally,

14  metaphysically had not passed through Customs.  That is

15  something that has been invented in this proceeding.

16  Q    He had not gotten, had not metaphysically gotten to where

17  you actually exit the Customs area when you interviewed him?

18           THE COURT:  You are distinguishing between secondary

19  and Customs?

20           MR. SPIRO:  Correct.

21  Q    Right?

22  A    I'm sorry, sir.  What's the question?

23  Q    He had not gotten through the exterior of Customs.  He

24  had not gone through the final out bridge and outdoor of

25  Customs where a driver can pick you up when you interviewed

1   him, right?

2   A    I don't know where he was approached by Special Agent

3   Zukas.

4   Q    Well, when you leave Customs, are you allowed to walk

5   back in?

6   A    No.

7   Q    Okay.  So wherever he was approached by Agent Zukas,

8   where you weren't there because you had that bathroom

9   emergency, when he got approached by Agent Zukas, he had to

10  have been within Customs, right?

11  A    I don't know where he was, sir.

12  Q    Well, you know that you interviewed him within Customs,

13  right?

14  A    Yes.

15  Q    Okay.  So we could establish that as an absolute fact

16  that you interviewed him within Customs, right?

17  A    Yes.

18  Q    And we can also establish as an absolute fact that you

19  can't come into Customs once you've left Customs, right?

20  A    That's correct.

21  Q    Which means, as a matter of sheer logic, he was stopped

22  in Customs, right?

23  A    I don't know where he was stopped.

24  Q    Well, did anybody ever say, oh, my God, he's raced back

25  into Customs after exiting?

1  A    No, sir.

2  Q    Okay.  And your driver cannot come into that room where

3  you were, right, if you've got a driver picking you up?

4  A    No, sir.

5  Q    Do you remember that Mr. Aguilar asked you more than once

6  if he could make a phone call to call his driver?

7  A    No, sir, I don't.

8  Q    And you said no?

9  A    I don't remember that.

10            THE INTERPRETER:  I'm sorry, we're having technical

11  difficulties with the interpretation equipment.  We're trying

12  to bring new equipment that works in case Your Honor decides

13  that the interpreter is needed.  I apologize.

14  Q    You also said something that may have seemed

15  insignificant to you at the time, but I have to ask you about

16  it, which is, you said Agent Zukas unequivocally never touched

17  Javier Aguilar.  Do you remember saying that?

18  A    Yes, sir.

19  Q    Well, did Agent Zukas ever shake Mr. Aguilar's hand?

20  A    Not that I recall, sir.

21  Q    Okay.  And so if Agent Zukas testified here under oath

22  that after the interview, so cordial was this interview that

23  he reached out and shook Aguilar's hand, that would have not

24  been true, right?

25  A    I don't remember, sir.

Wood - Cross - Spiro                    282

1  Q    Well, on direct examination 45 minutes ago you remembered

2  and testified under oath that Zukas never touched Aguilar,

3  right?

4  A    Yes.

5  Q    So that would mean that if Zukas said he shook his hand,

6  that would not be true?

7           THE COURT:  In your presence?

8  Q    In your presence?

9  A    I don't know what Special Agent Zukas said --

10          THE COURT:  No.  The question is, do you recall

11 Special Agent Zukas ever shaking Mr. Aguilar's hand in your

12 presence?

13          THE WITNESS:  No, sir, I don't.

14 Q    And you certainly don't remember it twice, right?

15 A    I don't remember him shaking his hand twice.

16 Q    Right.  You don't remember that?

17 A    No, sir.

18 Q    Okay.  Now, we talked about your preparation here today,

19 but your preparation for this interrogation happened,

20 obviously, a couple of years ago, right?

21          THE COURT:  Of the interview?

22 Q    Of the interview?

23 A    No, sir, it did not.

24 Q    You didn't prepare to interview Mr. Aguilar?

25 A    I did, yes.

1  Q    Okay.  I'm asking you about that preparation, the

2  preparation for the interview of Aguilar.  Okay?  Shifting

3  time periods here.  Okay?

4  A    Okay.

5  Q    This case first came from the FBI to Agent Zukas, who is

6  a member of the FBI, and then later you were assigned, right?

7  A    I was never assigned to the case, sir.

8  Q    Okay, you weren't assigned to the case.  You were asked

9  to assist in the case?

10 A    Yes.

11 Q    Agent Zukas, a member of the FBI, was asked to assist in

12 the case before you were asked to assist in the case?

13 A    I don't know, sir, when he was asked.

14 Q    Okay.  But on June 12th, when the Department of Justice,

15 including the prosecutors are e-mailing back and forth and

16 Agent Zukas is e-mailing with Jimmy Kelley from the FBI,

17 you're not on those e-mails in June 12th, so your first

18 involvement does not come until June 29th; is that fair to

19 say?

20 A    My first involvement, June 29th, yes.

21 Q    So if something happened on June 12th, you had not been

22 asked to assist at that point, correct?

23 A    No.

24 Q    Okay.  And so on June 12th, if the -- did they ever tell

25 you that on June 12th, just two weeks or so before you got

1    involved, that, one, the plan was to arrest Aguilar?  Did they

2    tell you that?

3    A    No, sir.

4    Q    Okay.  Number two is, did they tell you just two weeks

5    before when this happened, that unequivocally Agent Kelley was

6    intending himself to come to Houston and do it?

7    A    No, sir.

8    Q    Okay.  So if you are correct, okay -- and I don't think

9    you are.  Being honest, okay?

10                MR. SOLOMON:  Objection.

11                THE COURT:  Sustained.

12   Q    If it is, in fact, the case that Agent Kelley changed his

13   mind about coming to Houston, okay, he never told you the

14   reason, did he?

15   A    I don't understand the question.

16   Q    Did Agent Kelley ever tell you why he changed his mind

17   about coming to Houston?

18   A    No, sir, I didn't know he changed his mind.

19   Q    So if you didn't know he changed his mind, he didn't give

20   you a reason why he changed his mind, fair?

21   A    I don't understand the question.

22   Q    Okay.  I am going to offer DOJ 3500-MW-12, which will be

23   Defense K.

24                MR. SOLOMON:  No objection.

25                THE COURT:  Okay.

1   Q    You remember that after you got assigned the case, the

2   first document you were given was a draft complaint accusing

3   Mr. Aguilar of crimes?

4            THE COURT:  Is that what K is?

5            MR. SPIRO:  Yes.

6            THE COURT:  Received in evidence.

7            (Defendant's Exhibit K was received in evidence.)

8   Q    Do you remember that?

9            MR. SOLOMON:  Objection, Your Honor.

10            THE COURT:  What are you objecting to?

11            MR. SOLOMON:  The description or the

12   characterization of the e-mail.

13            MR. SPIRO:  Withdrawn.  I'll re-characterize the

14   e-mail.  The e-mail is in evidence.  Okay?

15   Q    Did you get the draft complaint in this case?

16   A    Yes.

17   Q    Are you aware that the complaint in this case was filed

18   with this court the same exact day you did the interrogation?

19   A    No, sir.

20   Q    Nobody told you that?

21   A    No.

22   Q    Okay.  So this e-mail that we just entered into evidence,

23   June 29th, "Now that we had Rick sign off, I thought it would

24   make sense to start getting Matt up to speed."  Okay?

25            Do you know who Rick is?

1  A    No, sir.

2  Q    He had to sign off on this, though, it seems like, right?

3  A    Yes.

4  Q    Okay.  "Matt, I think the draft complaint is a good place

5  to start.  It's not approved yet, but I don't imagine the

6  final version will be much change."

7         Do you see that?

8  A    Yes, sir.

9  Q    Okay.  "Jimmy" -- and that's of course Jimmy Kelley,

10 right?

11 A    Yes.

12 Q    The boss of -- the lead agent on this case?

13 A    Yes, he's the lead agent.

14 Q    Boss of this case, as far as you're concerned, right?

15 A    Yes.

16 Q    -- "is in the best position to tell you what else makes

17 sense to review."

18        You agree with that, right, that the boss of the

19 case would be in the best position to tell you what to review,

20 right?

21 A    Yes.

22 Q    Okay.  And he says, "I would think that the 302s at a

23 minimum and perhaps some of the recorded calls," right?

24 A    Yes.

25 Q    The recorded calls were in Spanish, right?

1    A    Yes.

2    Q    And you knew that Mr. Aguilar's primary language is

3    Spanish, right?

4    A    Yes.

5    Q    Okay.  And then it says, from Jimmy Kelley to you on the

6    next e-mail, "I'll put together a few things and get them out

7    to you, review the complaint, take down questions."

8         Do you see that, "take down any questions"?

9    A    Yes.

10   Q    He directed you to do that, right?

11   A    He asked me to do that, yes.

12   Q    Did you?

13   A    Yes.

14   Q    Okay.  Did you ask him questions?

15   A    Yes.

16   Q    Did you take notes of those meetings?

17   A    No.

18   Q    None of those meetings?

19   A    No.

20   Q    None of the questions you had when he said take down

21   questions, you didn't take them down?

22   A    No.

23   Q    Not a note from any of the time period which you are

24   preparing for this?

25   A    No.

1   Q     You're positive?

2   A     Yes.

3   Q     Are you -- do you never take notes of anything?

4   A     I take a lot of notes.

5   Q     Okay.  Because you didn't take any notes of any of this

6   trying to get up to speed on a complicated case, right,

7   according to you?

8   A     Correct.

9   Q     According to you, as I understood you on direct

10  examination, you didn't take a note during the 90-minute

11  interview?

12  A     Correct.

13  Q     Why didn't you take notes?

14  A     During what instance, sir?

15  Q     Any of the instances.

16  A     During the interview?

17  Q     Sure, let's start there.

18  A     Special Agent Zukas took the notes.

19  Q     Right.  That's not my question though.

20            Why didn't you take the notes?

21  A     There's only one set of notes per interview.

22  Q     Is that a rule of the Department?

23  A     Yes, it's our personal rule.

24  Q     Whose personal rule?

25  A     It's mine.

1   Q    Okay.  So your personal rule is that if there's multiple

2   people in an interview, that only one should take notes?

