DCP:JPL
F. #2019R01460

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                      Docket No. <u>20-CR-390 (ENV)</u>

JAVIER AGUILAR,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X


THE GOVERNMENT'S REPLY IN OPPOSITION TO
THE DEFENDANT'S POST-HEARING
<u>MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO SUPPRESS STATEMENTS</u>


                              BREON PEACE
                              UNITED STATES ATTORNEY
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, NY 11201

Jonathan P. Lax
Assistant United States Attorney
      (Of Counsel)

Derek J. Ettinger
Jonathan P. Robell
Assistant Chiefs, Fraud Section
Clayton P. Solomon
Trial Attorney, Fraud Section
      (Of Counsel)

Adam Schwartz
Deputy Chief, Money Laundering and Asset Recovery Section
D. Hunter Smith
Trial Attorney, Money Laundering and Asset Recovery Section
      (Of Counsel)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ...................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.     The Court Should Reject Aguilar's Invitation to Impose a Higher Standard of Proof On the Government ............................................................................................. 2

II.    The Court Should Reject Aguilar's Mischaracterization of *FNU LNU* and Its "Progeny" 3

III.   The Interviewing Agents' Reasons For Conducting the Interview at the Airport Are Not Relevant ............................................................................................................ 9

      A.  The Subjective Views of The Agents Are Irrelevant ..................................... 9

      B.  Aguilar's Unsupported Theories About the Events Leading Up to the Interview ...... 10

IV.   The Fact That Multiple Agents Conveyed to Aguilar That He Was Free to Leave Weighs Heavily in Support of the Conclusion that Aguilar Was Not in Custody for Purposes of *Miranda* ............................................................................................ 14

V.    The Remaining Objective Circumstances Of Aguilar's Interview Further Support the Conclusion that Aguilar Was Not in Custody for Purposes of *Miranda* ......................... 21

VI.   The Interviewing Agents Immediately Honored Aguilar's Request to Consult With an Attorney ......................................................................................................... 27

VII.  The Government Had No Obligation to Record the Interview ......................................... 28

CONCLUSION ............................................................................................................... 31

## TABLE OF AUTHORITIES

**Cases**

United States v. FNU LNU, 261 F.R.D. 1, 3 (E.D.N.Y. 2009) ............................................. passim

California v. Beheler, 463 U.S. 1121, 1125 (1983) ....................................................... 7

Florida v. Bostick, 501 U.S. 429, 438 (1991) ............................................................. 10

Isasi v. Herbert, 176 Fed. App'x. 143, 144-145 (2d Cir. 2006)........................................ 7

Miranda v. Arizona, 384 U.S. 436 (1966). ............................................................. passim

Oregon v. Mathiason, 429 U.S. 492, 493, 495 (1977).................................................. 7

Stansbury v. California, 511 U.S. 318, 323 (1994)..................................................... 10

United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951)........................................... 19

United States v. Ambrose, 668 F.3d 943, 956-60 (7th Cir. 2012) .................................... 7

United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991)............................................ 3

United States v. Antone, 412 Fed. App'x 10, 11 (9th Cir. 2011) ..................................... 7

United States v. Brooks.................................................................................... 15

United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006) ...................................... 15

United States v. Chalmers, 410 F. Supp. 2d 278, 289 (S.D.N.Y. 2006)............................. 30

United States v. Czichray, 378 F.3d 822 (8th Cir. 2004).............................................. 15

United States v. Deloach, 530 F.2d 990, 997 (D.C. Cir. 1975). ..................................... 20

United States v. Djibo ..................................................................................... 7

United States v. Ferguson, 970 F.3d 895, 901-902 (8th Cir. 2020).................................. 7

United States v. Figaro, 2021 WL 4949218, at *7 (S.D.N.Y. Oct. 25, 2021). ...................... 27

United States v. FNU LNU, 653 F.3d 144 (2d Cir. 2011)............................................. 4

United States v. Galloway, 316 F.3d 624, 629 (6th Cir. 2003) ..................................... 10

United States v. Hester, 674 Fed. App'x. 31, 35-36 (2d Cir. 2016) ............................... 7

United States v. Knox, 839 F.2d 285, 293 (6th Cir. 1988) ................................................ 7

United States v. Loera, 2017 WL 2821546, at *7 (E.D.N.Y. June 29, 2017) .............................. 30

United States v. Martinez, 795 Fed. App'x. 367, 376 (6th Cir. 2019) ................................... 7

United States v. Melo, 954. F.3d 334, 342-342 (1st Cir. 2020) ........................................ 26

United States v. Mottl, 946 F.2d 1366, 1369-71 (8th Cir. 1991) ...................................... 7

United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) .......................................... 10

United States v. Muegge, 225 F.3d 1267, 1271 (11th Cir. 2000) ...................................... 7

United States v. Newton, 369 F.3d 659, 672 (2d Cir. 2004) ....................................... 7, 14

United States v. Norris, 428 F.3d 907, 912-13 (9th Cir. 2005) ...................................... 7

United States v. Oladokun, No. 15-cr-559 (BMC), 2016 WL 4033166, at *2 (E.D.N.Y. July 27, 2016) ........................................................................................ 8

United States v. Ramsey, No. 21-CR-495 (ARR), 2022 WL 539197, at * 4 (E.D.N.Y. February 23, 2022) ................................................................................ 16

United States v. Santillan, 902 F.3d 49, 60 (2d Cir. 2018) ........................................ 3

United States v. Silva, 715 F.2d 43, 46 (2d Cir. 1983) ........................................... 5

United States v. Solano, 966 F.3d 184 (2d Cir. 2020) ............................................ 29

United States v. Swanson, 341 F.3d 524, 530 (6th Cir. 2003) ....................................... 15

United States v. Thompson, 2010 WL 3069668, at *5 (S.D.N.Y. July 29, 2010) ....................... 27

United States v. Torres-Galindo, 206 F.3d 136, 144 (1st Cir. 2000) ............................. 18, 29

United States v. Tunstall,2021 WL 2666991, at *15 (E.D.N.Y. June 10, 2021) ...................... 27

United States v. Willoughby, 860 F.2d 15, 23 (2d Cir. 1988) ....................................... 7

United States v. Wilson, 100 F. Supp. 3d 268, 277-78 (E.D.N.Y. 2015) ............................. 3

United States v. Wright, 625 F.3d 583 (9th Cir. 2010) ......................................... 29, 30

United States v. Yunis, 859 F.2d 953, 960 (D.C. Cir. 1988). ...................................... 29

**Other Authorities**

Justice Manual § 9-13.001 .......................................................................................................... 28

## PRELIMINARY STATEMENT

The defendant Javier Aguilar has now submitted over 100 pages of briefing in support of his motion to suppress (DE 66),[1] and spent many hours cross-examining the two interviewing agents, but he still cannot overcome several core facts established at the hearing that, taken together, require denial of his motion: (1) that he was told by the U.S. Customs and Border Protection ("CBP") officer who performed his secondary inspection that his border screening was complete; (2) that the interviewing agents made clear to him that his interview was voluntary and that he was free to leave at any time; (3) that when Aguilar wanted to terminate the interview he did so, without issue; (4) that Aguilar was never restrained or threatened in any way; (5) that the room in which Aguilar was interviewed was large and the door was left open to make clear to him that he was free to leave; (6) that the agents never told Aguilar that he was under arrest or threatened him with arrest; and (7) that the agents honored Aguilar's request to speak with an attorney.

In an effort to distract from these facts, in his post-hearing memorandum of law in support of his motion to suppress (DE 97), Aguilar mischaracterizes the law, misquotes testimony, embellishes certain facts while ignoring others, relies on evidence not in the record and repeatedly asks the Court to draw strained inferences where there is unambiguous testimony to the contrary.

