UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------ x
:
UNITED STATES OF AMERICA                                :
:
:                    MEMORANDUM & ORDER
-against-                                               :
:                    No. 20-cr-390 (ENV)
JAVIER AGUILAR,                                         :
:
Defendant.             :
:
------------------------------------------------------ x

VITALIANO, D.J.

On October 12, 2021, defendant Javier Aguilar filed a motion to suppress any and all

statements that he made to law enforcement officers on July 10, 2020, during an interview at

George Bush Intercontinental Airport in Houston, Texas.  Dkt. 66.  Thereafter, Aguilar was

charged in a two-count indictment accusing him of conspiring to violate the Foreign Corrupt

Practices Act, 15 U.S.C. §§ 78dd–1 *et seq*., a crime under 18 U.S.C. § 371, and conspiring to

commit money laundering, in violation of 18 U.S.C. § 1956(h).  Dkt. 13.

The suppression hearing was conducted in-person on March 1 and 2, 2022.  Now, having

considered the evidence of record and the briefing of the parties, Dkts. 66, 73, 76, 94–98, 102,

103, Aguilar's suppression motion is denied for the reasons stated below.

## The Facts[1]

At around 8:00 A.M. on July 10, 2020, Javier Aguilar, returning to his Houston home

from Mexico City, Mexico, arrived at Bush airport.  Dkt. 96 ("Gov't Post Hrg Mem.") at 2;

---

[1] Unless indicated otherwise either explicitly or by context, the facts recited here are found by
the Court to have been established, for purposes of this motion, by a preponderance of the
evidence.  *See United States v. Wyche*, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004).

Aguilar Aff. ¶ 3.  In the ordinary course of re-entry into the country, he submitted to both a
"primary inspection" and a "secondary inspection" conducted by Customs and Border Protection
("CBP") officers.[2]  Aguilar Aff. ¶ 1–8.  At the end of the secondary inspection conducted by
CBP, which Aguilar contends lasted 15 minutes, a CBP officer told him that the screening was
complete and returned his bag and travel documents to him.  Aguilar Aff. ¶ 8.  At this point,
Aguilar proceeded toward the exit of the customs screening area, but, before reaching the exit,
was approached by a man, dressed in a suit, who showed Aguilar his credentials as he identified
himself as Federal Bureau of Investigations ("FBI") Special Agent Paul Zukas.  Aguilar Aff.
¶ 10; Dkts. 95–96; Suppression Hearing Transcript ("Tr."), at 16:24–17:3.

As might be imagined, the parties have two different accounts of what happened next.
Aguilar declined to give his from the witness stand, offering it instead in an affidavit not subject
to cross examination.  As Aguilar tells it, when Special Agent Zukas first approached him, he
recognized him as one of the men he saw speaking with the uniformed CBP officers who would
later perform secondary screening on his re-entry.  Aguilar Aff. ¶¶ 9–10.  Aguilar claims that
immediately after identifying himself, Special Agent Zukas directed him to a room off the
walkway he had been on, where he says he met Special Agent Matthew Wood of the Department
of Homeland Security Investigations ("DHSI"), whom he recognized as the second man he saw
with Special Agent Zukas and the CBP officers.  Id. ¶ 11–12.   When he entered the room, he
says he observed a table and a chair fastened together by handcuffs.  Id. ¶ 13.  Special Agent
Wood, he claims, directed him to sit in the chair, and then, seated with Special Agent Zukas on

---

[2] Aguilar also recalls that he was met on the jet bridge by a CBP officer, who checked his
passport and directed him to passport control.  Aguilar Aff. ¶ 4.  This encounter is unconfirmed
by other evidence and the identity of that CBP officer remains unknown.

the other side of the table, questioned him in English about criminal, non-border-entry-related matters. *See id.* ¶¶ 13, 16.  According to Aguilar's affidavit, the agents referenced documents and information obtained via surveillance that they claimed incriminated him, and—when Aguilar remained silent in response to certain questions—became visibly angry and shouted at him, warning him that lying to federal agents was a crime in itself. *See id.* ¶¶ 16–25.  Upping the ante, Aguilar charges in his affidavit that Special Agents Zukas and Wood twice declined his requests to speak with a lawyer, urging Aguilar to instead cooperate with them, before finally, after over an hour of questioning, honoring his third request for counsel. *Id.* ¶¶ 24, 26, 29.  At that point, at around 10:15 A.M., the interview terminated, and Aguilar left the room and, ultimately, the airport. *Id.* ¶ 29.

