UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -

JAVIER AGUILAR

                 Defendant.

– – – – – – – – – – – – – – – – – – – – – – – –X

No. 20-cr-390 (ENV)

**Served Via ECF On March 3, 2023**

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO SEVER AND DISMISS OR TRANSFER THE MEXICO-RELATED CHARGES

---

**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**

Alex Spiro
Tai H. Park
Daniel R. Koffmann
George T. Phillips
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
alexspiro@quinnemanuel.com
taipark@quinnemanuel.com
danielkoffmann@quinnemanuel.com
georgephillips@quinnemanuel.com

*Counsel for Defendant Javier Aguilar*

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND.................................................................................................................. 5

    A.    The Government Originally Charged Mr. Aguilar with Conspiring to Violate the FCPA Only in Ecuador. ........................................................................................ 5

    B.    Two-and-a-Half Years Later, and with Trial Just Months Away, the Government Charged Mr. Aguilar with Violating the FCPA in Mexico. ....................................... 9

ARGUMENT ..................................................................................................................... 12

I.    The Court Should Sever the Newly Filed Mexico Charges from the Long-Pending and Unrelated Ecuador Charges. ............................................................................. 12

    A.    Applicable Law ...................................................................................................... 12

    B.    The Superseding Indictment Improperly Joined the Mexico-Related Charges with the Ecuador-Related Charges under Rule 8(a)..................................................... 13

    C.    Absent a Severance under Rule 14(a), Mr. Aguilar Will Suffer Improper Prejudice from the Joinder of the Mexico- and Ecuador-Related Charges. ........................... 18

        1.    The belated joinder prejudices Mr. Aguilar's ability to prepare for trial............. 18

        2.    Severance is warranted to protect Mr. Aguilar's Fifth Amendment rights.......... 21

        3.    Severance is needed to avoid the prejudice of improper propensity evidence..... 24

II.    The Court Lacks Venue Over the Mexico-Related Charges, which Belong in the Southern District of Texas. ........................................................................................ 26

    A.    Applicable Law ...................................................................................................... 27

    B.    This District Lacks Venue over the Mexico-Related Charges. ................................ 28

    C.    In the Alternative, the Court Should Transfer the Mexico-Related Charges to the Southern District of Texas.................................................................................... 30

CONCLUSION................................................................................................................... 33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Kotteakos v. United States*,
    328 U.S. 750 (1946) ................................................................................. 17

*Simmons v. United States*,
    390 U.S. 377 (1968) ................................................................................. 22

*United States v. Alter*,
    81 F.R.D. 524 (S.D.N.Y. 1979) ............................................................. 32

*United States v. Aronoff*,
    463 F. Supp. 454 (S.D.N.Y. 1978) ....................................................... 32

*United States v. Barrett*,
    153 F. Supp. 3d 552 (E.D.N.Y. 2015) .................................................. 27

*United States v. Beech-Nut Nutrition Corp.*,
    871 F.2d 1181 (2d Cir. 1989) ......................................................... 27, 29

*United States v. Black*,
    918 F.3d 243 (2d Cir. 2019) ................................................................. 20

*United States v. Blakney*,
    941 F.2d 114 (2d Cir. 1991) ................................................................. 14

*United States v. Cashin*,
    281 F.2d 669 (2d Cir. 1960) ................................................................. 31

*United States v. Codner*,
    No. 18 Cr. 609 (RJD), 2022 WL 3139119 (E.D.N.Y. Aug. 5, 2022) ...................... 13, 24, 25

*United States v. DiScala*,
    No. 14 Cr. 399 (ENV), 2018 WL 1187394 (E.D.N.Y. Mar. 6, 2018) ........................ 16, 27

*United States v. Fiorentino*,
    No. 13 Cr. 338 (SJF), 2014 WL 108415 (E.D.N.Y. Jan. 6, 2014) ...................... 28, 30, 31

*United States v. Guzman*,
    754 F.2d 482 (2d Cir. 1985) ................................................................. 20

*United States v. Halper*,
    590 F.2d 422 (2d Cir. 1978) ...................................................... 16, 17, 18, 25

*United States v. Jordan,*
  112 F.3d 14 (1st Cir. 1997) ............................................................................... 23, 24

*United States v. Jordan,*
  No. 20 Cr. 305 (LDH), 2022 WL 4325870 (E.D.N.Y. Sept. 19, 2022) .............................. 18

*United States v. Litwok,*
  678 F.3d 208 (2d Cir. 2012) ........................................................................... 12, 18

*United States v. Mackins,*
  315 F.3d 399 (4th Cir. 2003) .................................................................................. 17

*United States v. Maldonado-Rivera,*
  922 F.2d 934 (2d Cir. 1990) ............................................................................ 28, 30

*United States v. Martino,*
  No. 00 Cr. 389 (RCC), 2000 WL 1843233 (S.D.N.Y. Dec. 14, 2000) ............................... 32

*United States v. Maxwell,*
  534 F. Supp. 3d 299 (S.D.N.Y. 2021) ........................................................................ 26

*United States v. Miller,*
  No. 03 Cr. 906, 2004 WL 1946381 (S.D.N.Y. Aug. 31, 2004).............................18, 19, 20

*United States v. Nachamie,*
  101 F. Supp. 2d 134 (S.D.N.Y. 2000) ...................................................................... 13

*United States v. Nerlinger,*
  862 F.2d 967 (2d Cir. 1988) .................................................................................... 16

*United States v. Novak,*
  443 F.3d 150 (2d Cir. 2006) ......................................................................27, 29, 30

*United States v. Page,*
  657 F.3d 126 (2d Cir. 2011) ............................................................................ 14, 15

*United States v. Pauling,*
  256 F. Supp. 3d 329 (S.D.N.Y. 2017) ...................................................................... 17

*United States v. Ramirez,*
  420 F.3d 134 (2d Cir. 2005) ......................................................................27, 29, 30

*United States v. Ray,*
  No. 20 Cr. 110 (LJL), 2022 WL 330517 (S.D.N.Y. Feb. 3, 2022) ............................... 13, 20

*United States v. Russell,*
  582 F. Supp. 660 (S.D.N.Y. 1984) ...................................................................... 30, 31

*United States v. Sampson*,
    385 F.3d 183 (2d Cir. 2004) ................................................................... 13, 21, 23, 24

*United State  v. Shellef*,
    507 F.3d 82 (2d Cir. 2007) ........................................................ 12, 14, 16, 17, 18, 25

*United States v. Spy Factory, Inc.*,
    951 F. Supp. 450 (S.D.N.Y. 1997) ................................................................... 32

*United States v. Tubol*,
    191 F.3d 88 (2d Cir. 1999) ................................................................... 17

*United States v. Webb*,
    827 F. Supp. 840 (D. Mass. 1993) ................................................................... 14

*Zafiro v. United States*,
    506 U.S. 534 (1993) ................................................................... 13

## Constitutional Provisions, Statutes, and Rules

U.S. Const. art. III § 2, cl. 3 ................................................................... 27

U.S. Const. amend. VI ................................................................... 27

15 U.S.C. § 78dd-3 ................................................................... 22

18 U.S.C. § 1956 ................................................................... 17

18 U.S.C. § 3237 ................................................................... 27

Fed. R. Crim. P. 8 ................................................................... *passim*

Fed. R. Crim. P. 14 ........................................................ 1, 2, 4, 13, 18, 21

Fed. R. Crim. P. 18 ................................................................... 1, 4, 29

Fed. R. Crim. P. 21 ........................................................ 1, 4, 27, 28, 30

Fed. R. Evid. 404 ................................................................... *passim*

## Other Authorities

U.S. Dep't of Justice, *Former Manager of Oil Trading Firm Charged in Money Laundering
    and Bribery Scheme* (Sept. 22, 2020), https://www.justice.gov/usao-edny/pr/former-
    manager-oil-trading-firm-charged-money-laundering-and-bribery-scheme ........................ 31

U.S. Dep't of Justice, *Vitol Inc. Agrees to Pay over $135 million to Resolve Foreign Bribery
    Case* (Dec. 3, 2020), https://www.justice.gov/opa/pr/vitol-inc-agrees-pay-over-135-
    million-resolve-foreign-bribery-case ................................................................... 5

