UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

    - against -

JAVIER AGUILAR

                Defendant.

– – – – – – – – – – – – – – – – – – – – – – – – – X

No. 20 Cr. 390 (ENV)

**Served Via ECF On November 17, 2023**

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S AFFIRMATIVE MOTIONS IN LIMINE

---

**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**

William D. Weinreb (pro hac vice pending)
Michael T. Packard (admitted pro hac vice)
111 Huntington Avenue, Suite 520
Boston, MA 02199
(617) 712-7100
billweinreb@quinnemanuel.com
michaelpackard@quinnemanuel.com

Alex Spiro
Daniel R. Koffmann
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
alexspiro@quinnemanuel.com
danielkoffmann@quinnemanuel.com

William C. Price (pro hac vice pending)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
williamprice@quinnemanuel.com

*Counsel for Defendant Javier Aguilar*

## TABLE OF CONTENTS

**Page**

I.   The Court Should Preclude the Government from Using Irrelevant and Inflammatory Terms. ....................................................................................1

    A.   Legal Standard ..........................................................................................1

    B.   Application ................................................................................................1

II.   The Court Should Bar Evidence of Distinct, Uncharged, and Unfulfilled Ecuadorian Business that Mr. Aguilar Discussed. ...............................................5

    A.   Relevant Background..................................................................................6

    B.   Legal Standard ..........................................................................................8

    C.   Application ................................................................................................8

III.   The Court Should Prohibit Evidence or Argument Regarding Mr. Aguilar's Compensation, Including Any Effort to Connect His Compensation to the Execution or Performance of the Contracts Underlying the Charged Schemes. ................................13

IV.   The Court Should Hold a Pretrial Hearing to Determine the Admissibility of Purported Coconspirator Statements or, Alternatively, Require the Government to Disclose All Purported Coconspirators 30 Days Before Trial. ............................................17

V.   The Court Should Enter Sequestration and Nondiscussion Orders Covering Nonparty Witnesses and Their Representatives....................................................20

VI.   The Court Should Prohibit the Government from Introducing at Trial Any Rule 16 Discovery Produced to Mr. Aguilar After November 17, 2023..........................................23

CONCLUSION....................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### Cases

*Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Ams.*,
  No. 04 Cv. 10014 (PKL), 2009 WL 3111766 (S.D.N.Y. Sept. 28, 2009) ................. 2, 3, 16, 17

*Arizona v. Fulminante*,
  499 U.S. 279 (1991) ................................................................................................................ 5

*Arlio v. Lively*,
  474 F.3d 46 (2d Cir. 2007) ................................................................................................. 1, 14

*Bourjaily v. United States*,
  483 U.S. 171 (1987) ......................................................................................................... 17, 18

*United States v. Badalamenti*,
  794 F.2d 821 (2d Cir. 1986) ................................................................................................. 18

*United States v. Belk*,
  No. 01 Cr. 180 (LTS), 2002 WL 342585 (S.D.N.Y. Mar. 4, 2002) ........................................ 11

*Berk v. Bates Advert. USA, Inc.*,
  No. 94 Cv. 9140 (CSH), 1998 WL 726030 (S.D.N.Y. Oct. 14, 1998) ................................. 2, 4

*Bradshaw v. Perdue*,
  319 F. Supp. 3d 286 (D.D.C. 2018) ................................................................................. 21, 22

*United States v. Cruz*,
  343 F. Supp. 2d 226 (S.D.N.Y. 2004) ................................................................................... 11

*United States v. Dowdell*,
  70 F.4th 134 (3d Cir. 2023) ................................................................................................... 10

*United States v. Downing*,
  297 F.3d 52 (2d Cir. 2002) ................................................................................................. 8, 11

*FarFromBoring Promotions.Com, LLC v. Campbell*,
  No. 20 Cv. 80774 (WPD) (WM), 2020 WL 5076994 (S.D. Fla. Aug. 27, 2020) ................... 22

*United States v. Friedman*,
  854 F.2d 535 (2d Cir. 1988) ................................................................................................... 22

*United States v. Garcia*,
  291 F.3d 127 (2d Cir. 2002) ................................................................................................... 10

*United States v. Garcia*,
  730 F. Supp. 2d 1159 (C.D. Cal. 2010) ................................................................................. 26

*United States v. Gasparik,*
    141 F. Supp. 2d 361 (S.D.N.Y. 2001) ....................................................................... 9

*United States v. Gigante,*
    166 F.3d 75 (2d Cir. 1999) ...........................................................................18, 19

*United States v. Gilbert,*
    229 F.3d 15 (1st Cir. 2000) ................................................................. 12, 13, 15

*Hart v. RCI Hosp. Hldgs., Inc.,*
    90 F. Supp. 3d 250 (S.D.N.Y. 2015) .................................................................. 16

*United States v. Hatfield,*
    685 F. Supp. 2d 320 (E.D.N.Y. 2010) ............................................................... 12

*United States v. Heatley,*
    994 F. Supp. 483 (S.D.N.Y. 1998) ..............................................................17, 18

*United States v. Helbrans,*
    No. 19 Cr. 497 (NSR), 2021 WL 4778525 (S.D.N.Y. Oct. 12, 2021) ...................... 2

*United States v. Henry,*
    848 F.3d 1 (1st Cir. 2017) ................................................................................. 11

*Highland Cap. Mgmt., L.P. v. Schneider,*
    551 F. Supp. 2d 173 (S.D.N.Y. 2008) ................................................................. 2

*United States v. Jackson,*
    60 F.3d 128 (2d Cir. 1995) ............................................................................... 21

*United States v. Jadusingh,*
    No. 18 Cr. 257 (KAM), 2020 WL 207950 (E.D.N.Y. Jan. 14, 2020) ..................... 13

*United States v. James,*
    607 F. Supp. 3d 246 (E.D.N.Y. 2022) ..............................................................8, 9

*Jerry Parks Equip. Co. v. Se. Equip. Co.,*
    817 F.2d 340 (5th Cir. 1987) ........................................................................... 22

*Kinsey v. Cendant Corp.,*
    588 F. Supp. 2d 516 (S.D.N.Y. 2008) ............................................................... 15

*L-3 Commc'ns Corp. v. OSI Sys., Inc.,*
    No. 02 Cv. 9144 (PAC), 2006 WL 988143 (S.D.N.Y. Apr. 13, 2006) ................... 15

*United States v. Levy,*
    No. 11 Cr. 62 (PAC), 2013 WL 655251 (S.D.N.Y. Feb. 22, 2013) ....................9, 12

*United States v. Macon,*
    No. 3:21 Cr. 172 (JAM), 2023 WL 4083230 (D. Conn. June 20, 2023) .................. 9

*United States v. Marcial*,
No. 22 Cr. 208 (AT), 2023 WL 1818548 (S.D.N.Y. Feb. 8, 2023) .............................. 2

*United States v. Mason*,
No. 06 Cr. 80 (NRB), 2008 WL 281970 (S.D.N.Y. Jan. 25, 2008) ........................... 26

*MF Glob. Hldgs. Ltd. v. PricewaterhouseCoopers LLP*,
232 F. Supp. 3d 558 (S.D.N.Y. 2017) .................................................................1, 2

*United States v. McCallum*,
584 F.3d 471 (2d Cir. 2009) ................................................................................ 11

*United States v. Midyett*,
603 F. Supp. 2d 450 (E.D.N.Y. 2009) .................................................................8, 9

*United States v. Nachamie*,
101 F. Supp. 2d 134 (S.D.N.Y. 2000) ..................................................................... 8

*United States v. Newton*,
No. 01 Cr. 635 (CSH), 2002 WL 230964 (S.D.N.Y. Feb. 14, 2002) .................10, 11

