**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7617**

WRITER'S EMAIL ADDRESS
**danielkoffmann@quinnemanuel.com**

January 27, 2024

<u>VIA ECF</u>

Honorable Eric N. Vitaliano
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:     <u>*United States v. Javier Aguilar*, No. 20 Cr. 390 (ENV) (E.D.N.Y.)</u>

Dear Judge Vitaliano:

We write on behalf of Defendant Javier Aguilar in connection with the Court's ongoing evaluation of whether Mr. Aguilar's trial defense has "opened the door" to evidence of the alleged, uncharged, and highly prejudicial "Diversion Scheme" that the Court previously excluded. Mr. Aguilar acknowledges the Court's preliminary ruling on this issue, through which it has asked the government to make an "offer of proof," Trial Tr. 1660:21–1664:16, but respectfully asks the Court to reconsider this issue.

The Court's rulings before and during trial did not—until this week—clearly draw the "line in the sand" that the Second Circuit requires a defendant deliberately to cross in order to open the door to previously excluded, inflammatory evidence. *See, e.g.*, *United States v. Mont*, 306 F.2d 412, 415 (2d Cir.) (Friendly, J.) (defendant "opened the door" to previously excluded evidence when counsel disregarded a "*specific warning* from the Court that the consequences would be that 'the floodgates are open and the Government can tell all they know about your client'" (emphasis added)), *cert. denied*, 371 U.S. 935 (1962). Because the Court's prior rulings did not clearly draw that line, and because Mr. Aguilar steadfastly heeded the Court's warning shot this week that the parties would mention alleged kickbacks "at their own peril," Trial Tr. 1546:10–13, Mr. Aguilar requests that the Court resolve this case-critical dispute on a "thus far and no further" basis.

The Court should decline to admit evidence of the alleged Diversion Scheme at this time, and hold that *if* Mr. Aguilar introduces additional evidence or elicits additional testimony concerning his lack of "kickbacks" from the Pere brothers, *then* the government may introduce evidence of the alleged Diversion Scheme—provided it can satisfy the offer of proof that the Court has requested.

quinn emanuel urquhart & sullivan, llp

ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

I.      **RELEVANT BACKGROUND**

A.      <u>**Pretrial Motion Practice and Orders**</u>

To appreciate the situation in which the Court and the parties now find themselves, it is important to remember why the Court excluded evidence of the alleged Diversion Scheme in the first place. The Court excluded that uncharged evidence under Rule 403 because its "probative value" to show (among other things) Mr. Aguilar's ability to control the so-called "slush fund" that Lionel Hanst allegedly maintained was not "particularly great" and was "cumulative" of "numerous other pieces of evidence," while its "potential for unfair prejudice" was "significant" because it involved alleged conduct that was "more inflammatory than that in the [charged] scheme[s]," and which "many jurors could see as particularly unsavory." ECF No. 155 at 2, 5–6. In particular, the Court stressed that although "the charged scheme[s] involve[ ] Aguilar directing bribes in order to benefit his employer," "the Diversion Scheme allegedly involves him directing his employer's money to his own pockets" to purchase "luxury goods" and pay "alimony," which "inescapably paints him in a significantly more negative light as a bad character." *Id.* at 6. The Court added that piling on evidence of the Diversion Scheme to an already "complex" case would "confus[e] [ ] the issues" for the jury—confusion that "could [not] be adequately mitigated through a jury instruction." *Id.* at 2, 6–8.

After the Court excluded the alleged Diversion Scheme, and in the lead up to trial, the government repeatedly asserted that certain defenses Mr. Aguilar might present at trial could open the door to that evidence. The Court rebuffed those efforts in two pretrial orders.

