**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | S1 20 Cr. 390 (ENV) |
| JAVIER AGUILAR, | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JAVIER AGUILAR'S POST-TRIAL MOTIONS FOR JUDGMENTS OF ACQUITTAL OR A NEW TRIAL

CLARK SMITH VILLAZOR LLP

Rodney C. Villazor
Michelle E. Lee
666 Third Avenue, 21st Floor
New York, New York 10017
(212) 377-0850 (Telephone)
(212) 377-0868 (Facsimile)
rodney.villazor@csvllp.com
michelle.lee@csvllp.com

*Attorneys for Defendant Javier Aguilar*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................... 1

RELEVANT BACKGROUND ................................................... 2

    A.    Only Some of the Grand Jury's Charges Make It to Trial ............................. 2

    B.    The Court Excludes Evidence of Mr. Aguilar's Alleged "Diversion" but Changes Course Midtrial ................................................... 4

    C.    The Court Rules that PPI Employees Are Not "Public Servants" Under Mexican Law and Eliminates the Mexican Law Specified Unlawful Activity ............................. 7

    D.    The Court Sustains the Remaining Mexico-Related Specified Unlawful Activity and Rejects Several Jury Instructions that Mr. Aguilar Requested ............................. 8

    E.    The Jury Convicts Mr. Aguilar on All Three Counts ............................. 9

LEGAL STANDARD ................................................... 9

ARGUMENT ................................................... 12

I.    The Court Improperly Allowed the Government to Introduce Incurably Prejudicial Evidence of Mr. Aguilar's Alleged and Uncharged "Diversion" of Vitol Funds ............ 12

    A.    The Court's Pretrial Orders Authorized Mr. Aguilar to Pursue His Intended Defense Without Opening the Door to Diversion Evidence ............................. 12

    B.    The Court Erred in Ruling Sua Sponte that Mr. Aguilar Had Opened the Door ....... 20

        1.    Mr. Aguilar's Defense Did Not Open the Door to Diversion, and the Court's and the Government's Actions Never Warned that it Could. ............................. 20

            (a)    Mr. Aguilar's Opening Statement ............................. 20

            (b)    Cross-Examination of Nilsen Arias ............................. 21

            (c)    Cross-Examination of Antonio Pere ............................. 24

            (d)    The Court's Sua Sponte Midtrial Ruling ............................. 26

        2.    The Court Improperly Overlooked the Government's Failure to Satisfy the "Offer of Proof" Required to Admit Diversion Evidence. ............................. 27

        3.    The Introduction of Diversion Evidence Improperly Prejudiced Mr. Aguilar and Irreparably Tainted the Jury's Verdict. ............................. 30

        4.    Vacatur and a New Trial on all Counts is the Only Appropriate Remedy. .......... 33

II.     The Court Erred in Failing to Instruct the Jury on the Foreign Corrupt Practices Act's Foreign Law Affirmative Defense. ........................................................ 34

III.    The Government Constructively Amended and Prejudicially Varied from the Grand Jury's Indictment When It Shifted Its Mexico-Related Theory of Criminality Midtrial. ................................................................................................................ 41

        A.     The Fifth Amendment Prohibits Shifting Theories of Criminality. ........................... 41

        B.     The Government's Shifting Theories of Criminality on Mexico Violated Mr. Aguilar's Fifth Amendment Rights. ................................................................ 43

               1.     When Mr. Aguilar Disproved the Grand Jury's Theory of Criminality, the Government Improperly Shifted Theories Midtrial. ................................................ 43

               2.     The Government's Eleventh-Hour Pivot Prejudiced Mr. Aguilar. ...................... 52

IV.     The Evidence Supporting the Sole Remaining Mexico-Related Specified Unlawful Activity in Count Three Is Insufficient. ............................................................... 53

        A.     PPI Is Not an Instrumentality of the Mexican Government. ..................................... 54

        B.     Nor Did These PPI Employees Work in an Official Capacity on Behalf of an Instrumentality of the Mexican Government. ......................................................... 57

        C.     The Court Should Enter a Judgment of Acquittal on Count Three or, Alternatively, Vacate that Conviction and Order a New Trial. ................................. 59

V.      The Prejudicial Spillover from the Fatally Flawed Mexico-Related Specified Unlawful Activity Taints the Jury's Convictions on All Counts. ..................................... 60

VI.     The Court Erroneously Failed To Require Unanimity on the Specified Unlawful Activities Underlying Count Three. ..................................................................... 63

VII.    The Court Erred in Allowing the Government to Elicit Testimony About Mr. Aguilar's Alleged Statements During the Airport Interrogation. .............................. 66

        A.     Agent Wood's Testimony Violated Mr. Aguilar's Fifth Amendment Rights Under *Miranda*. ................................................................................................. 67

        B.     The Court Should Have Excluded Agent Wood's Testimony Under Rule 403. ........ 73

VIII.   The Ecuador-Related Evidence Is Insufficient to Sustain the Convictions on Counts One and Two. ......................................................................................... 76

CONCLUSION ................................................................................................................... 82

# TABLE OF AUTHORITIES

PAGE(S)

**<u>Cases</u>**

*Arizona v. Fulminante*,
499 U.S. 279 (1991) ............................................................................................ 74

*Boykins v. City of New York*,
47 F.3d 27 (2d Cir. 1995) .................................................................................... 18

*Caruso v. Forslund*,
47 F.3d 27 (2d Cir. 1995) .................................................................................... 17

*Colter v. Reyes*,
No. 15 Civ. 3214 (ENV), 2017 U.S. Dist. LEXIS 103617 (E.D.N.Y. July 4, 2017) .............. 18

*Dowling v. United States*,
493 U.S. 342 (1990) ............................................................................................ 29

*Duarte v. United States*,
289 F. Supp. 2d 487 (S.D.N.Y. 2003) .................................................................. 63

*Dunn v. United States*,
842 F.2d 1420 (3d Cir. 1988) .............................................................................. 18

*In re Nat'l Prescription Opiate Litig.*,
589 F. Supp. 3d 739 (N.D. Ohio 2022) ...................................................... 19, 27, 30

*Jackson v. Virginia*,
443 U.S. 307 (1979) .............................................................................................. 9

*John Wiley & Sons, Inc. v. Book Dog Books, LLC*,
327 F. Supp. 3d 606 (S.D.N.Y. 2018) .................................................................. 18

*Kastigar v. United States*,
406 U.S. 441 (1972) ........................................................................................ 7, 29

*LaForest v. Former Clean Air Holding Co.*,
376 F.3d 48 (2d Cir. 2004) .............................................................................. 28, 29

*Martin v. Perez*,
No. 13 Civ. 6803 (KMK) (PED), 2015 WL 10381752 (S.D.N.Y. Dec. 29, 2015), *R&R adopted*, 2016 WL 828129 (S.D.N.Y. Feb. 24, 2016) ............................................ 18

*McDonnell v. United States*,
579 U.S. 550 (2016) ............................................................................................ 12

*McKoy v. North Carolina*,
  494 U.S. 433 (1990) ............................................................................... 63, 64, 65

*Miranda v. Arizona*,
  384 U.S. 436 (1966) ......................................................................................... 67

*Rios v. Artuz*,
  No. 07 Civ. 330 (NGG), 2007 WL 1958899 (E.D.N.Y. June 29, 2007) ................................. 18

*Shaw v. Delta Air Lines, Inc.*,
  463 U.S. 85 (1983) ........................................................................................... 38

*Sidebottom v. Delo*,
  46 F.3d 744 (8th Cir. 1995) ................................................................................ 18

*Simmons v. United States*,
  390 U.S. 377 (1968) ......................................................................................... 29

*Stansbury v. California*,
  511 U.S. 318 (1994) ......................................................................................... 71

*Tankleff v. Senkowski*,
  135 F.3d 235 (2d Cir. 1998) ............................................................................... 71

*United States v. 15 Bosworth St.*,
  236 F.3d 50 (1st Cir. 2001) ............................................................................... 17

*United States v. Afjehei*,
  869 F.2d 670 (2d Cir. 1989) ............................................................................... 34

*United States v. Aguilar*,
  No. 20 Cr. 390 (ENV), 2024 WL 665947 (E.D.N.Y. Feb. 16, 2024) ...................................... 7

*United States v. Alvarez*,
  No. 09 Cr. 386 (DAB), 2009 WL 3459219, at (S.D.N.Y. Oct. 27, 2009) ............................... 37

*United States v. Archer*,
  977 F.3d 181 (2d Cir. 2020) ........................................................................... 11, 60

*United States v. Autuori*,
  212 F.3d 105 (2d Cir. 2000) ........................................................................... 11, 78

*United States v. Bender*,
  265 F.3d 464 (6th Cir. 2001) ............................................................................. 19

*United States v. Beros*,
  833 F.2d 455 (3d Cir. 1987) .............................................................................. 65

iv

*United States v. Biaggi*,
    909 F.2d 662 (2d Cir. 1990)............................................................... 10, 12, 79

*United States v. Brown*,
    785 F.3d 1337 (9th Cir. 2015) ................................................................. 73

*United States v. Bryant*,
    885 F. Supp. 2d 749 (D.N.J. 2012) ........................................................ 12

*United States v. Campbell*,
    702 F.2d 262 (D.C. Cir. 1983) ............................................................... 12

*United States v. Clark*,
    740 F.3d 808 (2d Cir. 2014)................................................................... 10

*United States v. Cohen*,
    372 F. Supp. 2d 340 (E.D.N.Y. 2005) .................................................... 68

*United States v. Craighead*,
    539 F.3d 1073 (9th Cir. 2008) ........................................................... 69, 70

*United States v. Curley*,
    639 F.3d 50 (2d Cir. 2011).................................................................... 33

*United States v. D'Amato*,
    39 F.3d 1249 (2d Cir. 1994).................................................................. 10

*United States v. DiNome*,
    954 F.2d 839 (2d Cir. 1992).................................................................. 63

*United States v. Dowdell*,
    70 F.4th 134 (3d Cir. 2023) .................................................................. 25

*United States v. Durham*,
    825 F.2d 716 (2d Cir. 1987).................................................................. 35

*United States v. Durrani*,
    835 F.2d 410 (2d Cir. 1987).................................................................. 37

*United States v. Elfgeeh*,
    515 F.3d 100 (2d Cir. 2008).................................................................. 13

*United States v. Esquenazi*,
    752 F.3d 912 (11th Cir. 2014) ........................................................ passim

*United States v. FNU LNU*,
    653 F.3d 144 (2d Cir. 2011)............................................................ 68, 70

*United States v. Full Play Grp., S.A.*,
   No. 15 Cr. 252 (PKC), 2023 WL 5672268 (E.D.N.Y. Sept. 1, 2023) ..................................... 12

*United States v. Giddins*,
   858 F.3d 870 (4th Cir. 2013) ...................................................................................... 69

*United States v. Gladden*,
   394 F. Supp. 3d 465 (S.D.N.Y. 2019).......................................................................... 73

*United States v. Guiliano*,
   644 F.2d 85 (2d Cir. 1981)........................................................................................... 61

*United States v. Hall*,
   421 F.2d 540 (2d Cir. 1969).......................................................................................... 71

*United States v. Haskins*,
   511 F.3d 688 (7th Cir. 2007) ........................................................................................ 51

*United States v. Homick-Van Berry*,
   240 F. App'x 966 (3d Cir. 2007) .................................................................................. 19

*United States v. Hutcher*,
   622 F.2d 1083 (2d Cir. 1980)........................................................................................ 25

*United States v. Jacobs*,
   431 F.3d 99 (3d Cir. 2005)............................................................................................ 71

*United States v. Johnson*,
   513 F.2d 819 (2d Cir. 1975).......................................................................................... 80

*United States v. Johnson*,
   968 F.2d 208 (2d Cir. 1992)................................................................................... 37, 40

*United States v. Jones*,
   393 F.3d 107 (2d Cir. 2004)....................................................................................... 9, 10

*United States v. Khalupsky*,
   5 F.4th 279 (2d Cir. 2021) ...................................................................................... 42, 52

*United States v. Kiam*,
   432 F.3d 524 (3d Cir. 2006)......................................................................................... 70

*United States v. Kohut*,
   No. 21 Cr. 115 (ENV) (E.D.N.Y. Aug. 18, 2020) ...................................................... 14

*United States v. Kozeny*,
   582 F. Supp. 2d 535 (S.D.N.Y. 2008).................................................................... 35, 36

*United States v. Landesman*,
  17 F.4th 298 (2d Cir. 2021) ............................................................................ passim

*United States v. Landry*,
  631 F.3d 597 (1st Cir. 2011) ...................................................................................... 18

*United States v. Lee*,
  724 F.3d 968 (7th Cir. 2013) ..................................................................................... 30

*United States v. Liersch*,
  No. 04 Cr. 2521 (JSR), 2005 WL 6414047 (S.D. Cal. May 2, 2005) ....................... 64

*United States v. Lorenzo*,
  534 F.3d 153 (2d Cir. 2008) .................................................................... 9, 10, 79, 80

*United States v. Mathis*,
  331 F. App'x 997 (3d Cir. 2009) ............................................................................... 19

*United States v. McCallum*,
  584 F.3d 471 (2d Cir. 2009) ........................................................................ 32, 33, 62

*United States v. McCray*,
  433 F.2d 1173, 1175 (D.C. Cir. 1970) ................................................................. 18, 19

*United States v. Midyett*,
  603 F. Supp. 2d 450 (E.D.N.Y. 2009) ....................................................................... 61

*United States v. Milstein*,
  401 F.3d 53 (2d Cir. 2005) ........................................................................................ 42

*United States v. Mollica*,
  849 F.2d 723 (2d Cir. 1988) ...................................................................................... 42

*United States v. Murph*,
  452 F. App'x 31 (2d Cir. 2011) ................................................................................. 18

*United States v. Mont*,
  306 F.2d 412 (2d Cir.), *cert. denied*, 371 U.S. 935 (1962) ................................. 17, 18

*United States v. Newton*,
  369 F.3d 659 (2d Cir. 2004) ...................................................................................... 68

*United States v. Newton*,
  No. 01 Cr. 635 (CSH), 2002 WL 230964 (S.D.N.Y. Feb. 14, 2002) ....................... 32

*United States v. Ng Lap Seng*, No.,
  No. 15 Cr. 706 (VSB) (S.D.N.Y.) ....................................................................... 38, 64

*United States v. O'Connor,*
    580 F.2d 38 (2d Cir. 1978)..................................................................... 34

*United States v. Pacheco,*
    434 F.3d 106 (1st Cir. 2006)................................................................. 17

*United States v. Rodriguez,*
    392 F.3d 539 (2d Cir. 2004)............................................................ 10, 79

*United States v. Rooney,*
    37 F.3d 847 (2d Cir. 1994)........................................................ 60, 61, 62, 63

*United States v. Roshko,*
    969 F.2d 1 (2d Cir. 1992)...................................................................... 42

*United States v. Salmonese,*
    352 F.3d 608 (2d Cir. 2003)............................................................. 42, 52

*United States v. Sanchez,*
    969 F.2d 1409 (2d Cir. 1992)................................................................ 11

*United States v. Serrano,*
    224 F. Supp. 3d 248 (S.D.N.Y. 2016)................................................. 11, 41, 66

*United States v. Servider,*
    No. 15 Cr. 174 (ENV), 2018 WL 2172661 (E.D.N.Y. May 10, 2018) ............ 18, 19

*United States v. Silver,*
    948 F.3d 538 (2d Cir. 2020)................................................................. 12

*United States v. Sine,*
    493 F.3d 1021 (9th Cir. 2007) ............................................................. 30

*United States v. Slaight,*
    620 F.3d 816 (7th Cir. 2010) .............................................................. 69

*United States v. Solano,*
    966 F.3d 184 (2d Cir. 2020)................................................................. 73

*United States v. Stavroulakis,*
    952 F.2d 686 (2d Cir. 1992)............................................................ 65, 66

*United States v. Sturman,*
    49 F.3d 1275 (7th Cir. 1995) .............................................................. 64

*United States v. Tapia-Ortiz,*
    593 F. App'x 68 (2d Cir. 2014) ........................................................... 17

*United States v. Thornton,*
    177 F. Supp. 2d 625 (E.D. Mich. 2001)................................................................. 73

*United States v. Torres-Galindo,*
    206 F.3d 136 (1st Cir. 2000)................................................................. 73, 75

*United States v. Truman,*
    688 F.3d 129 (2d Cir. 2012)................................................................. 78

*United States v. Vega Molina,*
    407 F.3d 511 (1st Cir. 2005)................................................................. 26

*United States v. Waggoner,*
    103 F.3d 724 (8th Cir. 1997)................................................................. 40

*United States v. Winston,*
    447 F.2d 1236 (D.C. Cir. 1971)................................................................. 30

*United States v. Wright,*
    625 F.3d 583 (9th Cir. 2010)................................................................. 73

*United States v. Zayac,*
    765 F.3d 112 (2d Cir. 2014)................................................................. 34, 37

*Warner Bros. Inc. v. Am. Broad. Cos., Inc.,*
    720 F.2d 231 (2d Cir. 1983)................................................................. 17

*Yates v. United States,*
    574 U.S. 528 (2015)................................................................. 40

*Young v. United States,*
    97 U.S. 39 (1877)................................................................. 38

**Statutes**

15 U.S.C. § 78dd................................................................. passim

18 U.S.C. § 1956................................................................. 66

U.S. Const. amend. V................................................................. 42

**Rules**

Fed. R. Crim. P. 29 ................................................................. passim

Fed. R. Crim. P. 33 ................................................................. passim

Fed. R. Evid. 201(b)(2)................................................................. 72

Fed. R. Evid. 803(8) ............................................................................................................. 72

**<u>Foreign Legal Authorities</u>**

Mexican Cont., Article 14 ...................................................................................................... 43

Mexican Penal Code, Article 212 .................................................................................. passim

**<u>Other Authorities</u>**

*Black's Law Dictionary* (11th ed. 2019) .............................................................................. 38

Dep't of Justice, *Justice Manual* (*f/k/a U.S. Attorneys' Manual*) § 13.001 (2023) ...................... 72

*Oxford English Dictionary* (2023 ed.) ................................................................................. 38

Defendant Javier Aguilar respectfully moves the Court under Rules 29 and 33 of the Federal Rules of Criminal Procedure for orders granting judgments of acquittal or a new trial on all Counts. Further, Mr. Aguilar respectfully requests that the Court hold oral argument on the post-trial motions herein.[1]

## PRELIMINARY STATEMENT

Mr. Aguilar moves for a judgment of acquittal or, in the alternative, a new trial, on the following grounds:

I.   Mr. Aguilar moves for a new trial on all Counts because the Court improperly allowed the government to admit evidence of the alleged and uncharged "diversion" scheme by finding that Mr. Aguilar had opened the door to that evidence;

II.   Mr. Aguilar moves for a new trial on all Counts because the Court erred in failing to instruct the jury on the foreign law affirmative defense in the Foreign Corrupt Practices Act ("FCPA");

III.   Mr. Aguilar moves for a new trial on Count Three because the government both constructively amended and prejudicially varied from the grand jury's indictment on the alleged "Mexico Bribery Scheme" when it abandoned the charged theory of criminality and pivoted midtrial to a new and uncharged theory of criminality in violation of the Fifth Amendment;

IV.   Mr. Aguilar moves for a judgment of acquittal, or, alternatively, a new trial, on Count Three because the evidence adduced at trial was insufficient to support a

---

[1]   Unless otherwise indicated, this memorandum of law omits from quotations and citations all internal quotation marks, alterations, footnotes, and citations.  The Roman headers used in this memorandum of law correspond to the Roman numerals used in Mr. Aguilar's motion.  Unless otherwise indicated, this memorandum of law references the Counts as they were numbered in the redacted indictment (ECF No. 244) and as the Court charged them to the jury (ECF No. 314).

conviction beyond a reasonable doubt predicated on the alleged "Mexico Bribery Scheme," an error that prejudicially spilled over into and thus tainted the jury's verdict on Count Three, triggering a verdict that went against the weight of the evidence and created a manifestly unjust outcome;

V.  Mr. Aguilar moves for a new trial on all Counts because of the prejudicial spillover resulting from the tainted and insufficient proof of the "Mexico Bribery Scheme";

VI.  Mr. Aguilar moves for a new trial on Count Three because the Court's instructions and verdict form allowed the jury to render an unconstitutionally nonunanimous verdict;

VII.  Mr. Aguilar moves for a new trial on all Counts because the Court erred in allowing the government to elicit testimony about Mr. Aguilar's alleged statements to federal agents at Houston's international airport on July 10, 2020; and

VIII.  Mr. Aguilar moves for judgments of acquittal on Counts One and Two because the evidence adduced at trial was insufficient to support convictions beyond a reasonable doubt as to the alleged "Ecuador Bribery Scheme."

## RELEVANT BACKGROUND

### A.  Only Some of the Grand Jury's Charges Make It to Trial

On July 10, 2020, the government obtained a warrant for Mr. Aguilar's arrest on a criminal complaint charging that he conspired to violate the Foreign Corrupt Practices Act ("FCPA") and to launder money.  ECF No. 1.  On September 22, 2020, a grand jury in the Eastern District of New York returned a two-count indictment charging Mr. Aguilar with those same offenses. ECF No. 13.  Both charges concerned an alleged scheme to bribe government officials in Ecuador to win petrochemical contracts from Petroecuador.

