UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
UNITED STATES OF AMERICA        :
        :
        :
        :    <u>MEMORANDUM & ORDER</u>
    -against-    :
        :    1:20-cr-390 (ENV)
JAVIER AGUILAR,        :
        :
        Defendant.   :
------------------------------------------------------------- x

VITALIANO, D.J.

On February 23, 2024, following an eight-week trial, a jury returned a verdict convicting defendant Javier Aguilar of one count of conspiracy to violate the Foreign Corrupt Practices Act ("FCPA"), one count of violating the FCPA, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(A), 1956(a)(2)(B)(i).  *See* Jury Verdict, Dkt. 328.

Presently before the Court is Aguilar's motion for judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29, or, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33.  *See* Mot., Dkt. 354.  For the reasons that follow, finding that he is entitled neither to a judgment of acquittal nor a new trial, Aguilar's motion is denied in its entirety.

<u>Background</u>

The Court presumes the parties' familiarity with the substantive facts and procedural history of this case, and they will not be needlessly repeated here.  For ease of reference, however, an index of the Court's principal prior rulings and decisions follows: the Court's Memorandum and Order denying Aguilar's motion to suppress statements made to federal agents at George Bush Intercontinental Airport ("IAH") can be found at Dkt. 106.  *See also United States v. Aguilar*, No.

1

20-cr-390, 2022 WL 3139100 (E.D.N.Y. Aug. 5, 2022).  The Court's memoranda and orders denying Aguilar's motions to dismiss can be found at Dkts. 140, 154 (*see also United States v. Aguilar*, No. 20-cr-390, 2023 WL 3807383 (E.D.N.Y. May 31, 2023)), and 176.  The Court's pre-trial evidentiary orders are located at Dkts. 155 (*see also United States v. Aguilar*, No. 20-cr-390, 2023 WL 3807731 (E.D.N.Y. June 2, 2023)), 202, 213, 226, 230, and 238.  The Court's Memorandum Opinion expounding on its evidentiary ruling admitting evidence of Aguilar's kickbacks can be found at Dkt. 324.  *See also United States v. Aguilar*, No. 20-cr-390, 2024 WL 759973 (E.D.N.Y. Feb. 22, 2024).  The Court's Memorandum and Order regarding Article 222(II) of Mexico's penal code is located at Dkt. 313.  *See also United States v. Aguilar*, —F. Supp. 3d–, 2024 WL 665947 (E.D.N.Y. Feb. 16, 2024).

<u>Legal Standard</u>

As required by Rule 29(a), a trial court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  The pathway to Rule 29 relief, though, is leavened critically by the "heavy burden" the moving defendant bears when challenging the sufficiency of the evidence.  *United States v. Hamilton*, 334 F.3d 170, 179 (2d Cir. 2003).  Indeed, a conviction must be upheld so long as, "after viewing the evidence [and all permissible inferences] in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see also United States v. Parkes*, 497 F.3d 220, 225 (2d Cir. 2007).

Importantly, the rule does not alter in any way the standard given to the jury guiding their review of the evidence.  So, for example, circumstantial evidence alone can form the basis of the jury's verdict.  *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995).  This principle leads

to another stark reality: a defendant's burden is even heavier in the case of a conspiracy conviction, where "deference to a jury's findings is especially important . . . because a conspiracy is by its very nature a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court." *United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006) (quoting *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004)).

A new trial motion is related to yet distinct from a motion for judgment of acquittal. Rule 33 gives a trial court the discretion "to vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). In considering a motion for a new trial, "the court is entitled to 'weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'" *United States v. Robinson*, 430 F.3d 537, 543 (2d Cir. 2005) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)). The trial court may not, however, wholly usurp the jury's role, and it is only "where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000) (internal quotations omitted); *Robinson*, 430 F.3d at 543. At bottom, "[t]he ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). Put differently, "to grant a new trial pursuant to Rule 33, '[t]here must be a real concern that an innocent person may have been convicted.'" *United States v. McPartland*, 81 F.4th 101, 123 (2d Cir. 2023) (quoting *Ferguson*, 246 F.3d at 134). As follows logically, courts are to "exercise Rule 33 authority 'sparingly' and in 'the most extraordinary of circumstances.'" *Sanchez*, 969 F.2d at 1414.

Discussion

I.   Motion for Acquittal

In the first of an assortment of claimed evidentiary insufficiencies, Aguilar contends that, upon the evidence the government produced at trial, no rational trier of fact could, as charged in Count Three,[1] conclude that he conspired to launder money in order to promote the specified unlawful activity of violating the FCPA in connection with the charged Mexico scheme.  Def.'s Mem., Dkt. 354-1, at 64–71[2]; Def.'s Reply, Dkt. 360, at 25–31.  In this regard, Aguilar takes aim at the proof offered by the government to establish the status of Gonzalo Guzman or Carlos Espinosa under the FCPA's definition of "foreign official," either resulting from their employment by PEMEX Procurement International ("PPI"), or as a result of direct actions either of them may have taken on behalf of PEMEX.  Def.'s Mem. at 65–71.  Fundamental to an examination of this defense claim, it must be kept in mind that, so long as the evidence was sufficient for a jury to convict Aguilar on either one of the theories, acquittal notwithstanding the verdict is beyond the reach of Rule 29.  *See United States v. Masotto*, 73 F.3d 1233, 1241 (2d Cir. 1996) ("When the jury is properly instructed on two alternative theories of liability, as here, we must affirm when the evidence is sufficient under either of the theories.").

This inquiry is keyed to the FCPA's use of the term "instrumentality," which, definitionally, provides one available hook by which to satisfy "foreign official" status.  15 U.S.C. § 78dd-2(h)(2)(A).  But first, to tamp down potential confusion, a prefatory note about a separate and independent finding by the Court is in order.  The Court's conclusion as to whether Guzman

---

[1] References to the counts in the Indictment are made with regard to the Redacted Indictment.  *See* Redacted Indictment, Dkt. 244.

[2] Unless otherwise noted, page citations to the parties' briefing and the Court's prior orders are with reference to ECF pagination, except for transcript citations, which reference the internal line numbering and pagination of the transcript.

4

and Espinosa are "public servants" for purposes of Article 222(II) of Mexico's penal code, *see* Mexican Law Order, Dkt. 313, does not foreclose a jury from concluding that PPI is an instrumentality of Mexico and therefore Espinosa and Guzman were "foreign officials" for FCPA purposes.  The inquiries are separate.

Although "instrumentality" is not defined by the statute, all agree that the five non-exhaustive factors outlined in *United States v. Esquenazi*, 752 F.3d 912, 925–26 (11th Cir. 2014) are to be considered by a jury when determining instrumentality status.[3]  Aguilar contends that, balancing these factors, no rational juror could conclude that PPI met the test.  Def.'s Mem. at 65–66.

Notwithstanding Aguilar's argument that the Court's conclusion regarding Mexican law is dispositive of the FCPA instrumentality inquiry, it is undisputed that Mexico's formal designation of PPI is merely one *Esquenazi* factor to be weighed by a jury in determining instrumentality status.  *Compare* Def.'s Mem. at 65, *with* Gov't Opp'n, Dkt. 357, at 19–20; *see also Esquenazi*, 752 F.3d at 925–26.  At any rate, on this factor and the others, the government adduced sufficient evidence permitting a reasonable jury to conclude that PPI is an instrumentality, and therefore Guzman and Espinosa are "foreign officials" within the meaning of the FCPA.  To start, the evidence established that, although PPI is designated as an "affiliate" entity under Mexican law, it is a wholly-owned affiliate of PEMEX, itself indisputably a state-owned entity.  Accordingly, in the face of that designation, coupled with testimony of Guzman and Espinosa of the close relationship between PPI and PEMEX, a jury could certainly conclude that "affiliate" designation weighs in

---

[3] Those factors include: (1) "the foreign government's formal designation of th[e] entity"; (2) "whether the government has a majority interest in the entity"; (3) "the government's ability to hire and fire the entity's principals"; (4) "the extent to which the entity's profits, if any, go directly into the governmental fisc, and, by the same token, the extent to which the government funds the entity if it fails to break even," and (5) "the length of time these indicia have existed." *Id.* at 925.

favor of instrumentality status. *See* Tr. at 2664:13–17 ("[PPI] is part of the Dirección Operativa de Procura Abastecimiento [("DOPA")], which is the domestic buying department for PEMEX."); *id.* at 2667:16–19 ("[E]verything that [] is done in Pemex Procurement International is reported back to . . . the DOPA department in PEMEX. So, they would kind of be the bosses of – our office here in Houston.").

