1867

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,        : 20-CR-00390(ENV)
                                 :
                                 :
                                 :
        -against-                : United States Courthouse
                                 : Brooklyn, New York
                                 :
                                 :
                                 : Monday, January 29, 2024
JAVIER AGUILAR,                  : 10:00 a.m.
                                 :
        Defendant.               :
                                 :
- - - - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE ERIC N. VITALIANO
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: BREON PEACE, ESQ.
                    United States Attorney
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201

                BY:  JONATHAN POWELL LAX, ESQ.
                     MATTHEW R. GALEOTTI, ESQ.
                     Assistant United States Attorneys


                    U.S. DEPARTMENT OF JUSTICE
                        Fraud Section - Criminal Division
                        1400 New York Avenue
                        Washington, DC 20005

                BY:  DEREK ETTINGER, ESQ.
                     CLAYTON P. SOLOMON, ESQ.
                     Assistant United States Attorneys

1868

```
 1  A P P E A R A N C E S:   (Continued)

 2

 3   For the Defendant:    QUINN EMANUEL URQUHART & SULLIVAN, LLP
                                51 Madison Avenue
 4                              22nd Floor
                                New York, New York 10010
 5
                          BY:  DANIEL KOFFMANN, ESQ.
 6                             NEIL T. PHILLIPS, ESQ.

 7                        QUINN EMANUEL URQUHART & SULLIVAN, LLP
                                111 Huntington Avenue
 8                              Suite 520
                                Boston, Massachusetts 02199
 9
                          BY:  MICHAEL PACKARD, ESQ.
10                             WILLIAM WEINREB, ESQ.

11

12                        QUINN EMANUEL URQUHART & SULLIVAN, LLP
                                865 South Figueroa Street
                                10th Floor
13                              Los Angeles, California 90017

14                        BY:  WILLIAM PRICE, ESQ.

15

16

17

18

19

20

21   Court Reporter:  Michele Lucchese, RPR, CRR,
                          225 Cadman Plaza, 373N
22                        Brooklyn, New York 11201
                          718-613-2272
23                        E-mail:  MLuccheseEDNY@gmail.com

24
     Proceedings recorded by computerized stenography.  Transcript
25   produced by Computer-aided Transcription.
```

Proceedings                                    1869

1          (In open court - jury not present.)

2          THE COURTROOM DEPUTY:  All rise.  Court is now open.

3    The Honorable Eric N. Vitaliano presiding.

4          Case on calendar is USA versus Aguilar, case number

5    20-CR-390 on for jury trial.

6          Will the attorneys please note their appearance,

7    beginning with Government counsel.

8          MR. LAX:  Good morning, Your Honor.  Jonathan Lax,

9    Matthew Galeotti, Derek Ettinger, Clayton Solomon, and Peyton

10   Jefferson here on behalf of the Government.

11         THE COURT:  And good morning, Mr. Lax, and to your

12   table.

13         MR. KOFFMANN:  Good morning, Your Honor.  Daniel

14   Koffmann, Michael Packard, William Price, William Weinreb,

15   Gabriella Trevino, Raymond McLeod here on behalf of Javier

16   Aguilar, who is present in court.

17         THE COURT:  And to you as well, Mr. Koffmann.

18   Welcome to you and your table and to Mr. Aguilar.

19         THE COURTROOM DEPUTY:  We also have a standby

20   Spanish interpreter, who needs to note their appearance for

21   the record and has been previously in this case.

22         THE INTERPRETER:  Roberto Orrantia, Spanish

23   interpreter.

24         THE COURT:  And good morning to you as well and

25   thank you for your service.

Proceedings                                    1870

1          THE INTERPRETER:  Good morning.

2          THE COURTROOM DEPUTY:  All parties are present,

3    including the defendant.

4          THE COURT:  Do we have any housekeeping before we

5    begin?

6          MR. LAX:  Your Honor it, is Jonathan Lax on behalf

7    of the Government.

8              As I'm sure the Court is aware and saw there were a

9    number of filings over the weekend.  I wanted to address

10   briefly the legal filing that was filed by the defense in

11   connection with the Mexico law issue and I think that Mr.

12   Galeotti intends to address the issue with respect to a filing

13   with respect to the continuing cross of Enrique Pere.

14             Both parties, as we indicated, filed, you know,

15   these sort of opening briefs, if you will, on Saturday and the

16   Government of course intends to respond on Wednesday.  I

17   imagine that the defense does as well to the Government's.

18             I did want to note really the defense's response

19   here includes over 1,000 pages of Mexico law and a declaration

20   from a Mexico law expert.  This is really just an untimely

21   disclosure.

22             As the Court recalls, when trial was reset from July

23   until now we set an entirely new briefing schedule:  Motions

24   in limine, 3500, et cetera.  One of those deadlines was for

25   the defense to disclose any experts in connection with the

Proceedings                                              1871

1   case and that deadline that was set on June 7th, the deadline

2   was October 2, 2023.  The Government had already filed its

3   expert law disclosures in May of 2023.  So for this filing to

4   come now really is just not -- it is, frankly, untimely, and I

5   think the Government is going to ask, to the extent that the

6   defense is asking the Court to rely on declarations or

7   testimony of this expert, it should be precluded.

8            MR. WEINREB:  Good morning, Your Honor.  William

9   Weinreb for Mr. Aguilar.

10           THE COURT:  Good morning.

11           MR. WEINREB:  Your Honor, if we were proposing to

12  have this expert testify in front of the jury, then I think

13  Mr. Lax's point would be well taken.  But this is a different

14  situation, that the Court is simply being asked to construe a

15  provision of the law, of Mexican law.  Under Rule 26.1, the

16  Court can consider absolutely anything.  The Court could make

17  a phone call to somebody in Mexico, you know, out of the

18  presence of the parties, ask them what their view was and

19  consider that.  There's actually case law of that authority

20  from the Eastern District of New York.

21           So we don't believe that under Rule 26.1 any

22  particular kind of disclosure is required.  As the Court

23  knows, in addition, the rules of evidence don't apply.  So

24  Rule 701 does not apply here.

25           This is simply being -- this expert is the

1   equivalent of a, you know, member of our team.

2          THE COURT:  You're saying it is a brief?

3          MR. WEINREB:  It's essentially a brief, correct.

4          THE COURT:  Mr. Lax.

5          MR. LAX:  Your Honor, I mean, look, we will

6   certainly defer to the Court as the Court wishes to proceed.

7          We had initially tentatively scheduled testimony by

8   the Government's expert for this Friday.  It may make sense,

9   to the extent the Court wants that testimony, to move that

10  expert to the following week, on the 9th.  We will defer to

11  the Court, and I think the Court has the Government's

12  position.

13         THE COURT:  We have your position and Catherine and

14  I were talking about that before we came down and the

15  first-cut of the look-see was to determine whether or not we

16  actually needed a hearing.  But as far as -- I'm never set in

17  my rules, despite maybe I succumb to it, but I've never

18  curtailed counsel's ability to write.  I know some of my

19  colleagues have page limits and the like.  Aside from

20  pre-motion conference letters, I don't have page limits.

21  People want -- every lawyer has a responsibility under the

22  code of conduct to do what he or she believes is ethical and

23  in the best interest of their client.  If that's two

24  paragraphs, it's two paragraphs.  If it's 1,000 pages, it's a

25  1,000 pages.

Proceedings                                            1873

1      So we are conducting a first-cut review with the

2  idea that there may be a hearing this Friday.  I'm sure Cat is

3  probably very happy to know that the witnesses may be around

4  on the 9th as opposed to only on the 2nd, but we will keep

5  that thought in mind either way.

6      I think we can proceed apace from there basically on

7  legal issues.  I don't know if I would go as far as Mr.

8  Weinreb suggesting to call somebody in Mexico, but pretty much

9  any source of information of an objective nature in the sense

10 of readily available to anyone, the Court can consult.  And to

11 the extent the defense has marshaled it and got it reduced to

12 only 1,000 pages, we appreciate your efforts.

13      MR. WEINREB:  Your Honor, if I might add one thing.

14 I do think that scheduling any hearing, to the extent the

15 Court is going to want one, for the 9th rather than the 2nd

16 would be the better choice in part because the Government's

17 brief that was filed over the weekend simply refers back to

18 their initial jury instruction proposal.  My suspicion is

19 they're going to have a lot more to say on the subject in

20 their opposition to our brief, and we're going to be seeing

21 many of their arguments at that point for the first time.

22      Their expert, Mr. Lopez, in his disclosure, on which

23 they've relied, simply cites the different provisions of

24 Mexican law.  He doesn't argue about them or respond to any of

25 the arguments or address any of the arguments that we've made.

Proceedings                                    1874

1   I assume we are going to be hearing something that's

2   addressing those arguments, and we're going to want a chance

3   to respond to that.  It's would really be like seeing their

4   opening brief at that point.

5           So this is not an easy question of Mexican law for

6   the Court to decide.  We want the Court to have all of the

7   information at its disposal that could be useful.  I think it

8   is mischaracterization to say we filed a thousand pages.  We

9   filed a lot of translations of Mexican law so that -- for the

10  Court's convenience.  The Court can actually look up citations

11  of Mexican law that's not in the brief itself, so it's not so

12  lengthy.  But we do think that it makes important points and

13  we think the point should be developed and we don't think

14  that's going to happen by Friday.

15          We propose if there is a hearing to be scheduled, at

16  least tentatively, that it be scheduled a week from Friday if

17  that's available on the Court's calendar.

18          THE COURT:  We hear you.  As you know, we were sort

19  of aware that we might have something this Friday, but nothing

20  has been set in stone, including whether or not we are going

21  to have any hearing.  We understand your position.  After we

22  get a chance to review what we think we have, then we can more

23  intelligently address the question of obtaining things we

24  don't have.

25          MR. WEINREB:  Very well.  Thank you, Your Honor.

Proceedings                                          1875

1          THE COURT:  You're welcome.

2          Mr. Galeotti.

3          MR. GALEOTTI:  Yes, Your Honor.  The Government

4    wants to be heard briefly in response to the letter that was

5    filed with respect to proposed cross examination of Enrique

6    Pere.  There are two categories of documents.  The first is

7    easier.  It is evidence of transmission of documents.  The

8    Government doesn't object to the DX-32, DX-9 or GX-3006.  The

9    specific messages that are identified because these are

10   transmission of documents, they're not hearsay for the

11   purposes of what the defendant is offering them.

12          The second set, though, Your Honor, the Government

13   does object to.  These contain the same content of the

14   recordings that Your Honor previously ruled on on Friday

15   prohibiting the use of those recordings.  There are several

16   reasons why these documents that the defense is proposing

17   should be precluded:  The first is they're communications

18   between two witnesses that have no relevance to Mr. Aguilar's

19   knowledge, which is the purported reason for which they are

20   being offered.  They don't go to the credibility of this

21   witness, Enrique Pere, because he didn't draft them.  The

22   defense asked the drafter of these documents, Nilsen Arias,

23   regarding these documents.  They asked him about the documents

24   themselves.  They crossed him on whether $651,000 was owed,

25   was not owed, et cetera.  He answered those questions.

Proceedings                                    1876

1           I don't think there is any dispute, or, at least,

2    not in connection with this motion, that the success fee was

3    paid.  So really all the defense is trying to do here is to

4    impeach Nilsen Arias by way of asking Mr. Enrique Pere about a

5    document that Mr. Pere did not draft, that he can't possibly

6    be sure of, and all he would be doing is referencing what is

7    on the material and given the page that he's being shown.  The

8    document's already in evidence.  The defense has crossed the

9    witness who prepared the Excel spreadsheet that they want to

10   put in and the defense can make whatever arguments.

11          Mr. Pere's cross-examination will add nothing to the

12   question of whether Mr. Aguilar was aware of this mistake by

13   Mr. Arias and will add nothing to Mr. Pere's credibility

14   because he didn't prepare the document.

15          So for all of those reasons, Your Honor, and because

16   the evidence is already in, the Government proposes that the

17   defense be precluded from putting in the documents in the

18   second portion of their letter.

19          THE COURT:  Is that the spreadsheet with the

20   handwriting on it?

21          MR. GALEOTTI:  Correct, Your Honor.

22          THE COURT:  Does the record note whose handwriting

23   it is?

24          MR. GALEOTTI:  My understanding is that it is not

25   Enrique Pere's handwriting.  We believe it is Antonio Pere's,

Proceedings                                1877

1    but I'm not certain.

2           MR. KOFFMANN:  Good morning, Your Honor.  Daniel

3    Koffmann.

4           So there are two documents that the Government has

5    objections to.  The first is the text message from Mr. Arias

6    to Enrique Pere that says 16 September 2018, paid $651,000

7    fuel oil.  As I hear the Government, it doesn't sound like

8    they're arguing that that's hearsay.  It sounds like they are

9    making a relevance argument, which I will address in a moment.

10          The second document is Defense Exhibit 31, which my

11   understanding is that some of these notes are Antonio Pere's,

12   some of them are Enrique Pere's.  We know that Enrique Pere

13   sent this document to Mr. Arias.  We can settle very quickly

14   when he testifies whose handwritten notes these are.  But,

15   again, I don't hear the Government to be arguing that this

16   document is hearsay.  So to address the relevance argument --

17          THE COURT:  One at a time.

18          Is that accurate, Mr. Galeotti?

19          MR. GALEOTTI:  Yes, Your Honor.  So we are making a

20   403 argument, not a hearsay argument here.

21          MR. KOFFMANN:  So the relevance, Your Honor, as I

22   explained on Friday, is the fact that these alleged

23   co-conspirators -- and this is continuing a line of

24   cross-examination from Mr. Arias's cross-examination -- that

25   they could not figure out what the deal was.

Proceedings                                      1878

1          At one point they believed maybe it was $225,000.

2    At one point they believed it was $800,000.  At this point

3    they believed it was $651,000.  And then ultimately they've

4    come into court and said it is $300,000.  That is relevant to

5    whether there was any deal at any point sufficient for there

6    to be a conspiracy with which Mr. Aguilar could be charged.

7          Separately, a deal that is so vague and unformed, it

8    is a fair inference, and one that we will be arguing to the

9    jury, that there would be no reason to tell Mr. Aguilar about

10   a deal that was never even finalized.  This vague notion well,

11   maybe we'll pay Mr. Arias, I don't know, we really haven't

12   figured out exactly how much it is, we keep going back and

13   forth.  It's a fair inference from that that there would be no

14   reason to tell Mr. Aguilar about a deal that has never been

15   finalized.  So it is relevant.  There is no confusion that

16   comes from that.  There is no countervailing factor under 403

17   that would substantially outweigh, let alone outweigh at all,

18   the relevance of this evidence.

19          MR. GALEOTTI:  Your Honor, so I understand why the

20   defense would want to make that argument, of course.  It just

21   is a mischaracterization of the evidence.

22          So, for starters, this is during the period of

23   Enrique Pere's cooperation.

24          Second, the evidence is actually pretty clear, and

25   Mr. Arias was crossed on this quite a bit, that he was owed

Proceedings                                          1879

1   about a million dollars, the success fee cost about $350,000

2   and he was owed another 650 or so for volume fees or whatever

3   else.  What we showed and what we showed through the testimony

4   of Enrique Pere is quite clearly how the success fee was paid.

5   I don't think that's being disputed here.  The idea that two

6   -- because there was perhaps a mistake in one co-conspirator's

7   text message to another co-conspirator during the course of

8   one of the co-conspirator's cooperation period has nothing to

9   do with Mr. Aguilar's agreement to enter into the conspiracy

10  or not.  In fact, Defense Exhibit 33, which they've again

11  admitted through Nilsen Arias properly to cross-examine him

12  about it, shows that in later iterations of the spreadsheet

13  the document says pendiente fuel oil in relationship to the

14  651, which makes clear that it was pending.  So whether there

15  was a mistake in a text message from Nilsen Arias to Enrique

16  Pere is completely irrelevant to what Mr. Aguilar knew at the

17  time or what he thought at the time and certainly irrelevant

18  with respect to a non-drafting witness' credibility.  It

19  doesn't weigh on relevance and it doesn't weigh on this

20  witness' credibility.

21              MR. KOFFMANN:  Two brief points in response, Your

22  Honor.  I appreciate that Mr. Galeotti is explaining for us

23  what the evidence is.  I thought it was the jury who decided

24  what the evidence is and what to infer from it.

25              Second, I believe Mr. Galeotti just said that a

Proceedings                                              1880

1   later version of a spreadsheet said that the amount of fuel

2   oil was pending.  I don't believe that either spreadsheet is

3   dated and I believe the evidence suggests that that

4   spreadsheet came before the spreadsheet that says that he was

5   actually paid, which is significant in and of itself because,

6   as I understand it, the Government is now arguing that he

7   wasn't paid that amount but he believes he was owed that

8   amount.  The fact that he says he was paid that amount is

9   important evidence.  It goes to exactly the point I just made,

10  which is we don't even know if there was a deal at all at any

11  point ever.  And if there was no deal, then Mr. Aguilar cannot

12  be guilty of being complicit and conspiring in that.

13              THE COURT:  All right.  We thank counsel.  We have

14  had that request that came over the weekend under review.  We

15  will continue to keep it under review.  We appreciate the

16  advice that we have received from counsel and can help us

17  refine our research from where Catherine and I ended up this

18  morning before I came down.

19              MR. KOFFMANN:  Thank you, Your Honor.

20              MR. GALEOTTI:  Thank you, Your Honor.

21              THE COURT:  Are we otherwise ready to proceed?

22              MR. KOFFMANN:  One other issue, Your Honor, for the

23  defense.  There was some briefing over the weekend on the

24  opening-the-door issue.  The Government filed a letter last

25  night.  The defense does plan to respond to that letter and we

Proceedings                                                1881

1  are working on it now and aim to get it to the Court as

2  quickly as we can.

3          THE COURT:  And we have a letter from you on that

4  subject already, don't we?

5          MR. KOFFMANN:  We do.  We have a letter essentially

6  saying that --

7          THE COURT:  A line in the sand?

8          MR. KOFFMANN:  Exactly, but the Government has now

9  made its offer of proof.

10         THE COURT:  And you want to respond to that?

11         MR. KOFFMANN:  Yes, Your Honor.

12         THE COURT:  Okay.

13         MR. KOFFMANN:  Thank you.

14         THE COURT:  I think this closes all the loops, but

15 we will -- if we left something open, I'm sure one of the

16 tables will jump up and let us know.

17         So, otherwise, refresh me, we're still on Enrique

18 Pere and Mr. Koffmann, we are still on your cross; correct?

19         MR. KOFFMANN:  Yes, Your Honor.  And I was planning

20 to address the issues that Mr. Galeotti and I were just

21 discussing.  I think it would be better if I move to something

22 else.

23         THE COURT:  Move to something else.  If that was the

24 last topic, then we have to think --

25         MR. KOFFMANN:  It's not the last topic.

```
                    Proceedings                    1882
```

1          THE COURT:  Okay.  Move to something else and we

2    will come back.

3          MR. KOFFMANN:  Will do.  Thank you.

4          THE COURT:  If that works.

5          Okay.  We can bring the jury in.

6          MR. LAX:  Your Honor, we are going to bring in the

7    witness, as well.

8          THE COURT:  Yes, please.

9          (Witness takes the stand.)

10          (The jury enters the courtroom.)

11          THE COURT:  Be seated, please.

12          Counsel will stipulate that the jury is present and

13    properly seated.

14          MR. LAX:  Yes, Your Honor.

15          MR. KOFFMANN:  Yes, Your Honor.

16          THE COURT:  Thank you, counsel.

17          Ladies and gentlemen of the jury, welcome back.

18    Hopefully you had an opportunity to refresh yourself and relax

19    a little bit over the weekend.  Hopefully you're happy with

20    the results of the football games.  Some of you probably are

21    and some of you probably are not.  We're here to begin a new

22    week.  I'm sure whether you're happy or not happy with the

23    football results, you're happy to remember that this a

24    four-day week, rather than the exceptional five-day jury

25    anticipation week that we had last week.  The Court will not

Proceedings                                    1883

1   be sitting with all of you on Friday, so you will have your

2   opportunity to go back to work or do whatever else you might

3   want to do on that day.

4        We also again appreciate your patience and

5   punctuality and cooperation.  I do want you to know while we

6   were waiting for you to come out, we had -- there's two parts

7   to every trial and obviously you're in control of the fact

8   portion of the trial.  There is the law portion of the trial.

9   That's also equally important.  We had to spend sometime with

10  counsel this morning working on some legal issues that are

11  essential for us to resolve before we can get to the point of

12  admitting the testimony, which you all will have an

13  opportunity to consider in reaching your verdict during the

14  deliberation portion of the trial.

15       We are still on the evidence-building portion of the

16  trial.  You will recall when you left us on Friday, we had Mr.

17  Enrique Pere on the stand.

18       I remind him that he is still under oath.

19       We are in the midsts of Mr. Koffmann's

20  cross-examination and Mr. Koffmann will now resume that

21  cross-examination.

