657

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,        : 20-CR-00390(ENV)
4                                 :
                                  :
5                                 :
        -against-                 : United States Courthouse
6                                 : Brooklyn, New York
                                  :
7                                 :
                                  : Tuesday, January 16, 2024
8  JAVIER AGUILAR,                : 10:00 a.m.
                                  :
9           Defendant.            :
                                  :
10 - - - - - - - - - - - - - - - - - X

11

12           TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
             BEFORE THE HONORABLE ERIC N. VITALIANO
13             UNITED STATES SENIOR DISTRICT JUDGE

14

15                      A P P E A R A N C E S :

16 For the Government: BREON PEACE, ESQ.
                       United States Attorney
17                     Eastern District of New York
                       271 Cadman Plaza East
18                     Brooklyn, New York 11201
                  BY:  JONATHAN POWELL LAX, ESQ.
19                     MATTHEW R. GALEOTTI, ESQ.
                       Assistant United States Attorneys
20

21                     U.S. DEPARTMENT OF JUSTICE
                       Fraud Section - Criminal Division
22                     1400 New York Avenue
                       Washington, DC 20005
23                BY:  DEREK ETTINGER, ESQ., ESQ.
                       CLAYTON P. SOLOMON, ESQ.
24                     D. HUNTER SMITH, ESQ.
                       Assistant United States Attorneys
25

SAN.    OCR    RMR    CRR    RPR

658

```
 1                      A P P E A R A N C E S:  (Continued)
 2

 3
       For the Defendant:       QUINN EMANUEL URQUHART & SULLIVAN, LLP
 4                                  51 Madison Avenue
                                    22nd Floor
 5                                  New York, New York 10010
                                 BY:  DANIEL KOFFMANN, ESQ.
 6                                    NEIL T. PHILLIPS, ESQ.

 7
                                 QUINN EMANUEL URQUHART & SULLIVAN, LLP
 8                                  111 Huntington Avenue
                                    Suite 520
 9                                  Boston, Massachusetts 02199
                                 BY:  MICHAEL PACKARD, ESQ.
10                                    WILLIAM WEINREB, ESQ.

11
                                 QUINN EMANUEL URQUHART & SULLIVAN, LLP
12                                  865 South Figueroa Street
                                    10th Floor
13                                  Los Angeles, California 90017
                                 BY:  WILLIAM PRICE, ESQ.
14

15

16

17

18

19

20

21

22     Court Reporter:  Stacy A. Mace, RMR, CRR
                        Official Court Reporter
23                      E-mail:  SMaceRPR@gmail.com

24     Proceedings recorded by computerized stenography.  Transcript
       produced by Computer-aided Transcription.
25
```

*SAM.   OCR   RMR   CRR   RPR*

*Proceedings*                                                   659

1           (In open court - jury not present.)

2           THE COURTROOM DEPUTY:  All rise.

3           (Judge ERIC N. VITALIANO entered the courtroom.)

4           THE COURT:  The court is now open.  The Honorable

5    Eric N. Vitaliano is now presiding.

6           Case on the calendar is USA versus Aguilar, case

7    number 20-CR-390 on for a jury trial.

8           Will the attorneys please note their appearance,

9    beginning with Government counsel.

10           MR. LAX:  Good morning, Your Honor.

11           Jonathan Lax, Matthew Galeotti, Clayton Solomon,

12    Derek Ettinger, Hunter Smith and Peyton Jefferson, here on

13    behalf of the Government.

14           THE COURT:  And good morning to you, Mr. Lax, and

15    your table.

16           MR. KOFFMANN:  Good morning, Your Honor.

17           Daniel Koffmann, Michael Packard, William Price,

18    William Weinreb, Gabriella Trevino and Raymond McLeod, here on

19    behalf of Javier Aguilar, who he is present in court.

20           THE COURT:  And welcome to you, Mr. Koffmann, and

21    your table and to Mr. Aguilar.

22           THE COURTROOM DEPUTY:  We also have two standby

23    Spanish interpreters who need to note their appearances for

24    the record and also need to be sworn.

25           Please raise your right hand, both of you.

*Proceedings*                                                    660

1          Do you solemnly swear or affirm that you will well

2   and truly interpret the proceedings now before the Court, so

3   help you God?

4              INTERPRETER ORRANTIA:  I do.

5              INTERPRETER GOTLER:  I do.

6              THE COURTROOM DEPUTY:  Thank you.

7          Please state your name for the record.

8              INTERPRETER ORRANTIA:  My name is Dagoberto

9   Orrantia.

10             THE COURTROOM DEPUTY:  Please spell your last name.

11             THE INTERPRETER:  O-R-R-A-N-T-I-A.

12             THE COURTROOM DEPUTY:  Thank you.

13             INTERPRETER GOTLER:  Marcia, M-A-R-C-I-A, Gotler,

14  G-O-T-L-E-R, on standby for the Government witness.

15             THE COURT:  Good morning to both of you and welcome

16  to both of you.  Your talents are much appreciated.

17             INTERPRETER GOTLER:  Thank you, Your Honor.

18             INTERPRETER ORRANTIA:  Thank you, sir.

19             THE COURTROOM DEPUTY:  All parties are present,

20  including defendant.

21             THE COURT:  Okay.

22         Mr. Lax.

23             MR. LAX:  We are ready to proceed, Your Honor.  I am

24  happy to bring in the witness and I can resume at the podium,

25  if that's all right with the Court.

*Proceedings*                                                661

1      THE COURT:  And, Mr. Koffmann?

2      MR. KOFFMANN:  We're ready to go, Your Honor.

3      THE COURT:  Then we're ready to go.  Bring in

4  Mr. Pere and Mr. Villanueva will bring in the jury.

5      MR. PRICE:  Your Honor, this is William Price at

6  defense table.

7      Just for the record, in the rare prospect that there

8  might be objections, the voice you will be hearing is mine.

9      THE COURT:  Okay.  Appreciate that, Mr. Price.

10      (The witness entered and resumed the stand.)

11      (Jury enters.)

12      THE COURT:  Be seated, please.

13      Counsel will stipulate that the jury is present and

14  properly seated.

15      MR. LAX:  Yes, Your Honor.

16      MR. KOFFMANN:  Yes, Your Honor.

17      THE COURT:  Thank you, counsel.

18      Ladies and gentlemen of the jury, welcome back.

19  Hopefully you enjoyed the four-day time off between the time

20  we were here last and today.

21      We want to thank the jury for struggling through

22  this morning.  The snow made travel difficult and coupled with

23  some, apparently, serious subway service interruptions, it

24  took us some time to get together, but your efforts are very

25  much appreciated by all of us and we look forward to moving

*Proceedings*                                                    662

1    the trial along as quickly as we can.

2              As you will recall, Mr. Antonio Pere was on the

3    stand.  We were at the beginning of Mr. Lax's direct

4    examination, and we shall continue from there.

5              Mr. Lax.

6              MR. LAX:  Thank you, Your Honor.

7

8              (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   **ANTONIO PERE**,

2       called as a witness by the Government, having been

3       previously duly sworn/affirmed by the Courtroom Deputy,

4       was examined and testified further as follows:

5   DIRECT EXAMINATION (Continuing)

6   BY MR. LAX:

7   Q    Good morning, Mr. Pere.

8   A    Good morning.

9   Q    And I'll remind you that you're still under oath.

10  A    Yes.

11  Q    Also, we have a standby Spanish interpreter if necessary.

12  But if it's okay with you, we'll continue in English.

13  A    Yes, it's okay.

14  Q    When we left off last week, we were speaking about

15  individuals who participated in the scheme with you and the

16  defendant involving the fuel oil deal?

17  A    Yes.

18  Q    You mentioned that there was someone from whom you and

19  your brother received money in connection with that deal.

20      Who was that?

21  A    Lionel Hanst.

22  Q    And he had two companies, what were those companies?

23  A    Lion Oil and Zanza Oil.

24      MR. LAX:  So I am going to affix them to the board

25  now.

1          For the record, I've added in the second column

2     Lionel Hanst, Lion Oil and Zanza Oil.

3          You also said that you had, I think it was two

4     nicknames.

5          What were those nicknames?

6     A    For Lionel Hanst?

7     Q    For yourself.

8     A    Oh, for myself.  Colorado and Tuco.

9          MR. LAX:  All right.  So I'll affix Tuco and

10    Colorado.

11    Q    And we discussed three companies; that EIC, OIC and OPV.

12         Do you recall those?

13    A    I do.

14         MR. LAX:  All right.  I am going to add those at the

15    bottom of the third column.

16    BY MR. LAX:

17    Q    We also spoke about someone named Mauricio Samaniego?

18    A    Yes, we did.

19    Q    And where did he work?

20    A    He worked at PetroEcuador.

21    Q    What was his title there?

22    A    International trade manager.

23    Q    All right.  And I showed you a photograph of him last

24    week.

25         MR. LAX:  So, I am going to add him to the final

1  column.

2  Q    And there was another person that worked at PetroEcuador

3  that we spoke about, José Augusto.

4        What was José Augusto's role in the government?

5  A    José Augusto worked at the Ministry of Hydrocarbons and

6  also at the presidency, he was Secretary General.  At the

7  beginning in the hydrocarbons ministry, he was advisor to the

8  minister and then he became minister.

9  Q    All right.

10        MR. LAX:  So I am going to add him to the final

11  column as well.

12  Q    Were there any nicknames for Mauricio Samaniego?

13  A    Tuqueado.

14  Q    What does that mean?

15  A    It means strong.

16  Q    I am going to add Tuqueado.

17        Were there any nicknames for José Augusto?

18  A    Pepin.

19        MR. LAX:  I'll add Pepin.

20        And finally for identification, I am going to add a

21  sticker to the board identifying it as Government Exhibit 50.

22  BY MR. LAX:

23  Q    All right.  Mr. Pere, I'd like to show you a few other

24  photos.  These are not in evidence.

25        MR. LAX:  If we could show the witness and the

A. Pere - direct - Lax                                          666

1  parties and the Court Government Exhibit 3, please.

2  BY MR. LAX:

3  Q    Do you recognize the person shown in Exhibit 3?

4  A    No.

5  Q    I'd like to show you Government Exhibit 4.

6         MR. LAX:  None of these are in evidence.

7  Q    Do you recognize the person in Government Exhibit 4?

8  A    No.

9         MR. LAX:  Government Exhibit 6, please.

10 Q    Do you recognize the person in Government Exhibit 6?

11 A    No.

12        MR. LAX:  Government Exhibit 7.

13 Q    Do you recognize that person?

14 A    No, I don't.

15        MR. LAX:  Government Exhibit 9.

16 Q    Do you recognize that person?

17 A    No.

18        MR. LAX:  Government Exhibit 11.

19 Q    Do you recognize that person?

20 A    No.

21        MR. LAX:  Government Exhibit 16.

22 Q    Do you recognize the person shown in Government

23 Exhibit 16?

24 A    No.

25 Q    We've spoken -- shifting gears a little bit, we've spoken

1    about PetroEcuador a little bit.

2            What is PetroEcuador?

3    A    PetroEcuador is the Ecuadorian oil company.  It's

4    state-owned.

5    Q    What does it do?

6    A    Well, PetroEcuador is in charge of doing explorations,

7    production of oil.  Also, refining of oil, exporting oil.

8    They also -- well, actually they sell oil and they buy

9    products.  So, they do -- when I say products, like gasoline

10   or diesel.  So, they import also products.

11   Q    You've referred so far to two people who held the title

12   the international trade manager.

13            What does the international trade manager do?

14   A    The international trade manager is in charge of the

15   exports that PetroEcuador exports.  Like I said, oil and fuel

16   oil mainly; and also, purchases gasoline and diesel from

17   other -- I mean from other companies.  So, the international

18   trade manager is the person that is in charge of executing

19   both operations.

20   Q    Aside from the international trade manager, are you

21   familiar with the organizational structure of PetroEcuador

22   generally?

23   A    In general, yes.

24   Q    Could you describe it?

25   A    Well, it has a board that it's presided by the Minister

1    of Hydrocarbons.  The Board members are representatives of

2    other government entities.  Then there is the CEO or general

3    manager of PetroEcuador.  And you also have under him

4    approximately three main units.  One which is production; the

5    other one that has to do with exports and imports, which is

6    the area we were or the department we were talking about; and

7    the other one that does the refining.

8    Q    You've mentioned some of the products that PetroEcuador

9    deals with, diesel and gasoline.

10             What are those used for in Ecuador?

11   A    Oh, and I forgot mention, I'm sorry, LPG, gas.

12   Q    Okay.  So let's start with LPG.

13             What is LPG used for in Ecuador?

14   A    LPG is liquified petroleum gas.  It's the gas used for

15   burning stoves and cooking and heating water in Ecuador.  It

16   is a very, very important product because it's widely used.

17   Q    What about diesel and gasoline, what are those used for?

18   A    Well, diesel mainly for industries, for heavy equipment

19   and heavy transportation, big trucks mainly.  And gasoline, of

20   course, for automobiles.

21   Q    We've spoken about fuel oil.

22             What is fuel oil?

23   A    Fuel oil is a product that comes out of the refineries.

24   When you refine oil, there is some byproduct which is mixed

25   with some chemical and it becomes Fuel Oil Number 6.

1   Q    What is fuel oil used for?

2   A    It is used for producing energy in thermoelectric plants,

3   and also for -- as a fuel for vessels I understand.

4   Q    Now, in connection with PetroEcuador, we've also

5   discussed the Ministry of Hydrocarbons.

6            What is the Ecuadorian Ministry of Hydrocarbons?

7   A    Well, the ministry is in charge of setting the strategy

8   for the oil sector for -- it's also responsible for setting

9   some norms for the sector.  And -- and as Chairman of the

10  Board of PetroEcuador, of course, he has a very important role

11  in -- in the strategy of PetroEcuador.

12  Q    How does the role of the Ministry of Hydrocarbons compare

13  to that of PetroEcuador?

14  A    Can you ask that again?  I'm sorry.

15  Q    How does the Ministry of Hydrocarbons compare to

16  PetroEcuador in terms of what they do?

17  A    Okay.  The minister of hydrocarbons is really a position

18  appointed by the president, as it's like a secretary of, let's

19  say, transportation here.  And, again, it's responsible for

20  the general guidelines and it's responsible for coordinating

21  actions with all the other secretaries of state.  And

22  PetroEcuador is under him, and it's really a -- a public

23  company.  I mean it works independently.  So, yeah,

24  PetroEcuador is executing what at the high level is being set.

25  Q    I am going to shift gears a little bit now, Mr. Pere.

1          We've talked about so far at a high level your

2    participation in a scheme that began in or about 2015 with the

3    defendant and others in connection with a fuel oil contract.

4          Was that the first time that you, sir, participated

5    in a scheme like that?

6    A    No.

7    Q    When was the first time?

8    A    The first time was in -- in around 2010 in a exchange

9    program of oil for products.

10   Q    Was there a particular company involved in that?

11   A    Yes.  The company was Trafigura.

12   Q    Did the defendant have anything to do with that deal?

13   A    No.

14   Q    So, what is Trafigura?

15   A    Trafigura is one of the largest commodity traders, oil

16   traders in the world.

17   Q    And how did the scheme involving Trafigura begin?

18   A    Well, it began when Nilsen Arias was named international

19   trade manager at PetroEcuador.  And the president had

20   established that it was better for PetroEcuador to do business

21   with state-owned companies from other countries directly.

22          So, if the country, PetroEcuador did that, then

23   there was no need to go through tender processes, public

24   tenders.  And Trafigura used a company called ANCAP,

25   A-N-C-A-P, from Uruguay, as a fronting for this exchange of

1    crude oil for diesel and gasoline.

2    Q    Were bribes paid in connection with that deal?

3    A    Yes.

4    Q    Who to?

5    A    Nilsen Arias.

6    Q    And who paid those bribes?

7    A    Those bribes were paid by Trafigura through a company in

8    Uruguay, and then to one of my companies, and then to Nilsen

9    Arias' companies.

10   Q    Did you pay Nilsen Arias directly in connection with that

11   deal?

12   A    Yes.

13   Q    How were the payments to you calculated in connection

14   with the Trafigura scheme?

15   A    It was X amount of cents per barrel of oil exported.

16   Q    And approximately how much in bribes were paid to

17   Mr. Arias in connection with the Trafigura deal?

18   A    200,000, approximately.

19   Q    Dollars?

20   A    Yes.

21   Q    You mentioned someone last week named Francisco Acosta.

22        Did he have any participation in this deal?

23   A    Yes.  He -- first of all, he introduced me to Nilsen

24   Arias.  And second, there were some payments that were made to

25   Francisco Acosta or accounts related to him, and he also had a

1    benefit, an economic benefit from the contract.

2    Q    In addition to Trafigura, you participated in other

3    similar schemes?

4    A    Yes.

5    Q    With what companies?

6    A    With a company called Gunvor, G-U-N-V-O-R.

7    Q    Any others?

8    A    And with Vitol.

9    Q    Let's talk about, let's talk about Gunvor.

10          For that scheme, did the defendant have anything to

11   do with that?

12   A    No.

13   Q    What is Gunvor?

14   A    Gunvor is another trader, one of the largest traders in

15   the world for oil.

16   Q    Approximately when did the scheme involving Gunvor begin?

17   A    2012, 2013 -- 2012.

18   Q    Is that when your participation in that scheme began?

19   A    Yes.

20   Q    And for approximately how long did you participate in

21   that scheme?

22   A    Since 2012 until 2019.

23   Q    How did the Gunvor scheme begin, how did your

24   participation in the scheme begin?

25   A    Well, Ecuador had decided to, like I said before, that it

1    was better, the president had decided that it was better to

2    sign between, sign contracts between state-owned companies and

3    started seeking, I started seeking or looking for a company

4    that can do that.  And I was introduced to Ray Kohut from

5    Gunvor.  After meeting him, I also met other people from

6    Gunvor and started contacts through Gunvor with a Chinese

7    state-owned company called UNIPEC.

