792

1
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,        : 20-CR-00390(ENV)
4
                                 :
5                                :
        -against-               : United States Courthouse
6                                : Brooklyn, New York
                                 :
7                                :
                                 : Wednesday, January 17, 2024
8    JAVIER AGUILAR,             : 10:00 a.m.
                                 :
9            Defendant.          :
                                 :
10   - - - - - - - - - - - - - - - - - X

11

12          TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
              BEFORE THE HONORABLE ERIC N. VITALIANO
13           UNITED STATES SENIOR DISTRICT JUDGE

14

15               A P P E A R A N C E S :

16  For the Government: BREON PEACE, ESQ.
                        United States Attorney
17                      Eastern District of New York
                        271 Cadman Plaza East
18                      Brooklyn, New York 11201
                    BY: JONATHAN POWELL LAX, ESQ.
19                      MATTHEW R. GALEOTTI, ESQ.
                        Assistant United States Attorneys
20

21                      U.S. DEPARTMENT OF JUSTICE
                        Fraud Section - Criminal Division
22                      1400 New York Avenue
                        Washington, DC 20005
23                  BY: DEREK ETTINGER, ESQ., ESQ.
                        CLAYTON P. SOLOMON, ESQ.
24                      D. HUNTER SMITH, ESQ.
                        Assistant United States Attorneys
25

793

A P P E A R A N C E S:  (Continued)


For the Defendant:       QUINN EMANUEL URQUHART & SULLIVAN, LLP
                             51 Madison Avenue
                             22nd Floor
                             New York, New York 10010
                         BY:  DANIEL KOFFMANN, ESQ.
                              NEIL T. PHILLIPS, ESQ.


                         QUINN EMANUEL URQUHART & SULLIVAN, LLP
                             111 Huntington Avenue
                             Suite 520
                             Boston, Massachusetts 02199
                         BY:  MICHAEL PACKARD, ESQ.
                              WILLIAM WEINREB, ESQ.


                         QUINN EMANUEL URQUHART & SULLIVAN, LLP
                             865 South Figueroa Street
                             10th Floor
                             Los Angeles, California 90017
                         BY:  WILLIAM PRICE, ESQ.

Court Reporter:  Stacy A. Mace, RMR, CRR, RPR
                 Official Court Reporter
                 E-mail:  SMaceRPR@gmail.com

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

*SAM     OCR     RMR     CRR     RPR*

*Proceedings*                                                          794

1              (In open court - jury not present.)

2              THE COURTROOM DEPUTY:  All rise.

3              (Judge ERIC N. VITALIANO entered the courtroom.)

4              THE COURTROOM DEPUTY:  The Court is now open.  The

5     Honorable Eric N. Vitaliano is presiding.

6              Case on the calendar is USA versus Aguilar.  Case

7     number 20-CR-390 on for jury trial.

8              Will the attorneys please note their appearances,

9     beginning with Government counsel.

10             MR. LAX:  Good morning, Your Honor.

11             Jonathan Lax, Matthew Galeotti, Clayton Solomon,

12    Derek Ettinger, Hunter Smith and Peyton Jefferson here on

13    behalf of the Government.

14             THE COURT:  Good morning, Mr. Lax, and to your

15    entire group.

16             MR. KOFFMANN:  Good morning, Your Honor.

17             Daniel Koffmann, Michael Packard, William Price,

18    William Weinreb, Gabriella Trevino, Raymond McLeod, here on

19    behalf of Mr. Javier Aguilar, who is present in court.

20             THE COURT:  And, Mr. Koffmann, good morning to you

21    and your group and to Mr. Aguilar.

22             THE COURTROOM DEPUTY:  We also have two standby

23    Spanish interpreters who need to note their appearance.

24             INTERPRETER BERAH:  Sonya Berah, Spanish

25    interpreter, B-E-R-A-H.

*Proceedings*                                                    795

1              INTERPRETER GOTLER:  And Marcia Gotler.

2              THE COURT:  And good morning to both of our

3    interpreters.  We welcome them and appreciate their services,

4    even as they stand by.

5              THE COURTROOM DEPUTY:  We will need, at least, to

6    have one of the standby interpreters sworn.

7              Ms. Berah, please raise your right hand.

8              Do you solemnly swear or affirm that you will well

9    and truly interpret the proceedings now before the Court, so

10   help you God?

11             INTERPRETER BERAH:  I do.

12             (Interpreter sworn.)

13             THE COURTROOM DEPUTY:  Thank you.

14             All parties are present, including defendant.

15             THE COURT:  Thank you.

16             Now that you are sworn, we doubly appreciate your

17   service.

18             All right.  Counsel, are we ready to go?

19             MR. LAX:  On behalf of the Government, yes, we are,

20   Your Honor.

21             THE COURT:  And I know we've got an in limine sort

22   of request; and, Mr. Koffmann, you probably saw it late, so I

23   don't know how to --

24             MR. KOFFMANN:  We did, Your Honor.  And just to

25   address that briefly.

1          This issue has already been ruled on.  This was

2   briefed pretrial.  And what it appears the Government is doing

3   is trying to get a preview of our cross-examination of the

4   agent, which, particularly given the Court's already ruled on

5   this, we think is improper.  And unless the Court needs to

6   hear further, you know, we think it would be unfair to require

7   us to preview our cross-examination of the -- of the agent.

8          THE COURT:  All right.  I didn't really catch it

9   that way.  I am not going to take care of that housekeeping

10  now.

11         Let's get started, and based on what I saw of it,

12  it's not relevant with what we're doing now.

13         MR. KOFFMANN:  No.

14         THE COURT:  And the way we're going, I don't know

15  when, but probably sometime just before Tisha B'Av, but I

16  don't know.

17         MR. KOFFMANN:  Let's hope so.

18         THE COURT:  Other than that, we're ready to go?

19         MR. LAX:  Yes, Your Honor.  We'll bring in the

20  witness and I'll return to the podium.

21         THE COURT:  Indeed.

22         (Pause.)

23         (The witness entered and resumed the stand.)

24         (Jury enters.)

25         THE COURT:  Be seated, please.

*Proceedings* 797

1          Counsel will stipulate that the jury is present and
2     properly seated.

3          MR. LAX:  Yes, Your Honor.

4          MR. KOFFMANN:  We do, Your Honor.

5          THE COURT:  Thank you, counsel.

6          Ladies and gentlemen, welcome back.  Again, we
7     appreciate your services, particularly given these inclement
8     conditions.  And we, as I say we appreciate your services and
9     ask you again, as you know we can't start until everyone is
10    here, and to the extent that conditions are making it harder
11    for us to get here on time, then we encourage all to
12    reconsider the time they start and move it up earlier so that
13    we all can be here and start as close to on time as possible.

14         I'll remind you of something I said at the very
15    beginning of the trial, that an Army can only move as fast as
16    its slowest unit.  So, if we want to try to keep to the
17    schedule that counsel have outlined for us at the beginning of
18    the case, all of our units have to be moving along smartly.

19         But we do appreciate the service you're providing
20    and understand the conditions, but the sun is shining today.
21    At any rate, we are ready to start.

22         Mr. Antonio Pere is back on the stand.  He is
23    reminded that he remains under oath.  Mr. Lax is on direct,
24    and he shall continue his direct now.

25         MR. LAX:  Thank you, Your Honor.

A. Pere - direct - Lax                                              798

1    **ANTONIO PERE**,

2          called as a witness by the Government, having been

3          previously duly sworn/affirmed by the Courtroom Deputy,

4          was examined and testified further as follows:

5    DIRECT EXAMINATION (Continuing)

6    BY MR. LAX:

7    Q    Good morning, Mr. Pere.

8    A    Good morning.

9    Q    I'd like to return to the time when the fuel oil contract

10   was signed and went into effect.

11               Approximately when was that?

12   A    It was signed on December of 2016, and it started being

13   executed January of 2017.

14   Q    And at that time, did Vitol start taking delivery of fuel

15   oil?

16   A    Yes.

17   Q    After the signing of that contract, was that the end of

18   efforts to obtain business with PetroEcuador?

19   A    No.

20   Q    Did you and the defendant pursue additional deals with

21   PetroEcuador?

22   A    Yes.

23   Q    Could you describe those -- those efforts?

24   A    Well, we tried, we continued trying to obtain a contract

25   for selling LPG gas again.  And also, at some point in time we

1  tried to obtain a contract to sell oil, meaning crude oil to

2  Vitol.

3  Q    At a high level, could you summarize the early stages of

4  the potential LPG deal after the signing of the fuel oil

5  contract?

6  A    The intention was to -- for Vitol to loan Ecuador, I

7  believe it was also 300 million, in order to be able to

8  negotiate directly without going through a public tender, and

9  sell LPG for, I don't remember exactly for how long or the

10  volume.

11           MR. LAX:  If I could please show the witness,

12  Ms. Jefferson, Government Exhibit 1171.

13           It seems my monitor is not working.

14           All right, well, I can't see it, but I understand

15  it's on the screen.

16           Oh, thank you, Mr. Villanueva.

17           I think I'll be able to make my way through it.

18  I'll just sort of confirm with my team at the table and

19  counsel that it's on.

20           It's on the screen?

21           THE COURTROOM DEPUTY:  Yes.

22           MR. LAX:  Okay.

23  BY MR. LAX:

24  Q    So, do you see 1171, sir?

25  A    Yes.

*A. Perez - direct - Lax*                                                    800

1    Q    Do you recognize it?

2    A    Yes.

3    Q    What is it?

4    A    It's an e-mail that I sent to Javier Aguilar.

5    Q    And what's the date?

6    A    December 12th, 2016.

7            MR. LAX:  Can we please show the attachment to that

8    e-mail, 1171-A?

9    Q    And let me know when you can see it, please.

10   A    Okay.

11   Q    Do you recognize the attachment?

12   A    Yes.

13           MR. LAX:  The Government offers 1171 and 1171-A.

14           MR. PRICE:  No objection.

15           THE COURT:  Received without objection.

16           (Government's Exhibits 1171 and 1171-A were received

17   in evidence.)

18           MR. LAX:  Can we please publish for the jury 1171.

19           (Exhibit published.)

20           MR. LAX:  Okay.

21   BY MR. LAX:

22   Q    So looking at 1171, who is the e-mail from and to?

23   A    It's from Javier Aguilar to me.

24   Q    Which e-mail address is yours here?

25   A    The one that says Francisco Echartea.

1    Q    What e-mail address is that?

2    A    That's an e-mail that I created to deal with any business

3    that would be performed by MexGas.

4    Q    Why were you using that e-mail address here?

5    A    Because it was an e-mail that looked like it was from

6    MexGas, if you see the e-mail address.  And also, because it

7    was an e-mail in which we were going to exchange documents

8    that were not public.

9    Q    What do you mean by that?

10   A    It's an e-mail to use -- to be used to send information

11   from, internal information from PetroEcuador during the course

12   of the -- during the time we were pursuing this contract.

13   Q    Now, the date, December 12th, 2016, where is that in

14   relation to the signing of the fuel oil contract?

15   A    I believe it's -- it's right after signing or very close.

16   Q    Now, there's an attachment here.  And what's the

17   attachment titled?

18   A    OTI LPG Version 2.

19   Q    And I'm sorry, who is the -- who is in the "from" line

20   here, the sender?

21   A    The sender?

22   Q    Yes.

23   A    Again, it's me.

24   Q    Okay.  And the "to" line, the recipient?

25   A    The recipient?

1   Q     Yes.

2   A     It's TexMex, e-mail perezmarcos007@gmail.com, that's

3   Javier Aguilar.

4           MR. LAX:  Let's turn to the attachment, please,

5   Government Exhibit 1171-A.

6           (Exhibit published.)

7           MR. LAX:  All right.

8   BY MR. LAX:

9   Q     Can you see that attachment?

10  A     Yes.

11  Q     What is this?

12  A     This is the draft of a letter to be sent by OTI to the

13  general manager of PetroEcuador, Mr. Pedro Merizalde.

14          And OTI is, first of all, thanking PetroEcuador for

15  the signing of the fuel oil contract, and it's also expressing

16  OTI interest in a long-term gas contract to -- to be provided

17  together with a 300-million-dollar loan.

18  Q     Who wrote this letter?

19  A     I did.

20  Q     Where did the information about 300-million-dollar loan

21  come from?

22  A     It was a coordination between Nilsen Arias from the

23  perspective of the government and Javier Aguilar from the

24  perspective of Vitol.

25  Q     What do you mean by that?  Let's begin with Nilsen Arias.

1  A    Nilsen Arias knew how much -- the size of the loan that

2  would -- that would generate interest from the financial

3  authorities in Ecuador.  So, just saying 300 million is

4  something that's gonna catch the attention of the Ministry of

5  Finance.

6         And from Vitol's perspective, is knowing that Vitol

7  was able to loan $300 million to PetroEcuador in connection

8  with this contract.

9  Q    There are two people listed at the bottom under cc.

10        Mr. Fausto Herrera, why was he included there on the

11  draft letter?

12  A    He was the Minister of Finance, and we wanted to generate

13  his interest in order to get his push for the signing of this

14  contract.

15  Q    What do you mean by that?

16  A    I mean that Ecuador, again, needed the money, fiscal

17  situation was tight, and if the Minister of Finance saw an

18  opportunity to get money for the country, he would make an

19  effort to push PetroEcuador to close a deal like this one.

20  Q    And why copy Nilsen Arias?

21  A    Because Nilsen Arias was the person that would be

22  executing a reaction needed in order to sign this contract.

23        MR. LAX:  If I could now please show just to the

24  witness, Government Exhibit 1206-A.

25  Q    Do you recognize Government Exhibit 1206-A?

*A. Perc - direct - Lax*                                                          804

1    A    Yes.

2    Q    What is it?

3    A    It's an e-mail from Javier Aguilar from his Vitol e-mail,

4    sent to me on January 23, 2017.

5            MR. LAX:  The Government offers Government

6    Exhibit 1206-A.

7            MR. PRICE:  No objection, Your Honor.

8            THE COURT:  Received without objection.

9            MR. LAX:  And may we please publish?

10           THE COURT:  You may.

11           (Government's Exhibit 1206-A was received in

12   evidence.)

13           (Exhibit published.)

14   BY MR. LAX:

15   Q    So, looking at 1206-A, let's just start here and then

16   we'll look at the document, itself.

17           What e-mail address was this sent from?

18   A    From Javier's Vitol address.

19   Q    And what e-mail address was it sent to?

20   A    To my -- two e-mail address that I had, one ending in

21   AdexusConsulting.com and the other one with the domain

22   Alianzec.com.

23   Q    What is the defendant's e-mail address that was used

24   here?

25   A    jva@vitol.com.

1    Q    All right.

2              MR. LAX:  I've got one of these, so I am going to

3    add it to Government's Exhibit 50 on the board.

4              All right, if we could please zoom out on this

5    exhibit now.

6    BY MR. LAX:

7    Q    I'd like to direct your attention to the bottom portion

8    there.

9              So this is a portion that's forwarded to you,

10   ultimately?

11   A    Yes.

12   Q    What is -- can you explain the bottom portion here?

13             First of all, let's begin with who sends this --

14   this portion of the e-mail?

15   A    Well, it's sent by Nilsen Arias to Talal Awfi, copying

16   several people.

17   Q    Yes.  Whose names do you recognize there in the cc line?

18   A    Pedro Merizalde.

19   Q    Who is that?

20   A    General manager of PetroEcuador.  William Vasconez.

21   Q    Who is that?

22   A    Undersecretary of Finance at the finance ministry.

23   Santiago Palacios.

24   Q    Who is that?

25   A    That's somebody who worked in the International Trade

1   Department in PetroEcuador.

2   Q    Okay.  And then, obviously, we've got Nilsen Arias again?

3   A    Yes.

4   Q    Do you know who Sam Naylor is?

5   A    I'm not sure, somebody from OTI.  I've seen his name many

6   times.

7   Q    Or Wail Al Jamali?

8   A    Same thing.  Somebody from OTI.

9   Q    I guess just to round it out, Alejandro Mosquera?

10  A    That's that worked at the International Trade Department

11  in PetroEcuador.

12  Q    Can you describe the portion, the written portion of the

13  e-mail at the bottom here, what's this about?

14  A    They are asking -- they, I mean Nilsen Arias is asking

15  OTI for confirmation of the economic offer that OTI made

16  before in connection with the loan and the new LPG contract.

17  Q    And the loan amount here is listed as 300 million?

18  A    Yes.

19       MR. LAX:  I'd like to turn to the next page of this

20  exhibit.  If you could just zoom in at the top, please.

21  BY MR. LAX:

22  Q    Target closing date January 30th, 2017.

23  A    Yes.

24  Q    So, the e-mail was sent January 23rd, 2017, but there's a

25  target closing date of January 30th?

1    A    Yes.

2    Q    Are you aware of any urgency in connection with trying to

3    get this done?

4    A    Well, first of all, the urgency of the loan.  And second,

5    at that time we were very close to presidential elections in

6    Ecuador, and the political situation in the country made it

7    necessary to sign this before the elections.

8    Q    What do you mean by that?

9    A    After you have elections and new authorities, at least

10   elected authorities, this -- in general, this newly-elected

11   officials ask the Government not to sign any important

12   contracts because they want to do it themselves, meaning the

13   new authorities, when they start their periods.

14   Q    And in connection with the elections, what, if anything,

15   did that mean for the position of the international trade

16   manager?

17   A    It meant that the international trade manager would

18   change.

19         MR. LAX:  If I could please show the witness

20   Government Exhibit 1218-A.

21   BY MR. LAX:

22   Q    Do you recognize Government Exhibit 1218-A?

23   A    Yes.

24   Q    What is it?

25   A    It's an e-mail from Javier Aguilar from his e-mail at

1   Vitol, and he sends it to me, to three e-mail addresses that I

2   have.

3   Q    And I'll show you the attachment, 1218-B.

4          Do you recognize 1218-B?

5   A    Yes.  This is a letter from OTI to PetroEcuador.

6          MR. LAX:  The Government offers 1218-A and 1218-B?

7          MR. PRICE:  No objection, Your Honor.

8          THE COURT:  Those documents are received without

9   objection.

10         (Government's Exhibits 1218-A and 1218-B were

11  received in evidence.)

12         MR. LAX:  All right, let's go back and look at the

13  e-mail quickly, and then we can turn to the attachment.

14         (Exhibit published.)

15  BY MR. LAX:

16  Q    Okay.  So just to orient, this is from the defendant's

17  Vitol.com e-mail address?

18  A    Yes.

19  Q    And to three of your e-mail addresses, all those are

20  yours in the "to" line?

21  A    Yes.

22  Q    And the date of the e-mail?

23  A    February 6th, 2017.

24         MR. LAX:  All right.  If we could please pull up the

25  attachment, 1218-B.

1              (Exhibit published.)

2    BY MR. LAX:

3    Q    What is -- what is this attachment?

4    A    This is a letter from OTI directed to the general manager

5    of PetroEcuador, basically, stating price conditions of what

6    would be the new LPG contract.

7              MR. LAX:  I'd like to turn to the second page of

8    this.

9    Q    All the way down at the bottom it says:  All other terms

10   remain the same.  We look forward to signing the contract

11   during the week of the 13th of February 2017.

