UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,    : 20-CR-00390(ENV)
                             :
                             :
     -against-               : United States Courthouse
                             : Brooklyn, New York
                             :
                             :
                             : Thursday, January 18, 2024
JAVIER AGUILAR,              : 10:00 a.m.
                             :
          Defendant.         :
- - - - - - - - - - - - - - - - X


TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE ERIC N. VITALIANO
UNITED STATES SENIOR DISTRICT JUDGE


A P P E A R A N C E S:

For the Government: BREON PEACE, ESQ.
                    United States Attorney
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201
                BY: JONATHAN POWELL LAX, ESQ.
                    MATTHEW R. GALEOTTI, ESQ.
                    Assistant United States Attorneys


                    U.S. DEPARTMENT OF JUSTICE
                    Fraud Section - Criminal Division
                    1400 New York Avenue
                    Washington, DC 20005
                BY: DEREK ETTINGER, ESQ., ESQ.
                    CLAYTON P. SOLOMON, ESQ.
                    D. HUNTER SMITH, ESQ.
                    Assistant United States Attorneys

                    A P P E A R A N C E S:  (Continued)


For the Defendant:      QUINN EMANUEL URQUHART & SULLIVAN, LLP
                            51 Madison Avenue
                            22nd Floor
                            New York, New York 10010
                        BY:  DANIEL KOFFMANN, ESQ.
                             NICOLE MOLEE, ESQ.

                        QUINN EMANUEL URQUHART & SULLIVAN, LLP
                            111 Huntington Avenue
                            Suite 520
                            Boston, Massachusetts 02199
                        BY:  MICHAEL PACKARD, ESQ.
                             WILLIAM WEINREB, ESQ.


                        QUINN EMANUEL URQUHART & SULLIVAN, LLP
                            865 South Figueroa Street
                            10th Floor
                            Los Angeles, California 90017
                        BY:  WILLIAM PRICE, ESQ.








                                ooo0ooo

Court Reporter:  Stacy A. Mace, RMR, CRR, RPR
                 Official Court Reporter
                 E-mail:  SMaceRPR@gmail.com

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

1              (In open court - jury not present.)

2         THE COURTROOM DEPUTY:  All rise.

3         Court is now open.  The Honorable Eric N. Vitaliano

4    is presiding.  The case on the calendar is USA versus Javier

5    Aguilar, case number 20-CR-390, on for a jury trial.

6         Would the attorneys please note their appearance,

7    beginning with Government counsel.

8         MR. LAX:  Good morning, Your Honor.

9         Jonathan Lax, Matthew Galeotti, Clayton Solomon,

10   Hunter Smith and Peyton Jefferson are here on behalf of the

11   United States.

12        THE COURT:  And good morning to you, Mr. Lax, and

13   your entire table.

14        MR. KOFFMANN:  Good morning, Your Honor.

15        Daniel Koffmann, Michael Packard, William Price,

16   William Weinreb, Nicole Molee, and Raymond McLeod here on

17   behalf of Mr. Javier Aguilar, who is present in court.

18        THE COURT:  And good morning to you, Mr. Koffmann,

19   as well and to Mr. Aguilar, too.

20        THE COURTROOM DEPUTY:  We also have two standby

21   Spanish interpreters who need to note their appearance for the

22   record.

23        INTERPRETER GOTLER:  Good morning.  Marcia Gotler.

24        INTERPRETER BERAH:  Good morning.  Sonya Berah.

25        THE COURT:  And good morning to both of you.  Thank

1    you for your services.

2              THE COURTROOM DEPUTY:  Counsel for both sides are

3    present, including defendant.

4              THE COURT:  All right.

5              Do we have any housekeeping before we begin?

6              MR. LAX:  Your Honor, Jonathan Lax for the

7    Government.

8              I have one very minor housekeeping matter.

9              Yesterday we offered Government Exhibit 8008.  It

10   was a stipulation relating to the recordings.  It wasn't

11   actually received in evidence.  I didn't see it on the

12   transcript.  So, I wanted to just have it noted that it was

13   received.

14             I am happy to offer it again in front of the jury.

15             THE COURT:  No, I thought I said received, I guess

16   maybe I didn't.

17             MR. LAX:  I didn't see it in the transcript, that's

18   the only reason I say that.

19             THE COURT:  We'll make it appear today.

20             MR. LAX:  And so it is.

21             THE COURT:  It's in.  So ordered.

22             (Government's Exhibit 8008 was received in

23   evidence.)

24             THE COURT:  So ordered.

25             If nothing else, then we'll resume.  We'll bring in

1    the Mr. Pere and also the jury.

2                MR. LAX:  Thank you, Your Honor.

3                (The witness entered and resumed the stand.)

4                (Jury enters.)

5                THE COURT:  Be seated, please.

6                Counsel will stipulate that the jury is present and

7    properly seated.

8                MR. LAX:  Yes, Your Honor.

9                MR. KOFFMANN:  Yes, Your Honor.

10               THE COURT:  Thank you, counsel.

11               Ladies and gentlemen of the jury, welcome back.

12   Punctuality is at the top of the list today, so

13   congratulations on, at least, under these continued trying

14   conditions.  Fortunately, you will not be, the rest of us will

15   be tested on Friday, but you won't be tested because, as I

16   indicated to you, we won't be sitting this Friday.

17               But, again, thank you for your punctuality today and

18   your usual attentiveness and cheerfulness, and we all

19   appreciate that.

20               We are ready to resume.  Mr. Antonio Pere has

21   resumed the stand.  I remind him that he is under oath.  We're

22   still on direct examination by Mr. Lax.

23               And that examination may continue now.

24               MR. LAX:  Thank you, Your Honor.

25               (Continued on the following page.)

1  **ANTONIO PERE**,

2       called as a witness by the Government, having been

3       previously duly sworn/affirmed by the Courtroom Deputy,

4       was examined and testified further as follows:

5  DIRECT EXAMINATION (Continuing)

6  BY MR. LAX:

7  Q    Good morning, Mr. Pere.

8  A    Good morning.

9  Q    Is your microphone working?

10 A    It seems no.

11      THE COURT:  Punctuality improves, but technology in

12 this courtroom remains a daily challenge.

13 A    Good morning.

14      THE COURT:  You never know when the gremlin will pop

15 up.  Yesterday it was Mr. Lax's phone, today it is Mr. Pere's

16 microphone.  So God knows what next week will bring.

17      Anyway, try again, Mr. Lax.

18      MR. LAX:  We'll do our best.

19 Q    All right.  Mr. Pere, good morning.

20 A    Good morning.

21      MR. LAX:  Could we please, for the witness, pull up

22 Government Exhibit 1574.

23 Q    Mr. Pere, do you recognize Government Exhibit 1574?

24 A    Yes.

25 Q    What is it?

1   A     It's an e-mail sent to me by Mr. Aguilar.

2   Q     And what's the date?

3   A     May 23, 2019.

4   Q     And there's an attachment to this.

5             MR. LAX:  If we could show the witness, please,

6   Government Exhibit 1574-A.

7   Q     Do you recognize the attachment?

8   A     Yes.

9             MR. LAX:  The Government offers Government

10  Exhibit 1574 and 1574-A.

11            MR. PRICE:  Your Honor, I have no objection, but I

12  think the witness misspoke as to who the e-mail was to and

13  from.

14            MR. LAX:  Could we pull up 1574 again.

15  BY MR. LAX:

16  Q     Who is listed in the "from" line?

17  A     Yeah, it's an e-mail that I sent to Mr. Aguilar.

18            MR. LAX:  Okay.  The Government offers Government

19  Exhibits 1574 and 1574-A.

20            MR. PRICE:  No objections, Your Honor.

21            THE COURT:  Thank you, Mr. Price.

22            No objection and the documents, plural, are received

23  in evidence.

24            (Government's Exhibits 1574 and 1574-A were received

25  in evidence.)

1       (Exhibit published.)

2       MR. LAX:  I'll note, we -- we have a Government

3   Exhibit 1574-T.  I don't think we've actually reached a

4   stipulation on that.

5       So I'll offer it now subject to connection of the

6   parties reaching a final resolution on the -- on the

7   transcript or the translated version of this document.

8       MR. PRICE:  No problem, Your Honor.

9       THE COURT:  The record will so reflect.

10      (Government's Exhibit 1574-T was so marked.)

11  BY MR. LAX:

12  Q    So, Mr. Pere, we are sort of taking a step back for a

13  moment from where we left off yesterday.

14      This e-mail is May 23rd, 2019.

15  A    Correct.

16  Q    And I think you testified yesterday about a meeting that

17  you had with the defendant on this day or the following day?

18  A    Yes.

19      MR. LAX:  Could we please pull up Government

20  Exhibit 1574-A, the attachment.

21      (Exhibit published.)

22  Q    In the first paragraph, Mr. Pere, where it says -- I'm at

23  the end of the very first line here, "it is in" -- well, first

24  of all, what is this attachment?

25  A    This is a draft of a letter that I prepared to be sent to

1  Mauricio Samaniego at PetroEcuador.

2  Q    And at the very first, the end of the first line there it

3  says, "it is in our best interest to resolve the temporary

4  invoicing issue and obtain the final ones as soon as

5  possible."

6           What were you referring to there?

7  A    Referring to the fact that there was no agreement as to

8  the price for finishing the contract, I mean for -- for formal

9  invoices with the new price.

10 Q    The fuel oil contract?

11 A    Yes.

12 Q    Okay.

13          MR. LAX:  Thank you, Ms. Jefferson.

14 Q    And now, let's pick up where we left off yesterday.

15          MR. LAX:  And if we could please pull up Government

16 Exhibit 3015-T-F in evidence.

17          (Exhibit published.)

18          MR. LAX:  Okay.

19 Q    So, Mr. Pere, this is another extract of your

20 conversation via WhatsApp with the defendant, is that right?

21 A    Yes.

22 Q    I'd like to direct your attention to the message all the

23 way on the bottom.

24          What date did you send this message?

25 A    This is January 20, 2020.

1   Q    And what did you write?

2   A    "I'm sending you this draft reply to the OTI letter in

3   the strictest confidentiality, please.  As you will see, they

4   are proposing the price in the way I put forward to you."

5             MR. LAX:  All right.  Could we look at the next

6   page, please, of this exhibit.

7             (Exhibit published.)

8   Q    And the message that you sent after that, the same date?

9   A    Yes.

10  Q    And what did you write?

11  A    "OF reply OTI proposal January 2020."

12  Q    What did you mean by "OF"?

13  A    I think I -- that's a typo and should be FO, fuel oil.

14  Q    We'll come to the attachment in just one moment, but I

15  just want to direct your attention now to the bottom two

16  messages on this same page.

17            The defendant responded to you:  "The Chinese told

18  me that in the price in their contract the differential was

19  fixed."

20            Do you see that?

21  A    Yes.

22  Q    And then he said:  "Is there a way to check that?"

23            What do you understand those messages to mean?

24  A    I understand from this messages that Mr. Aguilar talked

25  to a Chinese company that was purchasing fuel oil from

1   PetroEcuador also.  And this Chinese company told him that the
2   price issue, the differential was fixed.
3   Q    Let's look at the attachment now, please, which is the
4   third page of Government Exhibit 3015-T-F.
5        So, here's the attachment that you sent as part of
6   that message.
7        (Exhibit published.)
8   Q    Can you explain what this is?
9   A    Yes.  This is a letter in reference to a potential new
10  fuel oil contract between PetroEcuador and Oman Trading
11  International, OTI.
12  Q    For what period of time?
13  A    November 2020 to December 2023.
14  Q    And a couple lines beneath that where it says, "Price, PF
15  equals PLATTS plus or minus differential."
16  A    Yes.
17  Q    What does that mean in the context of the text messages
18  we just looked at?
19  A    This is the way in which the price per barrel is to be
20  set, and it has two parts.  The first part where it says
21  PLATTS is -- it's an official reference.  PLATTS is a company
22  that reports prices of different products every day.  So, this
23  is a number that changes every day, and not PetroEcuador nor
24  Vitol have any influence in that part.
25        Then you add or subtract what's called the

1  differential, which is the issue that has been discussed so
2  much between OTI and PetroEcuador, and that's a fixed amount
3  that in the first contract was set to be negotiated or
4  renegotiated every six months.
5  Q    All right.
6         MR. LAX:  If we could please now pull up Government
7  Exhibit 3015-T-G, also in evidence.
8         (Exhibit published.)
9         MR. LAX:  All right.
10 Q    So, Mr. Pere, we're looking at another extract of your
11 WhatsApp chat with the defendant, is that right?
12 A    Yes.
13 Q    All right.  I'd like to direct your attention to the
14 second message on this page.
15        Sent by you on what date?
16 A    On February 5, 2020.
17 Q    And you wrote:  "Mauricio is going to be in Houston
18 Thursday and Friday and he wants to meet with 'the OTI
19 people.'"
20        First, who were you referring to when you wrote
21 Mauricio?
22 A    Mauricio Samaniego, PetroEcuador.
23 Q    And what did you mean when you wrote, in quotes, the OTI
24 people?
25 A    With the people who handle the OTI contract, and I meant

1   to say Vitol people, that's why I put 'em in -- put those

2   words in quotes.

3   Q    All right.

4           MR. LAX:  Ms. Jefferson, can we now take a look at

5   the defendant's two replies.

6   BY MR. LAX:

7   Q    How did the defendant reply to your message?

8   A    "This Thursday and Friday?"  He's asking.

9   Q    And the next one.

10  A    He's saying that he's not in.

11          MR. LAX:  Ms. Jefferson, let's go to the next page,

12  page 2 of 3015-T-G.  And let's look at the top two messages,

13  please.

14          (Exhibit published.)

15  Q    So, here the defendant wrote to you, "And there is no one

16  from OTI here."

17          Do you see that?

18  A    Yes.

19  Q    And how did you respond?

20  A    I said:  "Of course there is no one from OTI, but I

21  thought it might be worthwhile for him to meet with you."

22  Q    And by "him" who are you referring to?

23  A    Mauricio Samaniego.

24          MR. LAX:  Ms. Jefferson, could we please now jump to

25  page 7 of this exhibit.  And let's look at the first message

1   on the page.

2           (Exhibit published.)

3   Q    All right.  So we're still February 5th, 2020.

4           Do you see that?

5   A    Yes.

6   Q    You wrote:  "Could you meet right now with Mau at the

7   Sheraton City Center?"

8           Who were you referring to as Mau?

9   A    Mauricio Samaniego again.

10          MR. LAX:  And, Ms. Jefferson, can we please look at

11  the following two messages sent in reply.

12          (Exhibit published.)

13  BY MR. LAX:

14  Q    How did the defendant respond to your text message there?

15  A    Well, he said yes.  And "but give me 45 minutes."

16          MR. LAX:  All right.  Ms. Jefferson, now turning to

17  page 8, and if we could zoom in on the bottom two messages.

18          (Exhibit published.)

19  Q    So still February 5th, is that right?

20  A    Yes.

21  Q    You wrote to him:  "I'll tell him."

22          Who were you referring to there?

23  A    Mauricio Samaniego.

24  Q    And how did the defendant respond to you?

25  A    He said, "Confirmed."

1     MR. LAX:  And then let's look at the next message,
2  which can be found on page 9.
3          (Exhibit published.)
4  Q    And how did you respond, in turn, to that?
5  A    "Looks like it."
6          MR. LAX:  Ms. Jefferson, could we please now go to
7  page 10, and zoom in on the very bottom message.
8          (Exhibit published.)
9  Q    All right, so we're still February 5th, 2020.
10         Do you see that?
11 A    Yes.
12 Q    What did you write to the defendant here?
13 A    I said, "When you meet, remember that if it's needed, the
14 name of the intermediary is Nicolas."
15 Q    Who were you referring to there, "Nicolas"?
16 A    Nicolas Naranjo.
17 Q    All right.  I am going to adjust the board a little bit.
18         Nicolas Naranjo was the same person pictured in
19 Government Exhibit 10?
20 A    Yes.
21 Q    In that message, Mr. Pere, you described him as an
22 intermediary.
23         An intermediary between who?
24 A    Between Vitol and Mauricio Samaniego, between Javier
25 Aguilar and Mauricio Samaniego.

