**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------ X
                    :

UNITED STATES OF AMERICA,      :      20-cr-390 (ENV);
                    :      24-cr-304 (ENV)
                    :

        vs.               :
                    :
                    :

JAVIER AGUILAR,           :
                    :
          Defendant.     :
------------------------------------------------------ X

 

**<u>SENTENCING MEMORANDUM ON BEHALF OF JAVIER AGUILAR</u>**

i

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...............................................................................................................1

RELEVANT FACTUAL BACKGROUND.......................................................................3

    I.      JAVIER'S PERSONAL BACKGROUND .............................................................3

          A.      Upbringing and Family Life ......................................................................3

                1.      Javier's Childhood ........................................................................3

                2.      College and Post Graduate Degree ...............................................3

                3.      Career as an Oil & Gas Trader.......................................................4

                4.      Javier Starts His Own Family .......................................................5

                5.      Javier Remains Close with His Family...........................................6

          B.      Javier's Kindness to Others and His Generosity........................................7

    II.      OFFENSE CONDUCT AND PROCEDURAL HISTORY ...................................8

ARGUMENT.......................................................................................................................9

    I.      THE SENTENCING GUIDELINES CALCULATION ......................................9

          A.      Federal Sentencing Framework ..................................................................9

          B.      Sentencing Guidelines Analysis ...............................................................10

          C.      A Downward Departure is Warranted .......................................................11

                1.      Using the Overall Gain to Javier's Employer Overstates the Seriousness of the Offense............................................................12

                2.      A Forensic Accounting Analysis of Data Collected from Vitol Demonstrates that Javier's Personal Gain was *De Minimis* Compared to the $19.8 Million Profit Attributable to Him Under the Guidelines ................................................................13

                        a.      Javier Did Not Realize a Direct Benefit Related to the Fuel Oil Contract Through His Annual Salary .......................14

                        b.      Javier Also Did Not Realize a Direct Benefit Through His Discretionary Annual Bonus Related to the Fuel Oil Contract............................................................................14

                        c.      Javier Only Realized a Direct Benefit Related to the Fuel Oil Contract Through His Percentage of Employee Share Ownership in Vitol in the Amount of $48,265 ................15

          D.      The Court Should Consider the Shadow Guidelines .................................18

                 1.      Javier's Culpability Is Low.........................................................21

                 2.      There Is No Victim Impact Because There Are No Victims........24

3.      Final Calculations Under the Proposed Amendments to the
        Guidelines Without Considering § 3553(a) Factors ......................25

        a.      Under the Shadow Guidelines, Javier's Offense Level
                Should be Capped at 10 ..................................................26

E.      The Court Should Also Consider the Recent Proposed Amendments to the
        Guidelines ........................................................................................27

F.      A One-Point Reduction Should Apply to Take Into Account the "Trial
        Penalty"............................................................................................28

II.     THE § 3553(a) FACTORS SUPPORT A NON-CUSTODIAL SENTENCE.......29

A.      Javier's History and Characteristics.........................................................30

B.      Nature and Circumstances of the Offense .................................................34

C.      Javier's Family Circumstances and Collateral Immigration Consequences
        Support a Variance from the Guidelines...................................................38

D.      Javier's Satisfaction of His Significant Forfeiture, By Way of a Lump Sum
        Payment Prior to Sentencing, Supports a Non-Custodial Sentence...........40

E.      The Need to Avoid Unwarranted Sentence Disparities Warrants a Non-
        Custodial Sentence..............................................................................41

        1.      A Non-Incarceratory Sentence Avoids Unwarranted Sentence
                Disparities with Other Defendants Sentenced Before This
                Honorable Court for Similar FCPA Violations ............................41

        2.      A Non-Incarceratory Sentence Also Avoids Unwarranted Sentence
                Disparities with Other Defendants Sentenced in Courts Throughout
                the Country for Similar FCPA Violations ...................................42

F.      The Guideline Range Reflects An Inappropriate Trial Penalty ................44

G.      Under New DOJ Guidance, Similar Cases Are No Longer Being
        Prosecuted ........................................................................................46

H.      There Is No Need for an Incarceratory Sentence for General or Specific
        Deterrence ........................................................................................48

I.      The Kinds of Sentences Available...........................................................49

J.      Restitution .......................................................................................52

CONCLUSION.....................................................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Fiscalia General Del Estado v. Aguilar,*
No. 17282202202214 (Ecuador) ........................................................................... 36

*Gall v. United States,*
552 U.S. 38 (2007) ................................................................................................ 9

*Kimbrough v. United States,*
552 U.S. 85 (2007) ................................................................................................ 9

*Lafler v. Cooper,*
566 U.S. 156 (2012) ......................................................................................... 44, 45

*Missouri v. Frye,*
566 U.S. 134 (2012) ............................................................................................ 44

*Padilla v. Kentucky,*
559 U.S. 356 (2010) ............................................................................................ 38

*Pepper v. United States,*
562 U.S. 476 (2011) ......................................................................................... 29, 39

*Peugh v. United States,*
569 U.S. 530 (2013) ............................................................................................ 10

*Ramos v. Louisiana,*
590 U.S. 83 (2020) .............................................................................................. 45

*Rita v. United States,*
551 U.S. 338 (2007) ............................................................................................ 10

*Spears v. United States,*
555 U.S. 261 (2009) ............................................................................................ 10

*United States v. Adelson,*
441 F. Supp. 2d 506 (S.D.N.Y. 2006) ....................................... 2, 19, 34, 39, 49

*United States v. Andrade,*
No. 17-CR-497 (ENV) (E.D.N.Y.) ................................................................ 41, 42

*United States v. Aries,*
No. 24-286 (D.D.C. 2025) .................................................................................. 43

*United States v. Ballard,*
    552 F. Supp. 3d 461 (S.D.N.Y. 2021)..................................................................45

*United States v. Barker,*
    771 F.2d 1362 (9th Cir. 1985) ...................................................................29, 30

*United States v. Broderson,*
    67 F.3d 452 (2d Cir. 1995).............................................................................16

*United States v. Caruso,*
    814 F. Supp. 382 (S.D.N.Y. 1993)...................................................................12

*United States v. Cavera,*
    550 F.3d 180 (2d Cir. 2008)...........................................................................10

*United States v. Coburn,*
    No. 19-CR-120 (D.N.J.)..................................................................................47

*United States v. Cohen,*
    No. 19-CR-741 (WHP) (S.D.N.Y. June 9, 2020) ...............................................51

*United States v. Connolly,*
    No. 16-CR-370 (CM) (S.D.N.Y. Nov. 19, 2019) .......................................39, 50, 51

*United States v. Corsey,*
    723 F.3d 366 (2d Cir. 2013)........................................................................19, 20

*United States v. Coscia,*
    866 F.3d 782 (7th Cir. 2017) ..........................................................................17

*United States v. Diaz,*
    No. 18-CR-140-ENV (E.D.N.Y. Oct. 18, 2024)............................16, 17, 18, 42. 44

*United States v. Dorvee,*
    616 F.3d 174 (2d Cir. 2010)............................................................................29

*United States v. Douglas,*
    713 F.3d 694 (2d Cir. 2013)............................................................................29

*United States v. Elias,*
    154 F.4th 56 (2d Cir. 2025) ............................................................................40

*United States v. Emmenegger,*
    329 F. Supp. 2d 416 (S.D.N.Y. 2004)...............................................................18

*United States v. F.G. Mason Eng'g & Francis Mason,*
    No. 90-CR-29 (D. Conn.) ...............................................................................42

*United States v. Faibish*,
   No. 12-CR-265 (ENV), 2015 WL 4637013 (E.D.N.Y. Aug. 3, 2015) ........................... 19, 20

*United States v. Farias*,
   No. 20-CR-80 (S.D. Tex.) ...................................................................................... 17, 18, 43

*United States v. Farrell*,
   No. 03-CR-290 (S.D.N.Y.) .............................................................................................. 42

*United States v. Finocchi*,
   No. 17-CR-600 (ENV) (E.D.N.Y. Aug. 16, 2024) ...................................................... 24, 42

*United States v. Free*,
   No. 14 Cr. 19, 2015 WL 8784738 (W.D. Pa. Dec. 15, 2015) ........................................... 37

*United States v. Haymond*,
   588 U.S. 634 (2019) ........................................................................................................ 45

*United States v. Haynes*,
   456 F. Supp. 3d 496 (E.D.N.Y. 2020) ......................................................................... 45, 46

*United States v. Hirsch*,
   No. 15-CR-358 (D.N.J.) ................................................................................................... 43

*United States v. Hoskins*,
   No. 12-CR-238 (D. Conn. Mar. 17, 2020) ....................................................................... 49

*United States v. Jenkins*,
   854 F.3d 181 (2d Cir. 2017) ............................................................................................. 29

*United States v. Lewis*,
   No. 03-CR-930 (S.D.N.Y.) .............................................................................................. 42

*United States v. Lopez & Full Play Group S.A.*,
   No. 15-CR-252 (E.D.N.Y.) ............................................................................................. 47

*United States v. Lumiere*,
   No. 16-CR-483 (JSR) (S.D.N.Y. Jun. 14, 2017) ............................................................. 20

*United States v. Luque-Flores*,
   No. 17-CR-537 (CBA) (E.D.N.Y.) .................................................................................. 42

*United States v. Maldonado*,
   No. 15-CR-635 (S.D. Tex. 2015) ..................................................................................... 43

*United States v. McBride*,
   362 F.3d 360 (6th Cir. 2004) ........................................................................................... 12

*United States v. Ministro-Tapia*,
  470 F.3d 137 (2d Cir. 2006) ................................................................................. 29

*United States v. Moneke*,
  No. 18-CR-442-1 (WFK), 2021 WL 3190382 (E.D.N.Y. July 26, 2021) ............................ 16

*United States v. Nunez Troyano*,
  No. 19-CR-135 (ENV) (E.D.N.Y.) ............................................................................ 42

*United States v. Oakford Corp.*,
  79 F. Supp. 2d 357 (S.D.N.Y. 1999) .................................................................... 12, 18

*United States v. Oligmueller*,
  198 F.3d 669 (8th Cir. 1999) ................................................................................ 12

*United States v. Parris*,
  573 F. Supp. 2d 744 (E.D.N.Y. 2008) ...................................................................... 20

*United States v. Perez*,
  No. 16-CR-1164 (S.D. Tex. 2016) .......................................................................... 43

*United States v. Redemann*,
  295 F. Supp. 2d 887 (E.D. Wisc. 2003) .................................................................... 12

*United States v. Robie*,
  166 F.3d 444 (2d Cir. 1999) ................................................................................ 17

*United States v. Russo*,
  643 F. Supp. 3d 325 (E.D.N.Y. 2022) ...................................................................... 45

*United States v. Sagar*,
  No. 22-CR-710 (CM) (E.D.N.Y. Sept. 24, 2025) .......................................................... 51

*United States v. Schulman*,
  No. 16-CR-442 (E.D.N.Y. Oct. 6, 2017) .................................................................... 33

*United States v. Sharma*,
  No. 24-CR-302 (D.D.C. July 3, 2025) ...................................................................... 39

*United States v. Stewart*,
  590 F.3d 93 (2d Cir. 2009) .................................................................................. 37

*United States v. Stuart*,
  22 F.3d 76 (3d Cir. 1994) .................................................................................. 17

*United States v. Tavberidze*,
  769 F. Supp. 3d 264 (S.D.N.Y. 2025) ................................................................. 28, 45

*United States v. Vitol, Inc.*,
No. 20-CR-539 (ENV) (E.D.N.Y. Dec. 3, 2020) ........................................................... 23, 49

*United States v. Walters*,
87 F.3d 663 (5th Cir. 1996) ....................................................................................... 16

*United States v. Wardlaw*,
576 F.2d 932 (1st Cir. 1978) ..................................................................................... 30

*United States v. Yeaman*,
194 F.3d 442 (3d Cir. 1999) ...................................................................................... 17

*United States v. Yeaman*,
248 F.3d 223 (3d Cir. 2001) ...................................................................................... 49

**Statutes**

18 U.S.C. § 371 ........................................................................................................... 44

18 U.S.C. § 982 ...................................................................................................... 29, 40

18 U.S.C. § 1956 ......................................................................................................... 11

18 U.S.C. § 3553 ................................................................................................. *passim*

18 U.S.C. § 3582(c) .................................................................................................... 46

28 U.S.C. § 994(j) ...................................................................................................... 26

First Step Act ............................................................................................................. 50

Foreign Corrupt Practices Act ............................................................................ *passim*

Travel Act .................................................................................................................... 9

U.S.S.G. § 2B1.1 ............................................................................................... *passim*

U.S.S.G. § 2C1.1 ................................................................................................... 11, 25

U.S.S.G. § 2S1.1(b)(2)(B) .......................................................................................... 11

U.S.S.G. § 3E1.1 ........................................................................................................ 28

U.S.S.G. § 3E1.2 ........................................................................................................ 27

U.S.S.G. § 5K2.0(a)(1)(A) ..................................................................................... 12, 18

**Other Authorities**

Executive Order No. 14209, *Pausing Foreign Corrupt Practices Act Enforcement to Further American Economic and National Security* (Feb. 10, 2025) ................................ 46

Matthew R. Galeotti, Assistant Att'y Gen., Dep't of Just., Head of Justice Department's Criminal Division Matthew R. Galeotti Delivers Remarks at American Conference Institute (June 10, 2025) ..................................................... 37

Memorandum from the Off. of the Deputy Att'y Gen., Guidelines for Investigations and Enforcement of the Foreign Corrupt Practices Act (June 9, 2025) ................................................................................................................... 46

Press Release, Dep't of Just., McKinsey & Company Africa to Pay Over $120 Million in Connection with Bribery of South African Government Officials (Dec. 5, 2024) ..................................................................................................... 511

*Proposed Amendments to the Sentencing Guidelines*, U.S. Sent'g Comm'n (2025) ...................................................................................................................... 27

Sabrina Valle & Andy Hoffman, *Ex-Petrobras Trader 'Phil Collins' Says Vitol Bribed Him*, Bloomberg News (Nov. 25, 2019) .................................................... 23

*Sentence Imposed Relative to the Guideline Range by Primary Sentencing Guideline*, U.S. Sent. Comm'n, 2024 Federal Sentencing Statistics (2024) .......................... 20

Todd Blanche (@DAGToddBlanche), X (June 10, 2025 at 8:30 AM) ..................................... 47

*Mexico Travel Advisory*, U.S. Dep't of State (Aug. 12, 2025) .................................................... 38

U.S. Sent'g Comm'n, *What Does Federal Economic Crime Really Look Like?* (Jan. 2019)................................................................................................................. 23

## **INTRODUCTION**

We respectfully submit this memorandum on behalf of Javier Aguilar in advance of his sentencing. Javier comes before the Court accepting full responsibility for his actions, and with the utmost remorse. While Javier exercised his Sixth Amendment right to trial in this Court, following his conviction he pleaded guilty to the related Southern District of Texas case that is now also before Your Honor. Javier's guilty plea included a waiver of his right to appeal either of the convictions and an agreement to forfeit over $7 million. He fulfilled his forfeiture obligation in a timely manner.

