JRS:JPL/NMA
F. #2019R01460

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

Cr. Nos. 20-390 (S-1) / 24-304 (ENV)

JAVIER AGUILAR,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GOVERNMENT'S SENTENCING MEMORANDUM

JOSEPH NOCELLA, JR
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Jonathan P. Lax
Nick M. Axelrod
Assistant United States Attorneys

Derek J. Ettinger
Assistant Chief, Fraud Section
(Of Counsel)

D. Hunter Smith
Trial Attorney, Money Laundering, Narcotics and Forfeiture Section
(Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ........ 1

FACTUAL BACKGROUND ........ 3

I. Overview ........ 3

II. The Ecuador Bribery Scheme ........ 4

A. Origins of the Scheme ........ 4

B. Aguilar Bribes Ecuadorian Government Officials for the Fuel Oil Contract ........ 6

III. The Mexico Bribery Scheme ........ 8

A. Origins of the Scheme ........ 8

B. Aguilar Bribes Mexican Government Officials for the Ethane Supply Contract ........ 9

IV. Concealment of the Schemes and Laundering of the Proceeds ........ 10

A. Use of Intermediaries, Shell Companies, International Wire Transfers, Sham Agreements, Fake Invoices, and Kickbacks ........ 10

B. Use of Aliases, Coded Language, Structured Transactions, and Other Tradecraft ........ 13

C. Aguilar's Lies to Law Enforcement to Cover Up His Schemes ........ 15

PROCEDURAL HISTORY ........ 15

THE APPROPRIATE SENTENCE ........ 18

I. Legal Standard ........ 18

II. The Sentencing Guidelines ........ 19

A. The Applicable and Agreed Upon Guidelines Range of Imprisonment is 292 to 365 Months ........ 19

B. The Defendant's Objections to the Guidelines Calculation are Unavailing ........ 20

1. There is No Basis for a Downward Departure ........ 20

2. The Court Should Not Speculate About Proposed Amendments ........ 21

3. The Court Should Not Consider the "Shadow Guidelines" in This Case ........ 22

4. The Court Should Reject Aguilar's Claimed Acceptance of Responsibility ........ 24

III. A Substantial Term of Incarceration is Warranted ..... 26

A. The Nature, Circumstances and Seriousness of the Offense ..... 26

B. The History and Characteristics of the Defendant ..... 30

C. The Need for Adequate Deterrence ..... 33

D. The Need to Avoid Unwarranted Sentencing Disparities ..... 38

IV. Restitution, Forfeiture and Fine ..... 41

A. The Court Should Defer Ruling on PPI's Claim for Restitution ..... 41

B. Forfeiture ..... 42

C. The Court Has Discretion to Impose a Fine ..... 42

CONCLUSION ..... 45

PRELIMINARY STATEMENT

The defendant Javier Aguilar corrupted two foreign governments to obtain hundreds of millions of dollars in oil and gas contracts, to set up even bigger corrupt deals in the future, and, ultimately, to enrich himself. For over half a decade, the defendant planned and executed these corrupt schemes. For the defendant—a well-educated and successful commodities trader—bribery was the ultimate trade and he used all the impressive resources at his disposal to maximize his upside while minimizing the risk he would get caught. He conspired with foreign and domestic middlemen and fixers, he exploited an elaborate network of offshore shell companies and bank accounts, and he used sham contracts, fake invoices, alias email accounts and coded language to conceal his conduct.

At the time the defendant began these crimes, he was already highly successful, making more than a million dollars a year, and had amassed more than six million in Vitol equity alone. He was motivated solely by greed and ego; not need or poverty. The amount of wealth he had amassed when the scheme *began* is almost an incomprehensible amount of money for one person. By 2020, the year he was arrested, his wealth in Vitol equity alone had grown by more than a complete order of magnitude, to over $75 million. And yet, that was still not enough for him. When the defendant was arrested, he was pursuing new and bigger corrupt deals and refining his means and methods to conceal his ongoing schemes.

The defendant must be held to account for these serious crimes. The Court must not permit the defendant's cool calculation of the cost and benefit of his crimes to pay off. His sentence must also send a message to other professionals who are tempted to gain an advantage or to win business through cheating and bribery. The Court's sentence must also reflect the real harm corruption inflicts on the citizens of foreign governments whose trust is broken, on competitors

who choose to play by the rules, and on the reputation of our country, which is tarnished every time an American resident or company pays bribes abroad.

The defendant's sentencing memorandum seeks to minimize his conduct and defy the jury's verdict. As the defendant would tell it, he committed a harmless and technical offense. And even then, he is a victim of circumstance, merely the product of a corrupt environment whose only chance at success was to follow others down a path paved by corruption. Based on this premise, and the suggestion that the goals of sentencing have already been achieved because he paid a criminal forfeiture money judgment in full and is facing deportation, the defendant takes the extraordinary step of seeking an entirely non-incarceratory sentence.

International corruption is not a victimless crime. The defendant's sentencing submission and request for a non-incarceratory sentence demonstrates his fundamental failure to accept responsibility or grapple with the harm his actions have caused for two governments, the law-abiding people who are governed by them, and companies that seek to compete fairly in international markets. The Court should reject the defendant's effort to blame everyone but himself for two schemes that he originated and executed over more than five years. The evidence at trial demonstrated that he was at the center of his schemes, not on the outside looking in. The Court should reject the defendant's request that he simply be permitted to pay a fine and walk away to Mexico—an outcome he contemplated at the time of the schemes—because that result does not serve any of the Section 3553(a) factors. It would not provide just punishment or deterrence to Aguilar or other similarly-situated individuals. It would neither promote respect for the law nor reflect the seriousness of Aguilar's crimes.

The Court should impose a sentence of at least 144 months in prison. Aguilar's key role in five years of widespread corruption merits such a sentence. His failure to accept

responsibility and selfish motives warrant such a sentence. Such a sentence will send a message to others that the United States will not be a part of the corruption of foreign governments and that the rewards of this corruption are not worth the risks.

## FACTUAL BACKGROUND[1]

### I. OVERVIEW

Aguilar was a senior commodities trader at Vitol, Inc. ("Vitol") with decades of industry experience. Vitol was a United States company with its principal place of business in Houston, Texas, that was beneficially owned by Vitol Holding BV, a company based in the Netherlands. These companies, together with their affiliates, including Switzerland-based Vitol S.A. (collectively, the "Vitol Group"), formed one of the largest oil distributors and energy commodities traders in the world. During the time Aguilar operated his schemes, 2015 through 2020, Aguilar lived and worked in Houston. Before that, Aguilar worked in the Vitol Group's London office.

Between 2015 and July 2020, Aguilar, together with others, engaged in international bribery and money laundering schemes in which he corruptly offered, paid, and agreed to offer and pay over $1 million in bribes to and for the benefit of Ecuadorian and Mexican

[1] Because the Court has presided over this case for years, including the two-month trial and substantial pre- and post-trial motion practice, the government does not describe all aspects of the criminal conduct or cite all evidence relevant to the matters addressed herein. Many of these facts are set forth in the Presentence Investigation Report ("PSR") at ¶¶ 12–67, and the government also references certain trial testimony ("T."), government exhibits ("GX") admitted during trial, and ECF docket entries ("DE").

officials. In exchange for these corrupt offers and payments, Vitol obtained and retained more than $500 million-worth of business with and related to Petroecuador,[2] and PEMEX and PPI.[3]

To execute the bribery schemes and to conceal the proceeds derived from them, Aguilar and his co-conspirators (a) transferred bribe payments through a web of domestic and offshore bank accounts associated with numerous shell companies and intermediaries, (b) created and used sham consulting agreements and fake invoices, (c) communicated about the corrupt payments through the use of pseudonymous personal email accounts and encrypted messaging platforms, (d) referred to each other using aliases, and (e) used coded language to describe corrupt funds used in furtherance of and derived from the schemes.

## II. THE ECUADOR BRIBERY SCHEME

### A. Origins of the Scheme

In 2015, the defendant wanted to generate new business for Vitol in Ecuador. At the time, Nilsen Arias Sandoval ("Arias"), also known as "Gordo" and "Juice," was the International Trade Manager for Petroecuador, one of the most important positions in the Ecuadorian government at the time. In that role, Arias was responsible for overseeing the purchase and sale of oil and petroleum products on behalf of the Ecuadorian government. Xavier Rodriguez ("Rodriguez"), also known as "Del Hierro" and "Tocayo," was at times also a high-ranking Ecuadorian official, including the Undersecretary of Hydrocarbons and later the Acting Minister and Chairman of the Board of Petroecuador. (T. 133, T. 307, T. 646, GX-1063-T, GX-5105-T,

[2] Empresa Pública de Hidrocarburos del Ecuador ("Petroecuador") was the state-owned oil company of Ecuador.

[3] Petróleos Mexicanos ("PEMEX") was the state-owned oil company of Mexico. PEMEX Procurement International, Inc. ("PPI") was a wholly-owned and controlled subsidiary of PEMEX headquartered in the United States that handled the acquisition of goods and services on behalf of PEMEX.

