Ballard Spahr LLP

1675 Broadway, 19th Floor
New York, NY 10019-5820
TEL 212.223.0200
FAX 212.223.1942
www.ballardspahr.com

Celia A. Cohen
Tel: 646.346.8002
Fax: 212.223.1942
cohenc@ballardspahr.com

September 10, 2026

*Via ECF*

Honorable Eric N. Vitaliano
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *United States v. Javier Aguilar*, Case No. 20-cr-00390-ENV

Dear Judge Vitaliano,

On behalf of Javier Aguilar, we respectfully submit this response to the government's sentencing memorandum, dated August 12, 2026, ECF 412. In light of the time that has elapsed since Javier's sentencing submission of March 17, 2026, ECF 408, we ask that the Court also consider the following information in imposing a sentence that is "sufficient, but not greater than necessary" to comply with the purposes set forth in 18 U.S.C. § 3553(a).

**I. Acceptance of Responsibility**

Contrary to the government's characterization, Javier does not minimize his conduct, dispute the seriousness of the offense, or relitigate the jury's verdict. Indeed, the very first pages of Javier's March 17 submission expressed deep remorse for his crimes. *See* Def. Mem. at 1. But acceptance of responsibility is not incompatible with asking the Court to weigh the circumstances of those crimes. To the contrary, the advisory nature of the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") exists precisely so that the Court may examine the circumstances of the offense, the context in which it was committed, and the individual standing before it.

Contrary to the government's claim, Javier's guilty plea unequivocally saved the government the time and expense of a second multi-week trial. The Southern District of Texas indictment contained five counts, and a trial would have required summoning witnesses from multiple countries, presenting hundreds of exhibits, and consuming weeks of the Court's time. Javier spared the government and the Court all of that. Additionally, his waiver of his right to appeal in both cases is an extraordinary concession that reflects genuine acceptance, not strategic calculation.

Further, the government improperly claims that Javier's argument concerning forfeiture shows a lack of acceptance of responsibility. Javier accepting the forfeiture amount instead of contesting it, which he could have done, is the essence of accepting responsibility. Indeed, Javier could have successfully contested the $7,129,938 forfeiture amount under Second Circuit law because it was not based on the disgorgement of ill-gotten gains. *See* Def. Mem. at 40 (citing *United States v. Elias*, 154 F.4th 56, 62–63 (2d Cir. 2025)). Instead, he agreed as part of his Rule 20 transfer and plea agreement to pay the forfeiture without litigating it. He paid this lump sum almost a year before sentencing. That is the conduct of a person who has accepted responsibility. In contrast, in *United States v. Oztemel*, a case analogous in many ways to Javier's, the defendant, who was sentenced to 15 months' imprisonment, initially disputed forfeiture on these very grounds. Def. Opp. to Forfeiture, *Oztemel*, 23-cr-26 (D. Conn. 2025), ECF 424. The government argued that Oztemel should forfeit $7.8 million because it represented the total amount of funds laundered during the conspiracy, which is the same argument the government is making here. Gov. Mot. for Forfeiture, *Oztemel*, ECF 416; *see also* Gov. Memo at 37, n.10. After oral argument on this issue when Oztemel relied on Second Circuit law to support the claim that the government's methodology was incorrect, the government entered into a settlement with Oztemel under which he agreed to forfeit $1,709,138. Forfeiture Order, *Oztemel*, ECF 455. Accordingly, here, Javier's agreement to forfeit money outside of "ill-gotten gains" demonstrates his acceptance of responsibility.

The government also treats Javier's July 10, 2020 voluntary interview as a reason to add to his sentence and deny that he has accepted responsibility. Gov. Mem. at 15. However, an uncharged, unsworn interview that did not impede a completed investigation is not a reason to enhance Javier's sentence.

## II. The Existing Bribery Scheme Within Vitol Is Critical to Analyzing Javier's Culpability

The government's characterization of Javier as the "originator" of this "sophisticated international bribery and money laundering scheme" and the "driving force" behind the bribery scheme, *see id.* at 2, 27, is a complete mischaracterization of the record and ignores the reality of the corporate environment in which Javier worked. The bribery infrastructure was in place long before Javier's involvement. Marc Ducrest, a senior Vitol executive, introduced Javier to Lionel Hanst, the Curacao-based intermediary who controlled the shell companies and offshore accounts used to channel the bribe payments. Trial Tr. at 2162:3–7. The shell companies (Lion Oil, Zanza Oil), the offshore bank accounts, and the sham consulting agreements were all in place and operational before Javier utilized them. *Id.* at 2338:16–2339:9. The government dismisses this as a mere "distraction," Gov. Mem. at 27, but it is nothing of the sort.