3   A    Correct.

4   Q    Okay.  And that personal view is, in fact, in

5   contradiction to law enforcement practice and guidance from

6   various law enforcement manuals, isn't it?

7   A    I don't know, sir.

8   Q    Well, don't you think it would be helpful to you, two

9   years later, to have your own notes?

10  A    No, sir.  That's why there's a report.

11  Q    Not my question.

12       My question is, would the notes be helpful to you?

13  A    No, sir.

14  Q    Is it, for you, one thing and one thing exclusively can

15  be helpful or isn't it possible a second thing could also be

16  helpful?

17  A    It's possible two things can be helpful.

18  Q    Okay.  So it's possible that if you had notes, it would

19  be helpful, right?

20  A    Certainly possible.

21  Q    And you know many other law enforcement agents take notes

22  when they are interviewing people, right?

23  A    Everyone takes notes when they interview people.

24  Q    Well, not you, not on this day, not on this case when

25  you're finally being called into a suppression hearing, you

1  are telling us you didn't take a note?

2  A    Well, one agent takes the notes and that agent writes the

3  report.

4  Q    Well, tell me, did you review his notes?

5  A    I did not.

6  Q    Well, wait a second.

7         You don't take notes, right?  We talked about that,

8  right?  And you didn't even review his notes?

9  A    I did not.

10  Q    Did you record the interview?

11  A    No, sir.

12  Q    After you got this draft complaint, did you ever provide

13  comments, edits or anything after your interview to aid in the

14  finalization of the complaint?

15  A    No, sir.

16  Q    In fact, because you saw the complaint and knew that it

17  was not imagined to be much different from the final version,

18  you knew at the time you conducted this interview that there

19  was probable cause to arrest Javier Aguilar, correct?

20  A    Well, probable cause had not been found yet, sir.  It was

21  a draft complaint.

22  Q    Well, it hadn't been found by a judge, but you, in your

23  own mind, believed there to be probable cause, right?

24  A    Sure.

25  Q    So when you are interviewing Javier Aguilar, there's no

Wood - Cross - Spiro                            291

1    doubt in your mind, there's no doubt that he did what you're

2    asking him questions about, that he's guilty, right?

3    A    Um, no.

4    Q    And it's not just that you had the complaint, you had

5    lots of other materials and the other materials -- withdrawn.

6            It's not just that you had the complaint and the

7    other materials we just talked about, there were actually

8    additional materials sent to your office, physical office,

9    correct?

10   A    That's correct.

11   Q    And you did not provide -- even though the defense has

12   asked for all of the materials you reviewed, you didn't

13   provide those materials to the prosecutors in this case,

14   right?

15   A    That's correct.

16   Q    And so the defense doesn't know all of the materials that

17   were mailed to your office, do we, as far as you know?

18   A    They were the same documents -- it's my understanding

19   they were the same documents that were provided to me by

20   e-mail.

21   Q    It's your understanding that after Agent Kelley telling

22   you in an e-mail that some of the stuff is too big to send in

23   an e-mail and documents arrive at you're his office in

24   Houston, it's your understanding that they were the identical

25   set of documents?

1   A    You know, they could have been the actual recordings, the

2   recordings of the calls or the meets.

3   Q    So you got the recordings.

4          You got other stuff too, right?

5   A    I don't know.

6   Q    Okay.  But we can both agree that you certainly didn't

7   take the time to compare everything that you got in your

8   e-mails to everything that you got printed out in your office,

9   agreed?

10  A    No, I don't think that's -- that's not correct.

11  Q    You took the time -- I'm asking you -- this is the

12  question.  I want to make sure you understand because it's

13  important.

14         Did you, sir, before sitting here today, take the

15  time to look at everything that got physically mailed to your

16  office and compare it to everything you were e-mailed about

17  this case?

18  A    No.

19  Q    Of course not, right?

20         And what happens during this time period, on

21  July 6th to be precise, is Mr. Zukas tells you and others that

22  because there has been a change in his flight, that there are

23  three options, he tells you.  One, you can go to his house and

24  interview him.  Okay?  Two, you can go to his house and

25  interview him when he gets back.  Okay?  Or three, you could

1    quote, "get him at the airport."

2            Do you remember those three options given to you?

3    A    I'm sorry, are you reading from a document?

4    Q    I am.  But if you can just tell me if you remember it.

5    A    May I see it?

6    Q    You can in a minute, but first I'm going to ask a

7    question.

8    A    I don't remember.

9    Q    Okay.  It's in evidence, DX C.

10           It says, from Paul Zukas to you, Jimmy Kelley, the

11   boss of the case, "He departs tomorrow.  He'll be most likely

12   at the house getting ready.  If we approach tomorrow," --

13   right?  So approaching tomorrow is one option, at the house.

14           And then in the final sentence, they give you two

15   options, get him at the airport or wait until he gets home

16   later, right?

17   A    You mind if I read it?  Do you mind if I read it?

18   Q    Of course.  Take your time.

19   A    Okay.

20   Q    Okay.  So you agree with me, in this e-mail, Agent Zukas

21   on July the 6th, four days before the interview, you agree

22   with me, one, Mr. Aguilar's flight had been changed, correct?

23   A    Based on the e-mail.

24   Q    Well, you don't doubt that assertion from your partner,

25   do you?

1    A    I don't.

2    Q    Okay.  And he gives you three options, right?  Just to

3    say them again:  One, you meet him at his house now.  Okay?

4    Two, meet him at his house when he gets back.  Or three, get

5    him at the airport, right?

6    A    Yes.

7    Q    You guys go with get him at the airport, right?

8    A    We did, yes.

9    Q    And that directive, as you can tell from the e-mail

10   above, or tell me if I'm wrong, it was a team decision

11   directed by Agent Kelley, right?

12   A    Yes, sir, I don't know what the -- the team is.

13   Q    Well, it says in this e-mail "the team," right?

14   A    Yes.

15   Q    You're on the team, right?

16   A    Presumably, yes.

17   Q    Agent Zukas is on the team?

18   A    Yes.

19   Q    Kelley's on the team, right?

20   A    Yes.

21   Q    Prosecutors are on the team?

22   A    Yes.

23   Q    There were, in the course of these e-mails and in your

24   preparation to go, if you include CBP and the prosecutors and

25   the folks in D.C., the prosecutors in D.C. and the local ones

1   and the FBI and the FBI in Miami, there were like 15 people

2   working on this, right?

3   A    Yes.

4   Q    This was a big case?

5   A    I don't know how big the case is.

6

7              (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS-EXAMINATION (Continued.)

2    BY MR. SPIRO:

3    Q    It was a big case to you?

4    A    No, sir.

5    Q    You wanted to do your best, didn't you?

6    A    Of course.

7    Q    You wanted him to give you a statement, didn't you?

8    A    Yes.

9    Q    You wanted him to cooperate, right?

10   A    Yes.

11   Q    And of course you wanted to keep working on your FCPA

12   cases with the Department of Justice and the FBI after this,

13   right?

14   A    Yes.

15   Q    And you have continued to work with the FBI on these FCPA

16   cases since the interview, right?

17   A    Yes.

18   Q    And you presumably hope to do that after your testimony

19   here today?

20   A    Yes.

21   Q    You're the only one that is interested in your entire

22   department?

23   A    No, sir.

24   Q    You're not?

25   A    No.

1  Q     Are you the key person who does that in your department?

2  A     Yes.

3  Q     When you have the phone call where the team decides to go

4  to the airport and not take the other suggestions by Agent

5  Zukas, do they go through those six factors you told us about

6  here in court or no?

7  A     I don't recall.

8  Q     There's certainly nothing in any of the emails, any of

9  the contemporaneous correspondence that gives any light to any

10 of the six reasons you've given in court, right?

11 A     I don't know that.

12 Q     Well, have you reviewed the emails and your own emails

13 and your own text messages in preparation for your testimony

14 here today?

15 A     My own -- in my own messages, no, it does not.

16 Q     Okay.  For sure it doesn't, right?

17 A     Yes.

18 Q     Nobody comes and says in one of these emails, well, given

19 it's COVID we should just do it at the airport that sounds

20 really safe to go to an international airport where people are

21 landing from all over the world and haven't been tested and go

22 there, nobody says that, right?

23 A     In an email, no.

24 Q     Well, did anybody say that on the phone?

25 A     I don't recall.

Wood - Cross - Spiro                    298

1    Q    And you continue -- this is Defense L, the day before the

2    interview, okay, Jimmy Kelley sends you an email saying that

3    he wants to have -- well, DOJ wants to have a call, another

4    call before tomorrow's approach on July the 9th, do you see

5    that?

6    A    Yes, sir.

7    Q    That was a call that happened with the prosecutors,

8    right?

9    A    Yes.

10         MR. SPIRO:  Okay.  I'd offer this?

11         MR. SOLOMON:  Can you tell us which exhibit this is.

12   You said --

13         MR. SPIRO:  K, DOJ-3500-MW13 --

14         MR. SOLOMON:  MW13.

15         MR. SPIRO:  L.  Sorry.  I think I've had to go over

16   with these exhibits.

17         MR. SOLOMON:  No objection, your Honor.

18         THE COURT:  Received without objection as L.

19         (Defendant's Exhibit L was received in evidence.)

20   Q    The DOJ wanted to have yet another call with you right

21   before, the day before the big interview, right?

22   A    Yes.

23   Q    And you actually went the day before to the airport to

24   scope it out, right?

25   A    I don't recall that.

Wood - Cross - Spiro                                   299

1   Q    I'm going to show MW14, which I'm marking as M, July 9th

2   you to Kelley, boss of this case, and Zukas, July 9th we're

3   going to meet with the airport duty agent.

4              THE COURT:  Any objection?

5              MR. SOLOMON:  No objection, your Honor.

6              THE COURT:  Received without objection.

7              (Defendant's Exhibit M was received in evidence.)

8   Q    You see that?

9   A    Yes, sir.

10  Q    So you were at the airport planning this out the day

11  before, right?

12  A    No, sir.

13  Q    Well, you didn't go to your -- I mean, no pun intended,

14  you didn't go to the international airport for your health in

15  the middle of COVID-19, right?

16  A    That's correct.

17  Q    Okay.  So you went to the international airport the

18  evening before the interview with Mr. Aguilar, correct?