This reply brief clarifies the appropriate legal standard under long-standing case law in this Circuit and focuses on the facts that are relevant to the Court's determination of custody under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).  It does not attempt to address each and every one of Aguilar's mischaracterizations.   As discussed below, the Court should reject Aguilar's

---

[1]     Parenthetical references to "DE" refer to entries on the Court's docket; references to "Tr.," "GX" and "DX" refer to the transcript, government exhibits and defense exhibits from the hearing, respectively.

invitations to raise the burden of proof and to invent a new rule of law that <u>Miranda</u> warnings are required any time a federal agent questions a person at an international airport about non-border-entry-related matters.  The Court should also disregard Aguilar's arguments related to events and investigative decisions that took place before or after the interview and focus solely on the objective circumstances of the interview.  Finally, the Court should credit the agents' testimony that they told Aguilar that he was free to leave and that they honored his one and only request to speak with an attorney.

For the reasons set forth herein and for the reasons set forth in the government's prior filings (DE 73; DE 96), the Court should deny Aguilar's motion.

<u>ARGUMENT</u>

## I. <u>THE COURT SHOULD REJECT AGUILAR'S INVITATION TO IMPOSE A HIGHER STANDARD OF PROOF ON THE GOVERNMENT</u>

In his earlier filings, Aguilar stated that the government's burden was to establish by a preponderance of the evidence that "there was no custodial interrogation implicating <u>Miranda</u> . . . ."  (DE 66-1 at 10).  Now, in his post-hearing brief, Aguilar repeatedly cites <u>Miranda</u> for the proposition that the government's burden is "heavy" or "weighty." (DE 66-1 at 9; DE 76 at 9; DE 97 at 1, 6, 7, 8, 10, 38, 45).  However, the language he cites from <u>Miranda</u> is inapplicable here because it presupposes the subject is in custody and has invoked his or her right to silence or to request an attorney, and describes what law enforcement must show under those circumstances in order to establish waiver of those rights.  <u>Miranda</u>, 384 U.S. at 475 ("If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.").

Here, the government does not argue that Aguilar waived his <u>Miranda</u> rights. Instead, the government argues that <u>Miranda</u> does not apply because Aguilar's interview was voluntary and non-custodial.  Under these circumstances, the law is clear that the government's burden, if it has one, is merely to establish the lack of custody by a preponderance of the evidence. <u>United States v. Wilson</u>, 100 F. Supp. 3d 268, 277-78 (E.D.N.Y. 2015) (quoting <u>United States v. Anderson</u>, 929 F.2d 96, 99 (2d Cir. 1991).[2]   In other words, in opposing a defendant's motion to suppress, the government must at most show that it was more likely than not that a reasonable person in Aguilar's position would have understood he was free to leave, and failing that, to show that Aguilar was not subject to a restraint of his freedom of movement that was akin to a formal arrest.  <u>United States v. Santillan</u>, 902 F.3d 49, 60 (2d Cir. 2018).  To the extent that Aguilar is arguing that the government's burden of proof is anything higher than the standard of preponderance, the Court should reject that argument.

## II.    THE COURT SHOULD REJECT AGUILAR'S MISCHARACTERIZATION OF *FNU LNU* AND ITS "PROGENY"

Faced with the fact that both Federal Bureau of Investigation ("FBI") Special Agent Paul Zukas and U.S. Department of Homeland Security, Homeland Security Investigations ("HSI") Special Agent Matthew Wood told Aguilar his interview was voluntary, among other

---

[2]    Several decisions from this District have stated that the burden of demonstrating custody, as opposed to demonstrating waiver, rests with the defendant.  <u>See</u>, <u>e.g.</u>, <u>United States v. Shteyman</u>, 2011 WL 2006291, at *14 (E.D.N.Y. May 23, 2011) ("[O]n a motion to suppress statements, it is the defendant who bears the burden of demonstrating that he was subject to custodial interrogation.") (collecting cases); <u>United States v. Wilson</u>, 100 F. Supp. 3d 268, 277 (E.D.N.Y. 2015) (citing <u>United States v. Chin</u>, 2013 WL 5406239, at *9 (D. Vt. Sept. 26, 2013)). <u>See also</u> <u>United States v. Arboleda</u>, 633 F.2d 985, 989 (2d Cir. 1980) ("It is well established that the burden of production and persuasion generally rest upon the movant in a suppression hearing.").

facts, Aguilar advocates for a sweeping change in long-standing Second Circuit law. According to Aguilar, under United States v. FNU LNU, 653 F.3d 144 (2d Cir. 2011), and its "progeny," the only fact that the Court needs to consider regarding the circumstances of his interview is that it was conducted at an international airport and involved non-border-entry-related questions. (DE 97 at 11-12). Aguilar is incorrect and the law dictates otherwise.

Aguilar cites to FNU LNU more than 30 times in his filings, but never discusses the facts and reasoning of that case—or for that matter the holding, which affirmed the denial of a motion to suppress. Rather, he selectively quotes from a handful of sentences that relate to facts that are markedly different than in this case, including, most notably, that the defendant still had not cleared customs and was thus not actually free to leave.[3]

In FNU LNU, a CBP officer identified the defendant, who was arriving at John F. Kennedy International Airport on an international flight, as having an outstanding warrant for her arrest. Id. at 146. An armed guard met the defendant at the terminal gate and escorted her to a closed secondary inspection room, outside of public view. Id. at 146, 155. The CBP officer interviewed her, did not tell her that she was free to leave, and later testified that the defendant was, in fact, not free to leave. Id. The defendant was fingerprinted and asked if she had ever been arrested. Id. at 146. The CBP officer's questioning lasted approximately 90 minutes, focused on the defendant's name, background and her passport applications, and he showed her several photographs. Id. at 146-47. The defendant was not provided with Miranda warnings. Id.

---

[3] The Second Circuit in FNU LNU also noted an interrogation can be found noncustodial even when the defendant was not in fact free to leave, explaining that "custody for Miranda purposes is not coterminous with the colloquial understanding of the term." Id. at 153 (quotations and citations omitted).

In <u>FNU LNU</u>, the defendant's motion to suppress her statements made to the CBP officer was denied, and the Second Circuit affirmed. At the District Court, the Honorable Jack B. Weinstein concluded that <u>Miranda</u> warnings were not required in a "routine border crossing inquiry." <u>Id</u>.; <u>United States v. FNU LNU</u>, 261 F.R.D. 1, 3 (E.D.N.Y. 2009) (citing <u>United States v. Silva</u>, 715 F.2d 43, 46 (2d Cir. 1983)).[4] On appeal, the primary question considered by the Second Circuit was whether to recognize a "routine border questioning" exception to <u>Miranda</u>, akin to the "routine border search" exception to the Fourth Amendment's warrant requirement. <u>FNU LNU</u>, 653 F.3d at 148-49. The Second Circuit declined to do so and held that controlling precedent establishes an objective test with respect to the attitudes and knowledge of the questioner and the person questioned—including at the border. <u>Id</u>. at 151. The determination of whether an interrogation is custodial, the Second Circuit explained, "necessarily involves considering the circumstances surrounding the encounter with authorities." <u>Id</u>. (citations omitted). Those circumstances include:

> the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion.

<u>Id</u>. (citations omitted). After considering all these factors, the Second Circuit found in <u>FNU LNU</u> that a reasonable person in the defendant's position would have felt free to leave.

---

[4]     Though Judge Weinstein recommended a "dramatic departure in the law" that would require <u>Miranda</u> warnings whenever a suspect is interviewed in a secondary inspection area, he recognized controlling law required him to deny the motion to suppress. <u>FNU LNU</u>, 261 F.R.D. 1, at * 4. The Second Circuit, however, did not adopt this recommendation and continued to apply the law as it currently stands. Here, Aguilar advocates for a dramatic departure from controlling law that is closely similar to the one Judge Weinstein recognized he had no authority to grant and which the Second Circuit declined to consider.

Moreover, the Second Circuit's reasons for declining to recognize an across-the-board exception are also instructive.  In considering the factors that would support such an exception, the Second Circuit acknowledged that international travelers arriving at an American airport will always expect certain constraints and questions as part of the customs and immigration process, and that, during that process, they are not free to leave.  Id. at 153-154.  The Second Circuit also acknowledged that those expectations "reduce[] the likelihood that a reasonable person in that situation would consider themselves to be under arrest."  Id. at 154.  Nonetheless, the Second Circuit explained, the fact that travelers expect certain questions at the border is not determinative of custody, since the nature of the questions asked is "not . . . the only relevant factor."  Id.  Indeed, "[t]o look at any single factor would be inconsistent with Miranda[]."  Id.