Aguilar's affidavit also sketches out what he contends were other restrictions on his liberty during his interview by the two agents.  Two CBP officers, he says, were guarding the room during the interview. *Id.* ¶ 14.  In a roundabout manner, he suggests that neither agent ever told him that the interview was voluntary, or that he could stop their questioning at his own choosing. *Id.* ¶ 31.  He does not, however, describe in his affidavit any of the circumstances that led to his departure from the interview.  He does not say, for example, that he left the interview when he did because it was only then that the officers relented and permitted him to do so.  There is, in other words, no explanation in the affidavit about how he came to conclude that he was free to go when he did go.  He simply says that the agents never read him his *Miranda* rights, which no one disputes, and that overall he did not feel as though he was free to leave the room or refuse to answer their questions. *Id.* ¶¶ 32–33.  He also bemoans that the conversation was conducted in English, which he notes is not his native language. *See id.* ¶ 23.  However, his affidavit, which sets forth, in English, a fairly detailed narrative of the events that morning, does not

3

suggest that it was prepared with the assistance of a translator, or that he was assisted by a translator in remembering or recounting the details of the conversation he had with the agents and describes in the affidavit.  *See id.*

Both Special Agent Zukas and Special Agent Wood testified at the in-person suppression hearing.  As with so much of our lives in 2020, the COVID-19 pandemic had a role to play.  The agents explained that neither of them was the case agent nor assigned to the investigative team working the case that precipitated their airport interview of Aguilar.  Tr. 10:18–11:17; 52:12–15; 232:5–25.  Instead, both were tabbed to assist with the interview of Aguilar because they were stationed in the Houston area, where Aguilar was most easily found, and because COVID-19 driven travel restrictions, internally imposed by the FBI, prevented the investigative team responsible for the case to travel from their base to Houston to conduct the interview.  *See id.*

There are, of course, discordant notes upsetting the harmony between the accounts given by the agents and the one authored by defendant in his affidavit.  For example, Special Agent Zukas testified that, on the morning of the interview, dressed in plain clothes, he was waiting for Aguilar in the walkway located beyond the secondary inspection point—before the customs exit doors leading to the international baggage claim area. Tr. 14–16.  After Aguilar cleared the secondary inspection process and was proceeding towards the customs exit, he said he approached Aguilar and, contradicting Aguilar's account, introduced himself as a FBI agent, shook Aguilar's hand, and asked him if he'd be willing to be interviewed. Tr. 17:1–7, 184:17–20. Aguilar, he testified further, agreed.  *See id.*  Setting the scene with more precision, Special Agent Zukas said that, while he and Aguilar were still in the walkway area, Special Agent Wood, also dressed in plain clothes, returned from the restroom, and introduced himself to Aguilar by presenting his credentials.  Tr. 17:21–18.  The agents say they then pointed to a nearby room,

just off the corridor where they were standing, and informed Aguilar that the interview would take place there.  Tr. 18:2–6.  Aguilar, they say, confirmed his willingness to be interviewed, and the trio headed off to the interview room.  *Id.*  Squarely at odds with the story told by defendant in his affidavit, Special Agent Zukas explained, at multiple points in his testimony, that, on the morning of the interview, he did not work or coordinate with CBP with respect to the logistics of the interview, and was not involved in the CBP immigration process that Aguilar was subjected to that morning.  Tr. 16:5–7, 69:13–14, 84:1, 91:17–18; 92:5–7; 94:9–13; 110:9–11.