Defendant Javier Aguilar respectfully submits this memorandum of law in support of his motion to:  (i) sever the Mexico-related charges and allegations from the distinct Ecuador-related charges in the Superseding Indictment under Rules 8(a) and 14(a) of the Federal Rules of Criminal Procedure, and (ii) either dismiss the Mexico-related charges for lack of venue in the Eastern District of New York under Rule 18, or transfer them to the Southern District of Texas under Rule 21(b).[1]

## PRELIMINARY STATEMENT

After two-and-a-half years of extensive discovery on a single charge that Mr. Aguilar conspired to violate the Foreign Corrupt Practices Act ("FCPA") by allegedly bribing government officials in connection with a fuel-oil transaction in Ecuador (and an associated money-laundering-conspiracy charge), the Court set a July 2023 date for a complex trial.  For the government's case *alone*, that trial was estimated to take six weeks and require 15 witnesses.  In December, less than a month after the Court set this trial schedule, the government filed a superseding indictment that more than doubles the charges and alleges an entirely separate scheme to violate the FCPA in Mexico by bribing different officials in connection with different transactions.  The misjoinder of these alleged schemes will transform an already demanding trial in which jurors will be asked to absorb the complicated economics of state-sponsored fuel-oil deals in Ecuador, pore over detailed bank statements and arcane financial data, and parse the credibility (through translators) of several alleged coconspirators, into a multiheaded hydra that needlessly will burden the Court and the jury and severely prejudice Mr. Aguilar.  For the reasons below, the Court should sever these unrelated

---

[1]   The "Mexico-related charges" are set out at ¶¶ 22–24, 37–46, 50–54 and Counts 2 and 4 of the Superseding Indictment.  The "Ecuador-related charges" were set out in the original Complaint and Indictment (ECF Nos. 1, 13), and appear now at ¶¶ 22–36, 47–49, 53–54 of the Superseding Indictment and Counts 1 and 3.  Unless otherwise indicated, this brief omits from quotations and citations all internal quotation marks, alterations, footnotes, and citations.

charges and limit the upcoming trial to the Ecuador-related charges and evidence that this Court expected to hear when it carefully set the schedule last November.

The Mexico-related allegations have almost nothing to do with the Ecuador-related charges, which means that, absent a severance, some hapless jury will be asked to spend the summer and early autumn enduring two highly complex white-collar trials in one. The only apparent connections between the two alleged schemes are that Mr. Aguilar was the alleged payor working for his employer, Vitol Inc., and that Lionel Hanst processed transfers to alleged coconspirators. There are *no other facts* common to the two alleged schemes. The Superseding Indictment charges the two schemes separately and makes clear that they involve different countries; different alleged coconspirators; different alleged foreign officials; different alleged modes of execution; and different kinds of contracts, commodities, and economic objectives. These two alleged schemes are different and do not belong in the same indictment, much less the same trial. Because Rule 8 prohibits this kind of misjoinder, the Court should sever.

Even if joinder of the Ecuador- and Mexico-related charges passes muster under Rule 8(a) (it doesn't), the Court should sever under Rule 14(a). Not only would the jury and the Court have to endure extraordinary burdens in sorting through pitched battles over two entirely different charges—the prejudice to Mr. Aguilar also will be overwhelming. After the government filed the Mexico-related charges last December, it produced a vast volume of new discovery—almost none of which concerns these new charges—and has since conceded that its investigation into Mexico is *far from finished*. With just four months before trial, at a time when the defense has been feverishly preparing for trial on the Ecuador-related charges, Mr. Aguilar cannot be expected to pivot to these new charges and be ready. He has waited nearly three years for his day in court on

the original charges, and he should have that day in July as scheduled by the Court. The only way to do that fairly is to sever the Mexico-related charges.

Moreover, charging both schemes in one trial will interfere with Mr. Aguilar's right to testify in his own defense as to Mexico-related events while preserving his Fifth Amendment right against self-incrimination as to the very different Ecuador-related events. Binding precedent is clear that where, as here, a defendant wishes to testify on one set of charges but not another, and the charges concern unrelated offenses, a district court errs, and vacatur is required, when it fails to sever the charges to protect a defendant's constitutional rights to pursue both those alternative courses. The defense currently expects that Mr. Aguilar would pursue alternative courses as to the two disparate charges, as is his constitutional right—and as further illustrates how completely distinct the two fact patterns are. Only separate trials would preserve this right.

In addition, an entirely separate form of prejudice is that the misjoinder introduces propensity evidence in violation of Rule 404(b) of the Federal Rules of Evidence. There is an inescapable risk that the jury will conclude that because Mr. Aguilar was allegedly involved in payments not only in Ecuador but also in Mexico, he must be guilty of both. The government, of course, understands this risk well. At the pretrial conference in early November 2022 when the Court scheduled this case for trial, the government noted that it would either file a superseding indictment or seek to enter evidence of related conduct pursuant to Rule 404(b). We now know what that other conduct is: the Mexico-related allegations. After that conference, the government evidently concluded that it could not satisfy the requirements of Rule 404(b), so it opted instead to charge the Mexico-related conduct in the same indictment. The government's apparent analysis of Rule 404(b) was correct: the new charges constitute propensity evidence, pure and simple, and would be inadmissible in a standalone trial on the Ecuador-related charges. But it is wrong to

think that charging this conduct in a superseder is a viable workaround. A defendant's due-process rights are violated whether the evidence is improperly admitted under Rule 404(b) or through a misjoined charge. Courts have rejected this very tactic by severing such charges.

Any one of these forms of prejudice—the belated superseder and ongoing discovery, with no end in sight even though trial is just four months away; the interference with Mr. Aguilar's exercise of his Fifth Amendment privilege; or the introduction of otherwise improper propensity evidence—warrants severance under Rule 14(a). Taken together, there can be no genuine dispute that severance is appropriate.

Once the Court severs the Mexico-related charges, it also should dismiss them for lack of venue under Rule 18 of the Federal Rules of Criminal Procedure. The government alleges that all the conduct supporting those charges took place in and around Houston, or in foreign jurisdictions far from the Eastern District of New York. The crux of these newly brought charges is that payments one Houstonian allegedly made to two other Houstonians gave one Houston-based company a leg-up when doing business with another Houston-based company. The government cannot show that the alleged conduct has the substantial contacts with this district required for venue.

Even if there were some marginal or technical basis for venue (there isn't), the Court should transfer the charges to the far more appropriate venue, the Southern District of Texas, under Rule 21(b). That district is where the offense conduct allegedly occurred, where nearly all the likely witnesses (including Mr. Aguilar) reside, where most of the relevant evidence is located, and where the alleged victim is based. In circumstances like these, courts have embraced their power to transfer charges to a more appropriate venue, and the Court should do so here.

With trial set to begin in just a few months on the long-pending Ecuador-related charges, the Court should return the parties to status quo ante by severing the belatedly brought Mexico-related

charges from this two-and-a-half-year-old case. The government loses nothing by bringing those charges separately and in a district where they belong, while severance (and dismissal or transfer) of those charges will ensure that Mr. Aguilar's due-process and Fifth Amendment rights are honored.

## BACKGROUND

### A.   The Government Originally Charged Mr. Aguilar with Conspiring to Violate the FCPA Only in Ecuador.

More than two-and-a-half years ago, in July 2020, the government first alleged that Mr. Aguilar and others had conspired to bribe two Ecuadorian government officials in violation of the FCPA and to launder money in connection with that alleged scheme. ECF No. 1. A few months later, a grand jury returned an Indictment on those same charges, which related solely to that complex alleged scheme involving officials in Ecuador. ECF No. 13.

Neither the Complaint nor the Indictment suggested that Mr. Aguilar violated any law relating to transactions in Mexico. This was so even though the Indictment resulted from an even older investigation of Mr. Aguilar's employer, Vitol Inc., that encompassed conduct in "three separate countries": Brazil, Mexico, and Ecuador.[2] In announcing Vitol's agreement to a deferred prosecution in December 2020, the government noted that it had charged Mr. Aguilar "for his alleged role in the Ecuador scheme," and never mentioned any connection between him and Mexico. *Id.* Notwithstanding the government's awareness (since at least late-2020) of conduct in Mexico that led it to charge Vitol with that conduct, it did not charge Mr. Aguilar with anything related to Mexico.