*United States v. Ng Chong Hwa*,
No. 18 Cr. 538 (MKB) (E.D.N.Y. Dec. 9, 2021) (Min. Entry) ............................... 20

*Old Chief v. United States*,
519 U.S. 172 (1997) ............................................................................................. 16

*Perry v. Leeke*,
488 U.S. 272 (1989) ............................................................................................. 22

*United States v. Rajaratnam*,
No. 13 Cr. 211 (NRB), 2014 WL 2696568 (S.D.N.Y. June 10, 2014) ..................... 8

*United States v. Ray*,
No. 20 Cr. 110 (LJL), 2022 WL 558146 (S.D.N.Y. Feb. 24, 2022) .......................... 4

*Ricketts v. City of Hartford*,
74 F.3d 1397 (2d Cir. 1996) ...........................................................................15, 16

*United States v. Robinson*,
No. 16 Cr. 98 (CKK) 2017 WL 11496710 (D.D.C. June 26, 2017) ........................ 15

*United States v. Runner*,
No. 18 Cr. 578 (JS), 2023 WL 3727532 (E.D.N.Y. May 30, 2023) .......................3, 5

*United States v. Saneaux*,
365 F. Supp. 2d 493 (S.D.N.Y. 2005) ................................................................... 17

*United States v. Sepulveda*,
15 F.3d 1161 (1st Cir. 1993) ................................................................................ 22

*United States v. Schatzle*,
901 F.2d 252 (2d Cir. 1990) ...................................................................................... 12

*United States v. Siemaszko*,
No. 3:06 Cr. 712 (DAK), 2008 WL 7489322 (N.D. Ohio July 31, 2008) ................................ 5

*United States v. Stein*,
521 F. Supp. 2d 266 (S.D.N.Y. 2007) ...................................................................... 8, 12

*United States v. Ulbricht*,
79 F. Supp. 3d 466 (S.D.N.Y. 2015) ............................................................................ 13

*United States v. W.R. Grace*,
526 F.3d 499 (9th Cir. 2008) (en banc) .................................................................. 25, 26

*United States v. Watts*,
934 F. Supp. 2d 451 (E.D.N.Y. 2013) ...................................................................... 2, 3

*United States v. Wey*,
252 F. Supp. 3d 237 (S.D.N.Y. 2017) ............................................................................ 1

*United States v. Williams*,
585 F.3d 703 (2d Cir. 2009) ........................................................................................ 9

## Statutes & Rules

Fed. R. Crim. P. 16 ....................................................................................... 23, 24, 25

Fed. R. Evid. 104 ...................................................................................................... 17

Fed. R. Evid. 401 ....................................................................................... 1, 13, 14, 16

Fed. R. Evid. 402 ............................................................................................. 1, 5, 8, 13

Fed. R. Evid. 403 .................................................................................................. *passim*

Fed. R. Evid. 404 .................................................................................................. *passim*

Fed. R. Evid. 611 ...................................................................................................... 21

Fed. R. Evid. 615 .................................................................................................. 21, 22

Fed. R. Evid. 801 ........................................................................................... 17, 18, 19

Defendant Javier Aguilar respectfully moves the Court to enter the orders in limine described below regarding evidence and arguments that the government may seek to introduce at trial.[1]

## I.   THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM USING IRRELEVANT AND INFLAMMATORY TERMS.

The Court should preclude the government from using pejorative and loaded terms with no probative value that will inflict unfair prejudice on Mr. Aguilar, including (but not limited to): "shell company" or "front" entities; "sham" agreements and invoices; "inside information"; and "confession" or "admission" of guilt.

### A.   Legal Standard

"Irrelevant evidence is not admissible."  Fed. R. Evid. 402.  Evidence is relevant only if (a) it tends "to make a fact more or less probable than it would be without the evidence," and (b) "the fact is of consequence in determining the action."  Fed. R. Evid. 401; *see Arlio v. Lively*, 474 F.3d 46, 52 (2d Cir. 2007) ("If [evidence] does not tend to prove a material fact, it is irrelevant.").  Even relevant evidence is inadmissible "if its probative value is substantially outweighed by a danger of [among other things] unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

### B.   Application

Under Rule 403, courts routinely preclude the use of irrelevant and inflammatory terms that lack probative value and present an inherent danger of unfair prejudice.  *See, e.g.*, *MF Glob. Hldgs. Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 570 (S.D.N.Y. 2017)

---

[1]   Unless otherwise indicated, this brief omits from quotations and citations all internal quotation marks, alterations, footnotes, and citations.  Mr. Aguilar has redacted from these motions in limine portions discussing information that falls under the protective order, ECF No. 171; or which is essential to redact to prevent "disclosure of certain elements of the defense's trial strategy," *United States v. Wey*, 252 F. Supp. 3d 237, 243 (S.D.N.Y. 2017).  All such redactions are marked in {braces}.

("[C]ourts often prohibit the use of certain pejorative terms when such categorizations [are] inflammatory and unnecessary to prove a claim and such statements do not bear on the issues being tried."). This rule applies with full force to the government and its witnesses in criminal cases. *See, e.g.*, *United States v. Marcial*, No. 22 Cr. 208 (AT), 2023 WL 1818548, at *2 (S.D.N.Y. Feb. 8, 2023) (granting motion "to preclude the Government from using the terms 'domestic violence,' 'assault in progress,' and 'strangulation' on the ground that these terms are unduly inflammatory and irrelevant to the charged offense," and instead ordering the government to "use the term 'domestic incident'"); *United States v. Helbrans*, No. 19 Cr. 497 (NSR), 2021 WL 4778525, at *17 (S.D.N.Y. Oct. 12, 2021) (precluding government from using pejorative terms including "brainwash," "coerce," "cult," and "survivor").

In cases involving complex financial transactions, like this one, courts in this Circuit have cited Rule 403 to preclude a host of pejorative terms, including the very terms that Mr. Aguilar seeks to preclude here. *See, e.g.*, *United States v. Watts*, 934 F. Supp. 2d 451, 482 (E.D.N.Y. 2013) (precluding phrases "shell company" and "shell corporation" as "pejorative" and lacking "evidentiary value"); *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 193 (S.D.N.Y. 2008) (precluding parties from "characteriz[ing] admissible evidence and testimony as securities fraud, illegal, insider trading, inside information, and market manipulation"); *Berk v. Bates Advert. USA, Inc.*, No. 94 Cv. 9140 (CSH), 1998 WL 726030, at *2 & n.2 (S.D.N.Y. Oct. 14, 1998) (precluding "pejorative nouns" like "pretext" and "sham" because they went to "ultimate issue[s]" and because a juror "is perfectly able to detect a pretext if and when it sees and hears one"); *see also Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Ams.*, No. 04 Cv. 10014 (PKL), 2009 WL 3111766, at *7 (S.D.N.Y. Sept. 28, 2009) (precluding phrase "tax haven" on the ground that it is "inflammatory" and cautioning the parties against using "inflammatory terms and making

derogatory statements that do not bear on the issues being tried"). As the Honorable Kiyo A. Matsumoto explained in *Watts*, such terms "could be perceived to have a pejorative meaning," and their exclusion is warranted because "[n]o evidentiary value is added by allowing" parties or witnesses "to use those terms." 934 F. Supp. 2d at 482.

Here, there is a clear risk that the government will try to use these and other inflammatory phrases at trial. Every charging instrument has used the phrase "shell companies" to describe entities controlled by (among others) Lionel Hanst or Antonio and Enrique Pere, all of whom are cooperating with the government. *See, e.g.*, ECF No. 120 ¶¶ 12–20 (listing so-called "Intermediaries and Shell Companies" controlled by those witnesses and others); ¶ 23 (alleging that "Aguilar and his co-conspirators" wired payments "through a network of shell companies and intermediaries"); ECF No. 1 ¶¶ 6–8 (describing purported "shell companies"); ECF No. 13 ¶ 2(b)–(d) (same). And the government repeatedly has characterized these entities' contractual materials—for example, agreements and invoices—as "shams." *See, e.g.*, ECF No. 120 ¶¶ 24, 31–34 (alleging various forms of "sham" agreements and invoices). The government also has described information provided to Mr. Aguilar by the alleged Mexican officials as "inside information." *See, e.g.*, *id.* ¶¶ 37–38, 52(*i*).