*First*, the government moved in limine to allow Mr. Hanst to testify to his subjectively held (but concededly mistaken) belief that Mr. Aguilar was concealing "kickbacks" from the Pere brothers—and asserted that Mr. Aguilar could not rebut that misleading testimony "by affirmatively suggesting to the jury that [he] did not receive kickbacks" without "open[ing] the door" to the Diversion Scheme. ECF No. 205 at 2 & n.1. In response, Mr. Aguilar explained why siphoning money from Mr. Hanst to himself would be categorically distinct from taking kickbacks from the Pere brothers—because only the latter could be probative of his knowledge of any bribes the Pere brothers were paying. ECF No. 214 at 2–3. In making this argument, Mr. Aguilar explicitly compared his own conduct to Ray Kohut's and explained exactly what he intended to argue at trial:

> Nor is there any other logical relationship between disputing that Mr. Aguilar received kickbacks from, for example, the Pere brothers, and showing that he embezzled money from Vitol in the Diversion Scheme. The former is relevant because it tends to rebut an inference that Mr. Aguilar knew of or was willfully blind to the Pere brothers' scheme to pay government officials: if Mr. Aguilar did not receive anything special or otherwise abnormal with a regular consulting arrangement, then he justifiably could have believed there was nothing special or otherwise abnormal with the Pere brothers' consulting business. Such evidence is particularly salient here, given that the Pere brothers *did* pay kickbacks to a trader at another trading company called Gunvor, which paid

> tens of millions of dollars to the Pere brothers in connection with other Petroecuador contracts. The fact that Mr. Aguilar did not receive such kickbacks undermines what the government will argue he knew or should have known about the Pere brothers' corrupt methods.
>
> The Diversion Scheme, by contrast, relates to entirely different issues: whether Mr. Aguilar had authority to direct Mr. Hanst to make payments and whether Mr. Aguilar has a disposition to commit crimes. That is categorically unlike, and has little to do with, the purposes for which Mr. Aguilar would dispute that he received kickbacks from the Pere brothers or Mr. Cazarin.

*Id.* at 3; *see also id.* at 3 n.3 (citing *United States v. Kohut*, No. 21 Cr. 115 (ENV)).

*Second*, the government opposed Mr. Aguilar's responsive motion in limine to exclude uncharged downstream transactions from Mr. Hanst by again claiming that, should Mr. Aguilar tell the jury "he did not receive any money" from the Pere brothers, it would "open[ ] the door to the diversion scheme." ECF No. 210 at 9. In reply, Mr. Aguilar explained that:

> If Mr. Aguilar sought to argue that he never profited from the alleged conspiracy with Mr. Hanst, then the government might have a fair claim to present evidence of the Diversion Scheme. But merely asserting that he did not make money on the *charged* Ecuador or Mexico bribery schemes—a fact the government does not dispute—is far different. As Mr. Aguilar explained in his prior letter regarding Mr. Hanst, [ECF No. 214 at 2–3], the latter assertion is directly relevant to Mr. Aguilar's state of mind and whether he was on notice of facts that would suggest to him the Pere brothers or Christian Cazarin were engaging in criminality. That has nothing to do with whether he allegedly embezzled money from his employer, which is the gravamen of the Diversion Scheme, and thus cannot fairly be said to open the door to admission of that excluded evidence.

ECF No. 219 at 7–8.

In both instances, the Court rejected the government's claims about what would "open the door" to the Diversion Scheme, ECF Nos. 226, 230—and therefore declined to limit the trial defenses that Mr. Aguilar previewed, including a defense that hinged on the fact that while others (like Mr. Kohut) received millions in kickbacks from the Pere brothers, Mr. Aguilar did not.

### B. Trial Defenses and Rulings

As foreshadowed in his pretrial submissions, Mr. Aguilar's opening statement explained that the evidence would show his lack of intent because, unlike Mr. Kohut, Mr. Aguilar neither solicited nor received kickbacks from consulting fees paid to the Pere brothers:

-3-

> [T]he Pere brothers had to give up part of their fee to keep this going, to keep it quiet to Mr. Kohut. Obviously that is not something they wanted to happen. The evidence is undisputed that in this case Mr. Aguilar did not receive a penny from the amount of money that the Pere brothers received. The evidence will show that Mr. Aguilar did not know, and no one wanted him to know how this success was being done. It was unnecessary and it would have been hurtful.