More than two years later, and after the Court set a trial date on the original charges, another grand jury in this district returned a Superseding Indictment against Mr. Aguilar on December 2, 2022, alleging that he engaged in bribery schemes in both Ecuador and Mexico, where the government alleged Mr. Aguilar bribed two employees of PEMEX Procurement International, Inc. ("PPI") to win contracts to supply ethane to Mexico.  ECF No. 120.  The Superseding Indictment charged Mr. Aguilar with five counts: (1) conspiracy to violate the FCPA (Ecuador); (2) conspiracy to violate the FCPA (Mexico); (3) substantive violation of the FCPA (Ecuador); (4) substantive violation of the FCPA (Mexico); and (5) conspiracy to commit money laundering (Ecuador and Mexico).  *Id* at 17-24.

After the Court declined to sever the Mexico-related counts, ECF No. 140, the Court dismissed Counts Two and Four (the Mexico-related FCPA and FCPA-conspiracy charges) for lack of venue on May 31, 2023.  ECF No. 154 at 1-2.  But the Court denied Mr. Aguilar's motion to dismiss the Mexico-related portion of Count Five—the money-laundering conspiracy charge encompassing both the Ecuador and Mexico schemes—after holding that careful jury instructions and a special verdict form could mitigate the conceded risks of juror confusion and of a nonunanimous verdict on that combined, doubly derivative Count.  *Id.* at 4.  The Court also denied Mr. Aguilar's motion to dismiss Count Five as duplicitous while similarly noting that, "[w]ith respect to a risk of juror confusion and lack of unanimity, . . . any such risk can [] be resolved through a jury instruction."  ECF No. 176 at 6.

After the Court dismissed both Mexico-related FCPA counts for lack of venue, the government obtained a new indictment against Mr. Aguilar in the Southern District of Texas on August 3, 2023.  ECF No. 166-1 (Indictment, *United States v. Aguilar*, No. 4:23 Cr. 335 (GCH) (S.D. Tex.)).  The Texas indictment charged the same Mexico-related FCPA counts that this Court

had dismissed and added a Texas state law commercial bribery charge (under the federal Travel Act) and two substantive money-laundering counts.  *Id.*  The government currently is set to try Mr. Aguilar on all those charges in Houston starting August 26, 2024.  *See* Min. Order to Continue, *United States v. Aguilar*, No. 4:23 Cr. 335 (GCH) (S.D. Tex. Feb. 29, 2024).

As a result of these pretrial motions, the remaining counts tried in Brooklyn were: (1) conspiracy to violate the FCPA (Ecuador); (2) substantive violation of the FCPA (Ecuador), and; (3) conspiracy to launder money, with three underlying specified unlawful activities ("SUAs") encompassing both schemes:   (i) violations of the FCPA (Ecuador and Mexico), (ii) violations of Ecuadorian antibribery law, and (iii) violations of Mexican antibribery law. ECF No. 244 (redacted Superseding Indictment).

### B.   The Court Excludes Evidence of Mr. Aguilar's Alleged "Diversion" but Changes Course Midtrial

In a pretrial order on June 2, 2023, the Court denied the government's motion to admit evidence of Mr. Aguilar's alleged participation in a separate "diversion" scheme because that evidence had minimal probative value to show Mr. Aguilar's control over that money but imposed substantial undue prejudice on Mr. Aguilar by inflaming and confusing the jury.  ECF No. 155 at 5–8.  Just before trial, the Court twice reaffirmed that decision and held that the government could not introduce diversion evidence unless Mr. Aguilar opened the door in certain specified ways.   ECF No. 226 at 2–4; ECF No. 230 at 1.   Both those orders expressly declined the government's invitation to hold that Mr. Aguilar would open that door if he compared himself to a Gunvor trader named Ray Kohut who (unlike Mr. Aguilar) knew about a bribery scheme involving the Pere brothers and sought kickbacks from them once he found out.  Mr. Aguilar's pretrial filings explicitly and repeatedly previewed this defense:  that the lack of evidence that Mr. Aguilar sought a kickback from the Pere brothers tended to show, when contrasted with

Mr. Kohut, that Mr. Aguilar did not know about the Pere brothers' bribery scheme.  *See, e.g.*, ECF No. 214 at 2–3; ECF No. 219 at 7–8.

In reliance on the Court's pretrial orders, Mr. Aguilar's repeated reference to this defense in his pretrial submissions, and the government's inconsistent trial objections, Mr. Aguilar discussed this defense in his opening statement and elicited testimony from two government cooperators confirming that, unlike Mr. Kohut, Mr. Aguilar never received any kickbacks from the Pere brothers.  Trial Tr. 62:2–63:15 (defense opening), 482:19–483:6 (Arias cross), 1056:5–14 (A. Pere cross).  The government never objected to Mr. Aguilar's discussion of this evidence in his opening statement.  When Mr. Aguilar elicited testimony about kickbacks from the Pere brothers during the cross-examination of the government's first witness, Nilsen Arias, the Court explicitly held that Mr. Aguilar's questioning did *not* open the door.  *See* Trial Tr. 483:4–491:6.  Mr. Aguilar then elicited similar testimony about Mr. Kohut during the cross-examination of the government's next witness, Antonio Pere.  Trial Tr. 1056:5–14.  The government never objected to these questions during Antonio Pere's cross-examination.  *Id.*  On the contrary, it elicited testimony about Mr. Kohut during its own direct examination of Enrique Pere.  Trial Tr. 1540:20–1541:4.

Days after Antonio Pere's cross-examination—and with no warning from the Court or objection from the government—the Court sua sponte reconsidered its prior orders and stated that it would determine whether Mr. Aguilar's cross-examination of Antonio Pere several days earlier had opened the door for the government to introduce diversion evidence.  Trial Tr. 1069:18–1072:11.  The Court told the parties that it would take the issue under advisement.  *Id.*  After the government examined its next witness, Enrique Pere, about Mr. Kohut's kickbacks, Mr. Aguilar informed the Court that the defense had "been silent on this issue" since the Court

stated it might open the door, even though the government seemingly was trying "to wedge open the door by raising it themselves." Trial Tr. 1543:15–19. Mr. Aguilar also "remind[ed] the Court that [h]e previewed, prior to trial, exactly this argument and this defense" and that "[t]here was no order that [ ] pursuing that defense would open the door." Trial Tr. 1543:21–1544:20. The Court responded that "[t]o the extent that anyone goes beyond the testimony with respect to Mr. Kohut that's already in the record, they do so at their own peril for their respective positions on the pending motion." Trial Tr. 1546:10–13.

Even though Mr. Aguilar steadfastly heeded that warning, the Court nevertheless ruled that it would allow the government to introduce previously excluded diversion evidence if the government could satisfy an offer of proof establishing that Mr. Aguilar's so-called diversion began only *after* Vitol began making payments to the Pere brothers. Trial Tr. 1663:2–1664:12.

The government's attempt to make that offer of proof consisted of a representation that several witnesses could testify, based on financial records, that Mr. Aguilar siphoned Vitol money from Mr. Hanst after he began paying the Pere brothers in January 2017. ECF No. 274 at 3–6. The government's proffer, however, made no attempt to show that Mr. Aguilar had not siphoned money before that time. Instead, the government simply stated that the first diversion-related payment in February 2017 was merely the first one "*of which the government is aware*." *Id.* at 4 (emphasis added).

Mr. Aguilar responded to the government's representations and explained why they failed to satisfy the offer of proof that the Court required. ECF No. 277. Mr. Aguilar pointed out that the government's letter showed only that Mr. Aguilar siphoned money from Mr. Hanst after January 2017—but made no effort to meet its burden to establish that Mr. Aguilar had not done so before that time. *Id.* at 2–3. Mr. Aguilar added that the government's letter showed it failed to

investigate money flows from Mr. Hanst to a number of downstream recipients in 2015 and 2016 to confirm that *none* of those funds ended up in Mr. Aguilar's control, and that the government could not state it had done so because it failed to obtain financial records from all of Mr. Aguilar's accounts, or those of his relatives or other diversion recipients, from before January 2017. *Id.* at 3. Mr. Aguilar further explained that the Court's order put him in an unconstitutional Fifth Amendment quandary by requiring him either (1) to admit his participation in potential crimes to avoid the improper introduction of propensity evidence against him, or (2) to stay silent to avoid potential new charges while allowing the government to introduce highly prejudicial evidence against him. *Id.* at 4. To avoid that unconstitutional dilemma, Mr. Aguilar asked the Court to permit him to respond affirmatively to the government's offer of proof with immunity from prosecution or penalty. *Id.* (citing *Kastigar v. United States*, 406 U.S. 441 (1972)).

The Court rejected Mr. Aguilar's arguments without addressing those Fifth Amendment concerns, ruled that the government had satisfied the offer of proof, and permitted the admission of the diversion evidence, Trial Tr. 2207:10–22, which the government introduced during the testimony of an expert financial-tracing witness, Michael Petron of Stout Risius Ross, LLC, *see* Trial Tr. 3128:1–3213:20. The government also repeatedly referenced Mr. Aguilar's alleged embezzlement during its summations, including by urging the jury to convict because "Javier Aguilar was stealing from Vitol." Trial Tr. 3774:16–3775:7 (rebuttal summation).

### C. The Court Rules that PPI Employees Are Not "Public Servants" Under Mexican Law and Eliminates the Mexican Law Specified Unlawful Activity

Toward the end of trial on February 16, 2024, the Court ruled that the PPI employees whom Mr. Aguilar paid—Carlos Espinosa Barba and Gonzalo Guzman Manzanilla—were not public servants under Mexican antibribery law. ECF No. 313 (*United States v. Aguilar*, No. 20 Cr. 390 (ENV), 2024 WL 665947 (E.D.N.Y. Feb. 16, 2024)). The Court therefore removed violations of

Mexican antibribery law from the SUAs underlying Count Three's money-laundering conspiracy and instructed the jury that employees of PEMEX affiliate companies like PPI are *not* "public servants" under Mexico's penal code and "therefore are not subject to Mexico's criminal bribery provisions."  Trial Tr. 3875:11–13; ECF No. 314 at 211.

### D.      The Court Sustains the Remaining Mexico-Related Specified Unlawful Activity and Rejects Several Jury Instructions that Mr. Aguilar Requested

Although the Court's ruling on Mexican law established that Mr. Aguilar's alleged payments were "lawful" under Mexican law, the Court denied Mr. Aguilar's motion for acquittal on the Mexico-related FCPA SUA underlying Count Three under the FCPA's written foreign law affirmative defense.  Min. Order (Feb. 20, 2024) (denying motion lodged at ECF No. 316); *see* 15 U.S.C. §§ 78dd-2(c)(1), 78dd-3(c)(1) ("It shall be an affirmative defense [that] . . . the payment, gift, offer, or promise of anything of value that was made, was lawful under the written laws and regulations of the foreign official's . . . country[.]").  The Court also rejected Mr. Aguilar's request for a jury instruction on that affirmative defense.  Min. Order (Feb. 20, 2024).  The Court held that its ruling on Mexican law was "insufficient" to show the payments were "lawful" under foreign law and that Mr. Aguilar's request would "add to the FCPA an element for the government to prove." *Id.*

At the charge conference, the Court further refused Mr. Aguilar's request for an instruction requiring unanimity on each SUA underlying Count Three, and similarly declined to use a special verdict sheet requiring such unanimity.  Trial Tr. 3412:18–21.  The Court did so even though it twice had acknowledged the need for such protections to limit the risk of a nonunanimous verdict. *See supra* Background Section A.

### E.      The Jury Convicts Mr. Aguilar on All Three Counts

After the close of the government's case, the defense moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, and the Court reserved decision. Trial Tr. 3293:6–8.  On February 23, 2024, after the jury sent two notes to the Court regarding the three-hundred page, three-hour-long instructions that the Court had recited, the jury returned a verdict of guilty on all Counts, while finding Mr. Aguilar not guilty as to the territorial prong of the FCPA conspiracy.  ECF No. 328.

Mr. Agular now moves under Rules 29 and 33 of the Federal Rules of Criminal Procedure for orders granting judgments of acquittal or a new trial on all Counts.

### LEGAL STANDARD

After the jury has returned a guilty verdict, a court may "set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c).  A defendant is entitled to a judgment of acquittal under Rule 29 when, after viewing the evidence in the light most favorable to the government, no rational jury could have found all the essential elements of the crime beyond a reasonable doubt.  *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008). This burden is high but not insurmountable.  *See, e.g.*, *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004) (reversing conspiracy convictions because of insufficient evidence and instructing district court to acquit).  If the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury *must* necessarily entertain a reasonable doubt." *Lorenzo*, 534 F.3d at 159, 160–62 (emphasis added) (reversing conviction for conspiracy to import cocaine and conspiracy to distribute and possess with intent to distribute cocaine, and instructing district court to acquit despite "ample evidence" of the existence of the conspiracy, false exculpatory statement disclaiming knowledge of coconspirator, and recordings of conversations with coconspirator because there was no evidence they knew the contents of the

suitcases).  Although the government may resort to circumstantial evidence to meet its burden, it still must prove each element of the offense beyond a reasonable doubt.  *See United States v. Rodriguez*, 392 F.3d 539, 545–48 (2d Cir. 2004) (reversing conviction for possession with intent to distribute heroin and conspiracy to distribute heroin, and instructing district court to acquit despite serving as lookout, bringing weapons to the scene, calls with coconspirators, and proximity to heroin in his vehicle because the heroin was concealed inside a box).  After all, "knowledge, though inferable from circumstances, must be based on evidence, not speculation." *United States v. Biaggi*, 909 F.2d 662, 681 (2d Cir. 1990) (reversing son's conviction for aiding and abetting father in bribery offenses where there was no evidence the son was told the purpose of the stocks he held in his father's name).

When considering motions under Rules 29 and 33, the Court "must take seriously [its] obligation to assess the record[.]" *United States v. Clark*, 740 F.3d 808, 811 (2d Cir. 2014).  Although the Court ordinarily defers to a jury's assessments of credibility, conflicting testimony, and competing inferences, "specious inferences are not indulged," *Lorenzo*, 534 F.3d at 159 (citation omitted), and "a conviction based on speculation and surmise alone cannot stand," *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (vacating mail fraud convictions and ordering dismissal of the indictment where government failed to produce sufficient evidence of criminal intent).  "It thus remains axiomatic that, it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty." *Rodriguez*, 392 F.3d at 544 (cleaned up).  Accordingly, the Court of Appeals reviews orders denying relief under Rule 29 de novo. *Jones*, 393 F.3d at 111.

In addition, the Court may "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Because different standards govern Rule 29 and

Rule 33 motions, a court may grant a Rule 33 motion even if it denies a Rule 29 motion. "Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992); *cf. United States v. Landesman*, 17 F.4th 298, 331 (2d Cir. 2021) (reversing grant of Rule 29 motion and conditional relief under Rule 33 because defendant was made aware of the criminal scheme's details and operations in numerous emails and other communications). "A new trial is appropriate if a court harbor[s] a real concern that an innocent person may have been convicted." *United States v. Serrano*, 224 F. Supp. 3d 248, 255 (S.D.N.Y. 2016). To grant a Rule 33 motion, the evidence must "preponderate[] heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand." *Landesman*, 17 F.4th at 330; *see United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020) (same). Courts may grant a motion for a new trial when, among other things, "the evidence was patently incredible or defie[d] physical realities," *Archer*, 977 F.3d at 188, "an evidentiary or instructional error compromised the reliability of the verdict," *id.*, or "the government's case depends upon strained inferences drawn from uncorroborated testimony," *Landesman*, 17 F.4th at 331. In resolving motions for a new trial under Rule 33, the Court may weigh the evidence and credibility of witnesses on its own. *See, e.g.*, *United States v. Autuori*, 212 F.3d 105, 120-21 (2d Cir. 2000) (affirming grant of new trial because of dubious testimony of government's witnesses). Although courts generally should defer to the jury's credibility assessments and resolution of conflicting evidence, on a Rule 33 motion courts "may intrude upon the jury function of credibility assessment" when there is "a real concern that an innocent person may have been convicted." *Landesman*, 17 F.4th at 330. The Court of Appeals reviews an order granting a new trial for abuse of discretion. *Autuori*, 212 F.3d at 120.

Courts in and beyond the Second Circuit do not hesitate to grant post-trial relief to criminal defendants under Rules 29 and 33, including in bribery cases. *See, e.g.*, *United States v. Silver*, 948 F.3d 538, 577 (2d Cir. 2020); *Biaggi*, 909 F.2d at 681; *United States v. Full Play Grp., S.A.*, No. 15 Cr. 252 (PKC), 2023 WL 5672268, at *27 (E.D.N.Y. Sept. 1, 2023); *see also, e.g.*, *McDonnell v. United States*, 579 U.S. 550, 580–81 (2016); *United States v. Campbell*, 702 F.2d 262, 266-67 (D.C. Cir. 1983); *cf. United States v. Bryant*, 885 F. Supp. 2d 749, 751 (D.N.J. 2012).

## ARGUMENT

I.   **The Court Improperly Allowed the Government to Introduce Incurably Prejudicial Evidence of Mr. Aguilar's Alleged and Uncharged "Diversion" of Vitol Funds.**

   A.   **The Court's Pretrial Orders Authorized Mr. Aguilar to Pursue His Intended Defense Without Opening the Door to Diversion Evidence.**

Seven months before trial, the Court denied the government's motion in limine to introduce evidence that Mr. Aguilar purportedly "diverted" to himself (or to his relatives or others for his benefit) money that Vitol had sent to Lionel Hanst.  ECF No. 155.  The Court excluded all evidence of this uncharged conduct under Rule 403 because its probative value was not "particularly great" and "cumulative" of "numerous other pieces of evidence" of charged conduct, while its "potential for unfair prejudice" was "significant" and "substantial[ ]" because it involved alleged conduct that was much "more inflammatory than that in the [charged] scheme[s]," and which "many jurors could see as particularly unsavory."  *Id.* at 2, 5–8.  In excluding this evidence, the Court stressed that "the charged scheme[s] allegedly involve[ ] Aguilar directing bribes in order to benefit his employer," while "the Diversion Scheme allegedly involves him directing his employer's money to his own pockets" to purchase "luxury goods" and pay "alimony," which "inescapably paints him in a significantly more negative light as a bad character."  *Id.* at 6.  The Court further concluded that gilding the lily in an already "complex" case backed by a large volume of charged evidence (including the assistance of more than half-a-dozen cooperating witnesses and hundreds of hours

of cooperator recordings) would "confus[e] [ ] the issues" for the jury—confusion that "*could* [*not*] be adequately mitigated through a jury instruction." *Id.* at 2, 6–8 (emphasis added).  Nothing in the Court's ruling excluding diversion evidence cautioned that particular defenses or lines of inquiry that Mr. Aguilar might raise at trial potentially could open the door to this evidence.  *See* ECF No. 324 at 1–2 (post-trial decision references no "flags" of any color being raised at this stage).

After the Court excluded the diversion scheme, the government repeatedly tried to backdoor this now-forbidden evidence—but the Court rebuffed each of those efforts in a series of pretrial rulings.

The government first sought to have Mr. Hanst testify that he believed Mr. Aguilar was concealing "kickbacks" from the Pere brothers while tying Mr. Aguilar's hands so that he could not rebut that misleading testimony "by affirmatively suggesting to the jury that [he] did not receive kickbacks" without also "open[ing] the door" to diversion evidence.  ECF No. 205 at 2 & n.1.  In response, Mr. Aguilar explained why (1) siphoning money from Mr. Hanst to himself would prove nothing about his knowledge of any bribes that the Pere brothers were paying, but (2) the fact that he neither sought nor received kickbacks from the Pere brothers themselves would illuminate his lack of knowledge and intent about the Pere brothers' corrupt arrangement with Nilsen Arias.  ECF No. 214 at 2–3.  Mr. Aguilar added that because these were factually distinct issues, the latter could not be deemed to open the door to the former.  *See id.* (citing *United States v. Elfgeeh*, 515 F.3d 100, 128 (2d Cir. 2008) (door to excluded evidence opens only when party introduces inadmissible evidence "on the same issue")).

As part of this argument, Mr. Aguilar previewed in his December 18, 2023 letter that one of his intended trial defenses would be to compare his own conduct to that of Gunvor trader Ray

Kohut, who (unlike Mr. Aguilar) accepted kickbacks from the Pere brothers, which showed that

he (unlike Mr. Aguilar) knew the Pere brothers were using Gunvor's commissions to pay bribes:

> Nor is there any other logical relationship between disputing that
> Mr. Aguilar received kickbacks from, for example, the Pere
> brothers, and showing that he embezzled money from Vitol in the
> Diversion Scheme.  The former is relevant because it tends to rebut
> an inference that Mr. Aguilar knew of or was willfully blind to the
> Pere brothers' scheme to pay government officials:  if Mr. Aguilar
> did not receive anything special or otherwise abnormal with a
> regular consulting arrangement, then he justifiably could have
> believed there was nothing special or otherwise abnormal with the
> Pere brothers' consulting business.  Such evidence is particularly
> salient here, given that the Pere brothers did pay kickbacks to a
> trader at another trading company called Gunvor, which paid tens of
> millions of dollars to the Pere brothers in connection with other
> Petroecuador contracts.  The fact that Mr. Aguilar did not receive
> such kickbacks undermines what the government will argue he
> knew or should have known about the Pere brothers' corrupt
> methods.
>
> The Diversion Scheme, by contrast, relates to entirely different
> issues:  whether Mr. Aguilar had authority to direct Mr. Hanst to
> make payments and whether Mr. Aguilar has a disposition to
> commit crimes.  That is categorically unlike, and has little to do
> with, the purposes for which Mr. Aguilar would dispute that he
> received kickbacks from the Pere brothers or Mr. Cazarin.