Similarly, with respect to whether the Mexican government has a majority interest in the entity, the jury likewise could well have concluded that PEMEX, a state-owned entity, which in turn wholly owns PPI, favors instrumentality status under the FCPA.[4] Espinosa testified that PPI was part of the "domestic buying department for PEMEX," *id.* at 2664:13–17, and both Guzman and Espinosa testified that PPI operates, in part, out of PEMEX offices in Mexico City (in addition to its headquarters in Houston). *Id.* at 2958:4–13 (Guzman); *id.* at 2939:12–21 (Espinosa).

Evidence supporting the jury's verdict on this issue did not end there. With respect to the Mexican government's ability to hire and fire PPI principals, Espinosa testified that PPI's board of directors is comprised of "high position executives [] in PEMEX . . . [l]ike the director of PEMEX Exploración, PEMEX Refinación, PEMEX Etileno." *Id.* at 2666:17–23. Additionally, Espinosa testified that where the Mexican administration changes, so too did the PPI board structure. *Id.* at 2667:2–6. As for non-board members of PPI, Espinosa testified that PEMEX has the ability to hire and fire those employees. *Id.* at 2668:1–4.

---

[4] Contrary to Aguilar's contention, *see* Def.'s Mem. at 67, Def.'s Reply at 26, the Court's note in its previous Order, *see* Mexican Law Order at 5–6, that PEMEX's 100% ownership of PPI did not render PPI a majority state-owned entity under Mexico's penal code, and its citation to *Del Castillo v. PMI Holdings N. Am. Inc.*, No. 4:14-CV-03435, 2016 WL 3745953, at *10 (S.D. Tex. July 13, 2016), does not mean, on the mixed FCPA question of law and fact for the jury, that no rational juror could conclude that the government had a majority interest in PPI for FCPA instrumentality purposes. To be sure, the Court noted in its previous Order that *Del Castillo*, which interpreted a similar but different statute, was persuasive, not binding, authority. Mexican Law Order at 6, 8 n.7.

Furthermore, Espinosa testified that PPI exclusively received its funding from the DOPA, PEMEX's domestic buying department.  *Id.* at 2668:5–13.  Indeed, Espinosa testified that PPI received funding from no other source.  *Id.* at 2668:14–18.  This testimony was corroborated by Guzman, who explained that PEMEX, which is funded by the Mexican government, funds PPI.  *Id.* at 2970:19–23.

In the final analysis, the *Esquenazi* framework does not require that every evidentiary box must be checked in favor of the prosecution to sustain a conviction.  Bluntly, the mere fact that some testimony could weigh against an instrumentality finding does not mean that no rational trier of fact could find that PPI is an instrumentality and that Aguilar was guilty beyond a reasonable doubt as charged in Count Three.  *See United States v. Rivera*, 546 F.3d 245, 250 (2d Cir.  2008) (affirming conviction where jury, weighing six-factor non-exhaustive test, convicted defendant, and evidence "arguably satisf[ied] several [] factors").  Because the government introduced ample evidence permitting the jury to conclude that PPI is an instrumentality under the FCPA, the Court cannot and will not "substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury."  *Autuori*, 212 F.3d at 114.  On this reasoning, that branch of Aguilar's Rule 29 motion seeking entry of a judgment of acquittal on Count Three is denied.[5]

---

[5]  As noted earlier, where there is argument that multiple theories of law and evidence warrant conviction, sufficient evidence supporting any one of those theories is all that is required to uphold the conviction.  *See Masotto,* 73 F.3d at 1241.  As a consequence, even if the government had come up short in its evidentiary showing on the second "foreign official" theory, Aguilar would not be entitled to acquittal.  Here, in any case, there was no shortcoming on the second theory; the government carried its burden there as well.  As outlined, the proof showed that Guzman and Espinosa acted on behalf of PEMEX.  Frankly, the testimony of Guzman and Espinosa on their job-related entanglements with PEMEX satisfactorily established that.  *See* Tr. at 2652:25–2653:3 ("I [(Espinosa)] was responsible for buying goods and services on behalf of PEMEX."); *id.* at 2664:13–17 ("[PPI] is part of the Dirección Operativa de Procura Abastecimiento, which is the domestic buying department for PEMEX."); *id.* at 2667:16–19 ("[E]verything that [] is done in Pemex Procurement International is reported back to . . . the DOPA department in PEMEX.  So, they would kind of be the bosses of – our office here in Houston."); *id.* at 2970:25–2971:3

Defendant does not fare better on the balance of his Rule 29 motion. Rooted in very soft soil, Aguilar contends that the evidence was woefully insufficient to establish his knowledge that bribes were being paid to foreign officials in Ecuador and therefore to convict him of conspiring to violate or violating the FCPA under Counts One and Two. Def.'s Mem. at 87–92; Def.'s Reply at 37–40. It is an argument that asks the Court and jury to turn a blind eye to the commonplace use by co-conspirators of coded language. In short, Aguilar principally targets the fact that no one directly testified to using the word "bribe," so there was insufficient proof that he knew the Pere brothers—intermediaries through which bribe payments from Aguilar and Vitol passed—were forwarding bribes to foreign officials. *See* Def.'s Mem. at 87–89. For example, Aguilar pinpoints Antonio Pere's statement that he told Aguilar he "worked with" Nilsen Arias, the International Trade Manager at Petroecuador, during the relevant period. *Id.* at 87 (citing Tr. 1058:25–1059:10). But, taking this evidence that puts him in an ostensibly corrupt relationship with an official at the very center of Ecuador's international petroleum trading business, Aguilar doubles down on the proffer of the relationship as one of innocence not guilt, contending that Arias himself never used the word "bribe" with him. *Id.* at 89.

But, even if true, without borrowing defendant's pruning shears to cherry pick this nugget of evidence and toss away the balance of the evidence offered about Aguilar's relationship with Arias, the evidence Aguilar clutches has minimal exculpatory value. On this point, the

---

(Guzman) ("[PPI is] the goods and services arm of procurement [] for PEMEX."). Indeed, their testimony about the procurement of products on behalf of PEMEX was supported by documentary evidence, including, for example, the buying orders, *see* GX 5321-T; GX 5322-T, and finalized supply contracts awarded in connection with bribes paid by Aguilar, *see* GX5161; GX 5161-T. While Aguilar contends that Guzman and Espinosa were actually working for PEMEX Etileno, another PEMEX subsidiary, Def.'s Mot. at 68–70, particularly when construed in favor of the government, as it must be, *see Parkes*, 497 F.3d at 225, such evidence, if accepted as true, certainly supports conviction by any rational trier of fact.

unvarnished evidence in its totality included thousands of pages of documentary evidence, hours of phone recordings, and the testimony of numerous witnesses, including various co-conspirators, supporting his conviction on Counts One and Two.  For example, Nilsen Arias, indisputably an Ecuadorian foreign official, testified that he received bribe payments from Aguilar.  Tr. at 91:7–12.    Arias  likewise  testified  that  another  foreign  official,  Xavier  Rodriguez,  the  then-Undersecretary of Hydrocarbons of Ecuador, introduced Arias to Aguilar and communicated to Arias that Aguilar was willing to pay bribes to secure business for Vitol.  *Id.* at 134:3–8; *id.* at 138:14–21; *id.* at 144:3–15.  Arias gave detailed testimony about how the deals would be effectuated, including his direction to Rodriguez that he and Aguilar should meet with the Pere brothers to discuss bribe payments.  *Id.* at 156:21–157:14.  Further, when payments were being made, Arias testified that Antonio Pere, the conduit for the bribes to be paid from Aguilar and Vitol, confirmed the scheme.  *Id.* at 164:15–25.