22       Mr. Koffmann.

23       MR. KOFFMANN:  Thank you, Your Honor.

24       Ladies and gentlemen, good morning.

25       (Continued on next page.)

1  **ENRIQUE PERE**,

2       called as a witness, having been previously

3       sworn/affirmed, was examined and testified as follows:

4  CROSS-EXAMINATION

5  BY MR. KOFFMANN:  (Continuing)

6  Q    Good morning, Mr. Pere.

7  A    Good morning.

8  Q    Can you hear me all right?

9  A    I do.

10 Q    Mr. Pere, I want to start with the spreadsheets that you,

11 and I spent some time talking about on Friday.  Do you recall

12 that testimony?

13 A    The spreadsheet that we were looking at.

14 Q    Yes.

15 A    There was a few.

16      MR. KOFFMANN:  Let's bring up Defense Exhibit 2,

17 please.  Let's go to the last page, which is January 2017

18 spreadsheet.

19 Q    Mr. Pere, do you recall testifying about these

20 spreadsheets on Friday?

21 A    Yes.

22 Q    In column A, it lists a number of deals that the

23 consulting business had helped to obtain for its clients?

24 A    Yes.

25      MR. KOFFMANN:  We have -- may we -- this is in

E. Pere - cross - Koffmann                1885

1    evidence.

2            Thank you, Mr. Villanueva.

3    Q    In column A, we have deals the consulting business helped

4    to obtain for its clients; correct?

5    A    Yes.

6    Q    There's -- in row five it has a number of people to whom

7    payments would be made in connection with those contracts?

8    A    Yes.

9    Q    There is a spreadsheet like this for every month in 2017;

10   correct?

11   A    I don't know.

12   Q    Well, let's look through them.  So this is January.

13   Let's go to the prior page.  This is February; right?

14   A    Okay.

15   Q    Let's go to the next page.  This is March; correct?

16   A    Yes.

17   Q    The next page is April; correct?

18   A    Yes.

19   Q    What month is this?

20   A    May.

21           June.  July.  August.  September.  October.

22   November.  December.

23   Q    And then the prior page we have a monthly breakdown

24   listing what each one of these people in row four was to be

25   paid for the year of 2017; correct?

1  A    Yes.  That's what it says.

2  Q    Okay.  And we have -- you testified on Friday that JGO

3  was a reference to Mr. Arias?

4  A    Yes.

5  Q    And there was a reference to you as well; correct?

6  A    Yes.

7  Q    And what's that?

8  A    BRU.

9  Q    And that's for Bruce; right?

10 A    Yes.

11 Q    Where is the reference to your brother?

12 A    I don't see one.  Oh, at the end.  COL.

13 Q    What does that stand for?

14 A    I'm guessing that's him.  Colorado.

15 Q    Colorado.

16       MR. KOFFMANN:  Let's go back to page of the January

17 spreadsheet.

18 Q    Mr. Pere, in the left-hand column, the first row of the

19 spreadsheet, row six lists UNI-C1.  Do you see that?

20 A    Yes.

21 Q    And this is a deal that involved PetroEcuador and UNIPEC;

22 correct?

23 A    Yes.

24 Q    UNIPEC is a Chinese state-owned entity?

25 A    Yes.

1   Q    In this deal, it partnered with a private commodities
2   trader; correct?
3   A    Yes.
4   Q    That was Gunvor?
5   A    Yes.
6   Q    And Gunvor was the consulting business's client on this
7   deal; correct?
8   A    Yes.
9   Q    So on this deal, this spreadsheet tracks how the
10  consulting business was going to split up the fees that it
11  obtained in the month of January on that contract; correct?
12  A    Yes.
13  Q    So we talked about JCH on Friday.  That was Mr. Hidalgo?
14  A    Yes.
15  Q    And then we see payments for, among others, Mr. Arias,
16  and yourself and your brother; right?
17  A    Yes.
18  Q    Row seven, that's another UNIPEC contract; correct?
19  A    Yes.
20  Q    And in this deal the consulting business had a client;
21  right?
22  A    Yes.
23  Q    And that client was a private commodities trader that
24  partnered with UNIPEC for that deal; right?
25  A    Yes.

E. Pere - cross - Koffmann                    1888

1    Q    And your client on that deal, the private commodities

2    trader paid a fee to the consulting business?

3    A    Yes.

4    Q    And then in this spreadsheet, we see that fee being split

5    up to make payments to people, including Mr. Arias?

6    A    Yes.

7    Q    And that payment to Mr. Arias, that's a bribe; right?

8    A    Yes.

9    Q    The same thing with PTT-1 and PTT-2; correct?

10   A    Yes.

11   Q    These are deals, you have private commodities trader as

12   your client; right?

13   A    Yes.

14   Q    That's Gunvor; right?

15   A    Yes.

16   Q    And in those deals, Gunvor partnered with a state-owned

17   entity; correct?

18   A    Yes.

19   Q    And what was that state-owned entity?

20   A    PetroChina.

21   Q    Gunvor pays a commission to the consulting business?

22   A    Yes.

23   Q    We see on this spreadsheet how that gets divvied up among

24   the people listed on the spreadsheets; right?

25   A    Yes.

E. Pere - cross - Koffmann                1889

1  Q    And the spreadsheets lists everybody who's getting paid
2  on that deal, doesn't it?
3  A    Yes.
4  Q    Let take a look at FOIL OTI.  Well, sorry.  Just before
5  we get to that, FOIL C1 and FOIL C3, those are part of the
6  UNIPEC contracts that we talked about; correct?
7  A    Yes.
8  Q    There was a fuel oil component to both of those deals;
9  right?
10 A    Yes.
11 Q    And, again, both Gunvor deals; correct?
12 A    Yes.
13 Q    So Gunvor's deals also had a fuel oil component to them,
14 at least these two?
15 A    One of them was never paid.
16 Q    So one of them --
17 A    I don't remember which one.
18 Q    Sorry.  Say it again.
19 A    I don't remember which one, but one I know was never
20 paid.
21 Q    So one of them was not paid on the fuel oil component;
22 the other one, however, was paid on the fuel oil component?
23 A    Yes.
24 Q    Meaning that Gunvor made payments to the consulting
25 business for fuel oil on at least one deal?

1   A    Yes.

2   Q    Okay.  So let's talk about the FOIL OTI.

3   A    Yes.

4   Q    That's the deal that Vitol was involved in; correct?

5   A    Yes.

6   Q    And that deal was signed in December of 2016?

7   A    I think -- yes.

8         MR. KOFFMANN:  We can bring up Government Exhibit

9   5105, which is in evidence.  Let's go to page 92.  Let's

10  highlight the first paragraph.

11  Q    So, Mr. Pere, you recognize that this is the contract

12  between PetroEcuador and OTI?

13  A    Yes.

14  Q    And we see that it was signed on December 6th of 2016;

15  correct?

16  A    Yes.

17  Q    And the first month of that contract is January 17th;

18  correct?

19  A    I guess so.

20        MR. KOFFMANN:  Let's go to page 94 of this exhibit,

21  paragraph 3.1.

22  Q    Do you see, Mr. Pere, five lines down, it says beginning

23  on January 1, 2017?

24  A    Yes.  Yes.

25  Q    So the Vitol/OTI fuel oil deal began shipping barrels in

E. Pere - cross - Koffmann                    1891

1   January of 2017; correct?

2   A    Yes.

3   Q    And the consulting business received payment from Mr.

4   Hanst in January of 2017, didn't it?

5   A    Yes.

6   Q    You've testified about that on direct examination;

7   correct?

8   A    Yes.

9        MR. KOFFMANN:  Let's take a look at Government

10  Exhibit 4203-B, as in boy, which is in evidence.

11  Q    This was a document that Mr. Galeotti showed you?

12  A    Yes.

13  Q    In fact, he had one on his poster board?

14  A    Yes.

15  Q    And we see on the first line, January 23, 2017, payment

16  for 185,000 Euros; right?

17  A    Yes.

18  Q    And you recorded the receipt of that payment on your own

19  spreadsheet.  Do you recall that?

20  A    On which one?  Not the ones I just saw.

21  Q    Let's look at Government Exhibit --

22  A    The -

23  Q    I'm sorry.  Remember, we can't talk over each other.

24  A    Sorry.

25       MR. KOFFMANN:  Government Exhibit 514-A-2, which is

E. Pere - cross - Koffmann                    1892

1    in evidence.  If we can zoom in on the ENE column.

2    Q    Mr. Pere, this is the spreadsheets you testified about on

3    direct examination?

4    A    Yes.

5    Q    And this shows your receipt of a payment in connection

6    with the OTI fuel oil contract; right?

7    A    Yes.

8    Q    So in January of 2017, we know that barrels shipped on

9    the OTI deal; right?

10   A    Yes.

11   Q    And we know that the consulting business received payment

12   on the OTI deal --

13   A    Yes.

14   Q    -- right?

15        MR. KOFFMANN:  Let's go back to Defense Exhibit 2 at

16   page 14.

17   Q    But if we look in row 12, there are no payments being

18   divvied up to anybody; correct?

19   A    That's correct.

20   Q    Okay.  You also received payment -- the consulting

21   business also received payment on the OTI deal in February of

22   2017; right?

23   A    Yes.  February of 2017, yeah.

24        MR. KOFFMANN:  If we can go back to Government

25   Exhibit 4203-B, which is in evidence.  We see payments on

E. Pere - cross - Koffmann                    1893

1    February 6th and February 10th of 2017; correct?

2    A    Yes.

3              MR. KOFFMANN:  If we could go to Government Exhibit

4    514-A-2, which is in evidence and zoom in on the Feb column.

5    Q    We see you recording almost 306 -- almost $307,000 on the

6    OTI fuel oil deal in February; right?

7    A    Yes.

8              MR. KOFFMANN:  Let's go to Defense Exhibit 2, page

9    13.  Can we highlight row -- thank you, Mr. McLeod.

10   Q    No payments being divvied up to anybody on the OTI deal;

11   right?

12   A    It's not showing any, yeah.  No.

13   Q    Even though barrels shipped and money was paid to the

14   consulting business; right?

15   A    Yes.

16   Q    And by the way, Mr. Pere, when you received the money on

17   the -- when the consulting business received payment in

18   January and February on the OTI deal, that money went into an

19   account in the Cayman's; correct?

20   A    Yes.

21   Q    And, sir, it's common in Ecuador for people to have

22   accounts in the Cayman's; right?

23   A    Not that much, but, yeah.

24   Q    Especially people who have a significant amount of money?

25   A    I guess so.

E. Pere - cross - Koffmann                    1894

1  Q    And the reason for that is because the financial system
2  in Ecuador is not always stable?
3  A    One of the reasons, maybe.
4  Q    And another reason is because if you have a lot of money
5  in an account in Ecuador, you could become a target for
6  kidnappings; right?
7          MR. GALEOTTI:  Objection.
8          THE COURT:  I'm going to sustain the objection.
9  Q    In any event, there's nothing unusual about having an
10 account in an offshore jurisdiction; right?
11 A    Not really.
12 Q    So we have barrels shipped, money paid in both January
13 and February on the OTI deal and nothing recorded on these
14 spreadsheets by way of payments owed to Mr. Arias or anybody
15 else; right?
16 A    I don't see anything recorded there.
17         MR. KOFFMANN:  Let's go to March.
18 Q    No payments in March?
19 A    I don't see any recorded there.
20         MR. KOFFMANN:  Let's go to April.  Highlight row 12.
21 Q    No bribes owed reflected in April?
22 A    I don't see any --
23         MR. KOFFMANN:  Let's go to May.
24 A    -- on the paper.
25 Q    The same thing for May?

E. Pere - cross - Koffmann                    1895

1    A    Yes, I don't see any on the paper.

2         MR. KOFFMANN:  Let's go to June.

3    Q    The same thing, right?

4    A    Yes.

5    Q    How about July, nothing reflected here in July by way of

6    bribes on the OTI deal; correct?

7    A    No.

8    Q    August?  No bribes owed for OTI in August?

9    A    I don't see anything on the paper.

10   Q    September reflects no bribes owed for OTI?

11   A    September, I don't see anything on that paper.

12   Q    October, nothing here for OTI?

13   A    No, I don't see anything on that paper.

14   Q    November?

15   A    No, I don't see anything on that paper.

16   Q    And December?

17   A    No, I don't see anything on that paper.

18   Q    So we just looked at every month in 2017 in the

19   spreadsheets that are tracking bribes that are owed on the

20   deals that the consulting business helped to obtain for its

21   clients; right?

22   A    Yes.

23        MR. KOFFMANN:  Let's go to page 1 of this exhibit.

24   Q    And we see on page 1 --

25        THE COURT:  Which exhibit is that, Mr. Koffmann?

E. Pere - cross - Koffmann                    1896

1      MR. KOFFMANN:  This is Defense Exhibit 2, Your

2  Honor.

3  Q    Again, row four on this tab lists the people to whom

4  bribes are owed; correct?

5  A    Yes.

6  Q    There is Mr. Arias?

7  A    Yes.

8  Q    There's you and your brother?

9  A    Yes.

10 Q    And there's not a single reference in Defense Exhibit 2

11 to Xavier Rodriguez, is there?

12 A    No.

13     MR. KOFFMANN:  Let's go to Defense Exhibit 3.

14 Q    So this is a similar spreadsheet for 2018, correct, Mr.

15 Pere?

16 A    Yes.

17 Q    And the consulting business received money on the Vitol

18 deal in 2018; correct?

19 A    I think it did.

20     MR. KOFFMANN:  Let's look at Government Exhibit

21 4182.  This is not yet in evidence, and let's go to page --

22 Q    Mr. Pere, you recognize that this is a document from your

23 bank for the --

24 A    Yes.

25 Q    For the OPV account?

1  A    Yes.

2         MR. KOFFMANN:  Offer Government Exhibit 4182.

3         MR. GALEOTTI:  No objection.

4         THE COURT:  Received without objection.

5         (Government Exhibit 4182 was received in evidence.)

6         MR. KOFFMANN:  May we publish?

7         THE COURT:  Yes.

8         MR. KOFFMANN:  Thank you, Your Honor.

9         (Exhibit published.)

10        MR. KOFFMANN:  If we can go to page 2, if we can

11 zoom in on the top three.  Just the top three, please.

12 Q    So, Mr. Pere, this document shows that in May of 2018 OPV

13 received $19,000 from Zanza Oil; correct?

14 A    Yes.

15 Q    And that was a payment on the OTI deal; correct?

16 A    Yes.

17 Q    Because the consulting business had helped Vitol to

18 obtain that deal; right?

19 A    Yes.

20 Q    So you received 19,000 and change in May of 2018.

21        MR. KOFFMANN:  Let's take a look at Defense Exhibit

22 3 at page 10.

23 Q    So, Mr. Pere, this is the spreadsheet that tracks the

24 bribes that are owed on the deals the consulting business

25 helped to obtain for its clients for May of 2018; correct?

E. Pere - cross - Koffmann                    1898

1    A    Yes.

2    Q    And still we have no entries for the OTI deal; right?

3    A    Yes.

4    Q    Even though you received money on the OTI deal that

5    month?

6    A    Yes.

7             MR. KOFFMANN:  Let's go back to Government Exhibit

8    4182.

9    Q    The second entry here, it says 9/7/2018, but that's

10   actually July 9, 2018, correct, Mr. Pere?

11   A    Yes.

12   Q    It shows a payment of $100,000?

13   A    Yes.

14   Q    So let's look at the July 2018 bribe-tracking

15   spreadsheet.  That's Defense Exhibit 3 at page 8.

16           Again, no entries for OTI; correct?

17   A    No.

18           MR. KOFFMANN:  Let's go back to 4182, please.

19   Q    Just to round it out.  We have a payment here on the 7th

20   of September of 2018 for almost $84,000?

21   A    Correct.

22           MR. KOFFMANN:  And if we could go to Defense Exhibit

23   3 of page 6.

24   Q    This is the September spreadsheet and it has no entries

25   for OTI; correct?

E. Pere - cross - Koffmann                    1899

1  A    Correct.

2  Q    And you testified on your direct examination that you

3  made payments to Mr. Arias in 2018 in connection with the

4  Vitol fuel oil contract; correct?

5  A    I believe from something they showed me, yes.

6  Q    Let's take a look at Government Exhibit 4164.  This is

7  what they showed you; right?

8  A    Yes.  Those are -- yes, those are transfers made to

9  Nilsen, yeah.

10 Q    Transfers made to Nilsen of money originally obtained

11 from Vitol; right?

12 A    Yes, from Lionel, yes.

13 Q    In relation to the OTI contract?

14 A    Yes.

15 Q    All right.  And we just looked at Defense Exhibit 3 and

16 there were no payments listed on the OTI deal at all; correct?

17 A    Yes.  Remember, I didn't make those, so I have no idea.

18 I'm just reading off paper that you're showing me.

19 Q    All right.  You understand that's the spreadsheet that

20 was tracking what was owed on the deals that the consulting

21 business helped to obtain for its client, right?  You

22 testified to that earlier?

23 A    No.  I testified that I was reading from a paper that you

24 were showing me from all those years, but I don't believe

25 that's mine.  So I -- I cannot tell you -- I mean, I'm reading

E. Pere - cross - Koffmann                    1900

1  from that paper, but that's not -- I don't think I made that

2  ever.  I said that yesterday, I'm sorry, Friday.

3  Q    The record will reflect what you testified to, sir.

4         And the fact is on none of those spreadsheets does

5  it have any entry for the OTI deal; correct?

6  A    Yes.

7         MR. KOFFMANN:  And let's go back to Defense Exhibit

8  3, page 2.

9  Q    No reference to Xavier Rodriguez on this spreadsheet;

10  right?

11  A    No.

12         MR. KOFFMANN:  Can we bring up Defense Exhibit 4,

13  please.  This one is shorter.  Let's go to the last page.

14  Q    This is January of 2019; correct?

15  A    Yes.

16  Q    No entries for OTI?

17  A    No.

18         MR. KOFFMANN:  Let's go to February.  I guess we

19  just have April.

20  Q    No entries for OTI in April?

21  A    No.

22         MR. KOFFMANN:  Let's go to the first page.

23  Q    No reference to Xavier Rodriguez; correct?

24  A    No.

25  Q    Sir, the entries in these spreadsheets line up perfectly

E. Pere - cross - Koffmann                    1901

1  with what you received from Gunvor, don't they?

2  A    Yes.  Probably.  I mean, I'm not checking one thing

3  against the others, but I'm guessing it does.

4         MR. KOFFMANN:  Let's bring up Defense Exhibit 11.

5  This is not yet in evidence.  Let's take a look at the first

6  page.  The second page, that is.  The next page.

7  Q    Mr. Pere, this is an invoice that you sent to Gunvor, is

8  it not?

9  A    Yes.

10        MR. KOFFMANN:  Let's take a look at page 100 of this

11 exhibit.

12 Q    And this is another invoice that you sent to Gunvor;

13 correct?

14 A    Yes.

15 Q    And that's in --

16        MR. KOFFMANN:  Well, offer Defense Exhibit 11, just

17 page 100.

18        MR. GALEOTTI:  Just page 100, no objection.

19        THE COURT:  I didn't hear you, Mr. Lax.

20        MR. GALEOTTI:  Your Honor, it is Mr. Galeotti.  Your

21 Honor, just page 100, no objection.

22        MR. KOFFMANN:  Can we publish that?

23        THE COURT:  You may.

24        Proceed without objection to that one page.

25        (Defense Exhibit 11, page 100 was received in

E. Pere - cross - Koffmann                    1902

1    evidence.)

2              (Exhibit published.)

3    Q    So, Mr. Pere, I believe you testified that this is an

4    invoice sent to Gunvor?

5    A    Yes.

6    Q    And it is an invoice that is dated September of 2018;

7    correct?

8    A    Yes.

9    Q    And it refers to crude oil that had shipped in August of

10   2018?

11   A    Yes.

12             MR. KOFFMANN:  Can we highlight that, Mr. McLeod, in

13   the description section.

14   Q    And the amount that you invoiced Gunvor for August of

15   2018 on this deal was $61,740.86; right?

16   A    Yes.

17             MR. KOFFMANN:  Can we bring up side by side Defense

18   Exhibit 3 at page 7.

19             Can see zoom in on column -- basically cells A-6

20   through B 6.

21   Q    We see the invoice on the right is for $61,740.86, and we

22   see in the bribe spreadsheet $61,740.86; correct?

23   A    That's correct.

24             MR. KOFFMANN:  Can we bring -up, let's keep DX-3 on

25   the left and on the right -- let's take both of these down.

1          And let's bring up just for the witness Defense
2    Exhibit 9.
3    Q    Mr. Pere, this is another invoice that you sent to
4    Gunvor?
5    A    Yes.
6          MR. KOFFMANN:  Offer Defense Exhibit 9.
7          THE WITNESS:  Yes.
8          THE COURT:  Mr. Galeotti?
9          MR. GALEOTTI:  No objection to DX-9-001.
10         MR. KOFFMANN:  I believe this is a one-page
11   document.  If it's not, I'm only offering that one page.
12         MR. GALEOTTI:  No objection in that case.
13         THE COURT:  Received without objection.
14         (Defendant's Exhibit DX-9-001 was received in
15   evidence.)
16         MR. KOFFMANN:  May we publish?
17         THE COURT:  You may.
18         (Exhibit published.)
19   Q    So this is an invoice sent in December of 2018 for
20   barrels shipped in November of 2018; correct?
21   A    That's correct.
22   Q    And it's for $99,180?
23   A    Yes.
24         MR. KOFFMANN:  Can we put that side by side with
25   Defense Exhibit 3 at page 4.