8    Q    All right.  Let me ask you a couple of follow-up

9    questions.

10           Ray Kohut, who is Ray Kohut?

11   A    Ray Kohut is somebody that worked with -- worked for

12   Gunvor.

13   Q    And what was his role at Gunvor?

14   A    He was in charge of developing new markets.  I believe

15   that was his title.

16   Q    In addition to you and Ray Kohut, who else participated

17   in the scheme involving Gunvor?

18   A    There was Antonio Marin from Gunvor, and Nilsen Arias

19   from PetroEcuador, Francisco Acosta.

20   Q    Can you summarize Antonio Marin's role?

21   A    Antonio Marin was a trader at Gunvor.  He was responsible

22   for -- for buying and selling oil at Gunvor, a trader.

23   Q    What about your brother Enrique, was he involved?

24   A    Yes, he was.

25   Q    Were there contracts obtained as part of the scheme

1    involving Gunvor?

2    A    Yes.

3    Q    High level, could you describe those contracts?

4    A    Well, those contracts stated that we were going to get

5    paid, that we were gonna get paid X amount of cents per barrel

6    of oil exported.

7    Q    What do you mean by "we"?

8    A    When I say "we," I'm referring to the whole group that I

9    just mentioned; Enrique, Nilsen, myself.

10   Q    You mentioned that there was, I think you said a Chinese

11   company involved in that, UNIPEC.

12         What was UNIPEC's -- how did UNIPEC figure into

13   that?

14   A    UNIPEC, it's one of the -- China's oil companies.  And

15   since it was a state-owned company, was allowed to sign

16   contracts with PetroEcuador directly by negotiating directly

17   without having to participate in public tenders.

18   Q    Can you summarize the contracting relationship?

19   A    Between?

20   Q    Between so far we've talked about PetroEcuador, UNIPEC

21   and Gunvor.

22         What was the contracting relationship?

23   A    Well, PetroEcuador had in its contract would receive,

24   actually did receive loans at first from China, from a Chinese

25   bank, and PetroEcuador would pay that loan with oil.

1          Gunvor was the company that actually dealt with that

2     oil, did all the operations related to the oil.  And that was

3     it.  I mean the two companies together, UNIPEC was, again,

4     like in the case of the company from Uruguay that I mentioned

5     before, it was a fronting for Gunvor.

6     Q    Did there come a time when there was another state-owned

7     entity involved in the Gunvor scheme?

8     A    Yes.

9     Q    What, what entity was that?

10    A    It's PetroThailand, PTT.

11    Q    What were the -- what was the product or products

12    involved in the Gunvor scheme?

13    A    In the Gunvor was mainly oil, but there was some fuel oil

14    also.

15    Q    When you say oil, do you mean a particular type?

16    A    Crude oil.

17    Q    And how many contracts were involved related to Gunvor?

18    A    Three.

19    Q    You mentioned something called a public tender before.

20         What's a public tender?

21    A    A public tender is when PetroEcuador or the company, as a

22    matter of fact, wants to sell oil, there would be a public

23    gathering in which each company who wants to buy oil would

24    present a closed envelope with the price that they are willing

25    to pay.  Then, in this case PetroEcuador would open the

1    envelopes and see which one had the best price for

2    PetroEcuador and assign that bid to that company.

3    Q    Were any of the Gunvor deals public tenders?

4    A    No.

5    Q    How did the Gunvor deals differ from a public tender?

6    A    It's different because Gunvor acted behind a state-owned

7    company, and state-owned companies were allowed to negotiate

8    directly with PetroEcuador.

9    Q    Was there any particular term for that arrangement?

10   A    There was a -- it was really a strategic alliance.  It

11   was part of a strategic alliance signed by the company.

12   Q    What is a strategic alliance?

13   A    It's a document in which two state-owned companies agree

14   to cooperate with each other in different aspects of — the oil

15   sector being one of them — the international commerce.

16   Q    Were you paid in connection with the Gunvor deals?

17   A    Yes, I was.

18   Q    How were your payments calculated?

19   A    They were calculated on a basis of X amount per barrel.

20   Q    When you say "X," why do you say X?

21   A    Because at some point it was less, I believe 21 cents,

22   and later on it was higher.

23   Q    How were you paid?

24   A    I was paid by wire transfers made by Gunvor to one of the

25   companies that you mentioned before; EIC, OIC, in particular.

1  Q    Did one of your companies have a contractual relationship

2  with Gunvor?

3  A    Yes.

4  Q    Can you describe that?

5  A    The contractual relationship with Gunvor, it's -- it's a

6  contract that states that Gunvor would pay that commission per

7  barrel.  And we, our companies — mentioning again OIC, EIC —

8  had the responsibility of doing many things for Gunvor like

9  marketing studies and general -- general responsibilities that

10 were established in that country -- contract, I'm sorry.

11 Q    Were the services in those contracts actually performed?

12 A    No.

13 Q    Once one of your companies received money from Gunvor --

14 and let me ask, were you paid directly by Gunvor?

15 A    Yes; Gunvor Singapore.

16 Q    Once you or one of your companies was -- was paid, what

17 did you do with the money?

18 A    I paid the people involved in the -- in the scheme by

19 wires --

20 Q    Who --

21 A    -- and also in cash.

22 Q    Who?

23 A    I paid Nilsen Arias.  I paid Francisco Acosta.  I paid

24 Ray Kohut.  I paid later, when Nilsen left his position, I

25 paid the new person at that position, which was Mauricio

*A. Pere - direct - Lax*                                             678

1  Samaniego.  Also, José Augusto.

2  Q    Approximately how much was paid to Arias in connection

3  with the Gunvor scheme?

4  A    Maybe 8 million, 5 million-something, around those lines.

5  Q    Are you familiar with a company called Sargeant Marine?

6  A    Yes, I am.

7  Q    What is Sargeant Marine?

8  A    It's a company that sold asphalt.

9  Q    Did you participate in a scheme involving Sargeant

10 Marine?

11 A    Yes, I did.

12 Q    Did the defendant have anything to do with that?

13 A    No, he didn't.

14 Q    When did you begin to participate in a scheme involving

15 Sargeant Marine approximately?

16 A    The year was 2014, 2015.

17 Q    How did it begin?

18 A    Well, Nilsen Arias asked me to contact somebody in

19 Sargeant Marine, and I contacted through a person in Chile, a

20 gentleman whose name is Finocchi, Roberto Finocchi.

21        And there was an emergency in Ecuador because it

22 needed asphalt in a very -- needed to buy asphalt very fast.

23 I don't remember what problem Ecuador had at the time.  So, I

24 got in touch with Mr. Finocchi and helped him participate in a

25 emergency contracting process in Ecuador with the help of

1    Nilsen Arias.

2    Q    Was a contract obtained?

3    A    I'm sorry?

4    Q    Was a contract obtained?

5    A    Yes.

6    Q    Can you describe at a high level?

7    A    It was a contract for the sale of -- I don't remember the

8    volume of asphalt.  It was a short-term contract for the

9    delivery, and the contract specified certain characteristics

10   that the provider must have, which Sargeant Marine had.

11   Q    And the provider here was who?

12   A    Sargeant Marine.

13   Q    Provided asphalt to PetroEcuador?

14   A    Yes.

15   Q    Were payments made to Nilsen Arias in connection with

16   that?

17   A    Yes.

18   Q    By who?

19   A    By -- Sargeant Marine paid one of our companies.  When I

20   say "our companies," Enrique and myself, and we paid Nilsen

21   Arias to an account designed by -- I mean directed by him.

22   Q    What do you mean by that?

23   A    Nilsen gave us a name of a company and accounts in order

24   for us to pay him.

25   Q    Approximately how much was paid to Arias in connection

1  with the Sargeant Marine deal?

2  A    Approximately $200,000.

3  Q    All right.  Let's turn back to the scheme involving the

4  defendant and Vitol and fuel oil.

5         Approximately when did that scheme begin?

6  A    Well, I met the defendant in 2015, and the purpose for

7  meeting him was to see -- to seek opportunities for doing

8  business with Vitol and PetroEcuador.

9  Q    How did that meeting come about?

10  A    Nilsen Arias introduced me to Xavier Rodriguez, and I met

11  for the first time with Xavier Rodriguez in Mexico.  And in

12  that meeting I met the defendant, who was a friend or former

13  business partner of -- I mean Javier Aguilar and Xavier

14  Rodriguez, both.

15  Q    Before we get to that, that meeting, did you have any

16  conversations with Nilsen Arias in anticipation of that

17  meeting?

18  A    Yes, I did.

19  Q    Can you describe those conversations?

20  A    I would say two main topics.  One, try to find

21  opportunities to do business with Vitol.  And two, fix Vitol's

22  problems with PetroEcuador.  At the time Vitol was

23  black-listed, which means he was not allowed to do business

24  with PetroEcuador.  Those were the two main issues discussed.

25  Q    Did you discuss any particular opportunities or potential

1  opportunities?

2  A    The potential opportunity was for Vitol to sell gas.

3  Q    What type of gas?

4  A    LPG.

5  Q    Before -- before this meeting, did you have conversations

6  with Nilsen Arias about his relationship with Xavier

7  Rodriguez?

8  A    He said that Xavier Rodriguez was close to him and that

9  Xavier Rodriguez was close to the defendant.

10 Q    What did you understand that to mean, being close to?

11 A    For me, when somebody --

12        MR. PRICE:  I'm going to object, irrelevant.  No

13 foundation.

14        Your Honor, I'm objecting, irrelevant, no

15 foundation.

16        MR. LAX:  Discussing his state of mind before he

17 goes into his first meeting with -- with the defendant.

18        THE COURT:  I'll hear it.  Let's not get too far

19 afield, Mr. Lax.

20        MR. LAX:  Yes, Your Honor.

21 BY MR. LAX:

22 Q    I just simply asked what you, Mr. Pere, understood when

23 Arias said that someone was close to?

24 A    It meant to me that he can do business with him, manage

25 payments with him.

1    Q    Meaning what?

2    A    Meaning that they were close enough that they can

3    coordinate and receive bribes.

4    Q    Why not use Gunvor for potential LPG business?

5    A    Diversification.  We had our businesses with Gunvor and

6    we wanted to have another company like Gunvor, in this case

7    Vitol, to do other operations.

8    Q    Let's turn now to that meeting.

9            Where was the meeting?

10   A    The meeting was in Mexico City.

11   Q    Where specifically in Mexico City?

12   A    At the Marriott Hotel in Polanco.

13   Q    And approximately when was the meeting?

14   A    It was mid 2015.

15   Q    Did you go alone?

16   A    I went alone.

17   Q    What happened once you got to the Marriott?

18   A    When I got to the hotel, I met Xavier Rodriguez and we

19   talked for, I don't know, half an hour at the most.

20   Q    Where did you meet Xavier Rodriguez?

21   A    At the bar of the hotel.

22   Q    So far, just the two of you?

23   A    So far, yes.  After that, Javier Aguilar came to -- to

24   the meeting at the -- at the bar.  Actually, we moved to a

25   conference room to talk.

A. Perez - direct - Lax                                    683

1  Q    Before we get to that, can you describe your initial

2  conversation with Xavier Rodriguez at the bar?

3  A    My initial conversation was, of course, a little social.

4  And then he described, he -- he mentioned that he was close to

5  Javier Aguilar, that he had dealings with Javier Aguilar

6  before.  And, of course, we -- he talked about -- about Vitol

7  and the company and how good it was for commercialization of

8  LPG.

9  Q    Was it significant to you that he said he was close to

10 the defendant or had dealings with him?

11 A    For me, that meant that he had been paid before by Javier

12 Aguilar, being -- I'm not sure if Xavier Rodriguez at the time

13 was in PetroEcuador or the Ministry of Hydrocarbons, but he

14 came -- he was there on and off for many years.

15 Q    Approximately, how long did you speak with Xavier

16 Rodriguez at the bar?

17 A    About half an hour.

18 Q    What happened after that?

19 A    After that, Javier Aguilar arrived and we moved into a

20 conference room.

21 Q    Can you describe the room?

22 A    It was a small conference room.  You enter the room,

23 there was a long table, maybe for eight people or so.

24 Q    What happened once you got to the room?

25 A    Well, I -- I got into the room.  First, Xavier -- no, I'm

A. Perc - direct - Lax                                                684

1   sorry.  I got into the room first.  I sat on the side of the

2   door.  And then Xavier Rodriguez and Javier Aguilar came into

3   the room and sat, Xavier Rodriguez on my right side and Javier

4   Aguilar in front of me.

5   Q    Can you describe how the defendant introduced himself?

6   A    Just by name.  He didn't talk much about the company.  He

7   just mentioned his experience in LPG and that he had worked

8   for Trafigura before.  And basically, he sold the company --

9   the company and his capacity to offer LPG to PetroEcuador in

10  good conditions.

11  Q    When you say "the company," what do you mean by "the

12  company"?

13  A    Vitol.

14  Q    What else did you talk about?

15  A    We talked about the problems that Vitol had with

16  PetroEcuador and how they can -- how they could be -- be

17  solved, so that Vitol could start doing business with

18  PetroEcuador again.

19  Q    What problems were discussed?

20  A    Well, Vitol had certain payments that, I think they were

21  penalties in -- in contracts with PetroEcuador before that had

22  to be paid to PetroEcuador, among other issues that had to be

23  solved.

24  Q    Like what?

25  A    I'm not sure, but -- I mean I cannot say exactly, but

A. Perez - direct - Lax                    685

1   there were documents that needed to be presented in order for

2   PetroEcuador to allow Vitol to do business.

3   Q    Going, I guess, back a little bit in the meeting, how did

4   you introduce yourself?

5   A    The main introduction had already been made by Xavier

6   Rodriguez, so I did not go into the details of who I am or who

7   I represented.

8          I highlighted my close relationship with Nilsen

9   Arias and also the experience I had in doing business with

10  PetroEcuador and Nilsen Arias, before referencing the Gunvor

11  deals.

12

13          (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

A. Pere - direct - Lax                                                686

1   DIRECT EXAMINATION (Continuing)

2   BY MR. LAX:

3   Q    What did you say about that about, your closeness?

4   A    I said that I was very close to Nilsen and that I was

5   able to take advantage of any opportunity that could arise in

6   PetroEcuador.

7   Q    What did you mean by take advantage?

8           MR. PRICE:  Objection.  At this point what his

9   understanding is irrelevant as to what he meant.

10          THE COURT:  I'm not following where you are going.

11  Do you want to explain at sidebar?

12          MR. LAX:  He is speaking to the defendant.

13          THE COURT:  And you're asking about what the

14  defendant said to him?

15          MR. LAX:  I'm asking about what the witness said to

16  the defendant and what he meant by that?

17          THE COURT:  As part of a communication?

18          MR. LAX:  A face-to-face meeting.

19          MR. PRICE:  The objection isn't what he said, but

20  the undisclosed what he meant.  That's the objection.

21          THE COURT:  I'm going to allow it, what his

22  understanding was of a conversation he had with the defendant.

23  A    Could you ask the question again just like you did.

24  Q    Yes.  When you said you could take advantage to the

25  defendant, what did you mean by that?

A. Pere - direct - Lax                                          687

1   A    That I was able to pay Nilsen Arias a bribe and take

2   advantage of any opportunity for selling products or buying

3   oil from PetroEcuador.

4   Q    Were there any particular deals discussed at this meeting

5   or potential deals?

6   A    Potentially selling LPG to PetroEcuador.

7   Q    Can you describe that conversation, about the potential

8   deal to sell LPG to PetroEcuador?

9   A    Well, the conversation -- during the conversation, Xavier

10  Rodriguez and Javier Aguilar mentioned how and in what state

11  was the contract or the contracts that allowed for another

12  company to sell LPG to PetroEcuador and how a new contract

13  could be signed, meaning when, what volume.  They were better

14  informed than I was about those details.

15  Q    What, if anything, did the defendant say about that

16  potential deal?

17  A    He said that Vitol was extremely competitive in LPG,

18  which was his area of expertise.

19  Q    Did you and the defendant and Xavier Rodriguez have any

20  discussions about a potential structure for that deal during

21  that meeting?

22  A    I don't remember.

23  Q    Were any other topics discussed during that meeting?

24  A    In general, products, fuel oil -- I'm sorry, not fuel oil

25  at the time -- products and crude oil besides LPG saying that

A. Pere - direct - Lax                      688

1    PetroEcuador dealt with those products.

2    Q    Approximately how long was that meeting?

3    A    Less than an hour.

4    Q    How did you get to Mexico City?

5    A    I flew from Miami.

6    Q    Do you recall how long you stayed in Mexico City for that

7    trip?

8    A    One or two nights.

9    Q    So at the end of that meeting, how did you, the

10   defendant, and Xavier Rodriguez leave things?

11   A    Well, I gave Javier Aguilar a summary of the issues that

12   had to be sold -- I'm sorry -- that had to be resold with

13   PetroEcuador so that Vitol could be taken out of the blacklist

14   and be allowed to do business with PetroEcuador.

15   Q    What was his reaction to that?

16   A    He was very positive, seemed to me that he expected a --

17   bigger problems, like he was happy to see that the payment

18   that Vitol had to make was not substantial.

19   Q    What do you mean by that, the payment wasn't substantial?

20   A    Vitol had to pay I think less than $200,000, meaning,

21   when I said not substantial, that I'm trying to say that it

22   was not a very high payment for a company like Vitol.

23   Q    Pay for what?

24   A    Penalties.

25   Q    To what end?

1  A    So that it -- so that Vitol could be registered or

2  included in the registry of the international trade department

3  at PetroEcuador so that Vitol would be allowed to do business

4  with PetroEcuador.