12             Do you see that?

13   A    Yes.

14   Q    Was this signed?

15   A    No.

16   Q    Why not?

17   A    I'm not sure.

18             MR. LAX:  If I could now please show the witness

19   Government Exhibit 1252.

20   Q    All right.  Do you recognize Government Exhibit 1252?

21   A    Yes.

22   Q    What is it?

23   A    It's an e-mail that I sent to Javier Aguilar to his

24   perezmarcos007 Gmail address.

25   Q    On what date?

1   A     On May 8, 2017.

2   Q     I'll show you the attachment to this, Government

3   Exhibit 1252-A.

4            All right.  Do you recognize the attachment?

5   A     Yes.

6   Q     Let me also show you while we're doing this, Government

7   Exhibit 1258-A.

8            MR. LAX:  Still just for the witness.

9   BY MR. LAX:

10  Q     Do you recognize 1258-A?

11  A     Yes.

12  Q     What is it?

13  A     It's an e-mail, again, sent by Javier Aguilar to me at my

14  e-mail address Apolo1964@protonmail.com.

15  Q     On what date?

16  A     On May 16, 2017.

17  Q     All right.  I am going to show you an attachment to this

18  e-mail, 1258-F.

19            Do you recognize 1258-F?

20  A     Yes.

21            MR. LAX:  The Government offers 1252 and 1252-A, as

22  well as 1258-A and F?

23            MR. PRICE:  No objection, Your Honor.

24            MR. LAX:  I'm sorry, I didn't hear.  Were they

25  received?

```
 1              THE COURT:  I didn't hear.

 2              MR. LAX:  Oh.  1252 and 1252-A and 1258-A and F.

 3   The Government offered.  I understand there's no objection.

 4              MR. PRICE:  There's no objection, Your Honor.

 5              THE COURT:  Received without objection.

 6              (Government's Exhibits 1252, 1252-A, 1258-A and

 7   1258-F were received in evidence.)

 8              MR. LAX:  All right, if we could please pull up

 9   1252.

10              (Exhibit published.)

11              MR. LAX:  Okay.

12   BY MR. LAX:

13   Q    So, once again now, what -- who is this e-mail from and

14   to?

15   A    It's an e-mail I sent to Javier Aguilar.

16   Q    And this appears to be forwarded from an Eddie Peralta.

17              Whose e-mail address is that?

18   A    That's Enrique Pere's e-mail.

19   Q    And the e-mail address that Enrique used is what?

20   A    He had more than one e-mail address, and this was an

21   e-mail address with a different name like we have used in

22   other occasions.

23              MR. LAX:  If you could turn to the attachment,

24   1252-A, please.

25              (Exhibit published.)
```

1    BY MR. LAX:

2    Q    What is this?

3    A    This is a draft of a letter to be sent to the Minister of

4    Hyrdrocarbons at the time.

5    Q    What was the purpose of the letter?

6    A    To try to continue with the LPG deal.

7    Q    I'd like to direct your attention to the first paragraph.

8              We would like to take this opportunity to

9    congratulate the Republic of Ecuador and its people for the

10   election of Mr. Lenín Moreno as the new president.

11             Who wrote that?

12   A    I wrote it.

13   Q    Why?

14   A    Because it was a proper introduction to a letter after

15   the new president took office.

16   Q    Was there any significance to including something like

17   that in this letter?

18   A    Yes.  It's emphasizing that OTI, it's -- has -- it's a

19   strategic ally of Ecuador.

20   Q    Turning now to the second paragraph.

21             Can you explain the second paragraph?

22   A    The second paragraph is, again, they want to pick up

23   where the conversations left in January of the same year in

24   regards to the LPG contract.

25             And also, OTI is offering additional financing for

*A. Perez - direct - Lax*                                            813

1   Ecuador to do upgrades to the LPG terminal in Monteverde.

2   And, yeah, financing for that purpose.  Together they are also

3   offering a crude oil long-term provision and prepayment

4   contract.

5   Q    Let me direct your attention now to the third paragraph

6   of this -- this draft letter.

7              What's the proposed financing component here?

8   A    1.5 billion.

9   Q    How did it increase from 300 to 1.5?

10  A    Well, 300 had to do with LPG exclusively.  Now, as we saw

11  in the previous paragraph, Vitol is talking about LPG,

12  construction and management or, at least, updates and

13  management of the LPG terminal, and also Vitol is proposing a

14  financial component that has to do with the purchase of crude

15  oil.  So, this is a larger operation because it includes three

16  elements.

17  Q    Where did the 1.5 billion figure come from?

18  A    From Nilsen Arias.

19  Q    Did you have any conversation with the defendant about

20  the 1.5 billion figure?

21  A    Yes.

22  Q    Around this time?

23  A    Yes.

24  Q    What was that conversation?

25  A    The conversation had to do with the fact that for Ecuador

1  to be interested in doing this businesses with OTI, it had to

2  get a 1.5 -- a total of $1.5 billion.

3  Q    You also mentioned earlier that in light of the election,

4  the international trade manager position might change.

5         Did you have conversations with the defendant about

6  that?

7  A    Yes.

8  Q    Also around this time?

9  A    Yes.

10 Q    Could you describe those conversations?

11 A    Basically, letting him know that the possibility of

12 Nilsen Arias leaving his position was high.

13 Q    What was his reaction?

14 A    He got worried and tried to push, together with me, the

15 execution -- execution of this project as soon as possible.

16 Q    Now looking at this, at this draft letter, Arias is still

17 copied here on the bottom?

18 A    Yes.

19 Q    Was he still the international trade manager at this

20 point?

21 A    Yes.

22         MR. LAX:  Now, if we could please show Government

23 Exhibit 1258-A in evidence.

24         (Exhibit published.)

25 Q    And who sent this e-mail?

1    A    Javier Aguilar.

2    Q    To you?

3    A    To me.

4    Q    On May 15 or 16, I can't make that out.

5         Can you make that out?

6    A    May 16, 2017.

7    Q    So, about a week later from what we were just looking at

8    before?

9    A    Yes.

10   Q    Let's look at the attachment 1258-F.

11        MR. LAX:  And if we could pull up, please, 1258-F on

12   the right and 1252-A on the left, please.

13        (Exhibit published.)

14   BY MR. LAX:

15   Q    All right.  So, the one on the left is the one we were

16   just looking at before?

17   A    Yes.

18   Q    And the one on the right is an attachment to an e-mail

19   about a week later?

20   A    Yes.

21   Q    How do these two compare?

22   A    They are basically the same letter, almost identical.

23   Q    They both include the 1.5-billion-dollar proposal?

24   A    Yes.

25   Q    Both copy Nilsen Arias?

1    A    Yes.

2         MR. LAX:  Now I'd like to show for the witness only,

3    please, Government Exhibit 1273.

4    BY MR. LAX:

5    Q    Do you recognize Government Exhibit 1273?

6    A    Yes.

7    Q    What is it?

8    A    It's an e-mail I sent to Javier Aguilar.

9    Q    On what date?

10   A    June 6th, 2017.

11        MR. LAX:  The Government offers Government

12   Exhibit 1273.

13        MR. PRICE:  No objection, Your Honor.

14        THE COURT:  Received without objection.

15        (Government's Exhibit 1273 was received in

16   evidence.)

17        (Exhibit published.)

18        MR. LAX:  Okay.

19   Q    Mr. Pere, what are we looking at, what are we looking at

20   here in this e-mail?

21   A    This is an e-mail written by Nilsen Arias, sent to OTI

22   saying that the offer OTI presented has been reviewed or has

23   been given to the Minister of Hyrdocarbons and that the

24   minister authorized Nilsen Arias to have conversations ASAP.

25   And it's offering -- it's putting a date for a visit by Nilsen

1    Arias to OTI.

2    Q    When you received this e-mail -- first, how did you

3    receive it?

4    A    Well, it was sent to me by Nilsen Arias.

5    Q    What did you understand him to mean when he said

6    conversations with you ASAP?

7    A    That there was a concern about timing that this had to be

8    done really quickly.

9    Q    Or what?

10   A    Can you repeat the question?  What do you mean "or what"?

11   Q    Why the concern?

12   A    Oh, because Nilsen Arias was about to leave his position

13   at PetroEcuador.

14   Q    And then you forwarded it to the defendant.

15        Why did you forward it to him?

16   A    For him to be aware that that e-mail had been sent, for

17   him to follow up with OTI.

18

19              (Continued on the following page.)

20

21

22

23

24

25

A. Pere - direct - Lax                                    818

1    DIRECT EXAMINATION (Continuing)

2    BY MR. LAX:

3    Q    Did this 1.5 billion LPG deal or I guess multi-product

4    deal go through?

5    A    No.

6    Q    Why not?

7    A    The political conditions were not appropriate and more

8    than that, Nilsen Arias left his positions afterwards.

9    Q    In relation to this e-mail, approximately when did you

10   leave?

11   A    June, July of 2017.

12   Q    Did you have any discussion with the defendant about

13   Arias's departure?

14   A    Yes.

15   Q    Did you have those conversations around this time?

16   A    Yes.

17   Q    Can you describe those conversations?

18   A    I said that most probably or definitely Nilsen Arias was

19   going to be out of his position pretty soon.

20   Q    Did you discuss with the defendant Arias after Arias

21   left?

22   A    Yes.

23   Q    Describe that conversation.

24   A    After Arias left, I told Javier Aguilar that I would be

25   working or making contacts in the Government to try to get a

A. Pere - direct - Lax                              819

1  replacement for Nilsen Arias, a replacement that would be

2  close to me.  And also I told him that there was a person in

3  the new Government at a very high level with whom I have a

4  close relationship.

5  Q    What was the defendant's reaction to that?

6  A    Well, he is happy to know that I had an important

7  contact, but, of course, he and I were worried about who was

8  going to be replacing Nilsen Arias.

9  Q    Who was the person that you're referring to, the high-up

10  contact in the government?

11  A    Jose Agusto.

12  Q    Once Arias left, did you take steps to get this deal back

13  on track?

14  A    Yes.

15  Q    Can you describe those steps?

16  A    Well, I made a connection with the minister of

17  hydrocarbons through Jose Agusto and asked him to receive OTI

18  either through a visit or a phone call and explore this

19  possibility of signing this new deals.

20  Q    Who's the general manager of PetroEcuador at this point?

21  A    I don't remember.

22  Q    What happened next in your efforts to get this going

23  again?

24  A    Well, there was a visit that Jose Agusto coordinated with

25  the minister and this visit was from OTI.

A. Pere - direct - Lax                    820

1   Q    How do you know about that visit?

2   A    Because I asked Jose Agusto to talk to the minister about

3   it and the visit or the -- I had a conversation about the

4   visit with Javier Aguilar just to make sure that it was

5   possible.

6   Q    That what was possible?

7   A    For somebody from OTI to visit the minister of

8   hydrocarbons.

9   Q    And can you describe what you learned about that visit?

10        MR. PRICE:  Objection.  Foundation.

11  Q    How did you learn about the visit?

12  A    I learned about the visit by talking with Javier Aguilar

13  and also with Jose Agusto, the minister's -- he was an advisor

14  to the minister of hydrocarbons.

15        THE COURT:  Are you satisfied with the foundation,

16  Mr. Price?

17        MR. PRICE:  Pardon me?

18        THE COURT:  Are you satisfied with the foundation?

19        MR. PRICE:  Certainly with Mr. Aguilar.  If he can

20  break them up, that would be best.

21        MR. LAX:  Sure.

22  Q    Well, first of all, was this a conversation with both of

23  the defendant and Jose Agusto or were those two separate

24  conversations?

25  A    Separate.

A. Pere - direct - Lax                      821

1   Q    All right.  Let's begin with the conversation with the

2   defendant.  Can you describe your conversation with the

3   defendant about this?

4   A    I expressed we needed to demonstrate interest from OTI

5   and that we needed to engage OTI with the new authorities.

6   Q    What did you mean by interest?

7   A    What do I mean by engage?

8   Q    Interest.

9   A    Say the whole question again, please.

10  Q    I think you said you wanted to express interest.

11  A    Yes.

12  Q    What did you mean by interest?

13  A    I wanted to show or we wanted to show that OTI was

14  interested in doing businesses with PetroEcuador.

15  Q    And what did you mean by engage?

16  A    Catch the attention of the minister and make -- make him

17  start working towards the execution of one of those projects.

18  Q    Engage how?

19  A    Engage by receiving people from OTI or receiving

20  communicating from OTI and pushing forward the execution of

21  one of those -- or all of those opportunities.

22  Q    And now turning to the conversation with Jose Agusto on

23  this topic.  Can you describe that conversation?

24  A    I asked him to coordinate, to talk to the minister about

25  it, about this possibility and about the funds that could be

A. Pere - direct - Lax                                    822

1  received by Ecuador.

2  Q    In general, how did Jose Agusto react to this?

3  A    Very positive.  Very positive.  And he said he would work

4  on it.

5  Q    Do you have an understanding as to why his reaction was

6  positive?

7        MR. PRICE:  Objection.  Speculation.

8  Q    Just yes or no for now.  Do you have an understanding as

9  to why his reaction was positive?

10  A    Yes.

11  Q    What is that based on?

12  A    On my conversations with him.

13  Q    Why was his reaction positive?

14  A    Because he knew he was going to get paid if any contract

15  with OTI was signed.

16  Q    Were offers made to him in connection with this?

17  A    Yes.

18  Q    How were those offers made?

19  A    At first, just in general.

20        Before this time, I met with Jose Agusto and

21  explained to him all the contracts that I had managed and that

22  I was following up with PetroEcuador, and I told him he would

23  be paid for helping maintain those contracts flowing.

24        MR. LAX:  I would like to show the witness

25  Government 512-A-2, please.  There's three pages in this.

A. Pere - direct - Lax                          823

1    Q    Do you recognize Government Exhibit 512-A-2?

2    A    Well, I only recognize the dates because they are covered

3    in black, but I can see that the date is my writing and --

4    yeah.

5    Q    What is it from?

6              I understand there's redactions on here, but other

7    than that, what's this from?

8    A    This is from one of my notebooks.

9    Q    One of the ones that we spoke about yesterday?

10   A    Yes.

11   Q    And looking at the second page.  Do you see that note?

12   A    Yes.

13   Q    Without reading from it, high level, what does it relate

14   to?

15   A    It just a list of the three projects that we've been

16   talking about with the title Pepin, which meant Jose Agusto

17   and the $1.5 billion.

18             MR. LAX:  The Government offers Government Exhibit

19   512-A-2.

20             THE COURT:  Mr. Price.

21             MR. PRICE:  No objection.  So I don't keep repeating

22   this, Your Honor, we have the continuing objection from

23   yesterday.

24             THE COURT:  Yes.

25             MR. PRICE:  Otherwise, no objection.

A. Pere - direct - Lax                 824

1          THE COURT:  Anything related to the notebook you

2     have a continuing objection.

3          MR. PRICE:  Thank you.

4          THE COURT:  Notebooks plural.

5          MR. PRICE:  So no objection except as to that.

6          THE COURT:  Yes.  And that objection has already

7     been ruled on.

8          (Government's Exhibit 512-A-2 received in evidence.)

9          THE COURT:  You have an exception and you may

10    proceed, Mr. Lax.

11         MR. LAX:  Thank you, Your Honor.

12         Can we please publish this and let's just start on

13    page 1 just to orient.

14    BY Mr. Lax:

15    Q    So there are some dates here.  What are the dates here?

16    A    June 2, 2017, June 5, 2017, June 6, 2017.

17    Q    Let's turn to the next page.  Are there any dates on this

18    particular page?

19    A    No.

20    Q    And then just to continue, the final page, there's

21    another date here.

22    A    June 9th.

23    Q    Let's go back in between those two June dates.

24         THE COURT:  The first two --

25    Q    Between June 6 and June 9, 2017, the page there, what is

A. Pere - direct - Lax                          825

1   this note about?

2   A    These are things that I wrote that I had to talk to Jose

3   Agusto about and I mentioned the crude oil, and here I'm

4   specifying 80 million barrels of crude oil.

5          I'm also specifying 2 million metric tons of LPG,

6   and I'm talking also the third point was the LPG terminal in

7   Monteverde for -- and also the products terminal in

8   Monteverde.

9          THE COURT:  Mr. Pere, during that time period that

10  you are referring to, those conversations, did Mr. Agusto have

11  a title?

12         THE WITNESS:  Yes, he was an advisor to the minister

13  of hydrocarbons.

14         THE COURT:  And that's a paid position?

15         THE WITNESS:  Yes.

16  Q    You mentioned this note refers to Jose Agusto.  Is that

17  the same Jose Agusto here, Government Exhibit 15?

18  A    Yes, that's him.

19  Q    Where do you see Jose Agusto in your notes?

20  A    At the top, where it says Pepin.

21  Q    Why didn't you just write Jose Agusto?

22  A    Pepin was the name I used to call him.

23         MR. LAX:  Now, if we could please show the witness

24  1298.

25  Q    Once it's up, let me know if you recognize 1298, please.

1  A    Yes, I do.

2  Q    What is it?

3  A    It's an e-mail sent from my Mex Gas e-mail address to

4  Javier Aguilar, to his e-mail address perezmarcos007.

5  Q    On what date?

6  A    On August 2, 2017.

7  Q    All right.  Let's look at the attachment to this, 1298-A.

8  Do you recognize the attachment?

9  A    Yes.

10        MR. LAX:  And I will also show just for the witness

11  Government Exhibit 1300-A, please.

12  Q    Do you recognize 1300-A?

13  A    Yes.

14  Q    What is it?

15  A    An e-mail from Javier Aguilar sent to me.

16  Q    On what date?

17  A    On August 7, 2017.

18  Q    The attachment to this Government Exhibit 1300-B?

19  A    OTI letter to PetroEcuador.

20  Q    Do you recognize the attachment 1300-B?

21  A    Yes.

22        MR. LAX:  The Government offers Government Exhibits

23  1298 and 1298-A, as well 1300-A and B.

24        MR. PRICE:  No objection.

25        THE COURT:  All of those documents are received

A. Pere - direct - Lax                    827

1   without objection.

2              (Government's Exhibits 1298 and 1298-A, as well

3   1300-A and B received in evidence.)

4   Q    All right.  Let's take a look at 1298, please.  All

5   right.  So we have seen these e-mail addresses before Vitol?

6   A    Yes.

7   Q    From you to the defendant?

8   A    Yes.

9   Q    Let's look at the attachment, 1298-B, please.  What is

10  this attachment?

11  A    It's a letter to Eduardo Mangas, secretary general of the

12  presidency of Ecuador.

13  Q    Who wrote it?

14  A    I did.

15  Q    Why?

16  A    Because I needed to give a draft to Javier Aguilar for

17  OTI to send an official letter.

18  Q    And what's the purpose of this draft?

19  A    Again, mentioning the different options we have talked

20  about before and the credit facility of up to $1.5 billion.

21  Q    In the second to last paragraph, it reads:  We believe

22  that it is due to the recent changes in Government that we

23  have not received a response to our letter.

24              Do you see that?

25  A    Yes.

A. Pere - direct - Lax                    828

1  Q    Why was that included?

2  A    Because the last letter sent by OTI had not been

3  answered.

4  Q    What do you mean?

5  A    OTI send a letter before this one and got no response

6  from PetroEcuador.

7  Q    Was that prior letter sent to anyone in particular?

8  A    To the minister.  Either to the minister of hydrocarbons

9  or to the general manager of PetroEcuador.

10 Q    Do you remember?

11 A    No, I'm not sure which one.

12 Q    Around this time, August of 2017, how was your

13 relationship to the people in PetroEcuador?

14 A    It was -- I had practically no relationship with the

15 people at PetroEcuador.