 1   Q     And we covered this yesterday, but his nickname again was

 2   what?

 3   A     Dr. Baker.

 4   Q     All right.  So back to the messages.

 5         MR. LAX:  Let's go to page 11, please, just the very

 6   next message.

 7         (Exhibit published.)

 8         MR. LAX:  And we'll look at the first one from

 9   there.

10   BY MR. LAX:

11   Q     So still February 5th, 2020, is that right?

12   A     That's right.

13   Q     And you wrote to the defendant:  "Confirm with me if you

14   spoke."

15         Do you see that?

16   A     Yes, I see it.

17   Q     Beneath that then you receive two screenshots.

18         Do you see that there?

19   A     Yes.

20         MR. LAX:  Let's go ahead to page 13.  We'll look at

21   one of them.

22   Q     So, this is one of the screenshots that you received from

23   the defendant?

24   A     Yes.

25   Q     What is this?

1   A     This is the chat via WhatsApp that he had at that moment

2   with Mauricio Samaniego.

3   Q     And can you see what they are discussing?

4   A     They are just agreeing for a meeting at the Sheraton

5   Hotel in 45 minutes.

6   Q     All right.

7          MR. LAX:  Ms. Jefferson, can we now please turn to

8   page 15 of Government Exhibit 3015-T-G, the same exhibit.  And

9   let's look at the second message on the page, please.

10          (Exhibit published.)

11  Q     All right.  So still February 5th, 2020.  You wrote:  "I

12  wanted to stretch out the matter a little since Mau may leave

13  soon, but there's no reason to wait because he might not even

14  go.  Whoever goes will still be from the minist and we control

15  it."

16          First, who were you referring to when you wrote

17  "Mau"?

18  A     Mauricio Samaniego, again.

19  Q     Can you explain what you meant by "stretch out the matter

20  a little... but there's no reason to wait"?

21  A     What I meant was that I had not been pushing so

22  aggressively, that I was not trying to -- to be too fast on

23  this matter because Mauricio would be leaving soon probably.

24          But then I said, "but there's no reason to wait"

25  because he might not even go, saying, hey, maybe he stays at

1    the end, who knows.

2           Then I go to say:  Whoever goes or whoever is

3    appointed to that position will still be from the minister and

4    that we control it.

5    Q    What did you mean by "we control it"?

6    A    That it would be somebody we could work with, meaning we

7    can pay and have him support us in any way that's necessary.

8           MR. LAX:  Let's look at the defendant's response,

9    the very next message, please.

10          (Exhibit published.)

11   Q    And the defendant responded simply:  "Ok."

12   A    Correct.

13   Q    All right.

14          MR. LAX:  Ms. Jefferson, could we turn now to the

15   next page, page 16.

16          (Exhibit published.)

17          MR. LAX:  And let's zoom in on just the top two

18   messages.

19   Q    All right.  So now we're into February 6th, 2020?

20   A    Yes.

21   Q    And the defendant wrote to you:  "Can you talk?"

22          Do you see that?

23   A    Yes.

24   Q    How did you respond?

25   A    I will call you in 15, please.

1   Q    Okay.  I'd like now, Mr. Pere, to direct your attention
2   to the transcript binder that's in front of you.  And we are
3   going to turn to Government Exhibit 3504.
4            MR. LAX:  And, Ms. Jefferson, if we could queue that
5   up for the record, please.
6   BY MR. LAX:
7   Q    Let me know when you're ready, Mr. Pere.
8   A    I am.
9   Q    So, 3504.  What's the date of this recording?
10  A    February 6, 2020.
11  Q    Same date where we just left off in the text messages?
12  A    Yes.
13  Q    Where were you physically located when this call took
14  place?
15  A    I was in Brooklyn.
16           MR. LAX:  All right.  Ms. Jefferson, can you please
17  start playing?
18           (Audio recording played; paused.)
19           MR. LAX:  Can you play just one more?
20           (Audio recording played; paused.)
21           MR. LAX:  All right.
22  Q    Mr. Pere, I'd like to back up and ask you a couple
23  questions about that approximately one-minute clip.
24           MR. LAX:  And for the record, we've paused at one
25  minute and 12 seconds.

1    Q    Directing your attention to the first page of this

2    transcript in box 6, when the defendant said to you "he

3    greeted me in a very gushy manner," who did you understand him

4    to be referring to?

5    A    Mauricio Samaniego.

6    Q    And what did you understand when he said "very gushy

7    manner"?

8    A    That he was very curtish [sic]--

9         (The witness conferred with the interpreter.)

10   A    -- courteous and very -- he mentions here very open.

11   Q    Now, turning to same page in box 8, when the defendant

12   referred to the notice to OTI would be going out soon, what

13   did you understand him to be referring to?

14   A    He's referring to that letter that PetroEcuador had to

15   send to OTI regarding this new contract.

16   Q    And now directing your attention to the next page, and

17   I'll focus you at the bottom of box 9 and that exchange that

18   goes to about where we stopped at 13.

19        When you said:  I want to know what details you have

20   before -- before talking to -- yes, with -- and he told me no,

21   to the friends over there.

22        You said before talking to the friends over there.

23        What were you referring to?

24   A    Before talking to the people in Ecuador, the people from

25   PetroEcuador.  Before talking with Nicolas Naranjo.

1  Q     All right.

2         MR. LAX:  Ms. Jefferson, could we please pick up

3  where we left off.

4         (Audio recording played.)

5         MR. LAX:  You can stop there, please.

6         (Audio recording paused.)

7         MR. LAX:  Thank you.

8         For the record, we're stopping at 4 minutes and

9  29 seconds.

10 BY MR. LAX:

11 Q     Mr. Pere, I just want to ask you a couple of questions

12 about some of that that we just went through.  I'll refer you

13 to page 4 of the transcript at the bottom of box 22.

14        When the defendant said:  So, no, we kept talking

15 about the political issues and about Lenín and how bad the

16 Government is, who did you understand him to be referring to

17 when he said Lenín?

18 A     Lenín Moreno, the president of Ecuador at the time.

19 Q     And he continued:  I don't know what else -- and he says

20 to me, but the good thing is that -- is that now is the time

21 to do things.  Right now we can get anything.

22        When the defendant said "he" says to me, who did you

23 refer [sic] him to be referring to there?

24 A     To Mauricio.

25 Q     All right.

1          MR. LAX:  And then I'll direct everyone's attention

2     back to page 5 where we had left off at the top where it

3     begins -- oh, hold on.

4          Ms. Jefferson, can you play that?

5          (Audio recording played.)

6          MR. LAX:  Pause it.

7          (Audio recording paused.)

8          MR. LAX:  So, for the record, we're stopping now at

9     8 minutes and 2 seconds.

10    BY MR. LAX:

11    Q    Mr. Pere, just a moment ago, I'm on page 8, box 39, you

12    said:  I can tell you that without a shadow of a doubt he is

13    involved.  He -- he receives his -- his -- his thing.

14         Who were you referring to?

15    A    Mauricio Samaniego.

16    Q    What did you mean by "thing"?

17    A    Money.

18    Q    And the defendant responded to you how?

19    A    His share.

20         MR. LAX:  All right, we'll pick up from where we

21    were, please.

22         (Audio recording played.)

23         MR. LAX:  And we're stopping again now at 8 minutes

24    15 seconds.

25         (Audio recording paused.)

1    Q    I want to refer you back to page 8, 43.

2           Mr. Pere, when you said:  He is going to earn some

3    money there, you know that; who were you referring to?

4    A    Mauricio Samaniego.

5    Q    And how did the defendant respond to you?

6    A    He says:  Yes, yes, okay.  And in fact, I mean -- I

7    noticed that he was being very open, very cooperative.

8    Q    I'm sorry, I was asking about 43.  It goes from page 8,

9    onto page 9.

10   A    I'm sorry.

11   Q    He is going to earn some money there, you know that.

12          The defendant's response, line 44?

13   A    Yes, he said -- well, I said Mauricio Samaniego is going

14   to make money, he's gonna receive money.  You know that.

15          And Mr. Aguilar responds:  Of course.

16          MR. LAX:  All right, Ms. Jefferson, could we please

17   resume.

18          (Audio recording played; paused.)

19          MR. LAX:  Stop.  Thank you.

20   Q    So, Mr. Pere, now for the record we've stopped at 9

21   minutes and 26 seconds.

22          Referring you back to page 9 of the transcript, at

23   the very bottom of box 49, do you see that?

24   A    Yes.

25   Q    You referred to someone as "our friend José."  Who were

1   you referring to there?

2   A     José Agusto.

3   Q     And then turning to the next page, page 10, box 53, when

4   you said "the one who runs the distribution of payments and

5   all that, well, that's Nicolas."

6           Who were you referring to there?

7   A     Nicolas Naranjo.

8           MR. LAX:  All right, let's resume.

9           (Audio recording played.)

10          MR. LAX:  Stop it.

11          (Audio recording paused.)

12  BY MR. LAX:

13  Q     So, for the record now, Mr. Pere, we've stopped at

14  12 minutes, 11 seconds.

15          I'd like to direct your attention to page 12,

16  box 67.  When you said he is going to be motivated to make

17  things happen quickly, who were you referring to by "he"?

18  A     Mauricio Samaniego.

19  Q     And then you continued in the same, a little bit further

20  down in that same box:  I am not coming through with the

21  payments that I was supposed to make for -- from the previous

22  deal.

23          What -- what were you referring to there?

24  A     I'm saying that I had not paid, that I'm not being able

25  to pay the people in PetroEcuador in regards to the fuel oil

1    contract between PetroEcuador and OTI.

2    Q    Which people?

3    A    Nicolas Naranjo and through him José Agusto, Mauricio

4    Samaniego, and other people in PetroEcuador.

5    Q    Is that in relation to the promises that you had

6    testified about yesterday?

7    A    Yes.

8    Q    And then the defendant responded to you on page 13,

9    box 70.

10            I'm fixing that already, believe me, believe me,

11   believe me.

12            Is that what he said back to you?

13   A    Yes.

14            MR. LAX:  All right, Ms. Jefferson, can you please

15   resume?

16            (Audio recording played; paused.)

17            MR. LAX:  Thank you.

18   BY MR. LAX:

19   Q    So now, Mr. Pere, we're stopping at 12 minutes,

20   43 seconds.

21            Same page, page 13, box 71, there's a reference now

22   to Enrique and to Lionel.

23            Who were you referring to?

24   A    I'm referring to Enrique Pere and to Lionel Hanst.

25   Q    And then in box 73 at the bottom when you said because he

1    wants to do it all with -- with new accounts, what did you
2    mean by that?
3    A    That Lionel was going to pay us from accounts that still
4    needed to be open, that he was going to pay from different
5    accounts.
6    Q    And then when the defendant in the next line, 74,
7    responded:  Well, yes, that in fact he is, he is working on
8    that; who did you understand him to be referring to?  Sorry.
9    A    Lionel Hanst.
10   Q    Okay.
11        MR. LAX:  All right, Ms. Jefferson, let's please
12   resume.
13        (Audio recording played; paused.)
14        MR. LAX:  Thank you.
15   Q    So now, Mr. Pere, we've stopped at 13 minutes,
16   44 seconds.
17        Page 14 in box 84, when the defendant said to you:
18   When there are new things to do, well, they are always
19   reminding you of the past; what did you understand him to be
20   referring to?
21   A    That any time the company wants or Javier Aguilar or
22   anybody in his position, I would say, wants to pursue some new
23   business, the people that have not been paid will remind you
24   of that, will remind you of the fact that, yes, I mean that,
25   hey, we have not been paid.

1    Q    And then a little bit beneath that he then says:  There

2    is a commitment.  It's a commitment.  I mean I will take it

3    on.

4         What did you understand the defendant to mean when

5    he said that?

6    A    That he was going to keep his word, that there was an

7    agreement, a commitment to pay something, and that he would do

8    it.

9    Q    Pay what?

10   A    Bribes.

11   Q    All right, let's turn to another recording, please.

12        MR. LAX:  Ms. Jefferson, let's turn to Government

13   Exhibit 3505.  I'm sorry, 3507.

14

15        (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

1   DIRECT EXAMINATION

2   BY MR. LAX:  (Continuing)

3   Q    And Mr. Pere, I will direct you to page 6, box 26.  We

4   are to begin at 6 minutes and 23 seconds.

5   A    I'm sorry, you're saying page 6?

6   Q    I'm in Government Exhibit 3507-T, page 6, box 26.

7   A    Okay.

8            MR. LAX:  And Ms. Jefferson, when you're ready.

9            (Audio playing.)  (Audio paused.)

10           MR. LAX:  So, for the record, we have stopped at 7

11  minutes, 15 seconds.

12  Q    Mr. Pere, I forgot to ask you, 3507 is a new recording.

13  What's the date of this recording?

14  A    February 12, 2020.

15  Q    So about a week after the one that we were just listening

16  to?

17  A    Yes.

18  Q    Referring you to page 7, box 30, the defendant referred

19  to someone named Pepe Dapelo.  Who did you know him to be

20  referring to?

21  A    He is an Ecuadorian that introduced himself as a good

22  intermediary to do business with PetroEcuador.

23  Q    Have you ever met Pepe Dapelo?

24  A    No, I haven't.

25  Q    Did you work with him at all in connection with this?

1    A     No.

2          MR. LAX:  All right.  Ms. Jefferson.

3          (Audio playing.)  (Audio paused.)

4          MR. LAX:  All right.  For the record, we are

5    stopping at 10 minutes and 4 seconds.

6    Q     Mr. Pere, let me direct your attention to page 8, box 39,

7    and I will refer you down to the fifth line in box 39 where

8    you refer to a person by the name of Jose.  Who are you

9    preferring to there?

10   A     Jose Agusto.

11   Q     And then a little bit further down, after where you said

12   energy minister, I've been close to him, who are you referring

13   to there?

14   A     Jose Agusto.

15   Q     All this time, for safety reasons and peace of mind, I

16   don't write to him but rather everything we agree upon is

17   through Nicolas.  What did you mean by safety reasons and

18   peace of mind?

19   A     That we would have been talking about this kind of

20   agreement in which there were payments and processes that

21   really were not legal and Jose and I thought that it was

22   better not to have a record of those conversations or texts or

23   anything like that.

24   Q     Let me now direct your attention to page 9 at the bottom.

25   There is a reference there to Dapelo.  Is that Pepe Dapelo?

1   A    Yes.

2   Q    And then when you say:  I have great confidence in him

3   and also the conditions he may have with me are better than

4   the ones he may get with the intermediaries on the other side,

5   what did you mean by that?

6   A    I mean that Jose Agusto knows me, knows that I am fair in

7   the distribution of benefits of a contract, and that I'm going

8   to be better at that than some other intermediary.

9   Q    Let's turn to another recording now, if we might.

10  Government Exhibit 3509.  What's the date of this recording?

11  A    February 25, 2020.

12       MR. LAX:  Ms. Jefferson, we are going to play this

13  one from the beginning, please.

14       (Audio playing.)

15  Q    You referred to yourself as Leonardo.  What did you mean

16  by that?

17  A    That's a code name that the FBI used, that I used with

18  the FBI.

19  Q    Did you use that as directed by the FBI?

20  A    Yes, I did.

21       (Audio playing.) (Audio paused.)