Javier is deeply ashamed of his conduct, has learned from it, and as the past 5.5 years since his arrest have demonstrated, he is an otherwise law-abiding person. Javier is particularly disappointed in himself because his family instilled in him the value of hard work. He worked hard to go to college and ultimately to obtain a PhD. He was proud to follow in his parents' footsteps in the oil and gas industry, and they were proud of him. In that desire to succeed at Vitol Inc. ("Vitol" or the "Company"), Javier lost himself and paid the bribes at issue here. He knows that this conduct was inconsistent with who he is and how he was raised. It is a choice that he regrets and, as a result, he will suffer the consequences for the rest of his life.

These consequences are considerable and have destroyed his life, regardless of the sentence imposed. Javier was passionate about his profession, and he will never again work in the oil and gas industry. His reputation, which he worked hard to build, is now lost. He forfeited over $7 million dollars and has been under pretrial supervision for almost six years, which included GPS monitoring and a strict curfew for the majority of the time.[1] He will also be

---

[1] The Court removed the ankle monitor on September 27, 2023, because of concerns "about the impacts of this very visible form of monitoring," including on Javier's children. *See* Sept. 27, 2023 Tr. 7, ECF 319-1. Following Javier's conviction in February 2024, he was put back on GPS monitoring. Accordingly, in total, Javier has been on GPS monitoring for 5.4 years.

deported and is already defending himself against prosecution in Mexico and Ecuador. But most difficult for Javier is that once he is deported, he will no longer be able to raise his two young daughters who are U.S. citizens and reside in the United States. As evidenced by the letters submitted in support of Javier, his daughters are his pride and joy, and the most important things in his life. These consequences are substantial punishment for Javier in this case and, in and of themselves, are sufficient to meet the goals of sentencing.

Furthermore, Javier's criminal conduct in this case must be viewed as an anomaly in the scope of his life. He is an otherwise law-abiding citizen, a hard worker, a loving father, son, sibling, and friend who is generous and caring towards others in his community. The tremendous impact his conduct has had on his life, coupled with his future deportation, his pending Ecuador criminal case, and the criminal investigation pending against him in Mexico, are more than sufficient to deter Javier of any future crime. Nor does the public need to be protected from Javier's activity. He is no longer in the oil and gas industry, and has been a model supervisee. The guidelines range in accordance with the United States Sentencing Guidelines Manual (the "Guidelines") in this case, moreover, is higher than sentences for many violent offenders, and does not remotely reflect a fair sentence. *See United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (discussing "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense").

The Court is required to fashion a sentence that reflects the seriousness of the offense while recognizing the unique facts and circumstances of this case. When taking all of that into consideration, a non-custodial sentence is appropriate, and respectfully, for the reasons set forth

more fully below, any additional punishment would be inconsistent with the purposes of sentencing.

**RELEVANT FACTUAL BACKGROUND**

**I.      JAVIER'S PERSONAL BACKGROUND**

    **A.      Upbringing and Family Life**

        *1.      Javier's Childhood*

Javier was born in Mexico City, Mexico on ███████ 1974, and lived there with his parents and three siblings until he was approximately 26 years old.  From a very young age, Javier was taught the value of hard work.  His mother, Carmen Morales Valtierra, and his father, Humberto Aguilar Pacheco, were the first ones in their families to graduate from college.  They met one another while working at Pemex, and Mrs. Morales at that time was the only woman working at that refinery.  *See* C. Morales Valtierra Ltr., Ex. 7 at 1.  It was important to Javier's parents that he and his siblings learn the value of hard work along with the principle of the Catholic Religion.  *Id.*  And Javier took those lessons to heart.  He always did well at school, worked hard, and never got into trouble.  *Id.* at 2.  He was disciplined and would wake up before school to exercise.  As his sister Carmen Aguilar Morales wrote: "[M]y parents were very hardworking people who came from a family of limited resources.  We learned by example from them that the only way to get ahead in life is by studying and working hard." *See* C. Aguilar Morales Ltr., Ex. 8 at 1.

        *2.      College and Post Graduate Degree*

Javier's hard work in high school paid off, and he pursued a chemical engineering degree at the National Autonomous University of Mexico.  There, he studied hard, earned money as a teaching assistant, received top grades, and ultimately earned a scholarship to study abroad at the University of Calgary, Canada.  He also won a prestigious scholarship through the National

3

Council of Science and Technology of Mexico to continue his studies in the petrochemical industry, culminating with him obtaining his PhD at Imperial College in London, England.

From a young age, Javier's dream was to follow in both of his parents' footsteps and work in the Mexican petrochemical industry. At Imperial College, Javier received his PhD with a dissertation which addressed an optimization model for long-range planning in the Mexican petrochemical industry. Beyond his academic successes, Javier built a strong and international social network. One of Javier's Imperial College classmates described Javier's for his "dedication, integrity and enduring commitment to excellence" during his time in London. E. Linder-Lopez Ltr., Ex. 9. This same classmate also credits Javier with "accept[ing] and support[ing] . . . [his] sexuality" and that Javier strived to make his peers feel welcomed in a society where "prejudice and discrimination still exist." *Id*.

### 3. Career as an Oil & Gas Trader

While obtaining his PhD, Javier secured a highly coveted job at Trafigura as a Liquefied Petroleum Gas ("LPG") trader. Securing this job was no small feat for Javier as it required that he continue taking PhD classes while working as a trader. After approximately five years working for Trafigura, Javier obtained a more prestigious job as an LPG trader at Vitol in London. However, in 2012, because Javier's primary focus was the Mexican petrochemical industry, Vitol transferred him to its Houston office so that Javier would be closer to his primary customer base located in Mexico. During his almost ten-year career at Vitol, Javier experienced tremendous success. He started in an entry-level position as an LPG trader but quickly impressed his superiors with his work ethic and passion for LPG trading. Those who encountered Javier at work describe him generally as hard-working, passionate about his work, and loved by his peers. A former high school friend and fellow trader, Emiliano Pescador, who is now the CEO of Blue Marine – an oil and gas offshore energy company – recalls working with Javier on a project involving a joint

4

venture between Blue Marine and Vitol for gas importation into Mexico. He states that "Javier always conducted himself with integrity and professionalism" and "that Javier possessed a deep technical knowledge of the petrochemical industry and he love[d] his work." E. Pescador Ltr., Ex. 10 at 2. Nanette Van Gend, Javier's ex-wife, described him as "so incredibly talented and dedicated that he frequently out-performed his peers, not least due to his love for his work and natural enthusiasm for working longer and harder than the rest." N. Van Gend Ltr., Ex. 11 at 2. Ultimately, Javier helped open a new Vitol office in Mexico City, Mexico before his arrest in July 2020.

### 4.    *Javier Starts His Own Family*

At Imperial College in London, Javier met and dated Ms. Van Gend in 2002, and they were married in 2007. Ms. Van Gend was from South Africa and had moved to London to work and study when she met Javier. After they were married, the couple lived in London for five years until Vitol required them to relocate to the United States. N. Van Gend Ltr., Ex 11 at 1. Javier and Ms. Van Gend wanted to have children ███████████████████████████ █████████████████████████ they had two twin girls, █████████████. Javier's daughters became the center of his universe. Since the time they were born, Javier has been a devoted, loving, and extremely involved father. *See, e.g.*, J. Hord Ltr., Ex. 12. In 2019, Javier and Ms. Van Gend divorced amicably and remain loyal to one another. His daughters are currently 11 years old and Javier and Ms. Van Gend co-parent. They live close to one another so that they are each there for their daughters. The letters in support of Javier comment about his love and devotion to his daughters. He is described as a "loving father who prioritizes the well-being and happiness of his daughters above all else." Dr. E. Lindner Ltr., Ex 9. "His role as a parent is one of the utmost importance to him, and he has always strived to provide them with love, guidance, and support." *Id.* A former Bureau of Alcohol, Tobacco, Firearms and Explosives

5

("ATF") agent and police officer who has been friends with Javier for ten years described how "[t]he first thing I noticed about him was his devotion to his twin daughters. . . . I have observed him to be a patient, loving, caring and maybe most importantly involved parent." S. Cohen Ltr., Ex. 13. His neighbor, Frank Nadolney, also commented that:

> What stands out most in my mind about Javier is how much he loves his twin daughters and how much they love him. The love between Javier and his girls is palpable and their bond is special. I love seeing Javier and his two children together, whether playing games in their front yard or taking me to lunch together. It is rare in today's society to see a devoted father like Jaiver [*sic*].

F. Nadolney Ltr., Ex. 14 at 2. His ex-wife explained that "Javier's daughters know him only as a caring, hard-working father" who has "met, and even exceeded. his child support responsibilities and is a cooperative co-parent." N. Van Gend Ltr., Ex. 11 at 3. A gym coach who has been working with Javier for the past five years noted that "Javier's commitment to his daughters is unparalleled," and that "he has made it his life's mission to provide his daughters with love, guidance, and unwavering support. Every decision he makes is motivated by their well-being, and he consistently goes above and beyond to ensure that they have everything they need to thrive." J. Melendez Ltr., Ex. 15 at 1.

Every day that Javier has been able to spend with his daughters is a precious gift to him. Regardless of the sentence imposed by the Court, Javier will be deported to Mexico and separated from them. He cannot fathom being without them, and he knows they will be devastated without him. Ms. Van Gend, who left her home and family in South Africa to move to the United States with Javier, will now have to raise ███████████ by herself. Not being able to be with his daughters to help raise them is the ultimate punishment for Javier.

5.    *Javier Remains Close with His Family*

Javier was close to his parents and siblings while growing up and remains close with them. His sister Carmen explained that:

6

> We have always been a very close family, regardless of the physical distance separating us and the fact that each of us took different professional paths, we have always maintained a very close relationship and we always reunited in person during all of holidays such as Christmas and Easter, since we are a family of a strong Catholic faith.

C. Aguilar Morales Ltr., Ex. 8 at 1.  Javier's father ███████████████████████.  His mother still lives in Mexico████████████████████████████████.

### B.    Javier's Kindness to Others and His Generosity

From the many letters submitted on Javier's behalf, it is obvious that he formed strong friendships with individuals from all different walks of life.  These letters paint a picture of Javier as a generous and kind person, who consistently puts others before himself.  *See, e.g.*, E. Linder-Lopez Ltr., Ex. 9; S. Orozco Ltr., Ex. 16.  These letters describe Javier as a loyal and supportive friend.  As one of Javier's friends shared:

> I suffered from ██████████████████████████████.
> Javier talked to me and made me see that what I was doing was not normal and on his initiative, he spoke to my mother and father and told them about the situation I was going through.  He asked them not to judge me and to support me. . . .  At the celebration of ███████████████████████ I invited Javier to attend the ceremony and he was present.

C. Rinetti Ltr., Ex. 17 at 2.  Another friend, who is Javier's neighbor, shared that, "[d]uring COVID-19, Javier helped me and my now deceased wife, Carmen, by bringing us groceries and meals, as it was difficult for us to leave our house during the unprecedented pandemic."  F. Nadolney Ltr., Ex. 14 at 2.  Nadolney also recalled how Javier jumped into action and "drove Carmen to the emergency room" after she fell.  *Id*.  Another friend explained how Javier "immediately became a big supporter and sponsor" of her boxing career so that she could achieve her dream of representing the United States in the Olympics as a member of the U.S. Olympic Boxing Team.  V. Fuchs Ltr., Ex. 18.  In another example of his generosity towards friends, another professional boxer friend stated that, "Javier has been a constant and invaluable presence

7

in my journey, offering not only emotional encouragement but also practical assistance."  M. Flores Ltr., Ex. 19 at 1.  Another friend recalled how Javier volunteered to offer advice and guidance to her college-aged son ███████████████████████.  J. Hord Ltr., Ex. 12 at 2. Another friend, Robert McDonald, recalled how he "observed firsthand how discreetly and quietly Javier helped those less fortunate" by "helping a struggling ceramic artist" and his observations of Javier fighting against social inequities.  R. Mc Donald Ltr., Ex. 20.  Finally, his friend, Samuel Cohen, a retired 34-year ATF Special Agent recalled how Javier helped him through his grieving process after losing his wife from ███████████.  S. Cohen Ltr., Ex. 13.