GX-5901-T). The defendant and Rodriguez had known each other since at least 2010, when Aguilar worked for Trafigura, another trading company and one of Vitol's competitors. (T. 223, T. 649; PSR ¶ 118). They referred to each other as "Tocayo," or namesake, meaning someone who you are close with and shares the same name. (T. 929, GX-1009, GX-3501). In order to gain access to the Ecuadorian market, Aguilar recruited Rodriguez to introduce him to Arias. Arias testified that he understood from the outset that the defendant would pay bribes to Arias and Rodriguez in connection with future deals, so he referred them to Antonio Pere Ycaza ("Antonio Pere"), also known as "Tuco," "Colorado" and "Dr. Botts." (T. 134, T. 212–13). Antonio Pere, together with his brother Enrique Pere Ycaza ("Enrique Pere" and together with Antonio Pere, the "Peres"), also known as "Bruce," owned and controlled several shell companies, including Energy Intelligence & Consulting Corp. ("EIC"), Oil Intelligence Corp. ("OIC") and Oil Pacific Ventures Corp. ("OPV"), which they used to facilitate corrupt payments to Arias and other Ecuadorian officials.

The arrangement between Aguilar, Rodriguez, Arias, and Antonio Pere was corrupt from the beginning. Aguilar and Rodriguez met Antonio Pere for the first time in a private hotel conference room in Mexico City on June 10, 2015, to discuss future business with Petroecuador. (T. 682, GX-1014-A, GX-5250, GX-5251, GX-8005). At the meeting, Antonio Pere communicated to the defendant that he was very close to Arias and able to facilitate bribe payments to Arias in exchange for business opportunities with Petroecuador. (T. 686–87). They all agreed to work together. Just two months later, Rodriguez received a $15,000 wire transfer funded by Vitol via Lion Oil B.V. ("Lion Oil"), an offshore shell company controlled by Lionel Hanst ("Hanst"), the Curaçao-based intermediary whom Aguilar used to funnel bribe and other corrupt payments (GX-4210, GX-6009), and whom Aguilar would later personally refer to as "merely a

tool" with "no decision power, zero." (GX-3516). Although the initial conversation in Mexico City focused on liquified petroleum gas ("LPG"), Aguilar's area of expertise, that deal fell through. At Aguilar's insistence, the conspirators agreed to start with a deal for fuel oil instead. (See, e.g., T. 227). As the evidence at trial showed, Aguilar and his co-conspirators anticipated that the fuel oil deal would position Vitol (and Aguilar) to win a bigger contract for LPG in the future, which would in turn further benefit Aguilar. Mere weeks after the fuel oil contract was signed, Aguilar touted the deal to Vitol's Executive Committee, suggesting it would open the door to bigger deals with Petroecuador in the future: "I will make sure the deal works…..if concluded… this deal will help us do more in the America's pacific side." (GX-1186-A).

B. Aguilar Bribes Ecuadorian Government Officials for the Fuel Oil Contract

In December 2016, Petroecuador and Oman Trading International ("OTI"), the Omani state-owned oil and gas company that acted as a front for Vitol, entered into an oil-backed loan agreement (the "Fuel Oil Contract"). (T. 296, T. 636, GX-5105). Under the Fuel Oil Contract, Petroecuador agreed to supply OTI with fuel oil over a 30-month period in exchange for a $300 million up-front payment. OTI made the up-front payment using funds provided by the Vitol Group. Vitol stood to benefit from the Fuel Oil Contract because Vitol, through an affiliate, entered into a separate but related back-to-back agreement with OTI to market, sell, and transport the oil products delivered pursuant to the Fuel Oil Contract with Petroecuador, approximately 17.1 million barrels of fuel oil over the 30-month term of the contract.

Aguilar obtained the Fuel Oil Contract by promising to bribe Arias and Rodriguez through the Peres. (T. 93, T. 230–32, T. 636–37). Arias, in turn, directed Petroecuador to award the Fuel Oil Contract to OTI for the benefit of Vitol. Arias and other co-conspirators also provided confidential, non-public information about Petroecuador that assisted Aguilar and helped Vitol

collect oil from Petroecuador at times convenient for Vitol, which minimized late fees and other fees levied against Vitol and thereby increased Vitol's profits.

Aguilar held up his end of the corrupt bargain. He agreed with the Peres that Vitol would pay 25 cents per barrel of fuel oil exported by Petroecuador—a "success fee" of 3 cents per barrel due when the Fuel Oil Contract was signed (approximately $510,000), plus 22 cents per barrel over the life of the contract (approximately $3.5 million). (T. 734–35). The majority of the success fee was split among Arias, Rodriguez, and Antonio Pere. (T. 745, T. 748, T. 774–775, GX-508-A-1). Arias received his share of the success fee, approximately €268,000 (or $302,000), which was funded by Vitol, routed through Lion Oil, EIC and OIC, and ultimately received by an entity Arias controlled and by his architect and interior designer for his benefit. (T. 371, T. 375, T. 382, T. 1608–26, T. 3143–56, GX-6000). Rodriguez was paid his share of the success fee, approximately $60,000, in cash by Enrique Pere at a Guayaquil hotel. (T. 761–762, T. 783, T. 1574, T. 1580–1581, GX-515-A-2). Antonio Pere kept the remainder.

The conspirators split the 22 cent per-barrel portion of the bribes as well. Rodriguez was promised $5,000 per cargo (multiplied by 3 cargos per month), or $15,000 per month, and typically paid every two months, or $30,000 at a time, so long as the money kept flowing from Aguilar and Vitol through Hanst to the Peres. (T. 749, T. 761, GX-508-A-1). Numerous cash payments to Rodriguez made on Aguilar's and Vitol's behalf are reflected in bribe ledgers maintained by the Peres—$30,000 in April 2018, $30,000 in July 2018 and $30,000 in November 2018. (GX-510-A-3, GX-514-A-1, GX-515-A-2). Enrique Pere was to be paid 3 cents per barrel, and Antonio Pere and Arias would split the rest. (T. 749, T. 1607).

Following the Ecuadorian presidential elections in 2017 and a change in the administration, Mauricio Samaniego ("Samaniego"), also known as "Tuqueado," replaced Arias

as Petroecuador's International Trade Manager. Jose Agusto Briones ("Agusto"), also known as "Pepin," also joined the Ecuadorian government including at times as the Minister of Hydrocarbons, the post previously held by Rodriguez in an acting capacity. With the Fuel Oil Contract underway and the potential for future business with Petroecuador on the line, Aguilar made what he referred to as a "commitment" (GX-3504) to cut Samaniego and Agusto into the corrupt deal and bribe them both—a flat fee of approximately $200,000 for fuel oil shipments in 2018, and 6 cents per barrel thereafter—to be paid through yet another intermediary, Nicolas Naranjo ("Naranjo"), also known as "Dr. Baker," an Ecuadorian lawyer. (T. 842, T. 851, GX-515-A-2, GX-3504). In order to do that, the amounts that had been promised to Arias and Rodriguez were reduced.

Between August 2015 and November 2018, Aguilar and others caused the payment of at least $300,000 and $150,000 in bribes to Arias and Rodriguez, respectively. By January 2019, Antonio Pere promised the payment of approximately $400,000 in bribes on Aguilar's and Vitol's behalf to Augusto and Samaniego via Naranjo. The net value of the benefit received by Vitol under the Fuel Oil Contract was at least $19.6 million.

## III. THE MEXICO BRIBERY SCHEME

### A. Origins of the Scheme

In 2017, Aguilar began bribing Mexican officials at PPI using the same money laundering system he used to pay Ecuadorian officials. Mexico, through PEMEX and PPI, was seeking a long-term ethane supplier, a contract worth hundreds of millions of dollars. Aguilar was introduced to Gonzalo Guzman Manzanilla ("Guzman"), a Procurement Manager at PPI, by Ricardo Loubet ("Loubet"), a Vitol Group employee and former employee of another PEMEX subsidiary. (T. 190, T. 3125–26). With Loubet, Aguilar met Guzman for the first time at a restaurant in Houston on August 7, 2017, to discuss business with PEMEX and PPI. At the

meeting, Aguilar and Loubet told Guzman that they knew that PPI would be managing the procurement process for the ethane supply contract and that they wanted to obtain information about the process. (T. 2974, T. 2982–83). Guzman, who was not personally overseeing that procurement, did not have the information they sought. Instead, Guzman introduced Aguilar to Carlos Espinosa Barba ("Espinosa"), another PPI Procurement Manager, who did. (T. 2983). Shortly thereafter, Aguilar met with Guzman and Espinosa in Houston. At the meeting, and at subsequent meetings that took place in Houston between September 2017 and April 2018, Aguilar agreed to pay bribes to Guzman and Espinosa for confidential, inside information to assist Vitol in winning business from PPI.

B. Aguilar Bribes Mexican Government Officials for the Ethane Supply Contract

Guzman and Espinosa provided Aguilar with inside information and other forms of assistance to help Vitol and Aguilar corruptly obtain business for Vitol with PEMEX and PPI. For example, they supplied Aguilar with a confidential market research study that PPI commissioned to identify potential suppliers, i.e., Vitol's competition. (T. 2920, T. 3116–17, GX-3024-T-E). Guzman and Espinosa also helped Aguilar win a short-term "spot" ethane supply contract for Vitol, and an extension of that spot contract. (T. 2747–48, T. 2769–71, GX-5155, GX-5158).