The existence of a pre-existing bribery apparatus within Vitol goes directly to Javier's culpability and to the nature and circumstances of his offense. Indeed, Vitol admitted in its deferred prosecution agreement ("DPA") that its Latin American bribe schemes began before Javier joined the Company. *See* DPA at 33–34, *United States v. Vitol, Inc.*, No. 20-CR-539 (ENV) (E.D.N.Y. Dec. 3, 2020), ECF 10-1. Senior Vitol executives—individuals far above Javier in the corporate hierarchy—were also implicated in the same type of conduct. Additionally, the DPA covered bribery in Brazil that did not involve Javier. This is further corroborated by the indictment

filed by the Brazilian Federal Prosecution Service, Ministério Público Federal ("MPF"), implicating both Vitol Inc.'s chief executive officer ("CEO") and its head of Latin American trading.[1]

Hanst's cooperation agreement stipulated that he was also paying government officials in Venezuela—conduct with no connection to Javier and undertaken on behalf of other Vitol employees. 3500-LH-10 at 4. Further, Nilsen Arias testified that he took money from multiple trading companies since at least 2011, well before he met Javiers. Trial Tr. at 391, 393. Carlos Espinosa similarly admitted receiving a bribe in 2014 or 2015, before he ever met Javier. *Id.* at 2973–74. Gonzalo Guzman admitted a separate PPI scheme of his own. Espinosa admitted to using Christian Cazarin for his prior scheme. *Id.* at 2709:7–13.

Javier was a trader who joined, used, and directed an existing regional practice that Vitol, its counterparties, and its intermediaries already knew how to operate. Vitol's corporate history confirms the point: in November 2007, Vitol S.A. pleaded guilty in New York state court to grand larceny for paying approximately $13 million in illegal surcharges to Saddam Hussein's regime under the U.N. Oil-for-Food Program—more than a decade before the conduct at issue here. Edith Honan, S*wiss Firm Vitol Pleads Guilty in UN Oil/Food Case*, Reuters (Nov. 20, 2007), https://www.reuters.com/article/markets/oil/swiss-firm-vitol-pleads-guilty-in-un-oilfood-case-idUSN20582111/.

Yet, the government asks this Court to treat Javier as though he were the mastermind of the entire enterprise. He was not. He was a mid-level trader who operated within a system that predated and exceeded his individual participation. Javier takes full responsibility for his role in participating in this corruption. But when weighing his sentence, the Court should consider the environment in which he operated.

As discussed more fully herein, a judge in the District of Connecticut recently recognized this same distinction. *See* Sent'g Tr. at 63:17–64:1, *Oztemel*, ECF 434. There, the defendant was a senior trader at Arcadia Fuels, Inc. ("Arcadia") and subsequently Freepoint Commodities LLC ("Freepoint") who participated in an eight-year bribery scheme. In recognizing that he was part of a preexisting corrupt environment, the court stated that while the defendant "certainly participated" in the scheme, there was corruption "from the inside out." *Id.* at 63:17–64:1. Accordingly, here, the Court should also recognize that while Javier participated in the scheme, he was part of pre-existing corporate system that was also corrupt from the inside out.

## III. Javier Did Not Operate Out of Greed

The government's portrayal of Javier as greedy and egotistical is a gross distortion of the facts. What the government calls greed is better understood as an effort to function within a corrupt corporate culture. It argues that Javier's desire to "reinstate Vitol as a trusted partner of Petroecuador and capture the LPG market" proves greed. Gov. Mem. at 28. That ambition describes the environment in which Javier worked, and is not proof that personal enrichment drove

[1] Indeed, neither the CEO nor the head of Latin America trading were charged in the United States.

the crime. Javier did not pay bribes and launder money because he was unwilling to earn an honest living—he was a dedicated professional who built his career through legitimate efforts, and who found himself operating within a system rife with corruption.

The government points to Javier's communications with Vitol's Executive Committee as evidence of "greed, power, and glory." *Id.* at 28. But read in context, these communications show only what any ambitious employee would do: report his business successes to his superiors. Certainly, touting a successful deal to one's employer is not evidence of criminal motivation. And many successful businesspeople strive for continued professional success despite already being wealthy by most standards. Moreover, the fact that Javier was well-compensated does not mean his participation in bribery was driven by avarice. Javier's flaw was that he did not refuse to participate in an entrenched corporate culture of bribery. That is far different than a person who conceived and executed a scheme driven by personal greed. Further, Javier's salary, bonuses, and equity participation were not tied to the corrupt contracts. Def. Mem. at 14.