19  A    No, sir.  I believe that the flight was rescheduled.

20  Q    So you never went?

21  A    Never went that evening.

22  Q    But did you talk to the duty agent?

23  A    I don't recall.

24  Q    Do you recall coordinating this all the way up the chain

25  with Chris Dowell?

1   A     Yes.

2   Q     Okay.  And now we're at N and in fact you say to Chris

3   Dowell on July 9, that you're going to interview a Vitol

4   executive, right?

5   A     Yes.

6           THE COURT:  This is another email?

7           MR. SPIRO:  Yes, I offer this N.

8           THE COURT:  N as in Nancy?

9           MR. SPIRO:  Yes.

10          THE COURT:  Any objection?

11          MR. SOLOMON:  Can you tell us where it is in the

12   binder.

13          MR. SPIRO:  The next email, MW10.

14          MR. SOLOMON:  Thank you.  No objection.

15          THE COURT:  Received without objection.

16          (Defendant's Exhibit N was received in evidence.)

17   Q     You told this senior person that Javier Aguilar was a

18   Vitol executive, right?

19   A     Yes.

20   Q     And you believed him to be a Vitol executive, right?

21   A     Yes.

22   Q     And Vitol and its executives all had lawyers, right?

23   A     I don't know if they did or not, sir.

24   Q     Well, did that ever come up in conversations between you

25   and the Department of Justice?

1  A    No, sir.

2  Q    Are you aware sitting here today that all of Vitol's

3  executives at the time had counsel?

4  A    No, sir.

5  Q    No one has every told you that?

6  A    No.

7  Q    Were you aware that Vitol and its executives were

8  negotiating a deferred prosecution agreement at the time of

9  your interview?

10  A    Yes.

11  Q    So you knew that, right?

12       Did you understand that the people negotiating the

13  DPA with the government were of course lawyers, right?

14  A    Yes.

15  Q    And they were working on behalf of Vitol and its

16  executives, right?  Right?

17  A    Yes.

18  Q    Okay.  And in fact, one of reasons why this was so

19  important was because that DPA would soon be signed and if

20  somebody couldn't get Aguilar to flip up the chain, that was

21  going to be the end of that case, right?

22  A    I have no idea.

23  Q    Well, you knew it was important to get Aguilar to flip,

24  right?

25  A    It's always important to try to get people to cooperate,

1    yes.

2              Can you please put the email back up?  Can I look at

3    it again.

4    Q     Sure.

5    A     So we seem to be focused on the executive word.

6    Q     I don't want to -- we did this a lot with Agent Zukas

7    today.  I'd rather just ask questions and you answer rather

8    than you trying to figure out where I'm going with my next

9    question.

10   A     Well, can I respond to your last question?

11   Q     I doubt it's going to be my last question that you're

12   responding to.

13   A     No, I wish that it was.

14   Q     Okay.

15   A     But the last question you asked.

16   Q     Fair enough.

17   A     So the word "executive" in there is something that I

18   typed.  It's not a definitive word.  I mean, I was not making

19   a conclusion there that he was an executive.  I was just

20   informing my chain of command I was going to talk to a senior

21   level employee of Vitol at the airport.  So the executive word

22   is something that I put in there without any thought about it.

23   Q     Fair to say you weren't prepped by the government on me

24   asking you about the word executive, right?

25   A     That's fair to say, yes, at the time.

1  Q    Right.  So now that you heard my question and you saw

2  where it was going --

3          THE COURT:  He said at the time, I don't know if you

4  heard him.

5  Q    Did the government prep you, in preparation for today,

6  did they tell you Spiro is going to ask you a question about

7  the word executive?

8  A    No, sir.

9  Q    So when I asked you that question you were not expecting

10  that question, right?

11  A    That's correct.

12  Q    And now you want to clarify your answer, right?

13  A    I just want to clarify why I put executive in the email,

14  yes.

15  Q    You're not saying he wasn't an executive?

16  A    I'm saying I don't -- I don't know what he was within the

17  organization.  To me at the time when I typed the email

18  executive is the word I put in there.

19  Q    When you were at the airport that day -- well, let me ask

20  you this, did DHS ICE now has a body cam program, right?

21  A    Yes.

22  Q    You were wearing a body camera now when you're on duty?

23  A    No, sir.

24  Q    The other CBP and other ICE agents are using them now,

25  right?

1   A    I don't know.

2   Q    When was the last time you were in that airport?

3   A    Probably a month ago.

4   Q    You're going to land back there after testifying?

5   A    Yes, sir.

6   Q    Can you check that so that if we meet again you can tell

7   me, but I believe now they are wearing that body camera?

8   A    I don't know if they are, sir.

9   Q    And the reason that they started doing that is because

10  people were raising questions about what was going on in the

11  ICE box in part, right?

12  A    I don't know.

13  Q    You don't know why the Department of Homeland Security

14  and ICE decided for, to use their word, transparency everybody

15  should start wearing body cameras?

16  A    No, sir.

17  Q    Have you heard in the news or in emails within your

18  department concerns over the veracity of people's statements

19  about what goes on in custody in ICE?

20  A    No, sir.

21  Q    You haven't heard that as a popular topic of concern by

22  the public?

23  A    No.

24  Q    Let me ask you this:  The Homeland Security memorandum

25  policy statement that has to do with electronic recordings

1   encourages, in criminal investigations, electronic recording,

2   correct?

3   A    I don't know.  Can I see the policy please?

4   Q    You can but first I'm going to ask you some questions

5   about it.

6   A    Okay.

7   Q    I'll show it to you, I don't care.  There's -- well, let

8   me ask you this first.  Is there a presumption of recording if

9   a person is in custody?

10  A    It's my understanding that the policy is if a person is

11  in custody you do record.

12  Q    And the only person who made the determination of whether

13  or not Aguilar was in custody at that moment was you?

14  A    Yes.

15  Q    So you made the choice, you made the decision he's not in

16  custody, says me, I'm not going to use the presumption of

17  recording and I did not record the interview, correct?

18  A    Yes.

19  Q    And you know, sir, do you not, that the person conducting

20  the interview has principal responsibility of deciding whether

21  or not to record, did you know that?

22  A    No, sir.

23  Q    You know that if the reason for that is so that you can't

24  later say oh, well, Zukas said I shouldn't record, right, that

25  there is some onus that goes on you, sir, did you know that?

1    A     Yes.

2    Q     Okay.  And, in fact, even when a person is not in

3    custody -- this is important so I want to make sure you follow

4    this -- even when a person is not in custody, according to

5    your department guidelines, the exceptions, okay, the

6    exceptions to recording are refusal by the interviewee.  Did

7    he refuse to be recorded?

8    A     No.

9    Q     In fact, according to Agent Zukas and you, he was happy

10   as a clam, right?

11   A     Yes.

12   Q     Second, public safety/national security exception.

13   National security exception, public safety.  Was there some

14   public safety or national security reason not to record this

15   interview?

16   A     No.

17   Q     Number three, recording is not reasonably practicable,

18   okay.  Such circumstances may include equipment malfunction.

19   Was there any equipment malfunction?

20   A     No.

21   Q     That's the end of the exceptions other than a residual

22   exception, a residual exception is what this says.

23         And the special agent in charge and the United

24   States Attorney agree that a significant and articulable law

25   enforcement purpose requires setting it aside.  This exception

1   is to be used sparingly, that's the residual exception.  We

2   don't think that applies, right?

3   A    I don't understand that, no.

4   Q    We talked about how you marked in this CBP system

5   mandatory referral, enforcement referral directing CBP to make

6   sure that he was searched, right?

7   A    Requesting CBP, yes.

8   Q    Well, it says mandatory --

9   A    Well --

10  Q    -- right?

11  A    It's a request.  I can't direct CBP to do anything.

12  Q    Well, have you ever given a mandatory directive to them

13  and have them refuse?

14  A    Yes, sir, I have.

15  Q    You have?  In one of your 20 plus interviews in the room?

16  A    It would have been one of the 20 plus interviews that

17  didn't occur.

18  Q    That didn't occur, okay.  But in all of the ones that did

19  occur, when you made your mandatory directive they followed

20  it?

21  A    It's a request.  It's my understanding -- and I'm not

22  being argumentative, but I understand it's a request.

23  Q    Okay.  I mean, listen, I'm reading from your form it

24  says -- can we agree it says mandatory?

25  A    I haven't seen it.

1   Q    Well, are you aware that 48 hours ago the government

2   provided a couple of additional emails to you including a form

3   from between you and CBP, did you know that?

4   A    No.

5   Q    Well, did you know -- let me ask you this question, did

6   you hand something to the government that you had not

7   previously ever provided to them 48 hours ago approximately?

8   A    Yes.

9   Q    Is one of them this, which I'm now offering as O.  L, M,

10  N, O.

11          MR. SOLOMON:  Your Honor, we would ask that the

12  entire exhibit be admitted into evidence.

13          MR. SPIRO:  They can do that on redirect.  It's not

14  what I'm doing right now.

15  Q    Is this --

16          THE COURT:  For purposes of continuity later, if

17  there was a jury issue we would hash it out now, but there is

18  no need to hash it out now.  Just remember, Mr. Solomon, to

19  put it on in redirect.

20          MR. SPIRO:  It's fine, it's in Judge.  I'm waving

21  the white flag, it's in.

22          THE COURT:  Oh, it's in.  It's all part of O?

23          MR. SPIRO:  All part of O.

24          THE COURT:  Admitted as -- Defendant O is admitted

25  without objection.

1           (Defendant's Exhibit O was received in evidence.)

2    BY MR. SPIRO:

3    Q    Did you just give them this 48 hours ago?

4    A    Yes, sir, I did.

5    Q    Can you tell me why you didn't turn that over with the

6    rest of your stuff originally?

7    A    No.

8    Q    In this, as we zoom in, it says mandatory referral,

9    right?

10   A    It does say mandatory referral, yes.

11   Q    I just wanted you to see.  It doesn't look -- if I'm the

12   CBP officer and I'm looking at this, it doesn't look very

13   optional, right, it looks pretty mandatory, right?