The new single-factor rule that Aguilar asks the Court to adopt—that "an interrogation of a traveler at an international border about criminal, non-border-entry-related matters cannot occur unless Miranda warnings are first provided" (DE 97 at 1), would turn FNU LNU and other Supreme Court and Second Circuit precedent on its head.  As noted above, the central holding of FNU LNU was that the determination of custody is a "holistic" inquiry in which the "nature and context of the questions asked, together with the nature and degree of the restraints placed on the person questioned, are relevant."  FNU LNU, 653 F.3d at 154.[5]  Further, the Second

---

[5]      Aguilar's repeated reference to a line from the concurring opinion in FNU LNU in which the Honorable Chief Judge Jacobs observed that, "Practically speaking, the most important factor in determining whether Miranda applies at our borders will often be the objective function of an inspector's question," (id. at 156 (emphasis in original)), is also taken out of context.  Aguilar fails to note that Judge Jacobs wrote separately because she believed FNU LNU was the "easiest of cases" and that the court's abrogation of Silva would unnecessarily muddy the Second Circuit's Miranda law.  Id.  Judge Jacobs further stated that, in most cases, the routine nature of an officer's questioning, standing alone, will be enough to establish that the interrogation was not custodial, but that Miranda warnings "might" be required in "clearly exceptional" cases such as when handcuffs were used or weapons were drawn, none of which occurred here.  Id.

Circuit's "holding comports with those of [its] sister circuits that <u>Miranda</u> warnings <u>might</u> be required even at the border if the interrogation occurs while the defendant is handcuffed to a bench in a locked security office for four hours, placed in a locked cell, or physically restrained while officers had weapons drawn." <u>Id.</u> (internal citations, quotations and ellipses omitted) (emphasis added).[6]

Finally, the so-called "progeny" of <u>FNU LNU</u> amounts to just two cases, neither of which support Aguilar's position.[7]  The first of those cases, <u>United States v. Djibo</u>, says nothing

---

[6]     Aguilar's proposed new single-factor rule would also run afoul of the myriad cases holding the location of an interview, or the fact that the questioning took place in a "coercive environment," is not determinative of custody.  <u>See</u> <u>California v. Beheler,</u> 463 U.S. 1121, 1125 (1983) ("[W]e have explicitly recognized that <u>Miranda</u> warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'");  <u>United States v. Knox</u>, 839 F.2d 285, 293 (6th Cir. 1988) ("Following the dictates of the Supreme Court, we reject, as the sole criterion for the attachment of <u>Miranda</u> rights, reliance on the concept of an 'inherently coercive environment.'").  Indeed, examples are legion of courts finding interrogations non-custodial in settings far more "police dominated" than an airport.  <u>See, e.g.,</u> <u>Oregon v. Mathiason</u>, 429 U.S. 492, 493, 495 (1977) (police station); <u>United States v. Hester</u>, 674 Fed. App'x. 31, 35-36 (2d Cir. 2016) (same); <u>United States v. Newton</u>, 369 F.3d 659, 672 (2d Cir. 2004) (same); <u>United States v. Willoughby</u>, 860 F.2d 15, 23 (2d Cir. 1988) (prison); <u>Isasi v. Herbert</u>, 176 Fed. App'x. 143, 144-145 (2d Cir. 2006) (Mexican police office); <u>United States v. Ferguson</u>, 970 F.3d 895, 901-902 (8th Cir. 2020) (tribal justice office, under polygraph); <u>United States v. Mottl</u>, 946 F.2d 1366, 1369-71 (8th Cir. 1991) (FBI headquarters); <u>United States v. Martinez</u>, 795 Fed. App'x. 367, 376 (6th Cir. 2019) (city's public safety headquarters); <u>United States v. Norris</u>, 428 F.3d 907, 912-13 (9th Cir. 2005) (police station); <u>United States v. Antone</u>, 412 Fed. App'x 10, 11 (9th Cir. 2011) (police station); <u>United States v. Ambrose</u>, 668 F.3d 943, 956-60 (7th Cir. 2012) (FBI office); <u>United States v. Muegge</u>, 225 F.3d 1267, 1271 (11th Cir. 2000) (Air Force Office of Special Investigations building).

[7]     All of the other "progeny" cases cited in support of this argument were decided <u>before</u> <u>FNU LNU</u> and, in any event, involved questioning during the customs and immigration process where the defendant, unlike Aguilar, was not free to leave (nor, obviously, told that he or she was free to leave).  In fact, the <u>FNU LNU</u> court specifically abrogated two of the cases Aguilar relies upon, <u>Silva</u> and <u>United States v. Moody</u>, 649 F.2d 124 (2d Cir. 1981).  <u>See</u> <u>FNU LNU</u>, 653 F.3d at 151 ("To the extent that <u>Silva</u> and <u>Moody</u> rely on the officer's subjective motives for the interrogation (including the uncommunicated existence of probable cause or intent to arrest) in determining whether the interaction qualifies as custodial, we agree with the defendant that [the Supreme Court] abrogate[d] them.").

about a per se rule for interviews on non-border-entry-related matters.  After observing that "the likelihood that a reasonable person being questioned by CBP officers on a jet way would consider himself or herself under arrest is diminished, but of course still possible," the district court explained that "[t]he Court must view the totality of the circumstances . . . ."  151 F. Supp. 3d 297, 305 (E.D.N.Y. 2015).  In United States v. Oladokun, No. 15-cr-559 (BMC), 2016 WL 4033166, at *2 (E.D.N.Y. July 27, 2016), the district court also considered all the circumstances surrounding the defendant's questioning by CBP (including, but not limited to the nature of the officer's questions), and ultimately denied the defendant's motion to suppress.  Like FNU LNU, these cases both stand for the simple and established proposition that, in deciding custody for Miranda purposes, the Court must look to all the circumstances surrounding the questioning and not just the location or the nature of the agents' questions.[8]

Accordingly, the central premise of Aguilar's argument in support of suppression here—that "when an interrogation at the border exceeds the tight bounds of a 'routine' border-crossing inquiry, the suspect must be given Miranda warnings" (DE 97 at 22)—is without legal

---

[8]     Moreover, these cases, like FNU LNU and the other cases that Aguilar cites for this argument, have no applicability to this case because, unlike Aguilar here, the defendants in those cases had not cleared customs and were not actually free to leave. (DE 73 at 13-14).  In Djibo, the defendant was an outbound traveler, but was asked to execute an inbound passenger customs declaration form, 151 F. Supp. 3d at 299.   An HSI agent stood "two to three feet" from the defendant while two customs officers inspected his bags for illegal currency and questioned him at the inspection area after the CBP officers found cellular phones in his luggage.  Id.  In Oladokun, a case in which the defendant's suppression motion was denied, the defendant was interviewed by a CBP officer in a private room regarding his visa, 2016 WL 4033166, at *1.  In denying the motion, the court noted that the uniformed officer did not draw his weapon and no restraints were used.  Id. at *3-4.  Here, Aguilar concedes he was informed by CBP that his border screening was complete and his passport and green card were returned before he was approached by Special Agent Zukas.  (DE 66-2 at ¶ 8).

support and is inconsistent with the establish legal framework.  Thus, his argument on that premise must fail.

III.    THE INTERVIEWING AGENTS' REASONS FOR CONDUCTING THE INTERVIEW AT THE AIRPORT ARE NOT RELEVANT

Aguilar acknowledges that the agents' "motivations are irrelevant to Miranda's custody inquiry."  (DE 97 at 3).  Nonetheless, he spends several pages of his post-hearing brief arguing that the agents had an improper motivation in deciding to conduct the interview at the airport.  (Id. at 13-19).  As set forth below, not only are the agents' motivations irrelevant as a matter of law, the record also demonstrates that the agents had a number of entirely proper reasons to interview Aguilar at the airport, including safety and security.