Special Agent Wood's testimony was to the same effect as that of his FBI mate.  He testified that, on the morning of the interview, he did not speak with anyone at CBP, but did acknowledge that, in advance of the meeting, he submitted an electronic request with CPB for their uniformed officers to conduct a secondary inspection of Aguilar upon his arrival. Tr. 237:24–25; 307:4–11.  He acknowledged, too, that he coordinated the logistical aspects of the interview with the DHSI agent stationed at the Houston airport, and he also said that, before his initial encounter with Aguilar, he had waited in the interview room with Special Agent Zukas. 238:10–14.  Special Agent Wood also confirmed Special Agent Zukas's testimony that he first met Aguilar after he had returned from a restroom stop and while Special Agent Zukas was already interacting with him in the walkway. Tr. 241:9–16.

The three accounts of the interview itself have broad consistency, with many of the details provided in the live testimony of the two agents either in accord with Aguilar's account or not expressly disputed by it.  For instance, it is not disputed that, as Aguilar sat across from them for approximately 90 minutes, the agents, without administering *Miranda* warnings, asked him questions, in English, pertaining generally to criminal matters unrelated to border security. Tr. 27:5–7; 29–32, 253:23–25; 337:9–17.  The agents also acknowledged that, at some point

during the interview, they believed Aguilar was not being truthful and warned him that lying to federal agents was a crime. *See id.* Moreover, nothing in Aguilar's affidavit contradicts claims made by Special Agent Zukas and Special Agent Wood that the door to the interview room remained open to the walkway where the trio first met, that at no point was Aguilar handcuffed or otherwise physically restrained, and that, at the conclusion of the interview, Aguilar was free to, and ultimately did, leave. Tr. 23:15–16, 37:19–25, 242:1–10, 247:7–11, 250:18–20. Furthermore, and significantly, since, by his own admission, Aguilar is unable either to confirm or deny it, the record is uncontradicted that, as both Special Agent Zukas and Special Agent Wood testified, Aguilar was expressly told by them that his interview with the agents was voluntary, and that he was free to terminate it and leave at any time. Tr. 17:1–10, 26:17–24, 184:19–20, 251:24–252:3.

There remains, naturally, an assortment of occurrences, about which there is disagreement. For instance, in sharp contrast to Aguilar's contrary declaration, the agents testified that, apart from the possibility of occasionally passing by, no CBP officers guarded or stood watch outside the open door to the interview room. Tr. 36:9–10 & 21–22, 244:12–13, 250:15–17, 254:11–19, 335:5–8. Special Agent Zukas and Special Agent Wood also testified that they never shouted, threatened Aguilar with arrest, or told him that he was guilty of committing a crime, or being charged with one. Tr. 37:8–16, 254–55, 257:10–17. Cut from a similar cloth, Special Agent Wood rebuffed efforts suggesting that Aguilar may have been overwhelmed by a physical law enforcement presence, testifying that he had not brought handcuffs with him that morning and that no handcuffs were likely ever in Aguilar's line of sight. Tr. 244:5–12. Indeed, photographs of the interview room, introduced at the hearing,

depict a chair attached to the table by a metal chain, rather than by handcuffs, as Aguilar claimed in his affidavit. *See* Gov. Ex. 1A.

Lastly, as for the fact that the interview was conducted in English, both agents testified that Aguilar did not appear to have any difficulty understanding their questions. Tr. 27:23–28:6, 251:8–21. Additionally, regarding counsel, Special Agent Zukas testified that they did not ignore any requests by Aguilar for an attorney. Tr. 31:20–32:3, 154:15–19. The agents agree, though, that late in the interview Aguilar did ask for an attorney. That request caused them to stop questioning him about the subject matter that had prompted their request for an interview. 255:10–15. They did admit, however, that, after that point, they answered certain logistical questions posed by Aguilar. Tr. 153–154, 255:18–23. Then, they say, Aguilar, offered additional, unprompted, statements, and left. *See id.*