---

[2]   U.S. Dep't of Justice, *Vitol Inc. Agrees to Pay over $135 million to Resolve Foreign Bribery Case* (Dec. 3, 2020), https://www.justice.gov/opa/pr/vitol-inc-agrees-pay-over-135-million-resolve-foreign-bribery-case. The government has never alleged that Mr. Aguilar participated in any of the Brazil-related conduct described in Vitol's deferred-prosecution agreement.

The charges that the government did file against Mr. Aguilar relate only to Ecuador and are extremely complex. They involve multiple entities in the United States, Switzerland, Ecuador, Portugal, Curaçao, and the Middle East. They allege that starting in 2015, Mr. Aguilar agreed with others to bribe Nilsen Arias Sandoval ("Arias") and another Ecuadorian-government official (together, "Ecuadorian Officials") to "secure an improper business advantage" for Vitol, a Switzerland-based global company with a U.S. affiliate based in Houston, Texas. *See* ECF No. 1 ¶¶ 16–23; ECF No. 120 ¶¶ 25–30. Vitol supposedly needed that "advantage" to obtain a prefinance contract to lend money up front to the Ecuadorian government in exchange for later deliveries of an oil derivative called fuel oil. *See id.* (both sources). Vitol acquired that fuel oil from an entity commonly known as "Petroecuador." *See id.* (both sources). A "State-Owned Entity" in the Middle East worked with Vitol to purchase the fuel oil from Petroecuador. *See id.* (both sources).

The government did not allege that Mr. Aguilar paid any bribes himself. Rather, it alleged that the Ecuadorian Officials introduced Mr. Aguilar to two local consultants—Antonio Pere Ycaza and his brother Enrique (together, "Pere brothers")—whom Vitol later retained. *See* ECF No. 1 ¶¶ 9–10, 19, 21; ECF No. 120 ¶¶ 12–13, 29–30. Vitol allegedly paid the Pere brothers for their consulting work using a consultant in Curaçao named Lionel Hanst. *See* ECF No. 1 ¶ 21; ECF No. 120 ¶¶ 29–30. The Pere brothers then allegedly rerouted a portion of that money to the Ecuadorian Officials as supposed bribes on Vitol's behalf, purportedly with Mr. Aguilar's knowledge, while keeping the rest for themselves. *See id.* (both sources).

The Ecuador-related charges included allegations that resulted from, among other things, the cooperation of the Pere brothers, which the government secured long after the alleged scheme began and the fuel-oil contract had terminated. *See* ECF No. 1 ¶ 16 n.3; *see also* Case Nos. 20 Cr.

376 & 20 Cr. 377 (ENV) (E.D.N.Y.).  Their cooperation yielded a "series of recorded phone calls and meetings," in which the Pere brothers allegedly discussed the scheme with Mr. Aguilar and other alleged coconspirators while being recorded by government agents.  ECF No. 1 ¶¶ 27–31.[3]  The Pere brothers also secretly recorded a March 2020 meeting in Houston, Texas, during which Mr. Aguilar and the Pere brothers allegedly "discussed payments" that Vitol "had promised" the Pere brothers and which purportedly "would be used to pay bribes promised to" Arias.  *Id.* ¶ 30.

Just hours before obtaining a warrant for his arrest, ECF No. 1, the government intercepted Mr. Aguilar in the secure Customs area of an international airport, and two federal agents interrogated him for more than an hour.  *See* ECF No. 97.  That interrogation purportedly resulted in Mr. Aguilar "acknowledg[ing]" to the agents "that the payments to [Hanst] were probably not part of a legitimate business deal, and that some portion of the money was 'probably' going to officials at Petroecuador." ECF No. 73 at 4–5.  The Court denied Mr. Aguilar's motion to suppress those statements.  ECF No. 106.  Mr. Aguilar of course disputes the government's key claims about that airport interaction and his alleged statements.  ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████   *See* Spiro Decl. ¶ 9.

In the two-and-a-half years since the government brought the Ecuador-related charges, the government has produced approximately two million pages of documents and hundreds of hours of recorded meetings and phone calls.  *Id.* ¶ 6.  Most of those materials are in foreign languages and require translation to review and will require official translation for use at trial.  *See id.*  The

---

[3]   These and other phone calls and meetings were conducted in foreign languages, and any quoted language in the charging instruments reflects the government's translations, which the defense has yet to receive in full.  *See* ECF No. 1 ¶¶ 27–30.

government made these productions over this long period in 28 separate volumes—and counting. Meanwhile, the defense has had countless exchanges with the government about discovery issues and brought multiple motions, including motions for bills of particulars and suppression, all to ensure that Mr. Aguilar's rights to a fair trial are fully protected.

When, at last, it appeared that the bulk of the government's productions had been completed and meaningfully reviewed by the defense team, and the parties' motion practice was largely complete, the defense asked the Court to schedule a trial. At a conference on November 4, 2022, the Court did so, setting the case for trial to commence with jury selection on July 5, 2023. *See* Min. Entry (Nov. 4, 2022) (setting trial date).

At the November conference, as the Court and parties discussed details of the trial schedule, the government represented that it expected its case to last around six weeks, with the government presenting around 15 witnesses. Spiro Decl. Ex. A at 4:10–20. The government also noted that it intended "to make an evidentiary motion" to introduce evidence of allegedly related crimes under Rule 404(b) of the Federal Rules of Evidence. *Id.* at 4:21–5:3. In the next breath, the government added that "the scope of that motion could change" because the government also was "contemplating whether or not to file a superseding indictment." *Id.* at 5:4–8. When asked to provide more clarity, the government represented that either the Rule 404(b) motion or the superseded allegations "would have to do with an interrelated bribery scheme" that would "interrelate[] to the scheme that is already charged." *Id.* at 5:20–25. The Court directed that pretrial motions be filed by March 3, 2023, so that it would have adequate time to rule on them in advance of the trial. *See id.* at 11:12–14:1; *accord id.*, Ex. B at 4:7–14:8.

8

**B.** **Two-and-a-Half Years Later, and with Trial Just Months Away, the Government Charged Mr. Aguilar with Violating the FCPA in Mexico.**

Less than a month after this exchange, on December 2, 2022, the government superseded the indictment, doubling the size and complexity of the prosecution by alleging that Mr. Aguilar committed FCPA violations involving Mexican officials in an alleged scheme having nothing to do with Ecuador. ECF No. 120 ¶¶ 1, 37–46, 50–52. The Superseding Indictment charges separate substantive FCPA and associated conspiracy counts for each country.[4] No fewer than 54 new paragraphs were added to an indictment that originally had just six paragraphs. *Compare* ECF No. 13, *with* ECF No. 120. If, as the government now claims, the charges are "interrelated," it is unclear why it waited so long to bring them.

The Mexico-related charges are every bit as complex as the Ecuador-related charges. They assert that starting in 2017, Mr. Aguilar conspired to, and did, bribe Carlos Espinosa Barba ("Espinosa") and Gonzalo Guzman Manzanilla ("Guzman"), each of whom is "a citizen of Mexico and a resident of Houston Texas." ECF No. 120 ¶¶ 9–10. Espinosa and Guzman allegedly were "procurement managers" for Pemex Procurement International, Inc. ("PPI"), a private company incorporated in Delaware and based in Houston, Texas that was "formerly known as Integrated Trade Systems, Inc." *Id.* ¶¶ 8–10; Spiro Decl. Exs. C–D; *see also id.* ¶ 10(b). The government alleges that Mr. Aguilar bribed Espinosa and Guzman to obtain "confidential, inside information" from PPI that supposedly gave Vitol "improper advantages" when doing business with PPI. ECF No. 120 ¶¶ 37–38. The government also asserts that Espinosa and Guzman were paid through a different "Intermediary" in Mexico. *Id.* ¶¶ 19, 40. The only features common to both the Ecuador

---

[4] Only the money-laundering-conspiracy charge (Count 5) encompasses both Mexico and Ecuador. *See* ECF No. 120 ¶¶ 55–56. Thus, if the Court severs, dismisses, or transfers the Mexico-related charges, then it should splice the money-laundering charge insofar as it concerns transactions related to the alleged Mexico scheme.

and Mexico schemes are that Vitol and Mr. Aguilar allegedly sought an advantage on government-related deals, and that they used Hanst to effect the payments. *See id.* ¶¶ 16, 22–24. The two schemes otherwise have nothing in common.