These loaded terms litter the charging instruments, suggesting that the government intends to make them familiar refrains when presenting evidence and argument to the jury. *Contra United States v. Runner*, No. 18 Cr. 578 (JS), 2023 WL 3727532, at *5 (E.D.N.Y. May 30, 2023) (permitting defendant to renew at trial his "request to preclude references to shell companies" where the government represented that any use of those terms "will be de minimis"). Indeed, the charging instruments show that the government plans to use such inflammatory terms to characterize some of the most important and disputed issues in the case: for example, the

legitimacy of the transactions at issue and the services or information that Vitol and others allegedly received.  That is improper because such inflammatory terms presume ultimate issues that the jury must decide to render a verdict.  *See, e.g.*, *United States v. Ray*, No. 20 Cr. 110 (LJL), 2022 WL 558146, at *25–26 (S.D.N.Y. Feb. 24, 2022) (precluding government and witnesses from using the term "victim" because it presumed ultimate question before the jury:  whether defendant committed a crime); *Berk*, 1998 WL 726030, at *2 & n.2 (precluding witness from using "pejorative nouns" including "pretext" and "sham" because they went to "ultimate issue[s]").

These terms are not just unfairly prejudicial because of their pejorative tone, implication, and presumption of ultimate issues—they also are misleading.  As to the so-called "shell companies," trial evidence will demonstrate that entities controlled by Mr. Hanst, the Pere brothers, and others all appeared—to Mr. Aguilar—to be legitimate companies.  Nor did Mr. Aguilar have any basis to believe that these entities' agreements or invoices were "shams." Yet the government wants its witnesses to use these loaded terms to suggest that these companies and their related agreements were illicit on their face—thereby using prejudicial innuendo to plug a gap in their proof.  That is improper.  Similarly, the information Mr. Aguilar allegedly received from Mr. Espinosa and Mr. Guzman was not material, "inside information."  To the contrary, evidence will show that it was immaterial and, in many cases, freely accessible to other parties seeking business with Pemex Procurement International, Inc. ("PPI").  ECF No. 120 ¶¶ 37–38. Yet if the government or its witnesses are permitted to use loaded phrases like "inside information," it will inevitably—and improperly—suggest that Mr. Aguilar committed a crime.

For similar reasons, the Court should preclude the government from referring to Mr. Aguilar's alleged statements to federal agents at Houston's international airport as a "confession," "admission" of guilt, or anything of the sort.  Mr. Aguilar vigorously disputes that

his alleged statements amount to any kind of confession.  At bottom, his alleged statements "speak for themselves," and "whether such statements amount to a 'confession' or an 'admission' of guilt is a matter of interpretation to be left to the trier of fact, the jury." *United States v. Siemaszko*, No. 3:06 Cr. 712 (DAK), 2008 WL 7489322, at *2 (N.D. Ohio July 31, 2008) (precluding those terms to describe defendant's alleged statements).  Because "[a] confession is like no other evidence" and "ha[s] a profound impact on the jury," *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991), the use of pejorative terms like "confession" or "admission" of guilt to describe this hotly disputed evidence would be unfairly prejudicial in violation of Rule 403.

Accordingly, the Court should preclude the government and its witnesses from using these and other pejorative terms to describe the alleged entities, agreements, invoices, information, or statements at issue.  Alternatively, the Court should require the government first to prove the factual prerequisites for each use of any such term before its counsel and witnesses can state them in the jury's presence. *See Runner*, 2023 WL 3727532, at *5 (allowing government to use phrase "shell company" only if it was "able to establish a factual predicate . . . prior to usage of the descriptive term").

## II.    THE COURT SHOULD BAR EVIDENCE OF DISTINCT, UNCHARGED, AND UNFULFILLED ECUADORIAN BUSINESS THAT MR. AGUILAR DISCUSSED.

The Court should prevent the government from introducing evidence of unconsummated Ecuadorian business opportunities that Mr. Aguilar discussed in 2019 and 2020—all of which are distinct from the fuel oil deal that is the sole focus of the alleged "Ecuador Bribery Scheme" and related money-laundering conspiracy charge.  *See* ECF No. 120 § III.B; *id.* (Counts One, Three, and Five).  **First**, evidence of these distinct, uncharged, and unconsummated opportunities is irrelevant and therefore inadmissible.  *See* Fed. R. Evid. 402.  **Second**, even if these unconsummated opportunities were marginally relevant (they aren't), they would constitute evidence of prior bad acts that is inadmissible under Rules 404(b) and 403.

## A.    Relevant Background

The government alleges that Mr. Aguilar conspired to bribe, and did bribe, two alleged Ecuadorian government officials, Nilsen Arias Sandoval and "Ecuadorian Official #1." ECF No. 120 ¶¶ 5–6, 25; *see also id.* ¶¶ 47–49, 53–54 (Counts One and Three).   Mr. Aguilar purportedly bribed them "in exchange for . . . securing improper advantages for Vitol in obtaining and retaining business in connection with a December 2016 contract" involving the purchase of the fuel oil from Petroecuador, which the government calls the "Fuel Oil Contract."  *Id.* ¶ 25. Specifically, the government claims Mr. Aguilar violated the Foreign Corrupt Practices Act ("FCPA") by bribing these two individuals in exchange for three "improper advantages": (a) "helping to direct Petroecuador to award the Fuel Oil Contract" to Vitol; (b) "providing confidential, non-public information about Petroecuador" that helped Mr. Aguilar and his coconspirators get the Fuel Oil Contract for Vitol; and (c) "helping Vitol collect [fuel] oil from Petroecuador at times convenient for Vitol," which saved Vitol money.  *Id.* ¶ 28.  All those allegedly improper advantages relate only to the Fuel Oil Contract—a contract executed in December 2016 and completed in June 2019.

The government also alleges that Mr. Aguilar and others conspired to launder money in connection with that alleged "Ecuador Bribery Scheme."  *Id.* ¶¶ 55–56 (Count Five). The Superseding Indictment asserts that Mr. Aguilar did so by, among other things, "agree[ing] to pay companies controlled by the [Pere brothers] a purported commission per barrel of fuel oil secured from Petroecuador in connection with the Fuel Oil Contract," while knowing that "[t]he actual purpose of th[ose] commissions . . . was to facilitate bribe payments to . . . Nilsen Arias Sandoval and Ecuadorian Official #1." *Id.* ¶ 33.  Thus, the alleged Ecuadorian money laundering conspiracy likewise relates only to the Fuel Oil Contract.

Although the alleged "Ecuador Bribery Scheme" solely concerns the Fuel Oil Contract, the government may seek to admit evidence regarding other, uncharged Ecuadorian business opportunities that are separate from the Fuel Oil Contract.[2]  Because the government has produced hundreds of hours of audio recordings and millions of documents, it is impossible to catalogue all the distinct, uncharged Ecuadorian business opportunities that Mr. Aguilar discussed with the Pere brothers and others.  But there are many such discussions:  Mr. Aguilar's job at Vitol involved originating commodities deals in Latin American countries like Ecuador, where the Pere brothers held themselves out as knowledgeable consultants.   None of the opportunities that the Pere brothers pitched to Mr. Aguilar in these recordings and documents, however, came to fruition.  Nevertheless, at trial, the government may seek to admit evidence related to these speculative, unconsummated deals to suggest that, by discussing them, Mr. Aguilar somehow sought to engage in bribery or other misconduct with respect to those deals, including by bribing alleged Ecuadorian officials *other than* Nilsen Arias and "Ecuadorian Official #1."