Trial Tr. 62:2–63:15. The government did not object to those remarks either during Mr. Aguilar's opening statement or after it concluded.

In his cross-examination of the government's first witness, Nilsen Arias, Mr. Aguilar continued the defense strategy previewed in his pretrial submissions and opening statement. Mr. Arias admitted that he "understood Ray Kohut was actually getting a cut from the Peres," meaning "the Peres were paying money to Ray Kohut." *Id.* at 482:19–483:26. Counsel then asked Mr. Arias whether "the Peres [ ]ever told you that they were paying a cut of their money to Mr. Aguilar." *Id.* at 483:7–8. The government objected and, during the ensuing sidebar, reiterated its position (which the Court's pretrial rulings rejected) that this line of questioning would open the door to the Diversion Scheme. *Id.* at 484:5–15. Counsel for Mr. Aguilar responded:

> There is a money flow that goes from trading company to the Peres, and then the Peres give a kickback to Ray Kohut on the Gunvor scheme. We are drawing the parallel that on this alleged scheme, there was no payment from the Peres to Mr. Aguilar, which is evidence, in our view, that Mr. Aguilar was not part of the Peres bribe scheme. That is separate from the diversion issue. * * * Discussions about, Your Honor, evidence about embezzlement has nothing to do with bribery, as Your Honor has already held. Not to mention the substantial risk of undue prejudice that would come with admitting evidence of the embezzlement scheme. These things are completely different, they're being offered for different purposes, and I think the Government, this is another example of the Government seeking by hook or crook to get this extremely prejudicial evidence into the record.

*Id.* at 484:22–487:20. The Court overruled the government's objection because the Court "[did not] believe it open[ed] the door" and permitted the question to which the government had objected. *Id.* at 491:3–5. Mr. Arias, as predicted, admitted that Antonio Pere never told Mr. Arias that Antonio Pere was paying a cut to Mr. Aguilar. *Id.* at 492:7–9.

Based on the Court's pre- and mid-trial rulings allowing him to pursue this foreshadowed defense theme, Mr. Aguilar likewise cross-examined Antonio Pere regarding the kickbacks that Mr. Kohut demanded and received but Mr. Aguilar had not:

-4-

> Q: "So about the time of the third contract that Gunvor had with your company, Mr. Kohut comes to you and says, I know what's going on, I want a percentage of your money, I want a percentage of your 70 percent. He does that after the third contract; doesn't he?"
>
> A: "Yes, he does that. I'm not sure if it's after the third contract, but he does it at some point in time, yes."
>
> Q: "By the way, Mr. Aguilar never, ever asks for any portion of the money that you received, correct?"
>
> A: "That is correct, yes."

*Id.* at 1056:5–14. These two questions are the sum total of Mr. Aguilar's examination of Antonio Pere on this issue. Nor did the government to either of these questions. It was not until prompted by the Court's January 22 remarks that the government voiced any complaint about Mr. Aguilar's cross-examination of Antonio Pere regarding the distinction between payments to Mr. Kohut and the lack of payments to Mr. Aguilar. *See id.* at 1069:18–1072:19.

## II.   A "THUS FAR AND NO FURTHER" APPROACH IS APPROPRIATE

As explained above, the Court's pretrial orders—including its original exclusion order and its orders on the parties' motions in limine—did not warn Mr. Aguilar that the defense theme he had disclosed in multiple filings could open the door to evidence of the inflammatory Diversion Scheme. Mr. Aguilar's pretrial filings previewed exactly this line of defense, and the Court's pretrial orders never warned against pursuing it.

Nor did any of the Court's mid-trial rulings provide a warning against such a defense. To the contrary: the government did not object to Mr. Aguilar's opening statement; the Court overruled the government's objection during the cross-examination of Mr. Arias; and the government once again did not object during the cross-examination of Antonio Pere. Instead, it was not until this week—the fourth week of trial—that the Court, *sua sponte*, warned the parties that it was considering whether Mr. Aguilar had opened the door through (1) five sentences of his opening statement, (2) one question to Mr. Arias, and (3) two questions to Antonio Pere. Trial Tr. 1546:10–13; *see id.* at 1069:18–1072:11; 1660:21–1664:18.