*Id.* at 3; *see also id.* at 3 n.3 (citing Compl. ¶ 31, *United States v. Kohut*, No. 21 Cr. 115 (ENV)

(E.D.N.Y. Aug. 18, 2020)).

The Court accepted Mr. Aguilar's arguments and rejected the government's, reiterating its

prior ruling excluding diversion-related evidence and holding that "Hanst will not be permitted to

testify about his belief that Aguilar was receiving kickbacks."   ECF No. 230  at 1  (citing

ECF No. 155).  As with the Court's initial order excluding diversion evidence, nothing in this

December 26, 2023 ruling cautioned that any particular trial defenses might open the door to that

evidence.  *See* ECF No. 324 (post-trial decision does not mention this order or state that it raised

any "flags").

14

Undeterred in its desire to backdoor this unfairly prejudicial propensity evidence, the government tried again when opposing Mr. Aguilar's motion in limine to exclude trial exhibits related to uncharged downstream transactions from Mr. Hanst, including diversion-related exhibits.  The government again asserted that if Mr. Aguilar told the jury that "he did not receive any money" from the Pere brothers, that defense would "open[ ] the door to the diversion scheme." ECF No. 210 at 9.  As he had the day before, Mr. Aguilar responded by letter on December 19, 2023 that he did intend to assert such a defense and explained why that defense would not open the door to diversion evidence:

> If Mr. Aguilar sought to argue that he never profited from the alleged conspiracy with Mr. Hanst, then the government might have a fair claim to present evidence of the Diversion Scheme. But merely asserting that he did not make money on the charged Ecuador or Mexico bribery schemes—a fact the government does not dispute—is far different.  As Mr. Aguilar explained in his prior letter regarding Mr. Hanst, [ECF No. 214 at 2–3], the latter assertion is directly relevant to Mr. Aguilar's state of mind and whether he was on notice of facts that would suggest to him the Pere brothers or Christian Cazarin were engaging in criminality.  That has nothing to do with whether he allegedly embezzled money from his employer, which is the gravamen of the Diversion Scheme, and thus cannot fairly be said to open the door to admission of that excluded evidence.

ECF No. 219 at 7–8.

The Court's December 21, 2023 decision yet again rejected the government's argument that the defense Mr. Aguilar previewed would open the door to diversion evidence.  ECF No. 226 at 3–4.  The Court ruled that Mr. Aguilar would open the door to diversion evidence *only if* (1) he "argue[d] that he never profited from the alleged conspiracy with Lionel Hanst," or (2) he asserted the government could not "account for all funds transferred at Lionel Hanst's behest."  *Id.* at 3.  In so ruling, the Court adopted Mr. Aguilar's crucial distinction between arguing that he siphoned no money from Mr. Hanst (which would open the door), and arguing that he took

15

no kickbacks from the Pere brothers (which would keep the door shut). *Id.* Although its ruling was "[w]ithout prejudice to the government's argument to the contrary at the time of trial," the Court made it clear that it could "presently conceive of *no other* door-opening inquiries" based on the parties' many pretrial submissions. *Id.* (emphasis added).

The timing of these events is crucial. On both December 18 and 19, Mr. Aguilar explicitly made the Court aware that he intended to compare his lack of kickbacks from the Pere brothers to Mr. Kohut's seeking and receiving such kickbacks. ECF No. 214 at 2–3; ECF No. 219 at 7–8. On December 21 and again on December 26, the Court made clear that Mr. Aguilar's intended defense *would not* open the door to diversion. ECF No. 226 at 3 (holding that the only ways the "the Court can presently conceive of" by which Mr. Aguilar potentially could open the door to diversion evidence would be by "argu[ing] that he never profited from the alleged conspiracy with Lionel Hanst" or by questioning "the government's ability to account for all funds transferred at Lionel Hanst's behest"); ECF No. 230 at 1 (holding that "Hanst will not be permitted to testify about his belief that Aguilar was receiving kickbacks" and declining to accept the government's door-opening assertions).

By listing just two ways that Mr. Aguilar could open the door and stating that it presently could think of no other ways to open the door—which did not include the defense Mr. Aguilar previewed in his submissions just days earlier—the Court expressly (or at least impliedly) held that Mr. Aguilar's previewed defense would not open the door. This sequence of events thus made it impossible for the Court's December 21 and 26 orders to have raised "caution flags" of any color that Mr. Aguilar's long-previewed defense might open the door to diversion evidence. *Contra* ECF No. 324 at 2.

16

As a result, the Court's resolution of the parties' pretrial motions *allowed* Mr. Aguilar to assert this defense without opening the door to diversion—or, at minimum, *led* him into a reasonable, good-faith understanding that his intended and explicitly previewed defense would not open the door to this highly prejudicial evidence. *See, e.g.*, *United States v. Mont*, 306 F.2d 412, 415 (2d Cir.) (Friendly, J.) (defendant "opened the door" to previously excluded evidence when counsel disregarded a "*specific warning* from the Court that the consequences would be that 'the floodgates are open and the Government can tell all they know about your client'" (emphasis added)), *cert. denied*, 371 U.S. 935 (1962).  Courts in and beyond the Second Circuit routinely grant relief when a party reasonably relies on a trial court's prior rulings to craft trial strategies and later is prejudiced when the court backtracks on those rulings. *See, e.g.*, *Warner Bros. Inc. v. Am. Broad. Cos., Inc.*, 720 F.2d 231, 246 (2d Cir. 1983) (courts abuse discretion to reconsider interlocutory rulings when litigants "act to their detriment in reliance on the initial ruling"); *United States v. Tapia-Ortiz*, 593 F. App'x 68, 71 (2d Cir. 2014) ("[w]e are concerned by the possibility that [defendant] was lulled into believing that the district court" would do something it failed to do); *Caruso v. Forslund*, 47 F.3d 27, 31 (2d Cir. 1995) (expressing concern that "the district court may well have lulled the plaintiff into failing to object" to an instructional error); *see also, e.g.*, *United States v. Pacheco*, 434 F.3d 106, 115–17 (1st Cir. 2006) (vacating and remanding conviction where district court "did not deliver on its implicit promise" in earlier rulings, which "defense counsel was entitled to rely on," and instead "pulled the rug out from under the defense when, without notice or an opportunity for cure, it reverted to a different, inconsistent" course of action that prejudiced defendant); *United States v. 15 Bosworth St.*, 236 F.3d 50, 52 (1st Cir. 2001) (vacating and remanding for new trial before different judge where district court erred and made statements that "may have lulled [forfeiture] claimants into a false sense of security");

*Sidebottom v. Delo*, 46 F.3d 744, 750 (8th Cir. 1995) (granting relief where criminal defendant was "lulled into inactivity by the district court's representation"); *Dunn v. United States*, 842 F.2d 1420, 1435 (3d Cir. 1988) (vacating and remanding because "plaintiffs may have been lulled into a false sense of security (and into making a poor strategic judgment not to adduce additional evidence) by the manner in which the district court decided the case.").

These pretrial rulings also sharply contrast with the established practice of this Court and others to give parties clear advance warnings on what would or would not open the door to prejudicial excluded evidence. *See, e.g.*, *United States v. Servider*, No. 15 Cr. 174 (ENV), 2018 WL 2172661, at *1 (E.D.N.Y. May 10, 2018) (giving clear "caution[ary]" warning to defendant on what tactics would and would not open the door to excluded evidence); *Boykins v. City of New York*, No. 13 Civ. 2299 (ENV), 2017 U.S. Dist. LEXIS 193768, at *13 (E.D.N.Y. Nov. 22, 2017) (similar); *Colter v. Reyes*, No. 15 Civ. 3214 (ENV), 2017 U.S. Dist. LEXIS 103617, at *18 (E.D.N.Y. July 4, 2017) (similar). Similar decisions abound.[2]

---

[2]   *See, e.g.*, *United States v. Mont*, 306 F.2d 412, 415 (2d Cir. 1962) (Friendly, J.), *cert. denied*, 371 U.S. 935 (1962) (door opened only after counsel disregarded a "specific warning" from the trial court); *United States v. Murph*, 452 F. App'x 31, 35 (2d Cir. 2011) (door opened only after counsel defied clear "warning" from trial court that his intended strategy would open the door); *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 629 (S.D.N.Y. 2018) (court clearly warned counsel that specific line of defense would open the door to excluded evidence but he "failed to heed [that] warning"); *Martin v. Perez*, No. 13 Civ. 6803 (KMK) (PED), 2015 WL 10381752, at *3 (S.D.N.Y. Dec. 29, 2015), *R&R adopted*, 2016 WL 828129 (S.D.N.Y. Feb. 24, 2016) (court clearly warned counsel that line of inquiry would open the door to excluded evidence yet he asked those questions anyway); *Rios v. Artuz*, No. 07 Civ. 330 (NGG), 2007 WL 1958899, at *7 (E.D.N.Y. June 29, 2007) (after being "warned by the court, [counsel] deliberately opened the door to [prior-bad-acts] evidence").

Other Circuits likewise have held that counsel open the door only after disregarding clear warnings from the trial court. *See, e.g.*, *United States v. Landry*, 631 F.3d 597, 601 (1st Cir. 2011) ("[T]he district court initially directed the Government not to mention evidence of the 2008 traffic stop, but warned [defendant] that the evidence would be admissible if she opened the door to it. After [defendant's] opening statement indicated a defense of good faith and computer error, the district court ruled that the evidence of the traffic stop would be admissible."); *United States v. McCray*, 433 F.2d 1173, 1175 (D.C. Cir. 1970) (per curiam) ("Evidence of the occurrence of two other

In *Servider*, for example, this Court excluded evidence that the defendant's coconspirator had ties to organized crime.  2018 WL 2172661, at *1.  But this Court also "cautioned" the defendant "that certain arguments or evidence might open the door to the evidence."  *Id.* This Court then listed three specific ways that the defendant would open the door to "limited evidence" of the coconspirator's ties to organized crime.  *Id.*  And (as here) this Court clarified that certain other potential defenses "would not" cause the door to "swing open."  *Id.*  This Court's order in *Servider* thus gave the defendant clear guidance on what he could and could not do at trial without opening the door to forbidden evidence.

This Court gave similarly clear guidance here before trial, which plainly indicated that Mr. Aguilar could—without opening the door to the diversion evidence—argue that he lacked knowledge of bribes because he never asked the Pere brothers for kickbacks.  Moreover, given the settled judicial practice of drawing clear lines in the sand on what defenses would or would not open the door, Mr. Aguilar justifiably relied on the Court's pretrial rulings when preparing and executing this explicitly previewed line of defense at trial.  As explained below, the Court's

---

larcenies would normally not have been admissible, but [defendant] opened the door by his inquiries—in the face of warnings by the judge—on cross-examination."); *United States v. Mathis*, 331 F. App'x 997, 999 (3d Cir. 2009) ("Defense counsel disregarded a clear warning from the District Court and opened the door to this damaging answer[.]"); *United States v. Homick-Van Berry*, 240 F. App'x 966, 969 (3d Cir. 2007) ("Defense counsel disregarded a clear warning from the Court and opened the door to the admission of this evidence by questioning Varvaro about all payments that he had received from the FBI since January 2002 in exchange for his cooperation."); *United States v. Bender*, 265 F.3d 464, 471 (6th Cir. 2001) (defendant opened door to details of prior conviction where court warned "she will be opening the door" if she "affirmatively denied knowledge of drugs" but counsel went on to do so "[d]espite this warning"); *In re Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d 739, 772–73 (N.D. Ohio 2022) (after cross-examination "cracked the door open" to excluded evidence, the court first "strictly warned" defendants "to avoid this line of questioning," and defendants opened the door only after they disregarded that clear warning).

sua sponte midtrial ruling opening that very door triggered irreparable unfair prejudice which could not be and was not cured, requiring vacatur and a new trial on all Counts.

> **B.     The Court Erred in Ruling Sua Sponte that Mr. Aguilar Had Opened the Door.**
>
> > **1.     *Mr. Aguilar's Defense Did Not Open the Door to Diversion, and the Court's and the Government's Actions Never Warned that it Could.***

Mr. Aguilar relied on the Court's pretrial rulings when he proceeded at trial to assert his long-foreshadowed defense that he lacked knowledge of the Pere brothers' bribes because, unlike Mr. Kohut, Mr. Aguilar neither solicited nor received any kickbacks from the Pere brothers' commissions.  The government's failure to object consistently to this defense, and the Court's sidebar decision to allow Mr. Aguilar to pursue it the lone time the government did object, further led Mr. Aguilar to believe that this defense would not open the door to diversion evidence.  All this underscores the incurable prejudice to Mr. Aguilar when the Court suddenly backtracked on its prior rulings in a sua sponte midtrial pivot that irreparably tainted the jury's consideration of all three Counts and significantly damaged Mr. Aguilar's defense.

> **(a)     Mr. Aguilar's Opening Statement**

As previewed in his pretrial submissions, Mr. Aguilar asserted in his opening statement that the evidence would show his lack of criminal intent because, unlike Mr. Kohut, he never asked for any kickbacks from the consulting fees Vitol paid the Pere brothers:

> [T]he evidence will also show that it was not in Antonio or Enrique Pere's interest, and it was not necessary for Mr. Aguilar to know what was going on.  You'll hear evidence, for example, that Mr. Pere did not want people to know about the criminal scheme. The more people that know about it, the more likely you're going to get caught.  So it's only on a need to know basis.
>
> The evidence will also show that the problem in letting the client know is it might affect what you get here, and let me give you an example.

> Remember I told you about Gunvor?  There is a gentleman called Ray Kohut who is like a trader for Gunvor, an agent, and he hooked up with the Pere brothers.  He had extensive experience in Ecuador, by the way.
>
> And after a couple of the oil contracts that the Pere brothers helped Gunvor get, he thought, yeah, I know what you're doing, you're bribing government officials.
>
> So he went to the Pere brothers and said, hey, I know what's going on, I want part of your fee.
>
> What happened, of course, is the Pere brothers had to give up part of their fee to keep this going, to keep it quiet to Mr. Kohut.  Obviously that is not something they wanted to happen.
>
> The evidence is undisputed that in this case Mr. Aguilar did not receive a penny from the amount of money that the Pere brothers received.  The evidence will show that Mr. Aguilar did not know, and no one wanted him to know how this success was being done.  It was unnecessary and it would have been hurtful.

Trial Tr. 62:12–63:15.  This was no "bit of a warble" the Court or the government could ignore, *contra* ECF No. 324 at 2 n.1—it was a clear assertion of Mr. Aguilar's long-previewed defense that his lack of kickbacks from the Pere brothers showed his lack of knowledge, while Mr. Kohut's receipt of such kickbacks proved his knowledge in similar circumstances.

Consistent with the Court's pretrial rulings finding that this defense would not open the door to diversion, the government did not object to these remarks either during or after Mr. Aguilar's opening statement.  Nor did the Court raise any concerns on its own accord.

### (b)    Cross-Examination of Nilsen Arias

Five days later, in his cross-examination of Nilsen Arias (the government's first witness), Mr. Aguilar continued the defense previewed in his pretrial submissions and outlined in his opening statement by eliciting admissions from Mr. Arias that Mr. Kohut had solicited and received kickbacks from the Pere brothers while Mr. Aguilar had not.  Mr. Arias admitted he "understood Ray Kohut was actually getting a cut from the Peres," meaning "the Peres were paying

money to Ray Kohut."   Trial Tr. at 482:19–483:6.   Then, when Mr. Aguilar asked whether

"the Peres [ ]ever told [Mr. Arias] that they were paying a cut of their money to Mr. Aguilar," the

government at last objected.   Trial Tr. 483:7–10.   During the ensuing sidebar, the government

asserted for the first time at trial that this line of questioning would open the door to diversion

evidence—exactly the argument the Court's pretrial rulings had rejected.   Trial Tr. 484:5–15

("our position will be that that's opening the door").   Mr. Aguilar's counsel responded and noted

that the Court's pretrial rulings allowed Mr. Aguilar to assert this defense:

> There is a money flow that goes from trading company to the Peres,
> and then the Peres give a kickback to Ray Kohut on the Gunvor
> scheme.
>
> We are drawing the parallel that on this alleged scheme, there was
> no payment from the Peres to Mr. Aguilar, which is evidence, in our
> view, that Mr. Aguilar was not part of the Peres bribe scheme.
> That is separate from the diversion issue. * * *
>
> Your Honor has already held correctly that the diversion scheme is
> separate from this scheme [in Ecuador].   Whether or not Mr. Aguilar
> managed to siphon money from his employer to himself is separate
> from the alleged scheme involving the Peres.   They never touched
> the money that he got in the diversion scheme and they have nothing
> to do with one another.   * * *
>
> Discussions about, Your Honor, evidence about embezzlement has
> nothing to do with bribery, as Your Honor has already held.   Not to
> mention the substantial risk of undue prejudice that would come
> with admitting evidence of the embezzlement scheme.   These things
> are completely different, they're being offered for different
> purposes, and I think the Government, this is another example of the
> Government seeking by hook or crook to get this extremely
> prejudicial evidence into the record.

Trial Tr. 484:22–485:4, 486:6–11, 487:12–20.

The Court (again) agreed with Mr. Aguilar's distinction between embezzling Vitol money

from Mr. Hanst and the lack of any kickbacks from the Pere brothers.   Trial Tr. 485:5–11.   In doing

so, the Court expressly rejected the government's argument that Mr. Aguilar's defense had opened

the door to diversion evidence.  When the government asserted that the Rule 403 "balance has now gravely shifted," the Court disagreed, stating, "I don't know that it has."  Trial Tr. 488:2–8.

The Court then shifted gears to ask why the analogy to Mr. Kohut was relevant in the first place.  Trial Tr. 488:8–16 ("From what I'm gathering, I mean this whole business with Ray Kohut getting a cut was pretty far afield as far as this case, the case against Aguilar is concerned. So, whether or not Mr. Arias knows whether or not Mr. Aguilar may have been taking money that was supposed to go to Vitol [sic], what's the relevance of that . . . under my prior ruling?"). The government picked up on the Court's signposting and pivoted from its unsuccessful door-opening objection to a new relevance objection.  *See, e.g.*, Trial Tr. 488:17–499:4 ("I agree, Your Honor.  I think at this point the evidence of Ray Kohut really has no bearing on what's going on with Mr. Aguilar."); *id.* at 489:23–25 (Mr. Lax: "Your Honor, what other people do in other schemes is not relevant to the scheme that's charged here."  The Court: "That's what I said.").  But when the government sought to "preclude[] entirely" on relevance grounds the defense that Mr. Aguilar had previewed in his pretrial submissions and opening statement, the Court rightly noted, "Well, nobody objected."  Trial Tr. 489:3–5.

Mr. Aguilar responded to the government's distinct relevance objection and explained— as he had in his pretrial submissions—why Mr. Kohut's solicitation and receipt of kickbacks from the Pere brothers (which Mr. Aguilar neither sought nor received), was relevant and admissible through Mr. Arias because it went to his "state of mind."  Trial Tr. 490:4–20.  The Court agreed and "allow[ed]" Mr. Aguilar to ask Mr. Arias about the lack of kickbacks from the Pere brothers to Mr. Aguilar "on that basis, but that's it."  Trial Tr. 490:21–22.

At the end of this sidebar, Mr. Aguilar understood the Court's ruling on relevance and admissibility, and then specifically asked the Court to "*confirm* that [it also was] denying the

Government's motion that that, quote/unquote, opens the door" to diversion evidence. Trial Tr. 490:25–491:2 (emphasis added).  The Court responded unequivocally:  "I don't believe it opens the door, no, because it is going to be asked for that purpose and for that reason only"— that is, to the state of mind of the witness on the stand, Mr. Arias.  Trial Tr. 491:3–5  Nothing in the Court's ruling suggested that this could be "the last [question] on th[e] subject" of the lack of kickbacks from the Pere brothers to Mr. Aguilar.  *Contra* ECF No. 324 at 3.  Rather, the Court's remark "on that basis, but that's it," meant that the only basis on which Mr. Arias's response would be admissible would be to show his state of mind.  Trial Tr. 490:21–22.  Nor did Mr. Aguilar's request for *confirmation* at the end of a long sidebar "acknowledge[ ]," "tacit[ly]" or otherwise, that similar questions to other witnesses might open the door.  *Contra* ECF No. 324 at 3.  Instead, the request merely sought to confirm that the Court (once again) had rejected the government's argument that this defense might open the door.  This sidebar thus raised no flag whatsoever— much less a "red flag"—that Mr. Aguilar would open the door to diversion evidence if he asked any other questions about his lack of kickbacks from the Pere brothers.  *Contra id.*

### (c)      Cross-Examination of Antonio Pere

Both Mr. Aguilar and the government understood the Court's sidebar ruling to allow Mr. Aguilar to ask limited questions about the kickbacks from the Pere brothers that Mr. Kohut sought and received, but Mr. Aguilar had not.  The parties' conduct makes this plain. When Mr. Aguilar renewed this line of inquiry with the government's next witness, Antonio Pere, the government did not object or assert in any way that those questions had opened the door. Mr. Aguilar asked just two questions to Antonio Pere about kickbacks that went to his state of mind regarding Mr. Aguilar's conduct:

> Q: "So about the time of the third contract that Gunvor had with
> your company, Mr. Kohut comes to you and says, I know what's

going on, I want a percentage of your money, I want a percentage of your 70 percent.  He does that after the third contract; doesn't he?"