Acknowledging, as he must, that a conviction can hang on the testimony of a single witness, even a cooperating co-conspirator, *see United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012), Aguilar goes headlong against the damning testimony that Arias gave against him establishing his knowledge and involvement.  While the attack might have been headlong, it was merely an assemblage of conclusions.  Aguilar, for instance, simply calls that testimony "incredible on its face," *see* Def.'s Mem. at 88–89, but what the argument concedes is that Arias's testimony was corroborated by documentary evidence, including financial records tracking payments made at Aguilar's behest to Nilsen Arias, *see* GX 6000, recordings of Aguilar himself acknowledging that officials would "earn some money," *see* GX 3504-T,  and emails sent by Aguilar to Lionel Hanst, a Curaçao-based intermediary involved in moving money from Vitol to the Pere brothers, directing Hanst to make payments, *see, e.g.*, GX1345-T.  Defendant's urging rings hollow, of course, for

this evidence too hardly stands alone.  Beyond the documentary evidence, the government elicited testimony from several other co-conspirators, including both Pere brothers, who testified that they conspired with Aguilar to pay bribes to foreign officials in Ecuador.[6]  Tr. at 633:20–23; *id.* at 634:20–635:9; *id.* at 645:9–21; *id.* at 1513:10–1514:11.    Additionally, Antonio Pere corroborated Arias's testimony about the meeting in Mexico City between Aguilar, Rodriguez, and himself to negotiate the terms of the deal, including bribe payments.  *Id.* at 682:8–689:14.

The spreadsheet of corroborating evidence does not end there.  Some of it takes the form of words uttered by defendant himself.  Specifically, evidence was received regarding Aguilar's acknowledgement to federal agents that he believed the Peres to be paying money to foreign officials in Ecuador.  *Id.* at 2517:22–2518:5.  Then, there was Aguilar's concession that in the course of his international trading on behalf of Vitol, he had occasion to use alias email accounts and sham offshore companies and invoices; Aguilar, however, in the absence of an outright admission, urges the Court—as it did the jury—to discount this circumstantial evidence as insufficient to support a guilty verdict.  Def.'s Mem. at 91.

As long as it is, the evidence catalogued here is not exhaustive of the record.  Adding to the catalog would be pointless; Aguilar does not challenge the existence of evidence, rather merely that the evidence lacks sufficient credibility to sustain conviction.  *See id.* at 92.  That is, the evidence was insufficient to show that Aguilar was involved in the corrupt scheme to bribe officials of the Ecuadorian owned oil company.  *Id.*  The task that argument embraces is Herculean.  As

---

[6]  To the extent Aguilar argues that there was no credible proof that the Pere brothers had an agreement with Arias to pay bribes to benefit Vitol, *see* Def.'s Mem. at 88, both Pere brothers testified that they did conspire with Aguilar to pay bribes to Arias, *see* Tr. at 633:20–23; *id.* at 634:20–635:9 (Antonio Pere); *id.* at 1513:10–1514:11 (Enrique Pere), and Arias himself testified that he told Rodriguez and Aguilar to meet with the Peres to negotiate deal terms, *id.* at 156:21–157:14.

noted earlier, a court may not "substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury." *Autuori*, 212 F.3d at 114.  It was for the jury to credit or discredit this evidence.  The return of the guilty verdict stands as testament to the voluminous competent evidence they chose to credit.  Consequently, the jury's verdict finding Aguilar guilty on Count One and Count Two for his involvement in the bribery of officials responsible for Ecuador's international oil trading must be sustained and this aspect of his Rule 29 motion for a judgment of acquittal on those counts must be denied.[7]

II.   Motion Seeking a New Trial[8]

A.   Diversion Scheme

Off the start, and with crocodile tears, Aguilar's Rule 33 motion for a new trial revives his assault on the Court's evidentiary decision to permit the government to introduce evidence of Aguilar's embezzlement of Vitol funds from the pool of money sent to accounts controlled by Lionel Hanst, one of the intermediaries involved in the Ecuador and Mexico schemes.  Def.'s Mem. at 23–45; Def.'s Reply at 8–18.  The gravamen of Aguilar's argument is his contention that he relied on the Court's pretrial orders excluding this evidence, that nothing in those orders alerted him to the possibility that events at trial might counsel its admission, and, instead, the Court's ultimate admission of such evidence was unduly prejudicial warranting a new trial on all counts.

---

[7]  To the extent Aguilar also moves, in the alternative, for a new trial under Rule 33, *see* Def.'s Mem. at 92, such relief is denied for the same reasons as stated above.  Here, in the face of a mountain of compelling evidence implicating Aguilar in the paying of bribes to foreign officials, the Court has no concern that "an innocent person may have been convicted." *McPartland*, 81 F.4th at 123 (quoting *Ferguson*, 246 F.3d at 134).

[8]  The parties engage in footnote combat about the timeliness of Aguilar's Rule 33 motions. *Compare* Gov't Opp'n at 25 n.6, *with* Def.'s Reply at 8 n.2.  While it is true that, at both the close of the government's case and after the jury rendered its verdict, defense counsel mentioned only Rule 29, counsel did foreshadow briefing additional grounds for post-trial relief.  Tr. at 3917:14–21.  The Court therefore deems all branches of defendant's post-trial motion timely made.

*See* Def.'s Mem. at 23–45; Def.'s Reply at 8–18.

Two bedrock realities knife through the fog of litigation stoked by this branch of Aguilar's drive for a new trial.  First, from its initial *in limine* ruling on this topic, the Court always considered the evidence ultimately admitted against Aguilar to show that he had diverted some of Vitol's bribe money to his own pocket relevant and admissible under Rule 401.  *See* 6/2/2023 *In Limine* Order, Dkt. 155, at 2–3.  The *in limine* ruling barring use of the evidence rested only with the Rule 403 balancing of prejudice against probativeness and concluding, at that stage, the prejudicial nature of the evidence outweighed its probative value.  *Id.* at 4–8.  The reality, which Aguilar apparently chooses to overlook, is that case law provides litigants with the very warning he claims he did not receive: that is, the caution that a court may always revise an *in limine* ruling to fairly accommodate changed trial circumstances even if a litigant has prepared his case to be tried within the confines of the original ruling.  *See* Kickbacks Mem. Op., Dkt. 324, at 1–2.  It is a simple principle of law that pre-trial evidentiary rulings, particularly those hinging on the delicate Rule 403 balance, like the Court's ruling here, are not immutable.[9]  *See United States v. Wade*, 512 F. App'x 11, 14 n.1 (2d Cir. 2013) (summary order) ("[A] pretrial evidentiary ruling is not a 'straitjacket' that cannot be revisited in appropriate circumstances." (citing *Cruz v. U.S. Lines Co.*, 386 F.2d 803, 804 (2d Cir. 1967))).  That the Court's order hinged on Rule 403 alone forecasted the possibility that some trial stratagem might alter the balance in favor of admission.[10]  *See*

---

[9]  Indeed, the advisory committee's notes to Rule 103 counsel that "[e]ven where the court's [pretrial] ruling is definitive, nothing in the amendment prohibits the court from revisiting its decision when the evidence is to be offered." *Wade*, 512 F. App'x at 14 n.1 (quoting Fed. R. Evid. 103 advisory committee's 2000 note (alteration in original)).

[10]  Try as he might to manufacture an advance-warning rule in this circuit, Aguilar fails—as he did during trial—to identify any controlling precedent requiring a trial court to outline for parties what lines of inquiry may or may not open a door to previously excluded evidence.  The Court is aware of none.  That courts have, in some instances, given such guardrails, does not morph into a "settled judicial practice," Def.'s Mem. at 30.

*Weyant v. Okst*, 182 F.3d 902, at *2 (2d Cir. 1999) (summary order) (no abuse of discretion where opening statements at trial tilted Rule 403 balance in favor of admitting previously excluded evidence).