E. Pere - cross - Koffmann                    1904

1  Q    Mr. Pere, we see in Defense Exhibit 9-001, excuse me,

2  that you invoiced Gunvor for $99,180 and in Defense Exhibit 3,

3  at page 4, we see listed in the bribe spreadsheet $99,180;

4  right?

5  A    Yes.

6  Q    So, Mr. Pere, we see that in Defense Exhibits 1 through

7  4, the Gunvor money matches precisely with the Gunvor

8  invoices; right?

9  A    Yes.

10 Q    To the penny?

11 A    Yes.

12 Q    Because those are going to be sent out as payments to

13 people like Mr. Arias; right?

14 A    Yes.

15 Q    We also saw on Defense Exhibits 1 through 4 that there's

16 nothing recorded for the OTI deal?

17 A    Yes.

18 Q    It reflects no payments from Vitol or Mr. Hanst?

19 A    No.  There's nothing there.

20 Q    And there's not a single reference to Xavier Rodriguez?

21 A    No.

22 Q    So let's talk about the payments that you made to Mr.

23 Arias.

24       You testified a moment ago the fuel oil deal was

25 signed in December of 2016; right?

E. Pere - cross - Koffmann                    1905

1   A    Yes.

2   Q    And then the consulting business received payments in

3   January and February; right?

4   A    Yes.

5   Q    Of 2017?

6   A    Yes.

7   Q    And then that money -- which altogether was about 472,000

8   Euros; right?

9   A    Yeah.  Should be somewhere close to that.

10  Q    -- it sat in an account for several months?

11  A    Yes.

12  Q    And then you moved it to a different account that you

13  controlled; right?

14  A    Yes.

15  Q    And it sat there for another year and a half,

16  approximately?

17  A    Could be.

18  Q    Well, it wasn't until December of 2018 that you paid that

19  money to Mr. Arias; right?

20  A    I think that's -- I think that is what it says.

21       MR. KOFFMANN:  You can bring up Government Exhibit

22  4164, which is in evidence.

23  Q    So these are the payments you testified were payments to

24  Mr. Arias of Vitol money?

25  A    Yes.  Yes.

E. Pere - cross - Koffmann                 1906

1  Q    So this shows that the money was not paid out until the

2  earliest being December of 2018?

3  A    Yes.

4  Q    So -- and this -- by the way, this document shows that

5  all the money that you received from Vitol in January and

6  February of 2017 ultimately was paid to Mr. Arias; correct?

7  A    Yes, and there was something added to it ultimately.

8  Q    But more accurately it was paid to people on behalf of

9  Mr. Arias; right?

10 A    It was paid to people that Mr. Arias told us to send the

11 money to.

12 Q    Right.  He sent an invoice and he told you to pay that

13 invoice; right?

14 A    Yes.

15 Q    And he didn't tell you to pay that invoice until the

16 December 2018 timeframe?

17 A    I guess so.

18 Q    Otherwise you would have paid it; right?

19 A    I guess.

20 Q    During this period between 2017, beginning of 2017, when

21 you received the money from Mr. Hanst, and December of 2018,

22 almost two years, right?

23 A    Yeah.

24 Q    During that time period, you made a lot of payments to

25 Mr. Arias and a lot of payments for Mr. Arias; right?

E. Pere - cross - Koffmann                    1907

1  A    I would have to see them, but I'm not sure if there were

2  -- I know there were payments.  There must be money for

3  Gunvor.

4  Q    Is it your testimony, sir, you don't recall whether you

5  paid Mr. Arias in 2017 or 2018?

6  A    No, there were payments to Arias through the years.

7  Q    Right.

8         So Vitol paid you in early 2017, shortly after

9  signing the fuel oil contract; right?

10 A    Yes.

11 Q    That was part of the agreement with the consulting

12 business?

13 A    That was a success fee.

14 Q    The success fee, exactly.

15        And that was agreed upon that once they signed the

16 deal that Vitol would pay the success fee?

17 A    Yes.

18 Q    And then that money sat in accounts that you

19 controlled --

20 A    Yes.

21 Q    -- for almost two years; right?

22 A    Yes.

23 Q    And at the point that that money went into your account

24 -- strike that.

25        At the point that that money went into the account

E. Pere - cross - Koffmann                    1908

1    that was the consulting business's money, the account that had

2    your name on it, that was the consulting business's money;

3    right?

4    A    Yes.  When it comes into the account, yeah.

5    Q    You can use that money to pay anybody you want to; right?

6    A    I guess so.

7    Q    If you had an electricity bill, you could pay the

8    electricity bill with that money; right?

9    A    No.  I mean, I could, but I wouldn't.

10   Q    But you had that power; right?

11   A    Yes.  Yes.

12

13              (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. KOFFMANN: (Continuing)

2   Q    At this time in December of 2018 you owed money to Mr.

3   Arias for a variety of deals, right?

4   A    Yes.

5   Q    You owed him on the UNIPEC C1 deal?

6   A    Yes.

7   Q    There was a fuel oil component to that?

8   A    No.  I remember that didn't work, I think.

9   Q    It was a C1 deal?

10  A    I think it was C1 because I didn't see it there later.

11  Q    So the C3 deal, that was the UNIPEC deal that had both

12  crude and fuel?

13  A    I think so.

14  Q    You owed Mr. Arias money on that deal?

15  A    Yes.

16  Q    Same thing with PTT deals, right?

17  A    Yes.

18  Q    So when you paid money to Mr. Arias, it was because you

19  owed him money, right?

20  A    Yes, for the different deals.

21  Q    But regardless of which deal you owed him money on, if

22  you owed him money you paid him -- you paid him money, right?

23  A    Yes.

24  Q    Let's talk about Xavier Rodriguez.  You testified about

25  Xavier Rodriguez on your direct examination.

1            Do you recall that?

2    A    Yes.

3    Q    And you testified about some payments you made to him in

4    cash?

5    A    Yes.

6    Q    And you testified about some payments that were made to

7    him through Jorge Ode and Jorge Ponce.

8            Do you recall that testimony?

9    A    Through Jorge Ponce.  He was the driver who would take

10   him money.

11   Q    And the way that that was arranged was through Jorge Ode,

12   right?

13   A    Ode didn't know what the money was for.  He was just

14   changing dollars for cash, or whatever currency.

15   Q    And the person who knew what these payments were supposed

16   to be for, that was your brother, wasn't it?

17   A    And I knew because he would tell me and I kept those

18   records.

19   Q    So Mr. Pere, is it your testimony that you always knew

20   when cash payments were going through Jorge Ode or Jorge

21   Ponce, who those payments were supposed to go to?

22   A    Everything that went through Jorge Ponce, at least.

23   Yeah, basically everything was recorded.

24   Q    Not exactly my question.  My question is about what you

25   knew.  And is it your testimony that you knew what the purpose

1   of every payment that went through Jorge Ponce was?

2   A    There could have been a time that Antonio gave an order

3   that, you know, do you have any cash, I have to send cash to

4   my mother-in-law, to whatever.  I don't know, or whatever.  So

5   I can't tell you.  What I can tell you is what I recorded on

6   those spreadsheets.

7   Q    Mr. Pere, when you began cooperating you were asked a

8   number of questions about payments to Ecuadorian officials,

9   right?

10  A    Yes.

11  Q    You were asked questions about payments that went through

12  Jorge Ode?

13  A    Through Jorge Ponce.

14  Q    I'm asking about Jorge Ode right now.

15  A    Yes, I don't remember exactly.

16  Q    But you were asked that question by the FBI?

17  A    I was asked who Jorge Ode was.

18  Q    You were asked about payments that were made through him

19  to government officials, weren't you?

20  A    Maybe.  I don't know.  Could be.

21  Q    And you were asked about Xavier Rodriguez, weren't you?

22  A    Yes.

23  Q    Isn't it a fact, sir, that the first time that you said

24  anything about Xavier Rodriguez was in June of 2020?

25  A    I don't know.  Could be.  I don't remember.

1  Q    Prior to that you hadn't said anything about Xavier
2  Rodriguez, correct?
3  A    I don't remember.
4  Q    And the first time you said anything about Xavier
5  Rodriguez was on a day when you went to meet with Agent Kelley.
6         Do you recall meeting with Agent Kelley on June 8,
7  2020?
8  A    No, I don't recall.  But if I told somebody, it's going
9  to be most probably an agent, yes.
10        MR. KOFFMANN:  Let's bring up, just for the witness,
11 3500 EP-351.  If we could zoom in on just the top portion.
12 Sorry.  Let's include the next section down.
13 Q    Mr. Pere, does this refresh your recollection that you
14 met with Agent Kelley on June 8, 2020?
15 A    June 8, 2020, it says I did.  Yes, I guess it's right.
16 Q    And we talked about Agent Kelley before.  He's an FBI
17 agent?
18 A    Yes, he is.
19 Q    He was your handler?
20 A    Yes.
21 Q    I believe you said he was there from the beginning,
22 right?
23 A    That is correct.
24 Q    And he was clear with you from the beginning that part of
25 being a cooperator was that you needed to be forthcoming,

1    right?

2    A    Forthcoming?

3    Q    You needed to disclose everything you knew about what the

4    government was investigating?

5    A    Yes.

6    Q    You couldn't hold anything back?

7    A    Yes.

8    Q    And prior to this point, you had been asked about Xavier

9    Rodriguez, hadn't you?

10   A    I don't remember.  I'm not sure.  If he asked, I

11   answered.  If he didn't, I didn't.

12   Q    So on June 8th you met with Agent Kelley, and then you

13   left, and you went and you met with your brother.

14        Do you recall that?

15   A    No.

16        MR. KOFFMANN:  Let's go a little bit further down.

17   Let's highlight -- sorry.  Blow up the middle portion of that

18   page.  Can we highlight the bolded part at the bottom?

19   A    Okay.  June 12th.  Yes.  I don't recall the exact thing,

20   no.  But we talked about it, yes.

21   Q    So what happened on June 8th was you met with Agent

22   Kelley, you left, you met with your brother, right?

23   A    I left?

24        MR. KOFFMANN:  Let's take that down.

25   A    I don't remember meeting with my brother.

1  Q    Do you recall after meeting with Agent Kelley when you

2  were with your brother you called Agent Kelley?

3             MR. GALEOTTI:  Objection.  He said he doesn't

4  remember.

5             THE COURT:  He's trying to refresh him.  Is it past

6  testimony that might refresh him?

7  Q    Mr. Pere, why don't you take a look at what's on the

8  screen, the bottom portion.

9  A    It says CHS with --

10 Q    Just read it to yourself.

11 A    Okay.

12 Q    Have you read it?

13 A    Yes.  The bottom part?

14 Q    Yes, the bottom part.  You read it, now let me ask the

15 question.

16             Having reviewed that, Mr. Pere, does that refresh

17 your recollection that on June 8th after meeting with Agent

18 Kelley you then met with your brother, and you called Agent

19 Kelley and you told him about payments that had been made to

20 Xavier Rodriguez?

21 A    No.

22 Q    You don't recall that happening?

23 A    I don't recall.  I don't remember the exact details after

24 this.  I met with my brother, I don't know.

25 Q    Do you deny --

1   A    What?

2   Q    -- making that call with your brother to Agent Kelley and

3   stating for the first time the --

4   A    There's a number there.

5   Q    Sir, you have to let me ask the question, otherwise we'll

6   all be confused.  My question is, do you deny after you met

7   with Agent Kelley on June 8th, you went and met with your

8   brother, and after speaking with your brother you called Agent

9   Kelley and for the first time said anything about payments to

10  Xavier Rodriguez?

11           MR. GALEOTTI:  Objection.  Form, compound.

12           THE COURT:  It is quite compound.

13  Q    Mr. Pere, do you deny that the first time you said

14  anything about payments to Xavier Rodriguez was on June 8th of

15  2020?

16           Do you deny that, sir?

17  A    I can't confirm or deny that.

18  Q    Do you deny --

19  A    I don't remember that.

20  Q    Do you deny that you only made that statement to Agent

21  Kelley after you spoke with your brother about it?

22           Do you deny that, sir?

23  A    I can't confirm or deny because I'm telling you I don't

24  remember what happened after whatever the paper says.

25  Q    Isn't it a fact, sir, that when you pleaded guilty to

1    conspiracy you didn't say anything at all about Xavier

2    Rodriguez?

3    A    I don't know.

4           MR. KOFFMANN:  Let's bring up, just for the witness,

5    Defense Exhibit 11.  Sorry.  Defense Exhibit 111.

6    Q    Do you recognize this document, Mr. Pere?

7    A    Yes.

8    Q    Let's go to paragraph 14.

9    A    Wait.

10   Q    Read paragraph 14 to yourself.  Now let's look at

11   paragraph 34.  Let's take that down.

12          Mr. Pere, when you pleaded guilty there were three

13   schemes that were part of your guilty plea, correct?

14   A    I saw one there right now.

15   Q    I understand that.  But you recall when you pleaded

16   guilty to a crime in federal court, right?

17   A    Yes, I remember.

18   Q    And there were three components, there were three schemes

19   that were part of that guilty plea?

20   A    Maybe, yes.

21   Q    There was Gunvor, Vitol, and Sargeant Marine, right?

22   A    Yes.

23   Q    And with respect to Vitol, you pleaded guilty to making

24   payments to Nilsen Arias, right?

25   A    Yes.

1  Q    You did not plead guilty in connection with Vitol to

2  making payments to Xavier Rodriguez, did you?

3  A    I don't understand exactly what you're trying to tell me.

4  I would have to read the whole document again, but I don't

5  remember.  Back then we talked that there were three things

6  that were happening, and I just responded questions at the FBI

7  or whoever asked me.

8  Q    My question is --

9  A    I'm confused right now.

10  Q    I can tell.  My question is about what you pleaded guilty

11  to.  Okay?

12  A    Okay.

13  Q    And in your guilty plea and the document that you

14  admitted to that contained the charges against you --

15  A    Okay.

16  Q    -- referred to Ecuadorian official number one, right?

17  A    Yes.

18  Q    And that person was Nilsen Arias, correct?

19  A    I guess so.

20  Q    And it was then, for purposes of the charges that you

21  admitted to, it was split up into three different schemes, correct?

22        MR. GALEOTTI:  Objection, Your Honor.

23        Sidebar, please.

24        (Sidebar.)

25        (Continued on next page.)

*Sidebar*                                                                    1918

1          (Sidebar conference held on the record in the

2      presence of the Court and counsel, out of the hearing of the

3      jury.)

4          MR. GALEOTTI:  Your Honor, this is Matthew Galeotti.

5      It's my objection, so I'll start.

6          For one thing, this is -- the question is misleading

7      because the plea is to bribery of Ecuadorian government

8      officials, including Nilsen Arias, among others.

9          And so, the witness' answer is based on his

10     recollection.  He's said, essentially, that and getting

11     repeated questions about his information, which he didn't

12     write.  He was shown this information which, again, he didn't

13     write, but also it states Ecuadorian officials, including

14     Ecuadorian official number one.

15         There's just a misleading line of cross-examination

16     that's happening and could be improperly suggestive to a jury.

17         MR. KOFFMANN:  So the information he pleaded guilty

18     to, so the fact that he didn't write it is immaterial.  I'm

19     happy to make it clear that my question is that there is no

20     reference in what he pleaded guilty to, no explicit reference

21     to Xavier Rodriguez.  That's all I'm trying to establish.

22         MR. GALEOTTI:  That's even more improper because

23     that only shows that he didn't --

24         THE COURT:  I was wondering where everybody was

25     going.  Why is that relevant?

*Sidebar*                                                                1919

1          MR. KOFFMANN:  It's relevant for a number of

2    reasons.  It goes to whether there was an agreement with

3    Xavier Rodriguez.  It goes to --

4          THE COURT:  No, it doesn't.  It wasn't charged,

5    expressly.

6          MR. KOFFMANN:  Well, it's also significant because

7    he didn't raise anything about Xavier Rodriguez until nearly a

8    year into his cooperation.  It goes to what he knew about him,

9    if he's supposed to be a member of the conspiracy.

10         THE COURT:  The statements on that document are not

11   his.

12         MR. KOFFMANN:  Well --

13         THE COURT:  It's the information from the

14   United States attorney.

15         MR. KOFFMANN:  To which he pleaded guilty.

16         THE COURT:  Yes, okay.

17         MR. KOFFMANN:  He adopted them.

18         THE COURT:  No, no.  He pled guilty to that.  It

19   doesn't mean that's the only thing that's included within the

20   charge.  He pled guilty to the charge.

21         MR. KOFFMANN:  Very well, Your Honor.  I'll move on.

22         (Sidebar ends.)

23         (Continued on next page.)

24

25

*Proceedings*                                          1920

1       MR. KOFFMANN:  Your Honor, I'm noticing that it's

2   quarter to noon.  I'm happy to keep going or we can take a

3   break, whatever suits the Court.

4       THE COURT:  Well, we normally break between a

5   quarter of and noon.  If this is a good place to land, we'll

6   land.

7       MR. KOFFMANN:  This is as good as any, Your Honor.

8       THE COURT:  Okay.  All right, ladies and gentlemen,

9   we will take the midmorning break.  I'll give you a chance to

10  refresh and to relax.

11      Again, do not discuss the case amongst yourselves or

12  anyone else.  Continue to keep an open mind and we'll be back

13  in 15, and we'll see you then.

14          (Jury not present.)

15      THE COURT:  See you in 15 or so.

16          (Recess taken.)

17      THE COURTROOM DEPUTY:  Court is back in session.

18  All counsel are present, including the defendant.

19      THE COURT:  Are we ready to go?

20      MR. GALEOTTI:  Yes, Your Honor.

21      MR. KOFFMANN:  Briefly, Your Honor, Daniel Koffmann.

22  We had a discussion this morning about one of the spreadsheets

23  that had handwritten notes on it.  We researched during the

24  trial, and I shared with Mr. Galeotti during the break, that

25  according to Enrique Pere's 3500 material, he claimed those

*Proceedings*                                                              1921

1   handwritten notes were his.

2          Just to make the Court aware of that.  There was

3   some confusion about whose notes they were.  Apparently, the

4   witness told the government that they were his.

5          THE COURT:  That makes it even easier.  I didn't

6   find the 403 argument compelling.  I'm going to allow the

7   defense to use that document for the stated purpose.

8          MR. GALEOTTI:  Thank you, Your Honor.

9          We may, and we can take this up on redirect, we're

10  likely to offer a prior consistent statement under

11  801(d)(1)(B) from his 302 regarding the handwritten notes, if

12  that happens.

13         I guess we'll see how the testimony comes out, but

14  just flagging that in case redirect happens that we may offer

15  that portion from that same 302.

16         THE COURT:  Okay.  Alert us, specifically, where

17  you're going so we can have an advanced look, if we can.

18         MR. GALEOTTI:  Thank you, Your Honor.

19         One brief note on timing, if I may, which is we have

20  a witness who is a civilian witness who has flown in last week

21  and went back, given the length off the cross, and is now here

22  today and has a flight tonight.

23         I don't know if there's anything -- I don't know how

24  long the cross is going to be, but if there's any way to get

25  this witness on the stand today.

*Proceedings*                                                           1922

1          THE COURT:  We can interrupt.

2          MR. GALEOTTI:  I defer to Mr. Koffmann on that.  I

3   don't know exactly how much time we have on cross-examination.

4          MR. KOFFMANN:  I don't know exactly either, Your

5   Honor.  It depends on the witness.  I would -- Mr. Galeotti

6   said he would defer to me.  If it's up to me, I would say

7   don't interrupt my cross.

8          But let's take it as it comes.  My hope is that I

9   would not be still crossing this witness tomorrow.  I think I

10  can probably finish this afternoon, and if that's the case

11  then I believe the next witness is a relatively short one.

12  We'll take it as it goes.

13         MR. GALEOTTI:  All right.  Let's see what happens

14  and see if we can discuss it at lunch.

15         THE COURT:  Yes.  Discuss it over lunch.  Your

16  point, as I understand it, is the flight is tonight and you

17  want to get him or her out of here this afternoon.

18         MR. GALEOTTI:  Yes, Your Honor.

19         MR. KOFFMANN:  Not for nothing, Your Honor, but this

20  is the same witness who we discussed last week who might have

21  been slotted in between the direct and the cross.

22         I was very accommodating with that, but I think it's

23  different to interrupt a direct and cross to slot a witness

24  in.  It's very different to interrupt a cross that's in

25  progress.

1          THE COURT:  My view is that if you want to be

2   accommodating, you can.  I don't see much of a difference,

3   unless the witness had something to do with what's the subject

4   of the cross.  I don't know what this witness is all about.