5  Q    Following that meeting, did you have any follow-up

6  conversations with Nilsen Arias?

7  A    Yes, I explained to Nilsen Arias, I talked about the

8  meeting, of course.

9  Q    What did you say?

10  A    I said that the meeting -- that I had a very good

11  meeting, that Vitol was open to do business in -- actually, in

12  anything, in any product, but, of course, that we talked about

13  LPG, and that the first thing that would have to be done was

14  to resolve the issues that Vitol had with PetroEcuador.

15  Q    After the meeting, did you begin to pursue a potential

16  LPG deal involving Vitol?

17  A    Yes.

18  Q    Can you describe, at a high level, how you began to do

19  that?

20  A    Well, I obtained information from Nilsen and Xavier

21  Rodriguez about the current contract for providing LPG and

22  found out that probably at the end of 2015 there was going to

23  be an opportunity for selling LPG.

24  Q    What type of opportunity?  Can you summarize it?

25  A    The volumes that the company was selling LPG to

A. Pere - direct - Lax                                690

1  PetroEcuador at the time were going to be completed, either

2  the volumes or the term of the contract were going to be over

3  early in 2016, therefore, there was space for somebody else in

4  this case, Vitol, to sell LPG.

5  Q    Was that going to be a direct deal, Vitol to

6  PetroEcuador?

7  A    We discussed at different times different structures.

8         At that time it was just going to be an offer with a

9  price.  There was no loan involved.  And Vitol was able to

10 sell LPG or -- yeah, it was able to sell LPG at a better price

11 than the company that was already selling LPG.

12 Q    Which company was that?

13 A    Petredec.

14 Q    You said we discussed at the beginning of your last

15 answer.  Who were you referring to?

16 A    The defendant, Javier Aguilar, we discussed.

17 Q    Did there come a time when the structure of that

18 potential deal changed?

19 A    Yes.  Like I was saying, later on, we -- when I say we, I

20 mean Nilsen Arias, the defendant, and myself, discussed the

21 possibility of Vitol making a loan to Ecuador and that loan

22 would be paid.  Yeah, making a loan to Ecuador, which allowed

23 Vitol to sell LPG without going through a tender process.

24 Q    And how would that come to be, not going through the

25 tender process?

1   A    The law in Ecuador allowed at the time to negotiate

2   directly with a company the sale of products, gasoline,

3   diesel.  LPG directly, to negotiate directly and not have to

4   go through the tender process.

5   Q    Negotiate directly with who?

6   A    PetroEcuador and the company, in this case, Vitol.

7   Q    Did the direct deal between PetroEcuador and Vitol end up

8   happening?

9   A    No.

10   Q    Did that structure change at all?

11   A    The structure of the initial deal?

12   Q    This potential LPG deal, yes.

13   A    The potential LPG deal later on became a structure of

14   Vitol selling LPG and PetroEcuador paying that LPG with crude

15   oil.

16   Q    Are you familiar with a company called Mex Gas?

17   A    Yes.

18   Q    What is Mex Gas?

19   A    It's a company owned by the -- the state-owned company of

20   Mexico, PEMEX.

21   Q    Did MexGas take any potential role in this deal?

22   A    We discussed Mex Gas being the vehicle for selling LPG at

23   one point, yes.

24   Q    What do you mean by that?  Can you describe?

25   A    I mean by that that Vitol could sell the LPG to

A. Pere - direct - Lax                          692

1  PetroEcuador through Mex Gas, which was again a company owned
2  by the state.
3          MR. LAX:  I'd like to show the witness, please, Ms.
4  Jefferson, for the witness and parties only, Government
5  Exhibit 1017.
6  Q    Do you recognize Government Exhibit 1017?
7  A    Yes.
8  Q    What is it?
9  A    It's an e-mail from -- that I sent to Javier Aguilar to
10 his address, Marcos Peres.
11 Q    What is the date of the e-mail?
12 A    September 2015.
13         MR. LAX:  There is an attachment, Government Exhibit
14 1017-A.  If we could show that to the witness, please.
15 Q    Do you recognize the attachment?
16 A    Yes, I do.
17         MR. LAX:  The Government offers Government Exhibit
18 1017 and 1017-A.
19         MR. PRICE:  No objection.
20         THE COURT:  Received in evidence without objection.
21         (Government Exhibits 1017 and 1017-A received in
22 evidence.)
23         MR. LAX:  The Government also offers Government
24 Exhibit 1017-A-T a stipulated transcripts, a translated
25 version of 1017-A.

A. Pere - direct - Lax                     693

1          MR. PRICE:  No objection.

2          THE COURT:  And that stipulated translation is also

3    received in evidence without objection.

4          (Government Exhibit 1017-A-T received in evidence.)

5          MR. LAX:  If we could please publish Government

6    Exhibit 1017 for the jury.

7          THE COURT:  You may.

8          (Exhibit published.)

9    BY MR. LAX:

10   Q    So who is this e-mail from and to?

11   A    It is an e-mail that I sent to Javier Aguilar.

12   Q    Where does it say Javier Aguilar?

13   A    It says Marcos Peres, which was an e-mail address that

14   Javier Aguilar used.

15   Q    Do you have an understanding as to why he used that

16   e-mail address?

17         MR. PRICE:  Objection, lack of foundation.

18         MR. LAX:  I'm asking the foundation.

19         THE COURT:  He's trying to lay the foundation.

20   Q    Just yes or no, do you have an understanding as to why

21   the defendant used that e-mail address?

22   A    Yes.

23   Q    Based on what?

24         MR. PRICE:  Objection.  Lack of foundation, how.

25   What's the basis of understanding?

A. Pere - direct - Lax                                    694

1          MR. LAX:  That was my question.

2          MR. PRICE:  My hearing is bad as I age.  I

3  apologize.

4          THE COURT:  You may answer.

5          THE WITNESS:  Repeat the question, please.

6  Q    What is your understanding based on?

7  A    My understanding about the e-mail address he used?

8  Q    Right.

9  A    My understanding is that --

10  Q    Not what the understanding is, just what is it based on?

11  A    On what Javier Aguilar told me.

12  Q    Okay.  Based on what the defendant told you, why did he

13  use that e-mail address or what's your understanding of why he

14  used that e-mail address?

15  A    Because this were things that he didn't want to be in the

16  record of Vitol.

17  Q    I'd like show you now the attachment to this e-mail;

18  Government Exhibit 1017 --

19          MR. LAX:  I'm sorry, Ms. Jefferson, let's use

20  1017-A-T.

21  Q    What are we looking at here, Mr. Pere?

22  A    This is the draft of a letter that I wrote for Javier

23  Aguilar to coordinate with Mex Gas and send it to the general

24  manager of Ecuador.

25  Q    Why did you write it?

A. Pere - direct - Lax                              695

1  A    Because I knew the elements that a letter like this

2  should have in order to generate a positive reaction from

3  PetroEcuador and the Ecuadorian Government.

4  Q    Knew how?  Based on what?

5  A    Based on my conversations with Nilsen Arias and also my

6  previous experience with other deals, like Gunvor deal.

7  Q    What are those elements in this letter?

8  A    Well, the first element is financing when I described the

9  capacity to enter into deals with financing facilities.

10 Q    And I'm sorry to interrupt you, just to orient, are you

11 referring there to the middle of the third paragraph?

12 A    Yes.

13 Q    Where it says financing facilities?

14 A    Correct.  Next line.  Yes.

15 Q    Okay.  Please continue.

16 A    Another element was we can develop those projects -- I'm

17 sorry, these projects immediately.  Ecuador was in need of

18 funds at the time.  So the fact that we were saying in the

19 letter immediately, it's something that also was written to

20 catch the attention of the manager of PetroEcuador.

21       The other element was the bottom of the letter

22 copying William Vasconez.

23 Q    Why, if at all, was that significant?

24 A    Because William Vasconez was deputy secretary of public

25 financing of the finance ministry of Ecuador and he was, first

A. Pere - direct - Lax                    696

1   of all, close to Nilsen Arias.  They worked together in other

2   deals; second, because he was the person in charge of getting

3   funds via loans or selling bonds for Ecuador.  This means that

4   if he got the letter, he would have an element of motivation

5   for this process to continue.

6   Q    The letter is addressed to Engineer Pareja.  Who is that?

7   A    He was the general manager of PetroEcuador at the time.

8   Q    And then at the very top it says Mexico City federal

9   district, dot, dot, dot.  What does that mean?

10  A    That's the place where the letter was going to be signed.

11       MR. LAX:  Could we return, Ms. Jefferson, please to

12  1017.

13  Q    So why did you send this letter to the defendant?

14  A    I sent it so that he could use it as a draft for Mex Gas

15  to send it to PetroEcuador.

16  Q    I asked you about Marcos Perez.  What is the full e-mail

17  address associated with Marcos Perez?

18  A    Perezmarcos007@g-mail.com.

19       MR. LAX:  I'm going to add perezmarcos007 to

20  Government Exhibit 50.  Ms. Jefferson and Mr. Villanueva, for

21  the witness and for the parties only.

22  Q    Mr. Pere, I would like to show Government Exhibit 1020-A.

23  Do you recognize Government Exhibit 1020-A?

24  A    Yes.

25  Q    And what is it?

A. Pere - direct - Lax                           697

1    A    It's an e-mail.

2    Q    From who to who?

3    A    Sent by the defendant to me.

4    Q    On what date?

5    A    On October 5, 2015.

6    Q    There's a number of attachments to this e-mail.  I'll

7    show them to you and see if you recognize them.

8             Government Exhibit 1020-B, do you recognize that as

9    one of the attachments?

10   A    Yes.

11   Q    1020-C?

12   A    Yes.

13   Q    1020-D?

14   A    Yes.

15   Q    Yes, you recognize it?

16   A    Yes, I do.

17   Q    1020-E?

18   A    Yes, I do.

19   Q    1020-F?

20   A    Yes.

21   Q    1020-H?  I'm sorry, G?

22   A    Yes.

23   Q    And 1020-H?

24   A    Yes.

25   Q    At a very high level, what's the nature of the e-mail and

A. Pere - direct - Lax                          698

1    the attachment?  What does it have to do with?

2    A    It's an e-mail that contains -- I mean, I don't know if

3    all, but documents needed by Mex Gas to be registered or

4    included in the registry of PetroEcuador.

5    Q    In connection with the potential LPG deal that we've been

6    discussing?

7    A    Yes.

8              MR. LAX:  The Government offers Government Exhibit

9    1020-A through H.

10             MR. PRICE:  No objection.

11             THE COURT:  And those exhibits are received without

12   objection.

13             (Government Exhibits 1020-A through H received in

14   evidence.)

15             MR. LAX:  We also have translations that I will

16   offer pursuant to stipulation, Government Exhibits 1020-A-T,

17   1020-B-T, and 1020-H-T.

18             MR. PRICE:  No objection, Your Honor.

19             THE COURT:  And they are also received without

20   objection.

21             (Government Exhibits 1020-A-T, 1020-B-T, and

22   1020-H-T received in evidence.)

23             MR. LAX:  If we could please publish for the jury

24   Government Exhibit 1020-A-T.

25   Q    Mr. Pere, tell me if it is too small.  Where it says from

A. Pere - direct - Lax                    699

1  and to, are you able to read that?

2  A    I am.

3         MR. LAX:  I can't.  Let's blow it up a little bit

4  anyway.  Thank you.

5  Q    So who is it from and who is it to?

6  A    It's from Javier Aguilar to me.

7  Q    What e-mail address is that, Petrotel2011?

8  A    It's an e-mail address I used for -- especially when I

9  didn't want to have my name on an e-mail.

10 Q    What do you mean?

11 A    This was something that would involve payments to me and

12 to people in PetroEcuador, so I didn't want my name to appear

13 in any forward or in any use of the e-mail.

14        MR. LAX:  And if we can zoom out just to the body of

15 this e-mail, please.

16 Q    What is the e-mail that is being sent here?  Can you

17 summarize what this is?

18 A    Yeah.  The purpose is to provide with the documents that

19 were needed for Mex Gas to be able to do business with

20 PetroEcuador.

21        MR. LAX:  I'd like to direct witness's attention now

22 to Government Exhibit 1020-B-T.

23 Q    We don't need to go through all of them, but can you

24 explain what this attachment is?

25 A    Yeah.  It is a letter to Nilsen Arias from Mex Gas

A. Pere - direct - Lax                          700

1  presenting itself with details, with formal details about the

2  company.

3  Q    Directing your attention now to another attachment,

4  1020-H-T.  So this says, Subject reference letter.  Did I read

5  that right?

6  A    Yes, you did.

7  Q    And what is this letter?

8  A    It's a letter of reference from Vitol to PetroEcuador

9  stating that they have done businesses with Mex Gas for a few

10 years and they are recommending Mex Gas.

11           MR. LAX:  If we can please pull up the original

12 version of this, 1020-H.

13 Q    First, this is just the original Spanish version of what

14 we were look at; is that right?

15 A    Yes.

16 Q    Does it appear to be signed by anyone?

17 A    Yes.

18 Q    By who?

19 A    Javier Aguilar.

20           MR. LAX:  Thank you, Ms. Jefferson.

21 Q    Did that LPG deal involving Mex Gas, PetroEcuador, and

22 Vitol, did that ever close?

23 A    No.

24 Q    At the time, did you have an understanding as to why it

25 did not close?

A. Pere - direct - Lax                                    701

1        Without saying what it is, just yes or no, did you

2   have an understanding as to why?

3   A    No.

4   Q    Even though the deal didn't close, did you continue to

5   communicate with the defendant about getting Vitol business

6   with PetroEcuador?

7   A    Yes.

8   Q    What types of business did you discuss?  And we're still

9   2015 time period.

10  A    The main business was selling LPG, but we also talked

11  about the concession of terminal in Ecuador in which LPG is

12  received and stored, and also we talked about the construction

13  and operation of a terminal for oil and gas to be imported by

14  Ecuador, which was right next to the LPG terminal.

15  Q    Did those terminals have any names?

16  A    Monteverde LPG terminal.  And the other one, which is

17  referred to as a products terminal in Monteverde.

18  Q    Did that one have a name as well?

19  A    Just like I said, we referred to it as the terminal for

20  products.

21  Q    So shifting focus a little bit, did there come a time

22  when the deal shifted from potential LPG to something called

23  fuel oil?

24  A    Yes.

25  Q    We'll get into some specifics in a moment, but at a high

A. Pere - direct - Lax                    702

1   level, was a fuel oil actually reached?

2   A    Yes.

3   Q    Can you summarize the basic terms of the fuel oil?

4   A    The basic terms, first, Vitol, through a state-owned

5   company, would loan $300 million to Ecuador and Ecuador would

6   pay that loan with fuel oil by selling fuel oil to Vitol

7   through this state-owned company.

8   Q    Over what period of time were the sales?

9   A    From January 2017 until June 2019.

10  Q    And approximately when was that deal reached?

11  A    Late 2016.

12  Q    Let's go back to the beginning of the fuel oil deal.  How

13  did that start?

14  A    Nilsen Arias told me there were volumes of fuel oil that

15  PetroEcuador was able to sell and we discussed about talking

16  to Vitol and see if Vitol had a relationship with a

17  state-owned company so that the deal could be done without

18  having to go through a public tender process.

19  Q    And approximately when did that shift start, from LPG to

20  fuel oil?

21  A    Sometime in the second semester of 2016.

22  Q    Did you have conversations with the defendant about the

23  potential for a fuel oil deal?

24  A    Yes.

25  Q    Approximately when?

1  A    During that same time, mid-2016.

2  Q    Could you describe those conversations?

3  A    The first question was if they had a relationship with a

4  state-owned company that would look good signing a contract

5  with PetroEcuador.

6  Q    And what did he say?

7  A    He said yes.

8  Q    Was there any particular state-owned entity being

9  discussed at that point?

10  A    The state-owned company that we discussed about was Oman

11  Trading, OTI, the State company from Oman.

12  Q    When was the first time that you heard about OTI?

13  A    From Javier Aguilar.

14  Q    What did he tell you about it?

15  A    He told me that the company had been created, founded by

16  Vitol together with Oman and that Vitol had sold its

17  participation in the company and that it was owned by Oman, by

18  the Omanian Government.

19  Q    What happened to Mex Gas?

20  A    For some reason we didn't push Mex Gas further.  I don't

21  remember.

22  Q    So involving PetroEcuador, OTI, and Vitol, what was the

23  potential structure?

24  A    Vitol, through OTI, loaned the money to PetroEcuador, and

25  PetroEcuador exported fuel oil.

A. Pere - direct - Lax                    704

1          MR. LAX:  I'd like to show the witness, please,
2    Government Exhibit 1075.

3    Q    Do you recognize Government Exhibit 1075?

4    A    Yes.

5    Q    What is it?

6    A    It's an e-mail that I sent to Xavier Rodriguez.

7    Q    What's the general topic of the e-mail?

8    A    It's an amendment to a fuel oil contract.

9    Q    I show you the attachment, Government Exhibit 1075-A.  Do
10   you recognize 1075-A?

11   A    Yes.

12         MR. LAX:  The Government moves into evidence into
13   evidence Government Exhibits 1075 and 1075-A.

14         MR. PRICE:  No objection, Your Honor.

15         (Government Exhibits 1075 and 1075-A received in
16   evidence.)

17         MR. LAX:  Let's run through a few of these, if we
18   can mand we'll walk through them.

19         Government Exhibit 1076 still for the witness.

20   Q    Do you recognize Government Exhibit 1076?

21   A    Yes.

22   Q    What is it?

23   A    It's an e-mail that I sent to Xavier Rodriguez.

24   Q    And the date?

25   A    August 2016, August 28, 2016.

A. Pere - direct - Lax                            705

1    Q    And the attachment to this, Government Exhibit 1076-A?

2    A    Yes.

3    Q    Do you recognize the attachment?

4    A    I'm sorry?

5    Q    Do you recognize the attachment?

6    A    Oh, yes, I do.

7             MR. LAX:  The Government offers Government Exhibits

8    1076 and 1076-A.