16 Q    Who was the international trade manager at this time?

17 A    I don't remember the name.

18 Q    All the way down at the bottom, there's a cc for Carlos

19 Perez.  Who is that?

20 A    He is the minister of hydrocarbons.

21 Q    Let's turn to 1300-A, please.  Again, just to orient,

22 this is an e-mail from the defendant at his Vitol address to

23 you?

24 A    Yes.

25           MR. LAX:  Let's look at the attachment to this.

A. Pere - direct - Lax                    829

1   And, Ms. Jefferson, I guess if we can pull up on the left

2   1298-A and the right 1300-B.

3   Q    Okay.  So the one on the left is what we were just

4   looking at before?

5   A    Yes.

6   Q    And the one on the right is what?

7   A    Is the official letter sent by OTI to the secretary

8   general.

9   Q    How do these two compare?

10  A    They are very similar, if not exact.

11          MR. LAX:  I'd like to now please show the witness

12  Government Exhibit 1313.

13  Q    Do you recognize Government Exhibit 1313?

14  A    Yes.

15  Q    What is it?

16  A    It's an e-mail I sent to Javier Aguilar.

17  Q    On what date?

18  A    September 7, 2017.

19          MR. LAX:  The Government offers Government Exhibit

20  1313.

21          MR. PRICE:  No objection, Your Honor.

22          THE COURT:  Received without objection.

23          (Government's Exhibit 1313 received in evidence.)

24  Q    Why did you write this e-mail?

25  A    The minister and the CEO of OTI either talked or had a

A. Pere - direct - Lax                    830

1  meeting that didn't go well, meaning Carlos Perez was not
2  clear about what OTI wanted and the letter says that any
3  communication will be facilitated or coordinated with OTI by
4  his main advisor Jose Agusto.
5  Q    The same Jose Agusto we were looking at before in
6  Government Exhibit 15?
7  A    Yes.
8  Q    What was Jose Agusto's e-mail address?
9  A    joseagusto@hidroburos.gob.ec, with a b, as in bravo, dot
10 ec.
11 Q    And then beneath that you wrote, please have OTI him send
12 an e-mail saying something like, and then you drafted
13 something beneath?
14 A    Yes.
15 Q    Why?
16 A    Because it was necessary for OTI to remain in contact
17 with Jose Agusto, who would be the person in charge of
18 coordinating the relationship with OTI.
19          MR. LAX:  Your Honor, it is a little past 11:30.  If
20 you would like to do a midmorning break, I think now is a good
21 time.
22          THE COURT:  It's convenient.  It's a tad early, but
23 because it's a very convenient spot, we will take it.
24          Ladies and gentlemen, we will take our midmorning
25 break.  The usual rules apply.  The fact that they are usual,

A. Pere - direct - Lax                      831

1  does not lessen their importance.  Continue to keep an open

2  mind.  Do not discuss the case amongst yourselves or with

3  anyone else.  Please be back in 15 minutes.

4            (Jury exits the courtroom.)

5            THE COURT:  Okay.  We will take our break.  I was

6  shooting for 11:45.  We will take 11:30.

7            MR. LAX:  Yes, Your Honor.

8            (Recess taken.)

9            THE COURTROOM DEPUTY:  All rise.

10           Court is back in session.  Counsel for both sides

11  are present, including the defendant.

12           THE COURT:  Are we ready?

13           MR. LAX:  We are, Your Honor.

14           MR. KOFFMANN:  Yes, Your Honor.

15           MR. LAX:  Let's get the witness back in.

16           THE COURT:  Let's get the witness.

17           Be seated, please.

18           (The jury enters the courtroom.)

19           THE COURT:  Counsel will stipulate that the jury is

20  present and properly seated.

21           MR. LAX:  Yes, Your Honor.

22           MR. KOFFMANN:  Yes, Your Honor.

23           THE COURT:  Thank you, counsel.

24           Ladies and gentlemen, welcome back.  We are ready to

25  resume the second half of the morning session.

A. Pere - direct - Lax                         832

1          Mr. Pere remains on the stand and Mr. Lax remains on

2    direct.

3          MR. LAX:   Thank you, Your Honor.

4    BY Mr. Lax:

5    Q    Mr. Pere, before the break, we were looking at an e-mail

6    where you were describing miscommunications.  Do you recall

7    that e-mail?

8    A    Yes.

9    Q    Around that time, mid-late 2017, how were things going

10   with the fuel oil contract, the execution of it, I mean?

11   A    The fuel oil contract was being executed.  There was an

12   issue in regards to price.

13   Q    Can you summarize what that issue was?

14   A    The contract said that the price of the fuel oil would be

15   renegotiated or agreed between PetroEcuador and OTI every six

16   months, and they were not in agreement.

17   Q    What, if anything, did you do to try to resolve that

18   issue?

19   A    First thing, getting to Jose Agusto at the ministry of

20   hydrocarbons.  And afterwards, by getting in contact with new

21   authorities at PetroEcuador.

22   Q    Who are you referring to, new authorities?

23   A    The person who replaced Nilsen Arias and the gentleman

24   who was in charge between those two.

25   Q    Who is that?

A. Pere - direct - Lax                          833

1   A    Mauricio Samaniego.

2   Q    That's the person shown in Government Exhibit 14?

3   A    Yes.

4   Q    Top right?

5   A    Yes.

6            THE COURT:  He is the person who replaces and he is

7   not the interim; is that right?

8            THE WITNESS:  Correct.

9            MR. LAX:  I'd like to show the witness, please,

10  Government Exhibit 1344-A.

11  Q    Do you recognize 1344?  I'm sorry.

12  A    Sorry about that.

13  Q    You dropped your glasses.

14  A    Yes.

15           Yes.  This is an e-mail sent to me by Javier

16  Aguilar.

17  Q    On what date?

18  A    October 25, 2017.

19  Q    All right.  There is a number of attachments to this.

20  Let's just flip through them and I will ask you if you

21  recognize each of them.

22  A    Okay.

23  Q    1344-B?

24  A    Yes.

25           MR. LAX:  Can we zoom in on the top, please.

A. Pere - direct - Lax                    834

1   A    That's an e-mail from OTI to Javier Aguilar.

2   Q    This is an e-mail attached to another e-mail?

3   A    Yes.

4   Q    All right.  And then let's continue to look at the

5   attachments, 1344-C.  Do you recognize that?

6   A    Yes.

7   Q    1344-D, do you recognize that attachment?

8   A    Yes.

9   Q    1344-E?  Just a blank attachment?

10  A    Yes.

11  Q    1344-F, another attachment?  Do you recognize it?

12  A    Yes.

13  Q    1344-G, do you recognize that?

14  A    Yes.

15  Q    H?

16  A    Yes.

17  Q    Do you recognize that?

18  A    Yes.

19  Q    I, do you recognize that attachment?

20  A    I would like to see it larger, if it is possible.

21       Yes.

22  Q    J?

23  A    Yes.

24  Q    And K?  K is another blank?

25  A    Yes.

A. Pere - direct - Lax                                    835

1              MR. LAX:  So the Government will offer Government

2    Exhibits 1344-A, B, C, D, F, G, H, I, and J, all those, except

3    for the two blanks.

4              MR. PRICE:  No objections, Your Honor.

5              THE COURT:  Those documents are received without

6    objection.

7              (Government's Exhibits 1344-A, B, C, D, F, G, H, I,

8    and J received in evidence.)

9              MR. LAX:  And if we could please pull up and publish

10   1344-A.

11   Q    All right.  So this is the top e-mail, another e-mail

12   from the defendant at his Vitol address to one of your e-mail

13   addresses?

14   A    Correct.

15   Q    And what's the date?

16   A    October 25, 2017.

17   Q    There's two attachments to this.  The first one is called

18   Ecuador letter; is that right?

19   A    That's right.

20   Q    And then there's that blank file, and then re:  Invoices,

21   a second one?

22   A    Yes.

23   Q    And then another blank?

24   A    Yes.

25             MR. LAX:  Just to orient and then we will come back

A. Pere - direct - Lax                                     836

1   to this, can we pull up 1344-B.

2   Q    The subject line here is Ecuador letter; is that right?

3   A    That's right.

4   Q    And then there's a number of attachments to this

5   attachment?

6   A    Yes.

7   Q    And then let's jump ahead, please, to 1344-F and the

8   subject line here is re:  Invoices?

9   A    Yes.

10  Q    And then there are also a number of attachments to this

11  attachment; is that right?

12  A    That's right.

13  Q    Okay.  Let's just go back now, please, to 1344-A.  Let me

14  know if that's too small.  Are you able to read that?

15  A    No, I can.

16  Q    So this is a portion of an e-mail that is forwarded to

17  you; is that right?

18  A    Correct.

19  Q    Who are the people on the e-mail here that's forwarded?

20  Do you know any of them?

21  A    Javier Aguilar.

22  Q    How about Alexander Caldin?

23  A    No.

24  Q    Hernan Scolari?

25  A    No.

A. Pere - direct - Lax                                837

1  Q     Rick Evans?

2  A     No.

3  Q     Jose Luis Morena?

4  A     Yes.

5  Q     Who is that?

6  A     That's somebody that acted on behalf of Vitol in Ecuador.

7  I don't know if he is a representative, but I remember him

8  going to PetroEcuador to present offers or letters or

9  communications.

10 Q     Have you met him before?

11 A     No, I never met him.

12 Q     And Dominique Laborde?

13 A     No, I don't know her.

14 Q     So this e-mail begins, Jose Luis had a meeting with

15 Cisneros today.  Do you know who those two people are?

16 A     Cisneros was the international trade manager, and Jose

17 would be Jose Luis Moreno.

18 Q     The first paragraph beneath that, can you explain what

19 that means, the paragraph that begins Cisneros essentially

20 said?

21 A     Yes.  They are talking about the difference in prices

22 that Cisneros was having with Vitol, and also about a payment,

23 a payment of interest.  But in summary, it has to do with

24 pricing of the fuel oil.

25 Q     Is this the same pricing issue you were referring to

A. Pere - direct - Lax                                   838

1   earlier?

2   A     Yes.

3   Q     Approximately how long did this pricing issue go on for?

4   A     It went on almost until the end of the contract.

5         MR. LAX:  If we can now please show just the witness

6   and the parties Government Exhibit 1666.

7   Q     Do you recognize Government Exhibit 1666?

8   A     Yes.

9   Q     What is it?

10  A     An e-mail I sent to Javier Aguilar.

11  Q     On what date?

12  A     December 13, 2017.

13  Q     And the attachment to this, Government Exhibit 1666-A, do

14  you recognize the attachment?

15  A     Yes.

16        MR. LAX:  The Government offers Government Exhibit

17  1666 and 1666-A.

18        MR. PRICE:  No objections, Your Honor.

19        THE COURT:  Received without objection.

20        (Government's Exhibits 1666 and 1666-A received in

21  evidence.)

22        MR. LAX:  If we can please pull up and publish

23  Government Exhibit 1666.

24        (Exhibit published.)

25  Q     All right.  So we have seen these e-mail addresses

A. Pere - direct - Lax                                     839

1    before; is that right?

2    A    That's right.

3    Q    From you to the defendant?

4    A    Yes.

5    Q    Let's look at the attachment, please, 1666-A.  What is

6    this attachment?

7    A    This is a draft of a letter for OTI to send to the

8    minister in regards to the price issue.

9    Q    Where do you see the price issue?

10   A    In paragraph 1, it says, The actual loading dates occur

11   the first days of the following month, causing us serious

12   problems, other costs, and most important not pricing the

13   product with the corresponding assignment.

14   Q    And then what's the item under number two?  What does

15   that refer to?

16   A    It again has to do with the price also.

17             MR. LAX:  Can we just turn back to 1666 for a

18   moment.

19   Q    All right.  So this draft is sent December 13, 2017?

20   A    Yes.

21             THE COURT:  Now, just for the witness and parties,

22   please, Government Exhibit 1374.

23   Q    Do you recognize Government Exhibit 1374?

24   A    Yes.

25   Q    What is it?

1    A    An e-mail I sent to Javier Aguilar.

2    Q    On what date?

3    A    On January 22nd of 2018.

4    Q    And the attachment to this e-mail, Government Exhibit

5    1374-A, do you recognize that?

6    A    Yes.

7         MR. LAX:  The Government offers Government Exhibit

8    1374 and 1374-A.

9         MR. PRICE:  No objections, Your Honor.

10        THE COURT:  With no objection, the document is

11   received.

12        (Government's Exhibits 1374 and 1374-A received in

13   evidence.)

14        MR. LAX:  All right.  If we could please pull up

15   publish 1374.

16        (Exhibit published.)

17   Q    All right.  So we're now January 2018?

18   A    Yes.

19   Q    At this point, approximately how long has the fuel oil

20   contract been underway?

21   A    One year.

22   Q    And the e-mail is from one of your e-mail addresses?

23   A    Yes.

24   Q    To one of the defendant's e-mail addresses?

25   A    Yes.

A. Pere - direct - Lax                          841

1    Q    The 007 e-mail address?

2    A    Correct.

3    Q    Let's look at 1374-A, please, the attachment.  What is

4    this attachment?

5    A    It's a draft of a letter to be signed by OTI and sent to

6    the international trade manager Mauricio Samaniego.

7    Q    What happened to Cisneros?

8    A    Cisneros left.

9    Q    Who wrote this?

10   A    I did.

11   Q    Why?

12   A    Because we needed for OTI to send a letter raising the

13   price issues they were having.

14   Q    Who did you mean by "we"?

15   A    Javier Aguilar and myself.

16   Q    Where do you see the price issues in the letter?

17   A    It says that due to the price adjustments required by

18   PetroEcuador the contract has lost its economic value and they

19   are -- and they want to assign the contract to a third-party.

20   Q    How, if at all, did Samaniego replacing Cisneros affect

21   your ability to work with PetroEcuador?

22   A    Well, it helped lot.  Actually, it allowed me to do the

23   same coordination I was able to make with Nilsen Arias even

24   though not directly with him.

25   Q    What do you mean by same coordination?

1  A    What you see here, drafting letters, having Samaniego

2  write letters or receive letters and try to solve any problems

3  that were related to the contract and also explore or try to

4  continue with other projects we had talked with Vitol before.

5  Q    You mentioned that you didn't do that directly.  What did

6  you mean by that?

7  A    Well, I didn't know Samaniego, so there is a person that

8  was named by Jose Agusto called Nicolas Naranjo.  He didn't

9  work for the government, but Jose Agusto told Mauricio

10  Samaniego that Nicolas Naranjo was somebody close to Jose and

11  that they should meet in order to talk about projects in

12  Samaniego's area.

13  Q    Did you have any conversations with the defendant about

14  Samaniego's appointment?

15  A    Yes.

16  Q    Can you describe those conversations?

17  A    I told him that the new manager was somebody we could

18  work with, somebody I could influence.

19  Q    What did you mean by that?

20  A    I mean somebody who could be part of the business

21  individually, somebody that could be paid a bribe.

22  Q    I'm holding up Government Exhibit 10, which is in

23  evidence.  Can you see who that is?

24  A    Nicolas Naranjo.

25          MR. LAX:  I'm not going to attempt to re-adjust the

A. Pere - direct - Lax                              843

1   board now, but I'll hold him to the side.

2   Q    You mentioned this pricing issue went on for quite a

3   while?

4   A    Yes.

5        MR. LAX:  I'm going to show just for the witness and

6   the parties only, please -- we will go through a number of

7   exhibits -- Government Exhibit 1401-A.

8   Q    Do you recognize 1401-A?

9   A    Yes.

10  Q    If we could also on these -- I just want to show you some

11  of the contents so you can familiarize yourself.

12       Are you able to see what this e-mail is about?

13  A    Yes.  Again, it's related to the price.

14  Q    And 1401-A, I'm sorry, I forgot if I asked.  Who is the

15  e-mail between?

16  A    It is from Zonnia Martinez, somebody who worked at

17  PetroEcuador, sent to Oman Trading, meaning OTI.

18  Q    I'm sorry, I meant at the very top.

19  A    Fuel oil differential proposal.

20  Q    Who's the e-mail from and to?

21  A    From Javier Aguilar to me.

22  Q    All right.  Let's look at 1508, please.

23       Who is e-mail from and to?

24  A    From Javier Aguilar to me.

25  Q    Do you recognize it?

A. Pere - direct - Lax                    844

1  A    Yes.

2  Q    And the date?

3  A    September 12, 2018.

4        MR. LAX:  If we could show.

5  Q    Can you see what the general topic of this e-mail is

6  about?

7  A    Yes, the general topic is price.

8        MR. LAX:  Government Exhibit 1530, please.  Naranjo.

9  Q    Do you recognize this?

10  A    Yes.

11  Q    Who is it between?

12  A    Javier Aguilar and myself.

13  Q    December 8, 2018?

14  A    December 12, 2018, yes.

15  Q    Again, the same question, if you can take a look at the

16  general topic here.

17        What does the e-mail have to do with it?

18  A    It has to do with price.

19  Q    Government Exhibit 1559, please.  Do you recognize this?

20  A    Yes.

21  Q    Who is it from and to?

22  A    From Javier Aguilar to me.

23  Q    And the date?

24  A    February 18, 2019.

25  Q    The general topic?

A. Pere - direct - Lax                                    845

1    A    Price.

2    Q    Still price?

3    A    Yes.

4    Q    And Government Exhibit 1565, do you recognize Government

5    Exhibit 1565?

6    A    Yes.

7

8               (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. Pere - Direct - Lax                           846

1    (Continuing.)

2    BY MR. LAX:

3    Q    What is it?

4    A    E-mail by Javier Aguilar sent to me.

5    Q    And what date?

6    A    March 28, 2019.

7    Q    And what's the general nature or topic of the e-mail?

8    A    Prices, fuel oil price differential.

9          MR. LAX:  The Government offers Government

10   Exhibits 1401-A, 1508, 1530, 1559, and 1565.

11         MR. PRICE:  No objections, Your Honor.

12         THE COURT:  No objections noted.  They are

13   received in evidence without objection.

14         (Government's Exhibits 1401-A, 1508, 1530, 1559,

15   1565 received in evidence.)

16         MR. LAX:  Can we please publish the first one that

17   we looked at, Government Exhibit 1401-A.

18         (Exhibit published.)

19         MR. LAX:  I'm sorry, can we just look at the top

20   to get the date, please?  Thank you, Ms. Jefferson.

21   Q    So the date of this e-mail is what, sir?

22   A    April -- April 3rd, 2018.

23         MR. LAX:  And now, Ms. Jefferson, if we can please

24   show the bottom portion?  Thank you.

25   Q    Just can you describe what this e-mail is about?

A. Pere - Direct - Lax                    847

1   A    It's about price again.

2   Q    What do you mean?  Can you be a little more specific?

3   A    Yes.  It's related to the proposals that OTI or

4   Petroecuador made during the months before in order to avoid

5   using provisional values.  It means that the first semester

6   of the contract used one value, which was clearly stated,

7   but after that, when the price differential had to be

8   agreed, the invoices of Petroecuador would consider, or did

9   consider, the provisional value, meaning the value of the

10  first semester.

11           THE COURT:  And again, you are talking about the

12  fuel oil contract?

13           THE WITNESS:  And -- yes, I'm talking about the

14  fuel oil contract.

15           THE COURT:  That was at this point executed and in

16  place?

17           THE WITNESS:  Yes.

18  Q    And you mentioned earlier, the price issue continued

19  for a long time; is that right?