22       MR. LAX:  For the record, we are stopping at 3

23  minutes and 29 seconds.

24  Q    Mr. Pere, let me refer you back to page 3 of the

25  transcript, box 23.  When you said, The matter of the BLs but

1  you're the one who has to produce those for him, what were you

2  referring to?

3  A    I'm referring to the bill of lading, which is the

4  document, the official document that states that a certain

5  product, a certain volume was loaded on to the vessel on a

6  specific date, and Lionel had told Enrique that Javier Aguilar

7  was the one who had to produce or get him those BLs.

8  Q    Why?

9  A    Because they were needed.  They were required by the

10 bank.

11 Q    Now, I'll direct your attention to page 5.  At the very

12 top when the defendant said that he has to do now is, well, he

13 has to make up some fake contracts.

14       What did you understand the defendant to mean by

15 that.

16 A    That Lionel had to create, produce contracts that were

17 fake, as clear as that.

18 Q    Why?

19 A    Because they would not reflect the actual reason for the

20 payment that Lionel was making to our company.

21 Q    Which was what?

22 A    It was money to be paid to people in the Ecuadorian

23 Government.

24       MR. LAX:  All right.  Ms. Jefferson.

25       (Audio playing.) (Audio paused.)

1      MR. LAX:  So for the record, now we are stopping at

2  5 minutes and 40 seconds.

3  Q    Mr. Pere, let me direct you back to page 6, box 53, when

4  you said, I'm so late on the matter of payments to the

5  defendant, what did you mean by that?

6  A    That I had not been able to pay the people in Ecuador.

7  Q    And in line 54, how did the defendant respond?

8  A    No, I know dude, I know.

9      MR. LAX:  Your Honor, it is 11:30.  I'm going to

10  turn to another recording.  It is not particularly long.  I'm

11  happy to keep going but I am also at a good place for a break

12  if the Court would like.

13      THE COURT:  Yes, we shall.  We actually got started

14  a little more on time this morning, so we will move up the

15  break a little as well.  We will take your suggestion, Mr.

16  Lax, and take that break now.

17      Ladies and gentlemen, we will take a break and

18  refresh, use some of the rooms back there.

19      Keep an open mind.  Don't discuss the case with

20  anyone else or who you may run into in the hall, and we will

21  see you in about 15 minutes or so.

22      (Jury exits the courtroom.)

23      THE COURT:  We all can take a stretch and then we'll

24  see you in about 15 or so.

25      (Brief recess.)

 1          THE COURTROOM DEPUTY:  All rise.  Court is back in

 2   session.  Counsel for both sides are present, including the

 3   defendant.

 4          THE COURT:  Are we ready to go?

 5          MR. LAX:  Yes, Your Honor, we are.

 6          THE COURT:  Then we shall.

 7          (Jury enters.)

 8          THE COURT:  Be seated, please.

 9          Counsel will stipulate that the jury is present and

10   properly seated.

11          MR. LAX:  Yes, Your Honor.

12          MR. KOFFMANN:  Yes, Your Honor.

13          THE COURT:  Thank you, counsel.  Thank you, ladies

14   and gentlemen, welcome back, we are in the homestretch of the

15   morning session.  Again, we continue where we left off.  Mr.

16   Pere is on the stand.  Mr. Lax continues direct examination.

17          MR. LAX:  Thank you, Your Honor.

18   BY MR. LAX:

19   Q    Mr. Pere, I will direct you now to Government Exhibit

20   3511-T.  What is the date of this recording?

21   A    February 27, 2020.

22   Q    All right.  We are going to begin playing from the

23   beginning.

24          (Video playing.) (Video paused.)

25   Q    All right.  We have stopped the video clip at 3 minutes

1  and 50 seconds.

2        I just to direct your attention to the portion that

3  we just heard right now on page 5.  In box 38, when the

4  defendant said:  I don't want to tell him on the phone, who

5  did you understand the defendant to be referring to?

6  A    To Mauricio Samaniego.

7  Q    And then you continued a little bit later, I don't know

8  if he understands it, he infers it or not.  What did you

9  understand the defendant to mean when he said it?

10 A    I don't know -- he is saying he doesn't know if Mauricio

11 is clear about the fact that OTI will not be able to pay the

12 best price.

13 Q    The best price for what?  What's this referring to?

14 A    He is referring to the fuel oil.

15 Q    The future one that you were testifying about earlier?

16 A    Yes, the future one.

17 Q    All right.  I'd like now to direct your attention to

18 Government Exhibit 3513.  I guess we have got 3513-R on the

19 screen.

20        So, first, Mr. Pere, what is the date of this

21 recording?

22 A    3513-T is what I'm looking at.

23 Q    Yes.  T is the transcript.  The video that's on the

24 screen is 3513-R.

25 A    Okay.

1    Q    What is the date of this recording?

2    A    March the 5th of 2020.

3    Q    So far you've been hearing telephone calls.  Was this a

4    telephone call?

5    A    No.  This is a video recording.

6    Q    Of what?

7    A    Of a meeting I had with Javier Aguilar and Enrique Pere

8    in Houston.

9    Q    And now look at the screen, the box in the middle, is

10   that the video?

11   A    That's the initial part of the video, yes.

12   Q    There are some additional participants now on the right.

13   The way in which you described it earlier in terms of the

14   colors of the texts, does that indicate the speaker here as

15   well?

16   A    Yes, from what I remembered last time I saw it yes.  I

17   would have to see it again.

18   Q    Okay.  Where was the camera hidden during this meeting?

19   A    Enrique Pere had it in his watch.

20            THE COURT:  So I am clear, all of the participants

21   are in the same room at the same time?

22            THE WITNESS:  Yes.

23   Q    Well, let's see.  Who was physically present for the

24   meeting?

25   A    Javier Aguilar, Enrique Pere, and myself.

1    Q    Did anyone else join the meeting by phone at one point?

2    A    Yes.

3    Q    Who?

4    A    Lionel Hanst.

5    Q    And where exactly was the meeting?

6    A    At the Marriott Hotel in Houston, at a restaurant.

7    Q    All right.  I'd like to direct your attention to -- we

8    will start at page 9, at box 132, and we're going to begin

9    playing from 6 minutes and 10 seconds.

10            (Video playing.) (Video paused.)

11   Q    Pausing now at 7 minutes and 41 seconds, Mr. Pere, what

12   happened in the video?

13   A    Javier Aguilar called Lionel Hanst and put him on

14   speaker.

15            (Video playing.) (Video paused.)

16            MR. LAX:  Pausing now at 9 minutes, 33 seconds.

17   Q    Mr. Pere, directing your attention to page 13, box 171,

18   when the defendant said since I arrived, I was told you have

19   to speak with him, who did you understand the defendant to be

20   referring to as him?

21   A    Lionel Hanst.

22            (Video playing.) (Video paused.)

23   Q    All right.  So now pausing the video at 11 minutes.

24            Mr. Pere, directing your attention to page 14, box

25   194, when the defendant said he is up there already at the

1  place of the country of cheese, what did you understand the

2  defendant to be talking about there?

3  A    I understand that there was somebody in Switzerland for

4  coordinating those payments with Lionel.

5  Q    And in the same box when the defendant said my colleague

6  is the one who put together the circuit, what did you

7  understand the defendant to mean by circuit?

8  A    For me, circuit is establishing the way for making

9  payments in reference to companies, accounts, locations.

10  Q    Now, turning to box 196 on the same page, the defendant

11  said:  Now this one, he was on this side of the hemisphere.

12  Who did you understand the defendant to be referring to?

13  A    Let me read that again for one seconds.

14        That this person is in charge of managing or

15  conducting this type of payment on this hemisphere.

16  Q    Which hemisphere?

17  A    Ours.

18        MR. LAX:  All right.  Ms. Jefferson, let's please

19  continue.

20        (Video playing.) (Video paused.)

21  Q    Mr. Pere, I'm stopping again at 11 minutes, 48 seconds.

22  The text now is in green.  Who is speaking now when the text

23  is in green?

24  A    Enrique Pere.

25  Q    And earlier we saw a text that was in light blue.  Who

1   was speaking when the text was in light blue?

2   A    I didn't look at the color before.

3   Q    Who else joined the call?

4   A    Lionel Hanst.

5        (Video playing.) (Video paused.)

6   Q    Mr. Pere, stopping now at 14 minutes and 7 seconds.

7        Just a moment ago -- I'm on page 18, box 251 -- when

8   the defendant referred to the differential, what did you

9   understand that to mean?

10  A    He's referring to the price issue we've been having.

11  Q    Under the original fuel oil contract?

12  A    Correct.

13       MR. PRICE:  Your Honor, before we start again, just

14  for the record, I don't want the jury to be confused.  The

15  transcript I received from the Government have the pages out

16  of order.  I just want to make sure that's not the case with

17  the jury.  I went from page 17 to 20 but found the pages

18  later.  I just want to make sure that everyone is keeping up.

19  Okay.

20       THE COURT:  Hearing no response, it looks like

21  you're the lone wolf, Mr. Price.

22       MR. PRICE:  I wondered how that happened.

23       MR. LAX:  I'm happy to trade out if it helps.

24       MR. PRICE:  I'm fine.

25       MR. LAX:  Sorry about that.

1      THE COURT:  Just a test.  Apparently, you passed.

2      (Video playing.) (Video paused.)

3   Q    Mr. Pere, we just stopped the video at 15 minutes and 40

4   seconds.  Right there, page 20, box 269, when the defendant

5   said:  We're in contact with him, who did you understand the

6   "him" to be in that?

7   A    Let me read in English.  I was following in Spanish, just

8   to make sure.

9          We're in contact with Lionel.

10         MR. LAX:  Okay, Ms. Jefferson.

11         (Video playing.) (Video paused.)

12         (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (Continuing.)

2   BY MR. LAX:

3   Q    All right, Mr. Pere, we are stopping now at 21 minutes

4   and 40 seconds.

5            Just directing your attention to page 27, in box

6   350, when the Defendant said, I met him like eight years

7   ago, who did you understand the Defendant to be referring to

8   there?

9   A    Lionel Hanst.

10           MR. LAX:  All right.  I am going to skip ahead

11  just a little bit to page 29, at the top.

12           And, Ms. Jefferson, I think the timestamp is going

13  to be 23:03 or thereabouts.

14           (Video played; video paused.)

15           MR. LAX:  Stopping now at 25 minutes, 12 seconds.

16  Q    Mr. Pere, I will just direct your attention to page 30,

17  box 391.  There is a reference to -- the Defendant mentions

18  something called Glencore.

19           What is Glencore?

20  A    Glencore is another trading company.  Another very big

21  trading company.

22  Q    And then a little bit later in that same bit refers to

23  something called Lava Jato, what is that?

24  A    That's the --

25  Q    What is your understanding of what that was?

1  A    -- corruption scandal in Brazil which had to do mainly

2  with the company called Odebrecht.

3  Q    Thank you.

4            MR. LAX:  You can proceed.

5            (Video played; video paused.)

6            MR. LAX:  All right.  Pausing at 29 minutes and

7  43 seconds.

8  Q    Mr. Pere, let me direct your attention to page 34,

9  box 430 at the bottom, when the Defendant said, And I said

10 to them, I need at least 250 to be taken from me because I

11 have to show these people who -- I have to show that they

12 do, so please, before they close it, take it out, what did

13 you understand the Defendant to be talking about there?

14 A    That he told the people managing the payments that he

15 needed, meaning Javier Aguilar, that he needed to show these

16 people, meaning us, I have to show that they do, so please,

17 before they close it, take it out.

18            He's referring to the companies that had been used

19 and before Zanza Oil and Lion Oil, were going to be close,

20 before closing those companies, he wanted to make the

21 payments from those companies to our company.

22 Q    And then you said in the next line:  So the idea would

23 be that these 250 are made from the existing structure.

24            What did you mean by that?

25 A    I mean that the $250,000, that Vitol, through Hanst,

1   was going to pay us, would come to us through the same

2   structure they had before, meaning Lion Oil and Zanza Oil.

3   Q    And the 250 was payment owed for -- in connection with

4   what?

5   A    With the fuel oil contract between PetroEcuador and OTI.

6   Q    The one that was signed in 2016?

7   A    Correct.

8   Q    Let me now direct your attention to page 35.  I'm in

9   box 440.

10         When the Defendant said, I would tell you to get

11  this out and you can't deliver in Switzerland or something

12  like that, what did you understand him to be asking you?

13  A    He's asking us to -- I mean, he is asking us if it's

14  possible to receive payment in Switzerland.

15  Q    Did you have an understanding as to why?

16  A    Yes.

17             MR. PRICE:  Objection.

18             Calls for speculation.

19             THE COURT:  He has an understanding.  The answer

20  was he does.

21  Q    Based on?  Based on what?

22  A    Based on the fact that they were having problems in

23  the -- in Curacao, they needed to do it somewhere else.

24  Q    And based on the recording that we're watching now, in

25  part?

1   A     Yes.

2   Q     So what was the reason?

3   A     The reason for making the payments in Switzerland?

4   Q     Right.

5   A     The reason was that there were problems at the island

6   with Lionel with the structures and Javier thought that it

7   would be easier, that was my understanding, or that it was

8   possible to do it in Switzerland.

9   Q     Why Switzerland?

10  A     I don't know.

11        MR. LAX:  All right.  Ms. Jefferson, if we could

12  please proceed.

13        (Video played; video paused.)

14        MR. LAX:  Stopping now at 33 minutes and

15  47 seconds.

16  Q     Mr. Pere, directing your attention to page 40,

17  box 503 --

18  A     Before we do that, I'm going to ask you to please, when

19  you resume the -- playing the recording, to mention the box

20  number, because it's -- it's a little bit easier for me

21  to -- to follow.

22  Q     Happy to do that.  I'm sorry that I didn't do that

23  before.

24  A     No, it's okay.  I mean, I have been keeping up, but

25  it's going to make it easier.

1  Q    I think that makes sense for everyone.

2        So page 40, box 503, when the Defendant said:  So

3  he doesn't care much about whether it is related or not

4  related.

5        First, who did you understand the Defendant to be

6  referring to by "he"?

7  A    Lionel Hanst.

8  Q    And then what did you understand to mean when he said

9  related or not related?

10 A    Related or not related to the actual obligation that we

11 have.

12 Q    What was related or not related?

13 A    The payment that Hanst makes.  He's saying he doesn't

14 care much if it's related or not related to the actual

15 services provided by the company he's going to make a

16 payment to.

17 Q    Services listed where?

18 A    In the contract, in the original contract between one

19 of Lionel's companies and one of ours.

20 Q    And then later on, in that same area, when the

21 Defendant said, as long as it is not in Venezuela, it is

22 what the banks ask for, what did you understand him to be

23 referring to there?

24 A    To the support he needed to have in order to include a

25 description of services in the invoices that we would send

1   to him for payment to us.

2   Q    What does Venezuela have to do with that?

3   A    There were limitations, sanctions, and the banks did

4   not want to have anybody, any client making payments that

5   were related to Venezuela.

6              MR. LAX:  All right.  Now, we are going to pick

7   up, also, page 40.  I think we are in box 504.

8              (Video played; video paused.)

9   Q    Mr. Pere, now, stopping at 35 minutes and 31 seconds,

10  page 42, box 521, when you referred to Gordo has been

11  paid -- or has paid, who were you referring to?

12  A    Nilsen Arias.

13             MR. LAX:  And we are resuming in box 522 on the

14  same page.

15             (Video played; video paused.)

16  Q    Mr. Pere, now I've stopped at 39 minutes and

17  28 seconds.

18             Let me direct your attention to page 43, boxes 546

19  and 547, at the bottom of that page.

20             You said:  Gordo was paid, he was given his -- but

21  I agreed with him that once he was away, I would respect the

22  commitment we have with him.