## II.    OFFENSE CONDUCT AND PROCEDURAL HISTORY

Javier surrendered himself to the Federal Bureau of Investigation ("FBI") Houston Field Office on July 15, 2020, based on a criminal complaint that was filed on July 10, 2020, in the Eastern District of New York.  He made his initial appearance on July 15, 2020, at which time he was released on a $100,000 personal recognizance bond with location monitoring, a 5:00 a.m. to 9:00 p.m. curfew, and travel restrictions.  A grand jury returned an indictment on September 22, 2020.  Javier has been a model supervisee and has demonstrated through his compliance that he can be trusted, is reliable, and is law-abiding.  Indeed, for the past five and a half years, he never once violated his bond conditions.

In February 2024, Javier was convicted at trial in this Court of conspiracy to violate the Foreign Corrupt Practices Act ("FCPA") and a substantive FCPA violation based on Ecuadorean bribes, as well as a conspiracy to commit money laundering based on Mexican and Ecuadorian bribes.  Javier was initially also charged in the EDNY with FCPA and money laundering violations in connection with the Mexican bribes, but this Court dismissed those claims for lack of venue.  Thereafter, the Southern District of Texas indicted Javier for those dismissed claims, and specifically he was charged there with an FCPA conspiracy and substantive violation, along

8

with a money laundering conspiracy and corresponding substantive violation, and one count of a violation of the Travel Act – Texas Commercial Bribery. Following his EDNY trial, Javier and the government agreed to a global resolution of both the New York and Texas cases (the "Plea Agreement"), which included Javier pleading guilty to two counts of the Southern District of Texas case and waiving his right to appeal not only the conviction and sentence arising out of that case, but also the conviction and sentence in this case.[2] As part of the Plea Agreement, Javier agreed to forfeit $7,129,938 for all counts of conviction, a demonstration of extraordinary acceptance of responsibility, and on December 17, 2025, Javier satisfied his full forfeiture obligation with a lump sum payment.

## ARGUMENT

### I.    THE SENTENCING GUIDELINES CALCULATION

#### A.    Federal Sentencing Framework

We recognize that the Plea Agreement here sets the Guidelines calculation, and that the Court's analysis must begin with a correctly calculated advisory guidelines range in accordance with the United States Sentencing Guidelines Manual ("U.S.S.G."); *Gall v. United States*, 552 U.S. 38, 49 (2007). Although the Court must consider the Guidelines as part of the sentencing process, we emphasize that they are merely advisory and serve only "as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 101, 111 (2007). The sentencing court must consider the whole range of factors in 18 U.S.C. § 3553(a), including that the sentence should "reflect the seriousness of the offense," "provide just punishment for the offense," "afford adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a). The Court also

---

[2] Specifically, the plea agreement provides that Javier will not appeal his sentence as long as the Court does not impose a sentence above 365 months.

must consider "the nature and circumstances of the offense," as well as "the history and characteristics of the defendant," "the need to avoid unwarranted sentence disparities," and "the kinds of sentences available." *Id.*

The Court has "wide discretion to impose a non-Guidelines sentence" and indeed, the circumstances to justify a non-Guideline sentence need not be "extraordinary." *See United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008). In that regard, a non-Guidelines sentence is warranted when a sentencing judge finds that a particular Guideline or Guideline range fails to properly reflect § 3553(a) considerations, reflects "unsound judgment," or when "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351, 357 (2007). The Supreme Court clarified this point:

> Even when a particular defendant . . . presents no special mitigating circumstances—no outstanding service to country or community, no unusually disadvantaged childhood, no overstated criminal history score, no post offense rehabilitation—a sentencing court may nonetheless vary downward from the advisory guideline range.. . . The only fact necessary to justify such a variance is the sentencing court's disagreement with the guidelines.

*Spears v. United States*, 555 U.S. 261, 263–64 (2009) (*per curiam*); *see also Peugh v. United States*, 569 U.S. 530, 536 (2013) ("The district court 'may not presume that the Guidelines range is reasonable,' and it 'may in appropriate cases impose a non-Guidelines sentence based on disagreement with the [Sentencing] Commission's views.'" (citations omitted)).

### B.    Sentencing Guidelines Analysis

We respectfully submit that Javier's sentence should not turn on the Guidelines because his mathematical Guideline calculation severely overstates the seriousness of the offense, in addition to other considerations such as his history and characteristics, his role in the offense, his guaranteed deportation and resulting separation from his daughters, the additional charges he is currently facing in Ecuador, the pending charges he could also face in Mexico, and the massive

10

forfeiture payment he completed.  Nevertheless, for the Court's convenience, set forth below is the agreed-upon advisory range in the Plea Agreement.

Pursuant to the Plea Agreement and as set forth in the PSR, the parties agreed, under a grouping analysis, to a Guidelines offense level of 40.  This exorbitant number stems from the grouping analysis of the highest-level offense, which is the money laundering offense (Count Three of the EDNY indictment).  The money laundering offense is calculated by using the offense level for the underlying offense of bribery.  The bribery offense includes a base offense level of 12 pursuant to U.S.S.G. § 2C1.1(a)(2), plus two points for more than one bribe, U.S.S.G. § 2C1.1(b)(1), plus 20 additional points based on the value of the benefit Vitol received of over $9.5 million as a result of Javier's conduct.  Four points are also added because the bribery involved a high-level public official pursuant to U.S.S.G. § 2C1.1(b)(3), which yields a total offense level of 38.  A two-point increase also applies because Javier was convicted under 18 U.S.C. § 1956 (per U.S.S.G. § 2S1.1(b)(2)(B)), and there is a two-point enhancement for the sophisticated means of the money laundering, leading to a total offense level of 42.  Given that Javier is a zero-point offender, however, the total Guidelines level is decreased by two points. Thus, the parties and the Probation Officer agreed that Javier's total offense level is 40.  The advisory Guidelines range associated with an adjusted offense level of 40 for an individual with a criminal history Category I is 292 to 365 months' imprisonment.

### C.    A Downward Departure is Warranted

Although Javier stipulated to the Guidelines Calculation, a downward departure is appropriate here because (i) circumstances exist that were not adequately taken into consideration in the Guidelines, pursuant to U.S.S.G.§ 5K2.0(a)(1)(A); and (ii) his offense level, as calculated under the Guidelines, substantially overstates the seriousness of the offense, pursuant to Application Note 21 (C) to U.S.S.G. § 2B1.1.  Specifically, the Guideline range here

is primarily driven by a 20-point enhancement based on the profits to Vitol without considering the fact that Javier did not personally profit and there was no actual loss.

>    *1.     Using the Overall Gain to Javier's Employer Overstates the Seriousness of the Offense*

A downward departure from the Guidelines range is warranted when mitigating circumstances exist that the United States Sentencing Commission (the "Commission") did not adequately consider. U.S.S.G. § 5K2.0(a)(1)(A). Courts in the Second Circuit have recognized that the Guidelines may not fully account for the financial magnitude, or lack thereof, in certain white-collar crimes. *See United States v. Caruso*, 814 F. Supp. 382, 383 (S.D.N.Y. 1993) (granting probation with home confinement due to the small magnitude of the defendant's benefit, unforeseen by the Guidelines). A downward departure is warranted here because Vitol's profit, which is essentially viewed as a loss attributed to Javier under § 2B1.1 of the Sentencing Guidelines, overstates the seriousness of the offense. *See* Application Note 21 (C) to U.S.S.G. § 2B1.1; *see also United States v. Oakford Corp.*, 79 F. Supp. 2d 357, 368 (S.D.N.Y. 1999) (granting 13 level departure when offense level overstated the gravity of offense; each defendant personally realized "only a small portion of the overall gain" of $15 million); *United States v. McBride*, 362 F.3d 360, 374–75 (6th Cir. 2004) (remanding fraud case to district court to consider whether to depart downward under § 2B1.1 when intended loss of over $1 million "substantially overstated" actual loss of $800); *United States v. Oligmueller*, 198 F.3d 669, 671–72 (8th Cir. 1999) (upholding downward departure when actual loss amount of $829,000 stemming from false loan application overstated risk to defrauded bank warranting use of loss figure of $58,000); *United States v. Redemann*, 295 F. Supp. 2d 887, 900–01 (E.D. Wisc. 2003) (granting two level downward departure in bank fraud case where Guidelines were 18–24 months for loss of $2.5 million, in part because the loss significantly overstated seriousness of the offense).

While defense attorneys commonly argue in fraud cases that the loss amount overstates the seriousness of the offense, in those cases the court also must consider the harm that the loss caused and the defendant's knowledge that he was harming others. In contrast, here, the "loss" amount is not, in actuality, a loss at all but rather is the profit that Vitol received from the Ecuadorian fuel oil contract. Specifically, Vitol's purchase of fuel oil from Ecuador – and its subsequent processing, shipping, and resale at a profit – did not result in a corresponding loss to Ecuador. Commodity trading is not a zero-sum game; both parties can benefit through value addition, arbitrage, and market dynamic. But even accepting a framework that equates gain with loss, Vitol's corporate profit is the wrong measure of the offense's seriousness. The relevant figure is Javier's personal gain, which was comparatively modest. Using Vitol's gain as a proxy for the harm caused by Javier's conduct dramatically overstates the gravity of the offense.

> 2. *A Forensic Accounting Analysis of Data Collected from Vitol Demonstrates that Javier's Personal Gain was* De Minimis *Compared to the $19.8 Million Profit Attributable to Him Under the Guidelines*

Attached as Exhibit 1 is a forensic accounting report (the "Expert Report") prepared by Aaron Stai, CFA, CFE, FRM,[3] that analyzes data collected from Vitol and evaluates the comparative effect between Vitol's overall profit and the actual benefit Javier received.

The value of the benefit Vitol received in connection with the Fuel Oil Contract was stipulated at $19.8 million in the Plea Agreement. *Id.* In sharp contrast, the portion of Javier's overall profit from the value of the Company's stock that was derived from and attributable to the Fuel Oil Contract across the years of 2017 through 2019 (the time period over which Vitol realized profits from the Fuel Oil Contract) was grossly different. *Id.*

The Expert Report explains that, as a Vitol employee and shareholder, Javier received

---

[3] Mr. Stai's Curriculum Vitae is annexed hereto as Exhibit 1 at 248–57.

payment in three ways: (i) base salary; (ii) discretionary annual bonus; and (iii) Vitol share ownership. The following analysis shows that from 2017 through 2019, Javier's salary and discretionary bonuses were not affected by the Fuel Oil Contract. The only profit Javier derived from the Fuel Oil Contract came from his Vitol share ownership, which was $48,265 – a *de minimis* amount compared to the $19.8 million profit attributable to Javier under the Guidelines.

> a. Javier Did Not Realize a Direct Benefit Related to the Fuel Oil Contract Through His Annual Salary

The Expert Report provides that from 2017 through 2019, Javier earned an annual base salary of $225,000. His base salary did not change or increase during this time period, and his salary was commensurate with other Vitol employees in similar roles. *See* Ex. 1; *see also* July 7, 2023 Department of Justice Letter, Ex. 2. Additionally, and more significantly, at no point during this time period was Javier assigned to work in the fuel product matrix team that directly benefited from the Fuel Oil Contract. *See* Ex. 1. Accordingly, the report concludes that Javier did not realize a direct benefit related to the Fuel Oil Contract through his annual salary. *Id.*

> b. Javier Also Did Not Realize a Direct Benefit Through His Discretionary Annual Bonus Related to the Fuel Oil Contract

The Expert Report further provides that, in addition to his annual salary, Javier also received discretionary annual bonuses from Vitol. *Id.* Vitol established a bonus pool of 15% of the net profit generated by each product group team to pay bonuses to the members in that product group team. *Id.* Bonus amounts were then recommended by each product matrix head. *Id.* Ultimately, Javier's bonus was determined by Vitol's president Mike Loya. *Id.*; *see also* Ex. 2 at 4.

Javier's bonus payments in 2016 through 2019 did not include amounts derived from the Fuel Oil Contract because Javier's time was not allocated to the Fuel product matrix. *See* Ex. 1. This appears to be consistent with the fact that Javier did not receive any bonus for fiscal year

2018, even though the Fuel Oil Contract contributed positive gross profit to Vitol. *Id.*; *see also* Sept. 4, 2025 Letter from J. Levine to A. Levi, Ex. 3. Therefore, Javier did not receive a direct benefit through his discretionary annual bonus that was related to the Fuel Oil Contract. *Id.*

> c.    Javier Only Realized a Direct Benefit Related to the Fuel Oil Contract Through His Percentage of Employee Share Ownership in Vitol in the Amount of $48,265

The third component of Javier's overall earnings was in the form of equity shares in Vitol, which were issued and purchased by Javier through a related Vitol entity named Tinsel Group S.A. ("Tinsel"). *See* Ex. 1 at 3 (citing Attachments 9–10). Tinsel shares are a form of deferred compensation for Vitol employees, which enables the employee to participate in a portion of Vitol's net profits for each year the employee owns shares. *See id.* at 3 (citing Attachment 9). Thus, owners of Tinsel shares can benefit from Vitol's success as a whole, beyond the salary and bonus components related to their daily work. Javier owned 660 Tinsel shares, representing a 0.55% ownership interest in Vitol, 2017 through 2019. *Id.* at 3 (citing Attachments 4, 8).