In June 2018, PPI and Vitol entered into a contract to supply approximately $230 million dollars' worth or at least 540,000 tons of liquid ethane to PEMEX through 2020 (the "Ethane Supply Contract"). Aguilar signed the contract as Vitol's legal representative, and it was also initialed by Espinosa. (T. 2794, GX-5161). Leading up to the award of the contract, Espinosa and Guzman met repeatedly with Aguilar to help him with Vitol's bid. Espinosa also tried to rig the bidding process in Vitol's favor. When Vitol did not win the bid initially, Espinosa and Guzman tried to tank the winning bidder. (T. 2757, T. 2892, T. 2904, T. 2948). After obtaining the Ethane Supply Contract, Aguilar claimed credit for the deal to Vitol's CEO in the Americas,

Mike Loya, with an eye toward influencing Vitol's Executive Committee which was responsible for setting employee compensation: "I hope they talk about me at the board meeting and agree that they haven't treated me as they should." (GX-1450-T).

In exchange for their corrupt assistance in connection with the Ethane Supply Contract and other related business, Aguilar paid Guzman and Espinosa more than $625,000 in bribes—an amount well in excess of their government-funded salaries. Like the Ecuador Bribery Scheme, the illegal payments were funded by Vitol and transferred to and among offshore shell companies controlled by Hanst including Lion Oil and Zanza Oil B.V. ("Zanza Oil"). In turn, at Aguilar's direction, Hanst transferred funds to various Mexico-based shell companies used or controlled by yet another intermediary, Christian Cazarin Meza ("Cazarin"), which entities were used to receive, conceal, and distribute the corrupt payments from and on behalf of Vitol and Aguilar to and for the benefit of Guzman and Espinosa.

Between October 2017 and January 2020, Aguilar and others caused at least seven bribe payments totaling approximately $371,466 to be paid to or for the benefit of Guzman. Between October 2017 and September 2019, Aguilar and others caused at least eight bribe payments totaling approximately $255,895 to be paid to or for the benefit of Espinosa.

## IV. CONCEALMENT OF THE SCHEMES AND LAUNDERING OF THE PROCEEDS

### A. Use of Intermediaries, Shell Companies, International Wire Transfers, Sham Agreements, Fake Invoices, and Kickbacks

Aguilar and his co-conspirators created a sophisticated system of offshore accounts, sham agreements, and shell entities to launder the bribes they paid to Ecuadorian and Mexican officials and conceal their conduct. The payments began with wire transfers that Aguilar caused from one or more Vitol S.A. bank accounts in the United Kingdom to bank accounts in Curaçao held in the names of Lion Oil and Zanza Oil, which were controlled by Hanst. From there, Aguilar

and others caused Hanst to transfer funds from those accounts (a) to bank accounts in the Cayman Islands and Curaçao held in the names of OPV and EIC, which were controlled by the Peres (for the Ecuador Bribery Scheme), or (b) to bank accounts in Mexico in the names of shell and front companies controlled or used by Cazarin (for the Mexico Bribery Scheme). As to the Ecuador Bribery Scheme, the Peres in turn caused a portion of such payments to be transferred via wire to international bank accounts for the benefit of Arias and Rodriguez. On at least two occasions, Hanst, at Aguilar's direction, caused payments that he received from Vitol S.A. to be wired directly from a Lion Oil bank account to Rodriguez's bank account in the United States. As to the Mexico Bribery Scheme, Cazarin in turn made payments from shell and front companies he used or controlled to bank accounts in the United States and Mexico controlled by and for the benefit of Guzman and Espinosa. Some of the payments were also delivered to Guzman in cash by Cazarin in the United States and in Mexico. Guzman also directed Cazarin to make several payments to Guzman's relatives in Mexico in cash or to their bank accounts.

In order to further conceal and disguise the payments Aguilar and others caused the Vitol Group to make to Hanst in furtherance of both schemes, Hanst used Lion Oil and Zanza Oil to enter into a series of sham brokerage and commodity swap agreements with Vitol S.A. (together, the "Sham Vitol Agreements"). (See GX-5600). At Aguilar's direction, Hanst signed the Sham Vitol Agreements on behalf of Lion Oil and Zanza Oil even though Aguilar and Hanst knew that Hanst would not perform any of the services described in the agreements. Hanst then faxed the agreements to Vitol S.A. at a Swiss fax number provided by Aguilar. Hanst, at Aguilar's direction, also prepared and submitted to Vitol S.A. sham invoices (the "Hanst Invoices") on a periodic basis. (See id.). Aguilar provided Hanst with the information to include in the Hanst Invoices as

purported justification for the payments, even though Aguilar knew that Hanst, Lion Oil, and Zanza Oil did not provide any services in connection with any such payments.

Aguilar and his co-conspirators' efforts to conceal the corrupt payments went further still. To conceal and disguise the payments between Hanst and the second-tier intermediaries, the Peres (for the Ecuador Bribery Scheme) and Cazarin (for the Mexico Bribery Scheme), Hanst agreed with Aguilar to draft and execute sham consulting service agreements between them and their relevant shell companies (the "Sham Consulting Services Agreements"). With respect to the Ecuador Bribery Scheme, pursuant to the Sham Consulting Services Agreements, Lion Oil and Zanza Oil, through Hanst, agreed to pay companies controlled by the Peres a purported commission per barrel of fuel oil secured from Petroecuador in connection with the Fuel Oil Contract. (GX-1199-T, GX-1363-A, GX-1363-B, GX-5602, GX-5603). The actual purpose of the purported commissions, however, was to facilitate bribe payments to Ecuadorian officials, including Arias and Rodriguez. Additionally, Aguilar, Hanst and others knew that the services detailed in the Sham Consulting Services Agreements would not be performed. (T. 757, T.1603, T. 2240).

The Peres and Cazarin subsequently provided bank routing instructions and sham invoices from their respective shell companies (the "Sham Consulting Services Invoices") to Hanst, who then initiated wire transfers to those companies after receiving authorization from Aguilar. (T. 894–95, T. 2229, T. 2250, GX-1396-TR, GX-1425-T, GX-3015-T-D, GX-3015-T-E).

All of this conduct deviated from Vitol's standard practices and internal controls for onboarding and making payments to third parties and agents. Aguilar did not onboard Hanst and his companies through Vitol's typical agent process, which required approval from the local

compliance department, despite having the responsibility to do so. As a result, Hanst was not registered in Vitol's internal accounting systems known as Vista and Vega, and payments to Hanst occurred outside Vista and Vega through a manual payment process instead, circumventing internal controls. (T. 2041–42, T. 2046–47, T. 2072–73, T. 2114–15). Similarly, Aguilar failed to onboard the Peres and their companies through Vitol's typical agent process, despite having the responsibility to do so. (T. 2040–41, T. 2107). He also omitted Antonio Pere from official channels of communication concerning the Fuel Oil Contract even though Pere was intimately involved in negotiating the deal and seeing to its success. (T. 720, T. 836–37, T. 1447, T. 1470, GX-1153-A, GX-1190-A, GX-1344-A).

Moreover, Aguilar used the same money laundering network and concealment methods including sham invoices and coded language to pay himself hundreds of thousands of dollars in kickbacks from the proceeds of the bribery schemes. Between May 2017 and August 2018, he caused more than $610,000 transferred from Vitol to Hanst to be distributed to additional shell companies for his own benefit.

B. Use of Aliases, Coded Language, Structured Transactions, and Other Tradecraft

Aguilar and his co-conspirators also tried to evade responsibility by using aliases and coded language to hide their criminal conduct. Since in or about late 2014 or early 2015, Aguilar communicated with Hanst and others using the email address "perezmarcos007@gmail.com," (the "First Aguilar 007 Account") instead of Aguilar's official Vitol email address. In or about February 2019, Aguilar began to communicate with Hanst using a new non-Vitol email address, "sixtotomas007@gmail.com" (the "Second Aguilar 007 Account," and together with the First Aguilar 007 Account, the "Aguilar 007 Accounts"). Aguilar created and used these accounts, which were not held in his real name, despite already having a personal email account. (GX-5200, GX-5201, GX-5202). When Aguilar used the Aguilar 007 Accounts,

he was careful not to use his real name. (T. 2260). Similarly, the Peres and Rodriguez used multiple aliases when communicating about the scheme with Aguilar. (GX-1009, GX-1080, GX-1133, GX-1199, GX-1252).

Aguilar used coded words to describe payments, referring to bribe money as fuel, ethane, and barrels. (GX-1345-T (referring to $70,000 for the Ecuador scheme, the defendant emailed Hanst, "process these two bl's for 70 k of Ecuadorian fuel"), GX-1454-T (referring to $350,000 for the Mexico scheme, the defendant emailed Hanst, "we finally have the bbls of ethane for a long term. We need to move 350 Kbls divided into three.")). Similarly, Cazarin typically alerted Guzman that money had arrived from Aguilar, referring to the bribes in Spanish as "shoes," "medicine," invitations," "coffee," and other code words meant to obscure the illicit payments.

In order to avoid scrutiny from law enforcement, regulators, and financial institutions, Aguilar directed his co-conspirators to make payments in Euros instead of U.S. dollars. (T. 749, T. 1600, GX-1194-A, GX-5603, GX-6000). Aguilar similarly directed co-conspirators to make payments in smaller amounts, spaced out over time, rather than in larger lump sums. (GX-1426-T ("proceed but make payments to them for no more than 150k…and make them every 15 days…let them be patient"), GX-1454-T ("move 350 Kbls [$350,000] divided into three [tranches]")).