While the government characterizes the $610,000 in payments as "kickbacks," *see* Gov. Mem. at 13, 30, Vitol itself has never alleged that these funds were improperly obtained, nor has it ever sought to recoup them. Indeed, Vitol's own conduct refutes the theft theory: it paid out the remaining tranches of Javier's equity in full, before and after trial, without ever subtracting the $610,000, despite the fact that Vitol was under a DPA at the time that required it to refrain from any further criminal activity *See* Ex. A (July 4, 2024 Tinsel Group S.A. Letter); DPA at ¶¶6, 13–15, *Vitol*, ECF 10-1. The government's argument that Vitol "had no need" to pay compensation through Hanst, *see* Gov. Mem. at 30–31, ignores how Vitol actually operated in practice. This was a company that maintained a web of intermediaries and offshore entities for numerous purposes. The government relies on Valentine Douglas's testimony about Vitol's official compensation channels, but that testimony described how Vitol was *supposed* to operate—not how it *actually* operated in the environment that ultimately led to its DPA. Accordingly, contrary to the government's position, the fact that these payments were made manually does not illustrate that the $610,000 was improperly obtained given that Vitol admitted that it engaged in the business practice of making manual payments. *See* Def. Mem., Ex. 2 at 3.

And that Javier paid taxes on this income, undercuts the government's claim that he was concealing improper payments. The government's theory requires the Court to believe that Javier was simultaneously sophisticated enough to orchestrate a secret corrupt payment scheme and yet so careless—or so honest—that he voluntarily reported those very same payments to the tax authorities. That theory is implausible on its face. The far more logical inference is that Javier paid taxes on this income because he understood it to be legitimate compensation.

## IV. The Guidelines Range Overstates the Seriousness of the Offense

The government's submission fails to address the inappropriate use of Vitol's gain to skew the guidelines.[2] Indeed, this Court has repeatedly acknowledged in analogous cases the Guidelines

[2] While the defense mistakenly relied on the former Guidelines that permitted a downward departure in making its arguments, the arguments are the same. As the government recognizes, the removal of departure provisions from the Guidelines Manual was "outcome neutral," Gov.

range produces an unjust result where, as here, the offense level is driven overwhelmingly by the gain to the defendant's employer—not by the defendant's personal culpability or enrichment. Javier's personal gain of $48,265 bears no relationship to the astronomical Guidelines range or to the government's request of 144 months.[3]

Furthermore, the disparity between $48,265 and Vitol's profit of $19.8 million is the very mismatch this Court found decisive in *United States v. Diaz*, where a $538,000 personal gain stood against an $8.2 million corporate-gain figure. As this Court explained there: "Picking the highest number even though it has no real relationship to the gain or loss of the individual defendant does skew the numbers. It accelerates them and makes them in the long run, in my view, as many times expressed, makes the economic component useless." *Id.*, Ex. 5 (Sent'g Tr. at 20:12–17, *United States v. Diaz*, No. 18-CR-140 (ENV) (E.D.N.Y. Oct. 18, 2024)). This Court also found that Mr. Diaz's $538,000 personal gain was *de minimis* as compared to the company's $8.2 million gain. Therefore, here, Javier's personal gain should certainly be considered *de minimis* where Javier profited much less and Vitol profited much more.[4]

## V. The Shadow Guidelines Are Applicable to Economic Offenses, Including Bribery

The government's claim that the Shadow Guidelines are "limited to fraud cases" is unsupported. Indeed, the title of the report setting forth the Shadow Guidelines is titled "A Report on Behalf of The American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes." *See id.*, Ex. 6. The animating principle of the Shadow Guidelines—that the loss table mechanically inflates sentences beyond what culpability warrants—applies with equal force to bribery cases where the employer's gain, not the defendant's, drives the offense level. Indeed, the distortion is even greater in bribery cases because the defendant sometimes receives little or no personal financial gain from the employer's windfall or the bribe amount received by the recipient. The mere fact that the ABA Task Force's November 10, 2014 report used a fraud case as an example in the Shadow Guidelines does not mean that they are limited to fraud cases. The Shadow Guidelines shift the focus from loss amount to the defendant's culpability in guiding the sentencing determination, regardless of whether it is a fraud or a bribery case.