14   A    Yes, sir, it says mandatory.

15   Q    You understand that as part of the lead up to this case,

16   Mr. Aguilar's counsel, that's me, tried to get from the

17   government the names of the people that were involved in the

18   original inspections of Mr. Aguilar in CBP's custody before he

19   reaches you and Zukas, did you know that?

20   A    No, sir.

21   Q    They never told you that?

22   A    No.

23   Q    Did they ever ask you, they being the prosecutors, ever

24   ask you to try to ascertain who it was that met Aguilar at the

25   jet bridge and did the first passport?

1   A    Yes.

2   Q    Okay.  So they did ask you to do that?

3   A    They asked me to determine who first encountered

4   Mr. Aguilar, yes.

5   Q    Is it your testimony here today that you have not been

6   able to figure that out?

7   A    I have not, no.

8   Q    As we sit here today, despite many requests -- I'm not

9   blaming you, sir, so don't take that from my question -- but

10  despite many requests neither you nor your colleagues nor the

11  prosecutors have been able to identify who was that original

12  officer who met Aguilar at the bridge as he deboarded the

13  plane, correct?

14  A    I can only speak for myself, sir.

15  Q    You haven't?

16  A    I have not.

17  Q    And neither has anybody that you're aware of?

18  A    Not that I'm aware of.

19  Q    That request came to you, sir, they asked you to do that

20  to the best of your ability, right?

21  A    Well, they asked me to identify the particular officer

22  that met him, yes.

23  Q    And you did your best to do that, right?

24  A    Yes.

25  Q    And you don't have that person, right?

1    A    No.

2    Q    In fact, the CBP officer that was brought here, that I'm

3    supposed to be questioning at some point isn't even the right

4    officer, he's not the one who met him the jet bridge, right?

5    A    I have no idea.

6    Q    Well, you know he's not the one at the jet bridge because

7    that person hasn't been identified, right?

8    A    I don't know if that person hasn't been identified, sir.

9    Q    Let's move on.

10        This photo of the chair, okay, where Aguilar sat.

11        THE COURT:  Which is what, 1B?

12        MR. SPIRO:  1A.

13        THE COURT:  1A?

14        MR. SPIRO:  1A.

15   Q    Remember you identified this?  Okay.

16   A    Yes.

17   Q    Right?  You just did that an hour ago, right?

18   A    Yes.

19   Q    We pointed out -- somebody pointed out that there's

20   these, these -- the chain attaching his chair to the table,

21   right?

22   A    Correct.

23   Q    It's a chain, right?

24   A    Yes.

25   Q    You wouldn't call that hardware, would you?  I don't know

1  what that means in this context, but you agree with me it's a

2  chain, right?

3  A    I don't know what it is.  It looks like a chain to me.

4  Q    It looks like a chain to me too.

5         And then if you look -- and this is very important

6  so I want you to look -- do you see this hole on the other

7  side of the chair?

8  A    No.

9  Q    You don't see that hole on the other side of the chair?

10  A    That little small dot there?

11  Q    It's a little small dot that is not --

12  A    Oh, in the chair?

13  Q    In the chair?

14  A    Yes, I see it.

15  Q    You see it.  It's not a dot, it's a hole meaning

16  something goes into it, right?

17  A    Okay.

18  Q    Okay.  You agree with me, right?

19  A    I agree that there's something in the picture that

20  appears to be a hole in the chair.

21  Q    Okay.  That's where the handcuffs go.

22  A    I have no idea.

23  Q    You don't know that the reason why -- well, look at the

24  other side of the chair that's chained to the table.  You see

25  the other side of the chair?

1   A     Yes.

2   Q     Do you see that if you look on the same latitude that the

3   hole is exactly the same place?  You see?  The one side of the

4   chair has the chain to the table, the other side of the chair

5   doesn't currently in this photo have handcuffs, but is capable

6   of having handcuffs.

7   A     Never crossed my mind.

8   Q     That never crossed your mind?

9   A     No, sir.

10  Q     Well, it did cross your mind that the reason that his

11  chair was chained to the table was for officer safety?

12  A     Yes.

13  Q     Right?

14  A     Hmm.

15  Q     You agree with that, right?

16  A     Yes.

17  Q     And for officer safety sometimes things get -- or

18  officers determine that more safety is needed and sometimes

19  people are handcuffed to chairs, right?

20  A     I've never handcuffed anyone to a chair.

21  Q     Never?

22  A     No.

23  Q     But you are aware that people are handcuffed to chairs,

24  right?

25  A     I guess I've seen it on TV, but, no, I am not.  I've

1  never seen anyone in the 12 years that I've been on the job

2  handcuffed to a chair.

3  Q    This room -- you know, this room that you were in where

4  this interview happened, okay, had a sign, okay, that's agency

5  mandated that says keep detention safe.  That's mandated that

6  the agency has to put up in any room in which people are in

7  custody, did you know that?

8  A    No, sir.

9  Q    Do you recognize this?

10 A    Yes.

11 Q    And I'm going to see if this refreshes your memory as to

12 my question.

13        THE COURT:  Could you identify what "this" is for

14 the record.

15        MR. SPIRO:  Yes.  Well, what I'm putting up.  I

16 apologize.

17        THE COURT:  We're getting close to queue time,

18 Mr. Spiro.

19        MR. SPIRO:  I'm getting -- I'm getting closer.  But

20 I'll be able to take a break in a moment.

21        THE COURT:  Just let me know, that's why I wanted to

22 tell you.

23 Q    You see the keep detention safety poster and they blow up

24 the picture of the room, it's in the room, okay?

25 A    Okay.

1  Q    I'm just going to point out to you this is from the CBP
2  website that this is an agency mandated poster that goes into
3  every room in which individuals are in CBP custody.  Right?
4  A    Okay.
5  Q    And so you are aware that in each room in which people
6  are in custody, in CBP custody, in customs custody this sign
7  appears?
8  A    No, sir, I'm not aware of that.
9  Q    You're not aware of that?
10 A    No.
11 Q    Do you recognize the sign?
12 A    Just from the picture.
13 Q    You do recognize the sign, you just never thought why is
14 it in the room?
15 A    No, sir, and I don't know if it's a CBP policy or if it's
16 in every room in every airport in the country, I have no idea.
17 Q    But you do recognize it from your time in the Houston
18 airport, right?
19 A    I recognize that sign from the picture, yes.
20      THE COURT:  Do you ever recall seeing it other than
21 in this picture?
22      THE WITNESS:  No, sir.  In fact, I recall other
23 signage being in that room at different times.  I specifically
24 remember one that discussed human trafficking being in that
25 room at one time.

1    BY MR. SPIRO:

2    Q    You went back to that room apparently on a mission from

3    the prosecutors or whomever to go take photographs of that

4    room, correct?

5    A    Yes.

6    Q    Did you check for video?

7    A    No, sir.

8         THE COURT:  Check for video, in what context?  I

9    don't understand check for video.

10   Q    Did you check the video camera that's in that room for

11   video footage?

12   A    No, sir, I did not.

13   Q    There's a video camera in that room and you didn't check

14   it for footage?

15   A    I don't know if the camera works.

16   Q    Well, that's a convenient answer agent, but you didn't

17   check --

18        MR. SOLOMON:  Objection.

19   Q    You didn't check.

20   A    I did not check it.

21        THE COURT:  Go ahead.

22   Q    You know the defense requested it, right?  Did you know

23   that?

24   A    No, sir, I didn't.

25   Q    Now, who decided who was going to do the interview, you

1   or Zukas?  Meaning who made the decision that it would be you

2   and not Zukas?

3   A    It wasn't a preplanned decision.

4   Q    Well, surely you knew of it before the morning of?

5   A    No, sir.

6   Q    You literally, when you get to the airport that morning,

7   don't know whether it's going to be you or Zukas asking --

8   being the primary asker of questions?

9   A    That's correct.

10  Q    So you then -- let me ask you this.  When the interview

11  starts, do you know whether it's going to be you or he asking

12  more questions?

13  A    Based on the interviews I've done in the past, no.

14  Q    So when you enter that room and begin asking questions,

15  in your mind you don't know whether you'll end up asking more

16  questions or he'll end up asking more questions, right?

17  A    That's correct.

18  Q    Well, then here's the big question, which is how did you

19  know not to take notes then?

20  A    We discussed who would take notes.

21  Q    You discussed who would take notes.

22  A    Because it was an FBI investigation, the FBI took the

23  notes.

24  Q    Where did you get that rule?

25  A    So that the report would be uploaded into the FBI system.

1  Q    You're not allowed to give things to FBI agents to be

2  uploaded in the system, because we've got lots of stuff from

3  you?

4  A    I wouldn't be comfortable having an agent take notes for

5  me and write a report that they authored and attributed it to

6  myself, so that's why we do it that way.  So if I had taken

7  the notes and typed the report, Special Agent Zukas would have

8  had to upload it on my behalf into his system.  I prefer not

9  to do -- it's one of my practices I prefer not to do that.

10              MR. SPIRO:  Well, let's end there for a break,

11  Judge.

12              THE COURT:  Okay.  This is as good a place as any.

13              We'll take about a 10, 15 minute break.  Special

14  Agent Wood, you can step down and refresh and we'll be back in

15  about 15 minutes.

16              (Witness steps down.)

17              (Recess.)

18

19              (Continued on the next page.)

20

21

22

23

24

25

1          THE COURTROOM DEPUTY:  All Rise. The Court is back

2     in session.  Counsel for both sides are present, including

3     the defendant.

4          THE COURT:  Be seated, please.

5          Mr. Spiro, are you ready to resume?

6          MR. SPIRO:  I am.

7     CROSS EXAMINATION

8     BY MR. SPIRO:

9     Q    Agent Wood, it's fair to say given how many times you've

10    been in that room and how many interviews you've done in that

11    room in terms of the location of various chairs, tables, and

12    posters, your mind is not perfectly clear from one occurrence

13    to another; is that fair?

14    A    Yes.

15    Q    Is it also fair to say that while there are certain

16    patterns, sometimes maybe a person shakes hands or other habit

17    behavior, you don't remember the precise words you used on

18    this occasion, correct?

19    A    That's correct.

20    Q    Just wanted to show you GX-1C to clarify a couple of

21    small things.  You see right above Aguilar's chair is the same

22    poster we keep describing the detention poster of CBP, as I

23    refer to it, in Spanish?