A.    The Subjective Views of The Agents Are Irrelevant

Aguilar's position on the relevance of the agents' subjective views has shifted throughout this proceeding (and even throughout his post-hearing brief).[9]  Whatever Aguilar's position today, however, the law on the relevance of this information is clear.  "[T]he determination of custody depends on the objective circumstances of the interrogation, not on the subjective views

_____

[9]    In his motion to compel discovery (DE 78), where he sought several broad categories of documents related to the government's investigation of this case, Aguilar took the position that the agents' subjective views were relevant to the question of Miranda custody (DE 78).  The government disagreed and opposed the motion to compel but agreed to produce to Aguilar much of what he was seeking anyway, as part of the government's production pursuant to 18 U.S.C. § 3500.  The Court withheld ruling on the relevance of this material in its Order denying Aguilar's motion to compel.  (DE 84 at 2).

At the suppression hearing, likewise, Aguilar dedicated hours of cross-examination to his theory about why the interview was conducted at the airport.  Ultimately, as discussed further below, the agents consistently and repeatedly denied they chose to interview Aguilar at the airport because of any supposed coercive characteristics.

In his post-hearing brief, Aguilar argues that the agents' subjective believes are both irrelevant (DE 97 at 3) and relevant (DE 97 at 13-19).

harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994); United States v. Galloway, 316 F.3d 624, 629 (6th Cir. 2003); Florida v. Bostick, 501 U.S. 429, 438 (1991); United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996). In this case, those circumstances include: the agents telling Aguilar that he was free to leave; the location and atmosphere of the interrogation; the language and tone used by the agents; the fact that Aguilar was not searched, frisked, or restrained; the 90-minute length of the interrogation; and the fact that the agents' weapons were never drawn. See FNU LNU, 654 F.3d at 151. They do not include: why the agents conducted the interview at the airport rather than a Starbucks; why Special Agents Zukas and Wood (who live in Houston) were asked to conduct the interview; why Special Agent Wood asked the questions while Special Agent Zukas took notes; why Special Agent Wood once applied to be an FBI agent; why Aguilar was permitted to leave the country; why the agents did not tape-record the interview; the purported safety of Aguilar's neighborhood; or any of the many other irrelevant lines of inquiry on which Aguilar relies.

In short, the Court's custody inquiry should focus only on the events that took place between the time Aguilar arrived at the airport on the morning of July 10, 2020, and when he left approximately two hours later on his own initiative.

B.   Aguilar's Unsupported Theories About the Events Leading Up to the Interview

Although the government's internal decision-making process leading up to the interview is irrelevant, close scrutiny of Aguilar's claims demonstrates that he repeatedly misrepresents the record regarding this process. A few non-exhaustive examples include:

- Why Special Agents Zukas and Wood Conducted the Interview. Aguilar claims that Special Agent Wood was "parachuted" into the interview and that Special Agent Zukas was assigned the task of "scribe" merely to "take maximum advantage of the setting's

coerciveness." (DE 97 at 14, 20). The undisputed record points to a much simpler explanation: Special Agent Zukas and Special Agent Wood were asked to conduct the interview because they lived in Houston and because the case agent was not allowed to travel at that time due to COVID-19-related restrictions. (Tr. 11:2-9, 47:21-24, 48:9-22, 49:24-50:6, 232:24-25).

Without testimony to support his position, Aguilar asks the Court to speculate as to why the case agent could not travel to Houston instead of relying on local counterparts. But the mere fact that the FBI and HSI did not have formal written polices prohibiting travel at that time (that Special Agents Zukas and Wood were aware of), or that they did not memorialize in an email the reason why they were asked to assist with the interview, does not mean the government's decision was driven by a desire to create a certain interview environment. Nor is there anything to infer from the Department of Justice "for some reason" working with Special Agent Wood on other investigations. The Department's Foreign Corrupt Practice Act ("FCPA") unit was part of the investigative team and, as Special Agent Wood testified, he was on detail to the FCPA unit at that time. (Tr. 232:23-25).

- **Why the Interview Was Conducted at the Airport**. Aguilar goes to great lengths to cast doubt on the agents' reasons for conducting the interview at the airport. For starters, both Special Agent Zukas and Special Agent Wood testified that officer safety was a significant reason for conducting the interview at the airport. (Tr. 11:21-12:12; 233:25-234:2). As Special Agent Zukas testified:

> [K]nowing that [Aguilar] was going to be getting off a plane, the safety measures were probably going to be at their highest for us because you're not allowed to travel, obviously, with a firearm unless you are a law enforcement officer. So there's always a risk involved when you're going to somebody's house and you interview them on their soil . . . .

(Tr. 12:4-10).

11

Special Agent Wood similarly testified that he prefers the airport because "it's a sterile environment . . . It's controlled." (Tr. 234:1). When asked to clarify what he meant by those terms, Special Agent Wood testified as follows:

> Q: When you say a sterile environment, what do you mean by that?
>
> A: All travelers have gone through security so we know that no one has a weapon, everyone has been screened before boarding the aircraft. . . .
>
> Q: You use the word control, what do you mean by that?
>
> A: An environment where people stay in a particular area. So when you arrive at an airport you stay within a terminal the terminal itself is controlled. Once you exit the terminal you have to go through security to reenter. As long as you're in the terminal, it's a sterile, controlled environment.

(Tr. 234:5-17).[10]

According to Aguilar, however, this testimony cannot be credited because he lives in a safe, suburban neighborhood, and because he was not a flight risk. (DE 97 at 13, 26). Even assuming these facts are true, they do not undercut the rationale for conducting the interview at the airport. As the testimony at the hearing made clear, entering a subject's home always carries potential risks, regardless of how safe the neighborhood is. Special Agent Zukas specifically responded to this point on cross-examination: "just because a neighborhood appears not to be dangerous from an outward perception does not implicitly say the neighborhood is safe or I have to take less precautions." (Tr. 45:8-11). Moreover, the fact that the agents let him leave the country has nothing to do with officer safety.

---

[10]     Aguilar conveniently fails to mention Agent Wood's explanation of these terms in his post-hearing memorandum.

In addition, Aguilar's claims as to how COVID-19 affected the agents' decision to conduct the interview at the airport is equally unpersuasive. On direct examination, Special Agent Zukas gave two primary explanations for the decision to interview Aguilar at the airport. The first reason, as noted above, was officer safety. The second reason related to COVID-19. (Tr. 12:13-23). On cross-examination, however, defense counsel conflated these reasons and asked Special Agent Zukas to specify, "just as it pertains to COVID-19," why he believed an airport would be a safer place. (Tr. 84:2-13). With guidance from the Court on what counsel meant by this question, Special Agent Zukas responded that, as it related to COVID-19, he believed that interviewing Aguilar at the airport was safer for that reason as well. (Tr. 84:2-24). He added, "it's in my opinion safer, <u>one of</u> the reasons it's safer to do it there, than at the house." (Tr. 85:19-20 (emphasis added)).

Furthermore, Aguilar ignores Special Agent Wood's testimony on this subject, where he explained that COVID-19 factored into his decision because it might affect whether Aguilar would be willing to let the agents in his home for an interview. In response to a question from the Court, he explained:

> So every time we conduct an interview, including this particular interview, the safety of the agents and the interviewee is the first concern. So at this time, however, there were other factors that we took into consideration, such as COVID. <u>And I specifically remember, before this interview took place in my mind, we considered whether or not Mr. Aguilar's family would want us in his residence</u>. So, for example, we had people come to our house during the height of COVID, plumbers, electricians; we weren't comfortable with that. I didn't want them in the house. <u>I didn't want to force myself on someone else that way</u>.

(Tr. 270:10-20 (emphasis added)).

Finally, both Special Agent Zukas and Special Agent Wood testified that there were also practical reasons why they chose to interview Aguilar at the airport, including that the agents

knew exactly where he would be at a particular time.  (Tr. 11:24-12:2, 234:2-4).  Aguilar ignores this testimony as well.