## Legal Standard

The Fifth Amendment protects a person from being "compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. In *Miranda v. Arizona*, the Supreme Court concluded that the right against self-incrimination applies during "in-custody interrogation of persons suspected or accused of crime" because such questioning "contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. 436, 467, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). As a prophylactic against such pressures, the Court held that "the accused must be adequately and effectively apprised of his rights." *Id.* Courts give effect to these protections by holding inadmissible at trial statements a defendant made during a custodial interrogation prior to being apprised of his or her *Miranda* rights. *Id.* at 492, 86 S. Ct. 1602. Critically, however, "[a]n interaction between law enforcement officials and an individual

generally triggers *Miranda*'s prophylactic warnings [only] when the interaction becomes a 'custodial interrogation.'" *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011).  Most obviously, the questioning of a person formally detained in custody qualifies as custodial interrogation, *see Georgison v. Donelli*, 588 F.3d 145, 155 (2d Cir. 2009), but custodial interrogation can take place even where a person has not been formally arrested or detained, *see United States v. Schaffer*, 851 F.3d 166, 173 (2d Cir. 2017).  In any case, when a person requests to speak with counsel during custodial interrogation, the interrogation must cease until an attorney is present.  *Maryland v. Shatzer*, 559 U.S. 98, 104, 130 S. Ct. 1213, 1219, 175 L. Ed. 2d 1045 (2010).

On a motion to suppress at a criminal trial statements obtained from a defendant in alleged violation of his *Miranda* rights, the defendant bears the burden of demonstrating an adequate basis for the relief requested in the motion.  Specifically, in cases like this one, the defendant must demonstrate that he was subject to custodial interrogation.  *United States v. Funaro*, 253 F. Supp. 2d 286, 293–94 (D. Conn. 2003) (citing *United States v. Masterson*, 383 F.2d 610, 614 (2d Cir. 1967)); *United States v. Chin*, No. 13 Cr. 0028, 2013 WL 5406239, at *9 (D. Vt. Sept. 26, 2013) ("A criminal defendant bears the burden of establishing that he or she was subjected to custodial interrogation." (citations omitted)); *United States v. Wyche*, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004).  If the defendant succeeds on his motion, that is, for example, shows that no *Miranda* warning was given to him while he was in custody, the prosecution may not use statements obtained during the interrogation in its case in chief.  *United States v. Soteriou*, No. 5:12 Cr. 39, 2012 WL 5426440, at *3 (D. Vt. Nov. 7, 2012) (citing *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004)).

<u>Discussion</u>

In the Second Circuit, the question of whether an interrogation was custodial, for purposes of *Miranda*, is ultimately answered by asking "whether 'a reasonable [person] in the suspect's position would have understood' [himself] to be 'subjected to restraints comparable to those associated with a formal arrest.'" *FNU LNU*, 653 F.3d at 153 (alteration in original) (quoting *Donelli*, 588 F.3d at 155). In answering this question, courts consider the following factors (but not to the exclusion of others): "the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; [and] whether officers told the suspect he was free to leave or under suspicion." *Id.* (citing *Yarborough v. Alvarado*, 541 U.S. 652, 661–65, 124 S. Ct. 2140, 2147–50, 158 L. Ed. 2d 938 (2004)). The nature of the questions asked is also relevant. *Id.*

Bluntly, as explained in greater detail below, Aguilar has failed to carry his burden of establishing that the questioning of him by Special Agent Zukas and Special Agent Wood at the Houston airport on July 10, 2020, was a "custodial interrogation," and, therefore, he also fails to carry his burden of establishing that the absence of *Miranda* warnings prior to questioning was a violation of his constitutional rights.