These charges are vague as to what information or advantage Mr. Aguilar sought to obtain. It is unclear what information changed hands, why it was confidential, or how it gave Vitol any advantage, much less an unlawful one. Compelling answers to these questions will result in substantial litigation.[5] The government alleges vaguely that this information "concern[ed] Vitol's competitors in connection with a bidding process for business with PPI" involving sales of the chemical ethane to PPI. *Id.* ¶¶ 38, 52(a), (i). ████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████

Unlike the Ecuador-related charges, which the government will seek to prove in part with the testimony of the two federal agents who interrogated Mr. Aguilar, the Mexico-related charges lack any such proof. Instead, they evidently depend on the now-cooperating witnesses Espinosa and Guzman, who have each pleaded guilty. *See* Case Nos. 21 Cr. 259 & 21 Cr. 260 (ENV) (E.D.N.Y.). ████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████

The government has yet to explain why, given how different the alleged Ecuador and Mexico schemes are, it added the latter so close to trial in *this* long-pending case. Both the original

---

[5] Mr. Aguilar will seek separately to remedy these and other charging deficiencies through a motion for a bill of particulars.

Indictment and the Superseding Indictment contain allegations that purport to connect the *Ecuador*-related allegations directly to the Eastern District of New York.  ECF No. 1 ¶¶ 26, 28, 31(b), (d) (each alleging specific overt acts that took place, at least in part, in the Eastern District of New York or New York City, including a phone call between Mr. Aguilar and Antonio Pere that the government recorded while Antonio Pere "was in the Eastern District of New York"); ECF No. 13 ¶ 2(e) (alleging that the Pere brothers wired downstream payments "through a correspondent bank account located in New York, New York"); ECF No. 120 ¶ 49(b) (alleging that Mr. Aguilar forwarded an email to Antonio Pere, which had originally been sent between Vitol and its legal representatives "in New York, New York, through the Eastern District of New York").  By contrast, no allegations connect the *Mexico*-related charges to this district.  Instead, the venue-related allegations for those charges point exclusively to the Southern District of Texas.  For example:

- Espinosa and Guzman allegedly first asked Mr. Aguilar to pay them bribes during an in-person meeting "in Houston, Texas" in August 2017.  ECF No. 120 ¶¶ 38, 52(a).

- From September 2017 to April 2018, Mr. Aguilar allegedly met in-person with Espinosa and Guzman at several "subsequent meetings that took place in Houston, Texas."  *Id.* ¶ 38.

- The overt acts set out on the Mexico-related charges all occurred "within the Southern District of Texas."  *Id.* ¶¶ 51–52.

- Mr. Aguilar's alleged substantive violations of the FCPA charged in the indictment, whether for Ecuador or Mexico, occurred while he was "within the Southern District of Texas."  *Id.* ¶ 54.

The conspicuous lack of New York-related allegations for these belatedly brought charges is unsurprising given that Mr. Aguilar, Vitol, Espinosa, Guzman, and PPI are all based in Houston, Texas.  *See id.* ¶¶ 1–2, 8–10.

## ARGUMENT

I. **THE COURT SHOULD SEVER THE NEWLY FILED MEXICO CHARGES FROM THE LONG-PENDING AND UNRELATED ECUADOR CHARGES.**

The Court should sever the newly charged Mexico-related scheme for four independent reasons: *First*, it lacks a common character, transaction, scheme, or plan necessary for proper joinder with the Ecuador-related scheme. *Second*, the government's inexplicable delay in the misjoinder prejudices Mr. Aguilar's ability to prepare adequately for a trial in just four months, while the government would suffer no prejudice if severance were granted. *Third*, trying the two schemes together would unlawfully interfere with Mr. Aguilar's right to testify in his own defense on one set of charges (Mexico) while exercising his Fifth Amendment right not to testify on the other (Ecuador). *Finally*, because the government filed these new charges so late in the game in an apparent attempt to circumvent Rule 404(b), they effectively constitute propensity evidence, and their introduction at trial would violate Mr. Aguilar's due-process rights.

A. **Applicable Law**

Under Rule 8(a) of the Federal Rules of Criminal Procedure, an indictment "may charge a defendant in separate counts with 2 or more offenses" only "if the offenses charged . . . are of the same or similar character," are "based on the same act or transaction," or "are connected with or constitute parts of a common scheme or plan." Thus, when the new charges lack a "direct link" to, or meaningful "evidentiary overlap" with, the prior charges, and when hearing evidence of both sets of charges would "affect[] the jury's consideration" of either one, a district court's failure to sever improperly joined charges will result in vacatur. *United States v. Litwok*, 678 F.3d 208, 216–18 (2d Cir. 2012) (vacating convictions on misjoined charges on de novo review); *accord United States v. Shellef*, 507 F.3d 82, 98–102 (2d Cir. 2007) (same).

Even when two sets of charges are joined properly, the Court must still exercise its discretion to sever them under Rule 14(a) when a defendant shows "substantial prejudice" that overcomes the baseline interest in the "economy and efficiency" of joint trials.  *Zafiro v. United States*, 506 U.S. 534, 540 (1993).  A defendant can do so by showing that "there is a serious risk that a joint trial would compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or innocence."  *Id.* at 539; *see United States v. Nachamie*, 101 F. Supp. 2d 134, 155 (S.D.N.Y. 2000) ("courts have applied the *Zafiro* standard to the joinder of counts").  District courts abuse their discretion when denying severance, and vacatur is therefore required, in two circumstances relevant here:  *First*, when a court fails to sever charges to protect a defendant's Fifth Amendment rights because he "wishes to testify on one but not the other of two joined offenses which are clearly distinct in time, place and evidence."  *United States v. Sampson*, 385 F.3d 183, 190–91 (2d Cir. 2004) (vacating convictions for failure to sever on abuse-of-discretion review).  *Second*, when a court declines to sever charges to prevent the government from gaining an unfair leg-up at trial by strategically joining new charges with a "bad faith or dilatory motive," *United States v. Ray*, No. 20 Cr. 110 (LJL), 2022 WL 330517, at *2 (S.D.N.Y. Feb. 3, 2022), such as to "circumvent" Rule 404(b) of the Federal Rules of Evidence, *United States v. Codner*, No. 18 Cr. 609 (RJD), 2022 WL 3139119, at *3 (E.D.N.Y. Aug. 5, 2022).

Both Rule 8(a) and Rule 14(a) provide an independent basis for granting Mr. Aguilar's motion to sever, but when considered in combination, there can be no room for doubt.

## B.   The Superseding Indictment Improperly Joined the Mexico-Related Charges with the Ecuador-Related Charges under Rule 8(a).

The newly added Mexico-related charges are completely different from the Ecuador-related charges that are the basis for the trial scheduled for four months from now.  The two sets of charges are not "of the same or similar character," or "based on the same act or transaction," or

"connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). For the government to meet its joinder burden, it must show that "the same evidence may be used to prove each count, or [that] the counts have a sufficient logical connection." *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011).

The government cannot meet that burden here. The Superseding Indictment implicitly concedes that the only common thread between the two alleged schemes is how Vitol and Mr. Aguilar routed the alleged bribe payments at issue to two separate sets of payees. *See* ECF No. 120 ¶¶ 16, 22–24. Both sets of charges allege that Vitol and Mr. Aguilar used Hanst to carry out the illicit payments. *See id.* But "the presence of one overlapping member does not make two separate conspiracies part of the same series of acts or transactions," *United States v. Webb*, 827 F. Supp. 840, 841 (D. Mass. 1993)—especially if that person is essentially just a go-between for processing some of the allegedly unlawful payments, *see* ECF No. 120 ¶ 16. And "no one characteristic is always sufficient to establish similarity of offenses" to warrant their joinder. *United States v. Blakney*, 941 F.2d 114, 116 (2d Cir. 1991). The Second Circuit has vacated a defendant's convictions on misjoined charges where, as here, the "only common factual elements" between the two sets of charges were purely operational, such as the defendant's use of the same accounting firm to help carry out each alleged scheme. *See Shellef*, 507 F.3d at 99.