These deals were new opportunities unrelated to the "Ecuador Bribery Scheme" at issue.  The Fuel Oil Deal was signed in December 2016 and terminated in June 2019.  But the discussions about these speculative, unconsummated deals did not occur until late 2019 and early 2020—years after the Fuel Oil Contract was executed, and months after it finished.  Nor do the discussions about these speculative, future deals touch on the circumstances of the Fuel Oil Contract.

---

[2]   The government has moved in limine to admit certain vaguely described evidence predating the Fuel Oil Contract, which it states is unrelated to that contract.  *See* ECF No. 177 at 35 (asserting that the alleged Ecuador "co-conspirators met . . . to discuss a potential contract for liquified petroleum gas . . . and that Arias agreed to help, and did help, resolve a contract that would remove Vitol from the Petroecuador blacklist").  Mr. Aguilar asked the Court to defer ruling on that motion "[u]nless and until" the government provides a "full recitation of [its] expected evidence" so that the Court properly can assess its admissibility.  ECF No. 179 at 27.  The government responded that it "has no objection to deferring rulings as to the admissibility of specific pieces of evidence until trial."  ECF No. 171 at 17.

### B.   Legal Standard

"As the proponent of the evidence, the government has the burden of establishing [the] admissibility" of any uncharged conduct.  *United States v. Stein*, 521 F. Supp. 2d 266, 268 (S.D.N.Y. 2007).  That is true no matter if the government seeks to admit uncharged conduct directly or through the narrow gates of Rule 404(b).  *See United States v. Rajaratnam*, No. 13 Cr. 211 (NRB), 2014 WL 2696568, at *3 (S.D.N.Y. June 10, 2014); *United States v. Nachamie*, 101 F. Supp. 2d 134, 137 (S.D.N.Y. 2000).  Direct evidence must satisfy Rule 402's relevance standard and Rule 403's unfair prejudice standard.  *Stein*, 521 F. Supp. 2d at 272 (that evidence of other acts may be admissible directly "does not obviate the Rule 403 analysis").  And if the government seeks to admit evidence of uncharged conduct under Rule 404(b), it is subject to more exacting scrutiny than the familiar Rule 403 standard:  it must be "substantially more probative than prejudicial."  *United States v. Downing*, 297 F.3d 52, 58 (2d Cir. 2002).

### C.   Application

Evidence of Mr. Aguilar's uncharged conduct that is separate from and postdates the Fuel Oil Contract is inadmissible for two principal reasons.

***First***, evidence concerning this uncharged conduct is irrelevant to the charged conspiracies, which focus exclusively on Mr. Aguilar's alleged effort to bribe Nilsen Arias and "Ecuadorian Official #1" to help Vitol obtain and profit from the Fuel Oil Contract.  *See supra* § II.A.  "Courts within the Second Circuit typically employ a narrow construction in considering whether other acts constitute direct evidence" of the charges.  *United States v. James*, 607 F. Supp. 3d 246, 253 (E.D.N.Y. 2022).  Courts may not admit evidence of uncharged conduct directly unless (1) it "arose out of the same transaction or series of transactions as the charged offense," (2) "it is inextricably intertwined with the evidence regarding the charged offense," or (3) "it is necessary to complete the story of the crime on trial."  *United States v. Midyett*, 603 F. Supp. 2d 450, 459–60

8

(E.D.N.Y. 2009).  Evidence of Mr. Aguilar's discussions regarding *different* deals and *different* Ecuadorian officials, which occurred *years* after that Fuel Oil Contract was signed and months after it terminated, satisfies none of the "narrow" criteria for admissibility.  *James*, 607 F. Supp. 3d at 253; *see, e.g.*, *United States v. Williams*, 585 F.3d 703, 708 (2d Cir. 2009) (vacating and remanding conviction because admission of uncharged evidence "ignored a common sense precaution which should clearly be taken to limit the prosecutor's presentation to such facts as are reasonably necessary to prove the point for which the evidence is admitted, and to exclude unsavory details which go beyond what is necessary to make the point"); *United States v. Levy*, No. 11 Cr. 62 (PAC), 2013 WL 655251, at *1 (S.D.N.Y. Feb. 22, 2013) (excluding evidence of "a separate, discrete incident of fraud or deceit that [was] not inextricably intertwined with the Indictment's charges or necessary to complete the Indictment's story" because the charged and uncharged incidents were not "closely parallel" and had distinct objectives).

     ***Second***, even if evidence of these speculative, unconsummated opportunities had some marginal relevance (it doesn't), the evidence is inadmissible under Rule 404(b).  As a threshold matter, the government failed to give timely, written notice of its intention to admit such evidence, as the rule requires.   *See* Fed. R. Evid. 404(b)(3);  *see, e.g.*,  *United States v. Macon*, No. 3:21 Cr. 172 (JAM), 2023 WL 4083230, at *12 (D. Conn. June 20, 2023) (excluding evidence where government "failed to serve notice as required under Rule 404(b)"); *United States v. Gasparik*, 141 F. Supp. 2d 361, 368 n.4 (S.D.N.Y. 2001) (excluding evidence where government "failed to provide timely notice of its intent to offer such testimony").  Again, the charged "Ecuador Bribery Scheme" concerns only the Fuel Oil Contract—it has nothing to do with any later business opportunities that Mr. Aguilar may have discussed.  *See supra* § II.A.  Such uncharged conduct thus exceeds the schemes charged.  *Id.*  The Court set a deadline of October 2, 2023 for the

government's motions in limine.  Min. Order (June 7, 2023).  That deadline came and went with no motion to admit this evidence under Rule 404(b) or otherwise.  Nor does any good cause exist to excuse the government's failure to move to admit this evidence, which the government has known about for years—even *before* it originally charged Mr. Aguilar in 2020.  In addition, the government moved in limine to admit evidence of uncharged conduct *predating* the conspiracy, *see supra* note 2, but did not seek to admit uncharged conduct *postdating* the conspiracy— a decision that reveals a conscious waiver (or at least a forfeiture) of any right to do so.  *See, e.g.*, *United States v. Dowdell*, 70 F.4th 134, 140 (3d Cir. 2023) ("We enforce waiver and forfeiture against criminal defendants and the government equally.").

Yet even if the government had provided timely notice, this evidence still would be inadmissible under Rules 404(b) and 403.  *See United States v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002) ("government may not invoke Rule 404(b) and proceed to offer, carte blanche, any [uncharged] act of the defendant in the same category of crime").  None of permitted non-propensity purposes listed in Rule 404(b)(2)—"motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"—applies here.  Evidence of Mr. Aguilar's alleged conduct long after—and entirely separate from—the negotiation, execution, and performance of the Fuel Oil Contract is irrelevant to whether he corruptly intended to or did bribe Nilsen Arias or "Ecuadorian Official #1" years earlier to obtain or profit from that deal.  Moreover, even if this evidence had marginal relevance to a non-propensity purpose (it doesn't), the government need not present it because its cooperating witnesses already are poised to present a straightforward narrative regarding the Fuel Oil Contract itself.  *See, e.g.*, *United States v. Newton*, No. 01 Cr. 635 (CSH), 2002 WL 230964, at *2 (S.D.N.Y. Feb. 14, 2002) (extrinsic evidence inadmissible as background or narrative evidence where "[t]he charged crimes are

straightforward and may be fully understood without reference to" uncharged conduct); *United States v. Belk*, No. 01 Cr. 180 (LTS), 2002 WL 342585, at *1–2 (S.D.N.Y. Mar. 4, 2002) (same).