In these circumstances, Mr. Aguilar respectfully submits that the only fair and appropriate way to resolve this dispute is for the Court to hold that while the door has not yet been opened, Mr. Aguilar risks doing so *if*: (1) he introduces additional evidence or elicits additional testimony concerning Mr. Aguilar's lack of "kickbacks" from the Pere brothers and (2) the government can satisfy the offer of proof that the Court has requested, *see id*. at 1664:10–13. To hold that Mr. Aguilar has opened the door by pursuing a defense that he disclosed pretrial and that the Court did not hold would open the door is fundamentally unfair because it effectively moves the goalposts while the kick is in the air.

Such a "thus far and no further" approach accords with a legion of decisions from the Second Circuit, courts within it, and other Courts of Appeals. As the Honorable Henry J. Friendly explained in *Mont*, courts should give "*specific warnings*" of what litigants can and cannot do and

-5-

explain the "consequences would be that 'the floodgates are open'" *before* they open the door to inflammatory uncharged conduct. 306 F.2d at 415–16 (emphasis added). The Second Circuit reiterated that logic in holding that a defendant opened the door to his proffer statements when he deliberately defied a clear "warning" that a particular defense strategy "would open the door." *United States v. Murph*, 452 F. App'x 31, 35 (2d Cir. 2011). Numerous district courts in this Circuit have heeded this guidance in finding that litigants opened the door only after they persisted in spite of clear warnings from the judge. *See, e.g.*, *John Wiley & Sons, Inc. v. Book Dog Books,LLC*, 327 F. Supp. 3d 606, 629 (S.D.N.Y. 2018); *Martin v. Perez*, No. 13 Civ. 6803 (KMK) (PED), 2015 WL 10381752, at *3 (S.D.N.Y. Dec. 29, 2015), *R&R adopted*, 2016 WL 828129 (S.D.N.Y. Feb. 24, 2016); *Rios v. Artuz*, No. 07 Civ. 330 (NGG), 2007 WL 1958899, at *7 (E.D.N.Y. June 29, 2007).*

The logic of these decisions also finds support in the doctrine of waiver. A criminal defendant cannot waive a right—including a right under an evidentiary order—unless he does so knowingly and intelligently. *See, e.g.*, *United States v. Arrington*, 941 F.3d 24, 36 (2d Cir. 2019) ("Because we agree that [defendant's] waiver was not knowing and intelligent, we vacate [his] conviction and remand for a new trial."); *United States v. Ming He*, 94 F.3d 782, 794 (2d Cir. 1996) ("a waiver is valid only when it can be shown from the record that the waiver was made knowingly and intelligently" (cleaned up)). Courts therefore "must indulge in every reasonable presumption against waiver." *Ming He*, 94 F.3d at 794 (cleaned up).

This Court likewise has made sure to "caution[ ]" defendants *before trial* "that certain arguments or evidence might open the door to the evidence that the government seeks to admit" and has provided clear guidance on how to avoid that eventuality. *United States v. Servider*, No. 15 Cr. 174 (ENV), 2018 WL 2172661, at *1 (E.D.N.Y. May 10, 2018); *see also, e.g.*, *Boykins v. City of New York*, No. 13 Civ. 2299 (ENV), 2017 U.S. Dist. LEXIS 193768, at *13 (E.D.N.Y. Nov. 22, 2017) (cautioning parties before trial on what would or not open the door); *Colter v. Reyes*, No. 15 Civ. 3214 (ENV), 2017 U.S. Dist. LEXIS 103617, at *18 (E.D.N.Y. July 4, 2017) (similar).