A:  "Yes, he does that.  I'm not sure if it's after the third contract, but he does it at some point in time, yes."

Q:  "By the way, Mr. Aguilar never, ever asks for any portion of the money that you received, correct?"

A:  "That is correct, yes."

Trial Tr. 1056:5–14.

The government objected to neither question.  Nor did the government raise any objections after Mr. Aguilar finished cross-examining Antonio Pere.  Nor did the Court immediately raise any concern with the parties.

The Court's post-trial decision states that these two short questions "barreled the [*sic*] through the closed door," ignored an obvious "red flag" raised during Mr. Arias's cross-examination, and created an "epiphany moment" of great significance for the jury.  ECF No. 324 at 3–4.  There was no such epiphany—or if there was, it certainly did not register with the government, who sat idly by during this portion of Mr. Aguilar's cross-examination and raised no objection whatsoever.  If the two questions posed during the cross-examination of Antonio Pere had anything like the bombshell effect that the Court's post-trial order portrays, it is reasonable to expect that the government would have objected and redoubled its many efforts to introduce evidence of the diversion scheme.  *See United States v. Hutcher*, 622 F.2d 1083, 1087 (2d Cir. 1980) (collecting cases holding that parties waive issues when they "made no objection that clearly stated the specific ground now asserted on appeal"); *see also United States v. Dowdell*, 70 F.4th 134, 140 (3d Cir. 2023) ("We enforce waiver and forfeiture against criminal defendants and the government equally.").

Although the Court's post-trial decision fails to explain the government's waiver, the answer nonetheless is clear: the government did not object because both sides understood that the Court's pretrial and midtrial rulings expressly permitted Mr. Aguilar's defense, which he previewed and then executed only with the Court's blessing.

### (d)   The Court's Sua Sponte Midtrial Ruling

Given the sequence of events set out above, Mr. Aguilar was stunned when—four days later and without any suggestion or request for consideration from the government—the Court stated sua sponte that it was considering whether Mr. Aguilar's two short questions to Antonio Pere had opened the door to diversion evidence. Trial Tr. 1069:18–1072:11. Despite waiving its right to seek this remedy by failing to object, the government seized on the Court's invitation and asserted for the first time that those questions had opened the door. Trial Tr. 1072:13–25; *contra United States v. Vega Molina*, 407 F.3d 511, 524 (1st Cir. 2005) (courts should not "do the government's homework" to sidestep waiver). Mr. Aguilar responded by reiterating the distinctions (which the Court long had accepted) between the alleged diversion scheme and any kickbacks from the Pere brothers; by noting that he "made no secret of the fact that" he intended to pursue this defense at trial, consistent with the Court's pretrial rulings; and by explaining why admitting diversion evidence at midtrial would be inappropriate under Rule 403. Trial Tr. 1075:7–1077:15. After issuing this warning (its first), the Court took under advisement whether the door to diversion remained shut. Trial Tr. 1084:21–25.

Two days later, the government tried once more to wedge the door open on its own by eliciting testimony from Enrique Pere on direct that he and his brother had paid kickbacks to Mr. Kohut. Trial Tr. 1540:20–1541:4. During the next break in testimony, Mr. Aguilar objected to those questions, explaining that the government cannot try to "wedge open the door by raising it themselves." Trial Tr. 1543:12–20. The Court then reiterated its earlier warning and cautioned

26

the parties that they would bring up kickbacks going forward "at their own peril for their respective positions on the pending motion" (a motion the Court made for the government days after it failed to object).  Trial Tr. 1546:10–13.

The next day, the Court issued an oral ruling that Mr. Aguilar's long-previewed defense conditionally had opened the door to diversion evidence.  Trial Tr. 1660:20–1664:15.  The Court did so without considering *any* less prejudicial alternatives.[3]  Given the Court's many pretrial and midtrial rulings that allowed Mr. Aguilar to assert that defense or (at minimum) lulled him into a reasonable belief that he could do so without opening the door, and the government's inconsistent and unsuccessful objections to that defense, that decision was error.

### 2. *The Court Improperly Overlooked the Government's Failure to Satisfy the "Offer of Proof" Required to Admit Diversion Evidence.*

In addition to the unfair lack of notice, the Court's decision to admit the diversion evidence was unjustified even on its own terms.  Following its days-long further consideration of the trial record, the Court stated that the government could introduce diversion evidence if, and only if, it could show that Mr. Aguilar both (1) siphoned Vitol money from Lionel Hanst *after* he engaged the Pere brothers as consultants, and (2) *did not* did so *before* Mr. Aguilar engaged the Pere brothers in January 2017.  *Id.*; ECF No. 324 at 5.  If the government could not satisfy both requirements, then diversion evidence would remain inadmissible because it would not undercut

---

[3]   Neither the Court's midtrial bench ruling nor its post-trial written ruling discusses any less prejudicial alternatives to admitting diversion evidence.  For example, had the government objected during Antonio Pere's cross-examination, the Court could have simply instructed the jury to disregard his testimony about kickbacks. *See Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d at 772–73 (although cross-examination "had cracked the door open" to evidence of a government investigation, the court "instead . . . instructed the jury to disregard [the witness's] answer" while "*strictly warn[ing]*" defendants "to avoid this line of questioning because the Court viewed it as opening the door to questioning about the DOJ Complaint" (emphasis added)).  The Court's failure to consider any such alternatives underscores why its midtrial diversion ruling was error.

"the epiphany moment argument" that Mr. Aguilar had made (and long had previewed) by analogizing his lack of kickbacks from the Pere brothers to Mr. Kohut's receipt of such kickbacks. Trial Tr. 1661:22–25; ECF No. 324 at 4. Yet when the government failed to make the required showing, the Court paid no mind and admitted the diversion evidence anyway.

The government's attempt to make the required offer of proof discussed only the first requirement and made no attempt at all to satisfy the second. The government represented that it could show through documents and the testimony of several witnesses—including private-sector financial tracing expert Michael Petron—that Mr. Aguilar (or his relatives or others for his benefit) received Vitol money from Mr. Hanst after January 2017. *See* ECF No. 274 at 3–6 (proffering that Mr. Aguilar diverted money in 2017 and 2018). But the government made no effort to show that Mr. Aguilar *had not* similarly diverted money from Mr. Hanst for personal purposes before that time.

Mr. Aguilar detailed the government's failure to address—much less meet its burden to satisfy—the second requirement of the offer of proof in an opposition letter. ECF No. 277. In doing so, he pointed the Court to documentary evidence identifying payment streams from Mr. Hanst in 2015 and 2016 that the government had not investigated to determine whether any of those funds ended up in Mr. Aguilar's control. *Id.* at 2. He also explained why the government's inability to make that showing resulted from its deliberate failure to seek financial records from all of Mr. Aguilar's accounts, or those of his relatives or other diversion recipients, from before January 2017. *Id.* at 3. He added that the government had proffered no proof that Vitol (a cooperating witness subject to a deferred prosecution agreement) had not authorized the payments at issue for legitimate, on-the-ground business expenses. *Id.* at 3; *cf. LaForest v. Former*

*Clean Air Holding Co.*, 376 F.3d 48, 57 (2d Cir. 2004) ("the law does not take judicial notice of matters of common sense, and common sense is no substitute for evidence").

In addition, Mr. Aguilar explained that the Court's offer of proof put him in an unconstitutional Catch-22 by forcing him to choose between (1) potentially stating under oath that he embezzled Vitol money before January 2017, thereby admitting one crime to avoid the introduction of unconstitutional propensity evidence of another crime; and (2) staying silent to avoid potential new charges, thereby allowing the government to introduce incurably prejudicial evidence of his alleged embezzlement. ECF No. 277 at 4. That Hobson's choice, Mr. Aguilar noted, improperly infringed his Fifth Amendment privilege against self-incrimination. *Id.* (citing *Simmons v. United States*, 390 U.S. 377, 393–94 (1968) (reversible error to require defendant to "surrender[ ]" Fifth Amendment privilege to keep inadmissible evidence precluded from trial)); *see also Dowling v. United States*, 493 U.S. 342, 352 (1990) (defendants have a Due Process right not to face uncharged evidence of criminal propensity). Mr. Aguilar therefore submitted that requiring him to prove the existence of alleged diversion payments before January 2017 to justify continued exclusion of irreparably prejudicial diversion evidence would constitute unconstitutional reversible error unless the Court granted him immunity from prosecution (or penalty) for any representations he might make. ECF No. 277 at 4 (citing *Kastigar v. United States*, 406 U.S. 441 (1972)).

The Court's eventual ruling that the government had satisfied the required offer of proof brushed past the government's failure to satisfy the second part of that offer of proof and the Fifth Amendment concerns Mr. Aguilar raised. Indeed, neither the Court's midtrial bench ruling nor its post-trial written ruling did (or could) explain how the government had satisfied that offer of proof when it had not even tried to show that Mr. Aguilar received no kickbacks from Mr. Hanst before

29

January 2017.  Trial Tr. 2207:10–22; ECF No. 324 at 5.  Nor did either ruling confront the weighty

Fifth Amendment considerations that Mr. Aguilar had raised.  *See id.* (both sources).

### 3. *The Introduction of Diversion Evidence Improperly Prejudiced Mr. Aguilar and Irreparably Tainted the Jury's Verdict.*

The Court's decision to allow the government to introduce evidence of Mr. Aguilar's

alleged diversion also overlooked the fundamental fair-trial considerations that the Court carefully

weighed in excluding this evidence before trial under Rule 403.  *See, e.g.*, *United States v. Lee*,

724 F.3d 968, 976 (7th Cir. 2013) (reversing and remanding conviction because even if defendant

opened the door to uncharged conduct, "[t]he court still must weigh the probative worth of the

evidence against its potential for prejudice"); *United States v. Sine*, 493 F.3d 1021, 1037 (9th Cir.

2007) ("[T]he 'opening the door' doctrine is not so capacious as to allow the admission of *any*

evidence made relevant by the opposing party's strategy, without regard to the Federal Rules of

Evidence." (emphasis in original)); *see also Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d

at 773–74 (court allowed plaintiff "to ask a single question about" previously excluded evidence

after defendants opened the door).  As the Court of Appeals for the District of Columbia Circuit

has explained, "[t]his business about 'opening the door' is a much overused issue and it carries

with it an oversimplification.  Opening the door is one thing.  But what comes through the door is

another.  Everything cannot come through the door."  *United States v. Winston*, 447 F.2d 1236,

1240 (D.C. Cir. 1971) ("[t]he doctrine of curative admissibility is one dangerously prone to

overuse").

This Court explained in its original pretrial order that diversion evidence offered little-to-no

marginal probative value over all the evidence of the charged conduct that the government could

(and did) present at trial:  "The probative value of the Diversion Scheme evidence to substantiate

the [bribery] charges is not negligible, but neither is it particularly great" and "[t]he cumulative

nature of this evidence is a mark against admitting it."  ECF No. 155 at 5.  Nothing that happened at trial undermined that reasoned conclusion, given that the government presented several weeks of evidence of Mr. Aguilar's control of Mr. Hanst and the money flows through the testimony of a half dozen cooperating witnesses.

"More critically, the potential for prejudice from evidence of the Diversion Scheme [was] significant," *id.* at 5—and trial proved as much.  The Court held before trial that "the addition of evidence related to a scheme where Aguilar allegedly stole from his employer to benefit himself *inescapably* paints him in a significantly more negative light as a bad character," which was "*especially true* where, as here, the pilfered money was allegedly spent on luxury goods and alimony payments, expenditures that many jurors could see as particularly unsavory."  *Id.* at 6 (emphases added).  The Court added in equally absolute terms that the risk of juror confusion that admitting this evidence would trigger *could not* be remedied by curative instructions:  "Neither is this the sort of prejudice that can be resolved through limiting instructions.  Although it is theoretically possible that the character issues could be adequately mitigated through a jury instruction, the delay and confusion issues cannot be."  *Id.* at 7–8.

The government maximized the unfair prejudice to Mr. Aguilar at trial by exploiting evidence of his alleged diversion in two ways.  The government called a private-sector financial-tracing witness, Michael Petron from Stout Risius Ross, LLC, to testify that Mr. Aguilar siphoned hundreds of thousands of dollars that Vitol sent to Mr. Hanst.  The Court improperly denied Mr. Aguilar's motion to exclude Mr. Petron's testimony as an undisclosed witness *and* an undisclosed expert witness—an error that alone warrants vacatur and a new trial.  *See* Min. Order (Feb. 5, 2024) (denying motion lodged at ECF No. 284).  That allowed the government to have a highly credentialed witness put the imprimatur of his expertise behind the government's argument

that Mr. Aguilar knew he was committing the charged crimes because he also was embezzling similar funds. The very first thing the government did with Mr. Petron on direct examination was to have him establish his robust expertise and credentials in accounting, fraud examination, and financial tracing to the jury. Trial Tr. 3128:7–3129:15. By the time Mr. Aguilar could cross-examine Mr. Petron the next day to try to undermine his testimony by showing (among other things) that he had no idea whether Vitol had formally or informally sanctioned any alleged diversion payments, *see, e.g.*, Trial Tr. 3224:19–3225:17, 3231:13–3232:14, it was too late to undo the prejudice that the government's tactics had inflicted by then.

Making matters worse, the government's summations repeatedly exploited and underscored the improper propensity purpose behind its longstanding drive to get uncharged diversion evidence before the jury. *See, e.g.*, *United States v. McCallum*, 584 F.3d 471, 477 (2d Cir. 2009) (error to admit uncharged conduct "as propensity evidence in sheep's clothing . . . with insufficient regard for the unfair prejudice that surely would result"); *United States v. Newton*, No. 01 Cr. 635 (CSH), 2002 WL 230964, at *5 (S.D.N.Y. Feb. 14, 2002) (evidence inadmissible under Rule 403 because "its potential for unfairly prejudicing the jury by portraying [the defendant] as an immoral rule-breaker greatly outweighs that slight probative value"). The government's summation argued that Mr. Aguilar's embezzlement was "*powerful evidence* that he was in control of what was happening and that he knew that these contracts and invoices were fake." Trial Tr. 3544:7–11 (emphasis added). The government argued that Mr. Petron's testimony that Mr. Aguilar had siphoned money from himself was a *critical reason* "how you know the defendant knew what he was doing with the Peres." Trial Tr. 3545:25–3547:6. And the government claimed that "when the Defendant knew he could move money through Hanst" to

commit bribery "without anyone noticing, he siphoned $600,000" for himself.  Trial Tr. 3565:15–23.

The government doubled down on these improper propensity invitations in its rebuttal summation—and made them even more explicit by arguing that the jury should convict because "Javier Aguilar was *stealing* from Vitol."   Trial Tr. 3774:22–3775:7 (emphasis added). The government soon compounded that highly prejudicial accusation by asserting—based on pure speculation and its own reading of certain bank statements—that Mr. Aguilar had spent the money he stole from Vitol on fine art.  Trial Tr. 3789:14–24 ("Right after the money comes in, it gets sent out to two fine arts galleries in San Francisco."); *see* ECF No. 155 at 6 ("the pilfered money was allegedly spent on luxury goods," which "many jurors could see as particularly unsavory").

In short, the admission of the diversion evidence violated Rule 403 by allowing the government to introduce evidence that "*inescapably* paint[ed] him in a significantly more negative light as a bad character," *id.* at 6 (emphasis added), and the government repeatedly exploited that error to inflict irreparably unfair prejudice on Mr. Aguilar both in its case-in-chief and summations.

### 4.      *Vacatur and a New Trial on all Counts is the Only Appropriate Remedy.*

Because the Court's sua sponte midtrial ruling allowed the government to parade before the jury "propensity evidence in sheep's clothing," *McCallum*, 584 F.3d at 477, and because that evidence tainted the jury's consideration of all three Counts, the Court should vacate Mr. Aguilar's convictions and order a new trial under Rule 33.  *Landesman*, 17 F.4th at 331 (Rule 33 relief is appropriate when an "evidentiary . . . error compromised the reliability of the verdict").  Courts routinely grant that relief where (as here) the government prejudices a defendant by improperly introducing highly pejorative propensity evidence and urging the jury to convict because of the defendant's bad character.  *See, e.g.*, *United States v. Curley*, 639 F.3d 50, 59–63 (2d Cir. 2011)

(vacating and remanding conviction because district court plainly erred in admitting propensity evidence against defendant, which the government "highlighted . . . during summations," and because "limiting instructions did not suffice to protect the defendant from the risk of unfair prejudice"); *United States v. Afjehei*, 869 F.2d 670, 674 (2d Cir. 1989) (vacating and remanding conviction where district court improperly admitted propensity evidence against defendant, which the government exploited in summation); *United States v. O'Connor*, 580 F.2d 38, 43 (2d Cir. 1978) (reversing and remanding conviction where district court admitted "prejudicial [evidence that] might lead a jury to convict because it thought the defendant's character was such that he frequently committed crimes"). This Court should do the same thing here.

## II.    The Court Erred in Failing to Instruct the Jury on the Foreign Corrupt Practices Act's Foreign Law Affirmative Defense.

The Court's failure to instruct the jury on the FCPA's written foreign law affirmative defense was error. That error taints the jury's conviction on all Counts, requiring vacatur and a new trial under Rule 33.

The FCPA's foreign law affirmative defense immunizes a defendant from liability when "the payment, gift, offer, or promise of anything of value that was made, was lawful under the written laws and regulations of the foreign official's . . . country." 15 U.S.C. §§ 78dd-2(c)(1), 78dd-3(c)(1). That defense applied here once the Court ruled as a matter of law that Mr. Aguilar's payments to Mr. Espinosa and Mr. Guzman did not violate Mexico's criminal bribery law, ECF No. 313, and especially after the government conceded that the foreign law defense does not require that written laws "expressly permit" the payment, *see* ECF No. 318 at 4. As a result, Mr. Aguilar exceeded the minimal threshold showing required to warrant a jury instruction on this affirmative defense. *See, e.g.*, *United States v. Zayac*, 765 F.3d 112, 120 (2d Cir. 2014) ("A defendant is entitled to an instruction on an affirmative defense [when] the defense has a

foundation in the evidence."); *United States v. Durham*, 825 F.2d 716, 718–19 (2d Cir. 1987) ("We have repeatedly recognized a criminal defendant's right to a charge which reflects the defense theory. . . . [I]t is well established that a criminal defendant is entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible, that evidence may be.").

Neither of the Court's stated reasons for denying Mr. Aguilar an instruction on this affirmative defense holds water.

**First**, the Court wrongly asserted that its ruling that Mr. Aguilar is not liable "as a payer" under Mexican antibribery law was "insufficient to satisfy the defendant's burden to show that the payments at issue were lawful under Mexico's written laws and regulations." Min. Order (Feb. 20, 2024).  But the payments at issue were indeed lawful under Mexican law for both the payer (Mr. Aguilar) and the payees (Mr. Espinosa and Mr. Guzman).  As the Court ruled, PPI employees are not "public servants" under Mexico's bribery law.  ECF No. 313.  As the government's own Mexican law expert opined, Article 222—the provision the Court interpreted in Mr. Aguilar's favor—is the only written law in Mexico that prohibits public servants from taking bribes. *See* ECF No. 207-2 at 6.  Because PPI employees are not public servants, they cannot be prosecuted under Mexican antibribery law as payees, and thus the payments at issue are lawful.

Although the Court cited *United States v. Kozeny*, 582 F. Supp. 2d 535, 539 (S.D.N.Y. 2008) for the proposition that "[f]or purposes of the FCPA's affirmative defense, the focus is on the payment, not the payer," Min. Order (Feb. 20, 2024), *Kozeny*'s reasoning supports Mr. Aguilar's position.  There, the foreign country's written criminal laws prohibited the payments at issue but "reliev[ed] the payer of a bribe from criminal liability if the bribe [was] properly reported."  582 F. Supp. 2d at 539.  Because the reporting exception for bribe payers in *Kozeny*

was intended to expose corruption and facilitate the prosecution of bribe recipients, the payments themselves were still unlawful and the bribe recipient could still be prosecuted if the payor disclosed the payments, or vice-versa. *Id.* at 539–40. Here, by contrast, the payments at issue are lawful from both the payer *and* payee's perspective because PPI employees are not "public servants" under Mexican antibribery law. ECF No. 313. Thus, even under *Kozeny*'s logic—which "focus[es] on the payment, not the payer," 582 F. Supp. 2d at 539—the payments here were lawful under Mexican law. The FCPA's foreign law defense thus applies, and it was error not to instruct the jury on this affirmative defense.