Moreover, Aguilar's lament that he was ignorant about the mutability of pretrial rulings is squarely at odds with actual pretrial litigation in this very case relating to the admissibility of evidence showing his taking of a kickback from the bribe money targeted for Ecuadorian and Mexican officials.  Indeed, defendant concedes that the admissibility of this evidence continued to serve as litigation fodder throughout pre-trial briefing.  *See* Def.'s Mem. at 24–27.  In fact, in another pre-trial ruling mere days before trial, the Court explained that "all are agreed that [the] government would be barred from" introducing kickback evidence "in its case-in-chief *unless defendant opens the door to its admission*," and acknowledged some lines of inquiry proffered by the parties that would do so.  12/21/2023 *In Limine* Order, Dkt. 226, at 2–3 (emphasis added).  And

---

Struggling for a new angle of attack, Aguilar contends that "[c]ourts in and beyond the Second Circuit routinely grant relief when a party reasonably relies on a trial court's prior rulings to craft trial strategies and later is prejudiced when the court backtracks on those rulings."  Def.'s Mem. at 28.  But for a practice Aguilar paints as "routine," none of the cases he cites supports his proposition.  *Id.*; Def.'s Reply at 13.  In fact, in not one of the Second Circuit cases in this line did the court find prejudice at all, much less prejudice arising from a pre-trial evidentiary ruling (on Rule 403 grounds or otherwise) that later shifted in the context of trial.  In *Warner Bros, Inc. v. Am. Broad. Cos., Inc.*, 720 F.2d 231 (2d Cir. 1983), the district court initially denied defendant's summary judgment motion following full briefing, but after a two-week pretrial conference, granted partial summary judgment.  *Id.* at 238–39.  The court later *sua sponte* granted total summary judgment to defendant after re-reviewing all of plaintiff's evidence.  *Id.* at 246.  The Second Circuit found no procedural error, recognizing a trial court's "discretion to reconsider an interlocutory ruling."  *Id.* at 245–46.  In *United States v. Tapia-Ortiz*, 593 F. App'x 68 (2d Cir. 2014), the Second Circuit addressed the timeliness of a *pro se* litigant's appeal where it was unclear whether the district court construed a Federal Rule of Criminal Procedure 36 motion as a civil habeas petition, noted the court's ambiguous language and potential for litigant confusion, but affirmed.  *Id.* at 70–71.  And finally, in *Caruso v. Forslund*, 47 F.3d 27 (2d Cir. 1995), the Second Circuit remarked that the district court's statement at a charge conference that it would reserve a punitive damages charge might have "lulled the plaintiff into failing to object," but that ultimately, there was "no excuse for plaintiff's failure to raise the issue."  *Id.* at 31.

although it could not "presently conceive" of others, the Court explicitly noted that its ruling was "[w]ithout prejudice to the government's argument to the contrary at the time of trial." *Id.* at 3. While Aguilar represents the Court's order as identifying "only" two ways the door could be opened to this evidence, *see* Def.'s Mem. at 26, the Court's Order was not so limited. Put simply, Aguilar's reliance on the Court's June 2023 pre-trial Rule 403 assessment, in the face of the unsettled nature of that balance and the reality that the evidence's admissibility continued to be highly contested, falls well short of meeting his burden of showing "manifest injustice" tilting the scales and warranting a new trial. *See Ferguson*, 246 F.3d at 134.

With respect to the events occurring at trial and the Court's ultimate decision to permit the government to introduce evidence of Aguilar's kickbacks taken from funds controlled by Lionel Hanst, Aguilar rehashes his argument that defense counsel's line of questioning during cross-examination of Nilsen Arias and Antonio Pere did not create a misleading inference that equated the receipt of kickbacks to knowledge that bribery was afoot. *See* Def's Mem. at 33–38. Especially given the Court's ruling that, in the context of opening the door to the admission of diversion scheme evidence, further inquiry about kickbacks received by other oil traders should not be pursued, *see* Tr. at 490:21–22, the Court need not recapitulate the reasoning behind its decision to permit the government to cure the misimpression created by defense counsel's cross-examination, which it explained in detail in its February 22, 2024 Memorandum Opinion. *See* Kickbacks Mem. Op. at 1–6; *see also United States v. Bilzerian*, 926 F.2d 1285, 1296 (2d Cir. 1991) ("The weighing of relevance under Rule 403 may be altered when a false impression is created by earlier testimony."). For the reasons stated in that Memorandum Opinion, the Court finds no error in its decision to admit evidence of Aguilar's kickbacks. *See United States v. Napout*, 332 F. Supp. 2d 533, 556 (E.D.N.Y. 2018) (denying defendant's new trial motion

challenging court's reconsideration of pre-trial evidentiary ruling).  So, too, for Aguilar's charge that the Court "improperly overlooked the government's failure to satisfy the 'Offer of Proof.'" *See* Def.'s Mem. at 38–41; Kickbacks Mem. Op. at 5–6 (discussing offer of proof and government's satisfaction of it); Tr. at 2207 (same).

Aguilar's prejudice argument fares no better.  According to him, the Court's admission of kickback evidence resulted in undue prejudice because (1) the government called Michael Petron to present a flow-of-funds analysis, part of which included tracing Aguilar's kickbacks, and (2) the government improperly emphasized the propensity inference that the jury could draw from the kickback evidence.  Def.'s Mem. at 41–44.  The Court already rejected Aguilar's argument that Petron should not have been permitted to testify, *see* 2/5/2024 Order, a decision the Court finds no error in now.  In any event, Petron's testimony spanned topics broader than Aguilar's kickbacks, *see* Tr. at 3128–3213; Aguilar's contention that the Court's ruling on kickback evidence was the sole reason Petron was able to testify is therefore erroneous.

The next claim of prejudice rests on Aguilar's contention that the government wrongfully "exploited" the admission of the evidence to establish criminal propensity.  Def.'s Mem. at 43. Defendant's rear-view mirror analysis is without merit.  First, the case law on which Aguilar relies dealt with evidence admitted under Rule 404(b).  *See id.* (first citing *United States v. McCallum*, 584 F.3d 471, 477 (2d Cir. 2009), and then citing *United States v. Newton*, No. S101-cr-635 (CSH), 2002 WL 230964, at *5 (S.D.N.Y. Feb. 14, 2002)).  As the Court has repeatedly held, evidence of Aguilar's kickbacks constituted direct evidence of the charged schemes, 6/2/2023 *In Limine* Order at 2–3; Kickbacks Mem. Op. at 1, and was admitted as such.  Second, especially due to the inference created by the defense during trial, which led to its admission, evidence of Aguilar's kickbacks *was* highly probative of his control over funds sent from Vitol to Lionel Hanst and his

knowledge that bribery was afoot.  Kickbacks Mem. Op. at 4–5; Tr. at 1661:23–1663:2.  Indeed, although Aguilar protests that the government used the evidence to push a propensity argument during summation, the transcript quotes he himself cites reveal nothing more than the government's emphasis to the jury that Aguilar's kickbacks evidenced his knowledge and control over Vitol's bribe money, not to show that his embezzlement of Vitol's funds should be used by the jury as evidence of his disposition to commit the crimes charged against him in this case.  *See* Def.'s Mem. at 43–44 (quoting Tr. at 3544:7–11 ("[Aguilar] *knew* that these contracts and invoices were fake." (emphasis added)); *id.* at 3545:25–3547:6 ("[Aguilar] *knew* what he was doing with the Peres." (emphasis added)); *id.* at 3565:15–23 ("[Aguilar] *knew* he could move money through Hanst." (emphasis added))).  The Court thus finds no error in its admission of this evidence or with the government's summation.[11]

## B.  FCPA Affirmative Defense

After the close of evidence, Aguilar requested that the Court in its charge instruct the jury on the FCPA's affirmative defense.  *See* Def.'s Affirmative Defense Ltr. Mot., Dkt. 316, at 1–4.  He now contends that the Court's refusal to do so constitutes error requiring a new trial on all counts.  *See* Def.'s Mem. at 45–52; Def.'s Reply at 18–23. At trial, Aguilar linked his charge

---

[11]  Even assuming error in admitting the evidence, any such error was harmless.  There is a landslide of other evidence attesting to Aguilar's knowledge and willful participation in the schemes, including documents showing inculpatory communications (including Aguilar's) through alias email accounts, *see e.g.*, GX 1345-T, evidence that the bribe payments were effectuated through a concealed web using intermediaries outside of Vitol's traditional payment mechanisms, hours of phone call recordings in which Aguilar and his co-conspirators, using code, discussed the schemes and the bribe payments involved, *see, e.g.*, GX 3504-T; GX 3516, and the testimony of six co-conspirators who testified to Aguilar's involvement, *see, e.g.*, Tr. at 91:7–12 (Arias); *id.* at 2653:8–13 (Espinosa); *id.* at 2960:16–21 (Guzman).  In light of this non-exhaustive mountain of evidence independent from the kickback evidence, the Court has no concern that, by virtue of the evidence's admission, "an innocent person may have been convicted."  *McPartland*, 81 F.4th at 123 (quoting *Ferguson*, 246 F.3d at 134).

request to the Court's finding, as a matter of law, that Espinosa and Guzman were not "public servants" within Article 222(II) of Mexico's penal code, to his entitlement to an instruction that it is an affirmative defense to the FCPA where "the payment, gift, offer, or promise of anything of value that was made, was lawful under the written laws and regulations of the foreign official's . . . country." 15 U.S.C. § 78dd-2(c)(1).  Rejected at trial, Aguilar renews his arguments now.