5          MR. GALEOTTI:  Not at all, Your Honor.

6          A witness to explain Vitol related issues.  In any

7   event, we'll try to reach an agreement without intervention

8   from the Court, Your Honor.

9          THE COURT:  That makes sense.  So let's bring

10  Mr. Pere back and the jury, and we'll resume.

11          (Jury present.)

12          THE COURT:  Counsel will stipulate that the jury is

13  present and properly seated.

14          MR. LAX:  Yes, Your Honor.

15          MR. KOFFMANN:  Yes, Your Honor.

16          THE COURT:  Thank you, counsel.

17          Ladies and gentlemen, welcome back.  We're ready to

18  resume.  Mr. Pere is back on the stand and Mr. Koffmann will

19  resume his cross-examination.

20          MR. KOFFMANN:  Thank you, Your Honor.

21  BY MR. KOFFMANN:

22  Q    Mr. Pere, on Thursday during your direct examination Mr.

23  Galeotti asked you:

24          Mr. Pere, you testified that the money Lionel Hanst

25  sent to you -- and this transcript 1603, lines 2 to 6.

1          Mr. Galeotti asked you:  Mr. Pere, you testified

2   that the money Lionel Hanst sent you was just to pay bribes.

3          What was the purpose of preparing these invoices and

4   contracts?

5          Answer:  Because the banks would require some

6   support in order to open accounts and to receive money.

7          Mr. Pere, were you asked those questions and did you

8   give those answers?

9   A    I think so.

10  Q    Mr. Pere, you never actually said that all the money --

11  that the money Lionel Hanst sent you was just to pay bribes,

12  did you?

13  A    I don't know.  You said -- you're reading it for me.

14  Q    Right.  My question is, so that's what Mr. Galeotti asked

15  you.  But until that point, you had never actually said that

16  the money Lionel Hanst sent you was just to pay bribes.

17         You never said that, right?

18  A    I'm not sure.

19  Q    It wouldn't make any sense to say that, would it?

20  A    I'm guessing part was for bribes.  I mean everything

21  would have to be shared.

22  Q    Shared, I mean it was really your brother kept 70 percent

23  of it, didn't he?

24  A    I guess so.

25  Q    And you were also, you and your brother, you were doing

1   real work for Vitol, weren't you?

2   A    Like what?

3   Q    Well, let's bring up Government's Exhibit 1252 and

4   1252-A, which are in evidence.  Let's zoom in on the -- yes.

5          Mr. Pere, this is an email.  You see at the bottom

6   EddiePeraltaConsulcorp@Protonmail.ch.

7          That's you, right?

8   A    Yes.

9   Q    You sent a document to APolo1964@Protonmail.com.  That's

10  your brother?

11  A    That's what it looks like, yes.

12  Q    And he then forwarded that to Mr. Aguilar, correct?

13  A    Yes.

14  Q    There's an attachment?

15  A    Yes.

16  Q    Look at the attachment.  Mr. Pere, this is a draft letter

17  to be sent to the Minister of Hydrocarbons from OTI, right?

18  A    Yes.

19  Q    And you drafted this?

20  A    Yes, probably.

21  Q    Well, we saw --

22  A    Because sometimes Antonio would draft something and send

23  to me, I would correct.  Sometimes I would and he would

24  correct.  If it's being sent from me to Antonio, that's for

25  sure.

1    Q    It was either you or your brother that drafted this,

2    right?

3    A    Yes.

4    Q    And this is a draft letter that is to be sent to the

5    Minister of Hydrocarbons, right?

6    A    Yes.

7    Q    And in drafting this letter you relied on your experience

8    dealing with officials in Ecuador, didn't you?

9    A    It's just a letter.  I mean, something that you put

10   together.  I don't know what you mean by the experience.  It's

11   experience based on other letters that we've written for

12   different companies, yes.

13   Q    Written to whom?

14   A    To different either officials or companies itself.

15   Q    And you knew, too, it would be helpful to start out by

16   congratulating the Republic of Ecuador and its people for the

17   election of Mr. Lenin Moreno?

18   A    Yes.

19   Q    Isn't this exactly what consultants do?

20   A    Looks good.

21   Q    Looks good, right?

22   A    Yes.

23   Q    So that's an example of real consulting work, isn't it?

24   A    Could be, yes.

25   Q    Let's take a look at another one.  How about Government's

1    Exhibit 1298-A, also in evidence.

2            This is another letter that either you or your

3    brother drafted for OTI to send to an Ecuadorian official,

4    isn't it?

5    A    Yes.

6    Q    This is real consulting work, isn't it?

7    A    I guess it's part of it.

8    Q    So when Mr. Galeotti asked you if the money from Mr.

9    Hanst was just to pay bribes, that wasn't true, was it?

10   A    Just to pay bribes, I mean, I don't understand the

11   question.  You're saying when he asked me if the money was

12   just to pay bribes?  I don't recall it, but part of it was

13   being kept by us.

14   Q    And it was being kept by you in exchange for real

15   consulting work?

16   A    Yes, and making the connection, yes.

17   Q    You earned that fee, right?

18   A    Yes.

19   Q    And then what you did with the money that Vitol paid you

20   was your business, wasn't it?

21   A    I don't know what to say to that.  They would have to be

22   shared, otherwise it didn't work.

23   Q    That was a decision that you and your brother made?

24   A    Not me.  My brother, I remember this was all started with

25   my brother and he's the one that actually said okay, this goes

1   here, this goes there.

2   Q    He made that decision?

3   A    Originally, yes.

4   Q    You testified on direct examination, we can take that

5   down, about some bills of lading.

6             Do you recall that testimony?

7   A    Yes, we talked about bills of lading.

8   Q    And we saw some examples of bills of lading in connection

9   with the Vitol OTI deal, right?

10  A    I don't remember.  Maybe.

11  Q    Let's bring up Government Exhibit 1392, which is in

12  evidence.  This is an email that you sent to Mr. Hanst on

13  March 7th of 2018, correct, sir?

14  A    Yes.

15  Q    And it has a number of attachments?

16  A    Yes.

17  Q    Let's take a look at 1392-A.  This is one of the

18  attachments to that email?

19  A    Yes.  An invoice, not bill of lading.

20  Q    This invoice says fuel oil, right?

21  A    Yes.

22  Q    And, in fact, you were invoicing in connection with the

23  fuel oil deal, right?

24  A    Yes.

25  Q    Nothing fake about this invoice, right?

1   A    About the invoice, it's an invoice.

2   Q    And there is nothing fake on it?

3   A    The invoice itself, no.  It refers to an agreement.

4   Q    It lists the amount of barrels shipped, 175,635.88,

5   right?

6   A    Yes.

7   Q    It says, identifies fuel oil?

8   A    Yes.

9   Q    It has the date of the bill of lading?

10  A    Yes.

11  Q    Let's take a look at 1393-MM.  This is another invoice

12  that you sent to Mr. Hanst in relation to the Vitol fuel oil

13  deal.

14  A    Yes.

15  Q    Correct?

16  A    Yes.

17  Q    And, again, it lists the amount of barrels that were

18  shipped?

19  A    Yes.

20  Q    That's approximately 185,000?

21  A    Yes.

22  Q    It identifies fuel oil?

23  A    It is.

24  Q    It has the bill of lading date?

25  A    Yes.

1    Q    Nothing fake on this invoice, is there, sir?

2    A    No.

3    Q    All of these invoices relate to the actual fuel oil that

4    OTI, Vitol, bought from Petroecuador, don't they?

5    A    Yes.

6    Q    These refer to real shipments of real products, right?

7    A    Yes.

8         MR. KOFFMANN:  We can take these down.

9    A    I don't think these were the ones that were actually

10   used, yes.

11   Q    You don't think these were the ones that were actually

12   used?

13   A    Yeah.  Maybe there was two packages of those.

14   Q    I don't understand what you're saying, sir.

15   A    Yeah, there was a mistake on the first invoice and then

16   there was a -- there were more invoices sent, and I'm not sure

17   if those are the ones, if they do refer to the product itself,

18   but I think the amounts on these might be wrong.

19        MR. KOFFMANN:  Can we bring that back up?

20   Q    Vitol's deal was supposed to have 190,000 barrels per

21   month, wasn't it?

22   A    Say that again.

23   Q    Vitol's deal was supposed to have a 190,000 barrels per

24   month, right?

25   A    Okay.  And yes.

1   Q    And this says, approximately, 185,000 barrels, right?

2   A    Yes.

3   Q    It says fuel oil, right?

4   A    Yes.

5   Q    It has the date of the BL, the date of the BL, right?

6   A    Yes.

7   Q    And the consulting business earned a fee in connection

8   with each shipment of fuel oil under this contract, didn't it?

9   A    Yes.

10  Q    Let's talk about some other testimony that you gave on

11  direct examination.

12        During your direct, you discussed some recorded

13  phone calls that you had made with Lionel Hanst.  Do you

14  recall that?

15  A    Yes.

16  Q    And you were asked about -- let's bring up Government

17  Exhibit 3502-T, just line 154.

18        (Continued on next page.)

19

20

21

22

23

24

25

1  BY MR. KOFFMANN: (Continuing.)

2  Q    Mr. Pere, do you recall during your direct examination,

3  Mr. Galeotti asked about this line?

4  A    Maybe yes.  I remember the line.  I remember hearing it,

5  talking about it, but I don't remember the exact question.

6  Q    I can tell you.  This is transcript lines 1692 -- Page

7  1692, line 24 to 1693, line five, question, 154.

8        You said, Let's see, yes.  I would prefer to use the

9  same companies, but on the other hand, it worries me a little

10  bit.  In other words, like, I understand, like I told you,

11  there had been a few small problems.  Like, in other words, it

12  is better to change that.

13        What did you mean by that?

14        Answer:  I was asking him if it wasn't better to

15  change that.

16        Sir, were you asked those questions and did you give

17  that answer?

18  A    Yeah, that's what it seems here.

19  Q    And that reflects the question that you were asked and

20  the answer you gave, doesn't it, sir?

21  A    Yes.

22  Q    What did you mean when you said in response to

23  Mr. Galeotti's question, that it might be better to change

24  them?

25        What did you mean by that?

E. PERE - CROSS - MR. KOFFMANN                    1933

1   A    That it was better to change them for new -- there's a
2   lot of context to this.
3   Q    Sir, can you just speak into the microphone.
4   A    There was a lot of context to this.  We talked a lot
5   about it.  And if it was better to change it to the new
6   accounts that he was putting together, that Lionel was putting
7   together.  That's what we were talking about there.
8   Q    And you thought it would be better to change.
9           Were you nervous about using the old companies?
10  A    Me?  No.
11  Q    Then you said --
12          MR. KOFFMANN:  You can go back to line 154.
13  Q    You said, It worries me a little bit.
14  A    Yes.
15  Q    So you were worried?
16  A    It would be abnormal not to do and we were supposed to be
17  acting normal.
18  Q    Sir, I'm asking you about what's on the screen right now.
19  A    Yes.
20  Q    And this is a conversation between you and Mr. Hanst?
21          MR. GALEOTTI:  Objection, Your Honor.
22          Can we get a time period for the call, please?
23  Q    When was the call, Mr. Pere?
24  A    When?  During the cooperation.
25  Q    So at this point, you're making recorded phone calls

E. PERE - CROSS - MR. KOFFMANN                1934

1   between yourself and Mr. Hanst, right?

2   A    Uh-huh.

3   Q    And you're saying to Mr. Hanst, it worries me a little

4   bit?

5   A    Yes.

6   Q    And I'm asking you why you were worried.

7   A    I wasn't worried.  I was supposed to act normal and I was

8   asking him to -- isn't that a little worrying.  And we were

9   talking already about different companies, and he said he

10  would give me the new names of the companies.  I don't

11  remember exactly why we explicitly talked about that in that

12  conversation.

13  Q    So this would be another example of you trying to reel

14  somebody in to say something incriminating, right?

15  A    No.  This would be an example of me following what I'm

16  told.

17  Q    You were not trying to get him to say something that

18  would incriminate him?

19  A    I was following instructions and seeing if the new

20  companies were already put together, if the names came up,

21  whatever.

22  Q    You were not trying to get him to say something to

23  incriminate himself?

24            MR. GALEOTTI:  Objection, Your Honor.

25            Asked and answered.

E. PERE - CROSS - MR. KOFFMANN                1935

1          THE COURT:  It was asked.  You can answer the

2   question.

3   A    I was not trying to get him to say something

4   incriminating for him.

5          THE COURT:  So the answer is no?

6          THE WITNESS:  Yes.  No.  I was trying to get the

7   names of the companies.

8   Q    Sure.

9   A    That's what --

10  Q    You had a number of other calls with Mr. Hanst that we

11  heard during your direct examination, right?

12  A    Yes.

13  Q    And during those calls, you talked about how there were

14  people at Vitol who needed to approve Mr. Hanst making payment

15  to you, correct?

16  A    Yes.

17  Q    You talked about that on January 16th, 2020?

18  A    Could be.

19         MR. KOFFMANN:  Let's go to lines 83 to 86 of this

20  call.

21  Q    Here, Mr. Pere, Mr. Hanst says to you, Well no, I nudged

22  him today, but if tomorrow I don't hear from him, I go to my

23  contact, the one I always talk to for funds.  I need these

24  fund for that and this fund for such and such.

25         You say, There's that person who's a step above

E. PERE - CROSS - MR. KOFFMANN          1936

1   Javier.
2           Mr. Hanst says, Yes, yes.
3           And you respond, Got it.  Okay.
4           Do you recall that conversation?
5   A    Yes.
6   Q    You discussed it, again, during the same call --
7           MR. KOFFMANN:  Let's go to lines 104 to 106.
8           I guess 105.  104 to 105.
9   Q    Here, Mr. Hanst, in the highlighted portions says,
10  Because he told me that he already -- that's already approved
11  from higher up than him.  In other words, he said it was, in
12  other words, all approved.
13          And he says further down, And if I don't find him,
14  I'm going to call my contact.
15          Mr. Pere, you understood Mr. Hanst when he says "he"
16  and "him" in these portions, to be referring to Mr. Aguilar,
17  correct?
18  A    Not sure.  I'd have to read more of it.
19  Q    Let's see --
20  A    I don't see no references.
21          MR. KOFFMANN:  Can we include a portion of the prior
22  page.
23  A    Looks like that.
24  Q    So you understood Mr. Hanst when he referred to "he" and
25  "him" in the portions I read a moment ago, that he was

E. PERE - CROSS - MR. KOFFMANN                1937

1   referring to Javier Aguilar --

2   A    Can you give me the next page to this?

3   Q    Absolutely.

4   A    It seems to be.

5   Q    Sir, you testified about this call during your direct

6   examination, didn't you?

7   A    Yes.

8           THE COURT:  Speak into the mic.

9           THE WITNESS:  Yes.

10  Q    And before your examination, you prepared with the

11  prosecutors, didn't you?

12  A    Before my examination, I prepared, yes.

13  Q    And they played this call for you, didn't they?

14  A    Yes.

15  Q    And is it your testimony now, sir, that you don't know

16  who Mr. Hanst was referring to when he said "he" and "him" in

17  the portions I read a moment ago?

18  A    No, I just heard a very long conversation in which I had

19  all the context to it at that point.

20  Q    And at that point, was last week, right?

21  A    Yes.

22          MR. KOFFMANN:  Let's take a look at Government

23  Exhibit 3503T which is in evidence, lines 58 through 66.

24  Q    And sir, this is a transcript of a call you made on

25  February 3rd, 2020, right?

E. PERE - CROSS - MR. KOFFMANN                    1938

1   A    Yeah, I didn't get the date at the beginning.

2           MR. KOFFMANN:  Let's take a look at the first page.

3   A    February 3rd, yeah.  Okay.

4           MR. KOFFMANN:  Let's go to lines 58 to 66.

5   A    Fifty -- okay.

6   Q    And this portion, sir, you say, But Javier --

7           Mr. Hanst says, Okay.

8           You say, Hasn't sent you the money yet?

9           Mr. Hanst says, Yes.  No, no, no, because everybody

10  was waiting for the headquarters to tell us what to do, right?

11  A    Yes.

12  Q    So you understood, sir, that there were others at Vitol

13  who had to approve payments going to Mr. Hanst and to

14  yourself, correct?

15  A    That's what he said.

16  Q    And that's what you understood, isn't it?

17  A    Yes.  Partially, yes.  Because you always -- sometimes he

18  talked about Javier, sometimes he talked about somebody else,

19  somebody who I never heard of, but he never gave me a name.

20  But that's what he's referring to right now.

21  Q    And that person you understood to be based in

22  Switzerland?

23  A    Somebody to be based in Switzerland.

24  Q    And that somebody was higher up at Vitol than Mr. Aguilar?

25  A    That's what Lionel says.

E. PERE - CROSS - MR. KOFFMANN                    1939

1  Q    He was based at the headquarters, right?

2  A    That's what he says, yes.

3  Q    Mr. Hanst told you that, but you say that he never told

4  you that person's name?

5  A    No.

6  Q    So you never heard the name Marc Ducrest?

7  A    No.

8  Q    Or Marc Ducrest?

9  A    No.

10 Q    You never heard that name in your life?

11 A    No.

12 Q    And Mr. Hanst didn't tell you that this contact, that

13 he'd known that contact for 20 years?

14 A    I don't recall exactly.  Maybe he -- maybe he did in a

15 conversation.  But he had a contact, and that's all I know.

16 That's what he said, at least.

17 Q    And he also never told that you that contact was person

18 who brought Mr. Hanst to Vitol?

19          MR. GALEOTTI:  Objection, Your Honor.

20          THE COURT:  Probing the conversation.  I'm going to

21 allow it.

22          MR. GALEOTTI:  There is no conversation.  That's the

23 testimony.

24          Counsel is testifying.

25          THE COURT:  All right.  I thought I heard the

1    witness discuss a conversation with Mr. Hanst.

2              MR. KOFFMANN:  You did, Your Honor.

3              We also heard during direct and are reviewing now, a

4    number of conversations he had about this mystery man in

5    Switzerland.

6    Q    So Mr. Pere, Mr. Hanst never told you that his contact at

7    Vitol headquarters was the person who brought him to work at

8    Vitol?

9              He didn't tell you that, did he?

10   A    I don't remember hearing something like that.  But I

11   think it came from Javier Aguilar.  I'm not sure.  But again,

12   lot of conversations.

13   Q    And Mr. Hanst never told you that it was his contact in

14   Switzerland who had created this payment structure with

15   Mr. Hanst, right?

16             Mr. Hanst never told you that?

17   A    I'm not sure.

18   Q    And Mr. Hanst didn't tell you about his own contracts

19   that he had with Vitol?

20   A    I don't think so.

21   Q    He didn't tell you that those were approved by Vitol in

22   Switzerland, did he?

23   A    The contracts?  I don't know.  I have no idea.

24             MR. KOFFMANN:  Let's switch gears.

25             We can take that down.

E. PERE - CROSS - MR. KOFFMANN                    1941

1  Q    Mr. Pere, you testified that you've been living in the

2  United States since 2017, correct?

3  A    Yes.

4  Q    In fact, you moved to the United States in January of

5  2017, right?

6  A    Not exactly.  I don't think I moved here.

7  Q    Well, isn't it true, sir, that you were in the United

8  States from January 9th, 2017, until March 7th of 2017?

9  A    Could be.

10 Q    And, in fact, you spent almost the entire year of 2017,

11 you were in the United States; weren't you, sir?

12 A    Could be.

13        MR. KOFFMANN:  Let's bring up Defense Exhibit 572,

14 just for the witness.

15 A    Mm-hmm.

16 Q    Mr. Pere, do you recognize the number next to "document

17 number?"

18 A    Yes.

19 Q    That's your passport number?

20 A    That's my passport number.

21        MR. KOFFMANN:  Offer Defense Exhibit 572.

22        MR. GALEOTTI:  No objection.

23        THE COURT:  Received in evidence without objection.

24        (Defense Exhibit 572, was received in evidence.)

25        MR. KOFFMANN:  May we publish?

E. PERE - CROSS - MR. KOFFMANN                    1942

1    THE COURT:  You may.

2    (Exhibit published.)

3  Q    Mr. Pere this is a document that shows when you entered

4  and when you left the United States.  On this page, we see

5  from June 26th, 2017, until October 11th of 2019.

6    Do you see that?

7  A    That's -- yes.

8    MR. KOFFMANN:  So let's go to Page 2.

9  A    With several in and outs, yes.

10  Q    If you look at entry 16, this shows you arriving at -- in

11  Miami on January 9th of 2017, correct, sir?

12  A    Yes.

13  Q    Sir, this document shows that you moved to the United

14  States in January of 2017, doesn't it?

15  A    I was going back and forth from Ecuador to Miami, and I

16  see several arrivals and departures in that time.

17  Q    Sir, you spent about eight months in the United States in

18  2017, correct?