9             MR. PRICE:  No objection, Your Honor.

10            (Government Exhibits 1076 and 1076-A received in

11   evidence.)

12   Q    Let's do one more and then I will ask you a question,

13   Government Exhibit 1078.  Do you recognize 1078?

14   A    It's an e-mail sent by Javier Aguilar to myself on August

15   30, 2016.

16   Q    And the attachment, 1078-A, do you recognize what?

17   A    Yes.

18            MR. LAX:  The Government offers 1078 and 1078-A.

19            MR. PRICE:  Your Honor, we have no objections to any

20   of these documents:  1075, 1075-A, 1076, 1076-A, or 1078 and

21   1078-A.

22            (Government Exhibits 1078 and 1078-A received in

23   evidence.)

24            MR. LAX:  If we could please now show and publish --

25   let's go to ten 76.

A. Pere - direct - Lax                706

1   Q    Mr. Pere, who is e-mail from and to?

2   A    I sen that e-mail to the Xavier Rodriguez.

3   Q    And what e-mail address is Xavier Rodriguez using?

4   A    xr.upstream@g-mail.com.

5   Q    And what's the date of this e-mail?

6   A    August 28, 2016.

7   Q    So a fair amount of time has passed since the last e-mail

8   that I had showed you?

9   A    What was the day of the last e-mail?

10            MR. LAX:  If you could pull up, I think it was

11  1020-A.

12  A    Oh, yes.

13            MR. LAX:  Thank you.

14            Ms. Jefferson, back to 1070-A.  Actually, let's jump

15  right to the attachment, 1071 A.

16            I'm sorry, 1076-A.

17  Q    Mr. Pere, this is an attachment to the e-mail that you

18  sent to Xavier Rodriguez in August of 2016?

19  A    Yes.

20  Q    What is this attachment?  What is this spreadsheet?

21  A    This is the financial structure of the loan that Vitol,

22  through OTI, would make to Ecuador.  It's just like a mortgage

23  payment schedule.

24            (Continued on next page.)

25

A. Pere - Direct - Lax                707

1    (Continuing.)

2    BY MR. LAX:

3    Q    Directing your attention to column C.

4         What's the heading under column C?

5    A    Month, mes.

6    Q    It begins under October, what is that, 2014?

7    A    Yes.

8    Q    Why October 2014?

9    A    Because that's a spreadsheet that I had for Enrique

10   related to previous dealings, so it was like a template,

11   let's say.

12   Q    A template for -- for what?

13   A    For advertising a loan.

14   Q    And what was the amount of the loan?

15   A    Three hundred million dollars.

16   Q    Directing your attention now to column E.

17        Can you explain what that column is?

18   A    That's the equity on the loan.  That's how much it is

19   owed at that month.

20   Q    So how does this amount, this template, factor into the

21   potential fuel oil deal that you were discussing in

22   mid-2016?

23   A    Well, if you see column G, there is a monthly payment

24   that has to be made in -- for repaying the 300 million.  And

25   also there is column L where you have an estimate of the

1  invoice, meaning, an estimate of how much would the fuel oil

2  bought by Vitol through OTI or sold by PetroEcuador,

3  whatever, how much that would be, meaning that PetroEcuador

4  would be selling $15 million of fuel oil and, from that

5  amount, Vitol would deduct the monthly payment of

6  $10 million in column G.

7  Q    All right.  Let's -- let's break that down a little

8  bit.

9        So PetroEcuador gets how much upfront?

10 A    Three hundred million.

11 Q    And then what happens to that over time?

12 A    It gets reduced.

13 Q    By -- by how much per month?

14 A    It -- it gets reduced by, in the case of the second

15 month, $1.6 million; third month, 1.64.  And that is based

16 on the payments that PetroEcuador makes, minus the interest

17 for that month.

18 Q    And where's the interest?

19 A    Column F.

20 Q    So each month this is reduced how much?

21 A    Each month it's reduced -- it depends on the month

22 because you have to calculate the interest and the

23 principal, but the monthly payment must be $10.9 million,

24 again, every month.

25 Q    And in exchange for that payment, what happens?

1  A    In exchange for that payment, PetroEcuador sold fuel

2  oil for an estimate of 15 million.

3  Q    So then on a monthly basis, when PetroEcuador sells

4  about 15 million of fuel oil for that month, how is it paid

5  for?

6  A    Well, first, you deduct the amount that goes towards

7  the payment of the debt.

8  Q    And that's -- that's, where, column G?

9  A    Column G.  And the difference is paid to PetroEcuador.

10 Q    And at what point is that payment made?

11 A    It's deducted from the amount of the invoice.

12        MR. LAX:  Okay.  I would like to now show the

13 witness only Government Exhibit 1079.

14 Q    Do you recognize Government Exhibit 1079?

15 A    Yes.

16 Q    And there is an attachment, 1079-A?

17 A    Yes.

18 Q    Do you recognize the attachment?

19 A    Can you make it a little bigger?  Yes.

20        MR. LAX:  Government offers 1079 and 1079-A.

21        MR. PRICE:  No objection, Your Honor.

22        THE COURT:  Those documents are received without

23 objection.

24        (Government's Exhibits 1079, 1079-A received in

25 evidence.)

A. Pere - Direct - Lax                                710

1           MR. LAX:  And if we can now show the witness only

2    Government Exhibit 1080.

3    Q    Do you recognize Government Exhibit 1080?

4    A    Yes.

5    Q    And the attachment to this, 1080-A?

6    A    Yes.

7    Q    Do you recognize 1080-A?

8    A    Yes.

9           MR. LAX:  The Government offers 1080 and 1080-A.

10           MR. PRICE:  No objection, Your Honor.

11           THE COURT:  And those documents are similarly

12    received in evidence without objection.

13           (Government's Exhibits 1080, 1080-A received in

14    evidence.)

15           MR. LAX:  You can now please publish Government

16    Exhibit 1080.

17           (Exhibit published.)

18    Q    So Mr. Pere, who is this e-mail from and to?

19    A    This is an e-mail I sent to Javier Aguilar.

20    Q    And under what name did you send it?

21    A    Alonso Perez.

22    Q    And the defendant's e-mail address, here, was what?

23    A    Marcos Perez, meaning Perez Marcos 007.

24    Q    And this e-mail is August 30, 2016?

25    A    Yes.

1  Q    Let me show you the attachment, Government

2  Exhibit 1080-A.

3            (Exhibit published.)

4  Q    What is this attachment?

5  A    This is a -- an amendment to the contract for selling

6  fuel oil that PetroEcuador had signed with PetroChina.

7  Q    Why did you send this to the defendant?

8  A    To use it as a reference for the new contract that we

9  were working on with OTI.

10           MR. LAX:  And now for the witness, Government

11  Exhibit 1083.

12  Q    Do you recognize 1083?

13  A    Yes.

14  Q    What is it?

15  A    E-mail I sent to Xavier Rodriguez.

16  Q    And the date?

17  A    September 6, 2016.

18  Q    And the attachment to this e-mail, Government

19  Exhibit 1083-A, do you recognize that?

20  A    Yes.

21  Q    And I will show you, still for the witness, Government

22  Exhibit 1085.

23           What is Government Exhibit 1085?

24  A    It's an e-mail from Javier Aguilar to Xavier Rodriguez.

25  Q    Is there another e-mail address on the to line, as

A. Pere - Direct - Lax                          712

1   well?

2   A    Yes.  I am being copied.

3   Q    And the date of that e-mail?

4   A    September 13, 2016.

5   Q    And the attachment, Government Exhibit 1085-A, do you

6   recognize 1085-A?

7   A    Yes.

8           MR. LAX:  The Government offers Government

9   Exhibits 1083, 1083-A, 1085, and 1085-A.

10          MR. PRICE:  No objection.

11          THE COURT:  Those documents are also received

12  without objection.

13          (Government's Exhibits 1083, 1083-A, 1085, 1085-A

14  received in evidence.)

15          MR. LAX:  If we could please begin with 1083.

16          (Exhibit published.)

17  Q    So this e-mail is from who to who?

18  A    This is an e-mail I sent to Xavier Rodriguez.

19  Q    And the attachment, what's it titled?

20  A    OTI Letter V1.

21  Q    What does V1 mean?

22  A    It's the first version of that letter.

23          MR. LAX:  If we could please show the attachment,

24  1083-A.

25          (Exhibit published.)

1    Q    What are we looking at here?

2    A    This is a letter to be signed by OTI.  This is actually

3    a draft I made, I wrote.  And it has some elements that OTI

4    included, probably that first paragraph and second.  And

5    it's introducing OTI to PetroEcuador and saying that OTI has

6    interest in purchasing fuel oil from PetroEcuador through a

7    prepayment or considering a prepayment structure.

8    Q    Where do you see that?

9    A    In the third paragraph.

10   Q    You referred to earlier -- well, let me direct your

11   attention to the second paragraph.

12           Where did that information come from?

13   A    From Javier Aguilar.

14   Q    And what is that information?

15   A    It's information about OTI and it's saying that it's

16   100 percent owned by the government of Oman.

17   Q    And who is this draft letter addressed to?

18   A    To the general manager of PetroEcuador.

19   Q    Who is that?

20   A    Pedro Merizalde.

21   Q    And then at the bottom, Mr. Arias is copied on this

22   draft letter?

23   A    Yes.

24   Q    Why did you include that?

25   A    Because Nilsen Arias was the international trade

A. Pere - Direct - Lax                714

1  manager and is the person close to me with whom we worked on

2  the possibility of signing something like this.

3           MR. LAX:  Can we show 1083 again, just for one

4  moment?

5           (Exhibit published.)

6  Q   All right.  So the date is September 6, 2016?

7  A   Yes.

8           MR. LAX:  Let's jump to Government Exhibit 1085,

9  please.

10          (Exhibit published.)

11 Q   Okay, so the date now?

12 A   September 13.

13 Q   And who is this e-mail from and to?

14 A   From Javier Aguilar to Xavier Rodriguez.

15 Q   And whose e-mail address is anpeyca@gmail.com?

16 A   That's my e-mail also.

17 Q   Now, the attachment here reads OTI Letter V5; is that

18 right?

19 A   Yes.

20          MR. LAX:  Let's look at the attachment, please,

21 Government Exhibit 1085-A.

22          (Exhibit published.)

23 Q   What is this letter?

24 A   This is the same letter for which I wrote the draft and

25 sent before.

A. Pere - Direct - Lax                               715

1          MR. LAX:  Can we, Ms. Jefferson, please pull them

2     up side by side; 1083-A on the left and 1085-A on the right?

3          (Exhibits published.)

4     Q    So the one on the left is the draft that you wrote?

5     A    Yes.

6     Q    And the one on the right is -- now appears to be

7     signed?

8     A    Yes.

9     Q    Who is Talal Al Awfi?

10    A    The CEO of OTI.

11    Q    Can I ask you to take a moment and just compare these

12    letters?  How do they compare to each other?

13    A    The two letters are virtually the same.

14    Q    The one on the left, you wrote that one?

15    A    Yes.

16    Q    Did you work for OTI?

17    A    No.

18    Q    Why, at the bottom, all the Xs for the signature?

19    A    Because I didn't know who was going to sign it.

20    Q    Now, at some point, did the fuel oil deal -- you

21    testified earlier, the fuel oil deal eventually closed?

22    A    Yes.

23    Q    Did lawyers become involved in the fuel oil contract

24    negotiations and closing?

25    A    Oh, yes.

1    Q    Which law firms came to be involved?

2    A    Well, I know about the law firm that worked or that

3    supported PetroEcuador, which was Hogan Lovells.

4    Q    Do you recall the names of any other law firms that

5    came to be involved?

6    A    No.

7                MR. LAX:  If we can show the witness, please,

8    Government Exhibit 1127.

9    Q    Do you recognize Government Exhibit 1127?

10   A    Yes.

11   Q    What is it?

12   A    That's an e-mail I sent to Javier Aguilar.

13   Q    On what date?

14   A    On October 26, 2016.

15               MR. LAX:  The Government offers into evidence

16   Government Exhibit 1127.

17               MR. PRICE:  No objection.

18               THE COURT:  Received without objection.

19               (Government's Exhibit 1127 received in evidence.)

20   Q    So now looking at this, we are now in October 2016?

21   A    Yes.

22   Q    The e-mail addresses from and to, we've talked about

23   those.  I won't ask you questions about that, but who are

24   all the people beneath it?  It starts with the line from

25   Forbes-Cockell.

1              Do you know who that is?

2    A    No.

3    Q    What about Miguel Zaldivar?

4    A    Yes.  He's an attorney for Hogan Lovell.

5    Q    What about Gaston Fernandez?

6    A    The same.  He also work for the same law firm.

7    Q    Do you know who Jonathan Ching is?

8    A    No.

9    Q    Or Tyler Stypinski?

10   A    No.

11   Q    Why did you send this to the defendant?

12   A    To keep him informed or to inform him of the

13   advancements in the process, something that I received from

14   PetroEcuador.

15   Q    How did you get this?

16   A    I got it from Nilsen Arias.

17   Q    And what were the advancements being discussed here?

18   A    They are talking about the term sheet, the -- the basic

19   terms of the agreement.

20   Q    What's a term sheet?

21   A    Term sheet is a short version of a contract.  The term

22   sheet is something you review and agree before writing the

23   contract, actually, the actual contract.  And yeah, that's

24   what it is.

25              MR. LAX:  If I could now please show the witness

Government Exhibit 1133.

Q    Do you recognize Government Exhibit 1133?

A    Yes.

Q    What is it?

A    E-mail that I sent to Javier Aguilar.

Q    And the attachment, 1133-A?

A    Yes.

Q    Do you recognize the attachment?

A    Yes.

        MR. LAX:  Let me now also show you, while we are doing this, Government Exhibit 1153-A.

Q    Do you recognize Government Exhibit 1153-A?

A    Yes.

Q    What is it?

A    E-mail from Javier Aguilar to myself.

Q    And there's a number of attachments on this one, as well.  Let's flip through them.

        1153-B, do you recognize that?

A    Yes.

Q    1153-C, just a blank attachment?

A    Yes.

Q    1153-D?

A    Yes.

Q    And 1153-E?

A    Yes.

A. Pere - Direct - Lax                    719

1          MR. LAX:  So now The Government would move into

2   evidence Exhibits 1133 and 1133-A.

3          THE COURT:  Any objection?

4          MR. PRICE:  No objection, Your Honor.

5          MR. LAX:  As well as 1153-A through -E.

6          THE COURT:  Any objection to those?

7          MR. PRICE:  No -- no objection.  Puzzled by the

8   blank pages that are being admitted, but no objection.

9          MR. LAX:  Happy not to offer them.  Just offering

10  the whole -- the whole package.

11         MR. PRICE:  That's fine.

12         THE COURT:  With the puzzling blank pages

13  included.

14         MR. LAX:  I won't spend a lot of time on the blank

15  pages.

16         THE COURT:  That would be greatly appreciated,

17  Mr. Lax.

18         They are all received in evidence, and you could

19  spend time with the rest of them.

20         MR. LAX:  Thank you, Your Honor.

21         (Government's Exhibit 1133, 1133 A, 1153-A,

22  1153-B, 1153-C, 1153-D, 1153-E received in evidence.)

23         MR. LAX:  Let's go to 1133, please.

24         (Exhibit published.)

25  Q    And just to try and keep it moving, so this is an

A. Pere - Direct - Lax                    720

1   e-mail from you to the defendant?

2   A    Yes.

3   Q    All right.

4         MR. LAX:  Let's look at the attachment, 1133-A.

5         (Exhibit published.)

6   Q    What is the attachment?  I'm only going to show you the

7   first page.

8   A    It's a draft of the contract that would be signed

9   between PetroEcuador and Oman Trading International, OTI.

10  Q    And why did you send it to the defendant?

11  A    I sent it to the defendant to keep him informed of how

12  the contract was coming about.

13  Q    How involved were you in these contract negotiations

14  once the lawyers got involved?

15  A    Very little.  I was just informed of what was

16  happening.

17        MR. LAX:  Now let's take a look at 1153-A, please.

18        (Exhibit published.)

19        MR. LAX:  If we could zoom in just on the initial

20  address stuff to begin with.  Thank you.

21  Q    So this e-mail from the defendant to -- what are those

22  e-mail addresses?

23  A    Those are two of my e-mail addresses.  And so it's sent

24  by Javier Aguilar to myself in two different e-mail

25  addresses.

A. Pere - Direct - Lax                    721

1   Q    And if we can look beneath this, the e-mail that is

2   forwarded to you.  It's from -- all the way at the top --

3   again, from the defendant.

4         Who is that sent to?

5   A    Sent to Nilsen Arias, Sonia Martinez, also.

6   Q    Who is Sonia Martinez?

7   A    She is an employee of PetroEcuador.

8   Q    And what is -- can you summarize what this e-mail is?

9   A    Yes.  This is just a summary of changes to be made to

10  the contract.

11  Q    I want to direct your attention to where it says

12  Section 11.

13        What is the change written there?

14  A    They are adding a clause, allowing the appointment of

15  an operations agent.

16  Q    What's an operations agent?

17  A    To my understanding, it's the company that is going to

18  be handling the everyday operations related to the contract.

19        MR. LAX:  Let's look at, now, just one of the

20  attachments to this, Government Exhibit 1153-B.

21        (Exhibit published.)

22  Q    What is this attachment?

23  A    Yeah, this is, again, a version of the fuel oil

24  contract to be signed between PetroEcuador and OTI.