20  A    That's right.

21  Q    Let me just jump to the last one.  We don't need to go

22  through all the ones we just looked at, but Government

23  Exhibit 1565.  So we are now in, to orient, April 2018,

24  jumping up now almost a full year?

25  A    Yes.

*A. Pere - Direct - Lax*                    848

1    Q    Same types of issues?

2    A    Yes.

3    Q    During this time or around this time, were you or your

4    companies still being paid by the defendant through Hanst,

5    through Hanst's companies?

6    A    No.

7    Q    Did you have a belief as to why?

8    A    I believe --

9    Q    Just -- just for now, just yes or no, did you have a

10   belief as to why?

11   A    Oh, yes.

12   Q    What was that belief based on?

13   A    Based on the fact that we had not been able to fix the

14   price issue.

15   Q    Did you have conversations with the defendant about the

16   price issue around this time?

17   A    Yes.

18   Q    Throughout this period?

19   A    Yes.

20   Q    Why do you believe you were not being paid?

21   A    I believe we were not being paid -- I was not being

22   paid because the price issue was affecting Vitol negatively

23   and Vitol wanted to put some pressure on myself and the rest

24   of the people that worked with me in order to fix that

25   price.

1  Q    What do you mean, the people that worked with you?

2  A    The people in Petroecuador.

3  Q    Did you have conversations with the defendant about

4  that?

5  A    Yes.

6  Q    Can you describe?

7  A    Well, I told him that it was difficult for Petroecuador

8  to reach the prices that Vitol wanted, but that we had to

9  keep on pushing for an agreement and that I was working on

10 it.

11 Q    What did you mean by working on it?

12 A    Talking to the people in Petroecuador, Mauricio

13 Samaniego through Nicolas Naranjo.

14 Q    What impact did you not being paid have on your ability

15 to work with Petroecuador?

16 A    Well, the people in Petroecuador were not that helpful

17 at the time, they didn't want to fix the things, because

18 they were not being paid.

19 Q    What steps, if any, did you attempt to resolve this

20 pricing issue?

21 A    Well, I talked to Nicolas several times.  Nicolas

22 talked to Jose Agusto to put some pressure on Mauricio

23 Samaniego because of Jose Agusto's authority.  And we

24 discussed with Nicolas and he discussed with Mauricio

25 Samaniego other ways or ways for Petroecuador to have an

A. Pere - Direct - Lax                850

1    external opinion about the price so that Petroecuador could

2    make a decision based on a qualified third party.

3    Q    You said we discussed with Nicolas Naranjo.

4         Who did you mean by "we"?

5    A    Me, my brother Enrique.

6    Q    And then you referred to an external opinion.

7         What did you mean by that?

8    A    I asked Javier Aguilar for names of consulting

9    companies or consultants that could be hired by Petroecuador

10   to study the price issue and give a recommendation.

11   Q    Did he provide any information in response to your

12   request?

13   A    He gave me two resumes.  I'm sure one resume, and this

14   was the resume of a consultant that could do the work.  But

15   I had insisted in that it should be a company or that a

16   company's participation would have some more weight in the

17   decision.  And the resume I got didn't have all the

18   qualifications needed for somebody to go and do that work.

19   Q    Did you take other steps to attempt to resolve the

20   pricing issue?

21   A    Constant coordination and communication with Nicolas,

22   pushing for Petroecuador to solve it.

23   Q    Did you make additional offers of bribes?

24   A    Yes.

25   Q    To who?

1    A    To Nicolas.

2    Q    Who were those offers of bribes intended for?

3    A    For Jose Agusto, for Mauricio Samaniego, for other

4    low-ranking people from Petroecuador and also payment to

5    Nicolas.

6    Q    What amount was offered?

7    A    Six cents.  Close to $0.06.

8    Q    Six cents per barrel?

9    A    Per barrel.

10   Q    Was that for one person, for more than one person?

11   A    That was for more than one person.  That was, again,

12   for the people I mentioned before.  Jose Agusto, Nicolas,

13   Mauricio Samaniego, and other three people in Petroecuador.

14         MR. LAX:  I would like to show you, the witness

15   and the parties, please, 504-A-1.

16   Q    Do you recognize Government Exhibit 504-A-1?

17   A    Yes.

18   Q    What is it?

19   A    It's a page from one of my notebooks.

20         MR. LAX:  The Government offers Government

21   Exhibit 504-A-1.

22         MR. PRICE:  No other objections.

23         THE COURT:  It is received in evidence.  And the

24   objection will continue.

25         (Government's Exhibit 504-A-1 received in

1    evidence.)

2         THE COURTROOM DEPUTY:  Sorry about that.  Having

3    issues again.

4    Q    Mr. Pere, what is this note?

5    A    This is a note I made in regards to issues I dealt with

6    Javier Aguilar.  And I made several notes here.  First, the

7    price that had to be set from January to June of 2019.  I

8    make a note there will also that says $0.06 for NN, meaning

9    Nicolas Naranjo.

10   Q    How do you know that this relates to the defendant?

11   A    Because it says TexMex at the top.

12   Q    And what are the remainder of the notes, here?

13   A    The second item here is price for 2018.

14   Q    What did you mean by that?

15   A    That the price for 2018 had to be set.

16   Q    What do you mean?

17   A    Meaning that the price of the crude oil that OTI was

18   buying during 2018 had the same price that the contract had

19   at the beginning, so the price had not been renegotiated

20   during 2018.

21   Q    Crude oil?

22   A    Fuel oil.

23   Q    What are the remainder of the notes, here?

24   A    The third note says vessels, TexMex had not responded.

25   I'm not sure what that note means.

1    Q    And the other two?

2    A    Crude oil with 500 million, like Trafigura, referring

3    to a crude oil contract with a loan.

4    Q    What crude oil contract?

5    A    The crude oil contract we talked before when we

6    mentioned that OTI could offer three projects, being one of

7    them, a crude oil contract with a loan facility.

8    Q    Was that something that was finalized?

9    A    No, it wasn't.

10   Q    And then just what's the last line there?

11   A    Products.  It says products.  Meaning we had to talk

12   about products which refers to gasoline and diesel and see

13   if Vitol, through OTI, could sell the products.

14   Q    I would like to now return to Government

15   Exhibit 515-A-2, which is in evidence.

16          MR. LAX:  This is the one, Ms. Jefferson, that we

17   had yesterday.  Thank you.

18          (Exhibit published.)

19   Q    Page 4.  So which notebook, again, is this from?

20   A    This is the notebook where I wrote down the payments

21   made and some other considerations in regards to payments

22   that would be made or distribution of commissions.

23   Q    So we talked yesterday about the January 2nd, 2019,

24   entry for Del Hierro, but not the two beneath it.

25          What's the one right beneath it, January -- is

1    that 20 -- 2019?

2    A    That one says OTI/Baker, $0.06 per barrel, from January

3    to June 2018.  And 200,000 for the year 2018.

4    Q    What does OTI/Baker mean?

5    A    Well, OTI, Oman Trading and Baker was a name we used to

6    refer to Nicolas Naranjo.

7    Q    When you say "we," who do you mean by "we"?

8    A    Enrique, myself.

9    Q    Where did Baker come from?

10   A    When Nicolas Naranjo went to meet for the first time

11   with Mauricio Samaniego, he didn't and I didn't for Mauricio

12   Samaniego to know that I was behind those contracts.  So

13   Nicolas needed to have a source, needed to have somebody

14   that contacted him for handling projects with Petroecuador.

15        When he was on the way to meet with Mauricio

16   Samaniego, Nicolas called me and since he's a lawyer, he

17   told me he would tell Samaniego that a law firm from the

18   United States had contacted him to help them with issues

19   related to Petroecuador.  That Nicolas asked me if I knew of

20   a law firm in the U.S. that specialized in oil.

21        So he was in the car, he was on the way to meet

22   Mauricio Samaniego.  And I just Googled law firms, oil.  And

23   the name of a law firm called Baker Botts came up and that's

24   the name that I gave for Nicolas to use in his meeting with

25   Samaniego.  He would say he had been contacted by that law

A. Pere - Direct - Lax                      855

1   firm to work -- to help him -- to help the law firm with the

2   issues and the projects at Petroecuador.

3   Q    That's how Nicolas became Baker?

4   A    Yes.

5   Q    Did you earn another nickname Botts part of that?

6   A    Yes.

7   Q    What was that?

8   A    Dr. Botts.

9   Q    Turning back to the note, $0.06 per barrel, does that

10  say January to June, 2019?

11  A    Yes.

12  Q    Can you explain what that means?

13  A    That means that I would pay Nicolas Naranjo and,

14  obviously, through him, to the people in Petroecuador I

15  already mentioned, $0.06 per barrel of fuel oil exported by

16  Petroecuador during the period of January through June of

17  2019, meaning, the barrels of fuel oil, bought by OTI.

18  Q    And then the entry beneath it, 200,000, what does that

19  say after that?

20  A    That I had to pay 200,000 for the year 2018.

21  Q    Pay who?

22  A    Again, Nicolas Naranjo.

23  Q    Was that a lump sum instead of a per-barrel fee?

24  A    Yes.

25  Q    Let me now direct your attention to the note right

1    beneath it.

2            What is the date of that note?

3    A    May 8th, '19 -- 2019.

4    Q    Can you please -- well, let's just start with the first

5    line.  What's that first line?

6    A    The first line talks about calculations for the fuel

7    oil exported during 2018.  And then it says V-I-T, meaning

8    Vitol.

9    Q    And the next line in that calculation?

10   A    It says total payment, $0.25 times 190, meaning

11   190,000 barrels, times three, because there were three

12   cargos of 190,000 barrels per month, times 12 months.

13           It meant 6,000,840 barrels, which, doing that

14   math, resulted in $1,000,710.

15   Q    Which signified what?

16   A    That's the commission that Vitol had to pay me for the

17   crude oil bought by OTI during 2018.

18   Q    Beneath that, then, it says minus, and there's bunch of

19   entries.

20           Can you -- can you walk us through that, please?

21   A    It says minus the success fee of $0.03 per barrel,

22   which was $205,000.  The next line under the minus title

23   says Del Hierro, meaning Javier Aguilar, $10,000 per month.

24   Then the next line says juice, referring to Nilsen Arias,

25   $0.02 per barrel, resulting in 136,000 for the year.  And

A. Pere - Direct - Lax                              857

1  then the Nicolas Naranjo group, 200,000.  The difference,

2  that says colo, would be the amount for me, 1 million 48.

3  Q    And these are amounts that you were calculating as

4  opposed to amounts actually paid?

5  A    Yes.

6  Q    Del Hierro reduced, is that right, from what we were

7  talking about yesterday?

8  A    Yes.

9  Q    And the same for Nilsen Arias, Juice?

10  A    Yes.

11  Q    Why?

12  A    Because at this point there were additional people that

13  had to be paid, meaning Nicolas Naranjo and his group.  So I

14  adjusted all the numbers for the people involved since the

15  beginning.  And that's why I made that note and those

16  adjustments.

17  Q    Were these offers actually made?

18  A    Yes.

19        MR. LAX:  Can we show the witness, please,

20  Government Exhibit 1565?

21        You know what, Your Honor, may I have permission

22  to approach the witness?

23        THE COURT:  You may.

24        MR. LAX:  I am handing the witness what is marked

25  for identification Government Exhibits 3015 and 3015-T.

1  Q    Turning to Government Exhibit 3015, just take a moment

2  to familiarize yourself with it and look up at me when you

3  are ready.

4  A    Yes.  These are text messages.

5  Q    Between who?

6  A    Between Javier Aguilar and me.

7  Q    What type of text messages?

8  A    These were -- I'm pretty sure it was WhatsApp

9  application, because that's the one that we usually used.

10  Q    What's the date range of those messages?

11  A    From April 2019 -- in this first part -- through

12  July 11, 2020.

13        And in the second part --

14  Q    The second part, is that referring to 3015-T?

15  A    Correct.

16        MR. LAX:  I would like to offer -- first, let's

17  pull up Government Exhibit 8007, please.

18        This is a stipulation between the parties.  I will

19  offer it at this time, Government Exhibit 8007.

20        THE COURT:  Please.

21        MR. PRICE:  No objection.

22        THE COURT:  Are you reading it, Mr. Lax, are you

23  just going to put it in?

24        MR. LAX:  Yes, I am happy to read it.  It is

25  hereby stipulated and agreed by and between the undersigned

1  parties that Government Exhibit 3015 is a true and accurate

2  copy of electronic communications involving the Defendant,

3  Javier Aguilar, and Antonio Pere, via the application known

4  as WhatsApp, which were downloaded from Antonio Pere's

5  cellular telephone.

6            Government Exhibit 3015-T is a fair and accurate

7  Spanish-to-English translation of Government Exhibit 3015.

8  Government Exhibits 3015-T-A through 3015-T-H are fair and

9  accurate excerpts of 3015-T.  The materials described above

10 are all authenticated for purposes of Federal Rule of

11 Evidence 901.

12           And it continues on the next page just saying that

13 this stipulation marked as Government Exhibit 8007 is

14 admissible in evidence at trial and it is signed by the

15 parties and dated January 3rd, two thousand -- I don't know,

16 I can't make that out, but that's '24, not -- not '14.

17           MR. PRICE:  So stipulated.

18           THE COURT:  Received.

19           MR. LAX:  I will blame one of my colleagues for

20 the handwriting on that one.

21           THE COURT:  Received in evidence.

22           (Government's Exhibit 8007 received in evidence.)

23           MR. LAX:  All right.  So can we please pull up,

24 just for the witness right now, Government Exhibit 3015-T-A.

25 Q    All right.  I am showing you, Mr. Pere, Government

1   Exhibit 3015-T-A.  This is one of the excerpts from the

2   stipulation.

3            I want to draw your attention, first, just to the

4   date range.

5            MR. LAX:  Ms. Jefferson, if we could just expand

6   the first bubble.

7   Q    What's the date of the first message in this excerpt?

8   A    April 3rd, 2019.

9   Q    And then if we could turn to the last page, and,

10  Mr. Pere, if you could tell me the date of the last message

11  in this excerpt?

12  A    May 9, 2019.

13           MR. LAX:  The Government offers Government

14  Exhibit 3015-T-A.

15           THE COURT:  That's pursuant to the stip or is that

16  separate?

17           MR. LAX:  It's part of the stip.

18           MR. PRICE:  The stipulation, Your Honor, is

19  authenticity.  And I haven't had time to read all of these

20  to see whether they are relevant because it's a number, so

21  at this point, I have to object because -- on relevance.  If

22  I had time to look through them all, we might be able to

23  reach an agreement.

24           MR. LAX:  These were produced to the defense, Your

25  Honor, quite a while ago.  I am happy to address at sidebar.

A. Pere - Direct - Lax                    861

1            THE COURT:  Why don't you just -- since we can

2    probably capture it at sidebar, probably smart to do it that

3    way.

4                 (Sidebar.)

5                 (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                        862

1          (Sidebar conference held on the record out of the

2    hearing of the jury.)

3          MR. LAX:  So these were all produced, I think, I

4    don't have the exact date of production, I can look it up,

5    but quite a while ago.

6          I'll tell you, Mr. Price, we are going to be

7    offering all of the excerpts.  It's five to 1:00.  I am

8    happy to break now if you want to take look at them over the

9    lunch break and not go through it now.

10          THE COURT:  Well, I mean, I am content to take

11    them and strike them subject to your representation.

12          MR. LAX:  These are all text messages between this

13    witness and the defendant.  They had no other business other

14    than this charged conspiracy.  They're all relevant.  You

15    know, we've excerpted them within particular time periods.

16          THE COURT:  That's why I was willing to go out on

17    the limb.  To me, it has to be very sturdy.

18          MR. PRICE:  I mean, one way to do it, because you

19    are not going to talk about them all at once, as you put it

20    on the screen to the witness, I won't object if it seems to

21    be relevant.  You know, that's how we have been doing it.

22    And it seems like a way to do it, that way I will see it,

23    see exactly which one you are going to be talking about, and

24    my guess is I will say no objection.

25          THE COURT:  So you need a few more seconds, in

*Sidebar*                                                              863

1    other words?

2          MR. PRICE:  I am just saying that Mr. Lax can

3    simply say, I would like to show the witness page 1, is that

4    one of your texts, and then that will give me a chance to

5    look at it, he will say I move it in, and I will say fine or

6    he will say I want to show it and I will say I have no

7    objection.  I mean, that's kind of how we have been doing

8    it.

9          MR. LAX:  How is that different from what I just

10   did?

11         THE COURT:  I think you tried to put them all in.

12         MR. LAX:  No.  I offered this one now just

13   establishing the date range.  It's a continuous chain.

14         THE COURT:  So you are going to continue doing

15   what we have been doing?

16         MR. LAX:  Right.

17         MR. PRICE:  Yes, but you are offering 10 pages.

18         MR. LAX:  There's like two messages on a page.

19         MR. PRICE:  Oh, that's what I am saying.  Just

20   show it.  If you just show him that page and say I would

21   like to publish it.

22         THE COURT:  Before you start questioning on that

23   page.

24         MR. PRICE:  Yeah.  And I will say no objection.

25   It's what you have been doing.  I assume you will show him

*Sidebar*                                                                    864

1   one page, then I would like to publish, no objection, then

2   publish it.

3          THE COURT:  Or if you have multiple pages on the

4   same, like you have, you know, Exhibits A, B, C, C.

5          MR. LAX:  I mean --

6          THE COURT:  I don't think it's any different.

7          MR. LAX:  I don't.  I think it's going to take

8   much longer and I am hoping to get through these and keep

9   moving.  They are excerpts that are really not that long.

10  They were provided quite a long time ago.

11         If we want to do it --

12         MR. GALEOTTI:  We are at the break.

13         MR. LAX:  We are at the break.  If there is

14  something that is not relevant that you are going to object

15  to relevance --

16         MR. PRICE:  Here's the thing, you will say you

17  want to publish and I would say either objection or no

18  objection.  That doesn't take any time.  I don't know why we

19  are doing it differently.  We can go over these during the

20  break.  If you mean to go over A through --

21         MR. LAX:  H.

22         MR. PRICE:  -- H?  I'm not sure we can do all

23  that, but we can try.

24         THE COURT:  How many pages does it all come to?

25         MR. LAX:  I don't have it handy.

*Sidebar*                                                           865

1          THE COURT:  I didn't see it.

2          MR. LAX:  Each excerpt, some of them are five

3     pages, one or two are 15, but the text messages blocks are

4     like this, so there's only two or three text messages on a

5     page.

6          THE COURT:  So it's not like letters that are

7     going up and down the whole page?

8          MR. PRICE:  No.  There are attachments.

9          THE COURT:  You can review them at lunch.

10         MR. LAX:  I am trying to get a way to do this more

11    efficiently, so we can confer --

12         MR. PRICE:  I want you to finish, too.

13         MR. LAX:  -- over lunch.

14         THE COURT:  I think that to the extent that there

15    is some way to preview before you go on, for Mr. Price to

16    sort of preview, there's no objection, this way you can put

17    them in as a block and then get it admitted as a block.

18         MR. LAX:  Sure.  Yeah, I mean, in general, I have

19    to see if there's other things in general.  These have to do

20    with communications between Mr. Pere and the defendant about

21    this differential issue that we have been talking about.

22    You know, I've got a couple excerpts about that and related

23    issues.  I think there is some text message in there about

24    getting, you know, the Bills of Lading or the barrel

25    information from Lionel to facilitate.