23             What did you mean by that?

24  A    I meant to say that Nilsen Arias had been paid when he

25  was in PetroEcuador, as international trade manager.  And

1  also that I agreed with him that I would respect that

2  commitment when he left PetroEcuador.

3  Q    Why agree to continue to pay him even though he had

4  left PetroEcuador?

5  A    Because he had my word.

6  Q    You then continue, now I am at the top of page 44:  I

7  was negotiating with him a bit.

8          Who are you referring to there?

9  A    With Nilsen.

10  Q    And then you continued:  Because now we have another

11  person, Mauricio, Jose.

12          What do you mean by that, because we now have

13  another person, Mauricio, Jose?

14  A    Because now that Nilsen was not international trade

15  manager, I had to pay other people, being one of them

16  Mauricio Samaniego, another one Jose Agusto, and other

17  people.

18  Q    And then when you said negotiating, negotiate what?

19  A    The amount of money I would pay him since or starting

20  at the time that he left PetroEcuador.

21  Q    Did you negotiate that?

22  A    Yes, I did.

23  Q    How?

24  A    I told him that now I had to pay other people and that

25  his commission had to be reduced.

1  Q    And by "he," who are you referring to?

2  A    Nilsen.

3            MR. LAX:  All right.  Let's jump ahead a little

4  bit.  I will direct everyone's attention to page 49,

5  line 596.

6            And, Ms. Jefferson, I think the timestamp is going

7  to be 42:03.

8  Q    Are you with me, Mr. Pere?

9  A    Yes.  What box?  I'm sorry?

10 Q    Five-ninety-three.

11 A    Yes.

12           (Video played; video paused.)

13 Q    Mr. Pere, stopping now at 44 minutes.

14           Right there, when the Defendant said, We have to

15 maintain it, what did you understand him to be referring to?

16 A    Hold on.  Which box?

17 Q    Box 609, page 50.

18 A    Yes.  We have to maintain it, meaning we should

19 maintain Nilsen Arias in his position or bring him back.

20 Q    What do you mean by that?

21 A    I mean that all of us, and in this case, Javier, he is

22 saying that it would be very good to maintain Nilsen Arias

23 in that position, meaning as international trade manager of

24 PetroEcuador.

25 Q    Hadn't he left by this time?

1    A    Yes.

2    Q    So can you explain?

3    A    Well, Nilsen Arias left PetroEcuador after the

4    Government changed, when the presidential period for Lenin

5    Moreno started, after a couple of months or after a month,

6    Nilsen Arias left his position at PetroEcuador.

7    Q    And so if he had already left PetroEcuador by here --

8    by this time, the time of this conversation, maintain,

9    maintain what?

10   A    Maintain payments to Nilsen Arias.

11   Q    Even though he had left by then?

12   A    Yes.

13          MR. LAX:  Your Honor, it's 1 o'clock.  I'm not --

14   I still have a bit to go in this recording.  I would suppose

15   now is as good a time as any to take a break.

16          THE COURT:  Just one question, then we will do

17   that.

18          When you say "maintain," does that mean equal, at

19   the same rate?

20          THE WITNESS:  No.

21          THE COURT:  If I did some damage there, Mr. Lax.

22   BY MR. LAX:

23   Q    I guess, Mr. Pere, if you could just explain what you

24   mean by no?

25   A    What I mean is the amount was not going to be the same

1   as before, because there were other people that had to be

2   paid.  It was important to maintain a payment to Nilsen

3   Arias.

4   Q    Even if the amount was reduced, then, from what it had

5   been before?

6   A    Yes.

7          MR. LAX:  Nothing else for right now, Your Honor.

8          THE COURT:  Okay.  Then didn't want to leave that

9   hanging out there, so I am glad we were able to clarify

10  that.

11         And sometimes, ladies and gentlemen, you will hear

12  this later in the charge, sometimes I ask questions to

13  clarify an issue.  Doesn't mean I have a position on an

14  issue or that I found facts.  I think of the facts, as you

15  will hear in my final charge, is irrelevant.  It's only what

16  you, as jurors, think of the facts after you've concluded

17  your deliberations that will be important.

18         Now, with that, we do break for lunch.  It seems

19  to me a little warmer than it was yesterday, so hopefully,

20  some of that ice will disappear out there.  If you do

21  venture out, please be careful.  That's an additional

22  admonition.  It goes with all the other important

23  admonitions.  Don't discuss the case amongst yourself or

24  with anyone else.  Continue to keep an open mind.  Again,

25  all of the work is done here in the courtroom and in the

1    deliberation room.  There's no outside research of any kind

2    at any time, by electronic search engine or the

3    old-fashioned way.

4              We do remain on radio silence.  No mention of the

5    fact that you are here or anything that remotely touches on

6    the case, personalities, any of the issues.  And during the

7    lunch period, if something pops up on social media or any

8    other sort of media that references the case, tune it out,

9    don't listen to it, don't read it.

10             Enjoy your lunch.  Try to get back to the jury

11   room around 1:15, so we don't have people rushing around on

12   the ice.  And we will start as close to 1:15 -- 2:15, and

13   2:30 as possible.  Enjoy your lunch, and we will see you

14   when you return to the central jury room as usual.

15             (Jury exits.)

16             (Witness steps down.)

17             THE COURT:  All right.  The usual rules apply

18   here, too.  If you want to leave something, William will be

19   locking up the courtroom.  If you need it, take it with you.

20   See you between 2:15, 2:30 or so.

21             MR. KOFFMANN:  Thank you, Judge.

22             THE COURT:  You are welcome.

23             (Luncheon recess taken.)

24

25             (Continued on the following page.)

1                        AFTERNOON SESSION

2                 (In open court - jury not present.)

3            THE COURTROOM DEPUTY:  All rise.

4            (Judge ERIC N. VITALIANO entered the courtroom.)

5            THE COURTROOM DEPUTY:  Court is back in session.

6            Counsel for both sides are present, including

7     defendant.

8            THE COURT:  Ready to go?

9            MR. LAX:  Yes, Your Honor.

10            THE COURT:  Let's bring everybody in.

11            (Pause.)

12            (The witness entered and resumed the stand.)

13            (Jury enters.)

14            THE COURT:  Be seated, please.

15            Counsel will stipulate that the jury is present and

16     properly seated.

17            MR. LAX:  Yes, Your Honor.

18            MR. KOFFMANN:  Yes, Your Honor.

19            THE COURT:  Thank you, counsel.

20            Ladies and gentlemen, welcome back.  I'm glad

21     everyone has returned safely.  I hope you enjoyed your lunch.

22     We are ready to pick up where we left off.

23            Mr. Antonio Pere is back on the stand and Mr. Lax

24     continues his direct examination.

25            MR. LAX:  Thank you, Your Honor.

1  **ANTONIO PERE**,

2       called as a witness by the Government, having been

3       previously duly sworn/affirmed by the Courtroom Deputy,

4       was examined and testified further as follows:

5  DIRECT EXAMINATION (Continuing)

6  BY MR. LAX:

7  Q    Mr. Pere, when we left off before lunch we were in the

8  middle of Government Exhibit 3513, and I am going to pick up

9  more or less where we left off, although we'll skip ahead a

10 little bit.

11          And I'll direct your attention to page 58, box 685

12 at the top of that page.

13 A    Uh-hum.

14 Q    And we'll be resuming from the time stamp 50 minutes

15 31 seconds.

16          Let me know when you reach page 58.

17 A    I'm on 685 now.

18 Q    Yes, number -- box 685, page 58.

19 A    Yeah.

20          (Audio recording played; paused.)

21          MR. LAX:  All right, stopped at 53 minutes,

22 32 seconds.

23 Q    Mr. Pere, directing your attention to page 60, box 715.

24          When you said:  What we have to do there is make the

25 payment to him and to both, José and Mauricio; what were you

1  referring to there?

2  A    Making a payment to Nilsen Arias and also to José Agusto

3  and Mauricio Samaniego.

4  Q    Where is the reference to Nilsen Arias?

5  A    Well, we've been talking before about Nilsen Arias and

6  how it was important to -- to have him close and -- excuse me,

7  and keep him -- keep him happy.

8  Q    So in box 715, the reference to -- to "him" is to who?

9  A    To Nilsen Arias.

10 Q    And then "both," meaning José Agusto and Mauricio

11 Samaniego?

12 A    Yes.

13 Q    And then now directing your attention to box 717 where

14 you said:  I paid for his help.

15        Who are referring to there, "his"?

16 A    Nilsen Arias.

17 Q    And continuing.  And also for being prepared for the

18 future.

19        What did you mean by that?

20 A    To make sure we maintain a contact, make sure I keep my

21 word so that if in the future he goes back to the same

22 position, he will be willing to support us as before.

23 Q    And then you continued:  It seems to me that he is now

24 pressured by, and then there's something unintelligible, the

25 rest for Mauricio and José.

1          What did you mean by that?

2   A    I don't -- I cannot interpret what I meant by pressure

3   there, but I can tell you the rest for Mauricio and José is

4   the rest of the commission.

5   Q    All right.  Let me now direct your attention to page 86.

6   We're going to jump ahead a bit, and it's going to be the very

7   top of page 86, which is part of the way through box 1011.

8          But we'll start at the top of page 86 where it

9   begins, "Um, well, then," and I think the beginning starting

10  point is one hour 18 minutes and 10 seconds, please.

11          (Video recording played; paused.)

12  BY MR. LAX:

13  Q    Mr. Pere, now I'm stopping at one hour, 24 minutes and

14  12 seconds into the recording.

15          I want to ask you a question about just the portion

16  that we just -- we just saw and heard, page 92, line 1099.

17          When you said:  Do you remember that you attended a

18  meeting that was from OTI with PetroEcuador; and the defendant

19  responded:  Yes.  Well, I was told to go.

20          What did you understand that to mean?

21  A    I'm reminding him about the time that Javier Aguilar

22  participated in a meeting with OTI and PetroEcuador, and

23  Javier is saying:  Yes, I was told to go.  Meaning that he was

24  there because somebody told him to go.

25  Q    What meeting is that a reference to?

1  A     That is a meeting in reference to the fuel oil contract
2  that was signed in December 2016.
3           MR. LAX:  All right.  Could we resume playing?
4           (Video recording played; paused.)
5           MR. LAX:  All right, pausing now at one hour,
6  25 minutes and 16 seconds.
7           Let's jump ahead.
8  BY MR. LAX:
9  Q     I'll direct your attention to page 108.  Starting at the
10 top of page 108 is box 1302, and I think we're going to pick
11 up from time stamp one hour, 36 minutes and 26 seconds.
12          (Video recording played; paused.)
13          MR. LAX:  All right, stopping now at one hour,
14 38 minutes, 55 seconds.
15 Q     Mr. Pere, let me direct your attention to page 108, in
16 box 1302.
17          When you said on the fourth line:  We're clear on
18 the new thing, what did you mean by "the new thing"?
19 A     Give my one second.
20          (Pause.)
21 A     The new payments, the new structure to make the payments.
22 Q     And then when you said "the prior one" in the next line,
23 what did you mean by "the prior one"?
24 A     I mean the way that we had been receiving funds, we had
25 been receiving payments, meaning from Lionel's companies,

1  Zanza Oil, Lion Oil, to one of our companies.

2  Q    Let me direct your attention now to page 110, at -- well,

3  I'll start at the bottom of 109 into 110 at box 1326.

4        When the defendant said:  I also understand, without

5  knowing, but I understand that my partner made him pull the

6  trigger.

7        First, who do you understand the defendant to be

8  referring to when he says "partner"?

9  A    Somebody in -- in Vitol.

10  Q    And then when he said "him," who did you understand the

11  defendant to be referring to by "him"?

12  A    I'm not sure.

13  Q    Later on in that same portion when the defendant said,

14  Then it stops in this country, then it stops in this other

15  country, and from there.

16        What did you understand defendant to be referring to

17  there?

18  A    That the wire transfers, the transfer of the money for

19  the payments, was -- originated in one country, then went to

20  another country to a different account; and then to another

21  country, another account; and then finally to Lionel.

22  Q    Now, let's jump ahead again.

23        Direct your attention to page 115, line 1394, and

24  the time stamp is one hour, 42 minutes and 51 seconds --

25  55 seconds.

1              (Video recording played.)

2              MR. LAX:  Can you hold that for one second?

3              (Video recording paused.)

4    BY MR. LAX:

5    Q    So, Mr. Pere, I paused at one hour, 43 minutes and 3

6    seconds.

7              The video, you and the defendant and your brother

8    had been at a table before, but you appear to have moved.

9              Can you explain that here in this jump?

10   A    Well, we finished lunch and we were getting to the lobby

11   of the hotel.

12             (Video recording played; paused.)

13             MR. LAX:  Okay.

14   Q    Mr. Pere, I'd like to show you now something just for the

15   witness and the parties.

16             MR. LAX:  I think Mr. Villanueva stepped out.  I'm

17   not sure if we're able to convert the monitor.

18             THE COURT:  Cat can do it.  We can try.

19             MR. LAX:  Why don't -- I think I've got a physical

20   copy, Your Honor, so I can approach the witness with a

21   physical copy.

22             THE COURT:  Yes.

23             MR. LAX:  I'm not sure if I'll get to it before

24   William -- Mr. Villanueva gets back here, but I'll try.

25             THE COURT:  Yes, you can work around it, if you can.

1      MR. LAX:  All right.  Permission to approach, Your

2   Honor.

3          THE COURT:  Yes.

4          MR. LAX:  I am going to be handing the witness

5   what's marked for identification, Government Exhibit 103.

6          THE COURT:  This is like at a hockey game, ladies

7   and gentlemen, when the Zamboni breaks down, how they used to

8   do it.  This is how we used to do it.

9          MR. LAX:  May I inquire from here, Your Honor?

10          THE COURT:  Yes, please.

11   BY MR. LAX:

12   Q   Mr. Pere, take a look at Government Exhibit 103.  It's a

13   photograph.

14          Do you recognize any of the people in the

15   photograph?

16   A   Yes.

17   Q   Who?

18   A   Javier Aguilar, Enrique Pere, and myself.

19   Q   Did you take that photograph?

20   A   No.

21   Q   Do you know when it was taken?

22   A   The day of the -- of the lunch.

23   Q   That we just watched?

24   A   Yes.

25   Q   Does that photograph fairly and accurately depict you,

1   Enrique Pere and the defendant?

2   A     Yes.

3   Q     Where was that photograph taken?

4   A     At the lobby of the Marriott Hotel in which we had lunch.

5              MR. LAX:  The Government offers Government

6   Exhibit 103.

7              MR. PRICE:  I'll object, it's cumulative.  There's

8   no dispute the lunch that took place and the video is there.

9              THE COURT:  Overruled.  It's harmless.

10             MR. LAX:  Thank you, Your Honor.

11             It's received?

12             THE COURT:  Yes.

13             And that's in Houston, correct?

14             MR. LAX:  Yes, Your Honor.  The same -- the same day

15  as the lunch as the witness testified.

16             (Government's Exhibit 103 was received in evidence.)

17             MR. LAX:  May we please publish Government

18  Exhibit 103?

19             THE COURT:  Yes.  I think William is back.

20             THE COURTROOM DEPUTY:  I am back.  Sorry about that.

21             (Exhibit published.)

22  BY MR. LAX:

23  Q     So, looking here at a zoomed-in portion, Mr. Pere, of

24  Government Exhibit 103, can you just describe who's depicted

25  in the photograph from left to right, please?

1   A    It's me on the left, then Enrique Pere, and farther to

2   the right, the last one is Javier Aguilar.

3   Q    All right.  Mr. Pere, now I am going to direct your

4   attention to Government Exhibit 3514-T.

5          MR. LAX:  And, Ms. Jefferson, if you could please

6   queue up 3514.