As set forth in the Plea Agreement, Vitol realized a gross profit of $19.8 million related to the Fuel Oil Contract. However, only a very small portion of that $19.8 million profit ultimately trickled down to the shareholders, including Javier. In fact, Javier's share of the net profit derived from the Fuel Oil Contract was $48,265[4] – a *de minimis* amount when compared

---

[4] The PSR provides that between May 2017 and August 2018, Javier additionally derived $610,083 from Vitol during the offense conduct. However, those funds were part of Javier's employee compensation, and Javier paid taxes on them. *See* Ex. 4; Ex. 4-T (Exhibit 4-T is an English translation of page 1 of Exhibit 4. Exhibit 4 is a standard document and its remaining pages contain largely the same language as page 1; however, we can provide an English translation of the remaining pages of Exhibit 4 should the Court so request). Had these funds been stolen or improperly taken and purposefully laundered by Javier, there would be no reason to pay taxes on them. Additionally, Vitol has never asserted a victim's claim for the loss of those funds, nor has it ever requested that Javier pay it back. Nevertheless, even assuming *arguendo*

15

to the $19.8 million in gross profits to Vitol.

Both the PSR and Javier's Plea Agreement contain a 20-point enhancement based on the $19.8 million benefit to Javier's employer, Vitol, stemming from the 2016 Fuel Oil Contract. As explained above, however, there is a gross disparity between Javier's limited personal gain and the amount for which he is being held responsible under the Guidelines, thereby significantly overstating the seriousness of the offense. *See United States v. Walters*, 87 F.3d 663, 671 (5th Cir. 1996) (applying six month downward departure when defendant did not personally benefit from the fraud; lack of benefit was not considered by the Guidelines); *United States v. Broderson*, 67 F.3d 452, 457–59 (2d Cir. 1995) (finding in white collar contracts fraud, seven level departure was warranted in part because the defendant did not profit personally and "calculated loss significantly . . . overstated the seriousness of the defendant's conduct"); *United States v. Moneke*, No. 18-CR-442-1 (WFK), 2021 WL 3190382, at *3–4 (E.D.N.Y. July 26, 2021) (holding that although the government and the PSR agreed that a 14-level enhancement was appropriate based on a loss amount exceeding $550,000, they both nevertheless suggested a downward departure because this amount "may overstate the seriousness of the offense," which the court agreed and ultimately imposed a sentence of time served).

Indeed, using overall "gains" to enhance a defendant's Guidelines under U.S.S.G. § 2B1.1 has been rejected by this Court and many other courts throughout the country. *See, e.g.*, Sent'g Tr. 11:13–12:8, *United States v. Diaz*, No. 18-CR-140-ENV (E.D.N.Y. Oct. 18, 2024) attached as Exhibit 5 (sentencing defendant convicted of FCPA violations to one year of probation despite

---

that said amount were included as part of Javier's personal gain, a gross disparity would still exist between this amount and the $19.8 million loss for which he is being held responsible under the Guidelines.

a Guidelines loss calculation of $1.5 million and an $8.2 million gain amount to the Company, and stating that applying either of those amounts overstated the seriousness of offense when the defendant's comparative overall profit was *de minimis*); *United States v. Robie*, 166 F.3d 444, 455 (2d Cir. 1999) (vacating sentence when no economic loss occurred, holding that gain cannot substitute for loss); *United States v. Coscia*, 866 F.3d 782, 801 (7th Cir. 2017) (stating gain is not a proxy for loss absent a reasonable estimate of victim loss). Courts require a logical relationship between gain and loss for the former to serve as a surrogate. *See United States v. Yeaman*, 194 F.3d 442, 456 (3d Cir. 1999); *United States v. Stuart*, 22 F.3d 76, 82–83 (3d Cir. 1994) (finding that a nine-level loss enhancement may overstate defendant's criminality because he only personally received a maximum of 1.6% of the government's loss figure).

In *United States v. Diaz*, No. 18-CR-140 (ENV), this Court sentenced Diaz to one year of probation for his participation in a conspiracy to violate the FCPA. In fashioning an appropriate sentence for Diaz, the Court noted:

> Clearly . . . given the *de minimis* nature of the benefit or that portion of the benefit that was received by the defendant personally as opposed to the greater organization lessens his culpability in the Court's view and the guidelines calculations, as is the case with most economic crimes. Picking the highest number even though it has no real relationship to the gain or loss of the individual defendant does skew the numbers. It accelerates them and makes them in the long run, in my view, as many times expressed, makes the economic component of the guidelines useless.

*See* Ex. 5 <u>at 20:6–17</u>.

In *United States v. Farias*, No. 20-CR-80 (S.D. Tex. Feb. 7, 2020), the Southern District of Texas rejected the application of a similar employer-based gain enhancement (noting the defendant received far less than the $13 million attributed to his employer) and sentenced the defendant to probation, recognizing that the economic benefit accrued to the employer, not the defendant.

Here, Javier's personal gain from his participation in the instant offense was *de minimis*

17

when compared to the economic benefit Vitol incurred. Javier's discretionary bonus was tied to his performance as an LPG trader, and the deals with PEMEX Procurement International, Inc. ("PPI") would not have increased it. *See* Trial Tr. 2064:10–2065:22 (Javier's salary and bonus were capped, and equity shares were performance-based). In fact, as the government acknowledged in its July 7, 2023 letter, Javier's base salary increased over time but was always commensurate with the increases given to other employees in similar roles. *See* Ex. 2.

As explained in the Expert Report and based on these facts, none of Javier's earnings during his employment with Vitol (including his salary, bonus, and shareholder awards) were directly derived from the contracts at issue. *See United States v. Oakford Corp.*, 79 F. Supp. 2d 357, 368 (S.D.N.Y. 1999) (Guidelines overstated offense when defendant's personal gain was minimal). Judicial recognition of the large disparity between the employer-based gain enhancement and the economic benefit to the individual defendants in the *Diaz* and *Farias* cases, should also be applied here where Javier's personal gain was grossly different from Vitol's overall gain. Thus, if the Court were to apply the *Diaz* and *Farias* rationale to the facts here, Javier's offense level would be reduced to a level 20, with a corresponding Guidelines imprisonment range of 33 to 41 months. Considering the foregoing facts and applicable case law, a significant downward departure pursuant to U.S.S.G. § 5K2.0(a)(1)(A) and Application Note 21(C) of § 2B1.1 is warranted.

**D.    The Court Should Consider the Shadow Guidelines**

Another way to analyze the appropriate sentence in this case is by looking to the Shadow Guidelines, which reflect an increased view among district courts that the rigid application of the § 2B1.1 loss table in economic crime cases is neither just nor effective. *See, e.g., United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (describing the amount of loss as a "relatively weak indicator of the moral seriousness of the offense"). Indeed, as this Court has

18

recognized in other economic crime cases, the acceleration of the Guideline range due to the loss calculation overstates the offense. *See, e.g.*, *United States v. Faibish*, No. 12-CR-265 (ENV), 2015 WL 4637013, at \*2 (E.D.N.Y. Aug. 3, 2015) (stating the Guideline's "loss table is but one example of the seemingly mindless acceleration of penalties for economic crimes incorporated in the current Sentencing Guidelines regime"); *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring) ("For the small class of defendants convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense. Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges." (internal quotation marks and alterations omitted)). That principle applies here, where the Guideline offense level of 40, which calls for 24 to 34 years in prison, drastically overstates the seriousness of the offense. *See Adelson*, 441 F. Supp. 2d at 512 (discussing "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense").

As the Court is aware, in April 2013, in an effort to try to address the absurd impact of using loss as a yard stick to determine punishment, the Criminal Justice Section of the American Bar Association assembled a Task Force ("ABA Task Force") to evaluate the reforms needed in the sentencing of federal economic crimes and to draft a proposed federal sentencing guideline to effectuate those reforms.[5] The ABA Task Force's November 10, 2014 report, known as the Shadow Guidelines, provides an alternative approach to the Guidelines when they are driven

---

[5] The ABA Task Force consisted of a number of notable professors, practitioners (including one of Javier's own counsel Marjorie Peerce), organizational representatives, observers from the Department of Justice and the Federal Defenders, as well as current and former judges, including the Honorable John Gleeson, the Honorable Jed Rakoff, the Honorable Gerard Lynch, the Honorable Nancy Gertner, Yale Law School professor Kate Stith.

largely by the aggregate dollar value of the financial crime.  The Shadow Guidelines shifts the focus from loss amount to the defendant's culpability in guiding the sentencing determination.

Notably, in fiscal year 2024 (the last year for which full data are available), only 48.4% of sentences imposed by district courts were within the applicable Guidelines range when the primary Guideline was Section 2B1.1 (not including sentences for cooperators).[6]  Such statistics clearly indicate that the sentencing ranges prescribed by the loss table consistently fail to accord with judges' determinations regarding what sentences are just, fair, and sufficient but not greater than necessary.  Indeed, in this Circuit, judges routinely criticize the loss table, describing it as:

- "[B]roken," leaving judges "without meaningful guidance in high-loss cases."  *Corsey*, 723 F.3d at 378.

- "Ridiculous, absurd, barbaric" and "bear[ing] no relationship" to "any of the factors set forth in Section 3553(a)."  Sent. Tr. 28:6–14, *United States v. Lumiere*, No. 16-CR-483 (JSR) (S.D.N.Y. Jun. 14, 2017), ECF 115.  "[M]uch more typical of a brutal regime than of a proud American legal system."  *Id.* at 28:23–24.

- "Mindless acceleration" for which "a whole host of judges . . . have said so publicly and scores of others . . . [have] grumbled about it privately."  Sent Tr. 23:1–9, *United States v. Faibish*, No. 12-CR-265 (ENV) (E.D.N.Y. Mar. 10, 2016), ECF 271.

- A "black stain on common sense."  *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (Block, J.).

Because bribery under the FCPA fits within the broader categories of economic crimes or financial crimes, we respectfully ask the Court to apply the animating principles and factors that underlie the Shadow Guidelines in determining an appropriate sentence in this case.  Those principles and factors, which include a focus on culpability, the number of victims, and whether the defendant is a first-time offender, are analyzed below.

---

[6] *Sentence Imposed Relative to the Guideline Range by Primary Sentencing Guideline*, U.S. Sent. Comm'n,        2024        Federal        Sentencing        Statistics,        Tbl.        32 (2024), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2024/Table32.pdf.

###### 1.    *Javier's Culpability Is Low*

In assessing culpability, the Shadow Guidelines suggest that sentencing courts consider "an array of factors," including the defendant's motive and the "correlation between the amount of loss and the amount of the defendant's gain." Ex. 6 at 1. An analysis of Javier's case under these factors demonstrates low culpability, which the Shadow Guidelines instruct should lead to a reduction of 3–5 points.

*First*, in considering motive, the report distinguishes offenses, like this one, that are "gatekeeping," *i.e.*, offenses that "not specifically intended to cause loss or shift risk," and often involving facilitation or access in systems where such conduct is expected. *Id.* at 3 (App. N. 2(A)(4)). Javier's offense was related to bribes paid to gain access to contracts in "pay-to-play" environments, not to directly cause economic loss or shift risks. For example, Ecuadorian official Nilsen Arias Sandoval testified to taking bribes from multiple companies (Gunvor, Trafigura, etc.) before Javier, indicating the corruption was systemic and initiated by officials. *See* Trial Tr. 391:5–7, 393:6–8; 3500-AP-292 (Antonio Pere's cooperation agreement); 3500-NAS-41 (Sandoval's cooperation agreement). Both Carlos Espinosa and Gonzalo Guzman's testimonies described a gatekeeping scenario where they provided access to insider information (even though they were not in a decision-making position to ultimately award the bid) in an already corrupt system at PPI (each receiving bribes prior to Javier), without predatory intent. Trial Tr. 2973:19–2974:7, 2709:1–18. Javier's role was facilitative – paying to "unlock" opportunities in rigged bidding processes –without evidence of intent to harm the entities (*e.g.*, no proven inflated prices or suboptimal terms). This aligns with gatekeeping examples in the Shadow Guidelines at page 3, where defendants enable business in corrupt contexts without predatory motives.

Further, Javier's actions were not intended to cause loss to other parties, but rather to benefit Vitol by obtaining and/or retaining business for the Company. In fact, the trial record

21

demonstrates that there was no intent to harm PetroEcuador or Pemex as a result of the 2016 Fuel Oil Contract. *See, e.g., id.* at 506:5–17 (Sandoval testified the Fuel Oil Contract benefited Ecuador's government and citizens); *id.* at 1803:6–23 (E. Pere testifying that Vitol's $300 million prepayment was vital to the stability of Ecuador because it had a significant need for immediate cash to help them with recovery efforts related to a recent, devastating 7.8 magnitude earthquake which killed 700 people and injured more than 6,000 others); DX-217-T at 29 (Arthur D. Little report concluded the deal was viable for Ecuador); Trial Tr. 229:20–25 (Sandoval testified Ecuador needed the funds); Trial Tr. 510:17–511:17 (PetroEcuador sought the deal to diversify partners); GX 5322-T at 1 (Pemex budgeted $296,567,040 but paid $231 million, saving $65 million); Trial Tr. 2931:23–25 (Vitol matched the lowest bid after Sabic withdrew); Trial Tr. 2786:18–20 (Pemex paid the same price with Vitol as it would have with Sabic)*.* As such, Javier's offense, as analyzed under the Shadow Guidelines, has less culpability than those where loss is specifically intended. *See* Shadow Guidelines, at 2–3 (comparing motive/nature of offense for predatory and gatekeeping).

*Second*, the Shadow Guidelines also analyze culpability based on the defendant's personal gain. Here, as explained above, because Javier received minimal personal gain, his culpability is the least severe category. Ex. 6 at 4 (App. N. 2(B)).