To further avoid detection in light of increasing scrutiny by law enforcement, regulators, and compliance personnel within the commodities trading industry, Aguilar discussed (a) having Hanst "make up some [new] fake contracts" (GX-3509) and create new shell companies because, as Aguilar put it, "When a vehicle had many miles on it . . . It gets to a point where . . . one has to change" (GX- 3501), (b) having the Peres open new shell companies and offshore bank accounts in Dubai and Switzerland (GX-3517), and (c) making it "a habit" of using non-Vitol

channels of communication such as his personal cell phone to conceal the scheme from Vitol's compliance department because he knew that compliance "scans the computers" and "has access . . . to the phones" (GX-3516).

C. Aguilar's Lies to Law Enforcement to Cover Up His Schemes

On July 10, 2020, Aguilar consented to a voluntary non-custodial interview with agents of the Federal Bureau of Investigation ("FBI") and U.S. Department of Homeland Security, Homeland Security Investigations. During the interview, which occurred after the Ecuador Bribery Scheme had been ongoing for more than five years, Aguilar lied about many aspects of his role in the scheme. For example, (a) Aguilar initially falsely denied knowing anything about the Fuel Oil Contract or a deal involving Vitol and Petroecuador, and he later falsely claimed that he may have heard about the deal, but that he was not involved, (b) Aguilar feigned the inability to recall either of the Peres' or Hanst's full names, for example referring to the Peres only as "Antonio" and "the bald guy," despite having conspired with them for years, (c) Aguilar falsely denied knowing about any relationship between Vitol and Lion Oil, (d) when confronted about the fact that a meeting in March 2020 between Aguilar and the Peres was recorded, Aguilar falsely claimed that he met with the Peres only to communicate a message from Hanst, and (e) Aguilar feigned the inability to positively identify the First Aguilar 007 Account as his own. (T. 2513–16, T. 2519).

PROCEDURAL HISTORY

On July 15, 2020, Aguilar self-surrendered to the FBI in Houston, Texas, pursuant to an arrest warrant and criminal complaint charging him with conspiracy to violate the Foreign Corrupt Practices Act ("FCPA") in connection with the Ecuador Bribery Scheme, in violation of 18 U.S.C. § 371. United States v. Aguilar, No. 20-CR-390 (ENV) ("Aguilar I"), DE 1. Aguilar was released on bond that same day. An initial appearance was held telephonically in this District

on July 23, 2020, and an appearance bond with conditions was initially set at $100,000, partially secured by $10,000 in cash. On September 20, 2020, a grand jury sitting in this District returned an indictment charging Aguilar with one count of conspiracy to violate the FCPA and one count of conspiracy to commit money laundering. Id., DE 13. Both counts related to the scheme to bribe Ecuadorian officials.

On December 2, 2022, a grand jury sitting in this District returned a five-count superseding indictment. Id., DE 120 (the "Superseding Indictment"). Counts One and Three of the Superseding Indictment charged Aguilar with conspiracy to violate and with violating the FCPA in relation to the Ecuador Bribery Scheme. Counts Two and Four of the Superseding Indictment charged Aguilar with conspiracy to violate and with violating the FCPA in relation to the Mexico Bribery Scheme. Count Five of the Superseding Indictment charged him with money laundering conspiracy in relation to the promotion and concealment of the proceeds of both the Ecuador and Mexico Bribery Schemes.

Following extensive pre-trial motion practice initiated by Aguilar, on May 31, 2023, the Court dismissed without prejudice, and without objection from the government, Counts Two and Four of the Superseding Indictment on venue grounds. Id., DE 154. On August 3, 2023, a grand jury in the Southern District of Texas returned a five-count indictment against Aguilar. See United States v. Aguilar, No. 24-CR-304 (ENV) ("Aguilar II"), DE 1-2 (the "SDTX Indictment"). Each of the counts related to the Mexico Bribery Scheme. Counts One and Two of the SDTX Indictment alleged a conspiracy to violate the FCPA and a substantive FCPA violation, and were substantially similar to the two counts that were dismissed without objection in this District on venue grounds. Count Three alleged a violation of the Travel Act, 18 U.S.C. § 1952, in relation to the promotion and distribution of proceeds of violations of the Texas Commercial

Bribery Statute, Tex. Pen. Code § 32.43. Counts Four and Five alleged substantive money laundering violations under 18 U.S.C. § 1956(a)(2)(B)(i).

On February 23, 2024, following eight weeks of trial, Aguilar was convicted of all the remaining counts in the Superseding Indictment, (a) one count of conspiracy to violate the FCPA, 18 U.S.C. § 371, and (b) one count of violating the FCPA, 15 U.S.C. § 78dd-2, both in connection with the Ecuador Bribery Scheme, as well as (c) one count of money laundering conspiracy, 18 U.S.C. § 1956(h), in connection with both the Ecuador and Mexico Bribery Schemes.[4] The government called eleven witnesses, including six of Aguilar's former co-conspirators (three of whom were government officials bribed by Aguilar). The Court admitted nearly 800 exhibits, including hours of audio and video recordings of the defendant and his former co-conspirators and thousands of pages of emails, business records and financial records. After deliberating for less than one day, the jury returned a verdict of guilty on all counts.

Following trial, Aguilar moved for a judgment of acquittal or, in the alternative, for a new trial pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure on at least eight purported grounds for relief. Aguilar I, DE 354. The Court denied Aguilar's motion in its entirety. Id., DE 365.

On August 21, 2024, upon Aguilar's consent to transfer Aguilar II back to this District pursuant to Rule 20 of the Federal Rules of Criminal Procedure, Aguilar pled guilty before the Court, pursuant to a plea agreement (the "Plea Agreement"), to Counts One and Three of the SDTX Indictment, which charged (a) one count of conspiracy to violate the FCPA, 18 U.S.C. § 371, and (b) one count of violating the Travel Act, 18 U.S.C. §§ 1952(a)(1)(A), 1952(a)(3)(A)

---

[4] Counts One, Three and Five of the Superseding Indictment were renumbered Counts One, Two and Three, respectively, for purposes of trial. Aguilar I, DE 244.

and 2. Among other things in the Plea Agreement, Aguilar stipulated to the government's calculation of the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.").

The defendant now faces sentencing in a consolidated proceeding before the Court on all five counts of conviction in Aguilar I and Aguilar II. Sentencing is scheduled for June 5, 2026, at 3:00 p.m.

## THE APPROPRIATE SENTENCE

### I. LEGAL STANDARD

A "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct; [and]
> >
> > (C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

## II. THE SENTENCING GUIDELINES

### A. The Applicable and Agreed Upon Guidelines Range of Imprisonment is 292 to 365 Months

The government respectfully submits that the Guidelines calculation set forth in the PSR is accurate. As set forth in the PSR, the total offense level is 40. Because the defendant is within Criminal History Category I, the corresponding Guidelines range of imprisonment is 292 to 365 months. This is also consistent with the government's estimate of the Guidelines calculation in the plea agreement, to which Aguilar has stipulated. Plea Agmt. ¶ 2.

B. The Defendant's Objections to the Guidelines Calculation are Unavailing

Although Aguilar stipulated to the Guidelines in his plea agreement, his sentencing submission nonetheless argues that the Court should downwardly depart and calculate a new, lower Guidelines range. Aguilar's arguments are by turns legally flawed and factually incorrect. They also demonstrate his failure to accept responsibility and continued minimization of his own essential role in wide-ranging interrelated schemes to corrupt two governments for years.

1. There is No Basis for a Downward Departure

Aguilar devotes multiple pages of his sentencing memorandum seeking a downward departure based on Guidelines sections that no longer exist. See Aguilar I, DE 408 ("Def. Mem."), at 11–18.[5]

Pursuant to U.S.S.G. § 1B1.11(a) "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced," which, here, is the 2025 Guidelines Manual. See also 18 U.S.C. § 3553(a)(4)(A)(ii). In seeking a downward departure, Aguilar relies on U.S.S.G. § 5K2.0 and Application Note 21(C) to U.S.S.G. § 2B1.1. These Guidelines were deleted by Amendment 836 to the Guidelines, which took effect on November 1, 2025. See generally Guidelines; see also Guidelines, Appendix B, Part III (Compilation of Deleted Departure Provisions). This alone requires the Court to reject Aguilar's arguments for a downward departure. See United States v. Cavera, 550 F.3d 180, 190 (2d Cir. 2008) (miscalculating the Guidelines constitutes procedural error).

In connection with the deletion of downward departures, the U.S. Sentencing Commission (the "Commission") has remarked that the removal of departures from the Guidelines Manual was "outcome neutral" and "does not limit the information courts may consider in

---

[5] Page citations to the defendant's sentencing memorandum are made with reference to the internal pagination, not to the page numbers assigned by ECF.

imposing a sentence nor does it reflect a view from the Commission that such facts should no longer inform a court for purposes of determining the appropriate sentence." Introductory Commentary to Guidelines, Chapter 1, Part A; see also 18 U.S.C. § 3661. Accordingly, the government addresses Aguilar's factual claims used in support of his request for a downward departure in the government's discussion of the 18 U.S.C. § 3553(a) sentencing factors, below, where appropriate.