Moreover, the government's attack on the "gatekeeping" characterization, Gov. Mem. at 23, once again conflates the seriousness of the offense category with the culpability of this

---

Mem. at 20–21 (quoting the Sentencing Commission), because the Court can still rely on the same arguments in granting a downward variance under § 3553(a).

[3] Notably, the government does not contest Javier's expert's analysis, which concludes that Javier received a trickled down benefit of $48,265 to his Vitol stock holdings.

[4] Even if the $610,000 that the government alleges were kickbacks, which they were not, that amount would still be considered *de minimis* as compared to Vitol's $19.8 million profit given that in *Diaz*, the defendant's $538,000 gain was found to be *de minimis* as compared to the company's $8.2 million profit.

defendant. The Shadow Guidelines report refers to gatekeeping offenses that are not specifically intended to cause loss or shift risks. Javier does not contend that foreign bribery is trivial—he accepts full responsibility. But the institutional harms in this case, as discussed in Javier's initial submission and above, were well entrenched before Javier's involvement, and went on well beyond him.

Therefore, as the Court has done in other economic-crime sentencings, and which is supported by the Shadow Guidelines themselves, we respectfully request that the Court focus on Javier's own culpability, the existence and amount of actual victim loss, and first-offender status, rather than on a table that multiplies corporate profit into an extended term of imprisonment. *See United States v. Faibish*, No. 12-cr-265 (ENV), 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015); *United States v. Shapiro*, No. 14-cr-399 (ENV), 2022 WL 2758129, at *1–2 (E.D.N.Y. July 14, 2022); Sent'g Tr. at 22:19–25, *United States v. Meneses*, 18-cr-358 (ENV) (E.D.N.Y. March 20, 2024) (disregarding the sentencing table and imposing a sentence of one year of probation, with forfeiture of the $90,165.58 Mr. Meneses personally received, when the advisory range was built on the company's $8.2 million profit—an 18-level enhancement stacked on a base offense level of 12).

## VI. Deterrence

The government claims that Javier needs to be deterred from committing future crimes because he has not accepted responsibility. As detailed above in Section I, Javier has accepted full responsibility for his actions. The mere fact that Javier has presented the specific circumstances of his offense to the Court for consideration at sentencing certainly does not indicate that he is going to commit additional crimes. Moreover, the government's argument that he will commit another crime is belied by the record. Javier has been a model supervisee for over six years, complying with GPS monitoring and honoring every restrictive condition of his release, including a curfew and inspections by Probation. The government's pattern of unsupported predictions further undermines its position. Before and after trial, the government repeatedly insisted that Javier posed a flight risk, claiming his "incentive to flee [wa]s astronomical"—just as it now contends there is "little comfort" that he would not reoffend. Gov. Mem. at 36. The government's prediction that Javier would flee proved wrong, and its speculation that he will reoffend is equally unfounded in light of a record that demonstrates otherwise.

The government's reliance on a conversation with Antonio Pere, a cooperating witness, to argue that Javier had "factored in the chance he would need to live in Mexico" is also misplaced. *Id.* at 37. The quotes the government used are taken out of context and do not reflect the fact that a cooperator was leading the conversation. They are being improperly used to suggest to the Court that living in Mexico was somehow Javier's plan, and that he will not suffer as a result. But that argument makes no sense given the reality of the situation—living in Mexico would separate him from his daughters; that is a punishment, not a plan. Moreover, Javier has a pending criminal investigation in Mexico, further countering the government's narrative that he wants to escape to Mexico.

**VII. Sentencing Disparities**

The government attempts to discredit the cases Javier cites on the ground that the sentences those defendants received were based on their cooperation. *Id.* at 38. But Javier recognized this distinction in his submission. He explained that while those "defendants may have received credit for their substantial assistance to the government or acceptance of responsibility by pleading guilty, sentencing Javier to the imprisonment term dictated by the Guidelines would nevertheless be grossly disparate to the non-incarceratory sentences received by th[ose] defendants." Def. Memo at 42. Indeed, the majority of those defendants received either probation or time served despite committing more egregious crimes. *Id.* at 41–42.

For example, in *United States v. Luque-Flores*, No. 17-cr-537 (CBA) (E.D.N.Y.), Luque-Flores was not, like Javier, a salaried employee operating within a corrupt environment built by his employer; rather, Luque-Flores owned and controlled the contractor that captured the corrupt business outright, obtaining five contracts and additional supplemental contracts from Petroecuador. He and his co-conspirators paid more than $3.2 million in bribes, roughly triple the $1.1 million bribes paid in Javier's case and, in further contrast to Javier, Petroecuador paid his company approximately $27.8 million. The corrupt profits were Luque-Flores's own. Yet on April 16, 2021, Judge Amon sentenced Luque-Flores to four years of probation with six months of home confinement. Judgment, *Luque-Flores*, ECF 82; *compare* Judgment, *United States v. Finocchi*, 17-cr-600 (ENV) (E.D.N.Y.), ECF 33 (convicted trader was active in the Ecuador, Venezuela, and Brazil bribery schemes and received a sentence of time-served).