24    A    Yes.

25    Q    And these doors that are down here, further down this

1  corridor, these doors lock from the outside.  You can see it

2  there, right?

3  A     Yes.

4  Q     People can be held in those rooms, correct?

5  A     I believe those are actually what they call interview

6  rooms.

7  Q     They may call them interview rooms, but sometimes they

8  are used to hold people?

9  A     Down the hallway to the left there are holding cells

10  there.

11  Q     You're saying to the left is the holding cells and these

12  are the interview rooms?

13  A     Correct.

14  Q     Okay, we're in the mouth of the jail, for the lack of a

15  better term?

16  A     Detention.

17  Q     Okay, detention.

18         This is not a common area for lounging is it, sir?

19  A     No.

20  Q     No way, right?

21  A     No.

22  Q     No vending machines, things to nosh on, nothing like

23  that?

24  A     It would be nice.

25  Q     Would be nice.  But not there?

1   A     No.

2   Q     No USA Todays or Houston Chronicles, right?

3   A     No.

4   Q     You never told anybody it's a common area, right, to

5   lounge in or relax in?  Have you told anybody that?

6   A     I have.

7   Q     You have.

8   A     Yes.

9   Q     I asked you before, I guess are we on P -- I'm marking

10  this as P -- I asked you questions before about how much time

11  was spent looking at the possibility of doing the interview at

12  Aguilar's home.  And we're on July 3rd, Paul Zukas to you and

13  the lead agent on the case:  And we had a discussion about

14  well, he could have just driven by, as in a moving vehicle.

15        Do you remember that conversation?

16  A     Yes.

17  Q     In this e-mail he's indicating to you that he spent an

18  hour at the house?

19  A     Okay.

20  Q     Do you agree with me?

21  A     That's what he says, yes.

22        MR. SPIRO:  I'm offering P.

23        THE COURT:  An e-mail from Special Agent Zukas?

24        MR. SPIRO:  Correct.

25        THE COURT:  To Special Agent Wood?

1           MR. SPIRO:  Correct.

2           MR. SOLOMON:  No objection.

3           THE COURT:  Admitted without objection.

4           (Defendant's Exhibit P was received in evidence.)

5    Q    Fair to say he wouldn't be spending that time outside the

6    house if it wasn't a real possibility that you could do the

7    interview at the house?

8    A    I can't speak for Special Agent Zukas.

9    Q    He's part of your team, right?

10   A    He is.

11   Q    You didn't say to him in that e-mail, what are you doing

12   in the house?  We don't go to houses during COVID.  You didn't

13   say that, right?

14   A    I did not, no.

15   Q    You decided where Aguilar would sit, right?

16   A    We decided, Special Agent Zukas and I.

17   Q    Law enforcement decided, correct?

18   A    Yes.

19   Q    In the middle of the interview you walked out of the room

20   and you called Agent Kelley, correct?

21   A    I don't recall that, no.

22   Q    Do you recall exiting the room in the middle of the

23   interview?

24   A    I don't.

25   Q    And making a phone call?

1  A    No, sir, I don't recall that.

2  Q    You turned over a text message in this case, do you

3  remember that?

4  A    Which one?

5  Q    You turned over text messages in this case.  I only got

6  one, I don't know how many you turned over.  Did you turnover

7  text messages to the prosecutors?

8  A    Yes.

9  Q    How many?

10 A    I don't know.

11 Q    Several?

12 A    Yes.

13 Q    I only got one.  Did you know that?

14 A    I don't know what you got, no.

15 Q    It would be possible for you to check your phone records

16 to see if you made a phone call in the middle of the

17 interview, right?

18 A    It's possible.

19 Q    But you're telling me that you have no recollection as

20 you're standing here today that during a point in time in the

21 middle of the interview you walked into the hallway and called

22 Agent Kelley.  You have no recollection of that?

23 A    No, I don't.

24 Q    No recollection as you sit here today of making any phone

25 calls in the middle of the interrogation?

1    A    I don't recall that.

2    Q    No call of in your mind of having a reason to do that

3    then?

4    A    Correct.

5    Q    You don't know a reason to do it because you don't

6    remember doing it, right?

7    A    Yes.

8    Q    Do you recall ever during any of the interrogations

9    you've done in that room leaving in the middle of the

10   interrogation to make a phone call?

11   A    Not specifically, no.

12   Q    When Aguilar walked in the room our during the

13   interrogation, the files that you had received were all over

14   in front of the table, right, different files that you had to

15   question him about?

16   A    Don't remember that, no.

17   Q    Do you remember that you had documents there?

18   A    I had documents.

19   Q    Do you remember they were on the table?

20   A    No, I don't remember that.

21   Q    When you say you don't remember, you're not saying I

22   don't remember it and it didn't happen; you're just simply

23   saying you don't have a clear memory as you sit here today?

24   A    I don't remember where the documents were during the

25   interview.

Case 1:20-cr-00390-ENV  Document 98-16  Filed 04/05/22  Page 326 of 360 PageID #: 1431

1   Q    You were wearing a mask during the interview?

2   A    I don't remember that either.

3   Q    Again, when you say you don't remember -- I'm not trying

4   to give you a hard time -- what you mean is you don't remember

5   one way or the other.  You're not suggesting by saying I don't

6   remember that you didn't wear a mask?

7   A    Correct.

8           MR. SOLOMON:  Objection.

9           THE COURT:  Overruled.

10  Q    You testified to the substantive questions that began the

11  interview, and you said that you believe you started with

12  questions about his biography.  Do you remember testifying to

13  that?

14  A    That's my recollection.

15  Q    That may not have been the order, right?

16  A    That's correct.

17  Q    That's your best guess basically, right?

18  A    To my memory, yes.

19  Q    If Agent Zukas' notes show that not until 45 minutes, an

20  hour, into the interrogation did anybody ask any questions

21  about biography, you don't dispute those notes, do you?

22  A    I haven't seen the notes.

23  Q    Is it to possible that those notes are more accurate than

24  your memory here two years later?

25  A    I don't know.

Wood - Cross - Spiro                        326

1   Q    It is possible, you would agree with me, that the

2   questions about biography don't happen until later.

3   A    I cannot agree with you on that.

4   Q    You can't agree with me that it's possible?

5   A    Possible.

6   Q    His notes have the questions about biography happening 45

7   minutes at least into the interview.

8   A    Okay.  I haven't seen the notes.

9   Q    I understand that.  What I'm asking you is, is it

10  possible that you don't ask questions about his biography

11  until the middle of the interview.  Is that possible?

12  A    If I could see the notes it might help me remember.

13  Q    Have you ever read Special Agent Zukas' handwriting?

14  A    I have not.

15  Q    Did he ever tell you that sometimes he just injects

16  exclamation points into his writing?

17  A    No, sir, I never heard that.

18  Q    Did you ever tell you sometimes in the middle of writing

19  the FBI interview notes he crosses things out both

20  contemporaneously and long after?

21  A    No, he never told me that.

22  Q    Do you use exclamation points randomly that are not

23  intended to suggest exclaimed statements?

24  A    No, sir, I typically don't use exclamation points when

25  taking notes.

1  Q    If you did, you would mean it as the traditional use of

2  the exclamation point, to show an exclaimed sentence, right?

3  A    I assume so.

4  Q    I know it sound the absurd.

5         THE COURT:  Do you know what the traditional use of

6  an explanation point is?

7         THE WITNESS:  Yes, sir, I do.

8  Q    As long as we're on exclamation points, you said that you

9  never changed the tone of your voice during the interview; is

10 that accurate?

11 A    Yes.

12 Q    You don't remember the interview clearly, do you?

13 A    I remember some things about the interview.

14 Q    I understand you remember somethings about the interview

15 and there are somethings you don't remember.  What I'm asking

16 about is the periods of time in the interview that you do not

17 remember.  How do you know that your voice never changed?

18 A    I typically do business the same way every time.

19 Q    That's the key here, right, that a lot of what you're

20 testifying to about what happens in that room is because this

21 was not the first time you've been in that room with somebody

22 doing a very similar routine, right?

23 A    That's fair, yes.

24 Q    When you say, I never raised my voice.  When Zukas says

25 it was monotone.  You're not saying you have a clear memory

1   that your voice never went up or down, are you?

2   A    Of course my voice goes up and down from time to time.

3   Q    Well, he in his notes uses exclamation points as to

4   Aguilar's statement several times within the notes.  I get it,

5   you haven't reviewed the notes for some reason.  It's fine.

6            Do you remember Aguilar's voice changing from

7   standard tone to a more excited tone?

8   A    No.

9   Q    You have no basis to remember one way or another what

10  those explanation points could have been about?

11  A    I have no idea.

12  Q    Okay.  These are his notes, which are in DXF, and the

13  interview starts and the first statement is:  I need to know

14  what this is about.

15  A    Okay.

16  Q    Then it's:  I have no knowledge of bribes being paid.

17  Right?

18  A    Okay.

19  Q    And then you say that Aguilar said that he never -- he

20  never -- he said he didn't want a lawyer?  Are you telling

21  this Court that you remember Aguilar saying:  I don't want a

22  lawyer?

23  A    No, I never said that.

24  Q    I thought I heard you say when he brought up lawyers and

25  that the other people at Vitol had lawyers.  He said you said

1   something to the effect -- it's not in the notes -- that

2   Aguilar suggested he doesn't want a lawyer just everybody

3   else?

4   A    He said everybody else had a lawyer, he did not.

5   Q    That's all he said.

6   A    Yes.

7   Q    According to you.

8           Then, by the way, right after this part of when he

9   says:  I need to know what this is about.  I have no knowledge

10  of bribes being paid.

11          It says:  Shows picture, looks at picture.  I'm

12  always meeting people there.  Exclamation point.

13          Do you see that on the first page of the notes?

14  A    I do.

15  Q    Does this jog your memory that what happens out of the

16  gate in that room is you confront him with bribes, you

17  confront him with the best evidence in this case.  And he

18  explains back to you:  I've always been meeting people there.

19  Does that refresh your memory?

20  A    This refreshes my memory of what Aguilar said about the

21  pictures, yes.

22  Q    Does it refresh your memory that the interview started

23  like that, not with biography information about where he's

24  from and what he does for work?