In short, even if the Court were to consider the Special Agents Zukas's and Wood's subjective reasons for conducting the interview at the airport, the record does not support Aguilar's speculative theory that the agents were seeking improperly to capitalize on the purportedly coercive nature of the airport.  Nevertheless, even if the interviewing agents did consider such a strategy, which they did not, there is no basis to suggest that it was somehow communicated to Aguilar such that it had an objective effect on the circumstances of the interview.

IV.  THE FACT THAT MULTIPLE AGENTS CONVEYED TO AGUILAR THAT HE WAS FREE TO LEAVE WEIGHS HEAVILY IN SUPPORT OF THE CONCLUSION THAT AGUILAR WAS NOT IN CUSTODY FOR PURPOSES OF *MIRANDA*

Aguilar concedes that CBP told him that his border screening was complete, and both interviewing agents offered unrebutted testimony that they told Aguilar that the interview was voluntary.  These facts should weigh heavily in the Court's analysis—not just because of the words themselves, or the fact that they were recited, but also because such statements necessarily influence how a reasonable person would perceive the overall circumstances of the interview.

Contrary to Aguilar's claim (DE 97 at 43-44), the government has never argued that the agents' admonitions regarding voluntariness, standing alone, are sufficient reason to find that Aguilar's interview was non-custodial.  But such statements are an important, if not the most important, factor in a Miranda custody analysis.  United States v. Newton, 369 F.3d 659, 677 (2d Cir. 2004) (telling a defendant he is not under arrest is a "significant factor" in assessing the degree to which one is at the mercy of the authorities);[11] United States v. Brown, 441 F.3d 1330, 1347

---

[11]  In Newton, the Second Circuit found that defendant's interrogation to be custodial notwithstanding the fact that he was told he was not under arrest, but based that decision on the

(11th Cir. 2006) (describing statements that a subject is free to leave as the "most important" factor, explaining that "[u]nambiguously advising a defendant that he is free to leave and is not in custody is a powerful factor in the mix, and generally will lead to the conclusion that the defendant is <u>not</u> in custody absent a finding of restraints that are 'so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'"); <u>United States v. Czichray</u>, 378 F.3d 822 (8th Cir. 2004) ("[A]bundant advice of freedom to terminate the encounter should not be treated merely as one equal factor in a multi-factor balancing test."); <u>United States v. Swanson</u>, 341 F.3d 524, 530 (6th Cir. 2003) ("Most important to our analysis, though, is that Swanson was explicitly told by [the officer] that he was not under arrest and that he did not have to speak with him if he did not choose to.  Swanson readily acquiesced, and seemed very cooperative and willing to talk.") (collecting cases).

Here, the record before the Court conclusively establishes that three different federal officers, on three separate occasions, made clear to Aguilar that he was free to leave.  A reasonable traveler under similar circumstances would have understood these statements, individually and collectively, to mean that he or she could have simply said "no" to the interview and left the airport without incident.[12]  Indeed, that is what Aguilar himself understood: when he

---

fact that the defendant was handcuffed. 369 F.3d at 676.  The Second Circuit explained that "[T]elling a suspect that he is not under arrest does not carry the same weight in determining custody when he is in handcuffs as when he is unrestrained." <u>Id</u>.

[12]     Aguilar argues that, regardless of what the officers told him, a reasonable traveler in his situation would have still believed he was not free to leave because he was approached in the customs "area."  (DE 97 at 18).  His support for that argument, a pair of cases from the Ninth Circuit and the Eastern District of Arkansas, is misplaced.  The language he quotes from <u>United States v. Lobera-Valdovinos</u>, an illegal reentry case, comes from the district court's instructions to the jury, which the Ninth Circuit and both parties agreed were erroneous.  429 F.3d 927, 929 (9th Cir. 2005).  In <u>United States v. Brooks</u>, the defendant was first questioned by a police officer while he was still in his secondary screening and while CBP still had possession of his bag and

no longer wanted to answer questions without the assistance of a lawyer, he said so and left.  Cf. United States v. Ramsey, No. 21-CR-495 (ARR), 2022 WL 539197, at * 4 (E.D.N.Y. February 23, 2022) ("Indeed, the interview ultimately ended because Ms. Ramsey told the agents that she was done answering their questions.").

The first relevant statement was from the CBP officer who, after completing Aguilar's secondary inspection, told Aguilar that his "border screening was complete" and returned his passport and green card.  (DE 66-2 at ¶ 8; Tr. 240:14-17).

The second relevant statement was from Special Agent Zukas, who approached Aguilar after he finished the immigration and customs process and asked Aguilar whether he would be willing to speak with him voluntarily.  (Tr. 16:24-17:10).

The third relevant statement was from Special Agent Wood, who testified that the first thing he said to Aguilar before he began the interview was that Aguilar had "cleared customs and immigration," that he was "free to leave at any time," and that the agents "would appreciate it if he would voluntarily answer some questions."  (Tr. 251:24-252:3).  Special Agent Wood further stated that he makes such disclosures "100 percent of the time" before witness interviews because he "want[s] the person to understand that they are free to leave."  (Tr. 252:4-10).[13]

---

$112,230 in cash.  2019 WL 13157352, *2 (E.D. Ark. June 17, 2019).  The court in Brooks was merely observing that a reasonable person would likely not feel free to leave if the officers were still in possession of their belongings.  In contrast, here, Aguilar's travel documents and bags were returned to him prior to the interview.

[13]    Aguilar cites no authority for his argument that the government must prove that a reasonable traveler in his shoes actually heard the agents state that he was free to leave, that he actually understood them, and that he knowingly agreed to submit to their questioning.  All of the relevant cases describing this factor state that only courts must consider whether the agents "told" the suspect he was free to leave.  See, e.g. FNU LNU, 654 F.3d at 151.  Likewise, Aguilar's claim that his lack of English proficiency supports a finding of custody (DE 97 at 37) is unfounded.  The only evidence of Aguilar's supposed difficulty understanding "complex concepts verbally in

Aguilar's declaration, which was not subject to cross-examination, does not refute any of these facts.  It merely says he "do[es] not recall" being told by Special Agent Zukas or Special Agent Wood that the interview was "voluntary or that [he] could stop the questioning." (DE 66-2 ¶ 31).  Aguilar nonetheless asks the Court to disbelieve the testimony of two experienced federal officers by baselessly attacking the agents' credibility.  We address several of those attacks in turn.

- "Agent Zukas's notes . . . never mention . . . voluntariness."  (DE 97 at 39). For starters, as Special Agent Zukas explained, his notes do not reflect every single word that was stated in the interview, and they were never intended to.  (Tr. 172:4-14, 210:11-20).  One of the reasons for that is the pace of natural conversation.  (Tr. 210:24).  Another reason is that, unlike the formal report of the interview, Special Agent Zukas's notes were for himself, not for others. (Tr. 170:11-17, 190:20-24).  Regardless, the first entry in Special Agent Zukas's notes is Aguilar's statement that, "I need to know what this is about."  (DX-F at 1).  As Special Agent Zukas testified at the hearing, Aguilar asked what the interview was about when they first entered the room.  (Tr. 104:5-8).  In other words, Special Agent Zukas began taking notes at some point after they entered the room.  It is therefore not surprising that his brief interaction with Aguilar, which took place before they entered the room, is not reflected in his notes.