Credibility is crucial. Aguilar's credibility falters right from the start. Seemingly ignoring his concession that he had already been told by CBP, upon the completion of its secondary inspection, that the border screening process was complete, Aguilar contends that, because he was approached along, and the interview occurred in a room adjacent to, a walkway situated between the secondary inspection area, on one end, and a set of doors leading to the international baggage claim area, on the other, he was still in the midst of CBP processing when

he was interrogated by the two non-uniformed agents who identified themselves as affiliated with law enforcement agencies other than CBP, the agency with responsibility over border re-entry. *See* Dkt. 97 ("Def.'s Post Hrg Mem.") at 13–20. Presumably, Aguilar fabricates this false connection between the questioning by Special Agent Zukas and Special Agent Wood with his re-entry process to negate the voluntariness of the interaction, that is, that somehow he had to go with them in order to get back into the country, which is flatly at odds with his acknowledgement that he had just been told by CBP that he had successfully completed the re-entry process, *see* Aguilar Aff. ¶ 8, and which itself is, in all probability, why he does not express in his affidavit, in any way, that he believed that the questioning by Special Agent Zukas and Special Agent Wood was part of the re-entry process.

The bushel full of case citations that he offers does not alter the conclusion that Aguilar's tale is not credible, and that, fatal to his motion, the record evidence establishes that the interrogation was not custodial, and that there was no violation of *Miranda*. Indeed, these cases underscore how important Aguilar's fabrication of the questioning by the agents to be part of the CBP re-entry process is to his argument that the interrogation by the agents was custodial. Significantly, each of the cases he cites (including those finding the CBP interrogation to be non-custodial) concerns the interview of a defendant conducted by CBP in the course of the border security and re-entry process, meaning that, with the CBP re-entry process still incomplete, the interview occurred while the defendant was not free to leave. *See id.* at 12 (citing *FNU LNU*, 653 F.3d at 155 (interview of defendant by CBP officer held non-custodial despite it occurring as part of CBP's secondary inspection, where defendant had yet to clear customs and "was not, in fact, free to go."); *United States v. Silva*, 715 F.2d 43, 45 (2d Cir. 1983) (customs inspector's interview of defendant occurred as part of CBP secondary inspection, before defendant had

cleared CBP's border screening process); *United States v. Moody*, 649 F.2d 124, 126 (2d Cir. 1981) (questioning and pat-down of defendant, as well as inspection of her luggage, by two CBP officers held to be non-custodial); *United States v. Oladokun*, No. 15 Cr. 559, 2016 WL 4033166, at *1 (E.D.N.Y. July 27, 2016) (similar); *United States v. Djibo*, 151 F. Supp. 3d 297, 300 (E.D.N.Y. 2015) (search of defendant's bags and cell phones held to be custodial where defendant was told the searches were "part of the whole border enforcement exam."); *United States v. Ramirez*, 696 F. Supp. 2d 246, 254 (E.D.N.Y. 2010) (similar); *United States v. Tudoran*, 476 F. Supp. 2d 205, 207 (N.D.N.Y. 2007).  Transparently, Aguilar believes that fusing the questioning by the agents to the re-entry process gives him a leg up in establishing a custodial setting.

Perhaps so, if the agents' questioning were a factual, not fabricated, part of the CBP re-entry process, or if the preponderance of evidence were clear that it would not be unreasonable for a traveler re-entering the country to believe—*after* having just been told by CBP that its screening process was complete and that he was free to leave the airport—that the questioning by the agents was part of the re-entry process.  But, and the evidence is compelling, that is not the case here, and the line of cases upon which Aguilar relies is inapposite.  Indeed, any claim that the interview was part of the border re-entry process is quite unbelievable and cannot overcome the impact flowing from the wealth of evidence to the contrary.  The credible evidence preponderates the other way.  Drilling down on that evidence, Aguilar is hobbled by his concession that his interview with Special Agent Zukas and Special Agent Wood began after he had been told by CBP that it had completed its secondary inspection and expressly advised him that the border screening process was complete.  *See* Aguilar Aff. ¶ 8.  The Court also credits Special Agent Wood's testimony that he advised Aguilar, prior to questioning him, that he had

cleared customs.  Tr. 251:25–252:3.  Further to this same point, the agents testified that they did not interact with CBP personnel that morning, that CBP personnel did not guard the door to the interview room, and that, in contrast to the uniformed CBP officers, they were dressed in plain clothes.  The Court finds each of these factual assertions to be credible and that Aguilar's contrary assertions are not.  Succinctly, Aguilar does not get a leg up on establishing a custodial setting because his transparent attempt to shoehorn the questioning by the agents into the border re-entry process falters as factually incredible, and his corresponding catalog of border re-entry interrogation cases is inapposite and unhelpful.[3]