Moreover, the two schemes alleged here otherwise share no common features: (1) they involve two entirely different deals involving different chemicals and different business and regulatory structures; (2) the alleged foreign-government official "payees" were either Mexican or Ecuadorian, with no allegation that they even knew each other; (3) the payees relied on different alleged intermediaries as coconspirators to receive the funds; and (4) they took place in entirely different countries on different continents. *See id.* ¶¶ 22–46. The two schemes also allegedly took

place at different times, to achieve different business objectives, and with different funds. *Compare id.* ¶¶ 25–28, *with id.* ¶¶ 37–40. Nor can (or does) the government claim that Mr. Aguilar's roles in the two schemes were remotely similar: it alleges that the Pere brothers stood between Mr. Aguilar and the Ecuadorian officials whom the Pere brothers paid, while it asserts that Mr. Aguilar himself coordinated directly with, and directed all the alleged payments to, Espinosa and Guzman. *Compare id.* ¶¶ 30, 49(k), *with id.* ¶¶ 37–40, 52(a).

"[T]he same evidence" thus will not be "used to prove each count"—nor will there be any connection, much less a "sufficient[,] logical connection," between the two sets of proof. *Page*, 657 F.3d at 129. Nor will the jury hear evidence of any "common scheme." Fed. R. Crim. P. 8(a). Rather, the evidence will be starkly disparate, and one unfortunate jury will be forced to sit through what effectively will be two complex and fiercely disputed trials (with much of the key evidence presented in translation) back-to-back over months of the summer and fall. The first will present the testimony from Ecuador-related cooperating witnesses, as well as the many witnesses for the government and the defense who will talk exclusively about the complex terms of the Ecuador fuel-oil deal that spanned three years before completion. They will then have to listen to the Mexican cooperators and the myriad government and defense witnesses who will talk exclusively about the complex terms of an ethane deal, so-called "confidential" information, and a bid that Vitol ended up losing notwithstanding the supposed "advantage" Mr. Aguilar allegedly bought.

Thus, the government's contention that these two schemes are "interrelated" or "intertwined," Spiro Decl. Ex. A at 5:20–25; *id.* Ex. B at 8:11–17, remains unsupported. True, the jury will likely hear from the now-cooperating Hanst. But his purely operational role as an alleged go-between, *see* ECF No. 120 ¶ 16, will be a blip in a long and intricate trial featuring two entirely

different sets of witnesses who will try to show why Mr. Aguilar is guilty of bribing four different government officials in two different countries.  That is improper.  *See Shellef*, 507 F.3d at 99.

This case thus resembles *United States v. Halper*, in which the Court of Appeals vacated convictions when "no connection was shown sufficient to warrant the joinder" because "[c]ommission of one of the offenses neither depended upon nor necessarily led to the commission of the other" and "proof of the one act neither constituted nor depended upon proof of the other." 590 F.2d 422, 429 (2d Cir. 1978).  There, just as here, any "trace of sameness" across these different alleged schemes is not enough to warrant their joinder, and "the only time likely saved by joinder" will be "the time spent selecting the jury, and perhaps the time spent examining character witnesses."  *Id.* at 430–31.

The government's own charging decisions support this conclusion:  the Superseding Indictment's substantive FCPA charges and its FCPA-conspiracy charges each distinguish the alleged Ecuador scheme from the alleged Mexico scheme.  *Compare* ECF No. 120, Counts 1 & 3, *with id.*, Counts 2 & 4; *cf. United States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir. 1988) (a single conspiracy charge encompassing all defendants can support joinder under Rule 8(b)).  This is not a case where "one offense depends on or necessarily leads to the commission of another offense," where "proof of one act is proof of, or depends upon proof of, another act," or where "one scheme stem[s] from the other."  *United States v. DiScala*, No. 14 Cr. 399 (ENV), 2018 WL 1187394, at *17 (E.D.N.Y. Mar. 6, 2018).  Rather, it is a case in which there is a substantial risk that a jury—even a carefully instructed one—would naturally conflate the cumulated (and highly complex, largely Spanish-language) evidence on both sets of charges and punish Mr. Aguilar unfairly.

Although the money-laundering-conspiracy charge (Count 5) incorporates both schemes into a single conspiracy, that charge relates only to the logistics of the money transfers.  *See* ECF

No. 120 ¶¶ 55–56. That charge has no substance unless the government proves the two underlying disparate bribery schemes—which are elements of the money-laundering offense—beyond a reasonable doubt. *See* 18 U.S.C. § 1956(a)(1). It is the tail, not the dog; it cannot supply the basis for joinder of multiple unrelated predicate schemes against a single defendant, as courts in analogous cases consistently have held. *See, e.g.*, *Shellef*, 507 F.3d at 99–100 (that proceeds from one alleged scheme may have been used to help perpetrate another alleged scheme did not bridge the gaps between them to cure their prejudicial misjoinder); *United States v. Mackins*, 315 F.3d 399, 412–13 (4th Cir. 2003) (similar).

Nor can the government assert that this money laundering count encompasses both the alleged schemes through a "hub and spoke" conspiracy. It charges a conspiracy among "Mr. Aguilar" and unspecified "others" to launder the funds for or proceeds of violations of the FCPA and other laws. ECF No. 120 ¶¶ 55–56. But the government does not assert that the alleged coconspirators on the Mexico spoke knew anything about the Ecuador spoke, or vice-versa. Thus, if the government asserts that this count encompasses both schemes and supports joinder, that argument would flout longstanding precedent. *See, e.g.*, *United States v. Pauling*, 256 F. Supp. 3d 329, 334 (S.D.N.Y. 2017) ("In the context of wheel conspiracies, to prove a single conspiracy, the Government must show that there was a rim around the spokes, such that the spokes became coconspirators with each other." (citing *Kotteakos v. United States*, 328 U.S. 750, 754–55 (1946))).

In circumstances like these, courts in this Circuit sever, or refuse to join, the unrelated charges. *See, e.g.*, *United States v. Tubol*, 191 F.3d 88, 95 (2d Cir. 1999) (vacating convictions on misjoined charges because the defendant "allegedly used distinctly different methods in the two robberies for which he was convicted" and "targeted distinctly different victims—a bank and a small store"); *Halper*, 590 F.2d at 431 (vacating convictions on misjoinder even though "both

17

charges involved alleged attempts by Halper to manipulate those whom he had employed in a way that would work to his profit"); *United States v. Jordan*, No. 20 Cr. 305 (LDH), 2022 WL 4325870 (E.D.N.Y. Sept. 19, 2022) (severing misjoined conspiracy charges that occurred at different times, with different persons, and involved different cocaine-distribution weights).

The Court should do the same here and sever charges that should never have been joined in the first place.

C.   **Absent a Severance under Rule 14(a), Mr. Aguilar Will Suffer Improper Prejudice from the Joinder of the Mexico- and Ecuador-Related Charges.**

Even if joinder were proper (it isn't), Rule 14(a) requires severance where, as here, the presence of separate charges in an indictment "appears to prejudice a defendant." Fed. R. Crim. P. 14(a); *see, e.g.*, *Litwok*, 678 F.3d at 218 (vacating convictions on counts that should have been severed); *Shellef*, 507 F.3d at 98–102 (same). Severance is warranted here because joinder (1) prejudices Mr. Aguilar's ability to prepare adequately for trial, (2) interferes with his exercise of his Fifth Amendment privilege, and (3) enables the government to backdoor improper propensity evidence that would be inadmissible under Rule 404(b).

1.   *The belated joinder prejudices Mr. Aguilar's ability to prepare for trial.*

The government's belated addition of a new and complicated set of allegations is improper and warrants a severance because of the long duration of this case, the short time until the trial that this Court has already scheduled on the Ecuador-related charges, and the severe prejudice that would result from requiring Mr. Aguilar to prepare for what would now be a twice-as-complex trial on this compressed timetable.