Further, this evidence fails to meet the requirement that it be "substantially more probative than prejudicial," as the Second Circuit has required for admission of Rule 404(b) evidence. *See Downing*, 297 F.3d at 5. There is an inescapable risk that the jury will punish Mr. Aguilar for being a "bad guy" if the government is permitted to suggest that, on top of all the charged conduct, Mr. Aguilar later allegedly tried to obtain *other* Ecuadorian deals by bribing *other* officials. *See, e.g.*, *United States v. McCallum*, 584 F.3d 471, 477 (2d Cir. 2009) (district court erred in admitting uncharged conduct "as propensity evidence in sheep's clothing . . . with insufficient regard for the unfair prejudice that surely would result"); *United States v. Cruz*, 343 F. Supp. 2d 226, 232 (S.D.N.Y. 2004) (evidence that might cause jury "to unfairly assume" that defendant "is a habitual" offender is "exactly the kind of character assessment Rule 403 is designed to prevent"); *Newton*, 2002 WL 230964, at *5 (evidence inadmissible under Rule 403 because "its potential for unfairly prejudicing the jury by portraying [defendant] as an immoral rule-breaker greatly outweighs that slight probative value"). The "similarit[ies]" between the charged and uncharged conduct only "increase[] the risk that the jury will draw an improper inference of propensity that unfairly prejudices the defendant's case." *United States v. Henry*, 848 F.3d 1, 9 (1st Cir. 2017).

Moreover, the charged conduct, on its own, presents a real risk that at the end of this complex, multi-month trial, the jurors will have difficulty separating out the Ecuadorian and Mexican conduct and rendering a fair verdict. *See, e.g.*, ECF No. 132 at 7–12; ECF No. 152 at 7–10; ECF No. 169-1 at 9–13; ECF No. 174 at 3–6. Adding evidence of *uncharged* conduct, concerning *different* Ecuadorian officials, and *different* deals—none of which came to fruition *years later*—will exacerbate that risk. Courts routinely exclude evidence of uncharged conduct in

such circumstances, and this Court should too.  *See, e.g.*, *United States v. Schatzle*, 901 F.2d 252, 256 (2d Cir. 1990) (Rule 403 precludes evidence that might cause the jury to "focus . . . upon the wrong event[s]" and convict defendant based on uncharged conduct); *Levy*, 2013 WL 655251, at *1 (excluding evidence of uncharged fraud scheme because of risk that jurors might find defendant had "a propensity to commit fraud," would "confus[e] the issues actually alleged in the Indictment," and would risk "misleading a jury that will already be tasked with determining the charged conduct," which involved multiple different allegedly unlawful schemes); *United States v. Hatfield*, 685 F. Supp. 2d 320, 324 (E.D.N.Y. 2010) ("[I]n a trial that will already likely last for 15–20 weeks and include tens of thousands of pages of witness testimony and exhibits, the [uncharged] evidence stands a good chance of confusing the jury as to the actual crimes charged, which a curative instruction may not alleviate."); *Stein*, 521 F. Supp. 2d at 271 (excluding uncharged evidence because it "was likely to divert the jury's attention from the charged transactions, which are sufficiently complicated in themselves, to another set of complex transactions").

And in an already overlong, multi-month trial, presenting and rebutting evidence of this uncharged conduct will be a burdensome and time-consuming detour for the jury, the Court, and the parties.  There is no good reason to make jurors suffer through a series of minitrials involving testimony and audio recordings that will need to be presented and contextualized through translators.  For the same reasons the Court previously excluded the Rule 404(b) evidence the government chose to notice, *see* ECF No. 155 at 6–8, the Court should exclude this evidence too. *See also, e.g.*, *United States v. Gilbert*, 229 F.3d 15, 24 (1st Cir. 2000) (precluding evidence of uncharged conduct because it was "nearly certain that there would be a mini-trial on whether" that uncharged conduct "actually took place" and "the potential for confusion of the issues and for

unfair prejudice in such a scenario is manifest"); *United States v. Jadusingh*, No. 18 Cr. 257 (KAM), 2020 WL 207950, at *4 (E.D.N.Y. Jan. 14, 2020) (precluding government from introducing uncharged evidence because it "runs the risk of confusing the jury and leading to a mini-trial"); *United States v. Ulbricht*, 79 F. Supp. 3d 466, 492–93 (S.D.N.Y. 2015) (excluding uncharged evidence where it might "mislead the jury and lead it to convict defendant for uncharged conduct," and where "such evidence may lead to a mini-trial on collateral issues").

For all of those reasons, the Court should prevent the government from introducing at trial evidence of uncharged Ecuador-related conduct that is separate from the Fuel Oil Contract and the alleged bribes to Nilsen Arias and "Ecuadorian Official #1."

## III.   THE COURT SHOULD PROHIBIT EVIDENCE OR ARGUMENT REGARDING MR. AGUILAR'S COMPENSATION, INCLUDING ANY EFFORT TO CONNECT HIS COMPENSATION TO THE EXECUTION OR PERFORMANCE OF THE CONTRACTS UNDERLYING THE CHARGED SCHEMES.

The Court should preclude the government from introducing evidence of Mr. Aguilar's compensation at Vitol or arguing that he stood to receive higher compensation—for example, in the form of salary, bonuses, or deferred stock-based compensation—as a result of the execution or performance of the Fuel Oil Contract with Petroecuador, *see* ECF No. 120 ¶ 25, or contracts to supply ethane to PPI ("Ethane Supply Contracts"), *see id.* ¶¶ 37–38.   The government has suggested that it will attempt to make this argument to show Mr. Aguilar's "motive to commit the charged offenses."   ECF No. 135 at 7 n.7 ("As the government will show at trial, Aguilar expected to receive millions of dollars in incentive compensation as a result of the bribery schemes with which he is charged.").   But the Court should preclude this argument—and any related evidence—because it depends on a demonstrably incorrect factual premise and risks severe unfair prejudice to Mr. Aguilar.   Accordingly, it is irrelevant under Rules 401 and 402 and unduly prejudicial under Rule 403.

Regarding relevance, it is an indisputable fact that Vitol's Fuel Oil Contract with Petroecuador and its Ethane Supply Contracts with PPI had no bearing on Mr. Aguilar's compensation from Vitol. As the government has averred, Mr. Aguilar "was the manager in charge of Liquid Petroleum Gas ('LPG') sales for Vitol." Decl. of Alex Spiro, Ex. A, at -108 (search warrant affidavit, filed under seal). Because Mr. Aguilar worked on Vitol's LPG desk in Houston, *see* ECF No. 120 ¶¶ 1–2, his incentive compensation hinged on Vitol's profits and losses in any given year from *LPG* trading. Thus, it did *not* hinge on deals for *fuel oil* or *ethane*—the petrochemicals involved in the contracts at issue in the alleged Ecuador and Mexico bribery schemes. *See* ECF No. 120 ¶¶ 25, 37–38. While the incentive compensation of Vitol's traders on the desks that handled those petrochemicals may have changed based on the execution and performance of the Fuel Oil and Ethane Supply Contracts, Mr. Aguilar's incentive compensation as an LPG trader had nothing to do with those contracts. Accordingly, Mr. Aguilar's Vitol compensation is irrelevant and inadmissible to establish any alleged motive to bribe foreign officials to obtain those deals. *See, e.g.*, *Arlio*, 474 F.3d at 52 (if evidence "does not tend to prove a material fact, it is irrelevant" and inadmissible under Rule 401). Yet the government still appears poised to present evidence of Mr. Aguilar's compensation to the jurors and argue that his income somehow depended on closing these allegedly dirty deals.