Here, the Court's pre- and mid-trial rulings provided no warning—much less a clear one— that pursuing this line of defense could open the door to the highly prejudicial alleged Diversion Scheme. And the government's inconsistent objections further obscured the boundaries of the

---

* *See also, e.g.*, *United States v. Landry*, 631 F.3d 597, 601 (1st Cir. 2011) ("[T]he district court initially directed the Government not to mention evidence of the 2008 traffic stop, but warned [defendant] that the evidence would be admissible if she opened the door to it. After [defendant's] opening statement indicated a defense of good faith and computer error, the district court ruled that the evidence of the traffic stop would be admissible."); *United States v. McCray*, 433 F.2d 1173, 1175 (D.C. Cir. 1970) (per curiam) ("Evidence of the occurrence of two other larcenies would normally not have been admissible, but [defendant] opened the door by his inquiries—in the face of warnings by the judge—on cross-examination."); *United States v. Mathis*, 331 F. App'x 997, 999 (3d Cir. 2009) ("Defense counsel disregarded a clear warning from the District Court and opened the door to this damaging answer[.]"); *United States v. Homick-Van Berry*, 240 F. App'x 966, 969 (3d Cir. 2007) (Barry, J.) ("Defense counsel disregarded a clear warning from the Court and opened the door to the admission of this evidence by questioning Varvaro about all payments that he had received from the FBI since January 2002 in exchange for his cooperation.").

-6-

field of play. Because Mr. Aguilar was unaware that this previously disclosed defense might risk opening the door, Mr. Aguilar could not have (and thus did not) knowingly and intelligently open the door to the excluded Diversion Scheme.

"More critically, the potential for prejudice from evidence of the Diversion Scheme is significant"—and will instantly poison the jury against Mr. Aguilar in the middle of trial. ECF No. 155 at 5. No matter that Mr. Aguilar has compelling defenses to the alleged Diversion Scheme—as the Court has held, the "addition of evidence related to a scheme where Aguilar allegedly stole from his employer to benefit himself inescapably paints him in a significantly more negative light as a bad character. This is especially true where, as here, the pilfered money was allegedly spent on luxury goods and alimony payments, expenditures that many jurors could see as particularly unsavory." *Id*. at 6. And as the Court ruled before, the risk of juror confusion that admitting this evidence would trigger cannot be remedied by curative instructions. *Id.* at 6–8; *see Bruton v. United States*, 391 U.S. 123, 132 n.8 (1968) (courts cannot and should not ask jurors to perform "mental gymnastic[s]").

Nothing that has transpired since the Order has undermined those fundamental bases for excluding the Diversion Scheme. *See, e.g.*, *United States v. Lee*, 724 F.3d 968, 976 (7th Cir. 2013) (reversing and remanding conviction because even if defendant opened the door to uncharged conduct, "the court still must weigh the probative worth of the evidence against its potential for prejudice"); *United States v. Sine*, 493 F.3d 1021, 1037 (9th Cir. 2007) ("[T]he 'opening the door' doctrine is not so capacious as to allow the admission of any evidence made relevant by the opposing party's strategy, without regard to the Federal Rules of Evidence."). Moreover, admitting evidence of the alleged Diversion Scheme can only extend an already protracted trial that even now looks like it could go longer than the two-month estimate provided to the jury. Injecting a distinct third scheme into this trial would impose an undue and unfair burden on a set of jurors who already have made exceptional sacrifices to serve as jurors in this case.

\* \* \*

Mr. Aguilar respectfully requests that the Court (1) rule that the Diversion Scheme remains inadmissible at present and (2) establish a clear line for the parties' conduct moving forward: *if* Mr. Aguilar introduces additional evidence or elicits additional testimony concerning Mr. Aguilar's lack of "kickbacks" from the Pere brothers, *then* the government may introduce evidence of the alleged Diversion Scheme—provided it can satisfy the offer of proof that the Court has requested.

Respectfully submitted,

 */s/ Daniel R. Koffmann*

Daniel R. Koffmann
*Counsel for Defendant Javier Aguilar*

cc: Counsel of Record (via ECF)