***Second***, the Court erred in denying Mr. Aguilar's request for an instruction on this affirmative defense by reasoning that he "points to no other written law or regulation in Mexico that makes lawful the payments at issue" apart from Article 222, and "[a] contrary conclusion would, in effect, add to the FCPA an element for the government to prove that the statute does not require." Min. Order (Feb. 20, 2024). That logic overlooks that the defendant, not the government, bears the burden to establish this affirmative defense—or, as relevant here, bears the minimal threshold burden to get an instruction on this affirmative defense. *See* ECF No. 316 at App'x (proposed instruction notes: "Because this is an affirmative defense, the defendant bears the burden to prove it by a preponderance of the evidence"). Mr. Aguilar met that burden by citing Article 222, which the Court held makes lawful the payments at issue. Just as Mr. Aguilar was not then required to survey the full corpus of Mexican law to prove a negative (that is, no other Mexican law criminalized the payments), the government was not required to do so either to prove the payments were, in fact, illegal. Rather, this affirmative defense functions just like any other: Once the movant has met his initial burden to show the defense applies by a preponderance of the evidence, the government is then required to respond and establish that the defense does not apply.

*See United States v. Durrani*, 835 F.2d 410, 420 (2d Cir. 1987) ("An affirmative defense requires a defendant to produce 'some evidence' placing the exception in issue; if he does so, the government would be required to prove its inapplicability."). That does not "add to the FCPA" any new element. *Contra* Min. Order (Feb. 20, 2024). After all, "an affirmative defense . . . is not an element of the offense that the Government must prove." *United States v. Alvarez*, No. 09 Cr. 386 (DAB), 2009 WL 3459219, at *3 (S.D.N.Y. Oct. 27, 2009).

Although the Court did not address the government's argument that Mr. Aguilar had to show the payments were permitted under *all* applicable Mexican laws—given the government's earlier concession, *see* ECF No. 318 at 4—that argument fails as well for several reasons. Once Mr. Aguilar showed that Mexican antibribery law (the only written law clearly applicable to the conduct at issue) did not proscribe the payments, Mr. Aguilar was entitled to the foreign law affirmative defense because it had a "foundation in the evidence." *Zayac*, 765 F.3d at 120. Once he made that showing, it became the government's burden to respond and identify which other Mexican laws might proscribe the conduct. The Second Circuit held as much in *United States v. Johnson*, 968 F.2d 208, 212 (2d Cir. 1992). There, the Court of Appeals affirmed the decision of the Honorable Pierre N. Leval, who held that when a defendant asserts an affirmative defense based on the absence of other laws prohibiting his alleged conduct, the defendant need not "prove that his conduct violated none of the panoply of . . . laws that might apply to his situation"; rather, given "the burdensome nature of proving such a negative," defendant need show only that he did not violate the statutes the government had identified. *Id.* Here, the government never identified any other potentially applicable Mexican criminal laws; nor did it support its interpretation of those laws with competent evidence. It could have done so at any point during or before this multi-month trial, but chose instead to rely on its (ultimately wrong) interpretation of Article 222.

The Court therefore should not have entertained (and should not now entertain) any attempt by the government to reference any Mexican laws not previously identified.

At any rate, when the government is required to negate this affirmative defense, that is by design.  Although the Court cited a bench ruling in *United States v. Ng Lap Seng*, No. 15 Cr. 706 (VSB) (S.D.N.Y.)—which states that "the [ ] instruction requested by defendant . . . would lead to impractical results," ECF No. 318-1 at 716:8-15—that terse oral ruling does not apply here.  In *Ng Lap Seng*, the defendant identified no written laws that made his payments lawful.  Here, by contrast, Mr. Aguilar pointed to rulings from this Court and two Mexican courts that showed no written laws in Mexico proscribed these payments.  *See* ECF No. 316.  *Ng Lap Seng*'s concern about "impractical results" is just as misplaced because, as explained above, the defense (not the government) bears the burden of proof on this affirmative defense.

The government conceded—and so the Court's minute order did not address—Mr. Aguilar's argument that he need show only that the foreign country's written laws do not *proscribe* his conduct.  *See* ECF No. 318 at 4.  As Mr. Aguilar explained, the statute's plain text, established precedent, and secondary sources all require such a reading.  *See* ECF No. 316 at 2.  Both general and legal dictionaries define "lawful" as "not contrary to law." *Oxford English Dictionary* (2023 ed.); *Black's Law Dictionary* (11th ed. 2019) (same).  The Supreme Court accordingly has held that conduct is "lawful" under written law when it is "not covered by" written law.  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103–04 (1983) (statute "is neutral on the subject of all [ ] practices it does not prohibit"); *accord, e.g.*, *Young v. United States*, 97 U.S. 39, 63 (1877) ("His acts are lawful in the sense that they are not prohibited.").  But even if Mr. Aguilar had to show that the foreign country's laws expressly permit the payments at issue, he met that burden because Mexico's energy reforms affirmatively established that employees of affiliate companies

such as PPI are not public servants and Mexican law does not govern their conduct.  ECF No. 313; *see also* ECF No. 270-9 (Mexican law establishes that affiliate companies like PPI "shall not be parastatal entities and shall have the legal nature and be organized in accordance with the private law of the place of their incorporation or creation").

Even if still more somehow were required to satisfy Mr. Aguilar's minimal burden to obtain a jury instruction on this affirmative defense, he explained at the charge conference that the Mexican civil law principle of *taxatividad*—a written rule of Mexican constitutional law— provides it.  *See* Trial Tr. 3332:3–21 ("[T]his gets back to the principle of taxavidad [*sic*] that Your Honor is familiar with the briefing of Dr. Mureddu's declaration, that if it's not prohibited, if it's not pr[o]scribed[.]").  Under Article 14 of Mexico's Constitution, "it is prohibited to impose, by simple analogy, and even by majority of reason, any penalty that is not decreed by a law that is exactly applicable to the crime in question."  ECF No. 270-22.  As explained in the Declaration of Mariana Mureddu Gilabert—whom this Court found "credible" and "persuasive," ECF No. 313 at 11—the principle of *taxatividad* enshrined in Article 14 provides "that no one can incur criminal liability as a result of violating a provision written with language that lacks clarity due to indeterminacy, ambiguity, vagueness, contradictions, redundancies, etc.," and only the legislature can decide what is criminal.  ECF No. 270-4 ¶ 6(a) (Mureddu Decl.).  Because the Mexican legislature deliberately and explicitly excluded employees of PPI from the definition of "public servant" in Mexico's written antibribery statute, ECF No. 313 at 8–9, and because the government has pointed this Court to no other criminal statute in Mexico that expressly proscribes the alleged conduct at issue, any payments Mr. Aguilar allegedly made to PPI employees were "lawful" under Mexico's written criminal law.

Moreover, while certain provisions of Mexican *civil* law may impose administrative penalties for the payments at issue, the government never has shown that any other Mexican *criminal* laws might prohibit the payments at issue.  For the FCPA's affirmative law defense, what controls is whether that foreign country's *criminal* laws proscribe the conduct at issue.  In certain contexts, "lawful" may only refer to what is lawful under criminal law.  *See United States v. Waggoner*, 103 F.3d 724, 726 (8th Cir. 1997) (noting undecided issue of whether the word "lawful" in the U.S. Sentencing Guidelines means conformity to criminal laws).  The FCPA is a criminal statute, as is Mexico's antibribery statute.  Thus, Congress's use of the term "lawful" within that statute implies that "lawful" means that no foreign *criminal* laws proscribe the conduct at issue.  *See, e.g.*, *Yates v. United States*, 574 U.S. 528, 537 (2015) ("[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but also by] the specific context in which that language is used, and the broader context of the statute as a whole.").

Finally, even if there were other written Mexican laws (civil or criminal) that clearly proscribed the conduct at issue—and as explained above, Second Circuit precedent prevents the government from implicating Mr. Aguilar under any new foreign laws—the correct course would have been for the Court to determine what those laws were.  Once the parties identified any other applicable laws, the Court could have instructed the jury on those foreign laws just as the Court instructed the jury that PPI employees are not public officials under Mexican bribery law.  Armed with that information, the jury could have then determined whether the foreign law affirmative defense properly applied to Mr. Aguilar.  That is precisely what the Second Circuit's decision in *Johnson* demands, 968 F.2d at 212—a decision that this Court's brief minute order neither referenced nor followed.

40

The Court's erroneous failure to charge the jury on the FCPA's foreign law affirmative defense created a "real concern that an innocent person may have been convicted." *Serrano*, 224 F. Supp. 3d at 255 (granting new trial because of instructional error). That error requires vacatur and a new trial on Count Three. And as explained in Section V *infra*, the prejudicial spillover from the many errors infecting the conviction on Count Three taints the jury's conviction on all other Counts too. The Court therefore should order a new trial on all Counts under Rule 33.

### III. The Government Constructively Amended and Prejudicially Varied from the Grand Jury's Indictment When It Shifted Its Mexico-Related Theory of Criminality Midtrial.

The superseding indictment charged Mr. Aguilar with bribing two PPI employees who assertedly were "foreign officials" under the FCPA because PPI was *itself* an "instrumentality" of the Mexican government. But after Mr. Aguilar debunked that argument through cross-examination, and especially after the Court ruled that PPI employees "are not 'public servants'" under Mexican antibribery law, ECF No. 313 at 1, the government pivoted on the eve of summations to a new theory of criminality, which it repeatedly hammered in its summation: that PPI employees were foreign officials under the FCPA no matter if PPI was an instrumentality because it purportedly acted "in an official capacity for or on behalf" PEMEX for the ethane contracts at issue.

Because that last-minute pivot violated Mr. Aguilar's rights under the Grand Jury Clause of the Fifth Amendment, the Court should vacate Mr. Aguilar's conviction on Count Three and order a new trial under Rule 33.

#### A. The Fifth Amendment Prohibits Shifting Theories of Criminality.

The Fifth Amendment's Grand Jury Clause prevents the government from obtaining a conviction based on a theory of criminality that differs from the theory on which the grand jury

indicted.  U.S. Const. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury[.]").  This unconstitutional practice can take two forms:  constructive amendment and prejudicial variance.

The government constructively amends an indictment "[w]hen the trial evidence or the jury charge operates to broaden the possible bases for conviction from that which appeared in the indictment." *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005).  A constructive amendment is a per se violation of a defendant's Fifth Amendment rights and requires relief even with no showing of prejudice.  *United States v. Roshko*, 969 F.2d 1, 5–6 (2d Cir. 1992).  The risk of constructive amendment is especially pronounced in conspiracy trials like this one.  As the Second Circuit has stressed:  "it is *critical* that courts vigilantly enforce the Fifth Amendment requirement that a person be tried only on the charges contained in the indictment returned by the grand jury" and courts "must be *especially alert* to subtle attempts to broaden the already pervasive and widesweeping nets of conspiracy prosecutions."  *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988) (emphases added).

The government's conduct triggers a variance "when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Khalupsky*, 5 F.4th 279, 294 (2d Cir. 2021).  Variance is unconstitutional and a new trial is warranted where, as here, it "substantially prejudice[s]" the defendant.  *Id.*  Such prejudice exists when, for example, the pleading and the proof do not substantially correspond, when the variance could have misled the defendant at trial, or when the variance could deprive the accused of his right to be protected against another prosecution for the same offense.  *United States v. Salmonese*, 352 F.3d 608, 621–22 (2d Cir. 2003).

The government's morphing theories of criminality related to Mexico were unconstitutional under either standard.

**B.    The Government's Shifting Theories of Criminality on Mexico Violated Mr. Aguilar's Fifth Amendment Rights.**

      *1.    When Mr. Aguilar Disproved the Grand Jury's Theory of Criminality, the Government Improperly Shifted Theories Midtrial.*

The theory of criminality that the grand jury charged in the superseding indictment was straightforward and depended on a central premise: PPI *itself* qualified as an "instrumentality" of the Mexican government under the FCPA—and thus its employees were "foreign officials" under the FCPA—because PPI itself "was a wholly-owned and controlled subsidiary of PEMEX." ECF No. 244 ¶ 8. The grand jury underscored that premise by charging that payments to PPI employees would directly violate Mexican criminal laws penalizing "bribery of a *public official*, and the misappropriation, theft and embezzlement of public funds by and for the benefit of a *public official*, in violation of the . . . Mexican Penal Code." *Id.* ¶ 56(a) (emphases added). The government further underscored that premise by asserting in a pretrial press release that Mr. Aguilar "agreed with others to bribe Mexican officials in order to win business advantages related to contracts with the Mexican government instrumentality, PEMEX Procurement International (PPI)."[4]

In the lead up to trial, the government reiterated the grand jury's theory of criminality— that is, that PPI itself is an FCPA instrumentality—by proffering the testimony of a purported expert on Mexican law, David Lopez, who opined (among other things) that (1) PEMEX owns 100% of PPI, (2) PPI is considered a "subsidiary compan[y]" and "affiliate[]" of PEMEX, and

---

[4]    U.S. Dep't of Justice, *Press Release: Houston oil trader charged in international bribery scheme* (Aug. 21, 2023), https://www.justice.gov/usao-sdtx/pr/houston-oil-trader-charged-international-bribery-scheme.

(3) the Mexican government controls PPI through its control over PEMEX's board under the PEMEX law.  ECF No. 207-2 at 10–12.

The government used Mr. Lopez's analysis to support its requests to charge on PPI's asserted status as an FCPA instrumentality.  ECF No. 232 at 39.  Those proposed instructions made it clear that "[t]he government contends that PEMEX *and* PEMEX Procurement International are instrumentalities of the government of Mexico."  *Id.* (emphasis added).  When the government later proposed additional Mexico-related instructions, they made it just as clear that the government would assert that PPI *itself* was an instrumentality based on Mr. Lopez's analysis. ECF No. 299-1 at 6–10.

At the beginning of trial, the government's opening statement further revealed that its plan for trial was, consistent with the indictment, to try to prove that PPI itself was an instrumentality under the FCPA:

> Like Petroecuador, the evidence will show that Pemex's employees and the employees of its subsidiaries are also government officials. Pemex is the state-owned oil company of Mexico.  When it wants to buy oil products on the international market, it sometimes uses its wholly owned subsidiary, Pemex Procurement.
>
> Pemex Procurement is incorporated in Delaware and has an office in Houston; *but, make no mistake, the individuals working for these companies are Mexican government officials as well.*  Among other things, you'll learn that everything those officials did, everything, was for and on behalf of Pemex and the Mexican government and that Pemex Procurement is 100 percent owned by its parent company and namesake Pemex.

Trial Tr. 46:20–47:8 (emphasis added).

Weeks later, when the government began examining witnesses about the alleged "Mexico Bribery Scheme," it reiterated the grand jury's theory of criminality: that PPI itself was an instrumentality under the FCPA because it "is an entity controlled by the [Mexican] government . . . that performs a function the controlling government treats as its own."  *United States v.*

*Esquenazi*, 752 F.3d 912, 925 (11th Cir. 2014) (standard cited in government requests to charge, ECF No. 232 at 20–21).  To recap briefly, *Esquenazi*'s "control" factors are:  (1) the government's formal designation of the entity; (2) whether the government has a majority interest in the entity; (3) the government's ability to hire and fire the entity's principals; (4) how much the government profits from or subsidizes the entity; and (5) how long those indicia have existed.  *See id.* at 925–26.  *Esquenazi*'s "government function" factors, meanwhile, are:  (1) whether the entity has a monopoly over the functions it performs; (2) whether the government subsidizes the entity's costs to perform those functions; (3) whether the entity provides services to the public at large; and (4) whether the public and government generally consider the entity to be performing a governmental function.  *See id.* at 926–27.

In its direct examinations of Mr. Espinosa and Mr. Guzman, the government elicited testimony that neatly tracked the *Esquenazi* factors that determine whether an entity is itself an FCPA instrumentality, underscoring the grand jury's theory of criminality that PPI was itself an instrumentality.  For example, the government elicited these admissions from Mr. Espinosa:

- PEMEX owns PPI, which it treats as "part of . . . the domestic buying part for PEMEX," Trial Tr. 2664:9–17;

- PPI's board membership would change as PEMEX's board changed, including after Presidential elections, Trial Tr. 2666:24–2667:6;

- PEMEX handled "everything" "with respect to employment decisions at [PPI]" and could "hire and fire" PPI employees at whim, Trial Tr. 2667:20–2668:4;

- PEMEX controlled PPI's budget, "g[a]ve PPI the budget to operate," and PPI had no other source of funds, Trial Tr. 2668:5–18; and

- The public sees PPI as affiliated with the Mexican government because PPI's logo contains PEMEX's well-known eagle logo, Trial Tr. 2676:1–15 (discussing GX 5310).

The government elicited similar admissions from Mr. Espinosa in his direct:

- PPI "is an affiliate of Petróleos Mexicanos" or PEMEX, Trial Tr. 2957:16–25;

- PPI maintains offices in Mexico that "were located in the offices that belonged to PEMEX," Trial Tr. 2958:4–8;

- PPI employees including Mr. Guzman typically left PPI "when there was a change of administration" in the Mexican government, Trial Tr. 2959:20–25;

- PPI "get[s] the money to fund its operations" "from PEMEX," Trial Tr. 2970:21–23;

- "When [PPI] acquires goods … the money come[s]" "[f]rom PEMEX," Trial Tr. 2971:4–6;

- "The majority of the time," "the goods that [PPI] acquires go" "to Mexico f[or] PEMEX," Trial Tr. 2971:7–8;

- PEMEX owns "100%" of PPI, Trial Tr. 2971:9–13;

- PPI's logo contains both "the name PEMEX" and an "eagle," which "is a reference to the shield on the Mexican flag," Trial Tr. 2971:14–21.

In his cross-examinations of Mr. Espinosa and Mr. Guzman, Mr. Aguilar elicited admissions from each witness to undermine PPI's purported status as an FCPA instrumentality and to show that Mr. Aguilar did not know PPI was a Mexican instrumentality. For example, Mr. Aguilar elicited these admissions from Mr. Espinosa:

- He worked in the "main office" of PPI in Houston, Texas, which was located in an office park, Trial Tr. 2828:20–2829:15 (discussing DX 479);

- PPI's offices functioned like a private business's office, with no uniformed Mexican security personnel, "no x-ray machines or security," and "[n]o metal detectors," Trial Tr. 2828:25–2930:20;

- PPI's office in Houston proudly displayed an American Flag next to the PPI logo, Trial Tr. 2833:4–8 (discussing DX 481);

- PPI's employees had employment agreements with, and received paychecks and had taxes paid from, an American third-party "outsourcing" company called "Insperity," had private health insurance, and did not receive government healthcare, pension, scholarships, or other benefits from the Mexican state to which PEMEX employees were entitled, Trial Tr. 2839:24–2845:22 (discussing DX 650); and

- PPI's certificate of incorporation in Delaware permitted PPI to do business with whatever clients it wanted, not just PEMEX, Trial Tr. 2846:9–2848:17 (discussing DX 358).

Mr. Aguilar elicited similar admissions from Mr. Guzman to show why PPI was not an FCPA instrumentality:

- While PEMEX employees "get government-provided health care" from the Mexican state, "PPI employees don't get government-provided health care" because "it would be too costly for PEMEX to have either a hospital or medical services" in another country, Trial Tr. 3080:1–3081:6;

- Instead, PPI employees got limited healthcare and other benefits through Insperity, a third-party American entity, Trial Tr. 3093:13–3094:20;

- While PEMEX employees got early retirement, pensions, and other benefits like subsidized loans, PPI employees get no such benefits from the Mexican state and have 401(k)'s instead, Trial Tr. 3081:7–3082:15; and

- PPI received money from PEMEX as payment for services rendered under a formal services agreement, rather than through government subsidies, Trial Tr. 3102:1–4.

The admissions that Mr. Aguilar extracted from Mr. Espinosa and Mr. Guzman created compelling grounds for reasonable doubt on whether PPI itself actually was an FCPA instrumentality and whether Mr. Aguilar subjectively appreciated PPI's alleged instrumentality status. That alone surely motivated the government to search for a new theory of criminality to convict Mr. Aguilar on the Mexico-related object of Count Three.

But it was the Court, not Mr. Aguilar, that drove in the final nail in the coffin on PPI's purported status as an FCPA instrumentality. Two days after the government and Mr. Aguilar rested, the Court issued its decision on Mexican law holding that PPI employees like Mr. Espinosa and Mr. Guzman were "not 'public servants' for purposes of" Mexican antibribery law, even though they worked for "a wholly-owned affiliate of PEMEX." ECF No. 313 at 1; *accord id.* at 12 ("[T]he Court concludes that, because PPI is neither itself a majority state-owned entity nor assimilated to one, its employees are not 'public servants' under Article 212 of [Mexico's federal

penal code], as required for Article 222(II), Mexico's criminal bribery provision."). That ruling eliminated one of the two Mexico-related SUAs undergirding Count Three's money-laundering conspiracy: violations of Mexican antibribery law. ECF No. 244 ¶ 56(a). That ruling *also* created firm grounds for reasonable doubt on the other Mexico-related specified unlawful activity, violations of the FCPA. Because the foremost factor determining whether an entity is an FCPA instrumentality is "the foreign government's *formal designation* of that entity," *Esquenazi*, 752 F.3d at 925 (emphasis added), the Court's ruling cemented Mr. Aguilar's case for reasonable doubt on whether PPI was an instrumentality and therefore whether Mr. Espinosa and Mr. Guzman were "foreign officials" under the FCPA under the theory of criminality that the grand jury charged in the indictment.