Defendant's argument essentially asks the Court to conflate its finding that Espinosa and Guzman were not public servants for purposes of violating a single section of Mexico's criminal law into a finding that the conduct was lawful under all sections of Mexican law.[12]  His reading falsely equates "not unlawful under *a* written law" with "lawful under *the* written law*s*."  *See* 15 U.S.C. § 78dd-2(c)(1) (emphases added).  But just because the conduct was not unlawful under Article 222(II) does not mean it was *lawful* under Mexico's written laws.  *See* 2/20/2024 Order.  Indeed, in *United States v. Ng Lap Seng*, court in the Southern District rejected a defendant's similar interpretation of the affirmative defense—that, if he could show that no law in Antigua or the Dominican Republic proscribed the payments, he was entitled to the affirmative defense.  No. 15-cr-706 (S.D.N.Y.), Trial Tr. 715-16.  The court held such an interpretation to be "inconsistent with the plain meaning of the language" of the statute.  *Id.*  That logic applies equally here.  In *Ng Lap Seng*, pointing to the absence of laws making conduct unlawful was insufficient to show that the payments were lawful.  Here, pointing to one law that does not make the conduct unlawful is equally insufficient to show that it is lawful.

---

[12]  To be clear, contrary to Aguilar's reading of the Court's Order regarding Article 222(II), the Court did not hold that Mexican antibribery law "did not proscribe the payments."  Def.'s Mem. at 48; Def.'s Reply at 20.  The Court's Order answered the narrow question before it: whether Guzman and Espinosa were "public servants" within the meaning of Article 212 as that term is used in Article 222(II).  The Court did not make any pronouncement of whether the payments were lawful generally under Mexico law.

Nor can Aguilar's reading be squared with congressional intent.  As courts within and outside this circuit have recognized, when construing the FCPA's affirmative defenses, Congress "narrowly defin[ed] exceptions and affirmative defenses against a backdrop of broad applicability."  *See United States v. Kay*, 359 F.3d 738, 756 (5th Cir. 2004); *see also United States v. Kozeny*, 493 F. Supp. 2d 693, 705 (S.D.N.Y. 2007).  That much is confirmed by the legislative history.  When Congress amended the FCPA to add the written laws affirmative defense, the conference report emphasized that "[t]he Conferees wish to make clear that the absence of written laws in a foreign official's country would not by itself be sufficient to satisfy this defense."  H.R. Conf. Rep. 100-576, 922, 1988 U.S.C.C.A.N. 1547, 1955.  The conference report thus reinforces the statutory text: whether Aguilar's payments were not *un*lawful under one—or any—provision of Mexican law does not entitle him to the affirmative defense that the payments were lawful.[13]

Moreover, Aguilar's reading is atextual in that it imports an additional element into the FCPA: under his theory, prosecution under the FCPA would necessarily be tethered to the existence of a provision of foreign law that criminalizes the defendant's specific conduct at issue.  *See* 2/20/2024 Order.  Practically speaking, under Aguilar's interpretation, the affirmative defense would be redrawn as a pleading obligation to show, presumably after an exhausting examination of the laws of the country victimized by corruption, that the payments could be punishable under

---

[13]  For all of its irony, defendant accepts, as he must, that it is his burden to prove the affirmative defense.  *See* Def.'s Mem. at 49.  Acceptance of that burden rings the death knell for his argument: beyond contending that the payments to Guzman and Espinosa were not unlawful under Article 222(II), Aguilar makes no effort to argue that they were not unlawful under other provisions of Mexican law—an argument that would still be insufficient under the statute.  This is perhaps due to his earlier concessions that "Article 212 . . . is not the only law that proscribes bribery, it is just the one that applies to public servants," and "PPI employees are subject to the same criminal, civil, and employment sanctions that apply to all private-company employees who steal from or defraud their employers by engaging in bribery, embezzlement, or other forms of corrupt conduct." Def.'s Ltr. Re Mexican Bribery Law, Dkt. 290, at 4.  It is most compelling, to be sure, that Aguilar does not, for he cannot, point to any provision of Mexican law making the payments lawful.

at least one provision of that country's law before the government could charge a violation of domestic law.  The statute's text does not contain such a requirement.  Were the Court to adopt Aguilar's approach, the statutory language—"lawful under the written laws"—would be meaningless.  Aguilar's argument is no more meritorious this time around, and he is accordingly not entitled to a new trial on this basis.

C.  Evidentiary Spillover

Aguilar next contends that he is entitled to a new trial on all counts based on the prejudicial spillover impact of evidence adduced at trial in the prosecution of the Mexico scheme as charged in Count Three.  Def.'s Mem. at 71–74; Def.'s Reply at 31–32.  Invalidation of a count in the indictment, however, is a condition precedent to a successful motion on this ground.  *See United States v. Rooney*, 37 F.3d 847, 855 (2d Cir. 1994) ("When an appellate court reverses some but not all counts of a multicount conviction, the court must determine if prejudicial spillover from evidence introduced in support of the reversed count requires the remaining convictions to be upset."); Def.'s Mem. at 71; Def.'s Reply at 31.

To the extent Aguilar's argument stems from the Court's decision finding Guzman and Espinosa to not qualify as "public servants" under Article 222(II) of the Mexican penal code, thereby eliminating the charged specified unlawful activity of violating that provision of foreign law, that decision did not invalidate Count Three, it merely removed one of the three charged specified unlawful activities undergirding that Count.  And, as explained *supra* Section I, the government produced more than sufficient evidence permitting the jury to convict Aguilar on Count Three in connection with the specified unlawful activity of violating the FCPA through the Mexico scheme that was unaffected by the Court's ruling that Espinosa and Guzman were not public servants under Article 222(II).  This branch of Aguilar's motion is therefore denied.

D. The Airport Statements

With the focus returning to the 2020 interview of Aguilar by two federal agents at IAH in Houston, Texas, defendant's new trial motion is an echo of the early days of this prosecution. The arguments have not changed much, nor has the evidence. The lifeblood of Aguilar's argument is, as it was then, that he was in custody at the time of his interview with the agents and that the statements he made must be suppressed because they were obtained in violation of his Fifth Amendment rights.[14] Def.'s Mem. at 77–84; Def.'s Reply at 35–38. But defendants aggrieved by the impact of unsuppressed statements at trial "may not use Rule 33 as a vehicle to relitigate pretrial rulings with which [they] disagree[]." *United States v. Flom*, 256 F. Supp. 3d 253, 272 (E.D.N.Y. 2017), *aff'd*, 763 F. App'x 27 (2d Cir. 2019).