19  A    Could be.

20  Q    And you were living in Miami, right?

21  A    Yes.

22    MR. KOFFMANN:  We can take that down.

23  Q    You moved to Miami because your brother told you to move

24  to Miami?

25  A    I came to Miami because he was worried about too much

1  noise on several contracts going on in Ecuador, and he felt it

2  was safer for me to be here.

3  Q    You moved to Miami because your brother told to you move

4  to Miami; isn't that correct, sir?

5  A    I wasn't thinking on moving to Miami at that point.  I

6  was just going to spend more time here.  But I started

7  spending more time in Miami.  If that's the question, yes.

8  Q    Because your brother told you to?

9  A    He told me, I believe it should be safer, it should be

10 better for you to spend more time here, because there's all

11 this noise in South America in Ecuador.

12 Q    Sir, didn't you tell the FBI in 2017, you, at the request

13 of Antonio, relocated to Miami to work with Antonio at the

14 office used for Adexus Consulting?

15       Didn't you tell that to the Government?

16 A    I don't recall it like that, exactly.

17       MR. KOFFMANN:  Let's bring up 3500 EP1A, Page 2,

18 bottom of the second paragraph.

19 Q    Read that to yourself, sir, the highlighted portions and

20 let me know when you've done so.

21       Have you read it, sir?

22 A    Yes, I have.

23 Q    Does that refresh your recollection that you told the

24 Government that in 2017, you, at the request of Antonio,

25 relocated to Miami to work with Antonio at the office used for

1  Adexus Consulting?

2  A    I don't recall saying it in that word, no.  I don't know.

3  That's not something I've written.

4  Q    Do you deny that you moved -- it's not a trick question,

5  sir.

6  A    No, I told you I came to Miami in 2017.  I'm not trying

7  to make it difficult.  I went in and out several times.

8  Q    And you did it at the request of your brother.

9        Is that the piece you won't admit to?

10  A    No.  He told me that he believed I should do something,

11  and I did.  I was not ordered to do so.  Maybe that's the

12  answer.  No?

13  Q    It's your answer, sir.

14        When you moved here, you were here on a visitor

15  visa, correct?

16  A    Yes.

17  Q    And I believe you were on a student visa?

18  A    Later.

19  Q    You weren't a student, were you, sir?

20  A    I'm sorry.

21  Q    You were not a student, were you?

22  A    I was studying French at Berlitz.

23  Q    Sir, your testimony is that you moved to the United

24  States on a student visa to take French classes?

25  A    Yes.

E. PERE - CROSS - MR. KOFFMANN                1945

1   Q    And while you were here, you were working, weren't you?

2   A    Yes.

3   Q    You're here on a student visa and you're working for your

4   brother, right?

5   A    I was doing the same things I always did since I started

6   working with him in Ecuador.

7   Q    And you knew then that you didn't have authorization to

8   work on your student visa, right?

9   A    No, I didn't.

10  Q    So that's visa fraud, right?

11  A    I don't know.

12  Q    Did you think that you were allowed to do that, sir?

13  A    I thought I was.

14  Q    You thought that you were allowed to move to the U.S. on

15  a student visa in order to take French classes and earn

16  millions of dollars at your brother's consulting business?

17          MR. GALEOTTI:  Objection.  Compound.

18          THE COURT:  Sustained.

19  Q    Is it true, sir, that you were earning millions of

20  dollars at your brother's consulting business while you were

21  here in the United States on a student visa?

22  A    If you mean millions, it's more than one, yes.

23  Q    And you knew that you were not allowed to do that?

24  A    I didn't know that I wasn't allowed to my work -- I

25  wasn't a nine to five employee with Antonio.  I was not

E. PERE - CROSS - MR. KOFFMANN                     1946

1  employed by his company either.  But I don't know.  Again, I
2  could be wrong.
3  Q    So you thought you were doing nothing wrong by being in
4  the United States on a visa that does not permit you to work,
5  and work at that same time?
6  A    I don't think it was wrong then.
7  Q    You don't think it was wrong then?
8  A    No.
9  Q    You mean you were allowed to do that then?
10         MR. GALEOTTI:  Objection.  Asked and answered.
11         THE COURT:  It is.  Sustained.
12 Q    Mr. Pere, while you were here on a student visa working
13 and earning millions of dollars, you didn't pay any tax on
14 that money, did you?
15 A    No.
16 Q    And you didn't pay any tax on that money in Ecuador
17 either, right?
18 A    No.
19 Q    You understand that's tax fraud, right?
20 A    I was on a student visa and from my understanding, I was
21 not to pay taxes on that.  That was not even business
22 happening in the U.S. at that point.
23 Q    You were living in Miami and working and earning money in
24 Miami, weren't you, sir?
25 A    Yes.

1  Q    And you were not paying any taxes on that in the United

2  States?

3  A    No.

4  Q    And you weren't paying any taxes on that in Ecuador?

5  A    No.

6  Q    And it's your testimony that you believe that you could

7  earn millions of dollars and pay no tax whatsoever anywhere?

8  A    At that point, I had my student visa.

9  Q    Not my question, sir.

10  A    What --

11  Q    My question is, did you believe that it was okay to earn

12  millions of dollars and not pay tax on it anywhere?

13  A    No, I believe that you should pay taxes.  That's why now

14  I got an accountant and I'm trying to get everything

15  organized.

16  Q    Again, not my question --

17  A    Oh, I'm sorry.

18  Q    You've got to listen for the question and answer it.

19  A    Oh, okay.

20  Q    When you were here prior to your period of cooperation

21  and you moved here in 2017, you were earning millions of

22  dollars and you were paying no tax on it at all, correct?

23  A    Yes.

24  Q    And it's your testimony that you thought it was okay to

25  do that?

1    THE COURT:  Meaning lawful, correct, Mr. Koffmann?

2    MR. KOFFMANN:  Yes.

3  A    I thought it was at that point because I was on a student

4  visa and I was taking classes.

5  Q    Your testimony is you thought it was lawful to earn

6  millions of dollars and pay no tax anywhere?

7  A    At that point.

8  Q    You really expect us to believe that?

9    MR. GALEOTTI:  Objection, Your Honor.

10    THE COURT:  Sustained.

11    MR. GALEOTTI:  Move to strike.

12  Q    You testified on Friday that you thought that part of the

13  reason why your brother had you put your name on OIC, EIC, and

14  OPV was for tax purposes.

15    Do you recall that testimony?

16  A    Yes, I believe so.

17  Q    What exactly did you mean by that?

18  A    That he was moving to the U.S., and until he got his

19  things organized, whatever, he didn't want to have foreign

20  companies, offshore companies involved with him.

21  Q    Isn't it true, sir, that the reason your brother -- that

22  any tax explanation for having your names on those companies

23  was so that he could commit tax fraud?

24  A    I don't know.  You would have to ask him.

25  Q    Well, isn't it true, sir, that you made payments to your

E. PERE - CROSS - MR. KOFFMANN                    1949

1    brother out of those companies, and you listed them as

2    donations?

3    A    Yes.

4    Q    You donated millions of dollars to your brother, right?

5    A    Yeah.  It was actually his money.

6    Q    It was his money, and it was fees that the consulting

7    business had earned from its clients, right?

8    A    Yes.

9    Q    A company that, although your names were on it,

10   ultimately, your brother owned?

11   A    Yes.

12   Q    Business income you were paying to your brother as

13   supposed donations, right?

14   A    Yes.

15   Q    And you understood that the reason for that was so that

16   he could avoid paying income tax on it.

17            Didn't you understand that, sir?

18   A    I guess so, yeah.

19   Q    So your brother had you put your names on the companies,

20   and then he had you help him commit tax fraud, right?

21   A    From what you're saying, yes.

22   Q    Well, that's what you understood at the time, isn't it?

23   A    Not at the time.

24   Q    What did you think the purpose of making millions of

25   dollars in donations of money that his company had earned,

1  what did you think the purpose of that was?

2  A    I don't know.  I'm guessing it was some sort of tax

3  issue, but it wasn't my money.  I was just signing for him,

4  those papers.

5  Q    When you say "tax issue," you mean tax evasion, don't

6  you, sir?

7  A    I don't want it to call it evasion.  I'm not a tax

8  lawyer.  Saving taxes, somehow.  I don't know.

9  Q    Saving taxes by cheating on your taxes?

10  A    Like I said, I don't know.

11  Q    In any event, sir, you haven't been charged with visa

12  fraud, have you?

13  A    No.

14  Q    And you have not been charged with tax fraud, right?

15  A    No.

16  Q    And during this time, 2017, you opened up a number of

17  bank accounts you testified about that, right?

18  A    2017, yes.

19  Q    Some of them were for the OIC, EIC, and OPV companies?

20  A    EIC, OIC, and OPV, yes.

21  Q    You also opened a bank account in your own name, right?

22  A    Could be.

23      MR. KOFFMANN:  Let's bring up Defense Exhibit 482,

24  just for the witness.

25      Let's go to the first page, please.

E. PERE - CROSS - MR. KOFFMANN                    1951

1   A    Yes.

2   Q    Sir, this is an application to open an account at EFG

3   Bank, correct?

4   A    Yes.

5   Q    And you signed it?

6   A    This was not signed.

7   Q    You wrote your name on this document?

8   A    Yes, that's my handwriting.

9          MR. KOFFMANN:  Offer Defense Exhibit 482.

10         MR. GALEOTTI:  How many pages are in here?

11         Objection.

12         THE COURT:  Sidebar.

13         (Continued on the next page.)

14         (Sidebar conference.)

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                              1952

1      (The following occurred at sidebar.)

2      MR. GALEOTTI:  Your Honor, this is a 16-page bank

3  record.  While the bank record itself, we're not disputing is

4  a record -- a bank record and would be a business record,

5  unlike the spreadsheets which Your Honor admitted the other

6  day, this has a series of additional statements within the

7  record that are separate and apart from their being just the

8  bank record itself.  I have to look at all 16 pages.  But it

9  appears there's some comments and reference to donations made

10 by Mr. Enrique Pere, and the purpose for which Mr. Koffman's

11 offering this is for truth purpose regarding the donations.

12     I think I'm going to continue to look at it while

13 we're here at sidebar.

14     MR. KOFFMANN:  So two points, Your Honor.

15     As Mr. Galeotti, I think, said, they've already

16 stipulated this is a business record.  That means that it's

17 subject to a hearsay exception.  Therefore --

18     THE COURT:  A business record of the bank?  I don't

19 know what it is.

20     MR. GALEOTTI:  Yes, of the bank, Your Honor.

21     MR. KOFFMANN:  It's an account opening document that

22 Mr. Pere filled out to open a bank account.  So they

23 stipulated to it's a business record --

24     THE COURT:  And are there things on this document

25 that were added after the account document was opened and

SIDEBAR CONFERENCE                    1953

1  completed?

2          MR. KOFFMANN:  There are what appears to be records

3  recorded in the account opening statement as comments from

4  Mr. Pere.

5          THE COURT:  To whom?

6          MR. KOFFMANN:  To the bank, that the bank then

7  recorded in the account opening statement.

8          And in particular, Your Honor, there's a statement

9  that says that he's going to be using the account to make

10 donations.  So my whole point is that these were not

11 donations.  So it's not being offered for the truth, it's

12 being offered for the opposite of the truth, for the fact that

13 he said it, and it was a lie.  So there's no hearsay.  Even if

14 there were -- even if the Government had not stipulated, this

15 document would not be subject to a hearsay exception, that

16 specific portion is not hearsay.  This is not being offered

17 for the truth.

18         MR. GALEOTTI:  Your Honor, first of all, we

19 stipulated it's a business record because there's no point in

20 bringing a bank custodian here to say this is a document of

21 the bank, of course.  We did not stipulate to admissibility

22 because a lot of these documents have other issues, including

23 a second layer of hearsay, which Mr. Koffmann just identified

24 statements of Mr. Pere contained within that are the actual

25 definition of double hearsay.  And he's trying to use it for

SIDEBAR CONFERENCE                    1954

1   the purpose that Mr. Pere made a statement that he was going

2   to make donations from this account which he just elicited

3   from the witness who said he made donations from this account.

4   That is the true purpose.  This doesn't shouldn't come in.

5            MR. KOFFMANN:  Your Honor, I can assure you it's not

6   my contention that he actually made donations.

7            Stipulating that something is a business record

8   therefore means it's subject to a hearsay exception.  They

9   preserve and all parties preserve when they stipulate on

10  hearsay issues, to make arguments about relevance, 403, other

11  things along those things.  If the Government had an issue

12  with supposed double hearsay within the document, then they

13  could have and they should have raised it previously.

14           MR. GALEOTTI:  That's 100 percent wrong --

15           THE COURT:  My understanding is we have a document

16  that's filled out, asks questions, and there's an answer to

17  the question, right.  Truthful or not.

18           Truthful or not, there's an answer to a question on

19  a bank form.  Once the document is completed, it then becomes

20  a business record of the bank.

21           MR. GALEOTTI:  Your Honor, I think this is more akin

22  to, like, a DD5 in an NYPD report where it's the record making

23  a record of NYPD.  But if a witness says, the man in the red

24  shirt did the murder, that's double hearsay, and this is

25  excluded.  It's the exact same thing that's happening here.

SIDEBAR CONFERENCE                                1955

1      MR. KOFFMANN:  Your Honor, that's far, far

2  different.  The purpose of a bank employee entering notes into

3  an account opening form is the -- exactly what a business

4  record is -- that's the whole purpose of a business record.

5  Their practice is when they're opening account, is to speak to

6  a customer and to get information from that customer.  It's

7  then recorded in the bank -- in the account opening statement.

8  It's a business record, as the Government's already stipulated

9  to.  To compare it to a police report is a total apples and

10  oranges.

11      THE COURT:  He's not reporting that he's making the

12  donation, he's reporting that it's his intention to make the

13  donation, as I understand it?

14      MR. KOFFMANN:  Exactly, Your Honor.

15      MR. GALEOTTI:  What's the line?  What's the page?

16      MR. KOFFMANN:  It's at Page 7.

17      THE COURT:  Because it could not have happened in

18  time if this is the opening statement.  It's not reporting

19  that he made a donation, it's only reporting that he's opening

20  the account for the purposes stated, and that obviously, if

21  it's on -- if that question is on the bank form, then it

22  indicates that the bank has some business reason to ask the

23  question.  And if he fills in the answer, then that's

24  providing the bank with information that the bank thinks is

25  important to the bank's business.

SIDEBAR CONFERENCE                    1956

1      MR. KOFFMANN:  So Your Honor, it's slightly

2  different in that this information, this statement which is

3  state of mind, 803(3), is included in a section that has been

4  filled out by the bank employee, so it's not as if it says,

5  what's your name, what's your social, what do you intend to

6  use with the bank, and he wrote that in.  But it reflects that

7  he had some conversation with the bank employee --

8      THE COURT:  So the entries are made by the bank

9  employee?

10      MR. KOFFMANN:  On this portion, yes.  In other

11  portions, he filled it in, in handwriting.

12      THE COURT:  But it's the same thing?

13      MR. KOFFMANN:  Yes.  Exactly.

14      MR. GALEOTTI:  I mean, I disagree, Your Honor,

15  because it's taking a statement, a second-level statement that

16  someone made, and that person is incorporating it in here.

17  But I understand Your Honor's ruling.

18      THE COURT:  It's not the report of a police

19  investigation.  This is creating an account, and this is the

20  information that the bank wanted to create the account.  So

21  I'm going to let it in.

22      MR. GALEOTTI:  Okay.

23      MR. KOFFMANN:  Thank you, Your Honor.

24      (End of sidebar conference.)(Continued on next page.)

25

1       (In open court; Jury present.)

2       MR. KOFFMANN:  Your Honor, I offer Defense

3   Exhibit 482.

4       MR. GALEOTTI:  No objection.

5       THE COURT:  Received without objection.

6       (Defense Exhibit 482, was received in evidence.)

7       MR. KOFFMANN:  May we publish?

8       THE COURT:  You may.

9       (Exhibit published.)

10  BY MR. KOFFMANN:

11  Q    So Mr. Pere, this is your application to open an account

12  at a bank, correct?

13  A    Yes.

14  Q    And it reflects information that you gave to the bank in

15  opening the account, correct?

16  A    Yes.

17       MR. KOFFMANN:  Let's go to Page 7, third paragraph.

18  Q    In this section, sir, it's called "purpose of account,"

19  correct?

20  A    Yes.

21  Q    And it says, among other things, To make quote, unquote,

22  gift donations to his brother throughout a four-year period,

23  payments to be in the 500K to 600K range.

24  A    Yes.  That's what it says.

25  Q    And that was a lie, wasn't it, sir?

E. PERE - CROSS - MR. KOFFMANN                    1958

1   A    I lied because it was his own money.

2   Q    You can't gift somebody their own money, can you, sir?

3   A    No.

4   Q    So this was a lie, right?

5   A    Yes.  It was required for the account opening, yeah.

6   Q    It was required for the account opening, and you lied,

7   right?

8   A    Yes.

9   Q    And you understand it can be a crime to lie to a bank,

10  right?

11           MR. GALEOTTI:  Objection.

12           THE COURT:  Sustained.

13           MR. KOFFMANN:  Your Honor, it's 1:10.  Should we

14  take a break?

15           THE COURT:  If we're moving to a different topic,

16  absolutely.

17           MR. KOFFMANN:  We are.

18           THE COURT:  All right, ladies and gentlemen, we're

19  at the time for the luncheon break, and we will actually do

20  that.

21           So the rules continue to apply.  Don't discuss the

22  case amongst yourselves or with anyone else.  Continue to keep

23  an open mind.  The no-homework rule remains in effect.  No

24  outside research, electronic or otherwise, during the break.

25  Radio silence still continues to apply.  No communication to

E. PERE - CROSS - MR. KOFFMANN                   1959

1    anyone that you're coming to the courthouse, that you're a

2    juror, or anything that remotely touches the personages or

3    issues raised in this case.  And to the extent, given the

4    broad definition of what passes for media, to the extent

5    anything pops up on one of the media that you use that relates

6    to the case, tune it out, and enjoy your lunch, otherwise.

7            We'll ask you to come back to the central jury room

8    between, if we go to a late start, around 2:30, and we will

9    resume, thereafter, as close as we can to that time.  And look

10   forward to seeing you then.  Enjoy your lunch.  Cafeteria is

11   open and looks like it's not raining.  So you can go outside.

12           (Jury exits the courtroom.)

13           THE COURT:  Okay.  We'll break for lunch, as well.

14           The usual rules, if you need it, take it with you.

15   Otherwise, you can leave it, and William will lock it up.

16           Mr. Pere, you can stand down.

17           (The witness steps down.)

18           (A luncheon recess was taken.)

19

20

21

22

23

24

25

Proceedings                                                1960

1           AFTERNOON SESSION

2               (In open court; jury not present.)

3           THE COURTROOM DEPUTY:  All rise.  Court is back in

4    session.  Counsel for both sides are present, including

5    defendant.

6           THE COURT:  Are we ready to go?

7           MR. LAX:  Yes, Your Honor.

8           MR. KOFFMANN:  Yes, Your Honor, just briefly on the

9    witness order, we offered for the Government to start the next

10   witness now and to interrupt my cross at this point.  I

11   understand they prefer to continue the witness and go to the

12   next witness.

13          MR. GALEOTTI:  It is unclear whether the next person

14   would get done with direct and cross today anyway, so we have

15   the issue, so we'd rather go forward.

16          THE COURT:  That's fine.

17          MR. GALEOTTI:  Frankly, we are at a day and a half

18   of cross already for a witness who was on direct for a day and

19   a half.  We would like to keep it moving a little.

20          THE COURT:  Fine with me.

21              In that connection, let's bring in the witness and

22   the jury.

23          MR. KOFFMANN:  I will resume the podium, Your Honor.

24          THE COURT:  Please.  Witness takes the stand.)

25              (The jury enters the courtroom.)

E. Pere - cross - Koffmann                1961

1      THE COURT:  Be seated, please.

2      Counsel will stipulate that the jury is present and

3  properly seated.

4      MR. LAX:  Yes, Your Honor.

5      MR. KOFFMANN:  Yes, Your Honor.

6      THE COURT:  Thank you, counsel.

7      Ladies and gentlemen, welcome back.  I hope you had

8  a chance to enjoy a good lunch.  I told you the weather was

9  die where he, remember, I didn't say it didn't get chillier.

10  Hopefully, you were able to weather through that.

11      We are ready to resume.  Mr. Pere is back on the

12  stand and Mr. Koffmann is ready to resume his

13  cross-examination.

14      MR. KOFFMANN:  Thank you, Your Honor.

15  CROSS-EXAMINATION

16  BY MR. KOFFMANN:  (Continuing)

17  Q    Mr. Pere, just before the lunch break we talked about

18  your visa and your failure to pay taxes and your complicity in

19  your brother's tax fraud.  Do you recall that?

20  A    Yes.

21  Q    And the Government knows all about those crimes, don't

22  they?

23  A    Yes.

24  Q    But they're not prosecuting you for those crimes;

25  correct?

E. Pere - cross - Koffmann                    1962

1   A    No.

2   Q    They've charged you with only one crime; isn't that

3   right?