25  Q    I would like to direct your attention to page 3, and

A. Pere - Direct - Lax                    722

1    down at the bottom, at Section 3.1, where it reads:  The

2    seller shall sell and deliver and buyer shall buy and

3    receive.

4             Who is the seller and who is the buyer here?

5    A    The seller is PetroEcuador and the buyer is OTI.

6    Q    And then it says, continues:  A minimum volume of

7    17,100,000 barrels of Fuel Oil Number 6.

8             What does that mean?

9    A    It means that the contract is for Ecuador -- for

10   PetroEcuador to sell at least or minimum, at minimum,

11   17,100,000 barrels of Fuel Oil Number 6.

12   Q    Over what period of time?

13   A    Ninety cargo lots.

14   Q    What does that mean, 90 cargo lots?

15   A    Each cargo lot is 190,000 barrels of fuel oil.

16   Q    How many cargo lots were sold under this contract per

17   month?

18   A    It doesn't say it in this clause, but it's three cargos

19   per month.

20            MR. LAX:  Let's flip to the next page, please,

21   just where this paragraph continues.  And if we could just

22   zoom in on the -- yes.

23   Q    So the duration here is January 1, 2017 to June 30,

24   2019?

25   A    Correct.

1    Q    Thirty months?

2    A    Correct.

3    Q    Do you see the 190,000 barrels that you were talking

4    about before?

5    A    Yes.

6            MR. LAX:  Now, if we could please turn to page 11.

7    Q    Now, let's look at clause 11.4.

8            First, this is underlined and none of the others

9    are.  Do you have an understanding of what that means?

10   A    No.  Something to be added.

11           MR. PRICE:  I object and move to strike the last

12   part of the answer since he has no understanding.

13           THE COURT:  He did not have an understanding.  We

14   don't want him to guess.

15           The question was do you have an understanding, and

16   the answer is you do not.

17           THE WITNESS:  I do not.

18   Q    There is a reference to an operations agent, here.

19           Do you have an understanding of what an operations

20   agent is?

21   A    Yes.

22   Q    And what is that?

23           MR. PRICE:  Object.  Foundation.  Basis and

24   understanding of this contract.

25           THE COURT:  He's a facility with the contract.

A. Pere - Direct - Lax                    724

1  Now, we have been asking several questions about the

2  contract, so I am going to allow him, if he has an

3  understanding.

4          First question, do you have an understanding?  And

5  then, what is it?

6  A    Yes, I do have an understanding.  And it is that the

7  buyer, in this case, OTI, can appoint a third party as

8  operations agent, meaning another company or another agent

9  that's going to be receiving and sending notices in

10  connection with the operational and logistical provisions of

11  the contract.

12  Q    And who -- who is that in this case?

13  A    In this case it would be Vitol.

14  Q    Was this contract eventually finalized?

15  A    Yes.

16  Q    And executed?

17  A    Yes.

18  Q    Have you seen it before?

19  A    Yes, I have.

20  Q    I would like to show you now what is in evidence,

21  Government Exhibit 5105.

22          (Exhibit published.)

23  Q    Do you recognize this?

24  A    Yes, I do.

25  Q    What is it?

A. Pere - Direct - Lax                    725

1   A    That's the contract for the purchasing of fuel oil by

2   OTI.

3              MR. LAX:  Let's jump to page --

4              THE COURT:  Mr. Lax, are we getting?

5              MR. LAX:  We are getting close, Your Honor.  If I

6   could ask for the Court's indulgence, I think I will have a

7   break in about five minutes or so.

8              THE COURT:  That's fine.

9              MR. LAX:   Page 94.

10  Q    And I would like to direct your attention to

11  clause 3.1.

12             Are you able to read that, sir?

13  A    Yes.

14  Q    Compared to the clause 3.1 that we looked at in the

15  draft before, how does this align?

16  A    It is the same.

17  Q    Seventeen-point-one million barrels?

18  A    Yes.  90 cargos.

19             MR. LAX:  If we could jump to page 102, please.

20  Q    And look at clause 11.4.  We've looked at an 11.4 in

21  the prior draft.

22             How does this compare?

23  A    It's very similar, if not the same.  Very similar.

24             MR. LAX:  Jump to page 99, please.

25             Or, you know what?  Let's just skip ahead.  Can we

1    go to page 120, please?

2    Q    So this Annex 3, what is this Annex 3?

3    A    It shows how many cargos are to be sold by PetroEcuador

4    every month during 2017, 2018, and during the first half of

5    2019.

6    Q    And how many per month?

7    A    Three.

8    Q    And how many total cargo lots?

9    A    Ninety.

10   Q    Ninety, nine-zero?

11   A    I'm sorry?

12   Q    I'm sorry, I didn't --

13   A    Ninety, nine-zero, yes.

14        MR. LAX:  And the next page, please, 121.

15   Q    What is this?

16   A    That's the amortization schedule for the loan, how it's

17   going to be repaid.

18        MR. LAX:  Can we jump back to page 92?

19   Q    All the way at the top is says:  Is hereby entered into

20   on this sixth day of December, 2016.

21        Do you see that?

22   A    Yes.

23   Q    Did you have any conversations with anyone about the

24   signing of this contract?

25   A    You mean before?  After signing?

A. Pere - Direct - Lax                    727

1   Q    After signing it, did you have a conversation about the

2   actual signing of the contract?

3   A    Yes.  I talked to Nilsen Arias, I talked to Javier

4   Aguilar, who were the most -- I mean, the two people most

5   interested besides me in signing the contract.

6   Q    What did Nilsen Arias say about it?

7   A    I don't remember exactly, but I do remember that he was

8   happy about it and saying job done, or something along those

9   lines.

10  Q    Do you know where this contract was signed?

11  A    No.

12  Q    Can you describe your conversation with the defendant

13  about the signing?

14  A    Just that the work had been done.

15         MR. LAX:  If I could show the witness, please, for

16  the witness, parties only, Government Exhibit 1189.

17         Do you recognize 1189?

18  A    Yes.

19  Q    What is it?

20  A    E-mail from Javier Aguilar to myself.

21  Q    On what date?

22  A    December 27th.

23  Q    What year?

24  A    I'm sorry, 2016.

25         MR. LAX:  And if I could also show for the witness

A. Pere - Direct - Lax                    728

1  only, Government Exhibit 1190-A.

2  Q    Do you recognize Government Exhibit 1190-A?

3  A    Yes.  That's an e-mail sent by Javier Aguilar to me to

4  two addresses that I have.

5        MR. LAX:  The Government moves into evidence

6  Government Exhibits 1189 and 1190-A.

7        MR. PRICE:  No objection.

8        THE COURT:  Those documents are received without

9  objection.

10        (Government's Exhibit 1189, 1190-A received in

11  evidence.)

12        MR. LAX:  If we could please publish 1189.

13        (Exhibit published.)

14  Q    And to orient, who is this e-mail from and to?

15  A    From Javier Aguilar to me.

16  Q    Beginning all the way at the bottom of this chain, can

17  you summarize what this is about?

18  A    Okay.  It's saying that this is from -- I don't know

19  who Rick Evans is, but it's sent to Javier Aguilar, saying

20  that everything is complete except for the confirmation from

21  PetroEcuador that that they will use or accept the

22  designation of Arkham as the operations agent for the fuel

23  oil offtake.

24  Q    What is Arkham?

25  A    Arkham is a company, from what I remember, related to

*Proceedings*                                                    729

1   Vitol.

2          MR. LAX:  Your Honor, I think I have passed my

3   five minutes, so I think that's a good place to stop.

4          THE COURT:  See how indulgent I am?  It's a good

5   place so stop and we shall.

6          Ladies and gentlemen, it has become obvious, we

7   decided to work through what would have been a morning

8   break, but since we got started so late, it became a little

9   too choppy.  So that brings us to lunch and not the break.

10  With the weather like this, the food in the cafeteria gets

11  even better, but if you do want a break and go out, you are

12  free to do that, as well.

13         The other rules continue to apply.  Continue to

14  keep an open mind.  Don't discuss the case amongst

15  yourselves or with anyone else.  Don't use the time to do

16  any homework.  There is no homework allowed.  We remain on

17  radio silence, so no communication whatsoever about anything

18  that touches on the case.  And, again, to the extent, with a

19  broad definition of social media, should anything pop up

20  about the case, don't listen to it, don't look at it.

21         Enjoy your lunch.  I know we got a late start on

22  the lunch break, so try to get back between 2:15 and 2:30.

23  Take your time on icy surfaces.  Come back hale and hearty.

24  And we will get started after 2:30 or as close as we can.

25         Again, we appreciate your patience, your

*Proceedings*                                                    730

1    cooperation, your attentiveness and today your walking

2    skills.

3              See you at about 2:30.  Again, return to the

4    central jury room and William will come to get you.

5              (Jury exits.)

6              (Witness steps down.)

7              THE COURT:  Okay, so we will take a break.  Again,

8    the usual rules there, as well.  If you need something, take

9    it with you, otherwise, William will lock it up securely for

10   you.

11             See you around 2:30, or whenever people skate back.

12             MR. PRICE:  Thank you, Your Honor.

13             (Luncheon recess taken.)

14

15             (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                    731

1              AFTERNOON SESSION

2         (In open court - jury not present.)

3         THE COURTROOM DEPUTY:  All rise.

4         (Judge ERIC N. VITALIANO entered the courtroom.)

5         THE COURTROOM DEPUTY:  Court is back in session.

6         Counsel for both sides are present, including

7    defendant.

8         THE COURT:  Are we ready to go?

9         MR. LAX:  Yes, Your Honor.

10        MR. KOFFMANN:  Yes, Your Honor.

11        THE COURT:  Then we shall.

12        MR. LAX:  Bring the witness in and I'll go back to

13   the podium, if that's okay.

14        THE COURT:  Yes.

15        (Witness entered and resumed the stand.)

16        (Jury enters.)

17        THE COURT:  Be seated, please.

18        Counsel will stipulate that the jury is present and

19   properly seated.

20        MR. LAX:  Yes, Your Honor.

21        MR. KOFFMANN:  Yes, Your Honor.

22        THE COURT:  Thank you, counsel.

23        Ladies and gentlemen, welcome back.  I'm glad you

24   arrived safely.

25        The Court continues to monitor the weather.  The

*Proceedings*                                                         732

1   conditions that you experienced at lunch are likely to

2   continue, so that slick and slippery conditions are out there.

3   To the extent that something more threatening comes upon or is

4   suspected to be coming upon us, we will adjust accordingly.

5              That being the case, we are ready to resume.

6   Mr. Antonio Pere is back the on the stand, remains on the

7   oath.  Mr. Lax is now going to continue his direct

8   examination.

9              Mr. Lax.

10             MR. LAX:  Thank you, Your Honor.

11

12             (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

*A. Pere - direct - Lax*                                          733

1   **ANTONIO PERE**,

2       previously called by the Government and sworn/affirmed by

3       the Courtroom Deputy, resumed the stand and was examined

4       and testified further as follows:

5   DIRECT EXAMINATION (Continuing)

6   BY MR. LAX:

7   Q    So, Mr. Pere, before lunch we left off and we left off

8   with the contract for fuel oil just being signed in December

9   of 2016, is that right?

10  A    Yes.

11  Q    By that point, had you been paid anything?

12  A    No.

13  Q    In connection with that contract?

14  A    No.

15  Q    Did you or any of your companies form a direct

16  contractual relationship with Vitol?

17  A    Yes.

18  Q    How so?

19  A    There was a contract signed between one of the companies,

20  OIC or OPV with Zanza Oil or Lion Oil, which stipulated, among

21  other things, that Zanza Oil or Lion Oil will pay -- would pay

22  25 cents per barrel of fuel oil exported by PetroEcuador.

23  Q    Was there ever a contract between OPV and Vitol directly?

24  A    No.

25  Q    Or EIC and Vitol?

1    A    No.

2    Q    Or OIC and Vitol?

3    A    No.

4    Q    Any of your companies and Vitol?

5    A    No.

6    Q    Did there come a time when you had conversations with the

7    defendant about getting paid in connection with the fuel oil

8    contract?

9    A    Yes.

10   Q    Approximately when did those conversations begin?

11   A    Before the contract was signed.

12   Q    Can you describe those conversations?

13   A    Basically, agreeing on a fee per barrel.  And part of

14   that fee being considered a success fee, meaning it would be

15   paid as soon as the contract was signed.  And then the rest of

16   that fee would be paid when the contract was being executed

17   and the fuel oil was being exported.

18   Q    Did you reach an agreement about how much you would be

19   paid for the success fee?

20   A    Yes.

21   Q    How much was that?

22   A    Three cents per barrel.

23   Q    And how many barrels were there in the contract?

24   A    It was 17 million barrels -- it was 90 times 190, 90

25   cargos times 190,000 barrels.  So, that was -- I don't want to

1    do the math again.

2    Q    I won't --

3    A    Yeah, 17 million.  17 million barrels.

4    Q    Okay.  I won't make you do the math.  I won't make you do

5    the math now.

6              So, you said three cents for the success fee.

7              What about the rest of it?

8    A    The rest of it, the 22 cents were paid based on the

9    volume of fuel oil that was exported every month.

10   Q    How did you have the conversations about your fee with

11   the defendant?

12   A    Well, we negotiated the fee.  I expressed that part of

13   the fee would be -- would have to be paid upon the signing of

14   the contract, and that the rest had to be paid over the

15   contract.

16   Q    And what was the fee to be used for?

17   A    The fee was to be used for paying Xavier Rodriguez,

18   Nilsen Arias, Enrique Pere and myself.

19   Q    Did you document the calculation of the fee in any way?

20   A    I made notes, yes.

21   Q    Could you describe the notes that you made?

22   A    The notes that I made, essentially, the -- calculating

23   the 25 cents minus the success fee, which was to be divided

24   between Nilsen and I.  And then the rest of the -- of the fee,

25   the per barrel over the life of the contract, was calculated

1    also.  And I deducted the amount to be paid by -- I mean to

2    Xavier Rodriguez and to Enrique, and then the rest or the

3    difference would be split between Nilsen and I.

4    Q    Where did you keep those notes?

5    A    In a -- one of the notebooks I had in my office.

6            MR. LAX:  Permission to approach the witness, Your

7    Honor.

8            THE COURT:  You may.

9    BY MR. LAX:

10   Q    Mr. Pere, I've handed you what are marked for

11   identification, Government Exhibit 502.

12           Do you see 502 there?

13   A    Yes.

14   Q    I've handed you 503.

15           Do you see Government Exhibit 503?

16   A    Yes.

17   Q    504?

18   A    Yes.

19   Q    512?

20   A    Yes.

21   Q    515?

22   A    Yes.

23   Q    And 508?

24   A    Yes.

25   Q    Do you recognize those items?

A. Perez - direct - Lax                                                737

1  A    Yes, I do.

2  Q    What are they?

3  A    Those are my notebooks.

4  Q    Let's begin first with Government Exhibit 502.  You can

5  set the other ones to the side for a moment.

6           What types of things did you write down in 502?

7  A    I wrote personal notes, things I had to do, things I

8  needed to remember when I was gonna have a conversation.  Many

9  of these notes had to do with my dealings with PetroEcuador.

10  Q    What about Government Exhibit 503, what kinds of things

11  did you write in 503?

12  A    Same kind of things.

13  Q    Five --

14  A    Personal, business.

15  Q    512?

16  A    Yes, 512, it's also the same kind of things, same type of

17  notes.

18  Q    And what about 504?

19  A    Yes, personal and business.

20  Q    The same types of things?

21  A    Same type.

22  Q    What -- what's the approximate time period that 502

23  covers?

24  A    June two-thousand -- 2015 through February,

25  approximately, of 2016.

1  Q     And what's the approximate time period for 503?

2  A     February 2016 until March 2016.

3  Q     March, what was the year?

4  A     Two-thousand-six -- I'm sorry.  This is March 2017.

5  Q     And same question for Government Exhibit 512, approximate

6  time period.

7  A     March 2017 through April 2018.

8  Q     And same question once more for Government Exhibit 504.

9  A     May 2018 through May 2019.

10 Q     All right.  I am going to ask you to set those to the

11 side, please, and take a look at Government Exhibit 508.

12         What is Government Exhibit 508?

13 A     This is just a legal pad that I used -- that I used for

14 making quick notes when I was on the phone or -- or just

15 thinking about something.

16 Q     What types of notes are in Government Exhibit 508?

17 A     Personal and business notes.

18 Q     What types of business notes?

19 A     Information about cargos of crude oil.  Information about

20 fees to be paid in connection with the fuel oil contract we've

21 been talking about.

22 Q     And finally, I'd like to direct your attention to

23 Government Exhibit 515.

24         What is that notebook?

25 A     This book registers payments or payments made to people

1    in conjunction with the contracts that I managed and executed.

2    And also notes about payments to be made or distribution of

3    the commissions I was expecting to receive.

4    Q    Do those notes relate to any one particular scheme?

5    A    No.  They relate to more than one.

6    Q    Did you keep a note of each and every payment that you

7    made?

8    A    No, no.  No, I didn't.

9    Q    Where did you keep those journals and that notepad?

10   A    In -- in my office.

11   Q    Is that the same office that was searched by the FBI?

12   A    Yes.

13   Q    Were they at the office when the FBI searched that

14   office?

15   A    Yes, they were.

16   Q    What happened to them?

17   A    They were taken by the FBI.

18   Q    All of them?

19   A    No, except 515.

20   Q    Did the FBI take other items from your office as well?

21   A    Yes.

22   Q    What happened with Government Exhibit 515?

23   A    That notebook was not together with the other notebooks I

24   see now.  And it was inside a folder and the FBI didn't take

25   it during the search.