*Sidebar*                                                    866

1          THE COURT:  But things you are going to do for the

2    day, get together in advance, because all you are doing is

3    you are giving an hour head start.

4          MR. LAX:  Yes, I imagine I could easily get

5    through these in about an hour or so.

6          THE COURT:  I am saying each day, to the extent

7    that we are having big batches of documents a day, if

8    there's some way to sort of prescreen them, then we know

9    that there will be no objection and you can put them all in

10   at once.

11         MR. LAX:  Perfectly happy to do that if we can

12   going forward.

13         THE COURT:  If you can.

14         MR. LAX:  Like I said, we tried that earlier on

15   and the parties just weren't able to reach an agreement and

16   that's why we sort of have come to this practice by dealing

17   with this document by document.  I am happy then to confer

18   with Defense Counsel.  If we can do a daily batch and we are

19   not going to have issues and move them in, great, I would

20   love that.  I think everybody would.  Including, probably

21   most importantly, the jury.

22         THE COURT:  Yes.

23         MR. LAX:  So Mr. Price and I will confer over the

24   lunch break.  I don't know that I will get to every single

25   one of these today, just the way in which the order I am

*Sidebar*                                                                867

1  going, so I will --

2          MR. PRICE:  I am hoping for you that you do.

3          MR. LAX:  It's going to be mixed with recordings,

4  and so that will take some time.

5          In any event, we will confer over the lunch break

6  and try to make this as expedient as possible.

7          THE COURT:  That works.

8          (Sidebar conference ends.)

9          (Continued on following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. Pere - Direct - Lax                    868

1          (In open court.)

2          THE COURT:  Thank Counsel, thank the jury for

3    their patience.

4          In conferring with Counsel it makes sense for us

5    to take the lunch break at this time.  So we shall do that.

6    The usual admonitions apply.  Continue to keep an open mind.

7    Don't discuss the case amongst yourselves or with anyone

8    else.  No homework rule applies and continues, but also we

9    remain on radio silence.  No communication about the fact

10   that you are here or anything that touches on the case.  To

11   the extent that anything pops up on social media or other

12   media during the lunch break that relates to this case, tune

13   it out, disregard it, don't listen to it, don't watch it,

14   don't read it.

15         Last we heard, it's still pretty cold out there,

16   but you are free to brave the outside elements.  The

17   cafeteria remains open as far as I'm told.  We will ask you

18   to come back to the central jury room at around no later

19   than 2:15 or so.  We will try to start as close to --

20   between 2:15 and 2:30 as we can.  Enjoy your lunch.

21         Again, we all appreciate your patience, your

22   heartiness, your attentiveness, and I look forward to seeing

23   you after lunch safely.

24         (Jury exits.)

25         (Witness steps down.)

1          THE COURT:  Okay.  Then we will break for lunch.

2   We give the usual rules the chance to work again.  William

3   will lock the courtroom.  If you need something, take it.

4   Otherwise, leave it.

5          And good luck to the conferees, maybe they will

6   agree and the bill will pass both houses.

7          MR. LAX:  Thank you very much, Your Honor.

8          THE COURT:  See you after lunch.  You are welcome.

9          (Luncheon recess taken.)