7          THE COURT:  Is that a double T, Mr. Lax?

8          MR. LAX:  I'm sorry?

9          THE COURT:  Was that a double T, did you say?

10         MR. LAX:  No, 3514-T is the transcript.

11  Q    And, Mr. Pere, while we're queuing up the corresponding

12  video, I will direct your attention to page 21.

13         We are going to begin at line 130.

14         MR. LAX:  And, Ms. Jefferson, I think we are going

15  to start from 22 minutes, 59 seconds or thereabout.

16         (Audio recording played; paused.)

17  Q    All right, Mr. Pere, we're pausing now at 24 minutes,

18  57 seconds into this recording.  I'd like to direct your

19  attention to page 22, and box 134.

20         When the defendant said:  It was urgent for me to

21  prove.  And you said:  Yes, that there's the will.  And the

22  defendant continued:  And that -- unintelligible -- calmed the

23  people on the inside.

24         Who did you understand the defendant to be referring

25  to there?

1  A    He's referring to the people who worked in the

2  government.

3  Q    And I'll direct your attention now back to page 23,

4  box 142, which is where we had left off before.

5            MR. LAX:  And, Ms. Jefferson, if we can continue.

6            (Audio recording played; paused.)

7

8            (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   DIRECT EXAMINATION

2   BY MR. LAX:   (Continuing)

3   Q    Mr. Pere, I paused it at 26 minutes and 44 seconds.  Let

4   me direct your attention to page 24 of this transcript in box

5   149, when you said, in the middle portion here, He would

6   prepare contracts, who did you mean by "he"?

7   A    Lionel.

8   Q    And that he would have the names of the new companies

9   that would be used, that they would no longer been Lion Oil

10  and Zanza Oil?

11  A    That Lionel would give us the name of new companies

12  because he was not going to be using Zanza Oil and Lion Oil to

13  pay us.

14  Q    Okay.  Mr. Pere, I would like to now show you Government

15  Exhibit 3015-T-H, which is in evidence.

16          Now we are back to the extract of the WhatsApp chat

17  between you and the defendant; is that correct?

18  A    Correct.

19  Q    I'm going to direct your attention to the first message

20  here.  What's the date of this message?

21  A    April 20, 2020.

22  Q    And what did you write here?

23  A    Hi, Javier.  I hope you're well.  Please help with the

24  payments of the outstanding amounts.  Believe me, this big

25  delay is causing us serious problems and affecting other

1   activity.  Please talk to Lionel because he says everything is

2   closed on the island.  He says there are no banks.  Hard to

3   believe.  Please check and we'll talk a little later in the

4   week.

5   Q    First, so this was April 20, 2020.  Referring to

6   everything is closed, there are no banks, can you put that

7   into context?

8   A    That was the explanation we were getting from Lionel

9   Hanst and that was the reason for him not being able to make

10  the pending payments.

11  Q    Referring to right above, affecting other activities,

12  what do you mean by the term affecting other activities?

13  A    Well, we were pursuing another contract, we were always

14  trying to do business with gas since the beginning of our

15  relationship, so that's what I meant by other activities, that

16  it became difficult to pursue other opportunities because of

17  the lack of payments.

18         MR. LAX:  Ms. Jefferson, if we can please now turn

19  page 3 of Government Exhibit 3050-T-H.

20  Q    Mr. Pere, I will direct your attention to the message at

21  the very top here.

22         First, the date of this message is June 2, 2020; is

23  that right?

24  A    Yes.

25  Q    When you wrote hi, Javier, I just called you because

1   Enrique received a message from Lionel yesterday asking me to
2   talk to you, this lack of payment has us in a very difficult
3   position, what did you mean by that?
4   A    I'm saying that Enrique got a message from Lionel and
5   Lionel told Enrique, hey, talk to Javier Aguilar that --
6   afterwards, I'm saying hey, this lack of payment, it has put
7   us in a very difficult position, meaning we cannot ask for
8   support of the people in Ecuador and meaning also we're having
9   a lot of pressure.
10  Q    So the date of this message again, June 2, 2020, I want
11  to now direct your attention to Government Exhibit 3516-T, we
12  will pull up the corresponding video as well.
13  A    3515?
14  Q    16?
15  A    16.
16  Q    What is the date of the recorded call as Government
17  Exhibit 3516?
18  A    June 2, 2020.
19         MR. LAX:  We are going to begin playing from the
20  beginning.
21         (Video playing.) (Video paused.)
22  Q    Mr. Pere, we have paused at two minutes and 34 seconds.
23         Let me direct your attention to page 2, box 20.
24  When the defendant said given the circumstances, I am making
25  this a habit for myself now, what did you understand him to be

1   referring to?

2   A    He's getting used to and trying to develop a habit of

3   using his personal phone for his communications.

4   Q    Why?

5   A    Because the calls that he made from the company's phone

6   stayed registered somewhere in the company's records and he

7   didn't want that to be the case.

8   Q    Let's see.  We left off now at page 4, right at the top

9   of page 4.

10  A    Uh-hum.

11          (Video playing.) (Video paused.)

12          MR. LAX:  Pausing at five minutes, 28 seconds.

13  Q    Mr. Pere, let me direct your attention to page 6, at the

14  very bottom, in box 52.  When the defendant said I plan on,

15  like I just told you, like, like, I told you just now to

16  expedite a payment for you and tell these people, who did you

17  understand the defendant to be referring to by these people?

18  A    People in Vitol who had the capacity or responsibility

19  for making payments.

20          MR. LAX:  Now, picking up where we left off, which

21  was page 7, at line 53.

22  A    Uh-hum.

23          (Video playing.) (Video paused.)

24          MR. LAX:  Pausing now at 7 minutes and 3 seconds

25  into this clip.

1  Q    Mr. Pere, I'll direct your attention to page 7, box 60.

2  A    Box 60, okay.

3  Q    60.  When the defendant referred to the friend, the

4  friend with whom you guys have a relationship, who did you

5  understand him to be referring to there?

6  A    Lionel Hanst.

7  Q    Directing your attention now to page 9, box 76.  When the

8  defendant says he has now registered everything, he now has

9  new companies, what did you understand him to mean by that?

10  A    That Lionel had new companies to replace the old

11  companies he had, meaning replacements for Zanza Oil and Lion

12  Oil, that all he needed was the green light from people at

13  Vitol.

14  Q    And then right above that box, 74, where it says he has

15  no decision power, zero, who did you understand the defendant

16  to be referring to there?

17  A    To Lionel Hanst.

18  Q    Let's skip ahead a little bit to page 11, at the very

19  bottom of page 11 in box 102.

20        MR. LAX:  And Ms. Jefferson, I think the timestamp

21  is 9:02.

22        (Video playing.) (Video paused.)

23  Q    Mr. Pere, I just paused for a moment here at 9 minutes

24  and 19 seconds.  When the defendant refers to he had already,

25  was already, was planning to leave, who did you understand the

1   defendant to be referring to at that point?

2   A    Let me read it again, please.

3            I'm not sure.

4   Q    Okay.

5            MR. LAX:  Can we please resume.

6            (Video playing.) (Video paused.)

7   Q    Mr. Pere, now pausing it at 12 minutes, 33 seconds.  I

8   will direct your attention to page 14, in box 124, when the

9   defendant said that there were some requirements from the

10  authorities here, for the office here, also the office in

11  Geneva, nothing to do with anything that should worry you,

12  what did you understand him to be referring to?

13  A    That there were investigations going on related to

14  Vitol's activities, but he goes on saying that it's nothing

15  that has do with me, that I shouldn't worry.

16  Q    Returning now to where we left off, page 15, box 125.

17           (Video playing.) (Video paused.)

18  Q    Mr. Pere, we've paused it now at 15 minutes and 55

19  seconds, I would like to direct your attention back to page

20  17, box 146, when the defendant said to you when dealing with

21  the T and the G, they don't do it from here, what did you

22  understand him to be referring to?

23  A    He's referring to Trafigura and Glencore.  They don't do

24  it from here, dude.  It's done from Europe.  What he means is

25  that they don't manage businesses that could be questioned

1   legal from here, illegal from here, from the U.S., they do it

2   from Europe together with some regional offices.

3   Q    I will now direct your attention back to page 19, box 155

4   where we left off.

5            (Video playing.) (Video paused.)

6   Q    Mr. Pere, now stopping at 19 minutes and 4 seconds, I

7   would like to direct your attention back to page 20, box 166.

8   When the defendant said I'm in the middle of box 166, he scans

9   the computers, he scans, he has access to the computers, to

10  the phones, who did you understand the defendant to be

11  referring to by he?

12  A    The new compliance officer at Vitol.

13           MR. LAX:  Your Honor, may I please have a moment to

14  confer with my co-counsel?

15           THE COURT:  Sure.

16  Q    All right.  Mr. Pere, I would like now direct your

17  attention to Government Exhibit 3570, and while we cue up that

18  video, what is the date of this call?

19  A    June 11, 2020.

20  Q    I will direct your attention to page 6, line 32, and let

21  me know once you're there.

22  A    I'm there.

23  Q    We are going to begin from 4 minutes and 10 seconds.

24           (Video playing.) (Video paused.)

25  Q    Mr. Pere, pausing at 6 minutes and 2 seconds, page 8, box

1  48, when Enrique and your brother both said everything

2  originates from Dubai, what did you understand them to mean?

3  A    That the funds to make the payments that people like

4  Lionel manage originates, originate, I'm sorry, in Dubai.

5  Q    The funds from where?

6  A    Funds from Vitol.

7  Q    All right.  Picking up right where we left off, right

8  beneath that.

9        (Video playing.) (Video paused.)

10 Q    Pausing at 8 minutes, 27 seconds.

11       Mr. Pere, I will direct your attention to page 11,

12 box 77, the same clip that's here up on the screen.

13       When the defendant said the authorities from here

14 told the authorities from over there and to the bank over

15 there to check certain movements which are his, what did you

16 understand the defendant to be referring to there?

17 A    I understand he's referring to authorities from the U.S.

18 contacting authorities from Curacao and to the bank in Curacao

19 to check certain money transactions which are -- or belong to

20 Lionel.

21 Q    Skipping ahead a little bit, I'll direct your attention

22 to page 15, line 125.  I think we will begin at timestamp

23 12:37.

24       (Video playing.) (Video paused.)

25       (Continued on next page.)

1  Continuing.)

2  BY MR. LAX:

3  Q    Mr. Pere, pausing at 14 minutes, 25 seconds, and I will

4  direct your attention, now, to page 18, box 150.

5         When you said it causes us a problem, what did you

6  mean by "it"?

7  A    That not getting paid causes a problem for us.

8  Q    What problem?

9  A    We have do deal with the people in Ecuador, who are

10 demanding we pay them in accordance to our commitment.  And,

11 of course, the opportunities that we may have in Ecuador are

12 not possible to take advantage of because they are not going

13 to be supporting us.

14 Q    What do you mean by supporting?

15 A    Doing the things they have to do in order to sign

16 contracts for new businesses.

17 Q    In box 151, when the defendant said, I don't want that

18 happen and there are also opportunities -- continuing to

19 153 -- that are passing by, what did you understand the

20 defendant to mean by that?

21 A    What he's saying is along the same lines of what I just

22 said.

23        First of all, he doesn't want to have a problem

24 with us, discussions, arguments, or anything of that sort.

25 And he mentions also that there are opportunities, like I

said, other projects, other contracts, that could be signed,

that are passing by.  So he doesn't want to be in this

situation anymore.

Q    Why were those opportunities passing by?

A    Because if I was not paying the people in Petroecuador,

the government, what I owed them, they will not do anything

new in terms of new businesses.

Q    With the defendant?

A    With the company.  With Vitol.

MR. LAX:  No further questions, Your Honor.

THE COURT:  Thank you, very much, Mr. Lax.

That actually brings us pretty much -- I was just

going to ask you to find a landing place, so you have.

Ladies and gentlemen, we will take our

mid-afternoon break, but now with direct concluded.  The

usual rules apply.  Don't discuss the case amongst

yourselves or with anyone else.  Continue to keep an open

mind.  And we will be back here in about 15 minutes,

20 minutes.

(Jury exits.)

(Witness steps down.)

THE COURT:  Okay.  We will get a fresh start on

cross.

Mr. Price, you are handling cross?

MR. PRICE:  Yes, I am.

1          THE COURT:  Give you a few extra minutes, there,

2    to get ready.

3          MR. PRICE:  Thank you.

4          (Recess taken.)

5          THE COURTROOM DEPUTY:  Court is back in session.

6    Counsel for both sides are present, including defendant.

7          THE COURT:  Are we ready to go?

8          MR. LAX:  Yes, Your Honor.

9          MR. PRICE:  Yes, Your Honor.

10          THE COURT:  We shall.

11          MR. PRICE:  Your Honor, should I go ahead and go

12    up to the podium?

13          THE COURT:  Yes, Mr. Price should go to the

14    podium.

15          MR. PRICE:  Thank you.

16          (Witness takes the stand.)

17          (Jury enters.)

18          THE COURT:  Be seated, please.

19          Counsel will stipulate that the jury is present

20    and properly seated.

21          MR. LAX:  Yes, Your Honor.

22          MR. KOFFMAN:  We do, Your Honor.

23          THE COURT:  Thank you, Counsel.

24          Ladies and gentlemen, welcome back.  As you know,

25    when we took the break, it was serendipity, Mr. Lax was just

1  finishing his direct.  And you have now been around the

2  block a couple of times.  You know what happens after

3  direct.  The other side has an opportunity to cross-examine

4  the witness.  And Mr. William Price will be handling that

5  cross-examination for the defense.

6          Mr. Price.

7          MR. PRICE:  Thank you, Your Honor

8  CROSS-EXAMINATION

9  BY MR. PRICE:

10          MR. PRICE:  Ladies and gentlemen, my name is Bill

11  Price.

12  Q    Mr. Pere, giving me some help, I don't want you to be

13  distracted, there is a younger attorney, Nicole Molee, and I

14  might be calling out to Mr. McLeod to put things on the

15  screen.

16          So I would like to start, if I can, with kind of

17  your history of illegal activity before you ever met

18  Mr. Aguilar.  And I want to direct your attention to some

19  things you said on direct examination.

20          You mentioned that you had this position at this

21  National Council of Modernization working with the

22  government of Ecuador, right?

23  A    Right.

24  Q    And I think you mentioned that you are like an

25  executive director of that?

1  A    Yes.

2  Q    And for a couple of years, you were actually the

3  president of that Council For Modernization; is that right?

4  A    No.

5  Q    Well, I may have made a mistake.  Let me see if you can

6  help me, here.

7          I am going to show you and counsel and not the

8  jury DX 52.  And I am going to direct your attention to the

9  second page, here.

10          And do you recognize what that is?  If you need me

11  to blow up anything, I will be happy to.

12 A    Yes.  That's my resume.

13          MR. PRICE:  Your Honor, I would move DX 52 into

14 evidence.

15          THE COURT:  Any objection, Mr. Lax?

16          MR. LAX:  No objection, Your Honor.

17          THE COURT:  Received in evidence without

18 objection.

19          (Defendant's Exhibit 52 received in evidence.)

20 Q    This is in Spanish and I don't know the language that

21 well, so I might have made an error here.

22          So if we look down it says, toward the bottom

23 third of that page, where it says 2002 to 2003, and it

24 says -- perhaps you can tell me what that identifies your

25 position as being between 2002, 2003.

1  A     I was president of CONAM for six months.

2  Q     And so that is this Modernization Council; is that

3  right?

4  A     Correct.

5  Q     And as a result of your work there, when you left, you

6  had, I think you said, lots of acquaintances and kind of a

7  big network which was important in order to obtain business

8  with the government for your clients; is that right?