*Third*, with respect to the degree of sophistication/organization, the Court should consider the fact that Javier did not create the sophisticated laundering structure in this case. That structure was already in place when Javier became involved. *See* Trial Tr. 2337:14–22, 2338:16–2339:9.[7]

---

[7] Lionel Hanst – the Curaçao-based middleman who testified at trial pursuant to a cooperation agreement – admitted that he created his two shell companies (Lion Oil and Zanza Oil) after talking to Marc Ducrest, his longtime associate and senior Vitol executive, but *before* he ever met Javier. Trial Tr. 2338:16–2339:9.

22

As such, his level of sophistication is not as high given that the bribes themselves were executed in a simple manner, despite the fact that others created a sophisticated mechanism for the payments.[8]  *Id.* at 4 (App. N. 2(C)).

Furthermore, as Vitol admitted in its deferred prosecution agreement ("DPA"), its Latin American bribe schemes extended beyond Javier and began before he joined the Company.  *See* DPA at 33–34, *United States v. Vitol, Inc.*, No. 20-CR-539 (ENV) (E.D.N.Y. Dec. 3, 2020), ECF 10-1.  Specifically, Vitol admitted to engaging in a multiple, long-running bribery schemes in Brazil entirely unrelated to Javier.  These schemes began in 2005 – years before Javier joined the Company in 2010, and well before his transfer to the Houston office in 2012.  Additionally, Carlos Roberto Barbosa, a former Petroleo Brasileiro SA oil trader who pleaded guilty to receiving bribes from Vitol, admitted to collecting payoffs dating back to 2003 and continuing through 2005.  *See* Sabrina Valle & Andy Hoffman, *Ex-Petrobras Trader 'Phil Collins' Says Vitol Bribed Him*, Bloomberg News (Nov. 25, 2019), https://www.bloomberg.com/news/articles/2019-11-23/ex-petrobras-trader-phil-collins-tells-judge-vitol-bribed-him.    These bribes were a result of negotiations with the head of Vitol in Brazil at the time, Lauro Moreira, and with the consent of the Company's U.S. boss Mike Loya and then-Latin America head Tony Maarraoui.  *Id.* Additionally, another trader at Petrobras' Houston office, Rodrigo Garcia Berkowitz, who pleaded guilty in this Court, admitted to accepting bribes in late 2018, including from Vitol, to receive confidential pricing information that Vitol used to win fuel oil contracts with Petrobras.

---

[8] Notably, in 2019, the Commission reported that in Fiscal Year 2017 (the last year for which data was available), the "sophisticated means" enhancement was applied in less than 15% of all cases involving economic crimes, and in only about one-quarter of all cases involving identity theft. U.S. Sent'g Comm'n, *What Does Federal Economic Crime Really Look Like?* 29 (Jan. 2019), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/20190130_Econ-Crime.pdf.  Javier's actions were certainly not more intricate or complex than those of defendants in similar FCPA cases.

23

The government claimed that Loya and Maarraoui were also involved with and gave consent to the transactions involving Berkowitz, but neither were charged.

Beyond Vitol, it is an unfortunate reality that before and during Javier's tenure at the Company, bribery was common in Latin American commodities deals. Several individuals who solicited bribes from Vitol admitted at trial that they did the same thing with *other* companies on *other* contracts, long before Javier offered or paid them anything. For example, PPI employee Carlos Espinosa admitted to receiving a bribe in 2014 or 2015, years before he met Javier. Trial Tr. 2973:19–2974:7. Similarly, Sandoval, an Ecuadorian official, admitted to taking bribes from "lots" of people, *id.* at 393:10–18, before he ever met Javier, *id.* at 391:5–7. And in Mexico, where Javier grew up, bribery is a common part of daily life and specifically in his industry, it was a common practice. While he knew his actions were wrong, Javier incorrectly believed that if he did not engage in bribe payments, he would fall behind or lose his job.[9] Notably, it was Javier's employer, Vitol, not Javier himself, that gained from making these bribe payments.

> 2.       *There Is No Victim Impact Because There Are No Victims*

The special offense characteristics under the Shadow Guidelines also include victim impact. The Shadow Guidelines advocates for various increases in Guideline levels depending on the level of victim impact (2–6 levels), but advocates for no increase when there are minimal or no victims. Here, there should be no increase as there are no victims. Trial evidence established that neither Ecuador nor Mexico were financially harmed by the two corrupt deals in which Javier was involved. Furthermore, there are no companies that claim that they were unfairly

---

[9] Indeed, other Vitol employees felt the same way. For example, former Vitol employee, Roberto Finocchi, expressed through his lawyer at sentencing that his action were based on his desire to keep his job. *See* Sent'g Tr., *United States v. Finocchi*, No. 17-CR-600 (ENV) (E.D.N.Y. Aug. 16, 2024), ECF 35 at 11:1–2 ("Mr. Finocchi, as he will express to the Court, felt he just wanted to be able to keep his job.").

penalized because they would have been rewarded the contract over Vitol but for Javier. Indeed, the government acknowledged Javier's guilty plea in August 2024 that it was unaware of any victims. *See* Aug. 21, 2024 Plea Tr. at 29:2–5 and discussed *infra* at Argument Section II.B. Accordingly, because there are no victims, there would be no increase for victim impact. This factor alone further calls for a lower sentence.

        3.      *Final Calculations Under the Proposed Amendments to the Guidelines Without Considering § 3553(a) Factors*

Applying this analysis under the Shadow Guidelines leads to the following calculation:

| Factor | Description | Points Assigned | Rationale |
|---|---|---|---|
| Base Offense Level | § 2C1.1(a)(2), | 12 | Bribery |
| Loss | Actual loss to victims | 0 | See Section I Above |
| Culpability | Low (-3 to -5) | -3 | Joined existing scheme; gatekeeping, minimal personal gain |
| Victim Impact | Minimal vulnerability/harm | 0 | Entities implicated in corruption; no economic loss. |
| Total | | 9 | |

When applying the Shadow Guidelines to Javier's case, it reveals an offense level of 9, with a corresponding Guidelines range of 4–10 months. This is a more appropriate starting point in this case because it is based on culpability rather than the value of the benefit received by Vitol.

While this analysis does not include the other enhancements set forth in the plea agreement, we include the above analysis to demonstrate what the Guidelines range would be under the Shadow Guidelines for the Court to consider when fashioning an appropriate sentence in this case. But even if some of the enhancements were included, as addressed below, the Shadow Guidelines instruct that the offense level should be capped at 10 for first offenders like Javier who meet certain criteria.

a.    Under the Shadow Guidelines, Javier's Offense Level Should be Capped at 10

The Shadow Guidelines provide that where a defendant like Javier has no criminal history points and has not been convicted of a crime of violence or an "otherwise serious offense" within the meaning of 28 U.S.C. § 994(j), the offense level should be capped at 10, and that a sentence other than imprisonment is generally appropriate.  The Shadow Guidelines state:

> Factors to be considered in determining whether the offense is one for which a sentence of probation is appropriate include the following: the amount of the loss; whether loss was intended at the outset of the offense conduct; whether the defendant's gain from the offense is less than the loss; whether the defendant's offense conduct lacked sophistication (including whether it was committed in a routine manner or without the involvement of a large number of participants); whether the defendant acted under duress or coercion; the duration of the offense conduct and the defendant's participation in it; whether the defendant voluntarily ceased the offense conduct before it was detected; and the nature of the victim impact caused by the offense.  Where the defendant has no criminal history points, and where the circumstances of the offense support a finding that the offense was not "otherwise serious," the offense level under this guideline shall be no greater than 10, and a sentence other than imprisonment is generally appropriate.

*See* Ex. 6 at 6–7 (App. N. 4).  By including this analysis within the Shadow Guidelines, which is only applicable to white collar crimes, the ABA task force intended that certain white-collar cases that meet the criteria above would qualify for a Guidelines cap of 10.  As such, Javier's Guideline under the Shadow Guideline should also be capped at 10.  As analyzed above, Javier meets this criteria because (i) there was no loss;  (ii) there was only a *de minimis* gain to Javier in comparison to Vitol's profit, (iii)  the sophistication of the money laundering scheme was not set up by Javier, (iv) there were no victims and thus no victim impact, and (v) Javier has no criminal history.  Javier's conduct is not "otherwise serious" as compared to other white-collar cases given the circumstances described above.

26

**E.    The Court Should Also Consider the Recent Proposed Amendments to the Guidelines**

The Court can also consider the recent prospective amendments to the Guidelines that reevaluate how loss is calculated in fraud cases, and like the Shadow Guidelines, propose shifting the focus towards the culpability of the individual and any harm to victims. *See Proposed Amendments to the Sentencing Guidelines*, U.S. Sent'g Comm'n, 57, 65–82 (2025), https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202512_rf-proposed.pdf. The amendments include a proposal to authorize a two-level decrease when the defendant committed the offense at an employer's direction for fear of negative employment consequences. *Id.* at 65, 70. Additionally, the Commission is also considering a separate proposed amendment that would provide a reduction at newly created §3E1.2 (Post-Offense Rehabilitation) based on a defendant's positive post-offense behavior or rehabilitative efforts. *Id.* at 82.

These proposed amendments are specifically applicable to Javier. First, Javier's conduct in this case was motivated by his belief that, given the widespread bribery in the industry and at Vitol, that he needed to offer bribes to excel his job. While no one directed Javier to offer bribes and he takes full responsibility for his conduct, he nevertheless acted under the fear of negative consequences at Vitol (*i.e.*, falling behind other employees by not offering bribes). As such, a two-level decrease is appropriate here. Second, the Court should also consider Javier's post-offense behavior in further reducing the Guidelines range – a reduction which is currently being considered by the Commission. In the five and a half years since his arrest, Javier has been a model supervisee, a loving father, and an asset to his community. He pleaded guilty to the Texas case, gave up his right to appeal the EDNY trial, and forfeited over $7 million even though he never received any of the funds the government seeks to forfeit. The Court should, therefore,

27

consider this post-offense behavior when analyzing the Guideline range. Both of these considerations would decrease Javier's Guidelines by 3 to 4 points in total according to the proposed amendments.

F.      A One-Point Reduction Should Apply to Take Into Account the "Trial Penalty"

Javier exercised his constitutional right to a jury trial and should not be penalized for doing so. In a recent decision in the Southern District of New York, Judge Rakoff noted that the Guidelines unconstitutionally penalize defendants who go to trial rather than plead guilty, also known as the "trial penalty." *United States v. Tavberidze*, 769 F. Supp. 3d 264, 270 (S.D.N.Y. 2025). Specifically, Judge Rakoff stated that § 3E1.1 of the Guidelines allows a one-point reduction in the offense level calculation of defendants who plead guilty if the government believes the defendant "pled guilty quickly enough to permit the prosecutor to avoid preparing for trial." *Id.* at 267. He stated:

> [S]ection 3E1.1 in its entirety effectively penalizes a defendant who, whether innocent or guilty, proceeds to trial based on his decision to exercise his Sixth Amendment right to trial. . . . [T]he only ground given for imposing the additional penalty under 3E1.1(b) is that the defendant failed to save the Government from having to prepare for trial. This cannot possibly be an adequate ground for penalizing a defendant for the exercise of a constitutional right. Worse still, on this flimsy basis section 3E1.1(b) penalizes a defendant who just takes too long to decide whether he wants to assert his constitutional right to trial, even if he ultimately waives it.

*Id.* at 270. As such, Javier's offense level should be reduced by one point "because the effect of not giving the one-point reduction to someone who chose to exercise, or considered exercising, his right to go to trial rather than save the Government some time and money is effectively an unconstitutional penalty on all who made that choice." *Id.* at 273.

Furthermore, the Court should also consider an additional two-point deduction, with a total point deduction of three, for acceptance of responsibility. While Javier went to trial, he

28

saved the government and the Court resources by pleading guilty to the Texas case, giving up his right to appeal in both the Texas case and this case, and by paying over $7 million in forfeiture.[10] Those actions demonstrate acceptance of responsibility, and thus, the Court should decrease the Guidelines by three points.

## II.    THE § 3553(a) FACTORS SUPPORT A NON-CUSTODIAL SENTENCE

Taking the foregoing into account, the Guidelines are merely a "starting point," *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010), and "truly advisory," *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013).  Under 18 U.S.C. § 3553(a)(6)(1), courts must "carefully consider on an individualized basis 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *United States v. Jenkins*, 854 F.3d 181, 190 (2d Cir. 2017); *see also Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (recognizing "the principle that the punishment should fit the offender and not merely the crime" (internal quotation marks omitted)).  Importantly, courts "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Finally, courts must "impose a sentence sufficient, but not greater than necessary to comply with the factors set out in 18 U.S.C. § 3553(a)(2)," in other words, "proportionality, deterrence, incapacitation, and rehabilitation."  *Douglas*, 713 F.3d at 700 (internal quotation marks omitted).  The Court should impart the lowest possible sentence that takes into account the factors set forth in that section.  *See United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) ("[I]f a district court were explicitly to conclude that two sentences equally served the statutory purposes of § 3553, it could not, consistent with the parsimony clause, impose the

---

[10] As set forth below in Argument Section II.D, this agreement to forfeit over $7 million demonstrates extraordinary acceptance of responsibility when, under Second Circuit law, the government would not have been able to support a claim for $7.1 million because that amount does not reflect "proceeds obtained directly or indirectly" under 18 U.S.C. § 982(a)(2).

higher."); *see also United States v. Barker*, 771 F.2d 1362, 1367 (9th Cir. 1985) (remanded for resentencing where the court reflected more on its "personal view of the opprobrium of the crime charged . . . than a careful weighing of mitigating factors and the relative levels of culpability and involvement of each defendant"); *United States v. Wardlaw*, 576 F.2d 932, 938 (1st Cir. 1978).