2. The Court Should Not Speculate About Proposed Amendments

Just as the Court must reject Aguilar's request to apply deleted Guidelines sections, so too should the Court ignore Aguilar's invitation to speculate about Guidelines sections that have not been and perhaps may never be adopted. Def. Mem. at 27–28. Unless Congress provides otherwise, a proposed Guidelines amendment takes effect only after adopted by the Commission and a prescribed period of congressional review has elapsed. See 28 U.S.C. § 994(p); Stinson v. United States, 508 U.S. 36, 41 (1993) ("Amendments to the Guidelines must be submitted to Congress for a 6-month period of review, during which Congress can modify or disapprove them."). Here, the Commission declined to adopt the relevant proposed Guidelines sections and, accordingly, any related period of congressional review has not even begun.

The proposed amendments cited by Aguilar were released for a public comment period running through February 10, 2026. See 90 Fed. Reg. 59660 (Dec. 19, 2025) ("2025 Notice of Proposed Amendments"). On April 30, 2026, consistent with the Commission's annual amendment cycle, the Commission issued revisions to the proposed amendments based on its review of the public comments and evaluation of testimony provided at subsequent public hearings. The Commission did not adopt either of the proposed amendments that Aguilar urges

the Court to consider.[6] The Court should therefore disregard them entirely. 18 U.S.C. § 3553(a)(4)(A)(ii); U.S.S.G. § 1B1.11(a). Even for the amendments that were adopted by the Commission, the 6-month congressional review process is still underway and whether they are approved, modified or disapproved remains to be seen.

3. The Court Should Not Consider the "Shadow Guidelines" in This Case

Aguilar also asks the Court to recalculate the Guidelines based on a hypothetical alternative set of Guidelines proposed by an ABA committee in 2014 (the so-called "Shadow Guidelines"). Def. Mem. at 18–26. The Shadow Guidelines have no force or effect. They were created without input by the Commission or Congress by a committee of practitioners including defense attorneys. Aguilar must be sentenced under the law as it is not as he wishes it were.

The Shadow Guidelines also do not contemplate bribery offenses like the defendant's crimes. Whatever persuasive value the Shadow Guidelines may have in traditional fraud offenses it does not extend to corruption offenses like foreign bribery which are considered under different provisions of the Guidelines, including, as here, Section 2C1.1.[7] The Shadow Guidelines do not mention bribery offenses. The taxonomy of offenses, ranging from "predatory" to "gatekeeping" offenses is geared to fraud offenses rather than corruption offenses. Moreover, the illustrative hypotheticals included in the Reporter's Notes to the Shadow Guidelines each

---

[6] With respect to one of the proposed amendments that Aguilar asked the Court to consider, even the defendant seemingly concedes that it would plainly not apply here even if it had been adopted. Compare 2025 Notice of Proposed Amendments at 59678 (proposed amendment to U.S.S.G. § 2B1.1 would provide for a 2-level decrease "if the defendant committed the offense at the direction of his or her employer"), with Def. Mem. at 27 ("no one directed [Aguilar] to offer bribes").

[7] The Court has previously considered the Shadow Guidelines in traditional fraud cases. See, e.g., United States v. Shapiro, No. 14-CR-399 (ENV), 2022 WL 2758129, at *1–2 (E.D.N.Y. July 14, 2022); United States v. Faibish, No. 12-CR-265 (ENV), 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015).

involve traditional fraud offenses—such as "lottery" schemes, bank fraud, and Medicare fraud—rather than any public corruption offense including foreign bribery.

Even more troubling is the defendant's proposed application of the Shadow Guidelines which demonstrates his continued minimization of his criminal conduct. The defendant describes his offense as a "gatekeeping" offense, essentially a victim-less crime, examples of which include "billing Medicare for medically necessary goods and services that are actually provided without the appropriate third-party verification of medical necessity." Def. Mem. at 21; see also REPORT ON BEHALF OF THE AMERICAN BAR ASSOCIATION CRIMINAL JUSTICE SECTION TASK FORCE ON THE REFORM OF FEDERAL SENTENCING FOR ECONOMIC CRIMES at 3 (Nov. 10, 2014).[8]

Corrupting high-level government officials in two countries for over five years to procure hundreds of millions of dollars in contracts with state-owned enterprises is not akin to providing lawful services without proper paperwork. The defendant describes his crime as victimless because the trial evidence did not establish a pecuniary harm to Ecuador or Mexico, without any reflection on the deep institutional harms that come with corrupting government officials. Def. Mem. at 24. The defendant describes his own culpability as low because, among other things, "everyone does it" and he made use of an existing network at Vitol to make his corrupt payments. See id. at 22–23. Even if that were true, the trial evidence demonstrated that Aguilar took whatever technique already existed for paying bribes, made it his own in Ecuador, and then deployed it with gusto to yet another bribery scheme in Mexico. He did not join the conspiracy late or play a limited role. Finally, the defendant contends that he received no personal benefit

---

[8] Available at https://www.postschell.com/uploads/Draft%20Guideline%20Final%20Draft%2011.10.14.pdf

from his crimes. Id. at 22. The evidence at trial demonstrated that Aguilar bribed public officials to enrich himself and demanded better treatment from Vitol's Executive Committee after securing the Ethane Supply Contract. (GX-1450-T). And Aguilar took at least $610,000 in kickbacks from the shell entities linked to same money laundering network that he used to pay Arias, Rodriguez, Guzman and Espinosa. (GX-6010, GX-6011, GX-6018, GX-6022). Six hundred thousand dollars may be a pittance to a multi-millionaire like Aguilar, but it is more than a teacher, police officer, or firefighter would make in many years in Brooklyn, Quito or Mexico City.[9]

4. The Court Should Reject Aguilar's Claimed Acceptance of Responsibility

Despite going to trial, having stipulated to a Guidelines calculation that does not include acceptance of responsibility, and, even today, minimizing his criminal conduct, Aguilar insists the Court should award him points for acceptance of responsibility pursuant to Section 3E1.1 of the Guidelines. Def. Mem. at 28. Aguilar's decision to plead guilty to the pending charges in the Southern District of Texas in exchange for the government's consent to a Rule 20 transfer is not acceptance of responsibility. The government had already proved at trial all of the facts of the Mexico bribery charges contained in the SDTX Indictment. See U.S.S.G. § 3E.1.1 app. n. 2 ("This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."). Aguilar's guilty plea, after an eight-week trial in which he was convicted of the same conduct, does not reflect an acceptance of responsibility. Instead, the plea saved few government resources, served the defendant's own interest in being sentenced

---

9 The fact that Aguilar may have paid taxes in Mexico on his kickbacks is of no moment, since, among other reasons, the tax authorities, much like his employer, would have had no reason to know that the funds were taken from the millions of dollars that he laundered through Hanst.

only once, and was necessary only because of Aguilar's earlier strategic decision to have his case tried in two venues, a decision he came to regret and sought to undo.

Aguilar's suggestion that Section 3E1.1(b) imposes an unconstitutional trial penalty is based on a misreading of Section 3E1.1. That section has two subprovisions. Section 3E1.1(a) provides a two-level reduction for defendants who accept responsibility, generally by pleading guilty. See U.S.S.G. § 3E1.1(a). As relevant here, Section 3E1.1(b) provides for an additional one-level reduction only if two requirements are met. First, the defendant must *already* qualify for a two-level reduction for acceptance of responsibility under Section 3E1.1(a) and, second, that the defendant "timely notif[ied]" the authorities of their decision to plead guilty. See U.S.S.G. § 3E1.1(b). Section 3E1.1(b) provides an additional benefit to certain defendants based on the *timing* of their decision to plead guilty, not the decision to plead guilty itself. A defendant's decision to plead guilty is rewarded in Section 3E1.1(a), not Section 3E1.1(b).

Moreover, the Second Circuit and the Supreme Court have long since rejected the notion that rewarding defendants who plead guilty—as in Section 3E1.1—amounts to an impermissible penalty for defendants who go to trial and do not receive the same benefit. See United States v. DiMassa, 117 F.4th 477, 484 (2d Cir. 2024) ("We have long held that a district court may properly treat a guilty plea as a "recognition of fault" and that "[a] show of lenience to those who exhibit contrition by admitting guilt does not carry a corollary that the Judge indulges a policy of penalizing those who elect to stand trial." (quoting United States v. Araujo, 539 F.2d 287, 292 (2d Cir. 1976)). To the extent the practical impact of Section 3E1.1 is to discourage going to trial, "the Supreme Court has held that such discouragement is both 'inevitable' and 'permissible' in a criminal legal system that allows plea bargaining." United States v. Matos, No.

18-CR-327 (JPO), 2026 WL 709803, at *4 (S.D.N.Y. Mar. 13, 2026) (quoting Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978)).

## III. A SUBSTANTIAL TERM OF INCARCERATION IS WARRANTED

A significant sentence of incarceration is warranted here given the nature and seriousness of the defendant's criminal offenses, the defendant's history and characteristics and the need for deterrence. See 18 U.S.C. § 3553(a). For these reasons, the government respectfully submits that a sentence of imprisonment of no less than 144 months is sufficient, but not greater than necessary, to satisfy the goals of sentencing.