Further, there have been other cases where the defendants did not cooperate, where the conduct was worse than Javier's, and the sentences were far below the 12 years the government seeks here. For example, in *Oztemel*, Judge Kari Dooley in the District of Connecticut sentenced the defendant, a senior oil and gas trader at Arcadia and subsequently Freepoint Commodities, to 15 months' imprisonment after being convicted at trial. Sent'g Tr. at 103:22–25, *Oztemel*, ECF 434; Gov. Mem. at 2, *Oztemel*, ECF 422. There, Oztemel was involved in an eight-year scheme in which he paid bribes to officials at Petróleo Brasileiro S.A. – Petrobras (together with its U.S. subsidiary Petrobras America, Inc., "Petrobras"), a Brazilian state-owned and state-controlled oil and gas company. *Oztemel*, Gov. Mem. at 2. In exchange for the bribes, the officials shared confidential information with Oztemel and others that gave them improper business advantages in trades with Petrobras and directed cargoes to Arcadia, Freepoint, and Oil Trade & Transport S.A. ("OTT"), a company owned by Oztemel's brother, Gary. *Id.* at 2–3, *Oztemel*. Like Vitol, Freepoint—Oztemel's employer—received a DPA. *Id.* at 6. Freepoint, however, received a far greater benefit of $30.5 million in return for the bribes paid, *id.* at 13, as compared to Vitol's benefit of $19.8 million. Additionally, Oztemel's Guidelines were higher. In fact, Oztemel received a four-point enhancement as an organizer/leader under § 3B1.1(a), which made him ineligible for the zero-point offender adjustment under § 4C1.1, which is applicable to Javier. Moreover, Oztemel set up the intermediary, owned by his brother, that controlled the shell companies and offshore accounts used for the bribes, *see id.* at 2, 23. By contrast, Javier had nothing to do with setting up the intermediary, Hanst. Indeed, there was trial testimony that the money laundering structure was already in place before Javier became involved and Hanst was working with other Vitol employees paying bribes in Venezuela. *See* Trial Tr. at 2338:16–2339:9

(Hanst testified that he created his two shell companies, Lion Oil and Zanza Oil, before he ever met Javier); 3500-LH-10 at 4.

In Javier's case—where Vitol benefited $10.7 million less than Freepoint, Javier was not an organizer or leader, and the bribery infrastructure was already in place—the government asks this Court to sentence Javier to 144 months, almost 11 years more than the sentence imposed on Oztemel. Notably, the *Oztemel* court did not resolve the parties' Guidelines disputes, holding even if Oztemel were to win every argument, the resulting Guidelines range of 97 to 121 months would still be "above any sentence that would be determined to be 'sufficient, but no greater than necessary, to serve the purpose of sentencing.'" Sent'g Tr. at 20:2–10, *Oztemel*. Therefore, given that Javier's conduct was less egregious than Oztemel's, his Guidelines are lower, he waived his right to appeal, did not dispute forfeiture, and will be deported, probation is an appropriate sentence that will avoid unwarranted sentence disparities among similarly situated defendants.

## VIII. Conclusion

Based on the reasons set forth above and in Javier's initial sentencing submission, we respectfully request that the Court impose a non-custodial sentence and self-deportation.

Respectfully submitted,

*/s/ Celia A. Cohen*

Celia A. Cohen
Marjorie J. Peerce
Kelly Lin
Ballard Spahr LLP
1675 Broadway
19th Floor
New York, NY 10019-5820
Telephone: 212-223-0200
Facsimile: 212-223-1942
Email: CohenC@ballardspahr.com
Email: PeerceM@ballardspahr.com
Email: LinK@ballardspahr.com

*/s/ Andrew K. Levi*

Andrew K. Levi
Sherleen M. Mendez
Lehr Levi & Mendez
1401 Brickell Avenue, Suite 910
Miami, FL 33131
Telephone: 305-377-1777
E-Mail: alevi@llmlawfirm.com
E-Mail: smendez@llmlawfirm.com

*Counsel for Javier Aguilar*