25  A    No, sir, it does not.

1    Q    It doesn't refresh your memory?

2    A    No.

3    Q    Do you dispute that this is how the interview started?

4    A    I don't dispute it, no.

5    Q    In fact, the 302, the formal interview report in this

6    case -- you reviewed before it became final, right?

7    A    Yes.

8    Q    It also doesn't suggest anything about his biography

9    being discussed out the gate, does it?

10   A    It does not.

11   Q    You signed off on that, didn't you, sir?

12   A    I did not sign off on it.

13   Q    Did you dispute it?

14   A    No.

15   Q    Did you tell Zukas that you agreed with it?

16   A    I don't remember specifically what I said about the

17   report, no.

18   Q    Do you remember looking at it and saying -- that was two

19   weeks later, and here we're two years later -- do you remember

20   two weeks later and saying this is all wrong?

21   A    No.

22   Q    If we look at these notes, it's not until page seven,

23   right, what happens is Aguilar says:  I don't know him.  At

24   the top.  This wasn't the first time in the interview where

25   Aguilar says, tries to reject something that you guys are

1   saying, right?  You guys are saying, you know him.  He's

2   saying, I don't know him.

3           Something happens at that moment.  And whatever

4   happens we'll never know, because Zukas crosses it out.  Do

5   you see that?

6   A    I see he crossed something out, yes.

7   Q    When you take notes, in formal criminal investigations of

8   this magnitude do you cross stuff out?

9   A    Typically no.

10  Q    Do you know of anyone in your department that crosses out

11  things in taking contemporaneous notes in interviews?

12  A    I don't know what other people do, how they take notes.

13  Q    You reviewed them in other cases, no?

14  A    No.

15  Q    Do you have any notes from any of the 20-plus interviews

16  that you've done in that room?

17  A    Do I have notes?

18  Q    Yes, you.

19  A    Yes.

20  Q    You do.  In other cases?

21  A    Yes.

22  Q    And then we're now in the middle of the interview, on

23  page of seven of this document, now it looks like you're

24  asking him biography questions.  It says:  I left Mexico city

25  in '99, degree in chemical engineering, Ph.D in London.  Do

1   you see the biography answers to your questions?

2   A    Yes.

3   Q    You would agree with me that this suggests, along with

4   the 302 that you looked at and did not reject, suggests that

5   the biography conversation that you earlier testified to

6   happened in the beginning of the interrogation actually did

7   not happen in the beginning of the interrogation.  Do you

8   think this suggests that?

9   A    Possibly, yes.

10  Q    It's not people's memory are faulted, but it's possible,

11  isn't it -- not only possible but probable -- that the

12  biography conversation you related, happened at a different

13  time in the interview.  So what, right?  You agree with me?

14  A    Yes.

15  Q    You also made a statement that during the interview --

16  during the interview, sir, let's be direct, you're focused on

17  conducting an interview, right?

18  A    Yes.

19  Q    You're not watching the door, right?

20  A    Correct.

21  Q    You're watching Aguilar, right?

22  A    Yes.

23  Q    You're a trained Special Agent trained in looking at the

24  person you're interviewing, body and face, right?

25  A    Yes.

1   Q     So you wouldn't be looking at door, sir, that would be a

2   dereliction of duty.

3   A     The door is always visible from our peripheral vision

4   from our stand point in the room.

5   Q     While you're doing the interview, focused on Aguilar and

6   making your observations, and according to you not taking any

7   notes -- and according to you, not taking in any notes to

8   prepare.  Is that your testimony?

9   A     Yes.

10  Q     That's how you want to leave that?

11  A     Yes.

12  Q     That you conducted this 90-minute interview that we have

13  in the 302, and you did not have one note going into that

14  interview?

15  A     That's correct.

16  Q     Even though you were the primary questioner?

17  A     That's how I do my interviews, yes, sir.

18  Q     Even though these are complex matters?

19  A     They are all complex.

20  Q     Lots of different names, locations, and wires are going

21  and the names of entities and bank accounts, you did that

22  without all a single note.  That's your testimony?

23  A     What is your definition of a note?

24  Q     Anything that you with your human hand wrote on a piece

25  of paper.

1    A    I didn't have that, no.

2    Q    You had none?

3    A    No.

4    Q    So while out of your peripheral vision you could see the

5    door, I understand theoretically, you agree with me you were

6    not watching the door to see who was coming by the door,

7    right?

8    A    I was not watching it, but I could see it.

9    Q    Well, it's a funny thing.  Do you remember you were asked

10   a question about did anyone ever come into the interview room?

11   A    Yes.

12   Q    You said:  Not to my knowledge.  Do you remember that?

13   A    Right.

14   Q    Because you don't have a clear memory of anybody coming

15   in, right?

16   A    That's correct.

17   Q    But so incomplete is your memory and so peripheral was

18   your vision of the door, that you couldn't swear on direct

19   that it's inconceivable that somebody popped their head in,

20   right?  Do you understand?

21   A    I understand the question, yes.

22   Q    Okay.  Right.  Because during the interview it's

23   peripheral to you, it's a long time ago, have zero notes, zero

24   recordings.  You can't even swear on your oath that you're

25   sure nobody popped in, right?

Wood - Cross - Spiro                           335

1    A     That's correct.

2    Q     So since you can't even be sure nobody entered the

3    interview, surely you can't be sure that nobody was hanging

4    out around the door, right?

5    A     No one to my knowledge, sir, no one came in during the

6    interview.  No one was hanging outside of the doorway.  There

7    may have been a few people cross by the doorway walking by,

8    but no one came in and no one stayed with us.

9

10              (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS-EXAMINATION

2    BY MR. SPIRO: (Continued)

3    Q    Okay.  We can agree nobody came in and stayed, right?

4    A    Right.

5    Q    But we can also agree that it's very possible CBP

6    officers were mingling by the door, right, isn't that

7    possible?

8    A    It's certainly possible because that's where they work.

9    Q    Correct.  And there was nothing else going on in the

10   airport that was more interesting than this in a day in which

11   the airport was mostly empty, right?

12   A    I can't agree with that, no.

13   Q    You don't think this is where the action was, sir, in the

14   airport that day?

15         Were there are other major FCPA interrogations going

16   on in the airport that day, as far as you know?

17   A    Possibly.  I don't know.

18   Q    Not to your knowledge there wasn't?

19   A    Not to my knowledge.

20   Q    And you're the lead DHS FCPA investigator in all of

21   Houston?

22   A    It's not as impressive as it sounds.

23   Q    Well, you know, it got you here, right?

24   A    It did.

25   Q    It got you here.

1    A    Unfortunately, it got me here.

2    Q    Correct.

3         And you are very much a part of this case now, are

4    you not?

5    A    I assisted on the case, yes.

6    Q    And another question you got was you never told Aguilar

7    that you believed he committed a crime.  Do you remember that?

8    A    That's correct.

9    Q    Okay.  You may not have used those words, but you told

10   him that lying to federal agents was a crime multiple times,

11   right, you told him that?

12   A    I told him that.

13   Q    Okay.  And by telling somebody, when you're a federal

14   agent, that lying to federal agents is a crime, suggests to

15   the listener that you are suspicious of their lying to federal

16   agents, isn't it?

17   A    That's correct.

18   Q    And when you say that to him, it's because you want him

19   to answer the next question differently than how he answered

20   the question the first time you put it to him, isn't it?

21   A    Well, if he lied the first time, yes.

22   Q    Right.  But you don't know that, right?  You're just

23   suggesting with your question that you want him to change his

24   answer, for all intents and purposes?

25   A    No, sir.  I want them to be truthful.

Wood - Cross - Spiro                            338

1    Q    Okay.  But you don't know what the truth is.  You weren't

2    in Ecuador when any of these events happened, were you?

3    A    No, sir.

4    Q    And you had been working on this case for a week, right?

5    A    A few weeks.

6    Q    Did you ever ask anybody for exculpatory information, any

7    of the prosecutors, anybody working the case, ever say got

8    anything pointing to his innocence?

9    A    No, sir.

10   Q    And so you then also told Aguilar, in sum and substance,

11   you bribed public officials; didn't you tell him that?

12   A    I don't remember how we phrased it.

13   Q    You don't remember how you phrased it, I thought you'd

14   say that.  But I'm asking you in sum and substance.

15        In sum and substance, you told him:  You paid

16   government officials?

17   A    We believe, yes.

18   Q    Well, you didn't say we believe.  You said, in

19   repetition, multiple times, we -- look at this photo of you

20   meeting with the informants, look at this recording of you

21   being recorded by the informants, we know that that money went

22   to government officials.  Didn't you tell him that, in sum and

23   substance?

24   A    In sum and substance, yes.

25   Q    Okay.  So, and that's a crime, right?

1   A    It is.

2   Q    Okay.  So you're sitting there with him in -- on the foot

3   of the detention area of this area within Customs and you're

4   telling him that you had evidence in the form of recordings

5   and photographs that money went from him to public officials

6   in a criminal way, aren't you, basically?

7   A    Yes.

8   Q    Okay.  And when he wouldn't answer some questions and sat

9   in silence or resisted answering, you, quote, instructed him

10  to answer?

11  A    No, sir.

12  Q    Okay.  Well, if the government prosecutors in this case

13  wrote in a motion in this court that you instructed Aguilar to

14  answer questions when he tried to remain silent, are you

15  saying that that's not true?

16  A    I haven't seen the document, sir.

17  Q    Well, I'm asking you.

18         Would that necessarily have been false or could

19  there have been times during the interview where Aguilar sat

20  silently and you said answer me?