- "The 302 . . . does insert this statement—but its integrity is deeply suspect at best."  (DE 97 at 39).  Special Agent Zukas's report contains an "Agent Note" that states that he

_____

English" is found in his declaration (written in English, untranslated), (DE 66-2 ¶ 23), which is belied by the agents' testimony, the fact that he has a PhD from a university in England, he resides in Houston, Texas, and he worked for a Swiss company in the United States and the United Kingdom for over a decade.

asked Aguilar "if he would voluntarily be willing to answer some questions in an adjacent room," to which Aguilar responded that he would.  (DX-D at 1).  Aguilar argues that the report cannot be credited because, among other reasons, a draft of the report was shared with the case agent, FBI Special Agent James Kelley.[14]  (DE 97 at 39).  Aguilar cannot explain why the simple act of sharing the draft report with the case agent working on the investigation somehow makes a final report less credible.  It is thus unsurprising that the case Aguilar cites for this argument concluded that the defendant "offered [the court] no evidence or argument that would indicate any impropriety in this case." United States v. Torres-Galindo, 206 F.3d 136, 144 (1st Cir. 2000).  Nor does Aguilar.  As to his baseless claim that Special Agent Kelley had "every incentive to suggest edits that would protect Mr. Aguilar's alleged statements from judicial scrutiny" (DE 97 at 39), Special Agent Zukas made clear at the hearing that Special Agent Kelley did not ask him to make any changes to the report.  (Tr. 186:20).  Also, those very few changes that Special Agent Zukas himself made to his report (changing "advised" to "stated" and "volunteered" to "offered") were completely mundane.  (Tr. 187:8-17).[15]

_____

[14]     Aguilar also makes the dubious argument that the report is not reliable because it was not completed in accordance with so-called 5-day "rule," which Agent Zukas noted was not even a "hard-line rule."  (Tr. 174-3).  Even assuming Special Agent Zukas took 19 days to prepare the 302, which he did not (the document itself indicates he began working on the draft four days after the interview, on July 14, 2020) (DX-D at 1), this fact would not cast any doubt on the veracity of Special Agent Zukas's statement that Aguilar was informed the interview was voluntary.

[15]     Aguilar's claim that the "government declined to make Special Agent Kelley available to testify" is simply not accurate.  (DE 97 at 17).  On November 4, 2021, counsel for Aguilar asked the government to advise Special Agent Kelley that he "may be called as a witness" and to "plan accordingly."  The government objected to Special Agent Kelley being called as a witness at a hearing focused entirely on the circumstances of an interview for which he was not present and requested that Aguilar reconsider his position.  On December 2, 2021, still unclear as to whether, after reconsideration, Aguilar intended to call Special Agent Kelley at the hearing, the government provided defense counsel with the relevant FBI contact information so that Aguilar could comply with relevant regulations consistent with United States ex rel. Touhy v. Ragen, 340

- The "Agent Note . . . uses different indentation and cadence from the rest of the 302" and does not mention which agent told Aguilar he was free to stop the interview. (DE 97 at 40). Aguilar offers no support for the notion that "indentation and cadence" bear on the reliability of a particular portion of the final report. Regardless, Special Agent Zukas explained that he used the Agent Note to differentiate it from the substance of the questioning and, further, that what is reflected in the Agent Note is "exactly what happened." (Tr. 201:214-217, 203:8).

- "Human recollection does not work this way." (DE 97 at 41). As discussed above, the fact that Special Agent Zukas's notes do not mention voluntariness is irrelevant. So too are any supposed inconsistences between the words that Special Agent Zukas used in his report and the words used by the government in its brief. The government's brief in opposition to Aguilar's motion is not evidence, and Special Agent Zukas's final report is consistent with, and corroborates, his and Special Agent Wood's testimony. (Compare DX-D at 1 ("AGUILAR was told that he was free to stop the interview at any time and leave on his own accord") with Tr. 23:18-22 ("[W]e had told him that he was free to leave at any point in the interview, that the interview was voluntary and if he didn't want to do it or wanted to terminate the interview, he was free to leave and we even pointed to the door."), 350:8-10 ("Q: Do you have a clear memory of telling him that he was free to leave?  A: Yes.")).

---

U.S. 462 (1951) ("Touhy").  This exchange was memorialized in a December 6, 2021 letter to defense counsel.  (DE 78-2, Ex. B, at 4).  That same day, defense counsel informed the government that it would not subpoena Special Agent Kelley on account of his international travel schedule, which by-then conflicted with the hearing then scheduled for January 11, 2022, but without prejudice to the defense seeking a continuance of the hearing if necessary.  As the Court is aware, due to a rise in COVID cases, the hearing was rescheduled from January 11, 2022 to March 1, 2022.  Aguilar never submitted a Touhy request to secure Special Agent Kelley's testimony or sought a continuance of the hearing on that basis.

- "[T]he agents simply could not get on the same page . . . .  Neither agent could remember the 'precise words' they told Mr. Aguilar" at the outset of their encounter."  (DE 97 at 41).  As Aguilar emphasizes, and as discussed further above, there are no magic words that make an interview non-custodial.  What matters is that a reasonable person in Aguilar's position would have understood he was free to leave.  Despite different recollections of the precise words used or when in the interview certain questions were asked or statements made, Special Agent Zukas's report and both agents' testimony were consistent: Aguilar was told the interview was voluntary and that he was free to leave at any time.  (DX-D at 1; Tr. 17:3-10, 23:18-22, 26:20, 184:19-20, 211:15, 219:3, 251:25-252:3, 350:10).  Moreover, such slight differences should be expected in truthful testimony, and, indeed, are "a hallmark of truth."  United States v. Deloach, 530 F.2d 990, 997 (D.C. Cir. 1975).

- "[T]he agents had every motive to ensure that Mr. Aguilar did not walk away from them."  (DE 97 at 42).  Here again, Aguilar speculates that the agents wanted Aguilar to believe he was in custody because, somehow, such an environment would make it more likely that the government could "flip" Aguilar and have him cooperate against others.  This argument, however, is factually unsupported by the evidence in this case.  Both agents testified to having precisely the opposite motive.  For example, both agents testified that they left the door open so Aguilar would feel that he was free to leave.  (Tr. 23:24-25 ("[W]e like to leave the door either open or cracked open so that they understand they are free to leave even after we say it."), 247:13-14 ("We wanted Mr. Aguilar to feel he was free to leave at any time.")).  Likewise, Special Agent Wood testified that he and Special Agent Zukas deliberately chose the largest room available for the interview for this same reason.  (Tr. 236:18-21).  There is simply no factual support for

Aguilar's speculation that the government believed it was in its interest to interview Aguilar in a coercive environment.

V.    THE REMAINING OBJECTIVE CIRCUMSTANCES OF AGUILAR'S INTERVIEW FURTHER SUPPORT THE CONCLUSION THAT AGUILAR WAS NOT IN CUSTODY FOR PURPOSES OF *MIRANDA*

Before the Court is an extensive record: two days of testimony from the interviewing agents; early and final drafts of the relevant report of the interview; Special Agent Zukas's contemporaneous notes; photographs of the room where the interview took place, including the chairs where Aguilar and the agents sat;[16] and the general measurements of the room. This record leaves no room for guesswork or misrepresentation, yet that is exactly what Aguilar does with respect to nearly every aspect of the interview.  We address several but not all of those instances below.

- The door was only "cracked open."  Aguilar repeatedly emphasizes in his brief that the door to the interview room was only "cracked open."  (DE 97 at 36 (emphasis in original)).  This quote is an obvious mischaracterization of Special Agent Zukas's testimony and ignores the fact that Special Agent Zukas wasn't even talking about the door in question.  Special Agent Zukas's full testimony on the subject is below:

> Because we had told him that he was free to leave at any point in the interview, that the interview was voluntary and if he didn't want to do it or wanted to terminate the interview, he was free to leave and we even pointed to the door.
>
> And in addition to this, it's - - we usually do this when we interview people [sic] that is voluntary in nature; we like to leave the door

---

[16]    The government had no obligation to create potential evidence by taking photos of the chairs and room, but agreed to do so at the defense's request and as an aid to the Court.  This fact alone, which Aguilar is well aware of, belies his claim that the government "deliberate[ly] attempted to downplay" the nature of the interview.  (DE 97 at 60).

> either open or cracked open so that they understand they are free to
> leave even after we say it.

(Tr. 23:18-24:1 (emphasis added)).  Special Agent Wood similarly testified:

> Q:  In this photo [GX-1E], that door is open.  Was that door open or
> closed during the interview?
>
> A.  Open.
>
> Q.  The whole time?
>
> A.  Yes.
>
> Q.  Was there any reason for that?
>
> A.  We wanted Mr. Aguilar to feel he was free to leave at any time.