In any case, the location of an interview alone is hardly dispositive of the nature of questioning by law enforcement officers. *See, e.g.*, *United States v. Kirsteins*, 906 F.2d 919, 924 (2d Cir. 1990).[4]  Instead, "the inquiry remains a holistic one," *FNU LNU*, 653 F.3d at 154, and, moving beyond the fact that the interview was conducted adjacent to a re-entry screening area, viewing his interrogation by the agents holistically, the conclusion that the interrogation of Aguilar by Special Agent Zukas and Special Agent Wood was noncustodial remains compelling. For instance, there is the thoroughly credible testimony of the agents that Aguilar was advised, more than once, that the interview was voluntary, and that he was free to leave at any time. Specifically, Special Agent Zukas testified that, upon approaching and introducing himself, he asked Aguilar to submit to an interview on a voluntary basis, and that once the three men sat

---

[3] That Special Agent Wood requested or directed CBP to conduct the secondary inspection is irrelevant absent any evidence—and there is none—that a reasonable person in Aguilar's shoes would have been aware of that fact.  *See United States v. Hassan*, No. 18 Cr. 603, 2019 WL 5684367, at *4 (E.D.N.Y. Nov. 1, 2019).

[4] Indeed, the Supreme Court has held, with respect to a police station house, surely a location more inherently coercive than an airport interview room, that "*Miranda* warnings are not required simply because the questioning takes place" there. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520, 77 L. Ed. 2d 1275 (1983).

down at the table, the agents reminded Aguilar, again, of the interview's voluntary nature. Tr. 17:1–12, 23:18–19, 26:17–21, 184:19–20.  Likewise, Special Agent Wood testified that, before the interview began, he reminded Aguilar that he had cleared customs and was free to leave at any time.  Moreover, Special Agent Wood reinforced this testimony by noting on direct examination that, in conducting airport interviews, he offers these disclaimers "100%" of the time.  Tr. 252:4–10.

Tellingly, Aguilar does not contend otherwise; he concedes that he does not recall whether the agents provided him with these assurances, but insists that he did not feel as though he was free to leave the interview.  Aguilar Aff. ¶¶ 32–33.  These subjective reservations, however, are of no moment, as "[t]he *Miranda* custody inquiry is an objective test . . . designed to give clear guidance to the police."  *Yarborough v. Alvarado*, 541 U.S. 652, 667, 124 S. Ct. 2140, 2151, 158 L. Ed. 2d 938 (2004).   In short, the agents' undisputed testimony that Aguilar was told, repeatedly, that the interview was voluntary and that he was free to leave at any time weighs heavily in favor of finding that he was not in custody.  *See United States v. Newton*, 369 F.3d 659, 677 (2d Cir. 2004) (informing a suspect that he is not under arrest is a "significant factor" in determining custodial nature of interview).

Additionally, the Court finds believable and compelling the testimony of the agents that the door remained open and unguarded throughout the interview, *see United States v. Wallace*, 178 F. App'x 76, 79–80 (2d Cir. 2006), *cert. denied*, 599 U.S. 1011, 127 S.Ct. 534 (2006); that Aguilar was never told he was being charged with a crime, threatened with arrest, or otherwise physically restrained, *cf. Newton*, 369 F.3d at 676; that they never drew their weapons or handcuffs, *see United States v. Wilson*, 100 F. Supp. 3d 268, 279 (E.D.N.Y. 2015); and that the interview took place in a largely conversational manner, as evidenced by the fact that Aguilar