The severance order in *United States v. Miller* is instructive. There, one month after the court set a trial date for a five-count indictment on various robbery, conspiracy, and narcotics offenses, the government obtained a superseding indictment that doubled the number of charges

by adding totally new robbery schemes.   No. 03 Cr. 906 (RPP), 2004 WL 1946381, at *1 (S.D.N.Y. Aug. 31, 2004).   The government defended its decision on the grounds that the defendant was supposedly on notice of the conduct charged in the superseder and supposedly had every "incentive" to investigate that conduct because the government had stated that it would seek to introduce evidence of that conduct under Rule 404(b).   *Id.* at *3.   The court severed the new charges, noting that the government's assertions "demonstrate[d] . . . obliviousness to the harm [its tactics had] caused to the trial schedule and to Defendants' preparations for trial."   *Id.*   The court also emphasized that while trying to introduce evidence of these new charges under Rule 404(b) would "not subject the Defendants to any further sentence," the superseder roughly doubled the defendants' potential Sentencing Guidelines ranges.   *Id.*   The court further was particularly concerned that "an investigation" into the crimes charged in the superseding indictment and allegedly committed "over 15 months ago . . . can be time consuming."   *Id.*

The court's reasoning in *Miller* applies squarely here.   Just as in *Miller*, the government here superseded the indictment one month after this Court had set a trial date on the Ecuador-related charges, more than doubling the number of charges Mr. Aguilar must now prepare to defend.   Likewise, the new charges materially change Mr. Aguilar's sentencing range under the U.S. Sentencing Guidelines.   If anything, the facts of *Miller* were less egregious than they are here because, just months from trial, this Superseding Indictment adds much more complicated FCPA charges, involving a completely unrelated scheme, featuring different witnesses, in a different country, and which allegedly occurred several years ago.

After more than two years litigating a case focused on one set of allegations, Mr. Aguilar cannot adequately prepare a defense to a new alleged scheme with trial just four months away.   A delay of this length in bringing new charges is "presumptively prejudicial" to Mr. Aguilar on its

own.  *See, e.g.*, *United States v. Black*, 918 F.3d 243, 254–55 (2d Cir. 2019) (charging delays "approaching one year may be considered presumptively prejudicial").  That prejudice is only compounded here given that the two-and-a-half-year-long delay comes with a ***doubling*** of the charges, ***doubling*** of the evidence to be presented at trial, and ***doubling*** of the efforts that the defense must undertake to prepare for trial, especially when the stakes under the Sentencing Guidelines are as high as they are here.  Because the Superseding Indictment "substantially change[d]" the government's case near trial, the resulting prejudice to the defendant's ability to mount a proper defense warrants severance.  *Ray*, 2022 WL 330517, at *2; *see United States v. Guzman*, 754 F.2d 482, 486 (2d Cir. 1985) (reversing conviction because a superseding indictment's changes were not "insubstantial" and the resulting expansion of the case prejudiced the defendant).

The Court should reject any argument that the prejudice to Mr. Aguilar is eliminated because the government had purportedly put the defense on notice of the possibility of these Mexico-related charges.  *See* Spiro Decl. Ex. B at 8:18–9:1 (previewing such an argument).  The government's prior threats of potential charges or the fact that the government's enormous productions of documents included some information about Mexico-related events, *see* Spiro Decl. ¶ 7, does not constitute notice for due-process purposes, either legally or practically, *see Miller*, 2004 WL 1946381, at *3 (rejecting argument that the defendant should have started investigating potential future charges before the government ever brought them).  Given the multi-year length of the government's investigation, the long charging delay, and the lack of venue in New York (*see infra* § II), the defense reasonably believed the government had wisely decided that no such charges should be brought or that, if they were to be brought, their prosecution would occur in Texas, not Brooklyn—and not in a case that has been pending for two-and-a-half years.  *See* Spiro

Decl. ¶ 7.  This is especially true given the government's disclosure, as recently as January 22, 2023, that its investigation remains ongoing.  *See id.* ¶ 8.

The defense reasonably expended its resources and focus these past years getting ready for trial on Ecuador.  It cannot be expected to shift so dramatically to this entirely new front at so late a date.  Thus, the government's belated decision to bring the Mexico charges only after the Court had set a trial date risks irreparable prejudice to the defense (not to mention massive disruption to the Court's schedule and huge burdens on the prospective jurors), warranting severance.

### 2. *Severance is warranted to protect Mr. Aguilar's Fifth Amendment rights.*

An independent basis for severance under Rule 14(a) is to preserve Mr. Aguilar's right to testify in his own defense on the Mexico-related charges, while invoking his Fifth Amendment privilege on the Ecuador-related charges.  The Second Circuit held in *Sampson* that substantial prejudice warranting severance "may develop when an accused wishes to testify on one but not the other of two joined offenses which are clearly distinct in time, place and evidence."  385 F.3d at 190–91.  The Court explained:

> [B]ecause of the unfavorable appearance of testifying on one charge while remaining silent on another, and the consequent pressure to testify as to all or none, the defendant may be confronted with a dilemma:  whether, by remaining silent, to lose the benefit of vital testimony on one count, rather than risk the prejudice (as to either or both counts) that would result from testifying on the other.

*Id.* at 191.  A defendant who shows that "he has both important testimony to give concerning one count and strong need to refrain from testifying on the other" thus can establish substantial prejudice, warranting severance.  *Id.*  To make that showing, he must describe "the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other." *Id.*  Once he makes that showing, a district court's failure to sever will result in vacatur. *Id.* at 193.

Mr. Aguilar makes that showing here.  If these charges were tried separately, he would intend to testify on the Mexico-related charges while exercising his Fifth Amendment right to remain silent in a standalone trial on the Ecuador-related charges.  Spiro Decl. ¶¶ 9–10.[6]

As to the Mexico-related charges, he would testify, among other things, ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

This testimony will be critical to Mr. Aguilar's defenses because ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

---

[6]   The defense reserves and neither forfeits nor waives Mr. Aguilar's right not to testify at trial after seeing the government's case-in-chief. *Id.* ¶ 11.  A court cannot compel a defendant to exercise his right to testify in his own defense up-front on one set of charges just for the speculative opportunity to exercise his right against self-incrimination on another set of charges if a court grants a motion to sever.  *See Simmons v. United States*, 390 U.S. 377, 393–94 (1968) ("[W]e find it intolerable that one constitutional right should have to be surrendered in order to assert another.").

By contrast—and further illustrating how fundamentally distinct the two sets of charges are—at a trial solely on the Ecuador-related charges, Mr. Aguilar expects to exercise his Fifth Amendment privilege against testifying.  Spiro Decl. ¶ 9. ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

Thus, if the two schemes are tried together, Mr. Aguilar would, as a practical matter, be required either to testify on both or not testify at all.  He could not testify just as to Mexico and expect the jury not to reach unfair adverse inferences when he says nothing about Ecuador.

The Fifth Amendment protects Mr. Aguilar from this dilemma.  The "pressure to testify as to all or none" that Mr. Aguilar faces here is exactly the same kind of prejudice that led the Second Circuit to vacate in *Sampson*, 385 F.3d at 191.  There, the district court abused its discretion, and vacatur was required, because it refused to sever two counts under Rule 14(a) even though the defendant made clear that he would have testified about a potential alibi with respect to one count, while remaining silent on the other count to avoid the introduction of a statement that he made in custody.  *Id.* at 191–92.

Similarly, in *United States v. Jordan*, the First Circuit vacated the defendant's convictions because he wished to remain silent on some charges, but said that he would have testified in a

separate trial on other charges to support a "good faith" defense. 112 F.3d 14, 16–17 (1st Cir. 1997). The joint trial substantially prejudiced the defendant by requiring him to choose between (i) bolstering an intent-specific defense with his own testimony on some charges, while waiving his Fifth Amendment right against self-incrimination on the other charges; or (ii) "eviscerating" that good-faith defense by declining to testify on those charges just to preserve his Fifth Amendment rights on the other charges. *Id.* at 17. The district court abused its discretion under Rule 14(a) by forcing the defendant to make that unconstitutional choice. *Id.* at 18.

Because Mr. Aguilar will be forced to make an unconstitutional choice between bolstering intent-specific defenses on the Mexico-related charges and remaining silent on the Ecuador-related charges, the constitutional principles underlying *Sampson* and *Jordan* require severing the Mexico-related charges.