Although Mr. Aguilar can disprove these unsupported attempts to link these deals to his compensation, he should not have to do so under Rule 403. That is because the admission of evidence related to Mr. Aguilar's income creates a significant risk of unfair prejudice that dwarfs whatever limited probative value it may have. Mr. Aguilar earned substantial income at Vitol— including ███████████ through annual salary and year-end bonuses, as well as ███████████ in deferred compensation tied to Vitol "shares" he was awarded over time.

14

If the government is permitted to present evidence of Mr. Aguilar's compensation from Vitol, there is a near-certain risk that the jury will assume the worst of him based on those numbers alone—for example, they may assume that anyone making that kind of money had to be involved in a crime, or they may punish him for his wealth rather than for any crime. Courts routinely exclude evidence related to a defendant's "income or wealth" where, as here, "its probative value would be substantially outweighed by the danger that the jury might mistakenly conclude that Defendant's wealth itself somehow shows that Defendant deserves to be punished or was engaged in wrongdoing of some sort." *United States v. Robinson*, No. 16 Cr. 98 (CKK) 2017 WL 11496710, at *1 (D.D.C. June 26, 2017). "[P]arties are not permitted to argue to the fact finder's potential economic sympathies or prejudices." *Kinsey v. Cendant Corp.*, 588 F. Supp. 2d 516, 518 (S.D.N.Y. 2008) (precluding evidence of party's "compensation package"); *see also L-3 Commc'ns Corp. v. OSI Sys., Inc.*, No. 02 Cv. 9144 (PAC), 2006 WL 988143, at *6 (S.D.N.Y. Apr. 13, 2006) (precluding evidence of witness's "wealth and lifestyle" because "its inclusion would be unfairly prejudicial"). That improper risk exists regardless of whether the money came from Mr. Aguilar's and Vitol's legitimate LPG profits (as Mr. Aguilar can show), or from the allegedly improper Fuel Oil and Ethane Supply Contracts (as the government wrongly claims).

Aside from the shock value that unfairly will prejudice Mr. Aguilar, admission of such evidence will generate minitrials of the sort that Rule 403 prohibits. *See, e.g.*, *Gilbert*, 229 F.3d at 24 (affirming preclusion of uncharged conduct because it was "nearly certain that there would be a mini-trial on whether" it "actually took place," and "the potential for confusion of the issues and for unfair prejudice in such a scenario is manifest"); *see also, e.g.*, *Ricketts v. City of Hartford*, 74 F.3d 1397, 1414 (2d Cir. 1996) (affirming exclusion of evidence that was "more confusing than

helpfully probative" because of the risk of a "trial within a trial"); *Hart v. RCI Hosp. Hldgs., Inc.*, 90 F. Supp. 3d 250, 280 (S.D.N.Y. 2015) (similar).

Unduly complicating trial with this compensation sideshow is also inappropriate given that the government has another vehicle by which it may attempt to establish Mr. Agular's motive: his alleged statement during his interrogation that, ███████████████████████

████████████████████████████████████████████████████████

███████ Spiro Decl., Ex. B, at -004 (Form 302 of that interrogation, filed under seal). That alleged statement—which the government will assert Mr. Aguilar himself made—is sufficient for the government to assert at trial that Mr. Aguilar had a financial motive to obtain the Fuel Oil and Ethane Supply Contracts for Vitol. *See Old Chief v. United States*, 519 U.S. 172, 184 (1997) ("[W]hat counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives."). The government should not be permitted to gild the lily with additional (and hotly disputed) assertions about Mr. Aguilar's compensation that will cause "undue delay, wast[e] time, [and] needlessly present[] cumulative evidence." Fed. R. Evid. 403.

The Court should preclude the government from referencing or admitting evidence of Mr. Aguilar's compensation at trial or arguing that his compensation provided a motive to commit the alleged crimes. At a minimum, the Court should preclude the government from referencing the specific amount(s) of Mr. Aguilar's incentive compensation, as any de minimis probative value of those figures (beyond the *fact* of his incentive compensation package) would be overwhelmed by the risk of inflaming the jury's prejudices. *See Old Chief*, 519 U.S. at 184 (Rule 403's balancing test requires "comparing evidentiary alternatives" to minimize unfair prejudice); *Aristocrat*

*Leisure*, 2009 WL 3111766, at *6 (precluding "the actual dollar figure of [defendants'] compensation" because it had slim additional probative value and was unfairly prejudicial).

## IV.   THE COURT SHOULD HOLD A PRETRIAL HEARING TO DETERMINE THE ADMISSIBILITY OF PURPORTED COCONSPIRATOR STATEMENTS OR, ALTERNATIVELY, REQUIRE THE GOVERNMENT TO DISCLOSE ALL PURPORTED COCONSPIRATORS 30 DAYS BEFORE TRIAL.

Ahead of this complex, multi-month trial, the Court should—for efficiency's sake—either (1) hold a pretrial hearing under Rule 104 to determine the admissibility of purported out-of-court statements from Mr. Aguilar's alleged coconspirators, or at a minimum, (2) require the government to disclose at least 30 days before trial the identities of all purported coconspirators whose out-of-court statements the government may seek to admit under Rule 801(d)(2)(E).

This will make trial more efficient, because it will give Mr. Aguilar a meaningful opportunity to identify which statements are objectionable, confer with the government, and, if necessary, raise issues with the Court.  The alternative would involve a recurring series of time-consuming and disruptive sidebars or, even worse, admission of testimony that requires a curative instruction or even more significant remedy, such as a mistrial.  *See, e.g.*, *United States v. Saneaux*, 365 F. Supp. 2d 493, 497 (S.D.N.Y. 2005) ("I am not willing to have the jury hear the [purported coconspirator statements] early in the government's case and then, if the requisite proof on admissibility is not forthcoming thereafter, having to choose between instructing the jury to forget rather dramatic statements that they heard several days earlier or declare a mistrial[.]").

Although pretrial *Bourjaily* hearings are not frequently held in this Circuit, one is necessary here given the large number of purported coconspirators (potentially *dozens*) and documents (potentially *millions*) that may contain out-of-court statements that the government might seek to admit.  In a complex prosecution before the proliferation of voluminous electronically stored evidence, the Honorable Sonia M. Sotomayor encouraged the government to "seek from the Court

an advance ruling on any potentially doubtful evidence under the *Bourjaily* standard which it might

seek to introduce at trial." *United States v. Heatley*, 994 F. Supp. 483, 490 (S.D.N.Y. 1998).

Given the complexity of this case and how long trial is expected to last, this Court likewise should

allow Mr. Aguilar a meaningful opportunity to raise objections to disputed coconspirator

statements before trial, rather than in a series of sidebars.

Notably, the Superseding Indictment fails to identify all of Mr. Aguilar's alleged

coconspirators:  It names a handful and then refers vaguely to an unnumbered collection of

anonymous coconspirators whose statements might be at issue.[3]  It also raises the troubling specter

of multiple, overlapping conspiracies with distinct objects, any number of which the government

may be unable to prove Rule 801(d)(2)(E)'s and *Bourjaily*'s requirements as to Mr. Aguilar at all,

let alone when the alleged statements were made.  *See, e.g.*, *United States v. Gigante*, 166 F.3d 75,

83 (2d Cir. 1999) (because it "is the unity of interests stemming from a specific shared criminal

task that justifies Rule 801(d)(2)(E) in the first place," there "must be a conspiracy with some

specific criminal goal"); *United States v. Badalamenti*, 794 F.2d 821, 828 (2d Cir. 1986)

(statements made by coconspirators before defendant allegedly joins conspiracy cannot be

admitted against him unless government can show that he was made "aware of what his new

partners had been doing and saying on behalf of the enterprise").  Counts One and Five allege