The government responded to the Court's ruling, and Mr. Aguilar's damaging admissions extracted on cross-examination, by pivoting to an *entirely new* theory of criminality—one that the grand jury did not charge in the indictment. The government unveiled that new theory of criminality for the first time when opposing Mr. Aguilar's motion for directed judgment of acquittal at the close of the government's case—that is, even *before* the Court's ruling that PPI employees are not "public servants" under Mexican law. In his oral motion under Rule 29, Mr. Aguilar argued that the government had not proven beyond a reasonable doubt that PPI was an FCPA instrumentality:

> [T]he first SUA is the FCPA, which I take it from the Government's examinations of the two PPI cooperators, they're also intending to argue that the Mexico case is relevant under that SUA, as well, which I think implies necessarily that they will be arguing that PPI is an instrumentality under the FCPA, and we don't believe that there's sufficient evidence for that finding by the jury, and the fact that PPI is an affiliate company and a private company also affects the instrumentality analysis as the Court has heard us argue at sidebar previously.

> That's the first [*Esquenazi*] factor, the foreign government's formal designation of that entity.   And here, the foreign Government formally designates PPI as a private entity that is not part of the public function or is not part of the Government, effectively, of Mexico.  The evidence is also that the Mexican Government does not subsidize or profit from PPI.   The cross-examinations established that these were not subsidies to PPI, these were payments in exchange for service.  The record is – I don't think there's anything in the record about what happens with the profits that PPI generates or doesn't generate.
>
> The indicia, in particular, the designation of PPI as an affiliate derives from the energy reform that occurred 10 years ago where the Mexican congress deliberately reclassified PPI to be an affiliate company as distinct from a government entity.   PPI has no monopoly over the function that it exists to carry out.  Again, there's no evidence that it received subsidies.   And in particular, the perception – and this is the final *Esquenazi* factor, which is whether the public and government generally perceive the entity to be forming a Governmental function.  Clearly that's not the case, given the arguments that we've put forth about the affiliate status of the company.  So I'll pause there.

Trial Tr. 3285:13–3286:20.

The government gave two counterarguments to this part of Mr. Aguilar's oral Rule 29 motion.  At first, the government asserted that "there's ample evidence in the record for the jury to conclude that PPI is an instrumentality" under *Esquenazi*'s flexible, multifactor test.  Trial Tr. 3286:21–3287:5.  In so arguing, the government conceded that Mr. Aguilar had shown that "some of [the instrumentality factors] *do cut against*" the government's case.   Trial Tr. 3287:6–7 (emphasis added).

But then, the government signaled its pivot to a new theory of criminality that the grand jury did not charge.  It argued that Mr. Espinosa and Mr. Guzman could be "foreign officials" under the FCPA *whether or not* PPI itself was an instrumentality because "[e]verything that PPI did, including the two employees that testified, they did it for and on behalf of PEMEX and therefore, on behalf of the Mexican government."  Trial Tr. 3287:11–13.  In other words, the grand

jury's theory of criminality—that PPI itself was an instrumentality and thus its employees were foreign officials under the FCPA—suddenly became irrelevant. Even if PPI were a purely private, nongovernmental entity, the government asserted, Mr. Espinosa and Mr. Guzman supposedly could be foreign officials under the FCPA simply because they took official action "on behalf of" an entity that actually was an FCPA instrumentality.

The government then improperly reiterated this entirely new theory in its summations. For example, in its opening summation, the government seemingly abandoned the grand jury's theory that PPI itself was an instrumentality by arguing to the jury: "I expect that the Judge will instruct you that PEMEX is an instrumentality of the Mexican Government for the purposes of the FCPA. . . . Even though Espinosa was not a PEMEX employee himself, he acted in an official capacity on behalf of PEMEX in connection with the ethane supply contracts, and that makes him a foreign official under the FCPA." Trial Tr. 3586:2–11.

In his summation on Mexico, Mr. Aguilar painstakingly rebutted the grand jury's charged theory of criminality by precisely detailing why PPI itself was not an instrumentality by exploring each of the *Esquenazi* factors. Trial Tr. 3619:20–3624:19. And, having heard the government's brand new theory of liability articulated for the first time in response to his Rule 29 motion, Mr. Aguilar also briefly addressed that new theory in his summation by explaining that (1) PPI did not act in any "official capacity" on behalf of anyone because it was just "a sales agent" doing commercial (rather than official) business; and (2) even if PPI were acting on behalf of anyone else, the record showed that it was not PEMEX itself, but another subsidiary called PEMEX *Etileno*, and nothing whatsoever in the record showed that PEMEX Etileno qualified as an FCPA instrumentality. Trial Tr. 3624:24–3628:12.

The government responded by doubling-down on its newly unveiled theory of criminality throughout its rebuttal summation, repeatedly inviting the jury to convict Mr. Aguilar no matter that PPI was not an instrumentality, as the grand jury had charged. The government's rebuttal summation starkly revealed this last-minute pivot: it spent just a *fleeting moment* on whether PPI itself was an instrumentality, Trial Tr. 3785:17–3786:16, yet used page after page of transcript in its 90-minute rebuttal to explain why the grand jury's charged theory simply did not matter under the government's newly unveiled theory of criminality, *see, e.g.*, Trial Tr. 3586:2–3288:3, 3752:20–25, 3758:14–18, 3784:13–3786:1.

Accordingly, the government's eleventh-hour pivot from the theory of criminality that the grand jury had charged (PPI itself is an instrumentality) to an entirely new theory (whether PPI is an instrumentality is irrelevant because it did work for PEMEX) both constructively amended and prejudicially varied from the indictment in violation of the Fifth Amendment's Grand Jury Clause. That is true even though the FCPA's text supports the government's new theory of criminality by defining "foreign official" to include "any person acting in an official capacity for or on behalf of any [foreign] government . . . instrumentality."  15 U.S.C. §§ 78dd-2(h)(2)(A), 78dd-3(f)(2)(A). The doctrines of constructive amendment and variance *presume* that the government's new theory is one based on law that makes conduct criminal. The issue under the Fifth Amendment is not whether the new theory is legally valid—but whether the eleventh-hour pivot shifted the government's theory to one that the grand jury chose not to charge. *See, e.g.*, *United States v. Haskins*, 511 F.3d 688, 692 (7th Cir. 2007) ("[T]he Grand Jury Clause . . . limits the available grounds for conviction to those specified in the indictment.").

That is precisely what the government did here. That improper, last-minute pivot in case theory constructively amended the grand jury's indictment in violation of the Fifth Amendment,

warranting a new trial under Rule 33.  It also varied from the indictment in a way that substantially prejudiced Mr. Aguilar, which further warrants a new trial.

### 2. *The Government's Eleventh-Hour Pivot Prejudiced Mr. Aguilar.*

As explained above, even when the government's shifting theories of criminality fall short of a constructive amendment to the indictment, a new trial is warranted when the government varies from the indictment because its "evidence offered at trial proves facts materially different from those alleged in the indictment" and that shift "substantial[ly] prejudice[s]" the defendant. *Khalupsky*, 5 F.4th at 294.  The government's conduct here prejudiced Mr. Aguilar in two important ways, both of which qualify as "substantial prejudice" under established Second Circuit precedent.  *See Salmonese*, 352 F.3d at 621–22 (listing examples of substantial prejudice warranting a new trial to remedy an improper variance).

The government's last-minute shift that rendered irrelevant PPI's alleged instrumentality status came *long after* Mr. Aguilar had prepared for and successfully executed a strategy that would show why PPI in fact was *not* an instrumentality of the Mexican government.  In other words, Mr. Aguilar extensively prepared for and successfully rebutted the grand jury's theory of criminality—only for the government to render all that effort a nullity by shifting the goalposts at the last minute.  As the Second Circuit explained in *Salmonese*, a defendant establishes a prejudicial variance when he can show (among other things) that the indictment's "pleading" of criminality and the government's "proof" at trial do not "substantially correspond," or that "the variance . . . could have misled the defendant at trial." 352 F.3d at 621.  Because the government's conduct triggered both those prejudicial outcomes here, a new trial is warranted to remedy the resulting variance.

The government's mutating theories of criminality also prejudiced Mr. Aguilar by depriving him of the time and opportunity to develop the extensive legal and factual record

necessary to show why PEMEX Etileno—the entity PPI actually acted on behalf of in connection with the ethane supply contracts (rather than PEMEX itself)—was not an instrumentality under the FCPA.  It took Mr. Aguilar months of pretrial time and extensive briefing on issues of Mexican law to develop and make a compelling case for why PPI was not an instrumentality.  The government's eleventh-hour pivot to its new "on behalf of" theory of criminality therefore made it impossible for Mr. Aguilar to build an affirmative case for why PEMEX Etileno, like PPI, was just another entity beyond the outer periphery of the Mexican state.  Mr. Aguilar thus had to rely instead on the absence of evidence, rather than affirmative proof to support his case.  *See* Trial Tr. 3626:10–3627:15 ("PEMEX Etileno is an instrumentality?  Says who?  Based on what evidence?  We have no idea whether PEMEX Etileno fits into that category of an instrumentality.").  Because that substantial evidentiary prejudice resulted from the misleading variance between the indictment's theory of criminality and the theory the government presented at trial, Mr. Aguilar is entitled to a new trial for this independent reason.

The grand jury returned an indictment on Count Three on one theory of criminality:  that the people Mr. Aguilar bribed were foreign officials because they worked for an entity that itself was an instrumentality.  When Mr. Aguilar refuted that theory at trial, the government shifted to an entirely new theory that rendered irrelevant that entity's alleged instrumentality status.  That last-minute pivot, after both sides had rested and on the eve of summations, both constructively amended and prejudicially varied from the indictment in violation of the Fifth Amendment's Grand Jury Clause.  The Court therefore should order a new trial under Rule 33.

## IV.    The Evidence Supporting the Sole Remaining Mexico-Related Specified Unlawful Activity in Count Three Is Insufficient.

Given the evidence introduced at trial, no rational jury could conclude beyond a reasonable doubt that Mr. Aguilar knowingly, willfully, and corruptly bribed Mexican "foreign officials" in

violation of the FCPA, an SUA underlying Count Three's money-laundering conspiracy.  None of the *Esquenazi* factors support a finding that PPI was an instrumentality of the Mexican government.  Nor does the evidence show that Mr. Espinosa or Mr. Guzman were acting in an official capacity on behalf of an actual instrumentality of the Mexican government.  This insufficiency, and the resulting prejudicial spillover into the rest of Count Three, warrant a judgment of acquittal on that Count under Rule 29 or, alternatively, a new trial under Rule 33.

### A.      PPI Is Not an Instrumentality of the Mexican Government.

The parties agree that an instrumentality is an entity controlled by a foreign government and which performs a function that the government treats as its own.  *Esquenazi*, 752 F.3d at 924-25.  *See supra* Section III.B.1  (listing *Esquenazi*'s control and public-function factors).

No reasonable jury could conclude that the Mexican government itself controls PPI under the factors set out in *Esquenazi*.  ***First***, the Mexican government's formal designation of PPI weighs heavily in favor of the defense because PPI employees are not public servants under Mexican law.  Trial Tr. 3875:11–13 (instructing that "[e]mployees of affiliate companies are not 'public servants' under Mexico's Penal Code").  Under Mexican law, affiliated companies like PPI have the legal nature and are organized in accordance with the private law of the place of their incorporation which, here, is Delaware.  Trial Tr. 3875:8–10; *see also id.* at 2815:9-17 (Espinosa cross).  PPI therefore is not a Mexican parastatal entity under Mexican law.  Trial Tr. 3875:3–4.  Intuitively, if even the Mexican government does not consider PPI employees to be government officials, then PPI cannot be an instrumentality of the Mexican government under the FCPA.

***Second***, PPI is owned by PEMEX, not the Mexican government itself, Trial Tr. 3874:23–3875:2 (instructing that PPI is an affiliate company and affiliate companies are those at least 50% owned by PEMEX), and the Court has already rejected the government's theory of indirect government ownership, ECF No. 313 at 5–6.

*Third*, the government submitted no evidence of the Mexican government's ability to hire and fire PPI's principals, and the Court instructed the jury that the Mexican Secretary of Energy merely could designate one member of the board of directors of PEMEX's affiliated companies. Trial Tr. at 3875:5–7.  Mr. Espinosa likewise testified merely that PEMEX—not the Mexican government—had the authority to hire and fire PPI employees.  Trial Tr. 2668:1–4.

*Fourth*, PEMEX's profits do not go straight into the Mexican treasury; rather, PPI's parent company PEMEX pays taxes like any other company.  Trial Tr. 3100:12–24 (Guzman cross).

*Fifth*, the Mexican government does not subsidize PPI.  Instead, PPI receives its funding through a services agreement with PEMEX.  Trial Tr. 3102:1–4 (Guzman cross).

Nor could a reasonable jury conclude PPI performs a function that the government treats as its own.  For one, PPI does not have a monopoly over procurement services to PEMEX—and the Court explicitly instructed the jury as much.  Trial Tr. 3875:14–15.  Nothing in PPI's Articles of Incorporation restricted them from working with a company other than PEMEX. Trial Tr. 2848:7–17 (Espinosa cross) (discussing DX 358).  Next, the Mexican government does not subsidize the costs associated with PPI's procurement services.  Trial Tr. 3102:1–4 (Guzman cross) (admitting PEMEX pays PPI under a services agreement for services rendered, rather than giving it money for nothing).  Further, PPI provides its services only to the end user—here, PEMEX Etileno, *see supra* Section III & *infra* Section IV.B—not to the Mexican public at large. Trial Tr. 2816:9–13 (Espinosa cross).  Finally, neither the Mexican government nor the Mexican people perceive PPI to be performing a governmental function because, as explained above, Mexican law does not consider PPI employees to be public servants.  Trial Tr. 3875:11–13 (jury charge); ECF No. 313.

A host of other considerations beyond those identified in *Esquenazi* reinforce the conclusion that PPI is not an FCPA instrumentality.  The reception area in PPI's main Houston office proudly displayed an American flag.  Trial Tr. 2833:4–8 (Espinosa cross).  PPI employees like Mr. Espinosa and Mr. Guzman were employed by Insperity, not PEMEX or the Mexican government, Trial Tr. 2843:20–24 (Espinosa cross); Trial Tr. 3062:9–12 (Guzman direct), and received their compliance training from Insperity, Trial Tr. 3095:11–14 (Guzman cross) (discussing GX 5306).  PPI employees did not get any of the many benefits PEMEX employees got as government employees, including healthcare, scholarships, or pensions.  Trial Tr. 2840:3–8 (Espinosa cross) (no healthcare); Trial Tr. 3080:8–12 (Guzman cross) (no healthcare); Trial Tr. 2841:19–2842:1 (Espinosa cross) (no scholarships); Trial Tr. 2841:4–10 (Espinosa cross) (no pension); Trial Tr. 3081:12–23 (Guzman cross) (no pension).  PPI's offices looked like a private business's office, with no uniformed Mexican security personnel, "no x-ray machines or security," and "[n]o metal detectors."   Trial Tr. 2829:1–2930:20 (Espinosa cross).   Not surprisingly, PPI employees could not even enter the PEMEX headquarters in Mexico without first obtaining a special badge.  Trial Tr. 2940:8–12 (Espinosa redirect).

The government's arguments at summation for why PPI is an instrumentality cannot overcome the overwhelming evidence in the defense's favor.  The government tried to argue that PPI is an instrumentality because it is *indirectly* owned by the Mexican government, Trial Tr. 3589:1–4, a theory the Court already rejected, *see* ECF No. 313 at 5–6.  The government asserted that "PEMEX also controls the money" because "PPI gets its budget, every cent, from PEMEX," Trial Tr. 3589:9–10.  But that is not an established *Esquenazi* factor; rather, *Esquenazi* asks whether an entity is subsidized and the profits go directly into the government fisc.  752 F.3d at 925.  The government also argued that PPI's board changes with each new Mexican government

administration, Trial Tr. 3589:11–14, but Mr. Espinosa admitted on cross that he stayed at PPI for well over a decade because "[w]ith the low ranks . . . they don't rotate as much." Trial Tr. 2854:6–9.  Although Mr. Espinosa and Mr. Guzman testified that PPI does not perform any work for any organization other than PEMEX, *see supra*, nothing in the PPI Articles of Incorporation restricted them from working with a company other than PEMEX, including (as is relevant here) PEMEX Etileno.  Trial Tr. 2848:7–17 (C. Espinosa, Cross) (discussing DX 358).

For these reasons, no reasonable jury could find that PPI was an instrumentality of the Mexican government—let alone that Mr. Aguilar *subjectively appreciated* that PPI was an arm of the Mexican government.  This insufficiency, and the resulting prejudicial spillover, warrant a judgment of acquittal on Count Three or, alternatively, a new trial.

### B.  Nor Did These PPI Employees Work in an Official Capacity on Behalf of an Instrumentality of the Mexican Government.

As explained above in Section III, the government pivoted midtrial to a new theory that PPI employees are foreign officials under the FCPA not because PPI itself is an instrumentality, but because they work on behalf of PEMEX.  Trial Tr. 3586:7–11 (government summation).  No rational jury could reach that conclusion either.

For starters, the ethane supply contract at issue does not state PPI acts as a sales agent on behalf of PEMEX itself.  To the contrary, the contract makes it clear that PPI is acting as a commercial (not official-capacity) agent of PEMEX *Etileno*.  Trial Tr. 2792:12–16 (Espinosa direct) ("This supply contract is executed on June 21st, 2018, by and between PEMEX Etileno through PEMEX Procurement International, Inc., PPI, . . . and Vitol") (discussing GX 5161-T at 1); *id.* at 2759:8–11 (PPI supplied ethane "on behalf of PEMEX Etileno").  Mr. Espinosa testified that PEMEX Etileno—not PEMEX—was the end user on the ethane supply contract. Trial Tr. 2746:12–14; 2759:12–16 (Espinosa direct).  Although PEMEX is an instrumentality of

the Mexican government, Trial Tr. 3871:24–25, this tells us nothing about PEMEX Etileno's status as an instrumentality because the two are separate companies.  As Mr. Espinosa explained, although PEMEX Etileno is under the "same PEMEX umbrella," they are still "different companies."  Trial Tr. 2824:4–7; 2824:16–19 (Espinosa cross).  Accordingly, the ethane contract with PEMEX specifies that PEMEX Etileno is a "production company subsidiary to [PEMEX]." GX 5161-T at 6; *see* Trial Tr. 2792:20–22 (Espinosa direct).  The government introduced no evidence at all from which the jury could find beyond a reasonable doubt that PEMEX Etileno is an instrumentality of Mexico, and the jury cannot speculate that PEMEX Etileno is an instrumentality just because another similarly named company is.  Any such finding would be irrational.

In addition, neither Mr. Espinosa nor Mr. Guzman worked on behalf of PEMEX Etileno or anyone else in any official (that is, government) capacity in connection with the ethane supply deals at issue.  Rather, both merely worked in a commercial capacity as sales agents.  The ethane supply contract specified that they were mere "sales agents."  Trial Tr. 2823:21–2824:3 (Espinosa cross) (discussing GX 5161-T at 7).  Similarly, the letters from PEMEX which the government cited in summation refer to PPI as a "Commercial Proxy."  Trial Tr. 2760:5–11 (Espinosa direct); *see* GX 5321-T at 1; GX 5322-T at 1.  PPI did not decide how much ethane to buy, or whether to seek a bid for ethane at all.  Trial Tr. 2817:12–14, 2818:9–16 (Espinosa cross).  Espinosa admitted on direct that he could not disqualify suppliers.  Trial Tr. 2740:17–18 (Espinosa direct).  Instead, only PEMEX Etileno in Mexico retained the power to disqualify bidders for not meeting technical requirements.   Trial Tr. 2816:14–19 (Espinosa cross) (PEMEX Etileno in charge of "all the technical"); Trial Tr. 2819:6–13 (Espinosa cross) ("the technical . . . will go to – to PEMEX Etileno in Mexico").  At summation, the government cited two letters from PEMEX as if they

were smoking guns showing PPI worked on behalf of PEMEX.  But on closer review, those letters actually state that the ethane supply contract was "requested by the project manager, Pemex Etileno," which is the "Requesting Unit."  GX 5321-T at 1; GX 5322-T at 1.  These letters refer to PPI as a "Commercial Proxy." *Id.* (both sources).  If anything, these letters reinforce that PPI acted on behalf of PEMEX Etileno (not PEMEX), and even then, only in a commercial capacity—not an official one, as the FCPA requires.

Because PPI was not working on behalf of PEMEX itself, and because it was merely acting in a commercial capacity for PEMEX Etileno, Mr. Espinosa and Mr. Guzman are not foreign officials under the FCPA by working on behalf of an instrumentality (an improper theory of criminality that the grand jury did not charge, *see supra* Section III.B).

### C.     The Court Should Enter a Judgment of Acquittal on Count Three or, Alternatively, Vacate that Conviction and Order a New Trial.