In a feeble effort to scrape together a new argument, Aguilar contends that the Court erred in "largely rest[ing]" its prior decision on a finding that two Customs officers informed Aguilar that he could leave, because he was subsequently approached by FBI agents, and thus clearly was not free to go. Def.'s Mem. at 80; *see also* Def.'s Reply at 36. Assuming solely for purposes of argument that defendant's challenging the Court's suppression findings can be transmuted into an argument for a new trial under Rule 33, such successful transmutation would do nothing to shore up the feeble nature of his argument that is rooted in his misreading of the Court's findings at the suppression hearing. Specifically, rather than hitch its "free to leave" finding on the statements of

---

[14] Just as before, Aguilar now cites the fact that the interview was conducted at an airport, in an interview room with two armed federal agents and with other Customs officers outside, while he was in a chair bound to the table and was questioned for over an hour. *Compare* Def.'s Mem. at 78–79, *with* Mot. to Suppress, Dkt. 66-1, at 7–9, 17–27; *see also* Post-Hr'g Suppression Mem., Dkt. 97, at 10–14. And, again, Aguilar urges the Court to discredit the agents' statements to him that he was free to leave, contending both now and then that the circumstances and setting of the interview negated any belief that he was in fact free to leave. *Compare* Def.'s Mem. at 80–81, *with* Mot. to Suppress at 23–30; *see also* Post-Hr'g Suppression Mem. at 14, 47.

the Customs officers made *before* Aguilar was questioned by FBI Special Agents Wood and Zukas, as Aguilar contends, the Court *actually* emphasized that it found credible the testimony of Special Agents Zukas and Wood themselves that they informed him that he was free to terminate the encounter and leave at any time.  Suppression Order, Dkt. 106, at 6, 12–13.

In yet another overreach, Aguilar repackages his suppression hearing contention that, because the agents who interviewed him at the airport believed he was guilty, those subjective beliefs of the agents converted the interview into a custodial interrogation.  *Compare* Def.'s Mem. at 81–82, *with* Post-Hr'g Suppression Mem. at 40–43.  He reinforces his argument by reference to a Supreme Court precedent he claims the Court overlooked, *Stansbury v. California*, for the proposition that "an agent's 'beliefs concerning the potential culpability of the individual being questioned' support a finding that the suspect was in *Miranda* custody when the officer reveals those beliefs to the suspect 'by word or deed.'"  Def.'s Mem. at 81–82 (quoting *Stansbury*, 511 U.S. 318, 325, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994)).  However, as the *Stansbury* Court made clear, an officer's subjective belief is "relevant only to the extent [it] would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'"  *Id.* (internal citations omitted).  Thus, an agent's or officer's subjective belief, "if undisclosed, does not bear upon" the Fifth Amendment inquiry, and even when disclosed, is merely "one among many factors that bear upon the" custody assessment.[15]  *Id.* at 324–25.

Reinforced by *Stansbury*, Aguilar's argument, at its essence, is that because of his preconceived belief of Aguilar's guilt, Agent Wood "worked aggressively over 90 minutes to try

---

[15]  For example, even an agent's "clear statement" to the suspect that he is a prime suspect "is not, in itself dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest."  *Id.*

to" get his admission of guilt "in a coercive, government-controlled setting," converting the interview from what it might otherwise have been to a custodial interrogation. Def.'s Mem. at 82. The aspirational meanders far from reality. Put simply, Aguilar points to nothing more than the same conditions that the Court has already held to not be custodial. Being unable to pinpoint anything indicating that Agent Wood disclosed any subjective belief—let alone that the disclosure unconstitutionally infected the interview—*Stansbury* is no life raft for Aguilar's new trial hopes. *See Flom*, 256 F. Supp. 3d at 272.

Unable to take out the suppression hearing with a single missile, defendant turns to a more traditional ground game—taking scatter gunshots at Agent Wood's credibility as a witness: namely, his fading memory, lack of notes, minimal involvement in the case prior to the interview, and the fact that the interview was not recorded. Def.'s Mem. at 83–84. The Court found these same arguments, *see* Post-Hr'g Suppression Mem. at 14–15, 68, unpersuasive, when it deemed Agent Wood's testimony credible. *See, e.g.*, Suppression Order at 16 (rejecting defense's "standard impeachment nibbles in an attempt to plant seeds of doubt about the veracity of the agents' testimony"). What's more, at trial, Agent Wood's credibility was put to the test by defense counsel's rigorous cross-examination on exactly these topics. Tr. at 2523–2525. The "[j]urors were aware that they could accept or reject [Agent Wood's] testimony," and, seemingly having accepted it, the Court will not substitute its credibility determinations for that of the jury had they been deficient. *United States v. Guerrero*, 882 F. Supp. 2d 463, 488 (S.D.N.Y. 2011), *aff'd*, 560 F. App'x 110 (2d Cir. 2014), *and aff'd*, 813 F.3d 462 (2d Cir. 2016). Accordingly, Aguilar's Fifth Amendment qualms do not warrant revisiting the Suppression Order, much less granting a new trial.

Nor does Aguilar's related evidentiary argument pursuant to Rule 403 compel a different

result.  As the government points out, *see* Gov't Opp'n at 55, Aguilar failed to interpose a Rule 403 objection to Agent Wood's testimony during trial.  It is therefore waived.  *See United States v. Amato*, 31 F. App'x 21, 24 (2d Cir. 2002); Fed. R. Evid. 103(a).  Even assuming, *arguendo*, that Aguilar did object, since the trial court would have the discretion to grant relief barring evidence that was otherwise relevant and probative, *see United States v. Yousef*, 327 F.3d 56, 121 (2d Cir. 2003), his Rule 403 argument—that Agent Wood's testimony was cumulative and therefore minimally probative, while the prejudicial effect was "enormous" because juries place undue weight on confessions or admissions of guilt—is unpersuasive.  *See* Def.'s Mem. at 84–86.

Reflection on the objection not made brings us to the substance of defendant's quandary.  In the same breath that Aguilar contends that the government failed to prove beyond a reasonable doubt his knowledge of bribes being paid to foreign officials, Def.'s Mem. at 87–92, he simultaneously contends that Agent Wood's testimony was cumulative of "the dozens of hours of recorded conversations" and "*hundreds* of pages of [his] emails that the government showed the jury" as evidence of knowledge.  *Id.* at 85 (emphasis in original).  Consequently, no matter how he cuts it, Aguilar recognizes that the issue of knowledge was a highly contested focal point of trial—particularly his knowledge of the fact that the Pere brothers were paying bribes to foreign officials.  Agent Wood testified about Aguilar's very own statements when questioned directly about the Pere brothers, Lionel Hanst, and the payment of money to foreign officials.[16]  Agent Wood's testimony presented a unique revelation of Aguilar's knowledge about matters at the heart of the case in Aguilar's own words, making the testimony highly probative of Aguilar's knowledge and intentional participation in the paying of bribes.

---

[16]  Indeed, Agent Wood testified that Aguilar claimed to not know the Peres (specifically, Enrique Pere's name) mere months after a sit-down lunch meeting with the Pere brothers on March 15, 2020.  *See* GX 3513 (lunch meeting recording); Tr. at 2606:18–21.

Furthermore, contrary to Aguilar's insistence, the potential prejudice occasioned by the risk that the jury would unduly weigh Agent Wood's testimony was sufficiently assuaged both by the defense's rigorous cross-examination of him, as noted *supra*, as well as by the Court's instruction to the jury on both law enforcement officer credibility and on defendant's statements made to law enforcement.   Tr. at 3813:19–3814:11 (law enforcement testimony charge); *id.* at 3818:20–3819:10 (consciousness of guilt charge); *see United States v. Botero-Jaramillo*, 118 F. App'x 535, 538 (2d Cir. 2004) (summary order) (finding risk that jury would place undue weight on FBI agent's testimony mitigated by district court's admonition that "testimony of a law enforcement officer is entitled to no special treatment or consideration").  In any event, considering all of the arguments individually and collectively, Aguilar has not carried his burden to show that Agent Wood's testimony yielded a "manifest injustice," and his Rule 33 motion is therefore denied on these grounds.  *Ferguson*, 246 F.3d at 134.

### E.  The Breadth of Count Three

Aguilar next moves for a new trial on Count Three only, asserting that the government pulled a fast one on him during trial and abandoned its theory of liability that PPI itself was an instrumentality in exchange for a "new theory of criminality": that Guzman and Espinosa worked on behalf of PEMEX.  Def.'s Mem. at 52–64; Def.'s Reply at 23–25.  This shift, Aguilar contends, constituted both a constructive amendment to the Indictment and a prejudicial variance.  Def.'s Mem. at 53.  It was neither.