4   A    Yes.

5   Q    And that is a conspiracy charge?

6   A    Yes.

7   Q    And you signed a cooperation agreement with the

8   Government in May of 2020; right?

9   A    Approximately.

10       MR. KOFFMANN:  Can we bring up Government Exhibit

11  3500-EP-276, which is in evidence.

12       Just waiting for the document, Your Honor.

13  Q    So, Mr. Pere, you're only charged with one charge and

14  that's a conspiracy charge; correct?

15  A    Yes.

16  Q    And the Government agreed not to charge you with any

17  other crimes relating to the bribery schemes that you told

18  them about; right?

19  A    Yes.

20       MR. KOFFMANN:  Can we bring up Government Exhibit

21  3500-EP-276.

22  Q    While we are waiting for the technology to work, Mr.

23  Pere, you understand that that single conspiracy charge covers

24  all your crimes in connection with bribery and money

25  laundering in Ecuador; right?

E. Pere - cross - Koffmann                              1963

1    A    Yes.

2    Q    And we spoke earlier --

3         MR. KOFFMANN:  Here we go.  So let's zoom in on

4    paragraph 1.

5    Q    And Mr. Pere, this is your cooperation agreement; right?

6    A    Yes.

7    Q    We can see here that you are pleading guilty to

8    conspiracy and that has a maximum term of imprisonment of five

9    years; right?

10   A    Yes.

11   Q    And we talked earlier today about the three separate

12   schemes to which you admitted paying bribes and laundering

13   money; right?

14   A    Yes.

15   Q    There was Gunvor; right?

16   A    Yes.

17   Q    There was Sargeant Marine?

18   A    Yes.

19   Q    And then there was the Vitol deal; right?

20   A    Yes.

21   Q    And the Gunvor -- let's start with the Gunvor scheme.

22   That involved bribes to the same foreign official that we have

23   been talking about and that's Nilsen Arias; right?

24   A    Yeah.  Not all of them, but it involves Nilsen Arias,

25   yes.

E. Pere - cross - Koffmann                    1964

1   Q    Gunvor involves Nilsen Arias?

2   A    Yes.

3   Q    And that scheme involving Gunvor and Nilsen Arias began

4   years before you ever met Javier Aguilar; right?

5   A    Yes.

6   Q    And the consulting business made almost $100 million from

7   Gunvor; right?

8   A    Yeah.  I don't remember exactly, but could be somewhere

9   close to that.

10  Q    And you received that money from Gunvor?  The consulting

11  business received that money from Gunvor in connection with at

12  least five different deals; right?

13  A    From Gunvor, yes.

14  Q    Right.  There were the UNIPEC deals, there were the

15  PetroThailand deals; right?

16  A    Yes.

17  Q    But all those related to Gunvor?

18  A    Yes.

19  Q    And your role in that payment, sorry -- strike that.

20       Your role in that scheme involved processing

21  payments to recipients of the bribes; right?

22  A    Yes.

23  Q    And that's why your conspiracy charge was both related to

24  bribery and money laundering; right?

25  A    Yes.

E. Pere - cross - Koffmann                    1965

1  Q    And let's talk about Sargeant Marine.  On Friday, you

2  testified that you weren't really part of Sargeant Marine.  Do

3  you recall that testimony?

4  A    Maybe.  I didn't receive anything from them.

5          MR. KOFFMANN:  Let's bring up transcript pages 1819

6  to 1820, lines 24 to line 1 on 1820.

7  Q    So on Friday, Mr. Pere, I asked you:  You also had

8  Sargeant Marine, right?

9          You answered:  I think that was a different era.

10 That was before that, I think.  I don't know.  I wasn't really

11 part of that.

12         Were you asked that question and did you give that

13 answer?

14 A    Yes.

15 Q    But you pleaded guilty to being part of a conspiracy

16 involving bribery and money laundering with Sargeant Marine,

17 didn't you, sir?

18 A    I guess so.  I don't remember exactly the whole details

19 of the cooperation agreement.

20         MR. KOFFMANN:  Let's bring up Defense Exhibit 111,

21 go to paragraph 35.  This is just for the witness.  This is

22 not in evidence.

23 Q    Mr. Pere, read just to yourself, not out loud.

24 A    Okay.

25         Yes.

E. Pere - cross - Koffmann                    1966

1   Q    Having read that, Mr. Pere, does that refresh your

2   recollection that you pleaded guilty to the Sargeant Marine

3   scheme?

4   A    Yes.

5   Q    And that began in 2014; right?

6   A    Yeah.

7            MR. KOFFMANN:  We can take that down, Mr. McLeod.

8   Thank you.

9   Q    You worked for the consulting business in 2014; right?

10  A    Yes.

11  Q    The Sargeant Marine scheme also involved Nilsen Arias;

12  right?

13  A    Yes.

14  Q    And you pleaded guilty to it, as you just said; right?

15  A    Yes.

16  Q    Yet when I asked you Friday about Sargeant Marine, you

17  said you weren't really part of it; right?

18  A    Because I didn't receive money from it.  I wasn't paid

19  anything.

20  Q    We just looked at your testimony, didn't we, sir?

21  A    Yes.

22  Q    And your testimony was I wasn't really part of that;

23  right?

24  A    Yeah.  You said that I wasn't really part of that on

25  Friday.

E. Pere - cross - Koffmann                1967

1  Q    That's what you said --

2  A    Yes.

3  Q    -- on Friday?

4  A    Yes.

5  Q    And that wasn't true, what you said on Friday?

6  A    Okay.  Maybe I misunderstood the question, but what I did

7  know is I made the invoices and I had the companies.

8  Q    The Sargeant Marine scheme began before you ever met Mr.

9  Aguilar; right?

10  A    I think so, yes.

11  Q    You also pleaded guilty to this alleged Vitol scheme;

12  right?

13  A    I think so.

14  Q    So even though there were three separate schemes that you

15  said that you were guilty of, you were only charged with one

16  conspiracy; right?

17  A    Yes.

18  Q    You understand, though, that had the Government chosen to

19  do so, they could have charged you with three separate

20  conspiracy charges; right?

21  A    I guess so.

22  Q    And each one of those conspiracies would have had a

23  potential prison sentence of five years; right?

24  A    I guess so.

25        MR. KOFFMANN:  Let's go back to EP-276, which is in

E. Pere - cross - Koffmann                                    1968

1    evidence.  Let's go to paragraph 1.

2    Q    Sir, you see here that it says the maximum term of

3    imprisonment for the conspiracy count to which you pleaded

4    guilty is five years; right?

5    A    Yes.

6    Q    So you understand had the Government chosen to charge you

7    with one conspiracy for each of these schemes, then you would

8    be facing multiple counts that have five-year maximum

9    sentences; right?

10   A    I guess so.

11   Q    You also understand that in addition to conspiracy, they

12   could have charged you with substantive violations of the

13   Foreign Corrupt Practices Act.  Do you understand that, sir?

14   A    That I don't know.  I'm not a lawyer.  My lawyers are the

15   ones that -- that went through this.

16   Q    You understand that you have not been charged with a

17   separate money laundering conspiracy charge; right?

18   A    I haven't been charged with a separate money for each?

19   Can you explain that?

20   Q    You understand the charges against you; right?

21   A    Yes.

22   Q    And they do not include a separate money laundering

23   conspiracy charge; correct?

24   A    I'm not sure.  I don't think so.

25   Q    Well, we are looking right now at your cooperation

E. Pere - cross - Koffmann                    1969

1   agreement.

2   A    Yeah, there's one charge.

3   Q    And you understand had the Government chosen to charge

4   you with a separate money laundering conspiracy charge that

5   you could be facing an additional 20 years in prison on that

6   charge alone; right?

7              MR. GALEOTTI:  Objection.

8              THE COURT:  Sustained.

9   Q    Sir, you understand had the Government chosen to do so,

10  they could have charged you with crimes facing decades in

11  prison; right?

12             MR. GALEOTTI:  Objection.

13             THE COURT:  I'm going to allow that in that general

14  form.

15  A    Maybe, yes.

16  Q    Maybe you understand that?

17  A    I mean, I'm -- I'm not a lawyer.  I'm just trying to

18  understand what you're explaining.

19  Q    My question -- I'm not explaining anything to you, sir.

20  I'm asking what your understanding is.

21             It's a yes-or-no question.

22  A    Yes.

23  Q    So your present exposure under this cooperation agreement

24  you understand is limited to five years?

25  A    Yes.

E. Pere - cross - Koffmann                    1970

1    Q    But you're also hoping to get even more benefits, aren't
2    you, sir?
3    A    Like what?  I'm hoping to get what?  Less than five
4    years, I hope so.
5    Q    You're hoping that the Government will tell the judge,
6    when it comes time to be sentenced, that you should get
7    leniency for cooperating; right?
8    A    I guess so.  Yeah, I guess so.
9    Q    You guess that that's what you're hoping for?
10   A    I understand that they have to give a letter that will
11   only state if I cooperated to the extent of my cooperation
12   agreement and that it's up to the judge.
13   Q    Your understanding is that they have to give that letter?
14   A    If it's an agreement and if I met the terms, yes.
15   Q    And you understand, sir --
16   A    They could, I think it says.  I'm not 100 percent sure.
17   Q    You're not 100 percent sure if the government has to --
18   A    From what I understood always, yeah --
19   Q    Sir, you have to let me ask the question.
20   A    Sorry.  Go ahead.
21   Q    You're not sure whether the Government has to write that
22   letter or whether they choose to write that letter?
23   A    No.  From my understanding once the -- as it was
24   explained by my lawyers, once the -- if I meet the cooperation
25   agreement and I'm truthful to it, the Government writes -- I

E. Pere - cross - Koffmann                    1971

1    think it's called 5K or K5 letter stating that I have

2    fulfilled my agreement.

3    Q    And you understand, sir, that it's the Government alone

4    that decides whether you cooperated fully; right?

5    A    Yes.

6    Q    And it's the Government alone that decides whether you've

7    been truthful; right?

8    A    Yes.

9    Q    It's these prosecutors at this table who make that

10   decision?

11             MR. GALEOTTI:  Objection.

12             THE COURT:  I'm going to sustain that.

13   Q    Do you understand, sir, it's not the jury who decides

14   whether to send that letter; right?

15   A    Yes.

16   Q    It's the Government who decides if you have been

17   truthful?

18   A    Yes.

19   Q    You also understand, sir, what happens if the Government

20   determines that you have not cooperated; right?

21   A    Yes.

22   Q    You understand that that means that they can walk away

23   from the deal but you, you're stuck with the deal; right?

24   A    If they walk away, there's no deal.

25   Q    What do you mean when you say there's no deal?

E. Pere - cross - Koffmann                    1972

1  A    There's -- if they walk away from the cooperation

2  agreement, there wouldn't be one.

3         MR. KOFFMANN:  Can we go to paragraph 17, to page 8

4  to 9.

5  Q    Starting at the third line of paragraph 1, Mr. Pere,

6  where it says, Should it be judged by the Government that the

7  defendant has failed to cooperate fully --

8  A    Yes.  Should I keep on reading?

9  Q    Then if you look a few lines down, it says, The defendant

10  will not be released from his plea of guilty, the Government

11  will be released from its obligation under this agreement,

12  including several things.

13         And then if we could go to the last sentence of this

14  paragraph, it says:  The defendant will also be subject to

15  prosecution for any federal criminal violation of which the

16  Government has knowledge, including, but not limited to, the

17  criminal activity described in paragraph 5 above, perjury and

18  obstruction of justice.

19  A    Yes.

20  Q    Sir, you understand what that means is that if the

21  Government determines that you have not cooperated fully then

22  your five-year cap goes away?  Do you understand that?

23  A    Yes, they can.

24  Q    All of those charges that they didn't bring before, they

25  can bring if they determine in their sole discretion that you

E. Pere - cross - Koffmann                    1973

1    have not cooperated fully; right?

2    A    Yes.

3    Q    You really hope that's not what happens; right?

4    A    I mean, I -- yeah, I mean, as long as I'm truthful and I

5    give my side, it should happen.

6    Q    Sir, isn't it that the Government thinks you've been

7    truthful, that's what matters, not what the actual truth is?

8              MR. GALEOTTI:  Objection.

9    A    No.

10              THE COURT:  I will allow it.

11    A    No.

12    Q    You're also facing the possibility of deportation, aren't

13    you, sir?

14    A    Yes.

15    Q    And that's because you're not a U.S. citizen?

16    A    Yes.

17    Q    And you understand that when you are convicted of certain

18    felonies and you're not a citizen, you get deported; right?

19    A    Yes, I am.

20    Q    But you're hoping that the Government will help you out

21    there too; right?

22    A    Yes.

23    Q    In fact, right now, as we sit here today, you're on a

24    deferred action; right?

25    A    Yes.

E. Pere - cross - Koffmann                    1974

1  Q    Even though you lied about your student visa before, the
2  Government helped you get deferred action, didn't they?
3  A    Yes.
4  Q    And you're hoping that when all this is over they are
5  going to help you get the S-visa; right?
6  A    Perhaps.
7  Q    Perhaps you hope?
8  A    No, I hope perhaps it happens.  Nothing has been
9  guaranteed to me so.
10 Q    But you're hoping that's what happens; right?
11 A    Yes.
12 Q    You understand that the S-visa is a special visa status
13 for cooperators; right?
14 A    Yes.
15 Q    And it will let you stay here in this country?
16 A    Yes.
17 Q    Sir, you've testified that your brother Antonio was
18 really the head of the consulting business; right?
19 A    Yes.
20 Q    He was the mastermind of these schemes to which you
21 pleaded guilty?
22 A    Yes.
23 Q    And you understand that the Government has allowed your
24 brother to plead guilty to only two conspiracy counts; right?
25 A    I think so.  I'm not 100 percent sure.  I haven't seen

E. Pere - cross - Koffmann                    1975

1  his paper.

2  Q    But you know he made tens of millions of dollars on these

3  schemes; right?

4  A    Yes.

5  Q    And you understand that there was no real way that your

6  brother could cooperate without your help; right?

7            MR. GALEOTTI:  Objection.

8            THE COURT:  I will sustain that.

9  Q    Sir, you're the one who kept all the numbers related to

10  the bribes; right?

11  A    Yes.

12  Q    It would be very difficult for your brother to be on a

13  recorded call and trying to convince somebody that they

14  accepted a certain bribe without your help; right?

15  A    Probably.

16  Q    And you also understood that if he cooperated and you did

17  not, you'd have no shot to beat the charges against you;

18  right?

19  A    To beat?

20  Q    To beat the charges against you?

21  A    If he cooperated and I did not, I had no chances of

22  beating the charges against me, that's the question?

23  Q    That's what you understood, right?

24  A    That's what you're asking me, right?

25  Q    Yes, sir.

1  A    Well, I don't know.  At that moment we were not really

2  going through it.

3  Q    Sir, your name was all over all these bank accounts;

4  right?

5  A    Yes, of course.

6  Q    And you were the one who was making these transfers;

7  right?

8  A    Yes.

9  Q    If your brother came into court and said Enrique did it

10  with me, you would have no shot; right?

11  A    Enrique did it with me, I had no shot, I don't know.  I

12  think I'm not really understanding your question.

13  Q    Sir, you understood the evidence that the Government

14  obtained after they raided your office; right?

15  A    Yes.

16  Q    You understood that was damning evidence; right?

17  A    Yes.

18  Q    You understood that if your brother cooperated you would

19  have no shot if you tried to fight the Government; right?

20  A    Not necessarily.

21  Q    You thought you could win?

22  A    I don't know if I was going to fight it if they would go

23  after me or not, I don't know.

24  Q    Sir, the moment that your brother decided to cooperate,

25  that sealed the deal for you, didn't it?

1    A    No.

2    Q    I asked you some questions on Friday about statements

3    that your brother made to you about having absolute respect

4    for him and strict compliance with the decisions that he made.

5    Do you recall those questions?

6    A    Having respect for him, yes, of course.  And complying,

7    with most things.

8    Q    And you recall that he told you that the two of you were

9    not equal; right?

10    A    Yes.

11    Q    And you recall that he told you that he kept an

12    imbalanced relationship between the two of you because he

13    feels like it and he can?

14         MR. GALEOTTI:  Objection, Your Honor.  We've covered

15    this at length.

16         THE COURT:  Why don't we move on, Mr. Koffmann.  We

17    have covered this kind of extensively.

18         MR. KOFFMANN:  Your Honor, may I be heard briefly at

19    sidebar?

20         THE COURT:  Sure.

21         (Continued on next page.)

22         (Sidebar conference.)

23

24

25

Sidebar                                           1978

1          (The following occurred at sidebar.)

2          MR. KOFFMANN:  So, Your Honor, we did cover this

3   earlier and it was in a different time period in a different

4   context.  It was within the context of running the business.

5          I'm now asking about at the period whether he

6   decided to cooperate and to two significant facts:  One, when

7   I asked him on Friday, he did not recall.  When I just asked

8   him now, he gave different answers to some of those questions.

9   And what I would like to do is see if I can refresh his

10  recollection.

11         THE COURT:  I think you asked two or three times

12  now.  Forget about last week.  I mean, if you don't like his

13  answer, you can argue that he lied to the jury.  He doesn't

14  seem to be changing his answer in this series.

15         MR. KOFFMANN:  May I be permitted an opportunity to

16  refresh his recollection with the memo, the talking points

17  that his brother wrote, that Antonio Pere admitted on

18  cross-examination that he wrote and see if that refreshes his

19  recollection?

20         MR. GALEOTTI:  There's no refreshing recollection

21  needed.  We covered this on Friday for hours.

22         THE COURT:  My point is that he has answered your

23  question.  The answer is he doesn't think so.  Do you have a

24  statement where he -- you're confronting him where he said

25  something different that we haven't already covered today,

Sidebar                                                1979

1  then you can do that.

2          MR. GALEOTTI:  They weren't even his statements.

3  They were someone else's statements.

4          THE COURT:  He is talking about the answer to his

5  question where he said no, they don't agree that I couldn't

6  beat the charges.

7          MR. KOFFMANN:  Your Honor, I moved on from that.

8  I'm asking about his brother saying to him we're not equal,

9  you owe absolute respect.  And the testimony to some of the

10 questions I asked on Friday was maybe, I don't remember.

11         I just asked him again he testified yes to some of

12 the ones that he said maybe on Friday.  And at this point I'm

13 just seeking an opportunity to refresh him.

14         THE COURT:  Okay.  If you are going to -- there's

15 certainly be an inconsistency between direct and cross and he

16 apparently failed to recollect.  Now he wants to confront him.

17 It is a little disjointed, but I will give him a chance to

18 confront.

19         MR. GALEOTTI:  But, Your Honor, at a certain point

20 when you ask the witness the question 10 times, all of the

21 answers --

22         THE COURT:  I agree with that.  This one is

23 different.  That's why I sustained your objection the first

24 time.

25         MR. GALEOTTI:  Thank you, Your Honor.

Sidebar                                    1980

1    THE COURT:  This is now a different question that's

2    being asked when we came over here, and I think given the

3    linkage between the answer on direct and an abortive attempt

4    to try to do this at some other point at cross, let's assume

5    I'm going to give him a chance, even though it's disjointed,

6    to refresh him now and then confront him.

7         MR. LAX:  Your Honor, it is Jonathan Lax.  I think

8    we're talking about the answers that were given on cross, not

9    direct.  We are essentially re-crossing the cross here.

10        THE COURT:  What I seem to remember on direct is an

11   inquiry about where do you fit in.

12        MR. LAX:  Certainly what Mr. Koffmann is doing here

13   is attempting to cross this witness on a document that Mr.

14   Pere wrote.

15        MR. GALEOTTI:  Antonio Pere.

16        MR. LAX:  I'm sorry.  For which there is no evidence

17   that this was ever shown to this witness, so it would be

18   virtually impossible to refresh him.  But setting that

19   aside --

20        THE COURT:  It's not impeachment.  He is asking him

21   to read it and then he is going to re-ask him the question.

22        MR. LAX:  He has essentially read this entire

23   document into the record last week.

24        THE COURT:  I don't know what he has read in the

25   record.

Sidebar                                                      1981

1        MR. KOFFMANN:  Your Honor, Antonio Pere testified

2   that these were talking points or notes for a conversation

3   that he was going to have.  I asked him on Friday.  It was

4   within the context of his consulting business.  I'm asking now

5   in the context of cooperation.  He testified he doesn't recall

6   whether -- he said maybe some.

7        THE COURT:  You just want to -- in other words, let

8   me cut to the chase.  Two topics with one document in common

9   for refreshment?

10       MR. KOFFMANN:  Actually, I just want to see if

11  seeing his brother's talking points refreshes his recollection

12  that the statements were made.

13       THE COURT:  Which statement?

14       MR. KOFFMANN:  You owe me absolute respect, strict

15  compliance for the decisions that I made, I keep this

16  imbalanced relationship because I feel like it and I can.