1  Q    Where was it located in -- in your office in relation to
2  the other notebooks that we've been discussing?
3  A    It was in a different drawer behind my desk.
4  Q    Does Government Exhibit -- so what happened to it after
5  that?
6  A    Well, it was inside a folder, so I had no notice that
7  that book was there, and when I found out I told my attorney
8  that I had that notebook.
9  Q    And I don't want to ask you about questions about what
10 you spoke with your attorney about, but what ended up
11 happening to that notebook?
12 A    It ended staying inside a folder in my house, in my home
13 office.
14 Q    And after that?
15 A    And after that, I turned it to -- to the attorneys also
16 because there was some information that was needed and I
17 realized it was there.
18 Q    You gave it to your attorneys?
19 A    Yes, I did.
20 Q    For what purpose?
21 A    So that the attorney can give 'em to the Government.
22         MR. LAX:  Ms. Jefferson, can we please show the
23 witness Government Exhibit 503-A-1.
24 BY MR. LAX:
25 Q    Mr. Pere, do you recognize Government Exhibit 503-A-1?

1    A    Yes.

2    Q    What is it?

3    A    That's a page from one of my notebooks.

4    Q    Is that from Government Exhibit 503?

5    A    Yes.

6    Q    What's the date of the page?

7    A    July 19th of 2016.

8              MR. LAX:  The Government offers Government

9    Exhibit 503-A-1.

10             MR. PRICE:  Objection, hearsay.

11             THE COURT:  Mr. Lax, do you want to be heard on that

12   over here?

13             MR. LAX:  Yes, Your Honor.

14             (Sidebar held.)

15

16             (Continued on the following page.)

17

18

19

20

21

22

23

24

25

1              (Sidebar conference held on the record in the

2      presence of the Court and counsel, out of the hearing of the

3      jury.)

4              MR. LAX:  Your Honor, these are notebooks of the

5      witness that he took during the course of the scheme.  They

6      are statements of a co-conspirator that were communicated in

7      furtherance of the conspiracy.  They are admissible on that

8      basis.

9              MR. PRICE:  They're not -- Bill Price.  They're not

10     communicated to anyone.

11             THE COURT:  Who were they communicated to?

12             MR. LAX:  They're still statements.  They don't have

13     to be communicated in order for them to be statements.  They

14     are statements --

15             THE COURT:  They are statements in furtherance of

16     the conspiracy?

17             MR. LAX:  Yes.  They all relate to the fuel oil

18     contract, how the commissions were paid, how they were

19     allocated.

20             THE COURT:  I gather that.

21             I have never encountered a situation, maybe I'm on

22     the same page with Mr. Price, I never encountered a situation

23     where the statement wasn't communicated to somebody.

24             MR. LAX:  Well, some of them relate to conversations

25     that he's had or information that was relayed from the

1   defendant, for example, in some of these.  Other ones are

2   statements, again, of things that he is going to do and steps

3   that he intends to take in furtherance of the conspiracy.

4          MR. GALEOTTI:  Your Honor, may I add?  Matthew

5   Galeotti for the Government.

6          There is a lot of precedence for this type of ledger

7   being kept.  For example, in 15-CR-252, United States v. Webb,

8   which your clerk can look up, which is otherwise known as the

9   FIFA cases, there were a series of ledgers just like this that

10  were kept.  They came in as statements of a co-conspirator

11  because what the witness is doing is recording statements and

12  information that he gained during the course of the conspiracy

13  from others and those that he intended to relay to others.

14         So, there is precedence precisely for this type of

15  note and ledger being kept.

16         MR. PRICE:  Well, a couple things.

17         I haven't looked at the case.

18         THE COURT:  Nor have I.

19         MR. PRICE:  And on a case-by-case basis maybe

20  something may come in as a co-conspirator statement.

21         Let me say first as to if he's writing down

22  conversations he had, then the conversations he had would come

23  in as co-conspirator statements in furtherance of the

24  conspiracy, but not the notes to himself.  Maybe they could be

25  used to refresh recollection or something like that.

1          With respect to noting certain transactions or

2    whatever, since it's not communicated as part of the

3    conspiracy, you would have to lay a foundation of kind of a

4    business records exception or something like that.  Which I

5    would think they might be able to do, but --

6               THE COURT:  They haven't.

7               MR. PRICE:  -- have not.

8               THE COURT:  Yet.

9               MR. PRICE:  Yes.

10              MR. LAX:  I mean I'm happy to ask him foundational

11   questions about whether or not this is a record that he

12   maintains in the ordinary course of his dealings and admit

13   them, admit them under that -- under that basis.

14          I mean he's testified to these notebooks as a

15   consistent sort of three, four-year time period as,

16   essentially, daily journals.

17          We have in this particular excerpt, and the excerpts

18   that we intend to offer, they all relate directly to the fuel

19   oil deal and the contract and how the evolution of the

20   commissions were calculated and later on that -- reflecting

21   that commissions and bribes were actually paid.

22              MR. PRICE:  Well, waving your hand and saying, the

23   witness saying these are kept in the ordinary course of

24   business does not lay the foundation.

25          So, the foundation hasn't been laid.  That would not

1    lay the foundation for it.  It doesn't tick off the elements.

2            And, again, you know, he could testify as to what

3    happened.  He can use these to refresh his recollection, but

4    so far no -- no foundation.

5            THE COURT:  I think the way to do this, and we'll

6    take a look at the case, so to avoid error, why don't you

7    proceed.

8            I mean best evidence, first of all, is going to be

9    his testimony about the contents.  Since they're statements,

10   if they're statements or records that he kept that reflect

11   payments made or received, and he can use that to refresh his

12   recollection.

13           In the interim, we'll take a look at the Webb case.

14   We'll take a look at that, and then we'll revisit whether the

15   documents, themselves, can come in, but his recollections of

16   the relevant portions, unless he indicates some of them are

17   personal.

18           MR. LAX:  Well, I'm not offering -- I'm not offering

19   those.

20           THE COURT:  I know, but it goes to the nature of the

21   book.

22           MR. GALEOTTI:  Your Honor, Matthew Galeotti again.

23           May I just also add that while this is being

24   considered not only as a co-conspirator statement, but also

25   during the opening statements there was a broadside attack

A. Perę - direcı - Lax                                                    746

1  launched on the credibility of this particular witness.  So,

2  these are also prior consistent statements that are admissible

3  for that purpose as well because his credibility has been

4  attacked, and certainly will be on cross in any event, but

5  it's already been done.  These are also prior consistent

6  statements that show that they were contemporaneously

7  recorded, and they are going to -- they are going to be

8  admissible for that purpose as well.

9           THE COURT:  Well, I know there have been some

10  changes in the rules that went into effect, I think,

11  Catherine, this November --

12           THE LAW CLERK:  December.

13           THE COURT:  -- for consistent statements, so we'll

14  have to check the rule.

15           MR. GALEOTTI:  I think it's 613, but I defer to the

16  Court on this.

17           THE COURT:  Well, they went into effect last month.

18           MR. PRICE:  It hasn't been impeached yet.

19           THE COURT:  But as I say, we'll revisit -- for now

20  we will sustain the objection to the books coming in, but

21  there's no reason why, Mr. Lax, we should waste the time and

22  you can get the contents in through questioning.

23           MR. LAX:  Okay.  Very well, Your Honor.

24           (Sidebar concluded; proceedings resumed.)

25           (Continued on the following page.)

1              (In open court; jury present.)

2    BY MR. LAX:

3    Q    Mr. Pere, could you please describe --

4              MR. LAX:  And, Ms. Jefferson, we can take this down,

5    please.

6    Q    Could you please describe how the success fee was

7    calculated?

8    A    The success fee was calculated based on the total volume

9    of fuel oil that was going to be sold to OTI, meaning three

10   cents times the number -- the total number of barrels, which

11   was 17 million, like we said before.

12   Q    What was the total amount of the success fee based on

13   that calculation?

14   A    It was around 500,000; 400.

15   Q    So taking that success fee, how was it going to be broken

16   down as part of the calculations?

17   A    The success fee was going to be divided between Nilsen

18   and myself.

19   Q    Was that all, just 50/50 from three cents to the seven --

20   times 17 million; how would that then be broken out?

21   A    You mean the -- you're talking just about the success

22   fee?

23   Q    Yes.

24   A    Oh, okay.  There was an amount left there for Xavier

25   Rodriguez also, which was about 50,000, $60,000.

1   Q    Okay.  So if we're following the math, you've got the

2   4 to 500,000 that you said, minus 50,000?

3   A    Correct.

4   Q    What happens with the balance?

5   A    The balance was divided between Nilsen Arias and myself.

6            THE COURT:  So I'm clear, when you say "balance,"

7   Mr. Lax, you're saying balance of the success fee?

8            MR. LAX:  Yes, Your Honor, 4 to 500, minus 50, 350

9   to 450; and then that amount divided by two.

10  BY MR. LAX:

11  Q    Do I have that right?

12  A    Yes, you do.

13           THE COURT:  And that's the entire success fee?

14           THE WITNESS:  Yes.

15           THE COURT:  If you added all those components up --

16           THE WITNESS:  Yes.

17           THE COURT:  -- you get to the total success fee?

18           THE WITNESS:  Correct.

19           THE COURT:  So there are three parts?

20           THE WITNESS:  Three parts?

21           THE COURT:  The part that's divided in half, and the

22  50,000?

23           THE WITNESS:  Correct, correct.

24  Q    In terms of payments to be made other than the success

25  fee, the per barrel arrangement that you described earlier,

A. Perez - direct - Lax                                          749

1    how was that going to be broken out?

2    A    That was -- there were $5,000 per cargo to Xavier

3    Rodriguez, meaning $15,000 per month because there were three

4    cargos.

5    Q    Per month?

6    A    Per month.

7    Q    Okay.

8    A    Yes.  And then one cent, one or two cents for Enrique

9    Pere, and the difference was to be divided or was divided

10   between Nilsen Arias and myself.

11   Q    The money that you received, how did you receive it?

12            Let's take the success fee.

13   A    It was paid by one of the companies managed and --

14   managed by Lionel Hanst, to one of the companies that we had,

15   OIC, EIC, or OPV.

16   Q    Did you have conversations with the defendant about how

17   you would receive the money?

18   A    I don't remember if I specified to which company or which

19   account, but I did talk about having an account preferably in

20   euros, I remember that.

21   Q    What do you mean by that?

22   A    That the suggestion that Javier Aguilar made was for me

23   to open an account in euros instead of dollars.

24   Q    Did he explain why?

25   A    The explanation he gave me was that the tracing of the

1    euros in maintaining those transfers outside of the

2    U.S./dollar radar was better for our agreement for -- for

3    paying our contract.

4    Q    What, if anything, did you do based on that conversation

5    with the defendant?

6    A    I asked Enrique Pere to open an account in euros.

7    Q    Did that happen?

8    A    Yes.

9    Q    Let's talk a little bit about some of the companies that

10   you just mentioned.

11                EIC, who -- who owned EIC?

12   A    Enrique Pere.

13   Q    Did that change over time at all?

14   A    No.

15   Q    Approximately when was EIC incorporated?

16   A    EIC was incorporated in 2012.  And now that you mention

17   it, at that time the company was mine.  It was under my name.

18   That changed later into Enrique's name.

19

20                (Continued on the following page.)

21

22

23

24

25

A. Pere - direct - Lax                                            751

1    DIRECT EXAMINATION (Continuing)

2    BY MR. LAX:

3    Q     Where was it incorporated?

4    A     In Panama or BVI.

5           MR. LAX:  I'd like to show you, for the witness

6    only, Government Exhibit 5505.

7           Ms. Jefferson, could we just flip through the first

8    few pages.

9    Q     Do you recognize Government Exhibit 5505?

10   A     Yes.

11   Q     What is it?

12   A     Those are the documents related to the creation of Energy

13   Intelligence and Consulting Corp., EIC.

14   Q     Did you maintain those?

15   A     If I maintaining in my possession those documents?

16   Q     Did you at one point, yes.

17   A     At one point, yes.

18          MR. LAX:  The Government moves into evidence

19   Government Exhibit 5505?

20          MR. PRICE:  No objection, Your Honor.

21          THE COURT:  Received without objection.

22          (Government's Exhibit 5505 received in evidence.)

23          MR. LAX:  May we please publish?  Thank you.

24          THE COURT:  You may.

25          (Exhibit published.)

A. Pere - direct - Lax                    752

1    Q    So looking at the first page here of Government Exhibit

2    5505, high level, what is this exhibit?  What are these

3    documents?

4    A    What is -- can you repeat the question, please.

5    Q    Just what is this exhibit?

6    A    Oh, it's -- it shows documents related to the creation of

7    Energy Intelligence in Panama.

8    Q    And up top it says Mossack Fonseca.  What is that?

9    A    Well, that's the law firm that created in Energy

10   Intelligence in Panama.

11   Q    I'd like to direct your attention page 3 of this exhibit.

12   And what is this?

13   A    Those are the names of the directors and other officers

14   of the company.

15   Q    Where do those names come from?

16   A    From Mossack Fonseca.

17   Q    Do you know any of those people?

18   A    No.

19   Q    I would like to direct your attention now to page 4.

20   What is this page?

21   A    It's a register for the shareholders.

22   Q    Who is listed as shareholder?

23   A    Me.

24   Q    And the date?

25   A    It is June 20, 2012.

A. Pere - direct - Lax                                753

1  Q    Did EIC own or maintain any bank accounts?

2  A    Yes.

3  Q    Who had signatory authority over those accounts?

4  A    At the beginning, I had.  Afterwards, Enrique Pere.

5  Q    In practice, who managed those accounts?

6  A    The everyday movement of funds, Enrique.

7  Q    Did EIC have any employees?

8  A    No.

9  Q    Or offices?

10  A    No.

11  Q    Turning to OIC, who owned OIC?

12  A    Enrique Pere.

13  Q    In practice, did you have the ability to control OIC?

14  A    Yes.

15  Q    Where and when was it incorporated?

16  A    OIC was incorporated in the British Virgin Islands around

17  2015, 2016.

18  Q    Why was it incorporated?

19  A    For -- it was a request from Gunvor not to operate in

20  Switzerland where Energy Intelligence had the account and also

21  it had to do with Mossack Fonseca not wanting to be related to

22  Mossack Fonseca.

23  Q    What do you mean by that?

24  A    Well, Mossack Fonseca had the Panama papers leak of

25  information and we didn't want -- when I say we, Enrique and

A. Pere - direct - Lax                    754

1   I, we don't want to be exposed more on that list.

2   Q     Did OIC maintain bank accounts?

3   A     Yes.

4   Q     Who had authority over those accounts?

5   A     Ultimately, I had authority.

6   Q     Were you a signor on those accounts?

7   A     No.

8   Q     Who was that?

9   A     Enrique Pere.

10  Q     And in practice, who managed the OIC bank accounts?

11  A     Day to day, Enrique Pere.

12  Q     Did OIC have any employees?

13  A     No.

14  Q     Or offices?

15  A     No.

16  Q     Finally, let's turn to OPV.  Where and when was OPV

17  incorporated?

18  A     OPV was incorporated in 2016, '17, at most, and it was

19  also incorporated in the British Virgin Islands.

20  Q     Was why OPV incorporated?

21  A     It was incorporated in order to deal with the OTI fuel

22  oil business.

23  Q     What do you mean by that?

24  A     That meant that the contract would be signed by a new

25  company, in this case, OPV, and that way I would maintain the

A. Pere - direct - Lax                    755

1  OTI/Vitol contract separated from contracts that I had before

2  with Gunvor.

3  Q    Did OPV maintain bank accounts?

4  A    Yes.

5  Q    And who had signatory authority over those accounts?

6  A    Enrique Pere.

7  Q    And who managed those accounts?

8  A    Enrique Pere.

9  Q    Did OPV have any employees?

10  A    No.

11  Q    Or offices?

12  A    No.

13  Q    In addition to opening a Euro account, were any other

14  steps taken in connection with payment from Hanst for the fuel

15  oil contract?

16  A    Well, we produced invoices for Lionel Hanst to be able to

17  have support for transactions for the bank that he used.

18  Q    What do you mean by that, support for the bank?

19  A    That the bank needed to know, hey, why are you making

20  this payment and he had to say I'm paying this invoice for

21  this description of services.

22  Q    What was the description of services on those invoices?

23  A    One time I recall being directly fuel oil deliveries and

24  also at other times it had do with different concepts, mostly

25  related to LPG for concepts that -- for description to be

A. Pere - direct - Lax                        756

1   included in the invoices that were given to us by either

2   Javier Aguilar or mostly Lionel Hanst.

3   Q    What type of information went on the invoices?

4            MR. PRICE:  Your Honor, I object, best evidence.

5            THE COURT:  I'm going to allow it.  I'm going to

6   allow it, the type.

7   A    The type of information was the description of a service,

8   not necessarily the contract that the -- or the services that

9   the contract stipulated, and there were different concepts.  I

10  didn't manage directly those invoices, but I can tell you that

11  the concepts were for items like I just mentioned.

12  Q    Like LPG?

13  A    Oh, yes, definitely LPG.

14  Q    What do you mean by concept?

15  A    The concept?  The description of the services for which

16  the invoice was being paid.

17  Q    Why was the invoice being paid?

18  A    It was being paid because that's what the contract

19  between ourselves and Zanza Oil or Lion Oil stipulated.

20  Q    Was it being paid in connection with any LPG products?

21  A    No.

22  Q    What product or products was it being paid in connection

23  with?

24  A    With the fuel oil.

25  Q    Why not just list fuel oil on the invoices?

A. Pere - direct - Lax                     757

1  A    Because that was the indication we received from Lionel

2  or from Javier Aguilar.

3  Q    You referred to contracts with Lionel.  Can you describe

4  the nature of those contracts?

5  A    The nature of the contract was first to establish the

6  fees to be paid in connection with the contract and it has a

7  broad description of services that had do with markets and

8  studies, things along those lines.