10

11         (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    AFTERNOON SESSION
 2              (In open court - jury not present.)
 3              THE COURTROOM DEPUTY:  All rise.
 4              (Judge ERIC N. VITALIANO entered the courtroom.)
 5              Court is back in session.  Counsel for both sides
 6   are present, including defendant.
 7              THE COURT:  Have we worked out our concerns,
 8   counsel?
 9              MR. LAX:  I think so, Your Honor.
10              The Government is just going to offer all those
11   excerpts.  I understand there's no objection from the defense.
12              MR. PRICE:  That's correct, Your Honor.
13              THE COURT:  That works.  We'll do that when the jury
14   is present.
15              And otherwise we're ready?
16              MR. LAX:  Yes, Your Honor.
17              THE COURT:  Let's bring them in.
18              MR. LAX:  All right, I'll get the witness.
19              THE COURT:  Yes.
20              (Pause.)
21              (The witness entered and resumed the stand.)
22              THE COURT:  Jon, is that podium thing working now?
23              MR. LAX:  Yes, Your Honor.
24              THE COURT:  Good news.
25              MR. PRICE:  Your Honor, assuming this is all on the
```

*Proceedings*                                                              871

1    record.  We are not getting realtime at the moment.

2              (Pause.)

3              (Jury enters.)

4              THE COURT:  Be seated, please.

5              Counsel will stipulate that the jury is present and

6    properly seated?

7              MR. LAX:  Yes, Your Honor.

8              MR. KOFFMANN:  We do, Your Honor.

9              THE COURT:  Thank you, counsel.

10             Ladies and gentlemen, welcome back.  Hope you had

11   the opportunity to enjoy a good lunch and enjoy yourself.  We

12   are ready to resume in the afternoon session.

13             Mr. Pere is back on the stand.  Mr. Lax continues

14   his direct examination.

15             MR. LAX:  Thank you, Your Honor.

16             At this time, the Government offers Government

17   Exhibits 3015-T-A through H.

18             MR. PRICE:  No objection.

19             THE COURT:  Received in evidence without objection.

20             (Government's Exhibits 3015-T-A through 3015-T-H

21   were received in evidence.)

22             MR. LAX:  And, Ms. Jefferson, if we could please

23   pull up Government Exhibit 3015-T-A.

24             (Exhibit published.)

25             MR. LAX:  Okay.

A. Pere - direct - Lax                                                872

1    **ANTONIO PERE**,

2         called as a witness by the Government, having been

3         previously duly sworn/affirmed by the Courtroom Deputy,

4         was examined and testified further as follows:

5    DIRECT EXAMINATION (Continuing)

6    BY MR. LAX:

7    Q    Mr. Pere, can you see that?

8    A    No, I can't.

9    Q    I'm sorry.  Just pull the microphone a little closer to

10   you so I can hear you.

11   A    What page is that?

12   Q    So, we can work, we can work on the screen.

13   A    On the screen.

14   Q    I just want to make sure your monitor was working.

15   A    No, my monitor is not working.

16   Q    You don't see anything on your screen?

17   A    No, it's -- it's dark.

18              MR. LAX:  Spoke too soon, Your Honor.

19              THE COURT:  I know.  I just came down from chambers

20   in an IT session.  Hopeless.

21              THE COURTROOM DEPUTY:  It's working now.

22              MR. LAX:  Thank you.

23              THE COURT:  You got it working, William?

24              THE COURTROOM DEPUTY:  Surprising, yes.

25              THE COURT:  Try again, Mr. Lax.

1            MR. LAX:  All right.

2            Let's please first zoom in on the participant

3    section.  All right.

4    BY MR. LAX:

5    Q    Now, before we left for the lunch break, this is -- these

6    are extracts of WhatsApp chats between you and the defendant?

7    A    Yes.  Yes.

8    Q    Now, I see the defendant's name and Tuco.

9            Who is that?

10   A    That's me.

11   Q    Okay.

12           MR. LAX:  Can we zoom out, please, and let's look at

13   just the first, the very first bubble there.

14   Q    All right.  So just the very first message in this simply

15   says:  Messages to this chat and calls are now secured with

16   end-to-end encryption.  Tap for more info.

17           Is that right?

18   A    That is right.

19   Q    Let's now look at the second message on this page.

20           Who is the sender and who is the recipient of this

21   message?

22   A    I am the sender and the recipient is Mr. Aguilar.

23   Q    Okay.  Where do you see that?

24   A    On top where it says from/to.

25   Q    Is there any -- there's an attachment to this.

1           Is there any writing to this particular message?

2   A    No.  I don't see any writing, just the attachment.

3   Q    All right.  Now, before we go to the attachment, just to

4   orient -- to orient everybody.

5           So, the green messages in these messages are your

6   messages?

7   A    Yes.

8   Q    And the blue on the left side are sent by who?

9   A    By Javier Aguilar.

10  Q    All right.

11          MR. LAX:  Could we please, sorry, Ms. Jefferson, I

12  just wanted to get the date of that message.

13  A    April 3rd, 2019.

14  Q    All right.

15          MR. LAX:  Let's look at the attachment, please.

16          (Exhibit published.)

17  Q    All right, so here's the attachment.

18          What -- what is this attachment that you sent?

19  A    This is an e-mail regarding the fuel oil price again, the

20  price differential.  And it's sent to Mauricio Samaniego

21  from -- from Sam Naylor OTI.

22  Q    How did you get this?

23  A    I got it from Nicolas Naranjo.

24  Q    And why did you send it to the defendant?

25  A    Just for him to know we were working on this.  I would

1    have to read it to -- to know exactly what detail.

2    Q     Please.

3    A     Okay.  Okay.  This is OTI saying that they want to meet

4    with Mauricio regarding the pricing issue that had not been

5    resolved, that they could meet in Dubai, London or Houston,

6    and that they were interested in renewing the fuel oil

7    contract.

8              MR. LAX:  Okay.  Let's go to the next page, please.

9              THE COURT:  Mr. Lax, so the record is clear, when

10   you say attachment, that's part of that Exhibit --

11             MR. LAX:  It's part of the exhibit, yes.

12             THE COURT:  -- T-A?

13             MR. LAX:  Yes, Your Honor.

14             So, this is page 3 of Government Exhibit 3015-T-A.

15   BY MR. LAX:

16   Q     Let's look at the top two messages in blue.

17             What did the defendant send you here?

18   A     First message is saying:  Hi.  And the next message he's

19   saying that Mauricio Samaniego is not replying to the

20   invitation to meet with OTI.

21   Q     What's that in reference to?

22   A     That's in reference to the pricing issue and the

23   possibility of renewing the contract.

24   Q     And then let's look at your response, please, right

25   beneath it.

1    A    I will discuss with you tomorrow.

2    Q    All right.  And what's the date of that message?

3    A    That's April 14, 2019.

4    Q    Okay.

5            MR. LAX:  Same exhibit, can we please jump ahead to

6    page 5.

7    BY MR. LAX:

8    Q    And the message in blue on the left.  This is a message

9    from the defendant to you?

10   A    Yes.

11   Q    What is this message?

12   A    It's saying that yeah, Mauricio is ready to meet, that he

13   will discuss with his boss about meeting in Houston.

14           MR. LAX:  Let's turn to page 6, please.  And the

15   very top left message.

16   Q    Now, this is -- this is still the same day, April 17th,

17   is that right?

18   A    That's right.

19   Q    When the defendant wrote to you:  I'm going to have lunch

20   with the person today, what did you understand that to mean?

21   A    That he was going to have lunch with Mauricio.

22   Q    Do you know if that meeting ever happened?

23   A    I know they met.  I don't know if they had lunch.

24   Q    How do you know that they met?

25   A    Because I was told by Nicolas Naranjo.

A. Pere - direct - Lax                                                    877

1    Q     What did Nicolas say about the meeting?

2    A     He said they met.  I believe they met a couple of times

3    in Houston.

4    Q     Have you ever met with the defendant in Houston?

5    A     Yes, I have.

6    Q     Approximately how many times?

7    A     I don't know, six, eight times.

8          MR. LAX:  Let's jump ahead to Government

9    Exhibit 3015-T-B in evidence.

10         (Exhibit published.)

11   BY MR. LAX:

12   Q     All right.  So we're looking at another extract here from

13   the same chat, is that right?

14   A     Yes.

15   Q     Let me direct your attention to the first message here,

16   upper right-hand portion.

17         You sent this message on what day?

18   A     On May 18, 2019.

19   Q     And what did you write?

20   A     I will be available in Houston from Thursday, the 23rd,

21   at 7 p.m. until Friday, the 23rd, at 3 p.m.  Topics:  Fuel oil

22   and LPG price.

23         MR. LAX:  So let's jump ahead to the 23rd, page 3 of

24   this exhibit.

25   A     I want to direct your attention, Mr. Pere, to the --

1          MR. LAX:  Ms. Jefferson, let's zoom in on the bottom

2   two messages.  All right.

3   BY MR. LAX:

4   Q    So, now we're on May 23, 2019, is that right?

5   A    That is correct.

6   Q    And what did you write?

7   A    I'm in Houston now.  Is it okay with you if we meet

8   tomorrow at 9:30 or I don't know, you tell me.

9   Q    What was the defendant's response?

10  A    Is in my office all right?

11         MR. LAX:  Can we go to the next page please of the

12  exhibit, page 4.

13  Q    And how did you reply?

14  A    Yes, perfect.

15  Q    Now, I'd like to direct your attention, the same page,

16  there's a message there on the bottom that you sent.

17         You wrote:  In a moment I'll send a doc on FOIL to

18  Marcos Perez for him to read.

19         What did you mean by that?

20  A    I meant that I was sending Javier a document about the

21  fuel oil to his Marcos Perez address, e-mail address.

22  Q    The 007 one?

23  A    Correct.

24         MR. LAX:  Page 6 of the exhibit, please.

25  Q    Now, up at the upper left-hand portion we're into the

1  next day, May 24th, 2019, is that right?

2  A    Yes.

3  Q    And what did the defendant write to you?

4  A    He says:  Come at 9:45 please.  He was a little late.

5  Q    And then I'll draw your attention to the message that you

6  have on the bottom of this page.

7        How did you respond?

8  A    I'll see you 9:45.

9  Q    Let me direct your attention down at the bottom where it

10  says:  1:55:20 p.m. UTC?

11  A    Correct.

12  Q    Do you know what UTC is?

13  A    I know it's a time reference.  I don't know what's the

14  hour difference with Houston.

15  Q    When you wrote 9:45, what -- what time did you mean, a.m.

16  or p.m.?

17  A    a.m.

18        All right.  So we keep our eye on 1:55:20.  Let's go

19  to the very next message.

20        What's the time now?

21  A    6:31.

22  Q    So, a difference of how much approximately?

23  A    Five hours.

24  Q    What did you write in this message?

25  A    Please send me sixto's e-mail again.  Meaning send me an

1  e-mail -- send me again the e-mail you sent me from the

2  sixto's e-mail, Javier Aguilar's e-mail.

3  Q    What's that e-mail?

4  A    That's a new e-mail that Javier Aguilar asked me to use

5  in communicating with him.

6           MR. LAX:  I'd like to look at his response now,

7  please.

8  Q    What was his response?

9  A    SixtoTomas007.  That's the e-mail address.

10           MR. LAX:  If I could now, just for the witness and

11  the parties, show Government Exhibit 1575.

12  BY MR. LAX:

13  Q    Do you recognize Government Exhibit 1575?

14  A    Yes.

15  Q    What is it?

16  A    It's an e-mail from Javier Aguilar's SixtoTomas007 e-mail

17  address sent to me.

18  Q    On what date?

19  A    On May 24, 2019.

20           MR. LAX:  The Government offers Government

21  Exhibit 1575.

22           MR. PRICE:  No objection, Your Honor.

23           THE COURT:  Received without objection.

24           (Government's Exhibit 1575 was received in

25  evidence.)

*A. Perez - direct - Lax*                                            881

1            MR. LAX:  And then before we publish, I'll also show

2    you Government Exhibit 1576.

3    BY MR. LAX:

4    Q    Do you recognize Government Exhibit 1576?

5    A    Yes.

6    Q    What is that?

7    A    It's an e-mail I sent Javier Aguilar saying that I have

8    received.

9    Q    On what date?

10   A    On May 24th, 2019.

11           MR. LAX:  The Government offers Government

12   Exhibit 1576.

13           MR. PRICE:  No objection, Your Honor.

14           THE COURT:  And that one is also received without

15   objection.

16           (Government's Exhibit 1576 was received in

17   evidence.)

18           MR. LAX:  All right.  Could we please publish now

19   Government Exhibit 1575.

20           (Exhibit published.)

21   BY MR. LAX:

22   Q    So, this is the same day as the messages we were just

23   looking at?

24   A    Yes.

25   Q    What is the e-mail address that the defendant used here?

*A. Perez - direct - Lax*                                                882

1  A     SixtoTomas007.

2  Q     And the domain?

3  A     @gmail.com.

4        MR. LAX:  I am going to add that now to the board,

5  Government's Exhibit 50.

6  BY MR. LAX:

7  Q     What was the subject of the e-mail?

8  A     *Prueba*, test.

9        MR. LAX:  And then if we could please show

10 Government Exhibit 1576.

11        (Exhibit published.)

12 BY MR. LAX:

13 Q     This is your response to that e-mail?

14 A     Yes.  Received.

15 Q     Received.  I'm sorry, I interrupted you.

16 A     I said yes, that's my response.

17 Q     Which was what?

18 A     Received.

19 Q     Did you meet the defendant in Houston on May 24, 2019?

20 A     Yes.

21 Q     Where?

22 A     At Vitol's offices.

23 Q     Why did you meet him there?

24 A     To talk about the issues we had pending, just as a

25 follow-up.

A. Perc - direct - Lax                                          883

1   Q    What issues?

2   A    Pricing issues, new -- renewing the OTI contract, and

3   other projects we had been talking about before.

4   Q    Had you been to Vitol's offices before?

5   A    Yes.

6   Q    Approximately how many times?

7   A    I don't know, four or five times.

8   Q    Over what approximate period of time?

9   A    Over four years since 2015 was the first time up until

10  2019.

11  Q    During the course of your dealings with the defendant,

12  did he ever introduce you to anyone else at Vitol?

13  A    Yes.  I met his boss, Mike Loya.

14  Q    Who is Mike Loya?

15  A    He was CEO or the highest authority, at least for Vitol

16  here in the USA, I understand.

17  Q    Approximately how many times have you met Mike Loya?

18  A    About three times.

19  Q    How long were those meetings?

20  A    Less than thirty minutes.

21  Q    Approximately when was the first time that you met Mike

22  Loya?

23  A    In 2015 or first semester of 2016.

24  Q    And where did you meet him?

25  A    At Vitol's offices in Houston.

*A. Perez - direct - Lax*                                          884

1    Q    Did you ever meet with Mike Loya alone?

2    A    No.

3    Q    Who else was present?

4    A    Javier.

5    Q    Javier?

6    A    Aguilar.

7    Q    In advance of your meeting with Mike Loya the first time,

8    did you have any conversations with the defendant about that

9    meeting?

10   A    Yes.

11   Q    Can you describe that conversation, please?

12   A    Basically, that he wanted me to meet Mike Loya, his boss.

13   Q    Did you discuss anything else in anticipation of meeting

14   Mike Loya?

15   A    Yes.  Javier Aguilar mentioned or told me not to mention

16   anything about side payments or bribes paid to anybody in

17   Ecuador.

18   Q    When you met with Mike Loya, did you follow the

19   defendant's instructions?

20   A    Yes, I did.

21        MR. LAX:  I'd like to now show what is in evidence,

22   Government Exhibit 3015-T-C, please.

23        (Exhibit published.)

24        MR. LAX:  You know, before we get to that.

25   Q    When you met Mike Loya, what types of things did you talk

1  about?

2  A    We talked about Ecuador, the oil sector, how things were

3  going in general terms in the oil sector.  Nothing specific

4  that I remember.

5  Q    Do you recall anything else about any of those

6  conversations?

7  A    About the first conversation or any conversation that I

8  had with him?

9  Q    The first one.

10  A    No.  I don't remember anything else about the first one.

11  Q    When you met with him on -- on any occasions, what types

12  of things did you discuss?

13  A    Well, I remember one time discussing the possibility of

14  signing a crude oil contract, and there was a trader or crude

15  oil specialist there and we -- Vitol was not interested in the

16  crude oil, at least when we talked during that meeting,

17  because of the price formula that Ecuador was applying.

18  Q    How so?

19  A    Well, I cannot tell you because I don't understand the

20  specific technical issues, but the Ecuadorian crude oil price

21  was referenced to a Middle East oil price and my understanding

22  from their conversation was that for Vitol, it would be better

23  just to go ahead and buy Middle East oil referenced by that

24  price instead of having to deal with different crude oil from

25  Ecuador.

A. Perez - direct - Lax                                              886

1           MR. LAX:  All right.  Now, if we could please return

2    to 3015-T-C.

3    BY MR. LAX:

4    Q    I'll direct your attention to page 2.

5           Now, this is another extract of your WhatsApp

6    conversation with the defendant?

7    A    Yes.

8    Q    I'll direct your attention to the first message there on

9    the top right of this page.

10          What's -- what's the date now, where are we in time?

11   A    Okay.  We are in July 12th of 2020.

12   Q    I'm sorry, what?

13   A    I'm sorry of 2019.

14   Q    And your message has a bunch of numbers and months here.

15          What is that?

16   A    Those are differentials, meaning a component of the price

17   again, for three periods:  January-June 2018;

18   July-December 2018; and January through June 2019.

19   Q    Where did you get those numbers?

20   A    I got them from Nicolas Naranjo, so they came from

21   PetroEcuador.

22   Q    Why did you send them to the defendant?

23   A    That's reference of what PetroEcuador had in mind in

24   terms of price.

25          MR. LAX:  Let's now turn to the next page, please,

1   Ms. Jefferson, page 3.  The same exhibit.

2            (Exhibit published.)

3   BY MR. LAX:

4   Q    Now, the first, let's do the two messages on the left.

5            The first message, is there any -- any text or body

6   to that first message?

7   A    No body, just a text.  I'm sorry, an attachment, a

8   picture.

9   Q    And then what's the message sent by defendant right

10  beneath it?

11  A    I'm sorry?

12  Q    What --

13  A    Could you repeat?

14  Q    -- is the message sent by the defendant right beneath it

15  there?

16  A    Oh.  We are still very far away.

17           MR. LAX:  Let's look at the attachment, which is

18  found on page 4.  The same exhibit.

19  Q    What is this?

20  A    This is a message to Sam.  I don't see the header there,

21  but I assume it's to -- I would understand it's to Sam Naylor

22  saying that regarding the technical aspects indicated, as we

23  mention in previous communications, we have analyzed your

24  point and arguments, and we do agree there are some

25  differences between the long-term contract we have with you

A. Pere - direct - Lax                                    888

1    than the terms and conditions applied for the FOB contracts,

2    being the main difference the operability of loading dates.

3              And then he goes to say that given the fact that the

4    contract ended the month before, there's a need to find a

5    solution for provisional invoicing.  And after evaluating

6    market conditions, he proposes the following differentials:

7    January-May 2018, minus 1.44; June-December 2019, minus 1.75;

8    and January-June 2019, minus 2.58.  All those are dollars.

9    Q    Where the message reads:  "Considering that our contract

10   finalized last month," what do you understand that mean?

11   A    That this message was sent in July of 2019, and that the

12   contract had to be liquidated and numbers had to be somehow

13   agreed.

14   Q    Which contract?

15   A    The fuel oil contract.

16   Q    So, that contract by July 2019 is -- is over?

17   A    Yes.

18             MR. LAX:  Ms. Jefferson, if it's possible, could we

19   pull up -- actually, before we do that.

20   Q    Let me show you just the bottom of this and ask you who

21   sent -- who sent this.

22             MR. LAX:  Can you show the whole page?

23             (Exhibit published.)

24   A    It's from PetroEcuador, Zonnia Martinez.  Okay.

25             MR. LAX:  Can we use the same exhibit, page 2 on the

1    left.

2              (Exhibit published.)

3              MR. LAX:  And if it's possible to zoom in on the

4    left, the top message.  Thank you.

5    BY MR. LAX:

6    Q    All right.  So, Mr. Pere, we're looking at this message

7    on the left that you sent before.

8    A    Correct.

9    Q    And on the right, these are numbers that came from where?

10   A    From PetroEcuador, the ones that are on the right; and

11   also the ones that are on the left, the numbers in the message

12   came also from PetroEcuador.

13   Q    All right.

14             MR. LAX:  Let's jump ahead now, please, to

15   Government Exhibit 3015-T-D.

16             (Exhibit published.)

17             MR. LAX:  And if we could look at the first message

18   here.

19   Q    So, this message is sent by you to the defendant on what

20   date?

21   A    On September 23, 2019.

22   Q    And what did you write to the defendant?

23   A    Hi, Javier, please send Enrique the fuel oil volumes to

24   be able to invoice.  We need to put that in order as soon as

25   possible.  Thanks in advance.

A. Perez - direct - Lax                                           890

1  Q    What did you mean by "the fuel oil volumes"?

2  A    I'm asking Javier to tell us how many barrels of fuel oil

3  were bought by Vitol or were loaded onto vessels for Vitol

4  during -- what's the period -- I'm not saying what period.

5  I'm just saying send me the volumes so that we can prepare

6  invoices.

7

8            (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. Pere - direct - Lax                    891

1   DIRECT EXAMINATION (Continuing)

2   BY MR. LAX:   (Continuing)

3   Q     Invoices to be sent where?

4   A     To be sent to Lionel Hanst.

5   Q     Now, I'll direct your attention to the bottom two

6   messages on the same page.

7           How did the defendant respond?

8   A     He says all right.  I sent them but now he asked me for

9   by month.

10  Q     Who did you understand the defendant to be referring to

11  when he said in that message?

12  A     Enrique Pere.

13  Q     What's the significant of by month?

14  A     That we wanted to send invoices month by month,

15  therefore, we needed to know month by month what was the

16  volume.

17  Q     Turning now, please, to page 2 of the same exhibit.  Let

18  me direct your attention to the message on the bottom here,

19  September 23, 2019; what did you write?

20  A     Remember that we have to invoice by shipment in

21  accordance with the contract.

22  Q     What contract?

23  A     With the contract we, meaning end Enrique and I, through

24  one of our companies, had with one of Lionel Hanst's

25  companies.

1    Q    And then just the very next message, please, on page 3.

2    And you sent another message writing what?

3    A    And that is how it has been done.

4    Q    What did you mean by that?

5    A    That we had been sending invoices stating cargo per cargo

6    month by month.

7           MR. LAX:  Now, just for the witness and the parties,

8    please, if I can show Government Exhibit 1593.

9    Q    Do you recognize Government Exhibit 1593?

10   A    Yes.

11   Q    What is it?

12   A    It's an e-mail Javier Aguilar sent to me.

13   Q    On what date?

14   A    On October 1, 2019.

15   Q    And there's an attachment, Government Exhibit 1593-A.  Do

16   you recognize the attachment?

17   A    Yes.

18          MR. LAX:  The Government offers Government Exhibit

19   1593 and 1593-A.

20          MR. PRICE:  No objections.

21          THE COURT:  Received.

22          (Government's Exhibits 1593 and 1593-A received in

23   evidence.)

24          MR. LAX:  Pursuant to a stipulation also a

25   translation of 1593.  So the Government will offer 1593-T.

A. Pere - direct - Lax                           893

1          THE COURT:  And that's admitted pursuant to stip.

2          (Government's Exhibit 1593-T received in evidence.)

3          MR. LAX:  Can we pull up 1593-T, please.

4    Q    Looking at the top, which e-mail address did the

5    defendant use here?

6    A    The Vitol address.

7    Q    And you are the recipient?

8    A    Yes.  That's one of my e-mails.  I don't remember having

9    that e-mail, but AP, my initials.

10   Q    Let's look at the attachment, please.  What's the

11   attachment to this e-mail?

12   A    The attachment is a list of cargos, of actually all

13   cargos, all exports since January of 2017 up to June 2019.

14         MR. LAX:  Can we zoom out just a little bit to show

15   the full -- go one more in.  Thank you.  And if we can scroll

16   down to the bottom.

17   Q    The field highlighted in yellow in row 40 beginning in

18   column K, total contract, what's that number?

19   A    That's the total number of fuel oil barrels actually

20   exported under that fuel oil contract with OTI.

21   Q    A little more than 17 million?

22   A    Yes.

23         MR. LAX:  If we can scroll up to the top, please.

24   Q    I will just direct your attention to column A, rows two

25   through four.

A. Pere - direct - Lax                    894

1   A    Well, row two is January, the month of 2017.

2   Q    And there's three rows listed under January.  What is

3   that a reference to?

4   A    Those are the names of the vessels that took that load.

5   Q    Are there cargos listed on this sheet?

6   A    Well, each vessel is one cargo.

7   Q    And how many cargos per month are listed here?

8   A    Three.

9   Q    I'd like now to direct your attention to Government

10  Exhibit 3015-T-E in evidence, and direct your attention to the

11  very first message.

12            What is the date of this message?

13  A    November 19, 2019.

14  Q    What did you write to the defendant on that day?

15  A    Hi, Javier.  We are still not able to move the issue

16  forward with Lionel.  You can imagine the huge problem I have

17  with those who have supported us.  We have worked thoroughly

18  and you have put us in a very difficult position.