9  A     Yes.

10         MR. PRICE:  And Your Honor, permission to publish

11  DX 52.

12         THE COURT:  Yes, please.  Well, it's in Spanish,

13  correct?

14         MR. PRICE:  Yes.

15         (Exhibit published.)

16  Q     And something else you might see are people coming up

17  and handing me notes throughout, so don't let that distract

18  you.

19         So you mentioned that when you left, then, you had

20  these network of acquaintances and associates which would be

21  important to be able to help clients who would be working

22  with the government, right?

23  A     Yes.

24  Q     So you were asked on your direct about activities that

25  started in 2010, when you began working with companies who

1   were trying to purchase or sell oil to the government of

2   Ecuador.

3           Do you recall that?

4   A    Yes.

5   Q    So I want to ask you about 2002 to 2010.

6           And let me start with this:  When you decided to

7   go and talk to the government and sort of seek a cooperation

8   agreement, did you agree that you would inform the

9   government of all of your criminal activities?

10  A    Yes, I did.

11  Q    So then let me focus on 2002 to 2010.

12          When you left the council, you started a

13  consulting business, right?

14  A    Right.

15  Q    And was it your intention that time to help clients,

16  using your contacts and the government, by paying bribes to

17  government officials?  Was that your intention?

18  A    In some cases.

19  Q    So at the time you started your consulting business,

20  that was something you thought you would be doing?

21  A    Yes.

22  Q    Did you also think that you would be helping your

23  client, using your government contacts, without bribing

24  government officials?

25  A    If the business had not -- nothing to do with the

 1  government, yes.

 2  Q    Oh, so I am sorry, I mean to focus on something else.

 3       Did you engage in any activity whatsoever where

 4  you helped a client in connection with business with the

 5  government where you did not pay bribes to government

 6  officials?

 7  A    Trying to -- to think about a case.  I'm not sure -- I

 8  cannot recall one.

 9  Q    Is it true that at some point you started working with

10  a Mr. Hidalgo?

11  A    Mr. Who?

12  Q    Is it Hidalgo, am I pronouncing that right?

13  A    Hidalgo.

14  Q    Thank you.

15       And with Mr. Hidalgo, did you attempt to pursue

16  legitimate business, where you would not have to pay bribes?

17  A    Yes.

18  Q    Did that business concern trying to help potential

19  clients with their dealings with the government?

20  A    Yes.

21  Q    So let me ask you this:  If you were trying to use your

22  contacts, you know, to help a client do legitimate business

23  with the government without bribes -- and you did attempt to

24  do that, right?

25  A    Without paying bribes when business was done with the

1   government?  No.  But you asked about businesses with

2   Mr. Hidalgo and I tried to do businesses with Mr. Hidalgo

3   that had nothing to do with the government initially.

4   Q    Okay.  So my understanding is is that what you are

5   telling us is that from 2002 until 2010, you did business

6   where you helped a client with the government and you bribed

7   government officials, right?

8   A    I'm trying to think about something important that

9   comes to mind.  I'm not sure which business.  I can't

10  remember.

11  Q    Well, when you cooperated with the government and you

12  told them that you would reveal to them, you know, all of

13  the criminal activity that you had engaged in, did you

14  attempt to recall whether or not you had engaged in any

15  criminal activity between 2002 and 2010, when you started

16  dealing with companies who were trying to do, you know,

17  purchase or sell oil to the Ecuadorian government?

18  A    Well, I tried to do business with the government for

19  clients, but not necessarily I made payment to somebody at

20  the government that I can recall.

21  Q    So I guess what I am trying to understand is this:

22  Between 2002 and 2010, you engaged in consulting services

23  where you assisted clients in their dealings with the

24  government, correct?

25  A    Yes.

1   Q    And you had this array of contacts that you had, which

2   you thought you could use to give your clients an advantage

3   in connection with their dealings with the government,

4   correct?

5   A    Yes.

6   Q    And of course you could take advantage of those

7   relationships that you had and help your client, you could

8   take advantage of that without paying bribes, right?

9   A    Right.

10  Q    So in fact, that's what lobbyists usually do, that is,

11  certainly, you are aware, in other countries, that lobbyists

12  have contacts in the government, close relationships, and

13  they try to take advantage of that to help their client,

14  correct?

15  A    Correct.

16  Q    And there are many ways to do that, to use your close

17  relationships that you have developed with the government to

18  assist a client, there are many ways of doing that without

19  paying bribes, correct?

20  A    Correct.

21  Q    Did you engage in that while you were a consultant

22  between 2002 and 2010?

23  A    Yes.

24  Q    Okay.  And did you represent yourself to clients in

25  that timeframe as -- or at least to some clients, as a

1  legitimate consultant who can help them without paying

2  bribes?

3  A    If it was a client that had intentions or a project

4  that had to do with the government, the way I introduced

5  myself didn't explicitly state -- stated that I was going to

6  pay bribes to deal with the government.  However, in our

7  country, in that area, it was commonly understood, it was

8  common knowledge that in order to do business with the

9  government, most, most of the time -- of the times, you had

10  to pay bribes.

11  Q    But you just told us that there were some clients who

12  hired you as a consultant where you helped them with the

13  government, using your close relationships, and you didn't

14  pay bribes, right?  You've told us that.

15  A    Yes.

16  Q    And so when you presented yourself to a client, your

17  practice was not to tell them one way or another whether or

18  not you were going to get your results by paying bribes,

19  correct?

20  A    Not necessarily.

21  Q    There are occasions where you would present yourself to

22  a client where you would not tell them that you were going

23  to get results by paying bribes, correct?

24  A    It's possible, yes.

25  Q    And, in fact, that was your general practice; wasn't

1  it?  It was to tell a client, I have contacts, I could help

2  you, and you would not tell them one way or another whether

3  or not you are going to pay bribes to help them, right?

4  A    It wasn't necessary.

5  Q    So the answer to my question is yes, that it was your

6  practice to tell a client that you could help them, that you

7  had contacts, and you wouldn't tell them one way or another

8  whether or not you were going to pay bribes to anyone in the

9  government, correct?

10 A    Sometimes.

11 Q    Well, did you like send out resumes talking about your

12 experience, resumes to potential clients?

13 A    Is that a question?  Can you repeat it, please?

14 Q    Yes, I'm sorry.

15         So in that timeframe, like did you send out

16 resumes to potential clients, kind of talking about your

17 experience, presenting yourself as a legitimate consultant?

18 A    No, I didn't.

19 Q    Did anyone do that on your behalf?

20 A    Not that I can remember.

21 Q    Let's see if I can help with your memory, here.

22         If I could show you and Counsel, but not the jury,

23 DX 418.  I'm going to show you -- actually, let's do 418-T,

24 which is the transcript.

25         THE COURT:  This is translated from the Spanish?

1    MR. PRICE:  It is, Your Honor.

2  Q    And then if we could go to the next page so that you

3  can see, Mr. Pere, the next page.

4         And when you are ready, I can go to the second

5  page.

6  A    Yes, you can go to the next page.

7  Q    Okay, let's go to the next page, page 3.

8         MR. PRICE:  Can you blow that up so that Mr. Pere

9  can see that?

10 A    Yes.

11 Q    And could you tell us what this is?

12 A    To tell you the truth, no, I don't remember what it is.

13 I know it's a letter.  It must have been somebody that was

14 not important for me to have it in my mind or remember.

15 Q    But you have no reason to dispute that this letter,

16 which appears to be sent by you to someone else, was, in

17 fact, a letter that was sent by you to a potential client,

18 correct?

19 A    Doesn't -- if you show me that I sent that letter to

20 the potential client, sure, but I don't see it here.  I

21 don't see that I sent it to anybody.  And it's not signed by

22 me.

23 Q    Well, let me put it this way, you understand that when

24 your business was raided, that the Government received many

25 documents, correct?

1  A    Of course.

2  Q    And then you also ended up -- well, actually, at your

3  business, there was a computer, correct?

4  A    Yes.

5  Q    And eventually, you also -- the government also got

6  your phone, correct?

7  A    Yes.

8  Q    And they scanned everything that was in your computer

9  and your phone, right?

10 A    Yes.

11 Q    I mean, up to, like they actually scanned how -- how

12 frequently you were walking, as it reflected on your phone,

13 right?

14 A    I don't know that.

15       MR. PRICE:  Your Honor, I think -- I believe -- is

16 there a stipulation as to the authenticity of this document,

17 I believe?

18       The authenticity stipulation is DX 7000.  I will

19 find that and read it into the record, unless we can forego

20 it by an agreement.

21       THE COURT:  Mr. Lax, what is your view on it?

22       MR. LAX:  Yeah, we agree it's authentic.

23       THE COURT:  In other words, do you want him to

24 read the stipulation in?

25       MR. LAX:  No.

1    THE COURT:  We have also done it without reading

2  it in, so.

3    MR. LAX:  I don't think that's necessary, but

4  we -- we agree it's authentic.

5    THE COURT:  Then the stipulation is received in

6  evidence.

7    (Defendant's Exhibit 7000 received in evidence.)

8    MR. PRICE:  In that case, I will move DX 418 into

9  evidence.

10    MR. LAX:  Object to relevance.

11    THE COURT:  You will have to do a little better on

12  the foundation given what you were asking.  It came out of

13  his computer, but --

14    MR. PRICE:  Let me look at the actual stipulation,

15  then.

16    THE COURT:  If it's easier at sidebar, we could do

17  it.

18    MR. PRICE:  Yes, we could.  Let me turn myself

19  off, here.

20    (Sidebar.)

21    (Continued on the following page.)

22

23

24

25

1          (Sidebar conference held on the record out of the

2     hearing of the jury.)

3          THE COURT:  Let me stay right where I am so since

4     you have an advantage, you can see the document.

5          As I understand it, the objection is relevance,

6     and I believe the basis is there is nothing on the document

7     that says when, and the witness doesn't provide us with

8     anything to show that it ever went anywhere, so if it's

9     relevant if it's ever been communicated with somebody.

10         MR. LAX:  Your Honor, if I may, this is Jonathan

11    Lax.  This is my objection.

12         So first of all, there is an e-mail --

13         THE COURT:  Is it an e-mail?

14         MR. LAX:  It's an e-mail with some unsigned letter

15    as an attachment to someone John Happ.  It's sent

16    June 21st --

17         THE COURT:  The e-mail?

18         MR. LAX:  The e-mail is sent by Enrique Pere to

19    Antonio Pere on June 21, 2011, and it attaches an unsigned

20    letter, I guess, to Mr. Antonio Pere's attention to someone

21    named John Happ.

22         So this is -- the witness can answer questions

23    about this, but --

24         THE COURT:  And Mr. Price can help me here.  Based

25    on what he responded to you, he doesn't recognize the letter

1  at all or say that it was sent to him or that he was

2  involved in it, so it can't help you lay the foundation.

3          MR. PRICE:  Your Honor, part of that is true.  He

4  has no memory of this now.  He doesn't remember sending it

5  to anyone.  We can establish it's been -- it's been

6  stipulated this actually came from his records.  There is an

7  e-mail from Enrique Pere sending it to him attaching this

8  letter to Mr. John Happ, right?  From that, it is -- it is

9  reasonable for a jury to assume that this was, in fact,

10  used.  Just because he can't remember it, doesn't mean it

11  wasn't sent.

12          THE COURT:  It's in his computer and it's

13  unsigned.  There isn't a signed copy, so there is no

14  indicia, so far, on the record, that it ever went anywhere

15  further than his computer.  And there is now, that it wasn't

16  even created by him, but it was sent to him.

17          MR. PRICE:  Sent to him by his partner, his

18  brother.

19          THE COURT:  His partner.

20          MR. PRICE:  And you would expect it usually to be

21  signed on the computer.  Now, what we are missing is we

22  don't have the -- whatever was printed out, et cetera,

23  but --

24          THE COURT:  And then he goes beyond that and says

25  he doesn't remember, doesn't recognize it.

1    MR. LAX:  I will add, Your Honor, that this

2    appears to be an attempt to put forth before the jury that

3    Mr. Pere held himself out as some kind of a legitimate

4    businessperson for certain purposes.  How he held himself

5    out to other people, which this defendant has no knowledge

6    of or no idea, and this e-mail gives no indication that he

7    ever saw this or seen it, makes it entirely irrelevant

8    notwithstanding the fact that we are four years before the

9    beginning of the conspiracy.  So how Mr. Pere held himself

10   out to whoever Mr. Happ is four years before the conspiracy

11   is not relevant in and of itself, similar inquiries like

12   that, as well, absent some indication that the defendant was

13   aware of this letter or how he was holding himself out.

14       MR. PRICE:  Your Honor, if there is some evidence

15   that his practice was to hold himself out as a legitimate

16   businessman, that would be relevant as to how he presented

17   himself to Mr. Aguilar, even if he denies that he did that.

18       THE COURT:  Yes, if you have some -- this doesn't

19   do it.  I think there is not enough foundation here for this

20   to be relevant.

21       MR. LAX:  That was also not exactly the witness 's

22   testimony.  He didn't say that he had a general practice.

23   He said he did it sometimes, not all the time.  He pushed

24   back on -- on your question.

25       MR. PRICE:  And even that would allow us to make

1  that inference with Mr. Aguilar.  Obviously the only person

2  who could testify to that other than this witness is

3  Mr. Aguilar.

4          THE COURT:  Mr. Aguilar.

5          MR. PRICE:  But, again, on the fact that this is

6  on his computer sent to him by his brother, and I think

7  obviously, the jury could conclude for the purpose of

8  communicating to people, it's not signed because it's on his

9  computer.

10          THE COURT:  But if it's on his computer as a

11  receive, doesn't mean it ever left his computer signed or

12  unsigned, that he ever used it, that he ever personally held

13  it out.  And that's the issue.  This doesn't do it.  It's

14  not enough foundation for me.

15          MR. PRICE:  Your rule matters.

16          MR. GALEOTTI:  May we make two more points to

17  avoid these going forward.  The witness said he doesn't

18  remember.  You can't just introduce extrinsic evidence when

19  the witness says he doesn't remember; you have to contradict

20  something that he's testified to.

21          And in any event, you can't use a document that

22  contains hearsay just to try to impeach this witness.  So I

23  don't know what's coming next.  We obviously maintain that

24  you can't -- this document's not relevant without some

25  connection to the defendant's state of mind, which is

1 clearly what this is, but beyond that, just so we don't run

2 into this every time when the witness doesn't remember a

3 document, you can't simply just offer the document to admit

4 it for that purpose.

5      THE COURT:  And if it was a prior inconsistent

6 statement that he acknowledges was a statement, he could.

7      MR. GALEOTTI:  Right.

8      THE COURT:  But he doesn't.

9      MR. PRICE:  And just for future purposes, if it's

10 this kind of document, obviously, this would not be offered

11 for the truth.  This would be offered for the fact that he

12 made the representation.  And I understand, respectfully

13 disagree with, I understand your ruling.

14      THE COURT:  You may find a document in there that

15 had left the computer.  I share your, you know, conversancy

16 with computers, so I understand that.  It's limited

17 conversancy.

18      MR. PRICE:  Yes.

19      (Sidebar conference ends.)

20      (Continued on following page.)

21

22

23

24

25

1   (Continuing.)

2            (In open court; jury present.)

3            THE COURT:  The reporter is ready, Mr. Price, you're

4   free to go.

5   CROSS-EXAMINATION (CONTINUING)

6   BY MR. PRICE:

7   Q    So, Mr. Pere, what was your brother Enrique Pere's

8   position at your consulting company as of, let's say, 2010?

9   A    At 2010, I don't think he had any position.

10  Q    Was he working for the company at all?

11  A    No.

12  Q    Let me show just you, if I could, it's page 4 of this.

13  DX 418-T-004.

14           MR. PRICE:  Not the jury yet.

15  Q    And if you could look at that and look at the bottom, can

16  you tell me whether or not you recognize the signature on this

17  page?