### A.    Javier's History and Characteristics

The letters submitted on Javier's behalf demonstrate a common thread: apart from the conduct here, Javier has led an otherwise law-abiding life, and is loyal, compassionate, kind, generous, empathetic, and hard working. And most of all, he is a loving father who puts his daughters' needs above all else and teaches them by demonstrating kindness and empathy. The dozens of letters in support of Javier come from people from all stages of his life, including high school friends, family, former colleagues, and friends he has made as an adult; yet, they all consistently use these qualities to describe Javier. Together, they paint a vivid portrait of a remarkably good man who has learned from his mistakes, and has otherwise demonstrated exceptional character in all other aspects of his life.

As Javier's friend and former Marine Corp. veteran Josh Melendez said:

> Javier is not just a good man; he is an outstanding member of society who enriches the lives of those around him. His generosity, kindness, and compassion are evident to all who have the privilege of knowing him. He embodies the values of empathy, respect, and humility in everything he does.

J. Melendez Ltr., Ex. 21. Similarly, his friend from college, Dr. Eduard Lindner, having known Javier for over 30 years explained that he has "witnessed Javier's dedication, integrity, and enduring commitment to excellence. He has always been a person of great moral character and has approached challenges with resilience and dignity and he has been a great travel companion and friend." *See* E. Lindner Ltr., Ex. 9. His friend Sam Cohen, a former police officer and ATF agent, also said the following about Javier's character"

> It impressed me that he never asked me to use my influence to help him in any way. Any type of criminal behavior on his part is wildly unlike the man I know and trust. I am generally pretty skeptical of people and don't often give them the benefit of the doubt until I know them well. It did not take Javier long to win me over. In the time I have known him he has proven to be a loyal, trustworthy and caring man. I have observed him to be kind and treat people with dignity and respect regardless of their social status.

*See* S. Cohen Ltr., Ex. 13. Another friend from his gym, Stephanie Orozco, a psychotherapist, similarly described Javier as having consistently demonstrated qualities of integrity, responsibility, and kindness. She also described how Javier is "well-respected by everyone who attends [their] gym," and that "[h]e is a generous person who would not hesitate to offer help if needed." *See* S. Orozco Ltr., Ex. 16. Moreover, these sentiments are reflected in the letter from his divorce attorney and a former judge, Alvin Zimmerman, who described Javier as "a loving father, adored by his children," who was "very fair with his wife in the division of property and child support" to make sure she would be comfortable and "economically capable of supporting the children too." A. Zimmerman Ltr., Ex. 22. He also remarked how forthright Javier was throughout the divorce as evidenced by their continued "cordial, respectful relationship," and about how Javier is "so well thought of by friends, family and acquaintances." *Id.*

And these descriptions of Javier's character are also reflected in the many acts of kindness and generosity he has done. For example, Javier's elderly neighbor, Frank Nadolney, a U.S. Air Force veteran, described how Javier helped him and his now deceased wife during COVID by "bringing us groceries and meals." F. Nadoleny Ltr., Ex. 13. He added that Javier was the one who drove his wife to the emergency room ███████████ ████████████. "After her accident, Javier would stop by our house to check on Carmen as she was convalescing, and he assisted us by bringing us groceries and meals." *Id.* His friend Robert McDonald described how he witnessed Javier's discreet manner of helping

31

those less fortunate while on a trip together. *See* R. Mc Donald Ltr., Ex. 20. He watched how Javier helped a struggling ceramic artist by commissioning a piece and reached out to the family of a recently deceased artist. *Id.* Mc Donald saw how discreetly and quietly Javier helped others – not even mentioning it or making a big deal of it. As he noted, "I am quite sure if I had not been with him at the two interactions mentioned above, I would never have known about them." *Id.* Mc Donald also witnessed Javier's generosity and kindness when his son opened his own gallery for emerging Mexican artists, and "Javier immediately asked [his] son which young artist he should buy and immediately bought a painting to help both [his] son and the young artist." *Id.* He noted that "Javier without looking for, or wanting any advantage for himself, gives his time freely and generously to others." *Id.* In another example, his friend from boxing, Miguel Flores, described how Javier helps to train young kids in boxing, most from disadvantaged backgrounds, because it "provides shelter to any kid," helps to "keep them on the right track," and provides them "with a support system." *See* M. Flores Ltr., Ex. 19. Javier has been a part of helping these children since before his case began and "has gotten even more involved in the last years." *Id.* Javier's sister, mother, and ex-wife also describe how he always supports them and the rest of their family, and described his hard-working nature, along with his kindness and generosity. *See* C. Aguilar Morales Ltr., Ex. 8; C. Morales Valtierra Ltr., Ex.7; N. Van Gend Ltr., Ex. 11.

Finally, and most notably, every single letter in support of Javier focused on his absolute devotion to his two daughters, ▮▮▮▮▮▮▮▮. As Josh Melendez described:

> Javier instills in his daughters the values of compassion, humility, and resilience. He leads by example, demonstrating kindness and empathy in his interactions with others and teaching his daughters the importance of treating everyone with dignity and respect.
>
> . . .

32

His unconditional love and unwavering devotion to his daughters serve as a shining example to all who know him. He is not only their father but also their mentor, their protector, and their greatest champion.

J. Melendez Ltr., Ex. 21. Similarly, Dr. Lindner commented:

Javier is not only a devoted friend but also a loving father who prioritizes the well-being and happiness of his daughters above all else. His role as a parent is one of the utmost importance to him, and he has always strived to provide them with love, guidance, and support.

E. Lindner Ltr., Ex. 9. Cohen also explained that:

The first thing I noticed about him was his devotion to his twin daughters. . . . I have observed him to be a patient, loving, caring and maybe most importantly involved parent. Having grown daughters, I know firsthand how important the father/daughter relationship is to young girls. Javier is involved in every aspect of his daughters' lives. I know he has bought and sold houses just to remain in close proximity to them. If his legal problems cause him to miss significant time with them. I fear it will be detrimental to both him and the girls.

S. Cohen Ltr., Ex. 13.

Javier's ex-wife also discussed how much her daughters will suffer without him:

Losing their father at this point would be a second, and undeserved, devastating blow as we have no extended family to lean on. The four of us only have each other. My entire nuclear family died in my early twenties, and Javier's siblings are unmarried and living in Mexico. Javier's daughters know him only as a caring. hardworking father.

N. Van Gend Ltr., Ex. 11.

Javier's history and characteristics reveal a man who is dedicated to his family and friends, is generous with his time, and cares about his community and those in need. And together, they reveal a man for whom imprisonment would serve no purpose. *See, e.g.*, Sent'g Tr., *United States v. Schulman*, No. 16-CR-442 (E.D.N.Y. Oct. 6, 2017), ECF No. 155 at 37:13–38:14 (imposing non-custodial sentence when letters "paint a picture of a man who cares deeply about his family, his friends, his community, and his ideals," "a lawyer who is beloved by those who work for him," and "a man willing to go out of his way to help

33

friends, acquaintances, colleagues, and members of his community"); *Adelson*, 441 F. Supp. 2d at 513–14 ("[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.").[11]

### B.    Nature and Circumstances of the Offense

The nature and circumstances of the offense counsel strongly in favor of a non-custodial sentence. *First*, the Court should consider the fact that Javier was a mid-level executive at Vitol who was not the mastermind behind the bribery there. Prior to Javier's employment at Vitol, as the trial testimony demonstrated, Vitol employees were involved in this bribery scheme and had arranged the consulting payments. Javier learned of this conduct from others at Vitol and was under the impression that this kind of behavior is what it took to succeed at the Company. Specifically, as established at trial, unindicted co-conspirator Ducrest, a Vitol executive located at its headquarters in Switzerland, originated the relationship with co-conspirator Hanst. And Hanst created Lion Oil and Zanza Oil to process Vitol payments for bribes long before Javier's involvement. Trial Tr. 2338:16–2339:9.[12] Once again, Javier takes responsibility for his actions and should not have participated in this scheme. But the Court should consider all of these circumstances when fashioning the appropriate sentence.

*Second*, the bribery payments made here were customary at Vitol. Indeed, Vitol entered into a DPA in December 2020 for its conduct in connection with a bribery scheme that began

---

[11] In *Adelson*, the court premised a downward variance, in part, on letters from "persons from all walks of life . . . attesting, from personal knowledge, to [defendant's] good works and deep humanity," his "generosity of spirit," and his "good deeds . . . not performed to gain status or enhance his image." 441 F. Supp. 2d at 513.

[12] Indeed, Hanst admitted during his testimony that he initially lied to the FBI when he told the agents that he had no contact with Ducrest after he received his subject letter and failed to disclose that Ducrest was paying his fees as a "loan." Trial Tr. 2352:20–2353:11, 2416:12–16.

long before Javier joined Vitol in 2010. Specifically, it admitted to paying bribes between 2005 and 2014 that amounted to over $8 million to Brazilian officials to secure an improper advantage to obtain and retain business from Petrobras in connection with the purchase and sale of oil products. According to the DPA, Vitol and its affiliated companies earned at least $33 million in profits from its corruptly obtained contracts with Petrobras. Javier's bribery scheme did not begin until 2017, over ten years after Vitol began paying bribes. Thus, this was something that Javier learned about during his employment at Vitol, and something he believed was necessary to keep his job. And, as described above, the structure for paying these bribes was already in place.

*Third*, Javier's payments were customary in the petroleum industry in general, and particularly in the local business environments of both Ecuador and Mexico. In fact, the Government recognized this issue and moved to preclude such evidence at trial. *See* Mem. of Law in Support of the Gov's Motion *in Limine*, ECF 178 at 9–13 (asking the Court to preclude evidence or argument that paying bribes was a common practice in Ecuador or Mexico or in the petroleum industry generally). The government admitted in its motion to preclude that it had produced evidence in discovery "indicating that certain of Vitol's competitors also paid bribes to Ecuadorian officials, in some instances to one or more of the same officials to whom (the government alleges) the defendant and his co-conspirators also paid bribes." *Id.* at 9–10. Notably, in Mexico, the payments did not even result in Vitol winning the bid process. Initially, Vitol's competitor, Sabic, a Saudi company, won the bid. Trial Tr. 2786:19–20; DX-397-T at 1. It was only after Sabic backed out of the deal that Vitol was awarded the contract by adopting Sabic's winning price – a price that was millions of dollars below what Vitol had initially bid. Trial Tr. 2787:14–2788:10, 2930:7–2931:1. Although this is not a defense to the crime of bribery, the Court should consider this environment in sentencing Javier. In fact, the Department of

35

Justice in its July 2025 Guidance on FCPA enforcement explicitly instructed prosecutors not to focus on, or penalize, routine business practices. Accordingly, the fact that these payments were routine at Vitol and in the industry should weigh in favor of a non-custodial sentence.

*Fourth*, Javier faces criminal actions against him in both Ecuador and Mexico following deportation, which further demonstrates why a sentence of incarceration is greater than necessary to achieve the purposes of sentencing. *See* 18 U.S.C. § 3553(a). Specifically, Ecuador has a pending criminal action against Javier that is scheduled for trial, and which involves the very same conduct for which the government prosecuted him here. *See Fiscalia General Del Estado v. Aguilar*, No. 17282202202214 (Ecuador). Javier is also being investigated by the Federal Prosecutor's Office in Mexico, again based on the same conduct. *See* Asunto: FED/FECC/FECC-CDMX/000035/2021 (Oct. 18, 2022) (Mex.). When considering all of the consequences of Javier's conviction – including his deportation, his separation from his daughters, the massive forfeiture payment, the loss of his profession, and the harm to his reputation – and the subsequent Plea Agreement, no term of incarceration is necessary to satisfy the purposes of sentencing. The fact that Javier is still facing active, ongoing criminal investigations and/or prosecutions in Ecuador and Mexico for the same conduct of his EDNY and SDTX convictions further justifies such an outcome.[13]

---

[13] Notably, the new FCPA guidelines also advise prosecutors to defer to foreign authorities when they are better suited to investigate and prosecute. Where the conduct does not implicate U.S. interests, which is the case with Javier, Acting Assistant Attorney General Galeotti, who also happened to be one of the assistant U.S. attorneys on this matter, stated:

> Conduct that does not implicate U.S. interests should be left to our foreign counterparts or appropriate regulators. And in those cases, the Criminal Division won't hesitate to work with our foreign counterparts or domestic regulators to provide assistance and ensure that those countries and regulators can vindicate their interests and pursue their mandates.

*Finally*, as set forth above, we submit that there are no victims in this case. Indeed, the government acknowledged at Javier's guilty plea in August 2024 that it was "not aware of any victims." *See* Aug. 21, 2024 Plea Tr. at 29:2–5. This statement was made after trial, when the government was aware of all of the facts and the evidence. Notably, neither Ecuador nor Mexico were financially harmed by the two corrupt deals in which Javier was involved. Nor are there any companies who would have otherwise received the contract if the crime had not occurred. The fact that there are no victims is relevant to assessing the seriousness of Javier's offense and the appropriate penalty. *See United States v. Stewart*, 590 F.3d 93, 139 (2d Cir. 2009) (It is "not unreasonable for the district judge to decide that the fact that no injury occurred in the case mitigated the gravity of [defendant's] offense"); *see also United States v. Free*, No. 14 Cr. 19, 2015 WL 8784738, at *6 (W.D. Pa. Dec. 15, 2015) ("[E]ven though a loss amount approaching (or greater than) $1,000,000 might be legally correct, from a logical perspective it overstated what the advisory Guideline sentence range should be in this case, given the very real possibility that there would not be much, if any, actual harm to creditors."). Accordingly, the Court should also consider the fact that there are no victims when determining the appropriate sentence.