### A. The Nature, Circumstances and Seriousness of the Offense

The nature and circumstances of the defendant's participation in the offense counsel strongly in favor of a significant sentence of incarceration. See 18 U.S.C. §§ 3553(a)(1) and (2)(A). For years, Aguilar orchestrated and executed sophisticated international bribery and money laundering schemes that spanned four continents and involved paying over $1 million in bribes and corruptly offering more to at least six high-ranking and influential government officials across two countries in pursuit of more than $500 million-worth of business. The defendant did not participate in the Ecuador and Mexico Bribery Schemes hesitantly, fleetingly, or minimally. He acted proactively, knowingly, and deliberately, over many years, and took careful steps to hide his tracks. He used all the means at his disposal as a well-to-do professional to get away with his crimes: multiple layers of middlemen between himself and the government officials he corrupted, anonymous email accounts, coded language, sham contracts, and fake invoices that would not tie him to the scheme. When that failed, he lied repeatedly to law enforcement about his culpability. These were schemes executed with hubris by a defendant who believed he could outsmart the law to get away with corruption.

Despite submitting a 53-page sentencing memorandum with over 400 pages of exhibits, the defendant allots virtually no meaningful discussion of the nature, circumstances, and seriousness of his crimes of conviction. Tellingly, any substantive discussion of the defendant's conduct seeks to minimize his role, see, e.g., Def. Mem. at 34 (Aguilar "was a mid-level executive at Vitol who was not the mastermind behind the bribery there"), characterize himself as merely a victim of a corrupt industry, see, e.g., id. at 34–35 (bribery payments were "customary" at Vitol and in the commodities trading industry), and trivialize the harm he caused, see, e.g., id. at 37 ("there are no victims in this case . . . neither Ecuador nor Mexico were financially harmed").

The evidence at trial established that Aguilar was the driving force behind both the Ecuador and Mexico Bribery Schemes. In Ecuador, Aguilar recruited Rodriguez, his "tocayo" whom he had known for nearly a decade from his time working at Trafigura, to gain corrupt access to Arias, Petroecuador, and the Ecuadorian market. When the initial deal involving LPG fell through, Aguilar insisted that Rodriguez pressure Arias to find a new deal. It worked. In Mexico, Aguilar used Loubet, a lower-level Vitol Group employee and former Mexican government employee himself, to gain corrupt access to Guzman, Espinosa, PPI, and the Mexican market. Once those connections were made, Aguilar had no further use for Loubet, cut him out of the deal, and conspired with Guzman and Espinosa directly. It worked.

Throughout his sentencing memorandum, Aguilar repeatedly attempts to shift blame for the bribery schemes onto Marc Ducrest ("Ducrest") and others at Vitol, just like he did at trial. But the mere fact that Ducrest introduced Aguilar to Hanst is a distraction from the defendant's high degree of culpability. It is of little importance in light of all the other evidence of Aguilar's control over the schemes including his directions that corrupt payments be made in euros and small tranches, and his in-person request of the Peres to open new shell companies and

offshore bank accounts in Dubai and Switzerland. It was Aguilar (not Ducrest) who personally met to discuss and coordinated the schemes with Arias, Rodriguez, the Peres, Samaniego, Guzman, and Espinosa.

Aguilar also devotes a significant portion of his sentencing memorandum to repeatedly argue that his personal gain from the schemes was "de minimus" and he therefore lacked motive and culpability. Id. at 13–18. This not only trivializes the defendant's calculated and sophisticated conduct yet again but also entirely ignores the defendant's true motivation as proven at trial: to finally reinstate Vitol as a trusted partner of Petroecudaor and capture the LPG market in Ecuador for greed, power, and glory. Vitol had been blacklisted by Petroecuador from participating in tenders due to a contract dispute in 2008. (T. 130–32). From the beginning of the Ecuador Bribery Scheme, the defendant was not pursuing a fuel oil deal, but rather a $1.5 billion dollar deal to supply LPG, diesel, and gasoline to Petroecuador using PEMEX as a front in order to circumvent the competitive tender process altogether. (T. 173–74, T. 187–88, GX-1033-A-T). The defendant made it clear to Arias from the outset, in 2015, that he already "controlled" people within PEMEX. (T. 189–190). It is also clear that the defendant's true aspirations from the outset for his corrupt scheme were massive, and that he always intended to engage in a scheme combining his corrupt influences in Ecuador and Mexico that he could in turn use to leverage even bigger paydays from Vitol.

Although the initial PEMEX and Petroecuador LPG deal fell through, the defendant refused to give up on LPG. (See, e.g., T. 811–14, GX-1252, GX-1252-A). Weeks after the signing of the Fuel Oil Contract, the defendant wrote to Vitol's Executive Committee, which set annual performance bonuses and profit sharing, touting his recent success in Ecuador and ongoing efforts to deliver the LPG deal: "I will make sure the deal works…..if concluded… this deal will help us

do more in the America's pacific side" (GX-1186-A); "We have been informed by OTI that the lpg supply and loan agreement with Petroecuador have been concluded. I will make sure the lpg team work hard enough to make the most of the deal. . . . Then we deliver the full ecuadorian demand" (GX-1208-A). Had the defendant succeeded in his goal of controlling the entire supply of LPG to Ecuador, he would have garnered immense leverage and control. As Arias explained at trial, "LPG is a less common yet harder to negotiate product than gas or diesel. And just so the importance of this is understood, without a supply of LPG in Ecuador for four or five days . . . There could be a potential collapse of the government . . . . It is so important that if people do not have LPG in their homes, it creates national chaos." (T. 333). As the evidence at trial including emails, letters, text messages, and recorded conversations from 2015 until his arrest in 2020 all demonstrated, the defendant's effort to corruptly secure lucrative LPG deals involving Petroecuador was unyielding. In the end, only his arrest in this case stopped the defendant from committing crime and spreading corruption throughout the Americas.

Finally, the defendant's suggestion that no one was harmed by his crimes is divorced from the reality of his conduct and ignorant to the very reasons why Congress enacted the FCPA in the first place. International corruption of the nature and extent engaged in by the defendant undermines the public's confidence in international markets and is deeply unfair to companies that play by the rules. See H.R. Rep. No. 95-640 (1977); S. Rep. No. 95-114 (1977). It destroys people's faith in their own governments, undermines the rule of law, and carries the potential to destabilize countries and even entire regions. When only the corrupt prosper, societies, governments, and legitimate businesses lose. Where, as here, foreign corruption is undertaken by an individual working in the United States at an international conglomerate with a large American

footprint, it also impacts confidence and trust in American businesses worldwide. The damage caused by this type of corruption is real and lasting.

The defendant's attempts to ignore, minimize and distract from the actual and exceedingly egregious nature and circumstances of his crimes should not be credited. A substantial term of incarceration is warranted.

B. <u>The History and Characteristics of the Defendant</u>

The defendant's sentencing submission describes certain aspects of his personal history and characteristics at length. The submission is notable both for what it shows, and for what it omits. It shows a defendant who had what many defendants before this Court lack: a stable upbringing, a loving and supportive family, an excellent education, loyal friends, professional success and significant wealth. It shows that the defendant had every reason not to commit crimes, and yet still chose to do so out of greed. It also shows that, as a result of his crimes, the defendant has caused pain to his family and friends, and has surrendered many of the advantages and opportunities of his former life. However, such consequences are not a reason to treat the defendant more leniently than other defendants, whose more modest circumstances meant that they did not have such advantages and opportunities to lose. Moreover, what the defendant's sentencing submission omits is that the defendant repeatedly and deliberately engaged in unethical conduct during the conspiracy period in addition to the criminal conduct underlying his conviction—important information that helps provide the true measure of the defendant's character, and counsels in favor of a significant sentence of incarceration.

In addition to utilizing the illicit web of intermediaries, shell companies and offshore bank accounts to promote and conceal his bribery schemes, the defendant used the same corrupt system to pay himself more than $610,000 between May 2017 and August 2018. (GX-6010, GX-6011, GX-6018, GX-6022). To siphon hundreds of thousands of dollars into his own

pocket, the defendant introduced new shell companies into the money laundering network and concealed his actions using more fake invoices and similarly coded language. (GX-1792, GX-1792-B, GX-1793, GX-1793-A, GX-1794, GX-1794-A). In a footnote to his sentencing submission, the defendant suggests, without a shred of credible evidence, that these payments were a legitimate part of his employee compensation from Vitol. See Def. Mem. at 15 n.4. His only support for this claim is a series of partially translated Spanish language documents that purport to show that he declared as employee compensation for purposes of Mexican tax obligations payments from some, but not all, of the shell entities that he used to steal these additional payments. See id. Ex. 4, 4-T. On their face, these documents have no connection to Vitol, because they are not what the defendant claims. Valentine Douglass, who managed Vitol's financial operations and treasury functions, testified at trial that traders at Vitol were compensated in three ways, a base salary, a discretionary annual performance bonus, and, for top performers and senior personnel, equity sharing through an entity called Tinsel Group. (T. 2064–66). Aguilar received all three. Vitol paid the defendant directly, recorded employee compensation in its accounting records (see, e.g., GX-5008–5012), and issued IRS Forms W-2 and Tinsel subscription memoranda and shareholder agreements (GX-5000, GX-5013–5019). Vitol, a multi-billion-dollar international conglomerate, had no need to (and didn't) pay Aguilar legitimate employee compensation through Hanst—a Curaçao-based intermediary who was not registered in any of Vitol's systems, communicated by fax, and worked from a small office that he shared with his brother (GX-105)—followed by a byzantine series of Mexico-based shell companies using fake invoices. The defendant's claim to the contrary is absurd.