21  A    No, sir.

22  Q    You never said answer me?

23  A    No.

24  Q    You're positive about that?

25  A    Yes.

Wood - Cross - Spiro                              340

1  Q    You also said that after he -- you do admit that he does
2  invoke his right to counsel at a certain point, right?
3  A    Correct.
4  Q    And after he invokes his right to counsel, there's lots
5  of notes that happen of statements that were made during that
6  time period?
7  A    Yes.
8  Q    Okay.  And are you saying that after he invokes, are you
9  positive that neither you nor Wood -- excuse me, neither you
10  nor Zukas asked a single question?
11  A    Mr. Aguilar initiated the conversation.
12  Q    I understand he initiated.  Okay?
13        Were you prepped to say that he initiated the
14  conversation?
15  A    No, sir.
16  Q    Were you prepped on this topic?
17  A    Yes.
18  Q    Okay.  And you were prepped to resist when I said to you
19  isn't it going to be the case that there's no possible way on
20  planet Earth that this entire last page of notes came from
21  spontaneous ramblings from Aguilar?
22  A    No, sir.  I was instructed to tell the truth.
23  Q    I know you were also instructed to tell the truth.  But
24  you were instructed to tell the truth but also at times you
25  were suggested with things that might be correct answers,

1  weren't you?

2  A    No, sir.

3  Q    Okay.  So, but you haven't answered my question.

4  A    What was the question?

5  Q    The question was, the last page plus of notes was not

6  just Aguilar spontaneously saying things.  There were -- while

7  he initiated, according to you, conversation or communication

8  after his unequivocal, even according to you, invocation,

9  there were followup questions after he initiated?

10 A    To my recollection, he's the one that asked us questions.

11 Q    Uh-huh.  But there's lots and lots of statements in there

12 that weren't question-marky question-type statements, they're

13 statements in which they look responsive to questions?

14 A    I haven't seen the notes, sir.

15 Q    Well, if you don't have a clear memory of this, Agent,

16 it's okay if you don't remember something.

17      I'm asking for your best memory of if you can say,

18 on your oath, that you all never asked him a followup

19 question.  Can you say that?

20 A    I can't say that on my oath, no.

21 Q    Okay.  And, you know, you talked a lot at one point --

22 actually, withdrawn.  You didn't really talk a lot.

23      You suggested, okay, in a question from the

24 prosecutor that you were -- you know, that your practice in

25 these interviews is to say to everybody, you know, free to

1    leave, voluntary.  Do you remember that?

2    A    Yes, sir.  That's standard.

3    Q    Right, standard.

4         You don't have clear memory of the actual, you know,

5    sentence that you said, but you have a clear -- you can say

6    that that is your practice, pattern of practice, right?

7    A    That's correct.

8    Q    Okay.  And of course, at least 20 of these people have

9    remained with you for one reason or another, haven't they, and

10   you've been able to interview them, right?

11   A    Yes.

12   Q    And despite this -- you know, let me ask you this.  How

13   come you just didn't read him his Miranda rights?

14   A    There was no need to.

15   Q    Well, according to you.

16        Did you make that call?

17   A    He was free to leave.

18   Q    Did you make that call?

19   A    I did.

20   Q    I just -- I guess, you know, and this is the thing, you

21   know, it's nowhere in the notes, right?  It's nowhere in the

22   notes.  You know, your memory is obviously unclear.  And I'm

23   just sort of wondering, if we're going to take the time to say

24   all the things that might have been said, I don't understand

25   why you can't just read him Miranda rights.

1          THE COURT:  Sustained.

2          You have a question, ask it.  You want to make a

3     speech, save it for summation.

4     Q    You're not allowed -- there's nothing in -- well,

5     withdrawn.

6          You said you haven't -- did you make any notes or

7     edits or any comments that you expected to become notes or

8     edits to the 302?

9     A    Not to my recollection, sir, no.

10    Q    Did you intentionally not put any notes or edits or

11    comments of the 302 -- regarding the 302 in writing?

12    A    Not intentionally, no.

13    Q    Do you know that if you put comments or notes to a 302 in

14    writing, that they would eventually have to be disclosed like

15    they are in this case?

16    A    Yes.

17    Q    Did you work with the prosecutors on their opposition

18    brief?

19    A    No, sir, I've never seen it.

20    Q    Well, do you remember them asking you questions about we

21    have to respond to their motion to suppress?  They came to

22    you, they asked you to go take photographs, right?  Did they

23    also come to you and say they've made a motion to suppress, we

24    need you to take photographs and we need to add things to what

25    we know about the case and put it in our motion?  Did they say

1  that to you and ask you more questions?

2  A    No, sir.

3  Q    Did they interview you in preparation for their motion to

4  oppose our motion to suppress, as far as you remember?

5  A    No, sir.

6  Q    Are you sure that they didn't or do you not know whether

7  they did or not?

8  A    I don't recall being interviewed for a motion to suppress

9  response.

10 Q    When was the first time you recall being interviewed by

11 the prosecutors in this case?

12 A    They never interviewed me.

13 Q    There weren't interviews regarding this, okay.

14 A    Yeah.

15 Q    Asked you questions about what happened on July 10th in

16 the airport?

17 A    I don't remember the date.  It's been several months ago.

18 Q    Okay.  It's been several months ago, like it could have

19 been, you know, December 2021?

20 A    It's possible.

21 Q    Could it have been June of 2021, nine months ago?  Or do

22 you think more recently, just preparing for the hearing, they

23 began to ask you questions?

24 A    I don't remember, sir.  I really don't.

25          MR. SPIRO:  Just a moment.

1          I don't have anything further at this time.  Thank
2    you.
3          THE COURT:  Thank you, Mr. Spiro.
4          Special Agent Wood, let me ask you a question.  I
5    want to make sure I have this clear.
6          THE WITNESS:  Yes, sir.
7          THE COURT:  As I understood from your testimony, you
8    recognize that there is a policy of Homeland Security
9    Investigations that if a subject is in custody and you wish to
10   conduct an interview of that subject, that those efforts must
11   be recorded?
12         THE WITNESS:  Yes, sir, that's my understanding.
13         THE COURT:  And that is what, visually, like a video
14   recording?
15         THE WITNESS:  No, sir.  It's my understanding it's
16   audio recording.
17         THE COURT:  An audio recording?
18         THE WITNESS:  At a minimum, yes.
19         THE COURT:  And does that require any special
20   equipment?
21         THE WITNESS:  Yes, sir.
22         THE COURT:  Identify it, if you could.
23         THE WITNESS:  Well, I'm not an expert in the
24   technical field, but I assume it would probably be just a
25   voice recorder of some kind, at a minimum, that we could use.

1          THE COURT:  But is there any protocol as to what

2     kind of recorder it is?

3          THE WITNESS:  There possibly is, Judge, but I don't

4     know personally.

5          I have not run into an issue -- I know that's the

6     matter we're discussing today, but I have not run into an

7     issue where I felt that I needed to record.

8          THE COURT:  Let me ask you another question then.

9          Have you ever conducted an interview of somebody who

10    actually was in custody?

11         THE WITNESS:  Yes, sir, I have.

12         THE COURT:  And did you use an audio or video

13    recorder to record them?

14         THE WITNESS:  No, sir, because it was done prior to

15    this policy.

16         THE COURT:  Okay.  That helps clear some things up.

17    Thank you.

18         Mr. Solomon, do you have any redirect?

19         MR. SOLOMON:  Your Honor, I have very few questions.

20         THE COURT:  Please.

21         THE WITNESS:  And, Judge, if I might clarify my

22    answer?

23         THE COURT:  Yes, sure.

24         THE WITNESS:  I don't know if -- the custodial

25    interviews I've done have been with the presence of counsel

1    and I honestly don't know if that changes the requirement for

2    the policy if the counsel is present, if it still has to be

3    recorded or if it's a custodial interview without the presence

4    of counsel.

5              THE COURT:  Okay.

6              THE WITNESS:  So every custodial interview I've done

7    has been post arrest with multiple defense counsel present

8    during the interview.

9              THE COURT:  And those were not recorded?

10             THE WITNESS:  That's correct, sir.

11   REDIRECT EXAMINATION

12   BY MR. SOLOMON:

13   Q    Just a few questions, Agent Wood.

14             You were asked by defense counsel a few minutes ago

15   a number of questions about Agent Zukas's testimony.  Do you

16   remember that?

17   A    Yes.

18   Q    Were you in the courthouse yesterday?

19   A    No, sir.

20             Oh, in the courthouse?  Yes, I was.

21   Q    Were you at any time in the courtroom yesterday?

22   A    No, sir.

23   Q    As you sit here today, do you know what Agent Zukas

24   testified about yesterday?

25   A    I don't.

1  Q    You were also asked questions about who was part of the

2  case team.  Do you remember that?

3  A    Yes.

4  Q    In your view, was CBP part of the case team?

5  A    No.

6  Q    You were asked questions about whose decision it was to

7  conduct the interview at the airport and Mr. Spiro referenced

8  a call, there was a team decision.  Do you remember that?

9  A    Yes.

10 Q    Whose decision was it to conduct the interview at the

11 airport?

12 A    It was my decision primarily to conduct the interview at

13 the airport.

14         THE COURT:  As opposed to someplace else?  Is that

15 the tenor of the question?

16         MR. SOLOMON:  Yes, Your Honor.

17         THE COURT:  And that is you decided to conduct the

18 interview at the airport as opposed to someplace else?

19         THE WITNESS:  Yes, sir.

20 Q    You were asked questions about the other rooms adjacent

21 to the room where Mr. Aguilar was interviewed and I think

22 Mr. Spiro described it as the mouth of the jail.  Do you

23 remember that?

24 A    Yes.

25 Q    Okay.  You had asked -- you had said that there were

1  holding cells in the vicinity.  Do you remember that?

2  A    Correct.

3  Q    Where were those located?

4  A    They were located down the hallway to the left.  If you

5  enter the room, walk past where we conducted the interview,

6  past the interview rooms on the right, there's a hallway that

7  goes back to the left and those detention rooms are on that

8  hallway.

9  Q    Would someone from the chair where Mr. Aguilar was

10  sitting be able to see those rooms, sir?

11  A    No, sir.  You have to be in the hallway.

12  Q    Is there a reason why you didn't conduct the interview in

13  those rooms?

14  A    Well, because that's not where I typically conduct

15  interviews.  And I don't want the person to be -- to feel like

16  they're held there and not allowed to leave.

17         THE COURT:  Did those rooms have a view of the

18  secondary inspection area?

19         THE WITNESS:  No, sir.  They are down the hallway.

20  You cannot see the room where we conducted the interview and

21  you cannot see the secondary inspection area either.

22  Q    Mr. Spiro asked you some questions in the context of

23  whether you remembered certain things about the interview and

24  not others.  Do you remember that?