(Tr. 247:7-14.)[17]

In short, the unambiguous testimony presented at the hearing was that the door

was open, and that the agents left it open for the express purpose of making Aguilar aware that

he was free to leave.[18]

The Alleged Handcuffs.  In his declaration, Aguilar stated that "[t]he chair had

handcuffs attached to it.  One handcuff connected the arm of the chair to the table, and the other

---

[17]    In his declaration, Aguilar also claimed that he observed two CBP officers standing
outside the "cracked" open door, blocking any exit.  (DE 66-2 at ¶ 14).  The agents denied that
anyone was blocking Aguilar from leaving the room.  (Tr. 23:14, 36:11, 256:14).  In addition,
Aguilar's assertion that Special Agent Zukas had "no reason to doubt" that Aguilar saw CBP
officers "standing in and around" is only half true.  (See DE 97 at 36).  What Agent Zukas said in
full was "I have no reason to doubt it and I also don't have any reason to expect that's the case."
(Tr. 138:18-19).  In other words, Agent Zukas testified only that he cannot speak to what Aguilar
saw or what he did not.  Because Aguilar did not testify, the Court cannot make this determination
either.

[18]    Courts have also found interviews non-custodial where the door is closed but
unlocked.  United States v. Ramsey, 2022 WL 539197, at *4 (E.D.N.Y. Feb. 23, 2022) ("While
the door was closed, [the agent] credibly testified that it was for privacy purposes and that this
purpose was explained to Ms. Ramsey.").

handcuff dangled from the arm of the chair." (DE 66-2 ¶ 13). However, the photo of the chair obtained by the government shows that the chair was attached to the table by a chain, not handcuffs. (GX-1A). Rather than ending the matter there, Aguilar argues that the contents of the room must have changed because, "evidently," the handcuffs were removed between July 2020 and today. (DE 97). He also contends that a miniscule hole on one arm of the chair could have received attachments for handcuffs (never mind the obvious fact that the easiest way to attach handcuffs to the chair would have been to attach handcuffs around the arm of the chair). (DE 97 at 48).

There is no need to engage in baseless speculation. The photo speaks for itself in that it shows that the chair is attached to the table by a chain, and the agents testified that the only handcuffs in the room that day were those of Special Agent Zukas and they were concealed underneath his suit jacket. (Tr. 14-16, 36:20; 244:12-13). Special Agent Wood did not even bring his handcuffs with him that day. (Tr. 244:8).

- Posters. In his post-hearing memorandum, Aguilar argues that the two photos shown in the photographs, which read "keep detention safe" and relate to sexual abuse, are relevant to whether a reasonable person would have felt free to leave. (DE 97 at 29).[19] Yet, Aguilar made no mention of any posters in his declaration—or, for that matter, anything in the room except for the alleged handcuffs. (DE 66-2). Nor is there any mention of posters in Aguilar's pre-hearing briefs. (DE 66-1; DE 76). Indeed, the first mention of any poster at all was during cross-examination of Special Agent Zukas, who then testified "I don't know if that poster was in

---

[19]    Aguilar misleadingly states in his brief, on multiple occasions, that the posters "advise[d] travelers that they were in government detention." See, e.g., (DE 97 at 4).

that room at that time.  I have no idea." (Tr. 135:21).  Special Agent Wood similarly testified that he did not recall ever seeing the poster other than when it was showed to him in the courtroom. (Tr. 315:22-25).  Finally, even in Aguilar's post-hearing brief he is careful to state that he "would" notice posters in the room, not that he actually did notice them, or that they were even in the room during his interview.  (DE 98 at 29).  In short, there is no evidence whatsoever that any posters, much less the posters shown in the December 2021 photos, were in the room on July 10, 2020.

- _The Size and Location of the Room_.  At Aguilar's request, the government took the measurements of the room (14.5 feet by 16 feet).  (DX-W).  The government also produced a schematic of the general area of where Special Agent Zukas met Aguilar, and where the interview occurred.[20]  (DX-H).  These records, combined with the agents' testimony, conclusively refute Aguilar's description of a "small," "cramped" space next to "jail cells."  (DE 97 at 39, 48).  As explained by Special Agent Wood, and as the schematic shows, the room was actually a "large" room—large enough for two desks, multiple chairs and plenty of additional open space.  (Tr. 236:18; GX-1D).  When asked why he chose that room in particular, Special Agent Wood testified: "It's the largest room that I am aware of that we can use to conduct interviews."  (Tr. 236:18-19). Moreover, the adjacent room was not a "jail cell," but an "interview" room.  (See DX-H (labeling the room "interview")), and while there were also "hold rooms" down the hall (see DX-H), Aguilar never went down that hall.  (Tr. 245:22).  When asked why he didn't conduct the interview in those rooms, Special Agent Wood stated: "I don't want the person to be – to feel like they're held there and not allowed to leave."  (Tr. 349:14-16).

---

[20]    The date of the schematic is unknown.

- The Agents' "Tone and Hostility."  Aguilar's supposedly "common sense" argument that the agents' tone and the overall hostility of the interview triggered Miranda is pure speculation.  (DE 97 at 45-46).  The thrust of this argument is that the Court should infer from Special Agent Zukas's use of exclamation points in his interview notes that he was memorializing "exclaimed statements" from Aguilar—statements that Aguilar surmises were "likely" in response to "aggressive questioning" by the agents.  (Id.).  Special Agent Zukas (and even Special Agent Wood) was cross-examined about his use of exclamation points at length, and that questioning made plain that Aguilar's assertions are incorrect.   (Tr. 158:22-167:13, 326:15-328:8).  Meanwhile, Special Agents Zukas and Wood both testified that their tone remained professional, and that they did not yell or shout.  (Tr. 30:23-31:7, 36:21-22, 254:15-17).  Also, because they both testified, the Court was itself able to assess their tone and manner of speaking.  There is simply no need to rely on Special Agent Zukas's choice of punctuation to decide custody in this case.

- The Agents' Alleged Belief of Guilt.  As noted above, Aguilar argues that the agents' subjective intent is irrelevant for some purposes (when their intent is not helpful to his argument), but relevant to others (when he believes their intent it is helpful to his argument).  One area where Aguilar believes that the agents' subjective intent is relevant is in relation to whether a reasonable person would have felt free to leave.  (DE 97 at 31-33, 45).

In general, a questioning officer's subjective motives are not relevant to determining whether an interrogation was custodial.  Stansbury, 511 U.S. at 323-326.  See also California v. Beheler, 463 U.S. 1121, 1122-23 (1983) ("But we have explicitly recognized that Miranda warnings are not required 'simply because . . . the questioned person is one whom the police suspect.").  Indeed, "[e]ven a clear statement from an officer that the person under

interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." Stansbury, 511 U.S. at 325; see also United States v. Melo, 954. F.3d 334, 342-342 (1st Cir. 2020) (affirming denial of a suppression motion where the agents told the defendant he was a "target" and testified that whether or not they were going to arrest the defendant depended upon his cooperation; "both agents were unequivocal in stating they did not convey an intention to arrest [the defendant] if he failed to cooperate."). The one very limited exception to this rule is where the officer's knowledge or beliefs were conveyed "by word or deed" to the individual being questioned. Stansbury, 511 U.S. at 325. That rare exception does not apply here, however, and the Court should reject Aguilar's backdoor attempt to bring in the government's unfiled, draft complaint into its custody analysis.

The following facts were established at the hearing and are unrebutted in Aguilar's declaration: the agents never told Aguilar he was under arrest (Tr. 37:14-16; 254:20-22); the agents never threatened Aguilar with arrest (Tr. 254:23-24); Aguilar never asked if he was under arrest (Tr. 37:17-18, 257:14-15); and the agents did not tell Aguilar that he had been charged with a crime (Tr. 37:11-13, 257:12-13). In addition, despite all of Aguilar's arguments related to the draft complaint, there is nothing in the record indicating that the agents ever mentioned the draft complaint during the interview or even that they brought the draft into the interview room, much less showed it to Aguilar, read portions of it to him or otherwise made him aware of it. As Aguilar's own declaration makes clear, the agents merely asked him questions that related to alleged criminal conduct, including, necessarily, whether he participated in that conduct. This fact, in addition to the agents expressly telling him that he was free to leave and end the interview (which he eventually did) makes the agents' subjective beliefs irrelevant to the question of Miranda custody.