13

was, from the outset and throughout the interview, mostly calm and cooperative, *see United States v. Faux*, 828 F.3d 130, 139 (2d Cir. 2016). Special Agent Wood also credibly testified that, while the interview room was housed along a corridor that would lead to a separate area where detention cells were located, based on his personal experience of conducting at least 20 interviews in the same room where Aguilar was questioned, the holding cells would not have been visible to a person in Aguilar's shoes. *See* Tr. 236, 249. A blueprint of the airport, which depicts the layout of the interview room and was introduced by defendant during the suppression hearing, confirms the agent's testimony. *See* Def. Ex. H (Sealed). Powerfully and instructively, it is undisputed that, at the conclusion of the interview, Aguilar left without being arrested just as the agents had promised him. *See United States v. Bershchansky*, 958 F. Supp. 2d 354, 382 (E.D.N.Y. 2013), *aff'd*, 788 F.3d 102 (2d Cir. 2015); *see also United States v. Soteriou*, No. 5:12 Cr. 39, 2012 WL 5426440, at *6 (D. Vt. Nov. 7, 2012) (lack of arrest at conclusion of interview "weighs heavily in favor of finding that the interrogation was not custodial"). These facts, established convincingly by the evidence of record, point clearly in a non-custodial direction.

Of course, Aguilar still spins a different story. He begins by pointing to certain undisputed facts, including that the interview lasted for around 90 minutes, and that he was questioned, in English, which is not his native language, about criminal matters unrelated to border security. Yet, though truthful, the probative value of these facts pales in comparison to the probative value solidly supporting the opposite conclusion. With the balance tipping heavily against a finding of custody, the duration of the interview, for example, does not fundamentally change its non-custodial nature. *See FNU LNU*, 653 F.3d at 154–55. As for the fact that the conversation took place in English, there is no evidence in the record that Aguilar has any difficulty speaking or understanding the English language. To the contrary, the agents testified

14

that Aguilar never expressed such reservations, nor did he otherwise appear to have any trouble understanding their questions. Tr. 27:24–28:6, 251:8–24; *see, e.g.*, *United States v. Yilmaz*, 508 F. App'x 49, 53 (2d Cir. 2013).

Aguilar also points to his assertion in his affidavit that Special Agent Zukas's holstered firearm became visible when he reached for his credentials. Special Agent Zukas, pressed on the matter during cross-examination, could neither confirm nor deny it. Tr. 103:19–42. In any case, beyond the fact that only the most novice television viewer is unaware that FBI agents normally carry firearms while on duty, this contention is a meritless point.[5] *See United States v. Drayton*, 536 U.S. 194, 205, 122 S. Ct. 2105, 153 L. Ed.2 d 242 (2002) (observing that a "holstered firearm" is unlikely to contribute to the coerciveness of an encounter absent "active brandishing"). Finally, in a nebulous attempt to attack Special Agent Wood's testimony that the holding cells would not have been visible to Aguilar from where the trio conversed in the interview room, Aguilar points to his assertion in his affidavit that holding cells are located along a corridor extending from the interview room. Glaringly, this assertion is unaccompanied by any claim that he actually saw holding cells that morning, *see* Aguilar Aff. ¶ 11, and therefore does not rebut Special Agent Wood's testimony on this point.

---

[5] Aguilar also contends, for the first time in his opening post hearing brief, that hanging on the walls of the interview room were posters advising travelers, *inter alia*, that they are in detention. *See* Def.'s Post Hrg Mem. at 19. These posters are visible in photographs depicting the interview room that were introduced by the government as exhibits during the suppression hearing. *See* Gov't Exs. C, E. Both agents testified that they did not recall whether such posters were present in the room during the interview. Tr. 135:21, 315:22–25. The absence of any mention of such posters in Aguilar's affidavit, however, strongly suggests that no such posters were present, and to the extent Aguilar contends that the display of the posters was a factor to be considered in favor of finding a custodial interrogation, he has failed to carry his burden of proving their presence. Moreover, even if he had, their presence would not have been dispositive. *Beheler*, 463 U.S. at 1125.