### 3. *Severance is needed to avoid the prejudice of improper propensity evidence.*

Severance is further warranted because the new charges operate "as a means to circumvent Federal Rule of Evidence 404(b)'s prohibition against propensity evidence by drawing attention to [the defendant's] criminal history." *Codner*, 2022 WL 3139119, at *3. Courts have explained that severance under these circumstances "reflects and gives meaning to the central precept of our system of criminal justice, the presumption of innocence." *Id.* That pernicious circumvention of Rule 404(b) is precisely what would occur here if the Mexico-related charges are not severed.

The government's own comments suggest that it views these new charges as a way to get evidence of Mr. Aguilar's alleged Mexico-related conduct into a trial about alleged Ecuador-related conduct, in lieu of complying with Rule 404(b). At the November 2022 conference, the government told the Court that it was considering two ways of presenting Mexico-related evidence: a motion in limine under Rule 404(b), or a superseding indictment. *See supra* at 8.

Soon after, the government chose the latter, apparently having concluded that it could not meet the requirements of Rule 404(b) to admit Mexico-related evidence that otherwise would spill over prejudicially into the jury's consideration of the Ecuador-related charges. These tactics, if allowed to succeed, would relieve the government of its burden to show that "evidence of the separate crimes would be admissible anyway" in a joint trial such that severance might not be needed. *Halper*, 590 F.2d at 431 (vacating convictions for failure to sever); *see also Shellef*, 507 F.3d at 100 (severing charges even though evidence of one count "may be relevant to determining whether [defendant] possessed the requisite mens rea for the" other counts because they "are not sufficiently unified by some substantial identity of facts or participants, nor do they arise out of a common plan or scheme").

Courts in this Circuit have repeatedly admonished the government not to exploit improper joinder to sidestep the strictures of Rule 404(b). Just last year, the Honorable Raymond J. Dearie granted a defendant's motion to sever two sets of counts when it appeared that the government had joined them to introduce evidence of his prior felony conviction through the backdoor. *Codner*, 2022 WL 3139119, at *3–4. Judge Dearie rejected this effort to "circumvent [Rule] 404(b)'s prohibition against propensity evidence." *Id.* at *3. The Court also noted that the few similarities between the two sets of charges were "simply too tenuous to overcome the prejudice that could result from the jury repeatedly hearing reference to [the defendant's] prior conviction." *Id.* at *4. The court added that severance was particularly warranted because even without the "adornment" of those other charges, "trial [was] expected to last six to eight weeks," on "multiple charges, and a multitude of alleged events over more than a year comprising the government's case." *Id.* at *4. Judge Dearie could have been talking about the facts of this very case.

Likewise, the Honorable Alison J. Nathan severed a perjury count against Ghislaine Maxwell because it appeared that the government might use that charge to "introduce unrelated allegations of sexual abuse," from civil cases against Jeffrey Epstein, "which would potentially expose the jury to evidence that might otherwise not be admissible" against her. *United States v. Maxwell*, 534 F. Supp. 3d 299, 320 (S.D.N.Y. 2021). Because that "present[ed] a significant risk that the jury will cumulate the evidence of the various crimes charged and find guilt when, considered separately, it would not do so," severance was required. *Id.* at 320–21.

So too here. The danger of the Ecuador- and Mexico-related charges leading to prejudicial spillover to "find guilt" is overwhelming. No amount of instructions will enable jurors to avoid the unlawful conclusion of criminal propensity. Thus, severance is the only effective remedy.

*     *     *

There are at least four separate bases for severance of the Mexico-related charges from the impending trial: misjoinder, insufficient time to prepare, interference with Mr. Aguilar rights to testify (or not), and the inevitable unfair prejudice that flows from propensity evidence. Each of these factors justifies severance, but in combination, the prejudice to Mr. Aguilar if severance is not granted is overwhelming.

## II.   THE COURT LACKS VENUE OVER THE MEXICO-RELATED CHARGES, WHICH BELONG IN THE SOUTHERN DISTRICT OF TEXAS.

Once the Court severs the charges, it should dismiss the Mexico-related charges because the allegations in the Superseding Indictment all point to the Southern District of Texas and not the Eastern District of New York. Even if the Court decides that it is too early to dismiss those charges for lack of venue, it should transfer them to the Southern District of Texas.

A.    **Applicable Law**

The Constitution twice codifies a defendant's right to be tried in, and before a jury comprised of residents of, the district in which his offense was allegedly committed.  U.S. Const. art. III § 2, cl. 3; *id.*, amend. VI; *see also* Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed.")  The Second Circuit has stressed the "strength" and "significanc[e]" of these constitutional protections.  *United States v. Novak*, 443 F.3d 150, 160–61 (2d Cir. 2006).

"The burden is on the government to prove that the crime was committed in the district in which the prosecution is brought."  *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989).  It must do so by a preponderance of the evidence.  *United States v. Ramirez*, 420 F.3d 134, 139 (2d Cir. 2005).  When a defendant challenges venue through a pretrial motion to dismiss, the government must "show[ ] that the indictment alleges facts sufficient to support venue," *United States v. Barrett*, 153 F. Supp. 3d 552, 561 n.5 (E.D.N.Y. 2015), and the Court assumes as true only the "factual allegations" in the indictment, *DiScala*, 2018 WL 1187394, at *25.  The government also must show that venue is proper as to each charge by establishing that conduct supporting each charge occurred within the district.  *Novak*, 443 F.3d at 160–61.

Although some continuing offenses may be "prosecuted in any district in which such offense was begun, continued, or completed," 18 U.S.C. § 3237(a), the Second Circuit has warned that even those charges may be tried only in a district that has "substantial contacts" with "the criminal acts in question," *Ramirez*, 420 F.3d at 139.  The substantial-contacts test "takes into account four main factors: (1) the site of the crime, (2) its elements and nature, (3) the place where the effect of the crim[e] occurs, and (4) suitability of the venue [ ] for accurate factfinding."  *Id.*

In addition, when a district's connection to the charged offenses is weak, a defendant may move to "transfer the proceeding, or one or more counts, . . . to another district for the convenience

of the parties, any victim, and the witnesses, and in the interest of justice." Fed. R. Crim. P. 21(b).

Courts consider many non-dispositive factors when deciding whether to grant a motion to transfer, including (as relevant here) the locations of the defendant, possible witnesses, "the events likely to be at issue," and the evidence. *United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990). "A defendant bears the burden of showing that a transfer of venue is in the interests of justice" under Rule 21(b) of the Federal Rules of Criminal Procedure. *United States v. Fiorentino*, No. 13 Cr. 338 (SJF), 2014 WL 108415, at *4 (E.D.N.Y. Jan. 6, 2014).

## B. This District Lacks Venue over the Mexico-Related Charges.

The Superseding Indictment's allegations plainly reveal that the Court lacks venue over the Mexico-related charges. Not one allegation in the Superseding Indictment connects those charges to the Eastern District of New York—to the contrary, the allegations show that those charges belong only in the Southern District of Texas. *See supra* at 10–11. This is unsurprising, given that the Mexico-related charges allege that Mr. Aguilar (a Houston resident) agreed to and did bribe Espinosa and Guzman (both Houston residents), so that Vitol (a Houston-based company) could allegedly get "improper advantages" when doing business with PPI (another Houston-based company). ECF No. 120 ¶¶ 1–2, 8–10, 37–38.

Nor do the allegations about the flow of money from Vitol to Espinosa and Guzman point toward the Eastern District of New York. The money allegedly flowed from Vitol's "accounts in the United Kingdom" to accounts "in Curaçao" controlled by Hanst, then to the Mexican "Intermediary['s]" shell-company "bank accounts in Mexico," followed by downstream transfers (unconnected to Mr. Aguilar) to: (1) "bank accounts in the United States and Mexico controlled by and for the benefit of [the Houstonians] Guzman and Espinosa"; (2) in cash to Guzman "in the United States and in Mexico," and (3) in cash or by electronic transfer "to Guzman's relatives in

28

Mexico." ECF No. 120 ¶ 40; *see also id.* ¶ 52(e), (h), (k), (m), (n) (charging payments to accounts controlled by Espinosa or Guzman "in the United States"—not in New York).