---

[3]  *See, e.g.*, ECF No. 120 ¶ 22 ("Aguilar, *together with others*, engaged in international bribery
and money laundering schemes"); ¶ 25 ("Aguilar, Antonio Pere Ycaza, Enrique Pere Ycaza, and
Nilsen Arias Sandoval, *together with others*, engaged in a bribery and money laundering scheme
involving the payment of bribes to Ecuadorian officials, *including* Arias and Ecuadorian
Official #1"); ¶¶ 29, 31, 33 (alleging that Aguilar "*and others*" directed unlawful payments);
¶ 37 ("Aguilar, *together with others*, engaged in a bribery and money laundering scheme involving
the payment of bribes to Mexican officials, *including* Gonzalo Guzman Manzanilla and Carlos
Espinosa Barba").  *See also, e.g.*, *id.* ¶¶ 49, 52 (both conspiracy charges at issue allege that
"Aguilar, *together with others*, committed and cause the commission of, *among others*," the few
overt acts enumerated in the Superseding Indictment).

distinct conspiracies:  an "Ecuador Bribery Scheme" and a "Money Laundering Scheme[ ]" with Ecuador- and Mexico-related objects.  ECF No. 120 §§ III.A–C; *id.* ¶¶ 55–56.  Each conspiracy allegedly had distinct pools of participants.  *See id.* (all sources).  And by the government's own allegations, the alleged coconspirators (including Mr. Aguilar) supposedly joined those conspiracies at different times.  The government alleges that Mr. Aguilar joined the purported Ecuador conspiracy sometime in 2015.  *Id.* ¶ 25.  But the government also asserts that Mr. Aguilar's supposed Ecuadorian coconspirators had a preexisting criminal relationship before they met Mr. Aguilar.  *See, e.g.*, ECF No. 1 ¶ 19; ECF No. 177 at 35.  So too for the alleged Mexico-related money laundering conspiracy, which government alleges Mr. Aguilar joined in August 2017.  ECF No. 120 ¶ 37.  The government alleges that other coconspirators—including the alleged Mexican officials, a Vitol colleague of Mr. Aguilar, and "Intermediary #1"—had preexisting criminal relationships before they supposedly involved Mr. Aguilar.  *Id.* ¶ 38.  Given those inconsistencies, it is unsurprising that the government has conceded the need for an instruction on multiple conspiracies at trial, which Mr. Aguilar also intends to seek.  *See* ECF No. 172 at 4 ("Whether the government's proof shows a single conspiracy or multiple conspiracies is a question of fact for a properly instructed jury.").  These multiple conspiracies underscore the need for a pretrial hearing on the admissibility of purported coconspirator statements.  *See Gigante*, 166 F.3d at 83 (error to admit coconspirator statements based on "a general overriding conspiracy" when the evidence showed there were multiple separate conspiracies with distinct objects).

If the Court determines not to convene a pretrial hearing, then it should at least require the government to disclose before trial the identities of all alleged coconspirators whose out-of-court statements it may seek to admit at trial under Rule 801(d)(2)(E).  Having a known universe of

potential coconspirators will assist the Court and the parties by narrowing potential disputes over admissibility and providing some guardrails around the government's potentially sprawling case. In a recent FCPA and money laundering case in this district, the Honorable Margo K. Brodie declined to hold a pretrial hearing on purported coconspirator statements, while committing to "provide the parties an opportunity to challenge [such] evidence either at the start or at the end of the trial date." *United States v. Ng Chong Hwa*, No. 18 Cr. 538 (MKB) (E.D.N.Y. Dec. 9, 2021) (Min. Entry). But in that case the government already disclosed—well before trial—the names of all the defendant's alleged coconspirators. *See* Def. Roger Ng's Mots. in Limine at 4, No. 18 Cr. 538 (MKB) (E.D.N.Y. Nov. 3, 2021) (ECF No. 89). This Court should, at a minimum, require the government to do the same here, at least 30 days before trial (that is, by December 4, 2023), which falls two weeks after the government's November 17, 2023 deadline to disclose its exhibit and witness lists, along with Section 3500 and *Giglio* material. Min. Order (June 7, 2023). By then, the government surely can identify the coconspirator statements that it may seek to admit at trial.

Accordingly, the Court should either convene a pretrial hearing to assess the admissibility of purported coconspirator statements or require the government to identify, no later than 30 days before trial, all purported coconspirators whose out-of-court statements it may seek to admit at trial.

## V. THE COURT SHOULD ENTER SEQUESTRATION AND NONDISCUSSION ORDERS COVERING NONPARTY WITNESSES AND THEIR REPRESENTATIVES.

The Court should sequester all nonparty witnesses and their representatives or agents— including counsel and related staff—from the courtroom except when that witness is testifying, and should further prohibit nonparty witnesses from relaying the substance of their testimony to other witnesses beyond the courtroom, whether directly or indirectly. Such an order is necessary here to prevent improper coordination among the many nonparty witnesses cooperating with the government, including (among others) Vitol witnesses, Antonio Pere, Enrique Pere, Lionel Hanst,

Nilsen Arias, Carlos Espinosa, Gonzalo Guzman, Christian Cazarin, and "Intermediary #1." Such an order is also needed to prevent the government from gaining a tactical advantage by having more than one case agent sit in during this multi-month trial. *See United States v. Jackson*, 60 F.3d 128, 135 (2d Cir. 1995) ("[W]hen the government requires more assistance than a single case agent could provide, non-witness personnel could generally be employed to help operate equipment and handle the evidence. In those cases, it would be up to the government to make some showing of a need to use the additional agents it planned to call as witnesses for those administrative tasks in the courtroom.").

"At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony." Fed. R. Evid. 615. The sequestration rule aims to prevent "fabrication, inaccuracy, and collusion" among witnesses. *Id.*, advisory committee note. Although courts may not sequester parties, their essential representatives, or others whose presence is required by law, *see id.* R. 615(a)–(d), courts otherwise "have broad discretion to achieve the goals of sequestration and may make whatever provisions they deem necessary to manage trials in the interests of justice including the sequestration of witnesses before, during, and after their testimony," *Bradshaw v. Perdue*, 319 F. Supp. 3d 286, 288 (D.D.C. 2018). Rule 611(a)(1) further instructs courts to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to . . . make those procedures effective for determining the truth." Because there is "a strong presumption in favor of sequestration," the opposing party "has the burden of demonstrating why [an] exception applies, and why the policy . . . in favor of automatic sequestration is inapplicable." *Jackson*, 60 F.3d at 135.

Rule 615 requires the Court to sequester all nonparty witnesses and their representatives from the courtroom except when that witness is testifying, and, with Rule 611, also endows the

Court with "broad discretion" to exclude such witnesses' representatives, including their counsel, to prevent an end-around the policies motivating sequestration. *Bradshaw*, 319 F. Supp. 3d at 288; *accord United States v. Sepulveda*, 15 F.3d 1161, 1176 (1st Cir. 1993) (likewise noting courts' "considerable discretion to fashion orders pertaining to sequestration"); *see also Jerry Parks Equip. Co. v. Se. Equip. Co.*, 817 F.2d 340 (5th Cir. 1987) (upholding sanctions against witness and his counsel who discussed pending case at lunch with sequestered nonparty witness). Moreover, it is "common practice" for courts to instruct witnesses "not to discuss [their] testimony with third parties until the trial is completed," including by prohibiting any "indirect[ ]" attempts to "circumvent[ ]" a sequestration order. *Perry v. Leeke*, 488 U.S. 272, 282 & n.4 (1989) (collecting cases enforcing broad "nondiscussion orders" covering nonparty witnesses).