For all these reasons, no rational jury could conclude beyond a reasonable doubt that Mr. Aguilar knowingly, willfully, and corruptly bribed Mexican government officials. This insufficiency, and the resulting prejudicial spillover into the rest of Count Three, as described below, warrant a judgment of acquittal on that Count under Rule 29.

Alternatively, those same insufficiencies—and Count Three's other legal and factual flaws detailed in Sections II and III—warrant vacatur and a new trial on Count Three under Rule 33 because the evidence preponderates heavily against the jury's verdict to such an extent that it would be a "manifest injustice" to let it stand.  *Landesman*, 17 F.4th at 330; *see id.* at 331 (courts may grant Rule 33 relief even when they deny Rule 29 relief).  The government's weak case and this Court's failure to instruct the jury on the foreign law affirmative defense leave "a real concern that an innocent person may have been convicted."  *Id.* at 330.

Put simply, vacatur and a new trial are warranted here because PPI is not an instrumentality of the Mexican government; its employees are neither public servants under Mexican law nor foreign officials under the FCPA; and the PPI employees at issue did not work in an official capacity on behalf of any Mexican instrumentality because there was insufficient evidence about PEMEX Etileno, Vitol's actual counterparty on the ethane supply contracts.  As a result, the government's case hinged on "strained inferences," *Archer*, 977 F.3d at 188, that PEMEX Etileno is an instrumentality just because the company is related to PEMEX and that PPI employees work in an "official capacity" when acting as sales agents even though they are *not* Mexican public officials.  In addition, the failure to instruct the jury on the foreign law affirmative defense, discussed *supra* Section II, was an "instructional error [that] compromised the reliability of the verdict," another independent ground for relief under Rule 33.  *Id.*

Given these many insufficiencies and deficiencies, and the resulting prejudicial spillover, the Court should enter post-trial relief on Count Three under Rule 29 or, alternatively, under Rule 33.

## V.   The Prejudicial Spillover from the Fatally Flawed Mexico-Related Specified Unlawful Activity Taints the Jury's Convictions on All Counts.

The Court should vacate the convictions on all Counts and grant a new trial because of the prejudicial spillover from the Mexico-related allegations underlying Count Three.  Prejudice spills over into other counts when "evidence is introduced on the invalidated count that would otherwise be inadmissible on the remaining counts, *and* this evidence is presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts."  *United States v. Rooney*, 37 F.3d 847, 856 (2d Cir. 1994) (vacating convictions for concealment and false statement to government because of spillover prejudice from reversed bribery conviction for lack of corrupt intent).  "In evaluating a claim of prejudicial spillover of

60

evidence from an invalidated count," the Court first "examine[s] whether the evidence on the reversed count would have tended to incite or arouse the jury into convicting the defendant on the remaining counts." *Id.* at 855. "[W]here the reversed and the remaining counts arise out of similar facts, and the evidence introduced would have been admissible as to both, the defendant has suffered no prejudice." *Id.* But even when there is sufficient evidence to support the remaining counts, the Court must vacate those convictions when they result from prejudicial spillover. *Id.* at 857 (vacating counts because of prejudicial spillover although the jury "certainly" could have found the defendant guilty); *see also United States v. Guiliano*, 644 F.2d 85, 88–89 (2d Cir. 1981) (similar). The risk of prejudicial spillover is especially high "when the evidence was barely sufficient to permit an inference of the disputed element of knowledge." *Guiliano*, 644 F.2d at 89 (vacating bankruptcy fraud count because of prejudicial spillover from invalid RICO charges where there was no direct evidence defendant knew of the bankruptcy adjudication).

Mr. Aguilar meets both requirements for prejudicial spillover. ***First***, the evidence from the invalidated Mexico-related SUAs would have been inadmissible (and plainly insufficient) as substantive proof of the remaining Ecuador-related Counts. *Rooney*, 37 F.3d at 856. As explained above in Sections II–V, the Mexico-related counts are invalid and should have never been tried. Had this trial featured only the Ecuador-related charges—as Mr. Aguilar repeatedly had requested, *see supra* Background Section A—Mexico-related evidence would have been inadmissible to prove the Ecuador-related charges because the two bribery schemes concededly involve different countries, companies, products, and actors. *See United States v. Midyett*, 603 F. Supp. 2d 450, 459–60 (E.D.N.Y. 2009) (evidence of uncharged criminal activity is admissible as direct evidence only if it "[1] arose out of the same transaction or series of transactions as the charged offense, [2] if it is inextricably intertwined with the evidence regarding the charged offense, or [3] if it is

necessary to complete the story of the crime on trial."). Had the government tried to admit evidence of the alleged Mexico bribery scheme under Rule 404(b) to show knowledge or lack of mistake—which it never moved to do—it still would have been excluded under Rule 403's balancing test as little more than "propensity evidence in sheep's clothing." *McCallum*, 584 F.3d at 477.

**Second**, the government improper relied on the invalid Mexico-related charges to bolster its weak Ecuador-related charges. In its rebuttal summation, the government argued the defense's theory "boiled down to two things[:] For Ecuador . . . He . . . didn't know [bribery] was happening," while "For Mexico . . . they're not government officials." Trial Tr. 3751:13–19. After juxtaposing those defenses, the government asked the jury "to pause" and ponder how "unreasonable . . . it seems" to have "two schemes going at the same time and the coincidence that in one you're totally unaware that these guys are getting bribes paid to them, and the other, you're paying them yourself but they just happen not to be government officials." Trial Tr. 3751:20–25. The Court should not allow the government to rely on the invalid and otherwise inadmissible Mexico-related scheme to compensate for the dearth of credible evidence that Mr. Aguilar knew the Pere brothers were bribing Ecuadorian officials. "[A]s is routine when examining potential prejudice in any criminal case, it is appropriate to look to the strength of the government's case on the counts in question." *Rooney*, 37 F.3d at 856.

*Rooney* is instructive. There, the Second Circuit vacated convictions for concealing non-reimbursable expenses because of prejudicial spillover from a bribery conviction the Court reversed for lack of corrupt intent. 37 F.3d at 854–57. Although "the jury certainly could have inferred [guilt] from the circumstantial evidence," the government "failed to produce any *direct* evidence that [the defendant] actually knew that reimbursement of such soft cost expenditures was

improper." *Id.* at 857 (emphasis added). The Court therefore vacated the false statement and concealment convictions because the government's reliance on the invalid bribery count to depict the defendant as someone "trying to take advantage of people . . . undermine[d] [the court's] confidence that the jury adequately separated the two occurrences." *Id.* at 856–57; *see also United States v. DiNome*, 954 F.2d 839, 844 (2d Cir. 1992) (reversing mail and wire fraud convictions related to bribery charges that defendants were acquitted of under Rule 29).

Likewise, here the government explicitly invoked the invalid Mexico-related charge to bolster its weak Ecuador-related charges because it has no credible evidence Mr. Aguilar knew of the bribes. Even if there was sufficient circumstantial evidence of Mr. Aguilar's knowledge, the risk of prejudicial spillover simply remains too great to sustain the jury's convictions. As in *Rooney*, "the potential for prejudicial spillover [is too] high because . . . the evidence [on the remaining counts] was barely sufficient to permit an inference of the disputed element of knowledge." 37 F.3d at 856 (vacating for prejudicial spillover despite sufficient evidence).

In short, the prejudicial spillover from the Mexico-related SUA underlying Count Three polluted the convictions on all three Counts, requiring vacatur and a new trial under Rule 33.

## VI.   The Court Erroneously Failed To Require Unanimity on the Specified Unlawful Activities Underlying Count Three.

The Court should vacate the jury's conviction on Count Three and order a new trial under Rule 33 because the Court failed to instruct the jurors that they had to agree unanimously on which (if any) SUAs Mr. Aguilar took part in, and by failing to use a special verdict sheet requiring the jury to specify the SUAs (if any) on which they unanimously agreed. The constitutional requirement of a unanimous verdict requires "substantial agreement as to the principal factual elements underlying a specified offense." *Duarte v. United States*, 289 F. Supp. 2d 487, 492 (S.D.N.Y. 2003), *aff'd*, 137 F. App'x 423 (2d Cir. 2005) (quoting *McKoy v. North Carolina*,

494 U.S. 433, 450 (1990) (Blackmun, J., concurring)).  Although "[t]his rule does not require that each bit of evidence be unanimously credited or entirely discarded . . . it *does* require unanimous agreement as to the nature of the defendant's violation, not simply the fact that a violation has occurred."  *McKoy*, 494 U.S. at 450 n.5 (Blackmun J., concurring) (emphasis added)).  As the Court of Appeals for the Seventh Circuit has explained, because "[i]t is not enough that the jury is unanimous as to guilt but divided in their assessment of which act supported the verdict," a "specific unanimity instruction" should be given that "advises the jury that where a charged offense can be predicated on one of several charged acts, the jury must be unanimous on the act before it can convict."  *United States v. Sturman*, 49 F.3d 1275, 1282 (7th Cir. 1995).

A wealth of precedent—including all the cases cited immediately above—supports Mr. Aguilar's requested jury instruction requiring unanimity as to each SUA.  In *United States v. Ng Lap Seng* (an FCPA case both parties cited for its proposed charge), the jury was instructed that "all twelve of you must agree on the particular 'specified unlawful activity' or activities that the defendant intended to promote" for the money-laundering conspiracy.  No. 15 Cr. 706 (VSB) (S.D.N.Y.) (lodged here at ECF No. 232-3 at 49).  Likewise, in *United States v. Liersch*, the court stated it would "give a unanimity instruction requiring the jury to identify the specified unlawful activity or activities upon which it unanimously agrees and provide the jury with a special verdict form" in a money-laundering conspiracy case with distinct SUAs.  No. 04 Cr. 2521 (JSR), 2005 WL 6414047, at *8 (S.D. Cal. May 2, 2005).  This Court *twice* relied on *Liersch* and repeatedly committed to give such a unanimity instruction and special verdict sheet to prevent juror confusion when assessing the money-laundering conspiracy count's multiple objects and underlying SUAs.  *See* ECF No. 154 at 4 (concerns about "risks of a non-unanimous jury verdict" for Count Three would "be resolved through a jury instruction and verdict sheet"); ECF No. 176

at 6 ("With respect to a risk of juror confusion and lack of unanimity, the Court has already held that any such risk 'can [ ] be resolved through a jury instruction' and a special verdict form."). But at the charge conference, the Court backtracked on those repeated commitments (on which Mr. Aguilar relied). Instead, the Court decided not to require unanimity as to the SUAs in either the jury instructions or the verdict sheet. The Court's sole stated reason for doing so was because it was following the instructions and verdict sheet that the Honorable Margo K. Brodie had used in a recent case; the Court offered no legal reasoning in support for its decision to backtrack on its prior rulings that such an instruction and verdict sheet were needed here. Trial Tr. 3412:18-21.

The government's argument at the charge conference that the underlying SUAs are not essential elements of a money-laundering conspiracy, Trial Tr. 3406:9–14, misses the point entirely. Regardless of whether something is an element or a critical fact, the Constitution "require[s] unanimous agreement as to the nature of the defendant's violation." *McKoy*, 494 U.S. at 450 n.5 (Blackmun J., concurring); *accord United States v. Beros*, 833 F.2d 455, 461–62 (3d Cir. 1987) (multi-predicate counts like this one may violate the Constitution where a jury could "unanimously conclude that there was a mode or manner of violating the law, but there would be no unanimity as to the predicate act[s]" undergirding the guilty verdict). The jury instructions given here invited precisely this sort of unconstitutionally nonunanimous verdict by (among other flaws) allowing jurors to convict if they found that Mr. Aguilar conspired to launder money in connection with FCPA violations in "*either*" Ecuador "*or*" Mexico. Trial Tr. 3871:3–8; ECF No. 314 at 201.

Moreover, the Second Circuit case the government cited is distinguishable because it only involved a money-laundering conspiracy to *conceal* the proceeds. *See United States v. Stavroulakis*, 952 F.2d 686, 688 (2d Cir. 1992) (defendants charged with concealing the proceeds

of specified unlawful activity).  As Mr. Aguilar explained, a conspiracy to launder money to *promote* SUAs is different because the statute is written such that the defendant has to have specifically intended to promote the SUA.  Trial Tr. 3407:9–13.  Under the promotion prong, the object of the money laundering is a "specified unlawful activity" whereas under the concealment prong the object of the money laundering is "the proceeds" of the specified unlawful activity. *Compare* 18 U.S.C. § 1956(a)(1)(A)(i), *with id.* § 1956(a)(1)(B)(i).  At any rate, *Stavroulakis* is inapt because it concerned whether the coconspirators must agree on the same underlying SUA in order to sustain a money-laundering conspiracy.  *See* 952 F.2d at 691.  The issue here, however, is whether the *jury* must be unanimous as to the SUA underlying the money-laundering conspiracy and whether the resulting risk of a non-unanimous jury verdict violates the Sixth Amendment. Because the jury could have agreed there were violations of the FCPA as to Ecuador but not Mexico, or vice versa, the lack of a specific unanimity instruction and special verdict sheet may have resulted in a non-unanimous verdict—an issue *Stavroulakis* never considered.

Because the Court failed to charge the jury on the need for unanimity as to each SUA, and failed to give the jury a verdict sheet requiring that unanimity, there is a "real concern that an innocent person may have been convicted." *Serrano*, 224 F. Supp. 3d at 255 (granting new trial based on erroneous jury instruction).  Thus, the Court should grant Mr. Aguilar's motion for a new trial for Count Three.

## VII.   The Court Erred in Allowing the Government to Elicit Testimony About Mr. Aguilar's Alleged Statements During the Airport Interrogation.

The Court should vacate Mr. Aguilar's convictions and order a new trial on all Counts under Rule 33 because it improperly allowed the government to elicit testimony from Homeland Security Special Agent Matthew Wood about statements that he allegedly obtained from Mr. Aguilar at Houston's international airport.  That violated Mr. Aguilar's Fifth Amendment

rights under *Miranda* and was improper under Rule 403 because the limited probative value of Agent Wood's testimony was no match for the enormous unfair prejudice that it triggered.

A.   **Agent Wood's Testimony Violated Mr. Aguilar's Fifth Amendment Rights Under *Miranda*.**

As Mr. Aguilar explained in his briefing on his pretrial motion to suppress statements, the government has not met its "heavy" burden to show that the statements he allegedly made to Agent Wood and his FBI colleague Special Agent Paul Zukas were not obtained in violation of *Miranda v. Arizona* because he was interrogated while in custody.   384 U.S. 436, 475 (1966); *see, e.g.*, ECF Nos. 66, 76, 97, 103.  For three main reasons, the evidence and testimony introduced at trial only buttress that conclusion and warrant the Court's post-trial reconsideration of its order denying Mr. Aguilar's motion to suppress.  *See* ECF No. 106.

***First***, armed federal agents deliberately obtained Mr. Aguilar's alleged statements without reading him a *Miranda* warning and by interrogating him in a coercive, government-dominated, and custodial setting—an interrogation room in a secure Customs area of an international airport, a border crossing.  As Agent Wood testified:

- He "personally preferred to conduct the interview at the airport rather than at Mr. Aguilar's home or another location," Trial Tr. 2550:6–9, evidently because it successfully overcomes travelers' ability to decline to answer questions and renders them unable or unwilling to disengage promptly;

- He accordingly has conducted interrogations in this government-controlled setting "[a]pproximately 30 times," Trial Tr. 2511:25–2512:4, and agreed that it was his "home turf," *id.* at 2588:24–2589:1;

- He questioned Mr. Aguilar in a sequestered, secondary-interview room that he and his "law enforcement colleagues controlled"—with two armed federal agents in the room with Mr. Aguilar and many more armed Customs agents patrolling outside, Trial Tr. 2587:24–2588:15;

- He sat Mr. Aguilar in a "sterile chair" that was "[b]olted to the table for officer safety" with "chains," Trial Tr. 2553:8–2554:25 (discussing DX 131); and

- He and Agent Zukas interrogated Mr. Aguilar in that government-dominated setting for around 90 minutes, Trial Tr. 2533:1–3.

These tactics were improper.  The Second Circuit has made it clear that the Customs area of an international airport is a place where "compulsory questioning . . . *inheres*" because a suspect has "no freedom to enter the United States and with nowhere to go."  *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011).  No reasonable traveler would feel free to ignore two federal agents' instructions in this austere, government-dominated setting.  *See, e.g.*, *United States v. Cohen*, 372 F. Supp. 2d 340, 350–51 (E.D.N.Y. 2005) ("anyone who travels by air knows that they are at the mercy of the authorities" because "airports involve heightened security in which an individual's freedom of movement can be curtailed in a way similar to an arrest"); *see also United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004) (custody is found when interrogation occurs in "settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak").

As a result, federal agents cannot question travelers in the secure Customs area without reading them *Miranda* warnings *unless* they limit the subject of their interrogation to the government's mission at the border.  *See FNU LNU*, 653 F.3d at 154 ("[T]he content of the officer's questions [at a border crossing] substantially inform whether a reasonable person would feel restrained in a way similar to a formal arrest."); *id.* at 156 (Jacobs, C.J., concurring) ("the *most* important factor in determining whether *Miranda* applies" at a border crossing is the "objective function of [the] questions [asked], not the custodial nature of the questioning" (emphasis in original)).  But Agent Wood's testimony underscored that his entire 90-minute interrogation concerned Mr. Aguilar's alleged bribery of foreign officials—not whether Mr. Aguilar properly could reenter the United States from Mexico.  *See* Trial Tr. 2512:19–2521:5.  Second Circuit precedent thus compels a finding that Mr. Aguilar was interrogated while in *Miranda* custody.

68

The Court's pretrial ruling to the contrary largely rested on a finding that the Customs agents who completed his final inspection and the interrogating agents told Mr. Aguilar that he had completed the reentry process and supposedly was "free to leave." *See* ECF No. 106 at 9–13. Mr. Aguilar submits that the Court erred in so finding.  That two Customs agents had told Mr. Aguilar he had completed the immigration process would not lead a reasonable traveler in Mr. Aguilar's shoes to believe that he could refuse a later instruction from another armed federal agent, from a different agency (the FBI, not Customs), who stepped into his path and asked him to answer more questions just steps before he could exit the secure Customs area. *See United States v. Craighead*, 539 F.3d 1073, 1088 (9th Cir. 2008) (Bybee, J.) (suspect could not rely on statement from one agent that he was free to leave when a reasonable person would not understand that statement to restrict the actions of the other law-enforcement officials at the scene).  Nor would a reasonable traveler and green-card holder like Mr. Aguilar believe that the Customs officials could speak for Agent Wood, a nonuniformed Special Agent with Homeland Security.  No reasonable traveler would think he could cross the border freely when one agent says "go ahead," but then another soon commands, "stop, we have more questions for you."

Even accepting Agent Wood's testimony that he "told Mr. Aguilar that he had cleared immigration and customs [and] was free to leave," Trial Tr. 2512:25–2513:2, that statement alone is not enough to overcome all the other powerful factors showing that Mr. Aguilar was in custody throughout this interrogation.  As the Courts of Appeals have time and again held, such statements are "not talismanic," especially in coercive settings like this one.  *United States v. Giddins*, 858 F.3d 870, 880 (4th Cir. 2013) (defendant in custody despite going voluntarily to police station and being told he was free to leave); *accord, e.g.*, *United States v. Slaight*, 620 F.3d 816, 821 (7th Cir. 2010) (Posner, J.) (cornering suspect in inherently custodial setting and "telling him repeatedly

that he's free to end the questioning and leave do[es] not create a safe harbor" for agents who would prefer not to give *Miranda* warnings); *United States v. Kiam*, 432 F.3d 524, 526 n.2 (3d Cir. 2006) (international traveler who "went with inspectors voluntarily" to a "secondary inspection area" was in custody when criminal investigators interrogated him about non-border issues). Moreover, even if Mr. Aguilar heard from Agent Wood that he was "free to leave," where was he to go? *See Craighead*, 539 F.3d at 1089 (suspect was in custody despite being told he was free to leave because he was interrogated in his home and thus "reasonably believed that there was simply nowhere for him to go"). Exiting the interrogation room would put Mr. Aguilar back in the secure Customs area—an interstitial place between borders—requiring him to rush past multiple armed federal agents to scamper across a heavily secured border crossing. *See FNU LNU*, 653 F.3d at 153 (travelers in the secure Customs area have "no freedom to enter the United States and [] nowhere to go"). No reasonable traveler would (and Mr. Aguilar did not) believe that he could do so at all—let alone without fearing severe consequences.

Because the place where Agent Wood interrogated Mr. Aguilar was an inherently coercive one, and because none of the questions concerned the border-crossing process, Agent Wood's testimony about Mr. Aguilar's alleged statements was inadmissible under *Miranda*, controlling Second Circuit precedent, and a legion of persuasive authority from its Sister Circuits.

**Second**, Agent Wood aggressively questioned Mr. Aguilar firmly believing that he was guilty, having prepared for the interrogation by reviewing a "draft complaint" and a transcript of a recorded meeting Mr. Aguilar had with the Pere brothers, evidence that he used throughout the interrogation. Trial Tr. 2530:16–2532:11; *see id.* at 2515:14–18. The Supreme Court has held that an agent's "beliefs concerning the potential culpability of the individual being questioned" support a finding that the suspect was in *Miranda* custody when the officer reveals those beliefs

70

to the suspect "by word or deed." *Stansbury v. California*, 511 U.S. 318, 325 (1994) (per curiam). Long before that, Second Circuit held the same: "The more cause for believing the suspect committed the crime, the greater tendency to bear down in interrogation and create the kind of atmosphere of significant restraint that triggers *Miranda*." *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969) (Friendly, J.).