#### i.  Constructive Amendment

Defendant principally argues that the government constructively amended the Indictment when it provided the jury with two alternatives for establishing that Guzman and Espinosa were "foreign officials" under the FCPA: (1) that PPI was an instrumentality; or (2) that,

24

notwithstanding PPI's status, Guzman and Espinosa acted on behalf of PEMEX, an instrumentality.  Def.'s Mem. at 59.  Aguilar contends that the second pathway to conviction was introduced at the eleventh hour of trial.  *Id.* at 60–62.

As with virtually all remedies designed to upset the verdict of a jury, the test is hard and the barrier firm.  "[T]o establish a constructive amendment, a defendant must show that the trial evidence or jury instructions 'so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment.'"  *United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014) (quoting *United States v. Rigas*, 490 F.3d 207, 227 (2d Cir. 2007)).  In other words, "a constructive amendment occurs where the government introduces proof of 'a complex of facts distinctly different from that' charged by the grand jury, not where it merely amends details pertaining to 'a single set of discrete facts' set forth in the indictment."  *Id.* at 223 (citing *United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012)).

"Not every divergence from the terms of an indictment, however, qualifies as a constructive amendment."  *Id.* at 220.  "For example, there is no constructive amendment 'where a generally framed indictment encompasses the specific legal theory or evidence used at trial.'"  *United States v. Teman*, 465 F. Supp. 3d 277, 295 (S.D.N.Y. 2020), *aff'd*, No. 21-1920-CR, 2023 WL 3882974 (2d Cir. June 8, 2023) (quoting *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003)).  Such is consistent with the reality that the Second Circuit has long followed the practice of "'permitt[ing] significant flexibility in proof' adduced at trial to support a defendant's conviction, 'provided that the defendant was given notice of the core of criminality to be proven' against him."  *Bastian*, 770 F.3d at 220 (citing *D'Amelio*, 683 F.3d at 417).  Thus, "[s]o long as the indictment identifies the 'essence of [the] crime' against which the defendant must defend himself,

discrepancies in 'the particulars of how a defendant effected the crime' do not constructively amend the indictment." *Id.* (citing *D'Amelio*, 683 F.3d at 418).

In the end, Aguilar's argument is superfluous because it is flattened by the words of the Superseding Indictment. It is axiomatic that, for an indictment to be constructively amended, the proof at trial must differ from what the indictment charges. The Superseding Indictment expressly charges that both Guzman and Espinosa were not only employees of PPI, but also that both individuals "acted in an official capacity for and on behalf of PEMEX."[17] Superseding Indictment, Dkt. 120, at ¶¶ 9 (Guzman), 10 (Espinosa).[18] Similarly, when describing the Mexico scheme, the government expressly charged that Aguilar paid bribes to Mexican officials—including Guzman and Espinosa—"in exchange for, among other things, securing improper advantages for Vitol in obtaining and retaining business *with PEMEX*." *Id.* at ¶ 37 (emphasis added). That the government's trial strategy focused less—in Aguilar's eyes—on its theory that Guzman and Espinosa worked on behalf of PEMEX and more on its argument that PPI was itself an instrumentality[19] does not mean that the proof at trial "differ[ed] significantly from the charge

---

[17] In fact, as Aguilar concedes, "the FCPA's text equally supports the government's new theory of criminality by defining 'foreign official' to include 'any person acting in an official capacity for or on behalf of any [foreign] government . . . instrumentality.'" Def.'s Mem. at 62 (citing 15 U.S.C. §§ 78dd-2(h)(2)(A), 78dd-3(f)(2)(A) (alteration in original)).

[18] Pointedly, when forced to confront the words of the Indictment, Aguilar's only rebuttal is that the Superseding Indictment focused more on PPI as an instrumentality than on the alternative theory. Def.'s Reply at 24.

[19] It bears repeating that whether, under Mexican law, Guzman and Espinosa were "public servants" within the meaning of Mexico's penal code is a distinct inquiry from whether PPI is an instrumentality under the FCPA, or whether individuals employed for a non-governmental entity may still act "on behalf of" an instrumentality for FCPA purposes. As such, Aguilar's contention that "the Court . . . drove in the final nail in the coffin on PPI's purported status as an FCPA instrumentality," Def.'s Mem. at 58, erroneously blurs the fault lines between domestic and foreign law.

upon which the grand jury voted,"[20] where the grand jury indictment contained *both* theories.[21] *United States v. Dove*, 884 F.3d 138, 146 (2d Cir. 2018); *see also Teman*, 465 F. Supp. 3d at 295 ("[T]here is no constructive amendment 'where a generally framed indictment encompasses the specific legal theory . . . used at trial.'" (quoting *Salmonese*, 352 F.3d at 620)). The evidence adduced at trial was therefore "wholly consistent with the terms of the superseding indictment voted on by the grand jury," *Dove*, 884 F.3d at 149, and does not warrant a new trial.

### ii.  Prejudicial Variance

In the alternative, Aguilar contends that the same "shift" constituted a prejudicial variance separately warranting a new trial. Def.'s Mem. at 63–64. "A variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." *Dove*, 884 F.3d at 149. In other words, where a constructive amendment requires that "the evidence or the jury charge on which [defendant] was tried broaden[ed] the possible bases for conviction beyond the indictment voted on by the grand jury, a defendant alleging a variance must establish that the evidence offered at trial differs materially from the evidence alleged in the indictment." *Id.* A defendant seeking a new trial based on a variance must show "(1) the existence of a variance, and (2) that 'substantial prejudice' occurred at trial as a result." *Id.* (citing *United States v. McDermott*, 245 F.3d 133, 139 (2d Cir. 2001)).

For reasons similar to those discussed above, it cannot be said that the evidence at trial

---

[20] Ironically, as the government points out, Gov't Opp'n at 46–47, Aguilar himself requested that the Court add to its jury charges the government's second "foreign official" theory. *See* Aguilar Request to Charge, Dkt. 231, at 30.

[21] Bluntly, despite Aguilar's characterization of the government's theory as being one that sprouted at the "eleventh hour" during trial, and notwithstanding the fact that the theory was actually charged in the Indictment, the government adhered to its theory in opening statements. *See* Tr. at 47:1–8 ("Among other things, you'll learn that everything those officials did, everything, was *for and on behalf of PEMEX* and the Mexican government." (emphasis added)). If the government was hiding this theory, it was hiding it out in the clear light of day.

"materially differed" from that charged in the Indictment.  Both Guzman and Espinosa were described in the Indictment as having worked in an official capacity on behalf of PEMEX and charged with receiving bribes from Aguilar in connection with his effort to retain business with PEMEX.  Superseding Indictment ¶¶ 9–10, 37.  Again, even if a jury were to conclude that PPI is not itself an instrumentality under the FCPA—despite the ample evidence in the record that would permit a rational juror from concluding otherwise, *see supra* Section I—the evidence adduced at trial about the relationship between PPI and PEMEX clearly supported a finding that, as charged in the Indictment, Guzman and Espinosa acted on behalf of PEMEX under the government's second theory.  *See, e.g.*, Tr. at 2652:25–2653:3 ("I (Espinosa) was responsible for buying goods and services on behalf of PEMEX."); *id.* at 2664:13–17 ("[PPI] is part of the Dirección Operativa de Procura Abastecimiento, which is the domestic buying department for PEMEX."); *id.* at 2667:16–19 ("[E]verything that [] is done in Pemex Procurement International is reported back to . . . the DOPA department in PEMEX.  So, they would kind of be the bosses of – our office here in Houston.").  Such testimony leaves no gap between the evidence produced by the government and the words of the Superseding Indictment.

As for prejudice, Aguilar contends that he was prejudiced because he had "extensively prepared for and," in the defense's view, "successfully rebutted" the government's theory that PPI itself was an instrumentality of the Mexican government, and that the government's so-called late-bloomed other theory "depriv[ed] him of the time and opportunity to" rebut that Guzman and Espinosa acted on behalf of PEMEX.  Def.'s Mem. at 63–64.  Yet, that defense counsel now lament that they did not adequately prepare to rebut a theory presented in the plain terms of the Superseding Indictment does not blossom into a Fifth Amendment violation.  *See United States v. Khalupsky*, 5 F.4th 279, 294 (2d Cir. 2021) ("[T]he superseding indictment itself put [the

defendant] on notice of much of the evidence about which he [now] complains."). Consequently, because there was, in fact, no variance from which Aguilar was prejudiced, this branch of his motion for a new trial on Count Three is denied.