17  Those statements.

18       MR. GALEOTTI:  Which time period were they for?

19  Because last time we heard about the time period for the

20  consulting business.  Now it's about cooperation.  We don't

21  have to use this document every time you want to ask these

22  questions.

23       THE COURT:  When were these statements made?

24       MR. KOFFMANN:  We don't know.

25       MR. GALEOTTI:  And they had the opportunity to ask

Sidebar                                    1982

1    the author, Antonio Pere.

2             Your Honor, on Friday, we spent three hours about

3    shrimp farming in a pool.  This is interminable.

4             MR. KOFFMANN:  Your Honor, I mean, the exaggeration

5    is unnecessary.

6             THE COURT:  It wasn't three hours.

7             MR. GALEOTTI:  We've also had quite a bit of

8    questions about what his motivation for going to Spain, why he

9    went to Spain, why he decided to cooperate, what these

10   conversations with Antonio Pere were, whether or not that

11   influenced his decision to cooperate or -- we have tread this

12   ground already.  We've covered this ad nauseam.

13            MR. KOFFMANN:  It is one document to see if it

14   refreshes his recollection.  That's it.

15            THE COURT:  All right.  One document, one question.

16            MR. KOFFMANN:  Thank you, Your Honor.

17            (End of sidebar conference.)

18            (Continued on next page.)

19

20

21

22

23

24

25

E. Pere - cross - Koffmann                1983

1           (In open court.)

2           MR. KOFFMANN:  Let's bring up, just for the witness,

3    Defense Exhibit 147.

4    BY MR. KOFFMANN:

5    Q    Mr. Pere, read this to yourself, not out loud.

6    A    Okay.

7    Q    Mr. Pere, having read that, does that refresh your

8    recollection that your brother Antonio told you that you owed

9    him absolute respect, strict compliance with the decisions he

10   made, that when he decided something, it has to be done as it

11   was established without changes?

12   A    I don't remember seeing this.

13          THE COURT:  No, no, he didn't ask you that.

14          THE WITNESS:  I'm sorry.

15          THE COURT:  He is only asking about the statement he

16   just asked you about, whether or not that -- what was

17   contained in the question was true?

18   A    Can you repeat the question, please.

19   Q    Having read that, does that refresh your recollection

20   that your brother Antonio told you that you owe him absolute

21   respect and strict compliance with the decisions he made, that

22   when he decided something, it has to be done as established

23   without changes?

24          THE COURT:  In other words, did your brother ever

25   tell you that, that you can recall?

1    A    I don't recall.

2            MR. KOFFMANN:  We can take that down.

3    Q    Mr. Pere, you spent most of your life working for members

4    of your family; right?

5    A    Yes.

6    Q    You worked for your brother -- I'm sorry, your father's

7    shrimp-farming business?

8    A    Yes.

9    Q    You worked for your brother's consulting business?

10   A    Yes.

11   Q    When you tried on your own, it didn't work out; right?

12   A    Yes.

13   Q    I'm going to ask you about some payments that you made to

14   Mr. Arias.

15           He had a number of companies that you made payments

16   to; right?

17   A    Yes.

18   Q    And one of those was Administraciones Carey del Sur?

19   A    Yes.

20   Q    One of them was Asia PT Consultancies?

21   A    Yes.

22   Q    One of them was Million Signs?

23   A    Yes.

24   Q    And there were a number of other companies that he

25   controlled that you made payments to; right?

E. Pere - cross - Koffmann                    1985

1  A    Yes.

2  Q    But sometimes you made payments that were for Mr. Arias

3  but you made those payments through a company that he did not

4  control; right?

5  A    I made payments -- I don't know if he controlled it or

6  not.  He asked the payments for the company and we made

7  payments.

8  Q    Sometimes another person would make a payment to Mr.

9  Arias on your behalf and then you would pay that person back;

10  right?

11  A    Another person?  Can you refresh that for me somehow?

12  Q    There were times when you made payments that were for Mr.

13  Arias but you paid them through another company; right?

14  A    At the very beginning, there could have been.

15  Q    Mr. Pere, do you recall making payments to a company

16  called Upland Ventures?  Excuse me, Uplander Ventures?

17  A    Yeah, the name sounds familiar.

18         MR. KOFFMANN:  Let's bring up, for the witness only,

19  Defense Exhibit 579-A:  If we can zoom in.

20  Q    Mr. Pere, this is a wire request that you made; correct?

21  A    Yes.

22         MR. KOFFMANN:  I offer Defense Exhibits 579-A and

23  579-A-T which is the translated version.

24         MR. GALEOTTI:  No objection.

25         THE COURT:  Received without objection.

1       (Defense Exhibits 579-A and 579-A-T were received in
2  evidence.)
3  Q    Why don't we look at the translated version.  Mr. Pere,
4  this is a --
5            MR. KOFFMANN:  Can we include the recipient.
6  Q    So, Mr. Pere, this is a transfer request; correct?
7  A    Yes.
8  Q    The recipient is Uplander?
9  A    Yes.
10 Q    The amount is $100,000?
11 A    Yes, I saw it.
12 Q    And the date is January 15, 2016?
13 A    Yes.
14 Q    And the instructions are wire transfer for professional
15 services; right?
16 A    Yes.
17 Q    And you signed this; correct?
18 A    I did.
19 Q    You made another transfer to Uplander on February 24th;
20 correct?
21 A    I don't remember.
22           MR. KOFFMANN:  Let's go to the next page.
23 A    Do you have it?
24           Yeah, there's one there.
25 Q    So this is another transfer request to Uplander?

E. Pere - cross - Koffmann                    1987

1    A    Yes.

2    Q    For $50,000?

3    A    Yes.

4    Q    And you signed this?

5    A    Yeah.  It says -- my signature and this is the English,

6    the translated version, yeah.

7    Q    You made another transfer to Uplander of $180,000 on

8    October 20th of 2016?  Do you recall that?

9    A    I don't recall.

10            MR. KOFFMANN:  Let's bring up for the witness only

11   Defense Exhibit 580-A.

12            MR. GALEOTTI:  No objection, if you want to go

13   ahead.

14            MR. KOFFMANN:  Yes, I offer it.

15            THE COURT:  Received without objection.

16            (Defendant's Exhibit 580-A was received in

17   evidence.)

18   Q    Sir, this is a transfer request for 180,000, to Uplander

19   on October 20, 2016?

20   A    Yes.

21   Q    Finally, on December 9, 2016, you transferred $200,000 to

22   Uplander; correct?

23   A    If you show me the --

24   Q    I show --

25   A    I don't remember.

E. Pere - cross - Koffmann                    1988

1          MR. KOFFMANN:  I show the witness Defense Exhibit

2    599-A.  I will offer this as well.

3          MR. GALEOTTI:  No objection.

4          THE COURT:  Received without objection.

5          (Defendant's Exhibit 599-A was received in

6    evidence.)

7    Q    This shows another transfer to Uplander, this time in the

8    amount of $200,000; correct?

9    A    Yes.

10   Q    So that's about half a million dollars in 2016 to

11   Uplander Ventures; correct?

12   A    According to this, yes.

13         MR. KOFFMANN:  Your Honor, before I forget, I'll

14   move in the translated versions of these documents, 580-A-T

15   and 599-A-T.

16         MR. GALEOTTI:  No objection.

17         THE COURT:  Received those documents as well without

18   objection.

19         (Defendant's Exhibits 580-A-T and 599-A-T were

20   received in evidence.)

21   Q    Mr. Pere, Uplander Ventures, that's your brother's

22   Francisco's business?

23   A    Could be.

24   Q    It is, isn't it?

25   A    I know that Francisco had a company and the name rings a

E. Pere - cross - Koffmann                    1989

1  bell.  I cannot assure you on this until I see something that

2  it is his, but I believe it is.

3          MR. KOFFMANN:  Let's show just the witness

4  Government Exhibit 3500-AP-235-A.  Let's go to page 5, and

5  that middle paragraph.

6  Q    Mr. Pere, will you please read the first sentence that

7  you see there just to yourself.

8  A    Yes.

9          MR. KOFFMANN:  Let's take that down.

10 A    Yes, so it is Francisco.

11 Q    So Uplander Ventures is your brother's Francisco's

12 business; right?

13 A    Yes.

14 Q    When you made those transfers to Uplander, those were

15 transfers for Nilsen Arias, weren't there?

16 A    I don't know.  I can't tell you because probably what was

17 being done there was just exchanging money.  Francisco might

18 have had cash and we would have need cash, so money was

19 transferred to his account and he would give us the cash.

20 Q    So your brother Francisco would give cash to Nilsen

21 Arias?

22 A    No, give us cash.  If he ever did, I couldn't remember.

23 But normally he would give either me or the driver or somebody

24 the cash for payments.

25 Q    Sir, do you deny that you and your brother Antonio made

E. Pere - cross - Koffmann                    1990

1   payments to Nilsen Arias using your brother Francisco to
2   facilitate that?  Do you deny that?
3   A     No.
4   Q     So you did make payments to Nilsen Arias using your
5   brother Francisco to facilitate that, didn't you?
6   A     Just to exchange money.  I cannot even tell you exactly
7   what that money was used for.
8   Q     Sir, when the Government asked you during your period of
9   cooperation whether there were any other family members who
10  were involved in your crimes, you told them no, didn't you?
11  A     Yes.
12  Q     And that's not true?
13  A     Why?
14  Q     Sir, didn't you just testify that your brother Francisco
15  facilitated payments to Nilsen Arias?
16  A     What I'm saying is my brother Francisco exchanged money
17  that might have been used for Nilsen or for whoever.
18              (Continued on next page.)
19
20
21
22
23
24
25

1   BY MR. KOFFMANN:   (Continuing)

2   Q    Sir, you lied to protect your brother Francisco, didn't

3   you?

4   A    No, I didn't.  Not at all.

5   Q    Let's talk about the period of cooperation where you were

6   trying to get Nilsen Arias to agree that he received $651,000

7   from Vitol.

8        Do you recall that period of your cooperation?

9   A    Yes.

10  Q    Do you recall that on January 3rd of 2020 Mr. Arias sent

11  you a text message that contained two spreadsheets?

12  A    I would have to see them, but we exchanged spreadsheets

13  more than once.

14  Q    Let's show just the witness Defense Exhibit 282.

15       Sir, this is a screenshot of text messages between

16  you and Nilsen Arias, right?

17  A    Yes.

18  Q    Let's zoom out for a second.

19       MR. KOFFMANN:  May I offer Defense Exhibit 282?

20       MR. GALEOTTI:  No objection.

21       THE COURT:  Received without objection.

22       (Defense Exhibit 282 was received in evidence.)

23       MR. LAX:  May we publish?

24       THE COURT:  You may.

25  BY MR. LAX:

1    Q    Mr. Pere, how do we know these are your text messages

2    with Nilsen Arias?

3    A    How?  I don't know.  You told me, so I'm guessing they

4    came from my phone.

5    Q    It says Juice Gringo at the top, right?

6    A    Yes.

7    Q    That is a reference to Nilsen Arias?

8    A    Yes.  But it's a phone that Antonio sent me, but I'm

9    guessing if you're telling me it's from my phone, I believe

10   it's from my phone.

11   Q    I can't tell you anything, sir.  You're the one that has

12   to testify.  Do you recall exchanging these text messages with

13   Nilsen Arias?

14   A    I recall exchanges several text messages.

15   Q    Do you recall him sending you spreadsheets on January 3,

16   2020?

17   A    I can't recall the date exactly because I'm not even

18   seeing my words there anywhere.  I'm seeing the spreadsheets.

19   Q    By January 3rd of 2020 you were cooperating, right?

20   A    Yes.

21   Q    And you spoke to him on January 3rd, as well, didn't you?

22   A    Don't remember.

23   Q    But you recall that at this point, anytime you spoke to

24   Mr. Arias you were doing so because you were trying to get him

25   to incriminate himself, right?

1    A    I was trying to get him to acknowledge whatever I was

2    told to get him to acknowledge.

3    Q    Let's bring up Defense Exhibit 32, which is in evidence.

4    Sir, you recognize this spreadsheet as the one that Mr. Arias

5    sent you in that text message that we just looked at, right?

6    A    Looks like it.

7    Q    And this is a spreadsheet that Mr. Arias created, right?

8    A    I believe so, yes.

9    Q    And Mr. Arias told you -- strike that.  You told the

10   government when you were cooperating with them that the line

11   on this spreadsheet that says Pendiente fuel oil was a

12   placeholder because Mr. Arias believed he was owed some money

13   but he didn't know how much, correct?

14   A    Could be.  I don't remember, exactly.

15   Q    Let's show the witness Government's Exhibit 3500-EP298-A.

16   Just for the witness.  This is at page 3, first paragraph.

17             Have you read that, sir?

18   A    I've read that.

19   Q    Having read that, does that refresh your recollection

20   that Pendiente fuel oil was a placeholder for pending payments

21   related to a fuel oil contract?  Let's take that down, please.

22   A    Yes, could have.  Yes.

23   Q    Does it refresh your recollection, or not?

24   A    I don't remember it.  I see this and it says that, but I

25   don't remember explicitly talking about it.

E. Perε - cross - Koffmann                                    1994

1  Q    Do you deny saying that?

2  A    No.  I'm saying I don't remember exactly what it says

3  there.  There was a lot of spreadsheets that were exchanged,

4  and some of them were very similar.

5  Q    Let's bring back Defense Exhibit 32.  And Mr. Pere, you

6  told the government that every other payment on this

7  spreadsheet related to Gunvor, right?

8  A    That's what that report says.

9  Q    And that's what you told the government, isn't it?

10 A    I don't recall.

11       MR. GALEOTTI:  Objection, Your Honor.

12       THE COURT:  He doesn't recall.

13 Q    Do you deny saying that?

14       MR. GALEOTTI:  Objection.

15       THE COURT:  He said he doesn't recall.

16 Q    You do recall, sir, we talked earlier this morning that

17 there was fuel oil in a number of the Gunvor contracts, right?

18 A    Yes.

19 Q    And you said that something happened with one of them and

20 it wasn't paid, right?

21 A    Yes.

22 Q    So at some point there was money for fuel oil owed to Mr.

23 Arias on the Gunvor contracts, right?

24 A    Yes.

25 Q    After you received this spreadsheet you met with Agent

1    Kelley at some point, right?

2    A    Yes.

3    Q    And you told him about this conversation with Mr. Arias?

4    A    Which one?

5    Q    The exchange of text messages that we just looked at.

6    A    Yes.

7    Q    And a couple months later, on March 11th, Mr. Arias sent

8    you another text message that said that he had been paid

9    $651,000 for fuel oil.

10            Do you recall that?

11   A    No.  Can I see it?

12            MR. KOFFMANN:  Can we show just for the witness

13   Government's Exhibit 3006-T, page 249.  If we can zoom in on

14   that.

15   Q    This is a text message from Mr. Arias on March 11th, 2020

16   that says 16 September '18 paid, $651,000 fuel oil, correct?

17   A    Yes.

18            MR. KOFFMANN:  I offer Government Exhibit 3006-T at

19   page 249.

20            MR. GALEOTTI:  No objection.

21            THE COURT:  Received without objection.

22            MR. KOFFMANN:  May we publish that?

23            THE COURT:  You may.

24            (Government's Exhibit 3006-T at page 249 was

25   received in evidence.)

1   Q    As of March 11, 2020, Mr. Arias is saying to you that he

2   has been paid on September 16, 2018, $651,000 for fuel oil,

3   correct?

4   A    Yes.

5   Q    So in January he had a blank.  It said Pendiente fuel

6   oil, right?

7   A    In January he had a blank according to that, yes.

8   Q    According to Defense Exhibit 32, right?

9   A    The spreadsheet you showed me.

10  Q    Correct.  He sent this to you in January and it said

11  Pendiente fuel oil?

12  A    Okay.

13  Q    Right?

14  A    Yes.

15  Q    And on March 11th he sent you a text message saying I was

16  paid in September of 2018, $651,000 for fuel oil, right?

17  A    Yes, according to that message.

18  Q    And on the very next day you went to see Agent Kelley,

19  right?

20  A    I don't remember.

21  Q    You made a phone call to Agent Kelley?

22  A    I could have.

23  Q    Let's show the witness only 3500-EP-162.

24       Let's highlight the first full paragraph, where it

25  says source reporting, please.  Have you read that, sir?

1   A     Yes.

2   Q     Having read that, does that refresh your recollection

3   that on March 12, 2020, the day after you received the text

4   message from Mr. Arias, that you phoned Agent Kelley and told

5   him that Mr. Arias told you that he had received $651,000 for

6   the fuel oil deal?

7   A     I don't remember that, but again --

8            MR. GALEOTTI:  Objection.

9            THE COURT:  He doesn't remember.

10  Q     You don't deny saying it, though?

11           MR. GALEOTTI:  Objection.

12           THE COURT:  Sustained.

13  Q     A few days after that Mr. Arias sent you another

14  spreadsheet, March 16th of 2020.  Do you recall that?

15  A     No.  Maybe we can see it.

16           MR. KOFFMANN:  Bring up Government's Exhibit 3006-T

17  at page 256.  This is not yet in evidence.

18  Q     Mr. Pere, this is a text message on March 16, 2020, from

19  Mr. Arias to you attaching a spreadsheet, correct?

20  A     From Arias to me attaching a spreadsheet, yes.

21           MR. KOFFMANN:  I offer 3006-T, page 256.

22           MR. GALEOTTI:  No objection.

23           THE COURT:  Received without objection.

24           MR. KOFFMANN:  If we can publish that.

25           THE COURT:  You may.

1          (Government's Exhibit 3006-T at page 256 was

2   received in evidence.)

3   Q    We can see here, Mr. Pere, this is a text message

4   attaching a spreadsheet, correct?

5   A    Looks like that, yes.

6   Q    The next day you met with Agent Kelley to discuss this

7   text message.  Do you recall that?

8   A    No.

9          MR. KOFFMANN:  Show just the witness 3500-EP-165,

10  page 2.

11  A    Yes.

12  Q    Let me ask the question, sir.  Does that refresh your

13  recollection that the day after you received the text message

14  on March 16, 2020, you spoke to Agent Kelley about that text

15  message?

16  A    No.

17  Q    Let's take that down.

18  A    We had a lot of calls.  I don't recall.

19  Q    Let me ask you this, do you recall Agent Kelley telling

20  you that you should have a recorded conversation with Mr.

21  Arias in which he admits to receiving the $651,000?

22  A    No, not exactly.  I don't recall the exact.  It's been a

23  while from this.

24  Q    Do you recall having recorded telephone conversations

25  with Mr. Arias in which you discussed the $651,000?  Do you

*E. Perez - cross - Koffmann*                                    1999

1  recall that?

2  A    I recall having several conversations.  I don't remember

3  the exact amount.

4  Q    Let's bring up just for the witness Government's Exhibit

5  3515-T, page 26, lines 238 to 239.

6             Read that to yourself, sir.

7  A    Yes.  That I remember.

8  Q    Having read that, does that refresh your recollection

9  that you had a recorded phone call with Mr. Arias in which you

10  attempted to get him to admit that he had received $651,000 on

11  a fuel oil contract?

12  A    Yes.

13  Q    And that is exactly what you did, isn't it?

14  A    I did.

15  Q    And you got him to admit that that money was in relation

16  to the Vitol fuel oil contract, right?

17  A    Yes, he acknowledged that.

18  Q    And you recall that later in this conversation you had

19  him acknowledge it a second time?

20  A    No, but it could be.

21  Q    Let's go to pages 28 to 29, line 274 to 277.

22  A    Yes.

23  Q    So does that refresh your recollection that at a later

24  point in that same conversation you got him to admit, again,

25  that he received $651,000 on the Vitol fuel oil contracts?

*E. Perez - cross - Koffmann*                                      2000

1   A    Yes.

2   Q    That's exactly what you did, isn't it?

3   A    Yes.

4   Q    And the reason you had this call was because Special

5   Agent Kelley told you to, right?

6   A    Yes.

7   Q    He said go get Arias to admit that he received $651,000

8   from Vitol, right?

9   A    Yes.  He said he wanted him to acknowledge.

10  Q    And after this call you stuck with that story, right, you

11  repeated that story to the government throughout the years of

12  your cooperation?

13           You can take that down.

14  A    I guess so.

15  Q    You told the government in March of 2021 that the

16  $651,000 payment was related to the Petroecuador and Vitol

17  involved fuel oil contract, right?

18  A    When?

19  Q    March of 2021.

20  A    Could be, yes.

21  Q    Let's bring up Government's Exhibit 3500-EP-298-A,

22  page 7, second paragraph.  Does that refresh your

23  recollection, sir, that on March 9, 2021, you told the

24  government that the $651,000 payment was related to the

25  Petroecuador and Vitol involved fuel oil contracts?

1   A    Yes.  I could have, yes.

2   Q    Does it refresh your recollection?

3   A    The thing is we had so many calls.  I said it.  We talked

4   about it more than once, but I don't know if that specific

5   moment it is.  That I can't recall.

6   Q    But you're not testifying now that the $651,000 was for

7   Vitol, are you?

8   A    I don't get the question.

9   Q    You testified on your direct examination about payments

10  that were made to Mr. Arias for Vitol.  Do you recall that?