9  Q    Were those services performed?

10  A    No, they were not.

11  Q    When the contracts were executed, did you have any

12  intention of performing those services?

13  A    No.

14        MR. LAX:  I would like to show the witness, please,

15  Government Exhibit 1381-A.

16  Q    Do you recognize Government Exhibit 1381-A?

17  A    Yes.

18  Q    And what is it?

19  A    It's an e-mail from Javier Aguilar to me.

20  Q    What's the date?

21  A    February 7th of 2018.

22  Q    I will show the attachment, 1381-W.  Do you recognize the

23  attachment?

24  A    Yes.

25        MR. LAX:  The Government offers 1381-A and B.

A. Pere - direct - Lax                    758

1           MR. PRICE:  No objection.

2           THE COURT:  Received without objection.

3           (Government's Exhibits 1381-A and B received in

4    evidence.)

5           MR. LAX:  May we please publish 1381-A.

6           And, Ms. Jefferson, if we could zoom out quickly so

7    the jury can see the whole document.

8    Q    So now zooming in again on the header.  Who is this

9    e-mail from and to?

10   A    From Javier Aguilar to me.

11   Q    What e-mail address did Javier Aguilar use here?

12   A    He used his official Vitol e-mail address.

13   Q    I asked you questions earlier about the Perez Marco 007

14   account.  Did you also communicate with him using the official

15   Vitol e-mail address?

16   A    Yes, sometimes.  Sometimes I received e-mails from that

17   e-mail address.  I don't think I sent e-mails to that e-mail

18   address.  I cannot recall that I sent one.

19          MR. LAX:  Let's look at the attachment please,

20   1381-B.  Ms. Jefferson, I'm sorry, if we can go back to A.

21   Q    Mr. Pere, what is the subject line of the e-mail?

22   A    Cargoes, meaning cargos of fuel oil, from January of 2017

23   to January of 2018.

24   Q    What does that mean?

25   A    That means what number of cargos were shipped, yeah,

A. Pere - direct - Lax                759

1    were shipped by PetroEcuador during those times.

2              MR. LAX:  Now, switch to B.

3    Q    All right.  So now looking at the attachment, what is

4    this?

5    A    Well, this is a chart that shows month and then the

6    number, meaning if it was first cargo of the contract, then

7    the name of the vessel on which those barrels of fuel oil were

8    loaded, then the window, meaning that fuel oil was loaded

9    somewhere during those dates, usually -- I mean, it was a

10   three-day window, and place, which is the terminal or the buoy

11   at which the fuel oil was loaded, then the bill of lading

12   date, and the number of barrels of crude oil, I'm sorry, of

13   fuel oil.

14   Q    What's the date of the spreadsheet?  Where does it begin?

15   A    2017, January.

16   Q    In column -- well, you mentioned cargos.  Is that like

17   the cargos you testified about earlier?

18   A    Yes.

19   Q    Do you see that type of information on this spreadsheet?

20   A    Yes.

21   Q    Where?

22   A    I see, in the case of January, you can see the one and

23   two, meaning two cargos.

24              In column G, you can see 199,000 or 175,000, which

25   is the amount of barrels, the contract stated for 190,000

A. Pere - direct - Lax                    760

1    barrels, plus or minus 10 percent.

2    Q    What, if anything, did you do with this information?

3    A    That was information used for producing the invoices.

4    Q    Which invoices?

5    A    The ones that were sent to Lionel Hanst to pay for the

6    fees that we had agreed with Vitol.

7    Q    Can you explain how you would use this information to

8    calculate the fee for an invoice?

9    A    Well, I would take the number of barrels and multiply it

10   by 22 cents, which was the fee, the net fee after subtracting

11   the three cents success fee.

12   Q    Let's shift gears a little bit to the bribes that were

13   promised and paid to Nilsen Arias.  What was the total amount

14   promised to Arias in connection with the fuel oil contract?

15   A    It was around -- approximately 10 or 11 cents per barrel

16   from the 17 million barrels of fuel oil, that would be 1.7

17   million.

18   Q    Was all of that actually paid to him?

19   A    No, it wasn't.

20   Q    What about the success fee portion, was that paid to him?

21   A    The success fee portion was paid to him, yes.

22   Q    Do you know where he was paid?

23   A    No, I don't remember.  I don't know, actually.

24   Q    Let's turn to Xavier Rodriguez.

25        You have testified that there was a success fee

A. Pere - direct - Lax                    761

1  portion for Xavier Rodriguez.

2  A    Yes.

3  Q    Was he paid a success fee in connection with the fuel oil

4  contract?

5  A    Yes, he was.

6  Q    How much?

7  A    He was paid 60, 80,000, 60,000.  Between 60 and 80,000.

8  Q    And then you also mentioned a monthly portion to Xavier

9  Rodriguez?

10  A    Yes.

11  Q    Was that paid consistently?

12  A    It was paid as long as Vitol had paid us, I mean, as long

13  as Lion Oil or Zanza Oil paid us.

14  Q    What do you mean by that?

15  A    I mean, that at one point in time that Lion Oil or Zanza

16  Oil stopped making payments and at that point in time I

17  stopped making payments to Xavier Rodriguez.

18         Actually, I made a mistake and paid two or three

19  cargos extra for which I had not received payment yet, but

20  that's how it worked.

21  Q    What amount was typically paid to Rodriguez when you did

22  pay?

23  A    30,000.

24  Q    Why 30,000?

25  A    That meant two months of shipments, because it was like

1    -- it was 5,000 per cargo; three cargos, 15,000; two months,

2    30,000.

3    Q    Can you describe how the payments were made to Xavier

4    Rodriguez?

5    A    The payments were paid in cash by Guayaquil.

6    Q    How?

7    A    There was a driver that picked up cash in the --  in an

8    office and somebody who had access to cash, and then delivered

9    it to Xavier Rodriguez in Guayaquil at a hotel usually where

10   Rodriguez said he would be.

11   Q    Who was the driver?

12   A    The name of the driver is Jorge Ponce.

13   Q    Who did Mr. Ponce work for?

14   A    He worked for Nicholas Naranjo.

15   Q    How did you get the cash?

16   A    Enrique Pere handled that part, but I know that the cash

17   was given to us by a, let's say, non-formal loan provider of

18   people in Guayaquil.

19   Q    What do you mean by that?

20   A    That it -- I mean, it was a person who made loans, but he

21   wasn't a bank or anything, so that's why I said informal.  He

22   made them themselves, I mean, himself.

23   Q    So just walk me through the steps.  So if you have money,

24   how do you convert that money to cash to then in turn use to

25   pay Xavier Rodriguez?

A. Pere - direct - Lax                    763

1   A    Okay.  What we would do is transfer money from offshore

2   accounts to this person's account offshore also and he would

3   give us the cash in Guayaquil.

4   Q    Where did you transfer the money to?

5   A    To a company -- sorry, to a company he had, to an

6   offshore company he had.

7   Q    Offshore, meaning where?

8   A    Panama or BVI.  I'm not sure.

9   Q    Who were the transfers to?  Who is the person you're

10  referring to?

11  A    Jorge Ode.

12  Q    Did you keep records of payments to Xavier Rodriguez in

13  connection with the fuel oil scheme?

14  A    Yes.

15  Q    Where did you keep those records?

16  A    It one of my notebooks.

17  Q    The notebooks there in front of you?

18  A    Yes.

19  Q    Do you maintain records of that in any other form?

20  A    Not that I can recall.

21  Q    Did you maintain records of these cash transactions

22  generally?

23  A    Sometimes.

24  Q    The cash transactions involving Mr. Ode, did that relate

25  to one particular scheme?

A. Pere - direct - Lax                                      764

1   A     No.

2   Q     Can you explain?

3   A     There were payments we made in cash.  When I say we, I am

4   referring to Enrique Pere and I.  Like I said, he was the

5   person in charge of the details, let's say, everyday details.

6   But we used that money to pay bribes in correction with Gunvor

7   contracts also.

8   Q     Did you track the cash that was being used in your

9   businesses?

10  A     Indirectly through Enrique, yes.

11  Q     Do you know how Enrique did that?

12  A     He had like ledger, like an accounting ledger where he

13  would put the cash received and the cash that went out.

14  Q     Have you seen those records before?

15  A     Yes, I have.

16  Q     Did you have regular access to them?

17  A     Yes, if I needed to.

18  Q     Where were they kept?

19  A     In Enrique's computer, maybe printout, maybe in e-mails

20  to me.  Not necessarily in one place.

21  Q     Were they kept in Adexus offices?

22  A     Yes.

23  Q     Do you recall the dates and the amounts of each and every

24  cash payment made to Xavier Rodriguez in connection with the

25  fuel oil scheme?

1    A    No.

2    Q    Is there something that would refresh your recollection

3    about that?

4    A    If you show me something in my notes.

5    Q    Did you record those types of things in your notes?

6    A    Yes.

7    Q    Would seeing them help you refresh your recollection

8    about those pages?

9    A    I would think so, yes.

10         THE COURT:  Mr. Lax, before we, maybe this would be

11   a good time for the break.

12         MR. LAX:  I think it would be, Your Honor.

13         THE COURT:  Ladies and gentlemen, we are going to

14   take our afternoon break.  We continue to check the weather

15   through our chambers upstairs.  Relax.  Use whatever rooms you

16   need to back there.

17         Don't discuss the case amongst yourselves or with

18   anyone else.  Continue to keep an open mind.  We will see you

19   in about 15.

20         (Jury exits the courtroom.)

21         THE COURT:  Okay.  Take a stretch and we will be

22   back in 15.

23         MR. GALEOTTI:  Your Honor, may we address the point

24   from sidebar earlier?

25         THE COURT:  Yes.  We are in open court right now.

A. Pere - direct - Lax                    766

1          MR. GALEOTTI:  I was citing a case at sidebar which

2     is the correct case.  It is 15-cr-252, United States v. Webb.

3     And in particular, I'm looking at transcript pages 1109 and

4     1110 in which precisely this type of notes are at issue.

5     There was a sidebar on it, and Judge Chen ruled such ledgers

6     and notebooks are co-conspirator statements.  She actually

7     said these are the classic co-conspirator statements, and they

8     are allowed in under 801(d)(2)(E).

9          Your Honor, these statements are clearly made in

10     furtherance of the conspiracy.  Mr. Peres has testified he is

11     taking notes and ledgers so he can record transactions that

12     have been promised and so that he can continue to effectuate

13     the conspiracy by making the payments that have been promised

14     to Government officials.

15          In addition to that, Mr. Enrique Pere, his brother,

16     who's the one there is a foundation has been the operations

17     man in the scheme, needed those notes as well so that he could

18     prepare ledgers and documents in order to effectuate the

19     scheme.

20          These are classic co-conspirator statements that

21     record what has happened in the scheme and what needs to

22     happen going forward, and they are evidence of that conspiracy

23     put in place to effectuate the particulars of that conspiracy.

24          So for those reasons, Your Honor, we submit they are

25     appropriately submitted under 801(d)(2)(E).

A. Pere - direct - Lax                    767

1          THE COURT:  We will take our break and we will take

2    a quick look.

3          You have given a case cite too.

4          MR. GALEOTTI:  15-cr-252, transcript pages 1109 and

5    1110.

6          THE COURT:  And that's available to --

7          MR. GALEOTTI:  I have sent a copy to Your Honor's

8    clerk, copying defense counsel as well, of the relevant pages.

9          THE COURT:  Judge Chen explains her ruling in those

10   transcript pages?

11         MR. GALEOTTI:  In the sidebar, Your Honor, yes.

12         THE COURT:  In the sidebar.

13         MR. GALEOTTI:  Yes.

14         THE COURT:  I will take a look.

15         MR. GALEOTTI:  Thank you.

16         (Recess taken.)

17         THE COURTROOM DEPUTY:  All rise.  Court is back in

18   session.  Counsel for both sides are present, including

19   defendant.

20         THE COURT:  Be seated, please.

21         We had a chance to review the material by the

22   Government and a couple other cites.  It seems to fall not

23   only within Judge Chen's ruling in the FIFA case, but it also,

24   given the foundation that has already been laid about the

25   contents and the making of those contents, that it fits within

1    -- comfortably within the Second Circuit decision in *Orena*,

2    which is at 32 F.3rd 704, which allows ledgers books of this

3    variety as admissible for the truth.  It's not hearsay because

4    hearsay exception to the non-hearsay rule, something like

5    that.  But basically the question that Mr. Price and I both

6    had I believe finds its soulmate in the old question of if a

7    tree falls in the woods and nobody hears it, does it make a

8    sound.  And if a statement is made and nobody hears it other

9    than the maker, *Orena* says it is.  So the objection is

10   overruled.

11              Are we otherwise ready?

12              MR. LAX:  Yes, Your Honor.

13              THE COURT:  Okay.  Gentlemen, we are going to try --

14   everybody is worried about the weather, think in terms of

15   between 5:00, 5:10.

16              MR. LAX:  Very good, Your Honor.  I will get to a

17   breaking point.  Even if it's a little early, would you rather

18   that I stop rather than launch into something new?

19              THE COURT:  Yes.  Because then it will make us that

20   we've all had discussions and then counsel are working to get

21   us out of here.

22              MR. LAX:  Very good.

23              (The jury enters the courtroom.)

24              THE COURT:  Be seated, please.

25              Counsel will stipulate that the jury is present and

A. Pere - direct - Lax                          769

1  properly seated.

2           MR. LAX:  Yes, Your Honor.

3           MR. KOFFMANN:  We do, Your Honor.

4           THE COURT:  Thank you, Counsel.

5           Ladies and gentlemen, welcome back.  We are in the

6  homestretch.  Again, we have been monitoring the weather.

7  Counsel and I have be making our plans.  We are going to try

8  to find a logical place to land short of where we normally

9  would go.  The roads remain clear.  The conditions are pretty

10 much what you saw at lunch.  It may take folks a little longer

11 to safely get home and for that reason is the reason we will

12 try to shorten it up.

13          Mr. Pere is back on the stand.  Mr. Lax continues

14 his direct.

15          MR. LAX:  Thank you, Your Honor.

16          The Government offers Government Exhibit 503-A-1.

17          MR. PRICE:  Is that just that first page?

18          MR. LAX:  Yes.

19          MR. PRICE:  Objection noted.  I understand the

20 Court's order.

21          THE COURT:  And the objection is continued.  The

22 exception is noted.

23          (Government's Exhibit 503-A-1 received in evidence.)

24          MR. LAX:  May we pull that up, please, Ms.

25 Jefferson?

A. Pere - direct - Lax                          770

1    Q    Mr. Pere, can you see that on the screen?

2    A    Yes.

3    Q    What are we looking at?

4    A    This is an entry I made on July 19th of 2016.

5    Q    I'd like to direct your attention down to the bottom

6    where it says foil, 2, 2, 3, 2, 2, 3.  Can you explain that

7    entry?

8    A    Well, this was July of 2016, Nilsen and I were just

9    starting to lay the ground for the fuel oil contract and 2, 2,

10   3, 2, 2, 3, means two cargos one month, two cargos the next

11   one, three cargos the next one, and then the sequence would be

12   repeated over a period of four years.  That meant that a total

13   of 21 million barrels of fuel oil would be delivered and that

14   would be together with a loan of $300 million starting in

15   January of 2017.

16             And the last line, I said fees, honorarios, they

17   have asking 0.25, meaning 25 cents.  At the bottom, the offer

18   I would accept would be 0.2, meaning 20 cents per barrel.

19   Q    Above this entry, there's an entry for GLP.  Do you see

20   that?

21   A    Yes, I see it.

22   Q    Can you explain that entry, please?

23   A    Well, we talked so many times --

24   Q    Who do you mean by "we"?  I'm sorry to interrupt.

25   A    Javier Aguilar, Nilsen Arias, Xavier Rodriguez, and

A. Pere - direct - Lax                          771

1  myself.

2          We talked so many times about selling LPG, which in

3  this case -- in this page saying GLP, which is LPG in Spanish,

4  and yeah, it says 1.5 million metric tons to be delivered in

5  three years, and -- meaning 500,000 metric tons per year, with

6  the deliveries at the same time that the other company, the

7  other company that supplied LPG, Petredec deliver.  This would

8  be together with a loan of $200 million, and the fee would be

9  between $4 and 6 per metric ton, asking price, again, and the

10 minimum fee would have to be between 3 and $4 per metric ton.

11 Q     Did that deal ever materialize?

12 A     No.

13          MR. LAX:  I'd like to show now just for the witness

14 and the parties Government Exhibit 508-A-1.

15 Q     Do you recognize 508-A-1?

16 A     Yes.

17 Q     What is it?

18 A     This is a page from my legal pad.  That's why it doesn't

19 look much in order.  Yes, it specifies the distribution that I

20 had in my mind at the beginning, the distribution of fees to

21 be received from that contract, and it was -- 25 cents times

22 nine cargos.

23 Q     I'm sorry to interrupt, just because it's not in evidence

24 yet.

25 A     Oh, okay.

A. Pere - direct - Lax                              772

1  Q    Is there a date on this page?

2  A    No, there isn't.

3  Q    Whose notes are these?  Who wrote this?

4  A    These are mine.

5  Q    What is the approximate date of this entry?

6  A    Sometime in 2016, mid--- I mean, second semester.

7              MR. LAX:  The Government offers 508-A-1.

8              MR. PRICE:  Subject to the existing objection,

9  nothing further.

10             THE COURT:  And this is a page similar to the ones

11 in the notebook?

12             THE WITNESS:  Yes.

13             THE COURT:  Same ruling, same exception noted.

14             MR. LAX:  May we publish this, please.

15             THE COURT:  You may publish.  Received in evidence.

16             (Government's Exhibit 508-A-1 received in evidence.)

17             MR. LAX:  Thank you, Your Honor.

18 Q    All right.  Let me first direct your attention to the top

19 left.  Let's start with the first four lines.