19  Q    Let's break that down a little bit.

20            What do you mean when you were referring to moving

21  the issue forward with Lionel?

22  A    That still we were not able to invoice and, therefore,

23  not able to get paid because Lionel was not producing -- I'm

24  sorry, was not giving us the descriptions to be included in

25  the invoices we had to send him.

A. Pere - direct - Lax                    895

1   Q    Then you wrote you can imagine the huge problem I have

2   with those who have supported us.  What did you mean by that?

3   A    I mean that I was having problems with the people that in

4   PetroEcuador and with Nicolas and with Javier Aguilar because

5   they did their work, they did the part of the deal, but I was

6   not being able to pay them.  They had not been paid.  That's

7   what I meant.

8   Q    And then when you wrote:  You put us in a very difficult

9   position, what did you mean by that?

10  A    First, that it's very uncomfortable for me to owe money

11  to people that I had agreed to pay; and second, that we were

12  not able to push forward for any other deal.  That's the

13  meaning of what I wrote, difficult position.

14  Q    What do you mean unable to push forward?

15  A    That I was not going to have the support needed from

16  PetroEcuador to execute any other deal.

17  Q    I'm going to shift gears a little bit, Mr. Pere.

18  Directing your attention to August 2019, what happened then?

19  A    My offices in Miami were raided, searched by the FBI.

20  Q    After that, what did you decide to do?

21  A    Well, first, get legal counsel, and afterwards, I decided

22  to cooperate.

23  Q    How soon after the search did you begin pursuing

24  cooperation?

25  A    Maybe about a month.

A. Pere - direct - Lax                                896

1   Q    As part of pursuing cooperation, did you meet with
2   federal prosecutors and agents?
3   A    Yes, I did.
4   Q    During those initial meetings with the Government, did
5   anyone promise you that you would get a cooperation agreement?
6   A    No.
7   Q    What did you have to do during those meetings?
8   A    I had to answer all of the questions asked by the
9   Government truthfully.
10  Q    Even if you truthfully answered the Government's
11  questions, were you assured a cooperation agreement?
12  A    No.
13  Q    Who chose the questions that you were asked at those
14  meetings?
15  A    The Government.
16  Q    As part of your efforts to cooperate, did you provide
17  materials to the Government?
18  A    Yes, I did.
19  Q    Ultimately, did you plead guilty to federal crimes?
20  A    Yes, I did.
21  Q    To what crimes?
22  A    Conspiracy to commit FCPA violations, meaning paying
23  bribes, and conspiracy to execute money laundering.
24  Q    Over what period of time?
25  A    From 2010 through 2019.

A. Pere - direct - Lax                    897

1   Q    Did you enter into a cooperation agreement with the
2   Government in connection your plea?
3   A    Yes.
4           MR. LAX:  Permission to approach the witness, Your
5   Honor.
6           THE COURT:  You may.
7           MR. LAX:  For the record, I'm going to be handing
8   the witness what is marked 3500-AP-292 and 3500-AP-351.
9   Q    Beginning with 3500-AP-292, do you recognize that
10  document?
11  A    Yes, I do.
12          MR. LAX:  For the witness only, please, Mr.
13  Villanueva.  Thank you.
14  Q    What is it?
15  A    That's the cooperation agreement signed with the
16  Government.
17  Q    Let me direct your attention to the last page.  There's a
18  bunch of signatures on that page.  Do you recognize any of
19  them?
20  A    Yes.
21  Q    Which one or ones?
22  A    My signature and my attorney's signature.
23  Q    Is the document dated?
24  A    Yes.
25  Q    What's the date?

A. Pere - direct - Lax                                    898

1  A    May 22, 2020.

2         MR. LAX:  The Government moves into evidence into

3  evidence 3500-AP-292.

4         MR. PRICE:  No objection.

5         THE COURT:  Received without objection.

6         (Government's Exhibit 3500-AP-292 received in

7  evidence.)

8  Q    Before we publish this, I will ask you a few more

9  questions.

10        When did you plead guilty?

11  A    In October of 2020.

12  Q    Why did so much time passed between when you signed this

13  agreement in May and pled guilty in October of 2020?

14  A    We were at the height of the pandemic, everything was

15  slower than usual.

16  Q    Under your agreement, are you required to pay forfeiture?

17  A    Yes.

18  Q    Approximately how much?

19  A    $45 million.

20  Q    What is your understanding of what that figure

21  represents?

22  A    That represents the money I made, the profit I had from

23  the activities that I am charged for.

24  Q    Have you paid any of that money to the Government so far?

25  A    Yes, I have.

A. Pere - direct - Lax                                    899

1    Q    Approximately how much?

2    A    Over $17 million.

3    Q    Where did that money come from?

4    A    It came from financial investments and also I sold a boat

5    that I had in order to pay that, and later on, I sold a

6    commercial property I had in Miami Beach.

7    Q    I gave you another document a moment ago, 3500-AP-351.

8    Do you recognize that document?

9    A    Yes.

10   Q    What is that document?

11   A    It's an addendum to the cooperation agreement.

12   Q    And I'll direct your attention to the last page.  There

13   are a number of signatures on that page.  Do you recognize any

14   of the signatures?

15   A    Yes.

16   Q    Whose?

17   A    My signature and my attorney's signature.

18   Q    Is the document dated?

19   A    Yes, March 7, 2022.

20           MR. LAX:  The Government moves into evidence

21   3500-AP-351.

22           MR. PRICE:  No objection.

23           THE COURT:  Received without objection.

24           (Government's Exhibit 3500-AP-351 received in

25   evidence.)

A. Pere - direct - Lax                                    900

1  Q    Why did you enter into the addendum?

2  A    Because before selling the commercial property, I

3  incurred expenses, which I incurred after signing the

4  cooperation agreement, and those expenses were to maintain the

5  property and the Government recognized those expenses and

6  credit them to my forfeiture payment.

7  Q    Under the addendum, what effect did that addendum have to

8  your cooperation agreement?

9  A    The effect was to lower the pending forfeiture payment by

10  $117,000 approximately.

11  Q    So after the addendum, what is the total amount of

12  forfeiture that you owe?

13  A    43 million plus.

14  Q    Other than reducing the forfeiture amount by

15  approximately $100,000, does this addendum change any other

16  aspects of your cooperation agreement?

17  A    No.

18  Q    Have there been any other addenda or changes to your

19  cooperation agreement?

20  A    No.

21  Q    Let's turn back to the cooperation agreement itself.

22        What are your understandings of your obligations

23  under the cooperation agreement?

24  A    My obligations under the agreement are to tell the truth,

25  to answer any question made by the Government, to be ready to

A. Pere - direct - Lax                        901

1  attend any time my presence was required in court, and do not

2  commit any criminal activities.

3          Maybe there's something that I am leaving out.

4  Q    Let me direct your attention now to page 8 of the

5  agreement?

6          MR. LAX:  And we can publish this now.  It's in

7  evidence.

8          THE COURT:  You may.

9          (Exhibit published.)

10 Q    I'm going to direct your attention to the first sentence

11 of paragraph 17 where it reads the defendant must -- and here,

12 that's you?

13 A    Yes.

14 Q    The defendant must at all times give complete, truthful,

15 and accurate information in testimony and must not commit or

16 attempt to commit any further crimes.  That's part of your

17 cooperation agreement?

18 A    It is, yes.

19 Q    Let me focus you on last portion of that obligation:

20 Must not commit or attempt to commit any further crimes.  Have

21 you fully and completely met that obligation?

22 A    No, not fully.

23 Q    Please explain.

24 A    I used cocaine once before, a couple of months before

25 pleading guilty and I reported it to the Court.

A. Pere - direct - Lax                               902

1   Q    And when did you use cocaine in that instance?

2   A    A couple of months before pleading guilty.

3   Q    Is that the first time that you had used cocaine?

4   A    No.

5   Q    Did you use cocaine during the period during which we've

6   been talking about?

7   A    Yes.

8   Q    Approximately how often?

9   A    Four, five times a year.

10  Q    When is the last time you used cocaine?

11  A    Two months before pleading guilty.

12  Q    The same instance you were just referring to?

13  A    Yes.

14  Q    Why did you disclose it?

15  A    Because I wanted to be truthful.

16  Q    What happened as a result?

17  A    Well, as a result, first, I had a very hard talk with

18  several prosecutors.  After that, I was subject to drug

19  testing every day for about three months, and occasionally, at

20  random afterwards, and I also had to have appointments with a

21  psychiatrist I believe every week or every two weeks for

22  months, and that was determined by Pretrial Services.

23  Q    What's your understanding of what Pretrial Services is?

24  A    It's part of court that monitors my movements, my

25  behavior, everything.  I have to report every week to the

1    pretrial officer, which I've been doing since 2020, and also
2    report if there's anything -- anything out of the ordinary.
3    Q    Other than the instance that you just described after
4    entering in your cooperation agreement but before pleading
5    guilty, have you fully and completely complied with the terms
6    of your cooperation agreement?
7    A    Yes, I have.
8    Q    We've talked about your understanding of what your
9    obligations are.  What is your understanding of what the
10   Government's obligations are under this agreement if you meet
11   your obligations?
12   A    If I meet the obligations, the Government may submit a
13   letter to the Court stating the level or the quality of my
14   cooperation and the Government has to turn in to the Court all
15   the evidence about all the crimes that I have committed and
16   told the Government about during the proffers.
17   Q    What is the maximum penalty that you face under your plea
18   agreement?
19   A    Ten years imprisonment.
20   Q    Is the maximum sentence of ten years still the maximum
21   sentence even if the Government writes that letter for you?
22   A    I understand yes.
23   Q    Sitting here today, do you know if you're going to get
24   that letter?
25   A    No, I don't.

A. Pere - direct - Lax                    904

1    Q    What is your hope in that regard?

2    A    I hope I get the letter.

3    Q    What is your understanding of who decides your sentence?

4    A    The judge.

5    Q    Will the Government recommend any particular sentence?

6    A    No, not that I am aware of.

7              MR. LAX:  Can we please pull up 3500-AP-292, page 8,

8    and the top portion of that paragraph that's running on to

9    page 8, please.

10   Q    Two sentences from the end of this paragraph, it reads:

11   The Government will not recommend to the Court a specific

12   sentence to be imposed.  Further, the Government cannot and

13   does not make a promise or representation as to what sentence

14   will be imposed by the Court?

15             Is that part of your cooperation agreement?

16   A    Yes, it is.

17   Q    Now, even if the Government writes that letter, is the

18   Court required to give you a lower sentence?

19   A    No.

20   Q    What sentence are you hoping to get?

21   A    The minimum.

22   Q    Meaning what?

23   A    I don't want to go to jail.

24   Q    What is your understanding of what happens if you lie?

25   A    If I lie, the cooperation agreement is void, voided, and

1    all the information about all crimes committed from 2010

2    through 2019 will be used by the Court, will be known by the

3    Court, and I will receive a sentence for all that.

4    Q    Will you get one of those letters?

5    A    What do you mean one of the letters?

6    Q    One of the letters we were talking about.

7    A    Oh, no.

8    Q    If your cooperation agreement is voided, do you get to

9    take back your guilty plea?

10   A    No, I cannot.

11   Q    You'd still be sentenced up to ten years in jail?

12   A    Yes.

13   Q    Still have to forfeit 40 plus million dollars?

14   A    Yes.

15   Q    As you sit here today, do you know what your sentence

16   will be?

17   A    No.

18   Q    Let's talk a little bit more about your cooperation.  As

19   part of your cooperation, were you directed by the FBI to try

20   to make recorded phone calls?

21   A    Yes.

22   Q    And in-person meetings?

23   A    Yes.

24   Q    Who decided who you called or met with?

25   A    The FBI.

A. Pere - direct - Lax                                906

1    Q    Did you make such recordings?

2    A    Yes, I did.

3    Q    Approximately when did you start making those recordings?

4    A    Early in 2020.

5    Q    Who are some of the people that you have recorded as part

6    of your cooperation agreement?

7    A    Javier Aguilar.

8         You mean related to this specific case or all

9    activity?

10   Q    All of your cooperation.

11   A    Okay.  I made recordings of conversations with Nilsen

12   Arias, Nicolas Naranjo, Carmen Rojas from Gunvor, Ray Kohut

13   from Gunvor also, Nicolas Naranjo, the contact I had for

14   working with PetroEcuador at some point in time.  Maybe

15   another person that I am not recalling right now.

16   Q    When you were making these recordings, other than the

17   person or people you were directed to record, did anybody else

18   participate in those recordings?

19   A    Yes.  Sometimes my brother Enrique, and he was part of

20   the call, and sometimes an FBI agent also.

21   Q    Why did Enrique participate in those calls?

22   A    Because that's what the FBI asked us to do.

23   Q    Enrique cooperated as well?

24   A    Yes.

25   Q    Can you please describe, for the members of the jury, the

A. Pere - direct - Lax                    907

1  process of making a recorded telephone call?

2  A     Well, if I am making the call, right before doing it, I

3  have a device that was given to me and it was kept by me for a

4  period of time, I don't know, a month, depending on how many

5  calls I had made.  So I had to turn on the device, mention the

6  date, the time, my name, and who I was calling, then I would

7  make the call and the device would be on during the whole

8  call.

9  Q     Where did you obtain the device?

10 A     It was given to me by one of the FBI agents.

11 Q     You said you had to record your name.  What name did you

12 use?

13 A     I used the name Leonardo.

14 Q     Why?

15 A     Because the FBI needed a name just any name, I didn't

16 know and I said Leonardo, like Leonardo DiCaprio, but fat and

17 old.

18 Q     Did Enrique have a name assigned by the FBI?

19 A     Yes.

20 Q     What was that?

21 A     I don't remember his name.

22 Q     During the course of your cooperation, were you allowed

23 to reveal your cooperation?

24 A     No.

25 Q     At the time of your guilty plea, was your plea public?

1   A    No.

2   Q    Throughout of period of your cooperation, did you reveal

3   the truth about your cooperation to anyone that you were

4   directed to contact?

5   A    No.

6        MR. LAX:  Your Honor, permission to approach the

7   witness.

8        THE COURT:  You may.

9   Q    I've handed you a number of discs.  For the record, I

10  have handed you what are marked for identification Government

11  Exhibits 3501-A, 3504-A, 3507-A, 3509-A, 3511-A, 3513-A,

12  3514-A, 3516-A, and 3517-A?

13  A    Yes.

14  Q    Do you see all of those there in front of you?

15  A    They are all in front of me.

16  Q    Let's start with Government Exhibit 3501-A.  I'd ask you

17  to please take a look at the disc and let me know if you

18  recognize it.

19  A    Yes, I recognize the disc.

20  Q    How do you recognize it?

21  A    Because it has my initials and the date when I initialed

22  it.

23  Q    Have you reviewed the contents of that disc before?

24  A    Yes.

25  Q    What's on it?

1  A    There is a recording conversation between Javier Aguilar

2  and myself on January 3, 2020.

3  Q    Is that a complete recording of that conversation?

4  A    Yes.

5  Q    Let's turn to Government Exhibit 3504.  Do you recognize

6  that disc?

7  A    Yes.

8  Q    How do you recognize it?

9  A    It has my initials and the date I initialled it.

10 Q    Have you reviewed the could be tents of that disc before?

11 A    Yes, I have.

12 Q    What's on it?

13 A    It's a recorded conversation between Javier Aguilar and

14 myself on February 6th of 2020.

15 Q    Turning to -- sorry, is that a complete recording of that

16 conversation?

17 A    It is, yes.

18 Q    Turning to Government Exhibit 3507-A.  Let me know if you

19 recognize it and how.

20 A    I do recognize the disc.  It has my initials.  It has the

21 date I wrote on it, and it is a conversation about Javier

22 Aguilar -- I mean between Javier Aguilar and myself on

23 February 12, 2020.

24 Q    Is that the complete recording of that conversation?

25 A    It is, yes.

1  Q    Government Exhibit 3509-A, do you recognize that disc?

2  A    Yes, I do.

3

4              (Continued on next page.)

A. Pere - Direct - Lax                                    911

1   (Continuing.)

2   A    It has my initials.  It has the date I wrote.

3   Q    Have you reviewed the contents of that disk before?

4   A    Yes, I have.

5   Q    What's on it?

6   A    The conversation between Javier Aguilar and myself on

7   February 25th of 2020.

8   Q    Turning to Government Exhibit 3511-A, do you recognize

9   that disk?

10  A    Yes.  It has my initials and the date I wrote on it.

11  Q    Have you reviewed the contents of the disk before?

12  A    I have, yes.

13  Q    What's on it?

14  A    There is a conversation between Javier Aguilar and

15  myself on February 2nd -- I'm sorry, February 27th of 2020.

16  Q    Government Exhibit 3513-A, do you recognize that disk?

17  A    Yes, I do.  It has my initials and the date I wrote on

18  it.

19  Q    You have reviewed the contents before?

20  A    I did, yes.

21  Q    What's on that disk?

22  A    This is a recording of a lunch we had with Javier

23  Aguilar, Enrique Pere, and myself.  And there's also the

24  voice of Lionel Hanst.

25  Q    Turning to Government Exhibit 3514-A, do you recognize

1    that exhibit?

2    A    Yes, I do.  Again, has my initials and the date I wrote

3    on the disk.

4    Q    Have you reviewed the contents of the disk?

5    A    Yes, I have.

6    Q    What's on it?

7    A    It's a conversation between Javier Aguilar and myself.

8    Q    On what date?

9    A    On April 8, 2020.

10   Q    Turning to Government Exhibit 3516-A, do you recognize

11   that disk?

12   A    Yes.  It has my initials and the date I wrote on the

13   disk.

14   Q    And you reviewed the contents before?

15   A    Yes.

16   Q    What's on that disk?

17   A    This is a conversation between Javier Aguilar and

18   myself on June 2nd of 2020.

19   Q    And Government Exhibit 3517-A, do you recognize that

20   disk?

21   A    Yes, I do.  It has my initials.  It has a date I wrote

22   on the disk.  And it's a conversation between Javier

23   Aguilar, Enrique Pere, and myself on June 11th of 2020.

24   Q    Are all those recordings on those discs the complete

25   recordings of the conversation?

*A. Pere - Direct - Lax*                    913

1  A    Yes, they are.

2          MR. LAX:  Your Honor, it's about 4 o'clock.  I

3  think we are at a good breakpoint before we dive into

4  something new.

5          THE COURT:  I had a suspicion, Mr. Lax, you might

6  be saying that right around this point.

7          Thank you.  Ladies and gentlemen, it is a good

8  breakpoint and we, indeed, will take the suggestion that we

9  break.  A chance to refresh for the homestretch.  Use

10 whatever rooms you need.  I understand one of them is

11 functioning a little bit better than it was before.

12         Keep an open mind, do not discuss the case amongst

13 yourselves or with anyone else, and we will see you in about

14 15 or so.

15         (Jury exits.)

16         (Witness steps down.)

17         THE COURT:  Okay.  We will take our break.

18         Jonathan, I figure that we will go to the normal

19 time, like around 5:30 today, just so we haven't heard too

20 many yaps, so we will take advantage of the sun.

21         MR. LAX:  Will do, Your Honor.

22         (Recess.)

23         THE COURTROOM DEPUTY:  All rise.  Counsel for both

24 sides are present.  Defendant is present.

25         THE COURT:  Are we ready to go?

*A. Pere - Direct - Lax*                    914

1           MR. LAX:  We are, Your Honor.

2           THE COURT:  Than we shall.

3           MR. LAX:  We are bringing in the witness and I

4   will head back to the podium.

5           THE COURT:  Yes.

6           (Witness takes the stand.)

7           (Jury enters.)

8           THE COURT:  Be seated, please.

9           Counsel will stipulate that the jury is present

10  and properly seated.

11          MR. LAX:  Yes, Your Honor.

12          MR. KOFFMANN:  Yes, Your Honor.

13          THE COURT:  Thank you, Counsel.

14          Ladies and gentlemen, I hope you had a chance to

15  refresh.  We are in the last inning of today's game.  No

16  extra innings are planned.

17          Mr. Pere remains on the stand.  Mr. Lax is on

18  direct examination.

19          Mr. Lax.

20          MR. LAX:  Thank you, Your Honor.

21          First, if we can pull up Government Exhibit 8008.

22  It's a stipulation between the parties and I will offer that

23  at this time.

24          MR. PRICE:  No objection.

25          MR. LAX:  Your Honor, I think there was no

1    objection.

2             THE COURT:  I know.  I didn't know if you were

3    reading it this time or just offering it.

4             MR. LAX:  I am going to offer it and then read it.

5             THE COURT:  Then please, being no objection.

6             MR. LAX:  Okay.  This stipulation reads:  It is

7    hereby stipulated and agreed -- my screen cut out.  I don't

8    know if anybody else.

9             THE COURTROOM DEPUTY:  It's me.  One second.  All

10   right.

11            MR. LAX:  We're back.

12            It is hereby stipulated and agreed by and between

13   the undersigned parties that Government Exhibits 3500-T

14   through 3511-T and 3513-T through 3518-T, the recordings

15   transcripts and translations contain true and accurate

16   Spanish language transcriptions of the recorded telephone

17   calls or in-person meetings described therein as well as

18   fair and accurate publish language translations of the

19   corresponding transcriptions.

20            Government Exhibits 3500 through 3511 and 3513

21   through 3518 contain fair and accurate compilations of

22   Government Exhibits including the recorded transcriptions

23   and translations as set forth below in a table.

24            I will just focus now on the recordings that we

25   have been discussing so far.  So Government Exhibit 3501 is

*A. Pere - Direct - Lax* 916

1   a compilation of 3501-A, 3501-T, 1 and 2.  3504 is a

2   compilation of 3504-A, 3504-T, 1 and 2.  3507 is a

3   compilation of 3507-A, 3507-T, 1 and 2.  3509 is a

4   compilation of 3509 A, 3509-T, 1 and 2.  3511 is a

5   compilation of 3511-A, 3511-T, 1 and 2.  3513-R is a

6   compilation of 3513-A, 3513-T, 1, 2 and 5.  3514 is a

7   compilation of 3514-A, 3514-T, 1 and 2.  3516 is a

8   compilation of 3516-A, 3516-T, 1 and 2.  And 3517 is a

9   compilation of 3517-A, 3517-T, 1, 2 and 5.

10          The materials described above are all

11  authenticated for the purposes of Federal Rule of Evidence

12  901 and this stipulation marked as Government Exhibit 8008

13  is admissible in evidence at trial.  It's dated January 9,

14  2024, signed by the parties.

15          In light of the stipulation, the Government now

16  offers 3501 and 3501-T, 3504, 3504-T, 3507, 3507-T, 3509 and

17  -T, 3511 and -T, 3513-R and -T, 3514 and -T, 3516 and -T,

18  and 3517 and -T.

19          THE COURT:  And I understand that, Mr. Price, that

20  they are all received in evidence without objection?

21          MR. PRICE:  That's correct.

22          THE COURT:  And that's ordered.

23          (Government's Exhibits 3501, 3501-T, 3504, 3504-T,

24  3507, 3507-T, 3509, 3509-T, 3511, 3511-T, 3513-R, 3513-T,

25  3514, 3514-T, 3516, 3516-T, 3517, 3517-T received in evidence.)

*A. Pere - Direct - Lax* 917

1      THE COURT:  Now, Mr. Lax, with respect to these

2  recordings, are they all in Spanish?

3      MR. LAX:  Yes, Your Honor.  So the audio is in

4  Spanish and I will have the witness explain the format.

5      What we have done is we have prepared binders for

6  all the jurors.  We have provided some to Defense Counsel

7  and we also have copies for the Court and we would ask for

8  permission to hand out all of the transcription translations

9  and then we will also play the compilations which include

10  subtitles for the audio.

11      THE COURT:  Permission to do all of that is

12  granted.

13      And ladies and gentlemen of the jury, some of you

14  have may be proficient in Spanish.  The transcript of the

15  Spanish translation is what is in evidence and that's what

16  will guide your deliberations and thoughts throughout the

17  trial.  So to the extent that your understanding of the

18  Spanish language may lead you to a different translation,

19  you are to disregard that translation and to follow the one

20  that is in evidence.

21      Mr. Lax?

22      MR. LAX:  Thank you, Your Honor.  I think my

23  colleague, Matthew Galeotti, is going to hand out the

24  binders to the jurors.

25      THE COURT:  And Mr. Lax, at the end of the day,

1    are you going to re-collect them, or are you leaving them

2    under the seats?  What is your plan?

3              MR. LAX:  Whatever the Court's preference.

4              THE COURT:  We don't have any other jury coming

5    in.  We will have other business on Friday.  So it's your

6    choice.  We will secure things the way we normally do.

7              MR. LAX:  Oh, you know, I should hand one to the

8    witness.

9              THE WITNESS:  That would be useful.  Thank you.

10   BY MR. LAX:

11   Q    So Mr. Pere, before we get into the recordings, let me

12   just first direct your attention to the first page of the

13   first transcript that is in the binder, and that is 3501-T.

14             Can you please explain what this page shows?

15   A    Okay.  It shows the date, the participants, and the

16   abbreviations you are going to find in the transcription or

17   translation.

18   Q    And then just turning the page, there is a column with

19   numbers and there are three other columns.

20             Would you please explain those columns from left

21   to right?

22   A    Okay.  The first column, speaker, that's the speaker

23   who is speaking at that time.  It's either A. Pere, myself,

24   or Aguilar, Javier Aguilar.  Transcription, in the next