18  A    Yes, I do.

19  Q    And whose signature is that?

20  A    Enrique Pere, but that doesn't mean he worked for the

21  company.

22           THE COURT:  Just answer the question that's posed.

23  You don't volunteer.

24           THE WITNESS:  Okay, sorry.

25  Q    And so, what you have in front of you is a document that

1   is signed by your brother, Mr. Pere, correct?

2   A    Correct.

3   Q    And it appears to be on behalf of the consulting company,

4   correct?

5   A    That is correct, yes.

6   Q    And it's around the 2010 timeframe, correct?

7   A    I would have to see the date again.

8          MR. PRICE:  Let's move it on up.

9   A    Yes.

10         MR. PRICE:  Your Honor, given that foundation and

11  the foundation for authenticity, I move DX-418-T-004 into

12  evidence.

13         MR. LAX:  The same objection, Your Honor.

14         THE COURT:  Same ruling.  I don't think the -- the

15  problem was not authenticity.  The problem is relevance.

16         MR. PRICE:  The problem was the first one was not

17  signed, this one is signed.

18         THE COURT:  Is this the same document or a different

19  document?

20         MR. PRICE:  It's the fourth page of this document,

21  but this letter is actually signed by the brother on behalf of

22  the partnership.

23         THE COURT:  Why don't you ask that question?

24  Q    Mr. Pere --

25         THE COURT:  And I'll hear more.

1          MR. PRICE:  Sure.

2     BY MR. PRICE:

3     Q    Mr. Pere, does this document appear to be signed by your

4     brother on behalf of your consulting business?

5     A    Yes.

6          MR. PRICE:  Your Honor, I think the foundation has

7     been laid for this witness to be examined by this.

8          MR. LAX:  Same objection as to relevance, Your

9     Honor.  Happy to take it up again at sidebar.

10          THE COURT:  Yes, this sounds like a different

11     document.  I don't know if it's the same document.

12          (Sidebar held.)

13

14          (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

1          (Sidebar conference held on the record in the

2     presence of the Court and counsel, out of the hearing of the

3     jury.)

4          THE COURT:

5          MR. LAX:  Your Honor, this is another attachment to

6     the same e-mail sent from Enrique Pere to Antonio Pere in

7     June 2011.  It appears to have Enrique's signature on it.

8     This letter is addressed to an Ashwin Patel.  Again, no idea

9     who that is.

10         It's still not relevant.  One, there's no indication

11    that it ever left either of the brothers' computers.  And two,

12    even if it had, again, absent some connection to this

13    defendant, extrinsic evidence of how they held themselves out

14    to other --

15         THE COURT:  You mean the witness?

16         MR. LAX:  I'm sorry?

17         THE COURT:  To the witness?

18         MR. LAX:  No, to the defendant.

19         Absent some indication that this was shown to the

20    defendant at some point, it has absolutely no bearing, for

21    example, on his -- on his state of mind four years ago before

22    the beginning of this conspiracy, the charged conspiracy.

23         THE COURT:  Well, are you going to offer it subject

24    to connection on that score?

25         MR. PRICE:  Well, I am not going to suggest

1   Mr. Aguilar ever saw this.

2           The point is, and it is relevant, that in this case

3   his brother signing on behalf of the company -- and by the

4   way, Mr. Pere knew he was because he received it.  There's the

5   e-mail showing he received it.  Sends Mr. Pere a letter to a

6   potential customer describing what the Pere brothers'

7   consulting company did.  And that is relevant.  We have a

8   signed document.  We have it being sent to him.

9           He can deny he ever saw it, but it's -- the jury is

10  allowed to make another inference since it was sent to him.

11          MR. LAX:  There is no indication who Ashwin Patel

12  is.  There's been no testimony that he is a potential client

13  or what his role is, or if this witness even knows who that

14  is.

15          MR. PRICE:  Your Honor --

16          THE COURT:  Well, the question is whether or not he

17  can ask those questions to qualify this.

18          The question is, is Enrique testifying?

19          MR. LAX:  He -- I expect he will.

20          THE COURT:  Then that's where it should be

21  introduced.

22          MR. PRICE:  It will be introduced there as well, but

23  it's important that the head of the company saw this.  And as

24  to who Mr. Parmar is, it says on the letter who he is, and the

25  kind of services they are offering to him.

1    So, this is enough for a jury to conclude this is

2  how they were soliciting business or, at least, one way, and

3  that's relevant.

4    MR. LAX:  How they held themselves out to other

5  people four years before the beginning of this conspiracy with

6  no connection to this defendant is absolutely not relevant.

7    He can ask the questions of how they held themselves

8  out.  Those questions are -- are fine.  We haven't objected to

9  those.  But extrinsic evidence of how he held himself out to

10  some third-party with no connection to this defendant years

11  before the beginning of the conspiracy simply just doesn't

12  have relevance here.

13    THE COURT:  Well, this you all came up when you --

14  so maybe you can help orient me.

15    This all came up on an inquiry about what this

16  witness told the Government about his activities between 2002

17  and 2010.

18    MR. PRICE:  Yes, Your Honor.  I started that way,

19  but the reason I did was I expected him to say:  Not all of my

20  activities were illegal.  I had legitimate consulting.  It was

21  a strategy.  I really wasn't trying to say that he didn't

22  represent anything to the Government.

23    Although, if he said it was all illegal, he would

24  not have represented that to the Government.  Instead, he

25  conceded that he sought business and got it legitimately,

1  helped clients with his government contacts.

2         This is an example of him seeking to do that, his

3  company seeking to do that.

4         THE COURT:  Well --

5         MR. PRICE:  That's relevant.

6         THE COURT:  There's a difference between him and his

7  company.

8         MR. PRICE:  Well, it's sent to him, signed by his

9  brother.  He knows it's going out.

10         So, yes, it's the company, it's the consulting

11  company, of which his brother is a part, trying to get

12  business.

13         MR. LAX:  We are making leaps and bounds in terms of

14  the inferences here.

15         Again, this is an attachment to an e-mail between

16  the two brothers.  No indication that this letter went any

17  further, that it went to Ashwin Patel or anybody else.

18         I don't know if this witness can answer that.  I

19  don't know if Enrique Pere can answer that.  And even if it

20  did, once again, it still wouldn't satisfy the fact that it is

21  not relevant.

22         THE COURT:  Yes, I am still having problems with the

23  relevance, but if you -- I will allow you to ask him whether

24  or not -- it sounds like a different name than you asked

25  before.

1          MR. LAX:  It is, Your Honor.

2          MR. PRICE:  It's a different letter.  It's a form

3    letter.  This one is signed by his brother, as we just

4    established and it is sent -- and it's not exactly the same

5    because they talk about a little different services.  One was

6    more tailored.

7          THE COURT:  Do you know who Mr. Patel is?

8          MR. PRICE:  This actually is sent to Mr. Parmar.

9          THE COURT:  The one that's signed.

10         MR. LAX:  Oh, my mistake, Mr. Parmar.

11         THE COURT:  Whatever his name, fill in the blank.

12         MR. PRICE:  The letter is signed by Enrique Pere.

13         THE COURT:  And who is that sent to?

14         MR. PRICE:  It's sent to Mr. Ashwin Parmar, who is

15   at Patel Engineering Limited.  And it talks about how

16   Mr. Pere, Enrique Pere, has reviewed their profile and has

17   said we have these projects, which can help your company given

18   what we know about your company.  So, it's actually tailored

19   to this -- to the recipient here.

20         And --

21         MR. LAX:  Again, there's no indication this was

22   actually sent to Mr. Parmar or that company, either through

23   the e-mail that it's attached to or through this witness.

24         MR. PRICE:  That is an easy inference from the fact

25   that it was written and it was signed.  Usually you do that to

1   send things out.  The fact that we don't have the actual hard

2   copy or envelope doesn't mean it's not relevant.  A jury,

3   there might be an argument it wasn't sent --

4           THE COURT:  Well, why don't you continue to try to

5   lay that foundation and then we'll come back and chat some

6   more, whether he knows who this fellow is and whether he --

7   what the practice is, and whether or not the fact that that

8   was in his computer meant that it was sent.

9           MR. LAX:  I'm still not sure what we're doing.

10           Even if we had the envelope stamped and it was sent

11   to Mr. Parmar, it's still not relevant to anything here in

12   this trial.

13           MR. PRICE:  We already confirmed that.

14           MR. LAX:  It can be asked how he held himself out or

15   he can ask about how he held himself out to the defendant, but

16   how he held himself out to Ashwin Parmar in 2011 just is not

17   relevant.

18           MR. PRICE:  Your Honor, this is why it's relevant.

19           The Government and the witness on the direct

20   basically were making the presentation that if you're doing

21   business in Ecuador with us it's corrupt.  We're paying

22   bribes.

23           That's -- that's the impression they're trying to

24   give.  And that's because in his discussion with Mr. Aguilar

25   he never mentioned bribes.  He said:  I have connections.  I

1  can take advantage of them.

2          And he is saying, and the Government's embracing

3  this, that means it's all bribes.  So, it's certainly relevant

4  that it's not all bribes and the fact that he's representing

5  himself to be legitimate.

6          THE COURT:  Well, let's see if this is the right

7  witness.  Maybe his brother is the right witness.

8          MR. PRICE:  I'm sure his brother is, yes.

9          THE COURT:  Let's find out.

10         MR. PRICE:  Let me do this, because I don't want to

11 waste too much more time on this.  And although I enjoy our

12 conversations, you probably prefer I be at the lectern as

13 well.

14         I don't think this witness will tell us what you

15 have concluded is necessary to get it in through him.

16         THE COURT:  It seemed to me if you're going to get

17 it in, it's through Enrique.  That's the surer way.

18         MR. PRICE:  So, I will --

19         THE COURT:  And the Government will still have its

20 own objections.  We will evaluate those objections at that

21 time.

22         MR. PRICE:  I don't think I'll be able to lay what

23 you require, so I will, in fact I'll ask the witness is your

24 brother in a better position to tell us what this is.

25         MR. LAX:  I mean I would object to that on

1   speculation.  Just ask the brother when he's here.  I mean

2   asking him what he thinks --

3          THE COURT:  Yes.  It doesn't really matter what he

4   thinks, it's what Enrique thinks.

5          All right.  So we will move on to another topic.

6   Reserve to come back to that.

7          MR. PRICE:  Right.  I can move on.  The next topic's

8   probably about -- probably about 50 minutes' worth.

9          THE COURT:  Why don't you start.

10          MR. PRICE:  Okay.

11          THE COURT:  And then find a convenient place where

12   we won't have to do too much more on Monday to refresh the

13   recollection.

14          MR. PRICE:  Okay.

15          THE COURT:  Okay.  We normally work until about

16   5:30, though.

17          MR. PRICE:  Okay.

18          (Sidebar concluded; proceedings resumed.)

19

20          (Continued on the following page.)

21

22

23

24

25

1  CROSS-EXAMINATION

2  BY MR. PRICE:  (Continuing)

3  Q    Mr. Pere, let me hold those off for questions for your

4  brother and shift to a slightly different topic.

5           You testified that beginning in 2010 you started

6  having dealings with clients who wanted to purchase or sell

7  oil to the Ecuadorian Government; correct?

8  A    Correct.

9  Q    And by the time that you met Mr. Aguilar, you had engaged

10  in multiple deals with the Government of Ecuador where you had

11  paid bribes in order to assist a client to get a contract,

12  right?

13  A    That is correct, yes.

14  Q    And, so, by the time you had met with Mr. Aguilar, you

15  had sort of a playbook on how you would do that for your

16  clients, right?

17  A    What do you mean a playbook?

18  Q    Well, you had like a structure in place.  You had

19  contacts in place.  You had contracts in place with the client

20  that you would enter into.  You had Government officials who

21  you knew you could contact to try to get their support.  You

22  would pay bribes.  That was sort of the playbook; right?

23  A    I understand, yes.

24  Q    So let me use an example Gunvor.  You told us by the time

25  you met Mr. Aguilar there were at least three contracts that

 1  you had helped Gunvor to obtain in connection with the

 2  purchase and sale of oil products; correct?

 3  A    Correct.

 4  Q    And by the way, some of those contracts were fuel oil

 5  contracts, right?

 6  A    Yes.

 7  Q    And what were the others?

 8  A    You mean the other products?

 9  Q    The other type of products.

10  A    Well, I did gasoline, diesel, and crude oil.

11  Q    So you if we see a notation something refers to crude

12  oil, we need to look at the context to see whether or not it

13  was referring to Gunvor or to Vitol, right?

14  A    Yes.

15  Q    So Gunvor is an example.  Your company or companies --

16  I'm going to put down here Pere Brothers -- would enter into

17  contracts with Gunvor; correct?

18  A    Correct.

19  Q    And under those contracts, your companies would receive a

20  certain amount per barrel of oil that was purchased by Gunvor

21  by the Government?

22  A    Correct.

23  Q    Was there a range of what that usually was?

24  A    Between 20 and 30 cents.

25  Q    Here you're getting 20 to 30 cents per barrel, and over

1   all the contracts you had with Gunvor, the total amount paid

2   from Gunvor to your companies was about $97 million; correct?

3   A    I don't recall the exact amount, but it was over 80

4   million.

5   Q    Well, let me see if I can refresh your recollection.  If

6   I could show you -- and if I could show you -- and at this

7   time it will just be you at this point.

8           MR. PRICE:  Actually, Your Honor, this does not have

9   an exhibit number on it.  I will tell the Government what it

10  is.  It is a December 30, 2023 letter by the Government to us

11  stating certain facts.

12          MR. LAX:  Objection to the extent that Mr. Price is

13  going to read from this.

14          MR. PRICE:  I'm not.  I'm going to show it to the

15  witness and refresh his memory as to how much he received.

16          May I approach the witness, Your Honor?

17          THE COURT:  You may.

18  Q    Mr. Pere, I'm going to show you this letter from

19  Government counsel that was sent to us on December 30, 2023

20  and I am directing your attention to the third paragraph here

21  and see if that helps refresh your memory as to how much money

22  your companies received from Gunvor.

23          Did you have a chance to look at it?

24  A    That's what it says.

25  Q    I'm not asking you whether or not that's what the

1    Government told us.  I'm asking you whether or not that helps

2    refresh your memory that the amount that you and Enrique

3    received from Gunvor was about $97 million?

4                THE COURT:  In other words, do you accept that

5    number?

6                THE WITNESS:  I accept the number.

7    Q    Fantastic.  So we have 97 million here.  And that's again

8    -- there's a contract in place that entitles you to that based

9    upon this figure, correct?  Based upon this 20 or 30 cents per

10   barrel, right?

11   A    Yes.

12   Q    You're owed that for every barrel that's purchased from

13   PetroEcuador by Gunvor, correct?

14               THE COURT:  The underlying price, not the total

15   price?

16               MR. PRICE:  Yes.

17   A    Correct.

18   Q    And then in order to accomplish the task of helping

19   Gunvor, you pay -- in the case of Gunvor, you paid Government

20   officials right?

21   A    Right.

22   Q    One of them was Mr. Arias?

23   A    Correct.

24   Q    Was he the only one?

25   A    No.

 1   Q     So what were the others?  Who were the others?  Sorry.

 2   A     Jose Agusto, Mauricio Samaniego; Santiago Palacios.

 3   Q     I'm going to put down others.

 4   A     Yeah.  You can put down.

 5   Q     Let me ask you, did you on the first contract you had

 6   with Gunvor --

 7   A     I haven't finished.

 8   Q     I just put down others.  We will come back to that.

 9   A     Okay.

10   Q     The first contract, the same group of people or did that

11   expand over time?