---

Matthew R. Galeotti, Assistant Att'y Gen., Dep't of Just., Head of Justice Department's Criminal Division Matthew R. Galeotti Delivers Remarks at American Conference Institute (June 10, 2025), https://www.justice.gov/opa/speech/head-justice-departments-criminal-division-matthew-r-galeotti-delivers-remarks-american. Accordingly, given the Department of Justice's ("DOJ") deference to foreign counterparties, the Court should also consider the fact that these circumstances are ones that the DOJ now takes into consideration in determining whether to prosecute a case at all.

**C.     Javier's Family Circumstances and Collateral Immigration Consequences Support a Variance from the Guidelines**

As set forth above, a grave consequence of any sentence in this case is that Javier will be deported and permanently separated from his young daughters, family, and community, which will impose a substantial hardship on innocent family members who bear no responsibility for Javier's offense.  Courts have long recognized that such immigration consequences are relevant to sentencing because they exacerbate the punitive effect of a conviction beyond the term of incarceration itself.  *See Padilla v. Kentucky*, 559 U.S. 356 (2010).  When considered under § 3553(a)(1) and the mandate to impose a sentence "sufficient, but not greater than necessary," the certainty of a defendant's removal and the resulting harm to the defendant's family are factors the Court should consider when determining whether the sentence imposed is greater than necessary to achieve the purposes of sentencing.

For nearly the past fourteen years, Javier has resided in the United States and built a life here for himself and his two daughters.  Javier shares joint custody of ▮▮▮▮▮▮▮▮ with his ex-wife and is a daily presence in their lives.  Deportation will not only permanently separate Javier from his U.S.-based life, including his twin daughters, but will also expose him to prolonged detention at an Immigration and Customs Enforcement ("ICE") facility.  Visitation with his daughters will be close to impossible considering the level of danger present when travelling to border cities like Reynosa or Matamoros, Tamaulipas – Level 4: Do Not Travel areas plagued by cartel patrols, kidnappings (including of U.S. citizens), and extortion.  *See Mexico Travel Advisory*, U.S. Dep't of State (Aug. 12, 2025), https://travel.state.gov/en/international-travel/travel-advisories/mexico.html?gad_source=1&gad_campaignid=44031958015&gclid=EAIaIQobChM I8oio_-P1kgMVvDYIBR0hIQnOEAAYASAAEgILqfD_BwE (warning of organized crime

38

targeting buses and cars, with limited emergency response; advising against all travel due to risks of murder, armed robbery, and sexual assault).

Courts have varied downward to avoid such situations. *See, e.g.*, Sent'g Tr. 91:8–92:13, *United States v. Connolly*, No. 16-CR-370 (CM) (S.D.N.Y. Nov. 19, 2019), ECF 457 (imposing probation, deeming incarceration unjust for non-citizen facing private prison and prolonged ICE custody); Sent'g Tr. 49:16–24, *United States v. Sharma*, No. 24-CR-302 (D.D.C. July 3, 2025), ECF 43 (imposing a sentence of three years of probation, 200 hours of community service, and a $150,000 fine to non-U.S. citizen convicted of conspiracy to violate the FCPA, facing deportation and extended confinement at an ICE detention center following imprisonment).

In *Adelson*, the Southern District of New York recognized that:

> [W]here . . . the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences.

441 F. Supp. 2d at 515. Consideration of the foregoing circumstances is consistent with the broader purposes of Section 3553(a). In fact, the Supreme Court has made clear that sentencing courts may consider a wide range of individualized factors beyond the advisory Guidelines, including personal and family circumstances, in crafting a sentence tailored to the defendant before the Court. *Pepper*, 562 U.S. at 487–88. Accordingly, the Court may – and should – account for the defendant's family responsibilities and resulting immigration consequences when determining a sentence that satisfies § 3553(a) without imposing punishment greater than necessary.[14]

---

[14] Given the substantial forfeiture payment Javier made in the case, the Court should not impose a fine.

**D.    Javier's Satisfaction of His Significant Forfeiture, By Way of a Lump Sum Payment Prior to Sentencing, Supports a Non-Custodial Sentence**

Javier has already paid his agreed forfeiture of $7,129,938 for all counts of his conviction. The $7,129,938 was calculated based on property "involved in" his crimes of conviction under 18 U.S.C. § 982(a)(1) instead of "proceeds obtained directly or indirectly" under 18 U.S.C. § 982(a)(2), which is the forfeiture methodology most often used by the government for typical white-collar defendants and for most of Javier's other co- conspirators.  Indeed, Javier agreed to this payment notwithstanding that Second Circuit law would not have supported payment of the full $7.1 million because "[c]riminal forfeiture focuses on the disgorgement by a defendant of his ill-gotten gains," and, as set forth above, Javier did not receive anywhere near $7 million as a result of his conduct.  *See United States v. Elias*, 154 F.4th 56, 62–63 (2d Cir. 2025) (quoting *United States v. Contorinis*, 692 F.3d 136, 146 (2d Cir. 2012)).  Thus, full satisfaction of this forfeiture obligation by way of a lump-sum payment prior to sentencing is a significant mitigating factor that supports the imposition of a non-custodial sentence.  By fully satisfying forfeiture before sentencing, Javier has accepted responsibility in a concrete and meaningful way, ensured the government has been made whole to the extent required by law, and eliminated any need for continued enforcement or collection efforts.  This prompt and voluntary compliance reflects genuine remorse and respect for the law, considerations that fall squarely within the Court's obligation to evaluate the defendant's history and characteristics under 18 U.S.C. § 3553(a)(1).

Moreover, the early satisfaction of forfeiture advances the purposes of sentencing set forth in § 3553(a)(2).  Sentencing's objectives are substantially achieved when a defendant has already incurred a significant financial penalty directly tied to the offense conduct.  In such circumstances, additional incarceration would run contrary to the directives of § 3553, resulting in a punishment greater than necessary.  This is particularly true when, as here, Javier poses no danger to the

40

community, has no prior criminal history, has been a model citizen while on pre-trial release, and has demonstrated a commitment to lawful conduct in the future. A non-custodial sentence would adequately promote respect for the law, provide just punishment, and afford sufficient deterrence, while recognizing Javier's proactive efforts to mitigate the wrongs committed by resolving his financial obligations prior to sentencing.

      **E.**      **The Need to Avoid Unwarranted Sentence Disparities Warrants a Non-Custodial Sentence**

One of the aims of Section 3553(a) is to avoid unwarranted sentence disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(6) ("The Court shall consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."). The factors in Section 3553(a) bolster Javier's requested sentence of probation with a special condition of a period of home confinement.

      *1.*      *A Non-Incarceratory Sentence Avoids Unwarranted Sentence Disparities with Other Defendants Sentenced Before This Honorable Court for Similar FCPA Violations*

To date, in this Court, there have been five defendants sentenced for very similar cases involving FCPA violations and money laundering who have not received prison sentences. The five cases involve a subsidiary of Vitol, Sargeant Marine, Inc. ("Sargeant Marine"), which entered into a plea agreement with the government and paid over $16 million in criminal fines related to bribery in Ecuador, Brazil, and Venezuela. As noted above, the Pere brothers acted as consultants for Vitol in relation to Javier's contract with PetroEcuador. They also served as consultants for Sargeant Marine in helping it secure a contract to deliver asphalt in Ecuador by paying bribes to the same government official involved in Javier's conviction – Sandoval.

The following cases involve individuals who were involved in other schemes regarding corruption for Sargeant Marine and also received probation: (i) *United States v. Andrade*, No. 17-

41

CR-497 (ENV) (E.D.N.Y.) (agent for Sargeant Marine who was sentenced to probation after pleading guilty to one count of conspiracy to violate the FCPA); (ii) *United States v. Nunez Troyano*, No. 19-CR-135 (ENV) (E.D.N.Y.) (trader and manager at Petróleos de Venezuela, S.A. ("PDVSA") who was sentenced to probation after pleading guilty to money laundering); (iii) *United States v. Diaz*, No. 18-CR-140 (ENV) (consultant for Sargeant Marine sentenced to one year of probation); and (iv) *Finocchi*, No. 17-CR-600 (ENV) (Vitol trader who was sentenced to time served).

While the foregoing defendants may have received credit for their substantial assistance to the government or acceptance of responsibility by pleading guilty, sentencing Javier to the imprisonment term dictated by the Guidelines would nevertheless be grossly disparate to the non-incarceratory sentences received by these defendants.

> 2. *A Non-Incarceratory Sentence Also Avoids Unwarranted Sentence Disparities with Other Defendants Sentenced in Courts Throughout the Country for Similar FCPA Violations*

A number of other FCPA defendants who committed similar offenses throughout the country have also received probation sentences. *See, e.g.*, *United States v. F.G. Mason Eng'g & Francis Mason*, No. 90-CR-29 (D. Conn.) (sentenced to five years' probation). In another court in this district, Judge Carol B. Amon sentenced a defendant, who was similarly situated to Javier, to probation. *See United States v. Luque-Flores*, No. 17-CR-537 (CBA) (E.D.N.Y.) (owner of a company who bribed officials at PetroEcuador to obtain hazardous waste removal contracts and was sentenced to probation including six months of house arrest).

The Southern District of New York has also followed suit and sentenced similarly situated FCPA defendants to either probation or time served. *See, e.g.*, *United States v. Lewis*, No. 03-CR-930 (S.D.N.Y.) (sentenced to time served); *United States v. Farrell*, No. 03-CR-290 (S.D.N.Y.) (sentenced to time served).

In the Southern District of Texas, Daniel Perez, received probation for his role in bribing Mexican officials in a conspiracy that lasted over the span of ten years, and in which he paid bribes totaling over $2 million. *See United States v. Perez*, No. 16-CR-1164 (S.D. Tex. 2016); *see also United States v. Maldonado*, No. 15-CR-635 (S.D. Tex. 2015) (defendant charged with money laundering and FCPA violations related to PDVSA investigation sentenced to two years of probation); *United States v. Farias*, No. 20-CR-80 (S.D. Tex. 2024) (defendant charged with FCPA violations related to PDVSA investigation sentenced to probation).

In *United States v. Hirsch*, the Honorable Mary L. Cooper sentenced Richard Hirsch to two months of probation for his role in a conspiracy which paid over $3.9 million in bribes to foreign officials to help Hirsch's company secure foreign government construction management contracts. *See United States v. Hirsch*, No. 15-CR-358 (D.N.J.).

Finally, in *United States v. Aries*, the Honorable Amit P. Mehta sentenced Julian Aries to 36 months of probation with the condition that the first year be served in home detention. The sentence represented a significant variance from the Guidelines for Aries, who was charged with numerous FCPA violations for his participation in two separate bribe schemes: one involving a $5.3 million loss and the other a $2.7 million loss. *See United States v. Aries*, No. 24-286 (D.D.C. 2025).

Given the totality of the circumstances, it is respectfully requested that the Court impose a similar non-incarceratory sentence for Javier. Javier has already endured years of court-ordered house arrest that substantially restricted his liberty and functioned as meaningful punishment. For years, Javier has lived under constant supervision and strict limitations on his movement without incident. This is an important factor that has been recognized by this Court and taken into consideration when fashioning an appropriate sentence for similarly situated defendants. In

*United States v. Diaz*, this Court noted: "The fact that he [the defendant] spent six unblemished years on pre-trial release suggests he has made great strides . . . ." *See* Ex. 5 at 20:1–3. Thus, a sentence of probation would not only be commensurate with Javier's role in the offense and the total punishment already imposed, but, under 18 U.S.C. § 3553(a)(6), would avoid an unwarranted disparity in the sentences of otherwise similarly situated defendants.

**F.      The Guideline Range Reflects An Inappropriate Trial Penalty**

The high Guidelines range here also inappropriately reflects a trial penalty against Javier given the enormous gap between the range and the government's plea offer. Notably, the government initially provided a plea offer on May 8, 2023, whereby Javier would plead guilty to two counts of conspiracy under 18 U.S.C. § 371 for both FCPA crimes in Ecuador and Mexico for a maximum of ten years' imprisonment. And even on the eve of trial, in November 2023, after the Court had severed the Mexico portion of the case, the government still offered Javier a plea of: (i) one count of conspiracy to violate the FCPA in Ecuador; (ii) one count of violating the FCPA in Ecuador; (iii); and one count of conspiracy to violate the FCPA in Mexico related to the case in the Southern District of Texas, with an agreement that the government could not argue above a sentence of 10 years. Thus, even after the government was fully prepped for trial, it continued to offer a plea that would not allow it to argue for a sentence above ten years total for the two cases. *See Lafler v. Cooper*, 566 U.S. 156 (2012); *Missouri v. Frye*, 566 U.S. 134 (2012).