In addition, while the defendant's friends and family describe him as honest, caring, and trustworthy, the evidence at trial showed otherwise. For example, in the span of just a single

20-minute conversation with the Peres, the defendant was captured on a recording disparaging Hanst as "merely a tool," describing office compliance as "bullshit," demeaning Vitol's Houston-based compliance officer as a "son of a bitch . . . military man," and expressing his preference for a superficial and intentionally ineffective compliance program, "In Europe it's a French woman, dude, that . . . You can just say like, 'Hey, this paper here. Look, there's a contract here.'" (GX-3516). That the defendant's friends, family, and colleagues have a different picture of him than what came across at trial is not surprising, however, since the Court and the jury had visibility into what they did not: what the defendant said and did when he believed no one was looking.

The defendant may well have publicly been the person described in his sentencing memorandum and in his letters of support. This is not atypical for white-collar defendants, who often come before the Court having been generous with favored family members and the community, while secretly engaging in criminal behavior. See United States v. Regensberg, 635 F. Supp. 2d 306, 308 (S.D.N.Y. 2009), aff'd, 381 F. App'x 60 (2d Cir. 2010) (noting that defendant's plea for mercy "falls into a pattern advanced by a subset of the white collar criminal. This category encompasses a select class: distinguished, reputable, highly esteemed model citizens such as this defendant. The list of their achievements and virtues is long and impressive. Let us count the ways. At home, they are good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners. To their community's charities and public causes they are generous patrons and sponsors. And as worshipers they are devout, often rising as leaders of the congregation. Yet, for all of their outward rectitude, these otherwise good people suffer a fatal flaw: they lead a double life."); see also United States v. Vrdolyak, 593 F.3d 676, 682 (7th Cir. 2010) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes . . . to find that a defendant was involved

as a leader in community charities, civic organizations, and church efforts," and the defendant "should not be allowed to treat charity as a get-out-of-jail card"). Aguilar's good acts cannot excuse his behavior.

C. The Need for Adequate Deterrence

A substantial sentence is also necessary to deter the defendant and to deter others who would consider engaging in similar conduct under similar circumstances. As the defendant's conduct demonstrates, white-collar criminals are capable of weighing risk and reward; they act deliberately and are therefore susceptible to deterrence if the consequences are severe enough. See United States v. Blech, 550 F. App'x 70, 71 (2d Cir. 2014) (summary order) ("Blech was sentenced based on the 18 U.S.C. § 3553(a) factors, including the need for specific deterrence for a recidivist, and the need for general deterrence for those who might otherwise feel that some white-collar crimes are 'game[s] worth playing.'") (quoting United States v. Goffer, 721 F.3d 113, 132 (2d Cir. 2013)); S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime. Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.")).

The potential financial rewards for foreign bribery are great and the chances of getting caught are low. White collar crime is difficult to detect to begin with. In foreign bribery cases, as in this one, much of the evidence and many of the conspirators may be overseas beyond the government's reach, making detection even less likely. This case demonstrates the sophisticated techniques that well-to-do criminals like the defendant may use to further reduce the likelihood they are caught, including shell companies, offshore accounts, sham invoices, and multiple layers of middlemen.

To ensure crime doesn't pay, the consequences of getting caught must be significant. See, e.g., Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). Because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After Booker, 47 WM. & MARY L. REV. 721, 724 (2005)) (internal quotation marks omitted); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. OF POLITICAL ECON. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

The defendant's argument that general deterrence has already been achieved—notwithstanding how difficult it is to detect and successfully prosecute cases such as this—because highly publicized prosecutions have been brought against him, Vitol, and other co-conspirators, because he made a large forfeiture payment, and because he will be deported, Def. Mem. at 48–49, flies in the face of equal justice, case law, and common sense, and should be rejected out of hand.

The approach for which the defendant advocates would lead to short or non-existent custodial sentences in all corruption cases, regardless of their size, scope, or complexity, which would frustrate proportionality, a paramount goal of sentencing. See United States v. Booker, 543 U.S. 220, 264 (2005). It would also lead to the perverse result that sentences in the largest and most complex cases would be the lowest, because those are precisely the cases most likely to involve the prosecution of corporate entities and significant media attention. The defendant does not deserve a lower sentence because the case he was involved in garnered media attention. In weighing the need for general deterrence, a court may not consider the deterrent effect of being "publicly prosecuted and suffer[ing] public humiliation," as such circumstances are "an ordinary consequence of [criminal] conduct, not a condition imposed by the criminal codes or the judicial process." United States v. Cutler, 520 F.3d 136, 171 (2d Cir. 2008). "Hence they cannot properly be viewed as fulfilling the need for the imposition of just punishment." Id.; see also United States v. Ulbricht, 858 F.3d 71, 94, 133 (2d Cir. 2017) (affirming district court's imposition of a life sentence, which considered, among other things, general deterrence and the fact that the sentence imposed "could have a powerful general deterrent effect because the case had attracted an unusually large amount of publicity").

If anything, the media attention in this case militates in favor of a more significant sentence, because the case has international visibility and thus the sentence imposed by this Court will be known in the very circles in which individuals may be tempted to repeat the defendant's offenses. Indeed, the evidence at trial proved that bad press alone does not deter white collar criminals, including this defendant; it encourages them to find even more cunning ways to commit crime without being caught. Here, when news articles ran about corruption problems *at Vitol* involving its business in Brazil and Vitol began instituting new compliance procedures, the

defendant did not stop paying bribes in Ecuador and Mexico. Instead, he complained about the compliance enhancements and changed his behavior to circumvent them. (T. 922, GX-3501, GX-3516). As one example, he stopped using Vitol-issued phones because he knew they were subject to monitoring and began using only his personal phone to communicate with the Peres, (GX-3516 ("given the circumstances, I am making this a habit for myself now")).

The argument that there is no need for general deterrence because the defendant made a large forfeiture payment is also unpersuasive. Imposing a non-incarceratory sentence upon the defendant because he satisfied a forfeiture money judgment would send the utterly perverse message that defendants with means who commit serious felonies can pay their way out of jail. This would further incentivize exactly the type of risk-to-reward analysis white collar criminals engage in when embarking on a criminal scheme that general deterrence is especially necessary to avert. See Martin, 455 F.3d at 1240; Heffernan, 43 F.3d at 1149.

The Court should also consider the need to deter the defendant from committing additional crimes in the future. Throughout his sentencing memorandum and in his statement in the PSR, the defendant repeatedly minimizes his own conduct and attempts to shift blame elsewhere for his actions: his upbringing in a country where bribery was accepted, his employment at a company where bribery was tolerated, his co-workers who created the illicit money laundering system, or his participation in an industry rife with corruption. The seemingly endless litany of excuses that he relies upon to explain away his actions, coupled with his insistence that forfeiting approximately $7 million after he was convicted on all counts is enough to satisfy the goals of sentencing, should give the Court little comfort that the defendant would not reoffend in the future

if he viewed it as worth the risk and ultimately to his advantage. Such is particularly the case if he receives the extraordinary sentence that he advocates for.[10]

The defendant's likely deportation to Mexico is not sufficient to deter him or others. The defendant apparently factored in the chance he would need to live in Mexico when he set out to commit his crimes and found that the reward outweighed the risk. As the defendant put it, living Mexico was a part of the "evacuation plan that you have always been planning and practicing." (GX-3501). As the defendant told Antonio Pere in January 2020, if he learned in advance about scrutiny within Vitol of the Ecuador and Mexico Bribery Schemes, "Shit, I would have called you from a public phone from Mexico the following day." (Id.). The Court should not count a consequence the defendant anticipated (and planned for) as punishment. The risk he would live in Mexico was not enough to deter the defendant in 2020 and it is not enough to deter him or others today.

Moreover, while deportation to Mexico may ultimately separate him from his children and the area in which he has lived since 2012, a factor the Court can consider, it is both unavoidable and undoubtedly far less severe a consequence when compared to the countless other defendants who face similar immigration consequences. According to the PSR, the defendant continues to maintain close ties with multiple family members in Mexico (see PSR ¶¶ 100–101), owns debt-free multiple residences throughout Mexico cumulatively worth more than $6.2 million,

---

[10] As yet another example of Aguilar's lack of true acceptance of responsibility, despite the representations the defendant made in the Plea Agreement, see Plea Agmt. ¶ 7, he now suggests, for the first time, that the amount of money he forfeited exceeds what the law permits. Def. Mot. at 40. To the contrary, the amount forfeited represents funds involved in or directly traceable to Aguilar's money laundering offense; it is a fraction of what the law permits, the approximately $20 million laundered through Vitol and Hanst for which the defendant was involved. See 18 U.S.C. 982(a)(1); United States v. Rosen, 296 F. App'x 188, 193 (2d Cir. 2008) ("For a money-laundering offense, forfeiture applies not only to the proceeds of the crime, but to assets involved in its commission.")

and has tens of millions more in a variety of assets including access to a significant volume of liquid assets in Mexican bank accounts (id. ¶ 120). Undoubtedly, returning to this mass accumulation of extraordinary wealth overseas without further consequences is the "evacuation plan" he hopes to execute now.