25  A    Yes.

1  Q    Okay.  On direct examination, you stated that you advised

2  Mr. Aguilar that he had cleared Immigration and Customs.  Do

3  you remember that?

4  A    Yes.

5  Q    Do you have a clear memory of telling Mr. Aguilar that?

6  A    Yes.  Because it was one of the primary things that I

7  wanted to tell Mr. Aguilar before the interview began.

8  Q    Do you have a clear memory of telling him that he was

9  free to leave?

10  A    Yes.

11         MR. SOLOMON:  No further questions.

12         MR. SPIRO:  I'm going to object on leading on the

13  last question.

14         THE COURT:  I am going to allow it anyway.

15         MR. SPIRO:  The Court sees it, so I'm not going to

16  ask any questions about it.  I think it's clear.

17         THE COURT:  Do you have any questions of any kind?

18         MR. SPIRO:  No, Your Honor.

19         THE COURT:  Okay.  Thank you very much, Mr. Spiro.

20         Special Agent Wood, thank you very much.  Travel

21  back safely to Houston or wherever it is you are going next.

22         THE WITNESS:  Thank you, sir.

23         THE COURT:  You are excused.

24         (Witness excused.)

25         THE COURT:  Mr. Solomon or Mr. Lax, where to next?

Proceedings                     351

1          MR. LAX:  No more witnesses from the government,

2     Your Honor.

3          THE COURT:  All right.  Any witnesses from the

4     defense, Mr. Spiro?

5          MR. SPIRO:  Your Honor, we learned, you know, just

6     an hour or two ago that the CBP officer here is not the

7     officer that we had hoped that he would be.  And what I mean

8     by that is, we had, as you heard during some of the testimony,

9     requested the officer that was on the bridge.  They tried to

10    produce that officer, I understand, or to identify the correct

11    officer; the officer that came is not that officer.  The

12    officer that came is the officer that did the secondary

13    inspection.

14         I only say that to lead into my request, which is

15    the government's rested, it's 5:15, I would be asking for a

16    short adjournment and we would update the Court on Monday if

17    we had any case or had any defense case and then we would

18    otherwise update the Court by Monday, or even do Friday if you

19    want it, but if we intend to rest.  We'll shoot for Friday,

20    actually.  And then if we rest, we rest hearing the

21    evidentiary portion is concluded.  If not, if we have any

22    additional requests, applications, we, I understand, could

23    come back Tuesday.  I just don't want to be in a position

24    without reviewing the transcripts, speaking to my colleagues

25    at 5:15 if necessary.

Proceedings                    352

1          Is that fair?

2          THE COURT:  I think it is eminently fair.

3          MR. SPIRO:  Thank you.

4          MR. LAX:  Your Honor, I would like just to sort of

5     correct this notion that the wrong CBP officer was brought

6     here.

7          I mean, we had discussed this officer.  He's been

8     here for many days now and, you know, these conversations go

9     back with defense counsel many, many months and they knew that

10    we would be bringing this person.  I don't recall any

11    representation made by the government that he was the person

12    on the jet bridge.  If that was a miscommunication between the

13    parties, then so be it.

14         We did also endeavor to identify all people that

15    came into contact with Mr. Aguilar during the course of that

16    and we provided the name of an additional CBP officer who

17    conducted the primary inspection and we provided that name

18    back in -- I think it was December.  And that person, you

19    know, was not here and we weren't asked to produce them.  Or

20    we may have been, but I think we may have declined and we

21    provided with a contact if they wanted to bring that person up

22    here.

23         So, you know, this CBP officer has been here.  He's

24    -- you know, we always agreed to produce him.  But I just want

25    to correct the notion that somehow the government is playing

Proceedings                                353

1   fast and loose of who we told the defense we would produce,

2   you know, versus who they perhaps thought they were.  And I

3   think some of this can be chalked up to miscommunication, but

4   I just want to make clear that we've been pretty consistent in

5   who we were going to provide at the defense's request.

6            MR. PARK:  Your Honor, may I address?  This is

7   Tai Park.

8            We're not ascribing any gamesmanship on the part of

9   the government at all.  It's clear that this was a

10  miscommunication.  We had specifically asked for the person

11  when he was coming off the jet plane who encountered our

12  client.  That's the person that we had an interest in.

13           We e-mailed on this issue.  We thought that the

14  government had identified that person as Davis and therefore

15  we said, yes, please make sure that Officer Davis is present.

16  Obviously, the government wasn't doing this to inconvenience

17  an agent who was kind of the wrong person from our

18  perspective, so absolutely I think this is a miscommunication.

19  We're not ascribing to the government any bad faith.

20           MR. LAX:  We agree to agree.

21           MR. SPIRO:  And I didn't mean to ascribe bad faith

22  either, but I can assure you I was intending to cross-examine

23  the guy on the bridge.

24           MR. LAX:  And I didn't hear you suggest it either,

25  but I did want to clear it up for the record.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

1    THE COURT:  I think we have made nice, which is

2    good.

3    Okay.  So we will hear from the parties on Friday as

4    to whether or not we need another day.  To the extent that

5    that should be the answer, we have floated Tuesday as a date.

6    Would that be the day or was that -- I guess it is going to be

7    subject to you finding the -- assuming you would want that

8    witness, we have to find the witness first.

9    MR. SPIRO:  Right.  I mean, you know, one question

10    for the Court, now that the government rests, is we put in an

11    affidavit that has not been disputed as to what occurred on

12    the jet way.  I don't know how much the Court wants to, needs

13    to or finds it necessary to hear from that person to proffer

14    that affidavit.  It's not rebutted, it's their burden, I

15    don't --

16    THE COURT:  Like in the good old days when we

17    actually had trials, to the extent that something can be

18    worked out in a stipulation, that is fine also, that X would

19    come and testify as follows.

20    MR. LAX:  I'm happy to confer with the defense.  I

21    mean, we took steps with CBP, you know, not just through

22    Special Agent Wood.  I mean, the government took steps through

23    CBP to identify that person, if that is a person.  I agree

24    that's in an affidavit and, you know, I will have to go back

25    and review the testimony, but, you know, both Special Agent

Proceedings                                        355

1    Wood and Special Agent Zukas, the two witnesses who testified,

2    were not on the jet bridge when Mr. Aguilar came off the jet

3    bridge.

4              I don't think that person is identifiable,

5    Your Honor.  We've asked CBP to do that.  We were told that

6    there were 50 people working that day.  They could identify

7    the primary officer and they could identify the secondary

8    officer, who's the person who is here, you know, and so we

9    sort of are where we are.  I don't know that two years after

10   the fact that we just can identify that person.  Could be the

11   primary, but that's just pure speculation by me.

12             THE COURT:  Right.

13

14             (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    356

1        THE COURT:  Right.  Well, I mean.

2        MR. LAX:  A long way of saying perhaps, your Honor,

3   we can work something out in the next -- on this particular

4   issue.

5        THE COURT:  Okay.  Just for purposes of the ultimate

6   workout, here's my concern, that the ultimate workout is that

7   we actually have to have a human body here and take testimony,

8   what day would that happen?  Do we know that yet, or is that

9   to be determined?

10       MR. SPIRO:  To be determined.

11       THE COURT:  To be determined, okay.

12       So we will try to keep Tuesday open in case miracles

13  do happen.  We'll find some other day, if not.

14       MR. LAX:  I mean, this officer is here now if

15  they -- he came from Houston, he's been here for days.

16       THE COURT:  I think what Mr. Spiro is saying is that

17  that particular officer does not have the -- did not have the

18  knowledge that they want to elicit for purposes of this record

19  on this motion.  Correct?

20       MR. SPIRO:  That's correct.  And it's also 5:20.

21       THE COURT:  There's nothing that that officer could

22  productively add to the defense case.

23       MR. SPIRO:  Not the right officer.

24       THE COURT:  Not the right officer.  Everybody agrees

25  it's not the right officer for the purpose that the defense

Proceedings                    357

1  wanted to call an officer.

2          MR. LAX:  Yes.  I think that's right, your Honor.

3          THE COURT:  So that's why you folks can chat and let

4  us know.  Ultimately, what we'll do whenever the hearing

5  actually concludes, then we'll set up a schedule for

6  post-hearing memorandum.

7          MR. LAX:  Will do, your Honor.  Thank you.

8          THE COURT:  Okay.  Aside from that major open

9  question, do we have anything else we need to attend to before

10 we adjourn tonight?

11         MR. SPIRO:  Not from the defense.

12         MR. LAX:  No, your Honor, not from the government.

13 I guess perhaps I forgot or my mind went blank, but are we to

14 put a letter on Friday, what's the sort of current schedule.

15         MR. SPIRO:  We'll put in a letter, I guess the

16 defense will confer and then put in a joint letter updating

17 the court no later than Monday and endeavor for Friday.

18         MR. LAX:  Makes sense.

19         THE COURT:  Okay, that's fine.  Then we'll go from

20 there.  Okay, thank you.

21         MR. LAX:  Thank you, your Honor.

22         THE COURT:  Much appreciated.  Nice to be back in

23 the courtroom and have real lawyers and real witnesses and

24 real court reporters and real clerks and we appreciate all of

25 your hard work.  Be safe, be smart.  Enjoy the evening, and

Proceedings                                        358

1    safe travels if anyone is traveling.

2              MR. SPIRO:  Likewise, your Honor, thank you.

3              MR. LAX:  Thank you, your Honor.  Good to be back.

4              THE COURT:  Yes.

5

6              (Whereupon, the hearing adjourned at 5:25 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**INDEX**

**WITNESS:**                                                    **PAGE:**

**MATTHEW WOOD**

              DIRECT EXAMINATION

                                          229

              BY MR. SOLOMON


              CROSS-EXAMINATION                         257

              BY MR. SPIRO

              REDIRECT EXAMINATION                      347

              BY MR. SOLOMON

*****

Government's Exhibit DOJ GX-1A                        248

Government's Exhibit DOJ GX-1B                        248

Defendant's Exhibit K                                285

Defendant's Exhibit L                                298

Defendant's Exhibit M                                299

Defendant's Exhibit N                                300

Defendant's Exhibit O                                309

Defendant's Exhibit P                                322

*****