## VI.   THE INTERVIEWING AGENTS IMMEDIATELY HONORED AGUILAR'S REQUEST TO CONSULT WITH AN ATTORNEY

Aguilar concedes—or at least does not dispute—that he had a Fifth Amendment right to counsel only if he was in custody.  (See DE 97, at 54 (stating that a defendant has right to counsel "[w]hen . . . interrogated in custody")).  Because Aguilar was not in custody, the Court should reject his argument that the government infringed his right to counsel.

But even if Aguilar had been in custody, the Court should still reject Aguilar's argument.  Both agents testified that they ceased questioning Aguilar as soon as he expressed a desire to speak with a lawyer.  (Tr. 31:19-33:5, 34:8-11, 255:10-19).  Early in the interview, Aguilar referred to other Vitol employees having counsel (Tr. 253:4-9), but that was in no way an "unambiguous or unequivocal request for counsel."  Davis v. United States, 512 U.S. 452, 462 (1994).  Indeed, Aguilar himself told the agents that "he did not" have counsel.  (Tr. 253:9; Tr. 33:20-24 ("he mentioned that . . . there were people . . . being looked at and they had attorneys, but he had nothing to do with that.")).  Nor does the fact that Aguilar's employer had counsel (if Aguilar even mentioned it) matter.  First, Aguilar's employer's counsel represented Aguilar's employer, not Aguilar.  And, in any event, "where a defendant merely references a lawyer . . . , the law does not require agents to stop their questioning."  United States v. Figaro, 2021 WL 4949218, at *7 (S.D.N.Y. Oct. 25, 2021).

Aguilar's attempts to attack the agents' testimony on invocation lack merit.  The only contrary evidence, Aguilar's self-serving declaration, was not subject to cross examination and is therefore not "worth much."  United States v. Thompson, 2010 WL 3069668, at *5 (S.D.N.Y. July 29, 2010); United States v. Tunstall, 2021 WL 2666991, at *15 (E.D.N.Y. June 10, 2021), report and recommendation adopted, 2021 WL 2661162 (E.D.N.Y. June 29, 2021)

(declining to credit defendant's hearsay affidavit over federal agents' "'credible, detailed and live

testimony,' . . . which was subject to cross examination").

VII.    THE GOVERNMENT HAD NO OBLIGATION TO RECORD THE INTERVIEW

The agents' choice not to record the interview does not mean that the interview was

custodial.  As an initial matter, the agents were under no obligation to record the interview.  Under

agency policy, "[i]nterviews in non-custodial settings are excluded" from the presumption that

interviews be recorded.    U.S. Dep't of Just., Just. Manual § 9-13.001 (2018),

https://www.justice.gov/jm/jm-9-13000-obtaining-evidence#9-13.001; Dep't Homeland Sec.,

Management Directive 047-03, Policy Concerning Electronic Recording of Statements in Federal

Criminal Investigations,   2 (2016), https://www.dhs.gov/sites/default/files/publications/mgmt

/law-enforcement/mgmt-dir_047-03-policy-recording-statements-federal-criminal-

investigations.pdf, https://perma.cc/SE77-MQU5..  Instead, the relevant polices only create a

presumption that interviews "in a place of detention with suitable recording equipment, following

arrest but prior to initial appearance" be recorded.  U.S. Dep't of Just., Just. Manual § 9-13.001

(2018), https://www.justice.gov/jm/jm-9-13000-obtaining-evidence#9-13.001; Dep't Homeland

Sec.,  Management Directive 047-03, Policy Concerning Electronic Recording of Statements in

Federal Criminal Investigations,   2 (2016),https://www.dhs.gov/sites/default/files/publications/

mgmt/law-enforcement/mgmt-dir_047-03-policy-recording-statements-federal-criminal-

investigations.pdf, https://perma.cc/SE77-MQU5.  For these reasons, and as the government

previously advised defense counsel in writing, no applicable policy required the agents to record

the interview.  (DE 78-2, Ex. B, at 5 n.4).[21]

---

[21]    Moreover, the policies are "solely intended for internal [agency] guidance" and "may not be relied upon" by Aguilar "to create any rights or benefits (substantive or procedural)."

There are, moreover, plenty of good reasons for agents not to record a voluntary, consensual interview, including that recording may make interviewees feel as if the agents are collecting evidence against them or that they are under arrest, when they are not. Thus, there is no reason to draw any inference based on the agents' choice not to record the interview here.

Nor do the cases that Aguilar cites hold to the contrary. In fact, one of those cases held that the agents' decision not to a record a custodial interrogation was at most of "dubious relevance" to a suppression motion. United States v. Yunis, 859 F.2d 953, 960 (D.C. Cir. 1988). Another merely speculated that a practice of not recording may be "susceptible of abuse," before dismissing defendants' contentions that such abuse occurred because they (like Aguilar) had offered no evidence "that would indicate any impropriety in this case." United States v. Torres-Galindo, 206 F.3d 136, 144 (1st Cir. 2000). United States v. Solano, 966 F.3d 184 (2d Cir. 2020) did not involve a suppression hearing at all and, in any event, the agents in that case failed even to take written notes of the relevant interview, in addition to presenting other "serious credibility questions," id. at 198-200 (2d Cir. 2020). Finally, in United States v. Wright, 625 F.3d 583 (9th Cir. 2010), the Ninth Circuit merely observed that a district court was free to draw whatever interference it thought appropriate when there is no recording and that it "may also consider that the FBI has adopted a policy of not recording interviews." Id. at 604 n.10.[22]

---

Aguilar's attempts to rely on the policies ignore this admonition. The press releases on new or "pilot programs" that Aguilar invokes (DX-BB; DX-CC)—which were issued after Aguilar's interview—are irrelevant.

[22]   Attempting to relitigate his discovery disputes, Aguilar asserts that the government made "no effort" to inquire whether it could obtain a recording made by a camera that was apparently mounted on the ceiling of the room where the interview occurred (and which may not have included audio capabilities). (DE 97 at 53). But Aguilar does not show that government lawyers failed to inquire about the availability of footage from the camera. In fact, they did and advised him as much. (See, e.g., DE 78-2). Moreover, the government's obligation to produce materials extends only to materials in the possession of the prosecution team. See United States

In sum, there is no inference to be drawn one way or the other based on the fact that this interview was not recorded.

---

v. Chalmers, 410 F. Supp. 2d 278, 289 (S.D.N.Y. 2006); United States v. Loera, 2017 WL 2821546, at *7 (E.D.N.Y. June 29, 2017).

CONCLUSION

For the reasons set forth herein and in the government's prior submissions, the Court should deny the defendant's motion.

Dated:      Brooklyn, New York
            April 26, 2022

                                    Respectfully submitted,

                                    BREON PEACE
                                    UNITED STATES ATTORNEY
                                    Eastern District of New York

                          By:       _____/s/_____
                                    Jonathan P. Lax
                                    Assistant United States Attorney


                                    JOSEPH S. BEEMSTERBOER
                                    Acting Chief, Fraud Section
                                    Criminal Division, U.S. Dept. of Justice

                          By:       _____/s/_____
                                    Derek J. Ettinger
                                    Jonathan P. Robell
                                    Assistant Chiefs
                                    Clayton P. Solomon
                                    Trial Attorney


                                    DEBORAH L. CONNOR
                                    Chief, Money Laundering and Asset Recovery
                                      Section
                                    Criminal Division, U.S. Dept. of Justice

                          By:       _____/s/_____
                                    Adam Schwartz
                                    Deputy Chief, International Unit
                                    D. Hunter Smith
                                    Trial Attorney, International Unit