Though unwilling to put his story to the test of cross-examination, Aguilar's affidavit also directly attacks aspects of the testimony of the agents.  His table of disputed facts includes his claim that the door was, in fact, guarded by uniformed customs officers, and that prior to being approached by Special Agent Zukas, he had seen both agents conversing with uniformed CBP personnel.  His affidavit also clashes with the agents' testimony that handcuffs were never visible at any point during the interview, and with the assertion by the agents that the interview was conducted in a relatively congenial atmosphere.  Aguilar contends that handcuffs attached his chair to the table where the trio sat, and he claims that the agents, at several points, became visibly angry and shouted at him.   Patently, the credibility of the story of Aguilar's interrogation as told in his affidavit pales in comparison to the account given in the cross-examined testimony of Special Agents Zukas and Wood.  *See, e.g.*, *United States v. Polanco*, 37 F. Supp. 2d 262, 264 & n.4 (S.D.N.Y. 1999).

Additionally, of course, the defense offers standard impeachment nibbles in an attempt to plant seeds of doubt about the veracity of the agents' testimony.  For instance, Aguilar contests the Special Agent Zukas's testimony that, from the start, he advised defendant that the interview was entirely voluntary.  Aguilar argues that, had the agent actually advised him of the interview's voluntary nature, that exchange would have appeared in Special Agent Zukas' handwritten notes.  *See* Def.'s Post Hrg Mem. at 39–41.   Yet, the absence of a written note on a matter such as the overall nature of the interview is hardly a reason to doubt the agents' consistent testimony on this point.  Nothing else in the record suggests otherwise.  The other impeachment forays by defendant are of the same stripe and meet the same fate.  *See United States v. Black*, 845 F. App'x 42, 49 (2d Cir.), *cert. denied sub nom. Pettway v. United States*, 142 S. Ct. 622, 211 L. Ed. 2d 384 (2021).

At bottom, the record demonstrates, by a preponderance of the evidence, that a reasonable person in Aguilar's shoes would not have believed his freedom of action to have been curtailed to a degree that a reasonable person would associate with police custody, or as "the equivalent of formal arrest." *FNU LNU*, 653 F.3d at 155. Such a reasonable person would have understood the interview to be, as Aguilar was told on multiple occasions, voluntary, and that he was free to terminate it and leave at any time, which is exactly what he did. Accordingly, the Court finds that Aguilar's statements to federal agents in response to their questioning of him on the morning of July 10, 2020, at the Houston airport were not made or obtained in violation of his constitutional rights under *Miranda*.[6]

---

[6] Because Aguilar was not in custody for *Miranda* purposes, his Fifth Amendment right to counsel had not attached. The Court therefore need not determine whether he requested counsel. *See, e.g.*, *United States v. Clark*, No. 1:19 Cr. 00155, 2022 WL 1210478, at *14 (W.D.N.Y. Apr. 25, 2022); *United States v. Vado*, 87 F. Supp. 3d 472, 480 (S.D.N.Y. 2015). Moreover, even if Aguilar was in custody when he was questioned at the Houston airport—which he was not—the agents testified consistently that Aguilar requested counsel only at the end of the interview, that, at that point, they stopped questioning Aguilar, and that none of the questions posed by Aguilar after that point—nor their answers to them—were substantively connected to the topics covered before Aguilar requested an attorney. As such, the record demonstrates, by a preponderance of the evidence, that, if it did exist, Aguilar's *Miranda* right to counsel was honored.

<u>Conclusion</u>

For the foregoing reasons, Aguilar's motion to suppress statements made to law enforcement officers on July 10, 2020, at George Bush Intercontinental Airport in Houston, Texas, is denied in its entirety.

So Ordered.

Dated:  Brooklyn, New York
       July 23, 2022

/s/ Eric N. Vitaliano
ERIC N. VITALIANO
United States District Judge