At no point does the Superseding Indictment indicate that conduct attributable to Mr. Aguilar—for either the conspiracy or substantive Mexico-related offenses—occurred in this district. *See supra* at 10–11. By contrast, the Superseding Indictment expressly alleges that conduct related to the Ecuador scheme occurred "within the Eastern District of New York and elsewhere." ECF No. 120 ¶ 48; *see also id.* ¶ 48(b) (alleging an overt act connecting the Ecuador-related conspiracy charge to this district). This creates a facially evident venue defect. *See Novak*, 443 F.3d at 161 (an indictment's venue defect is facially apparent when it charges that the offense conduct occurred in another district, regardless whether it also contains a boilerplate assertion that the offense occurred in the district of trial "and elsewhere"); *id.* (venue defect is also facially apparent when the government clearly charges in-district venue for one count but not another).

As a result, the government cannot meet its burden to show that the Superseding Indictment suggests "contacts"—much less sufficiently "substantial contacts"—between the Mexico-related charges and this district. *Ramirez*, 420 F.3d at 139; *accord Beech-Nut*, 871 F.2d 1188–89 (same). None of the four "substantial contacts" factors prescribed by the Second Circuit is present here, *Ramirez*, 420 F.3d at 139:

- ***Site of the Alleged Crime***:  the charges assert that all the offense conduct at issue occurred in or around Houston, in the Southern District of Texas.

- ***Elements and Nature of the Offense***:  the government alleges that all the essential elements of the offenses occurred in or around the Southern District of Texas, and the crux of the charged scheme was that one Houstonian agreed to bribe two other Houstonians to give one Houston-based company an advantage when doing business with another Houston-based company.

- ***Situs of the Alleged Crime's Effects***:  the effects of the Mexico-related charges were centralized in the Southern District of Texas because PPI, the victim of the alleged scheme, is based in Houston.

- ***Better Location for Factfinding***: the Southern District of Texas is better suited for accurate factfinding because nearly all the alleged coconspirators, the alleged beneficiary, and the alleged victim of these charges are all based in Houston, and because only a Texas jury can constitutionally consider these locally focused charges. *See infra* at 30–32 (discussing locations of parties, witnesses, evidence, and victims).

The government's assertions that the alleged Mexico and Ecuador schemes are "interrelated" or "intertwined," Spiro Decl. Ex. A at 5:20–25; *id.* Ex. B at 8:11–17, provide no basis for grounding venue in this district. Whatever the merit of that position—and there is none, *see supra* § I—the government must establish venue for ***each count***. *Novak*, 443 F.3d at 160–61.

The Court should dismiss the Mexico-related charges under Rule 18 for lack of venue.

## C.    In the Alternative, the Court Should Transfer the Mexico-Related Charges to the Southern District of Texas.

Even if venue might theoretically be possible in this district, the Court should exercise its discretion under Rule 21(b) to transfer the Mexico-related charges to the Southern District of Texas, because that district has much more "substantial contacts" with those charges. *Ramirez*, 420 F.3d at 139. "[F]or the convenience of the parties, any victim, and the witnesses, and in the interest of justice," courts can and should transfer charges to a more appropriate district. Fed. R. Crim. P. 21(b). The Court should transfer the Mexico-related charges because Mr. Aguilar, essential witnesses, key documents, and important events at issue are all located in or around Houston, and all the other factors that courts consider are neutral or inapplicable. *See Maldonado-Rivera*, 922 F.2d at 966 (listing factors).

*First*, Mr. Aguilar and his two young daughters reside in Houston, Texas, and "courts should, wherever possible, try defendants where they reside" as "a matter of policy." *Fiorentino*, 2014 WL 108415, at *4; *accord United States v. Russell*, 582 F. Supp. 660, 662 (S.D.N.Y. 1984) ("Unquestionably, it can be a hardship for defendants to stand trial far away from home."). Thus, Mr. Aguilar's "residence and family concerns" strongly favor transfer—especially considering

30

that Mr. Aguilar will already have to spend many weeks, and potentially many months, away from his daughters while he is in New York for the trial on the Ecuador-related charges. *Fiorentino*, 2014 WL 108415, at *4; *accord, e.g.*, *United States v. Cashin*, 281 F.2d 669, 675 (2d Cir. 1960) (courts should, "whenever possible," try charges "at the residence of the defendant").

*Second*, nearly all the likely witnesses for the Mexico-related charges are based in or around Houston. *See, e.g.*, *Russell*, 582 F. Supp. at 662–63 (granting transfer when a "majority of [the government's] witnesses will come from abroad" and "a large number of" defense witnesses would come from another district). Nearly all the government's likely witnesses—Espinosa, Guzman, the "Intermediary," other Vitol employees, and other PPI employees—reside in Houston or just across the border in Mexico. ECF No. 120 ¶¶ 1–2, 8–10, 19. Because PPI (the alleged victim) is headquartered in Houston, *id.* ¶ 8, any witnesses testifying about PPI likely live in that area. And the only other likely witness, Hanst, lives in Curaçao, which is effectively just as far from Brooklyn as it is from Houston. *Id.* ¶ 16.

As for government agency witnesses and the attorneys for the parties, a transfer to Texas will impose no undue burden. The government's expected witnesses, including its case agents, are located out-of-district in the Federal Bureau of Investigation's Miami-based International Corruption Unit.[7] The two agents who interrogated Mr. Aguilar are based in Houston; most of the prosecutors assigned to this case are based in the Washington, D.C. offices of the Department of Justice, *see id.*; and the U.S. Attorney's Office for the Southern District of Texas, which is based in Houston, could certainly help prosecute this case once transferred.

---

[7]   *See* U.S. Dep't of Justice, *Former Manager of Oil Trading Firm Charged in Money Laundering and Bribery Scheme* (Sept. 22, 2020), https://www.justice.gov/usao-edny/pr/former-manager-oil-trading-firm-charged-money-laundering-and-bribery-scheme.

Furthermore, the character witnesses whom Mr. Aguilar plans to call in his defense are all based in or around Houston. *See* Spiro Decl. ¶ 12. Although those witnesses are "[v]ery often the difference between liberty and imprisonment," the "inconvenience, expense and loss of time involved in transplanting [them] to testify in trials far removed from their homes are often too great to warrant their use." *United States v. Aronoff*, 463 F. Supp. 454, 458–59 (S.D.N.Y. 1978) (transferring charges when the defendant, his witnesses, his alleged illegal activities, and his business were all located in the transferee district, even though it required two separate trials).

*Third*, given that Mr. Aguilar, Vitol, Espinosa, Guzman, and PPI are all based in Houston, ECF No. 120 ¶¶ 1–2, 8–10, the relevant documentary evidence likely also is in the Southern District of Texas, further favoring transfer. Even if the government has seized some of the relevant documents and transferred them to the Eastern District of New York, that would "not properly lie in favor of the [g]overnment's opposition to the change of venue." *United States v. Spy Factory, Inc.*, 951 F. Supp. 450, 458 (S.D.N.Y. 1997) (Sotomayor, J.).

*Finally*, because the Southern District of Texas is clearly the "nerve center" of the Mexico-related charges, *see supra* at 10–11, 29–30; they should be tried in that district. *United States v. Alter*, 81 F.R.D. 524, 526 (S.D.N.Y. 1979) (Weinfeld, J.) (granting transfer when "most, if not all, of the acts and conduct in furtherance of the alleged scheme to defraud occurred in Miami," which "was the 'nerve center' of the alleged illicit operations"); *accord, e.g.*, *United States v. Martino*, No. 00 Cr. 389 (RCC), 2000 WL 1843233, at *7 (S.D.N.Y. Dec. 14, 2000) (similar).

Accordingly, if the Court declines to dismiss the Mexico-related charges for lack of venue, then it should transfer those charges under Rule 21(b) to the Southern District of Texas.

## CONCLUSION

For all these reasons, the Court should sever the Mexico-related charges, and then dismiss

them for lack of venue or transfer those charges to the Southern District of Texas.

Respectfully submitted,

Dated:  March 3, 2023

**QUINN EMANUEL URQUHART**
**  & SULLIVAN, LLP**

By: _____

Alex Spiro
Tai H. Park
Daniel R. Koffmann
George T. Phillips
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
alexspiro@quinnemanuel.com
taipark@quinnemanuel.com
danielkoffmann@quinnemanuel.com
georgephillips@quinnemanuel.com

*Counsel for Defendant Javier Aguilar*

cc:  Counsel of Record (via ECF)