The Court should enter an order sequestering nonparty witnesses and their representatives, including counsel, and prohibiting nonparty witnesses from directly or indirectly relaying the substance of their testimony to other witnesses. *See, e.g.*, *FarFromBoring Promotions.Com, LLC v. Campbell*, No. 20 Cv. 80774 (WPD) (WM), 2020 WL 5076994, at *3 (S.D. Fla. Aug. 27, 2020) ("The Court expressly prohibits any party, non-party, or counsel from circumventing or attempting to circumvent this [sequestration] Order and Rule 615[.]"). Such an order should expressly prohibit nonparty witnesses and their representatives (including counsel) from reviewing transcripts of trial testimony from anyone other than that witness, as the "reading of testimony may be more harmful than watching it because reading enables witness[es] to thoroughly review and study previous testimony in formulating [their] own." *United States v. Friedman*, 854 F.2d 535, 568 (2d Cir. 1988). And it should expressly preclude nonparty witnesses and their counsel from conferring with (1) counsel for the government, (2) counsel for *other* witnesses, or (3) any other third parties, regarding *other* witnesses' testimony.

22

## VI.   THE COURT SHOULD PROHIBIT THE GOVERNMENT FROM INTRODUCING AT TRIAL ANY RULE 16 DISCOVERY PRODUCED TO MR. AGUILAR AFTER NOVEMBER 17, 2023.

The Court should prohibit the government from introducing or using at trial evidence from discovery produced to Mr. Aguilar after November 17, 2023, the deadline for the government to disclose its exhibit and witness lists, along with all Section 3500 and *Giglio* material.  Min. Order (June 7, 2023).   Such a deadline gives the government ample time between then and its December 4, 2023 deadline to identify within that universe of produced documents all the payments that it intends to assert at trial were unlawful.   *See id.*; ECF No. 117 at 8 ("[T]he government will be precluded at trial from offering evidence of specific transactions that have not been described to defendant at the level of specificity of those already described in the charging documents and government representations as evidence of the alleged conspiracy, unless the government identifies and discloses these transactions with similar detail at least thirty days before the date set for trial in order to prevent unfair surprise.").

To be sure, Mr. Aguilar does not seek to bar the government from continuing to make Rule 16 productions in the lead-up to trial.  Rule 16 entitles Mr. Aguilar to those materials, and he expects the government to provide them as soon as is practicable after it receives the material in the first instance.  Nor does Mr. Aguilar waive or forfeit his right to introduce belatedly produced documents at trial to support his defense or for impeachment purposes.  But Mr. Aguilar simply cannot be expected to continue reviewing substantial volumes of new discovery just one-and-a-half months before trial, with multiple holidays and religious observances between now and jury selection, especially as additional Section 3500 material will be generated and produced up to and during trial.

The Court is well aware that the government has for three-and-a-half years been producing enormous volumes of discovery.  In the time since the government first charged Mr. Aguilar in

July 2020, the government has produced hundreds of hours of recordings and more than 3 million pages of documents.   Although it had years to investigate Mr. Aguilar's alleged conduct, the government repeatedly has declined to provide him with a pretrial completion deadline for Rule 16 discovery, whether for the original July 2023 trial date or the current January 2024 trial date.   In November 2022, when the Court set that original trial date, the government represented that it was "two to three months" away from completing its Rule 16 productions.   Nov. 4, 2022 Status Conf. Tr. 3:16–19.   But the government's conduct since that time belies that representation. Since then, the government has produced more than 673,000 pages of new documents and more than 57 hours of new recordings.   And much of that discovery was produced between the original July 2023 trial date and the date of this motion—including more than 283,000 pages of documents and the lion's share of those new recordings.   This belated discovery includes, among other case-critical evidence:   (1) discovery from Mr. Aguilar's former employer, Vitol, which the government could have obtained (yet somehow failed to obtain) in the lead-up to, or after the execution of, Vitol's deferred prosecution agreement in December 2020;   (2) handwritten notebooks from the government's Ecuadorian cooperators, including the alleged Ecuadorian government official, Nilsen Arias; and (3) text messages from the alleged Mexican officials who have been cooperating with the government since at least 2021.   In the last few weeks alone—on October 23 and November 9, 2023—the government produced its 38th and 39th volumes of discovery, which include more than 130 additional recordings of Mr. Aguilar and other alleged coconspirators—taken *years ago*—along with more than 143,000 pages of new documents. Mr. Aguilar expects the government will keep making sizeable Rule 16 productions before and perhaps even *during* trial, including from one cooperating witness that the government charged in

late-October 2023 and from other witnesses who Mr. Aguilar understands are, or soon may be, cooperating with the government.

The government's repeated delays in producing Rule 16 discovery already have prejudiced Mr. Aguilar's ability to prepare for trial, as Mr. Aguilar has noted time and again. For example:

- "We were told many times that we were getting close to the end of the rainbow on the end of the discovery. We got a huge production, you know, through out [*sic*] 2021. Hundreds of thousands of documents in May. . . . We got hundreds of thousands in July. We got hundreds of thousands just last week. Over a million documents, complex financial documents." Sept. 13, 2022 Status Conf. Tr. 6:9–18.

- "When we were here last November, the Government said that they expected to be done with discovery in 2 to 3 months. That didn't happen. We got to April and in a phone call with the Government, they told us that they were substantially complete with discovery, save for a few discrete categories and the normal sort of late grand jury returns, the dribs and drabs of every case. You know, certainly not 2 to 3 months, not consistent with what we heard in November, but on its face not necessarily unreasonable given a July 5th trial date. What's happened since then, your Honor, is concerning. We got a production within the last ten days, I believe it was last week, of 45,000 pages of additional documents, not dribs and drabs, not the sort of clean up kind of stuff, but pretty critical evidence. Things that there's no discernible, at least from our perspective, there's no obvious reason why we didn't have this a long time ago. Personal notebooks from somebody who's been complete cooperation with the Government for a year and a half, at least. Things that are absolutely critical to our defense and things that we now need to go investigate. And my goodness, had we been going to trial on July 5, I don't know what we would have done with this evidence." June 7, 2023 Status Conf. Tr. 11:1–23.

As the defense explained this past June, "[w]e can't . . . continue to be Charlie Brown with a football and continually thinking this case is in one place when it's really in another." *Id.* at 11:25–12:2.

The Court thus should preclude the government from using any late-produced materials at trial, consistent with Rule 16 and established practice. Fed. R. Crim. P. 16(d)(2)(C), (D) ("If a party fails to comply with [Rule 16], the court may . . . prohibit that party from introducing the undisclosed evidence; or . . . enter any other order that is just under the circumstances."); *see, e.g.*, *United States v. W.R. Grace*, 526 F.3d 499, 512 (9th Cir. 2008) (en banc) (Rule 16 empowers district courts to "exercis[e] their discretionary authority to order pretrial discovery and disclosures

25

from the government under terms and conditions that courts normally use to manage the fair and efficient conduct of trials"); *United States v. Mason*, No. 06 Cr. 80 (NRB), 2008 WL 281970, at *4 (S.D.N.Y. Jan. 25, 2008) (excluding evidence government failed to timely produce); *United States v. Garcia*, 730 F. Supp. 2d 1159, 1169 (C.D. Cal. 2010) (excluding evidence government failed to produce by deadline set in court-ordered discovery schedule).

## **CONCLUSION**

For all these reasons, the Court should, following oral argument, grant in full each of Mr. Aguilar's motions in limine.

Respectfully submitted,

Dated:  November 17, 2023

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By _____

William D. Weinreb (pro hac vice pending)
Michael T. Packard (admitted pro hac vice)
111 Huntington Avenue, Suite 520
Boston, MA 02199
(617) 712-7100
billweinreb@quinnemanuel.com
michaelpackard@quinnemanuel.com

Alex Spiro
Daniel R. Koffmann
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
alexspiro@quinnemanuel.com
danielkoffmann@quinnemanuel.com

William C. Price (pro hac vice pending)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
williamprice@quinnemanuel.com

*Counsel for Defendant Javier Aguilar*

cc:  Counsel of Record (via ECF)