That is precisely what happened here. Agent Wood believed Mr. Aguilar was guilty, knew his mission was to get "him to admit he was guilty," and worked aggressively over 90 minutes to try to do just that in a coercive, government-controlled setting. Trial Tr. 2622:20–23. These many powerful factors reinforce a finding that Agent Wood interrogated Mr. Aguilar while he was in custody and thus was entitled to a *Miranda* warning. *See, e.g.*, *United States v. Jacobs*, 431 F.3d 99, 107 (3d Cir. 2005) (affirming suppression when agent "plac[ed] [ ] incriminating [evidence] in Jacobs' view," asked "questions [that] were confrontational and intimidating," and "communicated . . . that [agent] thought she was guilty"); *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998) (defendant in custody when "subjected to increasingly hostile questioning at the police station, during which the detectives had accused him of showing insufficient grief, had said that his story was 'ridiculous' and 'absurd,' and had added that they simply 'could not accept' his explanations" given what detectives knew of the facts).

The Court therefore erred in overlooking these factors in allowing Agent Wood's testimony at trial. Its pretrial decision cited neither *Stansbury* nor *Hall*. Instead, by focusing only on whether the agents *overtly* told Mr. Aguilar that he was guilty of crimes, the Court disregarded those cases' command to focus on the entirety of the agents' words *and deeds* that create a coercive atmosphere. *Compare* ECF No. 106 at 6, *with Stansbury*, 511 U.S. at 325, *and Hall*, 421 F.2d at 545.

***Third***, Agent Wood's testimony about the interrogation—including Mr. Aguilar's alleged statements and the coercive circumstances that caused them—cannot be trusted because Agent Wood testified based solely on his failing memory of a three-and-a-half-year-old event, Trial Tr. 2603:24–2604:13; in a case where he stepped in for the interrogation but had no other role, *id.* at 2539:5–23; for or from which he never took any notes, *id.* at 2532:12–20, 2535:4–2536:14; and for which he wrote no formal report, *id.* at 2537:13–15.  The government cannot be heard to minimize these failings when it called only Agent Wood to testify about this interrogation, rather than FBI Agent Zukas, who took contemporaneous notes and wrote the resulting interview report many weeks later.  Trial Tr. 2544:1–9.

Worse, despite Agent Wood's fading memory, lack of notes, and obvious unfamiliarity with this extremely complex case, the government *deliberately* chose not to record the interrogation and never even tried to obtain security camera footage from the interrogation room. Trial Tr. 2603:5–23 (discussing DX 133-R).  The government did so even though Agent Wood clearly testified that doing so violated an express Homeland Security policy encouraging him to record the interrogation, Trial Tr. 2598:5–2600:11 (discussing DX 137); and undisputed and judicially noticeable public records show that the Department of Justice has adopted the same policy, *see* Dep't of Justice, *Justice Manual* (*f/k/a U.S. Attorneys' Manual*) § 13.001 (2023) (policy adopted in 2017); *see also* Fed. R. Evid. 201(b)(2), 803(8).  As courts from across the country repeatedly have recognized, the government's deliberate failure to record this interrogation warrants extremely close scrutiny of Agent Wood's testimony about what Mr. Aguilar allegedly

said and the coercive circumstances that caused him to say it.[5]  Because Agent Wood's testimony crumbles under even mild scrutiny, the jury never should have heard it.

For all these reasons, and all those Mr. Aguilar demonstrated in briefing his motion to suppress and at the suppression hearing (*e.g.*, ECF Nos. 66, 76, 97, 98-16, 103), the Court erred in allowing Agent Wood to testify about statements he allegedly obtained from Mr. Aguilar in violation of *Miranda*.  This error requires vacatur and a new trial on all Counts.

### B.      The Court Should Have Excluded Agent Wood's Testimony Under Rule 403.

Notwithstanding the Court's pretrial decision declining to suppress Mr. Aguilar's alleged statements, the Court still should have precluded Agent Wood's trial testimony under Rule 403.

On one end of the scale, Agent Wood's testimony had minimal marginal probative value because it duplicated the government's other evidence and resulted from his unreliable, fast-fading memory.  *See, e.g.*, *United States v. Gladden*, 394 F. Supp. 3d 465, 479 (S.D.N.Y. 2019) ("[W]hat little Moretti claimed to remember by the time of the hearing is of little probative value, given her lack of memory on virtually everything about the matter.")  The government asserted in its summation that there were "eight reasons" why the jury could conclude that Mr. Aguilar "kn[ew] that the Peres were paying bribes."  Trial Tr. 3480:18–24.  Agent Wood's fading recollections about his interrogation of Mr. Aguilar barely made the cut as the last item on the government's

---

[5]   *See, e.g.*, *United States v. Solano*, 966 F.3d 184, 199–200 (2d Cir. 2020) (vacating and remanding conviction where Homeland Security Investigations agent "admitted that he could have recorded [defendant's] admissions by using his cellphone" but "chose not to," which led to "serious credibility questions"); *United States v. Wright*, 625 F.3d 583, 604 n.10 (9th Cir. 2010) (factfinder may use "the lack of a recording" of an interrogation to "support any disbelief it has of any witness' testimony"), *superseded by statute on other grounds as stated in United States v. Brown*, 785 F.3d 1337, 1351 (9th Cir. 2015); *United States v. Torres-Galindo*, 206 F.3d 136, 144 (1st Cir. 2000) ("recogniz[ing]" that "the FBI's practice of not recording confessions, preferring instead to rely on the testimony of the interviewing agent," "is susceptible to abuse"); *United States v. Thornton*, 177 F. Supp. 2d 625, 628 (E.D. Mich. 2001) ("It certainly harms the prosecution in a close case when the [factfinder] cannot evaluate the actual confession.").

long list.  Trial Tr. 3569:22–3574:5.  In an opening summation that took nearly an entire trial day to deliver, the government's discussion of the interrogation lasted fewer than five pages of transcript.  *See id.*  By contrast, the lion's share of the government's opening and rebuttal summations focused on the dozens of hours of recorded conversations that the government had obtained of Mr. Aguilar that assertedly showed his knowledge of bribes being paid, which required two days of testimony to present to the jury and dozens of pages of summation transcript just to summarize.  *See* Trial Tr. 3550:10–3569:21, 3762:2–21, 3771:17–3773:8, 3791:12–22; *see also* GX 3501–GX 3517.  And those many long recordings were on top of the *hundreds* of pages of Mr. Aguilar's emails that the government showed the jury from both his business and personal accounts.  The government therefore had other, more-reliable evidence to try to show the jury what Mr. Aguilar and the Pere brothers had discussed.  The government all but admitted this in its rebuttal summation when it told the jurors to focus on those recordings, rather than the interrogation.  Trial Tr. 3773:6–9 ("Again, they say you can't trust cooperating witnesses.  How about the defendant?  How about what the defendant says when no one's watching?  Trust those words."); *id.* at 3790:18–20 ("But who can you trust?  You can trust the defendant when he doesn't think anyone's watching.").  Agent Wood's indirect testimony about what Mr. Aguilar may or may not have told him in a hostile interrogation that the government deliberately and tellingly chose *not to record* thus added little (if any) marginal probative value.

On the other end of the scale, the unfair prejudice to Mr. Aguilar from allowing Agent Wood's to mislead and confuse the jury was enormous and incurable.  The Supreme Court has recognized that juries have an unfair tendency to read far too much into a purported confession or admission of guilt.  *See Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) ("[a] confession is like no other evidence" and "ha[s] a profound impact on the jury").  The Courts of Appeals have

74

underscored that concern in cases like this one where the government chooses not to record an interrogation.  *See, e.g.*, *Torres-Galindo*, 206 F.3d at 144 ("recogniz[ing]" that "the FBI's practice of not recording confessions, preferring instead to rely on the testimony of the interviewing agent," "is susceptible to abuse"); *see supra* note 5 (collecting cases).  That sort of unfair prejudice was particularly acute in a case like this one, where Mr. Aguilar's alleged statements were easily explainable, yet his counsel could not un-ring the bell once the jury latched onto the government's characterization of his alleged statements.  As just one example, Agent Wood testified that Mr. Aguilar acknowledged that he "possibly" had "put [him]self in potential criminal liability for no reason[.]"  Trial Tr. 2521:1–3.  Mr. Aguilar showed the jury on cross-examination why that statement was an entirely reasonable one for a suspect to make when two federal agents are interrogating him in a secondary-inspection room armed with transcribed recordings of his private meetings.  Trial. Tr. 2620:19–2622:5.  But by the time Mr. Aguilar could rebut that purported admission on cross-examination, the government's misleading spin on it already had polluted the jury's understanding of the interrogation and of Mr. Aguilar's alleged knowledge and intent.  The acutely unfair prejudice to Mr. Aguilar from Agent Wood's testimony therefore could not be undone, no matter what Mr. Aguilar could do the next day in cross-examination within the constraints that the Court had imposed in granting only small portions of his motion in limine to admit critical exculpatory context and clarifications under the rule of completeness. *Compare* ECF No. 293, *with* Min. Order (Feb. 6, 2024).

Even if Agent Wood had complied with *Miranda*, Rule 403 still prevented his minimally probative, but enormously and unfairly prejudicial testimony.  The Court's error in admitting this evidence polluted the jury's consideration of all Counts and requires vacatur and a new trial.

*Landesman*, 17 F.4th at 331 (Rule 33 relief is appropriate when an "evidentiary . . . error compromised the reliability of the verdict").

## I.   The Ecuador-Related Evidence Is Insufficient to Sustain the Convictions on Counts One and Two.

The Court should acquit Mr. Aguilar of Counts One and Two because no jury could conclude beyond a reasonable doubt that Mr. Aguilar knowingly and corruptly bribed government officials in Ecuador.  This is true for two principal reasons.

Foremost, there was no credible proof that Mr. Aguilar knew the Pere brothers were paying government officials.  The Pere brothers never told Mr. Aguilar they were paying bribes to government officials before the Vitol fuel oil deal was signed.  On cross-examination, Antonio Pere admitted that the way he supposedly told Mr. Aguilar that he was bribing Nilsen Arias was by saying he had "worked with" Mr. Arias.  Trial Tr. 1058:25–1059:10.  Antonio Pere even admitted that if he had told Mr. Aguilar at the March 5, 2020 lunch that "you and I both know that I got that contract for you by bribing Mr. Arias," Mr. Aguilar "probably" would have said "I didn't know that at the time."  Tr. 1353:9–16 (A. Pere cross).  This is why, at that lunch, Antonio Pere instead deliberately said he "think[s]" he had told Mr. Aguilar they "paid [Arias] for his services." Trial Tr. 1359:16–23 (A. Pere cross).  Mr. Aguilar's supposed airport "confession," *see supra* Section VII, occurred months *after* the March 5, 2020 lunch where Antonio Pere informed Mr. Aguilar they had paid off Mr. Arias, and therefore cannot reveal what Mr. Aguilar knew at the time of the Vitol fuel oil deal.  *See* Trial Tr. 2518:3–10 (Wood direct) (during this interrogation Mr. Aguilar stated he "believed" payments were made to government officials because the "[Pere] brothers told him").  Moreover, multiple industry conference agendas in Mr. Aguilar's emails showed that Xavier Rodriguez was not a government official but a private energy consultant—

and that Mr. Aguilar had paid him in that private capacity as a Vitol consultant. *See* Trial Tr. 3300:25; 3304:2.

Nor was there any credible evidence that even the Pere brothers themselves had a corrupt agreement with Mr. Arias to pay bribes to benefit Vitol. On cross-examination, Mr. Arias testified that he did not know what, if any, payments from the Peres corresponded to the Vitol fuel oil deal. Trial Tr. 533:1–6. The amount in bribes Mr. Arias believed he received evolved from $0 to $300,000, and then to $800,000. Trial Tr. 466:1–15. On cross-examination, Enrique Pere (who handled all of the Pere brothers' payments) admitted that formal ledgers that the consulting business maintained for the purpose of determining bribe amounts owed on account of specific deals the brothers brokered contained no entries whatsoever for the Vitol fuel oil deal—unlike for Gunvor deals which were tracked to the penny. Trial Tr. 1904:6–17.

Tellingly, none of the eight reasons the government listed at summation for why Mr. Aguilar supposedly knew the Peres were paying bribes addressed these two glaring holes in the government's case. In light of the dearth of credible evidence supporting Counts One and Two, it is unsurprising that the jury acquitted Mr. Aguilar on the territorial prong of the Ecuador-related FCPA charges. ECF No. 328.

To be sure, Mr. Arias claimed that he had coded conversations with Mr. Aguilar about bribe payments on two occasions,[6] but a single witness's testimony cannot support a conviction

---

[6]   Mr. Arias also testified that around 2014 or 2015, he had a conversation with Ecuador's Undersecretary of Hydrocarbons Xavier Rodriguez about a potential LPG deal with Mr. Aguilar in which Mr. Arias and Mr. Rodriguez discussed bribes. *See* Trial Tr. 138:14–16 ("conversation with Mr. Rodriguez about bribes" was "[a]pproximately the year 2014, '15."); *id.* at 152:5–8 ("Mr. Rodriguez was acting on behalf of Mr. Aguilar, Vitol, and in order to move forward with contract, it was necessary that the amounts of the commissions, bribes, be defined."); *id.* at 156:21–25 (Mr. Arias stated he "had a conversation with Mr. Rodriguez about a potential LPG deal with the defendant and Vitol in which [Mr. Arias] discussed bribes"). However, Mr. Arias did *not*

when, as here, that testimony is "incredible on its face." *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012); *see also, e.g.*, *Autuori*, 212 F.3d at 120 (affirming grant of new trial because of dubious testimony from government's witnesses).   In 2015, Mr. Aguilar supposedly told Mr. Arias he felt "happy" and called the Pere brothers "friends" and "good guys" after meeting with them about a potential LPG deal.  Trial Tr. 172:10–23 (Arias direct).  Mr. Arias testified he understood this to mean "everything had been arranged" with regards to the bribe payments.  Trial Tr. 173:5–17 (Arias direct).  In September 2016 with regards to the fuel oil deal, Mr. Aguilar allegedly told Mr. Arias again after a meeting with Antonio Pere that he felt "happy," referred to Antonio Pere as a "friend" and "good people," and this time said "everything has been arranged," which Mr. Arias took to mean "the payment of the commissions, that is the bribes, had already been agreed to."  Trial Tr. 231:23–232:9 (Arias direct).

But Mr. Arias admitted on cross that in these conversations Mr. Aguilar never used any of the codewords for bribe that he had previously identified for the jury, such as "commissions" or "deals" or "business," and that he did not have any notes of the call.  Trial Tr. 534:24–536:15 (Arias cross).  Like the Pere brothers, Mr. Arias never used the word "bribe" around Mr. Aguilar.  Trial Tr. 534:12–14 (Arias cross).  And as to Antonio Pere, his coded language for bribes supposedly was telling Mr. Aguilar he "worked with" Mr. Arias, hardly a red flag for bribery.  Trial Tr. 1058:25–1059:10 (A. Pere cross).  None of these euphemisms means "bribe" and no one testified that there was an understanding with Mr. Aguilar that they meant "bribe."   Rather, Antonio Pere admitted his practice was to not tell people he was bribing government officials unless they needed to know.  Trial Tr. 1051:6–13 (A. Pere cross).

---

testify that Mr. Rodriguez told him that Mr. Aguilar spoke of bribes.  Rather, Mr. Arias merely testified that he and Mr. Rodriguez discussed bribes in relation to a potential LPG deal with Vitol.

Controlling Second Circuit caselaw sets a high bar for proving knowledge and authorizes a directed judgment of acquittal in circumstances like these.  In *Biaggi*, the Court of Appeals reversed where a defendant was convicted for aiding and abetting his father's bribery offense because there was no evidence he was told the purpose of the stock he held for his father.  909 F.2d at 681.  Although it was "possible that the Congressman told his son the true reason" for the payment, "knowledge, though inferable from circumstances, must be based on evidence, not speculation."  *Id.*  Accordingly, the son's conviction could not stand based on the speculative theory that the son must have known the stock's unlawful purpose simply because its grandiose value—$1,800,000—could have exceeded the value of the legal services in exchange for which the stock was provided.  *Id.*  Similarly, in a drug-related conspiracy, the Second Circuit reversed a conviction based on the lack of evidence that the defendant knew the contents of the suitcases he was carrying even though there was "ample evidence" of the existence of the conspiracy, recordings of conversations with coconspirator, and a false exculpatory statement disclaiming knowledge of coconspirator.  *Lorenzo*, 534 F.3d at 159, 160–62; *see also, e.g.*, *Rodriguez*, 392 F.3d at 545–49 (reversing and instructing the district court to acquit where defendant conspired to distribute heroin, despite defendant having served as lookout, bringing weapons to the scene, multiple calls with coconspirators, and possibly sitting next to the heroin in his own vehicle because it was concealed inside a box).  With no credible proof that Mr. Aguilar knew of the Pere brothers' payments to government officials at the time of the Vitol fuel oil deal and the lack of a clear agreement between Mr. Arias and the Pere brothers, the evidence at best "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence" even after evaluating it in the light most favorable to the government.  *Lorenzo*, 534 F.3d at 159.  Simply put, "[s]uspicious circumstances . . . are not enough to sustain a conviction for conspiracy."

*Id.* (citation omitted); *United States v. Johnson*, 513 F.2d 819, 824 (2d Cir. 1975) (same). So too here.

Even the government's best evidence—email aliases, false exculpatory statements, the use of Mr. Hanst's companies, and undercover recordings—cannot fill the gaping holes in the government's case.  Mr. Aguilar's use of email aliases is hardly suspect because he often signed off with his real name.  Trial Tr. 2490:6–19 (L. Hanst cross); *see, e.g.*, GX 1263; GX 1270; DX 661; GX 1231.  Mr. Aguilar's initial denial of knowing the Peres is, as a matter of law, insufficient proof to sustain a conviction since the other evidence of guilt is weak.  *See Lorenzo*, 534 F.3d at 159, 161 (reversing conspiracy conviction despite false exculpatory statement disclaiming knowledge of coconspirator).  Mr. Hanst's companies were set up after discussions with Vitol trader Marc Ducrest long before Mr. Hanst ever heard of Mr. Aguilar, Trial Tr. 2338:16–2339:9 (Hanst cross), and Mr. Ducrest was the person "a step above" Mr. Aguilar who approved payments, Trial Tr. 2363:8–13 (Hanst cross); GX 3502-T at 11:84; DX 659-T at rows 16-18 (text message exchange between Mr. Hanst and Mr. Ducrest regarding "processing" "650k").  Finally, the most the recordings show is that Antonio Pere told Mr. Aguilar he "think[s]" he told him they paid off Mr. Arias—which implies Mr. Aguilar was in fact *not* told.

Consequently, the facts here are readily distinguishable from *United States v. Landesman*, which reversed an acquittal under Rule 29.  17 F.4th 298.  In that case, the defendants committed wire and securities fraud by concealing the true number of bonds controlled by a hedge fund and an affiliated reinsurance company so they could rig a vote in their favor to give their stock preferential status over bondholders when the company they invested in went bankrupt.  *Id.* at 303–04.  Sufficient evidence supported the conviction of the reinsurance company's chief investment officer because emails and other documents directly showed at the time that he was

aware of the rule excluding affiliate bondholder's votes, was part of conversations about which affiliated bondholders to disclose, and knew how many affiliated votes were needed to change their stock's payment priority. *Id.* at 322–27. Here, in contrast, there is no contemporaneous evidence directly showing Mr. Aguilar knew of the Pere brothers' bribery scheme. Again, Antonio Pere merely told Mr. Aguilar he "think[s]" he told him they paid off Mr. Arias, which implies the complete opposite.

Accordingly, no rational jury could find beyond a reasonable doubt that Mr. Aguilar knowingly and corruptly bribed government officials in Ecuador for Counts One and Two. So too for the money-laundering conspiracy in Count Three insofar as it rests on the Ecuador-related SUAs. And as explained above in Section IV, there is insufficient evidence to support the remaining Mexico-related SUA in Count Three. The Court therefore should enter judgments of acquittal on all Counts under Rule 29.

In the alternative, the Court should grant Mr. Aguilar a new trial under Rule 33 because the insufficient proof and legal errors identified above, both individually and in combination, leave a real concern that an innocent person has been convicted.

## CONCLUSION

For all these reasons, the Court should, following oral argument, grant judgments of acquittal on all Counts or order a new trial on all Counts.

Dated: New York, New York
      May 24, 2024

CLARK SMITH VILLAZOR LLP

/s/ Rodney C. Villazor
Rodney C. Villazor
Michelle E. Lee
666 Third Avenue, 21st Floor
New York, New York 10017
(212) 377-0850 (Telephone)
(212) 377-0868 (Facsimile)
rodney.villazor@csvllp.com
michelle.lee@csvllp.com

Attorneys for Defendant Javier Aguilar

Served via ECF on May 24, 2024
cc: Counsel of Record (via ECF)