### F. Unanimity on Specified Unlawful Activities

On this branch of his Rule 33 motion for a new trial as to Count Three, defendant contends that the Court erred in failing to instruct the jury that the jurors had to be unanimous as to which specified unlawful activity they found to be the purpose of the money laundering conspiracy charged in that Count. Def.'s Mem. at 74–77; Def.'s Reply at 32–35. Aguilar argues that the charge, in the absence of the claimed missing instruction, violated the constitutional guarantee that the jurors unanimously agree to "the nature of the defendant's violation." Def.'s Mem. at 76 (quoting *McKoy v. North Carolina*, 494 U.S. 433, 450 n.5, 110 S. Ct. 1227, 1237, 108 L. Ed. 2d 369 (1990) (Blackmun, J., concurring)).

To recapitulate, Count Three charged Aguilar with conspiring to launder money in violation of 18 U.S.C. § 1956(h)—a conspiracy which the government charged as having two objects: (1) a "promotional" object, and (2) a "concealment" object. *See* Superseding Indictment ¶ 56(a)–(b); 18 U.S.C. §§ 1956(a)(2)(A), 1956(a)(2)(B)(i). Underlying each object was an "intent to promote the carrying on" of two specified unlawful activities: (1) felony violations of the FCPA (relating to the Ecuador or Mexico scheme); and (2) offenses against a foreign nation in violation of the Ecuadorian penal code.[22] *See* Superseding Indictment ¶ 56(a)–(b). In its final instructions, the Court charged the jury that it must be unanimous on its conviction as to the object underlying Count Three. *See* Tr. at 3842:25–3843:7; *see also* Verdict Sheet, Dkt. 315, at 2. But beyond

---

[22] The third charged specified unlawful activity, offenses against a foreign nation in violation of the Mexican penal code, was eliminated by the Court's decision regarding Article 222(II). *See supra* Section II.C.

requiring unanimity as to the conspiracy's *object*, defendant contends that it was constitutionally infirm to not require additional unanimity as to the specified unlawful activity animating each object.

The over-arching law on this point is clear that unanimity is required as to each element of a charged offense. *See United States v. Estevez*, 961 F.3d 519, 527 (2d Cir. 2020); *United States v. Requena*, 980 F.3d 30, 48 (2d Cir. 2020) (quoting *Richardson v. United States*, 526 U.S. 813, 817, 119 S. Ct. 1707, 143 L. Ed. 2d 985 (1999)).   Surely, at times, there may be evidence of different means by which the defendant violated the law as charged in the indictment.   But, it does not matter whether all jurors agree to the same means used by the defendant to commit the crime, "'as long as all 12 jurors unanimously conclude that the Government has proved the necessary [] element'" of the crime related to the use of these means.[23]  *Requena*, 980 F.3d at 48–49 (cleaned up) (quoting *Richardson*, 526 U.S. at 817).   Accordingly, if the specified unlawful activities do not constitute elements of a money laundering offense, the jury need not have been unanimous as to those specified unlawful activities.

Aguilar's demand for granular unanimity is, however, foreclosed by case law.   The Second Circuit has rejected the notion that a specified unlawful activity charged within money laundering

---

[23]   To illustrate the distinction, the Second Circuit in *Requena* adopted the Supreme Court's discussion in *Mathis v. United States*, 579 U.S. 500, 136 S. Ct. 2243, 195 L. Ed. 2d 604 (2016), of a hypothetical statute requiring "'use of a deadly weapon' as an essential element of a crime" and further providing that "use of a 'knife, gun, bat, or similar weapon' would all qualify" as a deadly weapon.   *Requena*, 980 F.3d at 49 (quoting *Mathis*, 579 U.S. at 506) (internal quotation marks omitted).   Use of a deadly weapon *is* an element, but the list of deadly weapons provides "'diverse means of satisfying [that] element."   *Id.* (quoting *Mathis*, 579 U.S. at 506).   Thus, "a 'jury could convict even if some jurors concluded that the defendant used a knife while others concluded he used a gun, so long as all agreed that the defendant used a "deadly weapon."'"   *Id.* (quoting *Mathis*, 579 U.S. at 506) (internal quotation marks omitted).   Unanimity was required as to use of a deadly weapon—the element of the crime—but not as to which possible weapon from a list a defendant used to satisfy the element.

conspiracy is an essential element of the crime.  *See United States v. Stavroulakis*, 952 F.2d 686, 691–92 (2d Cir. 1992).  As the court explained, "Section 1956 does not penalize the underlying unlawful activity from which the tainted money is derived. . . . The statute [] does not distinguish among the[] specified unlawful activities either in degrees of importance or levels of criminal culpability."  *Id.* at 691; *see also Requena*, 980 F.3d at 49 (statutory alternatives not elements where they do not carry different minimum or maximum punishments).  Indeed, "[a]ll the specified unlawful activities are clustered, almost willy-nilly, under a single definition section of the statute. So long as the cash is represented to have come from *any* of these activities, a defendant is guilty of the substantive offense of money laundering."  *Stavroulakis*, 952 F.2d at 691 (emphasis in original).  That is because, as confirmed by the legislative history, "the focal point of the statute is the laundering process, not the underlying unlawful conduct that soiled the money."  *Id.* Accordingly, because the specified unlawful activity underlying Aguilar's conviction of conspiracy to launder money is not an essential element, unanimity as to which specified unlawful activity or activities triggered the violation of the statute was not required; unanimity that the elements of the crime they supported were present is all that was required.[24]

Try as he might, Aguilar cannot plausibly distinguish this controlling case law.  Contrary

---

[24]  Aguilar mistakenly asserts that the Court twice relied on *United States v. Liersch*, No. 04-cr-2521 (JSR), 2005 WL 6414047, at *8 (S.D. Cal. May 2, 2005) in its orders denying Aguilar's pre-trial motions to dismiss, for the proposition that the Court committed to giving a unanimity instruction as to the specified unlawful activities.  Def.'s Mem. at 75; Def.'s Reply at 34.  But the Court's only mention of *Liersch* was in its Order denying Aguilar's first motion to dismiss, and the Court merely quoted Aguilar's position in his reply brief, in which *he* quoted *Liersch*.  *See United States v. Aguilar*, No. 1:20-CR-390 (ENV), 2023 WL 3807383, at *2 (E.D.N.Y. May 31, 2023) (Dkt. 154) (quoting Aguilar's argument in his reply brief in support of motion to dismiss, which quoted *Liersch*).  In neither opinion did the Court adopt *Liersch* or rely on it—in fact, the Court did not so much as mention it in the second order Aguilar points to.  *Compare* Def.'s Mem. at 75–76 (arguing that the Court relied on *Liersch* in its September 21, 2023 Order), *with* September 21, 2023 Order, Dkt. 176, at 1–11 (no mention of *Liersch*).

to his insistence, *see* Def.'s Mem. at 76–77, the Second Circuit in *Stavroulakis* did not limit its statutory analysis—that Section 1956 "does not penalize the underlying unlawful activity from which the tainted money is derived"—to only money laundering conspiracies with the object of concealing proceeds, as opposed to those promoting specified unlawful activities.  *Stavroulakis*, 952 F.2d at 691.  Second, while Aguilar is correct that the Second Circuit did not formally speak to jury unanimity on specified unlawful activities, there is absolutely no indication that its finding that specified unlawful activities are not elements of a money laundering conspiracy is limited in any way.  As a result, Aguilar's jury unanimity claim is without merit, and this branch of defendant's motion seeking a new trial on Count Three is also denied.

<u>Conclusion</u>

For the foregoing reasons, Aguilar's motion pursuant to Rule 29 and, alternatively, Rule 33, is denied in all respects.

So Ordered.

Dated:   Brooklyn, New York
         July 26, 2024

                                                    /s/ Eric N. Vitaliano
                                                    ERIC N. VITALIANO
                                                    United States District Judge