11  A    Yes.

12  Q    We've been through it several times now, right?

13  A    Yes.

14  Q    And the payments that you made to him were on

15  Government's Exhibit 4164.  We can bring it up, again.

16  There's a payment of 148,000 Euros on December 11, 2018,

17  there's a payment of 120,000 Euros on December 21st, and then

18  we see the rest of this account drained of money in May of

19  2019, right?

20  A    Yes.

21  Q    This is what you testified were the payments to Mr. Arias

22  for the Vitol fuel oil contract, right, sir?

23  A    Yes.

24  Q    Not the $651,000?

25  A    Remember we talked that there was another payment.  I

*Proceedings*                                                    2002

1   don't know if you or the government showed me.

2   Q    Is it your testimony that you paid $651,000 to Mr. Arias

3   for the Vitol fuel oil contract?

4   A    It's what he told me that that was specific from Vitol.

5   Q    What he told you and you told Agent Kelley and Agent

6   Kelley told you to go --

7              MR. GALEOTTI:  Objection.

8              THE COURT:  Sustained.

9   Q    Didn't Agent Kelley tell you to get Nilsen Arias to admit

10  he received $651,000?

11             MR. GALEOTTI:  Objection.  Asked and answered.

12             THE COURT:  Sustained.  Move on.

13  Q    That's not true, is it?

14             MR. GALEOTTI:  Objection.

15             THE COURT:  Sustained.  Move on.

16             MR. KOFFMANN:  Could I have a moment, Your Honor?

17             THE COURT:  Yes.

18             (Pause.)

19             MR. KOFFMANN:  No further questions, Your Honor.

20             THE COURT:  Thank you very much.  Since we're going

21  to switch gears, Mr. Galeotti, I think probably we'll take our

22  midafternoon break a little earlier and give him a chance to

23  assemble his thoughts and make his redirect crisper.  I'm

24  assuming there is redirect, Mr. Galeotti.

25             MR. GALEOTTI:  I don't think so, but maybe I can

*Proceedings*                                                    2003

1   take a break to think about it.

2          THE COURT:  We'll take a break anyway.  We'll either

3   start with that or a fresh witness.  Either way, it's a major

4   shift.

5          Again, get a chance to relax before we get up to the

6   last thing.  Use whatever little room you need back there.

7   Continue to keep an open mind.  Don't discuss the case amongst

8   yourselves or anyone else, and we'll resume in 15 or so.

9          (Jury not present.)

10         THE COURT:  Mr. Galeotti, you can let us know what

11  we're anticipating.

12         MR. GALEOTTI:  Thank you, Your Honor.

13         THE COURT:  You're welcome.

14         (Recess taken.)

15         THE COURTROOM DEPUTY:  Court is back in session.

16  Counsel for both sides are present, including the defendant.

17         THE COURT:  Be seated, please.  So as I understand

18  it, we have a gap.

19         MR. GALEOTTI:  Yes, Your Honor.

20         We had an international witness, we weren't sure

21  when it was going to close.  It seems like he's going to stay

22  overnight, which it turns out he would have anyway given the

23  direct and closing today.

24         He had to go to the haberdashery to pick up a new

25  outfit for tomorrow.  We will have no further questions for

*Proceedings*                                                        2004

1   Mr. Pere.  Perhaps we can put that on the record and start

2   fresh tomorrow, with apologies for the mishap with the

3   civilian witness, Your Honor.

4           THE COURT:  Okay.  We have nothing else to fill in.

5   Any stips to read in?

6           MR. GALEOTTI:  We actually do.  I'll do one that

7   will be relevant for tomorrow.  I'll do it before we leave.

8           THE COURT:  Are you ready to go with those?

9           MR. GALEOTTI:  Yes.  We're ready to go with those.

10          THE COURT:  We'll bring the jury in, not the

11  witness, and we'll explain to the jury where we're at.

12          (Jury present.)

13          THE COURT:  Counsel will stipulate that the jury is

14  present and properly seated.

15          MR. LAX:  Yes, Your Honor.

16          MR. KOFFMANN:  Yes, Your Honor.

17          THE COURT:  Thank you, counsel.  Ladies and

18  gentlemen of the jury, welcome back from your break.

19          As you will recall when we broke, we had just

20  completed Mr. Koffmann's cross-examination of Mr. Enrique Pere

21  and we went to Mr. Galeotti to see if there was redirect.

22  Obviously, scheduling is always complicated and complex in any

23  trial.

24          So you try to make as much use of the time that you

25  have and try to make sure that you don't have gaps, but there

*Proceedings*                                                    2005

1   is a certain unpredictability in any trial.  So at times there

2   are gaps.  As it turns out, the time I guess in the back of

3   our minds we had planned for use on a redirect and potential

4   recross of Mr. Pere, we're short circuited when the government

5   didn't really need a redirect.  So not only will there not be

6   a redirect but there won't be a recross either.  So that freed

7   up that time.

8           Unfortunately, the gap was there to the point where

9   we could not productively get the next witness in to begin

10  this afternoon.  So what we're going to do is I'm advised by

11  counsel that there may be a stipulation, or two, that has to

12  be read into the record at some point.  It's just as easy to

13  read them in now, but that will bring us to the end of a

14  shortened day.

15          I know that you're all going to cry about that, that

16  you have to go home early and all of that, but that's

17  eventually what's going to happen.  You're going to have a

18  shortened day.

19          With that, is it you, Mr. Galeotti, or someone else?

20          MR. GALEOTTI:  It will be, Your Honor.  I'll put

21  officially on the record no further questions for Mr. Enrique

22  Pere and I'll read in a few stipulations to take advantage of

23  the time.  Thank you.

24          Ms. Jefferson, if we could pull up Government

25  Exhibit 8001.

*Proceedings* 2006

1          Government Exhibit 8001 says:

2          It is hereby stipulated and agreed by and between

3     the undersigned parties that:

4          All bank records, including account statements, wire

5     transfer records, account opening documents, and other

6     financial records marked as Government Exhibits 4026, 4119

7     through 4122, 4128 through 4129, 4134 through 4135, 4146,

8     4150, 4161, 4163 through 4178, 4178-A, 4189, 4181

9     through 4182, 4184 through 4195, 4198 through 4202, 4206

10    through 4226, 4228, and 4245 through 4246, known as the

11    financial records, are true and accurate copies of the

12    original evidence maintained by the producing party,

13    authenticated for purposes of Federal Rule of Evidence 901 and

14    C.) Satisfy the requirements of Federal Rule of Evidence

15    803(6).

16          THE COURT:  The stipulation is received in evidence.

17          (Government Exhibit 8001 was received in evidence.)

18          MR. GALEOTTI:  If we could pull up Government's

19    Exhibit 8002.  Your Honor, I believe during the course of this

20    stipulation, the defense and the government, we need to speak

21    briefly with Your Honor at sidebar for one moment.

22          THE COURT:  Before you --

23          MR. GALEOTTI:  Before we admit.  I'll read it and

24    before we admit, we'll come to sidebar.

25          So Government Exhibit 8002 states:

*Proceedings* 2007

1          It is hereby stipulated and agreed by and between

2     the undersigned parties that all financial and other business

3     records produced by Vitol, Inc. and Vitol, SA to the

4     government, known as the Vitol business records and marked as

5     Government Exhibits 4244, 5000 to 5012, 5013 to 5023, 5024,

6     5025, 5026, 5027, 5027-A, 5028, 5028-A, 5028-B, 5028-C,

7     5028-D, 5029, 5030, 5031 through 5036, 5104, 5161, 5186, and

8     5037 are true and accurate copies of the original evidence

9     maintained by producing party and B.) Authenticated for

10    purposes of Federal Rule of Evidence 901; and C.)  Satisfy the

11    requirements of Federal Rule of Evidence 803(6).

12          And two, all communications and where applicable

13    attachments thereto produced by Vitol, Inc. and Vitol, SA to

14    the government, also known as the Vitol communications, and

15    marked as Government Exhibits 1002 to 1010, 1012 to 1014,

16    1020, 1025, 1028, 1038, 1042, 1049, 1050, 1068, 1072, 1074,

17    1077, 1081 to 1082, 1082-A, 1082-B, 1086, 1091, 1093, 1099,

18    1100 to 1102, 1111, 1116 to 1117, 1124 to 1126, 1135 to 1138,

19    1144 to 1147, 1150 to 1157, 1156-A, 1167, 1169, 1172-A,

20    1172-B, C, D, E of 1172, 1175-A, 1180, 1180-A, 1183 to 1187,

21    1183-A, 1184-A, 1185-A, 1186-A, 1187-A, 1189 to 1190, 1195-A;

22          1203, 1206 to 1209, 1208-A, 1212 to 1213, 1218 to

23    1219, 1246, 1258, 1289, 1300 to 1301, 1307, 1309, 1327, 1337,

24    1340, 1344, 1346, 1348, 1350, 1359, 1361, 1364 through 1366,

25    1377-A, 1377-B to 1381, 1400 to 1401, 1416, 1416-A, 1416-B,

1    1420, 1427, 1434, 1450, 1450-A, 1492, 1493, 1495, 1508, 1530,

2    1532, 1559, 1562, 1565, 1693, 1623, 1643, 1764 to 1766,

3    1764-A, 1764-B, 1766, 1770, 1771-A, 1773, 1773-A, and 1757,

4    are true and accurate copies of the original evidence

5    maintained by the producing party and authenticated for

6    purposes of Federal Rule of Evidence 901.

7            If we may please have a sidebar now, Your Honor.

8            THE COURT:  You can.

9            (Sidebar.)

10           (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1             (Sidebar conference held on the record in the

2     presence of the Court and counsel, out of the hearing of the

3     jury.)

4             MR. SOLOMON:  Your Honor, this is Mr. Solomon for

5     the government.  Mr. Galeotti has read in Government's Exhibit

6     8002, which is the stipulation on the authenticity of Vitol

7     records.  There are two paragraphs of that.  The first

8     paragraph relates to Vitol corporate documents, which everyone

9     agrees are business records.

10            We will proceed to move into evidence everything in

11    paragraph one.  My understanding is that Mr. Packard has a

12    standing objection as to certain of those exhibits on other

13    grounds, namely that they relate to Mr. Aguilar's salary and

14    bonus.

15            Our position is that issue has been ruled upon, but

16    that's the reason for the sidebar, Your Honor.

17            MR. PACKARD:  That's correct, Your Honor.  Michael

18    Packard, on behalf of Mr. Aguilar.  Specifically, the

19    objections are to Government's Exhibits 5000 and then

20    Exhibits 5007 through 5021.

21            What these exhibits contain, Your Honor, are W-2s,

22    records of annual bonus payment and standard compensation

23    payment, records of awards of shares in Vitol through a period

24    of years.  And as outlined in our pretrial motions, we believe

25    that getting into the details of how much money Mr. Aguilar

1    made at Vitol is more prejudicial than it is probative.  It's

2    going to be -- there will, in fact, be a prejudicial sticker

3    shock when this jury is told how many money Mr. Aguilar earned

4    during his time at Vitol.

5            It's particularly low on the probative category

6    because most of the compensation was deferred compensation

7    earned, his shares worth tens of millions of dollars he got

8    before this alleged conspiracy ever began.  It invested over

9    time.  The shares themselves are rewarded before this alleged

10   scheme was hashed.

11           So we think, in particular, getting into evidence

12   deferred compensation is more prejudicial than probative.  We

13   want to make sure it's clear.  If the Court would like to

14   consider that issue, perhaps overnight and make a ruling

15   tomorrow.

16           THE COURT:  You have an in limine.  We'll see how

17   your explication matches.  I don't know why I haven't asked

18   this before, because I keep chuckling, but when we get to the

19   exhibits, since you've now produced the Manhattan phonebook,

20   when we get to deliberations how are we getting the exhibits

21   to the jury?

22           MR. PACKARD:  The actual copies of the exhibits?

23           THE COURT:  Or whatever they're getting, either some

24   electronic versions or what.  I don't know how they will be

25   accessed.

*Sidebar*                                                                    2011

1             MR. LAX:  Your Honor, it's Jonathan Lax.

2             What we have proposed, and is our standard practice,

3    is to prepare a laptop totally clean with exhibits.  We can

4    confer with defense and make sure all exhibits that have been

5    admitted are on the laptop and provide, give the defense an

6    opportunity to inspect the laptop and provide that laptop back

7    for the jury.

8             MR. KOFFMANN:  Your Honor, this is Daniel Koffmann.

9    I think we'll be able to work this out.

10            THE COURT:  You hope you have somebody on the jury

11   that can work a computer.

12            MR. KOFFMANN:  I think in 2024, hopefully, there's

13   at least one.

14            THE COURT:  Guys that look like me, they're in deep

15   trouble.

16            MR. KOFFMANN:  I don't think anyone is proposing to

17   dump an avalanche of paper on them.  We'll think of an

18   electronic way.

19            THE COURT:  I assumed it was along those lines.  As

20   long as you all work it out, and there's only one copy, one

21   machine.

22            MR. LAX:  Understood, Your Honor.

23            MR. SOLOMON:  Your Honor, if I could address one

24   final thing on the matter of the conversation documents.

25   Obviously, we've already briefed this.  What I expect you're

*Sidebar*                                                                    2012

1   going to hear.

2            THE COURT:  I mostly ruled on it.

3            MR. SOLOMON:  I think you have.  I want to make sure

4   everything is properly framed because Mr. Packard addressed

5   the issue of the share holdings.

6            What you'll hear in testimony is that there are

7   three forms of compensation for traders like Mr. Aguilar.  The

8   first being a base salary, which is kind of a nominal small

9   amount.  The second being an annual bonus, and then the

10  primary way the traders are paid is through their

11  shareholdings in a company called Tinsel.

12           THE COURT:  Tinsel?

13           MR. SOLOMON:  Yes, T-i-n-s-e-l, Your Honor.  All of

14  those are, obviously, relevant to his compensation and his

15  motive.  So without any one bucket, you're not painting an

16  actual picture of his financial motive, Your Honor.  With

17  that, we'll rely on our pretrial filings.

18           THE COURT:  Okay.

19           MR. PACKARD:  Thank you, Your Honor.

20           THE COURT:  Thank you.

21           Does that end the stipulations?

22           MR. GALEOTTI:  No.  We're going to get them all out

23  of the way now.

24           THE COURT:  Yes.

25           (End of sidebar; continued on next page.)

PROCEEDINGS                                    2013

1            (Continuing.)

2            THE COURT:  Do the parties have more stipulation?

3            MR. GALEOTTI:  Thank you, Your Honor.  With that

4    we'll move on to GX-8000, please.

5            It is hereby stipulated and agreed by and between

6    the undersigned parties that:

7            At all times relevant to the charges in this case,

8    Defendant Javier Aguilar, was holder and user of the e-mail

9    address JVA@Vitol.com, JAAMEX@gmail.com,

10   PerezMarcos007@gmail.com and sixtotomas007@gmail.com.  The

11   Government offers GX 8000 which --

12           MR. KOFFMANN:  No objection.

13           THE COURT:  Received without objection.

14           (Government Exhibit 8000, was received in evidence.)

15           MR. GALEOTTI:  And we'll do Government Exhibit 8003,

16   please.

17           It is hereby stipulate and agreed by and between the

18   undersigned parties that all records, including transactional

19   documents, internal memoranda, and official correspondence to

20   and from Empresa Pública de Hidrocarburos del Ecuador EP

21   PetroEcuador, and marked with the exhibit numbers in

22   Government Exhibit 8003 satisfies the requirements of Federal

23   Rule of Evidence 803(6).

24           The Ecuadorian official register dated December 30,

25   2015 which is marked as Government Exhibit 5901 is

PROCEEDINGS                                    2014

1   self-authenticating under Federal Rule of Evidence 902 and

2   satisfies the requirements of Federal Rule of Evidence 803(a).

3          The Government offers Government Exhibit 8003.

4          MR. KOFFMANN:  No objection.

5          THE COURT:  Received without objection.

6          (Government Exhibit 8003, was received in evidence.)

7          MR. GALEOTTI:  8005, please, Ms. Jefferson.

8          This is a stipulation for records identified as

9   records produced by the United States Department of Homeland

10  Security U.S. Customs and Border Protection and marked as

11  Government Exhibit 5250, records produced by American Airlines

12  and marked as Government Exhibits 5251 through 5253, records

13  produced by United Airlines and marked as Government

14  Exhibit 5254, then there's a table that I won't read that sets

15  forth the International Air Transport Association codes for

16  airports.

17         The Government offers Government Exhibit 8005.

18         MR. KOFFMANN:  No objection.

19         THE COURT:  Received without objection.

20         (Government Exhibit 8005, was received in evidence.)

21         MR. GALEOTTI:  And finally, 8006.

22         It is stipulated -- it is hereby stipulated and

23  agreed by and between the undersigned parties that Coordinated

24  Universal Time, otherwise known as UTC, is the primary time

25  standard by which the world regulates clocks and times.

1  Stipulation goes on to set forth Eastern Standard Time,

2  Central Standard Time, and provides an examples to guide on

3  how to calculate time under UTC.

4          The Government offers Government Exhibit 8006 into

5  evidence.

6          MR. KOFFMANN:  No objection.

7          THE COURT:  Received without objection.

8          (Government Exhibit 8006, was received in evidence.)

9          MR. GALEOTTI:  And with that, Your Honor we have no

10  further stipulations at this time.

11          THE COURT:  All right.  And as I understand it from

12  counsel, that would bring us to the end of the day for the

13  jury, correct?

14          MR. GALEOTTI:  Yes, Your Honor.

15          THE COURT:  All right.  Ladies and gentlemen, that

16  brings us to a shortened day.  We appreciate your sacrifice,

17  your patience, your attentiveness.  We will adjourn for the

18  day, and the fact that the day was a little shorter than

19  planned doesn't change any of the rules at all.  They continue

20  to apply with full vigor.

21          Don't discuss the case amongst yourselves or with

22  anyone else, continue to keep an open mind, do not use the

23  recess time as an opportunity to do homework.  That means any

24  investigations or electronic or old-fashioned books that

25  relate to any of the personalities or the issues in the case

1    or the parties' case.  That no-homework rule always applies.

2    So all the work that needs to be done is done with the four

3    walls of this courtroom, and then later during the time of the

4    deliberation, within the four corners of the deliberation

5    room.

6            The radio-silence rule continues to apply.  No

7    communications to any one, by any means, including face to

8    face, about the fact that you're a juror, that you're coming

9    to Brooklyn to participate in trial, anything that even

10   remotely even touches on the trial, much less things that

11   directly relate to the trial or people who are involved in the

12   case or issues raised in the case.  Also, the media rule

13   applies to the extent that there are any accounts of this case

14   on the media, whether it be the old-fashioned newspapers,

15   radio and T.V. or the more modern social media, you're

16   directed to totally disregard it, tune it out, don't look at

17   it, don't think about it.

18           And the Court also continues its suggestion that to

19   the extent that you can, you dial out, tune out, don't read,

20   accounts about any legal proceeding anywhere for fear that you

21   may hear or see something in connection with that proceeding

22   that will ultimately confuse you about what your role and

23   responsibilities are in this one.

24           So with all of those admonitions, we will bid you a

25   pleasant evening.  Get home safely and warmly and relaxed and

PROCEEDINGS                          2017

1    come back to see us tomorrow no later than 9:45 in the central

2    jury room, and we will get started as close to that time as we

3    can.

4              Again, we appreciate your service your attentiveness

5    and your sacrifice.  See you tomorrow.

6              (Jury exits the courtroom.)

7              THE COURT:  All right.  We'll see everybody

8    tomorrow.  Have a pleasant evening, and come back refreshed.

9                    *    *    *    *    *

10   (Proceedings adjourned at 4:50 p.m. to resume on January 30,

11   2024 at 10:00 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2018

1                         I N D E X

2       WITNESS                                    PAGE

3       ENRIQUE PERE

4       CROSS-EXAMINATION                          1884

5       BY MR. KOFFMANN

6

7                       E X H I B I T S

8

9        Government Exhibit 4182                    1897

10

11       Defense Exhibit 11, page 100               1901

12

13       Defendant's Exhibit DX-9-001               1903

14

15       Defense Exhibit 572                        1941

16

17       Defense Exhibit 482                        1957

18

19       Defense Exhibits 579-A and 579-A-T         1986

20

21       Defendant's Exhibit 580-A                  1987

22

23       Defendant's Exhibit 599-A                  1988

24

25       Defendant's Exhibits 580-A-T and 599-A-T   1988

```
                                                              2019

1

2      Defense Exhibit 282                                    1991

3

4      Government's Exhibit 3006-T at page 249                1995

5

6      Government's Exhibit 3006-T at page 256                1998

7

8      Government Exhibit 8001                                2006

9

10     Government Exhibit 8000                                2013

11

12     Government Exhibit 8003                                2014

13

14     Government Exhibit 8005                                2014

15

16     Government Exhibit 8006                                2015

17

18

19

20

21

22

23

24

25
```