20 A    Uh-hum.  The first line -- sorry.

21             The first line says Colo, mean Colorado.  That's me.

22 11.5 cents.  Then it says, on the second line, Gor, meaning

23 Gordo, Nilsen Arias, 11.5.

24             And then it says, on the third line, DH, meaning Del

25 Hierro, who is Xavier Rodriguez.

A. Pere - direct - Lax                    773

1        On the fourth line, this is an O.  Maybe I thought
2  about other.  I cannot be sure of that.
3        And on the following line, where I have DH, it says
4  50, meaning 50,000 at signing for DH, Xavier Rodriguez.
5        And then 15,000 per month.
6
7        (Continued on next page.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    (Continuing.)

2    BY MR. LAX:

3    Q    What is the word next to 50?

4    A    Firma, at signing.

5    Q    And what does that refer to?

6    A    To the success fee.

7            MR. LAX:  Ms. Jefferson, can we now please pull

8    up, sort of the right-hand side of this page all the way

9    down, please, yeah.

10   Q    Let's take this just sort of step by step.

11           Can you walk us through -- let's start with the

12   first three lines, ignoring the 342 up top.

13   A    In the first line, it says 25 times 90 times 190,000.

14   It's a reference to $0.25 times 90 cargos of 190,000 barrels

15   of crude oil.

16           So multiplying the $0.25 or 0.25, times 90 times

17   190,000, we get 513,000, which is the success fee.

18   Q    What's the line two lines below, three times 190 times

19   190?

20   A    Again, the same calculation.  I'm just saying that

21   there are three cargos of 190,000 barrels per month, but

22   there are 90 cargos in total.

23   Q    And then minus 50,000?

24   A    And then minus 50,000.  Those are the 50,000 that I

25   mentioned in the earlier highlight you made.

1   Q    Which 50,000?

2   A    The payments to Xavier Rodriguez as a success fee.

3   Q    And then can you walk us through the remainder of this

4   entry?

5   A    Okay.  That gives -- that leaves, I'm sorry, a net of

6   463,000, that's after the deduction of 50,000 for Xavier

7   Rodriguez.

8          Then the following line, 463,000 again, minus

9   A-L-A-D, that's Aladino, which is the name for William

10  Vasconez, under Secretary of Public Credit under the

11  Ministry of Finance.  463 minus the 10,000 for William

12  Vasconez left at the end a net of 453,000 to be divided by

13  two.  That's 226,500 for Nilsen Arias and the same amount

14  for me.

15         MR. PRICE:  Your Honor, I'm sorry, can we approach

16  sidebar on an issue?

17         (Sidebar.)

18         (Continued on the following page.)

19

20

21

22

23

24

25

*Sidebar*                                                                776

1            (Sidebar conference held on the record out of the

2      hearing of the jury.)

3            MR. PACKARD:  Mr. Koffmann will be speaking.

4            THE COURT:  Okay, Mr. Koffmann?

5            MR. KOFFMANN:  Your Honor, we are back again on

6      the issues of the pretrial payment disclosures.  It appears

7      as though they are eliciting testimony about a $10,000

8      payment to William Vasconez, which was not disclosed

9      pursuant to Your Honor's pretrial order, so we think that we

10     addressed this a week or two ago, we continue our objection.

11     We think that this testimony should be excluded and what has

12     been testified to should be stricken.

13           MR. LAX:  So anticipating this, I think he's

14     testifying about the calculation of the fee, not actual

15     payments.  My next question was going to be just that,

16     whether or not these were payments actually made or how he

17     was calculating the fee of payments to be made, to clarify

18     that, that very point.

19           I'm happy to add -- ask a leading question to that

20     effect to make that clear, but that -- it came out in

21     reverse order as planned, but I did intend to clarify that,

22     that very point.

23           MR. KOFFMANN:  Well, Your Honor, I mean, that --

24           THE COURT:  It's not a payment.

25           MR. KOFFMANN:  It's not a payment, but, Your

*Sidebar*                                                        777

1    Honor, it really seems to evade the spirit of the order.

2           THE COURT:  Okay.  It's not there, you know, he

3    hasn't explained anything about the payments on this sheet

4    at this point.  So it's fresh.

5           MR. KOFFMANN:  Okay, well --

6           THE COURT:  If the concrete was in, you could

7    break down the concrete, that's another story, but this is

8    fresh in his explanation of what those numbers are,

9    including the fact that it's not a payment.

10           MR. KOFFMANN:  We understand Your Honor's ruling.

11    We just note our objection for the record.

12           THE COURT:  Yes.  Okay.

13           (Sidebar conference ends.)

14           (Continued on following page.)

15

16

17

18

19

20

21

22

23

24

25

1              (In open court.)

2              MR. LAX:  Can we pull up that exhibit one more

3      time, please?

4      BY MR. LAX:

5      Q    Now, Mr. Pere, to be clear, these are payments -- well,

6      these are calculations that you had made about your fee; is

7      that right?

8      A    Yes.

9      Q    Not -- not actual reflections of payments actually

10     made?

11     A    No.  I don't think so.

12             MR. LAX:  For the witness and parties only,

13     Government Exhibit 503-A-2.

14     Q    Mr. Pere, do you recognize Government Exhibit 503-A-2?

15     A    Yes.

16     Q    What is it?

17     A    It's a page of one of my notebooks.

18     Q    What's the date?

19     A    January 23, 2017.

20             MR. LAX:  The Government offers Government

21     Exhibit 503-A-2.

22             THE COURT:  Mr. Price?

23             MR. PRICE:  Your Honor, the initial objection and

24     I don't think there is a foundation as to what this is

25     beyond that it's in his notebook.

*A. Pere - Direct - Lax* 779

1  Q    Directing your attention to the second line, do you see

2  the second entry?

3  A    Yes.

4         MR. LAX:  I am happy to offer just that line.

5         Thank you, Ms. Jefferson, for reading my mind.

6         The Government offers this line of Government

7  Exhibit 503-A-2, so as redacted, we will prepare a redacted

8  version.

9         THE COURT:  As redacted, Mr. Price?

10        MR. PRICE:  And I have no objection, although I

11  don't read Spanish.  So I have no objection, but I don't --

12  I can't know what it says, but I don't think I have an

13  objection.

14        THE COURT:  Okay.

15  Q    What does it relate to --

16        THE COURT:  Then I think there is nothing to

17  overrule, that's what I think, so it's received.

18        MR. LAX:  Not yet.

19        THE COURT:  Okay.

20        (Government's Exhibit 503-A-2 received in

21  evidence.)

22  Q    What does it relate to, sir?

23  A    This is a note that says that we received 185,270

24  Euros.  And I made that note to tell TexMex, Javier Aguilar,

25  that we had received that amount.

1          MR. LAX:  I lost track and I'm not sure if it's in

2     or not, but I will move it again for --

3          MR. PRICE:  I have no objection.

4          MR. LAX:  And then if we could just publish that

5     one line, please.

6          THE COURT:  Mr. Price?

7          MR. PRICE:  I have no objection to that.

8          THE COURT:  Received in evidence without

9     objection.

10         You may publish.

11         (Exhibit published.)

12    Q    All right.  So I think you said earlier the date of

13    this entry was January 23, 2017?

14    A    I believe so, yes.

15    Q    And can you explain this entry, please?

16    A    It's a note I made.  I knew we had credit in our

17    account for 185,270, so I wanted to let Javier Aguilar know

18    that we had received that money.

19    Q    And where it says TxMx, what is that a reference to?

20    A    TxMx means TexMex, who refers to -- which refers to

21    Javier Aguilar.

22    Q    And do you see the currency of this payment in here?

23    A    Euros.

24    Q    Where do you see that?

25    A    EU, right before the 185.

1          MR. LAX:  All right.  For the witness only,

2    please, Government Exhibit 515-A-2.

3    Q    Do you see Government Exhibit 515-A-2?

4    A    Yes, I see it.

5    Q    Which notebook is this from?

6    A    This is from the notebook in which I made the records

7    of either cash or transfers, let's say, payments, that I had

8    made to different people.  And like I said before, in some

9    occasions, maybe I made -- not made.  In some occasions, I

10   made notes of how payments were going to be distributed.  So

11   necessarily, this book does not only show payments.  Also

12   shows some other notes related to the distribution of

13   payments.

14         MR. LAX:  There is a few pages of this.  I will

15   flip through them, Mr. Price, so you can see.

16         A little bit slower, please.  Let's just go to

17   page 2.

18   Q    Another page from that notebook?

19   A    Yes.

20   Q    Page 3, another page from the notebook?

21   A    Yes.

22   Q    Four?

23   A    Yes, another page.

24   Q    And 5?

25   A    Yes, another page.

1  Q    Do you see entries in there related to the fuel oil

2  deal?

3  A    Yes.

4            MR. LAX:  The Government offers Government

5  Exhibit 515-A-2.

6            THE COURT:  Any objection?

7            MR. PRICE:  Your Honor, if I may, because I don't

8  understand some of the language.  I don't believe I have an

9  objection.  If I could reserve an objection depending upon

10  what the witness says about it.  My guess is I won't.

11            THE COURT:  Okay.  We'll find out.

12            Mr. Lax?

13            MR. LAX:  May we please publish it?

14            THE COURT:  Yes.  It's in for the moment.

15            (Government's Exhibit 515-A-2 received in

16  evidence.)

17            (Exhibit published.)

18  Q    So which notebook is this?

19  A    This is the -- the notebook where I wrote down payments

20  that I made.  Sort of a -- not a ledger, but just a record

21  of payments.  And some of the notes related to the contracts

22  and the payments to different people.

23  Q    All right.  Are they all necessarily related to Vitol

24  or fuel oil?

25  A    No, no.  There are other things here.

A. Pere - Direct - Lax                    783

1   Q    Let me direct your attention to the very top left
2   entry.
3   A    Yes.
4   Q    What is that entry?
5   A    This is an entry from March 17th of 2017.  It says Del
6   Hierro, on top, meaning Xavier Rodriguez.
7   Q    And that is the person depicted in Government
8   Exhibit 12?
9   A    Yes, that's him.
10           And it says that 60,000 as success fee in relation
11  to the fuel oil Vitol contract were given to him in
12  Guayaquil, at Oro Verde, which is a hotel in Guayaquil.
13  Q    Where do you see Guayaquil?
14  A    It says right Oro Verde, it says G-Q-U-I-L, that's
15  short for Guayaquil.
16  Q    Why did you make this entry in this ledger?
17  A    To remember that Xavier Rodriguez had been paid his
18  share of the success fee.
19           MR. LAX:  Let's turn to page 2 of this exhibit,
20  please.
21  Q    The second entry dated February 10, 2018?
22  A    Correct.
23  Q    Can you explain that entry, please?
24  A    Again, this is February 10, 2018.  Del Hierro, meaning
25  Xavier Rodriguez, delivered 30,000, meaning that $30,000

1    were given to him in reference to January and February of

2    2017.

3              Then it says apparently Vitol anticipated $0.03

4    after signing.

5    Q    What does that mean?

6    A    I'm not exactly sure what it means, because I'm making

7    a reference to the year before.  I don't know if there's a

8    mistake in the -- in the date, but I'm mentioning that the

9    $0.03 that were paid as success fee, mentioning the word

10   anticipo, here, which many times I used in the same meaning

11   as I used success fee.  And I'm just writing apparently

12   $0.03 after the signing.  But what I am -- what I can tell

13   you for sure is that $30,000 were given to Xavier Rodriguez

14   in regards to January and February of 2017.

15   Q    Can you explain the math, how that works for January

16   and February 2017?

17   A    Well, there were three cargos per month.  And that

18   means that there were six cargos per month in -- during

19   January and February of 2017.  Six cargos per month times

20   5,000, which is what I paid Xavier Rodriguez per cargo,

21   gives us a total of $30,000.

22             MR. LAX:  Let's turn, now, please, to page 3 of

23   the same exhibit.

24   Q    There is an entry on -- the third entry, there, yeah,

25   April 30th, 2018.

1      Would you please explain that entry?

2   A    Again, this is another payment to Xavier Rodriguez,

3   $30,000 given to him in Guayaquil for March and April of

4   2017.

5   Q    Where do you see Guayaquil?

6   A    In -- right after -- I mean, in the second line.  GYE,

7   which is the airport code for Guayaquil.

8   Q    Page 4, please, the top right entry?

9   A    It's from January of 2019.  Again, in regards to

10  payments to Xavier Rodriguez.  And it says that he has been

11  paid $30,000 in excess for the fuel oil deal.  That he was

12  paid in cash in Guayaquil on November 20th of 2018.

13  Q    Where do you see the fuel oil deal?

14  A    It says, after -- it says, on the second line:  Mas en

15  tema, F-O-I-L, meaning fuel oil.

16  Q    And you said in excess, what did you mean by that?

17  A    That means that I paid him $30,000 for those months by

18  mistake because I had not received payment from Vitol for

19  those two months when I made the payment to Xavier

20  Rodriguez.

21  Q    Now, this payment in November 2018, was Xavier

22  Rodriguez still in the ministry at that point?

23  A    I'm not sure.

24  Q    For all the payments that we just discussed, the 60,

25  30, 30, 30, how were those made to Xavier Rodriguez?

1   A    They were made in cash.

2   Q    The manner in which you testified about earlier?

3   A    Yes.

4            MR. LAX:  Your Honor, we are approaching 5:00, and

5   I have hit the end of a module, trying to adhere to the

6   Court's request to end on the earlier side, I would request

7   that now would be a good time.

8            THE COURT:  Okay, but before we do, let's -- where

9   are we with the status of this document?

10           MR. PRICE:  Your Honor, I have no objection to the

11  portions that pertain to these payments coming in.  I think

12  everything else should be redacted.

13           THE COURT:  And that's more the question -- my

14  next question to Mr. Lax.

15           I assume that's the basis on which you are

16  offering the document?

17           MR. LAX:  Yes, Your Honor.  There are a few other

18  portions that I might come back to.  So what I propose is I

19  will prepare a redacted version and send it to defense

20  counsel tonight and hopefully we can reach some agreement.

21           THE COURT:  Yes.  As indicated, there are some

22  things that don't even relate to the fuel oil contract in

23  here.

24           MR. LAX:  Yes.

25           THE COURT:  Okay.

*Proceedings*                                                    787

1           So with that, that buttons that up, and counsel

2    will confer after we excuse the jury.

3           Ladies and gentlemen of the jury, that's going to

4    bring us to the end of our proceedings today.  Again, we

5    appreciate your patience and attentiveness and certainly the

6    sacrifice and we share your concern that we all get home

7    safely tonight.

8           While we are doing that, we can reflect on the

9    things, the admonitions that we have to continue to remember

10   because they are important.  Don't discuss the case amongst

11   yourselves or with anyone else.  Continue to keep an open

12   mind.  Again, there's no homework, no investigation about

13   any of the subject matter, personalities or issues related

14   to this trial, whether electronically or some old-fashioned

15   method.

16          We remain on radio silence, no communication by

17   any means about even the fact that you are a juror coming to

18   Brooklyn, much less anything that relates to the case.  To

19   the extent in that broad brush of social media and regular

20   media, there should be any accounts of this case, you are to

21   totally tune it out, disregard it, don't read it, don't

22   listen to it, don't look at it.  And, again, I encourage you

23   throughout the trial to try to tune out reports about any

24   legal proceedings anywhere for fear that you may hear or see

25   something in that account that will confuse you about what

*Proceedings*                                                        788

1    your responsibilities are in this case.

2            So with that, we will break for the evening.  I am

3    going to ask you to come back, hopefully, on a better

4    weather day tomorrow to the central jury room.  Try to get

5    there no later than a quarter to 10:00.  And we will start

6    as soon thereafter as we can.

7            We bid you a very pleasant and more, perhaps,

8    importantly, a very safe evening in your travels.  I look

9    forward to seeing you tomorrow.  Have a pleasant evening.

10           (Jury exits.)

11           (Witness steps down. )

12           THE COURT:  So we will break.  Counsel will pass

13   things back and forth through the evening.  The admonitions

14   about being careful apply to all of us, so come back in one

15   piece tomorrow and we will proceed on with the case.

16           Thank you all.

17

18           (Matter adjourned to January 17, 2024, 10:00 a.m.)

19

20

21                            ooo0ooo

22

23

24

25

789

**I N D E X**

**WITNESS**                                              **PAGE**


  ANTONIO PERE

    DIRECT EXAMINATION (Continuing) BY MR. LAX        663

790

**E X H I B I T S**

Exhibit                                                          Page


Government Exhibits 1017 and 1017-A                        692


Government Exhibit 1017-A-T                                693


Government Exhibits 1020-A through H                       698


Government Exhibits 1020-A-T, 1020-B-T, and

1020-H-T                                                  698


Government Exhibits 1075 and 1075-A                        704


Government Exhibits 1076 and 1076-A                        705


Government Exhibits 1078 and 1078-A                        705


Government's Exhibits 1079, 1079-A                         709


Government's Exhibits 1080, 1080-A                         710


Government's Exhibits 1083, 1083-A, 1085,

1085-A                                                    712

791

1                          **E X H I B I T S**

2        <u>Exhibit</u>                                      <u>Page</u>

3

4        Government's Exhibit 1127                         716

5

6        Government's Exhibit 1133, 1133 A, 1153-A,

7        1153-B, 1153-C, 1153-D, 1153-E                    719

8

9        Government's Exhibit 1189, 1190-A                 728

10

11       Government's Exhibit 5505                         751

12

13       Government's Exhibits 1381-A and B                758

14

15       Government's Exhibit 503-A-1                      769

16

17       Government's Exhibit 508-A-1                      772

18

19       Government's Exhibit 503-A-2                      779

20

21       Government's Exhibit 515-A-2                      782

22

23

24

25