25   column, is what I said or what Mr. Aguilar said during the

A. Pere - Direct - Lax                    919

1  conversation.  And translation is the English version of

2  what was said during the conversation.

3  Q     Thank you.

4        MR. LAX:  Ms. Jefferson, can we please just queue

5  up for now Government Exhibit 3501?

6  Q     All right.  Do you see 3501 on your screen?

7  A     Yes.

8  Q     Before we begin playing, can you describe the format of

9  these compilation videos that we are going to look at?

10 A     Well, we have the -- the picture of the two people

11 having the conversation, Javier Aguilar with yellow lines on

12 the right and bottom sides, and myself with the white lines

13 on the right and bottom sides of the picture.  Whatever I

14 say is written or translated into English with white

15 letters.  And what Mr. Aguilar says is translated into

16 publish with yellow letters.

17 Q     And the subtitles, do they match what's in the

18 transcription binder that you have in front of you?

19 A     Yes, they do.

20 Q     All right.  So for Government Exhibit 3501, what is the

21 date of this recorded call?

22 A     It's January 2020.

23 Q     January, what day?

24 A     I'm sorry, January 3rd.

25 Q     Where were you located during this call?

*A. Pere - Direct - Lax*                           920

1   A    I was here, in Brooklyn.

2          MR. LAX:  All right.  And now if we begin on the

3   first page of 3501-T, and if we can please begin playing

4   3501.

5          (Video played; video paused.)

6          MR. LAX:  Let's pause there for a moment.

7   Q    Mr. Pere, I would like to go back and discuss some

8   portions of that clip.

9          First, at a high level, can you summarize that

10  portion of the conversation?

11  A    Well, I am complaining about the lack of payments and

12  Javier Aguilar mentions that he had spoken to Lionel,

13  meaning Lionel Hanst, the -- not the week before -- yeah,

14  the week before, saying that he would have a response from

15  Lionel the next week in regards to which routes, meaning

16  which companies and accounts Lionel would use to make the

17  payments of the monies that they owed me.

18         And he also mentions that just like Lionel, there

19  are other people, other Lionels, in other parts of the

20  world, but that he has to deal with Lionel.  That's the

21  person assigned to Javier Aguilar for making these payments.

22  Q    Where do you see the portion, there are other Lionels?

23  A    Okay.  In line 22, do you want me -- in one of the

24  lines of that paragraph, do you want me to read the

25  paragraph?

1  Q    Yes, please, the English.  Which portion were you

2  referring to?

3  A    Mr. Aguilar says:  I understand that there are people

4  like him around the world, meaning Lionel.  However, well,

5  this person is the one that I have to deal with, right?

6  Q    And referring to him, let me direct your attention back

7  to page 3 in line 13.

8           What did you say there?

9  A    I say I mean our own -- our own -- our own friend from

10  the island, let's say Lionel.

11  Q    Going back a little bit more now to page 2, in box 9,

12  where you say, you can imagine the situation I'm in with the

13  friends from over there, what did you mean by that?

14  A    I mean that I'm having a lot of pressure for payments

15  from the people in Ecuador.

16  Q    And then directing your attention now to page 4,

17  box 26, where the defendant says:  When a vehicle has many

18  miles on, you respond yes, it gets to the point where one

19  has to, and then you respond again, you can change the oil a

20  couple of times, but after that, the car has to be changed.

21           What do you understand that exchange to mean?

22  A    I understand that when the companies and accounts have

23  been used for a certain period of time, it's necessary to

24  use the new ones, just to -- to change them.  Like when a --

25  an automobile is getting old.

*A. Pere - Direct - Lax*                                        922

1    Q    Which companies?  Which accounts?

2    A    Referring to the companies that Lionel Hanst managed

3    and their respective accounts.

4              MR. LAX:  All right.  Let me bring us back to

5    where we left off, page 5, line 31.

6              And, Ms. Jefferson, if we can resume playing.

7              (Video played; video paused.)

8    Q    All right.  Mr. Pere, can you explain your

9    understanding of that portion of the conversation, please?

10   A    Well, there had been an article in the news about

11   corruption problems that Vitol had.  My understanding was

12   that there had been visits from authorities in Houston's --

13   Vitol's offices in Houston.

14             And Javier is saying that this is a matter that is

15   old, that has to do with something that happened long ago in

16   Brazil.  And he also says that there have been visits from

17   authorities in the offices -- to the offices in Switzerland

18   to Vitol and other companies, he mentioned T and G, which

19   mean Trafigura and Gunvor.  He mentions that they have now a

20   compliance department which is something used to -- to cover

21   their doings.

22             He also mentions that sometimes this news are

23   somehow produced to make more noise, that sometimes they are

24   pushed by the competition, and that that's the way it works,

25   but that I shouldn't worry about it, because that's a

1  question that I ask there.  I saw the news and -- the news

2  you sent to me and all that crap, I didn't know if I should

3  be worried or not.

4  Q    Let me direct your attention to the top of page 7.  And

5  it's right above the beginning of line 39, which is the end

6  of 38.

7            There is a reference, defendant says something,

8  the authorities from the country of cheese.

9            What did you understand that to mean?

10  A    Well, swiss cheese, that is Switzerland.

11            MR. LAX:  All right.  And we are going to pick up

12  from where we left off at line 41, Ms. Jefferson.

13            (Video played; video paused.)

14  Q    Mr. Pere, can you explain that portion of the

15  conversation?  I think there is a reference to a boss.  What

16  do you understand that to mean?

17  A    The boss was Mike Loya.

18  Q    Can you summarize that portion of the conversation?

19  A    Well, I am inquiring again about what had happened at

20  Vitol's offices in Houston, but he's correcting me, saying

21  that nothing had happened in Houston, that, again, there was

22  a -- an old employee from Vitol that had been mentioned by

23  the Brazilian state-owned company, when he says compania

24  carioca, that's what he means, but when I asked him about

25  the e-mails, because I say, hey, you told me that e-mails

*A. Pere - Direct - Lax*                                           924

1   were -- you were not allowed to delete e-mails or something

2   along those lines, he says that he had referred to only the

3   e-mails that had to do with that Brazilian company.  He says

4   that there's no evidence really.  And however, that all the

5   sirens go off, all the alarms go off, and then you have to

6   apply the evacuation plan that you had been planned --

7   planning and practicing, well, now you have to do it.

8

9                 (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. Pere - direct - Lax                                        925

1   EXAMINATION CONTINUES

2   BY MR. LAX:

3   Q    All right.  Now, let's pick up from where we were where

4   the defendant says:  If I had told you something, I would have

5   called you from a public phone from Mexico the following day.

6            MR. LAX:  Let's resume there, please.

7   A    Where is that?

8   Q    Right where we left off.

9   A    Where did we leave?

10  Q    Page 9, line 58.

11           (Video played.)  (Video paused.)

12  Q    Mr. Pere, I want to go back and ask you just about some

13  particular portions of this conversation.

14           Referring you to page 11 in boxes 72 and 74, the

15  defendant refers to a colleague from the LNG team and a

16  Panamanian company.

17           Can you explain your understanding of that?

18  A    Well, he's saying that another trader employee of Vitol

19  who was in charge of LNG — LNG is natural gas, it stands for

20  liquified natural gas — had been approached.  This guy had

21  been approached by a Panamanian company who supposedly had

22  been approached by somebody from Ecuador, somebody from my

23  country.  This colleague talks to the people that had -- that

24  were mentioned about Ecuador, and he says that they had talked

25  about the Monteverde LPG project.

A. Pere - direct - Lax                                             926

1          Javier says that he's been looking briefly into

2    that.  And finally, the people from Panama told his colleague

3    that the people in Ecuador wanted to talk to them about the

4    LNG, about the natural gas.

5          I said, yeah.

6          And Aguilar says that this is a project that since

7    he knows his Tocayo, meaning Xavier Rodriguez, it's been

8    always in his mind, referring to Javier Aguilar's mind.

9    Q    What -- what does Tocayo mean?

10   A    Tocayo means somebody close to you who shares the same

11   name and you call him just Tocayo.

12   Q    And so on page 12, line 78, when the defendant refers to

13   Tocayo, you understand that to mean who?

14   A    Xavier Rodriguez.

15   Q    The same Xavier Rodriguez here (indicating) pictured in

16   Government Exhibit 12?

17   A    Yes.

18          MR. LAX:  I am going to add Tocayo to the board.

19   BY MR. LAX:

20   Q    All right.  Mr. Pere, I'd like to direct your attention,

21   let's jump ahead in this recording to page 36.  And we're

22   going to pick up at line 275.

23          Let me know when -- when you're there.

24   A    I'm there.

25          MR. PRICE:  Your Honor, before we start that, could

1   we have a quick sidebar?

2            THE COURT:  Yes, sure.

3            (Sidebar held.)

4

5            (Continued on the following page.)

*Sidebar*                                                              928

1           (The following sidebar conference held on the record

2      in the presence of the Court and counsel, out of the hearing

3      of the jury.)

4           MR. PRICE:  Your Honor, I didn't want to make a

5      number of objections, so I just object to the witness

6      summarizing what was said because the words speak for

7      themselves.

8           I have no objection to him explaining things that

9      might be code or, you know -- but what we've seen happen is

10     the question is:  Can you tell us what was just said?  And I

11     think that's inappropriate, injects his opinion,

12     characterization, speculation, et cetera.

13          THE COURT:  It's part of the conversation, but if

14     it's clear from the words, itself, it doesn't need further

15     explanation.  Obviously, if he's using like "him" or "he," or

16     things of that nature, or it's where if you were to look at

17     the sentence and it makes no good sense, it makes no sense,

18     then the additional information is not general, it's

19     important.

20          MR. PRICE:  And I agree.  If you said this sentence

21     here, what's the context, what does it mean; but instead, the

22     question has been:  Can you tell us, just playing, you know, a

23     few minutes, can you tell us what was said.  I mean it just

24     goes through and at some points, like the last one, just kind

25     of reads what's there.  And that's what I object to.

*Sidebar*                                                          929

1          So, I think it needs to be focused to what might be

2    ambiguous from those words.

3          THE COURT:  Or needs context or sharpening the

4    focus.

5          MR. PRICE:  Yes.

6          MR. LAX:  So, Your Honor, first, I don't think the

7    conversation is as clearcut and straightforward as Mr. Price

8    is suggesting.

9          Certainly the witness is allowed, and Rule 703 would

10   provide and allow for a witness, a lay witness to opine on his

11   understanding of what was said or what -- what he --

12         THE COURT:  Since he's part of the conversation.

13         MR. LAX:  -- what he meant.  Exactly.

14         However, I'm happy to certainly narrow the focus of

15   the questions and direct him to particular lines and

16   particular areas and ask him, you know, what did you

17   understand that to mean and what did you mean by that.

18         So, I'll narrow my inquiry in that sense.

19         THE COURT:  Try to narrow it.

20         MR. PRICE:  That would be great.

21         THE COURT:  So we're all on the same page.

22         MR. LAX:  Excellent.  Excellent.

23         THE COURT:  Works nicely.

24         MR. LAX:  And I guess while we're here, it's ten

25   after 5.  There's a few minutes left on this one.  I would

*Sidebar*                                                                 930

1  suggest, I'll propose breaking at the end of this recording

2  rather than launching into one which will take more than, I

3  think, twenty minutes, certainly, by the time we get there.

4           So, I just wanted to flag that for the Court and for

5  counsel.

6           THE COURT:  Counsel will know; good.

7           MR. LAX:  Okay.

8           THE COURT:  Nothing like a preview.

9           MR. LAX:  Thank you, Your Honor.

10          THE COURT:  Thank you.

11          (Sidebar concluded; proceedings resumed.)

12

13          (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

A. Pere - direct - Lax                                          931

1              (In open court; jury present.)

2    BY MR. LAX:

3    Q    Okay.  So, Mr. Pere, picking up from page 36, line 275.

4              MR. LAX:  And I think the time stamp, Ms. Jefferson,

5    is 34:06.  And let's resume from there.  We'll play to 34:50,

6    please.

7              (Video played.)  (Video paused.)

8              MR. LAX:  Okay.

9    Q    Mr. Pere, let me direct your attention to page 36,

10   line 275.

11             When you said:  "Don't forget to help me with this

12   pending matter next week," what did you mean by that?

13   A    Don't forget to pay me next week.

14   Q    And then turning to page 37, in line 278, the bottom

15   portion of that when the defendant said:  "I'm concerned

16   because I cannot pay you, man, because ultimately I don't like

17   to have that noise being in the way."

18             What did you understand him to mean by -- by "that

19   noise"?

20   A    Noise means, in the context of this conversation, having

21   an issue pending, having something there that makes it

22   difficult to communicate.

23   Q    Communicate with who about what?

24   A    With me and to communicate about new projects or things

25   that have to do with people in PetroEcuador.

A. Pere - direct - Lax                                             932

1          MR. LAX:  All right.  Ms. Jefferson, can we please

2    resume and we are going to pick up exactly where we left off,

3    page 37, line 279.  And for the record the time stamp is

4    34:50.

5                (Video played.)  (Video paused.)

6

7                (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. Pere - direct - Lax                          933

1    DIRECT EXAMINATION (Continuing)

2    BY MR. LAX:

3    Q    Mr. Pere, I want to go back and ask you just a couple of

4    questions about this section.  Directing your attention to

5    page 41 in box 303.  You refer to Noble.  What is Noble?

6    A    Noble is a company that signed a contract with

7    PetroEcuador for selling gasoline and diesel together with a

8    loan.  That's why they were able to sign a contract without

9    going through a public tender.

10   Q    And what is -- you referred to something also called

11   Petredec?

12   A    Petredec is another company.  In this case, Petredec sold

13   LPG to PetroEcuador also.

14   Q    Let me now direct your attention to page 42.  The bottom

15   of 309.  You said:  But not like I loan money to Ecuador and

16   because of that Ecuador is going to buy the gas from you

17   directly.

18        What were you referring to there?

19   A    I'm saying that at this time Ecuador was now allowed to

20   make a direct negotiation with anybody based on the fact that

21   that provider, or possible provider, loaned money to

22   PetroEcuador.  That's something that could be done before.

23   Noble did it, but now it cannot be done.

24   Q    And then you continued:  That will not happen.  I will

25   sign it for you.

A. Pere - direct - Lax                      934

1          And the defendant said:  Well, unless the chubby one

2    comes back.

3          What did you understand him to mean by that?

4    A    That that's something that could be done if Nilsen Arias

5    went back to his old position in PetroEcuador.

6    Q    The same Nilsen Arias pictured there in Government

7    Exhibit 8?

8    A    Yes.

9          MR. LAX:  Your Honor, it is about 5:25.  I'm not

10   going to have any more questions about this recording, so I

11   would submit it is a good time for the evening break.

12         THE COURT:  Another good suggestion, Mr. Lax.  We

13   appreciate that.

14         Ladies and gentlemen, that brings us to the end of

15   today's proceeding.  For your planning for the balance of the

16   week, we will be here again tomorrow starting at the usual

17   time.  The Court will be in session on Friday, but not in this

18   case.  That means Friday is yours.  You can go back to work if

19   that's what you would like to do.  Or if there are other

20   things you like to do, you can do those things too.  Whatever

21   you do, the rules that we applied at recesses apply wherever

22   you may find yourself tonight, tomorrow night, or Friday.

23   Again, and they are:  Continue to keep an open mind, do not

24   discuss the case amongst yourselves or with anyone else.  This

25   is a homework-free class assignment.  Everything you are asked

A. Pere - direct - Lax                    935

1  to do you will do here in the courtroom or back in the
2  deliberation room at the time of your deliberation.  No
3  outside research, electronic or otherwise.  We remain on radio
4  silence.  No communication about the case, not any of the
5  personalities, or the issues or the fact that you are coming
6  to Brooklyn as a juror at the federal court.  And that's
7  whether or not you're sending those communications by sending
8  a note or smoke signals, on X or Instagram, all of those other
9  social media opportunities.  They are all prohibited during
10 the course of the trial.

11        To the extent that there are accounts of this trial
12 in the media, again, that broad definition, that includes
13 social media, you're directed to totally disregard them, tune
14 them out, don't look at them, don't listen to them.

15        And I suggest that to the extent there are accounts
16 in the media about other cases, to try to tune them out as
17 well for fear that you will hear something and those accounts
18 about those cases that may ultimately confuse you about what
19 your responsibilities and obligations are in this case.

20        And with all of that, we will bid you a pleasant
21 evening.

22        Again, it remains cold.  It remains icy.  Be
23 careful.  Remember the more time we spend in the courtroom on
24 trial, the shorter number of trial days that we have.  So all
25 are encouraged to be on the same page.  And to the extent that

A. Pere - direct - Lax                      936

1  you need to leave earlier because the weather has been making

2  it a little trickier, then we have to suck it up and leave

3  earlier.

4          So with that, I bid you a pleasant evening and look

5  forward to seeing you tomorrow.

6          Report, as usual, to the central jury room by 9:45.

7  Thank you.

8          (Jury exits.)

9          THE COURT:  All right.  Do we need to attend to

10  anything else before we all go?

11         MR. LAX:  Not from the Government, Your Honor.

12         MR. KOFFMANN:  Yes, Your Honor, just a few

13  housekeeping issues.

14         THE COURT:  Yes.

15         MR. KOFFMANN:  First, with respect to last night's

16  letter, I think the Court had issued an order sometime in

17  December putting the parties on a 24-hour clock to respond to

18  letters.  I just wanted to seek the Court's guidance.  I

19  raised this issue this morning, that we didn't think there was

20  anything for the Court to rule on given the pretrial rulings,

21  and I'm curious if Your Honor is expecting a response from us

22  tonight.  If so, we can do so.  But if not, we won't burden

23  the Court with more briefing.

24         THE COURT:  No.  As I always say, nothing is ever

25  required when a motion is served.  Counsel make their own

Proceedings                                      937

1  determinations about it.  I will not assume that it is

2  unopposed if you file nothing.

3          If you do want to file something, feel free to do

4  so.  Again, as I indicated before at a lunch break, it's

5  obviously not related to anything that is currently before us,

6  so that really isn't any significant urgency.

7          Based on the pace that we've been going at with this

8  witness and the number of recordings that have been

9  identified, I don't think we are getting to another witness

10 before the end of the week.

11         MR. KOFFMANN:  That does seem to be the way things

12 are going, Your Honor.

13         THE COURT:  So there is no urgency.  To the extent

14 that you elect not to file anything, that's fine.  We will

15 find some time when we can resolve.  Not all of the issues

16 that were raised in the Court's view are resolvable before

17 they actually come up in court.  Some of them are.  We will

18 try to address them at a convenient gathering, particularly if

19 we come up with a gap and we can fill it, excuse the jury and

20 fill it with this.

21         MR. KOFFMANN:  Very well, Your Honor.  To be clear,

22 we do oppose the motion.

23         THE COURT:  I got that.

24         MR. KOFFMANN:  I figured.

25         THE COURT:  I got that loud and clear, but I always

Proceedings                                                          938

1    allow counsel, if they elect to write something, feel free to,

2    but not required.

3           MR. KOFFMANN:  Right.  I mentioned it briefly this

4    morning, but just to make it clear, to the extent the Court

5    wants to hear further, we will file something.  We don't

6    believe we should be required to do so now, because, as we see

7    it, the purpose of the Government's motion is to get our

8    explanation and we think that's unfair.

9           THE COURT:  I got your commercial before.

10          MR. KOFFMANN:  On a related issue, there was a

11   letter that the Government filed a week or two ago about the

12   Mexican and Ecuadorian legal experts, and where we left that

13   was we were going to confer, the parties were going to confer

14   to see if we can narrow the issues, just to report back to the

15   Court.  That process is ongoing.  We expect to hear back from

16   the Government at some point about that.  And when that issue

17   is ripe, we will bring it back to the Court for your

18   attention.

19          THE COURT:  Yes.  Alert us so we can refresh on the

20   filings that have already been made.  Should that be required,

21   to the extent that you have worked it all out, that won't be

22   required.

23          MR. KOFFMANN:  Very well.

24          And a final issue, Your Honor, is the Court had set

25   a deadline for the Government's pretrial disclosure of its

Proceedings                                      939

1   witness list.  It had not set a deadline for the defense

2   disclosure of its potential witnesses.  That topic has been

3   the subject of discussions between the parties and we have

4   reached an agreement, and just to put on the record that the

5   agreement is that the Government will alert defense counsel

6   when it anticipates -- when it is a week away from when it

7   anticipates resting its case in chief.  At which point, the

8   defense will disclose its potential witnesses.  And in

9   exchange, the Government will keep the defense apprised of its

10  anticipated next three witnesses in its case in chief at all

11  times.

12          THE COURT:  I think that is an eminently fine

13  suggestion right now.  We are able to count the witnesses on

14  one hand.  Hopefully we will do more in a week than one

15  finger.

16          MR. KOFFMANN:  As I said, Your Honor, hope springs

17  eternal.

18          THE COURT:  As I said earlier, it's awfully cold.

19          MR. KOFFMANN:  Exactly.

20          THE COURT:  Anything else?

21          MR. LAX:  No, Your Honor.  Nothing to add from the

22  Government right now.

23          THE COURT:  Okay.  We appreciate the update from

24  both counsel.

25          I bid you a pleasant evening also and look forward

Proceedings                                                    940

1   to seeing you tomorrow morning.

2              MR. LAX:  Thank you, Judge.

3              MR. KOFFMANN:  Thank you.

4              THE COURT:  You're welcome.

5

6              (Matter adjourned to January 18, 2024 at 10:00 a.m.)

7

8

9                            ooo0ooo

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

941

**I N D E X**

**WITNESS**                                                    **PAGE**


  **ANTONIO PERE**

    DIRECT EXAMINATION (Continuing) BY MR. LAX       798

942

# E X H I B I T S

Exhibit                                                          Page


Government's Exhibits 1171 and 1171-A              800


Government's Exhibit 1206-A                             804


Government's Exhibits 1218-A and 1218-B           808


Government's Exhibits 1252, 1252-A, 1258-A

and 1258-F                                                        811


Government's Exhibit 1273                               816


Government's Exhibit 512-A-2                          824


Government's Exhibits 1298 and 1298-A, as

well 1300-A and B                                             827


Government's Exhibit 1313                               829


Government's Exhibits 1344-A, B, C, D, F, G,

H, I, and J                                                         835


Government's Exhibits 1666 and 1666-A             838

SAM      OCR      RMR      CRR      RPR

943

**E X H I B I T S**

| Exhibit | Page |
|---|---|
| Government's Exhibits 1374 and 1374-A | 840 |
| Government's Exhibits 1401-A, 1508, 1530, 1559, 1565 | 846 |
| Government's Exhibit 504-A-1 | 851 |
| Government's Exhibit 8007 | 859 |
| Government's Exhibits 3015-T-A through 3015-T-H | 871 |
| Government's Exhibit 1575 | 880 |
| Government's Exhibit 1576 | 881 |
| Government's Exhibits 1593 and 1593-A | 892 |
| Government's Exhibit 1593-T | 893 |
| Government's Exhibit 3500-AP-292 | 898 |

944

1                        **E X H I B I T S**

2       Exhibit                                    Page

3

4       Government's Exhibit 3500-AP-351                 899

5

6       Government's Exhibits 3501, 3501-T, 3504,

7       3504-T, 3507, 3507-T, 3509, 3509-T, 3511,

8       3511-T, 3513-R, 3513-T, 3514, 3514-T, 3516,

9       3516-T, 3517, 3517-T                            916

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25