12   A     That expanded over time.

13   Q     So the first contract, who was paid?

14   A     Nilsen Arias.

15   Q     Just for the first one, just Mr. Arias, and I put

16   contract number one there.

17              So, in total, you received 97 million.  In total,

18   how much of that are you paying out, or did you and Gunvor?

19   A     To everybody that I had to pay?

20   Q     Yes.

21   A     Maybe 30 million, approximate.

22   Q     Approximately 30 million.  So you're keeping -- I don't

23   have a calculator in front of me.  You're keeping, with those

24   numbers, about 70 percent of what you were receiving from

25   Gunvor; correct?

1   A    That's the math, yes.

2   Q    So are you familiar with the phrase middleman?

3   A    Yes.

4   Q    Saying that you were the middleman here would be kind of

5   insulting to you, wouldn't it?

6   A    I'm sorry?

7   Q    Saying that you were a middleman would kind of be

8   insulting to you?  It would certainly understate your role in

9   what happened with Gunvor; correct?

10  A    I was in the middle of the transaction, yes.

11  Q    You're keeping 70 percent, I mean, probably, you'd agree

12  the word mastermind might be a little more accurate than

13  middleman in this case?

14  A    Can you repeat that please.

15  Q    Yeah.  You would agree that the word mastermind might be

16  a little more accurate than middleman in describing this

17  situation where you're getting $97 million from Gunvor and

18  keeping 70 percent of it?

19  A    That depends on my contribution to the business.

20  Q    Whatever your, quote, contribution is, you're keeping 70

21  percent, right?

22  A    That's right.

23  Q    Now, with respect to these bribes that were paid, it's

24  certainly accurate that it's best not to advertise your

25  criminality, it's best not to let a lot of people know that

 1   you're paying bribes, right?

 2   A    Yes.

 3   Q    That would put you kind of at their mercy if they knew

 4   that you were committing crimes; right?

 5   A    Correct.

 6   Q    And your practice, because you didn't want to be caught

 7   for committing crimes, your practice was not to tell somebody

 8   that you were committing bribes unless they needed to know

 9   that; right?

10   A    Right.

11   Q    And, in fact, if they knew that, they might ask you for a

12   cut of what you're making, right?

13   A    It's possible, yes.

14   Q    Not only possible, it's what happened, isn't it, with

15   Gunvor?

16   A    Yes.

17   Q    So let's talk about that and what you're using Gunvor's

18   illustration of your practice.  You met with Mr. Kohut and

19   told him that you had contacts with influential people; right?

20   A    Right.

21   Q    And by the way, you told the Government about this in

22   your meetings with them, right?

23   A    Right.

24   Q    When you met with Mr. Kohut and Mr. Kohut, by the way,

25   Ray Kohut, he was -- how do you spell his last name?

1    K-O-H-U-T?

2  A    Correct.

3  Q    So he was sort of the equivalent of Mr. Aguilar with

4  Vitol.  He was the person you met with and discussed with and

5  kind of dealt with in connection with these contracts, right?

6  A    Yes.

7  Q    So when you met with him, you told him that you had

8  contacts in the Government, influential people, right?

9  A    Right.

10 Q    You told him that you would need the support of people in

11 the Government; right?

12 A    Can you repeat that, please.  I'm sorry.

13 Q    Yes.  You told him that in order for Gunvor to get

14 contracts with Ecuador that people in the Government would

15 have to support that happening, right?

16 A    Yes.

17 Q    And, of course, that would be true with any contract that

18 a Government, you know, handed out or allowed, someone in the

19 Government has to be in support of it; right?

20 A    Right.

21 Q    And after telling him that, you then went and met with

22 Mr. Arias, correct?

23 A    I'm sorry?

24 Q    After telling Mr. Kohut that you thought you could help

25 him because you had contacts in the Government and he would

1   need their support, you went and you met with Mr. Arias;

2   correct?

3   A    I met with Mr. Arias, yeah.

4   Q    And when you met with Mr. Arias, you told him that if he

5   would support this contract that he would get a certain number

6   of cents per barrel; correct?

7   A    Not in my first meeting with Mr. Arias.

8   Q    Did you tell Mr. Arias -- let me ask you this:  Following

9   your initial meeting with Kohut, did you meet with Mr. Arias

10  following news that PetroChina would agree to split barrels

11  with UNIPEC which would therefore involve Gunvor?

12  A    Yes.

13  Q    And did you discuss with Arias that Arias would receive a

14  certain number of cents per barrel from the UNIPEC contract?

15  A    Yes.

16  Q    And Mr. Arias agreed and you confirmed at that time to

17  yourself, at least, that you had Arias's support because you

18  said you would pay him, right?

19  A    At least I didn't have his adversity.

20  Q    Well, did you believe that you now possessed support with

21  Arias moving forward?

22  A    With my doubts.

23  Q    You then went and you talked with Mr. Kohut, correct,

24  after this meeting with Arias, right?

25  A    Yes.

1   Q    And you felt a sense of relief knowing that you now

2   possessed the support of Arias, right?

3   A    I don't remember how I said it.

4   Q    I'm not asking how you said it.  You realize I'm looking

5   at something that you said; right?

6   A    I don't know.  I haven't seen it.

7   Q    So let me ask whether you have a recollection of this.

8   If you don't, I'll try to refresh your recollection.  But

9   after meeting with Arias, you felt a sense of relief knowing

10  that you now had his support, right?

11  A    Yes.

12  Q    And you went and talked to Mr. Kohut and shared with him

13  your relief that you now have Mr. Arias's support; correct?

14  A    I'm not sure.  If you have something to help me remember.

15  Q    I'll be happy to give you something to help you remember,

16  sir.

17          MR. PRICE:  If we could show to the witness and

18  counsel, not the jury, 3500-AP-266-A at page 2.  If we could

19  highlight, is it page 2 or 3?

20          Highlight the last paragraph.  I'm sorry.  The last

21  full paragraph there, the first half of that so that Mr. Pere

22  can see it.

23  Q    If you look at the first two sentence there.

24  A    Yes, I see it.

25          (Continued on next page.)

1    (Continuing.)

2    Q    Does that refresh your recollection that after talking

3    to Mr. Arias and telling him you would pay him and getting

4    Aria's support, that you went to Mr. Kohut and shared had

5    women that you now had Aria's support and that you were

6    relieved?

7    A    You are right.

8         MR. PRICE:  You can take that down, now.

9    Q    And it's true, sir, that you did not tell Mr. Kohut how

10   you got that support?  If you don't need to know, don't

11   tell, right?

12   A    No, I don't think I did at the time.

13   Q    And, in fact, you don't recall overtly discussing

14   payments to Arias in any of these initial discussions,

15   correct?

16   A    Correct.

17   Q    However, in fact, you're not sure if specifics of

18   payments to Arias ever came up in connection with your

19   conversations with Mr. Kohut, correct?

20   A    Well, they came up later.

21   Q    So let me talk about that.

22         Mr. Kohut was very experienced in dealing with the

23   government of Ecuador, correct?

24   A    Correct.

25   Q    You had known of him before you ever met with him,

1  correct?

2  A    Can you repeat that?  I'm sorry.

3  Q    You had known of him before you had ever met with him?

4  A    Yes.

5  Q    So about the time of the third contract that Gunvor had

6  with your company, Mr. Kohut comes to you and says, I know

7  what's going on, I want a percentage of your money, I want a

8  percentage of your 70 percent.  He does that after the third

9  contract; doesn't he?

10 A    Yes, he does that.  I'm not sure if it's after the

11 third contract, but he does it at some point in time, yes.

12 Q    By the way, Mr. Aguilar never, ever asks for any

13 portion of the money that you received, correct?

14 A    That is correct, yes.

15 Q    Now, there are others, by the way, who were involved in

16 these schemes that you also kind of partitioned in

17 connection with what they needed to know about what

18 everybody else was doing, right?

19 A    Could you please explain?

20 Q    Sure.

21       So for example, in this first contract, Mr. Arias

22 didn't even know that Gunvor was involved, right?

23 A    He didn't know that Gunvor was involved in the

24 contracts?

25 Q    Yes.  Is that correct?

1   A    He did know.

2   Q    I'm talking about the first contract.

3   A    I'm not sure.  I believe he did.

4   Q    Well, let me ask you about -- you've talked about the

5   Vitol contract.

6             Mr. Samaniego didn't know you were involved in the

7   Vitol contract, right?

8   A    That's right, yes.

9   Q    He thought that the person involved was Nicolas

10  Naranjo, correct?

11  A    Correct.

12  Q    That was the Baker Botts thing, right?

13  A    Correct.

14  Q    And you would even tell your own brother that he

15  shouldn't be curious and try to know everything that was

16  going on in your business, correct?

17  A    I didn't tell my brother what?  I'm sorry?

18  Q    You told your brother not to be curious that he didn't

19  have a right to know everything that is going on in your

20  business in connection with these contracts, right?

21  A    Yeah, he didn't know everything.

22  Q    And that was intentional, right?

23  A    Of course.

24  Q    If you don't need to know, don't tell, right?

25  A    You don't need to know how I do my business, yes.

1  Q    And you understand one of the -- well, you met with
2  Mr. Aguilar in about June of 2015, right?
3  A    That's right.
4  Q    And a contract between, you know, with the government
5  and the Vitol companies, Mr. Hanst's companies, was executed
6  until January 2017, correct?
7  A    You are saying the contract with the government and
8  Mr. Hanst companies?
9  Q    Yes.
10 A    I don't think Mr. Hanst companies signed any contract
11 with the government.
12 Q    Yeah, let me rephrase that, okay.
13       There was a contract for the fuel oil in about
14 January 2017, correct?
15 A    That's correct, yes.
16 Q    And you are right, that was using the state-to-state
17 apparatus with Oman Trading, right?
18 A    That's correct, yes.
19 Q    And you know that one -- and you understand that, I
20 guess, you are telling us the government is saying that
21 Mr. Aguilar knew that that contract was obtained because you
22 were paying bribes or promised to pay bribes to Mr. Arias,
23 correct?
24 A    Yes.
25 Q    And the fact of the matter is, before that contract was

1   signed, at no time did you tell Mr. Aguilar that the way you

2   were accomplishing what you were accomplishing was by

3   bribing or promising to bribe Mr. Arias; isn't that correct?

4   A    I didn't use the word bribes because I would never use

5   it.

6   Q    Not even a code word?  We have heard of code words

7   here, commissions, arrangements.

8         You didn't use any of the code words for bribes

9   either; did you?

10  A    I used the word "worked" with Mr. Arias.

11  Q    Well, we will get into this in some detail, perhaps, on

12  Monday, but isn't what you told the jury is that you told

13  Mr. Aguilar that you had a close relationship with Mr. Arias

14  and that you believed you could take advantage of that

15  relationship, that's what you told him, right?

16  A    Yes.

17  Q    And you told us previously that you would say the exact

18  same thing when you were trying to help clients get business

19  from the government and there were no bribes involved

20  whatsoever, right?  That you had close contacts and that you

21  could take advantage of those to help them with the

22  government.

23        You told us you did that when there were no

24  bribes, right?

25  A    I never said exact.

1  Q    In any event, in a non-bribe scenario, it would be

2  pretty typical of a consultant who had close contacts to say

3  to a potential client --

4            MR. LAX:  Objection.

5            THE COURT:  Sustained.

6  Q    You have said to potential clients in situations which

7  you had no intention of bribing a government official, that

8  you had close contacts in the government and that because of

9  those contacts, you could take advantage of that and help

10  that client.

11            You've done that yourself; haven't you?

12  A    I'm trying to think about a client, but if you can help

13  me refresh my memory, I would appreciate it.

14  Q    I'm basing that based upon your testimony earlier when

15  you talked about getting clients when you bribed government

16  officials.  You would tell them about your contacts.  You

17  told them you could use your contacts.  That's my refreshing

18  of your recollection.

19            Isn't it true you, yourself, have done that?

20  A    Yes.

21            MR. PRICE:  Your Honor, I think this would be a

22  good time for a break.

23            THE COURT:  You are reading my mind.

24            MR. PRICE:  Or past a good time for a break.

25            THE COURT:  You are reading my mind, Mr. Price.

1   Particularly after Mr. Villanueva whispered to me.

2            So we are at the end of the day. And for -- also

3   serendipitous for you, the end of your time here in Brooklyn

4   this week, particularly given the impending forecast. For

5   some of us, we are returning tomorrow. We will skate in, I

6   guess. But wherever you are skating tomorrow, make sure you

7   do it safely and that you follow all of the usual rules and

8   we call them usual because they are so important we keep

9   repeating them, it makes it sound usual. And as you

10  continue to keep an open mind, do not discuss the case

11  amongst yourselves or with anyone else. There is no

12  homework allowed. No independent research of any kind. The

13  radio silence continues even when you are not here. You are

14  not allowed to communicate to anyone the fact that you do

15  come here or that you are a juror or anything that even

16  remotely touches upon the case, much less directly touches

17  on the case.

18           To the extent that there are media accounts,

19  again, the broad definition of media including social media,

20  that might mention this case, you are to totally tune it

21  out, disregard it, don't read it, don't listen to it. And,

22  again, I urge you to tune out reports of other legal

23  proceedings anywhere for fear that you may hear something in

24  that context that will confuse you, mislead you about what

25  your responsibilities are here.

1    Now, for planning purposes and we see this during

2    the course of the trial and it certainly fits in with the

3    old saying that if you want to make God smile, tell them you

4    have a plan.

5    Our plan for all you have next week is to work

6    five days, not four, so that you should anticipate the case

7    being on trial next Friday.  Not this, not tomorrow, but a

8    week from tomorrow.  And we will try to give you these

9    scheduling updates the best we can, but that is recognizing

10   limitations of the plan, that is what the plan is sand

11   hopefully that will make it a little easier for you to

12   schedule.

13   We understand, particularly, with the vagaries of

14   scheduling, this is a sacrifice.  We appreciate that

15   sacrifice.  We appreciate your attentiveness, particularly

16   today, your punctuality, your patience, and we look forward

17   to seeing you all safe and sound next week.

18   You will come back to the central jury room at the

19   usual time.  Try to be there no later than 9:45.  And

20   otherwise, to enjoy your time off, the three days, use as a

21   chance to refresh and relax and put the matters of this case

22   aside and perhaps focus in on some of those things you've

23   had to overlook as part of your sacrifice.

24   So again, thank you.  Pleasant evening.  We look

25   forward to seeing you on Monday.

1    (Jury exits.)

2    THE COURT:  Okay.  We are ready to adjourn for the

3  night.  Again, you will work out with William about stuff.

4  We do have a calendar tomorrow, so how you guys work that

5  out is fine with me.

6    MR. LAX:  We will tidy up, Your Honor.

7    THE COURT:  Thank you.

8    All right.  Have a pleasant evening, all.  Be safe

9  tomorrow in your travels.  Looks like we have another

10  greeting from the weatherman.

11    MR. KOFFMAN:  Thank you, Your Honor.

12

13    (Matter adjourned to January 22, 2018, 10:00 a.m.)

14

15                      ooo0ooo

16

17

18

19

20

21

22

23

24

25

<u>I N D E X</u>

<u>WITNESS</u>                                          <u>PAGE</u>


  ANTONIO PERE

     DIRECT EXAMINATION (Continuing) BY MR. LAX      950

     CROSS-EXAMINATION BY MR. PRICE                 1017

SAM    OCR    RMR    CRR    RPR

E X H I B I T S

Exhibit                                                    Page

Government's Exhibit 8008                                   948

Government's Exhibits 1574 and 1574-A                       951

Government's Exhibit 1574-T was so marked                   952

Government's Exhibit 103                                    1003

Defendant's Exhibit 52                                      1018

Defendant's Exhibit 7000                                    1028

SAM     OCR     RMR     CRR     RPR