Indeed, a sentence of the magnitude suggested by the Guidelines range is so disproportionate to the crime that it is effectively a penalty on Javier for exercising his Sixth Amendment right to trial, thus demonstrating that it is greater than necessary to achieve the goals of sentencing. Our justice system is premised on the right to a jury trial as guaranteed by the Sixth Amendment. U.S. Const. amend. VI. In reality, however, those who choose to exercise their right to a trial are penalized upon conviction for simply making the government do its job

44

of going to trial and proving its case beyond a reasonable doubt. *See Tavberidze*, 769 F. Supp. 3d at 273 (holding that although the PSR calculated the defendant's offense level at 20, the Court treated the defendant as if he had an offense level of 17, deducting the three-point penalty assed by the PSR for the defendant's exercising his right to go to trial); *Lafler*, 566 U.S. at 170 ("[C]riminal justice today is for the most part a system of pleas, not a system of trials."). Although the Supreme Court has "long explained that the Sixth Amendment right to a jury trial is fundamental to the American scheme of justice," the trial penalty has transformed the Sixth Amendment right to trial by jury into a fiction. *Ramos v. Louisiana*, 590 U.S. 83, 93 (2020); *see also United States v. Haymond*, 588 U.S. 634, 640–41 (2019) ("Together with the right to vote, those who wrote our Constitution considered the right to trial by jury 'the heart and lungs, the mainspring and center wheel' of our liberties, without which 'the body must die[,] the watch must run down[,] [and] the government must become arbitrary.'" (quoting Letter from Clarendon to W. Pym (Jan. 27, 1766), in 1 Papers of John Adams 169 (R. Taylor ed. 1977)). When the government offers a plea deal with a sentence that is widely disproportionate to the sentence after trial, the discrepancy essentially becomes a penalty placed on the defendant for exercising his constitutional right to a jury trial. *See United States v. Russo*, 643 F. Supp. 3d 325, 334–35 (E.D.N.Y. 2022) ("Courts have found that a gross disparity between sentences of co-defendants stemming from their choice to exercise or forgo their constitutional right to a trial is an extraordinary and compelling factor."); *United States v. Ballard*, 552 F. Supp. 3d 461, 468 (S.D.N.Y. 2021) (finding that a drastic sentencing disparity between co-defendants, which resulted in part from the fact that Ballard opted to exercise his right to trial when his co-defendant accepted a plea deal, supported a determination that extraordinary and compelling circumstances warranted a reduction of the defendant's sentence); *United States v. Haynes*, 456 F. Supp. 3d 496,

514 (E.D.N.Y. 2020) ("The Court readily concludes, on the facts as detailed above—including the brutal impact of Haynes's original sentence, its drastic severity as compared to codefendant Rivers's ten-year term, its harshness as compared to the sentences imposed on similar and even more severe criminal conduct today, and the extent to which that brutal sentence was a penalty for Haynes's exercise of his constitutional right to trial—. . . [constitute] an extraordinary and compelling circumstance warranting relief under § 3582(c)."). Here, a Guideline sentence of 20 years' imprisonment – twice the maximum sentence the defendant was offered by the government on the eve of trial – would constitute a trial penalty, rather than a sentence that adequately reflects the seriousness of the crime.

**G.    Under New DOJ Guidance, Similar Cases Are No Longer Being Prosecuted**

The appropriateness of a non-custodial sentence here is further underscored by the fact that the Department of Justice ("DOJ") issued guidance in 2025 that narrowed the type of FCPA cases that DOJ would consider pursuing and shifted the focus away from cases like Javier's. *See* Memorandum from the Off. of the Deputy Att'y Gen., Guidelines for Investigations and Enforcement of the Foreign Corrupt Practices Act (June 9, 2025) (the "DOJ Memorandum"). This DOJ Memorandum followed the executive order entitled "Pausing Foreign Corrupt Practices Act Enforcement to Further American Economic and National Security," in which the President ordered the Attorney General and the FCPA Unit to "focus on investigations" involving cartels and TCOs, out of the President's concern that the FCPA "has been systematically, and to a steadily increasing degree, stretched beyond proper bounds and abused in a manner that harms the interests of the United States." Executive Order No. 14209, Pausing Foreign Corrupt Practices Act Enforcement to Further American Economic and National Security (Feb. 10, 2025). The DOJ Memorandum provides factors that the DOJ shall consider when determining whether to pursue FCPA investigations and enforcement actions, including whether (i) the misconduct is linked

46

to the criminal operations, money launderers or shell companies, or employees bribed by cartels or transnational criminal organizations; (ii) the misconduct has undermined the economic growth and expansion of U.S. business opportunities abroad; (iii) the misconduct has harmed American national security interests, such as "defense, intelligence, or critical infrastructure"; and (iv) "serious" misconduct involving more than "routine business practices" but rather that which "bears strong indicia of corrupt intent." DOJ Memorandum at 2–4.[15]

Javier's case has the hallmarks of cases that the DOJ's guidance indicates should no longer be charged. Specifically, Javier's conduct did not harm U.S. entities or interests, did not involve drug cartels, did not threaten national security or public safety, and involves no identifiable victim. Furthermore, Javier was a classic "middleman" employee who did not significantly benefit from the conduct charged, and the payments made here were customary in the industry and in the local business environments of both Ecuador and Mexico.

In fact, in 2025, DOJ declined to prosecute a similar case that had more egregious facts, *see United States v. Coburn*, No. 19-CR-120 (D.N.J.), and recently dismissed a major bribery case following a conviction, *see United States v. Lopez & Full Play Group S.A.*, No. 15-CR-252 (E.D.N.Y.).

While the government did not expand on its reasons for recommending dismissal, its actions are consistent with the executive order and the DOJ Memorandum: Neither of the Cognizant executives' conduct, like Javier's, had anything to do with cartels or TCOs; the

---

[15] Notably, on June 10, 2025, the DOJ announced that it had closed approximately half of its open FCPA investigations, reflecting a deliberate decision to curtail the scope and volume of FCPA enforcement. *See* Todd Blanche (@DAGToddBlanche), X (June 10, 2025 at 8:30 AM), https://x.com/DAGToddBlanche/status/1932415168744444183).

construction contract's subject matter, like Javier's oil and gas contracts, had nothing to do with U.S. national security interests; and Cognizant was not competing against other American companies, while Javier was competing against foreign companies with histories of bribery themselves and his conduct benefited a U.S. company. If the Court were to impose incarceration here, particularly when Javier forfeited over $7 million, it would create a severe injustice when compared to a case such as Cognizant.

### H.    There Is No Need for an Incarceratory Sentence for General or Specific Deterrence

Section 3553(a) requires courts to consider the need for general and specific deterrence in fashioning a sentence. Both have already been accomplished here. The severe repercussions to Javier from this prosecution represent a significant deterrent to other corporations and individuals from engaging in such conduct.

First, as to specific deterrence, Javier has already endured severe consequences, and no further specific deterrence is needed. The conduct here relates to Javier's employment at Vitol as an oil and commodities trader, which ended with his arrest and prosecution. Javier will never work in the industry again after a very public trial that destroyed his reputation. Prior to this case, Javier had never encountered law enforcement, and he has been on pretrial release for years without a single violation. And, as set forth above, the forfeiture of more than $7 million is alone more than sufficient to deter Javier from any further crimes. But most of all, Javier will suffer when he is deported and separated from his daughters, whom he loves more than anything. The need for specific deterrence is non-existent here.

The same factors apply to general deterrence – incarceration is not necessary "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). First, the public is aware that Vitol settled its related cases with the government for fines and disgorgement totaling $135

48

million, or more than six times its alleged gains. *See* DPA at 45, *Vitol, Inc.*, No. 20-CR-539 (ENV) (E.D.N.Y. Dec. 3, 2020), ECF 10-1. This case received extensive coverage and signaled to the public that the government will prosecute those who violate the law, even when they are lower-level executives. And even a non-custodial sentence, coupled with the significant public attention this case has received, the large forfeiture payment, and the fact that Javier will be deported, is more than sufficient to provide general deterrence here. *See* Sent'g Tr. 82, *United States v. Hoskins*, No. 12-CR-238 (D. Conn. Mar. 17, 2020), ECF 631 ("[T]he goal of general deterrence has likely been largely achieved by the public attention to the prosecution of Mr. Hoskins and others in this case and through the substantial fines imposed on [the companies he worked for]."); *see also Adelson*, 441 F. Supp. 2d at 514 (stating there is "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders"); *United States v. Yeaman*, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J., dissenting) ("It is widely recognized that the *duration* of incarceration provides little or no deterrence for white collar crimes." (emphasis in original)). Members of the public, including members of the oil industry – many of whom have addressed letters to the Court – have witnessed the significant consequences Javier has already suffered and will be strongly deterred from engaging in this or other similar conduct, now or in the future.

Accordingly, there is no need for any period of incarceration to promote the aims of either general or specific deterrence here.

## I.    The Kinds of Sentences Available

There are a few different kinds of sentences available to the Court beyond a term of imprisonment. Javier could be sentenced to a term of home confinement, supervised release, or probation. In addition to the factors above that warrant a non-prison sentence, Javier's status as

49

a foreign national provides a compelling reason for the Court to utilize the alternatives to incarceration that are available.

As a foreign national, Javier would not be eligible under Bureau of Prisons regulations for designation to a minimum-security prison camp. *See* Decl. of Joel A. Sickler in Support of Javier Aguilar's Sent'g Memo., Ex. 24. Additionally, upon completing a term of imprisonment in the United States, rather than simply leaving prison and returning home, Javier would remain detained while awaiting the lengthy process of removed from the United States, which can take several months. Lastly, as a non-citizen, Javier is not eligible for earned time credits under the First Step Act. Judges have considered this dynamic in declining to impose a term of incarceration for financial crimes on noncitizens. *See* Sent'g Tr., *Connolly*, No. 16-CR-370 (CM) (S.D.N.Y. Oct. 24, 2019), ECF No. 457.

In *Connolly*, then-Chief Judge McMahon imposed sentences of time served with additional conditions of supervised release and home confinement on two defendants who were U.K. citizens. *Id.* In handing down the sentence for defendant Gavin Black, Judge McMahon explained:

> If I could sentence Mr. Black to a term of incarceration—a brief term of incarceration—knowing that he would go to a facility appropriate to his criminal conduct, I would do it. But I know that I can't. I know that simply because he is a noncitizen—and I use that term advisedly. He is not an illegal alien. But because he is a non-citizen, he will not be eligible to serve his sentence in the same way that any American citizen who stood convicted of this crime would serve. And that's not right.
>
> . . .
>
> [F]or reasons I cannot comprehend, at the end of that term he could not walk out the door and be picked up by [his attorney] and taken to the airport. He would be treated like an illegal alien, and he would be released into the custody of ICE, and at some point long after my intended sentence had expired he would be deported. And that's not right.

50

. . .

> I can't bring myself to impose a sentence of incarceration in the United States for Mr. Black.

*Id.* at 91:4–92:9.  Judge Pauley similarly declined to impose a term of imprisonment on a French citizen who pleaded guilty to conspiracy to commit securities fraud.  He noted at sentencing:

> Foreign nationals, unlike similarly situated U.S. citizens, are unable to serve terms of imprisonment in a camp or minimum-security facility.  And when foreign nationals complete a term of imprisonment, they are transferred to ICE detention where they can wait for an indefinite period to be returned to their home country.

Sent'g Tr. 42:7–12, *United States v. Cohen*, No. 19-CR-741 (WHP) (S.D.N.Y. June 9, 2020), ECF No. 48.

Judge Colleen McMahon of the Southern District of New York, in dealing with a similar non-citizen FCPA defendant, Vikas Sagar, sentenced him on September 24, 2025, to time served, to pay a fine of $250,000 within 30 days of sentencing, to return home to India within 72 hours of sentencing, and to be supervised on a long-distance basis from his home in India for 3 years by the Southern District of New York.  Sept. 24, 2025 Minute Entry, *United States v. Sagar*, No. 22-CR-710 (CM) (E.D.N.Y. Sept. 24, 2025).  Comparing the two cases, Vikas Sagar's FCPA violations resulted in $85 million in profits for his employer, McKinsey & Co., versus Javier's employer's profit for Vitol was $19.5 million (and a loss of $30 million for Mexico).  *See* Press Release, Dep't of Just., McKinsey & Company Africa to Pay Over $120 Million in Connection with Bribery of South African Government Officials (Dec. 5, 2024).  Vitol's DPA required them to pay $135 million in fines, and McKinsey & Co.'s DPA required them to pay fines of approximately $122.85 million.  *Id.*

The same considerations apply here.  By virtue of his foreign nationality, Javier will be punished in ways that no U.S. citizen would be for the exact same conduct.  It would be unjust to

51

exacerbate that nationality-based distinction through the imposition of additional prison time under the conditions described above, and particularly in this case and with this defendant.

### J.    Restitution

As set forth above, Javier submits that there are no victims in this case. While PPI submitted a claim for restitution, which includes attorneys' fees for its participation in the trial, the parties are working towards a resolution to relieve the Court from making this determination. If the parties do not reach an agreement, the parties will request a hearing within 30 days of sentencing.

### CONCLUSION

In consideration of all of the above, Mr. Aguilar respectfully requests that that a downward departure be granted on the basis that the offense level determined under Section 2B1.1 of the Guidelines substantially overstates the seriousness of the offense. Additionally, he respectfully requests that this Honorable Court grant a downward variance from the sentencing Guidelines, based on his exemplary history and characteristics, nature and circumstances of the offense, full satisfaction of the forfeiture amount, family circumstances, collateral immigration consequences and the need to avoid unwarranted sentence disparities. A non-custodial sentence and self-deportation would be sufficient but not greater than necessary to satisfy the objectives of sentencing.

**BALLARD SPAHR LLP**

Marjorie J. Peerce
Celia A. Cohen
Kelly Lin
1675 Broadway
19th Floor
New York, NY 10019
(646) 246-8039
peercem@ballardspahr.com
cohenc@ballardspahr.com
link@ballardspahr.com

**LEHR, LEVI & MENDEZ, P.A.**

Andrew K. Levi
Sherleen M. Mendez
4000 Ponce de Leon Blvd.
Suite 480
Coral Gables, FL 33146
(305) 377-1777
alevi@llmlawfirm.com
smendez@llmlawfirm.com

*Counsel for Defendant Javier Aguilar*