D. The Need to Avoid Unwarranted Sentencing Disparities

Imposing a significant incarceratory sentence will not result in any unwarranted disparities between Aguilar and other, similarly-situated defendants. Courts across the nation have regularly imposed significant incarceratory sentences for defendants convicted of paying bribes. See, e.g., United States v. Ng. Chong Hwa, No. 18-CR-538 (MKB) (E.D.N.Y) (after trial, defendant sentenced to 10 years in prison for conspiring to pay more than $1 billion in bribes to Indonesian government officials); United States v. Zaglin, No. 23-CR-20454 (S.D. Fla.) (after trial, defendant sentenced to 96 months in prison for paying several hundred thousand dollars in bribes to Honduran government officials in connection with a contract to supply tactical equipment to the Honduran National Police); United States v. Esquenazi, et al., No. 09-CR-21010 (JEM) (S.D. Fla.) (after trial, defendants sentenced to 15 years, 9 years and 7 years in prison, respectively, after being convicted at trial for conspiring to pay approximately $2.2 million in bribes to a Haitian-run telecommunications company). None of these defendants participated in two international bribery schemes. The defendant, who played a leading role in two schemes and in laundering millions of dollars, is as culpable if not more culpable than these other defendants.

[redacted]

[redacted]

[redacted]

[redacted][11, 12]

In the same vein, Aguilar also contends that recent executive action related to the enforcement of the FCPA presents a risk of unwarranted sentencing disparities. On February 10, 2025, President Donald J. Trump issued an Executive Order related to the enforcement of the FCPA (the "Executive Order"), and on June 9, 2025, pursuant to the Executive Order, the Deputy Attorney General issued Guidelines for Investigations and Enforcement of the FCPA ("FCPA Guidelines").[13] This case was reviewed pursuant to these policies and the undersigned attorneys were specifically authorized to proceed with the prosecution because this case is consistent with the factors set out in the FCPA Guidelines. This was twice communicated to counsel for the defendant, a fact that he omits in his sentencing submission.

---

11 [redacted]

12 [redacted]

13 These policies expressly create no enforceable rights for defendants. See also, e.g., San Pedro v. United States, 79 F. 3d 1065, 1070–1071 (11th Cir. 1996); United States v. Booth, 673 F.2d 27, 30 (1st Cir. 1982), cert. denied, 456 U.S. 978 (1982); United States v. Schwartz, 787 F.2d 257, 267 (7th Cir. 1986); United States v. Wilson, 614 F.2d 1224, 1227 (9th Cir. 1980); United States v. Serrano, 680 F. Supp. 58, 65 (D.P.R. 1988); United States v. North, No. 88-CR-80, 1988 WL 148491, at *2 (D.D.C. Nov. 10, 1988).

The defendant is simply wrong in his claim that similar cases are no longer being prosecuted. For example, just last week in this District, a jury convicted a former investment banker for his role in a scheme to bribe Ghanaian government officials in connection with the construction and financing of a power plant. United States v. Berko, No. 20-CR-328 (DG) (E.D.N.Y.). In February 2026, a jury convicted a former coal company executive for his role in a multi-year scheme to bribe Egyptian government officials on behalf of his company Corsa Coal. See United States v. Hobson, No. 22-CR-86 (RJC) (W.D. Pa.). And in September 2025, a Georgia businessman was convicted for his role in a scheme to bribe foreign officials in Honduras, through an intermediary, in exchange for government contracts. See Zaglin, No. 23-CR-20454 (JB) (S.D. Fla.). Additionally, in June 2025 and March 2026, respectively, two individuals each pleaded guilty to conspiracy to violate the FCPA for their roles in a scheme to bribe Mexican officials in order to assist a drilling company with obtaining and retaining a contract with PEMEX. See United States v. Bergonzi, No. 4:25-CR-20 (S.D. Tex); United States v. Wilson, No. 4:26-CR-135 (S.D. Tex). Other individuals and companies have likewise been charged with violations of the FCPA and related laws consistent with and post-dating the Executive Order and the FCPA Guidelines, and several other individuals have been sentenced. All are being prosecuted and sentenced in due course, just like the defendant.

## IV. RESTITUTION, FORFEITURE AND FINE

### A. The Court Should Defer Ruling on PPI's Claim for Restitution

As set forth in the second addendum to the PSR, PPI has filed a claim for restitution totaling $262,090.36. Aguilar submitted an objection to the PSR asserting that PPI is not a "victim" within the meaning of the Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A ("MVRA"), and therefore not entitled to restitution. The Court need not resolve this issue now.

The government recognizes the fundamental importance of crime victims' rights generally and fully embraces its obligations in ensuring that victims of crime are treated appropriately within the confines of the applicable law. With those concerns in mind, the government facilitated conversations between counsel for Aguilar and for PPI. Based on those conversations, which are ongoing, the government is optimistic that all parties will reach an agreed upon proposal for the Court to resolve these issues within 90 days of sentencing. See 18 U.S.C. § 3664(d)(5). Accordingly, the government respectfully requests that the Court sentence Aguilar as currently scheduled, but otherwise defer hearing additional argument or making a ruling as to whether PPI is a "victim" under the MVRA and, if so, what the appropriate amount of restitution should be. In the event the parties are unable to reach an agreed upon proposal, the government will notify the Court and be prepared to brief this matter promptly.

B. Forfeiture

Pursuant to the plea agreement, Aguilar consented to the entry of a forfeiture money judgment in the amount of $7,129,938 as any property, real or personal, involved in his violation of 18 U.S.C. § 1956(h), as alleged in Count Three of the Superseding Indictment, or any property traceable to such property, and/or a substitute asset, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1). The Court entered an order of forfeiture on December 12, 2025, Aguilar I, DE 399, and on December 17, 2025, Aguilar satisfied the forfeiture money judgment in full, see id., DE 402. Accordingly, the Court should incorporate the order of forfeiture, now satisfied, into the final judgment.

C. The Court Has Discretion to Impose a Fine

Title 18, United States Code, Section 3572(a) sets forth the factors to be considered by the Court before imposing a fine, in addition to the factors set forth in Section 3553(a). Those factors include: (1) the defendant's income, earning capacity, and financial resources; (2) the

burden that a fine will impose upon the defendant and any dependents; (3) any pecuniary loss inflicted upon others as a result of the offenses; (4) whether restitution is ordered; (5) the need to deprive the defendant of illegally obtained gains from the offenses; and (6) the expected costs to the government of any imprisonment. 18 U.S.C. § 3572(a).

The Guidelines provide that a district court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a) (emphasis added). The Guidelines further provide that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." Id. The defendant bears the burden of demonstrating an inability to pay a fine at present and in the future. See United States v. Camargo, 393 F. App'x 796, 798 (2d Cir. 2010) (upholding imposition of a fine despite the fact that Probation and the defendant argued the defendant was currently unable to pay such a fine because court concluded defendant was likely to be able to pay a fine in the future); United States v. Salameh, 261 F.3d 271, 276 (2d Cir. 2001) (concluding that the district court acted within its discretion in basing fines on defendants' future earnings potential "in the absence of any evidence from defendants to counter the inference that future income from media contracts was a substantial possibility").

Whether a fine will impose a "burden" on the defendant and is sufficiently "punitive" should be considered taking into account all other sanctions. Here, while the government requests that the Court defer imposing an order of restitution at this time, it notes that there is presently a single claim for restitution in the amount of $262,090.36, which may be resolved for less, and forfeiture is already fully satisfied. The maximum fine on Counts One and Two of the Superseding Indictment is $250,000 each, the maximum fine on Count Three of the Superseding Indictment is $500,000 or twice the value of the property involved in the transactions,

whichever is greater, 18 U.S.C. § 1956(a)(2) and (h), and the maximum fine on Counts One and Three of the SDTX Indictment is $250,000 each.[14]

The Probation Department has concluded, based on a review of the financial information that the defendant provided, that "[b]ased on the defendant's financial profile, which yields a significant, multi-million-dollar net worth and thousands of dollars of positive monthly cash flow," he has the ability to pay a fine. (PSR ¶ 124). As such, the government submits that the Court should consider imposing one here.

[14] Paragraph 133 of the PSR incorrectly states that the maximum fine on Count Three of the Superseding Indictment is $500,000. The maximum fine may easily be as high as $14,259,876, i.e., twice the value of the forfeiture money judgment as funds involved in his violation of 18 U.S.C. § 1956(h). Given, however, that the combined maximum fine here is at least $1.5 million (excluding the alternative basis for the fine calculation applicable to Count Three of Superseding Indictment), the Court need not conduct this analysis provided that it does not intend to impose a fine above $1.5 million.

CONCLUSION

For the reasons set forth above, the government respectfully submits that the Court should sentence the defendant to a substantial sentence of no less than 12 years' imprisonment, which is sufficient, but not greater than necessary, to advance the goals of sentencing.

Dated: Brooklyn, New York
August 12, 2026

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/
Jonathan P. Lax
Nick M. Axelrod
Assistant U.S. Attorneys

LORINDA LARYEA
Chief, Fraud Section
Criminal Division, U.S. Dept. of Justice

By: /s/
Derek J. Ettinger
Assistant Chief, FCPA Unit

MARGARET MOESER
Chief, Money Laundering, Narcotics & Forfeiture Section
Criminal Division, U.S. Dept. of Justice

By: /s/
D. Hunter Smith
Trial Attorney, International Unit